

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **ADAM JONES,** *et al.***,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 7:19-cv-403-RDP** |
| | ) | |
| **BUZZFEED, INC.,** *et al.***,** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **Defendants.** | ) | |

**OPPONENTS' RESPONSIVE SUBMISSION IN REPSONSE TO EXHIBIT B OF THE
COURT'S ORDER**

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' OPPOSED MOTION
TO STRIKE THE EXPERT REPORTS AND PRECLUDE EXPERT TESTIMONY OF
DR. EMILIE L. LUCCHESI**

---

**COMES NOW**, the Plaintiffs, Adam Jones and Joshua Hastings, by and through the undersigned counsel, and file this Response in Opposition to Defendants' Opposed Motion to Strike the Expert Report and Preclude Expert Testimony of Dr. Emilie L. Lucchesi (hereinafter referred to as "Motion to Strike"), [Doc. 51], and state the following:

**Table of Contents**

Dr. Lucchesi's Expert Report and Testimony.............................................................................. 2

Underlying Legal Standards ....................................................................................................... 5

Argument ................................................................................................................................... 12

I.    Dr. Lucchesi is qualified to testify competently regarding the concept of framing, intent and recklessness, and journalistic standards. ........................................................................... 13

II.   The methodology used by Dr. Lucchesi in her framing and content analysis meets the sufficiently reliable standard. .................................................................................................... 14

III.   Dr. Lucchesi's testimony will help the trier of fact understand the concept of framing, how it was used within the Buzzfeed Article, the intent and/or recklessness of the Defendants at the time of publication, and journalism standards. .................................................................... 16

Conclusion ................................................................................................................................. 21

## DR. LUCCHESI'S EXPERT REPORT AND TESTIMONY

Dr. Lucchesi is a highly educated, trained, and experienced journalist and analyst of mass media framing and stigma communication with extensive training and experience in academia. [Exhibit 1, p. 2-4, 36-45].[1] Dr. Lucchesi will offer expert testimony concerning media framing, in general and specifically related the subject article in this lawsuit (hereinafter the "Buzzfeed Article"), as well as the intent and recklessness of the Defendants at the time the Buzzfeed Article was published and journalistic standards. [Exhibit 1; Exhibit 2, p. 19: 24-25; Exhibit 2, p. 20: 1].[2]

Generally, news stories tell the reader what to think about, not what to think. [Exhibit 2, p. 72: 7-25; Exhibit 2, p. 73: 1-7]. However, when framing is used by reporters a border placed around a situation and, in turn, tells the reader what to think, not what to think about. [*Id.*]. Dr. Lucchesi explained it as: "So for example, if there is a parade and there's a camera, and the parade zooms in on 20 people who are standing on the side and cheering, that frame is going to make it look as though it's very, very crowded and that the parade was well attended; whereas, in fact, if you zoom out, you will see that it wasn't well attended at all." [Exhibit 2, p. 72: 11-18]. "Frames have the ability to shape how the public views an event or issue." [Exhibit 1, p. 7]. Basically, the concept of framing boils down to the writer and publisher controlling what the reader is exposed to in the way the writer wants the exposure to occur, which can lead to false information being conveyed or the writer leaving out critical source material that does not conform to the writer's narrative.

While a reasonable reader may not actively recognize the use of frames, a writer can strategically and intentionally manipulate the words of a story such that the reader will likely

---

[1] Dr. Lucchesi's expert report is attached hereto, incorporated herein by reference, and marked as Exhibit 1 (hereinafter referred to as the "Expert Report").

[2] Dr. Lucchesi's deposition transcript is attached hereto, incorporated herein by reference, and marked as Exhibit 2.

interpret the story in the way the writer intended. [Exhibit 2, p. 92: 14-22]. Moreover, reporters understand the concept of framing and use frames within their stories. [Exhibit 2, p. 81: 15-25; Exhibit 2, p. 82: 1-10; Exhibit 2, p. 96: 10-25; Exhibit 2, p. 97: 1-10]. Reporters sometimes use the term "angle" to mean framing. [Exhibit 2, p. 79: 17-23; Exhibit 2, p. 80: 1]. Further, the language and structure that is used in a story can signify the intent of the writer. [Exhibit 2, p. 83: 17-25; Exhibit 2, p. 83: 1-8; Exhibit 2, p. 200: 16-23].

The concept of framing has been articulated into an analytic framework which allows analysts, like Dr. Lucchesi, to determine the frames that a particular writer used to communicate to the reader. The methodology utilized by Dr. Lucchesi involves multiple peer-reviewed scholastic articles which lay out the analytical methodology and framework. [Exhibit 2, p. 88: 10-19; Exhibit 1, p. 7-9; Exhibit 1, p. 31-32]. In order to ascertain the particular frames used in the Buzzfeed Article, Dr. Lucchesi read the Buzzfeed Article multiple times, took notes, and organized the text of the Buzzfeed Article in an analytical way to "determine which frames emerged from the text." [Exhibit 1, p. 8]. Dr. Lucchesi organized the text in the form of a matrix to visualize consistent patterns throughout the Buzzfeed Article. [Exhibit 2, p. 216: 17-24; Exhibit 1, p. 33-35]. Dr. Lucchesi then applied the concepts from the peer-reviewed scholastic articles to identify the frames used by Katie Baker in the Buzzfeed Article. In the end, Dr. Lucchesi was able to determine which frames were used in the Buzzfeed Article. [Exhibit 1, p. 11-21; Exhibit 2, p. 105: 7-25; Exhibit 2, p. 106: 1-25; Exhibit 2, p. 107: 1-25; Exhibit 2, p. 108: 1-10; Exhibit 2, p. 106: 4-20]. While this type of analytical method may be subject to subjectivism, just like any other expert opinion,[3] the methodology employed by Dr. Lucchesi is designed to limit variations of outcomes. [Exhibit 2, p. 217: 9-21].

---

[3] If expert opinions were required to reach the same result, there would be no need for competing experts.

Through her content analysis and deposition testimony, Dr. Lucchesi also offers an expert opinion as to the journalistic standards that Defendants chose to intentionally and deliberately ignore. [Exhibit 1, p. 21-30; Exhibit 2, p. 36: 12-22; Exhibit 2, p. 207: 23-25; Exhibit 2, p. 234: 4-13; Exhibit 2, p. 244: 12-16; Exhibit 2, p. 247: 6-18; Exhibit 2, p. 262: 9-20; Exhibit 2, p. 263: 20-25; Exhibit 2, p. 264: 1-24; Exhibit 2, p. 266: 3-4; Exhibit 2, p. 269: 3-25; Exhibit 2, p. 281: 1-25; Exhibit 2, p. 282: 1-19]. Specifically, Dr. Lucchesi opines as to how the investigation into the story should have occurred and what Baker should have included in the Buzzfeed Article or disclosed to the reader in conformity with the industry standards. [*Id.*]. Dr. Lucchesi has an extensive background in journalism and writing published stories in which she bases these opinions on. [Exhibit 1, p. 36-45].

Per this Honorable Court's Order entered on August 21, 2020, Dr. Lucchesi's Expert Report was revised to "include a section stating which sentences of the Buzzfeed article contain defamatory statements." [Doc. 36]. This supplementation to Dr. Lucchesi's expert report was shared with the Defendants, in accord with the Court's Order, on August 28, 2020 (hereinafter referred to as the "Supplementation Report").[4] The Supplementation Report was built off the Expert Report regarding Dr. Lucchesi's opinion concerning the intent and recklessness of the Defendants, as well as the departure from journalistic standards. The Supplementation Report also discussed the concept of framing and the faming analysis of the Buzzfeed Article. [Exhibit 5].

On September 11, 2020, this Honorable Court further ordered the Plaintiffs to provide Defendants with a list of statements in which they contend are defamatory (hereinafter referred to as "Defamatory Statements list").[5] The Defamatory Statements list was drafted and prepared by

---

[4] Said supplementation to Dr. Lucchesi's expert report is attached hereto, incorporated herein by reference, and marked as Exhibit 5.
[5] Said Defamatory Statement list is attached hereto, incorporated herein by reference, and marked as Exhibit 6.

counsel for Plaintiffs (not Dr. Lucchesi) and provided to Defendants on September 30, 2020. The Defamatory Statements list is not intended to be included in Dr. Lucchesi's Expert or Supplementation Reports.

## UNDERLYING LEGAL STANDARDS

In their Motion to Strike, Defendants advance the argument that the Plaintiffs are public officials and must prove actual malice to prevail on their defamation claims. To be sure, Alabama's conflict-of-law doctrine and Alabama substantive law will apply in this case, along with the First Amendment limitations placed on a state law claim of defamation.[6] "In a diversity action such as this one, a federal court must apply the choice-of-law principles of the state in which it sits." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016). "Alabama continues to follow the traditional view of *Restatement (First) Conflicts of Conflicts of Law*, as discussed in *Fitts v. Minnesota Min. & Mfg. Co*., [581 So. 2d 819, 820 (Ala. 1991)], which looks to the *lex loci delicti* in tort claims, "in the state where the last event necessary to make an actor liable for an alleged tort takes place." *Ex parte U.S. Bank Nat. Ass'n*, 148 So. 3d 1060, 1070 (Ala. 2014) (quoting *Restatement (Frist) of Conflict of Laws* § 377 (1934)). While acts giving rise to the plaintiff's injuries may occur elsewhere, "the place of injury is the state where the 'fact which created the right to sue' occurs." *Id.* Since the Plaintiffs were injured and damaged in Alabama, Alabama substantive law will apply.

Further, Defendants claim that the Plaintiffs are public officials for defamation purposes and cite to *Smith v. Huntsville Times Co.*, 888 So. 2d 492, 496 (Ala. 2004) to support this proposition. However, in *Smith*, the plaintiff, an investigator with a city police department, did not argue "that a police officer is not a public official for defamation purposes," and the *Smith* court

---

[6] Defendants cite to many courts outside of Alabama and the Eleventh Circuit. It is unclear whether Defendants are advancing an argument related to a conflict-of-law issue. Out of an abundance of caution, Plaintiffs have decided to address and object to any conflict-of-law issue that may be raised by Defendants.

did not analyze whether the plaintiff would in fact be considered a public official. *Id.* The *Smith* court cited to two decisions which appear on their face to support the proposition that any law enforcement personnel will be considered public officials for defamation purposes. The first case cited by the *Smith* court was *St. Amant v. Thompson*, 390 U.S. 727 (1968); however, the *St. Amant* court accepted the findings of the Louisiana Supreme Court, which found a sheriff's deputy to be a public official, for that case only. The second cited case is *Hailey v. KTBS, Inc.*, 935 S.W. 2d 857 (Tex. App. 1996) which cited many cases finding various levels of law enforcement personnel being considered as public officials. It appears that many of the cases found that supervisory and managerial law enforcement personnel were public officials which would conform to those principles laid out in *Rosenblatt v. Baer*, 383 U.S. 75 (1966) and its progeny. On the other hand, many of the other cases cited, which do not involve supervisory or managerial law enforcement personnel (which is the category that Plaintiffs would fall into), applied a blanket rule that law enforcement personnel were public officials, which seem to all be based on cases in which the public official issue was not challenged or which seem to misapply or fail to apply *Rosenblatt*.[7]

In *Rosenblatt*, the Supreme Court expanded on its remarks in *New York Times v. Sullivan*, 376 U.S. 254 (1964) concerning the scope of the definition of public official. *Rosenblatt*, 383 U.S. at 85 ("We remarked in *New York Times* that we had no occasion to determine how far down into the lower ranks of government employees the public official designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included") (internal quotations and citations omitted). In *Rosenblatt*, the Supreme Court explained: "There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate

---

[7] Due to the large number of cited cases by *Hailey* and the limited time in which Plaintiffs must respond to Defendants' Motions to Strike, Plaintiffs request additional time to provide the Court with specific examples of this interpretation of the aforementioned cited cases should the Court wish for or require additional explanation.

about those persons who are in a position significantly to influence the resolution of those issues." *Id.* "It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* The Supreme Court further recognized that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Id.* at 86. "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply." *Id.*

While other sister circuits have adopted a blanket rule, which considers all law enforcement personnel as public officials, *see Young v. Gannett Satellite Information Network, Inc.*, 734 F.3d 544, 553 (6th Cir. 2013) (Moore, J. dissenting), it does not appear that the Eleventh Circuit has adopted the same blanket rule. Notably, in *Young* the majority questioned whether low ranking law enforcement personnel should be considered public officials for defamation purposes and questioned whether the Supreme Court of Ohio misinterpreted federal precedent by applying the blanket rule. *Id.* at 549-50.

Alabama courts, likewise, do not appear to have expressly adopted the blanket rule that all law enforcement personnel, regardless of rank and responsibility, are public officials for defamation purposes. While *Smith* does cite to cases in which other courts have adopted such a blanket rule, the *Smith* court does not analyze the public official issue, as the plaintiff in that case did not dispute the public official status. *Smith*, 888 So. 2d at 496.

In *Gary v. Couch*, 923 So. 2d 1130, 1135-36 (Ala. Civ. App. 2005), it appears that the Alabama Court of Civil Appeals hinted that it may take an alternate position to the general blanket rule. The court mentioned that the plaintiff, a lieutenant with the Gadsden Police Department, did not dispute her status as a public official and that it could not address whether plaintiff was in fact a public official because the issue was not raised before the trial court, which seems to suggest that the court would have at least gone through an analysis of whether the plaintiff was to be deemed a public official for defamation purposes if the plaintiff had raised such an issue. *Id.* at 1135. Notably, the *Gary* court cited to *Smith* and *Hailey* "for the *proposition* that law-enforcement officers are generally held to be public officials for the purposes of a defamation claim." *Id.* As defined by Black's Law Dictionary (11th ed. 2019), a proposition is "a point to be discussed or debated…."[8] Thus, from the court's use of the word proposition, it appears that the court suggested that it may take an alternate view to the blanket rule relied upon in *Smith* and *Hailey*. Further, the court notably stated that the plaintiff was "deemed *for the purpose of this opinion* to be a public official…." Therefore, providing further support that the only reason the court considered the plaintiff a public official was because that issue was not raised at the proper time and suggesting that the court may have taken an alternate view of the plaintiff's status.

Instead of applying a blanket rule, trial courts should analyze the public official status on a case-by-case basis dependent on the facts and in accord with the framework expressed by *Rosenblatt*. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 148 (1967) ("In *Time, Inc. v. Hill* . . ., 385 U.S. [374], 385 [(1967)], . . . we counseled against 'blind application of *New York Times Co. v. Sullivan*' and considered 'the factors which arise in the particular context.'"). A notable case concerning the issue of public official in the context of law enforcement personnel is *Gray v.*

---

[8] There are other definitions associated with proposition in Black's Law Dictionary; however, this particular definition seems the most appropriate in the context of the court's opinion.

*Udevitz*, 656 F.2d 588 (10th Cir. 1981) which briefly quotes *Rosenblatt* in an attempt to analyze the issue under the *Rosenblatt* standards. In doing so, the Tenth Circuit created its own factors as to whether a government employee will be considered a public official for defamation purposes. These factors include, whether the government employee (1) is visible to the public, (2) has the authority and ability to exercise force, and (3) can cause deprivation of constitutional rights and personal freedoms or cause bodily injury or financial loss if their authority is misused. *Id.* at 591.

Seemingly, by considering these factors, almost all, and possibly all, governmental employees likely will be considered public officials for defamation purposes. For example, a security guard at a county courthouse that is employed by the county likely would be considered a public official under the *Gray* factors. The security guard is highly visible to the public, as he or she will be stationed in a public building. The security guard also will have the ability and authority to use force to remove individuals who may attempt to bring weapons into the courthouse or commit another crime. Finally, the security guard has the means to deprive constitutional rights by detaining those who may attempt to bring weapons into the courthouse or commit another crime and to inflict bodily injury by restraining said individuals.[9] The fact that the security officer does not make courthouse or department policy and is restricted and limited by federal, state, and local laws is not considered in the *Gray* factors. *Id.* at 591. Presumably, *New York Times* and *Rosenblatt* did not envision a county courthouse security guard to fit into the definition of a public official for defamation purposes; rather, it seems like the public official definition under *New York Times* and *Rosenblatt* would only encompass elected public officials and government employees who have supervisory or managerial positions within the government (i.e., those who can make or change

---

[9] It is unclear what the *Gray* court meant by financial loss when it enumerated its public official factors, but in this example a detention by the security guard could result in the individual not being able to make it to work, which in turn would result in a financial loss to the individual.

policy and have the authority to direct or instruct those below him or her). *See Rosenblatt*, 383 U.S. at 86 n.13 (the night watchman example).

After analyzing these factors to the particular case, the *Gray* court falls back on the blanket rule that all law enforcement personnel are considered public officials under *New York Times*. *Id.* Again, most of the cases cited by the *Gray* court for support of this blanket rule involve supervisory and managerial law enforcement personnel. *Id.*

The *Gray* factors inappropriately over broadened *Rosenblatt* and *New York Times*, which limited the public official status from being applied to every governmental employee. The Court should analyze the facts of this case in accord with the *Rosenblatt* test, instead of applying a blanket rule:[10]

> Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply.

*Rosenblatt*, 383 U.S. at 86. The *Rosenblatt* court further stated, in explaining its test:

> It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the [scrutiny] and discussion occasioned by the particular charges in controversy.

*Id.* at 86 n.13. Certainly, with this explanation in mind, the *Rosenblatt* court would not have considered Plaintiffs to be public officials and did not envision the overly broad factors enumerated in *Gray*. The Plaintiffs' position, investigator, does not invite public scrutiny and discussion of the person holding it, entirely apart from the particular charges in controversy. The Plaintiffs were like

---

[10] "A court must determine as a matter of law a plaintiff's classification in the context of a defamation claim." *Cottrell v. NCAA*, 975 So. 2d 306, 332 (Ala. 2007) (citing *White v. Mobile Press Register, Inc.*, 514 So. 2d 902 (Ala. 1987)).

every other investigator that was within the Tuscaloosa County Homicide Unit, they received the same training, and they all functioned under the same standard operating procedures, rules and law. If the events that lead to the Buzzfeed Article had never happened, the public would not have known who the Plaintiffs were and likely would not have discussed or scrutinized the Plaintiffs. Interestingly, the Buzzfeed Article names no other investigator that worked on the underlying investigation. The public also does not have an independent interest in the qualifications of the Plaintiffs that is beyond the general public interest in the qualification and performance of all government employees, if there was such an interest, the position of investigator would be an elected position. Further, the Plaintiffs did not have any ability to change or make policy within their unit and were not employed in a managerial or supervisory role; they were rank and file officers.

While the *Gray* court recognized that law enforcement personnel have duties that are "peculiarly governmental in character," the Court failed to consider the limitations imposed on low ranking law enforcement personnel by standard operating procedures, supervisors, and federal, state, and local laws. The *Gray* court should have factored these limitations into their analysis, especially when the *Gray* court based its decision on the "substantial responsibility for or control over the conduct of governmental affairs" rule prescribed in *Rosenblatt*. *Gray*, 656 F.2d at 591. With the above in mind, the Plaintiffs do not fall within the category of public official to which the actual malice standard would apply, in accord with *New York Times* and *Rosenblatt*.

Most, if not all, of the courts which accept a blanket rule classifying all law enforcement personnel as public officials are built on a faulty foundation and a review of the historical precedent that was ignored by courts that adopted this blanket rule reveal the true test, as detailed in *Rosenblatt*, that should be applied on a case-by-case basis.

Recently, Justice Clarence Thomas authored a concurring opinion in the denial of certiorari which delved into the historical transformation of defamation law. *McKee v. Cosby*, 139 S.Ct. 675 (2019). In his concurrence, Justice Thomas worked through the historical development of defamation law prior to *New York Times* and thereafter. Justice Thomas took concern over how the court in *New York Times* created the actual malice standard out of thin air and without any precedential support. *Id.* at 678-82. Justice Thomas concluded by stating: "In short, there appears to be little historical evidence suggesting that the *New York Times* actual-malice rule flows from the original understanding of the First or Fourteenth Amendment . . . Like Justice White, I assume that *New York Times* and our other constitutional decision displacing state defamation law have been popular in some circles, 'but this is not the road to salvation for a court of law.' *Gertz*, 418 U.S., at 370, 94 S.Ct. 2997 (dissenting opinion). We did not begin meddling in this area until 1964, nearly 175 years after the First Amendment was ratified. The States are perfectly capable of striking an acceptable balance between encouraging robust public discourse and providing a meaningful remedy for reputational harm. We should reconsider our jurisprudence in this area." *Id.* at 682.

Just like the blanket rule concerning law enforcement personnel's status as public officials, Justice Thomas believed that *New York Times* was a faulty foundation in which subsequent precedent has been built upon. Like with all structures built on faulty foundations, it is only a matter of time before the structure collapses.

## **ARGUMENT**

In its Motion to Strike, Defendants argue that Plaintiffs cannot meet their burden of showing that Dr. Lucchesi meets the expert witness test utilized by the Eleventh Circuit. "The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by

*Daubert* and its progeny. Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). "To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1291-92. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* "'The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable' under *Daubert*." *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018) (quoting *Kumho Tire Co.*, 526 U.S. at 152). As discussed below, Plaintiffs have met their burden.

I.   **Dr. Lucchesi is qualified to testify competently regarding the concept of framing, intent and recklessness, and journalistic standards.**

In footnote 7 on page 9 of Defendants' Motion to Strike, Defendants blanketly assert that Dr. Lucchesi is not qualified to testify competently that the Buzzfeed Article is "false, defamatory and published with actual malice" because "Defendants are not aware of any court holding that expertise 'in mass media framing and stigma communication' qualifies an expert to opine on these issues in a defamation action." However, this is not the proper standard to determine whether an expert is qualified to testify competently.

While Dr. Lucchesi does offer opinions as to falsity, defamatory meaning, and malice in her deposition, the Plaintiffs expect to proffer Dr. Lucchesi to testify as to the concept of framing

and the use of frames in the Buzzfeed Article, as well as the intent and recklessness of the Defendants at the time the Buzzfeed Article was published and journalistic standards. "[T]he plain language of Rule 702 makes this clear: expert status may be based on 'knowledge, skill, experience, training, or education.'" *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Dr. Lucchesi has extensive knowledge, skill, experience, training, and education concerning the concept of framing and in performing a framing analysis (which is an inference that may show intent or, at least, recklessness), as well as journalistic standards. [Exhibit 2, p. 33: 22-25; Exhibit 2, p. 34: 1-6; Exhibit 1, p. 2-3, 36-45]. Thus, Plaintiffs have satisfied the first prong of the expert witness test.

## II.     The methodology used by Dr. Lucchesi in her framing and content analysis meets the sufficiently reliable standard.

Defendants argue that the methodology relied upon by Dr. Lucchesi is unreliable. "In ascertaining reliability under the second *Daubert* prong, [the Eleventh Circuit has] identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; [and] (4) whether the technique is generally accepted by the scientific community." *Rink*, 400 F.3d at 1292 (edits added). "This list of factors, however, does not exhaust the universe of considerations that may bear on … reliability." *Id.* (internal quotations omitted) (citations omitted). "District courts 'have substantial discretion in deciding how to test an expert's reliability.'" *Id.* (quoting *U.S. v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)).

In this case, Dr. Lucchesi's methodology can be tested. The methodology that Dr. Lucchesi relies upon in her opinion was developed by certain scholastic authors and published in peer-reviewed articles. [Exhibit 1, p. 7-10, 31-32]. As these scholastic articles are in written format and

lay out the analytical framework concerning the methodology used by Dr. Lucchesi, Dr. Lucchesi's methodology can be tested. In addition, the articles relied upon by Dr. Lucchesi have been peer-reviewed and published. [Exhibit 2, p. 88: 10-19; Exhibit 1, p. 7-9; Exhibit 1, p. 31-32]. Further, the method employed by Dr. Lucchesi has a known rate of error (i.e., subjectivism is inevitable). [Exhibit 2, p. 217: 9-21]. However, the method was designed to limit variations of outcomes. [*Id.*]. Finally, Dr. Lucchesi's technique is generally accepted. Dr. Lucchesi has studied frame and content analysis, has been trained in this analysis, and has published and presented materials concerning framing. [Exhibit 1, p. 2-3]. Thus, in considering these factors, Dr. Lucchesi's methodology is sufficiently reliable.

On page 20 of Defendants' Motion to Strike, the Defendants cite to *Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 667 (S.D. Fla. 2012) to advance the proposition that Plaintiffs must show that "[s]omeone else using the same data and methods must be able to replicate the result." *Id.* (quoting *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005)). This quotation is actually found in a citation string. Nevertheless, the court noted that "reproducible testing is a hallmark of reliable science." *Id.* The *Rembrandt* court concluded that the expert witness' methodology, in that case, was unreliable because the expert witness' procedures were undocumented and did not "conform to the governing scientific standards." *Id.* The court noted, "[the expert witness'] testing, however, was not reproducible because he failed to document and disclose the procedures he used to conduct his tests." *Id.* The court turned on the fact that the expert witness' procedure was not documented to determine that the methodology was unreliable.

Unlike the expert witness' methodology in *Rembrandt*, Dr. Lucchesi's methodology and procedure is well documented, not only in her written report but also in the cited peer-reviewed scholastic articles. Thus, *Rembrandt* is distinguishable from this case.

Instead of focusing on the documentation of Dr. Lucchesi's methodology, the Defendants seem to focus more on the correctness or credibility of Dr. Lucchesi's opinion. However, this is not an inquiry that is within the court's province, rather it lies with the jury. *See Adams v. Laboratory Corp. of America*, 760 F.3d 1322, 1332 (11th Cir. 2014) ("Bias in an expert witness's testimony is usually a credibility issue for the jury"); *Rembrandt*, 282 F.R.D. at 666 ("*Daubert*, however, does not ask courts to evaluate whether an expert's opinion is correct; instead, it requires courts to determine whether the expert has used a reliable *methodology*") (emphasis in original) (citing *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir. 1997)).

Therefore, in consideration of the above, the Plaintiffs have satisfied the second prong of the expert witness test utilized by the Eleventh Circuit.

### III.   Dr. Lucchesi's testimony will help the trier of fact understand the concept of framing, how it was used within the Buzzfeed Article, the intent and/or recklessness of the Defendants at the time of publication, and journalism standards.

Defendants set forth multiple arguments purporting to show that Dr. Lucchesi's testimony will not assist the jury at trial. However, the Defendants arguments boil down the argument that Dr. Lucchesi's testimony only offers legal conclusions as to actual malice, defamatory meaning, and falsity. While Dr. Lucchesi's opinions may include some legal conclusions, the Plaintiffs intend to proffer Dr. Lucchesi's expert opinions on framing, how framing was used within the Buzzfeed Article, and how the framing can show intent, or at least recklessness, on the part of the Defendants, as well as journalistic standards used within the industry.

"By this requirement, [the third prong or helpfulness prong,] expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing argument." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1110 (11th Cir. 2005) (quoting *U.S. v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004), citing in turn *U.S. v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). "[A] witness should not provide testimony that 'amounts to no more than an expression of the [witness'] general belief as to how the case should be decided.'" *Waites v. Limestone Correctional Facility,* 2017 WL 2787124, at \*4 (N.D. Ala. June 27, 2017) (quoting *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2nd Cir. 1977)). "It is also not proper, as the former Fifth Circuit observed, for a witness to offer his or her opinion on the law of the forum, or to provide legal conclusions." *Id.* (citing *Helms v. Sinclair Refining Co.*, 170 F.2d 289, 292 (5th Cir. 1948)).

> While an expert's *legal conclusions* are not admissible, an opinion as to the ultimate *issue of fact* is admissible, so long as it is based upon a valid scientific methodology and supported by the facts. *See* Fed. R. Evid. 704. The "ultimate issue of fact," as used in Rule 704, means that the expert furnishes an opinion about inferences that should be drawn from the facts and the trier's decision on such issue necessarily determines the outcome of the case.

*Id.* (emphasis in original) (quoting *Strickland v. Royal Lubricant Co.*, 911 F. Supp. 1460, 1469 (M.D. Ala. 1995)); *See also Hibbett Patient Care, LLC v. Pharmacists Mutual Ins. Co.*, 2017 WL 2062955, at \*2 (S.D. Ala. May 12, 2017) ("The Federal Rules of Evidence specify that an opinion is not objectionable just because it embraces an ultimate issue. That said, the general rule is that testifying experts may not offer legal conclusions") (original edits omitted) (internal quotations omitted) (citing Fed. R. Evid. 704(a); *Cook*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005)).

"After all, '[e]ach courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Hibbett Patient Care,*

*LLC*, 2017 WL 2062966, at *2 (quoting *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)). However, "an expert may properly testify as to facts that relate to a legal standard, so long as he or she does not offer opinions as to whether that legal standard has been met." *Id.* at *3.

Depending on how this Honorable Court classifies the Plaintiffs, the common law malice standard or actual malice (or constitutional malice) standard may apply. "In reality, evidence needed to establish constitutional malice and common-law malice 'overlap[s] significantly.'" *Wiggins v. Mallard*, 905 So. 2d 776, 787 (Ala. 2004) (edits in original) (quoiting *Paul v. Hearst Corp.*, 261 F. Supp. 2d 303, 306 (M.D. Pa. 2002)). "It overlaps insofar as the same evidence bears both on the defendant's motive, for purposes of common-law malice, and on the defendant's 'attitude toward the *truth or falsity of his published material*,' for purposes of constitutional malice. *Id.* (emphasis in original) (quoting *Gomes v. Fried*, 136 Cal. App. 3d at 934). "Indeed, 'evidence that the defendant failed to determine whether or not his or her statements were grounded in fact is probative of whether common-law malice motivated the statements, since disregard of the truth may suggest that ill will and hostility were actually at work.'" *Id.* (quoting *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1253 n. 16 (M.D. Ala. 1998)).

"[C]ommon-law malice may be shown, *not only* by 'evidence of hostility, rivalry, the violence of the language, the mode and extent of publication,' but, also, by proof of 'the recklessness of the publication and prior information regarding its falsity.'" *Id.* at 788 (quoting *Johnson Pub. Co. v. Davis*, 124 So. 2d 441, 450 (Ala. 1960)).

On the other hand, actual malice or constitutional malice requires the plaintiff to prove by clear and convincing evidence that when the defendant published the statement, the defendant knew the statement was false or that the defendant published the statement with reckless disregard

to whether the statement was false or not. *Finebaum v. Coulter*, 854 So. 2d 1120, 1124 (Ala. 2003). *See also Moore v. Cecil*, 2021 WL 1208870, at * 2 (N.D. Ala. Mar. 31, 2021).

Further, the Alabama Supreme Court has recognized defamation by implication or defamatory innuendo. *Finebaum*, 854 So. 2d at 1124-25. In order to prove defamation by implication, the plaintiff must also establish that defendant intended to imply or was reckless toward the implications. *Id.*

If the Plaintiffs are not deemed public officials and only must prove common-law malice, Dr. Lucchesi's testimony concerning framing and her framing analysis will be helpful to the trier of fact to show inferences that can be drawn from facts which support that Defendants wrote the Buzzfeed Article in a hostile and ill-will manner in order to inflict harm and damage upon the Plaintiffs. Based upon the framing analysis, the Defendants primed the readers to feel a certain negative way toward the Plaintiffs. [Exhibit 2, p. 148: 18-25; Exhibit 2, p. 149: 1-25; Exhibit 2, p. 150: 1]. The language and the positioning of the language in the Buzzfeed Article show that Defendants had an ill-will and hostile view toward the Plaintiffs. [Exhibit 2, p. 107: 22-25; Exhibit 2, p. 108: 1-10]. These concepts may not be readily recognizable by the trier of fact. Dr. Lucchesi will illuminate the concept of framing and how it was applied in the Buzzfeed Article such that the trier of fact can understand such inferences and then make a determination as to the hostility and ill-will the Defendants had towards the Plaintiffs.

Even if this Honorable Court finds that the actual malice standard applies to the Plaintiffs, Dr. Lucchesi's opinions and testimony concerning journalistic standards would be helpful to the trier of fact. While "[a]ctual malice requires more than a departure from reasonable journalistic standards," it does not appear that the Eleventh Circuit has taken the position that journalistic standards cannot be considered by the trier of fact. *Cf. Michel v. NYP Holdings, Inc.*, 816 F.3d 686,

703 (11th Cir. 2016); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999). Further, Dr. Lucchesi's testimony concerning journalistic standards may assist the trier of fact in determining whether the Defendants had an intent to avoid the truth. *See Cottrell v. NCAA*, 975 So. 2d 306, 349 (Ala. 2007) ("Indeed, the failure to investigate does not constitute malice, unless the failure evidences purposeful avoidance, that is, an intent to avoid the truth") (citations and quotations omitted). Thus, while journalistic standards, standing alone, will not suffice to show actual malice, the trier of fact may still be informed as to journalistic standards and consider such, along with other evidence, in its determination regarding actual malice.

Furthermore, the methodology and analysis used by Dr. Lucchesi also furnishes opinions about inferences that can be draw from the facts and in which the trier of fact may rely upon in order to determine the intent, or at least recklessness, on the part of the Defendants. [Exhibit 2, p. 53: 1-25; Exhibit 2, p. 54: 1-10; Exhibit 2, p. 83: 2-25; Exhibit 2, p. 84: 1-8; Exhibit 2, p. 199: 8-25; Exhibit 2, p. 1-23]. The language and structure used in the Buzzfeed Article may be considerations the trier of fact can use in its determination of intent. [*Id.*]. Dr. Lucchesi testimony uncovers the veil of the language and structure used in order to illuminate facts concerning the actual intent, or at least the recklessness, of Defendants when the Buzzfeed Article was published. Reporters, like Katie Baker, understand and use frames, the trier of fact should be educated on this concept, as well. [Exhibit 2, p. 81: 15-25; Exhibit 2, p. 82: 1-10; Exhibit 2, p. 96: 10-25; Exhibit 2, p. 97: 1-10; Exhibit 3;[11] Exhibit 4,[12] p. 3915].

Similar to her helpful testimony concerning framing in the context of malice, Dr. Lucchesi can inform the trier of fact, through her content analysis as to the effect of priming would have on

---

[11] Exhibit 3 is an email string between Buzzfeed employees, which is attached hereto and incorporated herein by reference.
[12] Exhibit 4 are notes taken by Katie Baker on the Buzzfeed Article, which is attached hereto and incorporated herein by reference.

determining the defamatory meaning of the Buzzfeed Article, which are opinions on inferences that can be drawn from the facts. [Exhibit 2, p. 114: 5-12]. "The test to factually determine the defamatory nature of a statement is that meaning that would be ascribed to the language by a reader or listener of 'average or ordinary intelligence, or by a common mind.'" *Camp v. Yeager*, 601 So. 2d 924, 927 (Ala. 1992) (quoting *Loveless v. Graddick*, 295 So. 2d 137, 142 (Ala. 1975)). With the use of frames, reporters have the ability to prime readers to think a certain way. [Exhibit 2, p. 148: 18-25; Exhibit 2, p. 149: 1-25; Exhibit 2, p. 150: 1]. This concept needs to be understood by the trier of fact such that the trier of fact can understand how the Defendants can write and manipulate words in a way to affect the meaning of the Buzzfeed Article. In turn, the trier of fact can determine whether the meaning is defamatory. Therefore, Plaintiffs have satisfied the third prong of the expert witness test.[13]

## CONCLUSION

In sum, as argued above, Dr. Lucchesi's expert opinion and testimony satisfies the expert witness requirements adhered to by the Eleventh Circuit. Dr. Lucchesi is qualified to competently testify to framing, intent and/or recklessness, and journalistic standards. Further, the methodology utilized by Dr. Lucchesi is sufficiently reliable. Finally, Dr. Lucchesi's opinions and testimony would be helpful to the trier of fact. WHEREFORE, premises considered, Plaintiffs respectfully request this Honorable Court to deny Defendants' Motion to Strike.

*Respectfully submitted this 1st day of July, 2021.*

*s/ Bobby H. Cockrell, Jr.*
Bobby H. Cockrell, Jr.
Bar Number: ASB-1332-E47B
Attorney for Plaintiffs
bcockrell@ccrr.law

---

[13] Plaintiffs do not intend to offer the opinions or testimony of Dr. Lucchesi concerning the falsity of the Buzzfeed Article.

*s/ G. Scotch Ritchey, Jr.*
G. Scotch Ritchey, Jr.
Bar Number: ASB-6144-Q55D
Attorney for Plaintiffs
sritchey@ccrr.law

**OF COUNSEL:**
COCKRELL, COCKRELL, RITCHEY & RITCHEY, LLP
1409 University Boulevard
Tuscaloosa, Alabama 35401
Telephone: (205) 349-2009
Facsimile: (205) 758-3090

---

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I have on this date, served a copy of the foregoing upon the following via private process server, and/or by U.S.P.S. certified mail, return service requested, with adequate postage prepaid, and/or electronic mail, and/or regular mail, and/or hand delivered, and/or by filing a copy of the foregoing using the AlaFile system which will automatically notify all counsel of record, and/or by filing a copy of the foregoing with the Clerk of Court using the CM/ECF system which will provide notice to the following CM/ECF participants:

**Katherine M. Bolger (*pro hac vice*)**
**Rachel F. Strom (*pro hac vice*)**
**John M. Browning (*pro hac vice*)**
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
katebolger@dwt.com
rachelstrom@dwt.com
jackbrowning@dwt.com

**J. Banks Sewell, III**
**John G. Thompson**
**Jonathan R. Little, III**
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Telephone: (205) 581-0772
Facsimile: (205) 380-9172
bsewell@lightfootlaw.com
jthompson@lightfootlaw.com
jlittle@lightfootlaw.com

*s/ G. Scotch Ritchey, Jr.*
*Of Counsel*