FILED
2021 Sep-15  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 61

Adam Jones                                                    12/7/2020

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CASE NUMBER
7:19-cv-00403-RDP

ADAM JONES and JOSHUA HASTINGS,
        Plaintiff(s),
vs.

BUZZFEED, INC., BUZZFEED NEWS, BEN SMITH,
and KATIE J. M. BAKER,
        Defendant(s).

VIDEO AND ZOOM DEPOSITION TESTIMONY OF:
ADAM JONES

DECEMBER 7, 2020
9:07 a.m.
COURT REPORTER:
NANCY W. PANNELL, CCR
The reading and signing of this deposition
has been waived

**Page 2**

1        S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED
3  by and between the parties through their
4  respective counsel that the VIDEO AND ZOOM
5  DEPOSITION of ADAM JONES may be taken
6  before Nancy W. Pannell, Certified
7  Shorthand Reporter and Notary Public,
8  State at Large, at the Birmingham
9  Reporting Tuscaloosa Office, WorkSouth
10  Tuscaloosa, 1409 Northbank Parkway, Suite
11  200, Tuscaloosa, Alabama, on DECEMBER 7,
12  2020, commencing at approximately 9:07
13  a.m.
14      IT IS FURTHER STIPULATED AND
15  AGREED that the signature to and the
16  reading of the deposition by the witness
17  IS waived, the deposition to have the same
18  force and effect as if full compliance had
19  been had with all laws and rules of Court
20  relating to the taking of depositions.
21      IT IS FURTHER STIPULATED AND
22  AGREED that it shall not be necessary for
23  any objections to be made by counsel to

**Page 3**

1  any questions, except as to form or
2  leading questions, and that counsel for
3  the parties may make objections and assign
4  grounds at the time of trial or at the
5  time said deposition is offered in
6  evidence, or prior thereto.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 4**

1      I N D E X
2
3  EXAMINATION BY:      PAGE NO.
4  MS. BOLGER      10
5  CERTIFICATE      392
6
7
8      INDEX OF EXHIBITS
9
10  PREVIOUSLY MARKED DEFENDANT'S EXHIBITS
11  REFERENCED AND ATTACHED TO DEPOSITION
12
13  2  Felony Packet    267
14  15  Timeline of Rondini Case,   253
15      1-23
16  16  SOP, Page 24-105    42
17  17  Tuscaloosa News Article   387
18  18  Grand Jury Report of M.   302
19      Rondini, Page 106-148
20  25  Email, Jones-Hastings 0187   339
21
22
23  DEFENDANT'S EXHIBITS:      PAGE NO.

Adam Jones                                                      12/7/2020

Page 5

| 1 | 26 | Adam Jones CV, | 30 |
| 2 | | Jones-Hastings 0452-0453 | |
| 3 | 27 | IACP Sexual Assault | 61 |
| 4 | | Incident Reports | |
| 5 | | Investigative Strategies, 8 | |
| 6 | | pages | |
| 7 | 28 | Transcription of | 83 |
| 8 | | Jones/Rondini conversation, | |
| 9 | | 3 pages | |
| 10 | 29 | Video Interview Transcript | 158 |
| 11 | | of Rondini, 71 pages | |
| 12 | 30 | Video Interview Transcript | 224 |
| 13 | | of Rondini, 48 pages | |
| 14 | 31 | Email, Jones-Hastings 224 | 265 |
| 15 | 32 | Affidavit of Adam Jones, 5 | 307 |
| 16 | | pages | |
| 17 | 33 | Email chain, Jones-Hastings | 317 |
| 18 | | 0193-0204 | |
| 19 | 34 | Email, Buzzfeed01630 | 321 |
| 20 | 35 | Screen shots of Facebook | 352 |
| 21 | | comments, Jones-Hastings | |
| 22 | | 0434-0441 | |
| 23 | 36 | Medical Records, 81 pages | 378 |

Page 6

A P P E A R A N C E S

1
2
3    FOR THE PLAINTIFF(S):
4        MR. BOBBY H. COCKRELL, JR.
5        MR. G. SCOTCH RITCHEY, JR. (Part in
6    person and part zoom)
7        COCKRELL, COCKRELL, TOWNSEND &
8    RITCHEY, LLP
9        1409 UNIVERSITY BOUELVARD
10       TUSCALOOSA, ALABAMA 35401
11
12   FOR THE DEFENDANT(S): (Via Zoom)
13       MS. KATHERINE M. BOLGER
14       MS. KATHLEEN FARLEY
15       DAVIS, WRIGHT, TREMAINE, LLP
16       1251 AVENUE OF THE AMERICAS
17       21ST FLOOR
18       NEW YORK, NEW YORK 10020-1104
19
20       MR. JOHN G. "J. T." THOMPSON
21       LIGHTFOOT FRANKLIN & WHITE
22       400 NORTH 20TH STREET
23       THE CLARK BUILDING

Page 7

1        BIRMINGHAM, ALABAMA 35203
2
3    ALSO PRESENT:
4        Josh Hastings
5        Allen Eaves, videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1        I, Nancy W. Pannell, a
2    Certified Shorthand Reporter of
3    Birmingham, Alabama, and a Notary Public
4    for the State of Alabama at Large, acting
5    as Commissioner, certify that on this
6    date, pursuant to the Federal Rules of
7    Civil Procedure and the foregoing
8    stipulation of counsel, there came before
9    me at the offices of Birmingham Reporting
10   Tuscaloosa office, WorkSouth Tuscaloosa,
11   1490 Northbank Parkway, Suite 200,
12   Tuscaloosa, Alabama, commencing at
13   approximately 9:07 a.m. on DECEMBER 7,
14   2020, ADAM JONES, witness in the above
15   cause, for oral examination, whereupon the
16   following proceedings were had:
17
18
19        VIDEOGRAPHER:  We are now on
20   the record.  This is the video deposition
21   of Adam Jones, Case Number
22   7:19-cv-00403-RDP in the United States
23   District Court for the Northern District

Adam Jones                                                    12/7/2020

Page 9

1    of Alabama, Western Division.
2         Today's date is December the
3    7th, 2020.  The time is 9:07 a.m.  Would
4    counsel introduce yourself into the
5    record, after which the court reporter
6    will swear in the witness.
7         MS. BOLGER:  Good morning,
8    everybody.  Kate Bolger from Davis,
9    Wright, Tremaine on behalf of the
10   defendants BuzzFeed, Katie Smith, and Ben
11   Smith -- Katie Baker and Ben Smith.
12        MR. THOMPSON:  J. T.
13   Thompson also here on behalf of the
14   defendants.
15        MR. COCKRELL:  Bob Cockrell
16   for the plaintiffs.
17        MR. RITCHEY:  Scotch Ritchey
18   for the plaintiffs.
19        ADAM JONES,
20   being first duly sworn, was examined and
21   testified as follows:
22        COURT REPORTER:  Thank you.
23   Usual stipulations?

Page 10

1         MR. COCKRELL:  Yes.
2         MR. THOMPSON:  Yes.
3         EXAMINATION
4    BY MS. BOLGER:
5    Q.    Hi, Investigator Jones.  My name
6    is Kate Bolger, as I said, and I'm a
7    lawyer and I represent BuzzFeed.  Have you
8    ever been deposed before?
9    A.    Yes, ma'am.
10   Q.    In what circumstances have you
11   been deposed?
12   A.    It was a deposition, I can't
13   remember who subpoenaed me for the
14   deposition.  It was in regards to the Bunn
15   case and the Rondini lawsuit.
16   Q.    And was that the only time you've
17   been deposed?
18   A.    Yes, ma'am.
19   Q.    Great.  Well, just to refresh your
20   recollection, the way this process works
21   is I ask some questions and you give me
22   some answers.
23        I do tend to talk rather quickly.

Page 11

1    I think Nancy must take long naps after
2    she's done writing down a deposition for
3    me.  If I talk too quickly, please just
4    tell me to slow down and I will promise to
5    try.
6         You and I should try not to talk
7    over each other, so I'll let you finish
8    talking, you let me finish talking and
9    every answer you give me should be
10   audible, so in other words, don't shake
11   your head or nod; just say yes or no.  Are
12   you with me so far?
13   A.    Yes, ma'am.
14   Q.    Great.  Bob or Scotch may from
15   time to time object to something I'm
16   saying.  Unless they instruct you to
17   answer -- instruct you not to answer, you
18   can still answer the question, okay?
19   A.    Okay.
20   Q.    Great.  Did you do anything to
21   prepare for this deposition today?
22   A.    Just spoke with the attorneys.
23   Q.    How long did you speak with the

Page 12

1    attorneys?
2    A.    An hour couple of weeks ago in the
3    office.
4    Q.    Great.  Did you review any
5    documents before you came here today?
6    A.    I looked through the case file.
7    Q.    And when you say case file, do you
8    mean the felony packet or something else?
9    A.    Yes, felony packet.
10   Q.    Did you read any of the
11   transcripts of the depositions that have
12   already taken place in this matter?
13   A.    No.
14   Q.    Have you spoken to Captain Hood
15   about his deposition?
16   A.    No.
17   Q.    What about Captain Hart?
18   A.    No.
19   Q.    What about your wife?
20   A.    We just talked about she was
21   nervous, and as far as the substance we
22   haven't talked about it.
23   Q.    Okay, great.  Do you have a social

3  (Pages 9 to 12)

Adam Jones                                                    12/7/2020

Page 13

1    media account?
2    A.    No.
3    Q.    Accounts?
4    A.    No.
5    Q.    So you don't have a Twitter
6    handle?
7    A.    No, ma'am.
8    Q.    Or a Facebook page?
9    A.    No.
10   Q.    Or an Instagram account or
11   anything like that?
12   A.    No, ma'am.
13   Q.    When were you born?
14   A.    ███████████.
15   Q.    And where were you born?
16   A.    Tuscaloosa County.
17   Q.    And have you lived in Tuscaloosa
18   County your whole life?
19   A.    Yes, ma'am.
20   Q.    Where did you grow up
21   specifically?
22   A.    North Tuscaloosa County.  They
23   call it the McConnells community, but it's

Page 14

1    around Samantha.
2    Q.    Okay.  And your father was a
3    pastor; correct?
4    A.    Yes, ma'am.
5    Q.    What was the name of his church?
6    A.    Phillips Chapel Freewill Baptist
7    Church.
8    Q.    And is he still a pastor there?
9    A.    He is, yes, ma'am.
10   Q.    How long has he been the pastor
11   there?
12   A.    I believe it was 1982 so he's been
13   there several years.
14   Q.    That's a really long time.  That's
15   amazing.  How big is that congregation?
16   A.    It's a small country church.  I
17   would probably say less than 50 on Sunday
18   morning.
19   Q.    And does your mom work outside the
20   home?
21   A.    She's retired.
22   Q.    What did she do before she
23   retired?

Page 15

1    A.    She was an x-ray technician for
2    the University Medical Center and she's
3    been retired about five or six years now.
4    Q.    Okay.  Did you have any -- do you
5    have any brothers or sisters?
6    A.    I have a brother.
7    Q.    What's your brother's name?
8    A.    Paul.
9    Q.    Does Mr. Jones live in Tuscaloosa
10   County?
11   A.    He does.
12   Q.    And are you guys -- do you live
13   close to each other?
14   A.    He actually lives next door to my
15   parents so we're about 15 minutes apart.
16   Q.    And what does your brother do?
17   A.    He currently works for the
18   probation and paroles office, state of
19   Alabama.
20   Q.    Are you guys close?
21   A.    We are.
22   Q.    And you are married; right?
23   A.    Yes, ma'am.

Page 16

1    Q.    Your wife's name is Nicole?
2    A.    Yes.
3    Q.    And how long have guys been
4    married?
5    A.    22 years.
6    Q.    You got married young.  Do you
7    guys have any children?
8    A.    Two children.
9    Q.    And how old are your kids?
10   A.    My daughter is 21 and my son is
11   17.
12   Q.    What's your daughter's name?
13   A.    Mackenzie.
14   Q.    And where does Mackenzie live?
15   A.    She lives just down the road from
16   me, probably a couple hundred yards from
17   us.
18   Q.    I like your strategy of keeping
19   your kids close.  What's your boy's name?
20   A.    Cody.
21   Q.    You said Cody is 17?
22   A.    Yes, ma'am.
23   Q.    And I assume he lives with you?

Adam Jones                                                12/7/2020

<table>
<tr><td colspan="2">

Page 17

1    A.    He does.
2    Q.    Where does he go to school?
3    A.    Tuscaloosa County High.
4    Q.    And how long have you lived in
5    your house?
6    A.    We built it in October -- I'm
7    sorry, we moved in September of 2005 so
8    15 years.
9    Q.    And what's your address?
10   A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮,
11   ▮▮▮▮▮▮▮▮.
12   Q.    Is Coker a small town?
13   A.    It is.  It's -- there's several
14   communities, I guess you could say, Buhl,
15   Elrod, Coker.  They're all a part of
16   Tuscaloosa County.
17   Q.    And before you lived in your house
18   that you moved into in September of 2005,
19   where did you live?
20   A.    I lived at ▮▮▮▮▮▮▮▮▮ in
21   Northport.
22   Q.    How long were you there?
23   A.    I believe it was four years.
</td>
<td colspan="2">

Page 18

1    Q.    Other than the house you live in,
2    do you own any other properties?
3    A.    No.
4    Q.    I think I know the answer to this
5    question, but I'm going to ask it any way,
6    have you ever been arrested?
7    A.    No.
8    Q.    Neither have I.
9          Have you ever been sued by
10   anybody?
11   A.    Just by the Rondini family.
12   Q.    And can you tell me what that
13   lawsuit was about?
14   A.    It was a wrongful death suit.
15   Q.    And it was by Michael and Cindy
16   Rondini?
17   A.    Yes, ma'am.
18   Q.    And how was that resolved, at
19   least when it comes to you?
20   A.    Best I understand it, the judge
21   dismissed it.
22   Q.    Do you understand why the judge
23   dismissed it?
</td></tr>
<tr><td colspan="2">

Page 19

1    A.    I don't -- I don't remember
2    exactly.
3    Q.    Did the judge reach a decision --
4    when it came to you, did the judge reach a
5    decision on whether the claim had merit or
6    not or was it based on the fact that, for
7    example, you were immune from liability?
8    A.    I don't think it was immunity.
9    I'm not sure.  I don't remember.
10   Q.    Okay.  Who was your lawyer in that
11   case?
12   A.    I was represented by Chris
13   McIlwain, city of Tuscaloosa.
14   Q.    So you didn't have to hire a
15   private lawyer; the city hired a lawyer?
16   A.    Yes, ma'am.
17   Q.    Was Mr. Joel Dillard involved in
18   the defense of that action?
19   A.    He represented Josh, the
20   sheriff -- the sheriff's office.  He
21   represented the sheriff's office.
22   Q.    When you say he represented Josh,
23   you mean Josh Hastings; right?
</td>
<td colspan="2">

Page 20

1    A.    Yes, ma'am.
2    Q.    Why did Mr. Dillard represent Josh
3    and not you, if you know?
4    A.    Well, we work for two separate
5    entities.  Josh Hastings works for the
6    sheriff's office.  I worked for the city
7    of Tuscaloosa.
8    Q.    And that's because the makeup of
9    what was once the Violent Crimes Unit --
10   sorry, what was once the Homicide Unit is
11   now the Violent Crimes Unit, is it was a
12   task force made up of law enforcement
13   officers from different agencies; correct?
14   A.    Yes, ma'am.
15   Q.    You were a part of that task force
16   as an officer in the Tuscaloosa Police
17   Department; correct?
18   A.    Yes, ma'am.
19   Q.    And Josh Hastings was an officer
20   in the Tuscaloosa Sheriff's Office;
21   correct?
22   A.    Yes, ma'am.
23   Q.    Have you ever sued anybody other
</td></tr>
</table>

5  (Pages 17 to 20)

Adam Jones                                              12/7/2020

---

**Page 21**

1 than BuzzFeed?
2   A.     No, ma'am.
3   Q.     Do you and your family belong to a
4 church?
5   A.     Yes.
6   Q.     What church is that?
7   A.     Well, I actually still belong to
8 my dad's church. We go to, or we went to
9 Northport Baptist Church. As far as a
10 membership, I'm a member at my dad's
11 church. My wife is actually a member of
12 her church where she grew up in. We just
13 never moved a membership to a church
14 together.
15   Q.     And what is your wife's church?
16   A.     Five Points Baptist.
17   Q.     Is your wife also a Tuscaloosa
18 neighborhood -- sorry, Tuscaloosa native?
19   A.     Yes, ma'am.
20   Q.     Where did you guys meet?
21   A.     She actually worked with my mother
22 at University Medical Center and my mother
23 introduced us.

---

**Page 22**

1   Q.     Kind of a nice story. So you guys
2 didn't go to high school together?
3   A.     Right.
4   Q.     And are you -- do you attend
5 church on the weekends?
6   A.     I don't.
7   Q.     So I take it then you're not
8 actively involved in any groups at church?
9   A.     No, ma'am.
10   Q.     Would you say you're actively or
11 are you involved in any community groups?
12   A.     No, ma'am.
13   Q.     You don't belong to any kind of
14 club?
15   A.     No.
16   Q.     Is there a Fraternal Order of
17 Police in Alabama?
18   A.     It is.
19   Q.     Have you ever belonged to the
20 Fraternal Order of Police?
21   A.     Yes, ma'am.
22   Q.     When were you part of that
23 organization?

---

**Page 23**

1   A.     While I was an active police
2 officer.
3   Q.     Did that involve going to meetings
4 of any kind or is it just a membership
5 card?
6   A.     It's really just a membership
7 card. They do have meetings, but I didn't
8 ever attend any meetings.
9   Q.     When was the last time you and
10 your family went to church?
11   A.     I guess it would have been Easter
12 of this year. We went to my dad's church.
13   Q.     Do you play any sports?
14   A.     I used to; don't anymore.
15   Q.     What did you used to play?
16   A.     I played football, baseball and
17 basketball in high school.
18   Q.     And how about as a grown man, for
19 lack of a better term?
20   A.     I played softball, church softball
21 for it's probably been 15 years ago.
22   Q.     What's your baseball team?
23   A.     The Braves. I don't follow them

---

**Page 24**

1 as strict as most people.
2   Q.     That's all right. I'm a Yankees
3 fan. I know that's a tough thing to say,
4 but I just figured I should mention my
5 loyalties.
6          And where do you currently work?
7   A.     Work for the University of
8 Alabama.
9   Q.     What job do you have there?
10   A.     I work in environmental health and
11 safety. I'm a health -- environmental
12 hazard technician.
13   Q.     Can you tell me what that means
14 you do?
15   A.     We inspect the buildings for fire
16 and life safety, you know, make sure the
17 fire alarms are working and up to date.
18 The smoke detectors are working and up to
19 date. They have batteries. Fire
20 extinguishers are charged. You know, exit
21 routes are open and exit doors are
22 accessible to make sure everybody can get
23 out of a building just in case of an

---

6 (Pages 21 to 24)

Adam Jones                                                          12/7/2020

---

Page 25

1    emergency.
2    Q.      And how long have you worked
3    there?
4    A.      February 3rd, 2020, was when I
5    started.
6    Q.      So it's a pretty new job?
7    A.      Yes, ma'am.
8    Q.      The world kind of fell apart
9    shortly after you took the job; right?
10   A.      That's right.
11   Q.      Have your responsibilities changed
12   as a result of the current pandemic?
13   A.      We actually go into some of these
14   spaces in these buildings where there have
15   been some active COVID cases and spray
16   disinfectant. It's more of a commercial
17   grade disinfectant to try to limit
18   exposure to other people.
19   Q.      And what made you decide to take
20   that particular job?
21   A.      I got my 20-year mark at the city,
22   you know, I felt like it was just -- it
23   was time to move on and I was able to get

---

Page 26

1    this position, and I'm thankful for it,
2    but that was really -- it was just a
3    decision that me and my wife made.
4    Q.      When you said you hit your 20-year
5    mark, does that mean that you left your
6    pension vested?
7    A.      Yes, ma'am. The city of
8    Tuscaloosa had a private pension. It's
9    not state-based or anything and there is a
10   20-year, that's the minimum amount of time
11   that you can work to draw a pension
12   benefit.
13   Q.      And in New York City I have a lot
14   of friends who are police officers. I
15   know their pension is essentially their
16   salary for a set period of time. Is that
17   the same for the Tuscaloosa Police
18   Department?
19   A.      It's actually for my life, and as
20   long as my wife is alive and doesn't
21   re-marry she will get the benefit.
22   Q.      You said that -- so you get your
23   full Tuscaloosa Police Department salary,

---

Page 27

1    plus your salary at the University of
2    Alabama; right?
3    A.      It's not a full pension. It's
4    hard to explain. It's a percentage -- a
5    full pension at the city is -- I forget
6    the dollar amount, but to get a full
7    pension would be working 25 years.
8        That's like the standard that you,
9    know, is there. You can work over 25.
10   You know, you can work as long as you want
11   to. Most people they have a drop program
12   or drop plan.
13       Once you pass your 25-year mark
14   you can sign up for this drop plan, and
15   the money that would normally come out of
16   my check to go into a pension fund would
17   go into like an annuity and I could work
18   in that capacity for up to five years, and
19   then at the end of that five years they
20   would, you know, hand me everything that
21   was in that annuity and then I would draw
22   a monthly pension benefit also.
23   Q.      But you chose not to do that?

---

Page 28

1    A.      Yes, ma'am.
2    Q.      Why is that?
3    A.      I just felt like my effectiveness
4    as a police officer was compromised and
5    that's why we decided to do that.
6    Q.      Can you explain that a little more
7    to me please?
8    A.      Well, you know, while you're
9    working, you know, you build relationships
10   with the community, you know, and in turn
11   as crimes happen, you know, a lot of the
12   time you have to go to the community to
13   get help, you know, because you couldn't
14   do it without the help of a community.
15       You know, it's all of us trying to
16   make the place better, and, you know, ever
17   since this article came out, I know the
18   guys that I work with in homicide they
19   stand behind our work and I stand behind
20   my work 100 percent, but, you know, when
21   you get calls that question your integrity
22   and, you know, they want you put in jail
23   for something that I didn't do, you know,

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                          12/7/2020

Page 29

1    it's -- you know, it's just hard to carry
2    out the duties of an officer if you've
3    lost the trust of the people that you're
4    supposed to help protect and serve.
5          And I've never had an issue with
6    that. I've never had disciplinary issues.
7    I've always respected authority within the
8    police department. You know, it's just I
9    felt like my credibility and my
10   effectiveness as an officer was gone, you
11   know, ever since that article.
12         You know, I just -- it questioned
13   my name and, you know, that's just
14   something that it's hard to get back. I
15   mean you have a lifetime to build trust
16   and, you know, it can be taken away in a
17   second, you know, and I just -- I felt
18   like my trust was lost, not on anything I
19   did, but it was the way that the article
20   was worded that, you know, basically
21   saying that I'm for sale, you know. My
22   name has never been for sale, never will
23   be for sale.

Page 30

1    Q.    Okay. How long had you worked --
2    sorry, what year did you first come to the
3    Tuscaloosa Police Department?
4    A.    June 21st, 1999.
5    Q.    And you were in the patrol
6    division; right?
7    A.    Yes, ma'am.
8          MS. BOLGER: J. T, can you
9    hand Investigator Jones it's Jones 4552?
10   Hold on, I didn't write down what document
11   that was. Sorry. It's AM.
12         MR. THOMPSON: Yeah.
13         MS. BOLGER: Thanks. Nancy,
14   I think we're at 26.
15         (Whereupon, a document was marked
16         as Defendant's Exhibit No. 26 and
17         is attached to the original
18         transcript.)
19         (Off the record.)
20         MS. BOLGER: So just for the
21   record, I'm handing -- asking J. T. to
22   hand the witness document produced by
23   Jones and Hastings and we gave the number

Page 31

1    Jones-Hastings 452, and it's a résumé with
2    the name Adam Jones on top.
3    Q.    And my first question,
4    Investigator, Jones is quite simple. Have
5    you seen this before?
6    A.    Yes, ma'am.
7    Q.    And what is this?
8    A.    It does look like a résumé.
9    Q.    Did you put this together?
10   A.    Yes.
11   Q.    When did you do that?
12   A.    I don't remember. It's -- I don't
13   remember the date or that I -- it
14   would have probably been a couple of years
15   ago.
16   Q.    Do you remember what occasioned
17   you to put it together?
18   A.    I don't know if this was when I
19   was, you know, just showing my experience
20   and everything on behalf of this or if
21   this was an actual résumé that I used for
22   a job. I don't remember.
23   Q.    Okay. You just said you don't

Page 32

1    know whether you did it showing your
2    experience in relation to this, or you
3    used words to that effect. What did you
4    mean by that?
5    A.    This lawsuit.
6    Q.    This lawsuit, the lawsuit against
7    BuzzFeed rather than the lawsuit brought
8    by the Rondini family?
9    A.    Yes, yes.
10   Q.    Okay. So if you take a look at
11   the patrol division, what were your job
12   responsibilities in the patrol division?
13   A.    Just answer calls for service as
14   they would come in, you know, citizens
15   would call, you know, whatever complaint
16   they had. We would go to the scene, take
17   a report. You know, if anybody had to go
18   to jail, took them to jail -- we took them
19   to jail.
20         You know. It was various calls.
21   It was, you know, it ranged anything from
22   an animal call to a shooting, you know.
23   Q.    And did you as a patrol officer

8 (Pages 29 to 32)

Adam Jones                                      12/7/2020

|  | Page 33 |
|---|---|

1    did you do the initial offense report?
2    A.    Yes.
3    Q.    And were you involved in any type
4    of rape investigations or any type of that
5    police work while you were in the patrol
6    division?
7    A.    I don't remember anything
8    specifically.  I know that I have taken
9    rape reports while I was in patrol.
10   Q.    And that was the initial report,
11   you didn't do the investigating; correct?
12   A.    Yes, ma'am.
13   Q.    One of the complexities of taking
14   a Zoom deposition is knowing how to look
15   you in the eye, so if I look like I'm not
16   looking you in the eye I apologize, I am
17   trying to but I can't figure out where it
18   is, so I apologize in advance if you think
19   I'm being shifty with my eyes.
20   A.    Okay.
21   Q.    Do you know, did the Tuscaloosa
22   Police Department use the phrase "special
23   inquiry"?

|  | Page 34 |
|---|---|

1    A.    Yes.
2    Q.    What is a special inquiry?
3    A.    It was any crime that -- well, I
4    say any crime.  It was any call that may
5    have not met the elements of a specific
6    crime but it warranted an investigation.
7         You know, like a special inquiry
8    sexual assault, special inquiry, burglary.
9    It could be various things, but it was,
10   you know, the officer could see that, you
11   know, a further investigation needed to be
12   done, but the elements of the crime was
13   not met to actually call it a burglary,
14   whatever the crime may be.
15   Q.    Okay.  Did you while you were
16   patrol officer ever designate an
17   investigation as a special inquiry?
18   A.    I'm sure I have.  I don't remember
19   any specifically.
20   Q.    Do you remember any type of rape
21   or sex investigation that you designated
22   as a special inquiry as a patrol officer?
23   A.    I don't remember.

|  | Page 35 |
|---|---|

1    Q.    So it says on your résumé that you
2    were in the patrol division from 1999 to
3    2005 and then you transferred to the
4    Criminal Investigations Division; correct?
5    A.    Yes, ma'am.
6    Q.    And what is the Criminal
7    Investigations Division?
8    A.    It investigated robberies,
9    financial crimes, burglaries, thefts, any
10   miscellaneous investigation other than a
11   serious crime, or violent crime I should
12   say.  That pretty much covered it.
13   Q.    Were you involved in any rape
14   investigations while working for the
15   financial -- I'm sorry, in the Criminal
16   Investigations Division?
17   A.    No, ma'am.
18        MS. BOLGER:  I'm just going
19   to close my blinds so I don't go blind.
20   Hold on, sorry about that.  Very sunny in
21   New York today.
22   Q.    Okay.  Did you -- well, you were
23   in the patrol division.  Did you have to

|  | Page 36 |
|---|---|

1    ask a supervisor before you designated
2    something as a special inquiry?
3    A.    Maybe as a younger officer I may
4    have, but, you know, the more experience
5    you get, you know, if you're not riding
6    with a training officer, if you're the
7    more veteran I guess you could say
8    officer, you realized the elements of a
9    crime that need to be met before you can
10   label it that crime, and I don't
11   specifically remember asking a supervisor
12   should I label this special inquiry.
13   Q.    Okay.  Then in 2014 -- sorry,
14   2009, you transferred to the traffic
15   division; right?
16   A.    Yes, ma'am.
17   Q.    Why did you do that?
18   A.    It was just -- it was a division
19   that I had interest in.  There happened to
20   be an opening and I applied for it and was
21   given the opportunity.
22   Q.    Why was it interesting to you?
23   A.    You ride a motorcycle, get to ride

9  (Pages 33 to 36)

Adam Jones                                            12/7/2020

Page 37

1    a Harley Davidson all day long, so you do
2    traffic accidents.  You know, writing
3    tickets, I was never huge on writing
4    tickets.  You know, they would always say
5    something you need to write more tickets
6    but, you know, it was just one of those
7    things that it's part of the job, you knew
8    you had to do it, but didn't really enjoy
9    it.
10   Q.    You're probably even too young for
11   Chips but that's what I think of when I
12   think of motorcycles --
13   A.    I've seen it.
14   Q.    Okay.  And while you were in the
15   traffic division were you involved in any
16   type of rape investigation?
17   A.    No, ma'am.
18   Q.    And you were in the traffic
19   division for five years; right?
20   A.    Yes, ma'am.
21   Q.    And in 2014 you transferred to
22   what was then called the Tuscaloosa
23   Homicide Unit; correct?

Page 38

1    A.    Yes.
2    Q.    And what month did you transfer?
3    A.    I believe it was January of 2014.
4    Q.    So it was January of 2014?
5    A.    Yes, ma'am, I believe so.
6    Q.    And why did you transfer there?
7    A.    Homicide is where -- ever since I
8    was I think my second year at the police
9    department I had -- there was an opening
10   in Homicide and I applied for it.
11        I knew I wasn't going to get it,
12   but I wanted to show that I was interested
13   in going, and, you know, as opening came
14   up through out those years during my
15   20-year -- or I'm sorry, up to that point
16   it was 14 years, but I had applied for the
17   openings in Homicide and, you know, it was
18   always more experienced or more senior
19   officers that were given that opportunity.
20        And then when that opening came
21   up, I believe it was late 2013, I applied
22   for it and was given that opportunity.
23   Q.    Okay.  And what were your

Page 39

1    responsibilities as an investigator in the
2    Violent Crimes Unit or Homicide Unit?
3    A.    We would as the cases were
4    assigned to us, the initial incident
5    offense reports that were taken by
6    officers, they would come into our office
7    and we would be assigned those cases.
8         Any active cases, you know, any
9    major crime that we were called out on, a
10   shooting, rape, you know, robberies with a
11   shooting, any kind of violent crime, we
12   were called out to process the scenes,
13   collect evidence, take photos, video, make
14   contact with suspects, victims, witnesses,
15   interview all of them, and basically that
16   you were taking care of a case from
17   beginning to end up there.
18   Q.    And did you have any training in
19   between being in the traffic division and
20   the Homicide Unit?
21   A.    There were certain schools that
22   would come available, excuse me, like
23   interviewing and interrogation schools.  I

Page 40

1    got to go to a couple of those.  It was
2    based out of Meridian, Mississippi is the
3    one I remember in particular because it
4    was about a week long school.
5         Several speakers I guess you could
6    say or teachers would come to the police
7    department and they would allow some slots
8    for the Tuscaloosa Police Department to
9    have people go, and there again, it was
10   like, you know, you would request to go.
11   If there were people that were more senior
12   than you, you know, they may get the nod
13   to go instead of you, but I had some
14   opportunities to go to some schools.
15   Q.    Okay.  So I just want to make sure
16   I understand that your answer is to my
17   questions, which is between the time that
18   you were in the traffic -- switching from
19   the traffic division to the Homicide Unit,
20   did you have training during that time?
21   Is there like a specific course that you
22   had to do --
23   A.    I don't remember any interrogation

10  (Pages 37 to 40)

Adam Jones                                          12/7/2020

---

Page 41

1    or interview schools or anything like that
2    during that time, no.
3    Q.    Okay.  So one day you were in the
4    traffic division and then the next day you
5    were in the Homicide Unit with no formal
6    transition; correct?
7    A.    Right.
8    Q.    Who did you report to when you
9    were in the Homicide Unit?  Actually let's
10   do this, in 2015 who did you report to in
11   the Homicide Unit?
12   A.    Well, there was a sergeant
13   assigned from the city, Robert Davis, and
14   then Captain Hart, I think he was a
15   lieutenant at that time, but I'm going to
16   call him Captain Hart, that's what he was
17   when I left, he was my immediate
18   supervisor with the city, but the
19   commander of the unit was Gary Hood.
20   Q.    Okay.  So sorry.  You said
21   captain, then Lieutenant Hart, was your
22   immediate supervisor?
23   A.    I believe he was a lieutenant

---

Page 42

1    then.  I'm not sure, but he was a
2    lieutenant before he was a captain.
3    Q.    Right.
4          MS. BOLGER:  J. T., would
5    you mind handing the witness it's
6    Exhibit 16 from the last deposition, which
7    is the AJ?
8          MR. THOMPSON:  Yeah, just a
9    second.
10         MS. BOLGER:  It's the
11   standards and procedures, page 24 of AJ.
12         (Whereupon, a document that was
13         previously marked as Defendant's
14         Exhibit No. 16 was referenced and
15         is attached to the original
16         transcript.)
17         MR. THOMPSON:  Do you just
18   want me to extract page 24, Kate, or do
19   you want the entire exhibit?
20         MS. BOLGER:  No, it's page
21   24, it's quite long so I'm sure you're
22   going to love that, it's 24 through 105 is
23   the standard operating procedures.

---

Page 43

1          We marked it as Exhibit 16
2    at the last deposition.
3          MR. THOMPSON:  I've got it.
4    Hang on.
5          MS. BOLGER:  The last
6    deposition I was at.
7    Q.    So Exhibit 16 is the Tuscaloosa
8    Violent Crimes Unit Standard Operating
9    Procedures 1 through 11.  Have you seen
10   this before?
11   A.    It's been a while but yes, ma'am.
12   Q.    When did you first see it?
13   A.    It would have been January of
14   2014.
15   Q.    And in what context did you see
16   it?
17   A.    They handed me a notebook that had
18   this in it.  You know, told me to review
19   it.
20   Q.    Were you required to read it?
21   A.    Yes.
22   Q.    Did you have to sign anything that
23   said you read it, like you have to do in

---

Page 44

1    school?
2    A.    I believe -- this one doesn't have
3    it but I believe at the end of every
4    procedure you had to initial, I believe,
5    if I remember correctly.
6    Q.    And other than that first time you
7    read it -- well, did you read it when you
8    first got it?
9    A.    Yes.
10   Q.    Other than that first time, have
11   you read it since?
12   A.    No.
13   Q.    Do you know if it's been amended
14   over time?
15   A.    I don't know.
16   Q.    Nonetheless, these are the
17   standard operating procedures of what was
18   then the Homicide Unit is now the Violent
19   Crimes Unit; right?
20   A.    Yes.
21   Q.    They're supposed to be your
22   standard operating procedures that you
23   followed as an investigator; correct?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 45

1   A.    Yes.
2   Q.    And to the best of your knowledge
3   did you follow them?
4   A.    Yes.
5   Q.    Okay.  If you'll take a look back
6   at your résumé, which is Exhibit 26, it
7   says education, you graduated from
8   Tuscaloosa Christian School in 1995; is
9   that right?
10  A.    Yes, ma'am.
11  Q.    And that's high school?
12  A.    Yes, ma'am.
13  Q.    Did you go to college at all?
14  A.    I went a couple of semesters.  I
15  started at the university and went one
16  semester and then I went to Shelton State
17  Community College for a semester.
18  Q.    When you say you started at the
19  university, you mean the University of
20  Alabama; right?
21  A.    Yes.
22  Q.    And then you decided college
23  wasn't for you?

Page 46

1   A.    Yes.
2   Q.    And then it says 1999 graduate
3   from APOSTC Academy in Selma, Class 107.
4   Do you see that?
5   A.    Yes, ma'am.
6   Q.    What is APOSTC?
7   A.    Alabama Peace Officers' Standards
8   and Training Commission.
9   Q.    Is that essentially basic training
10  for being a police officer?
11  A.    Police Academy, yes, ma'am.
12  Q.    And it says in 2007 you went to
13  the handwriting and statement analysis?
14  A.    Yes, ma'am.
15  Q.    Where was that?
16  A.    It was actually about like a Zoom
17  session now.  We did it online.  It was me
18  and a female in CID, or Criminal
19  Investigations, they sent us to this
20  training.  And I say sent us to the
21  training, it was online, so it was several
22  months of training.  It wasn't, you know,
23  an overnight thing.

Page 47

1   Q.    Okay.  And then if you look at the
2   second page of the exhibit, it's 453, and
3   it says schools attended on the top.  Are
4   you with me?
5   A.    Yes, ma'am.
6   Q.    Okay, great.  I think the sound
7   cut off for a second, so I apologize for
8   asking twice.
9         When you say schools, what do you
10  mean by schools?
11  A.    Training, training schools.  You
12  know, it's probably nothing, you know, a
13  year long or nothing like that.  It's just
14  training that I've attended.
15  Q.    And you mean like would a synonym
16  for schools be seminars?
17  A.    Some were more in-depth than
18  seminars.  There was some actual training
19  involved as far as seems like, and I can't
20  remember which ones, but there were tests
21  involved in some of these that you had to
22  actually pass to, you know, get your
23  certificate.

Page 48

1   Q.    That's part about being an adult
2   is not taking tests anymore so I apologize
3   for that.
4         You'll see there's a school
5   attended that says responding to sexual
6   assaults and rape.  Do you see that?
7   A.    Yes, ma'am.
8   Q.    What school was that?
9   A.    That was probably more of a
10  seminar type, and I think it was somebody
11  that came to the department to do training
12  and it was one of those that you had to
13  apply for and I'm not -- on this list here
14  I mean we had monthly training on
15  different topics, but this -- these are
16  particular ones that I was chosen to go to
17  or I had to apply to actually go to and
18  that was one of those, you know, I
19  was trying to improve my chances and my
20  knowledge of the job of homicide before I
21  even got there.  That's not one that I
22  went to while I was in Homicide.
23  Q.    When did you go?

12  (Pages 45 to 48)

Adam Jones                                                    12/7/2020

---

Page 49

1    A.    I don't remember.
2    Q.    Did you travel somewhere to go to
3    the seminar?
4    A.    I believe the instructor came to
5    the police department.
6    Q.    Do you remember the name of the
7    instructor?
8    A.    I don't.
9    Q.    Man or woman?
10   A.    I don't remember.
11   Q.    Do you remember how long it was?
12   A.    I don't remember.
13   Q.    Do you remember anything about
14   what you learned?
15   A.    I don't.
16   Q.    Can you place it at all in a
17   timeframe?  You said it was before you
18   were in Homicide.  Do you know how many
19   years before?
20   A.    I would probably say it's greater
21   than five years before I -- it could have
22   been when I was in the Criminal
23   Investigations.  I know it was not while I

---

Page 50

1    was in traffic division, that's all I
2    know.
3    Q.    You're saying it could have been
4    greater than five years before you were in
5    Homicide?
6    A.    Yes.
7    Q.    Too many papers on my desk, hold
8    on one second.  So before July of 2015,
9    how many sexual assaults had you
10   investigated?
11   A.    I would say dozens.  I don't have
12   a number.  I would say dozens.
13   Q.    And how many of those led to
14   arrests?
15   A.    I don't remember.
16   Q.    Most of them?
17         MR. COCKRELL:  Object to the
18   form.  I believe he answered.
19   A.    I don't remember.
20   Q.    (By Ms. Bolger) Would you say less
21   than 50 percent of them did?
22   A.    I don't remember.
23   Q.    Do you remember any of the

---

Page 51

1    investigations resulting in any
2    convictions?
3    A.    I don't remember.
4    Q.    How many rape -- for how many rape
5    investigations were you the lead
6    investigator?
7    A.    I don't remember.
8    Q.    So in July 2015, you had been in
9    the Homicide Unit for about 18 months.
10   Had you been the lead investigator for ten
11   rape investigations?
12   A.    I can't say for sure.
13   Q.    Well, does it feel to you like it
14   was less than ten?
15   A.    No, I would say -- I would say
16   more, but I don't know for sure.
17   Q.    More than ten.  Would you say less
18   than 20?
19   A.    I don't know.
20   Q.    Does 20 sound about right to you?
21         MR. COCKRELL:  Object to the
22   form.
23   A.    I mean, I don't have a number.  I

---

Page 52

1    don't really know how many it was.  There
2    was -- that was a busy year that year for
3    everything so I couldn't tell you how many
4    I worked or primary on.
5    Q.    (By Ms. Bolger) What do you mean
6    it was a busy year that year for
7    everything?
8    A.    Well, shootings, murders.  I mean
9    it was -- there was a lot in the unit
10   going on as far as cases go.
11   Q.    What is the difference -- what is
12   a lead investigator?
13   A.    It's basically the one that would
14   put the documents or the evidence
15   together, type up the felony packet,
16   present it to grand jury, and they were
17   basically responsible for the paperwork.
18   Q.    So as the lead investigator were
19   you supposed to be sort of across all of
20   the information in the file?
21   A.    Yes.
22   Q.    Before July 2015, other than the
23   course we talked about, what training had

---

13 (Pages 49 to 52)

Adam Jones                                            12/7/2020

Page 53

1  you undergone to investigate sexual
2  assaults?
3      A.   When I got to Homicide they sent
4  me to a school -- it was a homicide
5  school.  They did touch on sexual
6  assaults.
7          I know it was a retired detective
8  from Miami-Dade.  It was in the city of
9  Homewood.  But other than that, that was
10 probably the only school that I went to.
11     Q.   And you did that before July 2015?
12     A.   Yes.
13     Q.   And you said a homicide school, I
14 think what you said, and there is a slight
15 lag on Zoom so if I'm putting the wrong
16 words in your mouth, you'll have to
17 correct me, but I think you said there was
18 a homicide school that touched on sexual
19 assaults; right?
20     A.   Yes, yes.
21     Q.   And what do you mean touched on
22 sexual assaults?
23     A.   Well, they just -- I guess it was

Page 54

1  the response and, you know, investigative
2  techniques, or I don't remember specifics
3  about it.  It was more of -- honestly, it
4  was more of the guy standing up there
5  talking about his investigations that he
6  had at Miami-Dade County.
7      Q.   Okay.  About how much time did he
8  spend on sexual assaults?
9      A.   I would say probably a day.
10     Q.   A whole day on sexual assaults?
11     A.   Anywhere from half a day to a day,
12 yeah.
13     Q.   How long was the whole homicide
14 school?
15     A.   It was a week.
16     Q.   Did you ever have any special --
17 before July 2015, did you ever have any
18 special training for investigating crimes
19 on university campuses?
20     A.   No.
21     Q.   Did you ever have any training
22 before July 2015 for investigating
23 alcohol-based offenses?

Page 55

1      A.   No.
2      Q.   And before July 2015, had you ever
3  had any training on trauma-based
4  questioning?
5      A.   No.
6      Q.   Were you aware in 2015 of any
7  Tuscaloosa Police Department protocols or
8  instructions or standard operating
9  procedures that would have been involved
10 in sexual assault investigations?
11     A.   The only thing from the police
12 department division would be a PGO,
13 procedural general order, I couldn't tell
14 you the number, but it was basically
15 dealing with the Homicide Unit and it just
16 gave an outline, you know, if you as a
17 responding officer go to these and it gave
18 a list of crimes, murder, attempted
19 murder, assault first degree, assault
20 second degree, rape, kidnapping, if you go
21 to those, contact a supervisor and they
22 would in turn contact the homicide
23 division who would take over that

Page 56

1  investigation.
2      Q.   And we talk about the standard
3  operating procedures that I showed you.
4  Other than that PGO and the standard
5  operating procedure, were you aware of any
6  protocols or rules for sexual assault
7  investigations?
8      A.   No.
9      Q.   Now, the New York Police
10 Department has something called the patrol
11 book and the patrol book is a guide that
12 tells the police department how to
13 interact with the public and the media on
14 certain issues.  Is there such a thing in
15 the Tuscaloosa Police Department?
16     A.   The closest thing would be that
17 Procedure General Order, PGO.
18     Q.   Okay.  I just didn't know if there
19 was a separate -- I don't know what to
20 call it, I didn't know if there was a
21 separate book.
22     A.   That would be it.
23     Q.   After July 2015, which is after

14  (Pages 53 to 56)

Adam Jones                                                    12/7/2020

Page 57

1    the Rondini investigation, did you have
2    any training in sexual assault
3    investigation?
4    A.    No.
5    Q.    Or alcohol-based offense
6    investigations?
7    A.    No, ma'am.
8    Q.    Or trauma-based interview
9    questioning?
10   A.    No, ma'am.
11   Q.    Did anything change within the
12   Homicide Unit after the publication of the
13   BuzzFeed article?
14   A.    The name changed was the biggest
15   -- well, it's really the only thing I can
16   remember is the name of the unit changed.
17   Q.    And that was as a result of the --
18   was that as a result of the BuzzFeed
19   article or something else?
20   A.    I'm not sure.  I didn't have
21   anything to do with the change.  That was
22   up to the sheriff and, you know, the chief
23   deputies so, you know, we're still going

Page 58

1    -- we're still going to respond to the
2    crimes that we're assigned so, you know,
3    nothing changed as far as our work product
4    but it was just the name.
5    Q.    Did you -- have you ever had any
6    training specifically on interrogating
7    sexual assault victims?
8    A.    No.
9    Q.    Do you know what you a SANE nurse
10   is?
11   A.    Sexual assault nurse.
12   Q.    What is a SANE nurse?
13   A.    The way I understand it is they're
14   specialized and trained to collect
15   evidence and give aid and assistance to
16   sexual assault victims, and they do have
17   specialized training to preserve evidence.
18   Q.    In July 2015 were there any SANE
19   nurses in Tuscaloosa that you're aware of?
20   A.    I don't remember.  I know the
21   conversation had come up before, but I
22   couldn't say for sure.
23   Q.    Do you know if there are now?

Page 59

1    A.    I know there's at least one SANE
2    nurse -- I'm sorry, one SANE nurse in
3    Tuscaloosa County.
4    Q.    And who is that?
5    A.    I can't tell you her name.  I know
6    she's at the new center that was built.
7    Q.    What is the new center that was
8    built?
9    A.    The Safe Center.  There's a
10   director and then the SANE nurse, and I'm
11   not sure, you know, who's over the Safe
12   Center as far as any kind of funding or
13   anything like that.
14       I don't know if it's the director
15   or -- I just know that that's where sexual
16   assault victims do go now.
17   Q.    And when did that center open?
18   A.    I don't remember exactly.
19   Q.    Do you remember whether either the
20   Homicide Unit or the law enforcement
21   agencies in Tuscaloosa were involved in
22   the opening of that center?
23   A.    I'm not aware of it.

Page 60

1    Q.    Was that as a result of the
2    publication of the BuzzFeed article that
3    that center opened?
4    A.    I'm not sure.
5    Q.    Well, timing-wise, would that work
6    out?
7    A.    I mean, if timing is being after
8    the article, yes.  I mean, but I don't
9    know if that was the reasoning behind it
10   opening.
11   Q.    Have you heard that it was?
12   A.    I haven't heard that.
13   Q.    Have you ever heard of the
14   International Association of the Chiefs of
15   Police, IACP?
16   A.    I've heard of it, yes, ma'am.
17   Q.    What is it?
18   A.    I don't really know.  I just think
19   it's one of those organizations, you know,
20   in my mind I think it may be like for the
21   police chiefs to be members of and I guess
22   they get training maybe through IACP.  I'm
23   not sure.  I believe they do training, but

Adam Jones                                                    12/7/2020

Page 61

1   I've never been involved with IACP, so.
2   Q.    Okay.
3         MS. BOLGER:  J. T., could
4   you hand Investigator Jones AE?
5         And, Nancy, this will be 27
6   please.
7         (Off the record.)
8         (Whereupon, a document was marked
9         as Defendant's Exhibit No. 27 and
10        is attached to the original
11        transcript.)
12        MS. BOLGER:  For the record,
13  please feel free to look, Investigator
14  Jones, for the record Exhibit 27 is the
15  IACP Sexual Assault Incident Report
16  Investigative Strategies.
17  Q.    Investigator Jones, my question is
18  just going to be have you ever seen this
19  before?
20  A.    No, ma'am.
21  Q.    Has anyone ever talked to you
22  about the investigative strategies that
23  IACP recommends for sexual assaults?

Page 62

1   A.    No.
2   Q.    Have you ever heard that these
3   strategies were used in helping to draft
4   the Tuscaloosa Violent Crimes Unit
5   standard operating procedures?
6   A.    I've never heard that.
7   Q.    So you've never seen this before?
8   A.    No, ma'am, I haven't.
9   Q.    Okay.  You can put that aside.
10  Have you ever read or heard of a
11  publication called Prosecuting
12  Alcohol-Facilitated Sexual Assaults, which
13  was published by the American Prosecutor's
14  Research Institute?
15  A.    No, ma'am, never heard of it.
16  Q.    Captain Hood never talked to you
17  about it?
18  A.    No, ma'am.
19  Q.    And you've never read it?
20  A.    No, ma'am.
21        MR. COCKRELL:  What was the
22  name of that again, Kate?
23        MS. BOLGER:  I'm so sorry,

Page 63

1   say that louder.
2         MR. COCKRELL:  I couldn't
3   hear the name of that article.  What was
4   it?
5         MS. BOLGER:  Prosecuting
6   Alcohol-Facilitated Sexual Assaults, and
7   it was published by the American
8   Prosecutor's Research Institute.  And it's
9   in Captain Hood's emails to Katie, if
10  you're looking for it.
11        MR. COCKRELL:  Okay.
12        MS. BOLGER:  Why don't we
13  take a two-minute break?  We've been going
14  almost an hour, and I'm going to change
15  topics, so why don't we take a two-minute
16  break or a five-minute break and I'll be
17  right back.
18        VIDEOGRAPHER:  Off the
19  record at 10:04 a.m.
20        (Recess was taken.)
21        VIDEOGRAPHER:  We're back on
22  the record at 10:18 a.m.
23  Q.    Before we broke, Investigator

Page 64

1   Jones, you were talking about going to
2   interrogation schools and interviewing
3   schools.  Where were those?
4   A.    There was one in Meridian,
5   Mississippi.  There was another one that
6   the host actually came to -- or I'm sorry,
7   the speaker actually game to the
8   Tuscaloosa Police Department.  Both of
9   those were about a week, week-long
10  schools.
11        There were maybe, you know, some
12  day or two interview schools, but I can't
13  really remember the names of the
14  instructors or anything.
15  Q.    On your résumé that we talked
16  about, you talk about going to a training
17  center at Mississippi State University.
18  That was in -- this was in cybercrime
19  forensic training.  Did you go there for
20  those interrogation and interview schools?
21  A.    No, the interrogation schools were
22  at the Meridian Air Force base and inside
23  that Air Force base is regional -- RCTA is

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                    12/7/2020

Page 65

```
 1   what everybody calls it around the south,
 2   but it's regional counter drug training
 3   academy. It's -- the funding comes from I
 4   guess the DEA or, you know, something like
 5   that, but they span different schools like
 6   interview and interrogation, audio
 7   surveillance, it's various schools within
 8   that training academy in Meridian.
 9   Q.    Great, thank you. Did there come
10   a time when you learned that a Megan
11   Rondini was making allegations that she
12   had been sexually assaulted by a man named
13   T. J. Bunn?
14   A.    I'm sorry, the first part of it?
15   Q.    I said did there come a time when
16   you learned that a woman named Megan
17   Rondini was making allegations that she
18   was sexually assaulted by a man named
19   T. J. Bunn?
20   A.    Yes.
21   Q.    And how did you first learn of
22   that?
23   A.    I had received a call. It would
```

Page 66

```
 1   have probably been around 3:00, 3:00 or
 2   3:30 a.m. on the morning that that
 3   happened. I guess July the 1st.
 4   Q.    I think it's probably July
 5   the 2nd.
 6   A.    I'm sorry, it is the 2nd.
 7   Q.    So at about 3:30 in the morning
 8   you said?
 9   A.    Yes, ma'am.
10   Q.    And where were you?
11   A.    I was in the bed.
12   Q.    And in that initial telephone call
13   what did you learn?
14   A.    They usually kept it, you know,
15   short and sweet as far as the call, unless
16   we asked questions. They said that there
17   was a victim at the hospital, gave her
18   name, suspect was not on the scene, and I
19   don't know that they had made contact yet
20   as far as the initial responding officers.
21        I think they were at DCH Hospital
22   with the victim. They just said it was a
23   possible sexual assault and gave the names
```

Page 67

```
 1   of the victim and suspect, and I got
 2   dressed and went.
 3   Q.    Okay. So they did give the names
 4   of the victim and the suspect?
 5   A.    Yes.
 6   Q.    And when you heard the name
 7   T. J. Bunn, did you recognize the name?
 8   A.    Not specifically. I was, you
 9   know, just based on Bunn, I figured it had
10   to do with somebody affiliated with Bunn
11   Construction, S. T. Bunn Construction.
12   Q.    Okay. And can you tell me what
13   S. T. Bunn Construction is?
14   A.    They basically do asphalt paving,
15   pave roads. I think -- I know you see
16   them a good bit here in Tuscaloosa. My
17   understanding they're all over the state.
18   Q.    So the name Bunn is a prominent
19   name in Alabama such that you recognized
20   it when you got a telephone call at 3:30
21   in the morning; right?
22        MR. COCKRELL: Object to the
23   form.
```

Page 68

```
 1        Go ahead.
 2   A.    I recognized the name, just the
 3   last name, yes.
 4   Q.    (By Ms. Bolger) And, in fact, you
 5   told your wife at that time that it was a
 6   call involving a Bunn?
 7   A.    I don't remember telling my wife.
 8   The way I got most of my callouts was on a
 9   Southern LINC radio, and it was a speaker
10   type system, it wasn't a cell phone, so
11   she woke up -- every time that I got
12   called out she woke up, and she may have
13   heard the name over my LINC radio. I
14   don't remember telling her the name.
15   Q.    She testified last week that you
16   told her the name. Do you know that?
17   A.    I do. I just don't remember
18   telling her the name.
19   Q.    Do you think she's wrong?
20   A.    I'm not saying she's wrong. I'm
21   just saying I don't remember.
22   Q.    And what were you thinking when
23   you heard that there was a Bunn family
```

                                    17 (Pages 65 to 68)

Adam Jones                                                12/7/2020

Page 69

1    member involved?
2    A.    Nothing in particular.  I mean,
3    still an alleged crime that we have to
4    investigate.
5    Q.    Okay.  And what did you do next?
6    A.    We responded to DCH and spoke to
7    the victim.
8    Q.    I'm sorry, say that again.
9    A.    We responded to DCH and spoke with
10   the victim.
11   Q.    What is DCH?
12   A.    Druid City Hospital.  It's the
13   only hospital in Tuscaloosa.
14   Q.    Is that affiliated with the
15   university at all?
16   A.    No, ma'am.
17   Q.    Is there -- this is just -- I
18   don't know the answer to this question.
19   Is there a hospital affiliated with the
20   University of Alabama?
21   A.    They have a medical center.  It's
22   more of like, you know, primary care,
23   maternity.  I mean, I don't know the exact

Page 70

1    -- it's not a 24-hour hospital, though.
2    Q.    Okay.  Just -- that was mostly
3    pure curiosity.
4    A.    Okay.
5    Q.    Okay.  So you reported to the
6    hospital.  When you got the call at 3:30
7    in the morning, you heard there was a
8    victim and a suspect and what was the
9    alleged crime you were told in that
10   initial call at 3:30 in the morning?
11   A.    Sexual assault.
12   Q.    Did you know when you left your
13   house how long -- what the time period was
14   between the sexual assault and when you
15   received the call?
16   A.    I don't remember.  I can't
17   remember when I got the call, so I don't
18   remember from the investigation the time
19   that the victim said it happened to when I
20   got the call.  I don't remember that.
21   Q.    Did you know at the time that
22   Investigator Hastings would be working
23   with you on the investigation?

Page 71

1    A.    Yes.
2    Q.    And why did you know that?  Was
3    that part of the call or was that just
4    knowledge?
5    A.    Well, that particular day we were
6    partners.  My regular partner for that day
7    had taken off or had a family, you know,
8    emergency, something, I don't remember
9    exactly why, but Josh basically just
10   filled in for him.
11   Q.    What was the name of your regular
12   partner?
13   A.    Micah Rogers.
14   Q.    And had you worked as a partner
15   with Josh before?
16   A.    Yes.
17   Q.    How often?
18   A.    He was my first partner when I
19   came to homicide.  I don't know -- I don't
20   remember the term or the length of the
21   time we worked together.  I would say at
22   least a year.
23   Q.    And why did you switch from

Page 72

1    Mr. Hastings to another partner --
2    A.    I'm sorry, what was the last part?
3    Q.    I said Sergeant Hastings.
4    A.    Micah was a newly assigned
5    investigator to the homicide division, and
6    I guess, you know, the supervisors felt
7    comfortable enough to put me with him to,
8    you know, train him on investigations up
9    there in Homicide so that's why we split.
10        He ended up going to another
11   partner.  I can't remember who Josh went
12   to, but me and Micah started working
13   together then.
14   Q.    In July 2015, were you and
15   Investigator Hastings friends?
16   A.    Yes.
17   Q.    And in July 2015, were you and
18   Investigator Rogers friends?
19   A.    Yes.
20   Q.    Did you socialize with
21   Investigator Hastings outside of work?
22   A.    Other than just phone calls.  You
23   know, we didn't really hang out at each

                                18  (Pages 69 to 72)

Adam Jones                                          12/7/2020

Page 73

1    other's house or anything like that.
2    Q.    What do you mean by phone calls?
3    Did you call to check in on each other
4    socially?
5    A.    Well, it was mainly more just, you
6    know, joking around, picking at each
7    other.  I mean just cutting up.  It's
8    nothing -- nothing other than that really.
9    Q.    Okay.  And when you got that call
10   were you the lead investigator on the case
11   right away?
12   A.    Yes.
13   Q.    Why?
14   A.    Well, it was my normal call week
15   and it should have been me and Micah on
16   call, but since Josh was not -- this was
17   not his scheduled call week, I went ahead
18   and took the primary investigation over.
19   Q.    And how does -- how did you go
20   about doing that?
21   A.    Basically, just saying I'm going
22   to take this case.  You know, it's not
23   assigned really by a supervisor to a

Page 74

1    specific investigator.  Usually the team,
2    and when I say team, me and whoever I'm
3    working with, it's usually two-man teams,
4    they just decide between themselves who
5    will the primary investigator.
6    Q.    Okay.  So you said you left your
7    house at about 3:30 in the morning, or you
8    got the call at around 3:30 in the
9    morning.  Do you know what time you got to
10   the hospital?
11   A.    It would have been after 4:00.  I
12   can't remember the exact time, but I would
13   say between 4:00 and 4:30.
14   Q.    Do you know what time the sexual
15   assault allegedly occurred?
16   A.    I don't remember.
17   Q.    I read this file pretty carefully
18   and I'll tell you that generally, best
19   estimate is, it would have been somewhere
20   after one o'clock in the morning.  Does
21   that refresh your memory at all?
22   A.    Yes.
23   Q.    Sounds right to you?

Page 75

1    A.    Yes.
2    Q.    If you're getting to the hospital
3    at 4:30 in the morning, it's only about
4    three and a half hours after the alleged
5    assault; right?
6    A.    Yes.
7    Q.    Okay.  What did you do when you
8    got to the hospital?
9    A.    I don't remember if we arrived at
10   the same time, but we both ended up going
11   into the exam room and trying to get a
12   statement from the victim.
13   Q.    Before you went to the exam room,
14   did you talk to the officer who was on the
15   scene?
16   A.    I believe he was in the room also
17   when we got there.
18   Q.    Do you remember his name?
19   A.    Brad Phillips.
20   Q.    Did you know Officer Phillips?
21   A.    Just professionally.  I never --
22   other than the job, I didn't know him.
23   Q.    Had you worked with him before?

Page 76

1    A.    No.
2    Q.    Did you speak to Officer Phillips
3    before you spoke to Megan Rondini?
4    A.    I don't believe so.
5    Q.    Did you see any notes that he had
6    taken?
7    A.    I don't remember.
8    Q.    About how long -- did you talk to
9    anybody else at the hospital before you
10   spoke to Ms. Rondini?
11   A.    I don't believe so.
12   Q.    So you think you just spoke -- you
13   just walked in and started questioning
14   Ms. Rondini?
15   A.    Yes.
16   Q.    Where was she at the time?
17   A.    She was in an exam room.
18   Q.    And what was she wearing?
19   A.    I believe it was the clothes that
20   she came in wearing.  I can't remember
21   what it was, but it was street clothes.
22   Q.    Had she been examined already or
23   had that not happened yet?

19 (Pages 73 to 76)

Adam Jones                                              12/7/2020

Page 77

1    A.    That had not happened.
2    Q.    So she had not been examined yet.
3    She had just been -- she just arrived and
4    you were questioning her?
5    A.    Right, the exam had not taken
6    place.
7    Q.    Is that unusual for you to get
8    there before the exam, or is that how it
9    usually works?
10   A.    Sometimes we usually get there
11   right before the exam starts or sometimes
12   the exam has already started, but this
13   particular time we got there before the
14   exam.
15   Q.    As the investigating officer, do
16   you have the ability to ask the hospital
17   to conduct certain tests on alleged
18   victims of crimes?
19   A.    I don't.  That's usually between
20   the doctor and the patient.
21   Q.    You can't say, for example, boy,
22   you should do a blood test to see if she's
23   intoxicated?

Page 78

1    A.    I mean, I guess I could suggest
2    it, but that's really not up to me.
3    Q.    I know it's not up to you, but you
4    can suggest it; right?
5    A.    I could, yes.
6    Q.    Have you ever done that?
7    A.    No.
8    Q.    How long did you talk to Megan?
9    A.    Probably about ten or 15 minutes.
10   Q.    What was her demeanor like?
11   A.    I remember she started crying
12   during the interview.
13   Q.    She started crying during the
14   interview?
15   A.    Yes.
16   Q.    What made her start to cry?
17   A.    She was talking about how she
18   couldn't get out of her room and that
19   started getting her upset.  That's what I
20   remember.
21         She wasn't crying the entire time.
22   I was able to get a statement, but in to
23   the interview there she did start crying.

Page 79

1    Q.    Was she disheveled?
2    A.    I don't remember.
3    Q.    (Inaudible).
4         COURT REPORTER:  I'm sorry,
5    I couldn't hear that, Kate.
6    Q.    (By Ms. Bolger) I said what do you
7    mean you don't remember?  Did she look
8    disheveled?
9         MR. COCKRELL:  Object to the
10   form of the question.  He said he doesn't
11   remember.
12   A.    I mean, I don't remember, you
13   know, how she looked.  I don't remember
14   how she looked that night.
15   Q.    (By Ms. Bolger) Do you remember if
16   she looked like she was upset?
17   A.    I mean other than the crying,
18   that's what I remember.
19   Q.    Was her hair neatly combed and her
20   clothes neatly put on, or was she not that
21   neatly put together?
22   A.    I don't remember.
23   Q.    What do you remember about that

Page 80

1    initial -- that initial interview?
2    A.    We were just trying to get as much
3    information as we could without holding up
4    any kind of medical treatment that she may
5    need.  So, you know, we were trying to,
6    you know, get as much, if any, probable
7    cause we could get before we made contact
8    with the suspect.
9    Q.    So you were looking for probable
10   cause?
11   A.    As much as we can get.
12   Q.    Were you involved in the decision
13   to designate the investigation as a
14   special inquiry?
15   A.    No.
16   Q.    Who did?
17   A.    The officer writing the report I
18   assume.  It was either the officer that
19   wrote the report or a patrol supervisor.
20   Q.    You recorded that conversation
21   with Megan; right?
22   A.    Yes.
23   Q.    How did you record that?

Adam Jones                                                          12/7/2020

Page 81

1    A.     Just an audio recorder, hand held.
2    Q.     So it's not a wire that you wear?
3    It's an actual recording device?
4    A.     Yes, ma'am.
5    Q.     Okay.  And what does it look like?
6    A.     It's actually like -- almost
7    exactly like the one sitting here right in
8    front of me, so I think it was made by
9    Olympus.  I'm trying to -- I don't know if
10   you can --
11   Q.     Just, of course, I can't see it.
12   A.     Yeah, I was going to hold it up
13   here.
14   Q.     Okay.  So it has a little tape.
15   It's one of the little tapes?
16   A.     It's digital.  It's all digital.
17   Q.     It's digital?
18   A.     Yes.
19   Q.     Okay.
20          MS. BOLGER:  J. T., can you
21   hand Investigator Jones -- hold on, AQ,
22   that's the one I emailed you last night.
23          Just for the record, while

Page 82

1    J. T. looks for that, I will represent to
2    you, and Bob knows this, that we were
3    handed the files from the wrongful death
4    suit and also from the Tuscaloosa
5    Sheriff's Office, so we have the recording
6    of your interview with Ms. Rondini and we
7    had it transcribed and what we're about to
8    show you is a transcription with the
9    certification on the top.
10          MR. THOMPSON:  Kate, this
11   version does not have -- that we copied
12   before, does not have a certification
13   attached to it.  Are you saying what you
14   sent me this morning though does have the
15   cert?
16          MS. BOLGER:  Yeah.
17   Kathleen, who is on, will just shoot you a
18   quick email.
19          Bob and Scotch, would it be
20   okay with you -- we did get it certified
21   to make sure you knew it was authentic.
22   We're just having a COVID-related document
23   problem.  Can I go ahead and question the

Page 83

1    witness about the transcript and then
2    we'll get you the certification?  You guys
3    probably know me well enough to know that
4    I'm not deceiving you.
5          MR. COCKRELL:  No, you know,
6    we can always compare, so not a problem.
7    Go ahead.
8          MS. BOLGER:  Okay, great.
9    Just hand him the AQ you have, J. T.
10          (Off the record.)
11          (Whereupon, a document was marked
12          as Defendant's Exhibit No. 28 and
13          is attached to the original
14          transcript.)
15   Q.     You're welcome to read the whole
16   document, Investigator Jones, but I'm
17   going to ask you specific questions about
18   it.
19          MR. COCKRELL:  Probably go
20   ahead and take your time to read it.
21   A.     Okay.
22   Q.     (By Ms. Bolger) Okay.  Does this
23   refresh your memory about what the nature

Page 84

1    of your conversation was with Ms. Rondini
2    on the morning of the alleged assault?
3    A.     Yes.
4    Q.     And this is consistent with your
5    memory?
6    A.     Yes.
7    Q.     Okay.  And I want to ask you to
8    take a look at the first page, so the last
9    full graph on the page starts, and Sweet T
10   took us to his house.
11   A.     Okay.
12   Q.     At this point in the investigation
13   the only name Megan knew for Mr. Bunn was
14   Sweet T; correct?
15   A.     Yes.
16   Q.     It was actually the police that
17   told her that his name was Bunn; right?
18          MR. COCKRELL:  Object to the
19   form.
20   A.     I don't know who told her that.
21   It wasn't us.  But, I mean, I don't know
22   if it was an officer or not.
23   Q.     (By Ms. Bolger) But she didn't

Adam Jones                                                    12/7/2020

Page 85

1    know until after she --
2    A.    That's what she said.
3    Q.    I'm sorry.
4    A.    Yes, she said she didn't know his
5    name, yes.
6    Q.    Okay.  How did you-all know his
7    name because remember you told me at 3:30
8    in the morning you got a call with his
9    name, so she didn't know his name.  How
10   did you know his name?
11   A.    When they told me on the LINC or
12   the Southern LINC they gave me the call,
13   they gave me the names.
14   Q.    But how did the police department
15   know his name, if Megan did not?
16   A.    I don't know.
17   Q.    Okay.  You'll see that the -- if
18   you go one, two, three, four, five or so
19   sentences in, the fourth line down says, I
20   just went and sat on a couch in his room.
21   Do you see that?
22   A.    Yes, ma'am.
23   Q.    It says, "I just went and sat on

Page 86

1    the couch in his room and ten or 15
2    minutes later he comes up to his room and
3    he just wants to have sex, and I was like
4    I really need to go.  I have friends that
5    are waiting for me.  I have friends at
6    Innisfree, and I really just need to go.
7    And he just didn't really take that.  And
8    I really just felt like just letting him
9    have sex with me was the only way that he
10   would let me go."  Do you see that?
11   A.    Yes.
12   Q.    If you look at the next page.
13   Ms. Rondini repeatedly told you that she
14   didn't know how she got to Sweet T's
15   house; correct?
16   A.    Yes.
17   Q.    If you look in the -- kind of the
18   third full graph it starts out, I'm not
19   really sure.  Do you see that?
20   A.    On the second page?
21   Q.    Yes.  It's one, two, three, it
22   starts I'm not really sure of the in
23   between -- the third full paragraph.

Page 87

1    A.    I see it.  I see it.
2    Q.    So she said to you, "I'm not
3    really sure the in between of that
4    happening.  I wasn't drinking heavily.  I
5    wasn't intoxicated, so I just don't know
6    the bridge of where that happened."
7          She's referencing how she got to
8    Sweet T's -- into Sweet T's car; right?
9    A.    Yes.
10   Q.    Did that at any point make you
11   think that maybe she had been drugged?
12   A.    No.
13   Q.    Why did her lapse of memory -- you
14   don't ask any follow-up questions on her
15   lapse of memory.  Why not?
16   A.    Well, she said that she had been
17   drinking alcohol, and I think she made the
18   statement -- this was -- no, it was in the
19   other interview.  Just the way, you know,
20   based on this and remembering how she was
21   talking I don't -- I didn't feel like she
22   was on any kind of drugs or anything.
23   Q.    It didn't seem odd to you that she

Page 88

1    couldn't remember how she got in the car?
2    A.    Well, not, you know, just based on
3    experience of when you're dealing with,
4    you know, people that's been drinking
5    alcohol, sometimes that does cause memory
6    lapses and loss, so.
7    Q.    Okay.  Nothing in this made you
8    think you should get any kind of
9    toxicology results done while you were
10   there -- while she was there in the
11   hospital?
12   A.    Well, there again, it wasn't up to
13   me.  I mean, if she felt like she had been
14   drugged, she could convey that to the
15   doctor and then they could decide that.
16   Q.    Well, do people always know when
17   they've been drugged?
18         MR. COCKRELL:  Object to the
19   form.
20   A.    I can't really say how, you know,
21   if they know they've been drugged or not.
22   You know, I think it's up to each
23   individual person.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 89

```
 1    Q.    (By Ms. Bolger) Well, as an
 2  investigator investigating a crime, isn't
 3  it your job to figure out whether
 4  someone's been drugged?
 5    A.    If drugs were used, yes.
 6    Q.    Well, what if someone has large
 7  lapses of memory, as the investigator
 8  investigating a crime, isn't it your job
 9  to figure out why they have large lapses
10  of memory?
11    A.    Well, you know, just she never
12  mentioned anything about drugs.  She did
13  mention about alcohol and I just didn't --
14    Q.    Well, you can have alcohol
15  consumption in a toxicology screen, too,
16  can't you?
17    A.    I'm sorry?
18    Q.    Well, you use a toxicology screen
19  to find out about alcohol consumption too;
20  right?
21    A.    I'm not sure.  I'm sure it does
22  register that but it's through urine.
23    Q.    Nothing in the fact that she was
```

Page 90

```
 1  experiencing a significant lapse of memory
 2  related to an alleged assault made you
 3  think that she may have been drugged or
 4  had too much to drink?
 5    A.    At the time I didn't think that.
 6    Q.    You couldn't have suggested the
 7  test?
 8    A.    I mean, I guess I could have, but,
 9  you know, I didn't.
10    Q.    If you go down to the fourth graph
11  from the end, it starts the only reason I
12  know what.  Do you see that?
13    A.    Yes.
14    Q.    It says, "The only reason I know
15  what -- honestly I only know that Sweet
16  T's name is Sweet T, y'all keep calling
17  him T. J., and the only reason I knew that
18  is because in the dish with all of his
19  keys he has koozies, and it was Bunn," so
20  this is the first time she's heard that
21  he's T. J. Bunn; right?
22        MR. COCKRELL:  Object to the
23  form.
```

Page 91

```
 1    A.    And it could have been, you know,
 2  the officer that was taking the report,
 3  you know, if he had that information, he
 4  could have conveyed that to her.  I don't
 5  know.
 6    Q.    (By Ms. Bolger) Then you ask
 7  again, do you remember how to get to his
 8  house and she says no, not at all.
 9        Do you see that?
10    A.    Uh-huh (affirmative).  Yes, ma'am.
11    Q.    Again, she's signaling a memory
12  lapse to you again; right?
13    A.    Yes.
14    Q.    And you don't ask a follow-up
15  question about that; right?
16    A.    Yeah, I don't ask a question
17  there, no.
18    Q.    Then your next question to her is
19  when you got to her house, did he ever lay
20  hands on you.  He didn't force you into
21  the bedroom.  He told you -- and then she
22  says, he told me to go up there, and I did
23  it just because I didn't know what else to
```

Page 92

```
 1  do.  And then once I got up there, I did
 2  not want to have sex with him.  And he
 3  didn't hit me -- he didn't shove me, but
 4  he held me down and we -- and then you
 5  interrupt and say, where were his hands,
 6  on your shoulders or -- and she responds
 7  just kind of on my hips and on the top
 8  half of my body.  Do you see that?
 9    A.    Uh-huh (affirmative), yes, ma'am.
10    Q.    So she told you he held her down;
11  right?
12    A.    Yes.
13    Q.    And then a couple of lines down
14  you say to her, he didn't ever took your
15  phone from you and keep you from calling,
16  and she responds he did.  Do you see that?
17    A.    Uh-huh (affirmative), yes.
18    Q.    Why is that -- why is the fact
19  that she -- so after this interview, this
20  case gets designated as special inquiry,
21  right, because someone decides there's not
22  enough elements here to meet the crime of
23  sexual assault; correct?
```

                                    23  (Pages 89 to 92)

Adam Jones                                               12/7/2020

Page 93

1    A.    Yes.
2    Q.    What is lacking in this interview
3    to establish that she is alleging the
4    crime of sexual assault?
5    A.    She said that she let him have sex
6    with her.
7    Q.    Well, she says she didn't -- she
8    wanted -- she told him she wanted to go;
9    right?
10   A.    Well, she said she needed to go to
11   her friends that were at Innisfree.
12   Q.    Okay.  He holds her down; right?
13   A.    That's what she said.
14   Q.    According to her story, he held
15   her down --
16   A.    Yes.
17   Q.    -- right, by the hips; right?  And
18   he takes her phone; right?
19   A.    Yes.
20   Q.    She told you all of that; right?
21   A.    Yes.
22   Q.    To top it all off, she can't
23   remember anything about how she gets to

Page 94

1    this guy's house; right?
2    A.    Yes.
3    Q.    And she doesn't even know his
4    name; right?
5    A.    Right.
6    Q.    What else did she need to tell you
7    to have you-all investigate this as a
8    sexual assault?
9    A.    Just based on state law, it didn't
10   meet the elements of rape at that point.
11   Q.    What element did it not meet?
12   A.    Earnest resistance.
13   Q.    She got held down.
14   A.    She said she let him have sex with
15   her.
16   Q.    It says, he didn't shove me but he
17   held me down.  Why isn't being held down
18   and being forced to have sex against her
19   will not meeting elements of the crime of
20   sexual assault?
21        MR. COCKRELL:  Object to the
22   form.
23   A.    By her letting him have sex with

Page 95

1    her, and she's saying that he held her by
2    the hips, you know, at that point just
3    that alone that does not meet the elements
4    of rape.
5    Q.    (By Ms. Bolger) You're telling me
6    that in Alabama in July of 2015, you could
7    tell someone you didn't want to have sex
8    with them and be held down by the hips and
9    it didn't meet the -- after they take your
10   phone in a house where you don't know how
11   you got there, and it doesn't meet the
12   elements of rape?
13        MR. COCKRELL:  Object to the
14   form.
15   A.    She just -- she said in her
16   statement she let him have sex with her.
17   Holding her by the hips kind of, just kind
18   of on my hips and the top half of my body,
19   you know --
20   Q.    (By Ms. Bolger) -- right, to the
21   bed.  In Alabama you're telling me in July
22   of 2015, you can hold a women down to the
23   bed but because she doesn't say the right

Page 96

1    magic words, it isn't a sexual assault?
2        MR. COCKRELL:  Object to the
3    form.
4    A.    I didn't -- I'm just saying it
5    didn't meet the elements of rape at this
6    point.
7    Q.    (By Ms. Bolger) What element
8    didn't it meet at this point?
9    A.    Earnest resistance.
10   Q.    What did she have to say at this
11   point, two hours -- or four hours after
12   she's been sexually assaulted in a
13   hospital, what else did she need to say to
14   you to make you think that she earnestly
15   resisted Bunn?
16   A.    Well, it was, you know, what she
17   did say.  She let him have sex with her.
18   Q.    That's it?  A woman says I let him
19   have sex with me that can't be sexual
20   assault in your mind?
21        MR. COCKRELL:  Object to the
22   form.
23   A.    I'm just saying based on the law

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 97

1    that we have to go by, that did not meet
2    the element of rape.
3    Q.    Okay.  So you met her for you said
4    ten minutes, this was a ten-minute
5    interview at five o'clock in the morning
6    in a hospital, and you determined that
7    based on one sentence in her report,
8    ignoring everything else she said, because
9    she said she let him do it, you didn't
10   have a basis to think that this guy
11   sexually assaulted her; is that what
12   you're saying?
13            MR. COCKRELL:  Object to the
14   form.
15   A.    I'm saying that this is initial
16   interview, that we are trying to get as
17   much information as we can, and up and to
18   this point, there is not enough to meet
19   the elements of rape.
20   Q.    (By Ms. Bolger) Did you ask her a
21   question in this interview about what she
22   meant by he held her down by the hips and
23   the top half of her body?

Page 98

1    A.    No.
2    Q.    Did you ask her a question as a
3    follow-up to why the fact that she took --
4    he took her phone to keep her from calling
5    people?
6    A.    No.
7    Q.    Did Megan Rondini ever say that
8    Bunn sexually assaulted her?
9    A.    No.
10   Q.    What was she telling you then?
11   What did you think she was reporting --
12            MR. COCKRELL:  Whoa, whoa,
13   whoa, ask one question at a time.  I don't
14   know what the last question was.
15   Q.    (By Ms. Bolger) What was she
16   reporting to you?
17   A.    She was reporting that she let him
18   have sex with her, and he held her by the
19   hips and she couldn't get out of his room.
20   Q.    Is it your testimony that Megan
21   Rondini didn't think she was sexually
22   assaulted?
23   A.    I'm not saying what her mind frame

Page 99

1    was.  I'm just saying as far as what she's
2    told us up and to this point, it did not
3    meet the elements of rape.
4    Q.    That's not what I asked you.  I
5    asked you did Megan Rondini ever say that
6    Bunn sexually assaulted her?
7            MR. COCKRELL:  He already
8    answered that.  That's the second time
9    you've asked that and he answered that.
10   A.    She did not say that he sexually
11   assaulted her.
12   Q.    (By Ms. Bolger) Did she need to
13   say the magic words, sexually assaulted,
14   for you to consider it a sexual assault
15   investigation?
16            MR. COCKRELL:  Object to the
17   form.
18   A.    No.
19   Q.    (By Ms. Bolger) She has gone to
20   the hospital.  She is about to undergo a
21   rape investigation.  She's called the
22   police.  Did you guys think she was just
23   there for a picnic?

Page 100

1            MR. COCKRELL:  Object to the
2    form.
3            I'm just not even going to
4    -- I instruct you not to answer that
5    question.  Go ahead and answer.  Do you
6    think she was there for a picnic?
7    A.    No.
8    Q.    (By Ms. Bolger) She thought she
9    was sexually assaulted; right?
10   A.    She didn't say that.
11   Q.    Well, she said she was held down.
12   She said she was taken to a house she
13   didn't know where it was.  She said
14   someone took her phone and she wanted to
15   go.
16            MR. COCKRELL:  Object to the
17   form.
18   Q.    (By Ms. Bolger) Of course, she was
19   saying she was sexually assaulted.  What
20   is your basis for saying she wasn't saying
21   she was sexually assaulted?
22            MR. COCKRELL:  Object to --
23   object to the form.  He can't read

                              25  (Pages 97 to 100)

Adam Jones                                          12/7/2020

Page 101

1    somebody's mind.  He's a police officer.
2    Q.    (By Ms. Bolger) Now that your
3    counsel has told you how to answer the
4    question, Investigator Jones, you may.
5            MS. BOLGER:  Bob, you know
6    you can't tell the witness what to say --
7            MR. COCKRELL:  Well, you're
8    asking questions like he can read her
9    mind.
10   Q.    (By Ms. Bolger) -- Investigator
11   Jones, why don't you answer my question
12   please?
13   A.    I don't know what she's thinking.
14   You know, with her coming out saying I let
15   him have sex with me and he held me by the
16   hips, you know.
17   Q.    Held me down by the hips.  Held me
18   down by the hips.
19           MR. COCKRELL:  Object to the
20   form.  Not sure it's a question.
21   Q.    (By Ms. Bolger) Did she say
22   anything at the hospital that led you to
23   believe that the sex she had with Mr. Bunn

Page 102

1    was anything other than consensual?
2    A.    She didn't say that -- she didn't
3    say anything to lead me that it wasn't.
4    Q.    Okay.  So saying that she told him
5    she wanted to go home, that she was held
6    down by the hips and the top of her body,
7    that he had taken her phone and she didn't
8    know where she was, none of those four
9    character -- none of those four statements
10   lead you to believe that the sex she had
11   with T. J. Bunn was not consensual?
12           MR. COCKRELL:  Object to the
13   form.
14           You can answer.
15   A.    Not based on her statement.
16   Q.    (By Ms. Bolger) Why is being held
17   down by the hips when someone is having
18   sex with you after you told them not to
19   go, not an indication that it was not
20   consensual sex?
21           MR. COCKRELL:  Object to the
22   form.
23           Go ahead.

Page 103

1    A.    You know, I can't say how, you
2    know, if it was one of those things that
3    she changed her mind -- I'm not going to
4    speculate.
5            I'm not going to speculate on
6    that.  I've got to go with what exactly
7    she told me and when she says that she let
8    him have sex with her, whether he had his
9    hands on her hips at that point, she's
10   letting him do the act in her words.
11   Q.    (By Ms. Bolger) And that's it?
12   That's the only words you read in this
13   entire interview, the only words that mean
14   anything to you are she let him do it?
15   Every other factor that I just talked
16   about, you just ignore when she says those
17   magic words?
18           MR. COCKRELL:  Object to the
19   form.
20   A.    You have to look at the totality
21   of the circumstances.
22   Q.    (By Ms. Bolger) Apparently you
23   don't think you do.  Apparently you think

Page 104

1    if someone says I let him have sex with
2    me, it's the end of the inquiry; isn't
3    that what you're telling me?
4            MR. COCKRELL:  Object to the
5    form.  You know, we're here to answer
6    questions.  You ask him non-leading
7    questions and he'll answer it, okay?
8    Q.    (By Ms. Bolger) You can answer the
9    question I asked you.
10           MR. COCKRELL:  If you know
11   what she asked you, you can answer.
12   A.    Can you ask it again?
13   Q.    (By Ms. Bolger) Sure.  What I said
14   was is it your seriously your testimony as
15   you sit here that just because she said he
16   let him have sex with her, you were
17   entitled to ignore everything else she
18   said, including that she was held down,
19   including that she was taken to a place
20   she didn't know where it was, including
21   that he took her phone, including that she
22   told him she wanted to let you go, you
23   could ignore all of that and just focus on

Adam Jones                                                    12/7/2020

Page 105

1  fact that she said he let her do?  You're
2  saying that's okay?
3         MR. COCKRELL:  Object to the
4  form.
5    A.    I'm just saying that based on the
6  Alabama law, that that is not enough to
7  meet the elements of rape.
8    Q.    (By Ms. Bolger) After this
9  interview did you feel you had probable
10 cause to arrest T. J. Bunn?
11   A.    No.
12   Q.    Why not?
13   A.    Just based on the statement, you
14 know.  Yes, we need to talk to him but
15 based on the statement no, we did not have
16 probable cause.
17   Q.    So you know this man took this
18 woman to an isolated house that she
19 doesn't know where she is, she can't
20 remember anything about how she got there,
21 she doesn't know his name, she says she
22 wants to go, he holds her down by the
23 hips, he takes her phone and you think

Page 106

1  you've got no probable cause to arrest
2  T. J. Bunn; right?
3         MR. COCKRELL:  Object to the
4  form.
5    A.    Right, I don't have probable cause
6  at that point.
7    Q.    (By Ms. Bolger) Do you have
8  probable cause for any kind of search
9  warrant?
10   A.    I didn't think we did, no.
11   Q.    Why not?  What did you need?
12   A.    We need the elements of rape.
13   Q.    What did you need her to say to
14 get a search warrant?
15   A.    Like I said, she needed to meet
16 the elements of the rape statute.
17   Q.    I'm asking you what words you
18 needed her to the say to meet the elements
19 of the rape statute?
20   A.    That -- well, just for example,
21 you know, she didn't let him have sex with
22 her, that she actually told him no, I
23 don't want to have sex.

Page 107

1    Q.    As an investigator in the Homicide
2  Unit in Tuscaloosa, is it the case that
3  you always take what everybody says when
4  they're a witness and they're coming to
5  you and you take it as gospel truth, you
6  never question it?
7         MR. COCKRELL:  Object to the
8  form.
9    A.    You're always, you know, not
10 skeptical, but you believe as much as you
11 can, I guess you could say it that way.
12   Q.    (By Ms. Bolger) Right.  So when
13 Megan Rondini told you she let him have
14 sex with her and then said a whole bunch
15 of other stuff, wasn't it your job as an
16 investigator trying to reconcile those
17 statements?
18         I mean, are you really letting
19 someone have sex with you if they're
20 holding you down?  Wasn't it your job as
21 an investigator to get to the bottom of
22 what happened here?
23         MR. COCKRELL:  Object to the

Page 108

1  form.
2    A.    Yes, it's my job to investigate
3  the crime.
4    Q.    (By Ms. Bolger) Okay.  But you
5  were content to just not say there was any
6  probable cause here because one time she
7  said she let him have sex with her; right?
8    A.    The investigation did not end
9  there.  We still followed up with the
10 investigation.
11   Q.    But there was no arrest warrant;
12 right?
13   A.    No.
14   Q.    And there was no search warrant;
15 right?
16   A.    No.
17   Q.    Do you know what a pretext phone
18 call is?
19   A.    No.
20   Q.    Before you left the hospital had
21 you reached any conclusions, or I guess
22 you had reached conclusions about Megan
23 Rondini's allegations; right?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

---

Page 109

1          You had reached the conclusion
2    that she didn't meet the elements of
3    sexual assault; right?
4    A.    Up to that point.
5    Q.    And you reached the conclusion
6    that she said nothing other than that the
7    sex was consensual; right?
8          MR. COCKRELL: I missed that
9    last question. Can you slow it down a
10   little bit?
11   Q.    (By Ms. Bolger) You had reached
12   the conclusion that she had said nothing
13   other than that the sex was consensual;
14   right?
15         MR. COCKRELL: Object to the
16   form.
17   A.    Yes, she didn't -- she didn't say
18   it was other than consensual.
19   Q.    (By Ms. Bolger) After your
20   interview with Ms. Rondini, what happened
21   next in the investigation?
22   A.    We drove out to the Bunn residence
23   in Cottondale.

---

Page 110

1    Q.    Who is we?
2    A.    Josh Hastings and I.
3    Q.    Did you drive in the same car?
4    A.    No.
5    Q.    You drove separately?
6    A.    Yes.
7    Q.    Why is that?
8    A.    It's just standard on the calls
9    that, you know, we may get pulled in
10   different directions, you know, whatever
11   call we may be on, so we just always drive
12   separately.
13   Q.    Okay. Did you talk before you
14   went to Bunn's house?
15   A.    I don't remember.
16   Q.    Did you talk to Captain Hart or
17   Captain Hood before you went to Bunn's
18   house? Actually let my strike that
19   question, and I'll do it differently.
20         Had you spoken to Captain Hood
21   that morning?
22   A.    At that point, no.
23   Q.    Had you spoken to Captain Hart

---

Page 111

1    that morning?
2    A.    No.
3    Q.    Had you spoken to Hastings that
4    morning before -- other than in
5    interviewing Ms. Rondini, had you spoken
6    to Investigator Hastings, just the two of
7    you?
8    A.    I don't remember.
9    Q.    About the case obviously.
10   A.    I'm sorry, that last part broke --
11   Q.    I said about the case obviously.
12   I mean had you spoken about this matter.
13   A.    I don't remember that.
14   Q.    So after you interviewed with
15   Ms. Rondini, did you share your
16   impressions of the interview with
17   Mr. Hastings, Investigator Hastings?
18   A.    I don't remember.
19   Q.    Did he say anything to you about
20   the interview with Ms. Rondini?
21   A.    I don't remember that.
22   Q.    How long is the drive from DCH to
23   Cottondale?

---

Page 112

1    A.    To his house was probably about
2    eight miles, eight to ten miles I would
3    say.
4    Q.    And about how long time-wise does
5    that take?
6    A.    20 minutes.
7    Q.    What time did you get there?
8    A.    I can't remember.
9    Q.    I will tell you that from what I
10   can piece together, it appears you got
11   there around 6:20 in morning. Does that
12   sound right to you?
13   A.    Seems like I do remember the sun
14   coming up, so that's probably right.
15   Close.
16   Q.    And who got there first, you or
17   Investigator Hastings?
18   A.    I think we pulled up relatively
19   the same time.
20   Q.    And when you got out of the cars,
21   what did you guys do next?
22   A.    We went to the front door.
23   Q.    Did you go together?

---

28  (Pages 109 to 112)

Adam Jones                                    12/7/2020

Page 113

1   A.   Yes.
2   Q.   Both of you went to the front door
3   together?
4   A.   Yes.
5   Q.   And had you talked about what you
6   were going to ask Mr. Bunn or what the
7   next step was going to be?
8   A.   We didn't have -- to my knowledge,
9   we didn't have a conversation about what
10  we were going to ask him.  I believe Josh
11  walked to the door first, so he did -- he
12  talked to him at that point.  I don't -- I
13  don't ever remember even speaking with
14  him.
15  Q.   Okay.  So what happened -- did you
16  knock on the door or ring the doorbell?
17  A.   I don't remember.
18  Q.   But at some point Mr. Bunn came to
19  the door?
20  A.   Yes.
21  Q.   Did it take a while?
22  A.   Seems like it did.
23  Q.   And were both of you waiting

Page 114

1   outside the house?
2   A.   Yes.
3   Q.   And you both waited until Mr. Bunn
4   came to the door?
5   A.   Yes.
6   Q.   Okay.  And what happened next?
7   A.   I don't remember the general
8   statements that were made.  I think Josh
9   just basically laid it out there why we
10  were there and asked if he had taken a
11  female home that night and he said no.
12       I believe he may have asked him --
13  Josh in at that point, and then I started
14  to walk around the outside of the
15  residence.
16  Q.   Okay.  So when you said
17  Investigator Hastings laid out why we were
18  there, what did he say?
19  A.   Like I say, I don't remember
20  general statements, but I believe he was
21  just asking if he remembered taking a
22  female home that night and where he had
23  been, just, you know, general statements

Page 115

1   or general questions, I should say, at
2   that point.
3   Q.   Did he tell Mr. Bunn in words or
4   substance that you-all were investigating
5   a sexual assault?
6   A.   I don't remember that part of it,
7   because like I say, I had started walking
8   on the outside of the house and I know he
9   hadn't started an interview yet, so it's
10  not recorded or anything like to this
11  point, but they were in a conversation and
12  I started walking on the outside of the
13  house, just the perimeter of the
14  residence.
15  Q.   Were you there when Mr. Bunn lied
16  to you-all about the fact that he had
17  taken a woman home the night before?
18  A.   I don't remember that.  I was
19  probably walking around the perimeter of
20  the house.
21  Q.   You know that Mr. Bunn did lie to
22  Investigator Hastings; correct?
23  A.   I do know that, yes.

Page 116

1   Q.   And does that make -- did that
2   make you-all suspicious of Mr. Bunn at
3   all?
4   A.   Well, I mean, suspects, you know
5   -- well, people in general lie to the
6   police every day, so, you know, it's part
7   of the investigation, you know, that we
8   can use, but it doesn't mean, you know, we
9   can put him in handcuffs at that point,
10  no.
11  Q.   That's not what I asked you.  I
12  asked you if it made you suspicious?
13  A.   I mean, I guess it would, but like
14  I say, you know, people lie to the police
15  every day, so I guess you get used to it.
16  Q.   So would you be more suspicious of
17  someone who lies to you or less suspicious
18  of someone who lies to you?
19  A.   More suspicious.
20  Q.   So did anyone ask any follow-up
21  questions of him, like why are you lying
22  to us?
23  A.   I don't remember that.

29 (Pages 113 to 116)

Adam Jones                                                    12/7/2020

Page 117

1    Q.    You don't remember that happening;
2    right?
3    A.    Yeah, I don't remember that
4    happening.
5    Q.    Because it didn't happen; right?
6          MR. COCKRELL:  Object to the
7    form.
8    A.    I'm just saying that I was walking
9    on the perimeter of the house.  I don't
10   remember that at all.
11   Q.    (By Ms. Bolger) So as you sit here
12   you don't know if that ever happened?
13   A.    I don't.
14   Q.    In fact, it didn't happen, did it?
15         MR. COCKRELL:  Object to the
16   form.
17   A.    I don't know.
18   Q.    (By Ms. Bolger) So you went around
19   to walk the perimeter of the house.  Why
20   did you want to walk the perimeter of the
21   house?
22   A.    When she was telling us about how
23   she went out a window, you know, I wanted

Page 118

1    to see if I could locate where she
2    described going out the window, and I
3    believe there was a cooler and a trash can
4    that she had stacked up.  I wanted to see
5    if I could locate that.
6    Q.    Okay.  And were you able to do
7    that?
8    A.    Yes.
9    Q.    And where was it?
10   A.    It was on the backside of the
11   residence.
12   Q.    And then did something happen with
13   that window?
14   A.    I heard it close while I was
15   walking back there.
16   Q.    Okay.  So you heard the window
17   close?
18   A.    Yes.
19   Q.    Did you see the window close?
20   A.    I think it was more of I heard the
21   snap of the window close and then saw
22   maybe the drapes close.
23   Q.    So it was Mr. Bunn closed that

Page 119

1    window; right?
2          MR. COCKRELL:  Object to the
3    form.
4    A.    I don't know who closed it.  You
5    know, that -- I called Josh at that point
6    and said I think a window just closed and
7    that's how I let him know that.
8    Q.    (By Ms. Bolger) What did he say in
9    response?
10   A.    From what I understand, he asked
11   Bunn if he closed a window, and that's
12   when he said I believe I need to talk to
13   my lawyer.
14   Q.    Okay.  So just so I understand it,
15   you heard a window close.  You told
16   Hastings, Investigator Hastings, that a
17   window had closed, and he said to Bunn did
18   you just close a window, and Mr. Bunn said
19   I need my lawyer; right?
20   A.    I believe that's the way it
21   happened.
22   Q.    Okay.  So now Mr. Bunn has lied to
23   you, he's closed the window the victim

Page 120

1    says she climbed out of, and he said he
2    needs a lawyer.
3          Are you getting suspicious of
4    Mr. Bunn's ability to tell you the truth?
5    A.    Yes.
6    Q.    So what did you do next?
7    A.    When he requested his attorney,
8    you know, he's invoking his rights at that
9    time, so we get out of the residence, and
10   at that time we're probably going to try
11   to see -- put everything that we've got
12   together to get a search warrant.
13   Q.    Okay.  So why did you have to
14   leave the house?
15   A.    Well, with him -- at that point we
16   didn't have enough for a search warrant.
17   We both discussed that we didn't have
18   enough to get a search warrant in our
19   minds, so --
20   Q.    Why not?
21   A.    -- we just didn't feel like, you
22   know, she said she went out a window.  You
23   know, that's in line with her story that

Adam Jones                                                    12/7/2020

Page 121

1   she's told us, but going back to what her
2   statement said, you know, the elements of
3   that crime of rape was not met, so, you
4   know, we're still looking to investigate
5   this.
6        If he's asking for his attorney,
7   you know, we're trying to do this without
8   having to get a search warrant just
9   because it would be quicker that way, so
10  when he invokes his rights we decide, you
11  know, we're going to leave, go back to the
12  office and just go with what we've got.
13       We leave the residence, and I
14  believe Josh said that -- he called me on
15  the LINC, and that's the radios that we
16  use, he said you know I think we need --
17  let's just let the judge tell us no.
18       He turned around and went back and
19  pulled him and the guy that was in the
20  house with Bunn pulled him out of the
21  house and they locked the house down at
22  that point.  I was going to go back by the
23  hospital to try to get some more

Page 122

1   information from the victim.
2        When I stopped by, she was in the
3   middle of the exam so I went on to the
4   office and was waiting for information,
5   anything that we could get that I could
6   possibly type up a search warrant.
7   Q.    Okay.  So at the door with
8   T. J. Bunn he lies to you.  He closes a
9   window.  Megan Rondini has said that he
10  held her down, that she didn't want to
11  have sex with him, that he took her phone,
12  that she climbed out a window, and you
13  still don't think you have enough for a
14  search warrant?
15           MR. COCKRELL:  Object to the
16  form.
17  Q.    (By Ms. Bolger) Is that right?
18           MR. COCKRELL:  Object to the
19  form.
20  A.    Yes.
21  Q.    (By Ms. Bolger) Do all sexual
22  crimes in the state of Alabama require
23  earnest resistance?

Page 123

1   A.    No.
2   Q.    So you didn't need her to
3   earnestly resist?
4            MR. COCKRELL:  Object to the
5   form.
6   Q.    (By Ms. Bolger) You're
7   investigating for a crime; right?
8   A.    Well, you just asked for sexual
9   crimes.  Rape requires earnest resistance.
10  There's other sexual crimes --
11  Q.    Well, sexual misconduct doesn't,
12  does it?
13           MR. COCKRELL:  Object to the
14  form.
15  A.    I don't know the statute for
16  sexual misconduct.  I would just have to
17  read it to make sure.
18  Q.    (By Ms. Bolger) Why couldn't you
19  arrest him for that?
20  A.    Did it meet the elements?  I don't
21  know.
22  Q.    Well, did you think about that?
23  A.    Well, at the time we're trying to

Page 124

1   think about trying to do everything we can
2   for the victim that's at the hospital
3   without messing the case up, you know, as
4   far as, you know, if we stay in the house
5   he's asked us -- or he's invoked his
6   rights to a lawyer, and we were to keep
7   standing there questioning him, you know,
8   that's going -- it will mess the case up
9   from there, so --
10  Q.    Yeah, but why couldn't you arrest
11  him for sexual misconduct at this point?
12  What was the element --
13           MR. COCKRELL:  Object to the
14  form.
15  Q.    (By Ms. Bolger) -- missing from
16  sexual misconduct that prevented you from
17  arresting T. J. Bunn?
18  A.    I don't remember anything specific
19  that he could be arrested for on that.
20  Q.    Did Mr. Bunn invoke his right to a
21  lawyer?  You were in the house; right?
22  A.    Yes, I wasn't -- I'm sorry, I was
23  not in the house.  It was Investigator

Adam Jones                                          12/7/2020

                                        Page 125

1    Hastings.
2    Q.    I'm sorry, you said that. I
3    didn't mean to mislead you.
4         Investigator Hastings was in the
5    house. He invoked his right to a lawyer;
6    right?
7    A.    Yes.
8    Q.    When someone invokes their right
9    to a lawyer, you don't have to leave, do
10   you?
11   A.    No, I mean, it was basically the
12   questioning at that point, and we're
13   leaving because he's wanting to talk to
14   his lawyer, so, you know, it becomes one
15   of those issues is it, you know, Fourth
16   Amendment type thing that, you know, we
17   need to back out, get a search warrant, so
18   that's what we were looking at.
19   Q.    Did he tell you to leave the
20   house?
21   A.    I don't remember if he told him
22   that.
23   Q.    In fact, he invited Investigator

                                        Page 126

1    Hastings into the house; right?
2    A.    When we originally got there.
3    Q.    Right. So Investigator Hastings
4    was there and he invited Investigator
5    Hastings into the house; right?
6         MR. COCKRELL: Can you --
7    I'm having trouble understanding the
8    questions. Can you slow them down a
9    little bit?
10        MS. BOLGER: Sure.
11        MR. COCKRELL: I couldn't
12   hear myself.
13   Q.    (By Ms. Bolger) You testified
14   about two minutes ago that when you got to
15   the house, you rang the doorbell, Bunn
16   came in, and invited Investigator Hastings
17   into the house; correct?
18   A.    Yes.
19   Q.    Okay. So he was in the house at
20   Bunn's invitation; correct?
21   A.    Yes.
22   Q.    Okay. So then investigator --
23   then Mr. Bunn invokes his right to an

                                        Page 127

1    attorney, but you weren't obligated to
2    leave the house at that moment. You were
3    obligated to stop asking him questions;
4    correct?
5         MR. COCKRELL: Object to the
6    form.
7    A.    That's what we decided to do, was
8    to try to get a search warrant.
9    Q.    (By Ms. Bolger) You just told me
10   you couldn't get a search warrant.
11   A.    I didn't think we had enough. We
12   were going to do everything we could to
13   get one.
14   Q.    I still don't know why you left
15   the house. Can you explain to me why
16   Mr. Bunn's decision to invoke his right to
17   an attorney caused you both to leave the
18   house and leave him in it in a place that
19   was an alleged crime scene?
20   A.    There again, that was a decision
21   that we made to try to get a search
22   warrant for the house.
23   Q.    But then you said that Hastings,

                                        Page 128

1    for lack of a better word, changed his
2    mind and said let the judge tell us no and
3    went back to the house; right?
4         MR. COCKRELL: Object to the
5    form.
6    A.    He's just saying, well, let's just
7    let the judge tell us no. I mean, if we
8    don't have enough for a search warrant,
9    then the judge is going to have to be the
10   one to say you don't have enough for a
11   search warrant.
12   Q.    (By Ms. Bolger) Right. But he
13   changed -- that's a change in position;
14   right? You leave? You both leave; right?
15   A.    Yes.
16   Q.    And then Investigator Hastings
17   changes his mind and goes back; right?
18   A.    It was a mutual decision on our
19   part. You know, I'm just saying that
20   that's why, you know, we went back, there
21   again, to lock the scene down and just go
22   with what we had to get the search
23   warrant.

                                32  (Pages 125 to 128)

Adam Jones                                        12/7/2020

---

Page 129

1    Q.    Right.  But you changed your mind
2    to go back?  You made a mutual decision to
3    go back; right?
4    A.    Yes.
5    Q.    Okay.  And that's because you
6    decided that leaving was the wrong
7    decision; right?
8          MR. COCKRELL:  Object to the
9    form.
10   A.    Not necessarily a wrong decision.
11   I think, you know, we're taking everything
12   into account that we know thus far, and at
13   that point we didn't feel like or before
14   we left we didn't feel like it was enough
15   for a search warrant, but with, you know,
16   just a couple of minutes down the road we
17   decided, you know, let's just see if we
18   can get a search warrant for the house.
19   Q.    It wasn't a couple of minutes.  It
20   was about 15 minutes; right?
21   A.    I don't think it was that long.
22   Q.    Well, you left the house at 11:25
23   and you came back at 11:40; right?

---

Page 130

1    A.    11?
2    Q.    I'm sorry.  I'm looking at the
3    clock.  You left the house at -- sorry,
4    7:25 in the morning and you came back at
5    7:40 in the morning; right?
6    A.    That sounds right.
7    Q.    So it's 15 minutes; right?
8    A.    It didn't seem like it was that
9    long but I guess -- what's the times --
10   where is that time at?  Is it on a sheet
11   as far as like --
12   Q.    Yes, it's on a timeline created by
13   the attorney general's office.  I can show
14   it to you later --
15   A.    I'm not doubting you.  I'm just
16   saying I can't remember what --
17   Q.    Okay.  So between 7:25 and 7:40 is
18   15 minutes.  We can agree to that; right?
19   A.    Okay, okay, yes.
20   Q.    Okay.  So what happened, what
21   piece of information did you get between
22   7:25 and 7:40 to decide to turn the car
23   around?

---

Page 131

1    A.    No new information.
2    Q.    Did you and Investigator Hastings
3    speak to each other during that time?
4    A.    Over our LINC radios, yes.
5    Q.    What did you say to each other?
6    A.    Pretty much what I've told you,
7    that, you know, we're just going to go
8    back and see if we can lock the residence
9    down and get them out of the house and
10   I'll go back to the office, and I was
11   going to swing by the hospital to try to
12   get some more information if possible from
13   the victim and then go straight to the
14   office to try to type the search warrant
15   up.
16   Q.    Did you speak to Captain Hood
17   during that 15 minutes?
18   A.    I don't remember.
19   Q.    Well, you did speak to Captain
20   Hood that morning; right?
21   A.    Yes.
22   Q.    In fact, Captain Hood went to
23   T. J. Bunn's house; right?

---

Page 132

1    A.    I'm sure he probably did.  I just
2    don't remember it.
3    Q.    When did you speak to Captain
4    Hood?  When do you remember speaking to
5    Captain Hood?
6    A.    It would have been after I got to
7    the office.  I don't remember a time that
8    I spoke with him.  It would have been when
9    I was back at the homicide office.
10   Q.    How about Captain Hart?  When did
11   you first speak to then Lieutenant Hart?
12   A.    It would have been the same -- I'm
13   not saying that I talked to them at the
14   same time, but it would have been when I
15   was back at the office.
16   Q.    Somebody called Hart from the
17   crime scene -- sorry, someone called Hart
18   from Bunn's house; right?
19          MR. COCKRELL:  Object to the
20   form.
21   A.    It's possible.
22   Q.    (By Ms. Bolger) Well, we have
23   video of someone saying, call Kip.  Were

---

33 (Pages 129 to 132)

Adam Jones                                                    12/7/2020

Page 133

1    you one of the people who said call Kip?
2    A.    No.
3    Q.    Did you speak to Captain Hart in
4    the 15 minutes between 7:25 and 7:40 a.m.?
5    A.    I don't remember that.
6    Q.    Did you speak to Sheriff Abernathy
7    at any point --
8    A.    No.
9    Q.    -- the morning of the alleged --
10   of the investigation?
11   A.    Not at all.
12   Q.    Okay.  So at 7:25 after Mr. Bunn
13   lies to you and closes the window and
14   tells you he needs his lawyer, you guys
15   left the scene and he was completely by
16   himself in his house -- well, he and his
17   buddy were in his house alone between 7:25
18   and when you returned at 7:40; right?
19   A.    Yes.
20   Q.    And what did he do during that
21   time?
22   A.    What did he do?
23   Q.    Yes.

Page 134

1            MR. COCKRELL:  Object to the
2    form.
3    A.    I have no idea.
4    Q.    (By Ms. Bolger) What's that?
5    A.    I have no idea.
6    Q.    Right.  He could have done
7    anything; right?
8    A.    Right.
9    Q.    So now you have an alleged suspect
10   who a woman has said took her to a place
11   she didn't know, took her phone, held her
12   down by the hips, who she told me wanted
13   to have sex with, who's lied to you, who
14   closed a window, who invoked his lawyer
15   and he's completely by himself in the
16   crime scene; right?
17           MR. COCKRELL:  Object to the
18   form.
19           You can answer.
20   A.    Yes.
21   Q.    (By Ms. Bolger) Seems like that
22   may not be best practices to me, what do
23   you think?

Page 135

1            MR. COCKRELL:  Object to the
2    form.
3    A.    There again, we were going by --
4    up and to that point we were going with
5    everything that we had, with her
6    statement, and an open window, you know,
7    is not enough to arrest anybody for rape
8    or anything like that.  It goes along with
9    her statement, but we just have to get
10   more to meet the element of the crime.
11   Q.    (By Ms. Bolger) Then why come
12   back?  Why go back?
13   A.    We just -- to get, you know, to
14   try to get a search warrant for the house.
15   We just didn't think we had enough, so we
16   were going to say well, let's just --
17   let's let the judge tell us no.  If we
18   don't have enough, we don't have enough.
19   We didn't think we had enough.
20   Q.    What's the process for getting a
21   search warrant?
22   A.    You type up a complaint, you know,
23   include any probable cause for a crime

Page 136

1    that's been committed, take it over to a
2    judge, or they have a duty judge in
3    Tuscaloosa, certain ones that's on call,
4    so that's why they call it a duty judge.
5            You take it to that judge.  He
6    determines if enough probable cause is
7    there to sign the search warrant.
8    Q.    Can you do it by phone?
9    A.    No.
10   Q.    You have to hand deliver a
11   document; right?
12   A.    Yes.
13   Q.    Well, if Megan had -- or
14   hypothesize a victim you believed in the
15   hospital had been sexually assaulted.  If
16   you wanted to get a search warrant, would
17   you go to the judge before you went to the
18   suspect's house or would you go to the
19   suspect's house and then get the search
20   warrant?
21   A.    It just depends on the case.  It
22   varies.
23   Q.    Okay.  Well, in other cases, if

                              34  (Pages 133 to 136)

Page 137

1   there was a complaining witness at the
2   hospital, who you believed had been
3   sexually assaulted, would you go -- did
4   you go right to a judge to get a search
5   warrant or did you go to the suspect's
6   home?
7   A.    There again, it's just going to
8   vary.  You know, certain -- I mean, that's
9   the only way I can describe it.  It's just
10  going to vary from case to case.  It's
11  just different.
12  Q.    Okay.  Well, tell me have you ever
13  been in the hospital, interviewed a woman
14  who said she was raped who you believed
15  had met the elements of the crime, have
16  you ever gone right from the hospital to
17  the suspect's home in those circumstances?
18  A.    I don't remember.
19  Q.    What do you mean you don't
20  remember?  How could you not remember
21  that?
22  A.    I don't remember.
23        MR. COCKRELL:  Object to the

Page 138

1   last question.
2   Q.    (By Ms. Bolger) What's your usual
3   practice?  What was your usual practice?
4   A.    Usually going to the scene, you
5   know, sometimes you try to get consent
6   before you get a search warrant just
7   because it's a lot less time involved.
8   Q.    Okay.  Well, you returned to this
9   house at 7:40 and what happened next?
10  A.    I believe other investigators
11  started -- they showed up at his house,
12  and at some point somebody, I don't know
13  who, called -- or they didn't call, he
14  spoke with Bunn's attorney, and I don't
15  know which investigator it was but I know
16  that somebody on the scene out there
17  talked with Bunn's attorney.
18  Q.    Okay.  There was a lot in that
19  answer so let me unpack it.
20        Did you, yourself, go back to the
21  Bunn house?
22  A.    No.
23  Q.    So Investigator Hastings went back

Page 139

1   to the Bunn house; right?
2   A.    Yes.
3   Q.    And where did you go?
4   A.    I went back to the homicide
5   office.
6   Q.    Okay.  Why did you go back to the
7   homicide office?
8   A.    To type up a search warrant.
9   Q.    Okay.  Did you ultimately type up
10  that search warrant?
11  A.    No, they advised me that he had
12  given consent.
13  Q.    Who advised you?
14  A.    I can't remember who called me
15  that day.  It was somebody on the scene
16  said that he had given consent to search
17  the house and process the house, so I
18  didn't do a search warrant.
19  Q.    Were you involved at all, as you
20  put it, processing the house?
21  A.    No.
22  Q.    Were you getting updates from
23  Hastings or other investigators who were

Page 140

1   at the house?
2   A.    As updates would come in, I mean,
3   you know, it takes a while to take photos
4   and video, so, you know, they really don't
5   ever call during that -- the processing
6   time unless they find something.  You
7   know, at this particular time I don't
8   remember getting a call from anybody.
9   Q.    Do you remember hearing anything
10  about anybody actually questioning Bunn?
11  A.    I think they got a statement from
12  him on the scene.  There again, I don't
13  remember who exactly it was that talked to
14  him.
15  Q.    That morning did you know the
16  contents of the statement he gave?
17  A.    No.
18  Q.    When did you first know the
19  contents of the statement he gave?
20  A.    It would have been later on that
21  afternoon probably.
22  Q.    So you were the lead investigator
23  in the case and he's the suspect.  Is it

Adam Jones                                          12/7/2020

Page 141

1    unusual that you didn't stay to interview
2    the suspect?
3    A.    That's not -- that's not unusual.
4    Q.    Why not?
5    A.    Well, it's a lot of moving parts
6    in an investigation, and, you know, that's
7    why they usually team people up.
8    Sometimes it's more than one team, and,
9    you know, sometimes the lead investigator
10   may question both victim and suspect.
11   Sometimes it's split.  You know, there's
12   really -- there was nothing unusual about
13   the way it was done as far as the
14   interview, so.
15   Q.    One of the consent forms that was
16   signed by Bunn seems to -- says it was
17   signed at 6:47 in the morning.  Did
18   Mr. Bunn sign a consent to search form
19   before you left the house the first time?
20         MR. COCKRELL:  Object to the
21   form.
22   A.    I believe he signed one when it
23   was just me and Josh there, I believe he

Page 142

1    did.
2    Q.    (By Ms. Bolger) So why didn't you
3    search the house then?
4    A.    Well, there again, you know, with
5    him invoking his right, you know, how much
6    is going to get thrown out in court
7    potentially down the road if we stay there
8    and, you know, he's wanting to talk to his
9    lawyer.  You know, I'm just -- I'm just
10   giving you a for instance of what may be
11   going through our minds at that point, I
12   can't remember, but that sounds reasonable
13   that we were thinking that way.
14   Q.    Well, if he signs a consent form
15   at 6:47 in the morning and in vehicles his
16   attorney at 7:15 in the morning, that's
17   half an hour.  Did you search the house in
18   that half an hour?
19   A.    I don't believe so.
20   Q.    Did you start searching the house
21   in that half an hour?
22   A.    I think it was more -- there
23   again, I wasn't talking with him, but I

Page 143

1    know that, you know, you get further with
2    people if you're talking nice to them and
3    trying to, you know, not alarm them that
4    you're fixing to be looking through their
5    house.
6         So, you know, I feel like Josh he
7    does a good job with building rapport with
8    suspects, and I feel like that's probably
9    what he was doing during that time, just
10   knowing the way he interviews people.
11        And it's just, it's basically just
12   being nice to somebody to try to, you
13   know, get in to where you can search the
14   house.
15   Q.    But you could search the house.
16   You didn't have to ask him.  You already
17   had permission.  You had a consent form
18   saying that you could search his house
19   signed at 6:47 in morning; right?
20        I don't understand why he was
21   still asking him.  He had permission to
22   search the house.  Why not search the
23   house?

Page 144

1    A.    Well, there again, you know, by
2    signing a consent form it could be revoked
3    at any time.
4    Q.    Did he revoke it?
5    A.    I don't know.  I mean, not that
6    I'm aware of.
7    Q.    No, he didn't invoke it -- I'm
8    sorry, he didn't revoke it that you know
9    of; right?
10   A.    Not that I know of.
11   Q.    So you-all could have searched the
12   house; you chose not to, right?
13        MR. COCKRELL:  Object to the
14   form.
15   A.    I don't know -- it wasn't that we
16   didn't search the house.  It was probably
17   like I'm talking about, and then when I
18   called Josh about the window, then that's
19   when his tone changed, you know, wanting
20   his lawyer.
21   Q.    Right.  He wanted his lawyer, so
22   that meant you have to stop questioning
23   him, but he didn't revoke the consent;

Adam Jones                                                12/7/2020

Page 145

1    right?
2    A.    Not that I know of.
3    Q.    But you didn't search the house
4    anyway; right?
5    A.    Not at that time.
6    Q.    You left, left him alone in the
7    house, and then came back and then you
8    searched the house; right?
9    A.    Yes.
10   Q.    You said you went back to the
11   office to do a search warrant, but then
12   you didn't have to do a search warrant
13   because Bunn consented another time to
14   search his house, so what did you do back
15   at the office while Investigator Hastings
16   and colleagues were at the house?
17   A.    I was trying to get back in touch
18   with the victim because we just -- we
19   needed to talk to her to get some more
20   details about what was going on or what
21   went on, and that's what I was trying to
22   do is get her back into the office to
23   interview her.

Page 146

1    Q.    Okay.  Are you aware that the best
2    practices for interviewing sexual assault
3    victims is to determine the victim's
4    emotional and physical stability to
5    schedule to in-depth interview and
6    schedule the interview as soon as those
7    factors allow?
8         MR. COCKRELL:  Object to the
9    form.
10   A.    I know that that's a guideline to
11   use, but, you know, in this situation we
12   don't have enough to get -- I mean, I'm
13   sorry, to get an arrest warrant for Bunn.
14        We're trying to get as much
15   information from our victim as possible
16   because, you know, we can't hold him.  We
17   don't have an investigative hold here, so
18   I'm trying to get as much information to
19   where I can build this case to, you know,
20   if there's enough there that we can make
21   an arrest, we're going to arrest him.
22   Q.    (By Ms. Bolger) Well, you're --
23   you're letting Bunn have his house to

Page 147

1    himself, but you're trying to get
2    information from Megan?
3         MR. COCKRELL:  Object to the
4    form.
5    A.    At that point the investigators
6    were out there.
7    Q.    (By Ms. Bolger) Well, right,
8    before then.  You waited 30 minutes,
9    didn't do anything when you had a consent
10   to investigate and you left the house --
11        MR. COCKRELL:  Object to the
12   form.
13   Q.    (By Ms. Bolger) -- Mr. Bunn got to
14   stay in the house by himself, so you
15   weren't asking him questions, you were
16   only trying to get to Megan; right?
17        MR. COCKRELL:  Object to the
18   form.
19   A.    He's invoked his right.  We can't
20   ask him any questions.
21   Q.    (By Ms. Bolger) He didn't revoke
22   his consent to search his house; right?
23   We've agreed on that.

Page 148

1    A.    You're asking about questions.  We
2    didn't ask him any questions.
3    Q.    So what time did you first see
4    Megan?
5    A.    I can't remember the exact time
6    she came back in the office.  I would say
7    it was 11 o'clock.
8    Q.    There's actually something I don't
9    quite understand about the timing of the
10   window closing at the house, so let me
11   just talk about that before we talk about
12   Megan.
13        So you said the window closed
14   while Hastings, Investigator Hastings, was
15   talking to Bunn?
16   A.    From what I understand, they -- he
17   went in.  They went up to -- upstairs and
18   as I'm walking around the perimeter of the
19   house, that's when I hear the window close
20   and I see the curtains moving, and I
21   called Josh on the LINC and say I think
22   the window just closed.
23        I don't know -- I can't remember

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 149

1    where he said that he was at in the room.
2    I'm pretty sure he was upstairs, which I'm
3    pretty sure Josh was upstairs.  I know
4    Bunn was in the room, in the bedroom where
5    window closed, but that's when he asked
6    him about the window closing.
7    Q.    So Hastings was actually upstairs
8    in the -- in or around the bedroom where
9    the alleged crime took place when Bunn was
10   closing the window?
11         MR. COCKRELL:  Object to the
12   form.
13   A.    I don't remember exactly.  I think
14   that he said he was.
15   Q.    (By Ms. Bolger) So Hastings didn't
16   just stay in the foyer, he went throughout
17   the Bunn house?
18   A.    No, I don't -- that didn't --
19   there again, I think he's talking to him
20   the whole time trying to, you know, alarm
21   him of why we're here, you know, but I
22   don't -- I can't remember exactly where he
23   was at when that window closed.

Page 150

1          I want to say that he was either
2    at the top of those stairs right there at
3    the house, but I can't say for sure.
4    Q.    Is it your usual practice to not
5    to try to alarm suspects in violent crime
6    investigations?
7    A.    Well, if you're wanting to get
8    some cooperation it's better not to alarm
9    them.
10   Q.    Why did you want cooperation?
11         MR. COCKRELL:  What was the
12   last word?  I didn't hear it.
13         MS. BOLGER:  Cooperation.
14   A.    Well, like I say, it would be a
15   lot easier to get cooperation than have to
16   go through more paperwork to get search
17   warrants to search the house.
18   Q.    But you had cooperation by that
19   part.  He had signed the consent form to
20   search.  Why are you still bothering to
21   get cooperation if you've already got the
22   consent to search?
23   A.    Like I say, it was a large house.

Page 151

1    I don't know where they walked when they
2    went in the house, but it was going to
3    take more than 30 minutes to search that
4    house.
5    Q.    But you guys didn't even start;
6    right?
7    A.    I didn't go into search, no.
8    Q.    In that first visit to the Bunn's
9    house when he signed the consent search,
10   the first time, did you-all know there was
11   another person in the house?
12   A.    I believe he did tell us that at
13   the door.
14   Q.    And who was that?
15   A.    Jason Barksdale.
16   Q.    Okay.  And did you ask to speak to
17   him?
18   A.    No.
19   Q.    Why not?
20   A.    Well, at the time he was asleep in
21   the bed, and we just -- at that point we
22   didn't ask to speak with him.
23   Q.    I know.  I asked why not?

Page 152

1    A.    We just didn't.
2    Q.    Okay.  So you're back at the
3    police station and Megan came in and you
4    don't remember what time.  Do you have a
5    sense of how long it was between when you
6    returned and when Megan came?
7    A.    It was probably a couple of hours
8    I think.
9    Q.    It was apparently approximately
10   around 11:25 in the morning.  Does that
11   sound right to you?
12   A.    Yes.
13   Q.    Okay.  By the time Ms. Rondini
14   came in to be questioned by you, to be
15   interviewed by you, what information, if
16   any, had you obtained from the scene at
17   the Bunn's house?
18   A.    I don't remember anything
19   specifically at that point.
20   Q.    So I want to understand your
21   answer.  Did you know something and you
22   don't remember what it was now or did you
23   not know anything from the house or at the

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 153

```
 1  Bunn's?
 2  A.    I'm just saying I don't remember
 3  if they called me with any information
 4  then or if it was later on after the
 5  interview started.
 6  Q.    When you sat down to interview
 7  Ms. Rondini at 11:25 in the morning what
 8  did you know about the case?
 9  A.    I just knew that we had to get
10  some more information at that point.
11  Q.    Right.  But what information did
12  you have, you the person who was
13  interviewing you?  What information did
14  you have at that point?
15  A.    Just the statement that she gave
16  me and when we went out to the house, as
17  far as, you know, seeing where she had
18  stacked the cooler and trash can up and
19  the window closing.  I mean, I can't
20  remember everything at that point, what
21  information I had.
22  Q.    You basically had her story at the
23  hospital and actually the corroborating
```

Page 154

```
 1  things you had seen at Bunn's house;
 2  right?
 3  A.    Yes.
 4  Q.    And you had Bunn lying to you;
 5  right?
 6  A.    Yes.
 7  Q.    Do you know if Megan had slept
 8  between when you first saw her at the
 9  hospital and when she came into the room?
10  A.    I didn't know if she had.
11  Q.    Do you know if she had eaten?
12  A.    I don't.
13  Q.    Do you have a memory of what she
14  was wearing?
15  A.    Shorts and a T-shirt.
16  Q.    Do you have an impression of how
17  she looked?  Did she look unhappy?
18  Disheveled?  Anything like that?
19  A.    I don't remember.
20  Q.    What do you remember Megan telling
21  you at that interview?
22  A.    It was pretty much the same, same
23  thing, that she told me at the hospital.
```

Page 155

```
 1  Q.    What do you mean by that?
 2  A.    As far as the details, it was
 3  pretty much the same thing that she told
 4  me at the hospital.
 5  Q.    During that first impression did
 6  you -- during that first interview, did
 7  you form an impression of what had
 8  happened to Megan?
 9  A.    I know she was upset but, you
10  know, I didn't really know to the full
11  extent of what happened, so that's one
12  reason that we wanted to have her back in
13  the office to, you know, get some more
14  details about the alleged sexual assault.
15  Q.    I'm saying after that interview,
16  after that interview, did you have an
17  impression of what happened with Megan?
18  A.    It was really -- I mean we still
19  didn't have enough to get an arrest
20  warrant at that point.
21  Q.    What did you think had happened?
22  A.    I mean, just knowing what her
23  statement was, you know, she -- he
```

Page 156

```
 1  performed oral sex on her, she performed
 2  oral sex on him, and then he had
 3  intercourse.  She let him have sex with
 4  her.  I mean --
 5  Q.    Was it your impression that she
 6  had consensual sex with him at that point?
 7  A.    At that point, you know, what she
 8  was telling me didn't lead me to believe
 9  it was a sexual assault.
10  Q.    What other -- what else do you
11  remember about that interview?
12  A.    I know she eventually told, you
13  know, that she got a gun out of his car.
14  She had to climb back up into his room
15  because she was missing her car keys, or
16  keys.  I said car keys, but she's missing
17  keys.
18  Q.    It wasn't her car keys; right?  It
19  was her house keys; right?
20  A.    Yeah, I believe it was her
21  apartment, yeah.  I mean, just her adding
22  the information about the gun, I know
23  that, and then climbing back in the window
```

39 (Pages 153 to 156)

Adam Jones                                        12/7/2020

Page 157

1    that was new information that we had got
2    from -- different from the hospital.
3    Q.    What was different?
4    A.    Her taking the gun.
5    Q.    Right.  Sorry, I got lost, I
6    apologize.
7    A.    And taking the -- I'm sorry,
8    stacking up the cooler in the trash can to
9    climb back in the window, that was new
10   information.
11   Q.    That's what I thought I heard you
12   say, but she did say she climbed back in
13   the window at the hospital?  She did tell
14   you she went back into window?
15   A.    I'm looking.
16   Q.    I'm looking at it.  She says, I
17   got a cooler and a trash can and I jumped
18   onto the cooler and the trash can to try
19   and back up and see if I could get my
20   keys, so she did tell you that at the
21   hospital.
22   A.    Okay, yes, yes.
23   Q.    Okay.

Page 158

1         MS. BOLGER:  Hey, J. T.,
2    would you please show the witness AR.
3         MR. THOMPSON:  Yeah, hang
4    on.
5         MS. BOLGER:  And, Nancy, if
6    you'll mark it as Exhibit 29, I would be
7    grateful.
8         (Whereupon, a document was marked
9         as Defendant's Exhibit No. 29 and
10        is attached to the original
11        transcript.)
12   Q.    Before you take a look at it,
13   sorry, I should have asked you this.
14   Before Megan came in for her interview at
15   11:25, had you spoken to Captain Hood
16   about Megan's allegations?
17   A.    If I did, I don't remember it.
18   I'm sure I probably did because everybody
19   in the office was working on this case, so
20   I'm pretty sure that I spoke with him
21   about it.
22   Q.    Why was everybody in the office
23   working on this case?

Page 159

1    A.    Well, I mean, it's just helping
2    with the timeframe, searching the whole
3    house, processing everything, and
4    following up with the taxi driver, you
5    know, that's another team in another
6    direction.  I mean it was just a lot of
7    moving parts going right then.
8    Q.    Does everybody in the office work
9    on every case in the Homicide Unit?
10   A.    Not every case.
11   Q.    Why were there so many people
12   working on this particular case?
13   A.    Well, it was just, you know, he
14   was saying he was fixing to go out of town
15   so we wanted to get as much information
16   that we could that if we had enough to
17   arrest him, we could get him arrested
18   before he leaves town.
19   Q.    When did he tell you-all -- sorry,
20   I'm talking about before 11 o'clock in the
21   morning, but we don't have to worry about.
22   You said everybody is working on it
23   because he said he's fixing to leave town.

Page 160

1         When did you learn that he was
2    fixing to leave town?
3    A.    I don't remember that time.  It
4    was -- I don't remember.
5    Q.    What do you remember about it?
6    A.    I just remember him saying that he
7    had a planned trip to go out of town.
8    Q.    Okay.  And what did that -- what
9    did that cause you-all to do?
10   A.    Well, like I say, we were just
11   trying to get as much evidence as we can,
12   and if we can get the evidence and make
13   this case to get the arrest warrant, we're
14   -- that's what we're trying to do.
15   Q.    But you didn't call him in to the
16   police department to interview him that
17   day?
18   A.    He had invoked his rights.
19   Q.    But you talked to his lawyer and
20   you didn't have him and his lawyer come
21   into the office that day.  Why not?
22        MR. COCKRELL:  Object to the
23   form.

Adam Jones                                                    12/7/2020

Page 161

1          Go ahead.
2     A.    I don't know that his lawyer could
3     go to the office. I don't know that for
4     sure, but I don't know if his lawyer could
5     go.
6     Q.    (By Ms. Bolger) Well, you guys
7     wait on defense lawyer's schedules in the
8     police department in Tuscaloosa?
9     A.    Well, he talked to the lawyer --
10    somebody talked to the lawyer, his lawyer.
11    Q.    Right. But you talked to his
12    lawyer, you talked to him. Why couldn't
13    you say to them both get to the office,
14    get to the police station, we need to talk
15    with you?
16          MR. COCKRELL: Object to the
17    form.
18    A.    I don't know why that --
19    Q.    (By Ms. Bolger) Defense lawyers
20    don't usually get to tell the police what
21    to do, do they?
22    A.    If we don't have enough to bring
23    him in and hold him and they schedule a

Page 162

1     time to come in, that's not uncommon.
2     Q.    This is a guy who is being accused
3     of a violent crime and you guys didn't
4     feel like you could tell his lawyer to
5     come in the afternoon on the day of the
6     violent crime?
7           MR. COCKRELL: Object to the
8     form.
9     A.    I'm just saying if we don't have
10    enough to bring him in, you know, the
11    lawyer is not going to agree for him to
12    give us a statement on anything.
13    Q.    (By Ms. Bolger) Is it your
14    position as you sit here that you didn't
15    have enough with Megan saying she was held
16    down, Bunn taking her to a house that she
17    doesn't know where she is, Bunn taking her
18    to telephone, her saying she didn't want
19    to have sex with him, him lying to you,
20    him closing the window, you're saying you
21    didn't have enough to say to his lawyer
22    hey, you better come to the station this
23    afternoon? That's your testimony?

Page 163

1           MR. COCKRELL: Object to the
2     form.
3     A.    Yes, we didn't have enough.
4     Q.    (By Ms. Bolger) What do you need
5     in Tuscaloosa to have your lawyer be
6     compelled to show up at the police
7     station?
8     A.    There again, we just -- we did not
9     have the elements of rape met.
10    Q.    What did you need to bring
11    Mr. Bunn into the office for an interview
12    on July 2nd?
13    A.    Well, when we asked that's when
14    he's saying he's got to go out of town,
15    so, you know, if we're -- and not having
16    enough to arrest him at that point, if
17    we're being nice to him, as far as trying
18    to accommodate a schedule to get a good
19    statement from him, because once -- if his
20    lawyer is present and he says don't give
21    him anything, then we don't have anything.
22    Q.    Why are you being nice to
23    Mr. Bunn?

Page 164

1     A.    It's not necessarily -- I'm not
2     saying that we're being nice to him. It's
3     more of --
4     Q.    You just said you're being nice to
5     him. Why are you being nice to him?
6           MR. COCKRELL: Whoa, whoa,
7     whoa, let him answer the question before
8     you interrupt him, okay?
9     Q.    (By Ms. Bolger) Nice is your word.
10    Why were you being nice to him?
11          MR. COCKRELL: Whoa, whoa.
12    Whoa, whoa. I'm going to instruct him if
13    you will let him answer one question at a
14    time. You can answer the last question if
15    you remember it, the one you started to.
16    Q.    (By Ms. Bolger) Nice is your word.
17    Why were you being nice to him? That's
18    the pending question.
19    A.    I was just referring to you can
20    attract more flies with honey than you can
21    with vinegar.
22    Q.    Is that a common theme in law
23    enforcement?

41  (Pages 161 to 164)

Adam Jones                                              12/7/2020

Page 165

1    A.    It's an old southern saying,
2    that's all I know.  But I'm just saying if
3    we come in slamming things around, it's
4    going to be locked down right there.
5    Q.    Well, you had enough to bring him
6    in for questioning on July 6th.  Why
7    couldn't you bring him in on July 2nd?
8    Nothing happened.  You didn't get an
9    arrest warrant.  What was different
10   between July 2nd and July 6th?
11   A.    It was his statement.  He came in
12   with his attorney then.
13   Q.    Why couldn't you ask him to come
14   on July 2nd?
15   A.    He was fixing to get -- to go out
16   of town.
17   Q.    Why didn't someone from the
18   violent -- the Homicide Unit say to him
19   hey, come give a statement this afternoon
20   before you go?
21   A.    I'm sure it was said.  I don't
22   remember.
23   Q.    What's your basis for saying it

Page 166

1    was said?
2    A.    I'm sure they asked him for a
3    statement.
4    Q.    What's your basis for that?
5    A.    There is a recorded statement.
6    Q.    What is your basis for saying that
7    someone asked Bunn to come to the
8    sheriff's office that afternoon on
9    July 2nd?
10   A.    Well, that's when he told me that
11   he had to go out of town.  I'm assuming
12   that that was a question that was asked,
13   and he said that I've got a pre-planned
14   trip to go out of town.
15   Q.    So in Tuscaloosa if I'm accused of
16   sexual assault and the police ask me to
17   show up in the afternoon, I can just say
18   I'm sorry, I'm going out of town, I'll
19   catch you when I get back?
20        MR. COCKRELL:  Object to the
21   form.
22   A.    No.
23   Q.    (By Ms. Bolger) Why could Mr. Bunn

Page 167

1    do that?
2    A.    Anybody could do that.  If they
3    had what little we had, anybody could do
4    that.
5    Q.    In your experience, how many times
6    did you let suspects go out of town with
7    their attorneys before you questioned
8    them?
9    A.    I'm not aware of any on my side.
10   Q.    This is the only time that
11   happened?
12   A.    It's the only time I can think of.
13   Q.    Okay.  Will you take a look at the
14   document we just marked as Exhibit 29?
15        For the record, this is a
16   transcript of a video interview taken on
17   July 2nd, 2015, between officer, Megan,
18   and Ms. Stewart, and it was transcribed on
19   July 13th, 2017, and for the record, I
20   will say that this document was produced
21   to us as part of the documents in the
22   wrongful death suit brought by the
23   Rondinis, so we didn't actually make this

Page 168

1    one.  This was actually provided by the
2    parties.
3        MR. COCKRELL:  Hey, Kate,
4    it's about 11:58 here.  Do you want to
5    take a lunch break?
6        MS. BOLGER:  Yeah, why don't
7    we take -- can you guys go another
8    15 minutes before I do that or another
9    half an hour or are you hungry?
10       MR. COCKRELL:  I tell you
11   what let's take a ten-minute break and I
12   don't have a problem with you going
13   another 30 minutes.
14       MS. BOLGER:  Well, if you
15   need a break, we can take a break.  Why
16   don't we take like -- can we do -- I don't
17   know how easy it is to get lunch where you
18   guys are.  It's quite easy for me.  The
19   kitchen is downstairs.  So do you want to
20   do like a 45-minute lunch break; is that
21   enough time?
22       MR. COCKRELL:  Yeah, we can
23   try it.  I think we can do it.

42  (Pages 165 to 168)

Adam Jones                                          12/7/2020

Page 169

1    VIDEOGRAPHER: We're off the
2  record at 12:01 p.m.
3    (Lunch recess was taken.)
4    VIDEOGRAPHER: We're back on
5  the record at 12:53 p.m.
6  Q.    Okay. I had -- Nancy has been
7  kind enough to hand you Exhibit 29, which
8  is the transcript of your interview with
9  Megan Rondini. You can -- I'm sure you've
10  seen it before. You were there.
11    If you take a few seconds to flip
12  through the pages, but I'm just going to
13  ask you a couple questions about the
14  transcript, if that's okay.
15    All right. So if you would turn
16  to page seven please. Line 15. Do you
17  see the numbers on the side of the page?
18  A.    Yes.
19  Q.    Line 15, you said to Megan, you
20  decided to leave Innisfree, and she said,
21  I don't really remember actually leaving
22  Innisfree because I would have left with
23  my friends who were going to drive me

Page 170

1  home, Sammie and the other girl they were
2  DD for us. I don't remember leaving, but
3  I do remember like in the car with him on
4  the road, like in the backseat.
5    Do you see that?
6  A.    Yes.
7  Q.    And then again if you look page 10
8  you say to her, page 10 line 1, is you.
9  You say do you remember making any turns.
10  And she responds, I could not tell you how
11  to get there for the life of me.
12    Do you see that?
13  A.    Yes.
14  Q.    Okay. So in this interview Megan
15  is again telling you that she has
16  absolutely no memory of how she got to
17  T. J. Bunn's apartment. What did you
18  think about that at the time -- house.
19  What did you think about that at the time?
20  A.    Really, just, you know, she said
21  she did have some stuff to drink. You
22  know, I don't know if it was liquor or
23  beer. I can't remember that anyway.

Page 171

1    But, you know, she had made the
2  statement that she didn't feel like she
3  had been drugged or something to that
4  effect, so, you know, I thought it was
5  alcohol that may have caused the memory.
6  Q.    Didn't you want to figure out what
7  had happened to her during that period of
8  time when she forgets -- she leaves
9  Innisfree and ends up in Bunn's car?
10  Weren't you interested in what happened
11  then?
12  A.    Yes.
13  Q.    What did you do to try to figure
14  that out?
15  A.    Well, that's, you know, when we
16  tried to -- asked for consent to, you
17  know, look at her phone to look under the
18  GPS app, or, you know, whatever to try to
19  figure out the route that she went and
20  where he may have possibly picked her up,
21  if you could figure that out.
22  Q.    Doesn't it make you think maybe
23  there's something bad happened to this

Page 172

1  girl, she can't remember what's happening
2  in this time period. Maybe she was
3  drugged, maybe something happened to her?
4  Did you have any thoughts like that?
5    MR. COCKRELL: Object to the
6  form.
7  A.    I mean, it's possible, but, you
8  know, there again, she drank alcohol, and
9  I know alcohol does cause some memory
10  loss.
11  Q.    (By Ms. Bolger) All right. Will
12  you turn to page 12? You say, if you
13  start at line 7, you say did he say
14  anything to you, TJ or Jason, did anybody
15  say anything as y'all were walking into
16  the house from the car?
17    Megan responds no, he just took me
18  into like a big room or whatever. I mean,
19  I don't really remember any memorable
20  conversations that we had.
21    You say okay, did you see them on
22  the phone with anybody. And Megan says
23  no. You say I, and she says actually he

43  (Pages 169 to 172)

Adam Jones                                                        12/7/2020

---

Page 173

1    was texting someone, but I'm not sure who
2    he was texting.
3         Do you see that?
4    A.    Yes.
5    Q.    Did you ever dump T. J. Bunn's
6    phone?
7    A.    No.
8    Q.    Why not?
9    A.    Well, he didn't ever have any gaps
10   in his memory that he let onto us.  That
11   was the main thing.
12   Q.    This is a suspect in a crime;
13   right?  You're not just looking to fill in
14   his memory gaps.  You're looking to see if
15   he engages in behavior that he doesn't
16   want to tell you about; right?
17   A.    Right.
18   Q.    Right.  So if he's texting someone
19   just a few minutes before he goes upstairs
20   and allegedly sexually assaults them,
21   don't you want to know what he's saying in
22   those texts?
23   A.    I mean, I don't know how pertinent

---

Page 174

1    it is at this point -- I mean at that
2    point right there.
3    Q.    Well, I mean, you already know
4    that this guy has lied to you about having
5    a woman over at his house, right, you know
6    that before you have this interview;
7    right?
8    A.    Yes.
9    Q.    And you already know that he shut
10   the window, right, while you're in the
11   house; right?
12   A.    Yes, yes.
13   Q.    And you've already left him alone
14   in the house for 15 minutes by himself;
15   right?
16   A.    Yes.
17   Q.    Right.  And so you have reason to
18   be suspicious of the guy at this point;
19   right?
20   A.    Yes.
21   Q.    But it never occurs to you to see
22   who he's texting minutes before he
23   allegedly rapes this woman?

---

Page 175

1    A.    You know, there again, if it gets
2    to -- at this point in the interview
3    there's still no elements of a crime.
4    We've still got to build this case.
5    Q.    Well, a good way to build the case
6    would be what the suspect was saying to
7    his friends; right?
8    A.    It would be, but, you know, he's
9    asked for his attorney to be present.
10   Q.    You're about to dump Megan's
11   entire phone, you're going to get
12   everything you can from Megan, but it
13   doesn't even occur to you to ask about the
14   suspect?
15   A.    Well, I didn't interview the
16   suspect.
17   Q.    Well, did anybody ever say we
18   should dump his phone?
19   A.    I don't remember.
20   Q.    Did you ever say it?
21   A.    I don't remember.
22   Q.    Do you remember ever asking his
23   attorney to do it?

---

Page 176

1    A.    No, I don't remember.
2    Q.    Did it ever occur to you that you
3    might want to look at the text he was
4    sending ten minutes before he allegedly
5    raped someone?
6    A.    I mean, I didn't ask him to -- ask
7    him to download his phone.
8    Q.    Right.  I'm asking you did it ever
9    even occur to you to ask him what he was
10   texting to people 10 minutes before he
11   allegedly raped someone?
12   A.    I didn't interview him.
13   Q.    The girl can't remember anything
14   that's happened to her for the last hour,
15   this guy he's been with her, he's sending
16   text messages and you didn't even ask him
17   about them; right?
18        MR. COCKRELL:  Object to the
19   form.  He's already answered the question.
20   A.    I didn't talk to him.
21   Q.    (By Ms. Bolger) But you didn't
22   call Investigator Hastings and say dump
23   his phone, did you?

---

44  (Pages 173 to 176)

Adam Jones                                                    12/7/2020

Page 177

```
1    A.    No.
2    Q.    Did you tell Investigator Hastings
3  that he was texting someone 10 minutes
4  before he allegedly assaulted her?
5    A.    Not that I remember.
6    Q.    So you do nothing about the fact
7  that the suspect is allegedly texting
8  people after he's gotten this woman to his
9  house in a way that she cannot remember
10 and ten minutes before he allegedly rapes
11 her?  You didn't even pass that along to
12 Investigator Hastings?
13   A.    Not that I remember.
14   Q.    Okay.  You testified that during
15 this interview was the first time that
16 Megan told you that she had taken a gun
17 out of Mr. Bunn's car; correct?
18   A.    Yes.
19   Q.    Okay.  Was Megan telling you that
20 the first time you heard that?
21   A.    I can't remember if I had heard it
22 from an investigator that he was -- that
23 Bunn was looking around and saw that a gun
```

Page 178

```
1  was missing.
2         That conversation came up, but I
3  don't remember if it was before I had
4  asked her or before she told me this, or I
5  just can't remember the sequence of the
6  events on that.
7    Q.    So you just don't remember if you
8  knew before she said it?
9    A.    That's what I'm saying I don't
10 remember if I knew it then or if she told
11 me and that's when I found out.
12   Q.    Okay.  And she actually
13 volunteered the information about the gun;
14 right?
15         MR. COCKRELL:  Object to the
16 form.
17         You can answer the question.
18   Q.    (By Ms. Bolger) If you turn to
19 page 24.  You ask at line 8.  You say, do
20 you remember taking anything else thinking
21 that it might have been yours.
22         And Megan responds I didn't --
23 okay, I didn't tell you this earlier, but
```

Page 179

```
1  I remembered it when I was sitting down,
2  when I went to go look for my keys in the
3  Mercedes there was like a pocket pistol or
4  whatever, and I just put it in my shorts
5  for myself and then waited on the road.
6         But when my friends picked me up,
7  I -- it is in the grass like in front of
8  his house, like I just put it back on the
9  ground.
10        Do you see that?
11   A.    Yes.
12   Q.    So she volunteered the
13 information; right?
14   A.    I think I did know that
15 information before this.  I think I know
16 that the gun was missing anyways before
17 this.
18   Q.    Okay, but that's not my question.
19 My question is she actually volunteered
20 the information, you didn't ask her the
21 questions, she --
22   A.    Yes.
23   Q.    -- volunteered the information;
```

Page 180

```
1  correct?
2    A.    Yes.
3    Q.    Okay, great.  And then you got up
4  and left the room; correct?
5    A.    Yes.
6    Q.    Okay.  And you left the room
7  because you were afraid there was a gun on
8  the side of the road and you wanted
9  someone to pick up the gun; correct?
10   A.    Yes, yes.
11   Q.    So what did you do when left the
12 room?
13   A.    I tried -- I'm sure I asked who
14 was out on the scene.  I can't remember
15 who was in the office, but we got in
16 contact with some investigators that were
17 out at the Bunn residence and told them to
18 look on the side of the road for this gun.
19   Q.    Did you exchange any other
20 information with the investigators at the
21 Bunn house before you interviewed Megan or
22 during the interview with Megan?
23   A.    I don't remember.
```

45 (Pages 177 to 180)

Adam Jones                                          12/7/2020

Page 181

1    Q.    Before Megan came into the office
2    had you spoken to Captain Hood about her?
3    A.    I don't remember a conversation
4    per se, but I may have just let them know
5    that she was coming to the office to be
6    interviewed.
7    Q.    Well, they wouldn't have known who
8    she was, right, without context, so what
9    by that point had you told them -- like if
10   you had just said to them, hey, Megan
11   Rondini is coming in, they wouldn't have
12   known anything about it; right?  It would
13   just be a name.  So what had you told them
14   before Megan came in?
15   A.    I don't remember exactly what I
16   told them.
17   Q.    What about Captain Hart?
18   A.    I don't remember what I told them.
19   Q.    Did Captain Hood look in on the
20   interview?
21   A.    He was at some point, yes.  I
22   don't know what parts of the interview he
23   saw, but he was watching the interview at

Page 182

1    some point.
2    Q.    How did that come to pass?
3    A.    He was just sitting in the
4    conference room that has a direct feed to
5    the interview rooms and he was just
6    watching -- watching the interview.
7    Q.    Right.  But how did he come to be
8    in that conference room?
9    A.    I guess he knew that there was an
10   interview going on so he was -- he was in
11   there watching.
12   Q.    Well, how did he know there was an
13   interview going on?
14   A.    I don't remember.
15   Q.    Did he sit in on all of your
16   interviews?
17   A.    It was common for supervisors and
18   investigators to sit in on cases.
19   Q.    So Captain Hood commonly sat in on
20   your interviews?
21   A.    Not on all interviews, but it was
22   common for a supervisor or another
23   investigator or somebody to sit in and

Page 183

1    just watch the interview?
2    Q.    How many times before this had
3    Captain Hood sat in on interviews you did?
4    A.    I don't know.  I know he had
5    watched some, but I don't know how many.
6    Q.    Well, five or more than five?
7    A.    I don't know.
8    Q.    Less than five?
9    A.    I don't know.
10   Q.    Well, you can't think in your head
11   how many -- you can't remember if it was
12   five or ten?
13   A.    Well, I mean there may have been
14   times that he was in the back watching the
15   interview, I was in the interview room so
16   I don't know if he's in there or not, so I
17   mean I'm just saying I don't know how many
18   -- I don't know how many --
19   Q.    You knew this time; right?
20   A.    I knew --
21   Q.    You just told me that.
22   A.    -- I knew that there were people
23   watching the interview.

Page 184

1    Q.    Okay.  And you knew Hood was there
2    because you just told me he was there.
3    A.    You said he was there.  I'm
4    assuming that --
5         MR. COCKRELL:  Don't assume.
6    If you know if he's there --
7    Q.    (By Ms. Bolger) I said did Captain
8    Hood watch the interview and you said yes,
9    so that's what happened.
10        MR. COCKRELL:  Object to the
11   form.
12   A.    I don't -- I don't know who all
13   was back there watching.
14   Q.    (By Ms. Bolger) Okay.  How did the
15   people watching get in the conference room
16   to watch?  Who told them to come to that
17   conference room to watch?
18   A.    Well, the unit was tied up with
19   this case, so at the time that happened to
20   be the only thing, only case active so
21   they knew our victim was in the interview
22   room, so anybody that was there could have
23   watched the interview.

46  (Pages 181 to 184)

Adam Jones                                    12/7/2020

Page 185

1    Q.    This was the only case that was
2  active in Tuscaloosa homicide on July 5th?
3    A.    Right.  When I say active I'm
4  talking about recently occurred.
5    Q.    So the only crime that happened
6  that the Homicide Unit investigated on
7  July 2nd, 2015, was this one?
8    A.    As far as --
9    Q.    I'm sorry, go ahead.
10          MR. COCKRELL:  Let's break
11  that down.  Let's ask questions and you
12  give her a chance to finish her question
13  and then you listen to it and then answer
14  it if you know.
15    Q.    (By Ms. Bolger) This was the only
16  crime that happened on July 2nd, 2015 that
17  the Homicide Unit investigated; that's
18  your testimony?
19    A.    I don't know that.
20    Q.    Did Mr. Hart -- Captain Hart
21  listen in on the interview?
22    A.    No, I don't know.
23    Q.    When you were doing the interview

Page 186

1  with Ms. Rondini, were you talking to
2  anybody about the interview?  In other
3  words, were you stepping out and talking
4  to someone?
5    A.    The only time I remember is the
6  gun and seems like there was one other
7  time I stepped out, but I can't remember
8  if words were exchanged with anybody.
9    Q.    When you stepped out to handle the
10  gun situation, did you talk to anybody
11  while you were out of the room?
12    A.    I don't remember.
13    Q.    If you turn to page 37, if you
14  start in the middle of the page at 10, you
15  say when we talked to T. J., he said that
16  you were actually walking on University
17  Boulevard, not in the street but on the
18  sidewalk.
19          Do you see that?
20    A.    Yes.
21    Q.    So does this refresh your
22  recollection that someone had told you
23  that before you went into interview Megan?

Page 187

1    A.    I don't -- I don't know who would
2  have told me that.  I'm not -- you know,
3  obviously I said that, but I don't know
4  who told me that.
5    Q.    Did you talk to Investigator
6  Hastings?
7    A.    I don't remember.
8    Q.    Did you talk to Captain Hood or
9  Captain Hart about it?
10    A.    I don't remember.
11    Q.    Is there someone other than
12  Investigator Hastings who would have given
13  you this information?
14    A.    It could have been any
15  investigator on the scene.
16    Q.    How did you communicate with them?
17    A.    By the LINC radio.
18    Q.    You didn't have the LINC in the
19  room with you when you were interviewing
20  Megan; it was outside the door, right?
21    A.    Yes.
22    Q.    So you say when we talked to T.
23  J., he said that you were actually walking

Page 188

1  on University Boulevard, not in the street
2  but on the sidewalk.
3          And she says, I just don't think
4  that would happen because I already had
5  friends that were going to take me home.
6  And then you turn to the next page on 38,
7  and line 11, and it says, so if I say that
8  y'all stopped by your apartment before you
9  went to T. J.'s or Sweet T's before you
10  went there -- okay, because they have --
11  your complex has got video there?
12          You say do you remember.  And she
13  says I do not remember going there.
14          Do you see that?
15    A.    Yes.
16    Q.    And then at the bottom of the page
17  you say, do you remember fixing them a
18  drink.  And she says no, sir, I don't
19  remember being there at all, like, I don't
20  remember being there.
21          Do you see that?
22    A.    Yes.
23    Q.    Okay.  And at the end of the page

47 (Pages 185 to 188)

Adam Jones                                               12/7/2020

Page 189

```
 1    at line 18 you say, is any of this
 2    bringing back anything, and she says, I
 3    feel like I'm going to like throw up.
 4         Do you see that?
 5    A.    Yes.
 6    Q.    So this is the first time Megan
 7    has heard that she went back to her
 8    apartment with T. J. Bunn; right?
 9    A.    Yes.
10    Q.    And it makes her feel like she's
11    going to throw up; right?
12    A.    That's what she said.
13    Q.    Right.  Did you disbelieve her
14    that this was the first time she heard
15    this?
16    A.    No.
17    Q.    So she's blacked out long enough
18    that she gets in the car with a guy she
19    barely knows, goes to his house, takes a
20    drink and gets back in the car and goes
21    back to his house.  Are you thinking maybe
22    she's drugged?
23         MR. COCKRELL:  Object to the
```

Page 190

```
 1    form.
 2    A.    She said that she wasn't drugged
 3    -- she didn't feel like she was on any
 4    drugs.
 5    Q.    (By Ms. Bolger) I understand that
 6    she didn't feel like she was drugged, but
 7    people can be drugged without their
 8    knowledge.  Did it occur to you to ask her
 9    was there an opportunity for someone to
10    drug you?
11    A.    Well, with her statement saying
12    that she poured her own drinks that night
13    and she was always in the company of her
14    friends, she didn't feel like she was
15    drugged.
16    Q.    Right, I understand.  I understand
17    that she was -- she didn't tell you she
18    thought she was drugged.  I'm asking you
19    as someone who investigates crimes,
20    doesn't this sound like somebody who's
21    been incapacitated and maybe you should
22    have thought we should see if she was
23    drugged?
```

Page 191

```
 1         MR. COCKRELL:  Object to the
 2    form.
 3         THE WITNESS:  I was going to
 4    say it froze up.
 5    A.    It froze up for a second.  I'm
 6    sorry.
 7    Q.    (By Ms. Bolger) I'm sorry you
 8    froze up telling me it was froze up, so
 9    that's why we're talking past each other.
10         I'm wondering, I understand she
11    said she wasn't drugged, but why doesn't
12    this behavior make you think -- the things
13    that she's telling you make you think, oh,
14    my God, I wonder if she's drugged, we
15    ought to investigate that?
16         MR. COCKRELL:  Object to the
17    form.
18    A.    There again, alcohol can do that
19    also.
20    Q.    (By Ms. Bolger) If she was
21    intoxicated could she have consented to
22    sex?
23    A.    I don't know that she was
```

Page 192

```
 1    intoxicated.
 2    Q.    Well, you're telling me you don't
 3    think she was drugged, she might have been
 4    drunk, but now you're saying she might not
 5    have been drunk.
 6         My question is did you not just
 7    not believe her that she didn't remember
 8    huge portions of time?
 9         MR. COCKRELL:  Object to the
10    form.
11    A.    I believed what she was telling
12    me.
13    Q.    (By Ms. Bolger) It just didn't
14    matter to you that she was completely
15    unable to remember hours of time before
16    she alleged that she was raped?
17    A.    I'm just saying that alcohol can
18    cause memory loss like that in my
19    experience --
20    Q.    Alcohol can cause people not to
21    consent to sex; right?
22    A.    What did you say?
23         MR. COCKRELL:  Repeat the
```

Adam Jones                                                              12/7/2020

Page 193

1  question.
2  Q.     (By Ms. Bolger) I'm sorry, guys.
3  The sound is cutting off, so if someone is
4  saying something to me, I actually don't
5  know what they said so let's just take a
6  minute.
7         MR. COCKRELL:  We couldn't
8  hear your question, Kate, so if you could
9  repeat it.
10        MS. BOLGER:  I'm sorry, Bob,
11 all I heard is can you repeat it so I'm
12 sorry, I'm just going to repeat a
13 question.
14 Q.     What I'm going -- I don't even
15 remember what I was saying.
16        MS. BOLGER:  Nancy, did you
17 get the question at all?  No, okay.
18        COURT REPORTER:  Hold on.
19        (Whereupon, requested portion was
20        read back by court reporter.)
21 A.     It can.
22 Q.     (By Ms. Bolger) Yes, so someone
23 can be raped because they lack capacity;

Page 194

1  right?
2  A.     Right.
3  Q.     So wouldn't you be interested in
4  the fact that she has a huge amount of
5  memory loss the ten minutes before she has
6  sex with somebody?
7  A.     Well, she remembered details about
8  the sexual encounter.
9  Q.     Well, I mean couldn't that mean
10 she's just coming in and out of
11 consciousness?
12        MR. COCKRELL:  Object to the
13 form.
14 A.     I can't speak to her state of
15 mind.  I'm just going by her statement.
16 Q.     (By Ms. Bolger) Don't you sort of
17 have to speak to her state of mind?
18 You're investigating allegations that she
19 made that she was held down and raped by a
20 guy who took her to a house in the woods
21 and took her phone away.  Don't you have
22 to figure out what happened to you?
23        MR. COCKRELL:  Object to the

Page 195

1  form.
2  Q.     (By Ms. Bolger) Isn't that your
3  job?
4         MR. COCKRELL:  Object to the
5  form.
6  A.     Yes, we're trying to figure out
7  what happened to her.
8  Q.     (By Ms. Bolger) But you're just
9  taking it on faith that she forgot several
10 hours without doing any toxicology or
11 asking any other questions about it?
12        MR. COCKRELL:  Object to the
13 form.
14 A.     Once she leaves the hospital as
15 far as her toxicology and urine, I don't
16 have any control over that.  That was
17 between her and the doctor there.
18 Q.     (By Ms. Bolger) At this point, did
19 you think she was lying to you?
20 A.     I believed what she was saying.
21 Q.     When you called about the gun,
22 what did you say to the people you were
23 talking to?

Page 196

1  A.     I don't remember exactly what I
2  said.  It was where she -- the directions
3  of where she told me that she left it.
4  Q.     What did you say?  Did you say I
5  know where the gun that's missing is or
6  did you say, oh, my God, she left a gun on
7  the grass?  What did you say?
8  A.     I don't remember.  I don't
9  remember the wording that I used.
10 Q.     Did you think she had done
11 something wrong already when you called
12 about the gun?
13 A.     No.
14 Q.     That's not theft?
15 A.     Well, it is, but, you know, in her
16 mind she had a reason for doing what she
17 did, you know, as far as why she took the
18 gun.
19 Q.     Right.  But I thought you said you
20 couldn't tell me what was in her mind, so
21 why did you think it wasn't a theft that
22 she took the gun?
23        MR. COCKRELL:  I lost that

49 (Pages 193 to 196)

Adam Jones                                          12/7/2020

Page 197

1    last question.
2    Q.    (By Ms. Bolger) Why do you think
3    it wasn't a theft that she took the gun?
4            MR. COCKRELL:  Object to the
5    form.
6    A.    Yes, she took a gun.  Yes, it's
7    theft, but, you know, I'm -- I believe her
8    to everything that she's telling me, you
9    know, and she's got a reason why she did
10   that.
11   Q.    You're welcome to look through it
12   or look in the word index, but in this
13   entire interview you never ask her about
14   her earlier statement that she was held
15   down while having sex.  Why didn't you ask
16   that?
17   A.    I don't know.
18   Q.    And you never asked her in this
19   why Bunn took her phone?  Why didn't you
20   ask her that?
21   A.    I don't know.
22   Q.    You did however tell her you
23   wanted to dump her phone; correct?

Page 198

1    A.    Yes.
2    Q.    And we can look at it in the
3    transcript, but just to speed it up, you
4    tell her you want to dump the phone to try
5    to get location information so that she
6    knows -- you can figure out where she was.
7    Is that, in fact, the reason you did it or
8    was that pretextual?
9            MR. COCKRELL:  Object to the
10   form.
11           COURT REPORTER:  I'm sorry,
12   Kate, what was the last word?
13           MR. THOMPSON:  Pretextual.
14           MR. COCKRELL:  Can you read
15   back the --
16           MS. BOLGER:  I'll rephrase
17   it.
18   Q.    I'm actually asking, you told
19   Megan that you wanted to take the phone to
20   get location information to help fill her
21   memory lapse.  We can check that.  That's
22   what you said.
23   A.    Uh-huh (affirmative).

Page 199

1    Q.    I'm wondering if you said that
2    because that was truthful or if you said
3    it because you were looking for something
4    else on the phone?
5            I know police officers are allowed
6    to have pretextual reasons.  I'm asking
7    you if that was a pretextual reason when
8    you said it?
9    A.    No, the reason was to try to find
10   the GPS location of where she was or where
11   she walked.
12   Q.    Okay.  So she eventually signed
13   the consent form and you-all dumped her
14   phone; right?
15   A.    Yes.
16   Q.    I'm going to close the door so my
17   children don't hear this.  Hold on.
18   Everybody's back.  Sorry.
19           And what did you do when you took
20   the phone to go dump the phone?
21   A.    I just -- I got her to sign a
22   consent form and took the phone to Scotty
23   Rogers.

Page 200

1    Q.    And who is Scotty Rogers?
2    A.    He is the forensic examiner for
3    the sheriff's office, does all the
4    electronic forensics.
5    Q.    Okay.  And you gave him the phone
6    and he did whatever he needs to do.  How
7    quickly did you get the data back from
8    him?
9    A.    I don't remember.  The data was
10   immediately dumped.  I just don't remember
11   what time he gave it back to me.
12   Q.    How did he give it back to you?
13   A.    On a disc.
14   Q.    On like a DVD?
15   A.    Yes.
16   Q.    And did you immediately review the
17   data on that disc?
18   A.    No.
19   Q.    When did you view the data on that
20   disc?
21   A.    I don't remember.
22   Q.    That day?
23   A.    Probably not that day.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

|  | Page 201 |
|---|---|

```
 1    Q.    Within a week?
 2    A.    Probably so.
 3    Q.    But you didn't review it the day
 4    Megan was in the office?
 5    A.    Right, no.
 6    Q.    What data did you review first on
 7    that disc?
 8    A.    I don't remember.
 9    Q.    Is the data on that disc
10    searchable by -- was the data on that disc
11    searchable or do you just have to sort of
12    scroll through it?
13    A.    It is searchable.
14    Q.    It's like keyword searchable?
15    A.    Yes.
16    Q.    Did you keyword search anything on
17    that disc at any point?
18    A.    I don't remember.
19    Q.    Did you put in any searches to
20    find things on the disc at any point?
21    A.    I don't remember because I don't
22    know if I was actually the one that looked
23    at the disc.
```

|  | Page 202 |
|---|---|

```
 1    Q.    Who do you think looked at the
 2    disc?
 3    A.    I don't remember that.  I don't
 4    remember.
 5    Q.    So you don't remember when you
 6    looked at the data on the disc, you don't
 7    remember if you looked at the data on the
 8    disc, and you don't remember who looked at
 9    the data on the disc --
10    A.    Right.
11    Q.    -- correct?
12    A.    Right.
13    Q.    But you know you didn't do it on
14    July 2nd?
15    A.    Right.
16    Q.    Okay.  So after this first
17    interview with Ms. Rondini, you went to
18    her apartment; right?
19    A.    Yes.
20    Q.    I have been informed that Jason
21    Wilson from the DA's office came and
22    watched this Rondini interview; correct?
23    A.    Yes.
```

|  | Page 203 |
|---|---|

```
 1    Q.    How did it come to pass that
 2    Mr. Wilson was there?
 3    A.    I don't know who called him over.
 4    Q.    So you don't know?
 5    A.    I don't know.
 6    Q.    Is it commonplace for district
 7    attorneys to come over to watch an
 8    investigation?
 9    A.    Yes.
10    Q.    And what is the general protocol
11    for that happening?  Who generally makes
12    that call?
13    A.    It could be an investigator or a
14    supervisor.  I mean, it could be anybody
15    that calls.
16    Q.    And you don't know who made the
17    call here?
18    A.    I don't.
19    Q.    Did you speak to Mr. Wilson at all
20    after this first interview before you went
21    to the apartment building?
22    A.    I don't remember.
23    Q.    Did you speak to Captain Hood
```

|  | Page 204 |
|---|---|

```
 1    before you went to the apartment building?
 2    A.    I don't remember.
 3    Q.    How about Captain Hart?
 4    A.    I don't remember.
 5    Q.    Okay.  Did you at any point speak
 6    to Jason Wilson about Megan Rondini --
 7    about your interviews with Megan Rondini?
 8    A.    No, I didn't.
 9    Q.    Not a -- this is not a spoiler
10    alert.  We all know this happened.  At
11    some point you Mirandized Ms. Rondini.
12    Did you speak to Mr. Wilson before you
13    Mirandized Ms. Rondini?
14    A.    I don't remember speaking directly
15    to him.  I remember one of the supervisors
16    I believe he was in the room.  They were
17    in the conference room, and they thought
18    it would be best if we Mirandized her.
19    Q.    Okay.  And I didn't quite
20    understand that answer so I'm going to ask
21    you to go through it slow with me.
22         So you were in a room with
23    Mr. Wilson and a supervisor?
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                          12/7/2020

Page 205

1    A.    Well, it was in the conference --
2    it was a common room.  It's not a closed
3    office or anything.  It was in the
4    conference room where they were watching
5    the interview and they -- they were
6    already talking and thought that she
7    should be read Miranda.
8    Q.    Okay.  Who is they?
9    A.    I believe -- I can't remember the
10   supervisor that said it.  I believe it was
11   Captain Hood and Jason Wilson.
12   Q.    I didn't understand that answer so
13   it was Captain Hood speaking to Wilson and
14   they had decided that Megan needed to be
15   Mirandized; is that what you're telling
16   me?
17   A.    I don't remember.  I'm not -- I
18   don't want to say for sure.  I don't
19   remember how that conversation went down.
20         I know that it was a supervisor
21   that thought we needed to read her Miranda
22   and I don't remember which supervisor it
23   was.

Page 206

1    Q.    How many different supervisors
2    could it have been?
3    A.    Captain Hood, Captain Hart.  I
4    can't remember if any of the sergeants
5    were in the office at that time or not.
6    Q.    So you began this deposition by
7    telling me how dramatic the BuzzFeed
8    article was and how much it affected your
9    life; right?
10   A.    Yes.
11   Q.    And you're seeking $10 million of
12   damages in this lawsuit; right?  Right?
13   A.    I don't know the dollar amount.
14   Q.    Well, it's $10 million.  I can
15   read it to you or you can take my word for
16   it.  And the Megan Rondini investigation
17   and the article about it were a pretty big
18   deal in your life; right?
19   A.    Yes.
20   Q.    But you can't tell me who the
21   supervisor was who told you to Mirandize
22   her?
23   A.    I'm saying I don't remember.

Page 207

1    Q.    Another one of your colleagues
2    testified the attorney general's office
3    faulted you for Mirandizing her and said
4    it should have been done by another
5    deputy, another investigator; is that
6    true?
7          MR. COCKRELL:  Object to the
8    form.
9    A.    I have not seen the attorney
10   general's office report.
11   Q.    (By Ms. Bolger) You've never heard
12   that someone else other than you should
13   have Mirandized her?
14         MR. COCKRELL:  Object to the
15   form.
16   A.    I have not.
17   Q.    (By Ms. Bolger) The decision to
18   Mirandize someone who walks in and says
19   that she's been sexually assaulted is a
20   pretty significant decision; right?
21   A.    Yes.
22   Q.    But you don't remember who told
23   you to do it?

Page 208

1          MR. COCKRELL:  I believe
2    he's already answered it time and time --
3    at least three times -- two times.
4    Q.    (By Ms. Bolger) I tell you,
5    Investigator Jones, I find that really
6    hard to believe.  How could you not
7    remember --
8          MR. COCKRELL:  You may not
9    believe it, but he answered the question.
10   Q.    (By Ms. Bolger) -- Mirandizing a
11   sexual assault victim?  Is it just so
12   common that you Mirandize sexual assault
13   victims that you can't remember who told
14   you to do it?
15         MR. COCKRELL:  Object to the
16   form.
17   A.    I'm saying I don't remember.
18   Q.    (By Ms. Bolger) That conversation
19   you had with the mystery supervisor and
20   Mr. Wilson in which they told you that
21   they thought Ms. Rondini had to be
22   Mirandized, was that during your first
23   interview with Ms. Rondini or was it after

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                               12/7/2020

Page 209

```
 1   you came back from the apartment building?
 2   A.     I think it was after we came back.
 3   Q.     And what was the information that
 4   led you-all to decide to Mirandize Megan
 5   Rondini?
 6   A.     That she was admitting to taking a
 7   gun from a vehicle, going back into a
 8   residence, taking money from Bunn, various
 9   crimes that, you know, she could
10   potentially be admitting to.
11   Q.     You Mirandized her before she
12   talked about the cash, didn't you?
13   A.     I don't remember -- I don't
14   remember the order that it was.  If you
15   say it was before the cash, or before she
16   admitted that.
17   Q.     It was.
18   A.     Okay.  I just don't -- I just
19   don't remember that.
20   Q.     I'm not trying to trick you.
21   A.     Okay.
22   Q.     You Mirandized her, and I'll show
23   you in the transcript a little bit.
```

Page 210

```
 1   A.     Okay.
 2   Q.     You Mirandized her before she took
 3   the cash.  The only thing that she had
 4   admitted to was the gun, which you just
 5   told me five minutes ago wasn't a theft,
 6   so why did you-all Mirandize her?
 7            MR. COCKRELL:  Object to the
 8   form.
 9   A.     She was admitting to these things.
10   There were -- she was about to open
11   herself up to some possible criminal
12   activity herself based on what Bunn had
13   told some of the investigators out there
14   on the scene that he was interested in
15   prosecuting for the missing gun, for the
16   missing cash.  He also said there was a
17   credit card I think and some keys.
18   Q.     (By Ms. Bolger) So you guys were
19   Mirandizing her based on the fact that
20   Bunn was saying she stole things at this
21   point, correct, because she didn't tell
22   you she stole things before you Mirandized
23   her?
```

Page 211

```
 1            (Off the record technical issues.)
 2   Q.     Okay.  She didn't tell you she
 3   took the cash before you Mirandized her.
 4   The only thing she told you was she had
 5   the gun.  You told me you didn't think
 6   that was theft, so you-all decided to
 7   Mirandize her based on what Mr. Bunn said
 8   she had stolen; right?
 9            MR. COCKRELL:  Object to the
10   form.
11            You can answer.
12   A.     She had admitted to the gun theft.
13   Q.     (By Ms. Bolger) You just told me
14   that wasn't a theft.
15   A.     Well, I'm saying, and I was
16   speaking what her mind was going through
17   and I shouldn't have speculated what she
18   was in her mind, but what I was trying to
19   get to is she had a reason for taking that
20   gun.  I just needed her to tell me that,
21   but taking the gun is a theft.
22            It's actually a B&E, breaking and
23   entering.  Going back into the house could
```

Page 212

```
 1   be considered a burglary when she took the
 2   money, so with them advising us or
 3   advising me to read her Miranda, it's
 4   actually protecting her rights.  I wasn't
 5   going to put her in jail.
 6   Q.     She -- you didn't Mirandize her
 7   when she told you she took the gun.  You
 8   went out.  You could have come back and
 9   Mirandized her, and you didn't.  You only
10   Mirandized her when you came back.  It was
11   because Bunn told you she took the money
12   and the gun and Alabama tickets, right,
13   that's why she got Mirandized; right?
14            MR. COCKRELL:  Object to the
15   form, the lengthy dissertation.
16            Go ahead.
17   A.     It was because that she had
18   admitted to the gun.  He was filing a
19   complaint on the same thing saying that,
20   you know, she admitted going back into the
21   house but then she had got money and
22   whatever else, credit card, keys, whatever
23   he said it was, but if he's filing a
```

53  (Pages 209 to 212)

Adam Jones                                           12/7/2020

Page 213

1    complaint also, I'm actually protecting
2    her rights by reading her Miranda from
3    these charges that he's going to try to
4    bring up against her.
5    Q.    (By Ms. Bolger) You didn't
6    Mirandize him, though?
7    A.    I didn't talk to him.
8    Q.    He wasn't Mirandized on July 2nd,
9    was he?
10   A.    No, I don't think so.
11   Q.    She was making some pretty serious
12   allegations against him; right?
13   A.    You say she was making?
14   Q.    Yes.
15   A.    I just couldn't hear it.  It broke
16   up.  Yes.
17   Q.    But you didn't Mirandize him;
18   right?
19   A.    I didn't talk to him.
20   Q.    No one from the Tuscaloosa
21   Sheriff's Office or the Homicide Unit or
22   the Tuscaloosa Police Department
23   Mirandized T. J. Bunn July 2nd; right?

Page 214

1    A.    Not to my knowledge.
2    Q.    When you went to Megan Rondini's
3    house with her, can you tell me how long
4    you guys were gone?
5    A.    Probably an hour.  Probably less
6    than an hour.
7    Q.    Was her house close to the
8    sheriff's office?
9    A.    It's probably about a ten or
10   15-minute drive.
11   Q.    And when you got to the house with
12   Megan what did you-all do?
13   A.    We were just looking for her keys.
14   We went in her apartment with her.  She
15   was just -- we just basically just let her
16   walk through and see if she might remember
17   where she may have left her keys.
18   Q.    And did she?
19   A.    She didn't.
20   Q.    And you looked at liquor bottles;
21   right?
22   A.    Yes.
23   Q.    And what -- what was the point of

Page 215

1    doing that?
2    A.    In Bunn's statement he said that
3    she poured them drinks after he picked her
4    up, after she left Innisfree they went to
5    her apartment and she poured them drinks.
6    Q.    And so you looked to see if there
7    was less alcohol in the bottle; right?
8    A.    Well, just to see if there was any
9    alcohol there.
10   Q.    Got you.  Just trying to see if
11   there was evidence that she poured drinks?
12   A.    Right.
13   Q.    And was there?
14   A.    There was a couple of liquor
15   bottles on the kitchen counter and some --
16   I believe it was dishes in the sink.  I
17   couldn't say if it -- I can't remember if
18   it was cups, plates.
19   Q.    Okay.  And did Megan seem
20   surprised by that?
21   A.    She did.
22   Q.    What did she say?
23   A.    She just made mention that the

Page 216

1    content of the bottles did look lower than
2    what it was and that was her statement.
3    Q.    And she hadn't been home between
4    reporting -- sorry, between reporting the
5    assault and this interview; correct?  This
6    was the first time she had gone home;
7    right?
8    A.    Yes, I believe so.
9    Q.    She was at a friend's house in the
10   morning; right?
11   A.    Right.
12   Q.    So this was the first time she was
13   seeing it, so she was surprised; right?
14   A.    Yes.
15   Q.    And then what else did you do at
16   Megan's house -- apartment?
17   A.    That's all I remember.
18   Q.    And then you went back to the
19   police station; right?
20   A.    Yes.
21   Q.    When you got back to the police
22   station it was about 1:58 in the
23   afternoon.  Does that sound right about

54  (Pages 213 to 216)

Adam Jones                                                    12/7/2020

Page 217

1    that?
2    A.    That sounds right.
3    Q.    It's actually 12 hours since the
4    assault and about eight hours since you
5    first met her.  Does that seem about
6    right?
7    A.    Yes.
8    Q.    At that point you must have talked
9    to somebody at the investigation because
10   you told them about the gun; right?
11   A.    Yes.
12   Q.    Did you know about the allegation
13   that she had taken Bunn's wallet?
14   A.    At that time I believe I did.
15   Q.    And how did you know that?
16   A.    I don't remember who let me know
17   that.
18   Q.    What did they tell you, whoever it
19   was?
20   A.    I don't remember.
21   Q.    Was it Josh?
22   A.    I don't remember.
23   Q.    Was it Hood?

Page 218

1    A.    I don't remember.
2    Q.    Captain Hart?
3    A.    I don't remember.
4    Q.    Throughout the day on July 2nd who
5    do you remember talking to?
6    A.    There were several -- I mean
7    several investigators working, so it could
8    have been anybody in that office that I
9    talked to that day.
10   Q.    Who do you remember talking to?
11   Name names.  What people do you remember
12   talking to that day?
13   A.    I talked to Captain Hood, Captain
14   Hart, Josh -- I don't remember any
15   specific other person.
16   Q.    So when I have long, hard days, I
17   often remember who I talked to the most.
18   Do you remember who you talked to the
19   most?
20   A.    It would probably be Josh that
21   day.
22   Q.    Did you have a conversation with
23   Josh about Mirandizing Megan?

Page 219

1    A.    Not that I remember.
2    Q.    Was Josh back in the office?
3    A.    I can't remember who was there.
4    Q.    You had also spoken to Megan's
5    father before you went back in to
6    interview her a second time; right?
7    A.    Yes.
8    Q.    Tell me about that.
9    A.    He was just, you know, concerned
10   for his daughter and, you know, I told him
11   that we were going to -- we were going to
12   do everything we could to help her.
13        Seems like he insinuated that we
14   were going to try to cover stuff up
15   because she had told him that the Bunns
16   had a lot of money.  That's basically all
17   I remember.
18   Q.    What did you respond to that?
19   A.    I just told him, you know, we
20   don't allow money to influence our
21   decisions on cases.
22   Q.    Were you offended by it, by
23   Mr. Rondini?

Page 220

1    A.    Yeah, I mean, of course, you know,
2    people make accusations all the time, but,
3    you know, I wasn't, you know, fighting mad
4    or anything like that.  It's just, you
5    know, somebody accusing you of something
6    like that, that you're covering -- going
7    to cover something up and there's nothing
8    further from the truth.
9    Q.    So before you went back into the
10   room to interrogate Megan, you had already
11   made the decision to Mirandize her;
12   correct?
13   A.    Yes.
14   Q.    Now, you told me that that was a
15   decision -- your supervisor and the
16   lawyers together had told you to do that.
17   Do you have to do what you're told?  Did
18   you agree with that decision?
19   A.    Yeah, I mean at that time, you
20   know, if I wouldn't have agreed to it, I
21   probably wouldn't have done it.
22   Q.    Why did you think it was a good
23   idea?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 221

1   A.    Well, based on what was being said
2   as far as him filing a criminal complaint
3   on her, you know, she is going to possibly
4   open herself up to, you know, criminal
5   allegations and, you know, it's always
6   best to just advise victims -- I'm sorry,
7   advise her of her rights.
8   Q.    Well, she was a victim; right?
9   A.    Yes.
10  Q.    So you were Mirandizing a victim;
11  right?
12  A.    Ma'am?
13        MR. COCKRELL:  Object to the
14  form.
15  Q.    (By Ms. Bolger) You Mirandized the
16  victim?
17  A.    Yes.
18        MR. COCKRELL:  Object to the
19  form.
20  Q.    (By Ms. Bolger) Had you decided
21  you didn't believe her, that she was
22  sexually assaulted by that point?
23  A.    None of the statements that she

Page 222

1   had made up to that point was enough to
2   arrest anybody for rape.  It's not that I
3   didn't believe her what she said, it's
4   just that the elements of the crime wasn't
5   met.
6   Q.    I'm asking you right now do you
7   believe that Megan Rondini was sexually
8   assaulted?
9   A.    I don't know.
10  Q.    And on July -- in July of 2015,
11  did you believe Megan Rondini had been
12  sexually assaulted?
13  A.    I don't know.
14  Q.    Well, that's because it had only
15  happened 12 hours before; right?
16        MR. COCKRELL:  Object to the
17  form?
18  Q.    (By Ms. Bolger) You hadn't read
19  her emails; right?  Right?
20  A.    Yeah, I didn't read her emails.
21  Q.    You hadn't talked to Mr. Bunn;
22  right?
23  A.    I didn't talk to him.

Page 223

1   Q.    You didn't actually talk to any
2   other witness; correct?
3   A.    I did not.
4   Q.    The only person you had spoken to
5   was Megan Rondini, but you were already
6   concluding that she hadn't met the
7   elements of the crime; is that right?
8        MR. COCKRELL:  Object to the
9   form.
10  A.    Yes, the elements of rape had not
11  been met.
12  Q.    (By Ms. Bolger) There's lesser
13  included offenses in a sexual assault
14  charge, aren't there?
15  A.    Yes.
16  Q.    And had you sat down and gone
17  through every element of every possible
18  sexual misconduct crime and decided that
19  they hadn't been met at this moment, a
20  mere eight hours after interviewing Megan
21  Rondini for the first time?
22  A.    I don't remember going through
23  Title 13.

Page 224

1   Q.    Have you ever done that?
2   A.    I have, yes.
3   Q.    In respect to the Rondini crime,
4   the allegations?
5   A.    No.
6   Q.    Okay.
7        MS. BOLGER:  J. T., would
8   you hand over document AS?
9        MR. THOMPSON:  Yeah, just a
10  second.  AS?
11        MS. BOLGER:  Yes.  And
12  Nancy, if you'll be kind enough to mark it
13  as Exhibit 30.
14        (Off the record.)
15        (Whereupon, a document was marked
16        as Defendant's Exhibit No. 30 and
17        is attached to the original
18        transcript.)
19  Q.    And for the record while you take
20  a look at it, Investigator Jones, this is
21  a transcript of the interview taken
22  July 2nd, 2015, between officer and Megan,
23  transcribed on July 13, 2017.

56 (Pages 221 to 224)

Adam Jones                                      12/7/2020

Page 225

1          Again, this was produced to us in
2    the wrongful death lawsuit.  We did not
3    make this video transcript.
4          And, Investigator Jones, you're
5    welcome to take a quick peek.  This is a
6    transcript of your second interview with
7    Megan Rondini; correct?
8    A.    Yes.
9    Q.    So if you look at the second page
10   of the exhibit, so it's page 2 of the
11   transcript.  You begin, and you say, we
12   are in the process of getting the final
13   pieces as far as the videos and stuff.  We
14   still got to touch base with Innisfree,
15   but we're going back out to your apartment
16   to go ahead and pull that before it rolls
17   over and records over but so we're close
18   on your case.
19         Now, based on the statements that
20   you made to me earlier, I need to ask you
21   some questions about it, okay.  Before I
22   ask you any questions though, I mean, you
23   got a reasoning behind why you did what

Page 226

1    you did.
2          First of all, what do you mean by
3    close on your case?
4    A.    Close to getting all the videos
5    pulled.
6    Q.    Do you mean you were close to
7    wrapping up the case?
8    A.    No.
9    Q.    Then you say, I mean, you got a
10   reasoning behind what you did what you
11   did.  And Megan says, what do you mean?
12   And I have to say I agree with her
13   sentiment.  What did you mean by that?
14   A.    I know that she had a reason to
15   take -- for taking that gun, for taking
16   the money.  I just needed her to say that
17   in her own words.
18         I can't put words in her mouth to
19   say I took the gun in fear for my life and
20   I took this money because I was trying to
21   pay a cab, you know, I can't -- I can't
22   tell her what to say.
23         I just need her to tell me -- you

Page 227

1    know, I have no doubt of what she's
2    saying, you know.  It's not that I didn't
3    believe her.  It's just need her to tell
4    me that in her own words because I can't
5    lead her -- do a leading question, like
6    you took this gun because you were scared
7    for your life, didn't you?
8    Q.    Why couldn't you be nice to Megan;
9    you were nice to Mr. Bunn?
10   A.    I didn't talk to Mr. Bunn.
11   Q.    Well, you told me you've got to be
12   nice to Mr. Bunn.  You can't make him come
13   to the office if he's going away.  He's
14   got to be able to go away.  You've got to
15   be nice to Mr. Bunn --
16         MR. COCKRELL:  Object to the
17   form --
18   Q.    (By Ms. Bolger) -- why can you be
19   so accommodating to Mr. Bunn, but you
20   can't be accommodating to Megan?
21         MR. COCKRELL:  Object to the
22   form.
23   A.    I'm just saying that I can't ask

Page 228

1    her a leading question because I know in
2    her mind that she had a reason for taking
3    that gun and she had a reason --
4    Q.    (By Ms. Bolger) Why can't you ask
5    her a leading question?
6    A.    Huh?
7          MR. COCKRELL:  We lost that
8    question.
9    Q.    (By Ms. Bolger) Why can't you ask
10   her a leading question?
11   A.    I need her to tell me in her own
12   words why she did this.  Because that
13   would get -- the criminal case that she's
14   getting put on her or tried to get put on
15   her, it would push that away if she would
16   tell me I was afraid for my life, I took
17   this gun, there's not going to be, you
18   know, a jury anywhere that's going to
19   convict her of that.
20   Q.    You walked into the room and you
21   said this; right?  There's no page before
22   that.  That's the very first page of this
23   transcript; right?

Adam Jones                                              12/7/2020

Page 229

1     A.    Yes.
2     Q.    Before this moment she hadn't told
3   you anything about the wallet; right?
4     A.    I can't remember if she did or
5   not.
6     Q.    How did you expect her to know
7   what you were talking about when you
8   walked into the room and you said you got
9   a reasoning behind why you did what you
10  did?
11        You just walked in and said it.
12  How did she know what you were talking
13  about?
14    A.    I just wanted to be up front with
15  her and say I know that you had a reason
16  behind what you did.  And before I ask you
17  any questions about it, you know, I just
18  need you to tell me in your own words.
19    Q.    But you didn't say that, did you?
20  You said, I mean, you got a reasoning
21  behind why you did what you did.  That's
22  what you said; right?
23    A.    Yes.

Page 230

1     Q.    All right.  If you read down, she
2   says what do you mean.  And you respond,
3   well, that is what we are going to get
4   into.  Now, you -- I just need you to tell
5   me once we get into the questioning, you
6   know, what your reasoning was about why
7   you did these things, but before I ask you
8   the questions I have to read you your
9   rights, okay?  And then you read her her
10  rights; right?  What were these things
11  that you were referring to?
12    A.    The gun, and I mean, it's the
13  things that she was accused of taking.
14    Q.    So Bunn accuses her of taking
15  things after he takes her to a house,
16  takes away her phone, pins her down and
17  has sex with her -- holds her down and has
18  sex with her without her consent, you
19  don't feel the need to Mirandize him.
20        But then Bunn makes a couple of
21  allegations about some bucks in his wallet
22  and his credit card and you feel the need
23  to Mirandize her?

Page 231

1         MR. COCKRELL:  Object to the
2   form.
3     A.    There again, these items were
4   missing and she was -- I wanted her to
5   tell me why she took all this stuff.
6     Q.    (By Ms. Bolger) But this morning
7   you told me that the reason you didn't
8   Mirandize Bunn was because you wanted to
9   have a nice rapport with him to get him to
10  tell you information --
11        MR. COCKRELL:  That's a
12  mischaracterization.
13    Q.    (By Ms. Bolger) -- how could --
14        MR. COCKRELL:  Object to the
15  form.  Mischaracterization.
16    A.    I didn't say we didn't read him
17  Miranda.
18    Q.    (By Ms. Bolger) You told me this
19  morning that you wanted to be nice to him
20  so he would cooperate with the
21  investigation.  It was your word; don't
22  you agree?
23    A.    Yes.

Page 232

1     Q.    How come you can catch more flies
2   with honey when you're talking to
3   Mr. Bunn, but you're all vinegar with
4   Megan?
5         MR. COCKRELL:  Object to the
6   form.
7     A.    There again, I felt like I had her
8   best interest as far as protecting her
9   rights, by advising her of her rights
10  before she admits to these allegations.
11    Q.    (By Ms. Bolger) Will you look at
12  the third page for me?  And Megan says --
13  you, officer, you say, I told you that
14  we're going to go back and forth sometimes
15  on what we ask you, but I do want to go
16  back to one of the last things that you
17  made a statement about, and Megan says
18  also I wrote that before I came here.
19        She's referring to a specific
20  written statement that she had when she
21  walked into the office; correct?
22    A.    Yes.
23    Q.    And you remember she had that;

Adam Jones                                                    12/7/2020

Page 233

1    right?
2    A.    Yes.
3    Q.    It's actually in the felony packet
4    so we can look at it; right?
5    A.    Yes.
6    Q.    Okay.  And you say I haven't even
7    read it yet; right?
8    A.    Yes.
9    Q.    So you haven't read her statement
10   but you have concluded that she hasn't met
11   the elements of a crime; right?
12         MR. COCKRELL:  Object to the
13   form.
14   A.    I hadn't read the statement, no.
15   Q.    (By Ms. Bolger) But you've already
16   reached the conclusion that she hadn't met
17   the elements of sexual assault; right?
18   A.    The elements of the crime had not
19   been met.
20   Q.    But you haven't read her statement
21   yet; right?
22   A.    No.
23   Q.    Okay.  Then I will tell you that

Page 234

1    she -- you do talk about the theft of the
2    credit card, but you knew that before you
3    walked into the room; right?
4    A.    Yes.
5    Q.    But she didn't -- there was never
6    any evidence that she stole Bunn's credit
7    card; correct?
8    A.    There was evidence that stuff was
9    missing out of a wallet.  I had no idea
10   what had actually been taken.
11   Q.    Okay.  But that's not my question.
12   My question was there was never any
13   evidence that she stole Bunn's credit
14   card; correct?
15   A.    No.
16   Q.    In fact, the credit card she used
17   to pay for the cab was as she said in
18   here, her own; correct?
19   A.    Yes, yes.
20   Q.    Will you turn to page 22?  If you
21   start with line 9 -- first of all, you ask
22   her if she's got a fake ID.  Do you see
23   that?

Page 235

1    A.    Yes.
2    Q.    Why?
3    A.    She's 20 years old.  I just asked
4    her.
5    Q.    Just racking up the crimes?
6          MR. COCKRELL:  Object to the
7    form.
8    A.    We were not charging her with
9    anything.
10   Q.    (By Ms. Bolger) Why were you
11   asking her about the fake ID if you
12   weren't just looking for another way to
13   get her in trouble?
14   A.    I just -- I mean, she's in a bar
15   drinking.  You know she had to have a fake
16   ID, so I just asked her do you have a fake
17   ID.
18   Q.    Why did you have to -- is that
19   relevant to her sexual assault allegation?
20   A.    No.
21   Q.    Is it relevant to Bunn's theft
22   allegations?
23   A.    No.

Page 236

1    Q.    Okay.  You say I believe you, all
2    right.  Here's what I want to talk to you
3    about and I think you know this, I really
4    do.  When we talked at the hospital you
5    made a statement to me, you said you felt
6    like, you know, that you had been taken
7    advantage of or something to the effect
8    but you also told me you never said no.
9    What were you trying to say to her?
10   A.    That the elements of rape had not
11   been met.
12   Q.    But you're trying to tell her you
13   know that you think she knows that; right?
14   You say I think you know this.
15   A.    Well, just referring to her
16   remembering the statement.
17   Q.    Okay.  And she says to you I was
18   saying that I wanted to leave and when he
19   started to touch me I was not responsive
20   to him at all, and then you say -- and
21   then she says I just honestly felt like
22   because he wasn't going to stop, so if I
23   just kind of let him, then I would be able

Adam Jones                                              12/7/2020

Page 237

1    to leave.
2         Do you see that?
3    A.    Yes.
4    Q.    She doesn't agree with you that
5    this was not an assault; correct?
6         MR. COCKRELL:  Object to the
7    form.
8    A.    Well, I mean it's just -- again,
9    the elements of rape were not met.
10   Q.    (By Ms. Bolger) Page 14 -- sorry,
11   line 14 -- sorry page 23 line 14, you say,
12   here's my question to you and this is
13   after going over everything, and there
14   again, we're still working, it is still an
15   active case, okay?  We're still working
16   this case, but based on your statement to
17   me you said you never resisted him.
18        And Megan says, I did resist him.
19   The N-T is crossed out on this, because
20   there was a mistake in the transcript, so
21   it's I did resist him.  I said I wanted to
22   leave.  When he tried to kiss me, I turned
23   away, like I didn't -- and you interrupt

Page 238

1    her and say, but you never said no, okay.
2         And you said you felt like if you
3    let him have sex with you, then you would
4    be able to leave, okay, and then the
5    conversation goes on.
6         Had she said no instead of I have
7    to go, would you have thought the elements
8    of rape were met?
9    A.    It's possible.  I'm just saying
10   that it wasn't said so, you know, the
11   elements wasn't there.
12   Q.    Why does it matter whether she
13   said no?
14   A.    His -- it has to be met with
15   earnest resistance to be -- to meet the
16   elements of that crime, and it was not.
17   Q.    But not of lesser included
18   offenses; right?
19   A.    I'm not sure on that.  I would
20   have to look at Title 13.
21   Q.    Well, shouldn't you have been?
22   When there was a girl in your office
23   saying that she was sexually assaulted,

Page 239

1    shouldn't you have checked Title 13 then?
2    A.    That's one reason there was a lot
3    of people in the office, you know, and
4    another reason that the district attorney
5    or assistant district attorney was called
6    over.  If there was anything lesser
7    included that could be or could be charged
8    against Bunn, it would have been.
9    Q.    Did you talk to anybody about
10   that?
11   A.    I don't remember.
12   Q.    Okay.  On page 25, she says I
13   didn't want it to happen and, like, I am
14   pretty sure I was clear that I didn't want
15   it to happen.  And you say how.  That is
16   one thing I'm trying to get, you know, how
17   did you make it clear to him that you
18   didn't want it to happen.
19        And then Megan says, when he told
20   me to go upstairs I did not.  I stayed as
21   far away from his bed as possible.  I had
22   all my clothes on.  I tried to just not, I
23   don't know like, and then when he wanted

Page 240

1    me to come sit on the bed, I didn't come
2    sit with him and then he brought me to the
3    bed and I just -- and you interrupt her,
4    and you say, you know, I -- what I want to
5    stress to you also is I'm not here to
6    embarrass you in any way, but you never go
7    back to asking her what she did, how she
8    made it clear that she didn't want it to
9    happen.  Why didn't you let her tell you
10   that?
11   A.    I don't know.
12   Q.    Then you ask on page 26 you say,
13   but when you're talking about rape, you
14   know, why didn't you call the police, you
15   know.  And Megan says at the house, and
16   you said yes.  And Megan says I thought
17   about it but -- and you and.  And then she
18   says, at first I didn't even -- I wasn't
19   even going to go to the hospital and my
20   friends told me that I should go.  I
21   didn't want to make a big deal.
22        Do you see that?
23   A.    Yes.

Adam Jones                                                    12/7/2020

Page 241

1   Q.    Do you have any memory of Megan
2   ever telling you that her phone wasn't
3   working or her phone had died?
4   A.    I don't remember that.
5   Q.    I'll tell you absolutely candidly
6   Captain Hood testified that at some point
7   Megan said her phone had died, and I have
8   scoured the transcripts and the videotapes
9   and I can find absolutely nothing where
10  Megan ever said her phone had died.  I
11  don't think she said it.  Do you have any
12  reason to believe she said it?
13  A.    I don't remember her saying.  I
14  don't believe she said that, but.
15  Q.    And if it's not in these
16  transcripts or these videotapes, is there
17  somewhere else it would have been?
18  A.    No.
19  Q.    I think Captain Hood's mistaken.
20  I don't want you to think he's, you know,
21  making things up.  I just think he's
22  mistaken, but I just wanted to make sure I
23  was correct.  Okay.

Page 242

1          During this conversation you have
2   a lot of conversations with Megan about
3   talking to her father, your conversation
4   with her father.  Why did you tell her
5   that?
6   A.    I don't think it was anything in
7   particular.  Just to let her know that,
8   you know, he had called and was checking
9   on her.
10  Q.    Okay.  You certainly suggest that
11  you're unhappy with his allegation that
12  you might favor Bunn rather than her.  Why
13  would you communicate that to Megan?
14  A.    I don't know.
15  Q.    It doesn't have to do with whether
16  she was assaulted by Bunn; right?
17  A.    No.
18  Q.    And it doesn't have to do with
19  whether she stole things from Bunn; right?
20  A.    No.
21  Q.    In addition to this interview, you
22  offer her a non-prosecution form; is that
23  correct?

Page 243

1   A.    Yes.
2   Q.    Does that comport with your
3   memory?  Had you had conversations before
4   you went in to question Megan about
5   bringing in an non-prosecution form with
6   people outside of the office?
7   A.    I don't remember a conversation
8   about it.
9   Q.    Did you talk to one of your
10  supervisors or the district attorney about
11  that?
12  A.    I don't remember.
13  Q.    Okay.  Was it something that in
14  your discretion you could do, walk in with
15  a non-prosecution form, or generally did
16  you need a supervisor to sign off on that?
17  A.    No, you could go in on your own
18  and do that.
19  Q.    Do you remember making a choice to
20  do that here?
21  A.    I don't remember.
22  Q.    Why did you give her the
23  non-prosecution form?

Page 244

1   A.    Well, she was telling us that she
2   didn't want it to go any further and that
3   doesn't necessarily mean our investigation
4   stops.  It just means that, I guess for
5   lack of a better term, she doesn't want to
6   have anything to do with the case right
7   now or further.
8   Q.    But she didn't sign it?
9   A.    She didn't sign one, no.
10  Q.    In your experience investigating
11  sexual assault cases, do you often walk in
12  with a non-prosecution form?
13  A.    I believe I have before.
14  Q.    Before Megan or before now?
15  A.    Before -- I believe it was before
16  Megan.
17  Q.    How many times?
18  A.    I can't say for sure.
19  Q.    Okay.  In this interview you never
20  mention Megan's text messages; correct?
21  A.    Yes.
22  Q.    And that's because you hadn't seen
23  them yet?

Adam Jones                                          12/7/2020

Page 245

1    A.    Right.
2    Q.    You-all made the decision to
3  Mirandize Megan without seeing the text
4  messages; correct?
5    A.    Yes.
6    Q.    So Megan then left your office or
7  left the sheriff's office, and what was
8  the next thing you did in the
9  investigation into Megan's allegations
10  against T. J. Bunn?
11   A.    I'm sure it was to get the rest of
12  the videos that we knew were out there,
13  probably Innisfree, and checking with any
14  city-owned cameras that may have got
15  picked up anything on camera around
16  Innisfree, down University Boulevard.
17  That's more than likely that's what it
18  was.
19   Q.    As you sit here, do you actually
20  know what happened to Megan after she left
21  Innisfree between when she got into
22  T. J. Bunn's car?
23   A.    No.

Page 246

1    Q.    After Megan left your office, did
2  you have any internal meetings about the
3  investigation?
4    A.    Not that I remember.
5    Q.    Did you ever have a conversation
6  about the involvement of the Bunn family
7  in the allegations made by Megan with
8  Captain Hood?
9    A.    Not that I remember.
10   Q.    Did you ever have such a
11  conversation with Hart, Captain Hart?
12   A.    Not that I remember.
13   Q.    Did you ever have such a
14  conversation with Sheriff Abernathy?
15   A.    No.
16   Q.    How about Josh Hastings?
17   A.    Other than just the general
18  investigative questions, nothing specific
19  comes to mind.
20   Q.    Are you aware that Captain Hood
21  called one of his supervisors on the
22  morning of the alleged assault to tell him
23  that Bunn was involved?

Page 247

1    A.    I didn't know that.
2    Q.    Are you aware that Sheriff
3  Abernathy himself was told that Bunn was
4  involved?
5    A.    I was not aware of that, no.
6    Q.    Did you ever contact any of the
7  people who were at the Innisfree bar with
8  Megan Rondini?
9    A.    No.
10   Q.    You never spoke to Kara Whelpy?
11   A.    No.
12   Q.    You never spoke to Elisabeth
13  Mapes?
14   A.    No.
15   Q.    You never spoke to Hannah Carter?
16   A.    No.
17   Q.    You never spoke Logan St. Pierre?
18   A.    No.
19   Q.    You never spoke to Shannon Towles?
20   A.    No.
21   Q.    You never spoke to Haley Wightman?
22   A.    No.
23   Q.    You never spoke to Amie -- I'm

Page 248

1  going to mess it up -- Intagliata?
2    A.    No.
3    Q.    Never spoke to Bridget Bernarding?
4    A.    No.
5    Q.    You never spoke to Sammie Auer?
6    A.    No.
7    Q.    Couldn't they have all told you
8  when Megan left Innisfree and why?
9    A.    They could have -- well, I don't
10  know if they could have.
11   Q.    Well, wouldn't you want to know?
12  Wouldn't you want to ask them?
13   A.    I can't -- I think we had video
14  pretty quick from Innisfree.
15   Q.    But it was video.  It wasn't
16  audio; right?
17   A.    Right.
18   Q.    Isn't it supposed to be your job
19  to contact witnesses to crimes?
20   A.    They were just at the bar, yes.
21   Q.    But we still don't know what
22  happened to Megan Rondini from the time
23  when she left Innisfree, thinking to her

Adam Jones                                                    12/7/2020

Page 249

1    memory that she had a designated driver,
2    and when she's picked up on the side of
3    the road by T. J. Bunn; right?  We still
4    don't know what happened?
5    A.    All I know --
6    Q.    Wouldn't it --
7          MR. COCKRELL:  Wait a
8    minute.  Let him finish his answer.
9    A.    -- all I know is she walked out of
10   the bar.  That's --
11   Q.    (By Ms. Bolger)  Right.  But it
12   feels like these women would have been
13   able to tell you about that; right?
14   A.    Possible, if they hadn't left.
15   Q.    Did you ever interview a woman
16   named Rebecca Lundgren who was with Ciara
17   Younger when she came to pick up Rondini?
18   A.    I didn't.
19   Q.    Did you ever collect -- was
20   T. J. Bunn's clothing ever collected?
21   A.    I can't remember if his clothing
22   was collected.  It would probably be on
23   that evidence list in the felony packet.

Page 250

1    Q.    Okay, it's not.  So if it's not
2    there, would it have been collected?
3    A.    Probably not.
4    Q.    Okay.  So you said you looked at
5    some surveillance footage from various
6    cameras; I'm paraphrasing.  What else did
7    you do as to the Rondini investigation
8    after Megan left the office?
9    A.    I can't remember anything
10   specifically.
11   Q.    Okay.  Can you remember if
12   Investigator Hastings did anything?
13   A.    I don't know.
14   Q.    Did you hear again from
15   Mr. Rondini?
16   A.    I don't think so.
17   Q.    There was never a physical exam of
18   any kind done on Mr. Bunn, was there?
19   A.    Not to my knowledge.
20   Q.    And I know you took bedding from
21   the house, but you didn't do any analysis
22   on the bedding; right?
23   A.    I don't believe so.

Page 251

1    Q.    So sorry.  You said you didn't
2    speak to Mr. Rondini?
3    A.    I don't believe I did -- again
4    after that first time.
5    Q.    Right, I know you spoke to him the
6    first time, but the district attorney did
7    speak with him; correct?
8    A.    Yes.
9    Q.    And you had a meeting with the
10   district attorney before she spoke to
11   Mr. Rondini; right?
12   A.    I don't even know if I would call
13   it a meeting.  Seems like she just wanted
14   what were the facts of the case or
15   something to that effect.  I can't say for
16   sure, but it wasn't like a formal meeting.
17   Q.    Okay.  Informal or formal --
18   A.    Right.
19   Q.    -- did you have a conversation
20   with her face to face or a telephone
21   conversation?
22   A.    I don't remember.
23   Q.    Okay.  What do you remember the

Page 252

1    purpose of that meeting was?
2    A.    I think she just wanted, you know,
3    like I say the facts of the case.  That
4    way she would know what to talk about with
5    Mr. Rondini.
6    Q.    Did you have that conversation
7    with the district attorney before or after
8    you put together the felony packet?
9    A.    It would have probably been
10   before.
11         MS. BOLGER:  J. T., I'm
12   going to ask you to show the witness the
13   timeline which is -- it was Exhibit 15 --
14   wait, no.  Yes, it was Exhibit 15, but
15   it's AJ exhibit.  It's the first one
16   through 23, pages one through 23 of AJ is
17   the timeline of the Rondini case.
18         MR. COCKRELL:  I tell you
19   what, we've been going a little over an
20   hour, I think.  Let's just take maybe a
21   five-minute break.
22         MS. BOLGER:  Okay.
23         VIDEOGRAPHER:  We're off the

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                              12/7/2020

Page 253

```
 1    record at 2:11.
 2           MS. BOLGER:  Can I have 10
 3    more minutes, Bob, to finish this line of
 4    questioning?
 5           VIDEOGRAPHER:  Back on the
 6    record at 2:12 p.m.
 7        (Whereupon, a document that was
 8         previously marked as Defendant's
 9         Exhibit No. 15 was referenced and
10         is attached to the original
11         transcript.)
12    Q.    (By Ms. Bolger) For the record,
13    this is a document that Chief Waid I
14    believe identified as a timeline of the
15    Rondini case created by the attorney
16    general's office after the -- after
17    actually Ms. Rondini's death, and I'm only
18    going to ask you about one very specific
19    portion of the timeline.
20         You're welcome to read the whole
21    thing but I wanted you to turn to page 20.
22    There's a date of July 28, 2015 that I
23    wanted to talk to you about.  Are you with
```

Page 254

```
 1    me?
 2    A.    Yes, ma'am.
 3    Q.    Okay.  So it says, District
 4    Attorney Lyn Head came over to the office
 5    to speak with Investigator Jones about the
 6    case.  Head said she was going to speak
 7    with Ms. Rondini's father and she left the
 8    office a short time later.
 9         Approximately 30 minutes later, DA
10    Lyn Head came back to the office to speak
11    with Investigator Jones about the
12    conversation she had had with
13    Ms. Rondini's father.  Head provided
14    Investigator Jones with a synopsis of the
15    conversation she had with Mr. Rondini, see
16    the email below.
17         Do you remember that happening,
18    Investigator Jones?
19    A.    Yes.
20    Q.    And did you, in fact, receive an
21    email with the synopsis or did she give
22    you an oral synopsis and wrote it later?
23    A.    It was an email.
```

Page 255

```
 1    Q.    We didn't get that email when we
 2    saw this production.  Did you have a lot
 3    of emails related to this case?
 4    A.    No.
 5    Q.    Did you have any emails related to
 6    this case?
 7    A.    The ones I had I turned over, and
 8    I say that this is an email.  I don't know
 9    if she sent it directly to me or if she
10    sent it to a supervisor and they passed it
11    onto me.
12    Q.    But you have seen an email that
13    contains these contents?
14    A.    Yes, I've seen it.
15    Q.    I just want to ask you a couple of
16    questions about the second graph of the
17    email, so the second bullet or italicized
18    graph.
19         It starts, I apologized to him for
20    the delay in getting back with him and
21    explained to him that both of our offices
22    are understaffed and have a lot going on
23    during recent weeks, and we just had an
```

Page 256

```
 1    opportunity to go over the case again this
 2    morning.
 3         I told him that you reviewed the
 4    details of statements and video from the
 5    investigation with me and that you had
 6    referred to your case notes in doing so.
 7    Do you see that?
 8    A.    Yes.
 9    Q.    What case notes?
10    A.    It was probably notes that
11    everybody had taken whether it was on the
12    scene or, you know, in the interview.
13    Case notes could be, you know, written
14    statement or, you know, just somebody
15    jotting down notes, synopsis of a
16    statement.
17    Q.    I actually didn't see any notes by
18    you in the file.  There's no handwritten
19    notes by you.  Is that consistent with
20    your memory?
21    A.    I believe so.
22    Q.    And the next paragraph it says, he
23    asked what this office intended to do in
```

                              64  (Pages 253 to 256)

Adam Jones                                              12/7/2020

Page 257

1    the case.  I told him there was no
2    evidence of force or lack of capacity to
3    consent.  Because of the total absence of
4    evidence as to either of these required
5    elements, the case would not proceed to to
6    a grand jury.  Do you see that?
7    A.    Yes.
8    Q.    Okay.  And the next paragraph
9    starts out, he asked whether, but I just
10   wanted to have you look at bottom.  So the
11   final sentence in that paragraph, which is
12   third from the end reads, I also told him
13   that based on the statements of the three
14   individuals who gave statements concerning
15   her contact with the male subject, the
16   last cocktails that were made were made by
17   Megan at her apartment.  What were those
18   three statements?
19   A.    I don't know who she was referring
20   to.  I mean I don't know if she's talking
21   about Bunn, Barksdale, and Megan.  I don't
22   know if that's the three.  I don't know.
23   Q.    Okay.  She seems to be referencing

Page 258

1    something you said, so I wondered if you
2    had said there were three statements, but
3    if you don't remember you don't remember.
4    A.    Yeah, I don't remember.
5    Q.    Okay.  Then on the next page,
6    page 21, the graph starts he asked why her
7    Miranda rights were read to her.
8        Do you see that?
9    A.    Yes, ma'am.
10   Q.    She said, I informed him that I
11   did not understand that he ultimately
12   claimed that she had been sexually
13   assaulted.
14       Do you see that?
15   A.    Yes.
16   Q.    Is it your position that Megan
17   Rondini never claimed she was sexually
18   assaulted?
19   A.    Well, she claimed that, yes.
20   Q.    So that's wrong that she says here
21   I did not understand that she ultimately
22   claimed that she had been sexually
23   assaulted?  She did claim she had been

Page 259

1    sexually assaulted; right?
2    A.    Yes.
3    Q.    And you know that's what she
4    claimed; right?
5    A.    She didn't use the term sexually
6    assaulted.
7    Q.    She did or did not?
8    A.    Did not.
9    Q.    But that's what she was saying
10   happened to her; right?
11   A.    Yes.
12   Q.    And then the start of the next
13   paragraph starts out, he asked whether she
14   would be charged with a crime and stated
15   that would be an injustice under the
16   circumstances.
17       Do you see that?
18   A.    Yes.
19   Q.    And then if you look at the final
20   paragraph on the page, it says he told --
21   he then told me that the investigator had
22   been gruff with her and that it had been
23   inappropriate for a male to question her,

Page 260

1    that the lack of follow-up concerning
2    medical information at the hospital
3    (because he had called you and you had not
4    returned his call) and other things that
5    he had thought to do in the first ten
6    minutes of knowledge that this had
7    occurred and other things that a sergeant
8    in Las Vegas (his relative) has asked
9    about indicated that this so-called
10   investigation had been conducted in a
11   hillbilly manner that caused him concern.
12       Do you see that?
13   A.    Yes.
14   Q.    Then on the next page, I told him
15   that his lack of knowledge of the facts
16   and actions of the investigation and his
17   resulting use of the word "hillbilly" was
18   frankly the most offensive thing anyone
19   had said to me in 18 years I have been
20   working in this field.
21       Do you see that?
22   A.    Yes.
23   Q.    Did you also agree that hillbilly

65 (Pages 257 to 260)

Adam Jones                                                        12/7/2020

---

Page 261

1   is offensive?
2   A.     Not to me.  I mean, I've been
3   called worse.
4   Q.     And then he says, he never wants
5   you to contact his daughter ever again.
6   Do you see that?
7   A.     Yes.
8   Q.     And, in fact, you never did
9   contact his daughter again; right?
10  A.     Right.
11  Q.     Do you remember having any
12  reaction to this?
13  A.     No.
14  Q.     Okay.  Just quickly before we
15  break -- actually you know what, we can
16  come back.  We can take a break.
17         VIDEOGRAPHER:  We're off the
18  record at 2:19 p.m.
19         (Recess was taken.)
20         VIDEOGRAPHER:  We're back on
21  the record at 2:34 p.m.
22  Q.     Do you know a guy Scott Meyer,
23  Investigator Jones?

---

Page 262

1   A.     Just he had contacted me saying
2   that he was representing the Rondinis.
3   Q.     Okay.  And you originally agreed
4   to talk to him; right?
5   A.     Yes.
6   Q.     And then you didn't ultimately;
7   correct?
8   A.     Yes.
9   Q.     Why not?
10  A.     I can't remember exactly, but I
11  believe it was because he wanted to be
12  there any time Megan was there and the
13  only thing that she had to come back for
14  was picking up her property so it really
15  wasn't necessary to talk with him.
16  Q.     Was it also in part because the
17  Rondinis had said that they were
18  considering litigation against the
19  department?
20  A.     I don't know about the -- I don't
21  think that was in talks at that time.
22  Q.     Did there come a time when the
23  Rondinis said they were threatening a

---

Page 263

1   lawsuit?
2   A.     It wasn't made known to us.
3   Q.     It wasn't told to you?
4   A.     Up until the lawsuit was filed, I
5   mean, there wasn't talk saying, you know,
6   they're talking about filing a lawsuit.
7   Q.     Okay.  Did you speak to
8   Ms. Rondini when she came to get her
9   property?
10  A.     Yes.
11  Q.     What did you-all talk about?
12  A.     Just the gist of it was about the
13  property that I remember --
14  Q.     At that time -- I'm sorry, I cut
15  you off.  That was totally unintentional.
16         Can you tell me what you were
17  saying?
18  A.     I'm sorry, I believe it was just
19  about the property itself I think.  I
20  can't remember everything.
21  Q.     Do you remember her telling you
22  that they were planning to go a different
23  route?

---

Page 264

1   A.     Yes.
2   Q.     What did you understand her to
3   mean by that?
4   A.     I do remember asking her at that
5   point if she was talking about civilly,
6   like a civil suit, against the Bunns I'm
7   sorry.
8   Q.     Okay.  And what did she say to
9   that?
10  A.     I believe she said, yes.
11  Q.     At any point before the filing of
12  that lawsuit were you instructed not to
13  talk to the Rondinis anymore because this
14  was a civil matter and all things needed
15  to be directed through the district
16  attorney's office?
17  A.     I don't remember anybody ever
18  instructing me not to talk to the Rondinis
19  other than the attorney, Meyer, Scott
20  Meyer, the one --
21  Q.     I'm sorry, I thought you ended up
22  not talking to Mr. Meyer.  Did you have a
23  conversation with Mr. Meyer?

---

66 (Pages 261 to 264)

Adam Jones                                                    12/7/2020

Page 265

1    A.    Well, I think it was in letter
2    form, I think.
3    Q.    Okay.
4          MS. BOLGER:  J. T., can you
5    hand the witness letter N?
6          MR. THOMPSON:  Yes, just a
7    second.
8          MS. BOLGER:  And Nancy,
9    would you mark this 31.
10         (Whereupon, a document was marked
11         as Defendant's Exhibit No. 31 and
12         is attached to the original
13         transcript.)
14   Q.    (By Ms. Bolger) For the record,
15   Exhibit 31 is a document produced to us by
16   the plaintiffs that we've given the Bates
17   number Jones-Hastings 224.  It's an email
18   from Adam Jones to Kip Hart dated
19   August 19, 2015, with some handwriting on
20   the top.
21         Investigator Jones, do you
22   remember receiving this email -- or sorry,
23   do you remember sending this email to Kip

Page 266

1    Hart?
2    A.    I don't remember -- I'm not
3    doubting I did it.  I sent it, but I just
4    don't remember it.
5    Q.    Why send an email like that to Kip
6    Hart?
7    A.    I don't -- I don't know.
8    Q.    And the handwriting on top there's
9    a handwritten note that says, this is an
10   attorney the Rondinis had to contact me
11   during the investigation.  Do you see
12   that?
13   A.    Yes.
14   Q.    And that's your handwriting?
15   A.    Yes.
16   Q.    And was that a note you wrote as
17   to this litigation?
18   A.    I can't remember if -- I don't
19   know if I made that note printing it out
20   putting it in the file, case file, or I
21   can't remember writing that.  I know
22   that's my writing, but I just don't
23   remember when I wrote it.

Page 267

1    Q.    Okay.  You can put that aside.
2          MS. BOLGER:  J. T., would
3    you mind handing the witness letter I,
4    which is the felony packet, and for the
5    record this was marked as Exhibit 2 to the
6    deposition of Captain Hood -- Captain
7    Hart.
8          (Whereupon, a document that was
9          previously marked as Defendant's
10         Exhibit No. 2 was referenced and
11         is attached to the original
12         transcript.)
13   Q.    For the record, I have had -- the
14   witness has been handed the felony packet
15   related to the case in which Megan
16   Elizabeth Rondini is the victim and Terry
17   Jackson Bunn, Jr., is the defendant.
18         Investigator Jones, have you seen
19   this before?
20   A.    Yes.
21   Q.    In fact, you put this together;
22   correct?
23   A.    Yes.

Page 268

1    Q.    And when did you do that?
2    A.    It would probably be from anywhere
3    from the end of July through halfway
4    through August, at some time period in
5    there.
6    Q.    And if you'll flip through it, you
7    can do so at your leisure.  I want to just
8    make sure that this is the whole felony
9    packet.
10   A.    It does look like the entire
11   thing.
12   Q.    How did you go about putting this
13   together?
14   A.    Just collected the statements that
15   everybody had taken, the photos, and the
16   system that we use actually puts it in an
17   order.  Any handwritten statement or
18   anything we -- or Miranda rights or
19   anything like that, we'll put that in the
20   packet in the certain order that they want
21   it.
22   Q.    Okay.
23   A.    If that's what you're talking

67 (Pages 265 to 268)

Adam Jones                                          12/7/2020

Page 269

1  about.
2  Q.     And is the purpose of the felony
3  packet to put together all of the
4  important information in the case and then
5  you send it over to the district attorney
6  for presentation to the grand jury?
7  A.     Yes.
8  Q.     So you're trying to marshal all of
9  your evidence and put it in the grand jury
10  felony packet; right?
11  A.     Everything related to the case.
12  Q.     Okay.  Did you actually present
13  this case to a grand jury?
14  A.     Yes.
15  Q.     There's something in the files
16  that says that Investigator Adams
17  presented it to the grand jury.  Is that
18  wrong; you did it yourself?
19  A.     I don't know why people put that
20  as my last name, I guess.  My name is Adam
21  Jones, so I don't know why they do that
22  but it was me that presented it.
23  Q.     Okay.  When did you present it to

Page 270

1  the grand jury?
2  A.     I believe it was February of '16.
3  Q.     And that was after Megan died?
4  A.     Yes.
5  Q.     I want to ask you a couple of
6  questions about the packet.  So on the
7  first page you'll see it says charge
8  special inquiry.  Do you see that?
9  A.     Yes.
10  Q.     Have you put -- is putting special
11  inquiry as the charge for a case that goes
12  to the grand jury common?
13  A.     Yes.
14  Q.     Why?
15  A.     Well, like I say, we had
16  determined the elements of the crime for
17  rape had not been met.  We presented it to
18  the grand jury to see if they saw
19  otherwise.
20  Q.     You said you determined the
21  elements of rape had not been met.  Had
22  you determined that the elements of any
23  other crime of sexual misconduct had been

Page 271

1  met or not met?
2  A.     No.
3  Q.     Have you ever charged anyone with
4  a lesser sexual assault offense?
5  A.     Not that I can remember.
6  Q.     Do you know what they are?
7  A.     Well, I'm sure probably talking
8  about sexual misconduct, sexual abuse.
9  Q.     Do you know what the elements are
10  of sexual misconduct?
11  A.     Not in my head, no.
12  Q.     So how can you tell if something
13  is a crime if you were never -- if you
14  don't know the elements?
15  A.     Well, I'm just saying it's been a
16  year since I've worked in police work, so,
17  you know, I don't remember the elements of
18  that crime.  I'm not saying --
19  Q.     Did you know the elements of that
20  crime on the 2nd of July 2015?
21  A.     I'm sure I did.
22  Q.     Did you sit down and try to
23  determine whether the charges against --

Page 272

1  the claims against Mr. Bunn amounted to
2  sexual misconduct?
3  A.     Not that I remember.
4  Q.     Have you ever been trained on the
5  elements of sexual misconduct crimes other
6  than rape?
7  A.     Not -- no formal training, no.
8  Q.     Where did you get your
9  understanding of what earnest resistance
10  is?
11  A.     Just by the -- I believe it's the
12  legal definition in Title 13.
13  Q.     So just from reading the statute
14  is how you came to know what earnest
15  resistance was?
16  A.     Well, it's defined in the criminal
17  statute.
18  Q.     Okay.  But just by reading the
19  definition of earnest resistance is how
20  you came to understand what earnest
21  resistance was?
22  A.     When it's based on a crime, yes.
23  Q.     You never had a conversation with

Adam Jones                                                    12/7/2020

Page 273

1  anybody or trained in how to spot the
2  elements of earnest resistance?
3  A.    No.
4  Q.    When did you acquire your
5  knowledge of the elements -- when did you
6  acquire your knowledge of what earnest
7  resistance is?
8  A.    Probably been early on in my
9  career.  You don't use that as far as
10  determining element of a crime as much as
11  you do working in homicide.  You do as far
12  as like when I was in patrol taking the
13  actual report, yes, you would document
14  that, but you dealt with it a lot more in
15  homicide.
16  Q.    Okay.  But you never charged
17  anybody with any other sexual crime?
18  A.    I mean I have, yes.  I thought you
19  were talking about a lesser crime -- I see
20  what you're asking now.  As far as yes,
21  people have been charged -- I have charged
22  people with lesser sexual crimes.
23  Q.    What crimes?

Page 274

1  A.    Well, I guess it wouldn't be
2  lesser.  Sodomy.  I can't remember if I've
3  ever charged anybody with sexual
4  misconduct.  I have had rape been charged
5  -- charged people with rape.  Sexual
6  abuse.
7  Q.    What are the elements of sexual
8  abuse?
9  A.    There again, I would have to have
10  a Title 13 in front of me to know exactly
11  what it says.
12  Q.    Okay.  Page 2 of the document, and
13  I promise I won't ask you a question on
14  every page of this massive document, but I
15  will ask you questions on some.  It says
16  Tuscaloosa Homicide Unit felony sheet --
17  felony report fact sheet.  What is a
18  felony report fact sheet?
19      MR. COCKRELL:  What page are
20  you on?
21      THE WITNESS:  The second
22  page.
23  Q.    (By Ms. Bolger) Second page.

Page 275

1  A.    Basically just list the defendant,
2  victim, charge and the initial officer on
3  the scene, anybody that did any
4  interviews.
5  Q.    Is it generated automatically or
6  do you generate it?
7  A.    The format of it is generated
8  automatically.  We have to input the names
9  and stuff like that, addresses, dates, but
10  the general layout, I guess you could say,
11  is generated automatically.
12  Q.    Okay.  If you flip to --
13  unfortunately there are no page numbers,
14  and you're probably going to dislike me
15  for making you count a lot and I apologize
16  for that, but on the fourth page of the
17  exhibit it's called Tuscaloosa County
18  Homicide Unit Synopsis.  Do you see that?
19  A.    Yes.
20  Q.    And did you write this?
21  A.    Yes.
22  Q.    What is the purpose of the
23  synopsis in this packet?

Page 276

1  A.    It's basically for any supervisor
2  that's reviewing this, checking it I guess
3  you could say, to make sure any
4  corrections or anything needed to be made
5  as far as it's just a general overview of
6  the case.
7  Q.    Okay.  When say a supervisor, what
8  do you mean?
9  A.    Well, it goes through three
10  different supervisors.  One makes sure all
11  the paperwork is actually in the report.
12  There's another one that makes sure
13  there's no grammatical errors or spelling.
14      And then I believe it's one that
15  actually looks through, you know, to make
16  sure that, you know, the investigation was
17  done correctly or totally, and it's ready
18  to go to grand jury.
19  Q.    And who looked through this in
20  this case?
21  A.    I can't remember the order.  It
22  seems like it was Sergeant Davis, Sergeant
23  Franks, and possibly Captain Hood.  That's

69 (Pages 273 to 276)

Adam Jones                                              12/7/2020

Page 277

1    -- we put it in a box, in the first
2    sergeant's box.  He'll do what he checks.
3    It goes to another sergeant's box.  He
4    does his check, and then it goes to
5    Captain Hood.
6    Q.     Okay.  And then this packet goes
7    to the grand jury?
8    A.     It goes to the DA's office.
9    Q.     Goes to the DA's office.  And what
10   happens to it in the DA's office?
11   A.     My understanding is they put it in
12   their own folders.  They keep it as much
13   in entirety as possible, but I think they
14   would break the packets up from time to
15   time, I don't know why, but they go
16   through the packet, assign it a date to be
17   presented to grand jury, and then it's
18   presented on that date.
19   Q.     And did you -- when you presented
20   to the grand jury, did you present the
21   whole packet?
22   A.     Just relative to the alleged
23   sexual assault.  I mean there's an entire

Page 278

1    packet here, but like I don't go through
2    and read the synopsis for the grand jury.
3    It's usually just the facts of the case
4    that is presented.
5    Q.     In this case you did a
6    presentation to the grand jury?
7    A.     Yes, yes.
8    Q.     What did you present to the grand
9    jury?
10   A.     When?
11   Q.     What.
12   A.     What did -- it was this case, I
13   mean -- the felony --
14   Q.     What did you --
15   A.     -- the felony packet?
16   Q.     The felony packet?
17   A.     Yes.
18   Q.     Did you do an oral presentation or
19   did you hand them the felony packet?
20   A.     It was an oral presentation.
21   Q.     What parts of the felony packet
22   did you talk about in your oral
23   presentation?

Page 279

1    A.     It's usually the case report which
2    is --
3            MR. COCKRELL:  Hold on a
4    second.  Can we go off the record a
5    minute?
6            MS. BOLGER:  I'm sorry, I
7    can't hear you.
8            MR. COCKRELL:  Can we go off
9    the record for a minute?
10           MS. BOLGER:  Sure.
11           VIDEOGRAPHER:  We're off the
12   record at 2:53 p.m.
13           (Off the record.)
14           VIDEOGRAPHER:  We're back on
15   the record at 2:58 p.m.
16           MS. BOLGER:  For the record,
17   the parties just had an off-the-record
18   colloquy about when and how I can ask
19   about the witness's testimony at the grand
20   jury without putting anybody in an awkward
21   and potentially illegal situation, and
22   we're going to put a pin in that and come
23   back to it.

Page 280

1    Q.     For the time being, Investigator
2    Jones, can you take a look at page 4,
3    which is the synopsis, which is what we
4    had been talking about?
5    A.     Okay.
6    Q.     Okay.  And you'll see there's a --
7    it's actually the second or third full
8    graph starts, during the course of this
9    investigation.  Do you see that?
10   A.     Yes.
11   Q.     It says, "During the course of
12   this investigation several videos were
13   pulled.  The victim and suspect were
14   interviewed.  It was found no sexual
15   assault occurred and investigators were
16   able to determine that the victim went
17   with the subject willingly after they took
18   her home to Houndstooth Apartments.
19       After speaking with the DA on the
20   case, she advised me that the elements of
21   rape were not met."
22       Do you see that?
23   A.     Yes.

Adam Jones                                                    12/7/2020

Page 281

1    Q.    Are rape and sexual assault two
2  different crimes in Alabama?
3    A.    No.
4    Q.    And it says, "It was found no
5  sexual assault occurred."
6        Do you see that?
7    A.    Yes.
8    Q.    In any other felony packet have
9  you ever said that no crime occurred?
10   A.    I know that -- I know that I've
11 said that.  I don't know to what capacity
12 as far as being in a felony packet.  I
13 don't remember.
14   Q.    So sorry, I don't understand your
15 answer.  So you're saying you don't know
16 if you've ever done it before in a felony
17 packet?
18   A.    Yeah, I remember in a case file
19 putting that no crime was committed, but I
20 don't remember if it's ever been in a
21 felony packet that went to the grand jury.
22   Q.    What was that crime?  You don't
23 have to tell me the particulars, just the

Page 282

1  crime.
2    A.    And that's what I can't remember
3  that either.  I just remember putting that
4  no crime occurred.  I can't remember.
5    Q.    Can you remember what crime you
6  were investigating?
7    A.    I can't.
8    Q.    Okay.  Seems an unusual thing to
9  put in a felony packet that's going to go
10 to a grand jury to try to influence
11 whether they see a crime occurring.
12       Isn't that an unusual thing to say
13 if you want someone to take a fresh look
14 at a crime?
15   A.    Well, they don't hear this.  They
16 don't see this part of the packet.  They
17 actually -- to my knowledge they don't
18 even look at the felony packet.  This is
19 for the district attorney's office.
20   Q.    Then you say, "Investigators were
21 contacted by an attorney in Birmingham
22 saying that he represented the victim and
23 didn't want us to talk with her unless he

Page 283

1  was there."
2        Do you see that?
3    A.    Yes.
4    Q.    What does that have to do with
5  whether a crime occurred?
6    A.    There again, it's just a synopsis
7  of this entire case and I just included it
8  in the synopsis.
9    Q.    Okay.  The next page is page 5 and
10 it's the felony report witness list.  Do
11 you see that?
12   A.    Yes.
13   Q.    Are these the people that were to
14 testify in the grand jury?
15   A.    If they called them.  That's why
16 we turn over the names.  It's up to the
17 district attorney's office to subpoena.
18       And just so you know, on number
19 one and number three, it's been redacted
20 so I can't see a name, but I'm assuming
21 there's a name under that redacted part.
22   Q.    You're looking at a different
23 version than I am.  Okay, we'll come back

Page 284

1  to that.
2        And then the sixth page is the
3  case report.  Did you draft this?
4    A.    Yes.
5    Q.    Okay.  You'll see on the first
6  paragraph it is, "On July 2nd, 2015 at
7  approximately 5:00 a.m., investigators
8  were contacted by TPD and asked to respond
9  to DCH in reference to an alleged sexual
10 assault.  Investigators arrived at DCH and
11 stood -- and Investigator Jones obtained a
12 recorded audio statement from the victim.
13       The victim told the investigators
14 that she did not think the subject was
15 going to let her leave his residence until
16 she had sex with him.  Victim stated she
17 had sex with the suspect and she never
18 told him to stop or showed any form of
19 earnest resistance."
20       Do you see that?
21   A.    Yes.
22   Q.    Is it your testimony as you sit
23 here that Megan never told him to stop?

71  (Pages 281 to 284)

Adam Jones                                                    12/7/2020

Page 285

```
1    A.    Yes.
2    Q.    Even though she told you
3  repeatedly that she thought she had made
4  it clear to him that she wanted him to
5  stop?
6    A.    It was my understanding that she
7  just told him she needed to leave.
8    Q.    Well, she told you that she
9  thought she told him she didn't want to do
10 it in many different ways.  Remember?
11          MR. COCKRELL:  Object to the
12 form.
13   A.    There again, it was my
14 understanding that she never told him to
15 stop.  It was always her just saying she
16 needed to leave.
17   Q.    But Megan told you I did resist
18 him, I said I wanted to leave when he
19 tried to kiss me.  I turned away, like, I
20 didn't -- isn't that her telling him that
21 she wants him to stop?
22          MR. COCKRELL:  Object to the
23 form.
```

Page 286

```
1    A.    Well, she's just telling him that
2  she needed to leave and --
3    Q.    (By Ms. Bolger) Megan told you,
4  I'm pretty sure it was clear that I didn't
5  want it to happen.
6          Is that her telling him to stop?
7          MR. COCKRELL:  Object to the
8  form.
9    A.    No, she was saying she was pretty
10 sure that she made it clear, but she
11 didn't ever tell me how she made it clear.
12 She just said that she needed to leave.
13   Q.    (By Ms. Bolger) Well, that's
14 because you cut her off; right?
15   A.    I mean --
16          MR. COCKRELL:  Object to the
17 form.
18   A.    -- there was more opportunities
19 for her to tell me.
20   Q.    (By Ms. Bolger) Is it your
21 testimony that the only thing that she
22 could have possibly said that would have
23 communicated to you that she told
```

Page 287

```
1  T. J. Bunn to stop was if she said I told
2  him to stop?
3    A.    Make sure I understand your
4  question, could you ask it one more time?
5    Q.    Sure.  Is it your testimony that
6  the only way Megan could possibly have
7  communicated to you that she wanted
8  T. J. Bunn to stop having sex with her was
9  to say the words I wanted -- I told him to
10 stop having sex with me?
11          MR. COCKRELL:  Object to the
12 form.
13   A.    Well, with her saying that I need
14 to leave and stop having sex with me is
15 two different things.
16   Q.    (By Ms. Bolger) After that
17 paragraph -- this is the felony packet
18 that relates to the charges against -- the
19 charge against Bunn; right?  This felony
20 packet relates to the allegations made by
21 Megan Rondini against T. J. Bunn; correct?
22   A.    Yes, yes.
23   Q.    After that one paragraph that I
```

Page 288

```
1  just read, is there any place else in the
2  synopsis where you talk about Megan's
3  allegations of sexual assault against
4  Bunn?
5          MR. COCKRELL:  Did you hear
6  that question?
7          THE WITNESS:  Yes.
8          MR. COCKRELL:  Okay.  I
9  didn't hear it.  Could you read it back?
10         (Whereupon, requested portion was
11         read back by court reporter.)
12   A.    Looks like an overview of the
13 case.
14   Q.    (By Ms. Bolger) That wasn't my
15 question.  Is there any other paragraph in
16 this case report where you talk about
17 Megan's allegations against Bunn?
18   A.    No.
19   Q.    So you don't talk about it in the
20 second paragraph; right?
21   A.    No.
22   Q.    Or the third paragraph?
23   A.    No.
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

---

Page 289

```
 1    Q.    Or the fourth paragraph?
 2    A.    No.
 3    Q.    Or the fifth?
 4    A.    No.
 5    Q.    Or the sixth?
 6    A.    No.
 7    Q.    Or the seventh?
 8    A.    No.
 9    Q.    Or the eighth?
10    A.    No.
11    Q.    But you do say, "Investigators
12  received a letter from an attorney in
13  Birmingham saying he was representing the
14  victim"; right?
15    A.    Yes.
16    Q.    What does that have to do with
17  whether Megan Rondini was raped by
18  T. J. Bunn?
19    A.    That was just an overview of the
20  case.
21    Q.    I still don't understand what it
22  has to do with the case.  What does it
23  have to do with the case?
```

Page 290

```
 1    A.    It's just showing that they're
 2  going on a civil route for this case.
 3    Q.    What does that matter to whether a
 4  crime occurred?
 5    A.    It's just so everything can be
 6  documented in this -- in the case report.
 7    Q.    Why does that have to be
 8  documented in a case report that
 9  determines whether Megan Rondini was
10  assaulted by T. J. Bunn?
11    A.    It's just showing that she was
12  represented by an attorney.
13    Q.    It says that he was told that he
14  would not be getting any of the case file
15  unless it was subpoenaed.
16        Do you see that?  The last final
17  clause.
18    A.    Yes.
19    Q.    Why was he not getting any of the
20  case file unless it was subpoenaed?
21    A.    We don't normally release case
22  files to attorneys without a subpoena.
23    Q.    Well, but Megan Rondini was the
```

Page 291

```
 1  victim; right?  She was the alleged
 2  victim; right?
 3    A.    It was my understanding we didn't
 4  release the felony packets to anybody.
 5    Q.    Okay.  Was that because she had an
 6  attorney or was it you just don't release
 7  felony packets?
 8        MR. COCKRELL:  Object to the
 9  form.
10    A.    We don't -- well, she's got --
11  she's got an attorney, but we don't
12  release the felony packet to anybody.
13    Q.    (By Ms. Bolger) Okay.  So it
14  wasn't the fact that he was an attorney
15  that he could only get it by subpoena?  It
16  was just in general --
17    A.    Right.
18    Q.    -- you can't get felony packets;
19  is that right?
20    A.    Yes, we just didn't release the
21  felony packets to anybody.
22    Q.    If you look at next page is the
23  Alabama Uniform Incident Offense Report
```

Page 292

```
 1  and it goes from pages 8 -- it goes
 2  through the eighth, ninth, tenth and 11th
 3  pages of the exhibit.  What is this?
 4    A.    This is the initial report that
 5  the officer took at the hospital.
 6    Q.    Were you there when this was taken
 7  or does this represent a separate
 8  conversation with Megan?
 9    A.    This was a separate conversation.
10    Q.    And this is the report that Brad
11  Phillips got; correct?
12    A.    Yes.
13    Q.    So Brad Phillips had a
14  conversation with you separate -- with
15  Megan separate from the conversation you
16  had with Megan; correct?
17    A.    Yes.
18    Q.    And this records that
19  conversation?
20    A.    Yes.
21    Q.    Okay.  Can you look at the 13th
22  page of the exhibit which is the one, two,
23  and it says synopsis victim advised?
```

73 (Pages 289 to 292)

Adam Jones                                              12/7/2020

Page 293

1       The last page of the incident
2   offense report that we just talked was the
3   11th page of the exhibit; right?
4   A.    Okay, yes.
5   Q.    Then the next page is the Homicide
6   Unit statement?
7   A.    Yes.
8   Q.    And then the page after that
9   starts with a lower case synopsis and then
10  the paragraph begins victim advised?
11  A.    Yes.
12  Q.    Who drafted this document?
13  A.    I believe I did.
14  Q.    Okay.  And what did you do to
15  draft this document?
16  A.    I just listened to the audio
17  interview and did a synopsis of the
18  statement.
19  Q.    Okay.  So you pick and choose what
20  to put in the synopsis?
21  A.    Well, I didn't detail every word.
22  It's not dictation.  It's just an
23  overview.

Page 294

1   Q.    Okay.  And you did not say in here
2   that she told you that Bunn held her down
3   by the hips and the torso; right?
4   A.    No, I don't see that in there.
5   Q.    And you did not put in here that
6   he took her phone away from her?
7         MR. COCKRELL:  What was the
8   last part, Kate?
9   Q.    (By Ms. Bolger) You did not put in
10  here that he took -- that Bunn took
11  Rondini's phone away?
12  A.    No, I don't see that.
13  Q.    If you turn that page, you'll get
14  to the signed Miranda waiver by Megan
15  Rondini; right?
16  A.    Yes.
17  Q.    And then the next page after that
18  is a written statement form?
19  A.    Yes.
20  Q.    And it goes one, two, three pages?
21  A.    Yes.
22  Q.    Are those the notes that Megan
23  brought with her to office or did she

Page 295

1   write this in the office?
2   A.    She brought it with her.
3   Q.    That's the one that you said you
4   hadn't read in the interview; right?
5   A.    Right.
6   Q.    Okay.  Can you flip to the back of
7   the packet?  You'll see there's one, two,
8   three -- sorry, four, five -- six pages
9   from the end there's the first of three
10  letters from Scott James Meyer.
11  A.    Yes.
12  Q.    Why are there three letters from
13  Scott James Meyer in this packet?
14  A.    Just to make sure that the DA's
15  office had all of the information that I
16  had on this case.
17  Q.    Again, why is it relevant that she
18  had a lawyer?
19        MR. COCKRELL:  Besides --
20  A.    I just --
21        MS. BOLGER:  I didn't hear
22  whatever anybody just said.
23  A.    I just included this, like I say,

Page 296

1   to have all the documents sent over to the
2   district attorney's office.
3   Q.    (By Ms. Bolger) Okay.  And then
4   immediately before that there's several
5   pages of photocopies of DVDs.  Do you see
6   that?
7   A.    Yes.
8   Q.    When you put this felony packet
9   together did you actually include the
10  DVDs?
11  A.    Yes.
12  Q.    I have more questions about this
13  document that I can't ask unless we have
14  an agreement on the grand jury thing, so
15  I'm going to come back to this document,
16  but before I do actually this is a super
17  hard one, but it's the 49th page of the
18  document, so if you count the page you're
19  on, the -- sorry, the first page of DVDs
20  is the 67th page of the document.
21        MR. COCKRELL:  So what
22  number are we going to?
23  Q.    (By Ms. Bolger) We're going to 49.

                    74  (Pages 293 to 296)

Adam Jones                                          12/7/2020

| Page 297 |
| --- |

```
1    It's the consent to search form signed by
2    T. J. Bunn at 6:47 a.m.
3         MR. COCKRELL:  You said
4    consent to search form?
5         MS. BOLGER:  Yeah, it's the
6    form for consent to search signed by T. J.
7    Bunn on 7/2 at 6:47 a.m.
8         MR. COCKRELL:  We've got it.
9    Q.   (By Ms. Bolger) You'll see -- and
10   we've talked about this consent form
11   signed at 6:47 a m. so you can turn the
12   page.  The next one is another form for
13   consent search signed at what looks like
14   8:15 a m.
15        Do you see that?
16   A.   Yes.
17   Q.   Why is there a second signed form
18   consent?
19   A.   After the first one he asked to
20   speak with his attorney, so the
21   investigators that were on the scene they
22   got him to sign another one at the request
23   of his attorney.
```

| Page 298 |
| --- |

```
1    Q.   And there's still a third one on
2    the next page also signed at 8:15.  Do you
3    know what this one is?
4    A.   It's another consent form.  It
5    looks like it's just in a different --
6    it's just a different format.
7    Q.   Okay.  Let's put the felony packet
8    aside and then we'll see maybe later on
9    what we want to do with that.
10        Nowhere in the felony packet does
11   it reference any text messages sent or
12   received by Megan Rondini; is that
13   correct?
14   A.   Right.
15   Q.   Is that because you had not seen
16   them at the time you put the felony packet
17   together?
18   A.   I had viewed them before the
19   felony packet but to print out that report
20   it was several pages and they -- the
21   district attorney's office was getting the
22   disc that had all the information on it.
23   Q.   You felt like just handing them
```

| Page 299 |
| --- |

```
1    the disc was enough?
2    A.   Yes.
3    Q.   Did anyone talk to T. J. Bunn or
4    his lawyers about the decision to submit
5    the felony packet to the DA's office to go
6    to the grand jury?
7    A.   Not to my knowledge.
8    Q.   Did Mr. Bunn know that the case
9    was going to the grand jury?
10   A.   Not to my knowledge.
11   Q.   Would it surprise you if we found
12   that he did know?
13   A.   I don't know who would have let
14   him know.  I mean, it wasn't me.
15   Q.   I'm sorry, I didn't catch that
16   last answer.
17   A.   It wasn't me that let him know.
18   To my knowledge he wasn't told.
19   Q.   Okay.
20        MS. BOLGER:  J. T., can you
21   hand Investigator Jones the document it
22   was texted over the weekend?  It's BA.
23   It's Jones-Hastings 71.
```

| Page 300 |
| --- |

```
1         MR. THOMPSON:  Did you say
2    BA?
3         MS. BOLGER:  Yeah, B as in
4    boy, A.  If you don't have it it's not
5    that big a deal.
6         MR. THOMPSON:  Tell me what
7    it is if you don't mind.
8         MS. BOLGER:  It's
9    Jones-Hastings 71 and it's the listing of
10   text messages in extremely small print.
11   Q.   While J. T. is looking, did you
12   have the capacity to cut and paste
13   information into the felony report, so in
14   other words, if there were text messages
15   you thought were important, would you have
16   cut and pasted them into the felony
17   report?
18   A.   I didn't know how to do it.
19   Q.   Did anybody else?
20   A.   I'm sure they could.
21   Q.   You didn't ask?
22   A.   I didn't ask.
23        MR. THOMPSON:  Kate, I'm not
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Page 301

1    seeing BA.
2            MS. BOLGER:  That's fine.
3    We'll cross that bridge another time.
4    Q.    Okay.  Did you draft a timeline
5    when you were investigating Ms. Rondini's
6    allegations?
7    A.    No.
8    Q.    Is that something you do?  You've
9    done before?
10   A.    Yes, we've done it before.
11   Q.    In what kind of cases?
12   A.    Murder cases.  Murder cases
13   specifically.  I don't remember any other.
14   Q.    Okay.  Why didn't you do one here?
15   A.    I don't know.
16   Q.    Did you at any point refer charges
17   against Megan to the CID for
18   investigation?
19   A.    I did not.
20   Q.    Do you know if anybody else did?
21   A.    I don't.
22           MS. BOLGER:  J. T., could
23   you hand the witness what was marked

Page 302

1    already as Exhibit 18, but is pages 106
2    through the end of AJ?
3            MR. THOMPSON:  I don't think
4    he has that yet.  Hang on a second.  So
5    it's 106 through 148?
6            MS. BOLGER:  Yes, it's the
7    felony packet, the other felony packet.
8            (Off the record.)
9    (Whereupon, a document that was
10   previously marked as Defendant's
11   Exhibit No. 18 was referenced and
12   is attached to the original
13   transcript.)
14   Q.    Are you aware of whether the
15   charges against Megan went to the grand
16   jury?
17   A.    I don't know if it was presented.
18   Q.    Are you aware that charges went
19   from the Criminal Investigations Division
20   to the district attorney to be presented
21   to a grand jury?
22   A.    I wasn't aware of it.  Based on
23   this it was because that's their felony

Page 303

1    packet, but I wasn't aware of it.
2    Q.    So you'll see Exhibit 18 is the
3    Tuscaloosa County Sheriff's Office
4    Criminal Investigation Division Report to
5    a Grand Jury Warrantless Grand Jury
6    Presentation for Megan Elizabeth Rondini,
7    the charge of theft of property in the
8    second degree and unlawful breaking and
9    entering a vehicle.
10          Do you see that?
11   A.    Yes.
12   Q.    So no special inquiry here, huh?
13   A.    No.
14   Q.    What is a warrantless grand jury
15   presentation?
16   A.    No warrant was obtained on a
17   suspect and the case was presented to
18   grand jury for prosecution.
19   Q.    Okay.  And do you know
20   Investigator Thomas Nelson?
21   A.    I know him, yes.
22   Q.    Have you had conversations with
23   Mr. Nelson about the Rondini case?

Page 304

1    A.    No.
2    Q.    Well, how did he get this stuff?
3    These are your documents, if you flip
4    through it; right?  These are the
5    documents from your investigation?
6    A.    It's the Case Management -- I'm
7    sorry.
8    Q.    Sorry, go ahead.
9    A.    This is a Case Management System
10   that they had access to.
11   Q.    So everything you said you put
12   into the Case Management System and they
13   were able to pull off the Case Management
14   System?
15   A.    Yes.
16   Q.    But someone from the homicide
17   office side of things would have had to
18   have told them this case existed for them
19   to know; correct?
20   A.    Not necessarily.  It could have
21   went through just say if he filed a report
22   whoever took the initial report would be
23   sent to the patrol supervisor and then

Adam Jones                                          12/7/2020

Page 305

1    that case -- I'm sorry, the incident
2    offense report was then forwarded to the
3    Criminal Investigations Division.
4    Q.     Why weren't they speaking to you
5    about it if you were the lead investigator
6    on the other half of the investigation?
7    A.     I don't know.
8    Q.     If you'll go back to the felony
9    packet about the allegation made by Megan.
10   Just before those DVDs I talked to you
11   about there's a uniform incident offense
12   report.
13   A.     I got it.
14   Q.     Do you see that?  Are you with me?
15   A.     Yes.
16   Q.     And it says on the bottom that the
17   reporting officer is David Griffin?
18   A.     Yes.
19   Q.     Do you know David Griffin?
20   A.     No.
21   Q.     Who is David Griffin?
22   A.     He is -- he's a deputy, a road
23   deputy.  He's not in a division or

Page 306

1    anything.  He's just a road cop, I guess
2    you could say.
3    Q.     Okay.  Was he at the -- to your
4    knowledge was he at the Bunn's house the
5    morning of the investigation?
6    A.     I don't know.
7    Q.     Does he report through the
8    Homicide Unit or the Criminal
9    Investigations Division?
10   A.     He's actually in the patrol
11   division.  He's assigned to patrol or he
12   was assigned to patrol.  I think he's
13   since retired, but he is assigned to
14   patrol and he would have took this report
15   and probably went to his patrol supervisor
16   to submit it.
17   Q.     Do you have any understanding of
18   how the charges against Megan Rondini came
19   to be investigated by the Criminal
20   Investigations Division?
21   A.     No.
22   Q.     And as you sit here, you don't
23   know whether or not it was ever presented

Page 307

1    to a grand jury?
2    A.     I don't.
3    Q.     Who would know that?
4    A.     I guess Investigator Nelson would
5    know.
6    Q.     Anybody else?
7    A.     Probably whoever the sergeant or
8    lieutenant was in Criminal Investigations
9    at that time.
10   Q.     Okay.
11          MS. BOLGER:  J. T., can you
12   hand the witness AO?
13          MR. THOMPSON:  Yeah.
14          MS. BOLGER:  And, Nancy,
15   spoiler alert, this is going to be Exhibit
16   35.
17          (Off the record.)
18          (Whereupon, a document was marked
19          as Defendant's Exhibit No. 32 and
20          is attached to the original
21          transcript.)
22   Q.     For the record, Exhibit 32 is an
23   affidavit of Investigator Adam Jones in

Page 308

1    the matter of Rondini versus Terry Bunn,
2    Jr., and it is dated May 17, 2019.
3          Investigator Jones, do you
4    remember signing this affidavit?
5    A.     I don't -- I don't remember.
6    Q.     Well, is that your signature on
7    the back page?
8    A.     Yes.
9    Q.     Do you sign a lot of things under
10   oath that you don't remember?
11   A.     It's just been a while since I've
12   -- I just don't remember signing it.
13   Q.     Did you draft it?
14   A.     No.
15   Q.     Do you know who drafted it?
16   A.     I don't.
17   Q.     Do you know why you drafted it,
18   why you signed it, what it was for?
19   A.     I don't remember.
20   Q.     If you take a look at the second
21   page, the second graph says I then
22   provided Ms. Rondini's phone.  Do you see
23   that?

Adam Jones                                              12/7/2020

Page 309

```
 1    A.    Yes.
 2    Q.    Okay.  And the last sentence of
 3    that paragraph says, in the course of my
 4    investigation I reviewed much of the data
 5    from Ms. Rondini's cell phone and the
 6    downloaded data because a part of the file
 7    for this file.
 8          Do you see that?
 9    A.    Yes.
10    Q.    Is the only way that downloaded
11    data became a part of the file for this
12    case the DVD that was attached to the
13    felony packet?
14    A.    To my knowledge, yes.
15    Q.    And as you sit here, you don't
16    know the date on which you reviewed much
17    of the data from Ms. Rondini's cell phone;
18    correct?
19    A.    I don't.
20    Q.    But you know it wasn't before he
21    was Mirandized; right?
22    A.    Right.
23    Q.    And then if you turn to the third
```

Page 310

```
 1    page, there's a reference that said, I
 2    also reviewed photos sent in Snapchat from
 3    Ms. Rondini's phone during the early
 4    morning hours of July 2, 2015 which are
 5    attached as Exhibit F to the Defendant's
 6    motion for summary judgment.
 7          Do you see that?
 8    A.    Yes.
 9    Q.    What are those Snapchat photos?
10    A.    I believe it was her taking
11    photos, selfies in front of the animals in
12    Bunn's house.  There may be one or --
13    maybe one or two more inside the house.  I
14    can't remember -- seems like I remember
15    seeing animals in the background.  I don't
16    remember what was in the photos.
17    Q.    Do you remember why they were
18    relevant in this litigation between
19    Mr. Rondini and Terry Bunn?
20    A.    I don't.
21    Q.    When did you first come to know
22    that BuzzFeed was doing -- actually how
23    did you find out about Megan's death?
```

Page 311

```
 1    A.    Somebody told me about it, I do
 2    not remember who.  I don't know if it was
 3    another investigator, if it came from the
 4    DA's office.  I don't -- I don't remember.
 5    Q.    Where were you when you were told?
 6    A.    I was at work.
 7    Q.    Did someone walk up to you at your
 8    desk and say Megan's dead, or what did
 9    they tell you?
10    A.    I can't remember the conversation
11    exactly because I can't remember who told
12    me.
13    Q.    Do you remember when Megan died?
14    A.    Was it -- it would be a guess.  I
15    don't know for sure.  I'm thinking it was
16    around the time that -- been December of
17    '15 or January of '16.  I don't remember.
18    Q.    Okay.  So you don't remember who
19    told you, you don't remember where they
20    told you, you don't remember when they told,
21    you don't remember when she died.
22          Do you have any memory of how you
23    felt about hearing the news?
```

Page 312

```
 1    A.    I mean, I hate that the Rondinis
 2    lost their daughter.  I wouldn't wish that
 3    on anybody, but I do remember feeling
 4    sorry for the Rondini family.
 5    Q.    Did you talk to anybody about it?
 6    A.    No.
 7    Q.    Did you talk to your wife about
 8    it?
 9    A.    No.
10    Q.    Did you talk to Josh Hastings
11    about it?
12    A.    I don't remember any conversation
13    with him about it.
14    Q.    Did you talk to Captain Hood?
15    A.    I don't remember any conversation.
16    Q.    Captain Hart about it?
17    A.    I don't remember.
18    Q.    Do you remember hearing that on
19    her suicide note she referred to herself
20    as having been bullied by cops?
21    A.    I have heard that.
22    Q.    And when did you hear that?
23    A.    It was -- I believe it was in the
```

78  (Pages 309 to 312)

Page 313

1    BuzzFeed article.
2    Q.    The BuzzFeed article was the first
3    time you heard about it?
4    A.    Yes.
5    Q.    Had you read any articles at all
6    about Megan's death before the BuzzFeed
7    article?
8    A.    No.
9    Q.    And you had no conversations with
10   anybody about Megan's death before the
11   BuzzFeed article?
12   A.    No.
13   Q.    Seems to me like that would have
14   been a pretty serious bit of information
15   to learn, to learn that this girl who came
16   to you and alleged a sexual assault and
17   then you were putting a felony packet
18   together related to her sexual assault and
19   waiting for it to be presented to a -- for
20   you to present to a grand jury and learn
21   she's dead feels like that would be pretty
22   memorable.  That wasn't memorable for you?
23          MR. COCKRELL:  Object to the

Page 314

1    form.
2    A.    I just -- I don't remember when I
3    heard it, when I heard about it.
4    Q.    (By Ms. Bolger) Well, that's kind
5    of my point.  You're going to a grand jury
6    to present on something and then the girl
7    dies and you don't even think to yourself
8    oh, my God, I can't believe I went to the
9    grand jury about it?  You don't have any
10   thoughts about it that you can remember?
11          MR. COCKRELL:  Object to the
12   form.
13   A.    No.
14   Q.    (By Ms. Bolger) You have no
15   thought of like, oh my God, this is a
16   terrible tragedy?
17          MR. COCKRELL:  You can
18   answer.
19   A.    Yeah, I mean, I hate that it
20   happened.  I mean, I had nothing against
21   Megan.  You know, I hate for her family
22   that that happened.  And there again, I
23   wouldn't want that to happen to anybody

Page 315

1    but --
2    Q.    (By Ms. Bolger) But the
3    conversation that someone told you this
4    happened you can't even remember?
5          MR. COCKRELL:  Object to the
6    form.
7    A.    I can't remember.
8          MR. COCKRELL:  Asked and
9    answered.
10   Q.    (By Ms. Bolger) How did you first
11   come to know that BuzzFeed was planning to
12   do an article about Megan Rondini?
13   A.    We were getting some emails from
14   Katie Baker asking questions about that
15   case, so we were assuming that a story was
16   coming.
17   Q.    So that you can remember, getting
18   press inquiries about it?
19   A.    I remember getting emails, yes.
20   Q.    You can't remember the part where
21   somebody tells you that this poor girl
22   killed herself, but you can remember
23   getting emails about yourself; right?

Page 316

1          MR. COCKRELL:  Object to the
2    form.
3    Q.    (By Ms. Bolger) Right?
4    A.    Yes, I can't remember.
5    Q.    Okay.  Who was getting emails?
6    A.    I know I got at least one.  I
7    believe Josh got one.  He may have got
8    more than that, I don't know.  I at least
9    got one.  I don't who else got emails.
10   Q.    And do you remember when that was?
11   A.    Yes.  It would have been before
12   June of '17 before the story came out.
13   That's the only thing I can remember.
14   Q.    You can't remember a specific
15   date?
16   A.    No.
17   Q.    Do you know whether -- were you
18   involved in any correspondence between
19   Captain Hood and Katie Baker, the reporter
20   at BuzzFeed?
21   A.    No.
22   Q.    Did you see it before it went out?
23   A.    No.

Adam Jones                                           12/7/2020

---

Page 317

1          MS. BOLGER: Okay. J. T.,
2    can you hand the witness AA, which has
3    never been marked and is Jones-Hastings
4    193 through 204.
5          And this will be Exhibit 33.
6          (Whereupon, a document was marked
7          as Defendant's Exhibit No. 33 and
8          is attached to the original
9          transcript.)
10   Q.    And for the record Exhibit 33 is
11   an email from Gary Hood to Katie Baker
12   dated June 9th, 2017, at 3:08 p m. and
13   we've given it the Bates number
14   Jones-Hastings 193.
15         My first -- you're welcome to look
16   through it, I'm not going to ask you very
17   many questions, but my first question for
18   you is have you ever seen this before?
19   A.    I've never seen it.
20   Q.    Have you seen the emails -- I know
21   you've never seen this actual version of
22   this document, but have you even emails
23   contained in this string?

---

Page 318

1    A.    I've never seen it, no.
2    Q.    So just to speed it up a little
3    bit, just to summarize, these are emails
4    from Katie Baker asking specific factual
5    questions of Captain Hood and Captain Hood
6    responding to those.  So you were not
7    involved in crafting those responses at
8    all?
9    A.    No.
10   Q.    If you see on the top of the very
11   first page it list recipients, do you see
12   that?
13   A.    Yes.
14   Q.    Okay.  And there's Katie Baker,
15   Sheriff Abernathy, Robert Spence.  Do you
16   know who Robert Spence is?
17   A.    He's the county attorney.
18   Q.    And there's Kip Hart, Jeremy
19   Franks.  Do you know who Jeremy Franks is?
20   A.    He's a sergeant in Homicide.
21   Q.    And was he your superior officer
22   in Homicide?
23   A.    Yes.

---

Page 319

1    Q.    Okay.  And Robert Davis, who is
2    also a sergeant in Homicide; right?
3    A.    Yes.
4    Q.    And then Josh Hastings.  Do you
5    see that?
6    A.    Yes.
7    Q.    You're not here; right?
8    A.    Right.
9    Q.    Is there some reason why Josh
10   Hastings would be copied on this
11   correspondence but you wouldn't be, given
12   that the investigation was done by the two
13   of you?
14   A.    I don't know.
15   Q.    No one ever said to you, hey, can
16   you help us out in crafting response to
17   these emails?
18   A.    No.
19   Q.    Did you know that Captain Hood was
20   responding to questions from Katie Baker
21   when she was asking questions?
22   A.    I believe -- I remember him
23   mentioning something about it, but I don't

---

Page 320

1    know -- he didn't mention any questions or
2    anything.  He was just -- it was just like
3    a general statement of responding I need
4    to do an email back to BuzzFeed or
5    something to that effect.
6    Q.    Were you concerned about the
7    contents of what -- would you have liked
8    to have seen the contents of this article
9    -- sorry, of this email?
10   A.    I mean -- I guess they had a
11   reason why I wasn't in the chain there,
12   but I don't know, I don't know why I
13   wasn't.
14   Q.    So my question is would you have
15   liked to have seen it?
16   A.    Yeah, I would.
17   Q.    You did, in fact, speak to Katie
18   Baker on the phone once; correct?
19   A.    If I do, I don't remember that.
20   Q.    Okay.
21         MS. BOLGER: J. T., can you
22   show the witness AN, which is the BuzzFeed
23   1630?

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 321

1      (Whereupon, a document was marked
2      as Defendant's Exhibit No. 34 and
3      is attached to the original
4      transcript.)
5  Q.     And for the record, while
6  Investigator Jones is just acquainting
7  himself with the exhibit, this is an email
8  from Katie Baker to AJones@tcsoal.org
9  dated June 6, 2017 with the subject Megan
10 Rondini story.
11     Investigator Jones, my question is
12 just have you ever seen this before?
13 A.     Yes.
14 Q.     Okay. And you'll see -- did you
15 receive it on or about the time it's
16 dated?
17 A.     Yes.
18 Q.     And you'll see it asks -- it
19 starts with thanks for speaking just now.
20 I'm going to not shock you and let you
21 know that that's why I think you spoke to
22 Katie Baker at some point. Does that
23 refresh your memory at all?

Page 322

1  A.     And I'm not saying that I didn't,
2  but typically if it's any media format of
3  any kind calling about a case, it's always
4  referred to supervisors and that would
5  have been pretty much the extent of it.
6  That's probably why I don't remember it
7  because we've had media call before and
8  it's just referred to a supervisor.
9  Q.     Okay. Did you ever -- as you'll
10 see in the email there's several questions
11 that get asked.
12     Do you see that? Katie asked
13 several questions that are in bold?
14 A.     Yes, yes, yes.
15 Q.     Did anyone ever ask you to answer
16 those questions?
17 A.     No.
18 Q.     Did anybody talk to you about
19 responding to this particular email?
20 A.     No.
21 Q.     You forward this, I can tell you
22 but I can show you but it would take time
23 so just take my word for it, that this was

Page 323

1  forwarded on to Captain Hart.
2  A.     Yes.
3  Q.     You forwarded it to Captain Hart.
4  And you said in that email, just received
5  this from BuzzFeed. Does that refresh
6  your memory that you, in fact, sent it
7  onto Captain Hart?
8  A.     Yes.
9  Q.     And why did you sent it onto
10 Captain Hart?
11 A.     It was just a media inquiry, you
12 know, so it was just forwarded to the
13 supervisors.
14 Q.     Did you have a conversation with
15 Captain Hart about it?
16 A.     Not that I remember.
17 Q.     So you're getting all of these
18 press inquiries about this BuzzFeed
19 article. You know you've got them. You
20 know Josh Hastings is getting them. You
21 know other people are getting them. Were
22 you guys talking about these inquiries?
23 A.     I don't remember any conversations

Page 324

1  about it.
2  Q.     What was your reaction to getting
3  these inquiries?
4  A.     I was just assuming that there was
5  going to be a story written about this
6  case.
7  Q.     And were you worried about that?
8  Happy about that? What was your reaction?
9  A.     I don't remember -- I don't
10 remember having any feeling one way or the
11 other about it.
12 Q.     If you take a look at the first
13 paragraph in the email that's in front of
14 you -- sorry, if you take a look at the
15 email that's in front of you and you look
16 at the third paragraph, right, it starts I
17 can see from the tape that you quickly
18 decided that Megan hadn't earnestly
19 resisted Bunn as per Alabama law, but you
20 also built a case against Megan,
21 questioned her for multiple felonies she
22 didn't realize she had committed.
23     Do you see that?

Adam Jones                                              12/7/2020

Page 325

1    A.    Yes.
2    Q.    Do you feel that's an accurate
3    assessment of what happened?
4    A.    No.
5    Q.    What's inaccurate about it?
6    A.    It's not a quick decision.  You
7    know, like it states here, it's a quick
8    decision that you said that she hadn't
9    earnestly resisted.  That was part of the
10   interview process to try to get more
11   information and, you know, I didn't build
12   a case against Megan.
13   Q.    What else is inaccurate about
14   that?
15   A.    That's pretty much it.
16   Q.    And on the next paragraph it says,
17   "The IACP tells the police not to pressure
18   victims to make any decision about
19   prosecution during the initial stages of
20   the investigation.  At the end of the
21   interview you offered Megan a refusal to
22   prosecute form.  Do homicide department
23   investigators regularly undergo any type

Page 326

1    of assault training?  If so, please
2    explain what type of trainings and how
3    often they were held.  I would also love
4    to hear more about your general policies
5    and practices around sexual assault
6    investigations."
7          Do you see that?
8    A.    Yes.
9    Q.    What would your response be to the
10   question do department homicide
11   investigators regularly undergo any type
12   of sexual assault investigation training?
13   A.    You know, if there's training out
14   there and we have availability to go, you
15   know, we're sent.  It's not as easy as go
16   to a class.  You know, a lot of our
17   training that we get is on the job.
18   Q.    And the next paragraph says,
19   Captain Hood told BuzzFeed that as many as
20   40 percent of all reported sexual assaults
21   in Tuscaloosa are labeled special inquiry,
22   a term for cases where there is "not
23   enough information initially to meet the

Page 327

1    element of a crime".
2          Could you further clarify the
3    meaning behind special inquiry?  Is it
4    just sex crimes that can be labeled
5    special inquiry or other crimes as well?
6          How would you answer that last
7    question?  I'll ask you another one, which
8    is that you've testified that it isn't
9    just sex crimes that are labeled special
10   inquiry.  There are other crimes as well.
11         In your experience what percentage
12   of inquiry investigation are sex crimes?
13   A.    Just my opinion on that, Captain
14   Hood is probably correct on the
15   percentage.
16   Q.    But I'm asking you a different
17   one, which is what percentage of special
18   inquiries are sexual assaults.
19         So the question Captain Hood
20   answered is what percentage of sexual
21   assaults are labeled special inquiry.
22         I'm actually asking the opposite.
23   I'm asking you what percentage of actual

Page 328

1    crimes labeled special inquiry are sex
2    crimes?
3    A.    I don't know.  I don't even have a
4    guess because I don't -- I don't look at
5    stats usually.  It's -- that's a
6    supervisor that goes through.  You know,
7    they do their reporting to, you know, the
8    FBI or whatever the crime stats are, so I
9    don't -- I don't even have a good,
10   educated guess on it.
11   Q.    What about in your experience when
12   you labeled crimes special inquiry, what
13   percentage of your experience of labeling
14   crimes special inquiry related to sex
15   crimes?
16   A.    I would probably say 30 to
17   40 percent, just on my experience.
18   Q.    Of the other 60 to 70 percent of
19   crimes, was there one other crime that was
20   as high a percentage of sex crimes of
21   special inquiry as sex crimes are?  In
22   other words, were there some other crimes
23   that was also 30 to 40 percent or were

Adam Jones                                           12/7/2020

Page 329

1    they -- is it just the other 70 -- 60 to
2    70 percent composed of various other
3    things?
4    A.    Yeah, it was just various other
5    things.
6    Q.    Okay.  Did you want to respond
7    substantively to these questions from
8    Katie Baker or were you happy to not
9    respond?
10   A.    Honestly, I mean, we just don't
11   ever -- nobody ever talks to the media as
12   far as investigators go.  We always
13   forward it onto the supervisors, so that's
14   what I did.  I didn't feel one way or
15   another about answering it.
16   Q.    Okay.
17         MS. BOLGER:  All right.  Why
18   don't we go off the record, guys, and take
19   like a ten-minute break?  Bob, maybe you
20   can get to the bottom of how you want to
21   proceed about the grand jury stuff and
22   then we'll come back.
23         MR. COCKRELL:  I've got

Page 330

1    Scotch looking at.  I haven't heard from
2    him yet.
3          VIDEOGRAPHER:  We're off the
4    record at 3:54 p.m.
5          (Recess was taken.)
6    (Mr. Hastings did not return from recess.)
7          VIDEOGRAPHER:  We're back on
8    the record at 4:10 p.m.
9          MS. BOLGER:  While we were
10   taking a break, we kind of all had a
11   colloquy about what to do about asking
12   questions about what Investigator Jones
13   did or did not say in the grand jury.
14         I have questions about what
15   Investigator Jones said and what evidence
16   was presented to the grand jury, which I
17   think are relevant to the question of
18   whether the article is materially false,
19   which, of course, is a burden that's on
20   the plaintiffs to prove or substantially
21   true, which I'm entitled to seek to prove.
22         I understand that Bob, and he can
23   speak for himself, has done research which

Page 331

1    lends him to believe that this line of
2    questioning would be a felony under
3    Alabama law.
4          I obviously have no interest
5    in committing a felony, but I do have an
6    interest in obtaining discoverable
7    information relevant to a central issue in
8    the case.  So I'm not going to ask the
9    questions today, but I want to be totally
10   clear that the questions I would ask were
11   what information -- what Mr. Jones,
12   Investigator Jones said to the grand jury
13   and what information was presented to the
14   grand jury.
15         I wouldn't ask about anybody
16   else's testimony.  It would just be what
17   Mr. Jones did, which under New York law,
18   by the way, I'm entitled to ask.  And so
19   we will raise that issue with Judge
20   Proctor should we need to do so, and we'll
21   have to come back another day to have that
22   exchange.  Bob, anything to add?
23         MR. COCKRELL:  No, just be a

Page 332

1    standing objection and I just have to
2    instruct him not to answer based on the
3    research that Scotch did while we were,
4    you know, since he left.
5          MS. BOLGER:  Okay.  So why
6    don't we move on and we'll revisit the
7    issue before Judge Proctor.
8    Q.    Okay.  So Investigator Jones,
9    there did come a time when BuzzFeed
10   published an article about the Rondini
11   investigation; correct?
12   A.    Yes.
13   Q.    Have you read the article?
14   A.    Yes.
15   Q.    How many times have you read the
16   article?
17   A.    I would say a couple of times.
18   Q.    When was the last time you read
19   it?
20   A.    It's been a few weeks.  A few
21   weeks.  Probably a month or longer.
22   Q.    Okay.  A couple of times, I was
23   thinking you meant two.  Do you mean more

83  (Pages 329 to 332)

Adam Jones                                          12/7/2020

Page 333

1   than that?
2   A.    Talking about more than two
3   months?
4   Q.    No, more than two -- you said you
5   had read the article a couple of times.  I
6   took that to mean two.  Do you mean more
7   than two?
8   A.    Yeah, just a couple of times.
9   Q.    Why did you read it a couple of
10  months ago?
11  A.    Just to read it again, I mean.
12  Q.    Okay.  What is your reaction to
13  the article?
14  A.    I just feel like there were
15  cherry-picked items about the case that
16  were published and the entire case was not
17  presented.
18  Q.    What items do you think were not
19  presented?
20  A.    Well, the text messages.  As far
21  as specifics, it just painted us in a
22  false light, that we didn't do our jobs
23  and basically we are sellouts to people

Page 334

1   with money, you know, they control the
2   police department or sheriff's office and
3   it's just -- it's not -- it's not the way
4   it is at all.
5   Q.    Now, the article doesn't say
6   you're sellouts to people with money.  It
7   doesn't use those words; right?
8   A.    That's right.  It doesn't use
9   those words.
10  Q.    You're saying it implies that;
11  right?
12  A.    Yes.
13  Q.    What are the facts that you claim
14  it asserts to create that implication?
15  A.    It's more of the omitted facts.
16  You know, and as far as they're attacking
17  Josh and I for state law that, you know, I
18  don't have any part in writing any law for
19  state or anything to that effect.  I just
20  have to enforce what's there and --
21  Q.    What are the omitted facts?
22  A.    Well, you know, like I say, the
23  text messages that was in the file.

Page 335

1   Q.    The text messages that you didn't
2   have when you Mirandized Rondini; right?
3   A.    I didn't have the disc, yes.
4   Q.    And the text messages that weren't
5   in the felony packet -- weren't discussed
6   in the felony packet; right?
7   A.    Right.
8   Q.    And you had no -- they bore no
9   part of your decision-making when it came
10  to interviewing Megan or Mirandizing
11  Megan; right?  Correct?
12  A.    Right.
13  Q.    What else was omitted from the
14  article?  What else are the omitted facts
15  that you're referring to?
16  A.    Do we have a copy of the article
17  itself that I could look at?
18  Q.    We have, but I'm curious to know
19  what your thoughts are.  You are
20  testifying that the article damaged you.
21  I believe you.  I want to hear about it.
22  I don't need you to go through your
23  article.  I want to know what your

Page 336

1   thoughts are.  What else was false in the
2   article?
3   A.    Well, I just -- I just feel like
4   it showed law enforcement in general in a
5   false light, and, you know, showing that
6   we didn't care.  We were just worried
7   about this rich guy that, you know, got a
8   big construction company in town and that
9   just has nothing to do with our
10  investigation.  It's just the way that it
11  was slanted to give us, give our names,
12  give us a bad reputation and hurt our
13  name.
14  Q.    So you did not like the article's
15  opinion of the investigation?
16  A.    No.
17  Q.    Anything else you would like to
18  tell me that was false about the article?
19  A.    I mean, the main thing for me was
20  the way it, you know, it mentioned us
21  that, you know, it just cast a negative
22  light on our names when we went by the law
23  that is on the books.

84  (Pages 333 to 336)

Adam Jones                                      12/7/2020

Page 337

1          We didn't make up anything, and,
2    you know, that's what we have to work with
3    and, you know, it just sort of cast us in
4    a light that we could be bought and it's
5    just not true, I mean.
6    Q.    Where in the article does it talk
7    about money in terms of buying you?  You
8    keep saying the phrase bought and I don't
9    know if you mean actually bribed.
10   A.    Well, it's just the insinuation
11   that rich, powerful people can get their
12   way or get around police investigations
13   and that seems to be a standard protocol
14   around here, but that's nothing -- and
15   that's nothing that -- those words exactly
16   but that's the spin that it puts.
17         MS. BOLGER:  J. T., can you
18   -- well, before you do that.
19   Q.    Okay, after the article was
20   published -- well, I guess when did you
21   first see the article?
22   A.    It was probably on the day that it
23   was published.

Page 338

1    Q.    How did you hear about it?
2    A.    Somebody had told me that it was
3    published and I went to BuzzFeed and read
4    it.
5    Q.    Who told you it was published?
6    A.    I don't remember.
7    Q.    Did you talk to Josh Hastings
8    about it when it was published?
9    A.    Yes.
10   Q.    What did you guys say to each
11   other?
12   A.    I don't remember the conversation.
13   Just basically saying that, you know, it
14   makes us look like the bad guys in this
15   thing, something to that effect.  I don't
16   remember specific conversation.
17   Q.    Were you in the office at the
18   time?
19   A.    Yes.
20   Q.    And did you speak to Captain Hood
21   about the article at the time it was
22   published?
23   A.    I don't remember speaking to him.

Page 339

1    Q.    What about Captain Hart?
2    A.    I don't remember speaking to him.
3    Q.    You don't remember speaking to
4    Captain Hart about the article?
5    A.    No.
6    Q.    Ever?
7    A.    Not ever.  That particular day I
8    don't remember anything.  I don't remember
9    a conversation even later on about the --
10   about the article.
11   Q.    Okay.
12         MS. BOLGER:  J. T., can I
13   ask that you show the witness M that was
14   previously marked as Exhibit 25 and is
15   Jones-Hastings 187.
16         (Off the record.)
17         (Whereupon, a document that was
18         previously marked as Defendant's
19         Exhibit No. 25 was referenced and
20         is attached to the original
21         transcript.)
22   Q.    For the record, this is an email
23   Josh Hastings 187, previously marked as

Page 340

1    Exhibits 25.  Investigator Jones, you'll
2    see that the first email is an email from
3    you to Kip Hart that says may get more of
4    these, and if you look below it's a
5    comment from someone named Emily Furnish
6    on the article.
7          Do you remember this email?
8    A.    I don't.
9    Q.    Do you have any reason to doubt
10   that you sent this to Kip Hart?
11   A.    I don't.
12   Q.    I know you don't remember any
13   specific conversations with Captain Hood
14   or Captain Hart.  Do you remember any
15   specific conversations with any of your
16   supervisors about the article?
17   A.    I don't.
18   Q.    Do you remember any conversation
19   with anybody at the Tuscaloosa Police
20   Department or in the Homicide Unit about
21   the article?
22   A.    No.
23   Q.    Just going to again remind you

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 341

1    this is an article that you say caused you
2    tremendous damage, but you don't remember
3    talking about it to anybody at work?
4    A.    Well, I usually keep things to
5    myself, I mean that's just my nature.  You
6    know, I didn't -- it was bad enough that
7    it was published in a negative light on me
8    so, you know, I really -- I don't care in
9    bringing it up.
10   Q.    Did anybody in your office -- did
11   you ever talk to anybody at work about
12   this article?
13   A.    Really just Josh, and there again,
14   I don't remember any specific
15   conversations.  I know we've talked about
16   it but --
17   Q.    Did anybody at work ever raise the
18   subject with you?
19   A.    Not that I can remember.
20   Q.    Do you have any knowledge of
21   anybody -- any conversations anybody at
22   work had about the article?
23   A.    I don't have any knowledge of it.

Page 342

1    Q.    Do you have any reason to believe
2    that this article affected your career in
3    the Tuscaloosa Police Department?
4    A.    I feel like it did, not maybe as
5    much with individual officers.  It was
6    more of my job that investigating crimes
7    that when, you know, I was contacted by --
8    or I would contact victims, they, you
9    know, on a couple of occasions they
10   recognized my name and, you know, didn't
11   want me to investigate the case based on
12   this article.
13   Q.    Let's unpack that for a second.
14   My actual -- my focus should have been
15   more clear.  Let's talk about that victim
16   in one second.  Did anybody -- do you have
17   an impression that the name -- the article
18   had anything to do with how people in the
19   Tuscaloosa Police Department or the
20   Homicide Unit viewed you or made decisions
21   about your career?
22   A.    No.
23   Q.    Do you have any reason to believe

Page 343

1    that anybody in the Tuscaloosa Police
2    Department or the Homicide Unit thought
3    less of you because of the article?
4    A.    Not anybody in Homicide.
5    Q.    How about the Tuscaloosa Police
6    Department?
7    A.    Well, you know, and there again, I
8    never got any emails or conversations with
9    the police chief or anything like that.
10        I guess it was more of the
11   omission of reaching out and saying, you
12   know, I know that y'all did everything
13   that you could do in this investigation
14   and you know, that didn't happen.  You
15   know, the former police chief did; I do
16   remember that.
17   Q.    Sorry, the former police chief of
18   the Tuscaloosa Police Department reached
19   out to you in support?
20   A.    Yes.
21   Q.    But you're saying the Tuscaloosa
22   chief of police did not reach out to you
23   in support?

Page 344

1    A.    Right.
2    Q.    And what is your basis for
3    believing that that was because he thought
4    less of you as a result of the article?
5    A.    Well, I mean, he's your boss.  I
6    mean, you've got a guy that works for you,
7    you know, I have never had any
8    disciplinary issues, you know, nothing
9    negative in my file, you know, negative of
10   any kind and he don't reach out and say,
11   you know, just I'm here for you if you
12   need me.
13        You know, maybe that was his
14   personality, I don't know, but, you know,
15   it just -- it felt like I guess he didn't
16   have my back.  That's the way it felt to
17   me.
18   Q.    How long had you known the chief
19   of police at that point?
20   A.    I had known him for 15 years.
21   Q.    Were you close?
22   A.    Not -- not on a friendly basis as
23   far as, you know, spending time going out

Adam Jones                                                    12/7/2020

Page 345

1    to eat or anything like that or at each
2    other's homes.
3    Q.    So as you sit here, his failure to
4    reach out to you could have been just his
5    personality or that he thought less of you
6    and you have no way of knowing; right?
7    A.    Right.
8    Q.    Other than feeling like the chief
9    omitted to talk to you, do you have any
10   other basis to believe that anybody in the
11   Tuscaloosa Police Department thought less
12   of you because of the article?
13   A.    No.
14   Q.    Do you have any reason to believe
15   that you were denied any form of promotion
16   because of the article?
17   A.    No.
18   Q.    The promotion above investigator
19   would be sheriff; right?
20   A.    No, probably be sergeant.  You
21   would go --
22   Q.    I'm sorry, I meant sergeant, and I
23   apologize.  Did you ever seek to become a

Page 346

1    sergeant?
2    A.    I took the sergeant's test one
3    time when I was in Criminal Investigations
4    and there were several people, I don't
5    even remember how many people took it.  I
6    took it one time.  It was just never --
7    never appealed to me to be a supervisor.
8    I mean, I just like the hands-on work, not
9    saying that supervisors are not, but it's
10   just the work itself is what I enjoyed.
11   Q.    So as I understand your testimony,
12   when the article was published no one in
13   the Tuscaloosa Police Department reached
14   out to you to say like -- reached out to
15   you to talk about the article and no one
16   thought less of you; right?
17   A.    Right.
18   Q.    And when the article was published
19   no one in the Homicide Unit reached out to
20   you to talk about it and no one thought
21   less of you as a result of it; right?
22   A.    Right.
23   Q.    Outside of the police department

Page 347

1    or the Homicide Unit, were people
2    critical, did you feel, of you as a result
3    of the article?
4    A.    Yes, I know right after it was
5    published I was getting phone calls at my
6    desk, you know, it was just basically
7    calling for me to go to jail, you know,
8    comments on the article itself, you know.
9         You know, there was a couple that
10   actually wished harm on my daughter or
11   kids in general.  I think one specifically
12   said something about my daughter, not by
13   name.  It was just, you know, if he had a
14   daughter, it would have been different or
15   hopefully this never happens to his
16   daughter or something to that effect.
17   Q.    I'm sorry.  The wish was that if
18   he had a daughter -- it wasn't I hope this
19   happens to his daughter; right?
20   A.    Well, it was the gist of, you
21   know, this -- if this happened to his
22   daughter or something like that, you know,
23   it would have been different, something to

Page 348

1    that effect.  I don't remember the exact
2    wording.  It was more of a threatening
3    manner than just a statement.
4    Q.    Who was that?
5    A.    It was just a comment that I saw
6    on this article.
7    Q.    Do you even know if that was a
8    real person?
9    A.    I don't.  That's the --
10   Q.    Did you -- I'm sorry, I didn't
11   mean to cut you off.  That was a lag.
12   What were you about to say?
13   A.    I was just, you know, that that's
14   the, you know, the bad part is the unknown
15   for me.  You know, I don't know if that's
16   somebody that's here in Tuscaloosa that,
17   you know, where they're located and, you
18   know, as a dad and everything else, you
19   know, you're looking -- trying to look out
20   for your kids to, you know, hope nothing
21   happens to them because you don't know
22   what kind of folks these are, you know.
23        They're radical whatever, you

Adam Jones                                                    12/7/2020

Page 349

1    know. It's just the fear of the unknown
2    basically.
3    Q.    Okay. You said you got a lot of
4    phone calls to your desk. Can you tell me
5    more about that?
6    A.    It was basically just people I
7    wouldn't recognize the numbers or they
8    would block the numbers, call and say you
9    should be in jail, I hope y'all spend the
10   rest of your lives in jail, you know,
11   y'all could have done so much more to help
12   her and, you know, those were constant for
13   several months and --
14   Q.    How many phone calls were there?
15   A.    It was dozens. I don't have a
16   number. It was just constant, I mean, for
17   several months, and it got to the point
18   that I had to talk to Captain Hart about,
19   you know, I'm just going to have to wait
20   until I get a voicemail from, you know, if
21   it's a victim that I'm working the case
22   on, I'm going to have to get the voicemail
23   from them and then call them back because,

Page 350

1    you know, every time -- seemed like every
2    time I was answering the phone there for a
3    couple of months it was somebody calling
4    and making, you know, comments about we
5    should go to jail and something to that
6    effect.
7          But where I guess it hit closer to
8    home was when it was after the article was
9    published we were on the beach, we had
10   went to the beach for two or three days, I
11   don't remember how long, and I had
12   actually got a call from Captain Hart and
13   he said that it was a dad, I had a case, I
14   was working a case his daughter was a
15   victim and he didn't want me working the
16   case.
17         So he was just calling to let me
18   know that, and, I mean, I really didn't
19   know, what to -- what to do or think
20   because, you know, if these calls start
21   coming in like this, you know, I'm going
22   to end up -- they're going to move me out
23   of homicide because nobody is going to

Page 351

1    want me to work their case, and --
2    Q.    That never happened though; right?
3    You never got moved?
4    A.    No, I was never moved out of
5    homicide, no.
6    Q.    Do you have call logs or any
7    records of these constant phone calls as
8    you said?
9    A.    I don't.
10   Q.    Is there any way to get them at
11   the Homicide Unit?
12   A.    I don't think so. I'm not sure on
13   that though. Probably be through their IT
14   department.
15   Q.    Did any of the callers identify
16   themselves to you?
17   A.    No.
18   Q.    How do you know it wasn't just one
19   person calling you over and over?
20   A.    I don't. It was either blocked
21   numbers or the number did appear to change
22   so.
23   Q.    It was blocked numbers?

Page 352

1    A.    Well, some of them were blocked
2    that, you know, it would show up unknown
3    -- I'm sorry, not blocked. It would show
4    up unknown on the caller ID screen from my
5    desk phone. And then sometimes it would
6    be a number show up, so.
7          MS. BOLGER: J. T., would
8    you show Investigator Jones AZ, which is
9    Jones Hastings 434 through 441.
10         And, Nancy, if you would
11   mark that this time actually as Exhibit
12   35.
13         (Whereupon, a document was marked
14         as Defendant's Exhibit No. 35 and
15         is attached to the original
16         transcript.)
17   Q.    For the record, the witness is
18   looking at a document that bears the Bates
19   number 434 through 441, which was produced
20   by Jones-Hastings in this litigation.
21         You're welcome to take a look,
22   Investigator Jones, but my question is
23   going to be what is this?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                         12/7/2020

Page 353

1    A.    It looks like comments.  I don't
2    know if this is Facebook or on the
3    BuzzFeed article itself.
4    Q.    You told me that you didn't have a
5    Facebook page?
6    A.    Yes, I don't.
7    Q.    So did you ever look at Facebook
8    comments for the article?
9    A.    Usually when my wife would tell me
10   about it, you know, I would look, just
11   more than anything I wanted to make sure
12   that, you know, if I knew somebody, just
13   the type people that we deal with, make
14   sure that it was nobody that would cause,
15   you know, any physical harm obviously to
16   my family.
17   Q.    Okay.  Is this printed out of
18   these comments from you?
19   A.    No, I didn't do that.
20   Q.    Okay.  So you've never seen these
21   before?
22   A.    No.
23   Q.    Okay, I'll have to ask

Page 354

1    Investigator Hastings tomorrow.
2          When you looked at Facebook
3    comments that your wife drew your
4    attention to, did you -- what did you see?
5    A.    Well, there were some people that
6    we knew that, you know, would share the
7    article and there would be some to make
8    comments, and, you know, the way I see it
9    if they're sharing it, they believe it,
10   so, you know, one person in particular
11   shared it and made the comment to the
12   effect of heads should roll.
13   Q.    What is the basis for your belief
14   that if people are sharing the article,
15   they believe it?
16   A.    Well, I mean there are people out
17   there that like to spread lies, so I guess
18   I just assume that if they share it, I
19   mean, I'm not -- I'm not up to speed on
20   Facebook so I just assume that if people
21   share a story, that, you know, to their
22   knowledge, to their good faith that it's
23   true, they think it's true.

Page 355

1    Q.    Don't people sometimes just
2    forward things along to other people that
3    have shared common experiences and common
4    people?  So in other words, if you're in
5    your school and there's an article about
6    someone else in the school, don't people
7    just forward it along?
8          MR. COCKRELL:  Object to the
9    form.
10         Go ahead.
11   A.    I guess they could.
12   Q.    (By Ms. Bolger) Sure.  So you
13   don't actually have a reason to believe
14   that sharing it meant believing it other
15   than your own personal belief; right?
16         MR. COCKRELL:  Object to the
17   form.
18   A.    Right, other than, you know, like
19   I was mentioning, you know, people saying
20   heads should roll.  You know, the guy that
21   I'm talking about saying that, and, you
22   know, it's friends of friends that share
23   it and, you know, it got to the point, you

Page 356

1    know, you just get sick of looking at
2    it and --
3    Q.    You said -- sorry.
4    A.    My main concern was just for my
5    family anyway, the safety of my family.
6    Q.    Did anybody threaten the safety of
7    your family?
8    A.    Yeah, there were threats on
9    Facebook, you know, that --
10   Q.    There were no threats in the
11   BuzzFeed article; right?
12   A.    Not the written article, no.
13   Q.    Who said heads should roll?
14   A.    His name is Jimmy Adams.  He is my
15   -- let's see if I can describe it to you.
16   My wife's sister is married to his son.
17   Q.    Have you ever spoken to Mr. Adams
18   about it?
19   A.    I didn't.
20   Q.    Did anybody you know speak to
21   Mr. Adams about it?
22   A.    Not to my knowledge.
23   Q.    Do you have -- did you keep in any

89  (Pages 353 to 356)

Adam Jones                                               12/7/2020

Page 357

1    way records of the threats on Facebook?
2    Did you print them, write down names, do
3    anything like that?
4    A.    I haven't.  The threats I've never
5    screen shot or anything like that, just --
6    I don't know if it's ever -- I don't
7    remember ever saving any.
8    Q.    Do you know the names of anybody
9    who made these threats?
10   A.    No.  For the most part, the
11   threats came from people that I didn't
12   know.
13   Q.    Any of them come from people you
14   did know?
15   A.    Not that I'm aware of.
16   Q.    Do you know any of the threats,
17   people who made them threats were, for
18   example, real people?
19   A.    I don't know.
20   Q.    What kind of threats were they?
21   A.    Well, it was mainly just you,
22   know, there were some that they wished
23   that we were dead, you know.  The majority

Page 358

1    was wanting us to go to prison.  You know,
2    I know Josh had some that something to the
3    effect they should burn in hell.
4    Q.    Those aren't -- those aren't
5    threats, right?  Those are people saying
6    bad things, but no one was threatening to
7    kill you or hurt you or hurt your family;
8    right?
9    A.    Well, I perceived it that way as a
10   threat.
11   Q.    Are these still available on
12   Facebook somewhere?
13   A.    I don't know.
14   Q.    Where are they on Facebook if I
15   want to go look at them?
16   A.    I don't know if they're still
17   attached to the story.  I don't know.
18   Q.    Sorry.  You're saying they were
19   attached to the story on Facebook?
20   A.    That's -- I believe.  There again,
21   I'm not -- I'm not up to speed on social
22   media, but I believe it was underneath
23   where the article was -- and it could be

Page 359

1    the article was shared to somebody and
2    there were threats underneath somebody
3    that shared it, I don't know if it was
4    under the actual -- if BuzzFeed has got a
5    Facebook page, I don't know that, but if
6    do, I don't know if the comments were
7    under their Facebook page under that
8    article, I don't know.  I couldn't say
9    where it's at.
10   Q.    Have you seen them recently?
11   A.    I haven't looked.
12   Q.    Can you name anybody who made a
13   threat on the Facebook page?
14   A.    It's nobody that I know.
15   Q.    Other than threats on the Facebook
16   page, have you heard other -- have you had
17   other communications or read anything else
18   about the article?
19   A.    Not that I remember.
20   Q.    Do you personally know anybody who
21   believed what you allege to be falsities
22   in the article?
23   A.    Well, there again, I believe if

Page 360

1    they -- I believe if they share it, they
2    believe it.  I mean, my aunt was one of
3    them that shared it, you know, to my
4    knowledge --
5    Q.    I'm sorry, did you say your aunt
6    shared it?
7    A.    Yes.
8    Q.    I couldn't hear you.  Okay.  Have
9    you ever talked to your aunt about it?
10   A.    No.
11   Q.    What's your aunt's name?
12   A.    Susan Jones.
13   Q.    Do you know if Ms. Jones believes
14   the article is true?
15   A.    There again, if she shared it, I
16   believe that she thinks that it's true.
17   Q.    Is the only basis you have for her
18   thinking it's true that she shared the
19   article?
20   A.    Yes.
21   Q.    But you never talked to her about
22   it?
23   A.    No.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                          12/7/2020

---

Page 361

1    Q.    Anybody else that you know
2    personally who believes the article is
3    true you think?
4    A.    Well, Jimmy Adams, you know, just
5    specifics.
6    Q.    Jimmy Adams who is your wife's
7    sister's son's husband -- no --
8    A.    It would be my brother-in-law's
9    dad.
10   Q.    Brother-in-law's dad.  Okay.  Have
11   you ever spoken to him about it?
12   A.    No.
13   Q.    And how do you know he believes
14   it?
15   A.    Well, you know, he makes the
16   comment heads should roll, you know, and I
17   don't know how else to take that other
18   than he believes it.
19   Q.    Have you ever talked to your
20   brother-in-law about it?
21   A.    No.
22   Q.    Anybody else that you personally
23   know who believes the alleged falsities in

---

Page 362

1    the article?
2    A.    My wife's aunt shared it.  I don't
3    believe she made any comments about it but
4    she shared it.
5    Q.    Who is that?
6    A.    Cynthia Booth.
7    Q.    And what basis do you have for
8    believing that she believed the article
9    rather than just shared the article?
10   A.    That's all I have.
11   Q.    Anything else?
12   A.    I think she made comments, but I
13   don't know them to say it because I would
14   be speculating if I said it, so I don't
15   remember exactly what she said.  She did
16   make comments about the article.
17   Q.    To who?
18   A.    On Facebook.
19   Q.    But you just said she didn't make
20   a comment.
21   A.    Well, I'm sorry.  As far as
22   when --
23        MR. COCKRELL:  Object to the

---

Page 363

1    form.
2         Go ahead.
3    A.    As far as when she shared it there
4    was no -- there was no heading or whatever
5    you want to call it with the article that
6    it was shared.  It was under comments of
7    what she had shared.  I don't know if she
8    got into it with somebody.
9         There again, I don't remember but
10   according to my wife the way she was
11   responding to these people she believed
12   the article.
13   Q.    (By Ms. Bolger) Where is the heads
14   should roll comment?  Where would I find
15   that if I wanted to find it?
16   A.    I guess it would probably be on
17   his Facebook page, Jimmy Adams' Facebook
18   page.
19   Q.    So it's not on the BuzzFeed page?
20   It's on the Jimmy Adams Facebook page?
21   A.    When he shared the article, yes.
22   Q.    How about Cynthia Booth's comments
23   where would I find those?

---

Page 364

1    A.    I'm not for sure on that.  I'm
2    assuming that's her Facebook page also is
3    where my wife saw it because she was
4    friends with her on Facebook when this
5    happened.
6    Q.    So you know about Cynthia Booth
7    sharing the article and maybe making
8    comments because your wife told you that
9    she had seen it?
10   A.    Yes, she showed it to me.  I just
11   don't remember the exact comments, but my
12   wife was telling me that based on the way
13   she was responding and commenting on that,
14   that she believed it.
15   Q.    Not that your wife believed it --
16   A.    Yes.
17        COURT REPORTER:  I'm sorry,
18   say that again, Kate.
19        MS. BOLGER:  I was just
20   clarifying who the she was.  So I said not
21   that his wife believed it but that Cynthia
22   Booth believed it.
23   Q.    Anybody else?

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 365

```
 1      A.    Not anybody right -- well, hang
 2   on.  Trying to think.  I know there were
 3   some more -- I know there was a -- my
 4   son's football coach, his wife was on
 5   Facebook and she was making comments.
 6   There again, I don't know if it was on her
 7   page, somebody that shared the article's
 8   page, but the comments that she was
 9   making, there again, according to my wife,
10   she believed it.
11         And then he was my son's coach,
12   you know, in baseball and football, and,
13   you know, they just sort of -- after this
14   came out they just sort of separated
15   theirselves from us, didn't speak or
16   anything.
17      Q.    Did you have a social relationship
18   with them before the article came out?
19      A.    Nothing other than just with our
20   children.
21      Q.    Okay.  Do you know that they
22   separated themselves because of the
23   article or are you making assumptions?
```

Page 366

```
 1      A.    Well, was never you know --
 2   everybody would just sort of sit in groups
 3   up until this, and then after this came
 4   out they just sort of went their own way.
 5      Q.    So you're just making the
 6   assumption?
 7      A.    Yes.
 8      Q.    Anybody else you know that
 9   believed the -- what you claim are the
10   false allegations in the article?
11      A.    It would be my cousin, Jill
12   Slayton, I don't know -- I can't think of
13   any comments that she made, but she was
14   another one that -- comments on Facebook
15   that she made.
16         She approached my daughter at her
17   job and was confronting her about it
18   saying, you know, something to the effect
19   of what did your dad do, this girl didn't
20   commit suicide for no reason, and what do
21   you think about it, so it upset my
22   daughter and she walked off to the back
23   and, you know, just to try to avoid it.
```

Page 367

```
 1      Q.    Did she say she believed that
 2   article or was just asking your daughter
 3   questions about the article?
 4      A.    She didn't make the statement I
 5   believe the article, no.
 6      Q.    Okay.  I was just wondering what
 7   she said to your daughter.  I'm truly
 8   trying to know as much as I can,
 9   Investigator Jones.  I'm absolutely
10   asking.  My point was was she asking your
11   daughter questions about the article or
12   saying I can't believe your father did XY
13   and Z?
14      A.    To my knowledge the way my
15   daughter explained it to me, that's the
16   way it was.  You know, your dad -- they
17   must have done something, I believe is the
18   way she put it.  That girl wouldn't have
19   committed suicide for no reason.  The gist
20   is what she told me.
21      Q.    And have you ever spoken to her,
22   to Jill Slayton about that?
23      A.    No, we've just -- the people that
```

Page 368

```
 1   either share it or comment, we've just
 2   distanced ourselves from it, because I
 3   mean it's not going to do any good to
 4   confront anybody about it.  It's, you
 5   know, they're going to believe what
 6   they're going to believe anyway, so.
 7      Q.    Anybody else you know who believed
 8   the article personally?
 9      A.    Not -- not right now.  I can't
10   think of anything.
11      Q.    Did you lose any personal
12   relationships as a result of the article?
13      A.    Well, as far as, you know, just
14   these people that were making comments, it
15   wasn't close personal relationships, but,
16   you know, we would see them from time to
17   time and, you know, we just sort of
18   separated ourselves and just didn't want
19   to -- didn't want to have to rehash it
20   again.
21      Q.    Do you know anybody who thinks
22   less of you because of the article?
23      A.    No.
```

92  (Pages 365 to 368)

Adam Jones                                                    12/7/2020

Page 369

1    Q.    Did you ever talk about the
2    article with Chief Waid?
3    A.    No.
4    Q.    Did you ever talk about the
5    Rondini investigation with Chief Waid?
6    A.    No.
7    Q.    What about Chief Baker?
8    A.    No.
9    Q.    I think I've asked you this
10   already and I apologize if I did.  Did you
11   ever talk to Sheriff Abernathy about it?
12   A.    No.
13   Q.    Other than what we've talked
14   about, how would you say you were damaged
15   by the publication of these articles?
16   A.    It's just the way you have to
17   change your life and it shouldn't have to
18   happen that way because I mean being in
19   police work you're dealing with dangerous
20   people anyway, and you always tell your
21   kids to just look out, you know, watch
22   your surroundings, you know, stuff like
23   that.

Page 370

1         But, you know, seeing these
2    comments on Facebook, and there again,
3    it's the unknown that's out there.  There
4    are a bunch of radical people that's out
5    there that, you know, they'll, you know,
6    do whatever to you, you know, if they think
7    they're avenging somebody in some way.
8         I had a lady come in, her daughter
9    had filed a sexual assault report, and
10   this is more on a professional or work
11   related, but she was worried that her
12   daughter was going to end up committing
13   suicide because of the way that this
14   article portrayed our office and Josh and
15   I.
16        And I let her know, she didn't
17   even realize it at that time, or I won't
18   say that she didn't realize it.  I told
19   her that I was the lead investigator in
20   the case that she's talking about.
21        And, you know, you just feel like
22   when you're getting questioned like that
23   from victims or their family that come in

Page 371

1    you've lost the trust of the public.
2    That, you know, I don't know the victims.
3    You know, they know me, you know, because
4    we're in a small department and they can
5    look my name up online at the sheriff's
6    office or could look it up online at the
7    sheriff's office, see that I worked there
8    and it was more of how I was perceived by
9    victims and, you know, possible
10   prosecution of cases in the future because
11   of the way I was portrayed, you know,
12   victims, at least two that I know of, I
13   don't know that there was ever anybody
14   else that may have contacted a supervisor.
15        They didn't tell me if they had,
16   but that was on two occasions that they
17   asked me or insinuated that they didn't
18   want me to work their case.
19        And, you know, yes, I love the job
20   that I did, but at the end of the day it
21   is providing for my family, and, you know,
22   I felt like it was going to affect me,
23   because there again, I was just -- I felt

Page 372

1    like I was cast in a negative light and --
2    Q.    Just so I understand, the lady who
3    came to talk to you worried that her
4    daughter would commit suicide, she had
5    read the article but she didn't know you
6    were involved in the Rondini
7    investigation, you told her that?
8         MR. COCKRELL:  Object to the
9    form.
10        Go ahead.
11   A.    Yeah, I didn't know --
12   Q.    (By Ms. Bolger) -- sorry, say that
13   again.
14   A.    I just didn't know if she realized
15   that it was me.  She just said something
16   to the effect of I don't want my daughter
17   to end up committing suicide like that
18   girl did from that article.
19        And I just told her that I was the
20   lead investigator in that case and I'm
21   going to do everything I can to take care
22   of your daughter.
23   Q.    And did you investigate that case?

                              93  (Pages 369 to 372)

Page 373

1    A.    Her daughter never came in again
2    after her mother came up there.
3    Q.    Are there any other ways you feel
4    that you've been damaged by the
5    publication of the article?
6    A.    Just, you know, my family just
7    having to change the way we do things.
8    You know, from that -- the time that that
9    article came out, you know, you just sort
10   of go into defense mode and we called our
11   kids in there to let them know, you know,
12   what was going on, and, you know, of
13   course, they were on social media and they
14   were reading these comments.
15         And, you know, my son he's
16   12 years old and, you know, he's reading
17   this stuff and thinking that I'm going to
18   lose my job and so he's looking on, you
19   know, on the internet or trying to find
20   some way that me and him could work, you
21   know, to make money if I end up -- if I
22   end up getting fired.
23         And, you know, my daughter she was

Page 374

1    having issues sleeping.  She just I think
2    she was -- she got so involved in just
3    reading all these comments, comment after
4    comment, and I finally just had to tell
5    her to stop.  She was just -- she couldn't
6    sleep and, you know, ultimately she has
7    some anxiety from it, you know, because
8    she's worried about what it's going to do
9    to me and then I'm worried about how it's
10   affecting her, and, you know, we don't --
11   I didn't go out and lamblast anybody that
12   was making comments about it and I didn't
13   confront anybody about it because, you
14   know, it's not going to do any good, so we
15   just stayed to ourself and I mean just
16   sort of withdrew from everything.
17   Q.    What was the name of the woman who
18   came to talk to you about her daughter and
19   said she was afraid her daughter was going
20   to commit suicide?
21   A.    I don't remember her name.  I just
22   remember, you know, that specifically,
23   that she was worried that that was going

Page 375

1    to happen to her daughter.
2    Q.    Do you remember the name of the
3    person who Captain Hart told you didn't
4    want you investigating the case?
5    A.    I don't remember that either.
6    Like I say, I didn't have anything, of
7    course, I wouldn't have wrote it down, but
8    I was sitting on the beach.  You know, he
9    just called and was telling me that and I
10   don't remember a name.
11   Q.    Did any victim or any family of a
12   victim tell you they didn't trust you?
13   A.    No.
14   Q.    Anyone in your department tell you
15   hey, you've lost the trust of the public?
16   A.    No.
17   Q.    How many Facebook comments would
18   you say there were about this?
19   A.    I would say hundreds.  I don't
20   have a -- I would say hundreds.
21   Q.    When you say your daughter was
22   sitting around reading comments, she
23   wasn't reading the BuzzFeed article;

Page 376

1    right?  She was reading comments on
2    Facebook?
3    A.    Yes.
4    Q.    Any other damages you claim to
5    have suffered as a result of the
6    publication of the article?
7    A.    Just, you know, physically I never
8    had any kind of physical issues health
9    related at all and when that came out it
10   was just -- it was a couple of weeks I was
11   having headaches, chest pain, dizziness,
12   reflux.
13         I was having all of these symptoms
14   and it wasn't going away.  I had never had
15   anything like that before.  I was telling
16   my wife.  She works at a doctor's office.
17   She does billing.  She's not in the, you
18   know, health care -- hands-on health care
19   but she does the billing.
20         And she got me an appointment with
21   Dr. McEntyre.  She does work with him.
22   And he diagnosed me with high blood
23   pressure, and I had to go on two different

94  (Pages 373 to 376)

Adam Jones                                                    12/7/2020

Page 377

1    kinds of medication for blood pressure,
2    for acid reflux, and I actually had to
3    start taking some, which it was just like
4    a supplement, melatonin to try to help me
5    sleep.
6         That never worked as far as the
7    sleeping goes, so I started drinking, and
8    I've never been one to drink at all, but,
9    you know, I was just trying to find a way
10   to sleep and so I started drinking.
11   Q.   Are you still drinking?
12   A.   Not daily.
13   Q.   I'm sorry, I didn't hear you.
14   A.   Not daily.
15   Q.   So do you feel like you're doing
16   better?
17   A.   Yes.
18        MS. BOLGER:  J. T., would
19   you mind handing the witness AX, which are
20   the medical records that were produced?
21   It's kind on a thick packet.
22        (Off the record.)
23        (Whereupon, a document was marked

Page 378

1    as Defendant's Exhibit No. 36 and
2    is attached to the original
3    transcript.)
4    Q.   Investigator Jones, for the record
5    these are medical records which were
6    produced to us actually just last week
7    from your lawyers and they appear to be
8    medical records of some fairly recent
9    trips to the doctor.
10        You're welcome to check me on this
11   but none of these pre-date 2017.  Had you
12   not been to the doctor before 2017?
13   A.   I really had no reason to go to
14   the doctor.  I never had any health
15   issues.
16   Q.   So you weren't under the regular
17   care of a doctor that you went to like
18   annual checkups with before 2017?
19   A.   No.
20   Q.   So you're telling me there's no
21   baseline I can compare these medical
22   records to; right?
23   A.   No.

Page 379

1    Q.   Are you still going to the doctor?
2    A.   Just for, you know, yearly
3    checkups right now.
4    Q.   Has your high blood pressure
5    gotten better?
6    A.   It's under control with
7    medication.
8    Q.   Any other form of damages that you
9    suffered as a result of the article?
10   A.   When I -- excuse me.  I know there
11   was an occasion when I was, you know, I
12   just -- I felt like I had lost the public
13   trust, you know, and I knew as soon as my
14   20-year mark came I was going to look at
15   going ahead to retire, and I had applied
16   for a position in Northport and that's in
17   Tuscaloosa County.
18        It was a magistrate position.
19   It's my understanding that I was in the
20   top four candidates for the position.
21   When I did go for the interview, you know,
22   they asked me what I thought the role of a
23   magistrate was and I explained to them,

Page 380

1    you know, we assist victims or obtain
2    warrants and, you know, we swear officers
3    in to the traffic citations or any arrest
4    that they make.
5         And the lady that was over the
6    court system, and I don't remember her
7    name, but she made the comment of, you
8    know, we typically believe our victims
9    here, something to that effect, and, you
10   know, I automatically thought that this
11   is, you know, still due to this article,
12   you know, three years later and ultimately
13   didn't get the job.
14   Q.   Did she tell you it was because of
15   the article?
16   A.   She didn't tell me that.  That's
17   just what -- that's what came to my mind.
18   Q.   Did the doctor tell you that the
19   hypertension and the sleep problems were
20   caused by the article or by stress?
21   A.   I believe it was stress that he
22   said that was related to.
23   Q.   Did he mention anything about the

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                                    12/7/2020

Page 381

1    article?
2    A.    I did mention it to him.
3    Q.    Did he tell you he thought that
4    was the cause of your illness?
5    A.    He said it was a factor.  It was
6    definitely a factor in it.
7    Q.    Were there other factors?
8    A.    Not that I remember him
9    mentioning.
10   Q.    Did anyone anywhere ever tell you
11   that you lost the public's trust as a
12   result of the article?
13   A.    No.
14   Q.    And when you didn't get the job as
15   a magistrate, did anyone ever tell you
16   that was because of the article?
17   A.    No.
18   Q.    Who did get that job?
19   A.    I don't know.
20   Q.    Were there any other damages you
21   suffered as a result of the publication of
22   the article?
23   A.    Not to speak of right now.

Page 382

1    Q.    This is your moment, Investigator
2    Jones.  In good faith I want to know how
3    you feel you were damaged by the article,
4    so feel free to tell me anything that you
5    feel.
6    A.    You know, I just -- I really feel
7    like it was my name more than anything.
8    You know, my family has been in law
9    enforcement for -- since the 1940s, and
10   it's been my granddad, my uncle, and then
11   it was me and we all sort of overlapped
12   each other.  We all worked for the
13   Tuscaloosa Police Department.
14         You know, I've always took pride
15   in my job.  It's all I've ever wanted to
16   do.  I just feel like my name has been
17   tarnished because of this article, you
18   know.
19         You know, that's the only case out
20   of my career that's going to be
21   remembered.  You know, out of 20 years
22   that's going to be it.  And it's not -- I
23   am not a vain person.  I'm as unpolitical,

Page 383

1    anti-spotlight as anybody.
2          We have these perp walks is what
3    they would call them.  When we would have
4    a suspect they would walk them down the
5    steps there at the homicide office.  I
6    didn't care anything about even if it was
7    my case, I would let some of them other
8    guys do that.  As long as, you know, as
9    long as the job was done, that's all that
10   mattered to me.  You know, I'm not a bad
11   guy.  You know, I feel like that's the way
12   we were portrayed.  I care about people.
13         You know, I hate that it happened
14   to that family.  You know, I hate she took
15   her life, but, you know, I'm just -- you
16   know, after I die, you know, eventually
17   one day I will, but my name is going to
18   live on and it's one of those things that,
19   you know, you can't put a price tag on it
20   and you don't ever want to have anybody
21   even assume that you would compromise your
22   integrity or your name, your family name,
23   just because somebody's got some money.

Page 384

1          I mean, I think I said it at the
2    beginning that I've got a good family
3    name.  It was given to me in good standing
4    and I want to carry it -- carry it on that
5    way, but I feel like it was tarnished
6    because of this, and I just -- I don't
7    want my son primarily since he will carry
8    our name on, that I don't want him to have
9    to suffer for the way that I was portrayed
10   in this.  I just -- I don't think it was
11   right.
12   Q.    Anything else?
13   A.    No, ma'am.
14   Q.    Okay.  Did you ever consult with a
15   lawyer name Leila Watson?
16   A.    No.
17   Q.    In your document production you
18   produced a web page for Leila Watson with
19   a handwritten note that says this attorney
20   was given the original file.  Do you
21   understand what that means?
22   A.    I don't know if that attorney may
23   have subpoenaed the file.  I don't know.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Adam Jones                                          12/7/2020

Page 385

1    I don't remember that name.
2    Q.    Are you aware that Tuscaloosa News
3    published an article about the Rondini
4    investigation?
5    A.    Yes.
6    Q.    Was that -- who was it written by?
7    A.    Who was it written by?
8    Q.    Yes.
9    A.    Stephanie Taylor.
10   Q.    Do you know Stephanie Taylor?
11   A.    Just in passing, nothing on a
12   personal level.
13   Q.    Did you at any point talk to
14   Stephanie Taylor in her drafting of that
15   article?
16   A.    No.
17   Q.    Not even off the record?
18   A.    No.
19   Q.    Do you know that Ms. Taylor
20   currently works for the Tuscaloosa Police
21   Department?
22   A.    I had heard that, yes.
23   Q.    Did you two overlap at the

Page 386

1    Tuscaloosa Police Department?
2    A.    No, I was gone when she came.
3    Q.    Do you know how she got the files
4    from the Rondini case to write about?
5    A.    I believe she subpoenaed it.
6    Q.    Are you aware that T. J. Bunn and
7    his counsel took out a full page ad in the
8    Tuscaloosa News about Megan Rondini?
9    A.    I vaguely remember it.  I couldn't
10   tell you what it said.
11   Q.    What did you think about it, do
12   you remember?
13   A.    I don't remember the specifics of
14   what was said.
15   Q.    I know you don't remember the
16   specifics of what was said.  I'm asking
17   what your reaction to it was.
18   A.    I didn't really have any reaction
19   to it one way or another, I mean.
20   Q.    Well, you've been telling me how
21   upsetting this article was, so I'm
22   assuming you react pretty strongly to
23   things related to the Rondini

Page 387

1    investigation.  You're telling me you had
2    no real reaction to this full page ad
3    taken out --
4    A.    Well, I'm just saying that I don't
5    remember what it was concerning, I mean,
6    as far as what was written on that page,
7    you know.
8    Q.    Okay.
9         MS. BOLGER:  J. T., can you
10   show the witness AH?  And this was marked
11   already.
12        (Off the record.)
13        (Whereupon, a document that was
14        previously marked as Defendant's
15        Exhibit No. 17 was referenced and
16        is attached to the original
17        transcript.)
18   Q.    For the record, this is an
19   advertisement that was taken out in the
20   Tuscaloosa News dated July 27th, 2017.
21   This is after Megan Rondini was dead;
22   right?
23   A.    Yes.

Page 388

1    Q.    And it starts out a civil lawsuit
2    has been filed by a group of trial lawyers
3    seeking financial compensation for the
4    suicide of a young woman from Texas.  The
5    lawsuit names representatives of the
6    University of Alabama, deputies of the
7    Tuscaloosa County Sheriff's Office, the
8    sheriff of Tuscaloosa County, and
9    T. J. Bunn as defendants.  Do you see
10   that?
11   A.    Yes.
12   Q.    And then it goes on.  Was a
13   lawsuit filed by trial lawyers or was the
14   lawsuit filed by Megan's parents?
15   A.    It was my understanding it was her
16   parents.
17   Q.    And it goes on, and you can feel
18   free to read it, but it goes on to say
19   some disparaging things about Megan.  Do
20   you -- did you have any reaction to this?
21   A.    I'm just reading it.  Sorry.
22   Okay.
23        (Off the record.)

Adam Jones                                    12/7/2020

Page 389

1    Q.    Do you remember reading this
2    article?
3    A.    I don't know that I even read it
4    all the way through when it came out.
5    Q.    But Megan was dead, right, when
6    they wrote this article?
7    A.    Yes.
8    Q.    But they're still about talking
9    her private photos and her text messages
10   --
11   A.    You know, I do remember -- it's
12   not doing anybody any good to print
13   something like this.  I mean, she died in
14   a tragic way.  Her parents are, you know,
15   missing their daughter obviously and I
16   mean there's no -- I mean I don't think
17   there's any sense in printing it.
18         I mean that's my personal opinion
19   about it.  You know, I'm more of a person
20   that withholds a lot of stuff.  I wouldn't
21   go out and just attack, that's just me.
22   Q.    All right.
23         MS. BOLGER:  Why don't we

Page 390

1    take literally five minutes?  In that time
2    could you guys -- why don't we go off the
3    record and take a five-minute break.
4         VIDEOGRAPHER:  We're off the
5    record at 5:26 p.m.
6         (Recess was taken.)
7         VIDEOGRAPHER:  We're back on
8    the record at 5:35 p.m.
9    Q.    Investigator Jones, generally, and
10   I'm not asking you specifically in this
11   case.  Generally, I think you testified
12   earlier that generally felony packets as
13   in the piece of paper, the felony packet,
14   does not get handed to grand juries for
15   them to review; is that correct?
16   A.    That is my understanding of it.
17   It's given to the assistant district
18   attorney that's over the grand jury.  I
19   don't know if they make copies for each
20   grand juror, but it's my understanding
21   that they do not because there's -- it
22   would be a mass volume of paper if they
23   did that.

Page 391

1    Q.    Okay.  And that's based on your
2    understanding as someone who's testified
3    generally in grand juries; right?
4    A.    Yes, yes.
5    Q.    Okay.
6         MS. BOLGER:  Subject to the
7    fact that we have to leave open further
8    discussions about the grand jury for
9    another day, I have no further questions
10   for the day.
11         MR. COCKRELL:  Okay.  Start
12   tomorrow at 9:00?
13         MR. THOMPSON:  Tomorrow
14   morning at 9:00, Kate?
15         MS. BOLGER:  Yes, if that's
16   all right with you guys.
17         VIDEOGRAPHER:  Off the
18   record at 5:36 p.m.
19
20         [The deposition was concluded at
21   5:36 p.m., and further deponent saith
22   not.]
23

Page 392

1         CERTIFICATE
2    STATE OF ALABAMA   )
3    TUSCALOOSA COUNTY   )
4         I hereby certify that the above and
5    foregoing proceedings were taken down by
6    me in stenotype, and the questions and
7    answers thereto were reduced in transcript
8    form by computer-aided transcript under my
9    supervision, and that the foregoing
10   represents a true and correct transcript
11   of the proceedings occurring on said date
12   at said time.
13         I further certify that I am neither
14   of counsel nor of kin to the parties to
15   the action, nor am I anywise interested in
16   the results of said cause.
17   Signed December 7, 2020.
18
19   /s/ Nancy Pannell, CCR
20   NANCY PANNELL, CCR
21   Alabama CCR No. 30, Expires 9/30/2021
22   Commissioner for the State of Alabama at
23   Large, Commission expires 07/17/2021

| A | | | |
|---|---|---|---|
| **a.m** 1:19 2:13 8:13 9:3 63:19 63:22 66:2 133:4 284:7 297:2,7,11,14 | 321:6 **acquire** 273:4,6 **act** 103:10 **acting** 8:4 **action** 19:18 392:15 | 139:13 280:20 292:23 293:10 **advising** 212:2,3 232:9 **AE** 61:4 **affect** 371:22 | 252:15,16 302:2 AJones@tcso... 321:8 **Alabama** 1:2 2:11 6:10 7:1 | **allege** 359:21 **alleged** 69:3 70:9 75:4 77:17 84:2 90:2 127:19 133:9 134:9 |

*(Full index content below, merged in reading order by column)*

**a.m** 1:19 2:13 8:13 9:3 63:19 63:22 66:2 133:4 284:7 297:2,7,11,14
**AA** 317:2
**Abernathy** 133:6 246:14 247:3 318:15 369:11
**ability** 77:16 120:4
**able** 25:23 78:22 118:6 227:14 236:23 238:4 249:13 280:16 304:13
**absence** 257:3
**absolutely** 170:16 241:5,9 367:9
**abuse** 271:8 274:6,8
**academy** 46:3 46:11 65:3,8
**access** 304:10
**accessible** 24:22
**accidents** 37:2
**accommodate** 163:18
**accommodating** 227:19,20
**account** 13:1,10 129:12
**Accounts** 13:3
**accurate** 325:2
**accusations** 220:2
**accused** 162:2 166:15 230:13
**accuses** 230:14
**accusing** 220:5
**acid** 377:2
**acquainting**

321:6
**acquire** 273:4,6
**act** 103:10
**acting** 8:4
**action** 19:18 392:15
**actions** 260:16
**active** 23:1 25:15 39:8 184:20 185:2,3 237:15
**actively** 22:8,10
**activity** 210:12
**actual** 31:21 47:18 81:3 273:13 317:21 327:23 342:14 359:4
**ad** 386:7 387:2
**Adam** 1:8,16 2:5 5:1,15 8:14,21 9:19 31:2 265:18 269:20 307:23
**Adams** 269:16 356:14,17,21 361:4,6 363:20
**Adams'** 363:17
**add** 331:22
**adding** 156:21
**addition** 242:21
**address** 17:9
**addresses** 275:9
**admits** 232:10
**admitted** 209:16 210:4 211:12 212:18,20
**admitting** 209:6 209:10 210:9
**adult** 48:1
**advance** 33:18
**advantage** 236:7
**advertisement** 387:19
**advise** 221:6,7
**advised** 139:11

139:13 280:20 292:23 293:10
**advising** 212:2,3 232:9
**AE** 61:4
**affect** 371:22
**affidavit** 5:15 307:23 308:4
**affiliated** 67:10 69:14,19
**affirmative** 91:10 92:9,17 198:23
**afraid** 180:7 228:16 374:19
**afternoon** 140:21 162:5 162:23 165:19 166:8,17 216:23
**agencies** 20:13 59:21
**ago** 12:2 23:21 31:15 126:14 210:5 333:10
**agree** 130:18 162:11 220:18 226:12 231:22 237:4 260:23
**agreed** 2:2,15,22 147:23 220:20 262:3
**agreement** 296:14
**AH** 387:10
**ahead** 68:1 73:17 82:23 83:7,20 100:5 102:23 161:1 185:9 212:16 225:16 304:8 355:10 363:2 372:10 379:15
**aid** 58:15
**Air** 64:22,23
**AJ** 42:7,11

252:15,16 302:2
AJones@tcso... 321:8
**Alabama** 1:2 2:11 6:10 7:1 8:3,4,12 9:1 15:19 17:11 22:17 24:8 27:2 45:20 46:7 67:19 69:20 95:6,21 105:6 122:22 212:12 281:2 291:23 324:19 331:3 388:6 392:2,21,22
**alarm** 143:3 149:20 150:5,8
**alarms** 24:17
**alcohol** 87:17 88:5 89:13,14 89:19 171:5 172:8,9 191:18 192:17,20 215:7,9
**alcohol-based** 54:23 57:5
**Alcohol-Facili...** 62:12 63:6
**alert** 204:10 307:15
**alive** 26:20
**allegation** 217:12 235:19 242:11 305:9
**allegations** 65:11,17 108:23 158:16 194:18 213:12 221:5 224:4 230:21 232:10 235:22 245:9 246:7 287:20 288:3,17 301:6 366:10

**allege** 359:21
**alleged** 69:3 70:9 75:4 77:17 84:2 90:2 127:19 133:9 134:9 149:9 155:14 192:16 246:22 277:22 284:9 291:1 313:16 361:23
**allegedly** 74:15 173:20 174:23 176:4,11 177:4 177:7,10
**alleging** 93:3
**Allen** 7:5
**allow** 40:7 146:7 219:20
**allowed** 199:5
**amazing** 14:15
**amended** 44:13
**Amendment** 125:16
**American** 62:13 63:7
**AMERICAS** 6:16
**Amie** 247:23
**amount** 26:10 27:6 194:4 206:13
**amounted** 272:1
**analysis** 46:13 250:21
**animal** 32:22
**animals** 310:11 310:15
**annual** 378:18
**annuity** 27:17 27:21
**answer** 11:9,17 11:17,18 18:4 32:13 40:16 69:18 100:4,5 101:3,11

102:14 104:5,7
104:8,11
134:19 138:19
152:21 164:7
164:13,14
178:17 185:13
204:20 205:12
211:11 249:8
281:15 299:16
314:18 322:15
327:6 332:2
**answered** 50:18
99:8,9 176:19
208:2,9 315:9
327:20
**answering**
329:15 350:2
**answers** 10:22
392:7
**anti-spotlight**
383:1
**anxiety** 374:7
**anybody** 18:10
20:23 32:17
76:9 135:7
140:8,10 167:2
167:3 172:14
172:22 175:17
184:22 186:2,8
186:10 203:14
218:8 222:2
239:9 264:17
273:1,17 274:3
275:3 279:20
291:4,12,21
295:22 300:19
301:20 307:6
312:3,5 313:10
314:23 322:18
331:15 340:19
341:3,10,11,17
341:21,21
342:16 343:1,4
345:10 356:6
356:20 357:8
359:12,20

361:1,22
364:23 365:1
366:8 368:4,7
368:21 371:13
374:11,13
383:1,20
389:12
**anymore** 23:14
48:2 264:13
**anyway** 145:4
170:23 356:5
368:6 369:20
**anyways** 179:16
**anywise** 392:15
**AO** 307:12
**apart** 15:15 25:8
**apartment**
156:21 170:17
188:8 189:8
202:18 203:21
204:1 209:1
214:14 215:5
216:16 225:15
257:17
**Apartments**
280:18
**apologize** 33:16
33:18 47:7
48:2 157:6
275:15 345:23
369:10
**apologized**
255:19
**APOSTC** 46:3,6
**app** 171:18
**apparently**
103:22,23
152:9
**appealed** 346:7
**appear** 351:21
378:7
**appears** 112:10
**applied** 36:20
38:10,16,21
379:15
**apply** 48:13,17

**appointment**
376:20
**approached**
366:16
**approximately**
2:12 8:13
152:9 254:9
284:7
**AQ** 81:21 83:9
**AR** 158:2
**arrest** 105:10
106:1 108:11
123:19 124:10
135:7 146:13
146:21,21
155:19 159:17
160:13 163:16
165:9 222:2
380:3
**arrested** 18:6
124:19 159:17
**arresting** 124:17
**arrests** 50:14
**arrived** 75:9
77:3 284:10
**article** 4:17
28:17 29:11,19
57:13,19 60:2
60:8 63:3
206:8,17 313:1
313:2,7,11
315:12 320:8
323:19 330:18
332:10,13,16
333:5,13 334:5
335:14,16,20
335:23 336:2
336:18 337:6
337:19,21
338:21 339:4
339:10 340:6
340:16,21
341:1,12,22
342:2,12,17
343:3 344:4
345:12,16

346:12,15,18
347:3,8 348:6
350:8 353:3,8
354:7,14 355:5
356:11,12
358:23 359:1,8
359:18,22
360:14,19
361:2 362:1,8
362:9,16 363:5
363:12,21
364:7 365:18
365:23 366:10
367:2,3,5,11
368:8,12,22
369:2 370:14
372:5,18 373:5
373:9 375:23
376:6 379:9
380:11,15,20
381:1,12,16,22
382:3,17 385:3
385:15 386:21
389:2,6
**article's** 336:14
365:7
**articles** 313:5
369:15
**aside** 62:9 267:1
298:8
**asked** 66:16
99:4,5,9 104:9
104:11 114:10
114:12 116:11
116:12 119:10
123:8 124:5
149:5 151:23
158:13 163:13
166:2,7,12
171:16 175:9
178:4 180:13
197:18 235:3
235:16 256:23
257:9 258:6
259:13 260:8
284:8 297:19

315:8 322:11
322:12 369:9
371:17 379:22
**asking** 30:21
36:11 47:8
101:8 106:17
114:21 121:6
127:3 143:21
147:15 148:1
175:22 176:8
190:18 195:11
198:18 199:6
222:6 235:11
240:7 264:4
273:20 315:14
318:4 319:21
327:16,22,23
330:11 367:2
367:10,10
386:16 390:10
**asks** 321:18
**asleep** 151:20
**asphalt** 67:14
**assault** 5:3 34:8
55:10,19,19
56:6 57:2 58:7
58:11,16 59:16
61:15 66:23
70:11,14 74:15
75:5 84:2 90:2
92:23 93:4
94:8,20 96:1
96:20 99:14
109:3 115:5
146:2 155:14
156:9 166:16
208:11,12
216:5 217:4
223:13 233:17
235:19 237:5
244:11 246:22
271:4 277:23
280:15 281:1,5
284:10 288:3
313:16,18
326:1,5,12

Adam Jones                                                                12/7/2020

370:9
**assaulted** 65:12
  65:18 96:12
  97:11 98:8,22
  99:6,11,13
  100:9,19,21
  136:15 137:3
  177:4 207:19
  221:22 222:8
  222:12 238:23
  242:16 258:13
  258:18,23
  259:1,6 290:10
**assaults** 48:6
  50:9 53:2,6,19
  53:22 54:8,10
  61:23 62:12
  63:6 173:20
  326:20 327:18
  327:21
**asserts** 334:14
**assessment**
  325:3
**assign** 3:3
  277:16
**assigned** 39:4,7
  41:13 58:2
  72:4 73:23
  306:11,12,13
**assist** 380:1
**assistance** 58:15
**assistant** 239:5
  390:17
**Association**
  60:14
**assume** 16:23
  80:18 184:5
  354:18,20
  383:21
**assuming**
  166:11 184:4
  283:20 315:15
  324:4 364:2
  386:22
**assumption**
  366:6

**assumptions**
  365:23
**attached** 4:11
  30:17 42:15
  61:10 82:13
  83:13 158:10
  224:17 253:10
  265:12 267:11
  302:12 307:20
  309:12 310:5
  317:8 321:3
  339:20 352:15
  358:17,19
  378:2 387:16
**attack** 389:21
**attacking**
  334:16
**attempted** 55:18
**attend** 22:4 23:8
**attended** 47:3
  47:14 48:5
**attention** 354:4
**attorney** 120:7
  121:6 127:1,17
  130:13 138:14
  138:17 142:16
  165:12 175:9
  175:23 207:2,9
  239:4,5 243:10
  251:6,10 252:7
  253:15 254:4
  264:19 266:10
  269:5 282:21
  289:12 290:12
  291:6,11,14
  297:20,23
  302:20 318:17
  384:19,22
  390:18
**attorney's**
  264:16 282:19
  283:17 296:2
  298:21
**attorneys** 11:22
  12:1 167:7
  203:7 290:22

**attract** 164:20
**audible** 11:10
**audio** 65:6 81:1
  248:16 284:12
  293:16
**Auer** 248:5
**August** 265:19
  268:4
**aunt** 360:2,5,9
  362:2
**aunt's** 360:11
**authentic** 82:21
**authority** 29:7
**automatically**
  275:5,8,11
  380:10
**availability**
  326:14
**available** 39:22
  358:11
**avenging** 370:7
**AVENUE** 6:16
**avoid** 366:23
**aware** 55:6 56:5
  58:19 59:23
  144:6 146:1
  167:9 246:20
  247:2,5 302:14
  302:18,22
  303:1 357:15
  385:2 386:6
**awkward**
  279:20
**AX** 377:19
**AZ** 352:8

─────────
        **B**
─────────
**B** 300:3
**B&E** 211:22
**BA** 299:22 300:2
  301:1
**back** 29:14 45:5
  63:17,21
  118:15 121:1
  121:11,18,22
  125:17 128:3

128:17,20
  129:2,3,23
  130:4 131:8,10
  132:9,15
  135:12,12
  138:20,23
  139:4,6 145:7
  145:10,14,17
  145:22 148:6
  152:2 155:12
  156:14,23
  157:9,12,14,19
  166:19 169:4
  179:8 183:14
  184:13 189:2,7
  189:20,21
  193:20 198:15
  199:18 200:7
  200:11,12
  209:1,2,7
  211:23 212:8
  212:10,20
  216:18,21
  219:2,5 220:9
  225:15 232:14
  232:16 240:7
  253:5 254:10
  255:20 261:16
  261:20 262:13
  279:14,23
  283:23 288:9
  288:11 295:6
  296:15 305:8
  308:7 320:4
  329:22 330:7
  331:21 344:16
  349:23 366:22
  390:7
**background**
  310:15
**backseat** 170:4
**backside** 118:10
**bad** 171:23
  336:12 338:14
  341:6 348:14
  358:6 383:10

**Baker** 1:12 9:11
  315:14 316:19
  317:11 318:4
  318:14 319:20
  320:18 321:8
  321:22 329:8
  369:7
**Baptist** 14:6
  21:9,16
**bar** 235:14
  247:7 248:20
  249:10
**barely** 189:19
**Barksdale**
  151:15 257:21
**base** 64:22,23
  225:14
**baseball** 23:16
  23:22 365:12
**based** 19:6 40:2
  67:9 87:20
  88:2 94:9
  96:23 97:7
  102:15 105:5
  105:13,15
  210:12,19
  211:7 221:1
  225:19 237:16
  257:13 272:22
  302:22 332:2
  342:11 364:12
  391:1
**baseline** 378:21
**basic** 46:9
**basically** 29:20
  39:15 52:13,17
  55:14 67:14
  71:9 73:21
  114:9 125:11
  143:11 153:22
  214:15 219:16
  275:1 276:1
  333:23 338:13
  347:6 349:2,6
**basis** 97:10
  100:20 165:23

Adam Jones 12/7/2020

166:4,6 344:2
344:22 345:10
354:13 360:17
362:7
**basketball** 23:17
**Bates** 265:16
317:13 352:18
**batteries** 24:19
**beach** 350:9,10
375:8
**bears** 352:18
**bed** 66:11 95:21
95:23 151:21
239:21 240:1,3
**bedding** 250:20
250:22
**bedroom** 91:21
149:4,8
**beer** 170:23
**began** 206:6
**beginning** 39:17
384:2
**begins** 293:10
**behalf** 9:9,13
31:20
**behavior** 173:15
191:12
**belief** 354:13
355:15
**believe** 14:12
17:23 38:3,5
38:21 41:23
44:2,3,4 49:4
50:18 60:23
75:16 76:4,11
76:19 101:23
102:10 107:10
113:10 114:12
114:20 118:3
119:12,20
121:14 138:10
141:22,23
142:19 151:12
156:8,20 192:7
197:7 204:16
205:9,10 208:1

208:6,9 215:16
216:8 217:14
221:21 222:3,7
222:11 227:3
236:1 241:12
241:14 244:13
244:15 250:23
251:3 253:14
256:21 262:11
263:18 264:10
270:2 272:11
276:14 293:13
310:10 312:23
314:8 316:7
319:22 331:1
335:21 342:1
342:23 345:10
345:14 354:9
354:15 355:13
358:20,22
359:23 360:1,2
360:16 362:3
367:5,12,17
368:5,6 380:8
380:21 386:5
**believed** 136:14
137:2,14
192:11 195:20
359:21 362:8
363:11 364:14
364:15,21,22
365:10 366:9
367:1 368:7
**believes** 360:13
361:2,13,18,23
**believing** 344:3
355:14 362:8
**belong** 21:3,7
22:13
**belonged** 22:19
**Ben** 1:11 9:10
9:11
**benefit** 26:12,21
27:22
**Bernarding**
248:3

**best** 18:20 45:2
74:18 134:22
146:1 204:18
221:6 232:8
**better** 23:19
28:16 128:1
150:8 162:22
244:5 377:16
379:5
**big** 14:15 172:18
206:17 240:21
300:5 336:8
**biggest** 57:14
**billing** 376:17
376:19
**Birmingham**
2:8 7:1 8:3,9
282:21 289:13
**bit** 67:16 109:10
126:9 209:23
313:14 318:3
**blacked** 189:17
**blind** 35:19
**blinds** 35:19
**block** 349:8
**blocked** 351:20
351:23 352:1,3
**blood** 77:22
376:22 377:1
379:4
**Bob** 9:15 11:14
82:2,19 101:5
193:10 253:3
329:19 330:22
331:22
**BOBBY** 6:4
**body** 92:8 95:18
97:23 102:6
**bold** 322:13
**Bolger** 4:4 6:13
9:7,8 10:4,6
30:8,13,20
35:18 42:4,10
42:20 43:5
50:20 52:5
61:3,12 62:23

63:5,12 68:4
79:6,15 81:20
82:16 83:8,22
84:23 89:1
91:6 95:5,20
96:7 97:20
98:15 99:12,19
100:8,18 101:2
101:5,10,21
102:16 103:11
103:22 104:8
104:13 105:8
106:7 107:12
108:4 109:11
109:19 117:11
117:18 119:8
122:17,21
123:6,18
124:15 126:10
126:13 127:9
128:12 132:22
134:4,21
135:11 138:2
142:2 146:22
147:7,13,21
149:15 150:13
158:1,5 161:6
161:19 162:13
163:4 164:9,16
166:23 168:6
168:14 172:11
176:21 178:18
184:7,14
185:15 190:5
191:7,20
192:13 193:2
193:10,16,22
194:16 195:2,8
195:18 197:2
198:16 207:11
207:17 208:4
208:10,18
210:18 211:13
213:5 221:15
221:20 222:18
223:12 224:7

224:11 227:18
228:4,9 231:6
231:13,18
232:11 233:15
235:10 237:10
249:11 252:11
252:22 253:2
253:12 265:4,8
265:14 267:2
274:23 279:6
279:10,16
286:3,13,20
287:16 288:14
291:13 294:9
295:21 296:3
296:23 297:5,9
299:20 300:3,8
301:2,22 302:6
307:11,14
314:4,14 315:2
315:10 316:3
317:1 320:21
329:17 330:9
332:5 337:17
339:12 352:7
355:12 363:13
364:19 372:12
377:18 387:9
389:23 391:6
391:15
**book** 56:11,11
56:21
**books** 336:23
**Booth** 362:6
364:6,22
**Booth's** 363:22
**bore** 335:8
**born** 13:13,15
**boss** 344:5
**bothering**
150:20
**bottle** 215:7
**bottles** 214:20
215:15 216:1
**bottom** 107:21
188:16 257:10

Adam Jones                                                                          12/7/2020

305:16 329:20
**BOUELVARD**
6:9
**bought** 337:4,8
**Boulevard**
186:17 188:1
245:16
**box** 277:1,2,3
**boy** 77:21 300:4
**boy's** 16:19
**Brad** 75:19
292:10,13
**Braves** 23:23
**break** 63:13,16
63:16 168:5,11
168:15,15,20
185:10 252:21
261:15,16
277:14 329:19
330:10 390:3
**breaking** 211:22
303:8
**bribed** 337:9
**bridge** 87:6
301:3
**Bridget** 248:3
**bring** 161:22
162:10 163:10
165:5,7 213:4
**bringing** 189:2
243:5 341:9
**broke** 63:23
111:10 213:15
**Brookside** 17:20
**brother** 15:6,16
**brother's** 15:7
**brother-in-law**
361:20
**brother-in-la...**
361:8,10
**brothers** 15:5
**brought** 32:7
167:22 240:2
294:23 295:2
**bucks** 230:21
**buddy** 133:17

**Buhl** 17:14
**build** 28:9 29:15
146:19 175:4,5
325:11
**building** 6:23
24:23 143:7
203:21 204:1
209:1
**buildings** 24:15
25:14
**built** 17:6 59:6,8
324:20
**bullet** 255:17
**bullied** 312:20
**bunch** 107:14
370:4
**Bunn** 10:14
65:13,19 67:7
67:9,10,11,13
67:18 68:6,23
84:13,17 90:19
90:21 96:15
98:8 99:6
101:23 102:11
105:10 106:2
109:22 113:6
113:18 114:3
115:3,15,21
116:2 118:23
119:11,17,18
119:22 121:20
122:8 124:17
124:20 126:15
126:23 133:12
138:21 139:1
140:10 141:16
141:18 145:13
146:13,23
147:13 148:15
149:4,9,17
154:4 162:16
162:17 163:11
163:23 166:7
166:23 177:23
180:17,21
189:8 197:19

209:8 210:12
210:20 211:7
212:11 213:23
222:21 227:9
227:10,12,15
227:19 230:14
230:20 231:8
232:3 239:8
242:12,16,19
245:10 246:6
246:23 247:3
249:3 250:18
257:21 267:17
272:1 287:1,8
287:19,21
288:4,17
289:18 290:10
294:2,10 297:2
297:7 299:3,8
308:1 310:19
324:19 386:6
388:9
**Bunn's** 110:14
110:17 120:4
126:20 127:16
131:23 132:18
138:14,17
151:8 152:17
153:1 154:1
170:17 171:9
173:5 177:17
215:2 217:13
234:6,13
235:21 245:22
249:20 306:4
310:12
**Bunns** 219:15
264:6
**burden** 330:19
**burglaries** 35:9
**burglary** 34:8
34:13 212:1
**burn** 358:3
**busy** 52:2,6
**buying** 337:7
**BuzzFeed** 1:11

1:11 9:10 10:7
21:1 32:7
57:13,18 60:2
206:7 310:22
313:1,2,6,11
315:11 316:20
320:4,22 323:5
323:18 326:19
332:9 338:3
353:3 356:11
359:4 363:19
375:23
**Buzzfeed01630**
5:19

──────────

**C**

**C** 6:1
**cab** 226:21
234:17
**call** 13:23 32:15
32:22 34:4,13
41:16 56:20
65:23 66:12,15
67:20 68:6
70:6,10,15,17
70:20 71:3
73:3,9,14,16
73:17 74:8
85:8,12 108:18
110:11 132:23
133:1 136:3,4
138:13 140:5,8
160:15 176:22
203:12,17
240:14 251:12
260:4 322:7
349:8,23
350:12 351:6
363:5 383:3
**called** 37:22
39:9,12 56:10
62:11 68:12
99:21 119:5
121:14 132:16
132:17 138:13
139:14 144:18

148:21 153:3
195:21 196:11
203:3 239:5
242:8 246:21
260:3 261:3
275:17 283:15
373:10 375:9
**caller** 352:4
**callers** 351:15
**calling** 90:16
92:15 98:4
322:3 347:7
350:3,17
351:19
**callouts** 68:8
**calls** 28:21 32:13
32:20 65:1
72:22 73:2
110:8 203:15
347:5 349:4,14
350:20 351:7
**camera** 245:15
**cameras** 245:14
250:6
**campuses** 54:19
**candidates**
379:20
**candidly** 241:5
**capacity** 27:18
193:23 257:2
281:11 300:12
**captain** 12:14,17
41:14,16,21
42:2 62:16
63:9 110:16,17
110:20,23
131:16,19,22
132:3,5,10
133:3 158:15
181:2,17,19
182:19 183:3
184:7 185:20
187:8,9 203:23
204:3 205:11
205:13 206:3,3
218:2,13,13

241:6,19 246:8
246:11,20
267:6,6 276:23
277:5 312:14
312:16 316:19
318:5,5 319:19
323:1,3,7,10
323:15 326:19
327:13,19
338:20 339:1,4
340:13,14
349:18 350:12
375:3
**car** 87:8 88:1
110:3 130:22
156:13,15,16
156:18 170:3
171:9 172:16
177:17 189:18
189:20 245:22
**card** 23:5,7
210:17 212:22
230:22 234:2,7
234:14,16
**care** 39:16 69:22
336:6 341:8
372:21 376:18
376:18 378:17
383:6,12
**career** 273:9
342:2,21
382:20
**carefully** 74:17
**carry** 29:1 384:4
384:4,7
**cars** 112:20
**Carter** 247:15
**case** 1:5 4:14
8:21 10:15
12:6,7 19:11
24:23 39:16
73:10,22 92:20
107:2 111:9,11
124:3,8 136:21
137:10,10
140:23 146:19

153:8 158:19
158:23 159:9
159:10,12
160:13 175:4,5
184:19,20
185:1 225:18
226:3,7 228:13
237:15,16
244:6 251:14
252:3,17
253:15 254:6
255:3,6 256:1
256:6,9,13
257:1,5 266:20
267:15 269:4
269:11,13
270:11 276:6
276:20 278:3,5
278:12 279:1
280:20 281:18
283:7 284:3
288:13,16
289:20,22,23
290:2,6,8,14
290:20,21
293:9 295:16
299:8 303:17
303:23 304:6,9
304:12,13,18
305:1 309:12
315:15 322:3
324:6,20
325:12 331:8
333:15,16
342:11 349:21
350:13,14,16
351:1 370:20
371:18 372:20
372:23 375:4
382:19 383:7
386:4 390:11
**cases** 25:15 39:3
39:7,8 52:10
136:23 182:18
219:21 244:11
301:11,12,12

326:22 371:10
**cash** 209:12,15
210:3,16 211:3
**cast** 336:21
337:3 372:1
**catch** 166:19
232:1 299:15
**cause** 8:15 80:7
80:10 88:5
105:10,16
106:1,5,8
108:6 135:23
136:6 160:9
172:9 192:18
192:20 353:14
381:4 392:16
**caused** 127:17
171:5 260:11
341:1 380:20
**CCR** 1:21
392:19,20,21
**cell** 68:10 309:5
309:17
**center** 15:2
21:22 59:6,7,9
59:12,17,22
60:3 64:17
69:21
**central** 331:7
**cert** 82:15
**certain** 39:21
56:14 77:17
136:3 137:8
268:20
**certainly** 242:10
**certificate** 4:5
47:23 392:1
**certification**
82:9,12 83:2
**certified** 2:6 8:2
82:20
**certify** 8:5 392:4
392:13
**chain** 5:17
320:11
**chance** 185:12

**chances** 48:19
**change** 57:11,21
63:14 128:13
351:21 369:17
373:7
**changed** 25:11
57:14,16 58:3
103:3 128:1,13
129:1 144:19
**changes** 128:17
**Chapel** 14:6
**character** 102:9
**charge** 223:14
270:7,11 275:2
287:19 303:7
**charged** 24:20
239:7 259:14
271:3 273:16
273:21,21
274:3,4,5
**charges** 213:3
271:23 287:18
301:16 302:15
302:18 306:18
**charging** 235:8
**check** 27:16
73:3 198:21
277:4 378:10
**checked** 239:1
**checking** 242:8
245:13 276:2
**checks** 277:2
**checkups**
378:18 379:3
**cherry-picked**
333:15
**chest** 376:11
**chief** 57:22
253:13 343:9
343:15,17,22
344:18 345:8
369:2,5,7
**chiefs** 60:14,21
**children** 16:7,8
199:17 365:20
**Chips** 37:11

**choice** 243:19
**choose** 293:19
**chose** 27:23
144:12
**chosen** 48:16
**Chris** 19:12
**Christian** 45:8
**church** 14:5,7
14:16 21:4,6,8
21:9,11,12,13
21:15 22:5,8
23:10,12,20
**Ciara** 249:16
**CID** 46:18
301:17
**Cindy** 18:15
**circumstances**
10:10 103:21
137:17 259:16
**citations** 380:3
**citizens** 32:14
**city** 19:13,15
20:6 25:21
26:7,13 27:5
41:13,18 53:8
69:12
**city-owned**
245:14
**civil** 8:7 264:6
264:14 290:2
388:1
**civilly** 264:5
**claim** 19:5
258:23 334:13
366:9 376:4
**claimed** 258:12
258:17,19,22
259:4
**claims** 272:1
**clarify** 327:2
**clarifying**
364:20
**CLARK** 6:23
**class** 46:3
326:16
**clause** 290:17

Adam Jones                                              12/7/2020

Page 399

**clear** 239:14,17
240:8 285:4
286:4,10,11
331:10 342:15
**climb** 156:14
157:9
**climbed** 120:1
122:12 157:12
**climbing** 156:23
**clock** 130:3
**close** 15:13,20
16:19 35:19
112:15 118:14
118:17,19,21
118:22 119:15
119:18 148:19
199:16 214:7
225:17 226:3,4
226:6 344:21
368:15
**closed** 118:23
119:4,6,11,17
119:23 134:14
148:13,22
149:5,23 205:2
**closer** 350:7
**closes** 122:8
133:13
**closest** 56:16
**closing** 148:10
149:6,10
153:19 162:20
**clothes** 76:19,21
79:20 239:22
**clothing** 249:20
249:21
**club** 22:14
**coach** 365:4,11
**Cockrell** 6:4,7,7
9:15,15 10:1
50:17 51:21
62:21 63:2,11
67:22 79:9
83:5,19 84:18
88:18 90:22
94:21 95:13

96:2,21 97:13
98:12 99:7,16
100:1,16,22
101:7,19
102:12,21
103:18 104:4
104:10 105:3
106:3 107:7,23
109:8,15 117:6
117:15 119:2
122:15,18
123:4,13
124:13 126:6
126:11 127:5
128:4 129:8
132:19 134:1
134:17 135:1
137:23 141:20
144:13 146:8
147:3,11,17
149:11 150:11
160:22 161:16
162:7 163:1
164:6,11
166:20 168:3
168:10,22
172:5 176:18
178:15 184:5
184:10 185:10
189:23 191:1
191:16 192:9
192:23 193:7
194:12,23
195:4,12
196:23 197:4
198:9,14 207:7
207:14 208:1,8
208:15 210:7
211:9 212:14
221:13,18
222:16 223:8
227:16,21
228:7 231:1,11
231:14 232:5
233:12 235:6
237:6 249:7

252:18 274:19
279:3,8 285:11
285:22 286:7
286:16 287:11
288:5,8 291:8
294:7 295:19
296:21 297:3,8
313:23 314:11
314:17 315:5,8
316:1 329:23
331:23 355:8
355:16 362:23
372:8 391:11
**cocktails** 257:16
**Cody** 16:20,21
**Coker** 17:10,12
17:15
**colleagues**
145:16 207:1
**collect** 39:13
58:14 249:19
**collected** 249:20
249:22 250:2
268:14
**college** 45:13,17
45:22
**colloquy** 279:18
330:11
**combed** 79:19
**come** 27:15 30:2
32:14 39:6,22
40:6 58:21
65:9,15 135:11
140:2 160:20
162:1,5,22
165:3,13,19
166:7 182:2,7
184:16 203:1,7
212:8 227:12
232:1 240:1,1
261:16 262:13
262:22 279:22
283:23 296:15
310:21 315:11
329:22 331:21
332:9 357:13

370:8,23
**comes** 18:19
65:3 86:2
246:19
**comfortable**
72:7
**coming** 101:14
107:4 112:14
181:5,11
194:10 315:16
350:21
**commander**
41:19
**commencing**
2:12 8:12
**comment** 340:5
348:5 354:11
361:16 362:20
363:14 368:1
374:3,4 380:7
**commenting**
364:13
**comments** 5:21
347:8 350:4
353:1,8,18
354:3,8 359:6
362:3,12,16
363:6,22 364:8
364:11 365:5,8
366:13,14
368:14 370:2
373:14 374:3
374:12 375:17
375:22 376:1
**commercial**
25:16
**Commission**
46:8 392:23
**Commissioner**
8:5 392:22
**commit** 366:20
372:4 374:20
**committed**
136:1 281:19
324:22 367:19
**committing**

331:5 370:12
372:17
**common** 164:22
182:17,22
205:2 208:12
270:12 355:3,3
**commonly**
182:19
**commonplace**
203:6
**communicate**
187:16 242:13
**communicated**
286:23 287:7
**communicatio...**
359:17
**communities**
17:14
**community**
13:23 22:11
28:10,12,14
45:17
**company** 190:13
336:8
**compare** 83:6
378:21
**compelled** 163:6
**compensation**
388:3
**complaining**
137:1
**complaint** 32:15
135:22 212:19
213:1 221:2
**completely**
133:15 134:15
192:14
**complex** 188:11
**complexities**
33:13
**compliance** 2:18
**comport** 243:2
**composed** 329:2
**compromise**
383:21
**compromised**

Adam Jones                                                    12/7/2020

28:4
computer-aided
 392:8
concern 260:11
 356:4
concerned 219:9
 320:6
concerning
 257:14 260:1
 387:5
concluded
 233:10 391:20
concluding
 223:6
conclusion
 109:1,5,12
 233:16
conclusions
 108:21,22
conduct 77:17
conducted
 260:10
conference
 182:4,8 184:15
 184:17 204:17
 205:1,4
confront 368:4
 374:13
confronting
 366:17
congregation
 14:15
consciousness
 194:11
consensual
 102:1,11,20
 109:7,13,18
 156:6
consent 138:5
 139:12,16
 141:15,18
 142:14 143:17
 144:2,23 147:9
 147:22 150:19
 150:22 151:9
 171:16 192:21

199:13,22
230:18 257:3
297:1,4,6,10
297:13,18
298:4
consented
 145:13 191:21
consider 99:14
considered
 212:1
considering
 262:18
consistent 84:4
 256:19
constant 349:12
 349:16 351:7
construction
 67:11,11,13
 336:8
consult 384:14
consumption
 89:15,19
contact 39:14
 55:21,22 66:19
 80:7 180:16
 247:6 248:19
 257:15 261:5,9
 266:10 342:8
contacted 262:1
 282:21 284:8
 342:7 371:14
contained
 317:23
contains 255:13
content 108:5
 216:1
contents 140:16
 140:19 255:13
 320:7,8
context 43:15
 181:8
control 195:16
 334:1 379:6
conversation
 5:8 58:21
 80:20 84:1

113:9 115:11
178:2 181:3
205:19 208:18
218:22 238:5
242:1,3 243:7
246:5,11,14
251:19,21
252:6 254:12
254:15 264:23
272:23 292:8,9
292:14,15,19
311:10 312:12
312:15 315:3
323:14 338:12
338:16 339:9
340:18
conversations
 172:20 242:2
 243:3 303:22
 313:9 323:23
 340:13,15
 341:15,21
 343:8
convey 88:14
conveyed 91:4
convict 228:19
convictions 51:2
cooler 118:3
 153:18 157:8
 157:17,18
cooperate
 231:20
cooperation
 150:8,10,13,15
 150:18,21
cop 306:1
copied 82:11
 319:10
copies 390:19
cops 312:20
copy 335:16
correct 14:3
 20:13,17,21
 33:11 35:4
 37:23 41:6
 44:23 53:17

84:14 86:15
92:23 115:22
126:17,20
127:4 177:17
180:1,4,9
197:23 202:11
202:22 210:21
216:5 220:12
223:2 225:7
232:21 234:7
234:14,18
237:5 241:23
242:23 244:20
245:4 251:7
262:7 267:22
287:21 292:11
292:16 298:13
304:19 309:18
320:18 327:14
332:11 335:11
390:15 392:10
corrections
 276:4
correctly 44:5
 276:17
correspondence
 316:18 319:11
corroborating
 153:23
Cottondale
 109:23 111:23
couch 85:20
 86:1
counsel 2:4,23
 3:2 8:8 9:4
 101:3 386:7
 392:14
count 275:15
 296:18
counter 65:2
 215:15
country 14:16
county 13:16,18
 13:22 15:10
 17:3,16 54:6
 59:3 275:17

303:3 318:17
379:17 388:7,8
392:3
couple 12:2
 16:16 31:14
 40:1 45:14
 92:13 129:16
 129:19 152:7
 169:13 215:14
 230:20 255:15
 270:5 332:17
 332:22 333:5,8
 333:9 342:9
 347:9 350:3
 376:10
course 40:21
 52:23 81:11
 100:18 220:1
 280:8,11 309:3
 330:19 373:13
 375:7
court 1:1,20
 2:19 8:23 9:5
 9:22 79:4
 142:6 193:18
 193:20 198:11
 288:11 364:17
 380:6
cousin 366:11
cover 219:14
 220:7
covered 35:12
covering 220:6
COVID 25:15
COVID-related
 82:22
crafting 318:7
 319:16
create 334:14
created 130:12
 253:15
credibility 29:9
credit 210:17
 212:22 230:22
 234:2,6,13,16
crime 34:3,4,6

Adam Jones                                                      12/7/2020

Page 401

35:11 36:9,10
39:9,11 69:3
70:9 89:2,8
92:22 93:4
94:19 108:3
121:3 123:7
127:19 132:17
134:16 135:10
135:23 137:15
149:9 150:5
162:3,6 173:12
175:3 185:5,16
222:4 223:7,18
224:3 233:11
233:18 238:16
259:14 270:16
270:23 271:13
271:18,20
272:22 273:10
273:17,19
281:9,19,22
282:1,4,5,11
282:14 283:5
290:4 327:1
328:8,19
**crimes** 20:9,11
28:11 35:9
39:2 43:8
44:19 54:18
55:18 58:2
62:4 77:18
122:22 123:9
123:10 190:19
209:9 235:5
248:19 272:5
273:22,23
281:2 327:4,5
327:9,10,12
328:1,2,12,14
328:15,19,20
328:21,22
342:6
**criminal** 35:4,6
35:15 46:18
49:22 210:11
221:2,4 228:13

272:16 302:19
303:4 305:3
306:8,19 307:8
346:3
**critical** 347:2
**cross** 301:3
**crossed** 237:19
**cry** 78:16
**crying** 78:11,13
78:21,23 79:17
**cups** 215:18
**curiosity** 70:3
**curious** 335:18
**current** 25:12
**currently** 15:17
24:6 385:20
**curtains** 148:20
**cut** 47:7 263:14
286:14 300:12
300:16 348:11
**cutting** 73:7
193:3
**CV** 5:1
**cybercrime**
64:18
**Cynthia** 362:6
363:22 364:6
364:21

_____
**D**

**D** 4:1
**DA** 254:9
280:19
**DA's** 202:21
277:8,9,10
295:14 299:5
311:4
**dad** 348:18
350:13 361:9
361:10 366:19
367:16
**dad's** 21:8,10
23:12
**daily** 377:12,14
**damage** 341:2
**damaged** 335:20

369:14 373:4
382:3
**damages** 206:12
376:4 379:8
381:20
**dangerous**
369:19
**data** 200:7,9,17
200:19 201:6,9
201:10 202:6,7
202:9 309:4,6
309:11,17
**date** 8:6 9:2
24:17,19 31:13
253:22 277:16
277:18 309:16
316:15 392:11
**dated** 265:18
308:2 317:12
321:9,16
387:20
**dates** 275:9
**daughter** 16:10
219:10 261:5,9
312:2 347:10
347:12,14,16
347:18,19,22
350:14 366:16
366:22 367:2,7
367:11,15
370:8,12 372:4
372:16,22
373:1,23
374:18,19
375:1,21
389:15
**daughter's**
16:12
**David** 305:17,19
305:21
**Davidson** 37:1
**Davis** 6:15 9:8
41:13 276:22
319:1
**day** 37:1 41:3,4
54:9,10,11,11

64:12 71:5,6
116:6,15
139:15 160:17
160:21 162:5
200:22,23
201:3 218:4,9
218:12,21
331:21 337:22
339:7 371:20
383:17 391:9
391:10
**days** 218:16
350:10
**DCH** 66:21 69:6
69:9,11 111:22
284:9,10
**DD** 170:2
**DEA** 65:4
**dead** 311:8
313:21 357:23
387:21 389:5
**deal** 206:18
240:21 300:5
353:13
**dealing** 55:15
88:3 369:19
**dealt** 273:14
**death** 18:14 82:3
167:22 225:2
253:17 310:23
313:6,10
**deceiving** 83:4
**December** 1:18
2:11 8:13 9:2
311:16 392:17
**decide** 25:19
74:4 88:15
121:10 130:22
209:4
**decided** 28:5
45:22 127:7
129:6,17
169:20 205:14
211:6 221:20
223:18 324:18
**decides** 92:21

**decision** 19:3,5
26:3 80:12
127:16,20
128:18 129:2,7
129:10 207:17
207:20 220:11
220:15,18
245:2 299:4
325:6,8,18
**decision-maki...**
335:9
**decisions** 219:21
342:20
**defendant**
267:17 275:1
**Defendant's**
4:10,23 30:16
42:13 61:9
83:12 158:9
224:16 253:8
265:11 267:9
302:10 307:19
310:5 317:7
321:2 339:18
352:14 378:1
387:14
**Defendant(s)**
1:13 6:12
**defendants** 9:10
9:14 388:9
**defense** 19:18
161:7,19
373:10
**defined** 272:16
**definitely** 381:6
**definition**
272:12,19
**degree** 55:19,20
303:8
**delay** 255:20
**deliver** 136:10
**demeanor** 78:10
**denied** 345:15
**department**
20:17 26:18,23
29:8 30:3

Adam Jones                                                    12/7/2020

Page 402

33:22 38:9
40:7,8 48:11
49:5 55:7,12
56:10,12,15
64:8 85:14
160:16 161:8
213:22 262:19
325:22 326:10
334:2 340:20
342:3,19 343:2
343:6,18
345:11 346:13
346:23 351:14
371:4 375:14
382:13 385:21
386:1
**depends** 136:21
**deponent**
391:21
**deposed** 10:8,11
10:17
**deposition** 1:15
1:22 2:5,16,17
3:5 4:11 8:20
10:12,14 11:2
11:21 12:15
33:14 42:6
43:2,6 206:6
267:6 391:20
**depositions** 2:20
12:11
**deputies** 57:23
388:6
**deputy** 207:5
305:22,23
**describe** 137:9
356:15
**described** 118:2
**designate** 34:16
80:13
**designated**
34:21 36:1
92:20 249:1
**desk** 50:7 311:8
347:6 349:4
352:5

**detail** 293:21
**details** 145:20
155:2,14 194:7
256:4
**detective** 53:7
**detectors** 24:18
**determine** 146:3
271:23 280:16
**determined** 97:6
270:16,20,22
**determines**
136:6 290:9
**determining**
273:10
**device** 81:3
**diagnosed**
376:22
**dictation** 293:22
**die** 383:16
**died** 241:3,7,10
270:3 311:13
311:21 389:13
**dies** 314:7
**difference** 52:11
**different** 20:13
48:15 65:5
110:10 137:11
157:2,3 165:9
206:1 263:22
276:10 281:2
283:22 285:10
287:15 298:5,6
327:16 347:14
347:23 376:23
**differently**
110:19
**digital** 81:16,16
81:17
**Dillard** 19:17
20:2
**direct** 182:4
**directed** 264:15
**direction** 159:6
**directions**
110:10 196:2
**directly** 204:14

255:9
**director** 59:10
59:14
**disbelieve**
189:13
**disc** 200:13,17
200:20 201:7,9
201:10,17,20
201:23 202:2,6
202:8,9 298:22
299:1 335:3
**disciplinary**
29:6 344:8
**discoverable**
331:6
**discretion**
243:14
**discussed**
120:17 335:5
**discussions**
391:8
**dish** 90:18
**dishes** 215:16
**disheveled** 79:1
79:8 154:18
**disinfectant**
25:16,17
**dislike** 275:14
**dismissed** 18:21
18:23
**disparaging**
388:19
**dissertation**
212:15
**distanced** 368:2
**district** 1:1,2
8:23,23 203:6
239:4,5 243:10
251:6,10 252:7
254:3 264:15
269:5 282:19
283:17 296:2
298:21 302:20
390:17
**division** 1:3 9:1
30:6 32:11,12

33:6 35:2,4,7
35:16,23 36:15
36:18 37:15,19
39:19 40:19
41:4 50:1
55:12,23 72:5
302:19 303:4
305:3,23 306:9
306:11,20
**dizziness** 376:11
**doctor** 77:20
88:15 195:17
378:9,12,14,17
379:1 380:18
**doctor's** 376:16
**document** 30:10
30:15,22 42:12
61:8 82:22
83:11,16
136:11 158:8
167:14,20
224:8,15 253:7
253:13 265:10
265:15 267:8
273:13 274:12
274:14 293:12
293:15 296:13
296:15,18,20
299:21 302:9
307:18 317:6
317:22 321:1
339:17 352:13
352:18 377:23
384:17 387:13
**documented**
290:6,8
**documents** 12:5
52:14 167:21
296:1 304:3,5
**doing** 73:20
143:9 185:23
195:10 196:16
215:1 256:6
310:22 377:15
389:12
**dollar** 27:6

206:13
**door** 15:14
112:22 113:2
113:11,16,19
114:4 122:7
151:13 187:20
199:16
**doorbell** 113:16
126:15
**doors** 24:21
**doubt** 227:1
340:9
**doubting** 130:15
266:3
**download** 176:7
**downloaded**
309:6,10
**downstairs**
168:19
**dozens** 50:11,12
349:15
**Dr** 376:21
**draft** 62:3 284:3
293:15 301:4
308:13
**drafted** 293:12
308:15,17
**drafting** 385:14
**dramatic** 206:7
**drank** 172:8
**drapes** 118:22
**draw** 26:11
27:21
**dressed** 67:2
**drew** 354:3
**drink** 90:4
170:21 188:18
189:20 377:8
**drinking** 87:4
87:17 88:4
235:15 377:7
377:10,11
**drinks** 190:12
215:3,5,11
**drive** 17:20
110:3,11

111:22 169:23
214:10
**driver** 159:4
249:1
**drop** 27:11,12
27:14
**drove** 109:22
110:5
**drug** 65:2
190:10
**drugged** 87:11
88:14,17,21
89:4 90:3
171:3 172:3
189:22 190:2,6
190:7,15,18,23
191:11,14
192:3
**drugs** 87:22
89:5,12 190:4
**Druid** 69:12
**drunk** 192:4,5
**due** 380:11
**duly** 9:20
**dump** 173:5
175:10,18
176:22 197:23
198:4 199:20
**dumped** 199:13
200:10
**duties** 29:2
**duty** 136:2,4
**DVD** 200:14
309:12
**DVDs** 296:5,10
296:19 305:10

———————
**E**

**E** 4:1 6:1,1
**earlier** 178:23
197:14 225:20
390:12
**early** 273:8
310:3
**earnest** 94:12
96:9 122:23

123:9 238:15
272:9,14,19,20
273:2,6 284:19
**earnestly** 96:14
123:3 324:18
325:9
**easier** 150:15
**Easter** 23:11
**easy** 168:17,18
326:15
**eat** 345:1
**eaten** 154:11
**Eaves** 7:5
**educated** 328:10
**education** 45:7
**effect** 2:18 32:3
171:4 236:7
251:15 320:5
334:19 338:15
347:16 348:1
350:6 354:12
358:3 366:18
372:16 380:9
**effectiveness**
28:3 29:10
**eight** 112:2,2
217:4 223:20
**eighth** 289:9
292:2
**either** 59:19
80:18 150:1
257:4 282:3
351:20 368:1
375:5
**electronic** 200:4
**element** 94:11
96:7 97:2
124:12 135:10
223:17 273:10
327:1
**elements** 34:5
34:12 36:8
92:22 94:10,19
95:3,12 96:5
97:19 99:3
105:7 106:12

106:16,18
109:2 121:2
123:20 137:15
163:9 175:3
222:4 223:7,10
233:11,17,18
236:10 237:9
238:7,11,16
257:5 270:16
270:21,22
271:9,14,17,19
272:5 273:2,5
274:7 280:20
**Elisabeth**
247:12
**Elizabeth**
267:16 303:6
**Elrod** 17:15
**else's** 331:16
**email** 4:20 5:14
5:17,19 82:18
254:16,21,23
255:1,8,12,17
265:17,22,23
266:5 317:11
320:4,9 321:7
322:10,19
323:4 324:13
324:15 339:22
340:2,2,7
**emailed** 81:22
**emails** 63:9
222:19,20
255:3,5 315:13
315:19,23
316:5,9 317:20
317:22 318:3
319:17 343:8
**embarrass**
240:6
**emergency** 25:1
71:8
**Emily** 340:5
**emotional** 146:4
**encounter** 194:8
**ended** 72:10

75:10 264:21
**ends** 171:9
**enforce** 334:20
**enforcement**
20:12 59:20
164:23 336:4
382:9
**engages** 173:15
**enjoy** 37:8
**enjoyed** 346:10
**entering** 211:23
303:9
**entire** 42:19
78:21 103:13
175:11 197:13
268:10 277:23
283:7 333:16
**entirety** 277:13
**entities** 20:5
**entitled** 104:17
330:21 331:18
**environmental**
24:10,11
**errors** 276:13
**essentially** 26:15
46:9
**establish** 93:3
**estimate** 74:19
**events** 178:6
**eventually**
156:12 199:12
383:16
**everybody** 9:8
24:22 65:1
107:3 158:18
158:22 159:8
159:22 256:11
268:15 366:2
**Everybody's**
199:18
**evidence** 3:6
39:13 52:14
58:15,17
160:11,12
215:11 234:6,8
234:13 249:23

257:2,4 269:9
330:15
**exact** 69:23
74:12 148:5
348:1 364:11
**exactly** 19:2
59:18 71:9
81:7 103:6
140:13 149:13
149:22 181:15
196:1 262:10
274:10 311:11
337:15 362:15
**exam** 75:11,13
76:17 77:5,8
77:11,12,14
122:3 250:17
**examination** 4:3
8:15 10:3
**examined** 9:20
76:22 77:2
**examiner** 200:2
**example** 19:7
77:21 106:20
357:18
**exchange**
180:19 331:22
**exchanged**
186:8
**excuse** 39:22
379:10
**exhibit** 30:16
42:6,14,19
43:1,7 45:6
47:2 61:9,14
83:12 158:6,9
167:14 169:7
224:13,16
225:10 252:13
252:14,15
253:9 265:11
265:15 267:5
267:10 275:17
292:3,22 293:3
302:1,11 303:2
307:15,19,22

Adam Jones                                          12/7/2020

310:5 317:5,7
317:10 321:2,7
339:14,19
352:11,14
378:1 387:15
**Exhibits** 4:8,10
4:23 340:1
**existed** 304:18
**exit** 24:20,21
**expect** 229:6
**experience**
31:19 32:2
36:4 88:3
167:5 192:19
244:10 327:11
328:11,13,17
**experienced**
38:18
**experiences**
355:3
**experiencing**
90:1
**expires** 392:21
392:23
**explain** 27:4
28:6 127:15
326:2
**explained**
255:21 367:15
379:23
**exposure** 25:18
**extent** 155:11
322:5
**extinguishers**
24:20
**extract** 42:18
**extremely**
300:10
**eye** 33:15,16
**eyes** 33:19

**F**
**F** 310:5
**face** 251:20,20
**Facebook** 5:20
13:8 353:2,5,7

354:2,20 356:9
357:1 358:12
358:14,19
359:5,7,13,15
362:18 363:17
363:17,20
364:2,4 365:5
366:14 370:2
375:17 376:2
**fact** 19:6 68:4
89:23 92:18
98:3 105:1
115:16 117:14
125:23 131:22
177:6 194:4
198:7 210:19
234:16 254:20
261:8 267:21
274:17,18
291:14 320:17
323:6 391:7
**factor** 103:15
381:5,6
**factors** 146:7
381:7
**facts** 251:14
252:3 260:15
278:3 334:13
334:15,21
335:14
**factual** 318:4
**failure** 345:3
**fairly** 378:8
**faith** 195:9
354:22 382:2
**fake** 234:22
235:11,15,16
**false** 330:18
333:22 336:1,5
336:18 366:10
**falsities** 359:21
361:23
**family** 18:11
21:3 23:10
32:8 68:23
71:7 246:6

312:4 314:21
353:16 356:5,5
356:7 358:7
370:23 371:21
373:6 375:11
382:8 383:14
383:22 384:2
**fan** 24:3
**far** 11:12 12:21
21:9 47:19
52:10 58:3
59:12 66:15,20
99:1 124:4
129:12 130:11
141:13 153:17
155:2 163:17
185:8 195:15
196:17 221:2
225:13 232:8
239:21 273:9
273:11,20
276:5 281:12
329:12 333:20
334:16 344:23
362:21 363:3
368:13 377:6
387:6
**FARLEY** 6:14
**father** 14:2
219:5 242:3,4
254:7,13
367:12
**faulted** 207:3
**favor** 242:12
**FBI** 328:8
**fear** 226:19
349:1
**February** 25:4
270:2
**Federal** 8:6
**feed** 182:4
**feel** 51:13 61:13
87:21 105:9
120:21 129:13
129:14 143:6,8
162:4 171:2

189:3,10 190:3
190:6,14
230:19,22
325:2 329:14
333:14 336:3
342:4 347:2
370:21 373:3
377:15 382:3,4
382:5,6,16
383:11 384:5
388:17
**feeling** 312:3
324:10 345:8
**feels** 249:12
313:21
**fell** 25:8
**felonies** 324:21
**felony** 4:13 12:8
12:9 52:15
233:3 249:23
252:8 267:4,14
268:8 269:2,10
274:16,17,18
278:13,15,16
278:19,21
281:8,12,16,21
282:9,18
283:10 287:17
287:19 291:4,7
291:12,18,21
296:8 298:7,10
298:16,19
299:5 300:13
300:16 302:7,7
302:23 305:8
309:13 313:17
331:2,5 335:5
335:6 390:12
390:13
**felt** 25:22 28:3
29:9,17 72:6
86:8 88:13
232:7 236:5,21
238:2 298:23
311:23 344:15
344:16 371:22

371:23 379:12
**female** 46:18
114:11,22
**field** 260:20
**fifth** 289:3
**fighting** 220:3
**figure** 33:17
89:3,9 171:6
171:13,19,21
194:22 195:6
198:6
**figured** 24:4
67:9
**file** 12:6,7 52:20
74:17 256:18
266:20,20
281:18 290:14
290:20 309:6,7
309:11 334:23
344:9 384:20
384:23
**filed** 263:4
304:21 370:9
388:2,13,14
**files** 82:3 269:15
290:22 386:3
**filing** 212:18,23
221:2 263:6
264:11
**fill** 173:13
198:20
**filled** 71:10
**final** 225:12
257:11 259:19
290:16
**finally** 374:4
**financial** 35:9
35:15 388:3
**find** 89:19 140:6
199:9 201:20
208:5 241:9
310:23 363:14
363:15,23
373:19 377:9
**fine** 301:2
**finish** 11:7,8

Adam Jones                                                    12/7/2020

185:12 249:8
253:3
**fire** 24:15,17,19
**fired** 373:22
**first** 9:20 30:2
31:3 43:12
44:6,8,10
55:19 65:14,21
71:18 84:8
90:20 112:16
113:11 132:11
140:18 141:19
148:3 151:8,10
154:8 155:5,6
177:15,20
189:6,14 201:6
202:16 203:20
208:22 216:6
216:12 217:5
223:21 226:2
228:22 234:21
240:18 251:4,6
252:15 260:5
270:7 277:1
284:5 295:9
296:19 297:19
310:21 313:2
315:10 317:15
317:17 318:11
324:12 337:21
340:2
**five** 15:3 21:16
27:18,19 37:19
49:21 50:4
85:18 97:5
183:6,6,8,12
210:5 295:8
390:1
**five-minute**
63:16 252:21
390:3
**fixing** 143:4
159:14,23
160:2 165:15
188:17
**flies** 164:20

232:1
**flip** 169:11
268:6 275:12
295:6 304:3
**FLOOR** 6:17
**focus** 104:23
342:14
**folders** 277:12
**folks** 348:22
**follow** 23:23
45:3
**follow-up** 87:14
91:14 98:3
116:20 260:1
**followed** 44:23
108:9
**following** 8:16
159:4
**follows** 9:21
**footage** 250:5
**football** 23:16
365:4,12
**force** 2:18 20:12
20:15 64:22,23
91:20 257:2
**forced** 94:18
**foregoing** 8:7
392:5,9
**forensic** 64:19
200:2
**forensics** 200:4
**forget** 27:5
**forgets** 171:8
**forgot** 195:9
**form** 3:1 50:18
51:22 67:23
79:10 84:19
88:19 90:23
94:22 95:14
96:3,22 97:14
99:17 100:2,17
100:23 101:20
102:13,22
103:19 104:5
105:4 106:4
107:8 108:1

109:16 117:7
117:16 119:3
122:16,19
123:5,14
124:14 127:6
128:5 129:9
132:20 134:2
134:18 135:2
141:18,21
142:14 143:17
144:2,14 146:9
147:4,12,18
149:12 150:19
155:7 160:23
161:17 162:8
163:2 166:21
172:6 176:19
178:16 184:11
190:1 191:2,17
192:10 194:13
195:1,5,13
197:5 198:10
199:13,22
207:8,15
208:16 210:8
211:10 212:15
221:14,19
222:17 223:9
227:17,22
231:2,15 232:6
233:13 235:7
237:7 242:22
243:5,15,23
244:12 265:2
284:18 285:12
285:23 286:8
286:17 287:12
291:9 294:18
297:1,4,6,10
297:12,17
298:4 314:1,12
315:6 316:2
325:22 345:15
355:9,17 363:1
372:9 379:8
392:8

**formal** 41:5
251:16,17
272:7
**format** 275:7
298:6 322:2
**former** 343:15
343:17
**forms** 141:15
**forth** 232:14
**forward** 322:21
329:13 355:2,7
**forwarded**
305:2 323:1,3
323:12
**found** 178:11
280:14 281:4
299:11
**four** 17:23 85:18
96:11 102:8,9
295:8 379:20
**fourth** 85:19
90:10 125:15
275:16 289:1
**foyer** 149:16
**frame** 98:23
**FRANKLIN**
6:21
**frankly** 260:18
**Franks** 276:23
318:19,19
**Fraternal** 22:16
22:20
**free** 61:13 382:4
388:18
**Freewill** 14:6
**fresh** 282:13
**friend's** 216:9
**friendly** 344:22
**friends** 26:14
72:15,18 86:4
86:5 93:11
169:23 175:7
179:6 188:5
190:14 240:20
355:22,22
364:4

**front** 81:8
112:22 113:2
179:7 229:14
274:10 310:11
324:13,15
**froze** 191:4,5,8,8
**full** 2:18 26:23
27:3,5,6 84:9
86:18,23
155:10 280:7
386:7 387:2
**fund** 27:16
**funding** 59:12
65:3
**Furnish** 340:5
**further** 2:14,21
34:11 143:1
220:8 244:2,7
327:2 391:7,9
391:21 392:13
**future** 371:10

───── **G** ─────
**G** 6:5,20
**game** 64:7
**gaps** 173:9,14
**Gary** 41:19
317:11
**general** 55:13
56:17 114:7,20
114:23 115:1
116:5 203:10
246:17 275:10
276:5 291:16
320:3 326:4
336:4 347:11
**general's** 130:13
207:2,10
253:16
**generally** 74:18
203:11 243:15
390:9,11,12
391:3
**generate** 275:6
**generated** 275:5
275:7,11

Adam Jones                                                    12/7/2020

| | | | | |
|---|---|---|---|---|
| **getting** 75:2 | 86:4,6,10 | 135:8 173:19 | 237:13 240:19 | 277:17,20 |
| 78:19 120:3 | 90:10 91:22 | 189:19,20 | 248:1 252:12 | 278:2,6,8 |
| 135:20 139:22 | 93:8,10 97:1 | 238:5 270:11 | 252:19 253:18 | 279:19 281:21 |
| 140:8 225:12 | 100:5,15 102:5 | 276:9 277:3,4 | 254:6 255:22 | 282:10 283:14 |
| 226:4 228:14 | 102:19,23 | 277:6,8,9 | 275:14 279:22 | 296:14 299:6,9 |
| 255:20 290:14 | 103:6 104:22 | 292:1,1 294:20 | 282:9 284:15 | 302:15,21 |
| 290:19 298:21 | 105:22 112:23 | 328:6 377:7 | 290:2 296:15 | 303:5,5,14,18 |
| 315:13,17,19 | 121:11,12,22 | 388:12,17,18 | 296:22,23 | 307:1 313:20 |
| 315:23 316:5 | 128:21 129:2,3 | **going** 18:5 23:3 | 299:9 307:15 | 314:5,9 329:21 |
| 323:17,20,21 | 131:7,10,13 | 35:18 38:11,13 | 314:5 317:16 | 330:13,16 |
| 324:2 347:5 | 135:12 136:17 | 41:15 42:22 | 321:20 324:5 | 331:12,14 |
| 370:22 373:22 | 136:18 137:3,4 | 52:10 57:23 | 331:8 340:23 | 334:14,18,20 |
| **girl** 170:1 172:1 | 137:5 138:20 | 58:1 61:18 | 344:23 349:19 | 391:3,8 |
| 176:13 238:22 | 139:3,6 150:16 | 63:13,14 64:1 | 349:22 350:21 | **granddad** |
| 313:15 314:6 | 151:7 159:14 | 64:16 72:10 | 350:22,23 | 382:10 |
| 315:21 366:19 | 160:7 161:1,3 | 73:21 75:10 | 352:23 368:3,5 | **graph** 84:9 |
| 367:18 372:18 | 161:5 163:14 | 81:12 83:17 | 368:6 370:12 | 86:18 90:10 |
| **gist** 263:12 | 165:15,20 | 100:3 103:3,5 | 371:22 372:21 | 255:16,18 |
| 347:20 367:19 | 166:11,14 | 113:6,7,10 | 373:12,17 | 258:6 280:8 |
| **give** 10:21 11:9 | 167:6 168:7 | 118:2 120:10 | 374:8,14,19,23 | 308:21 |
| 58:15 67:3 | 179:2 185:9 | 121:1,11,22 | 376:14 379:1 | **grass** 179:7 |
| 162:12 163:20 | 199:20 204:21 | 124:8 127:12 | 379:14,15 | 196:7 |
| 165:19 185:12 | 212:16 225:16 | 128:9 131:7,11 | 382:20,22 | **grateful** 158:7 |
| 200:12 243:22 | 227:14 232:14 | 135:3,4,16 | 383:17 | **great** 10:19 |
| 254:21 336:11 | 232:15 238:7 | 137:7,10 138:4 | **good** 9:7 67:16 | 11:14,20 12:4 |
| 336:11,12 | 239:20 240:6 | 142:6,11 | 143:7 163:18 | 12:23 47:6 |
| **given** 36:21 | 240:19,20 | 145:20 146:21 | 175:5 220:22 | 65:9 83:8 |
| 38:19,22 | 243:17 244:2 | 151:2 159:7 | 328:9 354:22 | 180:3 |
| 139:12,16 | 256:1 263:22 | 162:11 164:12 | 368:3 374:14 | **greater** 49:20 |
| 187:12 265:16 | 268:12 276:18 | 165:4 166:18 | 382:2 384:2,3 | 50:4 |
| 317:13 319:11 | 277:15 278:1 | 168:12 169:12 | 389:12 | **grew** 21:12 |
| 384:3,20 | 279:4,8 282:9 | 169:23 175:11 | **gospel** 107:5 | **Griffin** 305:17 |
| 390:17 | 299:5 304:8 | 182:10,13 | **gotten** 177:8 | 305:19,21 |
| **giving** 142:10 | 305:8 326:14 | 188:5,13 189:3 | 379:5 | **ground** 179:9 |
| **go** 17:2 21:8 | 326:15 329:12 | 189:11 191:3 | **GPS** 171:18 | **grounds** 3:4 |
| 22:2 25:13 | 329:18 335:22 | 193:12,14 | 199:10 | **group** 388:2 |
| 27:16,17 28:12 | 345:21 347:7 | 194:15 199:16 | **grade** 25:17 | **groups** 22:8,11 |
| 32:16,17 35:19 | 350:5 355:10 | 204:20 209:7 | **graduate** 46:2 | 366:2 |
| 40:1,9,10,13 | 358:1,15 363:2 | 211:16,23 | **graduated** 45:7 | **grow** 13:20 |
| 40:14 45:13 | 372:10 373:10 | 212:5,20 213:3 | **grammatical** | **grown** 23:18 |
| 48:16,17,23 | 374:11 376:23 | 219:11,11,14 | 276:13 | **gruff** 259:22 |
| 49:2 52:10 | 378:13 379:21 | 220:6 221:3 | **grand** 4:18 | **guess** 17:14 |
| 55:17,20 59:16 | 389:21 390:2 | 223:22 225:15 | 52:16 257:6 | 23:11 36:7 |
| 64:19 68:1 | **God** 191:14 | 227:13 228:17 | 269:6,9,13,17 | 40:5 53:23 |
| 73:19 82:23 | 196:6 314:8,15 | 228:18 230:3 | 270:1,12,18 | 60:21 65:4 |
| 83:7,19 85:18 | **goes** 128:17 | 232:14 236:22 | 276:18 277:7 | 66:3 72:6 78:1 |

90:8 107:11
108:21 116:13
116:15 130:9
182:9 244:4
269:20 274:1
275:10 276:2
306:1 307:4
311:14 320:10
328:4,10
337:20 343:10
344:15 350:7
354:17 355:11
363:16
**guide** 56:11
**guideline** 146:10
**gun** 156:13,22
157:4 177:16
177:23 178:13
179:16 180:7,9
180:18 186:6
186:10 195:21
196:5,6,12,18
196:22 197:3,6
209:7 210:4,15
211:5,12,20,21
212:7,12,18
217:10 226:15
226:19 227:6
228:3,17
230:12
**guy** 54:4 97:10
121:19 162:2
174:4,18
176:15 189:18
194:20 261:22
336:7 344:6
355:20 383:11
**guy's** 94:1
**guys** 15:12,20
16:3,7 21:20
22:1 28:18
83:2 99:22
112:21 133:14
151:5 161:6
162:3 168:7,18
193:2 210:18

214:4 323:22
329:18 338:10
338:14 383:8
390:2 391:16

---

**H**

H 6:4
**hair** 79:19
**Haley** 247:21
**half** 54:11 75:4
92:8 95:18
97:23 142:17
142:18,21
168:9 305:6
**halfway** 268:3
**hand** 27:20 30:9
30:22 61:4
81:1,21 83:9
136:10 169:7
224:8 265:5
278:19 299:21
301:23 307:12
317:2
**handcuffs** 116:9
**handed** 43:17
82:3 267:14
390:14
**handing** 30:21
42:5 267:3
298:23 377:19
**handle** 13:6
186:9
**hands** 91:20
92:5 103:9
**hands-on** 346:8
376:18
**handwriting**
46:13 265:19
266:8,14
**handwritten**
256:18 266:9
268:17 384:19
**hang** 43:4 72:23
158:3 302:4
365:1
**Hannah** 247:15

**happen** 28:11
117:5,14
118:12 188:4
239:13,15,18
240:9 286:5
314:23 343:14
369:18 375:1
**happened** 36:19
66:3 70:19
76:23 77:1
87:6 107:22
109:20 113:15
114:6 117:12
119:21 130:20
138:9 155:8,11
155:17,21
165:8 167:11
171:7,10,23
172:3 176:14
184:9,19 185:5
185:16 194:22
195:7 204:10
222:15 245:20
248:22 249:4
259:10 314:20
314:22 315:4
325:3 347:21
351:2 364:5
383:13
**happening** 87:4
117:1,4 172:1
203:11 254:17
**happens** 277:10
347:15,19
348:21
**happy** 324:8
329:8
**hard** 27:4 29:1
29:14 208:6
218:16 296:17
**Harley** 37:1
**harm** 347:10
353:15
**Hart** 12:17
41:14,16,21
110:16,23

132:10,11,16
132:17 133:3
181:17 185:20
185:20 187:9
204:3 206:3
218:2,14
246:11,11
265:18 266:1,6
267:7 312:16
318:18 323:1,3
323:7,10,15
339:1,4 340:3
340:10,14
349:18 350:12
375:3
**Hastings** 1:8 7:4
19:23 20:5,19
30:23 70:22
72:1,3,15,21
110:2 111:3,6
111:17,17
112:17 114:17
115:22 119:16
119:16 125:1,4
126:1,3,5,16
127:23 128:16
131:2 138:23
139:23 145:15
148:14,14
149:7,15
176:22 177:2
177:12 187:6
187:12 246:16
250:12 312:10
319:4,10
323:20 330:6
338:7 339:23
352:9 354:1
**hate** 312:1
314:19,21
383:13,14
**hazard** 24:12
**he'll** 104:7 277:2
**head** 11:11
183:10 254:4,6
254:10,13

271:11
**headaches**
376:11
**heading** 363:4
**heads** 354:12
355:20 356:13
361:16 363:13
**health** 24:10,11
376:8,18,18
378:14
**hear** 63:3 79:5
126:12 148:19
150:12 193:8
199:17 213:15
250:14 279:7
282:15 288:5,9
295:21 312:22
326:4 335:21
338:1 360:8
377:13
**heard** 60:11,12
60:13,16 62:2
62:6,10,15
67:6 68:13,23
70:7 90:20
118:14,16,20
119:15 157:11
177:20,21
189:7,14
193:11 207:11
312:21 313:3
314:3,3 330:1
359:16 385:22
**hearing** 140:9
311:23 312:18
**heavily** 87:4
**held** 81:1 92:4
92:10 93:14
94:13,17,17
95:1,8 97:22
98:18 100:11
101:15,17,17
102:5,16
104:18 122:10
134:11 162:15
194:19 197:14

Adam Jones                                                          12/7/2020

294:2 326:3
**hell** 358:3
**help** 28:13,14
29:4 198:20
219:12 319:16
349:11 377:4
**helping** 62:3
159:1
**hey** 158:1
162:22 165:19
168:3 181:10
319:15 375:15
**Hi** 10:5
**high** 17:3 22:2
23:17 45:11
328:20 376:22
379:4
**hillbilly** 260:11
260:17,23
**hips** 92:7 93:17
95:2,8,17,18
97:22 98:19
101:16,17,18
102:6,17 103:9
105:23 134:12
294:3
**hire** 19:14
**hired** 19:15
**hit** 26:4 92:3
350:7
**hold** 30:10 35:20
50:7 81:12,21
95:22 146:16
146:17 161:23
193:18 199:17
279:3
**holding** 80:3
95:17 107:20
**holds** 93:12
105:22 230:17
**home** 14:20
17:10 102:5
114:11,22
115:17 137:6
137:17 170:1
188:5 216:3,6

280:18 350:8
**homes** 345:2
**Homewood** 53:9
**homicide** 20:10
28:18 37:23
38:7,10,17
39:2,20 40:19
41:5,9,11
44:18 48:20,22
49:18 50:5
51:9 53:3,4,13
53:18 54:13
55:15,22 57:12
59:20 71:19
72:5,9 107:1
132:9 139:4,7
159:9 165:18
185:2,6,17
213:21 273:11
273:15 274:16
275:18 293:5
304:16 306:8
318:20,22
319:2 325:22
326:10 340:20
342:20 343:2,4
346:19 347:1
350:23 351:5
351:11 383:5
**honestly** 54:3
90:15 236:21
329:10
**honey** 164:20
232:2
**Hood** 12:14
41:19 62:16
110:17,20
131:16,20,22
132:4,5 158:15
181:2,19
182:19 183:3
184:1,8 187:8
203:23 205:11
205:13 206:3
217:23 218:13
241:6 246:8,20

267:6 276:23
277:5 312:14
316:19 317:11
318:5,5 319:19
326:19 327:14
327:19 338:20
340:13
**Hood's** 63:9
241:19
**hope** 347:18
348:20 349:9
**hopefully**
347:15
**hospital** 66:17
66:21 69:12,13
69:19 70:1,6
74:10 75:2,8
76:9 77:16
88:11 96:13
97:6 99:20
101:22 108:20
121:23 124:2
131:11 136:15
137:2,13,16
153:23 154:9
154:23 155:4
157:2,13,21
195:14 236:4
240:19 260:2
292:5
**host** 64:6
**Houndstooth**
280:18
**hour** 12:2 63:14
142:17,18,21
168:9 176:14
214:5,6 252:20
**hours** 75:4
96:11,11 152:7
192:15 195:10
217:3,4 222:15
223:20 310:4
**house** 17:5,17
18:1 70:13
73:1 74:7
84:10 86:15

91:8,19 94:1
95:10 100:12
105:18 110:14
110:18 112:1
114:1 115:8,13
115:20 117:9
117:19,21
120:14 121:20
121:21,21
124:4,21,23
125:5,20 126:1
126:5,15,17,19
127:2,15,18,22
128:3 129:18
129:22 130:3
131:9,23
132:18 133:16
133:17 135:14
136:18,19
138:9,11,21
139:1,17,17,20
140:1 141:19
142:3,17,20
143:5,14,15,18
143:22,23
144:12,16
145:3,7,8,14
145:16 146:23
147:10,14,22
148:10,19
149:17 150:3
150:17,23
151:2,4,9,11
152:17,23
153:16 154:1
156:19 159:3
162:16 170:18
172:16 174:5
174:11,14
177:9 179:8
180:21 189:19
189:21 194:20
211:23 212:21
214:3,7,11
216:9,16
230:15 240:15

250:21 306:4
310:12,13
**huge** 37:3 192:8
194:4
**huh** 228:6
303:12
**hundred** 16:16
**hundreds**
375:19,20
**hungry** 168:9
**hurt** 336:12
358:7,7
**husband** 361:7
**hypertension**
380:19
**hypothesize**
136:14

─────── **I** ───────

**IACP** 5:3 60:15
60:22 61:1,15
61:23 325:17
**ID** 234:22
235:11,16,17
352:4
**idea** 134:3,5
220:23 234:9
**identified**
253:14
**identify** 351:15
**ignore** 103:16
104:17,23
**ignoring** 97:8
**illegal** 279:21
**illness** 381:4
**immediate**
41:17,22
**immediately**
200:10,16
296:4
**immune** 19:7
**immunity** 19:8
**implication**
334:14
**implies** 334:10
**important** 269:4

Adam Jones                                                      12/7/2020

300:15
**impression**
154:16 155:5,7
155:17 156:5
342:17
**impressions**
111:16
**improve** 48:19
**in-depth** 47:17
146:5
**inaccurate**
325:5,13
**inappropriate**
259:23
**Inaudible** 79:3
**incapacitated**
190:21
**incident** 5:4
39:4 61:15
291:23 293:1
305:1,11
**include** 135:23
296:9
**included** 223:13
238:17 239:7
283:7 295:23
**including**
104:18,19,20
104:21
**index** 4:8 197:12
**indicated** 260:9
**indication**
102:19
**individual** 88:23
342:5
**individuals**
257:14
**influence** 219:20
282:10
**Informal** 251:17
**information**
52:20 80:3
91:3 97:17
122:1,4 130:21
131:1,12
146:15,18

147:2 152:15
153:3,10,11,13
153:21 156:22
157:1,10
159:15 178:13
179:13,15,20
179:23 180:20
187:13 198:5
198:20 209:3
231:10 260:2
269:4 295:15
298:22 300:13
313:14 325:11
326:23 331:7
331:11,13
**informed**
202:20 258:10
**initial** 33:1,10
39:4 44:4
66:12,20 70:10
80:1,1 97:15
275:2 292:4
304:22 325:19
**initially** 326:23
**injustice** 259:15
**Innisfree** 86:6
93:11 169:20
169:22 171:9
215:4 225:14
245:13,16,21
247:7 248:8,14
248:23
**input** 275:8
**inquiries** 315:18
323:18,22
324:3 327:18
**inquiry** 33:23
34:2,7,8,17,22
36:2,12 80:14
92:20 104:2
270:8,11
303:12 323:11
326:21 327:3,5
327:10,12,21
328:1,12,14,21
**inside** 64:22

310:13
**insinuated**
219:13 371:17
**insinuation**
337:10
**inspect** 24:15
**Instagram**
13:10
**instance** 142:10
**Institute** 62:14
63:8
**instruct** 11:16
11:17 100:4
164:12 332:2
**instructed**
264:12
**instructing**
264:18
**instructions**
55:8
**instructor** 49:4
49:7
**instructors**
64:14
**Intagliata** 248:1
**integrity** 28:21
383:22
**intended** 256:23
**interact** 56:13
**intercourse**
156:3
**interest** 36:19
232:8 331:4,6
**interested** 38:12
171:10 194:3
210:14 392:15
**interesting**
36:22
**internal** 246:2
**International**
60:14
**internet** 373:19
**interrogate**
220:10
**interrogating**
58:6

**interrogation**
39:23 40:23
64:2,20,21
65:6
**interrupt** 92:5
164:8 237:23
240:3
**interview** 5:10
5:12 39:15
41:1 57:8
64:12,20 65:6
78:12,14,23
80:1 82:6
87:19 92:19
93:2 97:5,16
97:21 103:13
105:9 109:20
111:16,20
115:9 141:1,14
145:23 146:5,6
153:5,6 154:21
155:6,15,16
156:11 158:14
160:16 163:11
167:16 169:8
170:14 174:6
175:2,15
176:12 177:15
180:22 181:20
181:22,23
182:5,6,10,13
183:1,15,15,23
184:8,21,23
185:21,23
186:2,23
197:13 202:17
202:22 203:20
205:5 208:23
216:5 219:6
224:21 225:6
242:21 244:19
249:15 256:12
293:17 295:4
325:10,21
379:21
**interviewed**

111:14 137:13
152:15 180:21
181:6 280:14
**interviewing**
39:23 64:2
111:5 146:2
153:13 187:19
223:20 335:10
**interviews**
143:10 182:16
182:20,21
183:3 204:7
275:4
**intoxicated**
77:23 87:5
191:21 192:1
**introduce** 9:4
**introduced**
21:23
**investigate** 53:1
69:4 94:7
108:2 121:4
147:10 191:15
342:11 372:23
**investigated**
35:8 50:10
185:6,17
306:19
**investigates**
190:19
**investigating**
33:11 54:18,22
77:15 89:2,8
115:4 123:7
194:18 244:10
282:6 301:5
342:6 375:4
**investigation**
34:6,11,17,21
35:10 37:16
56:1 57:1,3
70:18,23 73:18
80:13 84:12
99:15,21 108:8
108:10 109:21
116:7 133:10

| | | | | |
|---|---|---|---|---|
| 141:6 203:8 | 124:23 125:4 | 125:5 134:14 | 245:10,22 | **Joel** 19:17 |
| 206:16 217:9 | 125:23 126:3,4 | 147:19 160:18 | 249:3,20 | **JOHN** 6:20 |
| 231:21 244:3 | 126:16,22 | **invokes** 121:10 | 252:11 265:4 | **joking** 73:6 |
| 245:9 246:3 | 128:16 131:2 | 125:8 126:23 | 267:2 287:1,8 | **Jones** 1:8,16 2:5 |
| 250:7 256:5 | 138:15,23 | **invoking** 120:8 | 287:21 289:18 | 5:1,15 8:14,21 |
| 260:10,16 | 140:22 141:9 | 142:5 | 290:10 297:2,6 | 9:19 10:5 15:9 |
| 266:11 276:16 | 145:15 148:14 | **involve** 23:3 | 299:3,20 | 30:9,9,23 31:2 |
| 280:9,12 | 176:22 177:2 | **involved** 19:17 | 300:11 301:22 | 31:4 61:4,14 |
| 301:18 303:4 | 177:12,22 | 22:8,11 33:3 | 307:11 317:1 | 61:17 64:1 |
| 304:5 305:6 | 182:23 187:5 | 35:13 37:15 | 320:21 337:17 | 81:21 83:16 |
| 306:5 309:4 | 187:12,15 | 47:19,21 55:9 | 339:12 352:7 | 101:4,11 208:5 |
| 319:12 325:20 | 203:13 207:5 | 59:21 61:1 | 377:18 386:6 | 224:20 225:4 |
| 326:12 327:12 | 208:5 224:20 | 69:1 80:12 | 387:9 388:9 | 254:5,11,14,18 |
| 332:11 336:10 | 225:4 250:12 | 138:7 139:19 | **J.'s** 188:9 | 261:23 265:18 |
| 336:15 343:13 | 254:5,11,14,18 | 246:23 247:4 | **Jackson** 267:17 | 265:21 267:18 |
| 369:5 372:7 | 259:21 261:23 | 316:18 318:7 | **jail** 28:22 32:18 | 269:21 280:2 |
| 385:4 387:1 | 265:21 267:18 | 372:6 374:2 | 32:18,19 212:5 | 284:11 299:21 |
| **investigations** | 269:16 280:1 | **involvement** | 347:7 349:9,10 | 307:23 308:3 |
| 33:4 35:4,7,14 | 284:11 299:21 | 246:6 | 350:5 | 321:6,11 |
| 35:16 46:19 | 303:20 305:5 | **involving** 68:6 | **James** 295:10,13 | 330:12,15 |
| 49:23 51:1,5 | 307:4,23 308:3 | **isolated** 105:18 | **January** 38:3,4 | 331:11,12,17 |
| 51:11 54:5 | 311:3 321:6,11 | **issue** 29:5 331:7 | 43:13 311:17 | 332:8 340:1 |
| 55:10 56:7 | 330:12,15 | 331:19 332:7 | **Jason** 151:15 | 352:8,9,22 |
| 57:6 72:8 | 331:12 332:8 | **issues** 29:6 | 172:14 202:20 | 360:12,13 |
| 150:6 302:19 | 340:1 345:18 | 56:14 125:15 | 204:6 205:11 | 367:9 378:4 |
| 305:3 306:9,20 | 352:8,22 354:1 | 211:1 344:8 | **Jeremy** 318:18 | 382:2 390:9 |
| 307:8 326:6 | 367:9 370:19 | 374:1 376:8 | 318:19 | **Jones-Hastings** |
| 337:12 346:3 | 372:20 378:4 | 378:15 | **Jill** 366:11 | 4:20 5:2,14,17 |
| **investigative** 5:5 | 382:1 390:9 | **italicized** 255:17 | 367:22 | 5:21 31:1 |
| 54:1 61:16,22 | **investigators** | **items** 231:3 | **Jimmy** 356:14 | 265:17 299:23 |
| 146:17 246:18 | 138:10 139:23 | 333:15,18 | 361:4,6 363:17 | 300:9 317:3,14 |
| **investigator** | 147:5 180:16 | | 363:20 | 339:15 352:20 |
| 10:5 30:9 31:4 | 180:20 182:18 | ___**J**___ | **job** 24:9 25:6,9 | **Jones/Rondini** |
| 39:1 44:23 | 210:13 218:7 | **J** 1:12 6:20 9:12 | 25:20 31:22 | 5:8 |
| 51:6,10 52:12 | 280:15 282:20 | 30:8,21 42:4 | 32:11 37:7 | **Josh** 7:4 19:19 |
| 52:18 61:4,13 | 284:7,10,13 | 61:3 65:13,19 | 48:20 75:22 | 19:22,23 20:2 |
| 61:17 63:23 | 289:11 297:21 | 67:7 81:20 | 89:3,8 107:15 | 20:5,19 71:9 |
| 70:22 72:5,15 | 325:23 326:11 | 82:1 83:9 | 107:20 108:2 | 71:15 72:11 |
| 72:18,21 73:10 | 329:12 | 90:17,21 | 143:7 195:3 | 73:16 110:2 |
| 74:1,5 81:21 | **invitation** | 102:11 105:10 | 248:18 326:17 | 113:10 114:8 |
| 83:16 89:2,7 | 126:20 | 106:2 122:8 | 342:6 366:17 | 114:13 119:5 |
| 101:4,10 107:1 | **invited** 125:23 | 124:17 131:23 | 371:19 373:18 | 121:14 141:23 |
| 107:16,21 | 126:4,16 | 158:1 170:17 | 380:13 381:14 | 143:6 144:18 |
| 111:6,17 | **invoke** 124:20 | 173:5 186:15 | 381:18 382:15 | 148:21 149:3 |
| 112:17 114:17 | 127:16 144:7 | 187:23 189:8 | 383:9 | 217:21 218:14 |
| 115:22 119:16 | **invoked** 124:5 | 213:23 224:7 | **jobs** 333:22 | 218:20,23 |

Adam Jones 12/7/2020

219:2 246:16
312:10 316:7
319:4,9 323:20
334:17 338:7
339:23 341:13
358:2 370:14
**JOSHUA** 1:8
jotting 256:15
**Jr** 6:4,5 267:17
308:2
**judge** 18:20,22
19:3,4 121:17
128:2,7,9
135:17 136:2,2
136:4,5,17
137:4 331:19
332:7
**judgment** 310:6
**July** 50:8 51:8
52:22 53:11
54:17,22 55:2
56:23 58:18
66:3,4 72:14
72:17 95:6,21
163:12 165:6,7
165:10,10,14
166:9 167:17
167:19 185:2,7
185:16 202:14
213:8,23 218:4
222:10,10
224:22,23
253:22 268:3
271:20 284:6
310:4 387:20
**jumped** 157:17
**June** 30:4
316:12 317:12
321:9
**juries** 390:14
391:3
**juror** 390:20
**jury** 4:18 52:16
228:18 257:6
269:6,9,13,17
270:1,12,18

276:18 277:7
277:17,20
278:2,6,9
279:20 281:21
282:10 283:14
296:14 299:6,9
302:16,21
303:5,5,14,18
307:1 313:20
314:5,9 329:21
330:13,16
331:12,14
390:18 391:8

---

**K**

**Kara** 247:10
**Kate** 9:8 10:6
42:18 62:22
79:5 82:10
168:3 193:8
198:12 294:8
300:23 364:18
391:14
**KATHERINE**
6:13
**Kathleen** 6:14
82:17
**Katie** 1:12 9:10
9:11 63:9
315:14 316:19
317:11 318:4
318:14 319:20
320:17 321:8
321:22 322:12
329:8
**keep** 90:16
92:15 98:4
124:6 277:12
337:8 341:4
356:23
**keeping** 16:18
**kept** 66:14
**keys** 90:19
156:15,16,16
156:17,18,19
157:20 179:2

210:17 212:22
214:13,17
**keyword** 201:14
201:16
**kidnapping**
55:20
**kids** 16:9,19
347:11 348:20
369:21 373:11
**kill** 358:7
**killed** 315:22
**kin** 392:14
**kind** 22:1,13
23:4 25:8
39:11 59:12
80:4 86:17
87:22 88:8
92:7 95:17,17
106:8 169:7
224:12 236:23
250:18 301:11
314:4 322:3
330:10 344:10
348:22 357:20
376:8 377:21
**kinds** 377:1
**Kip** 132:23
133:1 265:18
265:23 266:5
318:18 340:3
340:10
**kiss** 237:22
285:19
**kitchen** 168:19
215:15
**knew** 37:7 38:11
82:21 84:13
90:17 153:9
178:8,10 182:9
183:19,20,22
184:1,21 234:2
245:12 353:12
354:6 379:13
**knock** 113:16
**know** 18:4 20:3
24:3,16,20

25:22 26:15
27:9,10,20
28:8,9,10,11
28:13,15,16,17
28:20,22,23
29:1,8,11,12
29:13,16,17,20
29:21 31:18,19
32:1,14,15,17
32:20,21,22
33:8,21 34:7
34:10,11 36:4
36:5 37:2,4,6
38:13,17 39:8
39:10 40:10,12
43:18 44:13,15
46:22 47:12,12
47:22 48:18
49:18,23 50:2
51:16,19 52:1
53:7 54:1
55:16 56:18,19
56:20 57:22,23
58:2,9,20,23
59:1,5,11,14
59:15 60:9,18
60:19 64:11
65:4 66:14,19
67:9,15 68:16
69:18,22,23
70:12,21 71:2
71:7,19 72:6,8
72:23 73:6,22
74:9,14 75:20
75:22 78:3
79:13 80:5,6
81:9 83:3,3,5
84:20,21 85:1
85:4,6,9,10,15
85:16 86:14
87:5,19 88:2,4
88:16,20,21,22
89:11 90:9,12
90:14,15 91:1
91:3,5,23 94:3
95:2,10,19

96:16 98:14
100:13 101:5
101:13,14,16
102:8 103:1,2
104:5,10,20
105:14,17,19
105:21 106:21
107:9 108:17
110:9,10
114:23 115:8
115:21,23
116:4,6,7,8,14
117:12,17,23
119:4,5,7
120:8,22,23
121:2,4,7,11
121:16 123:15
123:21 124:3,4
124:7 125:14
125:15,16
127:14 128:19
128:20 129:11
129:12,15,17
131:7 134:11
135:6,13,22
137:8 138:5,12
138:15,15
140:3,4,7,15
140:18 141:6,9
141:11 142:4,5
142:8,9 143:1
143:1,3,6,13
144:1,5,8,10
144:15,19
145:2 146:10
146:11,16,19
148:23 149:3
149:20,21
151:1,10,23
152:21,23
153:8,17 154:7
154:10,11
155:9,10,10,13
155:23 156:7
156:12,13,22
159:5,13 161:2

Adam Jones                                                    12/7/2020

161:3,4,18
162:10,17
163:15 165:2
168:17 170:20
170:22,22
171:1,4,15,17
171:18 172:8,9
173:21,23
174:3,5,9
175:1,8 179:14
179:15 181:4
181:22 182:12
183:4,4,5,7,9
183:16,17,18
184:6,12
185:14,19,22
187:1,2,3
191:23 193:5
196:5,15,17
197:7,9,17,21
199:5 201:22
202:13 203:3,4
203:5,16
204:10 205:20
206:13 209:9
212:20 217:12
217:15,16
219:9,10,19
220:1,3,3,5,20
221:3,4,5
222:9,13
226:14,21
227:1,2 228:1
228:18 229:6
229:12,15,17
230:6 235:15
236:3,6,13,14
238:10 239:3
239:16,23
240:4,11,14,15
241:20 242:7,8
242:14 245:20
247:1 248:10
248:11,21
249:4,5,9
250:13,20

251:5,12 252:2
252:4 255:8
256:12,13,14
257:19,20,22
257:22 259:3
261:15,22
262:20 263:5
266:7,19,21
269:19,21
271:6,9,14,17
271:19 272:14
274:10 276:15
276:16 277:15
281:10,10,11
281:15 283:18
298:3 299:8,12
299:13,14,17
300:18 301:15
301:20 302:17
303:19,21
304:19 305:7
305:19 306:6
306:23 307:3,5
308:15,17
309:16,20
310:21 311:2
311:15 314:21
315:11 316:6,8
316:17 317:20
318:16,19
319:14,19
320:1,12,12
321:21 323:12
323:19,20,21
325:7,11
326:13,15,16
328:3,6,7
332:4 334:1,16
334:17,22
335:18,23
336:5,7,20,21
337:2,3,9
338:13 340:12
341:6,8,15
342:7,9,10
343:7,12,12,14

343:15 344:7,8
344:9,11,13,14
344:14,23
347:4,6,7,8,9
347:13,21,22
348:7,13,14,15
348:15,17,18
348:19,20,21
348:22 349:1
349:10,12,19
349:20 350:1,4
350:18,19,20
350:21 351:18
352:2 353:2,10
353:12,15
354:6,8,10,21
355:18,19,20
355:22,23
356:1,9,20
357:6,8,12,14
357:16,19,22
357:23 358:1,2
358:13,16,17
359:3,5,6,8,14
359:20 360:3
360:13 361:1,4
361:13,15,16
361:17,23
362:13 363:7
364:6 365:2,3
365:6,12,13,21
366:1,8,12,18
366:23 367:8
367:16 368:5,7
368:13,16,17
368:21 369:21
369:22 370:1,5
370:5,6,16,21
371:2,2,3,3,3,9
371:11,12,13
371:19,21
372:5,11,14
373:6,8,9,11
373:11,12,15
373:16,19,21
373:23 374:6,7

374:10,14,22
375:8 376:7,18
377:9 379:2,10
379:11,13,21
380:1,2,8,10
380:11,12
381:19 382:2,6
382:8,14,18,19
382:21 383:8
383:10,11,13
383:14,15,16
383:16,19
384:22,23
385:10,19
386:3,15 387:7
389:3,11,14,19
390:19

**knowing** 33:14
143:10 155:22
345:6
**knowledge** 45:2
48:20 71:4
113:8 190:8
214:1 250:19
260:6,15 273:5
273:6 282:17
299:7,10,18
306:4 309:14
341:20,23
354:22 356:22
360:4 367:14
**known** 181:7,12
263:2 344:18
344:20
**knows** 82:2
189:19 198:6
236:13
**koozies** 90:19

––––––––––
**L**

**L** 2:1
**label** 36:10,12
**labeled** 326:21
327:4,9,21
328:1,12
**labeling** 328:13

**lack** 23:19 128:1
193:23 244:5
257:2 260:1,15
**lacking** 93:2
**lady** 370:8 372:2
380:5
**lag** 53:15 348:11
**laid** 114:9,17
**lamblast** 374:11
**lapse** 87:13,15
90:1 91:12
198:21
**lapses** 88:6 89:7
89:9
**large** 2:8 8:4
89:6,9 150:23
392:23
**Las** 260:8
**late** 38:21
**law** 20:12 59:20
94:9 96:23
105:6 164:22
324:19 331:3
331:17 334:17
334:18 336:4
336:22 382:8
**laws** 2:19
**lawsuit** 10:15
18:13 32:5,6,6
32:7 206:12
225:2 263:1,4
263:6 264:12
388:1,5,13,14
**lawyer** 10:7
19:10,15,15
119:13,19
120:2 124:6,21
125:5,9,14
133:14 134:14
142:9 144:20
144:21 160:19
160:20 161:2,4
161:9,10,10,12
162:4,11,21
163:5,20
295:18 384:15

Adam Jones                                                      12/7/2020

**lawyer's** 161:7
**lawyers** 161:19
  220:16 299:4
  378:7 388:2,13
**lay** 91:19
**layout** 275:10
**lead** 51:5,10
  52:12,18 73:10
  102:3,10
  140:22 141:9
  156:8 227:5
  305:5 370:19
  372:20
**leading** 3:2
  227:5 228:1,5
  228:10
**learn** 65:21
  66:13 160:1
  313:15,15,20
**learned** 49:14
  65:10,16
**leave** 120:14
  121:11,13
  125:9,19 127:2
  127:17,18
  128:14,14
  159:23 160:2
  169:20 236:18
  237:1,22 238:4
  284:15 285:7
  285:16,18
  286:2,12
  287:14 391:7
**leaves** 159:18
  171:8 195:14
**leaving** 125:13
  129:6 169:21
  170:2
**led** 50:13 101:22
  209:4
**left** 26:5 41:17
  70:12 74:6
  108:20 127:14
  129:14,22
  130:3 133:15
  141:19 145:6,6

147:10 169:22
  174:13 180:4,6
  180:11 196:3,6
  214:17 215:4
  245:6,7,20
  246:1 248:8,23
  249:14 250:8
  254:7 332:4
**legal** 272:12
**Leila** 384:15,18
**leisure** 268:7
**lends** 331:1
**length** 71:20
**lengthy** 212:15
**lesser** 223:12
  238:17 239:6
  271:4 273:19
  273:22 274:2
**let's** 41:9 121:17
  128:6 129:17
  135:16,17
  168:11 185:10
  185:11 193:5
  252:20 298:7
  342:13,15
  356:15
**letter** 265:1,5
  267:3 289:12
**letters** 295:10,12
**letting** 86:8
  94:23 103:10
  107:18 146:23
**level** 385:12
**liability** 19:7
**lie** 115:21 116:5
  116:14
**lied** 115:15
  119:22 134:13
  174:4
**lies** 116:17,18
  122:8 133:13
  354:17
**lieutenant** 41:15
  41:21,23 42:2
  132:11 307:8
**life** 13:18 24:16

26:19 170:11
  206:9,18
  226:19 227:7
  228:16 369:17
  383:15
**lifetime** 29:15
**light** 333:22
  336:5,22 337:4
  341:7 372:1
**LIGHTFOOT**
  6:21
**liked** 320:7,15
**limit** 25:17
**LINC** 68:9,13
  85:11,12
  121:15 131:4
  148:21 187:17
  187:18
**line** 85:19
  120:23 169:16
  169:19 170:8
  172:13 178:19
  188:7 189:1
  234:21 237:11
  237:11 253:3
  331:1
**lines** 92:13
**liquor** 170:22
  214:20 215:14
**list** 48:13 55:18
  249:23 275:1
  283:10 318:11
**listen** 185:13,21
**listened** 293:16
**listing** 300:9
**literally** 390:1
**litigation** 262:18
  266:17 310:18
  352:20
**little** 28:6 81:14
  81:15 109:10
  126:9 167:3
  209:23 252:19
  318:2
**live** 15:9,12
  16:14 17:19

18:1 383:18
**lived** 13:17 17:4
  17:17,20
**lives** 15:14 16:15
  16:23 349:10
**LLP** 6:8,15
**locate** 118:1,5
**located** 348:17
**location** 198:5
  198:20 199:10
**lock** 128:21
  131:8
**locked** 121:21
  165:4
**Logan** 247:17
**logs** 351:6
**long** 11:1,23
  14:10,14 16:3
  17:4,22 25:2
  26:20 27:10
  30:1 37:1 40:4
  42:21 47:13
  49:11 54:13
  70:13 76:8
  78:8 111:22
  112:4 129:21
  130:9 152:5
  189:17 214:3
  218:16 344:18
  350:11 383:8,9
**longer** 332:21
**look** 31:8 32:10
  33:14,15 45:5
  47:1 61:13
  79:7 81:5 84:8
  86:12,17
  103:20 154:17
  158:12 167:13
  170:7 171:17
  171:17 176:3
  179:2 180:18
  181:19 197:11
  197:12 198:2
  216:1 224:20
  225:9 232:11
  233:4 238:20

257:10 259:19
  268:10 280:2
  282:13,18
  291:22 292:21
  308:20 317:15
  324:12,14,15
  328:4 335:17
  338:14 340:4
  348:19 352:21
  353:7,10
  358:15 369:21
  371:5,6 379:14
**looked** 12:6
  79:13,14,16
  154:17 201:22
  202:1,6,7,8
  214:20 215:6
  250:4 276:19
  354:2 359:11
**looking** 33:16
  63:10 80:9
  121:4 125:18
  130:2 143:4
  157:15,16
  173:13,14
  177:23 199:3
  214:13 235:12
  283:22 300:11
  330:1 348:19
  352:18 356:1
  373:18
**looks** 82:1
  276:15 288:12
  297:13 298:5
  353:1
**lose** 368:11
  373:18
**loss** 88:6 172:10
  192:18 194:5
**lost** 29:3,18
  157:5 196:23
  228:7 312:2
  371:1 375:15
  379:12 381:11
**lot** 26:13 28:11
  52:9 138:7,18

Adam Jones                                           12/7/2020

141:5 150:15
159:6 219:16
239:2 242:2
255:2,22
273:14 275:15
308:9 326:16
349:3 389:20
**louder** 63:1
**love** 42:22 326:3
371:19
**lower** 216:1
293:9
**loyalties** 24:5
**lunch** 168:5,17
168:20 169:3
**Lundgren**
249:16
**lying** 116:21
154:4 162:19
195:19
**Lyn** 254:4,10

──────────

**M**

**M** 1:12 4:18
6:13 339:13
**ma'am** 10:9,18
11:13 13:7,12
13:19 14:4,9
15:23 16:22
18:17 19:16
20:1,14,18,22
21:2,19 22:9
22:12,21 25:7
26:7 28:1 30:7
31:6 33:12
35:5,17 36:16
37:17,20 38:5
43:11 45:10,12
46:5,11,14
47:5 48:7 57:7
57:10 60:16
61:20 62:8,15
62:18,20 66:9
69:16 81:4
85:22 91:10
92:9 221:12

254:2 258:9
384:13
**Mackenzie**
16:13,14
**mad** 220:3
**magic** 96:1
99:13 103:17
**magistrate**
379:18,23
381:15
**main** 173:11
336:19 356:4
**major** 39:9
**majority** 357:23
**makeup** 20:8
**making** 65:11
65:17 170:9
213:11,13
241:21 243:19
275:15 350:4
364:7 365:5,9
365:23 366:5
368:14 374:12
**male** 257:15
259:23
**man** 23:18 49:9
65:12,18
105:17
**Management**
304:6,9,12,13
**manner** 260:11
348:3
**Mapes** 247:13
**mark** 25:21 26:5
27:13 158:6
224:12 265:9
352:11 379:14
**marked** 4:10
30:15 42:13
43:1 61:8
83:11 158:8
167:14 224:15
253:8 265:10
267:5,9 301:23
302:10 307:18
317:3,6 321:1

339:14,18,23
352:13 377:23
387:10,14
**married** 15:22
16:4,6 356:16
**marshal** 269:8
**mass** 390:22
**massive** 274:14
**materially**
330:18
**maternity** 69:23
**matter** 12:12
111:12 192:14
238:12 264:14
290:3 308:1
**mattered** 383:10
**McConnells**
13:23
**McEntyre**
376:21
**McIlwain** 19:13
**mean** 12:8 19:23
26:5 29:15
32:4 45:19
47:10,15 48:14
51:23 52:5,8
53:21 60:7,8
69:2,23 73:2,7
78:1 79:7,12
79:17 84:21
88:13 90:8
103:13 107:18
111:12 116:4,8
116:13 125:3
125:11 128:7
137:8,19 140:2
144:5 146:12
153:19 155:1
155:18,22
156:4,21 159:1
159:6 172:7,18
173:23 174:1,3
176:6 183:13
183:17 194:9,9
203:14 218:6
220:1,19

225:22 226:2,6
226:9,11,13
229:20 230:2
230:12 235:14
237:8 244:3
257:20 261:2
263:5 264:3
273:18 276:8
277:23 278:13
286:15 299:14
312:1 314:19
314:20 320:10
329:10 332:23
333:6,6,11
336:19 337:5,9
341:5 344:5,6
346:8 348:11
349:16 350:18
354:16,19
360:2 368:3
369:18 374:15
384:1 386:19
387:5 389:13
389:16,16,18
**meaning** 327:3
**means** 24:13
244:4 384:21
**meant** 97:22
144:22 332:23
345:22 355:14
**media** 13:1
56:13 322:2,7
323:11 329:11
358:22 373:13
**medical** 5:23
15:2 21:22
69:21 80:4
260:2 377:20
378:5,8,21
**medication**
377:1 379:7
**meet** 21:20
92:22 94:10,11
95:3,9,11 96:5
96:8 97:1,18
99:3 105:7

106:15,18
109:2 123:20
135:10 238:15
326:23
**meeting** 94:19
251:9,13,16
252:1
**meetings** 23:3,7
23:8 246:2
**Megan** 65:10,16
76:3 78:8
80:21 84:13
85:15 98:7,20
99:5 107:13
108:22 122:9
136:13 147:2
147:16 148:4
148:12 152:3,6
154:7,20 155:8
155:17 158:14
162:15 167:17
169:9,19
170:14 172:17
172:22 175:12
177:16,19
178:22 180:21
180:22 181:1
181:10,14
186:23 187:20
189:6 198:19
201:4 204:6,7
205:14 206:16
209:4 214:2,12
215:19 218:23
220:10 222:7
222:11 223:5
223:20 224:22
225:7 226:11
227:8,20 232:4
232:12,17
237:18 239:19
240:15,16
241:1,7,10
242:2,13 243:4
244:14,16
245:3,6,20

Adam Jones                                                      12/7/2020

246:1,7 247:8
248:8,22 250:8
257:17,21
258:16 262:12
267:15 270:3
284:23 285:17
286:3 287:6,21
289:17 290:9
290:23 292:8
292:15,16
294:14,22
298:12 301:17
302:15 303:6
305:9 306:18
311:13 314:21
315:12 321:9
324:18,20
325:12,21
335:10,11
386:8 387:21
388:19 389:5
**Megan's** 158:16
175:10 216:16
219:4 244:20
245:9 288:2,17
310:23 311:8
313:6,10
388:14
**melatonin** 377:4
**member** 21:10
21:11 69:1
**members** 60:21
**membership**
21:10,13 23:4
23:6
**memorable**
172:19 313:22
313:22
**memory** 74:21
83:23 84:5
87:13,15 88:5
89:7,10 90:1
91:11 154:13
170:16 171:5
172:9 173:10
173:14 192:18

194:5 198:21
241:1 243:3
249:1 256:20
311:22 321:23
323:6
**mention** 24:4
89:13 215:23
244:20 320:1
380:23 381:2
**mentioned**
89:12 336:20
**mentioning**
319:23 355:19
381:9
**Mercedes** 179:3
**mere** 223:20
**Meridian** 40:2
64:4,22 65:8
**merit** 19:5
**mess** 124:8
248:1
**messages** 176:16
244:20 245:4
298:11 300:10
300:14 333:20
334:23 335:1,4
389:9
**messing** 124:3
**met** 34:5,13 36:9
97:3 121:3
137:15 163:9
217:5 222:5
223:6,11,19
233:10,16,19
236:11 237:9
238:8,14
270:17,21
271:1,1 280:21
**Meyer** 261:22
264:19,20,22
264:23 295:10
295:13
**Miami-Dade**
53:8 54:6
**Micah** 71:13
72:4,12 73:15

**Michael** 18:15
**middle** 122:3
186:14
**miles** 112:2,2
**million** 206:11
206:14
**mind** 42:5 60:20
96:20 98:23
101:1,9 103:3
128:2,17 129:1
194:15,17
196:16,20
211:16,18
228:2 246:19
267:3 300:7
377:19 380:17
**minds** 120:19
142:11
**minimum** 26:10
**minute** 193:6
249:8 279:5,9
**minutes** 15:15
78:9 86:2 97:4
112:6 126:14
129:16,19,20
130:7,18
131:17 133:4
147:8 151:3
168:8,13
173:19 174:14
174:22 176:4
176:10 177:3
177:10 194:5
210:5 253:3
254:9 260:6
390:1
**Miranda** 205:7
205:21 212:3
213:2 231:17
258:7 268:18
294:14
**Mirandize**
206:21 207:18
208:12 209:4
210:6 211:7
212:6 213:6,17

220:11 230:19
230:23 231:8
245:3
**Mirandized**
204:11,13,18
205:15 207:13
208:22 209:11
209:22 210:2
210:22 211:3
212:9,10,13
213:8,23
221:15 309:21
335:2
**Mirandizing**
207:3 208:10
210:19 218:23
221:10 335:10
**miscellaneous**
35:10
**mischaracteri...**
231:12,15
**misconduct**
123:11,16
124:11,16
223:18 270:23
271:8,10 272:2
272:5 274:4
**mislead** 125:3
**missed** 109:8
**missing** 124:15
156:15,16
178:1 179:16
196:5 210:15
210:16 231:4
234:9 389:15
**Mississippi** 40:2
64:5,17
**mistake** 237:20
**mistaken** 241:19
241:22
**mode** 373:10
**mom** 14:19
**moment** 127:2
223:19 229:2
382:1
**money** 27:15

209:8 212:2,11
212:21 219:16
219:20 226:16
226:20 334:1,6
337:7 373:21
383:23
**month** 38:2
332:21
**monthly** 27:22
48:14
**months** 46:22
51:9 333:3,10
349:13,17
350:3
**morning** 9:7
14:18 66:2,7
67:21 70:7,10
74:7,9,20 75:3
82:14 84:2
85:8 97:5
110:21 111:1,4
112:11 130:4,5
131:20 133:9
140:15 141:17
142:15,16
143:19 152:10
153:7 159:21
216:10 231:6
231:19 246:22
256:2 306:5
310:4 391:14
**mother** 21:21,22
373:2
**motion** 310:6
**motorcycle**
36:23
**motorcycles**
37:12
**mouth** 53:16
226:18
**move** 25:23
332:6 350:22
**moved** 17:7,18
21:13 351:3,4
**moving** 141:5
148:20 159:7

Adam Jones                                            12/7/2020

multiple 324:21
murder 55:18
  55:19 301:12
  301:12
murders 52:8
mutual 128:18
  129:2
mystery 208:19

**N**

N 2:1 4:1 6:1
  265:5
N-T 237:19
name 10:5 14:5
  15:7 16:1,12
  16:19 29:13,22
  31:2 49:6
  57:14,16 58:4
  59:5 62:22
  63:3 66:18
  67:6,7,18,19
  68:2,3,13,14
  68:16,18 71:11
  75:18 84:13,17
  85:5,7,9,9,10
  85:15 90:16
  94:4 105:21
  181:13 218:11
  269:20,20
  283:20,21
  336:13 342:10
  342:17 347:13
  356:14 359:12
  360:11 371:5
  374:17,21
  375:2,10 380:7
  382:7,16
  383:17,22,22
  384:3,8,15
  385:1
named 65:12,16
  65:18 249:16
  340:5
names 64:13
  66:23 67:3
  85:13 218:11

275:8 283:16
  336:11,22
  357:2,8 388:5
Nancy 1:21 2:6
  8:1 11:1 30:13
  61:5 158:5
  169:6 193:16
  224:12 265:8
  307:14 352:10
  392:19,20
naps 11:1
native 21:18
nature 83:23
  341:5
neatly 79:19,20
  79:21
necessarily
  129:10 164:1
  244:3 304:20
necessary 2:22
  262:15
need 36:9 37:5
  80:5 86:4,6
  94:6 96:13
  99:12 105:14
  106:11,12,13
  119:12,19
  121:16 123:2
  125:17 161:14
  163:4,10
  168:15 225:20
  226:23 227:3
  228:11 229:18
  230:4,19,22
  243:16 287:13
  320:3 331:20
  335:22 344:12
needed 34:11
  93:10 106:15
  106:18 145:19
  205:14,21
  211:20 226:16
  264:14 276:4
  285:7,16 286:2
  286:12
needs 120:2

133:14 200:6
negative 336:21
  341:7 344:9,9
  372:1
neighborhood
  21:18
neither 18:8
  392:13
Nelson 303:20
  303:23 307:4
nervous 12:21
never 21:13 29:5
  29:6,22,22
  37:3 61:1 62:6
  62:7,15,16,19
  75:21 89:11
  107:6 174:21
  197:13,18
  207:11 234:5
  234:12 236:8
  237:17 238:1
  240:6 244:19
  247:10,12,15
  247:17,19,21
  247:23 248:3,5
  250:17 258:17
  261:4,8 271:13
  272:23 273:16
  284:17,23
  285:14 317:3
  317:19,21
  318:1 343:8
  344:7 346:6,7
  347:15 351:2,3
  351:4 353:20
  357:4 360:21
  366:1 373:1
  376:7,14 377:6
  377:8 378:14
new 6:18,18
  25:6 26:13
  35:21 56:9
  59:6,7 131:1
  157:1,9 331:17
newly 72:4
news 1:11 4:17

311:23 385:2
  386:8 387:20
nice 22:1 143:2
  143:12 163:17
  163:22 164:2,4
  164:5,9,10,16
  164:17 227:8,9
  227:12,15
  231:9,19
Nicole 16:1
night 79:14
  81:22 114:11
  114:22 115:17
  190:12
ninth 292:2
nod 11:11 40:12
non-leading
  104:6
non-prosecuti...
  242:22 243:5
  243:15,23
  244:12
normal 73:14
normally 27:15
  290:21
North 6:22
  13:22
Northbank 2:10
  8:11
Northern 1:2
  8:23
Northport 17:21
  21:9 379:16
Notary 2:7 8:3
note 266:9,16,19
  312:19 384:19
notebook 43:17
notes 76:5 256:6
  256:9,10,13,15
  256:17,19
  294:22
number 1:5 8:21
  30:23 50:12
  51:23 55:14
  265:17 283:18
  283:19 296:22

317:13 349:16
  351:21 352:6
  352:19
numbers 169:17
  275:13 349:7,8
  351:21,23
nurse 58:9,11,12
  59:2,2,10
nurses 58:19

**O**

O 2:1
o'clock 74:20
  97:5 148:7
  159:20
oath 308:10
object 11:15
  50:17 51:21
  67:22 79:9
  84:18 88:18
  90:22 94:21
  95:13 96:2,21
  97:13 99:16
  100:1,16,22,23
  101:19 102:12
  102:21 103:18
  104:4 105:3
  106:3 107:7,23
  109:15 117:6
  117:15 119:2
  122:15,18
  123:4,13
  124:13 127:5
  128:4 129:8
  132:19 134:1
  134:17 135:1
  137:23 141:20
  144:13 146:8
  147:3,11,17
  149:11 160:22
  161:16 162:7
  163:1 166:20
  172:5 176:18
  178:15 184:10
  189:23 191:1
  191:16 192:9

Adam Jones                                          12/7/2020

194:12,23
195:4,12 197:4
198:9 207:7,14
208:15 210:7
211:9 212:14
221:13,18
222:16 223:8
227:16,21
231:1,14 232:5
233:12 235:6
237:6 285:11
285:22 286:7
286:16 287:11
291:8 313:23
314:11 315:5
316:1 355:8,16
362:23 372:8
**objection** 332:1
**objections** 2:23
   3:3
**obligated** 127:1
   127:3
**obtain** 380:1
**obtained** 152:16
   284:11 303:16
**obtaining** 331:6
**obviously** 111:9
   111:11 187:3
   331:4 353:15
   389:15
**occasion** 379:11
**occasioned**
   31:16
**occasions** 342:9
   371:16
**occur** 175:13
   176:2,9 190:8
**occurred** 74:15
   185:4 260:7
   280:15 281:5,9
   282:4 283:5
   290:4
**occurring**
   282:11 392:11
**occurs** 174:21
**October** 13:14

17:6
**odd** 87:23
**off-the-record**
   279:17
**offended** 219:22
**offense** 33:1
   39:5 57:5
   271:4 291:23
   293:2 305:2,11
**offenses** 54:23
   223:13 238:18
**offensive** 260:18
   261:1
**offer** 242:22
**offered** 3:5
   325:21
**office** 2:9 8:10
   12:3 15:18
   19:20,21 20:6
   20:20 39:6
   82:5 121:12
   122:4 130:13
   131:10,14
   132:7,9,15
   139:5,7 145:11
   145:15,22
   148:6 155:13
   158:19,22
   159:8 160:21
   161:3,13
   163:11 166:8
   180:15 181:1,5
   200:3 201:4
   202:21 205:3
   206:5 207:2
   213:21 214:8
   218:8 219:2
   227:13 232:21
   238:22 239:3
   243:6 245:6,7
   246:1 250:8
   253:16 254:4,8
   254:10 256:23
   264:16 277:8,9
   277:10 282:19
   283:17 294:23

295:1,15 296:2
298:21 299:5
303:3 304:17
311:4 334:2
338:17 341:10
370:14 371:6,7
376:16 383:5
388:7
**office's** 207:10
**officer** 20:16,19
   23:2 28:4 29:2
   29:10 32:23
   34:10,16,22
   36:3,6,8 46:10
   55:17 75:14,20
   76:2 77:15
   80:17,18 84:22
   91:2 101:1
   167:17 224:22
   232:13 275:2
   292:5 305:17
   318:21
**officers** 20:13
   26:14 38:19
   39:6 66:20
   199:5 342:5
   380:2
**Officers'** 46:7
**offices** 8:9
   255:21
**oh** 191:13 196:6
   314:8,15
**okay** 11:18,19
   12:23 14:2
   15:4 19:10
   30:1 31:23
   32:10 33:20
   34:15 35:22
   36:13 37:14
   38:23 40:15
   41:3,20 45:5
   47:1,6 54:7
   56:18 61:2
   62:9 63:11
   67:3,12 69:5
   70:2,4,5 73:9

74:6 75:7 81:5
81:14,19 82:20
83:8,21,22
84:7,11 85:6
85:17 88:7
93:12 97:3
102:4 104:7
105:2 108:4
110:13 113:15
114:6,16 118:6
118:16 119:14
119:22 120:13
122:7 126:19
126:22 129:5
130:17,19,19
130:20 133:12
136:23 137:12
138:8,18 139:6
139:9 146:1
151:16 152:2
152:13 157:22
157:23 160:8
164:8 167:13
169:6,14
170:14 172:21
177:14,19
178:12,23
179:18 180:3,6
184:1,14
188:10,23
193:17 199:12
200:5 202:16
204:5,19 205:8
209:18,21
210:1 211:2
215:19 224:6
225:21 230:9
233:6,23
234:11 236:1
236:17 237:15
238:1,4 239:12
241:23 242:10
243:13 244:19
250:1,4,11
251:17,23
252:22 254:3

257:8,23 258:5
261:14 262:3
263:7 264:8
265:3 267:1
268:22 269:12
269:23 272:18
273:16 274:12
275:12 276:7
277:6 280:5,6
282:8 283:9,23
284:5 288:8
291:5,13
292:21 293:4
293:14,19
294:1 295:6
296:3 298:7
299:19 301:4
301:14 303:19
306:3 307:10
309:2 311:18
316:5 317:1
318:14 319:1
320:20 321:14
322:9 329:6,16
332:5,8,22
333:12 337:19
339:11 349:3
353:17,20,23
360:8 361:10
365:21 367:6
384:14 387:8
388:22 391:1,5
391:11
**old** 16:9 165:1
   235:3 373:16
**Olympus** 81:9
**omission** 343:11
**omitted** 334:15
   334:21 335:13
   335:14 345:9
**once** 20:9,10
   27:13 92:1
   163:19 195:14
   230:5 320:18
**ones** 47:20 48:16
   136:3 255:7

online 46:17,21
  371:5,6
open 24:21
  59:17 135:6
  210:10 221:4
  391:7
opened 60:3
opening 36:20
  38:9,13,20
  59:22 60:10
openings 38:17
operating 42:23
  43:8 44:17,22
  55:8 56:3,5
  62:5
opinion 327:13
  336:15 389:18
opportunities
  40:14 286:18
opportunity
  36:21 38:19,22
  190:9 256:1
opposite 327:22
oral 8:15 156:1
  156:2 254:22
  278:18,20,22
order 22:16,20
  55:13 56:17
  209:14 268:17
  268:20 276:21
organization
  22:23
organizations
  60:19
original 30:17
  42:15 61:10
  83:13 158:10
  224:17 253:10
  265:12 267:11
  302:12 307:20
  317:8 321:3
  339:20 352:15
  378:2 384:20
  387:16
originally 126:2
  262:3

other's 73:1
  345:2
ought 191:15
ourself 374:15
outline 55:16
outside 14:19
  72:21 114:1,14
  115:8,12
  187:20 243:6
  346:23
overlap 385:23
overlapped
  382:11
overnight 46:23
overview 276:5
  288:12 289:19
  293:23

───────────
        P
───────────
P 2:1 6:1,1
p.m 169:2,5
  253:6 261:18
  261:21 279:12
  279:15 317:12
  330:4,8 390:5
  390:8 391:18
  391:21
packet 4:13 12:8
  12:9 52:15
  233:3 249:23
  252:8 267:4,14
  268:9,20 269:3
  269:10 270:6
  275:23 277:6
  277:16,21
  278:1,15,16,19
  278:21 281:8
  281:12,17,21
  282:9,16,18
  287:17,20
  291:12 295:7
  295:13 296:8
  298:7,10,16,19
  299:5 302:7,7
  303:1 305:9
  309:13 313:17

335:5,6 377:21
  390:13
packets 277:14
  291:4,7,18,21
  390:12
page 4:3,16,19
  4:23 13:8
  42:11,18,20
  47:2 84:8,9
  86:12,20
  169:16,17
  170:7,8 172:12
  178:19 186:13
  186:14 188:6
  188:16,23
  225:9,10
  228:21,22
  232:12 234:20
  237:10,11
  239:12 240:12
  253:21 258:5,6
  259:20 260:14
  270:7 274:12
  274:14,19,22
  274:23 275:13
  275:16 280:2
  283:9,9 284:2
  291:22 292:22
  293:1,3,5,8
  294:13,17
  296:17,18,19
  296:20 297:12
  298:2 308:7,21
  310:1 318:11
  353:5 359:5,7
  359:13,16
  363:17,18,19
  363:20 364:2
  365:7,8 384:18
  386:7 387:2,6
pages 5:6,9,11
  5:13,16,23
  169:12 252:16
  292:1,3 294:20
  295:8 296:5
  298:20 302:1

pain 376:11
painted 333:21
pandemic 25:12
Pannell 1:21 2:6
  8:1 392:19,20
paper 390:13,22
papers 50:7
paperwork
  52:17 150:16
  276:11
paragraph
  86:23 256:22
  257:8,11
  259:13,20
  284:6 287:17
  287:23 288:15
  288:20,22
  289:1 293:10
  309:3 324:13
  324:16 325:16
  326:18
paraphrasing
  250:6
parents 15:15
  388:14,16
  389:14
Parkway 2:10
  8:11
paroles 15:18
part 6:5,6 17:15
  20:15 22:22
  37:7 48:1
  65:14 71:3
  72:2 111:10
  115:6 116:6
  128:19 150:19
  167:21 262:16
  282:16 283:21
  294:8 309:6,11
  315:20 325:9
  334:18 335:9
  348:14 357:10
particular 25:20
  40:3 48:16
  69:2 71:5
  77:13 140:7

159:12 242:7
  322:19 339:7
  354:10
particulars
  281:23
parties 2:3 3:3
  168:2 279:17
  392:14
partner 71:6,12
  71:14,18 72:1
  72:11
partners 71:6
parts 141:5
  159:7 181:22
  278:21
pass 27:13 47:22
  177:11 182:2
  203:1
passed 255:10
passing 385:11
paste 300:12
pasted 300:16
pastor 14:3,8,10
patient 77:20
patrol 30:5
  32:11,12,23
  33:5,9 34:16
  34:22 35:2,23
  56:10,11 80:19
  273:12 304:23
  306:10,11,12
  306:14,15
Paul 15:8
pave 67:15
paving 67:14
pay 226:21
  234:17
Peace 46:7
peek 225:5
pending 164:18
pension 26:6,8
  26:11,15 27:3
  27:5,7,16,22
people 24:1
  25:18 27:11
  29:3 40:9,11

Adam Jones                                              12/7/2020

| | | | | |
|---|---|---|---|---|
| 88:4,16 98:5 | person 6:6 88:23 | photos 39:13 | 158:2 169:16 | 60:21 64:8 |
| 116:5,14 133:1 | 151:11 153:12 | 140:3 268:15 | 326:1 | 84:16 85:14 |
| 141:7 143:2,10 | 218:15 223:4 | 310:2,9,11,16 | plus 27:1 | 99:22 101:1 |
| 159:11 176:10 | 348:8 351:19 | 389:9 | pocket 179:3 | 116:6,14 152:3 |
| 177:8 183:22 | 354:10 375:3 | phrase 33:22 | point 38:15 | 160:16 161:8 |
| 184:15 190:7 | 382:23 389:19 | 337:8 | 84:12 87:10 | 161:14,20 |
| 192:20 195:22 | personal 355:15 | physical 146:4 | 94:10 95:2 | 163:6 166:16 |
| 218:11 220:2 | 368:11,15 | 250:17 353:15 | 96:6,8,11 | 199:5 213:22 |
| 239:3 243:6 | 385:12 389:18 | 376:8 | 97:18 99:2 | 216:19,21 |
| 247:7 269:19 | personality | physically 376:7 | 103:9 106:6 | 240:14 271:16 |
| 273:21,22 | 344:14 345:5 | pick 180:9 | 109:4 110:22 | 325:17 334:2 |
| 274:5 283:13 | personally | 249:17 293:19 | 113:12,18 | 337:12 340:19 |
| 323:21 333:23 | 359:20 361:2 | picked 171:20 | 114:13 115:2 | 342:3,19 343:1 |
| 334:6 337:11 | 361:22 368:8 | 179:6 215:3 | 115:11 116:9 | 343:5,9,15,17 |
| 342:18 346:4,5 | pertinent | 245:15 249:2 | 119:5 120:15 | 343:18,22 |
| 347:1 349:6 | 173:23 | picking 73:6 | 121:22 124:11 | 344:19 345:11 |
| 353:13 354:5 | PGO 55:12 56:4 | 262:14 | 125:12 129:13 | 346:13,23 |
| 354:14,16,20 | 56:17 | picnic 99:23 | 133:7 135:4 | 369:19 382:13 |
| 355:1,2,4,6,19 | Phillips 14:6 | 100:6 | 138:12 142:11 | 385:20 386:1 |
| 357:11,13,17 | 75:19,20 76:2 | piece 112:10 | 147:5 151:21 | policies 326:4 |
| 357:18 358:5 | 292:11,13 | 130:21 390:13 | 152:19 153:10 | poor 315:21 |
| 363:11 367:23 | phone 68:10 | pieces 225:13 | 153:14,20 | portion 193:19 |
| 368:14 369:20 | 72:22 73:2 | Pierre 247:17 | 155:20 156:6,7 | 253:19 288:10 |
| 370:4 383:12 | 92:15 93:18 | pin 279:22 | 163:16 174:1,2 | portions 192:8 |
| perceived 358:9 | 95:10 98:4 | pins 230:16 | 174:18 175:2 | portrayed |
| 371:8 | 100:14 102:7 | pistol 179:3 | 181:9,21 182:1 | 370:14 371:11 |
| percent 28:20 | 104:21 105:23 | place 12:12 | 195:18 201:17 | 383:12 384:9 |
| 50:21 326:20 | 108:17 122:11 | 17:10 28:16 | 201:20 204:5 | position 26:1 |
| 328:17,18,23 | 134:11 136:8 | 49:16 77:6 | 204:11 210:21 | 128:13 162:14 |
| 329:2 | 171:17 172:22 | 104:19 127:18 | 214:23 217:8 | 258:16 379:16 |
| percentage 27:4 | 173:6 175:11 | 134:10 149:9 | 221:22 222:1 | 379:18,20 |
| 327:11,15,17 | 175:18 176:7 | 288:1 | 241:6 264:5,11 | possible 66:23 |
| 327:20,23 | 176:23 194:21 | Plaintiff(s) 1:9 | 301:16 314:5 | 131:12 132:21 |
| 328:13,20 | 197:19,23 | 6:3 | 321:22 344:19 | 146:15 172:7 |
| performed | 198:4,19 199:4 | plaintiffs 9:16 | 349:17 355:23 | 210:11 223:17 |
| 156:1,1 | 199:14,20,20 | 9:18 265:16 | 367:10 385:13 | 238:9 239:21 |
| perimeter | 199:22 200:5 | 330:20 | Points 21:16 | 249:14 277:13 |
| 115:13,19 | 230:16 241:2,3 | plan 27:12,14 | police 20:16 | 371:9 |
| 117:9,19,20 | 241:7,10 294:6 | planned 160:7 | 22:17,20 23:1 | possibly 122:6 |
| 148:18 | 294:11 308:22 | planning 263:22 | 26:14,17,23 | 171:20 221:3 |
| period 26:16 | 309:5,17 310:3 | 315:11 | 28:4 29:8 30:3 | 276:23 286:22 |
| 70:13 171:7 | 320:18 347:5 | plates 215:18 | 33:5,22 38:8 | 287:6 |
| 172:2 268:4 | 349:4,14 350:2 | play 23:13,15 | 40:6,8 46:10 | potentially |
| permission | 351:7 352:5 | played 23:16,20 | 46:11 49:5 | 142:7 209:10 |
| 143:17,21 | photocopies | please 11:3 28:7 | 55:7,11 56:9 | 279:21 |
| perp 383:2 | 296:5 | 61:6,13 101:12 | 56:12,15 60:15 | poured 190:12 |

215:3,5,11
powerful 337:11
practice 138:3,3
150:4
practices 134:22
146:2 326:5
pre-date 378:11
pre-planned
166:13
prepare 11:21
present 7:3
52:16 163:20
175:9 269:12
269:23 277:20
278:8 313:20
314:6
presentation
269:6 278:6,18
278:20,23
303:6,15
presented
269:17,22
270:17 277:17
277:18,19
278:4 302:17
302:20 303:17
306:23 313:19
330:16 331:13
333:17,19
preserve 58:17
press 315:18
323:18
pressure 325:17
376:23 377:1
379:4
pretext 108:17
pretextual 198:8
198:13 199:6,7
pretty 25:6
35:12 74:17
131:6 149:2,3
154:22 155:3
158:20 206:17
207:20 213:11
239:14 248:14
286:4,9 313:14

313:21 322:5
325:15 386:22
prevented
124:16
previously 4:10
42:13 253:8
267:9 302:10
339:14,18,23
387:14
price 383:19
pride 382:14
primarily 384:7
primary 52:4
69:22 73:18
74:5
print 298:19
300:10 357:2
389:12
printed 353:17
printing 266:19
389:17
prior 3:6
prison 358:1
private 19:15
26:8 389:9
probable 80:6,9
105:9,16 106:1
106:5,8 108:6
135:23 136:6
probably 14:17
16:16 23:21
31:14 37:10
47:12 48:9
49:20 53:10
54:9 66:1,4
78:9 83:3,19
112:1,14
115:19 120:10
132:1 140:21
143:8 144:16
152:7 158:18
200:23 201:2
214:5,5,9
218:20 220:21
245:13 249:22
250:3 252:9

256:10 268:2
271:7 273:8
275:14 306:15
307:7 322:6
327:14 328:16
332:21 337:22
345:20 351:13
363:16
probation 15:18
problem 82:23
83:6 168:12
problems
380:19
procedural
55:13
procedure 8:7
44:4 56:5,17
procedures
42:11,23 43:9
44:17,22 55:9
56:3 62:5
proceed 257:5
329:21
proceedings
8:16 392:5,11
process 10:20
39:12 135:20
139:17 225:12
325:10
processing
139:20 140:5
159:3
Proctor 331:20
332:7
produced 30:22
167:20 225:1
265:15 352:19
377:20 378:6
384:18
product 58:3
production
255:2 384:17
professional
370:10
professionally
75:21

program 27:11
prominent
67:18
promise 11:4
274:13
promotion
345:15,18
properties 18:2
property 262:14
263:9,13,19
303:7
prosecute
325:22
prosecuting
62:11 63:5
210:15
prosecution
303:18 325:19
371:10
Prosecutor's
62:13 63:8
protect 29:4
protecting 212:4
213:1 232:8
protocol 203:10
337:13
protocols 55:7
56:6
prove 330:20,21
provided 168:1
254:13 308:22
providing
371:21
public 2:7 8:3
56:13 371:1
375:15 379:12
public's 381:11
publication
57:12 60:2
62:11 369:15
373:5 376:6
381:21
published 62:13
63:7 332:10
333:16 337:20
337:23 338:3,5

338:8,22 341:7
346:12,18
347:5 350:9
385:3
pull 225:16
304:13
pulled 110:9
112:18 121:19
121:20 226:5
280:13
pure 70:3
purpose 252:1
269:2 275:22
pursuant 8:6
push 228:15
put 28:22 31:9
31:17 52:14
62:9 72:7
79:20,21 116:9
120:11 139:20
179:4,8 201:19
212:5 226:18
228:14,14
252:8 267:1,21
268:19 269:3,9
269:19 270:10
277:1,11
279:22 282:9
293:20 294:5,9
296:8 298:7,16
304:11 367:18
383:19
puts 268:16
337:16
putting 53:15
266:20 268:12
270:10 279:20
281:19 282:3
313:17

---

## Q

question 11:18
18:5 28:21
31:3 61:17
69:18 79:10
82:23 91:15,16

Adam Jones                                              12/7/2020

Page 421

91:18 97:21
98:2,13,14
100:5 101:4,11
101:20 104:9
107:6 109:9
110:19 138:1
141:10 164:7
164:13,14,18
166:12 176:19
178:17 179:18
179:19 185:12
192:6 193:1,8
193:13,17
197:1 208:9
227:5 228:1,5
228:8,10
234:11,12
237:12 243:4
259:23 274:13
287:4 288:6,15
317:17 320:14
321:11 326:10
327:7,19
330:17 352:22
**questioned**
29:12 152:14
167:7 324:21
370:22
**questioning**
55:4 57:9
76:13 77:4
124:7 125:12
140:10 144:22
165:6 230:5
253:4 331:2
**questions** 3:1,2
10:21 40:17
66:16 83:17
87:14 101:8
104:6,7 115:1
116:21 126:8
127:3 147:15
147:20 148:1,2
169:13 179:21
185:11 195:11
225:21,22

229:17 230:8
246:18 255:16
270:6 274:15
296:12 315:14
317:17 318:5
319:20,21
320:1 322:10
322:13,16
329:7 330:12
330:14 331:9
331:10 367:3
367:11 391:9
392:6
**quick** 82:18
225:5 248:14
325:6,7
**quicker** 121:9
**quickly** 10:23
11:3 200:7
261:14 324:17
**quite** 31:4 42:21
148:9 168:18
204:19

---

**R**

**R** 6:1
**racking** 235:5
**radical** 348:23
370:4
**radio** 68:9,13
187:17
**radios** 121:15
131:4
**raise** 331:19
341:17
**rang** 126:15
**ranged** 32:21
**rape** 33:4,9
34:20 35:13
37:16 39:10
48:6 51:4,4,11
55:20 94:10
95:4,12 96:5
97:2,19 99:3
99:21 105:7
106:12,16,19

121:3 123:9
135:7 163:9
222:2 223:10
236:10 237:9
238:8 240:13
270:17,21
272:6 274:4,5
280:21 281:1
**raped** 137:14
176:5,11
192:16 193:23
194:19 289:17
**rapes** 174:23
177:10
**rapport** 143:7
231:9
**RCTA** 64:23
**re-marry** 26:21
**reach** 19:3,4
343:22 344:10
345:4
**reached** 108:21
108:22 109:1,5
109:11 233:16
343:18 346:13
346:14,19
**reaching** 343:11
**react** 386:22
**reaction** 261:12
324:2,8 333:12
386:17,18
387:2 388:20
**read** 12:10
43:20,23 44:7
44:7,11 62:10
62:19 74:17
83:15,20
100:23 101:8
103:12 123:17
193:20 198:14
205:7,21
206:15 212:3
222:18,20
230:1,8,9
231:16 233:7,9
233:14,20

253:20 258:7
278:2 288:1,9
288:11 295:4
313:5 332:13
332:15,18
333:5,9,11
338:3 359:17
372:5 388:18
389:3
**reading** 1:22
2:16 213:2
272:13,18
373:14,16
374:3 375:22
375:23 376:1
388:21 389:1
**reads** 257:12
**ready** 276:17
**real** 348:8
357:18 387:2
**realize** 324:22
370:17,18
**realized** 36:8
372:14
**really** 14:14
23:6 26:2 37:8
52:1 57:15
60:18 64:13
72:23 73:8,23
78:2 86:4,6,7,8
86:19,22 87:3
88:20 107:18
140:4 141:12
155:10,18
169:21 170:20
172:19 208:5
236:3 262:14
341:8,13
350:18 378:13
382:6 386:18
**reason** 90:11,14
90:17 155:12
174:17 196:16
197:9 198:7
199:7,9 211:19
226:14 228:2,3

229:15 231:7
239:2,4 241:12
319:9 320:11
340:9 342:1,23
345:14 355:13
366:20 367:19
378:13
**reasonable**
142:12
**reasoning** 60:9
225:23 226:10
229:9,20 230:6
**reasons** 199:6
**Rebecca** 249:16
**receive** 254:20
321:15
**received** 65:23
70:15 289:12
298:12 323:4
**receiving** 265:22
**recess** 63:20
169:3 261:19
330:5,6 390:6
**recipients**
318:11
**recognize** 67:7
349:7
**recognized**
67:19 68:2
342:10
**recollection**
10:20 186:22
**recommends**
61:23
**reconcile** 107:16
**record** 8:20 9:5
30:19,21 61:7
61:12,14 63:19
63:22 80:23
81:23 83:10
167:15,19
169:2,5 211:1
224:14,19
253:1,6,12
261:18,21
265:14 267:5

Adam Jones                                                12/7/2020

267:13 279:4,9
279:12,13,15
279:16 302:8
307:17,22
317:10 321:5
329:18 330:4,8
339:16,22
352:17 377:22
378:4 385:17
387:12,18
388:23 390:3,5
390:8 391:18
**recorded** 80:20
115:10 166:5
284:12
**recorder** 81:1
**recording** 81:3
82:5
**records** 5:23
225:17 292:18
351:7 357:1
377:20 378:5,8
378:22
**redacted** 283:19
283:21
**reduced** 392:7
**refer** 301:16
**reference** 284:9
298:11 310:1
**referenced** 4:11
42:14 253:9
267:10 302:11
339:19 387:15
**referencing** 87:7
257:23
**referred** 256:6
312:19 322:4,8
**referring** 164:19
230:11 232:19
236:15 257:19
335:15
**reflux** 376:12
377:2
**refresh** 10:19
74:21 83:23
186:21 321:23

323:5
**refusal** 325:21
**regards** 10:14
**regional** 64:23
65:2
**register** 89:22
**regular** 71:6,11
378:16
**regularly**
325:23 326:11
**rehash** 368:19
**related** 90:2
255:3,5 267:15
269:11 313:18
328:14 370:11
376:9 380:22
386:23
**relates** 287:18
287:20
**relating** 2:20
130:16 131:18
132:2,4,7
**relation** 32:2
**relationship**
365:17
**relationships**
28:9 368:12,15
**relative** 260:8
277:22
**relatively**
112:18
**release** 290:21
291:4,6,12,20
**relevant** 235:19
235:21 295:17
310:18 330:17
331:7
**remember**
10:13 19:1,9
31:12,13,16,22
33:7 34:18,20
34:23 36:11
40:3,23 44:5
47:20 49:1,6
49:10,11,12,13
50:15,19,22,23
51:3,7 54:2
57:16 58:20

59:18,19 64:13
68:7,14,17,21
70:16,17,18,20
71:8,20 72:11
74:12,16 75:9
75:18 76:7,20
78:11,20 79:2
79:7,11,12,13
79:15,18,22,23
85:7 88:1 91:7
93:23 105:20
110:15 111:8
111:13,18,21
112:8,13
113:13,17
114:7,19 115:6
115:18 116:23
117:1,3,10
124:18 125:21
130:16 131:18
132:2,4,7
133:5 137:18
137:20,20,22
139:14 140:8,9
140:13 142:12
148:5,23
149:13,22
152:4,18,22
153:2,20
154:19,20
156:11 158:17
160:3,4,5,6
164:15 165:22
169:21 170:2,3
170:9,23 172:1
172:19 175:19
175:21,22
176:1,13 177:5
177:9,13,21
178:3,5,7,10
178:20 180:14
180:23 181:3
181:15,18
182:14 183:11
186:5,7,12
187:7,10

188:12,13,17
188:19,20
192:7,15
193:15 196:1,8
196:9 200:9,10
200:21 201:8
201:18,21
202:3,4,5,7,8
203:22 204:2,4
204:14,15
205:9,17,19,22
206:4,23
207:22 208:7
208:13,17
209:13,14,19
214:16 215:17
216:17 217:16
217:20,22
218:1,3,5,10
218:11,14,17
218:18 219:1,3
219:17 223:22
229:4 232:23
239:11 241:4
241:13 243:7
243:12,19,21
246:4,9,12
249:21 250:9
250:11 251:22
251:23 254:17
258:3,3,4
261:11 262:10
263:13,20,21
264:4,17
265:22,23
266:2,4,18,21
266:23 271:5
271:17 272:3
274:2 276:21
281:13,18,20
282:2,3,4,5
285:10 301:13
308:4,5,10,12
308:19 310:14
310:14,16,17
311:2,4,10,11

311:13,17,18
311:19,20,21
312:3,12,15,17
312:18 314:2
314:10 315:4,7
315:17,19,20
315:22 316:4
316:10,13,14
319:22 320:19
322:6 323:16
323:23 324:9
324:10 338:6
338:12,16,23
339:2,3,8,8
340:7,12,14,18
341:2,14,19
343:16 346:5
348:1 350:11
357:7 359:19
362:15 363:9
364:11 374:21
374:22 375:2,5
375:10 380:6
381:8 385:1
386:9,12,13,15
387:5 389:1,11
**remembered**
114:21 179:1
194:7 382:21
**remembering**
87:20 236:16
**remind** 340:23
**repeat** 192:23
193:9,11,12
**repeatedly**
86:13 285:3
**rephrase** 198:16
**report** 4:18
32:17 33:1,10
41:8,10 61:15
80:17,19 91:2
97:7 207:10
273:13 274:17
274:18 276:11
279:1 283:10
284:3 288:16

Adam Jones                                                    12/7/2020

Page 423

290:6,8 291:23
292:4,10 293:2
298:19 300:13
300:17 303:4
304:21,22
305:2,12 306:7
306:14 370:9
**reported** 70:5
326:20
**reporter** 1:20
2:7 8:2 9:5,22
79:4 193:18,20
198:11 288:11
316:19 364:17
**reporting** 2:9
8:9 98:11,16
98:17 216:4,4
305:17 328:7
**reports** 5:4 33:9
39:5
**represent** 10:7
20:2 82:1
292:7
**representatives**
388:5
**represented**
19:12,19,21,22
282:22 290:12
**representing**
262:2 289:13
**represents**
392:10
**reputation**
336:12
**request** 40:10
297:22
**requested** 120:7
193:19 288:10
**require** 122:22
**required** 43:20
257:4
**requires** 123:9
**research** 62:14
63:8 330:23
332:3
**residence**

109:22 114:15
115:14 118:11
120:9 121:13
131:8 180:17
209:8 284:15
**resist** 123:3
237:18,21
285:17
**resistance** 94:12
96:9 122:23
123:9 238:15
272:9,15,19,21
273:2,7 284:19
**resisted** 96:15
237:17 324:19
325:9
**resolved** 18:18
**respect** 224:3
**respected** 29:7
**respective** 2:4
**respond** 58:1
219:18 230:2
284:8 329:6,9
**responded** 69:6
69:9
**responding** 48:5
55:17 66:20
318:6 319:20
320:3 322:19
363:11 364:13
**responds** 92:6
92:16 170:10
172:17 178:22
**response** 54:1
119:9 319:16
326:9
**responses** 318:7
**responsibilities**
25:11 32:12
39:1
**responsible**
52:17
**responsive**
236:19
**rest** 245:11
349:10

**result** 25:12
57:17,18 60:1
344:4 346:21
347:2 368:12
376:5 379:9
381:12,21
**resulting** 51:1
260:17
**results** 88:9
392:16
**résumé** 31:1,8
31:21 35:1
45:6 64:15
**retire** 379:15
**retired** 14:21,23
15:3 53:7
306:13
**return** 330:6
**returned** 133:18
138:8 152:6
260:4
**review** 12:4
43:18 200:16
201:3,6 390:15
**reviewed** 256:3
309:4,16 310:2
**reviewing** 276:2
**revisit** 332:6
**revoke** 144:4,8
144:23 147:21
**revoked** 144:2
**rich** 336:7
337:11
**ride** 36:23,23
**riding** 36:5
**right** 15:22
19:23 22:3
24:2 25:9,10
27:2 30:6
36:15 37:19
41:7 42:3
44:19 45:9,20
51:20 53:19
63:17 67:21
73:11 74:23
75:5 77:5,11

78:4 80:21
81:7 84:17
87:8 89:20
90:21 91:12,15
92:11,21 93:9
93:12,17,17,18
93:20 94:1,4,5
95:20,23 100:9
106:2,5 107:12
108:7,12,15,23
109:3,7,14
112:12,14
117:2,5 119:1
119:19 122:17
123:7 124:20
124:21 125:5,6
125:8 126:1,3
126:5,23
127:16 128:3
128:12,14,14
128:17 129:1,3
129:7,20,23
130:5,6,7,18
131:20,23
132:18 133:18
134:6,7,8,16
136:11 137:4
137:16 139:1
142:5 143:19
144:9,12,21
145:1,4,8
147:2,7,16,19
147:22 150:2
151:6 152:11
153:11 154:2,5
156:18,19
157:5 159:7
161:11 165:4
169:15 172:11
173:13,16,17
173:18 174:2,5
174:7,10,11,15
174:17,19
175:7 176:8,17
178:14 179:13
181:8,12 182:7

183:19 185:3
187:20 189:8
189:11,13
190:16 192:21
194:1,2 196:19
199:14 201:5
202:10,12,15
202:18 206:9
206:12,12,18
207:20 211:8
212:12,13
213:12,18,23
214:21 215:7
215:12 216:7
216:10,11,13
216:19,23
217:2,6,10
219:6 221:8,11
222:6,15,19,19
222:22 223:7
228:21,23
229:3,22 230:1
230:10 233:1,4
233:7,11,17,21
234:3 236:2,13
238:18 242:16
242:19 244:6
245:1 248:16
248:17 249:3
249:11,13
250:22 251:5
251:11,18
259:1,4,10
261:9,10 262:4
269:10 286:14
287:19 288:20
289:14 291:1,2
291:17,19
293:3 294:3,15
295:4,5 298:14
304:4 309:21
309:22 315:23
316:3 319:2,7
319:8 324:16
329:17 334:7,8
334:11 335:2,6

335:7,11,12
344:1 345:6,7
345:19 346:16
346:17,21,22
347:4,19 351:2
355:15,18
356:11 358:5,8
365:1 368:9
376:1 378:22
379:3 381:23
384:11 387:22
389:5,22 391:3
391:16
**rights** 120:8
121:10 124:6
160:18 212:4
213:2 221:7
230:9,10 232:9
232:9 258:7
268:18
**ring** 113:16
**Ritchey** 6:5,8
9:17,17
**road** 16:15
17:10 129:16
142:7 170:4
179:5 180:8,18
249:3 305:22
306:1
**roads** 67:15
**robberies** 35:8
39:10
**Robert** 41:13
318:15,16
319:1
**Rogers** 71:13
72:18 199:23
200:1
**role** 379:22
**roll** 354:12
355:20 356:13
361:16 363:14
**rolls** 225:16
**Rondini** 4:14,19
5:11,13 10:15
18:11,16 32:8

57:1 65:11,17
76:3,10,14
82:6 84:1
86:13 98:7,21
99:5 107:13
109:20 111:5
111:15,20
122:9 152:13
153:7 169:9
181:11 186:1
202:17,22
204:6,7,11,13
206:16 208:21
208:23 209:5
219:23 222:7
222:11 223:5
223:21 224:3
225:7 247:8
248:22 249:17
250:7,15 251:2
251:11 252:5
252:17 253:15
254:15 258:17
263:8 267:16
287:21 289:17
290:9,23
294:15 298:12
303:6,23
306:18 308:1
310:19 312:4
315:12 321:10
332:10 335:22
369:5 372:6
385:3 386:4,8
386:23 387:21
**Rondini's**
108:23 214:2
253:17 254:7
254:13 294:11
301:5 308:22
309:5,17 310:3
**Rondinis** 167:23
262:2,17,23
264:13,18
266:10 312:1
**room** 75:11,13

75:16 76:17
78:18 85:20
86:1,2 98:19
149:1,4 154:9
156:14 172:18
180:4,6,12
182:4,8 183:15
184:15,17,22
186:11 187:19
204:16,17,22
205:2,4 220:10
228:20 229:8
234:3
**rooms** 182:5
**route** 171:19
263:23 290:2
**routes** 24:21
**rules** 2:19 8:6
56:6

---

## S

**S** 2:1 6:1 67:11
67:13
**s/** 392:19
**Safe** 59:9,11
**safety** 24:11,16
356:5,6
**saith** 391:21
**salary** 26:16,23
27:1
**sale** 29:21,22,23
**Samantha** 14:1
**Sammie** 170:1
248:5
**SANE** 58:9,12
58:18 59:1,2
59:10
**sat** 85:20,23
153:6 182:19
183:3 223:16
**saving** 357:7
**saw** 118:21
154:8 177:23
181:23 255:2
270:18 348:5
364:3

**saying** 11:16
29:21 50:3
68:20,21 73:21
82:13 95:1
96:4,23 97:12
97:15 98:23
99:1 100:19,20
100:20 101:14
102:4 105:2,5
117:8 128:6,19
130:16 132:13
132:23 143:18
153:2 155:15
159:14 160:6
162:9,15,18,20
163:14 164:2
165:1,2,23
166:6 173:21
175:6 178:9
183:17 190:11
192:4,17 193:4
193:15 195:20
206:23 208:17
210:20 211:15
212:19 227:2
227:23 236:18
238:9,23
241:13 259:9
262:1 263:5,17
271:15,18
281:15 282:22
285:15 286:9
287:13 289:13
322:1 334:10
337:8 338:13
343:11,21
346:9 355:19
355:21 358:5
358:18 366:18
367:12 387:4
**says** 35:1 45:7
46:2,12 47:3
48:5 85:19,23
90:14 91:8,22
93:7 94:16
96:18 103:7,16

104:1 105:21
107:3 120:1
141:16 157:16
163:20 172:22
172:23 188:3,7
188:13,18
189:2 207:18
226:11 230:2
232:12,17
236:17,21
237:18 239:12
239:19 240:15
240:16,18
254:3 256:22
258:20 259:20
261:4 266:9
269:16 270:7
274:11,15
280:11 281:4
290:13 292:23
305:16 308:21
309:3 325:16
326:18 340:3
384:19
**scared** 227:6
**scene** 32:16
66:18 75:15
127:19 128:21
132:17 133:15
134:16 138:4
138:16 139:15
140:12 152:16
180:14 187:15
210:14 256:12
275:3 297:21
**scenes** 39:12
**schedule** 146:5,6
161:23 163:18
**scheduled** 73:17
**schedules** 161:7
**school** 17:2 22:2
23:17 40:4
44:1 45:8,11
48:4,8 53:4,5
53:10,13,18
54:14 355:5,6

schools 39:21,23
40:14 41:1
47:3,9,10,11
47:16 64:2,3
64:10,12,20,21
65:5,7
Scotch 6:5 9:17
11:14 82:19
330:1 332:3
Scott 261:22
264:19 295:10
295:13
Scotty 199:22
200:1
scoured 241:8
screen 5:20
89:15,18 352:4
357:5
scroll 201:12
se 181:4
search 106:8,14
108:14 120:12
120:16,18
121:8 122:6,14
125:17 127:8
127:10,21
128:8,11,22
129:15,18
131:14 135:14
135:21 136:7
136:16,19
137:4 138:6
139:8,10,16,18
141:18 142:3
142:17 143:13
143:15,18,22
143:22 144:16
145:3,11,12,14
147:22 150:16
150:17,20,22
151:3,7,9
201:16 297:1,4
297:6,13
searchable
201:10,11,13
201:14

searched 144:11
145:8
searches 201:19
searching
142:20 159:2
second 29:17
38:8 42:9 47:2
47:7 50:8
55:20 86:20
99:8 191:5
219:6 224:10
225:6,9 255:16
255:17 265:7
274:21,23
279:4 280:7
288:20 297:17
302:4 303:8
308:20,21
342:13,16
seconds 169:11
see 34:10 43:12
43:15 46:4
48:4,6 67:15
76:5 77:22
81:11 85:17,21
86:10,19 87:1
87:1 90:12
91:9 92:8,16
118:1,4,19
120:11 129:17
131:8 148:3,20
157:19 169:17
170:5,12
172:21 173:3
173:14 174:21
179:10 186:19
188:14,21
189:4 190:22
214:16 215:6,8
215:10 234:22
237:2 240:22
254:15 256:7
256:17 257:6
258:8,14
259:17 260:12
260:21 261:6

266:11 270:7,8
270:18 273:19
275:18 280:6,9
280:22 281:6
282:11,16
283:2,11,20
284:5,20
290:16 294:4
294:12 295:7
296:5 297:9,15
298:8 303:2,10
305:14 308:22
309:8 310:7
316:22 318:10
318:11 319:5
321:14,18
322:10,12
324:17,23
326:7 337:21
340:2 354:4,8
356:15 368:16
371:7 388:9
seeing 153:17
216:13 245:3
301:1 310:15
370:1
seek 330:21
345:23
seeking 206:11
388:3
seen 31:5 37:13
43:9 61:18
62:7 154:1
169:10 207:9
244:22 255:12
255:14 267:18
298:15 317:18
317:19,20,21
318:1 320:8,15
321:12 353:20
359:10 364:9
selfies 310:11
sellouts 333:23
334:6
Selma 46:3
semester 45:16

45:17
semesters 45:14
seminar 48:10
49:3
seminars 47:16
47:18
send 266:5
269:5
sending 176:4
176:15 265:23
senior 38:18
40:11
sense 152:5
389:17
sent 46:19,20
53:3 82:14
255:9,10 266:3
296:1 298:11
304:23 310:2
323:6,9 326:15
340:10
sentence 97:7
257:11 309:2
sentences 85:19
sentiment
226:13
separate 20:4
56:19,21 292:7
292:9,14,15
separated
365:14,22
368:18
separately 110:5
110:12
September 17:7
17:18
sequence 178:5
sergeant 41:12
72:3 260:7
276:22,22
307:7 318:20
319:2 345:20
345:22 346:1
sergeant's 277:2
277:3 346:2
sergeants 206:4

serious 35:11
213:11 313:14
seriously 104:14
serve 29:4
service 32:13
session 46:17
set 26:16
seven 169:16
seventh 289:7
sex 34:21 86:3,9
92:2 93:5
94:14,18,23
95:7,16 96:17
96:19 98:18
101:15,23
102:10,18,20
103:8 104:1,16
106:21,23
107:14,19
108:7 109:7,13
122:11 134:13
156:1,2,3,6
162:19 191:22
192:21 194:6
197:15 230:17
230:18 238:3
284:16,17
287:8,10,14
327:4,9,12
328:1,14,20,21
sexual 5:3 34:8
48:5 50:9 53:1
53:5,18,22
54:8,10 55:10
56:6 57:2 58:7
58:11,16 59:15
61:15,23 62:12
63:6 66:23
70:11,14 74:14
92:23 93:4
94:8,20 96:1
96:19 99:14
109:3 115:5
122:21 123:8
123:10,11,16
124:11,16

146:2 155:14
156:9 166:16
194:8 208:11
208:12 223:13
223:18 233:17
235:19 244:11
270:23 271:4,8
271:8,10 272:2
272:5 273:17
273:22 274:3,5
274:7 277:23
280:14 281:1,5
284:9 288:3
313:16,18
326:5,12,20
327:18,20
370:9
**sexually** 65:12
65:18 96:12
97:11 98:8,21
99:6,10,13
100:9,19,21
136:15 137:3
173:20 207:19
221:22 222:7
222:12 238:23
258:12,17,22
259:1,5
**shake** 11:10
**Shannon** 247:19
**share** 111:15
354:6,18,21
355:22 360:1
368:1
**shared** 354:11
355:3 359:1,3
360:3,6,15,18
362:2,4,9
363:3,6,7,21
365:7
**sharing** 354:9
354:14 355:14
364:7
**sheet** 130:10
274:16,17,18
**Shelton** 45:16

**sheriff** 19:20
57:22 133:6
246:14 247:2
318:15 345:19
369:11 388:8
**sheriff's** 19:20
19:21 20:6,20
82:5 166:8
200:3 213:21
214:8 245:7
303:3 334:2
371:5,7 388:7
**shifty** 33:19
**shock** 321:20
**shoot** 82:17
**shooting** 32:22
39:10,11
**shootings** 52:8
**short** 66:15
254:8
**Shorthand** 2:7
8:2
**shortly** 25:9
**shorts** 154:15
179:4
**shot** 357:5
**shots** 5:20
**shoulders** 92:6
**shove** 92:3 94:16
**show** 38:12 82:8
130:13 158:2
163:6 166:17
209:22 252:12
320:22 322:22
339:13 352:2,3
352:6,8 387:10
**showed** 56:3
138:11 284:18
336:4 364:10
**showing** 31:19
32:1 290:1,11
336:5
**shut** 174:9
**sick** 356:1
**side** 167:9
169:17 180:8

180:18 249:2
304:17
**sidewalk** 186:18
188:2
**sign** 27:14 43:22
136:7 141:18
199:21 243:16
244:8,9 297:22
308:9
**signaling** 91:11
**signature** 2:15
308:6
**signed** 141:16
141:17,22
143:19 150:19
151:9 199:12
294:14 297:1,6
297:11,13,17
298:2 308:18
392:17
**significant** 90:1
207:20
**signing** 1:22
144:2 308:4,12
**signs** 142:14
**simple** 31:4
**sink** 215:16
**sir** 188:18
**sister** 356:16
**sister's** 361:7
**sisters** 15:5
**sit** 104:15
117:11 162:14
182:15,18,23
240:1,2 245:19
271:22 284:22
306:22 309:15
345:3 366:2
**sitting** 81:7
179:1 182:3
375:8,22
**situation** 146:11
186:10 279:21
**six** 15:3 295:8
**sixth** 284:2
289:5

**skeptical** 107:10
**slamming** 165:3
**slanted** 336:11
**Slayton** 366:12
367:22
**sleep** 374:6
377:5,10
380:19
**sleeping** 374:1
377:7
**slept** 154:7
**slight** 53:14
**slots** 40:7
**slow** 11:4 109:9
126:8 204:21
**small** 14:16
17:12 300:10
371:4
**Smith** 1:11 9:10
9:11,11
**smoke** 24:18
**snap** 118:21
**Snapchat** 310:2
310:9
**so-called** 260:9
**social** 12:23
358:21 365:17
373:13
**socialize** 72:20
**socially** 73:4
**Sodomy** 274:2
**softball** 23:20,20
**somebody** 48:10
67:10 132:16
138:12,16
139:15 143:12
161:10 182:23
190:20 194:6
217:9 220:5
256:14 311:1
315:21 338:2
348:16 350:3
353:12 359:1,2
363:8 365:7
370:7
**somebody's**

101:1 383:23
**someone's** 89:4
**son** 16:10
356:16 373:15
384:7
**son's** 361:7
365:4,11
**soon** 146:6
379:13
**SOP** 4:16
**sorry** 17:7 20:10
21:18 30:2,11
35:15,20 36:13
38:15 41:20
59:2 62:23
64:6 65:14
66:6 69:8 72:2
79:4 85:3
89:17 111:10
124:22 125:2
130:2,3 132:17
144:8 146:13
157:5,7 158:13
159:19 166:18
185:9 191:6,7
193:2,10,12
198:11 199:18
216:4 221:6
237:10,11
251:1 263:14
263:18 264:7
264:21 265:22
279:6 281:14
295:8 296:19
299:15 304:7,8
305:1 312:4
320:9 324:14
343:17 345:22
347:17 348:10
352:3 356:3
358:18 360:5
362:21 364:17
372:12 377:13
388:21
**sort** 52:19
194:16 201:11

Adam Jones                                    12/7/2020

Page 427

337:3 365:13
365:14 366:2,4
368:17 373:9
374:16 382:11
**sound** 47:6
51:20 112:12
152:11 190:20
193:3 216:23
**sounds** 74:23
130:6 142:12
217:2
**south** 65:1
**southern** 68:9
85:12 165:1
**spaces** 25:14
**span** 65:5
**speak** 11:23
76:2 131:3,16
131:19 132:3
132:11 133:3,6
151:16,22
194:14,17
203:19,23
204:5,12 251:2
251:7 254:5,6
254:10 263:7
297:20 320:17
330:23 338:20
356:20 365:15
381:23
**speaker** 64:7
68:9
**speakers** 40:5
**speaking** 113:13
132:4 204:14
205:13 211:16
280:19 305:4
321:19 338:23
339:2,3
**special** 33:22
34:2,7,8,17,22
36:2,12 54:16
54:18 80:14
92:20 270:8,10
303:12 326:21
327:3,5,9,17

327:21 328:1
328:12,14,21
**specialized**
58:14,17
**specific** 34:5
40:21 74:1
83:17 124:18
218:15 232:19
246:18 253:18
316:14 318:4
338:16 340:13
340:15 341:14
**specifically**
13:21 33:8
34:19 36:11
58:6 67:8
152:19 250:10
301:13 347:11
374:22 390:10
**specifics** 54:2
333:21 361:5
386:13,16
**speculate** 103:4
103:5
**speculated**
211:17
**speculating**
362:14
**speed** 198:3
318:2 354:19
358:21
**spelling** 276:13
**Spence** 318:15
318:16
**spend** 54:8
349:9
**spending** 344:23
**spin** 337:16
**split** 72:9 141:11
**spoiler** 204:9
307:15
**spoke** 11:22
69:6,9 76:3,10
76:12 132:8
138:14 158:20
247:10,12,15

247:17,19,21
247:23 248:3,5
251:5,10
321:21
**spoken** 12:14
110:20,23
111:3,5,12
158:15 181:2
219:4 223:4
356:17 361:11
367:21
**sports** 23:13
**spot** 273:1
**spray** 25:15
**spread** 354:17
**St** 247:17
**stability** 146:4
**stacked** 118:4
153:18
**stacking** 157:8
**stages** 325:19
**stairs** 150:2
**stand** 28:19,19
**standard** 27:8
42:23 43:8
44:17,22 55:8
56:2,4 62:5
110:8 337:13
**standards** 42:11
46:7
**standing** 54:4
124:7 332:1
384:3
**start** 78:16,23
142:20 151:5
172:13 186:14
234:21 259:12
350:20 377:3
391:11
**started** 25:5
45:15,18 72:12
76:13 77:12
78:11,13,19
114:13 115:7,9
115:12 138:11
153:5 164:15

236:19 377:7
377:10
**starts** 77:11 84:9
86:18,22 90:11
255:19 257:9
258:6 259:13
280:8 293:9
321:19 324:16
388:1
**state** 2:8 8:4
15:18 45:16
64:17 67:17
94:9 122:22
194:14,17
334:17,19
392:2,22
**state-based** 26:9
**stated** 259:14
284:16
**statement** 46:13
75:12 78:22
87:18 95:16
102:15 105:13
105:15 121:2
135:6,9 140:11
140:16,19
153:15 155:23
162:12 163:19
165:11,19
166:3,5 171:2
190:11 194:15
197:14 215:2
216:2 232:17
232:20 233:9
233:14,20
236:5,16
237:16 256:14
256:16 268:17
284:12 293:6
293:18 294:18
320:3 348:3
367:4
**statements**
102:9 107:17
114:8,20,23
221:23 225:19

256:4 257:13
257:14,18
258:2 268:14
**states** 1:1 8:22
325:7
**station** 152:3
161:14 162:22
163:7 216:19
216:22
**stats** 328:5,8
**statute** 106:16
106:19 123:15
272:13,17
**stay** 124:4 141:1
142:7 147:14
149:16
**stayed** 239:20
374:15
**stenotype** 392:6
**step** 113:7
**Stephanie** 385:9
385:10,14
**stepped** 186:7,9
**stepping** 186:3
**steps** 383:5
**Stewart** 167:18
**STIPULATED**
2:2,14,21
**stipulation** 8:8
**stipulations**
9:23
**stole** 210:20,22
234:6,13
242:19
**stolen** 211:8
**stood** 284:11
**stop** 127:3
144:22 236:22
284:18,23
285:5,15,21
286:6 287:1,2
287:8,10,14
374:5
**stopped** 122:2
188:8
**stops** 244:4

Adam Jones                                                12/7/2020

Page 428

**story** 22:1 93:14
120:23 153:22
315:15 316:12
321:10 324:5
354:21 358:17
358:19
**straight** 131:13
**strategies** 5:5
61:16,22 62:3
**strategy** 16:18
**street** 6:22 76:21
186:17 188:1
**stress** 240:5
380:20,21
**strict** 24:1
**strike** 110:18
**string** 317:23
**strongly** 386:22
**stuff** 107:15
170:21 219:14
225:13 231:5
234:8 275:9
304:2 329:21
369:22 373:17
389:20
**subject** 257:15
280:17 284:14
321:9 341:18
391:6
**submit** 299:4
306:16
**subpoena**
283:17 290:22
291:15
**subpoenaed**
10:13 290:15
290:20 384:23
386:5
**substance** 12:21
115:4
**substantially**
330:20
**substantively**
329:7
**sued** 18:9 20:23
**suffer** 384:9

**suffered** 376:5
379:9 381:21
**suggest** 78:1,4
242:10
**suggested** 90:6
**suicide** 312:19
366:20 367:19
370:13 372:4
372:17 374:20
388:4
**suit** 18:14 82:4
167:22 264:6
**Suite** 2:10 8:11
**summarize**
318:3
**summary** 310:6
**sun** 112:13
**Sunday** 14:17
**sunny** 35:20
**super** 296:16
**superior** 318:21
**supervision**
392:9
**supervisor** 36:1
36:11 41:18,22
55:21 73:23
80:19 182:22
203:14 204:23
205:10,20,22
206:21 208:19
220:15 243:16
255:10 276:1,7
304:23 306:15
322:8 328:6
346:7 371:14
**supervisors** 72:6
182:17 204:15
206:1 243:10
246:21 276:10
322:4 323:13
329:13 340:16
346:9
**supplement**
377:4
**support** 343:19
343:23

**supposed** 29:4
44:21 52:19
248:18
**sure** 19:9 24:16
24:22 34:18
40:15 42:1,21
51:12,16 57:20
58:22 59:11
60:4,23 82:21
86:19,22 87:3
89:21,21
101:20 104:13
123:17 126:10
132:1 149:2,3
150:3 158:18
158:20 161:4
165:21 166:2
169:9 173:1
180:13 205:18
238:19 239:14
241:22 244:18
245:11 251:16
268:8 271:7,21
276:3,10,12,16
279:10 286:4
286:10 287:3,5
295:14 300:20
311:15 351:12
353:11,14
355:12 364:1
**surprise** 299:11
**surprised**
215:20 216:13
**surroundings**
369:22
**surveillance**
65:7 250:5
**Susan** 360:12
**suspect** 66:18
67:1,4 70:8
80:8 134:9
140:23 141:2
141:10 173:12
175:6,14,16
177:7 280:13
284:17 303:17

383:4
**suspect's** 136:18
136:19 137:5
137:17
**suspects** 39:14
116:4 143:8
150:5 167:6
**suspicious** 116:2
116:12,16,17
116:19 120:3
174:18
**swear** 9:6 380:2
**sweet** 66:15 84:9
84:14 86:14
87:8,8 90:15
90:16 188:9
**swing** 131:11
**switch** 71:23
**switching** 40:18
**sworn** 9:20
**symptoms**
376:13
**synonym** 47:15
**synopsis** 254:14
254:21,22
256:15 275:18
275:23 278:2
280:3 283:6,8
288:2 292:23
293:9,17,20
**system** 68:10
268:16 304:9
304:12,14
380:6

─────────
**T**
─────────
**T** 2:1,1 6:20
9:12 30:8,21
42:4 61:3
65:13,19 67:7
67:11,13 81:20
82:1 83:9 84:9
84:14 90:16,17
90:21 102:11
105:10 106:2
122:8 124:17

131:23 158:1
170:17 173:5
186:15 187:22
188:9 189:8
213:23 224:7
245:10,22
249:3,20
252:11 265:4
267:2 287:1,8
287:21 289:18
290:10 297:2,6
299:3,20
300:11 301:22
307:11 317:1
320:21 337:17
339:12 352:7
377:18 386:6
387:9 388:9
**T's** 86:14 87:8,8
90:16 188:9
**T-shirt** 154:15
**tag** 383:19
**take** 11:1 22:7
25:19 32:10,16
39:13 45:5
55:23 63:13,15
73:22 83:20
84:8 86:7 95:9
107:3,5 112:5
113:21 136:1,5
140:3 151:3
158:12 167:13
168:5,7,11,15
168:16 169:11
188:5 193:5
198:19 206:15
224:19 225:5
226:15 252:20
261:16 280:2
282:13 308:20
322:22,23
324:12,14
329:18 352:21
361:17 372:21
390:1,3
**taken** 2:5 12:12

Adam Jones                                                12/7/2020

Page 429

29:16 33:8
39:5 63:20
71:7 76:6 77:5
100:12 102:7
104:19 114:10
115:17 167:16
169:3 177:16
217:13 224:21
234:10 236:6
256:11 261:19
268:15 292:6
330:5 387:3,19
390:6 392:5
**takes** 93:18
105:23 140:3
189:19 230:15
230:16
**talk** 10:23 11:3
11:6 56:2
64:16 75:14
76:8 78:8
105:14 110:13
110:16 119:12
125:13 142:8
145:19 148:11
148:11 161:14
176:20 186:10
187:5,8 213:7
213:19 222:23
223:1 227:10
234:1 236:2
239:9 243:9
252:4 253:23
262:4,15 263:5
263:11 264:13
264:18 278:22
282:23 288:2
288:16,19
299:3 312:5,7
312:10,14
322:18 337:6
338:7 341:11
342:15 345:9
346:15,20
349:18 369:1,4
369:11 372:3

**talked** 12:20,22
52:23 61:21
62:16 64:15
103:15 113:5
113:12 132:13
138:17 140:13
160:19 161:9
161:10,11,12
186:15 187:22
209:12 217:8
218:9,13,17,18
222:21 236:4
293:2 297:10
305:10 341:15
360:9,21
361:19 369:13
**talking** 11:8,8
54:5 64:1
78:17 87:21
142:23 143:2
144:17 148:15
149:19 159:20
185:4 186:1,3
191:9 195:23
205:6 218:5,10
218:12 229:7
229:12 232:2
240:13 242:3
257:20 263:6
264:5,22
268:23 271:7
273:19 280:4
323:22 333:2
341:3 355:21
370:20 389:8
**talks** 262:21
329:11
**tape** 81:14
324:17
**tapes** 81:15
**tarnished**
382:17 384:5
**task** 20:12,15
**taxi** 159:4
**Taylor** 385:9,10

385:14,19
**teachers** 40:6
**team** 23:22 74:1
74:2 141:7,8
159:5
**teams** 74:3
**technical** 211:1
**technician** 15:1
24:12
**techniques** 54:2
**telephone** 66:12
67:20 162:18
251:20
**tell** 11:4 18:12
24:13 52:3
55:13 59:5
67:12 74:18
94:6 95:7
101:6 112:9
115:3 120:4
121:17 125:19
128:2,7 135:17
137:12 151:12
157:13,20
159:19 161:20
162:4 168:10
170:10 173:16
177:2 178:23
190:17 196:20
197:22 198:4
206:20 208:4
210:21 211:2
211:20 214:3
217:18 219:8
226:22,23
227:3 228:11
228:16 229:18
230:4 231:5,10
233:23 236:12
240:9 241:5
242:4 246:22
249:13 252:18
263:16 271:12
281:23 286:11
286:19 300:6
311:9 322:21

336:18 349:4
353:9 369:20
371:15 374:4
375:12,14
380:14,16,18
381:3,10,15
382:4 386:10
**telling** 68:7,14
68:18 95:5,21
98:10 104:3
117:22 154:20
156:8 170:15
177:19 191:8
191:13 192:2
192:11 197:8
205:15 206:7
241:2 244:1
263:21 285:20
286:1,6 364:12
375:9 376:15
378:20 386:20
387:1
**tells** 56:12
133:14 315:21
325:17
**ten** 51:10,14,17
78:9 86:1 97:4
112:2 176:4
177:10 183:12
194:5 214:9
260:5
**ten-minute** 97:4
168:11 329:19
**tend** 10:23
**tenth** 292:2
**term** 23:19
71:20 244:5
259:5 326:22
**terms** 337:7
**terrible** 314:16
**Terry** 267:16
308:1 310:19
**test** 77:22 90:7
346:2
**testified** 9:21
68:15 126:13

177:14 207:2
241:6 327:8
390:11 391:2
**testify** 283:14
**testifying**
335:20
**testimony** 1:15
98:20 104:14
162:23 185:18
279:19 284:22
286:21 287:5
331:16 346:11
**tests** 47:20 48:2
77:17
**Texas** 388:4
**text** 176:3,16
244:20 245:3
298:11 300:10
300:14 333:20
334:23 335:1,4
389:9
**texted** 299:22
**texting** 173:1,2
173:18 174:22
176:10 177:3,7
**texts** 173:22
**thank** 9:22 65:9
**thankful** 26:1
**thanks** 30:13
321:19
**theft** 196:14,21
197:3,7 210:5
211:6,12,14,21
234:1 235:21
303:7
**thefts** 35:9
**theirselves**
365:15
**theme** 164:22
**thereto** 3:6
392:7
**thick** 377:21
**thing** 24:3 46:23
55:11 56:14,16
57:15 125:16
154:23 155:3

Adam Jones                                                        12/7/2020

173:11 184:20
210:3 211:4
212:19 239:16
245:8 253:21
260:18 262:13
268:11 282:8
282:12 286:21
296:14 316:13
336:19 338:15
**things** 34:9 37:7
103:2 154:1
165:3 191:12
201:20 210:9
210:20,22
230:7,10,13,15
232:16 241:21
242:19 260:4,7
264:14 287:15
304:17 308:9
329:3,5 341:4
355:2 358:6
373:7 383:18
386:23 388:19
**think** 11:1 18:4
19:8 30:14
33:18 37:11,12
38:8 41:14
47:6 48:10
53:14,17 60:18
60:20 66:4,21
67:15 68:19
76:12 81:8
87:11,17 88:8
88:22 90:3,5
96:14 97:10
98:11,21 99:22
100:6 103:23
103:23 105:23
106:10 112:18
114:8 118:20
119:6 121:16
122:13 123:22
124:1 127:11
129:11,21
134:23 135:15
135:19 140:11

142:22 148:21
149:13,19
152:8 155:21
167:12 168:23
170:18,19
171:22 179:14
179:15 183:10
188:3 191:12
191:13 192:3
195:19 196:10
196:21 197:2
202:1 209:2
210:17 211:5
213:10 220:22
236:3,13,14
241:11,19,20
241:21 242:6
248:13 250:16
252:2,20
262:21 263:19
265:1,2 277:13
284:14 302:3
306:12 314:7
321:21 330:17
333:18 347:11
350:19 351:12
354:23 361:3
362:12 365:2
366:12,21
368:10 369:9
370:6 374:1
384:1,10
386:11 389:16
390:11
**thinking** 68:22
101:13 142:13
178:20 189:21
248:23 311:15
332:23 360:18
373:17
**thinks** 360:16
368:21
**third** 86:18,23
232:12 257:12
280:7 288:22
298:1 309:23

324:16
**Thomas** 303:20
**Thompson** 6:20
9:12,13 10:2
30:12 42:8,17
43:3 82:10
158:3 198:13
224:9 265:6
300:1,6,23
302:3 307:13
391:13
**thought** 100:8
157:11 171:4
190:18,22
196:19 204:17
205:6,21
208:21 238:7
240:16 260:5
264:21 273:18
285:3,9 300:15
314:15 343:2
344:3 345:5,11
346:16,20
379:22 380:10
381:3
**thoughts** 172:4
314:10 335:19
336:1
**threat** 358:10
359:13
**threaten** 356:6
**threatening**
262:23 348:2
358:6
**threats** 356:8,10
357:1,4,9,11
357:16,17,20
358:5 359:2,15
**three** 75:4 85:18
86:21 208:3
257:13,18,22
258:2 276:9
283:19 294:20
295:8,9,12
350:10 380:12
**throw** 189:3,11

**thrown** 142:6
**tickets** 37:3,4,5
212:12
**tied** 184:18
**time** 3:4,5 9:3
10:16 11:15,15
14:14 23:9
25:23 26:10,16
28:12 40:17,20
41:2,15 44:6
44:10,14 54:7
65:10,15 68:5
68:11 70:13,18
70:21 71:21
74:9,12,14
75:10 76:16
77:13 78:21
83:20 90:5,20
98:13 99:8
108:6 112:7,19
120:9,10
123:23 130:10
131:3 132:7,14
133:21 138:7
140:6,7 141:19
143:9 144:3
145:5,13 148:3
148:5 149:20
151:10,20
152:4,13 160:3
162:1 164:14
167:10,12
168:21 170:18
170:19 171:8
172:2 177:15
177:20 183:19
184:19 186:5,7
189:6,14 192:8
192:15 200:11
206:5 208:2,2
216:6,12
217:14 219:6
220:2,19
223:21 248:22
251:4,6 254:8
262:12,21,22

263:14 268:4
277:14,15
280:1 287:4
298:16 301:3
307:9 311:16
313:3 321:15
322:22 332:9
332:18 338:18
338:21 344:23
346:3,6 350:1
350:2 352:11
368:16,17
370:17 373:8
390:1 392:12
**time-wise** 112:4
**timeframe**
49:17 159:2
**timeline** 4:14
130:12 252:13
252:17 253:14
253:19 301:4
**times** 130:9
167:5 183:2,14
208:3,3 244:17
332:15,17,22
333:5,8
**timing** 60:7
148:9
**timing-wise**
60:5
**Title** 223:23
238:20 239:1
272:12 274:10
**TJ** 172:14
**today** 11:21 12:5
35:21 331:9
**Today's** 9:2
**told** 43:18 68:5
68:16 70:9
84:17,20 85:7
85:11 86:13
91:21,22 92:10
93:8,20 99:2
101:3 102:4,18
103:7 104:22
106:22 107:13

Adam Jones                                                12/7/2020

| | | | |
|---|---|---|---|
| 119:15 121:1 | 97:23 102:6 | 54:18,21 55:3 | 388:13 |
| 125:21 127:9 | 150:2 265:20 | 57:2 58:6,17 | **trick** 209:20 |
| 131:6 134:12 | 266:8 318:10 | 60:22,23 64:16 | **tried** 171:16 |
| 154:23 155:3 | 379:20 | 64:19 65:2,8 | 180:13 228:14 |
| 156:12 166:10 | **topics** 48:15 | 272:7 326:1,12 | 237:22 239:22 |
| 177:16 178:4 | 63:15 | 326:13,17 | 285:19 |
| 178:10 180:17 | **torso** 294:3 | **trainings** 326:2 | **trip** 160:7 |
| 181:9,13,16,18 | **total** 257:3 | **transcribed** | 166:14 |
| 183:21 184:2 | **totality** 103:20 | 82:7 167:18 | **trips** 378:9 |
| 184:16 186:22 | **totally** 263:15 | 224:23 | **trouble** 126:7 |
| 187:2,4 196:3 | 276:17 331:9 | **transcript** 5:10 | 235:13 |
| 198:18 206:21 | **touch** 53:5 | 5:12 30:18 | **true** 207:6 |
| 207:22 208:13 | 145:17 225:14 | 42:16 61:11 | 330:21 337:5 |
| 208:20 210:5 | 236:19 | 83:1,14 158:11 | 354:23,23 |
| 210:13 211:4,5 | **touched** 53:18 | 167:16 169:8 | 360:14,16,18 |
| 211:13 212:7 | 53:21 | 169:14 198:3 | 361:3 392:10 |
| 212:11 217:10 | **tough** 24:3 | 209:23 224:18 | **truly** 367:7 |
| 219:10,15,19 | **Towles** 247:19 | 224:21 225:3,6 | **trust** 29:3,15,18 |
| 220:14,16,17 | **town** 17:12 | 225:11 228:23 | 371:1 375:12 |
| 227:11 229:2 | 159:14,18,23 | 237:20 253:11 | 375:15 379:13 |
| 231:7,18 | 160:2,7 163:14 | 265:13 267:12 | 381:11 |
| 232:13 236:8 | 165:16 166:11 | 302:13 307:21 | **truth** 107:5 |
| 239:19 240:20 | 166:14,18 | 317:9 321:4 | 120:4 220:8 |
| 247:3 248:7 | 167:6 336:8 | 339:21 352:16 | **truthful** 199:2 |
| 256:3 257:1,12 | **TOWNSEND** | 378:3 387:17 | **try** 11:5,6 25:17 |
| 259:20,21 | 6:7 | 392:7,8,10 | 120:10 121:23 |
| 260:14 263:3 | **toxicology** 88:9 | **transcription** | 127:8,21 |
| 284:13,18,23 | 89:15,18 | 5:7 82:8 | 131:11,14 |
| 285:2,7,8,9,14 | 195:10,15 | **transcripts** | 135:14 138:5 |
| 285:17 286:3 | **TPD** 284:8 | 12:11 241:8,16 | 143:12 150:5 |
| 286:23 287:1,9 | **traffic** 36:14 | **transfer** 38:2,6 | 157:18 168:23 |
| 290:13 294:2 | 37:2,15,18 | **transferred** 35:3 | 171:13,18 |
| 299:18 304:18 | 39:19 40:18,19 | 36:14 37:21 | 198:4 199:9 |
| 311:1,5,11,19 | 41:4 50:1 | **transition** 41:6 | 213:3 219:14 |
| 311:20,20 | 380:3 | **trash** 118:3 | 271:22 282:10 |
| 315:3 326:19 | **tragedy** 314:16 | 153:18 157:8 | 325:10 366:23 |
| 338:2,5 353:4 | **tragic** 389:14 | 157:17,18 | 377:4 |
| 364:8 367:20 | **train** 72:8 | **trauma-based** | **trying** 28:15 |
| 370:18 372:7 | **trained** 58:14 | 55:3 57:8 | 33:17 48:19 |
| 372:19 375:3 | 272:4 273:1 | **travel** 49:2 | 75:11 80:2,5 |
| **tomorrow** 354:1 | **training** 36:6 | **treatment** 80:4 | 81:9 97:16 |
| 391:12,13 | 39:18 40:20 | **Tremaine** 6:15 | 107:16 121:7 |
| **tone** 144:19 | 46:8,9,20,21 | 9:9 | 123:23 124:1 |
| **top** 31:2 47:3 | 46:22 47:11,11 | **tremendous** | 143:3 145:17 |
| 82:9 92:7 | 47:14,18 48:11 | 341:2 | 145:21 146:14 |
| 93:22 95:18 | 48:14 52:23 | **trial** 3:4 388:2 | 146:18 147:1 |
| | | | 147:16 149:20 |
| | | | 160:11,14 |
| | | | 163:17 195:6 |
| | | | 209:20 211:18 |
| | | | 215:10 226:20 |
| | | | 236:9,12 |
| | | | 239:16 269:8 |
| | | | 348:19 365:2 |
| | | | 367:8 373:19 |
| | | | 377:9 |
| | | | **turn** 28:10 55:22 |
| | | | 130:22 169:15 |
| | | | 172:12 178:18 |
| | | | 186:13 188:6 |
| | | | 234:20 253:21 |
| | | | 283:16 294:13 |
| | | | 297:11 309:23 |
| | | | **turned** 121:18 |
| | | | 237:22 255:7 |
| | | | 285:19 |
| | | | **turns** 170:9 |
| | | | **Tuscaloosa** 2:9 |
| | | | 2:10,11 4:17 |
| | | | 6:10 8:10,16 |
| | | | 8:12 13:16,17 |
| | | | 13:22 15:9 |
| | | | 17:3,16 19:13 |
| | | | 20:7,16,20 |
| | | | 21:17,18 26:8 |
| | | | 26:17,23 30:3 |
| | | | 33:21 37:22 |
| | | | 40:8 43:7 45:8 |
| | | | 55:7 56:15 |
| | | | 58:19 59:3,21 |
| | | | 62:4 64:8 |
| | | | 67:16 69:13 |
| | | | 82:4 107:2 |
| | | | 136:3 161:8 |
| | | | 163:5 166:15 |
| | | | 185:2 213:20 |
| | | | 213:22 274:16 |
| | | | 275:17 303:3 |
| | | | 326:21 340:19 |
| | | | 342:3,19 343:1 |
| | | | 343:5,18,21 |
| | | | 345:11 346:13 |

Adam Jones                                                    12/7/2020

Page 432

348:16 379:17
382:13 385:2
385:20 386:1,8
387:20 388:7,8
392:3
**twice** 47:8
**Twitter** 13:5
**two** 16:8 20:4
64:12 85:18
86:21 96:11
111:6 126:14
208:3 281:1
287:15 292:22
294:20 295:7
310:13 319:12
332:23 333:2,4
333:6,7 350:10
371:12,16
376:23 385:23
**two-man** 74:3
**two-minute**
63:13,15
**type** 33:3,4
34:20 37:16
48:10 52:15
68:10 122:6
125:16 131:14
135:22 139:8,9
325:23 326:2
326:11 353:13
**typically** 322:2
380:8

**U**

**U** 2:1
**Uh-huh** 91:10
92:9,17 198:23
**ultimately** 139:9
258:11,21
262:6 374:6
380:12
**unable** 192:15
**uncle** 382:10
**uncommon**
162:1
**undergo** 99:20

325:23 326:11
**undergone** 53:1
**underneath**
358:22 359:2
**understaffed**
255:22
**understand**
18:20,22 40:16
58:13 119:10
119:14 143:20
148:9,16
152:20 190:5
190:16,16
191:10 204:20
205:12 258:11
258:21 264:2
272:20 281:14
287:3 289:21
330:22 346:11
372:2 384:21
**understanding**
67:17 126:7
272:9 277:11
285:6,14 291:3
306:17 379:19
388:15 390:16
390:20 391:2
**unfortunately**
275:13
**unhappy** 154:17
242:11
**uniform** 291:23
305:11
**unintentional**
263:15
**unit** 20:9,10,11
37:23 39:2,2
39:20 40:19
41:5,9,11,19
43:8 44:18,19
51:9 52:9
55:15 57:12,16
59:20 62:4
107:2 159:9
165:18 184:18
185:6,17

213:21 274:16
275:18 293:6
306:8 340:20
342:20 343:2
346:19 347:1
351:11
**United** 1:1 8:22
**university** 6:9
15:2 21:22
24:7 27:1
45:15,19,19
54:19 64:17
69:15,20
186:16 188:1
245:16 388:6
**unknown**
348:14 349:1
352:2,4 370:3
**unlawful** 303:8
**unpack** 138:19
342:13
**unpolitical**
382:23
**unusual** 77:7
141:1,3,12
282:8,12
**updates** 139:22
140:2
**upset** 78:19
79:16 155:9
366:21
**upsetting**
386:21
**upstairs** 148:17
149:2,3,7
173:19 239:20
**urine** 89:22
195:15
**use** 33:22 89:18
116:8 121:16
146:11 259:5
260:17 268:16
273:9 334:7,8
**usual** 9:23 138:2
138:3 150:4
**usually** 66:14

74:1,3 77:9,10
77:19 138:4
141:7 161:20
278:3 279:1
328:5 341:4
353:9

**V**

**vaguely** 386:9
**vain** 382:23
**varies** 136:22
**various** 32:20
34:9 65:7
209:8 250:5
329:2,4
**vary** 137:8,10
**Vegas** 260:8
**vehicle** 209:7
303:9
**vehicles** 142:15
**version** 82:11
283:23 317:21
**versus** 308:1
**vested** 26:6
**veteran** 36:7
**victim** 66:17,22
67:1,4 69:7,10
70:8,19 75:12
119:23 122:1
124:2 131:13
136:14 141:10
145:18 146:15
184:21 208:11
221:8,10,16
267:16 275:2
280:13,16
282:22 284:12
284:13,16
289:14 291:1,2
292:23 293:10
342:15 349:21
350:15 375:11
375:12
**victim's** 146:3
**victims** 39:14
58:7,16 59:16

77:18 146:3
208:13 221:6
325:18 342:8
370:23 371:2,9
371:12 380:1,8
**video** 1:15 2:4
5:10,12 8:20
39:13 132:23
140:4 167:16
188:11 225:3
248:13,15
256:4
**videographer**
7:5 8:19 63:18
63:21 169:1,4
252:23 253:5
261:17,20
279:11,14
330:3,7 390:4
390:7 391:17
**videos** 225:13
226:4 245:12
280:12
**videotapes**
241:8,16
**view** 200:19
**viewed** 298:18
342:20
**vinegar** 164:21
232:3
**violent** 20:9,11
35:11 39:2,11
43:8 44:18
62:4 150:5
162:3,6 165:18
**visit** 151:8
**voicemail**
349:20,22
**volume** 390:22
**volunteered**
178:13 179:12
179:19,23
**vs** 1:10

**W**

**W** 1:21 2:6 8:1

Adam Jones                                                    12/7/2020

**Waid** 253:13
  369:2,5
**wait** 161:7 249:7
  252:14 349:19
**waited** 114:3
  147:8 179:5
**waiting** 86:5
  113:23 122:4
  313:19
**waived** 1:23
  2:17
**waiver** 294:14
**walk** 114:14
  117:19,20
  214:16 243:14
  244:11 311:7
  383:4
**walked** 76:13
  113:11 151:1
  199:11 228:20
  229:8,11
  232:21 234:3
  249:9 366:22
**walking** 115:7
  115:12,19
  117:8 118:15
  148:18 172:15
  186:16 187:23
**walks** 207:18
  383:2
**wallet** 217:13
  229:3 230:21
  234:9
**want** 27:10
  28:22 40:15
  42:18,19 84:7
  92:2 95:7
  106:23 117:20
  122:10 150:1
  150:10 152:20
  162:18 168:4
  168:19 171:6
  173:16,21
  176:3 198:4
  205:18 232:15
  236:2 239:13

239:14,18
  240:4,8,21
  241:20 244:2,5
  248:11,12
  255:15 268:7
  268:20 270:5
  282:13,23
  285:9 286:5
  298:9 314:23
  329:6,20 331:9
  335:21,23
  342:11 350:15
  351:1 358:15
  363:5 368:18
  368:19 371:18
  372:16 375:4
  382:2 383:20
  384:4,7,8
**wanted** 38:12
  93:8,8 100:14
  102:5 104:22
  117:23 118:4
  134:12 136:16
  144:21 155:12
  159:15 180:8
  197:23 198:19
  229:14 231:4,8
  231:19 236:18
  237:21 239:23
  241:22 251:13
  252:2 253:21
  253:23 257:10
  262:11 285:4
  285:18 287:7,9
  353:11 363:15
  382:15
**wanting** 125:13
  142:8 144:19
  150:7 358:1
**wants** 86:3
  105:22 261:4
  285:21
**warrant** 106:9
  106:14 108:11
  108:14 120:12
  120:16,18

121:8 122:6,14
  125:17 127:8
  127:10,22
  128:8,11,23
  129:15,18
  131:14 135:14
  135:21 136:7
  136:16,20
  137:5 138:6
  139:8,10,18
  145:11,12
  146:13 155:20
  160:13 165:9
  303:16
**warranted** 34:6
**warrantless**
  303:5,14
**warrants** 150:17
  380:2
**wasn't** 38:11
  45:23 46:22
  68:10 78:21
  84:21 87:4,5
  88:12 100:20
  102:3 107:15
  107:20 124:22
  129:19 142:23
  144:15 156:18
  190:2 191:11
  196:21 197:3
  210:5 211:14
  212:4 213:8
  220:3 222:4
  236:22 238:10
  238:11 240:18
  241:2 248:15
  251:16 262:15
  263:2,3,5
  288:14 291:14
  299:14,17,18
  302:22 303:1
  309:20 313:22
  320:11,13
  347:18 351:18
  368:15 375:23
  376:14

**watch** 183:1
  184:8,16,17
  203:7 369:21
**watched** 183:5
  184:23 202:22
**watching** 181:23
  182:6,6,11
  183:14,23
  184:13,15
  205:4
**Watson** 384:15
  384:18
**way** 10:20 18:5
  29:19 58:13
  68:8 86:9
  87:19 107:11
  119:20 121:9
  137:9 141:13
  142:13 143:10
  175:5 177:9
  235:12 240:6
  252:4 287:6
  309:10 324:10
  329:14 331:18
  334:3 336:10
  336:20 337:12
  344:16 345:6
  351:10 354:8
  357:1 358:9
  363:10 364:12
  366:4 367:14
  367:16,18
  369:16,18
  370:7,13
  371:11 373:7
  373:20 377:9
  383:11 384:5,9
  386:19 389:4
  389:14
**ways** 285:10
  373:3
**we'll** 83:2
  268:19 283:23
  298:8 301:3
  329:22 331:20
  332:6

**we're** 15:15
  30:14 57:23
  58:1,2 63:21
  82:7,22 104:5
  120:10 121:4,7
  121:11 123:23
  125:12 129:11
  131:7 146:14
  146:21 149:21
  160:13,14
  163:15,17
  164:2 169:1,4
  191:9 195:6
  225:15,17
  232:14 237:14
  237:15 252:23
  261:17,20
  279:11,14,22
  296:23 326:15
  330:3,7 371:4
  390:4,7
**we've** 63:13
  120:11 121:12
  147:23 175:4
  252:19 265:16
  297:8,10
  301:10 317:13
  322:7 341:15
  367:23 368:1
  369:13
**wear** 81:2
**wearing** 76:18
  76:20 154:14
**web** 384:18
**week** 40:4 54:15
  64:9 68:15
  73:14,17 201:1
  378:6
**week-long** 64:9
**weekend** 299:22
**weekends** 22:5
**weeks** 12:2
  255:23 332:20
  332:21 376:10
**welcome** 83:15
  197:11 225:5

Adam Jones                                                        12/7/2020

253:20 317:15
352:21 378:10
**went** 21:8 23:10
23:12 45:14,15
45:16 46:12
48:22 53:10
67:2 72:11
73:17 75:13
85:20,23
110:14,17
112:22 113:2
117:18,23
120:22 121:18
122:3 128:3,20
131:22 136:17
138:23 139:4
145:10,21
148:17,17
149:16 151:2
153:16 157:14
171:19 179:2
186:23 188:9
188:10 189:7
202:17 203:20
204:1 205:19
212:8 214:2,14
215:4 216:18
219:5 220:9
243:4 280:16
281:21 302:15
302:18 304:21
306:15 314:8
316:22 336:22
338:3 350:10
366:4 378:17
**weren't** 127:1
147:15 171:10
235:12 305:4
335:4,5 378:16
**Western** 1:3 9:1
**Whelpy** 247:10
**WHITE** 6:21
**whoa** 98:12,12
98:13 164:6,6
164:7,11,11,12
164:12

**wife** 12:19 21:11
21:17 26:3,20
68:5,7 312:7
353:9 354:3
363:10 364:3,8
364:12,15,21
365:4,9 376:16
**wife's** 16:1
21:15 356:16
361:6 362:2
**Wightman**
247:21
**willingly** 280:17
**Wilson** 202:21
203:2,19 204:6
204:12,23
205:11,13
208:20
**window** 117:23
118:2,13,16,19
118:21 119:1,6
119:11,15,17
119:18,23
120:22 122:9
122:12 133:13
134:14 135:6
144:18 148:10
148:13,19,22
149:5,6,10,23
153:19 156:23
157:9,13,14
162:20 174:10
**wire** 81:2
**wish** 312:2
347:17
**wished** 347:10
357:22
**withdrew**
374:16
**withholds**
389:20
**witness** 2:16
8:14 9:6 30:22
42:5 83:1
101:6 107:4
137:1 158:2

191:3 223:2
252:12 265:5
267:3,14
274:21 283:10
288:7 301:23
307:12 317:2
320:22 339:13
352:17 377:19
387:10
**witness's** 279:19
**witnesses** 39:14
248:19
**woke** 68:11,12
**woman** 49:9
65:16 96:18
105:18 115:17
134:10 137:13
174:5,23 177:8
249:15 374:17
388:4
**women** 95:22
249:12
**wonder** 191:14
**wondered** 258:1
**wondering**
191:10 199:1
367:6
**woods** 194:20
**word** 128:1
150:12 164:9
164:16 197:12
198:12 206:15
231:21 260:17
293:21 322:23
**worded** 29:20
**wording** 196:9
348:2
**words** 11:10
32:3 53:16
96:1 99:13
103:10,12,13
103:17 106:17
115:3 186:3,8
226:17,18
227:4 228:12
229:18 287:9

300:14 328:22
334:7,9 337:15
355:4
**work** 14:19 20:4
24:6,7,10
26:11 27:9,10
27:17 28:18,19
28:20 33:5
58:3 60:5
72:21 159:8
271:16 311:6
337:2 341:3,11
341:17,22
346:8,10 351:1
369:19 370:10
371:18 373:20
376:21
**worked** 20:6
21:21 25:2
30:1 52:4
71:14,21 75:23
271:16 371:7
377:6 382:12
**working** 24:17
24:18 27:7
28:9 35:14
70:22 72:12
74:3 158:19,23
159:12,22
218:7 237:14
237:15 241:3
260:20 273:11
349:21 350:14
350:15
**works** 10:20
15:17 20:5
77:9 344:6
376:16 385:20
**WorkSouth** 2:9
8:10
**world** 25:8
**worried** 324:7
336:6 370:11
372:3 374:8,9
374:23
**worry** 159:21

**worse** 261:3
**wouldn't** 181:7
181:11 194:3
220:20,21
248:11,12
249:6 274:1
312:2 314:23
319:11 331:15
349:7 367:18
375:7 389:20
**wrapping** 226:7
**Wright** 6:15 9:9
**write** 30:10 37:5
275:20 295:1
357:2 386:4
**writing** 11:2
37:2,3 80:17
266:21,22
334:18
**written** 232:20
256:13 294:18
324:5 356:12
385:6,7 387:6
**wrong** 53:15
68:19,20 129:6
129:10 196:11
258:20 269:18
**wrongful** 18:14
82:3 167:22
225:2
**wrote** 80:19
232:18 254:22
266:16,23
375:7 389:6

| X |
|---|

**X** 4:1
**x-ray** 15:1
**XY** 367:12

| Y |
|---|

**y'all** 90:16
172:15 188:8
343:12 349:9
349:11
**Yankees** 24:2

Adam Jones                                                          12/7/2020

**yards** 16:16
**yeah** 30:12 42:8
  54:12 81:12
  82:16 91:16
  117:3 124:10
  156:20,21
  158:3 168:6,22
  220:1,19
  222:20 224:9
  258:4 281:18
  297:5 300:3
  307:13 314:19
  320:16 329:4
  333:8 356:8
  372:11
**year** 23:12 30:2
  31:13 38:8
  47:13 52:2,2,6
  52:6 71:22
  271:16
**yearly** 379:2
**years** 14:13 15:3
  16:5 17:8,23
  23:21 27:7,18
  27:19 31:14
  37:19 38:14,16
  49:19,21 50:4
  235:3 260:19
  344:20 373:16
  380:12 382:21
**York** 6:18,18
  26:13 35:21
  56:9 331:17
**you-all** 85:6
  94:7 115:4,16
  116:2 144:11
  151:10 159:19
  160:9 199:13
  209:4 210:6
  211:6 214:12
  245:2 263:11
**young** 16:6
  37:10 388:4
**younger** 36:3
  249:17

---
**Z**

**Z** 367:13
**zoom** 1:15 2:4
  6:6,12 33:14
  46:16 53:15

---
**0**

**0187** 4:20
**0193-0204** 5:18
**0434-0441** 5:22
**0452-0453** 5:2
**07/17/2021**
  392:23

---
**1**

**1** 43:9 170:8
**1-23** 4:15
**1:58** 216:22
**10** 4:4 170:7,8
  176:10 177:3
  186:14 206:11
  206:14 253:2
**10:04** 63:19
**10:18** 63:22
**100** 28:20
**10020-1104** 6:18
**105** 42:22
**106** 302:1,5
**106-148** 4:19
**107** 46:3
**11** 43:9 130:1
  148:7 159:20
  188:7
**11:25** 129:22
  152:10 153:7
  158:15
**11:40** 129:23
**11:58** 168:4
**11th** 292:2 293:3
**12** 172:12 217:3
  222:15 373:16
**12:01** 169:2
**12:53** 169:5
**1251** 6:16
**13** 223:23
  224:23 238:20

---
239:1 272:12
  274:10
  ■■■■ 17:10
**13th** 167:19
  292:21
**14** 38:16 237:10
  237:11,11
**1409** 2:10 6:9
**148** 302:5
**1490** 8:11
**15** 4:14 15:15
  17:8 23:21
  78:9 86:1
  129:20 130:7
  130:18 131:17
  133:4 168:8
  169:16,19
  174:14 252:13
  252:14 253:9
  311:17 344:20
**15-minute**
  214:10
**158** 5:10
**16** 4:16 42:6,14
  43:1,7 270:2
  311:17
**1630** 320:23
**17** 4:17 16:11,21
  308:2 316:12
  387:15
**18** 4:18 51:9
  189:1 260:19
  302:1,11 303:2
**187** 339:15,23
**19** 265:19
**193** 317:4,14
**1940s** 382:9
**1977** 13:14
**1982** 14:12
**1995** 45:8
**1999** 30:4 35:2
  46:2
**1st** 13:14 66:3

---
**2**

**2** 4:13 225:10

---
267:5,10
  274:12 310:4
**2:11** 253:1
**2:12** 253:6
**2:19** 261:18
**2:34** 261:21
**2:53** 279:12
**2:58** 279:15
**20** 51:18,20
  112:6 235:3
  253:21 382:21
**20-year** 25:21
  26:4,10 38:15
  379:14
**200** 2:11 8:11
**2005** 17:7,18
  35:3
**2007** 46:12
**2009** 36:14
**2013** 38:21
**2014** 36:13
  37:21 38:3,4
  43:14
**2015** 41:10 50:8
  51:8 52:22
  53:11 54:17,22
  55:2,6 56:23
  58:18 72:14,17
  95:6,22 167:17
  185:7,16
  222:10 224:22
  253:22 265:19
  271:20 284:6
  310:4
**2017** 167:19
  224:23 317:12
  321:9 378:11
  378:12,18
  387:20
**2019** 308:2
**2020** 1:18 2:12
  8:14 9:3 25:4
  392:17
**204** 317:4
**20TH** 6:22
**21** 16:10 258:6

---
**21st** 6:17 30:4
**22** 16:5 234:20
**224** 5:12,14
  265:17
**23** 237:11
  252:16,16
**24** 42:11,18,21
  42:22 178:19
**24-105** 4:16
**24-hour** 70:1
**25** 4:20 27:7,9
  239:12 339:14
  339:19 340:1
**25-year** 27:13
**253** 4:14
**26** 5:1 30:14,16
  45:6 240:12
**265** 5:14
**267** 4:13
**27** 5:3 61:5,9,14
**27th** 387:20
**28** 5:7 83:12
  253:22
**29** 5:10 158:6,9
  167:14 169:7
**2nd** 66:5,6
  163:12 165:7
  165:10,14
  166:9 167:17
  185:7,16
  202:14 213:8
  213:23 218:4
  224:22 271:20
  284:6

---
**3**

**3** 5:9
**3:00** 66:1,1
**3:08** 317:12
**3:30** 66:2,7
  67:20 70:6,10
  74:7,8 85:7
**3:54** 330:4
**30** 5:1,12 147:8
  151:3 168:13
  224:13,16

Adam Jones

12/7/2020

Page 436

| | | | | |
|---|---|---|---|---|
| 254:9 328:16 328:23 392:21 | **49th** 296:17 | **83** 5:7 | | |
| **302** 4:18 | **5** | **9** | | |
| **307** 5:15 | **5** 5:15 283:9 | **9** 234:21 | | |
| **31** 5:14 265:9,11 265:15 | **5:00** 284:7 | **9/30/2021** 392:21 | | |
| **317** 5:17 | **5:26** 390:5 | **9:00** 391:12,14 | | |
| **32** 5:15 307:19 307:22 | **5:35** 390:8 | **9:07** 1:19 2:12 8:13 9:3 | | |
| **321** 5:19 | **5:36** 391:18,21 | **9th** 317:12 | | |
| **33** 5:17 317:5,7 317:10 | **50** 14:17 50:21 | | | |
| **339** 4:20 | **503** 17:20 | | | |
| **34** 5:19 321:2 | **5th** 185:2 | | | |
| **35** 5:20 307:16 352:12,14 | **6** | | | |
| **352** 5:20 | **6** 321:9 | | | |
| **35203** 7:1 | **6:20** 112:11 | | | |
| **35401** 6:10 | **6:47** 141:17 142:15 143:19 297:2,7,11 | | | |
| **35452** 17:11 | **60** 328:18 329:1 | | | |
| **36** 5:23 378:1 | **61** 5:3 | | | |
| **37** 186:13 | **67th** 296:20 | | | |
| **378** 5:23 | **6th** 165:6,10 | | | |
| **38** 188:6 | **7** | | | |
| **387** 4:17 | **7** 1:18 2:11 8:13 172:13 392:17 | | | |
| **392** 4:5 | **7/2** 297:7 | | | |
| **3rd** 25:4 | **7:15** 142:16 | | | |
| **4** | **7:19-cv-00403...** 1:6 8:22 | | | |
| **4** 280:2 | **7:25** 130:4,17,22 133:4,12,17 | | | |
| **4:00** 74:11,13 | **7:40** 130:5,17,22 133:4,18 138:9 | | | |
| **4:10** 330:8 | **70** 328:18 329:1 329:2 | | | |
| **4:30** 74:13 75:3 | **71** 5:11 299:23 300:9 | | | |
| **40** 326:20 328:17,23 | **7th** 9:3 | | | |
| **400** 6:22 | **8** | | | |
| **42** 4:16 | **8** 5:5 178:19 292:1 | | | |
| **434** 352:9,19 | **8:15** 297:14 298:2 | | | |
| **441** 352:9,19 | **81** 5:23 | | | |
| **45-minute** 168:20 | | | | |
| **452** 31:1 | | | | |
| **453** 47:2 | | | | |
| **4552** 30:9 | | | | |
| **48** 5:13 | | | | |
| **49** 296:23 | | | | |