FILED

2021 Sep-15  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 69

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | |
|---|---|
| ADAM JONES and<br>JOSHUA HASTINGS,<br><br>    *Plaintiffs,*<br><br>v.<br><br>BUZZFEED, INC., BUZZFEED<br>NEWS, BEN SMITH, and KATIE<br>J.M. BAKER,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 7:19-CV-00403-RDP

---

**DEFENDANTS' RULE 26(a)(2) DISCLOSURES**

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Defendants BuzzFeed, Inc., Katie Baker, and Ben Smith disclose the following experts:

1. Carlton R. Hershman
   9450 Mira Mesa Blvd, Ste. C, PMB # 433
   San Diego, California 92126

Mr. Hershman's expert report containing all information required by Rule 26(a)(2) is attached hereto as Exhibit A.

2. Michael H. Mertz
   P.O. Box 4589
   Dublin, Georgia 31021

Mr. Mertz's expert report containing all information required by Rule 26(a)(2) is attached hereto as Exhibit B.

Defendants reserve the right to supplement or amend these disclosures.

/s/ Katherine M. Bolger

Katherine M. Bolger (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, New York 10020-1104
T: (212) 489-8230
F: (212) 489-8340
katebolger@dwt.com


/s/ John G. Thompson, Jr.

John G. Thompson, Jr.
Lightfoot Franklin & White LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
T: (205) 581-0700
F: (205) 581-0799
jthompson@lightfootlaw.com

## CERTIFICATE OF SERVICE

I certify that on August 19, 2020, I served the following via electronic mail

on the following:

Bobby H. Cockrell, Jr.
Jonathan D. Townsend
G. Scotch Ritchey, Jr.
Cockrell, Cockrell, Townsend & Ritchey LLP
1409 University Blvd.
Tuscaloosa, Alabama 35401
T: (205) 349-2009
F: (205) 758-3090
bcockrell@cctr.law
jtownsend@cctr.law
sritchey@cctr.law

*Counsel for Plaintiffs*

/s/ John G. Thompson, Jr.
Of Counsel

# EXHIBIT A

**Sexual Assault Investigations Training & Consulting**

Detective **Carlton R. Hershman** (Ret.)

San Diego Police Department

9450 Mira Mesa Boulevard, Suite C, PMB #433

San Diego, California, 92126

(858) 349-7908

chershman@gmail.com

**Re:**   *Jones et al. v. BuzzFeed Inc., et al.*

Case No.: 19-cv-00403-RDP (ND. Ala 2019)

I was contacted by Davis Wright Tremaine LLP (New York, New York), which represents BuzzFeed Senior National Investigative Reporter Katie J.M. Baker, BuzzFeed Editor in Chief Ben Smith, and BuzzFeed Incorporated, for expert services in the above case number.

I was asked to review the files of an investigation by the Tuscaloosa County Homicide Unit of the Tuscaloosa Sheriff's Office, number 20150702471, dated July 2, 2015. In particular, I was asked to focus on the actions of investigators Joshua Hastings, and Detective Adam Jones, who I understand to be the plaintiffs in this action, in investigating the alleged sexual assault of Megan Elizabeth Rondini ("Rondini"), who is now deceased, which occurred on July 2, 2015.

**I.   Materials Reviewed**

My opinions are based on the below-listed documents, recordings, and videos, which I have reviewed. I also relied on my training, and experience to make my opinions, and conclusions. My analysis and conclusions are based on the information available to me as of the date this report was submitted. Should additional information become available to me as this matter proceeds, I reserve the right to update my analysis and refine my opinions as appropriate.

Page **2** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

1. BuzzFeed news article dated July 3, 2017, written by Katie J.M. Baker

2. BuzzFeed news article dated July 3, 2017, written by Tyler Kingkade

3. Tuscaloosa County Homicide Unit investigation case #20150702471/Felony packet,

   which included the following documents:

   i.    Felony Report Fact Sheet, dated September 9, 2015, written by Investigator Adam
         Jones ("Jones")

   ii.   Statement of Defendant, dated July 6, 2015, signed by Jones

   iii.  Synopsis, undated, written by Jones

   iv.   Witness List, undated, unattributed

   v.    Case Report for 201502471, undated, unattributed

   vi.   Alabama Uniform Incident/Offense Report dated July 2, 2015, written by Officer
         R.B. Phillips ID #1892

   vii.  Tuscaloosa County Homicide Unit Statement of Megan Elizabeth Rondini, report
         dated July 2, 2015, written by Jones

   viii. "The Rights of a Person Being Interviewed" statement form (Admonishment of
         Megan Elizabeth Rondini) dated July 2, 2015, written by Investigator Adam Jones

   ix.   Tuscaloosa Police Department Form, Handwritten Statement of Megan Rondini,
         report dated July 2, 2015, written by Officer Phillips

   x.    Handwritten statement of Megan Elizabeth Rondini, undated, written by Rondini

   xi.   Tuscaloosa County Homicide Unit Statement of Terry Jackson Bunn JR
         ("Bunn")., report dated July 6, 2015, written by Investigator Joshua Hastings
         ("Hastings")

   xii.  Handwritten notes of Terry Jackson Bunn's statement dated July 6, 2015, written

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

by Investigator Carroll

xiii. "The Rights of a Person Being Interviewed" statement form (Admonishment of Terry Bunn) dated July 6, 2015, written by Investigator Joshua Hastings

xiv. Tuscaloosa County Homicide Unit Statement Navid Khan, report dated July 2, 2015, written by Sergeant Davis

xv. Handwritten notes of Navid Khan's statement dated July 2, 2015, written by Sergeant Davis

xvi. Tuscaloosa County Homicide Unit Statement of Jason Stephen Barksdale, report dated July 2, 2015, written by Investigator T. Carroll

xvii. Handwritten notes of Jason Barksdale's statement, dated July 2, 2015, written by T. Carroll

xviii. Tuscaloosa County Homicide Unit Statement of Ciara Younger, report dated July 2, 2015, written by Sergeant R.J. Davis

xix. Tuscaloosa Police Department Form, Handwritten Statement of Ciara Younger, report dated July 2, 2015, written by Officer Phillips

xx. Handwritten notes of Ciara Younger's statement, dated July 2, 2015, written by Sergeant R.J. Davis

xxi. Evidence List

xxii. Copy of Rondini's debit card

xxiii. Taxi receipt, dated July 2, 2015

xxiv. Address list, undated

xxv. Photo log, dated September 9, 2015

xxvi. Tuscaloosa County Homicide Unit Consent to Search form for the premises and

> vehicle located at 15070 Cedar Drive, dated July 2, 2015, written by Investigators
>
> Jones and Hastings.

xxvii.   Tuscaloosa County Homicide Unit Consent to Search form for the residence

located at 15070 Cedar Drive, dated July 2, 2015, written by Investigators Jones,

Investigator T. Caroll, and Sgt. Franks.

xxviii.   Tuscaloosa County Homicide Unit Consent to Search form for Tery Bunn Jr.'s

person, property, premises, outbuilding and vehicle located at 15070 Cedar Drive,

dated July 2, 2015, written by Investigators Jones, Investigator T. Carroll, and

Sgt. Franks.

xxix.   Tuscaloosa County Homicide Unit Consent to Search form for the residence

located at 700 15Th Street #3202, dated July 2, 2015, written by Investigator

Adam Jones

xxx.   Tuscaloosa County Homicide Unit Consent to Search form for Megan Rondini's

cell phone, dated July 2, 2015, written by Investigator Adam Jones

xxxi.   Property Release form (Ford truck keys & Assorted keys on key ring), dated July

6, 2015, written by Investigator Hastings

xxxii.   Property Release Form (States "Victim requested clothing destroyed"), dated

August 21, 2015, written by Investigator Adam Jones

xxxiii.   Driver record for Megan Rodnini, dated July 2, 2015

xxxiv.   Sexual Assault Information Form (Megan Rondini), dated July 2, 2015, written by

Examining Physician Nicholas Vetrano, MD.

xxxv.   Form documenting "Theft of Property II – Special Inquiry" describing a Ruger

handgun, undated

    xxxvi.    Person details for Jason Stephen Barksdale, undated

    xxxvii.    Handwritten list of names & phone numbers, undated, not assigned

    xxxviii.    Letter addressed to Miss Rondini on Tuscaloosa County Homicide Unit letter head, dated August 14, 2015, written by Investigator Adam Jones

    xxxix.    Alabama Uniformed Incident/Offense Report listing Megan Rondini as a suspect in a theft, dated July 2, 2015

    xl.    Images of various DVDs and/or CDs

    xli.    Letter addressed to "Dear Mr. Jones:" (Representation letter) with Scott James Meyer, JD, LL.M letterhead, undated, written by Scott James Meyer, Esq.

    xlii.    Letter addressed to "Dear Mr. Jones:" (Cooperate letter) with Scott James Meyer, JD, LL.M letter head, undated, written by Scott James Meyer, Esq.

    xliii.    Letter addressed to "Dear Mr. Jones:" (Preserve evidence letter) with Scott James Meyer, JD, LL.M letter head, undated, written by Scott James Meyer, Esq.

    xliv.    Custody Receipt list, dated August 2, 2015, signed by Investigator Adam Jones

    xlv.    Disposition Receipt list, dated August 21, 2015, signed by Investigator Adam Jones

4. Timeline of events, dated May 4, 2020, written by Detective Carlton Hershman.

5. Text messages of Ciara Younger

6. Text messages of Courtney Rentas

7. Text messages of Hannah Carter

8. Text messages of Michelle Arcia

9. Civil complaint filed by Adam Jones & Joshua Hastings, Case 7:19-cv-00403-LSC, Filed March 7, 2019

10. Deposition of Investigator Adam Jones, dated February 14, 2019

11. Deposition of Terry Jackson Bunn, Jr., dated January 16, 2019

12. Videotape of Bunn's property by Law Enforcement, dated July 2, 2015

13. Audio of Rondini during search of her apartment

14. Audio of Rondini's interview at the hospital, by Jones

15. Videotape of Ciara Younger's interview, by Sgt. Davis

16. Transcription of Jason Barksdale's interview, by Hastings, dated July 2, 2015

17. Transcription of TJ Bunn, Jr. giving verbal consent to search of his property to Hastings, dated July 2, 2015

18. Transcription of police interview of TJ Bunn, JR, by Hastings, dated July 2, 2015

19. Screenshots of Innisfree bar surveillance video, dated July 1, 2015

20. Screenshots of Houndstooth Condominium surveillance video, dated July 1 & 2, 2015

21. Excerpt of data retrieved from Megan Rondini's phone by the Tuscaloosa County Homicide Unit of the Tuscaloosa Sheriff's Office

22. Videotape of Megan Rondini's interview, Part 1, by Jones, dated July 2, 2015

23. Videotape of Megan Rondini's interview, Part 2, by Jones, dated July 2, 2015

24. Videotape of TJ Bunn JR's interview, by Hastings, dated July 6, 2015

25. Tuscaloosa News article by Stephanie Taylor, titled "Files detail investigation into Megan Rondini case"

26. Report of Plaintiffs' Expert Robert G. Pastula. \

**II.     Hourly Rate**

I am a paid expert by the law firm of Davis Wright Tremaine LLP, New York, New York, at the rate of $75.00 an hour.

### III.   Background

For 31 years, from December 1986 until April 2017, when I retired, I was a police officer

and detective with the San Diego Police Department ("SDPD").  I now own and operate a

business called "Sexual Assault Training and Consulting."  A copy of my curriculum vitae is

attached. I was a detective assigned to the SDPD Sex Crimes Unit on two different occasions.

From October 1999 to November 2005 and November 2007 to November 2010, a total of

9 ½ years, I was part of a team of detectives that investigated thousands of sex related crimes,

mainly various types of sexual assaults and rapes.  Those cases included sexual battery, child

molestation, acquaintance rape, stranger rape, rape by force or fear, rape of an intoxicated

person, unlawful sex with a minor, rape in concert (gang rape), incest, sexting, stalking, image-

based pornography sexual abuse (revenge pornography), spousal sexual assault, same-sex partner

sexual assault, sexual assault of elders and sex with animals.

I was assigned as lead investigator on over 1,300 of these types of cases.

From July 2015 to April 2017, I was assigned to the "Computer and Technology Crime

High-Tech Response Team" (C.A.T.C.H. Team), which is a San Diego County task force

investigating cybercrimes. While assigned to this team as an investigator I was assigned

approximately 200 "image-based pornography sexual abuse" cases also known as "revenge

pornography" or "nonconsensual pornography."

As a detective my duties were to interview victims, suspects and witnesses and gather

evidence, write search/arrest warrants and submit a report to my superiors, as well as the San

Diego County District Attorney.  The reports to my superiors or the district attorney either

recommended or did not recommend prosecution of a particular case.

I also testified in the San Diego Superior Court system in my cases, and as an expert in

sexual assault investigations, behavior evidence, and delayed reporting.

I am certified by the State of California Law Enforcement as a POST (Police Officers Standard & Training) criminal investigator as to sex crimes and homicides. I am a lifetime member of the California Sexual Assault Investigators Association. I have been the instructor in over 300 courses and seminars concerning the investigations of sex-related crimes. Here are some of the more significant teaching assignments I have held:

- 2001 to 2017, an instructor at the San Diego Police Regional Law Enforcement Academy, teaching classes on sex crimes investigations, victimology of sex crimes, first responders to sex crimes, crime scene investigations, cold case sexual assault investigations, California sex crimes laws, drug facilitated sexual assaults and basic interviewing and interrogations.

- February 2002 to February 2009, an instructor training sexual assault victim advocates for the Center for Community Solutions, San Diego, California.

- May 2003 to November 2010, an instructor training sexual assault victim advocates for the United States military.

- June 2003 to September 2017, an instructor training sexual assault victim advocates for the Oceanside Women's Resource Center, Oceanside.

- July 2003 to May 2014, an instructor training for Sexual Assault Examiner in training for healthcare professionals.

- 2012 to present, a member of the "End Violence Against Women" cadre of experts and instructor in training sexual assault investigations, nationwide.

- October 2018 to present, an instructor in training sexual assault investigations for the "International Association of Chiefs of Police" nationwide.

I have testified as an expert at trial or by deposition in the following actions over the past

four years:

- L.S. vs. William Ashley Oliver III – Case No. 19-CV-0746-JLS-LL

  (United States District Court, Southern District of California)

  (Deposition 02/06/2020)

- N.G. vs. County of San Diego – Case No. 37-2018-00049834-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- D.F. vs. County of San Diego – Case No. 37-2018-00016761-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- T.M. vs. County of San Diego – Case No. 37-2018-00016624-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- P.S. vs. County of San Diego – Case No. 37-2018-00016743-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- People of the State of California vs. Alfonso Hernandez Oilvares – Case No.

  M233932SC

  (Super Ct. San Diego Co.) (Trial 02/13/18)

## IV.    REBUTTAL OF OPINION BY ROBERT G. PASTULA

I have read the report by Robert G. Pastula. I disagree with his analysis, conclusions, and

opinions. I will offer opinions rebutting his testimony.

## V.    OPINION

In my expert opinion, Jones and Hastings failed to complete a thorough, accurate, factual

and detailed investigation into Rondini's allegations of sexual assault. They drew premature

conclusions from the information gathered in the early stages of their investigation and failed to make follow-up inquiries, which meant that they did not properly assess the truth of their initial conclusions by corroborating or contradicting them. As a result, they did not properly assess whether Rondini earnestly resisted Bunn and/or whether Rondini was legally incapacitated and so unable to consent to sex. We will never know the true facts of what occurred between Ms. Rondini and Mr. Bunn on July 2, 2015 because of the failure of Jones and Hastings to correctly investigate the incident.

Initially, every case, no matter what type, has the same investigative goals: identification of the suspect(s), collection of evidence, exoneration of the innocent, and discovery of the truth. Some if not all of these goals can be tough to obtain. For this reason, an investigator should be trained and competent in obtaining these goals.

An investigation is supposed to either "corroborate" or "contradict" what people say or do. Investigators obtain these two pillars of an investigation by questioning people who are involved and collection of relevant evidence of different types.

The goal is to, as much as possible, "corroborate" or "contradict" what people tell an investigator. This will point an investigator in the right direction, and will lead to new information, new leads, other victim(s), witnesses, suspects, and relevant evidence. Corroboration makes people "truth" tellers. Investigators have to find out what happened and piece it together. Investigators should not make assumptions of any kind -- they should learn and verify facts.

Sexual-based investigations have their own unique dynamics and cannot be treated like other types of investigations. The investigator should be trained in all aspects of these special dynamics or they will not be successful. In particular, law enforcement professionals face three

fundamental challenges while conducting a sexual assault investigation involving a non-stranger victim interview.

- Most victims do not "physically" resist a sexual assault.

- Most victims only report their sexual assault to law enforcement after a delay of some kind.

- Most victims provide some information in their interview that is incomplete, inconsistent, or even untrue.

These challenges are obstacles to the ultimate truth-finding goal of a sexual assault investigation. When these challenges arise during a victim interview, investigators must recognize and overcome them. Using common and well-known investigative tools and practices, investigators must continue to probe beyond these challenges, rather than simply accept witness statements at face value. When investigators fail to recognize and attempt to overcome these common obstacles, the entire investigation becomes flawed, incomplete, and fails its truth-finding mission.

This case had all three of these challenges. But Jones and Hastings did not undertake an investigation sufficient to address them because they: 1) failed to follow necessary leads, including interviewing relevant witnesses and collecting evidence; 2) failed to properly interview Rondini at the hospital; 3) failed to allow Rondini the opportunity to sleep or eat before bringing her to the police station; 4) failed to arrest Bunn and remove him from his home; 4) failed to obtain a search warrant for Bunn's home; 5) allowed Bunn to contaminate the crime scene; 6) failed to collect evidence from Bunn and from his home; 7) failed to image Bunn's phone; 8) failed to interrogate Bunn in a timely manner, instead allowing him to travel with his attorney on a fishing trip before interrogating him; 9) failed to properly interview Rondini in the police

Page **12** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

station, including failing to conduct a trauma-based interview, which made it impossible for them to understand whether Rondini either earnestly resisted Bunn or was incapacitated at the time of the alleged assault; 10) chose to Mirandize and interrogate Rondini about her alleged theft of some money from Bunn's wallet and about moving his handgun from his car to his front lawn, which improperly shifted the focus of the investigation away from the assault and made Rondini the criminal; 11) failed to properly interrogate Bunn, not only allowing him to delay the interrogation, but also aiding him in responding to questions, not cross-examining him or seeking to confirm what he said and appearing to favor him by helping him to get Rondini to not prosecute the alleged assault. As a result, their investigation was incomplete and failed to find the truth.

## THE INVESTIGATION:

### A. A TIMELINE OF THE ALLEGED ASSAULT AND THE INVESTIGATION

Below is a timeline of the alleged assault and the law enforcement investigation thereof, as reflected in the documents provided to me.

### July 1, 2015

7:25 p.m. – Surveillance video shows Bunn arriving at Innisfree Bar.

8:30 p.m. – Surveillance video shows Rondini and friends enter Innisfree Bar for trivia night. Surveillance video from the bar shows Rondini and Bunn did not interact.

11:35 p.m. – Surveillance video shows Bunn leaving Innisfree with his friend, Jason Barksdale.

11:36 p.m. – Surveillance video shows Rondini exiting Innisfree alone. Rondini told law enforcement she did not recall leaving the bar.

Page **13** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Time unknown – Bunn told investigators he and Barksdale were driving down University Boulevard and saw Rondini walking down the road. Bunn stated he offered Rondini a ride and she entered the car. Rondini told law enforcement she remembered being in Bunn's car, but did not recall how she got there.

11:47 p.m. – Surveillance video from inside Rondini's apartment complex shows Rondini, Bunn, and Barksdale entering her apartment. Bunn told investigators that Rondini prepared drinks for the group. Rondini told investigators she did not recall being in her apartment with Bunn.

## July 2, 2015

12:02 a.m. – Surveillance video from inside Rondini's apartment complex shows Rondini, Bunn, and Barksdale leaving her apartment.

12:08 a.m. – Rondini sends text messages to her friends during the time in which she must have been riding in Bunn's car.

12:23 a.m. – Rondini sends her friends videos taken inside of a room in Bunn's house that had multiple animals mounted on the wall.

Time unknown – Rondini and Bunn have sexual intercourse. Bunn told investigators this intercourse was consensual; Rondini told investigators it was not. Bunn and Rondini both told investigators that Bunn fell asleep immediately after.

1:04 a.m. – Rondini's cell phone records show that she began texting and calling friends asking for help, telling them she needed help and needed a ride. She told friends she was unable to exit Bunn's bedroom because the door was locked and she could not figure out how to unlock it. Rondini also contacted several taxi companies to try to secure a ride.

Time unknown – Rondini told investigators that she climbed out of the window of Bunn's

bedroom.  Upon jumping to the ground, she realized she did not have her keys, so she climbed

back in.  She could not find her keys in Bunn's bedroom, so she took his car keys to unlock his

car in order to search for her keys.  Rondini did not find her keys in Bunn's car, but did find

Bunn's handgun and his wallet.  Rondini told investigators she took the handgun for protection,

but dropped it after she accidentally discharged the handgun.  Rondini also told investigators that

she removed $3 from Bunn's wallet to pay for the taxi she had contacted.

2:14 a.m. – Rondini told investigators a taxi that she called arrived at Bunn's house.  After

entering the car, she realized two of her friends had arrived to pick her up.  She paid for the taxi

and got into the car driven by her friend Ciara Younger.  Rondini's friends drove her to their

apartment, and then to the hospital, DCH Regional Medical Center.

3:50 a.m. – DCH Regional Medical Center staff notified the Tuscaloosa Police Department that

Megan Rondini had reported a sexual assault.

3:55 a.m. – Officer Jordan Phillips arrives at DCH.

4:01 a.m. – DCH personnel conduct a sexual assault examination on Rondini.

5:25 a.m. –  Investigators Hastings and Jones arrive at DCH.

5:37 a.m. – Jones conducts the first interview of Rondini at DCH (the "Hospital Interview").

The Hospital Interview is recorded by audiotape.

6:45 a.m. – Jones and Hastings arrive at Bunn's residence.  They then left briefly, allowing Bunn

to be alone inside of his residence, and returned "very shortly after they left" with several other

officers.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

6:47 a.m. —Bunn signs a form consenting to search of his residence.

7:00 a.m. – Bunn calls his attorney, Jason Neff.

8:19 a.m. – Sergeant Davis conducts his interview with Navid Khan, the cab driver called by Megan Rondini.

8:29 a.m. – Officer David Griffin fills out an "Alabama Uniform Incident/Offense Report" listing Bunn as a victim of a theft and Rondini as the suspect.

8:37 a.m. – Investigator T. Carroll obtained a recorded audio statement from Bunn, at his residence.

11:25 a.m. –Jones conducts his second interview with Rondini (the "Second Interview"). There is an advocate present.

12:05 p.m. – Sergeant R.J. Davis interviewed Ciara Younger.  Younger picked up Rondini from the Bunn residence and later took her to the hospital.

12: 43 p.m. – Rondini signs a form consenting to have the data on her phone collected by the Tuscaloosa Sheriff's office.

1:15 p.m. – Rondini signs a form consenting to Jones' search of her apartment.  Rondini accompanied Jones on the search of her apartment, which was apparently conducted to verify whether Bunn and Barksdale had returned to her apartment with her the night before.

1:59 p.m. –Jones and Rondini return to the police station. Jones conducts his interrogation with Rondini (the "Interrogation").  During this interrogation, Jones reads Rondini her rights and she signs a Miranda waiver form, after which he interrogates Rondini about her alleged theft of

Bunn's property incident to her escape from his residence.

**July 6, 2015**

9:41 a.m. –Hastings interviews Bunn at the Sheriff's office. Bunn's attorney is present.

**July 28, 2015**

District Attorney Lyn Head contacts Rondini's father to let him know Megan's case did not meet the legal definition of sexual assault and would not be brought to a grand jury.

**August 14, 2015**

A letter from Investigator Jones to Rondini written on Tuscaloosa County Homicide Unit letterhead. The letter notifies Rondini her case will be closed. Also, any items belonging to her will be released. The letter states, "Any evidence pertaining to this case will be destroyed if not claimed within ten days."

**August 21, 2015**

Tuscaloosa County Homicide Unit releases Rondini's shoes to her.  She requests that her clothing be destroyed.  The release of property is videotaped.

**February 26, 2016**

Rondini dies by suicide.

**March 2016**

Sexual assault case against Bunn is presented to a grand jury, which decides not to charge him with a criminal offense.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

### B.    ANALYSIS

My review of the investigation leads me to conclude that Jones and Hastings made grave

errors at almost every step of the investigation in a way that makes it difficult to know what

actually happened to Megan Rondini.

### 1.    The Investigation Was Not Sufficiently In Depth to Reach An Accurate Conclusion

Right from the start, it is worth noting that the bulk of the investigation took place over a

13-hour period, with one additional interview of Bunn conducted several days after Rondini first

reported the alleged assault.  This is simply insufficient to conduct a rape investigation

particularly where, as here, the complaining witness reported major failures of memory.  Indeed,

when she was initially interviewed at DCH, Rondini told the officers that she did not recall the

circumstances under which she ended up in Bunn's car.  Furthermore, although Bunn had told

the officers that he, Barksdale, and Rondini had visited her apartment that evening, Rondini

repeatedly stated that she had no memory of this trip back to her apartment.  To properly

understand the full context of what had happened that evening, Jones and Hastings should have

sought to determine why Rondini had blacked out, and whether she had been drugged.  They

also should have interviewed the women she was with at the bar, and most significantly, they

should have undertaken an investigation to determine exactly how Rondini ended up walking by

herself on the edge of a busy road, and was picked up in Bunn's car. None of those things

happened.

Notably, Jones and Hastings failed to contact multiple people who they were aware had

knowledge of key events of the night:

- They did not interview any of the nine people who accompanied Rondini to Innisfree

   Bar, even though Rondini provided their names and cell phone numbers to Investigator

Page **18** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Jones.  These witnesses could have shed light on, among other things, possible reasons

that Rondini left the bar alone, why she did not leave with her friends, her quantity of

alcohol intake at the bar and degree of intoxication, whether her behavior towards the end

of the evening was unusual, whether the group knew or discussed Mr. Bunn, and why she

was walking home alone on the side of the road.

- o   Kara Whelphy

- o   Elisabeth Mapes

- o   Hannah Carter

- o   Logan St. Pierre

- o   Shannon Towles

- o   Haley Wightman

- o   Aimee Intagliata

- o   Bridgette Bernarding

- o   Sammie Auer

- Jones and Hastings did not interview Rebecca Lundgren, who accompanied Ciara
  Younger to pick Rondini up from the Bunn residence.  Lundgren was one of the first
  people to whom Rondini disclosed she had been sexually assaulted.  Rondini provided
  her name and cell phone number to Investigator Jones.

- Jones and Hastings did not interview any of the numerous people to whom Rondini sent
  digital messages over the course of the night of the alleged assault, with the exception of

Ciara Younger. In particular, Rondini was participating in several digital message exchanges during the time where she experienced memory lapses, and the other parties to these conversations could have provided valuable information to the investigators. Jones and Hastings had collected the data from Rondini's phone, and thus had ready access to the names and cell phone numbers of the parties with whom Rondini was communicating over the course of the night.

Similarly, Jones and Hastings did not collect or ensure that the following evidence was collected:

- They never collected any data from Bunn's phone, even though Rondini recounted that she remembered that Bunn was sending text messages while she was in his car. This created probable cause to collect the data from Bunn's phone.

- They did not collect the clothing that Bunn was wearing immediately before the assault, missing the chance to perform forensic analysis of this clothing.

- No photos were ever taken of the injuries to Rondini's ankle, upper thigh, or upper calf. These injuries were described in the report of the physical examination conducted at DCH. The investigators should have made sure these injuries were properly documented.

- The hospital failed to collect a blood sample from Rondini, and only collected her urine. This prevented proper testing to determine if Rondini had been exposed to any date-rape drugs. Investigator Jones also failed to take custody of the sample, thus compromising the chain of evidence.

- There is no evidence that Jones or Hastings checked the social media of any of the

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

persons involved in this case. Investigators know that social media is used to

communicate between persons who have been involved in or witnessed criminal actively.

Social media is the easiest and fastest way to obtain information. Investigators do not

need to obtain a search warrant for this type of digital evidence.

Jones and Hastings simply failed to conduct a thorough investigation.

   2.   The Hospital Interview

In addition, the investigators made significant errors in their first interview with Rondini

that set the tone for the rest of the case.  The first victim interview is one of the most important

components of a sexual assault investigation – the initial victim statement is important because it

is "pure" and has not been corrupted by others making statements or comments about what

occurred.[1]  A badly done interview can only lead to a bad outcome. Investigators often use the

interview as a scale or gauge to determine "credibility" of the person with whom they are

speaking.  If the investigator is not trained to notice and take account of the credibility

"indicators" while interviewing a sexual assault victim, they will misjudge the victim.

Any mistake made during an interview can have a disastrous effect on the victim's

cooperation. This reduces the likelihood that the case will be successfully investigated and

prosecuted. One of the primary mistakes that is often seen is treating victims not only like

potential sources of evidence, but in fact, like suspects.

The Hospital Interview occurred at 5:37 am, only about five hours after the alleged

assault.  The questioning portion of the interview was less than nine minutes long. The entire

interview was ten minutes long.  I have reviewed the audiotape and, even though this initial

---

[1] Though Rondini had spoken to Ciara Younger and Rebecca Lundgren immediately after the
alleged assault, she did not speak in detail with them.

information-gathering interview was short, there was enough relevant information to form an idea that a sexual assault investigation was necessary.  But Jones and Hastings did not properly follow up.

Initially, it is clear from the audiotape that Rondini was disheveled, disorganized, and disoriented during the interview. This is consistent with post-incident stress and trauma. Jones and Hastings should have recognized this and sent Rondini home to shower, sleep and eat.  It is a gross departure from best practices that she was not allowed to do those things.

In addition, Rondini explicitly told the officers during her first interview that she had been "held down" by Bunn as he was allegedly assaulting her.  When asked, Rondini told the investigators, Bunn's hands were on her hips and the top half of her body. But Jones and Hastings appear to not have understood the importance of that statement because the very next question from Jones was, "*Did you ever resist him? Did you swing at him?*" But if one is being held down against their will then the element of resisting is already present.  These statements were more than enough "probable cause" to seek a court ordered search warrant, and detain, if not make an arrest of Bunn.  But Jones and Hastings did not follow up on Rondini's statements.

Rondini also explained very clearly to Jones and Hastings all the many ways in which she relayed to Bunn that she did not want to have sexual contact with him.  She repeatedly told Jones and Hastings that she said she did not want to have sex, turned her head away, and refused to participate among other things.  But still, she told them, Bunn held her down and did not halt his advances.  Rondini told the police that she ultimately had sex with Bunn because she felt it was the only way that he would let her leave his house and go home—she felt she had no choice. Jones and Hastings should have asked questions about all of these statements, rather than simply ignore them.  In fact, Rondini's actions immediately after Bunn falls asleep, and particularly the

fact, that she climbed down a second story to her freedom, provided further reason to believe the

sexual conduct was unwanted.  And Rondini provided other evidence as well.  When Jones asked

Rondini, *"He ever take your phone from you and keep you from calling...?"*  Rondini cut Jones

off to respond, *"He did, that's why I don't know where my keys are because he took my phone

and keys. I found my phone because it was like dinging because they were texting me."*  These

indicia, coupled with Rondini's statement that she was held down should have provided support

for a search warrant and/or arrest warrant for Bunn.

Instead, Jones and Hastings focused on Rondini's statement that she felt like "letting

[Bunn] have sex with her was the only way that he would let [her] go" as conclusive evidence

that she did not "earnestly resist" Bunn's advances and, consequently, no assault occurred.

Jones and Hasting erred in making this conclusion so early on in the investigation – with less

than 9 minutes of questioning – and particularly in light of the evidence Rondini had provided to

Jones and Hastings that she had been held down and did not give consent.  This error had an

impact on Rondini, who started crying apparently because she was beginning to deduce that

Jones and Hastings did not believe her.   As discussed more fully below, this is a terrible

dynamic to create in a police interrogation because it appears to have caused Jones and Hastings

to proceed under the assumption that the sex was consensual before they did any other work.

Furthermore, because Jones and Hastings had already begun proceeding under the

assumption that the sex was consensual, they did not take the opportunity at the hospital to

conduct a "pre-text" phone call between Rondini and Bunn. A pre-text phone call is a phone call

orchestrated by law enforcement and the alleged sexual assault victim in which the alleged

victim calls the alleged assailant and records the conversation.  Before the call, the victim and the

police agree on a list of questions they want the victim to ask, which might lead to new

Page **23** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

information or new witnesses. Pre-text phone calls are considered the "bread and butter" of

consent cases. It is a gross departure from best practices not to conduct a pre-text phone call

between a victim who was assaulted by a non-stranger. The potential to gain new information

and corroborate the actions/statements of persons who have been interviewed is very high.

   3. <u>The Initial Contact with Bunn</u>

  From the hospital, Jones and Hastings visited Bunn at his home. The visit to Bunn's

home, including the conversations between Bunn and the investigators, were video and

audiotaped and I have reviewed them. The interaction with Bunn was so poorly handled that it

prejudiced the rest of the investigation in multiple respects.

   *a)* *Bunn Was Allowed to Contaminate the Crime Scene*

  Initially, as Bunn testified at his deposition on January 16, 2019 in the wrongful death

action brought by Megan Rondini's family, Jones and Hastings initially arrived at his residence

and alerted Bunn to the nature of Rondini's allegations, prompting Bunn to call his lawyer.

Jones and Hastings then left briefly and allowed Bunn to be alone inside of his residence. Bunn

stated Hastings and Jones returned "very shortly after they left" with several other officers. This

was a serious error for at least two reasons. First, based on Megan's initial statement at the

hospital that she was "held down" and sexually assaulted by Bunn, he should have been

immediately arrested or brought in for questioning, not allowed to remain in his home without

law enforcement presence. At a minimum, the officers should have arrived with a search

warrant that allowed them to search Bunn's home immediately. Second, this error was made

more egregious by the fact that the officers alerted Bunn to their presence and the nature of

Rondini's allegations, and then left their prime suspect alone at the scene, thus entirely

compromising the crime scene. Bunn could have destroyed evidence in the time he was allowed

to remain in his house. And, indeed, it is notable that Rondini's keys to her apartment, which she told officers had been lost in Bunn's house, were never found. Bunn certainly had time to hide or dispose of them before Jones and Hastings returned.

> b)      *Bunn Lied To The Investigators And They Did Not Follow-Up*

Similarly, in the subsequent interview of Bunn, conducted on July 6, 2015, the investigators acknowledge that during their initial conversation with Bunn the morning of July 2, Bunn had stated that he was alone the night before the investigators arrived. This was a direct falsehood, one he then corrected moments later suddenly remembering that he slept with someone the night before. Yet the police do not follow up on it at all and, indeed, later help him explain away this falsehood. This is a radical departure from best practices and shows that right off the bat, the investigators were treating Bunn sympathetically and not like someone who had assaulted Rondini.

Indeed, the investigators appear to have inadvertently recorded themselves rationalizing Bunn's lie. One officer who is taking a video of Bunn's house can be heard saying "…had consensual sex so…Think he was scared when we showed up, still probably intoxicated, making some bad decisions." Another officer asks "do you get audio on that?" to the camera operator. The video then ends.

This is a valuable window into the investigators' state of minds, strongly suggesting they had already decided the sexual encounter Bunn had initially denied was consensual, even before they had conducted full-length interviews of Bunn or Rondini.

> c)      *Bunn Was Permitted To Follow the Investigators Around As They
>          Searched His Home*

Moreover, as the videotape of his police interview makes clear, the officers did not obtain a search warrant, but instead requested that Bunn consent to a search. They then permitted Bunn

to accompany them as they searched the house, repeatedly allowing him to contaminate the crime scene and successfully allowing Bunn to steer the conversation. For example, the officers allowed Bunn to rummage through the clothing he was wearing immediately before the alleged assault – potentially destroying any physical evidence of the alleged assault that could have been recovered through forensic analysis – in order to locate his wallet.

Second, when the officers allowed Bunn to tag along with them during their search of his home, he reported to the officers at the scene that he was missing $300 and a gas card from his wallet. Bunn was also allowed to look through his car, after which he informed the officers that his handgun was missing. After learning of these missing items, law enforcement derailed their investigation into Rondini's alleged assault in order to open a concurrent investigation into this purported theft of Bunn's property, re-framing Bunn as the victim of the theft and Rondini as the suspect. Had Bunn been properly removed from the scene, investigators could have completed the investigation into Rondini's allegations rather than been side tracked by Bunn's claims.

                        d)      *Insufficient Physical Evidence was Collected From Bunn and His Home*

Next, the investigators failed to collect the right or enough evidence from Bunn's home. First, the bodies of both Rondini and Bunn were evidence of the alleged crime. Rondini's body was (partially) examined – she submitted to a rape exam at the hospital. But Bunn's body was not examined. Remember, when the investigators arrived at the home, Rondini had already told them that she was raped by Bunn and that he held her down. In addition, Bunn told the police he had been alone the night before, which was false. The police had sufficient evidence for an arrest warrant and a search warrant. And Bunn, consistent with the standard protocol for sexual assault investigations should have been required to have a SANE exam to secure physical evidence. Because it was only a few hours after the alleged assault, a physical examination of

Page **26** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Bunn could have revealed physical evidence of his contact with Rondini, including DNA from her body. The taking of DNA, urine, and blood samples from Bunn could have determined his blood alcohol level and/or whether he had drugs in his system. These tests simply did not occur. This is a serious omission in the investigation.

Similarly, while investigators collected Rondini's clothes she was wearing at the time of the alleged assault at the hospital, they did not collect Bunn's, but instead allowed him to rifle through them. Left uncontaminated, Bunn's clothes could have proved key evidence of the events of the night before. Instead, investigators merely photographed them.

Critically, the investigators also failed to "image" or make a copy of the data on Bunn's cellular phone or phones, even though they did image Rondini's phone. This is a serious failure of the investigation. In particular, this type of evidence would have shown any text messages between Rondini and Bunn, text messages between Bunn and other people that evening, text messages between Bunn and other possible victims, photos Bunn may have taken of Rondini while she was in his room, and text messages sent by Bunn when Hastings first arrived at his door. It also would have contained call logs to see who Bunn could have called. In short, by not imaging Bunn's phone, investigators missed an obvious source of potentially inculpatory – or exculpatory – phone call records, photos, texts messages or other crucial evidence related to the alleged assault.

> e)      *Bunn Is Allowed To Take A Multi-Day Fishing Trip (With His*
>        *Attorney) Before Being Interrogated*

Furthermore, law enforcement did not conduct an in-depth interview of Bunn the day of the alleged assault. Instead, after recording an eight-minute interview with Bunn at his home, the investigators permitted Bunn to leave town to go fishing for a few days, and to return at his convenience for the videotaped interview. Bunn's attorney accompanied him on the fishing trip,

meaning he had more than three full days to prepare for the police interview with the benefit of

counsel.  Giving the suspect such a long period of time to rehearse his answers severely

compromised the reliability of the information ultimately elicited during Bunn's interview.

Furthermore, the simple fact that the investigators allowed a suspect who had been accused of a

serious violent crime to travel out of town for a recreational excursion before he had even faced a

full-length police interrogation demonstrated that they simply did not take the sexual assault

allegations against him seriously.  One infers that they would not have let a potentially dangerous

sexual predator freely travel out of town if they had not already made up their minds that he

could not possibly be guilty.

4.     Second Interview With Rondini:

After their visit to the Bunn home, Jones then interviewed Rondini a second time  at

police headquarters inside of an interview room.  I have reviewed the videotape.  It too is riddled

with errors.

First, it was entirely too short.  Rondini was sitting in the interview room for about two

hours, but only 31 minutes of that time was questioning of her (the interview was videotaped and

I reviewed the tape). This is not enough time to complete a professional, detailed, and in-depth

interview in relation to an allegation of a sexual assault. In my experience, it would have taken a

half hour just to obtain background information and build a rapport with Rondini. I understand

Investigator Jones had spoken with Rondini at the hospital, but that is not a substitute for a

proper interview.

Next, Jones immediately begins questioning Rondini about the prior night of events. He

does not establish trust, rapport, and comfort for Rondini.  Rondini had not slept for over 24

hours, had not eaten, and was alleging that she was the victim of rape and had just participated in

a physical rape examination, which is a deeply personal and invasive occurrence.  She was

clearly suffering from trauma.  The proper way to question her would have been to conduct a

"Trauma-Informed" interview. In a trauma-informed interview, questions are asked in ways that

are consistent with how traumatic memories are often encoded, stored, and retrieved.

Interviewers also understand, listen for, and gather information about common brain-based

impacts of trauma on attention, cognition, and behavior (e.g., narrowed attention, impaired

reasoning capacities, freezing, habit behaviors, dissociation, and tonic immobility). A trauma-

informed interview can elicit more complete and accurate information from sexual assault

victims, which can, in turn, lead to a more thorough "evidence-based" investigation.

Investigators must carefully elicit from victims during an interview "exactly" how they

responded to the "situation," and what they were thinking, and feeling at the time. When doing

so, it is critically important to use open-ended questions that allow victims to describe the

experience in their own words—*e.g., "How did that make you feel, was it fear?" "Did you think*

*you had any other options?" "What were you thinking?"*  Investigators should never ask

questions such as *"Did you fight back?" "Why didn't you try to escape?" "Did you scream for*

*help?" "Why didn't you immediately call 911?"* Questions like these imply to the victim that

there is a "correct" response to sexual assault. Yet for the majority of the victims, these types of

questions can make them feel they are being judged and/or their case is viewed with suspicion.

Jones' questioning of Rondini followed none of these techniques.  On the contrary,

Jones' interview technique with Rondini was at best ineffective, and at worst inappropriate or

even abusive. He failed to understand she was suffering from trauma, lack of food and sleep.

Jones uses very few "open-ended" questions, instead he uses "leading" questions

throughout the interview with Rondini. Jones does not encourage narrative responses from

Rondini and interrupts her repeatedly. Jones failed to have Rondini focus on what she can recall "thinking" and "feeling" throughout the alleged assault. Jones fails to obtain or understand Rondini's state of mind before, during, and after the alleged assault.  Jones failed to give her the opportunity to talk about her thoughts, feelings, and experiences during the alleged assault. This type of questioning would explain how Rondini "resisted". If Jones had conducted a proper interview with Rondini, he could have reconstructed the entire reality of the alleged assault.

In particular, Jones' questioning on the issue of consent and physical abuse was insufficient.  Notably, Jones again fails to follow-up on Rondini's statement that Bunn "held her down" while sexually assaulting her – in fact it does not come up at all in the Second Interview. This is remarkable as it was itself evidence relevant to whether Rondini resisted.  Indeed, while interviewing her, Jones tells Rondini that "based on your statements to me, you never resisted him." Jones simply does not sufficiently follow-up on Rondini's statements in an effort to see if a case can be made that she "earnestly resisted" Bunn.  Here is how Rondini communicated to Jones that she verbally and with her actions said "no" to Bunn in the Hospital Interview and in the Second Interview:

- Rondini told Bunn that she needed to go find her friends with her friends, but he insisted on showing her his house.

- When they arrived at Bunn's residence, she did not say anything because she didn't want to be *"rude."*  Rondini thought Bunn was going to show her the room in his house with all of the animals, and then was going to take her back home.

- Once inside of Bunn's bedroom, Rondini sat in a chair "away from his bed" and waited for him. She did not sit on the bed or disrobe.

- According to Rondini, Bunn entered the bedroom and indicated he wanted to have sex

with her.  She did not reciprocate his statement.  He then walked over to Rondini who

was still sitting in a chair and tried to kiss her, despite that she "really didn't want to."

- Rondini continued to communicate to Bunn she needed to leave. Rondini felt she could

  only leave if she let Bunn do whatever he wanted to her.

- Bunn took Rondini by the arm and "brought" her to his bed.

- Bunn started kissing Rondini. He removed her shirt and bra. Rondini was not interacting

  with Bunn. Bunn removed his own clothes.

- Bunn placed Rondini on her side while she was still wearing her shorts. Bunn placed his

  penis in Rondini's mouth. Rondini did not actively participate in orally copulating Bunn,

  stating to Jones "*I didn't do anything.*"

- Bunn "*held her down.*"

- Bunn "*pulled*" her shorts "*to the side*" to have vaginal sex with her.

- Rondini did not look at Bunn or say anything to him as he had sex with her.

  .Rondini decided to let Bunn have sex with her because he wasn't responding to her

  repeated statements that she needed to leave.. Rondini gave up and allowed Bunn to have

  sex with her because she felt it was *"the only way that he would let me go."*

- When Bunn was finished having sex with her, he fell asleep. Immediately Rondini

  grabbed her shirt and bra from the floor. She attempted to leave via the bedroom door.

  Rondini stated there were six doors in the room and she was unable to exit the bedroom.

- Rondini attempted to unlock the bedroom door, but was unable to. She tried several

  times.  When this did not work, she climbed out the window.

Jones should have followed up on all of these in order to determine whether a case could

be made that Rondini "earnestly resisted" Bunn within the meaning of the Alabama law. He did

not do so.

Next, Jones made no effort during this interview or at any other time to understand why

Rondini could not remember what happened to her during the night of the alleged assault.

Rondini had clearly experienced a "blackout" period prior to her sexual assault pursuant to which

she could not remember why she left the bar alone, how she got into the car with Bunn or that

she went back to her apartment with Bunn and Barksdale. This should have concerned Jones.

But, instead, he declines to follow-up on it.  Jones should have:

- Interviewed the witnesses set forth above to try to figure out what happened at the
  bar.

- Conduct a thorough interview of Barksdale and/or image his phone.  Barksdale
  was interviewed for less than five minutes at Bunn's house.  He was never
  brought to the police station for a formal interview, even though he was the only
  witness other than Bunn and Rondini to many of the events of the evening,
  including events that took place while Rondini had blacked out.

- Tried to ascertain how Bunn and Barksdale ended up in Rondini's apartment after
  offering her a ride, whether Bunn or Barksdale texted each other or any third
  parties from the apartment, and what prompted Rondini to decide to leave her
  friends, why Rondini decided to leave her apartment to accompany Bunn to his
  house, and whether Bunn or Barksdale texted anyone from the apartment. These
  and more questions where neither asked nor answered by the investigators.

     5.    <u>Interrogation of Megan Rondini:</u>
The second stage of Ms. Rondini's interview at the police station was even more

problematic.  After taking her to her apartment to investigate whether there was evidence of her

returning the prior evening with Bunn and Barksdale, Jones brings Rondini back to the police

station, and asks her more questions.  Prolonging the interview in this way was improper because

Rondini no longer had her advocate present, had not slept in over 24 hours, and was not in a

position to keep answering questions.  Moreover, this second stage of the interview immediately

turned into an interrogation (which is why I refer to it as such), as Jones read Rondini her

Miranda rights, and began treating her as a suspect in an investigation into the theft of Bunn's

property.  This is a gross departure from best practices, which dictate that the investigation into

the alleged assault be clearly separated from any related investigation into whether the victim of

the alleged assault may have also committed a crime.  If the police officers did feel they needed

to investigate whether Rondini had committed a crime by moving Bunn's gun from his car to his

lawn, and by taking $3 or $300 from his wallet, they should have pursued this investigation at a

later date.  This temporal separation would have helped to make it clear that the officers were

pursing an entirely different set of charges, distinct from the sexual assault, and that in this

investigation, Rondini was being viewed as the potential perpetrator, not the victim.

As it was, the shift from casting Rondini from victim to perpetrator – less than 12 hours

after the alleged assault took place – made it clear to Rondini that the police did not believe her

story in a way that made it impossible for Jones to continue the investigation in a productive

manner.  Once a victim feels they are not being believed by law enforcement, they will shut

down, alter, or give untruthful information.  They will not volunteer information believing

whatever they say will not be believed.  Losing the victim's trust in this way severely

compromises an officer's ability to gather the facts needed to pursue a meaningful investigation.

Jones solidifies Rondini's sense that he does not believe her by asking her to sign a

"refusal to prosecute" form at the end of the Interrogation, before he and the rest of the

department have had a meaningful opportunity to follow up on any of the information Rondini

had provided in the Second Interview or the Interrogation. Jones does not even volunteer the full

consequences of her signing this form – namely, that no charges would be filed against Bunn –

until Rondini repeatedly asks him what will happen if she signs. Indeed, even while he explains

the significance of the form, Jones references his perceived weaknesses in her case. By the time

Rondini leaves the police station, it has been made clear to her that no one sees her as a victim—

indeed, law enforcement only sees her as a suspect in a theft.

Jones' and Hastings' failure to conduct sufficient interviews of Rondini are significant

because their failures made it impossible for them to address the three challenges I identified at

the beginning of this report as being inherent in sexual assault allegations. As to the first

challenge, *i.e.* that most victims do not "physically" resist a sexual assault, Jones' and Hastings'

failure to follow-up on Rondini's statements – most notably that she was "held down" by Bunn –

made it impossible for them to assess whether in fact Rondini earnestly resisted her attacker. As

discussed above, Jones simply did not properly follow-up on those facts that could have led to a

charge that Rondini resisted Bunn and/or was too incapacitated to consent to sexual contact.

Similarly, Jones and Hastings failure to even attempt to learn what happened while Rondini was

blacked out made it impossible to determine whether Rondini was legally incapacitated at the

time of the alleged assault.

Next, the second fundamental challenge is that most victims only report their sexual

assault to law enforcement after a delay of some kind. An experienced investigator would have

understood that delays in reporting do not undermine a victim's credibility – and, indeed, the

delay here was not a long one. Nonetheless, one of Jones' questions was to ask Rondini "why"

didn't she immediately call "911."  Asking the question this way makes it sound like Rondini

has done something "wrong" by not calling 911 and, as discussed above, likely made her feel

that Jones did not believe her.  More than that, it shows that Jones misunderstood the immediate

actions Rondini took to extricate herself from Bunn's home.  First, it ignores the fact that

Rondini had been isolated by Bunn, by taking her to his residence. Rondini did not know the

address of Bunn's residence, so she would not have been able to give law enforcement the

address of her location.  And it ignores that Rondini contacted at least 12 friends seeking help

immediately after the alleged assault, and told the two women who came to assist her that she

had been sexually assaulted.  Jones' failure to address the ways in which Rondini did try to

report her assault failed to successfully address the complexity of the rape allegation.

Finally, Jones' strategy failed to address the third fundamental challenge, *i.e.* that most

victims provide some information in their interview that is incomplete, inconsistent, or even

untrue.  Rather than understand this and try to ask trauma- induced questions that might lead to

the truth of these inconsistencies, Jones either failed to follow up or used these inconsistencies as

tools to disbelieve Rondini.

Jones and Hastings failed to properly interview Rondini as the victim of a crime and,

instead, without allowing her to sleep, eat or bathe after an alleged sexual assault, treated her as a

criminal.  This hopelessly compromised the investigation.

6.    Bunn's Interrogation

The way in which Jones and Hasting conducted Bunn's interrogation was also a gross

departure from best practices.  There are two aspects of every investigation and that is "solving"

and "proving" a criminal case. The case was solved because Hastings knew Bunn was the

suspect. Hastings should have directed his interrogation down the path of proving Rondini's

allegations. If, after a proper interrogation, Hastings was able to "prove" a sexual assault did not occur, then Bunn would have been exonerated. Hastings did not properly interrogate Bunn. On the contrary, not one ounce of new information came out of the interrogation other than Hastings learning that Bunn enjoyed his fishing trip. This is a serious departure from what Hasting should have been doing.

Initially, as referenced above, Jones and Hastings knowingly allowed Bunn to go fishing with his attorney before requiring that he be interviewed. This is simply unheard of in any serious police investigation. Accordingly, when Bunn was interviewed on July 6, he had had not only the benefit of time, but also of extended legal guidance, in preparing his story. By allowing Bunn to leave town to go fishing, Jones exhibited favoritism. It would be natural for someone to think Bunn was handled in a special way.

In addition, I note that this interview of Jones was conducted by Hastings. There is no record that Jones ever spoke to Bunn after the morning of the alleged assault and, indeed, Jones testified as such at his deposition in the wrongful death action. This is a major mistake. Jones is the "lead investigator" and should know all aspects of the investigation.

Hastings' bias in favor of Bunn is on full display during the interview and it hopelessly compromises the investigation. He starts off by being chatty and conversational with Bunn, asking him details about his recent fishing trip. At no time does he give off the impression that he does not believe Bunn, or that he suspects Bunn of having done anything wrong. Indeed, he asks Bunn leading questions that help establish the narrative that Bunn did nothing wrong, and offers Bunn assistance in answering when he stumbles.

A particularly egregious example of this assistance occurs when Hastings brings up the lie Bunn told on the morning of the alleged assault. Rather than pushing Bunn to explain himself

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

and own up to the lie, Hasting helps Bunn rationalize his falsehoods.  Here is the exchange:

> HASTINGS: So after you had sex y'all end up falling asleep, you end up falling asleep?

> MR. BUNN: I apparently fell asleep.

> OFFICER: What do you remember next?

> MR. BUNN: You ringing my doorbell.

> HASTINGS: Okay. Okay. Do you remember anybody going in and out of a window in your house? Did you know a window was open?

> MR. BUNN: (Shaking head).

> HASTINGS: At what point did you realize -- you knew you had somebody there, right? You knew you had a female there? I know we talked to you –

> MR. BUNN: Once I had time -- I am not going -- you know, of course when you -- when you all rung the door and then thinking the worst, I really wasn't thinking about that, but once y'all were there for a few minutes and I got time to kind of collect my thoughts, yes.

> HASTINGS: So, because this is – you know, this is something that I have to ask the question because it has to be asked, but initially we asked did you have anybody there and your response was no, why?

> MR. BUNN: At that time, to be honest with you, I didn't recall.

> HASTINGS: Okay. Still trying to –

> MR. BUNN: Still trying to, you know –

> HASTINGS: Scared?

> Mr. BUNN: Of course, yeah, sure.

> HASTINGS: Okay.

> MR. BUNN: Sure was.

> HASTINGS: You know, you collect your thoughts –

> MR. BUNN: Still scared.

> HASTINGS: Right. Right. You end up collecting your thoughts and coming around and that is when you remember that you had her over there?

> MR. BUNN: Right.

This assistance the police provide to Bunn is simply astonishing.  I understand that Hastings has

suggested that his manner in questing Bunn was a tactic designed to elicit the truth. But if it was,

it was unlike any interrogation I have ever seen in my 32 years of law enforcement.  And

notably, it is unlike the demeanor Jones and Hastings used when questioning Rondini. They were quick to criticize and cross-examine Rondini but never once ask anything other than helpful questions of Bunn.

Hastings also provides a different kind of leeway by accepting Bunn's statements as the truth, never pushing back on Bunn's version of events. Most egregiously, Hastings never challenges Bunn's assertion that he and Rondini had consensual sex. Hastings never pursues any line of questioning aimed at establishing *why* Bunn thought Rondini had consented to sexual contact. Consent to sexual contact is rarely telegraphed as a direct "yes" or "no"—rather, it is communicated through indirect statements, body language and physical actions. Hastings never explored what Rondini and Bunn discussed before Bunn initiated sexual contact—if he had, he would have had Bunn's response to the fact that Rondini stated several times that she needed to leave to meet up with her friends. Hastings also failed to ask about Rondini's body language immediately before the sexual encounter—if he had, he would have learned that Bunn saw Rondini sitting on a chair and not on Bunn's bed and that she was fully clothed when he entered the bedroom. Hastings should also have asked Bunn to explain his statement that the only sexual intercourse he had with Rondini involved her being on top of him, as this did not match Rondini's account that Bunn placed her on her side and penetrated her from behind. None of these questions that could have been used to determine the presence or absence of consent were asked of Bunn.

Hastings clearly accepts Bunn's version of events. But there was nothing in the investigation that supported Hastings' belief in Bunn's credibility. Bunn's background was not investigated, beyond the fact that the investigators seem to know something about his family's status in the community. Jones and Hastings should have looked into Bunn's past. Hastings

should have conducted interviews with people at the pub, both staff and customers. Maybe Bunn

has done something similar in the past.   The investigators should have located and interviewed

Bunn's high school, and college friends, ex-girlfriend(s), ex-wife(s), friend(s), ex-friend(s),

neighbors, and co-worker(s). They should have learned Bunn's sexual experiences. Any one of

these people could have discredited or exonerated Bunn.

A particularly disturbing aspect of this interrogation is the discussion between Hastings

and Bunn about the fact that Bunn will not pursue charges against Rondini if she drops the

charges against him. This is a deeply problematic exchange.  First of all, how does Bunn know

that there are any charges to pursue?  The likeliest explanation is that there had been some

discussion between Bunn or his attorney and the police.   Second of all, charges are pursued by

law enforcement not by victims. This is not a civil matter. Hastings treats it as one. In particular,

at the end of the interrogation there is a very troubling exchange between Hastings and Bunn's

attorney:

> ATTORNEY: I know there is any number of things that could come, we just want this to
>
> be over with.

> OFFICER: I understand, and, you know, we are still kind of waiting to hear back from
>
> her. I mean, obviously, you know, we have got a couple issues we are dealing with here.
>
> We have got the vehicle broken into, we have got money stolen, cards stolen, now
>
> possibly even the possibility of a round that struck an occupied  residence, so there is a
>
> couple things there we are dealing with on that end of things with her, just kind of
>
> waiting to see what --how far she is going to push this.

This exchange makes it appear that Hastings is working with Bunn to get Rondini to not

pursue the charges against Bunn by threatening her with the charge of theft. This is not the role

of law enforcement and is deeply troubling. In one sentence, Hastings betrays the fact that law

enforcement never believed Rondini and were working to clear Bunn of wrongdoing. This is

simply wrong.

7.     Failure to Document and Create Timeline
Finally, the investigators failed to keep sufficient record of the investigation. Most

investigations are confusing, especially at the beginning. It does not become any easier when

persons involved are intoxicated due to alcohol or under the influence of narcotics. However, it

is vital for investigators to begin to ascertain the sequence of events, and which key persons were

involved in which events. In circumstances where one or more parties have clouded and

unreliable memories for part or all of the key period, it is also important to determine when their

memories started to become unreliable. Accordingly, it is a standard investigatory practice to

create a timeline of the incident. Jones and Hastings entirely failed to create such a timeline or to

otherwise synthesize the information that they gathered in any format. While they documented

that they had conducted interviews and collected evidence, they never presented any of the

conclusions they derived from their investigatory work. This is entirely improper.

**CONCLUSION:**

Jones and Hastings failed to complete a thorough, accurate, factual, and detailed

investigation.   Significantly, as described above they (1) failed to meaningfully interview Bunn

and allowed him to go fishing; (2) failed to issue a full search warrant and allowed Bunn to

compromise the crime scene; (3) failed to let Megan rest and relax before interviewing her; (4)

failed to properly interview Rondini; and (5) treated Rondini like a suspect on the same day she

reported the alleged assault. Each one of these failures alone compromised the

Page **40** of **40**
**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

investigation.  Together they constituted an egregious and gross departure from effective

investigative techniques.  We will, as a result, never know what really happened between

Rondini and Bunn.



**Signed:**_____

Detective **Carlton R. Hershman** (Ret.)

San Diego Police Department

Sexual Assault Training & Consulting

Cell: (858) 349-7908

Email: crhershman@gmail.com

Date of report:  **August 19, 2020**

# EXHIBIT B

## Expert Report of Michael H. Mertz

*Jones, et al. v. Buzzfeed, Inc., et al,* No.: 19-cv-00403-RDP (ND. Ala 2019)

### I.    Introduction

####   A.    Assignment

I was contacted by Davis Wright Tremaine LLP ("DWT"), counsel for defendants in the above-captioned action, and retained to provide expert services.

I was engaged to review the files of an investigation by the Tuscaloosa County Homicide Unit of the Tuscaloosa Sheriff's Office, number 20150702471, dated July 2, 2015. In particular, I was asked to focus on the actions of Investigators Joshua Hastings, and Adam Jones, who I understand to be the plaintiffs in this action, in investigating the alleged sexual assault of Megan Elizabeth Rondini ("Rondini"), who is now deceased, which occurred on July 2, 2015.

####   B.    Qualifications and Publications

My resume is attached as Appendix A.

####   C.    Previous Testimony

None during the previous 4 years.

####   D.    Statement of Compensation

I have been retained at the rate of $100 per hour.

####   E.    Documents and Information Considered

The list of documents, recordings, and videos that I relied on in this matter is given is Appendix B of this report.  My analysis and conclusions are based on the information available to me as of the date this report was submitted. Should additional information become available to me as this matter proceeds, I reserve the right to update my analysis and refine my opinions as

appropriate.

## II.     Statement of Opinion

Based on the case documents and supplemental documents provided to me for review, the following opinion reflects a best practices investigation assessment of the alleged rape of Megan Rondini (the "victim") by T.J Bunn, Jr. (the "alleged suspect") on July 02, 2015.

### A.     Background On Sexual Assault Investigations

According to the National Sexual Violence Resource Center (NSVRC), one in five women and one in sixteen men are sexually assaulted while attending college.  In a report by the Rape, Abuse, and Incest National Network (RAINN), only two percent of rapists (including those who commit rapes that go unreported by the victim) ever serve prison time.  Sexual assault cases involving college age women and men present unique challenges to prosecution.  Two of the most challenging circumstances involve delayed reporting to law enforcement and the prevalence of drug/alcohol related sexual assaults.  Many factors influence a victim's delayed or even non-reporting of sexual assaults including trauma, fear, shock, denial, self-blame, shame, and often uncertainty as to whether the event constitutes a sexual assault.  College age victims are often sexually assaulted while drinking and may be confused about what happened and afraid of consequences from school and parents if they report.

In cases where victims do report, the immediate effects of trauma, particularly when coupled with alcohol or drug consumption, may result in a victim's inability to recall specific events, details, and timelines.  It is common for victims to fail to report things that may come back to them after some time.  Victims of trauma may be working from a very fragmented or repressed memory.  Investigators should understand this does not mean a victim is hiding anything or lying.  The greatest fear a victim may have is that they will not be believed.  If a

victim feels the initial interviewer does not believe them then they will believe no one past that point will believe them.  The preliminary investigation should be limited to questions that will establish only the basic facts of the incident that occurred.  Follow-up interviews should be conducted to develop the details of the assault.

**B.      The Investigators' Interactions with the Victim**

In this case, the initial interview with Rondini, conducted at the hospital, identified Bunn as the alleged suspect, his home as the alleged crime scene, and provided sufficient details of the incident such that the investigators had reason to conduct a further investigation.  In my experience and based on best practice standards, officers should have been dispatched to make contact with the suspect and secure the alleged crime scene.

The second interview of the victim occurs at the law enforcement center beginning at approximately 11:30 a.m. and terminating at approximately 1:15 p.m. The interview was terminated after a consent to search the victim's phone was received by Investigator Jones ("Jones").  This is certainly not inconsistent with standard practice, however in my experience, the suspect's phone would have been seized for search as well.  Had both phones been forensically dumped, any contact between the victim and suspect preceding or following could have been verified.  Also, any discussion of the incident by either party could have been recorded.   During the second interview there is a sexual assault advocate present for the victim. The victim states to her that she is hungry, tired, and that she just wants it to be over.  She also states to the advocate that she is unsure what to do because the alleged suspect is well known and an influential person in Tuscaloosa.  Jones tells the victim that the alleged suspect reports that he, his friend, and the victim went to her apartment and had drinks before going to his house.  The victim claims to have no recollection of this incident.  Jones secures her phone and then asks her

to go to her apartment with him.  The victim gives consent to search her apartment.  After

searching the apartment, Jones and victim return to the law enforcement center interview room.

They return sometime around 2:00 p.m.

The third interview of the victim begins at 2:00 p.m.  The victim has still had no sleep nor

anything to eat.  During this interview, the victim describes taking a gun from the alleged

suspect's vehicle.  She states that when she removed it from the holster that it discharged and

that she discarded it in the grass in front to the residence.   The victim is read her Miranda rights

and interrogated about a gun, money, and credit card that the alleged suspect reports missing.

Jones has a mandate to investigate the report of the theft.  In my opinion, the more pressing of

the two investigations is to establish the rape allegation.  The other crime, though significant, can

be investigated once the rape has been resolved.  In training of best practice standards, there are

questions that are regarded as blaming questions.  We train investigators to not ask questions

such as, *"why did you go with him?", why didn't you call Police?", "why didn't you fight*

*back?"*  To reiterate, a victim's greatest fear is not being believed.  During this interview, Jones

says to the victim, "I want to believe you, but if we are talking about rape…why didn't you call

the police?  At this point there is a great deal of discussion about signing a waiver to prosecute.

Established best practice is not to talk about any waiver to prosecute until the case has

progressed far beyond this point.  The victim has been either at the hospital being subjected to a

sexual assault exam or at the law enforcement center being subjected to questioning for over 12

hours at this point.  Best practice standards would be to let her go home and get some rest and

think about what she wants to do.

### C.  The Investigators' Interactions with the Alleged Suspect

The investigators contacted the alleged suspect sometime around 6:45 a.m. at his

residence.   When first questioned about whether someone had been at his home the night before,

he lies and says no one was there.  After investigators confront him about a window closing, he

states that he needs to speak with his attorney.   Sometime after this point, investigators tell the

alleged suspect that they will need to secure a search warrant for the residence and then leave the

alleged suspect there and return sometime later. *See* Case Report 20150702471 ( stating

"investigators left and returned after a short period of time.") There is little explanation as to

why they left or how long.  The concern is that an active crime scene was left unsecured with the

alleged suspect still on scene.  In my experience and training and as a best practice standard, a

crime scene is never to be left unsecured.  The entire interview on record of the alleged suspect

lasted eight minutes that morning.  The alleged suspect informs investigators that he has a fishing

trip planned and is allowed to come in the following Monday with his attorney to make a

statement.  In total including both recorded interviews, the suspect is interviewed for less than 45

minutes.

### D.      Departures from Best Practices in the Investigation

This case presented the investigators with difficult facts commonly seen in sexual assault

investigations in the college setting.  As is common, the victim had been drinking alcohol, so she

was unable to recall exact times or details.  She may even have blacked out for a time.  She said

that she did not physically fight back against the suspect, scream for help, or call police, but her

description of events also made it clear that she did not want to have sex with the suspect and did

not willingly participate in his advances.  Her comments demonstrated that she clearly was

frightened and felt threatened.  The victim's manner of departure from the scene and removal of

money and a weapon from the suspect further complicated the case.  While all of these facts

made this a challenging case, these are not uncommon in college sexual assault cases.  The

investigators should have recognized that these difficult facts required further and deeper analysis. Instead, the investigators effectively abandoned the investigation prematurely. Looking at the investigation objectively and through a lens of best practice standards for investigation of sexual offenses, several pieces of the investigation were flawed.

1) The victim interviews were inconsistent with standards of best practice. The investigators knowingly subjected the victim to over nine hours straight of multiple police interviews and invasive hospital exams, without giving her the opportunity to sleep, rest, or even eat. Research on the neurobiology of trauma tells us is that this is never the best plan.

2) The investigators suddenly shifted from interviewing the victim's allegation of sexual assault to interrogating her about the alleged suspect's missing property. Although these allegations would need to be dealt with, this was not the time. In viewing the interviews beyond this point, the victim is just ready to be finished.

3) After the alleged suspect lied to the investigators at the alleged crime scene, the investigators then left the crime scene unsecured with the alleged suspect and another on scene. This goes against all standard of basic crime scene investigation.

4) A standard of training in crime scene investigation is that once the suspect is identified, a prompt investigation begins. Instead, here the investigators briefly interviewed the alleged suspect then allowed him to leave town for three days for a fishing trip with his attorney. Standards of training would have been to bring him in as quickly as possible.

5) The victim had been drinking. By her statement, she had not been drinking so much as to be intoxicated. She did, however, have time lapses and complete lapses of memory. The

investigators were given this information at the hospital.  Blood and urine samples should have been requested reference to the investigation.

6) The investigators suggested multiple times to the victim that she should sign a waiver of prosecution.  When the victim states that she would like to discuss it with her parents, the investigators coerced her by saying that she is an adult and that they really will not have any say in it.   The investigators did this incredibly early in the investigation.  This is clearly not consistent with best practice standards.

**E.      Rebuttal of Opinion by Robert G. Pastula**

I have read the report by Robert G. Pastula.  I disagree with his analysis, conclusions, and opinions.  I will offer opinions rebutting his testimony.

**III.   Conclusion**

In summary, this investigation does not meet a victim-centered national standard of best practices for investigation of sexually offenses.

Dated: August 19, 2020

_____
Michael H. Mertz

Appendix A – Resumé

# Michael H. Mertz
P.O. Box 4589 Dublin, Georgia 31021
(678)414-7013

## PROFILE

An experienced law enforcement professional with over twenty years investigating crimes of family violence, sexual assault, stalking, and child abuse. A dynamic presenter with19 years of training criminal justice professionals, mental health professionals, system advocates, and community partners on appropriate, victim centered response to crimes of family violence, sexual assault, and stalking.

- Certified expert witness on dynamics and investigation of crimes of family violence, sexual assault, stalking, and child abuse
- Georgia POST Certified Law Enforcement Officer
- Georgia POST Certified Instructor 2001
- Certified FLETC "S.T.A.R." instructor 2001
- Office of Victims of Crime Certified "Ultimate Trainer" 2005
- Southern Baptist Association Ordained Minister 1990

## EXPERIENCE

**Owner, Training Consultant**
**C&M Consulting and Professional Training Services LLC, Dublin GA**
> January 2003-Present

> Responsible for day to day operations to include supervision of contract employees, proposal development, contract negotiation, and development of training curriculum. Duties include: client needs assessments, training program development, and delivery of POST certified 40-hour course, "Law Enforcement Response to Domestic Violence", and the POST certified 40-hour course, "Sexual Assault Investigations" as well as other courses relating to family violence, sexual assault, and stalking response.  Responsible for working with State Agencies to develop statewide plans for family violence initiatives including training curriculum development and delivery and statewide family violence task force development.  This position is also responsible for identifying grant opportunities and assisting clients in preparing grant applications and securing grant funding.

**Violence Against Women Program Director**
**Georgia Association of Chiefs of Police, Duluth, GA**
> January 2001– December 2005

> Responsible for development of statewide law enforcement model protocols for response to victims of family violence and sexual assault. Duties included working with law enforcement agency heads to develop standard operating procedures for their agencies for response to incidents of family violence, sexual assault, and stalking. Responsible for development and delivery of training curriculum on family violence, sexual assault, and stalking response and investigation. Responsible for administration of Federal STOP grant funding.

Appendix A – Resumé

**Family Violence Division Commander**
**Forsyth County Sheriffs Office, Cumming, GA**
**December 1997- December 2000**

Responsible for supervision of investigators and responding officers assigned to the family violence, sexual assault, and stalking divisions. Duties included oversight of investigations, court case preparation, expert witness testimony, supervision of on scene response to crimes of family violence, sexual assault, stalking, and child abuse. This position was also responsible for procurement and oversight of Federal STOP grant funding.

## EDUCATION

North Georgia College, Dahlonega, Ga
- August 1981-May 1984
- Course of study, Biology/Education

Brenau College, Gainesville, Ga
- June 1983- August 1983
- Course of study, Chemistry 101, Chemistry 102

Gainesville College, Gainesville, Ga
- June 1984- August 1984
- Course of study, Business Communication, Computer Skills

## ACHIEVEMENTS

Author of "The Law Enforcement Response to Domestic Violence" POST approved 40-hour course curriculum, 2001, revised 2005, 2007, 2011, 2015

Co-author of "The Law and Psychology of Domestic Violence", 16-hour Course curriculum, 2003

Co-author of "Sexual Assault Investigations", POST approved 40-hour course curriculum. 2005, 2011

Contributor to the "Georgia Superior Court Judges Bench Book On Family Violence", 2005, 2006, 2007, 2008, 2011

Author of "Advanced Sexual Assault Investigations", POST approved 16-hour course curriculum, 2011

Author of "Roll Call Trainings on Family Violence" 2011, revised 2017, 2018

Contributor and co-author of the Board of Reagents course "Georgia Victim Assistance Academy", 2005

Author of "Family Violence Investigations", POST approved 40-hour course curriculum, 2016

Author of "Family Violence First Responders", POST approve 24-hour course curriculum, 2016

Co-author of "Primary Does Not Mean First, Identifying Primary Aggressors in Incidents of family Violence", 2019

Author of "Orders of Protection and Stalking Investigations" POST approved 8-hour presentation, 2016

Author of "Sexual Assault and the Separation Connection" Post Approved 4-hour presentation, 2017

Author of "Investigation and Enforcement of Violations of Criminal and Civil Orders of Protection", POST approved 4-hour presentation, 2015, revised 2016, 2017, 2018, 2019

Contributor to scripting and technical oversight of "Investigation of Family Violence Strangulation" video developed in conjunction with The Georgia Commission on Family Violence.

Appendix B – Materials Reviewed

1.  Tuscaloosa County Homicide Unit investigation case #20150702471/Felony packet, which included the following documents:

    i.   Felony Report Fact Sheet, dated September 9, 2015, written by Investigator Adam Jones ("Jones")

    ii.  Statement of Defendant, dated July 6, 2015, signed by Jones

    iii. Synopsis, undated, written by Jones

    iv.  Witness List, undated, unattributed

    v.   Case Report for 201502471, undated, unattributed

    vi.  Alabama Uniform Incident/Offense Report dated July 2, 2015, written by Officer R.B. Phillips ID #1892

    vii. Tuscaloosa County Homicide Unit Statement of Megan Elizabeth Rondini, report dated July 2, 2015, written by Jones

    viii. "The Rights of a Person Being Interviewed" statement form (Admonishment of Megan Elizabeth Rondini) dated July 2, 2015, written by Investigator Adam Jones

    ix.  Tuscaloosa Police Department Form, Handwritten Statement of Megan Rondini, report dated July 2, 2015, written by Officer Phillips

    x.   Handwritten statement of Megan Elizabeth Rondini, undated, written by Rondini

    xi.  Tuscaloosa County Homicide Unit Statement of Terry Jackson Bunn JR ("Bunn")., report dated July 6, 2015, written by Investigator Joshua Hastings ("Hastings")

    xii. Handwritten notes of Terry Jackson Bunn's statement dated July 6, 2015, written by Investigator Carroll

    xiii. "The Rights of a Person Being Interviewed" statement form (Admonishment of

Appendix B – Materials Reviewed

Terry Bunn) dated July 6, 2015, written by Investigator Joshua Hastings

xiv. Tuscaloosa County Homicide Unit Statement Navid Khan, report dated July 2, 2015, written by Sergeant Davis

xv. Handwritten notes of Navid Khan's statement dated July 2, 2015, written by Sergeant Davis

xvi. Tuscaloosa County Homicide Unit Statement of Jason Stephen Barksdale, report dated July 2, 2015, written by Investigator T. Carroll

xvii. Handwritten notes of Jason Barksdale's statement, dated July 2, 2015, written by T. Carroll

xviii. Tuscaloosa County Homicide Unit Statement of Ciara Younger, report dated July 2, 2015, written by Sergeant R.J. Davis

xix. Tuscaloosa Police Department Form, Handwritten Statement of Ciara Younger, report dated July 2, 2015, written by Officer Phillips

xx. Handwritten notes of Ciara Younger's statement, dated July 2, 2015, written by Sergeant R.J. Davis

xxi. Evidence List

xxii. Copy of Rondini's debit card

xxiii. Taxi receipt, dated July 2, 2015

xxiv. Address list, undated

xxv. Photo log, dated September 9, 2015

xxvi. Tuscaloosa County Homicide Unit Consent to Search form for the premises and vehicle located at 15070 Cedar Drive, dated July 2, 2015, written by Investigators Jones and Hastings.

Appendix B – Materials Reviewed

xxvii.   Tuscaloosa County Homicide Unit Consent to Search form for the residence located at 15070 Cedar Drive, dated July 2, 2015, written by Investigators Jones, Investigator T. Caroll, and Sgt. Franks.

xxviii.   Tuscaloosa County Homicide Unit Consent to Search form for Tery Bunn Jr.'s person, property, premises, outbuilding and vehicle located at 15070 Cedar Drive, dated July 2, 2015, written by Investigators Jones, Investigator T. Carroll, and Sgt. Franks.

xxix.   Tuscaloosa County Homicide Unit Consent to Search form for the residence located at 700 15Th Street #3202, dated July 2, 2015, written by Investigator Adam Jones

xxx.   Tuscaloosa County Homicide Unit Consent to Search form for Megan Rondini's cell phone, dated July 2, 2015, written by Investigator Adam Jones

xxxi.   Property Release form (Ford truck keys & Assorted keys on key ring), dated July 6, 2015, written by Investigator Hastings

xxxii.   Property Release Form (States "Victim requested clothing destroyed"), dated August 21, 2015, written by Investigator Adam Jones

xxxiii.   Driver record for Megan Rodnini, dated July 2, 2015

xxxiv.   Sexual Assault Information Form (Megan Rondini), dated July 2, 2015, written by Examining Physician Nicholas Vetrano, MD.

xxxv.   Form documenting "Theft of Property II – Special Inquiry" describing a Ruger handgun, undated

xxxvi.   Person details for Jason Stephen Barksdale, undated

xxxvii.   Handwritten list of names & phone numbers, undated, not assigned

Appendix B – Materials Reviewed

xxxviii.   Letter addressed to Miss Rondini on Tuscaloosa County Homicide Unit letter head, dated August 14, 2015, written by Investigator Adam Jones

xxxix.   Alabama Uniformed Incident/Offense Report listing Megan Rondini as a suspect in a theft, dated July 2, 2015

xl.   Images of various DVDs and/or CDs

xli.   Letter addressed to "Dear Mr. Jones:" (Representation letter) with Scott James Meyer, JD, LL.M letterhead, undated, written by Scott James Meyer, Esq.

xlii.   Letter addressed to "Dear Mr. Jones:" (Cooperate letter) with Scott James Meyer, JD, LL.M letter head, undated, written by Scott James Meyer, Esq.

xliii.   Letter addressed to "Dear Mr. Jones:" (Preserve evidence letter) with Scott James Meyer, JD, LL.M letter head, undated, written by Scott James Meyer, Esq.

xliv.   Custody Receipt list, dated August 2, 2015, signed by Investigator Adam Jones

xlv.   Disposition Receipt list, dated August 21, 2015, signed by Investigator Adam Jones

2.   Timeline of events, provided by DWT

3.   Text messages of Ciara Younger

4.   Text messages of Courtney Rentas

5.   Text messages of Hannah Carter

6.   Text messages of Michelle Arcia

7.   Deposition of Investigator Adam Jones, dated February 14, 2019

8.   Deposition of Terry Jackson Bunn, Jr., dated January 16, 2019

9.   Videotape of Bunn's property by Law Enforcement, dated July 2, 2015

10. Photos of Bunn's property, evidence, and handgun, dated July 2, 2015

Appendix B – Materials Reviewed

11. Audio of Rondini during search of her apartment

12. Transcription of Rondini's interview at the hospital, by Jones

13. Videotape of Ciara Younger's interview, by Sgt. Davis

14. Transcription of Jason Barksdale's interview, by Hastings, dated July 2, 2015

15. Transcription of TJ Bunn, Jr. giving verbal consent to search of his property to Hastings, dated July 2, 2015

16. Transcription of police interview of TJ Bunn, JR, by Hastings, dated July 2, 2015

17. Screenshots of Innisfree Bar surveillance video, dated July 1, 2015

18. Screenshots of Houndstooth Condominium surveillance video, dated July 1 & 2, 2015

19. Excerpt of data retrieved from Megan Rondini's phone by the Tuscaloosa County Homicide Unit of the Tuscaloosa Sheriff's Office

20. Transcription of Megan Rondini's interview, Part 1, by Jones, dated July 2, 2015

21. Transcription of Megan Rondini's interview, Part 2, by Jones, dated July 2, 2015

22. Transcription of TJ Bunn JR's interview, by Hastings, dated July 6, 2015

23. Tuscaloosa News article by Stephanie Taylor, titled "Files detail investigation into Megan Rondini case"

24. Report of Plaintiffs' Expert Robert G. Pastula