FILED
2021 Sep-15  PM 10:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| ADAM JONES, *et al.*,<br><br>Plaintiffs,<br><br>- against -<br><br>BUZZFEED, INC., *et al.*,<br><br>Defendants. | : | 7:19-CV-00403-RDP<br><br>**DECLARATION OF DEFENDANT KATIE J.M. BAKER** |

I, Katie J.M. Baker, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am an American citizen residing in London, England, am over the age of eighteen, and am competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment that I have filed, along with co-defendants BuzzFeed, Inc. ("BuzzFeed") and Ben Smith.

2. I am currently an investigative reporter for BuzzFeed and have worked at BuzzFeed since April 2014. As an investigative reporter, I investigate and write stories that are of interest to BuzzFeed's audience.

3. I wrote the article at the center of this lawsuit, which was published on BuzzFeed's website (www.buzzfeeed.com) on June 22, 2017 and titled "How Accusing A Powerful Man of Rape Drove A College Student to Suicide" (the "Article").

**My Background in Journalism**

4. I have wanted to be a journalist for as long as I can remember. In 2009, I graduated from University of California, Berkeley with a Bachelor's degree in English Literature. Because

Berkeley did not have a journalism program for undergraduate students, I immediately sought to obtain hands-on journalism experience. I began writing for the school newspaper during my freshman year and, throughout my time in college, also worked for a variety of local newspapers and other media outlets, including the *San Francisco Bay Guardian*, *Wired Magazine*, the *San Francisco Appeal*, and the *Eastbay Express*. During that time, I reported on everything from affordable housing controversies in San Francisco to local and national elections.

5. I have been working as a journalist for my entire professional career. After I graduated from college, I worked at the *San Francisco Chronicle* for a year and a half. While I began as an assistant to the editor-in-chief of the newspaper, I soon became a reporter, too, writing many articles, including ones published on the front page. For example, I wrote a front page investigative piece about San Francisco's crisis pregnancy centers. My article spurred the city to pass legislation requiring these centers to prominently disclose their stances on abortion so that women could more fully understand their healthcare options.

6. In 2011, I moved to New York City and began working at *The Daily*, an iPad publication owned by News Corporation.

7. In 2012, I took a job at *Jezebel*, an online publication that focused on topics important to women. While there, I won awards commending my work and was one of the first reporters to cover the issue of sexual assault on college campuses.

8. In 2013, I began working at *Newsweek* as a staff reporter. While there, I focused on investigative feature stories and was one of the first reporters to interview Bill Cosby's alleged rape victims. I traveled to Ethiopia to write a cover feature on the oppression of LGBT communities there, and wrote another cover feature on mental health on college campuses.

9. In 2014, I was hired by BuzzFeed as a reporter. Soon thereafter, I became a senior reporter as part of BuzzFeed's National Desk. In 2017, after the Article was published, I moved from the National Desk to the Investigations Desk, which focuses on longer-term investigative projects. As of the date of this declaration, I am still an investigative reporter for BuzzFeed.

10. While I do not have a set "beat" at BuzzFeed, I describe myself as a reporter interested in institutional injustice. I investigate and write stories on institutions, including but not limited to schools, police departments, corporations, and nonprofit organizations. I find reporting on institutions to be interesting because there are often vast troves of public and internal records that I can review, which inform my reporting. Over the course of my career, I have, therefore, spent much time reviewing judicial filings, police records, corporate disclosure statements, disciplinary records, medical records, and other similar documentation.

11. As part of my reporting on institutions, I have published numerous stories about how institutions handle claims of sexual assault. I have covered this topic from many angles, including sexual assault claims at nationwide corporations, investigations into how police departments apply state laws to claims by alleged victims and a profile of an expert who testifies for the defense in rape cases. I was also the first mainstream reporter to write about the perspective of young men on college campuses who are accused of sexual misconduct. I believe I was also the first mainstream reporter to seriously re-visit the rape claims against Bill Clinton in the leadup to the 2016 election. My reporting has helped to spur changes in state laws and in how institutions assess sexual assault complaints. For example, in September 2016, I published an article about how Maryland law required rape victims to show "force or threat of force." My article led Maryland lawmakers to change the state's legal definition of rape so that evidence of physical resistance by a victim was no longer required.

12. Throughout my time at BuzzFeed, however, I have had the opportunity to report on topics far beyond how institutions handle sexual assault. For example, I worked on a series of investigatory articles about the World Wildlife Fund's funding of anti-poaching paramilitary groups. As a result of this reporting, I was awarded the Overseas Press Club award and was a finalist nominated for a variety of other prestigious awards, such as the Atlantic's Michael Kelly award. I also attended a meeting at the United Nations to discuss my findings about the World Wildlife Fund. In addition, I have been nominated or a finalist for other awards including the Livingston, which is popularly referred to as the "Pulitzer for the Young".

**<u>The Article</u>**

***Communications with my Initial Source***

13. In late December 2016, I received a tip from a source to whom I have promised confidentiality. That source told me about the story of a 21-year-old University of Alabama student named Megan Rondini, who committed suicide after she claimed that she was raped by a member of a prominent Tuscaloosa family. According to my source, Megan reported her rape to the hospital, to the Police Department, and to counselors at the University of Alabama—exactly what women are told to do in such a situation—but none provided her with the help she needed. Because this story involved three different institutions, I found the tip intriguing. I believed there would likely be extensive public documentation of Megan's claims, which I could use to research the tip and, ultimately, to determine whether to draft an article telling this story.

14. On December 21, 2016, my source introduced me via email to Megan Rondini's father, Michael Rondini. A true and correct copy of the initial correspondence from my source, connecting me with Mr. Rondini, was produced in this litigation as BuzzFeed04491 and is annexed hereto as **Exhibit 6** (Doc.63-6).

15. I held my initial call with Mr. Rondini on December 30, 2016. During that call, he told me the story of Megan's alleged rape and her eventual suicide. He explained that in July 2015, Megan claimed that she was raped by a man named Terry Jackson ("TJ") Bunn, Jr., the son of a wealthy family that owned a prominent construction company in Tuscaloosa. He further explained that after the rape, Megan immediately went to the hospital to report what had happened. After the hospital, she went to the police station for an interview with investigators. Mr. Rondini said that he believed Megan was not taken seriously by the hospital or the Police, both of whom appeared more interested in covering up the allegations for Bunn than investigating Megan's claims. Indeed, when Megan told police officers that she had taken a few dollars and a gun out of Bunn's car for her safety, they read Megan her Miranda rights and began investigating her for felony theft. Later, when Megan sought counseling at the University of Alabama, her counselor refused to provide help because she knew the Bunn family. Eventually, Megan felt so isolated in Tuscaloosa that she withdrew from the University of Alabama, moved home to Texas, and started school at Southern Methodist University. Megan committed suicide in February 2016, leaving behind a medical intake form that read: "[r]aped, bullied by police, changed university."

16. After the call ended, I emailed Tina Susman and Marisa Carroll, my editors at BuzzFeed's National Desk, to summarize the discussion. I explained that I found the story interesting because, "the way [Megan's] family tells it," "the hospital, the cops, and the University of Alabama [] refused to touch [Megan's] case once they learned who the accused was." As the Rondinis told it, this was a "part basic mishandled rape story" and "part southern coverup." A true and correct copy of my email to my editors was produced in this litigation as BuzzFeed00002 and is annexed hereto as **Exhibit7** (Doc.63-7).

17. That same night, Mr. Rondini sent me an electronic folder of information that he gathered that he believed was relevant to Megan's claims. That folder included public articles about the Bunn family and their influence in the Tuscaloosa community, T.J. Bunn's arrest records for drunk driving, articles about the Tuscaloosa District Attorney, the initial police report on Megan's claims, Megan's handwritten notes about her alleged assault, and complaints that Mr. Rondini filed with the University of Alabama. Mr. Rondini also informed me that he had other information that he would share with me if we met in person. A true and correct copy of Mr. Rondini's emails and the attachments were produced in this litigation as BuzzFeed04556 through BuzzFeed04709 and are annexed hereto as **Exhibit 8** (Doc.63-8).

***My Early Investigation***

18. After my conversation with Mr. Rondini, I reviewed the various materials included in his email. Of particular interest to me was the initial police report. In it, Megan claimed that on the night of July 1, 2015, she and Bunn were both drinking at the Innisfree Irish Pub in Tuscaloosa. Although she could not remember how she ended up in Bunn's car, he eventually drove her to his home and, once they arrived, told her to go upstairs to his bedroom. Megan told the police officer that "she did not want to go to [Bunn's] bedroom, but that she felt as though she had no choice because she knew Bunn to be from a wealthy family." Bunn then went up to his bedroom with Megan, put her phone and keys on a table in his room, and "instructed her to get on his bed." Megan again told the police officer that "she stated she did not want to do this, but felt as though she had to," although she also said that she did not verbally or physically refuse Bunn's advances at this point. Megan then reported that she and Bunn had intercourse. She said "at some point during all of this, she verbally informed Bunn that she did not want to have sex with him and that she needed to rejoin her friends at Innisfree. She stated that Bunn ignored these statements

and continued to engage in intercourse with her." While she claimed that Bunn "never forced himself on her," she said that "he did place his hands on her hips and hold her down at some point." Megan told the police that, after Bunn fell asleep, she sent text messages to her friends begging for them to come help her. She attempted to open Bunn's door but could not do so. Eventually, Megan "opened an exterior window in the bedroom and climbed out onto a roof . . . then climbed down onto a fence and eventually onto the ground." Megan then realized that her keys were still inside Bunn's residence. She "located a cooler and a trash can outside his house [and] stacked them on top of each other and re-entered the residence through the window from which she had earlier escaped." She was unable to locate her keys, exited the residence, and ultimately, a friend picked her up and drove her to the hospital. *See* **Exhibit 8** at BuzzFeed04559–04562 (Doc.63-8, pp. 5-8). Megan's handwritten notes aligned with her initial report to police. *See id.* at BuzzFeed04564 (Doc.63-8, p. 10).

19. I also noticed that, in the police report, the "type of incident or offense" was listed as a "special inquiry." *See id.* at BuzzFeed04559 (Doc.63-8, p. 5). Although I had previously reviewed numerous police reports, I had never before seen this phrase and did not know what it meant. I made a mental note to ask the Tuscaloosa Police about this notation.

20. From reading this initial information alone, I could not—and did not—form any opinion on whether Megan's story met the elements of rape under the laws of Alabama. But, importantly, this was not what I was interested in reporting. Rather, I wanted to learn about how the various institutions handled Megan's claim after she reported what she believed to be rape. And after reading the initial police report, I saw numerous statements that I believed a police officer would want to further investigate including that Megan claimed Bunn took her phone and keys, ignored her statements she did not want to have sex and held her down by the hips. I also

thought the police and the hospital would investigate Megan's stated failure to remember how she ended up in Bunn's car. Accordingly, I was interested in seeing further police and hospital records to understand how these institutions handled these claims.

21. I decided to travel to Austin, Texas to meet with the Rondini family and to get the additional documents that Mr. Rondini indicated he had in his home. But because I was very curious to see the full police report in Megan's case, on January 5, 2017, before my trip to Austin, I again emailed Mr. Rondini asking whether he had any supplemental police reports and whether he knew how the case was ultimately closed. Mr. Rondini explained to me that the police refused to release records to him without a subpoena, so he did not yet have the full report. A true and correct copy of my correspondence with Mr. Rondini was produced in this litigation as BuzzFeed04872 and is annexed hereto as **Exhibit 9** (Doc.63-9).

22. Prior to traveling to Austin, I also began to conduct some preliminary background research based on the information that Mr. Rondini provided to me. This research included running Internet searches for information about the relevant Alabama institutions and Alabama's rape law as well as contacting experts and other individuals with knowledge about the subject matter of the potential story.

23. As I did this research, I kept notes to myself in a Scrivener file. Scrivener is an application for long-form writing projects, which allows writers to draft a main body of text but also draft and move around notes relevant to that text. A true and correct copy of my Scrivener notes was produced in this litigation as BuzzFeed03857 and was attached as Exhibit 4 to Plaintiffs' Opposition to Defendants' Motion to Strike the Expert Report of Dr. Emilie L. Lucchesi. *See* Doc.57-4. I did not compose the Article in the Scrivener application. I simply used it as a repository for documents, thoughts and ideas.

24. In researching the Tuscaloosa Police Department, I found articles discussing the case of another young woman, Emma Mannion, who was arrested for lying about sexual assault on campus. In the article, Tuscaloosa County Metro Homicide Unit commander, Captain Gary Hood, was quoted saying that many young women often falsely accuse men of rape because they "are not doing well in school and hope that by doing this they can get some help from the university with their grades." I was shocked by this quote. Throughout my time reporting on sexual assault claims, I have done much research and spoken to numerous experts about sexual assault reporting. I learned that false reports of sexual assault are very rare and, when they do occur, are often the result of another problem, such as mental health issues or prior sexual abuse. Captain Hood's statement directly contradicted everything I had learned during my prior reporting. I thought it was surprising that the commander of the Tuscaloosa Police Department would publicly make a statement like this one, which could discourage women from reporting sexual assault.

25. I also contacted an expert with whom I have worked on multiple occasions, Lisa Avalos, to see if she was familiar with the Mannion case. Ms. Avalos is the foremost expert on women falsely reporting rape, so I believed that she may have further details about the police investigation into Mannion's claims. Although I did not plan on reporting on the Mannion story, I wanted to learn all I could about the police in the area. Ms. Avalos provided me with the name of Mannion's lawyer, Leroy Maxwell, whom I contacted.

***My Trip to Austin, Texas***

26. On January 11, 2017, I traveled to Austin, Texas to meet with the Rondini family. I went to their home and asked them to tell me Megan's story chronologically. Although I had heard part of the story during our phone call, it was important for me to hear everything in person, so I could assess the Rondinis' credibility. As Mr. Rondini explained the story to me, I frequently

asked him whether there were documents that could corroborate his statements. He provided me with all of the documents and communications he had relating to Megan's claims, including a USB drive containing Megan's cell phone records, which I understood he had obtained from her phone after her death. He did not obtain them from the police at that time. Mr. Rondini was still waiting for additional documents from the police.

27. After meeting with the Rondinis, I believed them to be helpful, credible sources. My belief in their credibility was bolstered by their willingness to provide me documents including records from the police and hospital.

28. Following my meeting with the Rondinis, I reviewed the additional documentation that they provided to me. In particular, I read through the thousands and thousands of text messages from Megan's phone, which Mr. Rondini obtained after her death. The text messages very clearly showed the changes in Megan before and after her alleged rape. Prior to the incident, she appeared social and enjoyed her life at the University of Alabama. After the incident Megan appeared much more withdrawn and often talked about how isolated and upset she felt.

29. During this review, I saw one text message from the date of the alleged rape in which Megan tells one of her friends, "We are going to Guck." I was unsure of what this text message meant, both because "Guck" was presumably a typographical error and because I knew that only a few hours after Megan sent this text message, she reported that she was raped. Either way, because I was not investigating whether or not Megan was actually raped but, instead, how institutions responded to her report of rape, I did not believe this text message changed my general plans for the investigation. I did, however, note to myself that I wanted to speak with the recipient of the text message to see what she understood it to mean. A true and correct copy of this text

message thread that I reviewed from Megan's phone, which I received from Mr. Rondini, was produced in this litigation as BuzzFeed04165 and is attached hereto as **Exhibit 10** (Doc.63-10).

30. On January 13, 2017, I drafted a summary of the story, based on what the Rondinis told me and the records I had reviewed so far. The Rondinis believed that the Tuscaloosa institutions had failed Megan and had covered up for Bunn due to his family's influence in the community, prompting me to pose the question: "Is the tragedy another example of the criminal justice system failing victims, or something more sinister given that the accused rapist is the wealthy heir to an Alabama fortune?" A true and correct copy of the summary that I drafted and sent to my editors was produced in this litigation as BuzzFeed01169 and is attached hereto as **Exhibit 11** (Doc.63-11).

31. I was still at the very beginning of this investigation, so this summary is just an early idea for the story. I never intended to simply tell Megan's story from the Rondinis' perspective. I noted that, among other things, I still needed to obtain the full investigatory police report to better understand how the police handled Megan's claims. *See id.*

32. At this point, I decided to travel to Tuscaloosa to visit the places that Megan had referenced in her police report and speak with individuals who may have information about Megan.

***My Investigation Continues***

33. Prior to my trip to Alabama, I continued to conduct background research, contacting various experts and other relevant individuals and performing Internet searches. It is always my practice to contact experts as part of my investigative reporting. While I often do not quote these experts in my articles, these experts help me understand the information on which I am reporting and also sometimes lead me to other relevant sources of information. Specifically, at the beginning of this investigation, I contacted the following individuals:

a.   Corey Rayburn Yung, an expert in police departments and how they handle sexual misconduct claims.  I learned in my Internet research that the Tuscaloosa Police Department did not have a sex crimes unit.  Instead, sex crimes were investigated by the Tuscaloosa County Metro Homicide Unit—a joint task force comprised of officers from the Tuscaloosa Police Department, the Northport Police Department, the University of Alabama Police Department, and Tuscaloosa Sheriff's Office.  I was interested in learning whether this was common for police departments in towns the size of Tuscaloosa.  Mr. Yung explained to me that, given Tuscaloosa's size and the fact that crime rates likely varied based on the school calendar, it was not surprising that there was no specific sex crimes unit.  He recommended that I speak with the local rape crisis center to see if they could provide any additional information about rape investigations.

b.   Valentina Restrepo, a public defender in Birmingham, and a friend of my sister-in-law, who I had previously met at a family event.  Because she was a family friend, I spoke with Ms. Restrepo in a more colloquial manner than I would a regular source for an article, providing her a high-level summary of Megan's rape report and suicide, as told to me by the Rondinis.  I indicated to her that, based on what the Rondinis had told me, I was unsure of how much of this story was "business as usual for the Tuscaloosa police and how much has to do with the guy's family."  By "business as usual," I clarified that "cops often side with accused rapists even when they're not wealthy and connected."  Although I referred to this practice as "business as usual," it did not reflect my thoughts on the behavior of the specific Plaintiffs in this case.  Indeed, at this point, I did not even know the names of the officers responsible for investigating Megan's claims.  Rather, I was making a broader statement, based on information I learned in my prior reporting, that, systemically, police officers often do not believe accused rape victims.  I believed that Captain Hood's statement, that women who reported rape in Tuscaloosa often "are not doing well in school

and hope that by doing this they can get some help from the university with their grades," supported my general understanding.  I also asked Ms. Restrepo if, due to her profession, she could connect me with attorneys in the Tuscaloosa legal community who could help me understand how rape claims are reported and investigated there.  Ms. Restrepo was ultimately unable to connect me with anyone who could provide information related to the subject of my investigation and, accordingly, nothing that Ms. Restrepo told me was used in the final Article.

       c.   Leroy Maxwell, the attorney representing Emma Manion in the criminal case brought against her for falsely reporting rape.  Mr. Maxwell indicated that Ms. Mannion was not interested in speaking about the case, but he agreed to speak with me generally about rape cases in Alabama when I visited Tuscaloosa.

       d.   Meg McGlamery, the Director of Development and Communications for Crisis Center Birmingham, an organization that provides counseling for rape victims. From Ms. McGlamery, I was hoping to get a better understanding of support services for rape victims in Alabama.  Ms. McGlamery explained that there was an organization in Alabama called Turning Point, which provided intervention services for victims of sexual assault.

       e.   Amy Gundlach-Foster, the Executive Director of Turning Point.   From Ms. Gundlach-Foster, I was hoping to learn more about Alabama's rape laws and the process of reporting rape in Alabama.  She agreed to meet with me when I visited Tuscaloosa.

       f.   Joan Sulzman, a family friend of the Rondinis who tried to help Megan when she initially reported her rape.  Ms. Sulzman provided me with the names and contact information of various crisis counseling centers in Alabama, including the Crisis Services of North Alabama, the Alabama Coalition Against Rape, and the Alabama Coalition Against Domestic Violence.

34. I also contacted Bradley Fisher, the Corporate Director of Marketing and Communications for DCH, the hospital where Megan was treated after her alleged rape. I asked Mr. Fisher if he could provide me with hospital policies concerning treatment of patients who claim that they have been sexually assaulted, including whether the hospital had a SANE (Sexual Assault Nurse Examiners) program. I was not seeking information about Rondini at that time – I was just seeking to learn about general practices.

35. In addition, I asked my colleague, Alex Campbell, to assist me with research for the Article. Alex and I had worked together on the Maryland rape law article, mentioned in Paragraph 11, *supra*, and I trusted his ability to gather relevant information. Alex was initially supposed to work on the story with me but, due to timing conflicts, his role was limited to correspondence with individuals and institutions for background information.

36. Alex contacted the Tuscaloosa Police Department to ask for any statistics they had concerning the prevalence of rape claims and the number of claims that the police had marked "unfounded." Alex also asked what the "special inquiry" label on Megan's initial police report meant. Alex did not ask questions about Megan's case specifically because I planned to personally contact the police later in the investigation, once I had gathered the full police report – *i.e.*, the felony packet – in that case.

37. Alex spoke with Captain Hood on January 24, 2017. He summarized that call in an email to me. During the call, Captain Hood explained that the term "special inquiry" is used when a victim does not actually know whether a crime occurred. As an example, he noted that a victim may wake up and not know where she is or what happened the night before, so she reports a rape. Captain Hood explained that most cases like these are closed by the victim because she realizes that nothing happened. Captain Hood did note that the police investigate these claims, but

he said investigations are very difficult when victims cannot remember what happened. He also explained that there were 42 rape cases last year and 51 "special inquiry" cases. A true and correct copy of Alex's summary of his call with Captain Hood was produced in this ligation as BuzzFeed00027 and is attached hereto as **Exhibit 12** (Doc.63-12).

38. Alex also submitted Open Records Law requests to the Tuscaloosa District Attorney's Office ("DA's Office"), requesting documents related to Megan's case, and to the University of Alabama Police, requesting statistics about rape allegations. True and correct copies of Alex's requests were produced in this litigation as BuzzFeed00091 and BuzzFeed00172 and are attached hereto as **Exhibit 13** (Doc.63-13).

39. When Alex did not hear back from the DA's Office, he followed up via email. Jonathan Cross, a representative from the DA's Office, indicated that some of the information that Alex sought was already made public in the Alabama court but some of the information was pending amid a continuing criminal investigation. I was confused by Mr. Cross's response and asked Alex to continue to try to contact the DA's Office to discuss the information that we were seeking. A true and correct copy of Alex's communication with Mr. Cross was produced in this litigation as BuzzFeed00020 and is attached hereto as **Exhibit 14** (Doc.63-14).

***My Trip to Tuscaloosa, Alabama***

40. On January 31, 2017, I flew to Alabama to further investigate the story. I spent a total of one week there, during which I traveled between Birmingham and Tuscaloosa, visiting some of the locations relevant to Megan's story, including the Innisfree Pub.

41. During my trip to Alabama, I spoke with about six of Megan's friends from the University with whom she had communicated in the immediate aftermath of her alleged rape. These friends explained that Megan felt bullied by the hospital, the police, and her counselor at

the University of Alabama and became withdrawn after the incident.  They explained that Megan loved the University of Alabama and transferring to Southern Methodist University was an incredibly difficult decision for her.  But they claimed that the potential to see Bunn or his family members around the community caused Megan anxiety.

42.     I also spoke with the friend to whom Megan sent the "Guck" text message.  She said that she did not know how to interpret it; all she knew was that a few hours after Megan sent her the message, Megan reported that she had been raped by Bunn.  The friend explained her opinion that it is possible for a woman to indicate that she is going to have sex with a man but then revoke consent prior to intercourse.  The friend told me police never interviewed her.

43.     In addition, while in Alabama, I met with Mr. Maxwell (the attorney for Emma Mannion) and Ms. Gundlach-Foster (the Executive Director of Turning Point).  I did not speak with Mr. Maxwell much about Megan's claims.  Instead, he provided me general information about the challenges of reporting rape in Alabama.  Similarly, Ms. Gundlach-Foster discussed with me the process of reporting rape and the resources available to women who have been sexually assaulted.  I learned that it is difficult to prosecute rape claims in the state because of a requirement that victims "earnestly resist" their attackers. In fact, I had just written a story that I worked on for six months about this issue – and for that article, I interviewed numerous experts about the law nationwide, including former police chiefs from the International Association of Chiefs of Police ("IACP"). So, the issue was fresh in my mind. While the information that Mr. Maxwell and Ms. Gundlach-Foster provided me was helpful background that shaped my understanding of the relevant law, I did not ultimately quote them in the final Article.

***Drafting the Article***

44. Upon returning from Alabama in early February 2017, I discussed my trip and what I had learned with my editors. We agreed that it made sense for me to begin drafting an article. The first draft was never intended to be something that we published—indeed, my investigation was still very much in process. While I had spoken with the Rondinis, a few experts, and Megan's friends, I had not yet communicated with representatives from DCH, the police department, or the University of Alabama about Megan's claims, and I had not contacted Bunn. And while I had in my possession the initial police report, I still did not have the detailed investigatory files. I knew these additional conversations and documents would influence the Article. Thus, drafting what would eventually become the Article at this point was just a helpful way to organize my thoughts.

45. I used the Internet-based application, Google Docs, to draft the Article. Google Docs is a program that allows documents to be created, edited, and stored online. Documents created on Google Docs can be viewed and edited by numerous users simultaneously, making it useful for news organizations, like BuzzFeed, which must work collaboratively to draft and edit articles. Individuals with permission to edit the document can both make substantive changes to the document and can add "comments" into it. When a user adds a comment into a document, that comment both appears in the document itself and is sent via email to all other users receiving "notifications" for that document. Google Docs is a dynamic program. Accordingly, as the document changes and comments are added or deleted, updates can immediately be seen by everyone with access to the document. This means, however, that each version of the document is not saved. Rather, in order to freeze a specific version of the document, a person with access to the document must download it locally on his or her computer.

46. There were six separate drafts of the Article at issue in this litigation. I cannot state with specificity when each was created, but I can provide general descriptions of each draft.

a. The first draft is the draft that I wrote after I returned from Alabama in the middle of February. A true and correct copy of this draft was produced in this litigation as BuzzFeed03815 and is attached hereto as **Exhibit 15** (Doc.63-15).

b. The second draft was created a few days after the first and was more of a research document, in which I both revised the Article and typed in notes about my research as it progressed. A true and correct copy of this draft was produced in this litigation as BuzzFeed03826 and is attached hereto as **Exhibit 16** (Doc.63-16).

c. The third draft is the draft that Sharmila Venkatasubban, a fact-checker employed by BuzzFeed, fact-checked. A true and correct copy of this draft was produced in this litigation as BuzzFeed03803 and is attached hereto as **Exhibit 17** (Doc.63-17).

d. The fourth draft is the draft created in May 2017, where the bulk of my work occurred and where I made the most substantial changes to the Article. This is the first draft that substantively incorporated the information I obtained from the police's investigatory files. A true and correct copy of this draft was produced in this litigation as BuzzFeed03844 and is attached hereto as **Exhibit 18** (Doc.63-18).

e. The fifth draft is a draft that I discussed with BuzzFeed's attorneys. This document was withheld based on the attorney-client privilege and was logged on Defendants' privilege log.

f. The sixth draft is a second fact-checking draft that Sharmila fact-checked after we received the police's investigatory files. A true and correct copy of this draft was produced in this litigation as BuzzFeed03783 and is attached hereto as **Exhibit 19** (Doc.63-19).

In addition to these drafts, I also received dated email notifications for all comments added to any of the drafts, all of which I understand were produced in this litigation.

47. As explained in Paragraphs 44 and 45, *supra*, I wrote the first draft of the Article soon after returning home from Alabama. The draft still reflected the story as told to me by the Rondinis—that Megan was bullied by the various institutions who were seeking to cover up Bunn's actions. *See* **Exhibit 15** at BuzzFeed03815 (Doc.63-15, p. 2). This early draft changed substantially over time as I learned more information.

48. In addition, much of the first draft of the Article included information from a source to whom I provided confidentiality, which I understand has been redacted in the documents produced in this case. This source was unrelated to the investigation into Megan's rape claims. Because this source refused to be named or speak on the record, we eventually decided to remove any information about this source from the Article. Removing that information meant the story was substantially revised.

49. After I put together a first draft of the story, I sent it to my editors, Marisa and Tina, to get their high-level thoughts about it. Marisa and Tina provided numerous comments and suggestions in the draft. If I agreed with a change, I would make it in the draft. If their comment required discussion or if I disagreed with a suggestion, we would discuss it further either directly in Google Docs or via telephone. The same process occurred with the second draft and each subsequent draft of the Article.

***My Continued Communications with Experts and Other Sources***

50. As I drafted the Article, I also continued to contact experts to be sure that all of the material included in the article—down to the smallest details—was entirely accurate. I spoke with experts ranging from individuals knowledgeable of rape on college campuses, *see* **Exhibit 20**

(Doc.63-20), to representatives of the humane society who could explain to me what it meant to "hunt the Big Five" (as Bunn did), *see* **Exhibit 21** (Doc.63-21), to representatives from the DA's Office who explained why Bunn's DUI records were not be publicly available, *see* **Exhibit 23** (Doc.63-23). I also spoke with Linda Ledray, the director of the SANE-SART Resource Service, who explained to me the best practices for urine and blood collection of sexual assault victims. A true and correct copy of my communications with Ms. Ledray was produced in this litigation as BuzzFeed01535 and is annexed hereto as **Exhibit 22** (Doc.63-22).

51.  In addition, on February 7, 2017, I received an official email statement from Mr. Fisher at DCH, with whom I had been communicating prior to my trip to Alabama. *See* Paragraph 34, *supra*. In response to my questions about the hospital's policies for sexual assault victims, Mr. Fisher explained that DCH nurses are not SANE certified. He also noted that DCH informs patients that "the presence of family members, friends and others offering personal support during the examination [by nurses] may influence or be perceived as influencing her statements." A true and correct copy of this statement was produced in this litigation as BuzzFeed00057 and is attached hereto as **Exhibit 24** (Doc.63-24). I immediately included Mr. Fisher's comments in the first draft of my article. *See* **Exhibit 15** at BuzzFeed03819 (Doc.63-15, p.6).

52.  After receiving Mr. Fisher's comments, I discussed them with Ms. Gundlach-Foster from Turning Point to try to get a better understanding of the responses. She helped me draft some follow-up questions. A true and correct copy of my correspondence with Ms. Gundlach-Foster was produced in this litigation as BuzzFeed01211 and is attached hereto as **Exhibit 25** (Doc.63-25). While Mr. Fisher answered some of my questions, he declined to answer any further questions about the hospital's practices. A true and correct copy of additional correspondence with Mr. Fisher was produced as BuzzFeed00318 and is attached hereto as **Exhibit 26** (Doc.64-26).

53.     Alex similarly continued his discussions with Captain Hood concerning statistics on sexual assault in Tuscaloosa.  On February 24, 2017, Captain Hood provided detailed statistics on all sexual assault reports between 2011 and 2016, including the dispositions of such cases.  These statistics included "special inquiries" that could be potential sexual assaults.  Captain Hood again explained that special inquiries were instances where the victim "does not know if something happened to them or there is not enough information initially to meet the elements of a crime or there are some other extenuating circumstances."  Captain Hood also said that "special inquiries" could be as high as 30-45% of the sexual assault cases.  For the next two weeks, Alex and Captain Hood exchanged emails to ensure that we had a full understanding of the information that Captain Hood provided.  A true and correct copy of Alex's correspondence with Captain Hood was produced in this litigation as BuzzFeed00325 and BuzzFeed00346 and is attached hereto as **Exhibit 27** (Doc.63-27).

54.     Based on the information that Captain Hood provided to Alex along with my conversations with experts on rape reports in Alabama, I was surprised that Megan's case was labeled a "special inquiry."  This was not an instance where a victim did not know if something happened to her—Megan knew that she and Bunn had intercourse and said she did not want to.  I understood that by labeling Megan's case a "special inquiry," the police department doubted her claim that she had been raped under Alabama law.

55.     In order to better understand the information that Captain Hood provided, Alex and I contacted numerous additional sources, including:

a.     A representative from the Federal Bureau of Investigation in order to better understand how Tuscaloosa's statistics on rape prosecutions compared with federal data.

b. Jonathan Cross from the DA's Office in order to learn how many of the cases discussed by Captain Hood actually resulted in formal charges. While Mr. Cross initially refused to provide any documents to us, on a phone call with Alex, he eventually stated that his office could not determine how many sexual assault cases resulted in formal charges. He explained, "I'm ashamed to say—we don't know. Which is sort of a black eye in our office." A true and correct summary of Alex's call with Mr. Cross was produced in this litigation as BuzzFeed00434 and is attached hereto as **Exhibit 28** (Doc.63-28). I added Mr. Cross's statement into the second draft of the article. *See* **Exhibit 16** at BuzzFeed03827 (Doc.63-16, p. 3).

c. Leroy Maxwell, the attorney in the Mannion case. I wanted to understand how a "special inquiry" went to a grand jury and the difference between felony and misdemeanor sexual assault cases in Alabama.

d. Corey Rayburn Yung, the expert in police investigations. I asked Mr. Yung if he had ever heard of the phrase "special inquiry." He explained that he had not heard it before and, therefore, believed that it was a term local to the Tuscaloosa Police Department.

56. Finally, Alex called Captain Hood again to ensure that we truly understood what he meant by "special inquiry." Captain Hood provided another example of a special inquiry case that he said "happens all the time." He explained that a University student may be found by her roommate wearing only a t-shirt. The roommate may call the police thinking something happened. When the police arrive to discuss the case, the student's other friends say that nothing happened to her. Again, this seemed to be very different than what occurred in Megan's case. A true and correct copy of Alex's notes from this telephone call was produced in this litigation as BuzzFeed00371 and is attached hereto as **Exhibit 29** (Doc.63-29).

57. Once I felt that I understood the information that Captain Hood provided, I added it into the second draft Article. *See* **Exhibit 16** at BuzzFeed03827 (Doc.63-16, p. 3).

***Preliminary Fact-Check of the Article***

58. In early March 2017, once I had a cogent draft of the Article that had been reviewed by my editors, the draft was sent to Sharmila to conduct a preliminary fact-check of everything in the piece. The fact-checker reviews the draft and the source materials to ensure that everything we say in the article is accurate and supported by facts. This often involves discussions between the fact-checker, the journalist, and the editors. The fact-checker may also contact sources to ensure that details in the article are accurate.

59. I gave Sharmila access to all of my notes and communications from the investigation. When Sharmila would ask questions about the support for certain statements in the draft, I would point her to specific communications or other information. As I received further information from Captain Hood and Mr. Cross, among others, I sent that information to Sharmila to ensure that she had all relevant information. I provided Sharmila with every document, video, audio or other piece of information she requested.

60. Sometimes the Article changed as a result of Sharmila's fact-checking. For example, in the draft of the Article that Sharmila was reviewing, I had written that "Tuscaloosa authorities threatened to charge Megan herself with a crime." At that time, I had not yet reviewed the Investigators' felony packet and was basing this statement on an email from Lieutenant Hart and a text message Megan had sent to her friend. Sharmila said that, based on these materials, she could not conclude whether officers were actually threatening to charge Megan with a crime when she was first interviewed by the Police. Accordingly, we decided it would be better to change the draft to state that "Megan felt threatened" to make this point clearer. Ultimately, after we reviewed

the full police records, this portion of the draft was cut and did not appear in the final Article. A true and correct copy of this communication with Sharmila was produced in this litigation as BuzzFeed02675 and is attached hereto as **Exhibit 30** (Doc.63-30).

61. I also understand that Sharmila contacted the Rondinis to confirm that the information I learned from them was accurately reflected in the Article. A true and correct copy of this communication with Sharmila was produced in this litigation as BuzzFeed05781 and is attached hereto as **Exhibit 31** (Doc.63-31).

***Receipt of the Felony Packet and Megan's Medical Records***

62. By early March, Marisa, Tina, and I felt that we were in a position to begin wrapping up the reporting, which would have included reaching out to the parties discussed in the piece. But we discovered that would mean the Article would be scheduled to be published during spring break at the University of Alabama. Because this Article was on an issue of public importance and involved a former student at the University of Alabama, we believed that more students would read the Article if it was published after the school break. So we decided to hold the Article, and I did additional reporting.

63. Between April and May 2017, I received information from DCH and the police, which greatly affected my reporting.

64. Specifically, in April 2017, Mr. Rondini received Megan's medical records from DCH, which he forwarded to me. The medical records reported that when Megan arrived at the hospital, she stated that she had sex with Bunn that was "not consensual" and she told him that she "didn't want to." She said that Bunn at first did not hold her down but, eventually, had intercourse with her while holding her down. While the medical records were clear that a rape kit was performed on Megan, they were not clear if her blood and urine samples were ever sent for a

toxicology report. A true and correct copy of Megan's medical records were produced in this case as BuzzFeed05833 and is attached hereto as **Exhibit 32** (Doc.63-32).

65.     After I reviewed these medical records, I spoke with two members of the Alabama Department of Forensic Sciences about toxicology analyses and drug-facilitated sexual assaults. They confirmed that they did not have any records associated with Megan's case.  I was surprised by this.  Megan reported that she had been out drinking at a bar and then could not remember how she got into Bunn's car.  It seemed like it would have been important to know whether there were any drugs in Megan's body.  The Department also informed me that it is the Police's responsibility to order the testing of a victim's blood and urine if they suspect there may have been a drug facilitated sexual assault or if there were gaps in a victim's memory.  A true and correct copy of this correspondence was produced in this case as BuzzFeed01640 and is attached hereto as **Exhibit 33** (Doc.63-33).

66.     Separate from the medical records, Mr. Rondini also informed me that the police department had responded to his subpoena and turned over the investigatory files associated with Megan's case.  Because Mr. Rondini was concerned about sending this information via email, I flew to Texas and downloaded the information onto an external drive.  This material included, among other things, the entire felony packet that the police department created for Megan's claim against Bunn and video files of the police's interviews with Megan and Bunn.  A true and correct copy of the felony packet that I received was produced in this case as BuzzFeed01889 and is attached hereto as **Exhibit 34** (Doc.63-34).  True and correct copies of the videos I received are attached hereto as **Exhibits 35, 36 and 37** (Docs.63-35, 63-36 and 63-37), respectively.

67.     I was thrilled to receive this material as it finally allowed me to see precisely how the police department—specifically, Investigators Adam Jones and Josh Hastings, whose names I

learned for the first time as a result of these documents—investigated Megan's claims. I believed at the time I wrote the Article—and continue to believe to this day—that the felony packet and other police records were the best possible sources of information about the police's investigation into Megan's alleged rape.

68. I closely reviewed all of the materials that Mr. Rondini provided to me and found the documents and videos illuminating for numerous reasons:

a. *First*, I read about Bunn's initial discussions with the investigators who went to his home after Megan reported that she was raped. I learned that Bunn initially lied to the police and told them that no one had been at his home the evening before. I also learned that while investigators were at Bunn's home but before they could fully investigate the crime scene, Bunn closed the window from which Megan had climbed out of his room. Further, after Bunn stated that he wanted to speak with his attorney, investigators left the scene, allowing Bunn to remain in his home unsupervised. I thought this was extraordinary. Megan accused Bunn of raping her, Bunn had lied to the police and tampered with evidence, but the police nonetheless left him alone to contaminate the crime scene.

b. *Second*, I listened to the audio recording of Bunn's initial interview with police at his home. During this interview, Bunn was not read his Miranda rights despite the fact that Megan had accused him of rape. After the interview, Bunn was allowed to leave town for a fishing trip with his lawyer. To me, this was remarkable, particularly when compared with the way the police treated Megan.

c. *Third*, I listened to the interviews with Megan and Bunn from the police station. The difference between the interviews was notable. During Megan's interview, as soon as she indicated that she had taken Bunn's gun and money from his wallet, Investigator Jones left the

room.  When he came back, he questioned her about her alleged theft rather than focusing on her

sexual assault claims.  Eventually, he read Megan her Miranda rights and began to interrogate her

about the alleged theft.  He did so without formally announcing that he was changing the subject

of the investigation from her rape allegations to the potential theft of Bunn's property.  Investigator

Hastings' interview with Bunn—which occurred three days later—was much more cordial.  Bunn

referred to Investigator Hastings by his first name.  Investigator Hastings asked Bunn about his

fishing trip.  At one point, after Bunn thanked Investigator Hastings for his professionalism,

Investigator Hastings said, "if it was me on the other side, I would want someone to do the same

for me."

     d.   *Fourth*, I learned for the first time that the investigators discovered that Megan had

returned to her own apartment with Bunn and one of his friends before they went back to Bunn's

home.  Megan claimed that she had no recollection of this.

     e.   *Fifth*, I saw that Investigator Jones offered Megan a "refusal to prosecute" form on

the first day of her interviews with the police.  I was surprised at how quickly he did so.  I learned

in my previous reporting on rape cases that investigators should not pressure victims to drop their

cases immediately.

     f.   *Sixth*, the first page of the felony packet stated that "no sexual assault occurred."  I

thought it was unusual that a felony packet—which is created to present to a grand jury in order to

bring charges against a suspect—would indicate that no crime had occurred.

     g.   *Seventh*, the "Case Report" in the felony packet stated that Megan had sex with

Bunn and "that she never told him to stop or showed any form of earnest resistance."  But this

contradicted what was written in the initial report, in which Megan reported that she did, in fact,

tell Bunn to stop, he refused to do so, and he held her down by the hips.  There was no evidence

in the felony packet that Megan's statements during her initial report were further investigated by Investigators Jones and Hastings.

h.   *Eighth*, the felony packet contained notes on all of the other interviews that police had conducted as part of this investigation.  This included only: (1) the cab driver that Megan had called on the night of the incident; (2) Bunn's friend that was with him at Innisfree Pub and his home on the night of the incident; and (3) the friend that brought Megan to the hospital.  According to the felony packet, Investigators Jones and Hastings did not interview any of Megan's friends who were with her at Innisfree, any of the employees at Innisfree, or any of the other friends that Megan had texted immediately after the alleged rape.  I was surprised by this because it was clear that I had done more work to talk to Megan's friends than the police did.

i.   *Ninth*, the felony packet included information about Megan's alleged theft of Bunn's property.  At one point, Megan was listed as a "suspect" and Bunn was listed as a "victim *See* **Exhibit** 34, BuzzFeed01954 (Doc.63-34, p. 67).  I was confused as to how Megan's alleged theft of property had anything to do with whether or not she was raped by Bunn.

j.   *Tenth*, while there were some photographs of CDs at the end of the felony packet, including one titled "Cellphone Analysis," there was no indication that the police had ever looked at the contents of Megan's text messages.  Notably, the "Guck" text message that Megan sent to her friend on the night of the alleged rape was nowhere mentioned in the felony packet or in any of the interviews with Megan or Bunn.

k.   *Eleventh*, there was no indication that the police ever dumped Bunn's phone despite the fact that Megan told Investigator Jones that Bunn was texting with someone when they arrived at his house prior to the alleged sexual assault.  It was striking to me that the police had downloaded Megan's cell phone but not Bunn's.

69. After I reviewed all of this material, I made substantial changes to the draft Article. Specifically, I added numerous quotations from Megan's and Bunn's interviews with the police and also included information from the felony packet, such as the conclusion that "no sexual assault had occurred." Further, I added the fact that Megan had returned to her home with Bunn prior to going back to Bunn's home, but she could not recall doing so.

70. While Bunn and Investigator Hastings appeared friendly in the videos of Bunn's interview, and while Bunn did refer to Hastings by his first name, I did not see any evidence that the police covered up Bunn's assault of Megan because of his prominence in the community. I removed any reference to a "cover-up" in the Article.

71. At this point, because I was directly discussing and even quoting the police's interviews with Megan and Bunn for the first time, I included the names of Investigators Jones and Hastings in the draft Article. Investigators Jones and Hastings were the two lead investigators in Megan's case, and their names were featured in all of the documents on which I was reporting. I never questioned that their names should be included and, despite this lawsuit, I still do not question that decision. Throughout my time at BuzzFeed, whenever we are discussing police officers or other taxpayer-funded public officials, their names are included in the articles we write.

72. I also contacted a representative from the IACP (the International Association of Chiefs of Police), who agreed to speak with me on the phone, to ask whether the police's investigation of Megan's rape allegation was consistent with best practices. A true and correct copy of my email contacting the IACP was produced in this litigation as BuzzFeed05937 and is attached hereto as **Exhibit 38** (Doc.63-38).

73. The IACP representative with whom I spoke gave me background information on best law enforcement practices concerning sexual assault cases and pointed me to the IACP's

guidelines. The IACP guidelines explained that when victims of sexual assault have gaps in their memory, police should consider the possibility that drugs were involved. A true and correct copy of the relevant IACP guidelines is attached hereto as **Exhibit 39** (Doc.63-39)**.** From the felony packet, I understood that the investigators in Megan's case did not do so. In addition, the guidelines note that police should not pressure victims to make decisions about prosecution during the initial stages of an investigation. Investigator Jones' decision to offer Megan a "refusal to prosecute" form on the first full day of the investigation seemed to directly contradict this instruction. I added information about IACP guidelines into my draft Article.

74. Once I made these changes, the draft Article again underwent edits from my editors, Tina and Marisa, and we further communicated about how to best and most accurately present the story of how various institutions handled Megan's rape claims.

***The "No Surprises" Communications***

75. In late May 2017, as the story neared completion, I began sending out "no surprises" communications. "No surprises" communications are, in my opinion, the most important step in drafting an article. This is when we contact the individuals mentioned in the article, enumerate exactly what we plan to report about them and give them an opportunity to respond. It is important to wait until an article is almost fully formed before sending a "no surprises" letter. This way, we do not waste individuals' time and resources responding to points that we do not actually intend to include in the article.

76. Between May 31, 2017 and June 6, 2017, I sent "no surprises" communications to: (1) TJ Bunn; (2) DCH; (3) the University of Alabama; (4) Kathy Echols, the counselor at the University of Alabama who refused to treat Megan because of her relationship with the Bunn family; (5) Mr. Cross from the DA's Office; and (6) the Tuscaloosa Police, including Captain

Hood, Lieutenant Kip Hart, and Investigators Jones and Hastings. When sending these communications, I would generally first send a high-level email, explaining that I was writing about the investigation into Megan Rondini's alleged rape and asking if the person would speak with me about it. If they did not respond or if they said that they had no comment, I would then send another, more detailed email, spelling out the exact statements about them that I planned to include in the Article.

77. I went to great lengths to ensure that I received responses from everyone to whom I sent "no surprises" communications. For example, I initially sent an email to Bunn asking if he would speak with me. When he did not respond, I sent numerous follow-up emails to every email address that I could find him. In addition, I called phone numbers that were publicly listed for him. I also emailed and called his lawyers and called the corporate offices of his family's business, ST Bunn Construction. After all of that, I eventually received a response from Bunn's attorneys, which I included in the Article. True and correct copies of these "no surprises" communications to Bunn were produced in this litigation as BuzzFeed01589, BuzzFeed01599, BuzzFeed01614, BuzzFeed01618, BuzzFeed01621, BuzzFeed01623, BuzzFeed01625, BuzzFeed01627, and BuzzFeed01671 and, together, are annexed hereto as **Exhibit 40** (Doc.63-40).

78. As for the Tuscaloosa Police, I initially contacted Captain Hood, Lieutenant Hart, and Investigators Jones and Hastings via separate emails between June 1, 2017 and June 6, 2017. I sent these "no surprises" communications by regular mail, as well. True and correct copies of these initial "no surprises" communications were produced in this litigation as BuzzFeed01630, BuzzFeed01636, BuzzFeed00458, and, BuzzFeed01646, and, together, are annexed hereto as **Exhibit 42** (Doc.63-42). At some point, I learned that Captain Hood was the best person to speak with and would speak on behalf of the entire Police Department. Initially, Captain Hood refused

to respond to my requests for comment.  A true and correct copy of his correspondence to me refusing to comment on the Article was produced in this litigation as BuzzFeed00465 and is attached hereto as **Exhibit 41** (Doc.63-41).

79.     Because it was very important to me that I communicated with the police to ensure that the details of my story were accurate, I continued to email Captain Hood.  I asked whether he would be willing to speak more generally to discuss the police's training and policies rather than Megan's case specifically.  Again, Captain Hood refused.  A true and correct copy of his correspondence to me refusing to comment on the Article was produced in this litigation as BuzzFeed00462 and is attached hereto as **Exhibit 43** (Doc.63-43).

80.     I then sent Captain Hood a more detailed email, enumerating exactly what I planned to publish.  I was elated when, a mere three days later, Captain Hood sent me a lengthy email responding to my questions.

81.     In that email, Captain Hood explained that the Homicide Unit's investigators do receive sexual assault investigations training, but he did not provide me with any specific details. He explained that all sexual assaults, including "special inquiry" reports are investigated thoroughly.  He again provided me with examples of "special inquiry" cases.  As to Megan's case specifically, Captain Hood explained that her initial statements did not meet the criminal elements of rape.  He explained that her "lack of earnest resistance" was a factor in the investigation because she "admitted to being coherent and never told the suspect 'No.'  She was never threatened by the suspect either.  She never yelled for help, never called 911 or made any statement or took further action that would clearly reflect that she was not a willing participant in the sexual act.  Further, after she was sexually assaulted, she left the residence, then returned by climbing back into a second story window to get into the same bedroom with the suspect where she claimed she was

sexually assaulted." Captain Hood also noted that Megan "admitted to committing two felonies during her interview and possibility another one," so "[l]egally [they] were obligated to investigate this." He further explained that the Police did not ask the hospital to draw blood or urine because Megan was "conscious and did not make any claim that she was drugged, passed out or forced to drink alcohol." Captain Hood also explained that Megan's case was presented to a grand jury, which "no billed" the case. Finally, he claimed that Bunn's story was consistent throughout between his two interviews with police. A true and correct copy of Captain Hood's email to me was produced as BuzzFeed01656 and is annexed hereto as **Exhibit 44** (Doc.63-44).

82. I found Captain Hood's email very helpful. He enumerated exactly why the investigators did not believe that Megan had been raped under Alabama law. Notably, Captain Hood did not mention any of Megan's text messages, including the "Guck" message.

83. In response to Captain Hood's email, I sent some follow-up questions, hoping to clarify some of his responses. Captain Hood again responded to me, providing additional information. He noted that the police eventually presented "all cases to the Grand Jury and let them determine if any charges should be filed." He also reaffirmed that Investigator Hastings had never had contact with Bunn prior to this investigation. Despite repeated requests, he did not provide me with the Homicide Unit's policies and procedures for investigating sexual assaults. I again asked him for this documentation, but he never responded. I also asked him some further questions about the statistics that he provided to me to which he responded. True and correct copies of my further communications with Captain Hood were produced as BuzzFeed00556 and BuzzFeed00538 and are annexed hereto as **Exhibits 45 and 46** (Doc.63-45 and Doc.63-46).

84. Finally, confused about Captain Hood's comment that "all cases" were presented to the grand jury, I sent him one additional follow-up email asking him to clarify which of Megan's

cases went in front of the grand jury. He told me "[h]er case as the victim was presented, but her case as the suspect was not presented." A true and correct copy of this communication was produced in this litigation as BuzzFeed00596 and is annexed hereto as **Exhibit 47** (Doc.63-47). After the Article was published and as part of this litigation, I subsequently learned that Captain Hood was correct. Megan's case as a suspect was, in fact, presented to the grand jury after her death and was returned with a "true bill." Doc.63-70, pp. 47-48.

***The Final Fact Check***

85. Once I received comments to each of my "no surprises" communications, I added the responses from each individual or institution into the draft Article. The draft then continued to be revised by Tina and Marisa.

86. While Ben Smith was, at the time, the Editor in Chief of BuzzFeed, consistent with his job responsibilities, he was not involved in making day-to-day decisions about the Article. At the beginning of the investigation, I gave him a high-level overview of what I understood the story to be about. Unlike Marisa and Tina, he did not substantively edit the Article.

87. On May 22, 2017, when the draft Article was in a nearly final form, I again sent it to Sharmila for a second fact-check. I shared with her all of the investigatory files, including the felony packet and videos of Megan's and Bunn's interviews with police. Sharmila provided feedback on the draft, which I either incorporated or, when I disagreed with a comment, discussed with her. By the time the fact-check was complete, Sharmila told me that she felt fully comfortable with everything in the Article.

88. After the final fact-check, we eventually settled on the headline for the Article: "How Accusing a Powerful Man of Rape Drove a College Student to Suicide." While selecting a headline was not within my responsibilities as a reporter, I believe that the headline accurately

reflects the content of the Article. Unlike the headlines on the first draft, this headline in no way stated or implied that the Police Department or any other institution mentioned in the Article covered up Bunn's crimes.

***The Published Article and Succeeding Article***

89. On June 22, 2017, BuzzFeed published the Article on its website, www.BuzzFeed.com.

90. After the Article was published, I received an email from Ben Smith congratulating me on its publication.

**This Litigation**

***The Challenged Statements***

91. I understand that Plaintiffs specifically challenge eleven statements from the Article as false and defamatory. *See* [Chart of defamatory statements]. I feel confident, however, that each of these challenged statements is accurate. The information contained in these statements comes directly from the Investigators' interviews with Megan and Bunn, the felony packet, and my communications with Captain Hood and other sources.

92. *First*, I understand that Plaintiffs challenge the headline of the Article—"How Accusing a Powerful Man of Rape Drove A College Student to Suicide." *See* Doc.51-6, p. 2. Notably, this title does not even mention Plaintiffs. In any event, it is an accurate summary of the Article, which describes how Megan reported her alleged rape to the hospital, the Police, and therapists at the University of Alabama and eventually, after she felt that she had not been taken seriously by any of these institutions, she committed suicide.

93. *Second*, I understand that Plaintiffs challenge the sub-headline of the Article—"When an Alabama college student told the police she was sexually assaulted, she did everything

she thought she was supposed to do.  She ended up killing herself." *Id*. at 3.  This sub-headline, like the headline, is an accurate representation of events.  Megan did everything that young women are told to do when they are sexually assaulted—she went to the hospital, reported the claim to the police, and sought therapy.  She later killed herself, leaving behind a medical intake form that stated, "[r]aped, bullied by police, changed university."

94.     *Third*, I understand that Plaintiffs challenge the statement in the Article, "Megan never imagined that she would soon be cast as a criminal or that investigators would view Sweet T—really T.J. Bunn Jr., son of an influential Tuscaloosa family—as the true victim.  But that's exactly what happened." *See Id*. at 3.  This statement accurately characterizes the investigation into Megan's claims.  When Investigator Jones learned Megan took Bunn's gun, he shifted the focus of his questions from her allegations against Bunn to the crime she purportedly committed. *See* Doc.63-48, Tr. 24:11-62:8; Doc.63-49, Tr. 2:1-41:14.  The felony packet—which I understood to summarize the police's investigation into Megan's allegations—also contains a police report identifying Bunn as a "victim" and Megan as a "suspect." *See* Doc.63-34, p. 67.  I subsequently learned that the Tuscaloosa police presented the theft charges against Megan to a grand jury, which true-billed her case after her death.  Thus, it is accurate to state that the police viewed Bunn as the victim and Megan as the criminal.

95.     *Fourth*, I understand that Plaintiffs challenge the section of the Article noting that "the investigator who interviewed Megan quickly decided she hadn't fought back against Bunn. . . . His investigation would conclude that no rape occurred.  But he didn't stop there.  Instead, he started building a case against Megan." *See* Doc.51-6, p. 3.  This accurately describes Investigator Jones' conduct.  The Article directly quotes from Investigator Jones' interview with Megan, which took place just a few hours after the alleged assault during which he noted that Megan did not

"kick[]" or "hit" Bunn. *See* Doc.63-49, Tr. 32:4-13. The felony packet, prepared by Investigator Jones, concludes, "[i]t was found no sexual assault occurred and investigators were able to determine that the victim went with the suspect willingly after they took her home to Houndstooth Apartments." *See* Doc.63-34, p. 5. Finally, once Megan told Investigator Jones that she took Bunn's gun, he immediately began questioning her about that alleged theft, ultimately reading Megan her Miranda rights and interrogating her as a suspect. *See id.* Doc.63-49 (Tr. 2:12-3:4). Thus, it is accurate to state that Investigator Jones began "building a case against Megan."

96. I understand that Plaintiffs also challenge the statement in the next paragraph in the Article, "Later, when Megan tried to file a civil suit, she learned the only way to escape possible prosecution for those crimes was to drop her case." *See* Doc.51-6, p.3-4. This paragraph in the Article does not describe police conduct. Indeed, it could not do so because the police do not prosecute crimes. Instead, this statement accurately reflects that when the civil attorney the Rondinis hired to sue the police department reached out to the DA's Office, he was told the criminal case against Bunn for rape and the criminal case against Megan for theft would proceed together. The Rondinis' civil lawyer believed that he was told this to make him "cool [his] jets and wait for the criminal charges/case to 'play out' buying them some time, or at least hoping that [he'd] lay off until later." A true and correct summary of this conversation between the civil lawyer and the DA's Office is attached hereto as **Exhibit 51** (Doc.63-51).

97. *Fifth*, I understand that Plaintiffs challenge the statement "Megan's 3.8 GPA didn't stop police from marking her first report a 'special inquiry.' She didn't know that they already doubted her when she went to the station for a follow-up interview." *See* Doc.51-6. The initial police report unquestionably lists the "type of incident or offense" as "special inquiry." *See* Doc.63-8, p. 5. And, in response to my "no surprises" email, Captain Hood explained that Megan's

case was marked a "special inquiry" because her claim "did not meet the criminal elements of rape." *See* Doc.63-44, p. 4.  It is, therefore, clear when Megan's case was labeled a "special inquiry," police doubted that she was raped under Alabama law.

98.     *Sixth*, I understand that Plaintiffs challenge the statement "It took 21 minutes for Megan to tell investigator Adam Jones her side of the story, up to finding the pocket pistol . . . As soon as Megan mentioned the gun, Jones abruptly left the room . . . . After that, he changed his course of questioning.  For the next few hours, he came in and out of the room with questions for Megan that were about her behavior the previous night instead of her rape allegations." *See* Doc.51-6, p. 5.  This too is an accurate summary of Megan's interview at the Police Station. Megan told Investigator Jones:  "[W]hen I went to go look for my keys in the Mercedes there was like a pocket pistol or whatever and I just put it in my shorts for myself . . . But when my friends picked me up, I – it is in the grass like in front of his house, like I just put it back on the ground. . . . And that and like the keys are the only thing that I took . . . ." *See* Doc.63-48, Tr. 24:13-18.  As soon as Megan said this, Investigator Jones said, "Okay.  All right.  Let me check, I will be right back." *Id.* at 24:23-25:2.  Once Investigator Jones returned, he continued to question Megan about the gun. *Id.* at 26:18-22.  Eventually, Investigator Jones read Megan her Miranda rights and began interrogating her as a suspect for theft.  *See* Doc.63-49, Tr. 2:18-3:4.

99.     I understand that Investigator Jones says that he left the room to "alert investigators on the scene about the gun left in the neighborhood, that might have been found by children in the neighborhood." *See* Doc.51-6, p. 5-6.  But I reported exactly that in the Article, noting that Megan texted her friend that Jones seemed upset about the gun:  "He left as soon as I said that and hasn't come back and then told me that little kids could shoot themselves." Doc.63-5, p. 11.

100.     *Seventh*, I understand that Plaintiffs challenge the statement, "Studies show that trauma victims often have fragmented memories of assaults.  When confronted with such gaps, police should consider the possibility of drug-facilitated sexual assault, the International Chiefs of Police guidelines explain.  But investigators never tested Megan's blood or urine." *See* Doc.51-6, p. 6.  This statement reports accurately on: (1) the IACP guidelines (Doc.63-39, p. 8); and (2) Captain Hood's statement to me that the Police did not ask the hospital "to draw blood or urine because Rondini was conscious and did not make any claim that she was drugged, passed out or forced to drink alcohol.  She admitted to drinking alcohol on her own free will.  If circumstances dictate blood or urine is needed for a case, then we request that from the hospital." *See* Doc.63-44, pp. 4-5.

101.     *Eighth*, I understand that Plaintiffs challenge a section of the Article quoting from Investigator Jones' interview with Megan, specifically when he reads Megan her Miranda rights.  This portion of the Article notes, "[H]e didn't tell Megan that, although she had entered the room an alleged victim, she was now a suspect as well."  Doc.51-6, p. 6-7.  This portion of the Article directly quotes Megan's interview video.  *See* Doc.63-49, Tr.2:1-3:4.  Because Investigator Jones read Megan her Miranda rights, she was necessarily both an alleged victim and a suspect.  This is confirmed by Captain Hood's explanation:  Megan "admitted to committing two felonies during her interview and possibly another one.  Legally we were obligated to investigate this as well.  Thus, she was given Miranda since she could have incriminated herself further.  Legally, we had to do that.  Although she did not 'realize' she committed a crime does not negate the fact that she 'did' commit the crimes and bound us by our legal requirements to investigate them." *See* Doc.63-44, p. 4.

102.     *Ninth*, I understand that Plaintiffs challenge another section of the Article quoting from Investigator Jones' interview with Megan, this time when he told Megan that she never "kicked" or "hit" Bunn or "tried to resist him," and then offered to give Megan a "refusal to prosecute form." The Article explains, "[m]ore than 40% of people who reported sexual assault in Tuscaloosa from 2011 to 2016 officially dropped their charges by signing such forms." It then quotes Captain Hood, who explained to me why alleged victims may want to drop their cases. It finally notes that the IACP tells police "not to pressure victims to make any decisions about prosecution during the initial stages of the investigation." *See* Doc.51-6, p. 7-8. Much of this challenged statement directly quoted from Investigator Jones' interview. *See* Doc.63-49, Tr. 23:14-33:23. The statistics regarding sexual assaults in Tuscaloosa were provided to us by Captain Hood. *See* Doc.63-27, pp. 28-36. And Investigator Jones did give Megan a "refusal to prosecute" form less than 24 hours after the alleged rape occurred. *See* Doc.63-49, Tr. 27:15-33:23. While the Article never states that Investigator Jones violated IACP guidelines, I believe that presenting an alleged rape victim with a "refusal to prosecute" form within hours of reporting an alleged rape constitutes "pressure to make [] decisions" during the "initial stages of the investigation." *See* Doc. 63-39, p 6 (IACP guidelines)..

103.     *Tenth*, I understand that Plaintiffs challenge a section of the Article quoting from Investigator Hastings' interview with Bunn at the Police Station. *See* Doc.51-6, p. 9. As a preliminary note, Plaintiffs' Chart of Defamatory Statements omits large sections of the Article describing this interview. Regardless, as with the sections of the Article discussing Megan's interviews, this portion of the Article is a direct quote from Bunn's interview. *See* Doc.63-50, Tr. 4:20, 9:6-10:17, 16:14-17:10, 30:9-16, 38:17-39:5. Comparing Investigator Hastings' interview of Bunn with Investigator Jones' interview of Megan, it was clear to me that the police were much

friendlier to Bunn than to Megan.  This truth is also borne out by the fact that Bunn suffered no consequences for lying to the police and was allowed to leave town for three days with his lawyer before being questioned, while Megan was Mirandized within 12 hours of alleging that she was raped.

104.     *Eleventh*, I understand that Plaintiffs challenge the statement, "In a package deal, the grand jury would also rule on felony charges against Megan for breaking and entering into Bunn's car and stealing his gun.  Internal documents from September 2015 imply authorities didn't intend to fight too hard on Megan's behalf:  Investigators note they found 'no sexual assault occurred.'"  *See* Doc.51-6, p. 10.  Nowhere does this state that *Plaintiffs* made the decision to bring Megan's case to a grand jury.  That would be illogical—the DA's Office, not the police, is the entity that makes charging decisions.  And, indeed, this section of the Article reports on the conversation between Megan's civil attorney and the DA's Office.  *See* Paragraph 96, *supra*.  Police officers are, however, responsible for presenting cases to the grand jury.  And, as stated in Paragraph 95, *supra*, the felony packet states "no sexual assault had occurred."

105.     I also understand that Plaintiffs generally believe that the Article reports that they "incompetently and corruptly investigated" Megan's rape claims.  Doc.63-1 ("Compl."), ¶ 16.  Nowhere does the Article state as much, and I do not believe that the Article contains my opinion about the police's competence.  If asked to form an opinion, however, I think that there are many things the police could have—and should have—done differently.  For example: (1) Megan told the police that she was "held down" by Bunn, but no investigator asked additional questions about this; (2) Investigators did not interview any of Megan's friends at Innisfree as part of the investigation; (3) As soon as Megan mentioned that she took Bunn's gun, Investigator Jones stopped questioning her rape allegations and, instead, focused on the gun; (4) Investigator Jones

offered to give Megan a "refusal to prosecute" form during the day after the alleged rape; (5) The police did not test Megan's blood or alcohol for drugs, even though she could not remember large stretches of the night; (6) When police arrived at Bunn's home, he lied to them about having a woman there the previous night, but police did not arrest him or take him outside of his home. Bunn also closed his window, contaminating the crime scene; (7) Investigators Jones and Hastings left Bunn in his home after he asked to speak with his lawyer, allowing him to further contaminate the crime scene; (8) When police returned to Bunn's home, he was not read his Miranda rights and, after some brief questioning, was allowed to go on vacation for the weekend with his lawyer; (9) Police did not image Bunn's phone despite the fact Megan told police that she had seen him texting at his home.

106. Finally, I understand that Plaintiffs claim that the Article reports that Plaintiffs "illegally and deliberately conducted [the] sexual assault investigation in a manner to protect the alleged rapist, T.J. Bunn Jr., because Bunn was from a powerful, wealthy, and influential family." Compl. ¶ 21. This simply is not accurate. The Article *does not* state that Investigators Jones and Hastings were attempting to cover up for Bunn. While Mr. Rondini clearly believed this to be true, and while earlier drafts of the Article contained allegations to this effect, I removed any such statements after I reviewed the police's investigatory files. Bunn's prominence in the Tuscaloosa community was still relevant to the story, however, since Megan's counselor refused to provide treatment to Megan because she knew the Bunn family. Thus, the Article truthfully reports on the fact that Bunn's family was prominent in the Tuscaloosa community.

***Plaintiffs' Allegations of Actual Malice***

107. I understand that, in order to state a defamation claim, Plaintiffs are required to prove that I subjectively knew that the Article was false or that I was reckless with respect to the

truth of the allegations in the Article. From my review of the Complaint, Plaintiffs attempt to do this in a few ways. But each of Plaintiffs' claims is divorced from the reality of my investigation.

108. *First*, Plaintiffs claim that I like reporting on "sensational" rape stories and that I, therefore, ignored the facts of the Rondini case and simply reported a rape story that would go "viral." *See* Compl. ¶¶ 70-75. This is not only a gross distortion of my past work but is, frankly, insulting to me as an established journalist. I do not only write articles about sexual assault; I report on institutions. One of the many topics I cover is how institutions handle sexual assault claims. I do not simply report on "sensationalistic" stories. My reporting has often caused states to review and make changes to their laws governing sexual assault. And while I, like any journalist, am happy when people read my work, I do not write articles with the goal of "going viral." Instead, I truthfully report on stories that I believe are in the public interest. That is precisely what I did here. I received a tip, fully investigated it, and reported my findings. I would never publish an article that I did not believe was entirely accurate.

109. *Second*, Plaintiffs claim that I was privy to information proving that the Article was false. For example, Plaintiffs assert that Megan's "Guck" text message to her friends meant that I knew there was "little or no credibility to the Rondini sexual assault/rape allegations" and that it was "much more likely than not that the sexual encounter between Bunn and Rondini was planned, welcomed, voluntary, and consensual from Rondini's perspective." *See* Compl ¶¶ 83, 84, 89. But Plaintiffs' contentions entirely miss the point of the Article. I never was investigating whether or not Bunn actually raped Megan. Instead, I was investigating how various institutions handled Megan's allegations of rape. And, from my reporting, it was clear to me that Megan's text messages—including the "Guck" message—were not part of the Police's investigation into Megan's claims. The text messages were not mentioned in the felony packet, which fully

explained the police's investigation. Police did not ask Megan or Bunn about the text messages and did not interview the recipient of the text. And when Captain Hood explained to me why the police believed that no sexual assault occurred, he never once mentioned the text messages. Indeed, had the police made any determination about the merit of Megan's rape claim based on the text messages, but without consulting anyone about them, that in itself would be a problematic aspect of the investigation. Indeed, I am confident that if Captain Hood had told me that the "Guck" message was a part of the investigation, I would have included that in the Article because I wanted to accurately reflect law enforcement's perspective on the investigation.

110. Plaintiffs similarly insinuate that something in Megan's "handwritten notes" to Police should have alerted me that Megan was not raped. *See* Compl. ¶ 81(o). But again, I was not reporting on whether or not Megan was raped. And Megan's notes were entirely consistent with her initial report to police. Megan's story remained consistent throughout her interviews with Police—she believed that Bunn sexually assaulted her.

111. *Third*, Plaintiffs claim that I omitted "critical facts," including that Megan told Investigator Jones she did not fear for her life and that she did not try to fight or resist Bunn to the level required under Alabama law. *See* Compl. ¶ 51. But, as I understand it, a victim does not have to literally fear for their life to be raped under Alabama law. Megan did, in fact, tell Investigator Jones that she attempted to resist Bunn, explaining that she verbally informed him that she did not want to have sex with him, but he held her down by her hips. And, regardless of whether Megan feared for her life, she clearly reported to police that she had been raped. Moreover, I included in the Article precisely why Police believed Megan had not been raped, explaining that Captain Hood "outlined the holes he saw in Megan's story, many of which had to do with what he said was her 'lack of earnest resistance.' Even though she said she blacked out

for part of the night, she 'admitted to being coherent.' Even though she claimed she repeatedly told Bunn she wanted to leave, she never said 'No.' Even though she went to the hospital and interviewed with police within hours, she didn't yell for help or call 911, and she never 'made any statement or took any action' that convinced investigators she 'was not a willing participant in the sexual act.'"

112. At the time BuzzFeed published the Article, I believed it to be a true and accurate account of how DCH, the police, the DA's Office, and the University of Alabama's therapists responded to Megan Rondini's rape claims. I had no information that caused me to doubt anything that we published. To this day, I continue to believe that—other than the line in the Article stating that the charges against Megan were never heard by a grand jury (which was based on the incorrect information that Captain Hood provided to me)—the Article is true and accurate, and I stand by my reporting.

113. In addition, I never harbored (and, indeed, still do not harbor) any ill will against Investigators Jones and Hastings. I was simply reporting a newsworthy story about how the police and other Tuscaloosa institutions responded to Megan's rape allegations. Because Investigators Jones and Hastings were the two police officers responsible for investigating Megan's claims, their names were integral to the Article. This is no different than my reporting on any other public institution.

Katie Baker

KATIE J.M. BAKER