FILED
2021 Sep-16  PM 10:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**

---------------------------------------------------------- x

ADAM JONES, *et al*.

               Plaintiffs,

    - against -

BUZZFEED, INC., *et al*,

               Defendants.

---------------------------------------------------------- x

**ORAL ARGUMENT REQUESTED**

7:19-CV-00403-RDP

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**LIGHTFOOT, FRANKLIN & WHITE, LLC**

J. Banks Sewell, III
John G. Thompson
Jonathan R. Little, III

400 20th Street North
Birmingham, AL 35203-3200
T: (205) 581-0772
F: (205) 380-9172

**DAVIS WRIGHT TREMAINE LLP**

Katherine M. Bolger (*pro hac vice*)
Rachel F. Strom (*pro hac vice*)
John M. Browning (*pro hac vice*)

1251 Avenue of the Americas, 21st Fl.
New York, NY  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax

*Attorneys for Defendants Buzzfeed, Inc., Katie J.M. Baker and Ben Smith*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 2

    A.    The Parties ........................................................................... 2

    B.    BuzzFeed's Reporting............................................................ 3

          i.    Baker Gets a Tip and Starts to Investigate the Rondini Investigation ............. 3

          ii.    A Trip to Tuscaloosa and Communications with Captain Hood ...................... 4

          iii.    Early Drafts and More Reporting ................................. 5

          iv.    The Felony Packet and Interview Videos ..................... 6

          v.    BuzzFeed Seeks Comment and the Article Is Fact Checked Again ................ 8

          vi.    The Article ....................................................... 9

    C.    Undisputed Facts About the Investigation Confirmed During Litigation ................. 11

    D.    The Complaint .................................................................. 13

DISCUSSION OF RELEVANT LEGAL AUTHORITIES ..................... 14

STANDARD OF REVIEW ........................................................... 15

    I.    THE FACTS FROM POLICE RECORDS AND HEADLINES ARE PRIVILEGED AS FAIR REPORTS OF AN OFFICIAL INVESTIGATION .......... 16

          A.    The Rondini Investigation Is an "Official Proceeding"................................. 16

          B.    The Article Contains a Fair and Accurate Report of the Rondini Investigation.............. 17

               1.    The Accurately Quoted Facts from Police Records Are Privileged ................ 18

               2.    The Headlines Are Privileged ........................... 21

          C.    Plaintiffs Cannot Overcome the Fair Report Privilege ................... 23

    II.    THE STATEMENTS ARE NOT ACTIONABLE BECAUSE THEY ARE TRUE.. 25

          A.    Plaintiffs Cannot Prove that Any Statement Is Materially False ................... 26

          B.    Plaintiffs Cannot Establish Falsity by Claiming that the Article Contains an Implication that Simply Does Not Exist .................. 27

    III.    THE STATEMENTS CONTAINING EXPRESSIONS OF OPINION ARE NOT ACTIONABLE ........................................................... 32

    IV.    PLAINTIFFS' DEFAMATION CLAIMS MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF ACTUAL MALICE............................. 34

CONCLUSION........................................................................ 40

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alf v. Buffalo News, Inc.*,
   953 N.Y.S.2d 797 (N.Y. App. Div. 2012) ..............................................................17

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................15

*Arpaio v. Robillard*,
   459 F. Supp. 3d 62 (D.D.C. 2020) ......................................................................40

*Bell v. Smith*,
   281 So. 3d 1247 (Ala. 2019) ....................................................................22, 32, 33

*Berisha v. Lawson*,
   973 F.3d 1304 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021).............36, 37

*Birmingham Broad. (WVTM-TV) LLC v. Hill*,
   303 So. 3d 1148 (Ala. 2020)..............................................................16, 17, 25

*Bose Corp v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984)........................................................................................15, 35

*Brian v. Richardson*,
   660 N.E.2d 1126 (N.Y. 1995)..............................................................................25

*Byrd v. Jones*,
   2015 WL 2194697 (N.D. Ala. May 11, 2015), *aff'd*, 673 F. App'x 968 (11th Cir. 2016)......24

*Carr v. Forbes, Inc.*,
   259 F.3d 273 (4th Cir. 2001) ..............................................................................38

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168 (2d Cir. 2001)..................................................................................15

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
   406 F. Supp. 3d 1258 (M.D. Ala. 2019) ........................................................32, 34

*Crittendon v. Combined Commc'ns Corp.*,
   714 P.2d 1026 (Okla. 1985)..................................................................................18

*Deutcsh v. Birmingham Post Co.*,
   603 So. 2d 910 (Ala. 1992)..................................................................................26

*Dolgencorp, LLC v. Spence,*
    224 So. 3d 173 (Ala. 2016) ...................................................................24

*Erdmann v. SF Broad. of Green Bay, Inc.,*
    599 N.W.2d 1 (Wis. Ct. App. 1999) ....................................................37

*Files v. Deerfield Media (Mobile), Inc.,*
    2020 WL 1161089 (S.D. Ala. Mar. 10, 2020) .....................................24

*Finebaum v. Coulter,*
    854 So. 2d 1120 (Ala. 2003) ..............................................30, 31, 32, 36

*Forrester v. WVM TV, Inc.,*
    709 So. 2d 23 (Ala. Civ. App. 1997) ...............................................25, 26

*Fulton v. Advertiser Co.,*
    388 So. 2d 533 (Ala. 1980) ..................................................................23

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) .............................................................................36

*Gomes v. Fried,*
    136 Cal. App. 3d 924 (1st Dist. Ct. App. 1982) ..................................36

*Gubarev v. BuzzFeed, Inc.,*
    340 F. Supp. 3d 1304 (S.D. Fla. 2018) ................................................19

*Harris v. School Annual Publ'g Co.,*
    466 So. 2d 963 (Ala. 1985) ..................................................................30

*Harrison v. Chi. Sun-Times, Inc.,*
    793 N.E.2d 760 (Ill. App. Ct. 2003) ...............................................22, 23

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
    491 U.S. 657 (1989) .............................................................................35

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.,*
    399 N.E.2d (N.Y. 1978) .......................................................................18

*Howell v. Enter. Publ'g Co.,*
    920 N.E.2d 1 (Mass. 2010) ..............................................................17, 23

*Jackson v. WAFF, LLC,*
    109 So. 3d 1123 (Ala. Civ. App. 2012) ...............................................25

*Jamason v. Palm Beach Newspapers, Inc.,*
    450 So. 2d 1130 (Fla. Dist. Ct. App. 1984) ........................................23

*Journal-Gazette Co. v. Bandido's, Inc.*,
    712 N.E.2d 446 (Ind. 1999) ........................................................................23

*Kendall v. Daily News Publ. Co.*,
    716 F.3d 82 (3d Cir. 2013)............................................................................31

*Kesner v. Dow Jones & Co.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021)...........................................................22

*Lawton v. Ga. Television Co.*,
    456 S.E.2d 274 (Ga. Ct. App. 1995) .......................................................16, 21

*Leidig v. BuzzFeed, Inc.*,
    371 F. Supp. 3d 134 (S.D.N.Y.), *aff'd* 788 F. App'x 76 (2d Cir. 2019),
    *cert. denied*, 141 S. Ct. 256 (2020) .............................................................26

*Levan v. Capital Cities/ABC, Inc.*,
    190 F.3d 1230 (11th Cir. 1999) ....................................................................36

*Lewis v. NewsChannel 5 Network, L.P.*,
    238 S.W.3d 270 (Tenn. Ct. App. 2007) ........................................................37

*Little v. Consol. Publ'g Co.*,
    83 So. 3d 517 (Ala. Civ. App. 2011) ............................................................36

*Marks v. N.Y. Life Ins. Co.*,
    2020 WL 5752852 (S.D. Ala. Sept. 25, 2020)..............................................33

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991).......................................................................................25

*McCaig v. Talladega Publ'g Co.*,
    544 So. 2d 875 (Ala. 1989)...........................................................................15

*McManus v. Doubleday & Co.*,
    513 F. Supp. 1383 (S.D.N.Y. 1981)................................................................3

*Mead Corp. v. Hicks*,
    448 So. 2d 308 (Ala. 1983)...........................................................................23

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ....................................................25, 33, 35, 37

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990), *aff'd*, 6 F.3d 1247 (11th Cir. 2021) ...........................32, 36

*Miller v. Gizmodo Media Grp., LLC*,
    407 F. Supp. 3d 1300 (S.D. Fla. 2019) .........................................................17

*Moore v. Cecil*,
  2021 U.S. Dist. LEXIS 61843 (N.D. Ala. Mar. 31, 2021)......................................................31

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)................................................................................................... *passim*

*Newton v. Nat'l Broad. Co.*,
  930 F.2d 662 (9th Cir. 1990) ................................................................................................27

*Oney v. Allen*,
  529 N.E.2d 471 (Ohio 1988)................................................................................................17

*Perk v. Readers Digest Ass'n*,
  931 F.2d 408 (6th Cir. 1991) ................................................................................................27

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986)................................................................................................................26

*Rubin v. U.S. News & World Report Inc.*,
  271 F.3d 1305 (11th Cir. 2001) ............................................................................................30

*Saenz v. Playboy Enterprises, Inc.*,
  841 F.2d 1309 (7th Cir. 1988) ..............................................................................................31

*Salzano v. N. Jersey Media Grp. Inc.*,
  993 A.2d 778 (N.J. 2010)......................................................................................................22

*Seymour v. A.S. Abell Co.*,
  557 F. Supp. 951 (D. Md. 1983) ..........................................................................................37

*Shuler v. Garrison*,
  2017 WL 191267 (N.D. Ala. Jan. 13, 2017)................................................................ *passim*

*Silvester v. Am. Broad Cos.*,
  839 F.2d 1491 (11th Cir. 1988) ............................................................................................35

*Smith v. Huntsville Times Co.*,
  888 So. 2d 492 (Ala. 2004)...................................................................................................35

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)........................................................................................................35, 37

*Tah v. Global Witness Publ'g, Inc.*,
  991 F.3d 231 (D.C. Cir. 2021), *pet. for cert. docketed*, No. 21-121 (U.S. July 28, 2021) ......40

*Talley v. Time, Inc.*,
  923 F.3d 878 (10th Cir. 2019) ..............................................................................................38

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) ............................................................38

*Time Inc. v. Pape*,
    401 U.S. 279 (1971) ............................................................................37

*Torrance v. Morris Publ'g Grp., LLC*,
    656 S.E.2d 152 (Ga. Ct. App. 2007) ...................................................37

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) ........................................27, 30, 35, 40

*Wiggins v. Mallard*,
    905 So. 2d 776 (Ala. 2004) ................................................................18

*Wilson v. Birmingham Post Co.*,
    482 So. 2d 209 (Ala. 1986) ........................................................ *passim*

*WKRG-TV, Inc., v. Wiley*,
    495 So. 2d 617 (Ala. 1986) ................................................................24

**STATUTES**

Ala. Code § 13A-11-161 ............................................................................16

**RULES**

Federal Rule of Civil Procedure 56(a) ................................................1, 15

**OTHER AUTHORITIES**

H.R.3415, 115th Cong. (2017) (Megan Rondini Act) .................................26

Restatement (Second) of Torts § 611 ........................................................17

U.S. Const. amend. I ........................................................................ *passim*

Pursuant to Federal Rule of Civil Procedure 56(a), defendants Katie J.M. Baker ("Baker"), Ben Smith ("Smith") and BuzzFeed, Inc. ("BuzzFeed") ("Defendants") move for summary judgment against plaintiffs Adam Jones and Joshua Hastings ("Plaintiffs").

## PRELIMINARY STATEMENT

This defamation lawsuit, brought by two law enforcement officers, arises from an article describing what happened after Megan Rondini reported an alleged rape to the hospital, to the police and to her university.  Much of the article, originally entitled "How Accusing A Powerful Man of Rape Drove A College Student To Suicide" (Doc.63-5, the "Article"), is based on police records.  Plaintiffs do not contest the authenticity of the records or the accuracy of the Article's reporting of facts based on those documents.  In fact, Plaintiffs have not identified a single factual inaccuracy in the Article.  Instead, Plaintiffs essentially allege that the Article defamed them by making them look bad – either because it makes them look incompetent or because, they claim, it makes it seem as if they colluded with the alleged rapist.  Neither the law nor the facts of this case support Plaintiffs' remarkable defamation lawsuit.

As the Supreme Court held nearly 60 years ago, we expect public officials in the United States of America to be "men of fortitude, able to thrive in a hardy climate." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 275 (1964).  For those reasons, the First Amendment to the United States Constitution and the laws of the State of Alabama provide strong protections for speech, like the Article as issue here, that reports on the activities of public officials engaged in their public duties.  No fewer than four of these legal doctrines compel summary judgment here.  First, the Alabama fair report privilege shields the Article from liability because – as the factual record conclusively establishes and Plaintiffs tacitly admit – the Article accurately reports the police's own records of what Plaintiffs actually said and did during the Rondini investigation.  Second, Plaintiffs have failed to establish the existence of a materially false statement of fact.  Third, to

the extent the Article can be read as suggesting the investigation should have been handled differently, that is an expression of opinion entitled to absolute protection under the First Amendment.  Finally, Plaintiffs have not identified clear and convincing evidence that Defendants acted with actual malice because it is undisputed that Defendants believed (and continue to believe) that the Article is true in every respect.

Megan Rondini is dead, having killed herself shortly after filling out a psychiatric intake form describing herself as being "raped, bullied by police, changed university."  The Article uses truthful and privileged facts to shed light on this tragedy and, more broadly, to discuss the ways in which our institutions treat women who report sexual assault.  For precisely this purpose, the law unequivocally protects the "right of free public discussion of the stewardship of public officials." *Sullivan*, 376 U.S. at 275.  Plaintiffs cannot recover for defamation because they think they were criticized unfairly.  This court should grant summary judgment and end this case.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.**     **The Parties**

1.     Plaintiff Jones is an Officer and Investigator for the City of Tuscaloosa and was, in July 2015, assigned to the Tuscaloosa County Homicide Unit ("TCHU").  He was the lead investigator into Megan's claims that she was raped by T.J. Bunn. Doc.63-61, Tr. 73:9-12.

2.     In July 2015, Plaintiff Hastings was a Deputy Sheriff for the Tuscaloosa County Sheriff's Department and, having been assigned to the Tuscaloosa Metro Homicide Unit, he assisted Plaintiff Jones in investigating Megan's allegations.  Doc.63-62, Tr. 68:13-72:23. Plaintiff Hastings was promoted to Sergeant "shortly after the [A]rticle came out."  *Id.* at Tr. 35:9-21.

3.     Defendant BuzzFeed is the publisher of BuzzFeed News, a news organization that publishes investigative journalism online and received a Pulitzer Prize this year.  Doc.63-72.

2

4.      Defendant Baker is a BuzzFeed reporter with more than a decade of experience, who specializes in reporting on institutional injustice.  Doc.64-1 ¶¶ 4-12.[1]

5.      Defendant Smith was the Editor in Chief of BuzzFeed News until 2020 and is now the media columnist for the *New York Times*.  Doc.64-5 ¶ 2.  Smith played no role in researching, drafting or editing the Article.  *Id*. at ¶¶ 4-8.[2]

**B.      BuzzFeed's Reporting**

6.      The Article was the culmination of a more than five-month investigation led by Baker.  Doc.64-1 ¶¶ 17-90.  Baker interviewed dozens of people, traveled twice to Texas and once to Alabama, read thousands of pages of documentation and obtained substantive responses from the TCHU before the Article was published.  *Id*.

7.       Two experienced BuzzFeed editors – Tina Susman and Marisa Carroll – oversaw Baker's work.  Doc.64-2 ¶¶ 2-6; Doc.64-3, ¶¶ 2-8.  BuzzFeed also relied on an experienced fact checker, Sharmilla Venkatasubban, to ensure (to the extent possible) that the Article was factually accurate.  Doc.64-4, ¶¶ 2-9.

**i.      Baker Gets a Tip and Starts to Investigate the Rondini Investigation**

8.      Baker's reporting began in December 2016, when Baker received a tip from a confidential source introducing her to Megan's father, Michael Rondini.  Docs.64-1 ¶¶ 13-14.  The source told Baker that Megan had reported her rape to the hospital, to the Police Department, and to counselors at the University of Alabama – exactly what women are told to do in such a situation – but the Rondinis felt none of these institutions provided Megan the help she

---

[1] BuzzFeed's extensive reporting for the Article is set forth more fully in the Declarations of Baker, Carroll, Susman and Venkatasubban.  Docs.64-1 (¶¶ 13-88); 64-2 (¶¶ 7-26); 64-3 (¶¶ 9-32) and 64-4 (¶¶ 9-21).

[2] For this reason alone, the claims against Smith should be dismissed.  *See McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981) (dismissing defamation claims against editor because she was "entitled as a matter of law" to rely on an author's "reputation[] and experience").

needed.  *Id*. at ¶ 13.  Baker was intrigued and believed there would likely be extensive public documentation of Megan's claims that she could use to research the story.  *Id*.

9.      After Baker spoke to Michael, he provided her with a packet of documents – including the initial police report on Megan's claims.  *Id*. at ¶ 15.  Michael also told Baker that he believed the hospital and police were more interested in covering up for Bunn than seriously investigating Megan's claims.  *Id*.

10.      Baker began her investigation by reviewing the police incident report, which contained Megan's account of what happened.  *Id*. at ¶ 18.  Baker noted many details of Megan's claims that warranted further investigation, including that Megan reported blacking out for large amounts of the time on the evening of the alleged assault, did not know where she was during the alleged assault, claimed Bunn had taken her phone before assaulting her, said Bunn "place[d] his hand on her hips and h[e]ld her down at some point" during the assault and frantically sought help after the assault.  Doc.64-1 ¶ 18; Doc.63-8, pp. 6-8.  Baker also noted that the "type of incident or offense" was listed as a "special inquiry."  Doc.64-1 ¶ 19; Doc.63-8, p. 6.[3]

11.      Baker asked Michael for a more complete police file in January 2017 but was told he did not have it because police refused to release records without a subpoena.  Doc.64-1 ¶ 21.

12.      Baker also carried out further research, including running internet searches about the institutions involved in Megan's story, contacting experts with relevant knowledge and visiting Texas, where she interviewed Rondini's parents.  *Id*. at ¶¶ 22-27.

    **ii.      A Trip to Tuscaloosa and Communications with Captain Hood**

13.      On January 31, 2017, Baker travelled to Alabama and visited key locations in Megan's story (including the Innisfree Pub), met personally with multiple sources with whom

---

[3] Unless otherwise noted, all page references are to the page number generated in the ECF header of each exhibit.

she had previously discussed the case and spoke with approximately six of Megan's friends, all of whom said Megan felt bullied by the TCHU and other institutions.  *Id*. at ¶ 41.

14.     Baker had previously found an article about the case of another young woman in Tuscaloosa who had been arrested for lying about a campus rape.  *Id*. at ¶ 24.  That article quoted TCHU Captain Gary Hood as saying that many young women make false rape claims because they "are not doing well in school and hope that by doing this they can get some help from the university with their grades." *Id*.

15.     Baker asked her colleague, Alex Campbell, to contact Captain Hood to ask him about statistics related to rape investigations and to explain what a "special inquiry" was.  *Id*. at ¶¶ 36-37.  In the course of his communications with Campbell, Captain Hood provided the statistics and explained that "special inquiry" was a designation used where the victim "doesn't even know if [a crime] happened or not."  Doc.63-12, p. 2.  Campbell also sent open records requests to the Tuscaloosa District Attorney's Office (the "DA") and corresponded and spoke with DA representative Jonathan Cross seeking similar information.  Docs.63-13, 63-14.

### iii.    Early Drafts and More Reporting

16.     After returning from Alabama, Baker wrote the first of several drafts of the Article.  Doc.64-1 ¶ 44.  Baker's editors provided comments and suggested edits on the drafts, some of which were accepted, others rejected.  *Id*. at ¶ 49.  Over time, the focus of the Article evolved and changed as Baker learned more information.  *Id*. at ¶¶ 44-47.

17.     Baker also continued her news gathering, inquiring into Alabama rape law and the process for collecting blood and urine samples from alleged rape victims among many other topics.  *Id*. at ¶¶ 50-52.  She also reached out to the FBI and other expert sources.  *Id*. at ¶ 55.

18.     In or around March 2017, Baker submitted an early draft of the story to Venkatasubban for fact checking.  *Id*. at ¶ 58.  Venkatasubban was given access to all of Baker's

notes and communications, as well as additional corroborating materials upon request. *Id.* at

¶ 59. The fact check – which aimed to ensure that all facts reported were accurate and

substantiated – required tough questions and back-and-forth between Baker and Venkatasubban.

*Id.* at ¶¶ 59-61. Venkatasubban was ultimately satisfied that the facts were reported accurately.

Doc.64-4 ¶ 20.

19.    In April 2017, as her reporting continued, Baker received Megan's medical

records – which stated that Megan told hospital workers that the sex with Bunn was "not

consensual" but were inconclusive as to whether Megan's blood and urine samples were sent for

a toxicology report. Doc.64-1 ¶ 64; Doc.63-32, p. 15. Baker was ultimately told by two

members of the Alabama Department of Forensic Sciences that they did not have any records

that Megan's samples were ever processed. Doc.64-1 ¶ 65; Doc.63-33.

### iv.    The Felony Packet and Interview Videos

20.    In or around May 2017, Baker flew back to Texas to collect documents from the

Rondinis that changed the course of her reporting. Doc. 64-1 ¶ 66. These documents included

the entire felony packet submitted to the grand jury in the case against Bunn and videotaped

interviews that Jones and Hastings had conducted with Megan and Bunn, respectively. *Id.*

21.    The felony packet confirmed details Baker already knew and provided new

information. For example, Baker first learned about Plaintiffs' role in the investigation from the

felony packet. *Id.* at ¶ 67. Baker also discovered, *inter alia*, a statement by Plaintiff Jones on the

first substantive page of the document that "no sexual assault had occurred." *Id.* at ¶ 68; Doc.63-

34, p. 5. Baker also learned that Bunn had lied to the police when they arrived at his home on

the morning of the alleged rape about Megan's presence in the home the night before. Doc.64-1

¶ 68(a).

22.     The felony packet also contained information about criminal charges that were ultimately brought *against* Megan, specifically a "Uniform Incident/Offense Report" listing Bunn as the "victim" of theft and Megan as the "suspect" because she had taken some of Bunn's property while trying to escape his house.  *Id*. at ¶ 68; Doc.63-34, p. 67.  That report is dated 08:29 a.m. on July 2, 2015 (*id*.) – which is approximately three hours before Megan came to the police station for an interview.  Doc.63-35.

23.     Baker also reviewed videotapes of the interview and interrogation of Megan by Plaintiff Jones and the interview of Bunn by Plaintiff Hastings.  Doc.64-1 ¶ 68(c).

24.     Two videos depict Plaintiff Jones interviewing Megan for three hours – starting just a few hours after she reported being raped.  Doc.63-34; Doc.63-35.  During these interviews Plaintiff Jones told Megan her allegations did not rise to the level of rape, offered to give her a refusal to prosecute form, Mirandized her and questioned her over crimes relating to the taking of Bunn's money and gun.  *Id*.  The Article quotes the videos extensively.  Doc.63-5.

25.     In a third video, Plaintiff Hastings interviewed Bunn.  The interview occurred three days after the incident – after Bunn was permitted to go on a fishing trip with his lawyer – and lasted less than 45 minutes.  Doc.63-36.  The fishing trip is discussed during the interrogation.  *Id*. at 00:06:04-00:07:16.  Plaintiff Hastings demonstrates conspicuous courtesy on the videos, including by telling Bunn that "I'll get y'all out of here," suggesting that Bunn lied because he was "scared" and – when Bunn thanked him for his professionalism – responding "I would want you to do the same for me."  *Id*. at 00:03:15-00:03:18, 00:11:14-00:12:03, 00:21:35-00:21:50.  The Article quotes the video extensively.  Doc.63-5, pp. 13-14.

26.     Baker then spoke with a representative of the International Association of Chiefs of Police ("IACP") to better understand how Plaintiffs' conduct on the interview videos related

to best practices.  Doc.64-1 ¶¶ 72-73.  According to IACP guidelines, police should consider the possibility that victims of sexual assault who show signs of memory loss may have been drugged.  Doc.63-39, p. 8.  IACP guidelines also warn against pressuring victims to make decisions on whether to press charges early in an investigation.  *Id*. p. 7.

27.     After Baker received the felony packet and interview videos, she determined that she lacked sufficient evidence to support Michael Rondini's suspicion that the police had intentionally covered up Bunn's rape and deleted from all subsequent drafts any references to a "cover up".  Doc.64-1 ¶ 70.  The focus of the Article shifted away from possible corruption to how various institutions handled Megan's rape claims.  *Id*. at ¶ 74.

### v.     BuzzFeed Seeks Comment and the Article Is Fact Checked Again

28.     In late May and early June 2017, Baker contacted multiple entities and persons identified in the Article – including Plaintiffs, Captain Hood, Lieutenant Kip Hart, the DCH Medical Center, Bunn, the University of Alabama, and the DA – to inform them of the article and give them an opportunity to respond.  *Id*. at ¶¶ 75-78; Docs.63-40; 63-42.  Plaintiffs never responded.  *Id*.  Having received no response, Baker decided that Captain Hood was the best person to speak to and persisted with her efforts to speak with him.  *Id*.  Captain Hood rejected Baker's first two requests for comment.  *Id*. at ¶¶ 78-79; Doc.63-41; Doc.63-43.

29.     Days after she first contacted Captain Hood, and in response to an email asking specific questions about Megan, Baker received an email from him explaining why the investigators did not believe that Megan had been raped under Alabama law.  Doc.63-44. Captain Hood noted, for instance, that "sometimes evidence if found early which would preclude a criminal offense" and commented that Megan showed a "lack of earnest resistance" and never "made any statement or took any action" that convinced investigators she "was not a willing participant in the sexual act."  *Id*. at p. 4.  He added that "special inquires" are "cases where the

victim does not know what or if anything happened or the reporting officer does not feel" a crime was committed.  *Id*. at p. 3.

30.     In subsequent communications, Hood defended his officers' questioning of Megan because they were "legally obligated to investigate" the felonies Megan admitted to committing during her interview, even though "she did not 'realize' she committed a crime." Doc. 63-45, pp. 6-7.  At no point did Captain Hood mention text messages that Megan sent her friends earlier in the evening of her alleged rape indicating sexual interest in Bunn – including a text stating "[w]e are going to Guck."  *See* Docs.63-44, 63-45, 63-46 and 63-47.

31.     Baker was pleased to receive such a substantive response from Captain Hood and engaged in additional correspondence with him to clarify his responses and gather additional information.  Doc.64-1 ¶¶ 80-84.  Baker added information from Hood's responses to the Article.  *Id*. at ¶ 85.

32.     The Article was fact checked a second time after Baker had added comments from each individual and institution that had responded.  *Id.* at ¶ 87.  Venkatasubban was given access to all the investigatory materials Baker had received – including the felony packet and the interview videos.  *Id.*  The Article was also edited by Susman and Carroll.  *Id*. at ¶ 85.

**vi.     The Article**

33.     BuzzFeed published the Article on June 22, 2017. *Id*. at ¶ 89.  The final, published Article is about "how the police and other Tuscaloosa institutions responded to Megan's rape allegations."  *Id*. at ¶ 113.

34.     The Article gives an account of Megan's allegations as described in her handwritten notes, the police reports, the felony packet and the videotaped interview.  Doc.63-5. The Article states Megan "did everything she thought she was supposed to do" to report a rape and went immediately to the hospital for a "forensic exam," but it was "unclear if the hospital

even collected the blood and urine samples necessary for forensic testing when it performed a basic rape kit." *Id.* at 4, 11.

35.     The Article states that Megan reported the rape to police, and describes her questioning by Plaintiff Jones, including that she was Mirandized and "question[ed] for multiple crimes she wasn't even aware she had committed" relating to her admission that she took a gun and money from Bunn to aide her escape from his house.  *Id.* at 5, 11.

36.     The Article states that Megan later sought mental health treatment from the University of Alabama but her therapist told her that "she knew the Bunn family and therefore had to recuse herself."  *Id.* at 15.

37.     The Article describes the treatment of Bunn.  It recounts that when police came to his house on the morning after the incident, Bunn lied and told them "no one had been at his house the night before" – but Bunn suffered no adverse consequences.  *Id.* at 13.  It also reports that Bunn was permitted to go on "a weekend fishing trip" before going to the police station for a formal interview that was conducted with conspicuous courteousy.  *Id.*

38.     The Article reports that Megan filed a civil suit against Bunn but dropped the case and moved to a different state after discovering that prosecutors were pursuing "felony charges against [her] for breaking into Bunn's car and stealing his gun."  *Id.* at p. 15.

39.     The Article extensively quotes Captain Hood's comments "outlin[ing] the holes he saw in Megan's story" and defending Plaintiffs' handling of the investigation.  *Id.* at pp. 10-11, 12, 14-15.

40.     Finally, the Article reports that Megan "killed herself" on February 26, 2017.  *Id.* at 17.  On the medical intake forms next to her bed, she had written: "[r]aped, bullied by police, changed university."  *Id.*

10

41.     When the Article was published, Baker, Venkatasubban, Carroll and Sussman believed it to be true in every respect and still do to this day.  Docs.64-1 ¶ 112; 64-2 ¶¶ 29-30; 64-3 ¶¶ 33-34; 64-4 ¶¶ 20-21.[4]

**C.     Undisputed Facts About the Investigation Confirmed During Litigation**

42.     Discovery in this action has confirmed the following facts about the TCHU investigation into Megan's claims:

43.     Plaintiffs Jones and Hastings wives testified that as soon as their husbands received the call to come investigate Megan's claims, they told them that a member of the Bunn family was the suspect, revealing that they were familiar with the Bunn family before they even began their investigation.  Doc.63-65, Tr. 22:7-24:17; Doc. 63-66, Tr, 25:21-26:17.

44.     Although Rondini told Plaintiffs, a third police officer and hospital employees that she did not consent to having sex with Bunn and that he held her down by her hips at one point, neither Plaintiffs nor any other police officer ever asked her even a single follow-up question about being "held down."  Docs.63-61, Tr. 93:2-98:19; 63-32, p. 18; 63-8, p. 7-8.

45.     After conducting only a ten minute interview at the hospital, Plaintiff Jones concluded that Megan's claims had not met the elements of rape (which is why the case was designated a "special inquiry").  Doc.63-61, Tr. 97:3-19.  Plaintiffs could have asked for tests to determine whether Megan had been drugged, but neither did.  Doc.63-44, pp. 4-5.

46.     Plaintiffs went to Bunn's residence around 6:45 a.m. and when Bunn came to the door, he lied about having a woman there the night before.  Doc.63-62, Tr. 105:13-108:21. Plaintiff Hastings did not question him about the lie at the time.  *Id*.  While searching Bunn's

---

[4] To this day, they have no reason to doubt the accuracy of the facts in the Article – except for the one fact for which Captain Hood was the source.  Captain Hood told Baker that Megan's "case as the suspect was not presented" to the grand jury.  Doc.63-47, 2.  During discovery in this litigation, Defendants discovered that the authorities pdid send the case against Megan to the grand jury after she died and she was indicted.  Doc.63-70, pp. 47-48.

property, Plaintiff Jones heard the window Megan climbed through close and when Plaintiff Hastings asked Bunn whether he closed it, he responded that he needed his lawyer.  Doc.63-61, Tr. 112:16-120:3, 148:13-151:7.  Plaintiffs then left – despite suspicions about Bunn's ability to tell the truth – leaving Bunn alone in the home for 30 minutes, giving him the opportunity to tamper with the crime scene.  Doc.63-62, Tr. 133:11-136:7.  Hastings ultimately returned, removed Bunn and his friend, Jason Barksdale, and searched the house.  *Id*. at 137:3-145:15.

47.     Captain Hood was called to Bunn's residence and, on the way, he called either Sheriff Abernathy or Chief Waid to inform them that there was an investigation involving a member of the Bunn family.  Doc.63-63, Tr. 314:7-316:17.  Hood said that he would give the Sheriff a heads up for "high-profile" cases, and this was a high-profile case because it involved Bunn.  *Id*.  Bunn's family had given money to a PAC that funded Sheriff Abernathy's campaign.  *Id*. at 313:7-19.

48.     Plaintiffs allowed Bunn to leave town for the weekend to go on a fishing trip with his lawyer before coming to the police station.  Doc.63-62, Tr. 221:4-224:10.  Hastings described the decision to allow Jones to leave town as "unique" because "most of the suspects we deal with don't have the same means or whatever."  *Id*.  Officer Kip Hart and Captain Hood Chief Lloyd Baker also testified that this was one of the only cases in which a suspect was allowed to travel before being questioned.  Docs.63-63, Tr. 111:18-22; 63-67, Tr. 118:9-20.

49.     Plaintiffs failed to collect Bunn's phone records at any point because he was "able to kind of tell us how the evening went," even though another officer testified that it would have been "pretty standard procedure to do so" and Megan had told Jones that Bunn had been texting someone shortly before the assault.  Doc.63-62, Tr. 148:1-153:22; Doc.63-64, Tr. 39:12-40:13.

50.     Plaintiffs did collect data from Megan's phone, but Plaintiffs have testified that none of the information collected from Megan's phone played any role in their decision that Bunn had not raped her.  Docs.63-61, Tr. 199:21-202:15; 63-62, Tr. 358:4-9.

51.     In March 2016, after Megan's suicide, Plaintiff Jones presented the case against Bunn to the grand jury, which decided not to charge him with a criminal offense.  *Id*. at 269:2-270:4.

52.     In that same month, another investigator presented the case against Megan and – even though Megan was dead and the charge was based solely on the word of Bunn – the grand jury true billed theft counts against Megan.  Doc.63-73, Tr. 97:20-99:19; 116:22-117:13.

53.     Plaintiffs' own expert witness, Robert Pastula, testified that Plaintiffs departed from best practices while investigating Megan's rape claims.  Doc.63-68, Tr. 68:18-69-17, 132:16-134:17.  Defendants' expert witnesses, Carlton Hershman and Mike Mertz, also testified that Plaintiffs departed from best practices.  Doc.63-69, pp. 14-45, 48-53.

**D.     The Complaint**

54.     On March 7, 2019, Plaintiffs filed this defamation action.  Doc.1.[5]  Plaintiffs have produced, under Court order, an exhaustive list of eleven allegedly defamatory statements in the Article (the "Statements").  Doc.51-6.[6]  Each of the Statements falls into one or more of the following categories:

     a.     *The Headlines* – Statements 1 and 2 are the Article's headline – "How Accusing a Powerful Man of Rape Drove a College Student to Suicide" – and the sub-headline

---

[5] While the Amended Complaint sought damages for the publication of two articles, by email dated August 27, 2021, Plaintiffs' withdrew their claims as based on the second of the two articles.

[6] The 10-page table is too voluminous to quote in full here but a table listing the Statements identified by Plaintiffs, including why they allege each one defamed them, is annexed as Doc.66-1 ("Appendix A" or "Appx. A") and incorporated by reference.  The black text in Appendix A is taken directly from the Plaintiffs' submission.  Blue text was added by Defendants' counsel.

(collectively, the "Headlines").  Appx. A, Statements 1-2.  Plaintiffs allege that these Statements falsely portrayed "Plaintiffs as corrupt and the cause of and complicit in Ms. Rondini's tragic suicide." *Id.*

   b. *The Facts from Police Records* – Statements 3 through 11 (collectively, the "Facts from Police Records") contain quotations from the interview videos, citations to the felony packet and other facts accurately reported from official investigatory materials.  Appx. A, Statements 3-11.  Plaintiffs do not allege that any of the Facts from Police Records were reported inaccurately, but allege instead that "BuzzFeed published these statements to mislead the public" into believing that Plaintiffs mishandled the investigation into Megan's sexual assault claims.  Doc.1 ¶ 40.

   c. *The IACP Guidelines* – Statements 7 and 9 contain reference to IACP policies that encourage police to test victims for drugs when they show signs of memory lapses and warn investigators not to pressure victims about whether to press charges at the early stage of an investigation (the "IACP Guidelines").  Appx. A, Statements 7, 9.  Plaintiffs do not allege that the IACP Guidelines were reported inaccurately, but allege instead that the comparison between best practices and how they handled the Rondini investigation "imputes wrongdoing."  Appx. A, Statement 9.

## <u>DISCUSSION OF RELEVANT LEGAL AUTHORITIES</u>

   This case is about truthful, privileged reporting on the ways in which institutions, including Plaintiffs as officers of the TCHU, responded to Megan's rape allegations.  Summary judgment is warranted because the undisputed facts establish that (i) the Facts from Police Records and Headlines are protected by Alabama's statutory fair report privilege, (ii) Plaintiffs cannot meet their burden of proving that any of those Statements are materially false, (iii) the comparison of Plaintiffs' handling of the investigation to IACP Guidelines (or any other implied

criticism) is an expression of opinion subject to absolute First Amendment protection and (iv) Plaintiffs cannot establish that any of the Statements were published with actual malice.  At bottom, Plaintiffs brought this lawsuit because they feel the Article criticizes them, not because there is anything untrue about it.  But as the Supreme Court has held in cases involving public officials, "[c]riticism of their official conduct does not lose its constitutional protection merely because it is effective."  *Sullivan*, 376 U.S. at 273.

## <u>STANDARD OF REVIEW</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Moreover, "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protections is not merely a question for the trier of fact. Judges, as expositors of the constitution, must independently decide whether the evidence in the record is sufficient."  *Bose Corp v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984). Thus, to successfully stave off dismissal here, Plaintiffs must affirmatively identify facts sufficient to establish that Defendants published a (1) false and defamatory statement about Plaintiffs to a third party, (2) without any privilege and (3) with the requisite degree of fault, (4) causing damages.  *See McCaig v. Talladega Publ'g Co.*, 544 So. 2d 875, 877 (Ala. 1989); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).  The undisputed facts in this case – confirmed by Plaintiffs' own concessions – prove beyond any genuine question that Plaintiffs cannot establish the necessary elements of their defamation claim.

I.      **THE FACTS FROM POLICE RECORDS AND HEADLINES ARE PRIVILEGED AS FAIR REPORTS OF AN OFFICIAL INVESTIGATION**

This Court should grant summary judgment because Statements 1-2 (the Headlines) and

Statements 3-11 (the Facts from Police Records) are privileged under Alabama's fair report

privilege.  "Alabama has enacted an explicit statutory privilege protecting fair and accurate

reports of … official investigations."  *Wilson v. Birmingham Post Co.*, 482 So. 2d 209, 1211

(Ala. 1986).  That statute privileges the publication of "a fair and impartial report" about "any

investigation made by any … officer," including investigations conducted by police.  Ala. Code

§ 13A-11-161.  The Alabama fair report privilege is qualified but it cannot be overcome unless

the plaintiff can show that the communication was made with actual malice – *i.e.*, knowledge of

falsity or reckless disregard for the truth. *See Mead Corp. v. Hicks*, 448 So. 2d 308, 313 (Ala.

1983); Restatement (Second) § 611, cmt b. ("If the plaintiff is a public official, he must show

that the defendant knew of the falsity … of the statement or acted with reckless disregard [of the

truth].");  *Shuler v. Garrison*, 2017 WL 191267, at *20 (N.D. Ala. Jan. 13, 2017) (Proctor, J.).

"Whether a defendant is entitled to this qualified privilege is determined as a matter of law."  *Id.*[7]

A.      **The Rondini Investigation Is an "Official Proceeding"**

It is beyond dispute that the Rondini investigation is an official investigation to which the

fair report privilege applies.  As the Alabama Supreme Court has held, the privilege applies to

news reports about the content of "police incident report[s]," including records of "statements

made … during an official police investigation."  *Wilson*, 482 So. 2d at 1212 (holding that fair

_____

[7] Defamation claims are routinely dismissed before trial pursuant to the fair report statutes enacted by Alabama and other states.  *See, e.g.*, *Shuler*, 2017 WL 191267, at *20 (holding that accurate reporting on a "state court judgment, a matter of public record," could not "serve as the basis for a defamation claim, as a matter of law"); *Birmingham Broad. (WVTM-TV) LLC v. Hill*, 303 So. 3d 1148, 1158-59 (Ala. 2020) (overruling jury verdict in defamation case over "To Catch a Predator" news segment reporting that plaintiff was a "sex offender"); *Lawton v. Ga. Television Co.*, 456 S.E.2d 274, 278 (Ga. Ct. App. 1995) (granting summary judgment and dismissing defamation claim based on "'fair and honest' report of the National Guard report" finding that plaintiff committed sexual misconduct).

report privilege protected reporting of defamatory statements made by Cuban refugees about the

plaintiff, which were recorded as part of police incident report).  The fair report privilege,

therefore, extends to all of the Statements quoting or summarizing the contents of the felony

packet, interview videos and other official investigatory materials related to the case.

    **B.**    **The Article Contains a Fair and Accurate Report of the Rondini Investigation**

Next, the Statements fairly and accurately report on that proceeding.  "In order to show

that a publication falls within the privilege …, the defendant must demonstrate that the

publication is a *substantially accurate* report of the official record … to the ordinary reader,

without misleading the reader by the inclusion of inaccurate extra-record information or the

exclusion of relevant information in the record."  *Birmingham Broad.*, 303 So. 3d at 1156

(emphasis added) (quoting *Oney v. Allen*, 529 N.E.2d 471, 473 (Ohio 1988)).  *See also Wilson*,

482 So. 2d at 1213 ("[S]ubstantially accurate reports of official investigations are privileged.").

The privilege "has been given a liberal interpretation."  *Miller v. Gizmodo Media Grp., LLC*, 407

F. Supp. 3d 1300, 1310 (S.D. Fla. 2019) (quoting *Alf v. Buffalo News, Inc.*, 953 N.Y.S.2d 797,

798-99 (N.Y. App. Div. 2012)).[8]  A "statement is considered a fair report if its gist or sting is

true, that is, if it produces the same effect on the mind of the recipient which the precise truth

would have produced."  *Howell v. Enter. Publ'g Co.*, 920 N.E.2d 1, 22 (Mass. 2010) (citation

and internal quotation marks omitted).  In making this determination, "the language used [in the

allegedly defamatory publication] … should not be dissected and analyzed with a

---

[8] Because of the fundamental similarities between fair report laws across the nation and the paucity of Alabama fair report decisions, out-of-state precedent carries considerable weight on this issue.  As the Alabama Supreme Court has noted, the statutory privilege in Alabama codifies the Restatement (Second) of Torts § 611 and is analogous to other state fair report privileges derived from the same common law source.  *See Wilson*, 482 So. 2d at 1211 (citing and relying upon cases decided under New York, California, Washington, Pennsylvania, Maryland, Louisiana, Missouri, Kansas and North Carolina state law).

lexicographer's precision … Nor should a fair report which is not misleading … be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words." *Crittendon v. Combined Commc'ns Corp.*, 714 P.2d 1026, 1029 n.3 (Okla. 1985) (quoting *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d, 1185, 1187 (N.Y. 1978)). *See also Shuler*, 2017 WL 191267, at *19-20.

### 1.    The Accurately Quoted Facts from Police Records Are Privileged

Here, the Article quotes extensively and accurately from official records of the Rondini investigation.  "The application of the privilege turns on whether the alleged defamatory statement was an accurate, or substantially accurate, publication of the report of the arrest." *Wiggins v. Mallard*, 905 So. 2d 776, 783 (Ala. 2004) (internal citation, quotation marks, and emphasis omitted).  Here, the undisputed facts demonstrate that the Article's reporting of Facts from Police Records was *entirely* accurate – and is thus not actionable under the fair report privilege.  *See, e.g.*, *Shuler*, 2017 WL 191267, at *20 (article that "repeated" defamatory findings from a "state court judgment, a matter of public record" cannot "serve as the basis for a defamation claim"); *Wilson*, 482 So. 2d at 1212, 1213 (fair report privilege protects reports of the "oral comments of law enforcement officers" and "statements made to…[police]").

*First*, Statements 4, 8, 9 and 10 contain verbatim quotations from the police's own interview videotapes, which Baker obtained and relied upon for her reporting.  Statement 8, for instance, accurately transcribes the conversation between Plaintiff Jones and Megan – including Plaintiffs Jones' accusatory questions about whether Megan "had any reasoning behind why you did what you did."  *See* 63-36, 00:10:18-00:11:34.  The accuracy of the other Statements quoting interviews is just as easily confirmed by the videotape.  *See* Appx. A, Statements 4, 9 and 10

(citing video timecodes and transcripts).  These Statements, which quote official records to the letter, are privileged.[9]

Next, Statements 4, 6, 8, 9 and 10 fairly and accurately report actions that the interview videotapes clearly depict Plaintiffs undertaking.  For instance:

- Statement 6 accurately describes how "[Plaintiff] Jones abruptly left the room" when Megan mentioned taking Bunn's gun and then "changed his course of questions" to focus on Megan's "behavior the previous night instead of her rape allegations."  *See* Appx. A, Statement 6.

- Statement 8 accurately describes that Plaintiff Jones "read Megan her Miranda rights" but "didn't tell [her] that, although she had entered the room an alleged victim, she was now a suspect as well."  *Id*. at Statement 8.

- Statement 4 accurately reports that Plaintiff Jones "quickly decided" that Megan "hadn't fought back against Bunn" – which is apparent from the quoted statements he made during an initial interview with Megan that "[b]ased on your statements to me, you said that you never resisted him" and that "you never kicked him or hit him or tried to resist him."  *Id*. at Statement 4.  Similarly, Statement 4 accurately describes how Plaintiff Jones "started building a case" against Megan because the video clearly shows that he began "questioning her for multiple crimes she wasn't even aware she had committed."  *Id*.

- Statement 9 accurately describes that "Jones offered to give Megan a 'refusal to prosecute' form to sign," which he does not dispute.  *Id*. at Statement 9.

- Finally, Statement 10 accurately quotes Hastings during his interview with Bunn and accurately describes that Plaintiff Hastings "fumbl[ed] a bit" during his interview with Bunn.  *Id*. at Statement 10.

Because there is no dispute that Statements 4, 6, 8, 9, and 10 are accurate, they are all privileged.

*Compare* Doc.63-5 (the Article) *with* Appx. A (listing factual support for each Statement).

Statements 3, 5, 7 and 11 are fair and accurate reports of details from the felony packet or other official sources clearly referenced in the Article.  For example, Statement 5 correctly reports that "police mark[ed] Megan's first report a 'special inquiry'" based on the contents of the felony packet.  *See* Appx. A, Statement 5.  Statement 5 further states that police "doubted Megan when she went to the station for a follow-up interview" – which is also accurate given

---

[9] *See, e.g.*, *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1318 (S.D. Fla. 2018) (finding BuzzFeed's reporting on infamous "Steele Dossier" privileged because it "simply reproduces the Dossier").

Captain Hood's own definition (quoted in the Article) of a "special inquiry" as a case in which "'the victim does not know what or if anything happened' or the investigators don't think the complaint meets the criteria to be a criminal charge under state law." *Id.*  Next, Statement 7 reports the undisputed fact that Plaintiffs "never tested Megan's blood or urine, according to the state department that processes toxicology reports."  *Id.* at Statement 7.  And Statement 11 accurately cites the felony packet – *i.e.*, "[i]nternal documents" stating (entirely accurately) that "[i]nvestigators … found 'no sexual assault occurred.'"  *Id.* at Statement 8.

Statement 3 is also privileged.  It states that "Megan never imagined that she would soon be cast as a criminal, or that investigators would view Sweet T – really T.J. Bunn Jr., son of an influential Tuscaloosa family – as the true victim.  But that's exactly what happened."  Appx. A, Statement 3.  That Statement fairly and accurately reports what transpired during the investigation.  It is readily apparent, for instance, that Megan was "cast as a criminal" from the very beginning because police compiled an "Offense Report" naming her as a "suspect" several hours *before* she came to the station for an interview.  Doc.63-34, p. 67.  Her status as a suspect is confirmed by the interview videos – in which Plaintiff Jones spends hours "questioning her for multiple crimes" – and from the fact that authorities ultimately lodged "felony charges against [her] for breaking into Bunn's car and stealing his gun."  Appx. A, Statement 3.  Plaintiffs even cast (or recast) Megan as a criminal in their Complaint, which pointedly alleges that she "admitted to multiple crimes without the need for 'any building of a case….'"  Doc.63-1 ¶ 36.

It is equally apparent from the official record that Bunn was viewed as "the true victim" from the outset, rather than a legitimate rape suspect.  As the Article reports, Bunn was permitted to go on a three-day fishing trip with his attorney before coming to the station for a formal interview – despite the fact that he lied to police about having Rondini over to his house and

tampered with evidence.  Appx. A, Statement 3.  When Bunn finally sat for his interview,

Plaintiff Hastings focused on the ways that Bunn had been victimized, including the fact that his

car had been "broken into," his money "stolen" and "even the possibility of a round that struck

[his] occupied residence."  *Id*.  In a portion of the videotaped interview that Plaintiffs

conspicuously omit from their quotation of Statement 7 in the Complaint, Hastings spoon fed

Bunn excuses to explain why he had initially lied to police about Megan being at his house:

> "This is something… I'm gonna ask the question… it's gotta be asked," Hastings said,
> fumbling a bit.  When police arrived at Bunn's house early Thursday morning, how come
> Bunn said no one had been at his house the night before?
>
> "At that time, to be honest with you, I didn't recall," Bunn said.
>
> "Scared?" Hastings asked.
>
> "Of course, yeah, sure," Bunn said.  "Still scared."
>
> "You ended up collecting your thoughts, and coming around, and that's when you
> remembered you had her over there?"  Hastings said.
>
> "Right," Bunn said.

Doc.63-5, p. 13.  Bunn's status as a victim is further confirmed by the felony packet, which

explicitly identifies him as the "victim" and Megan as the "suspect" before either of them were

interviewed at the station.  Doc.63-34, p. 67.  Any doubt on this issue is conclusively resolved by

the fact that the Tuscaloosa Sheriff's office presented the case against Megan to the grand jury

after she died, quite literally making Bunn the "true victim."  Doc.36-70, pp. 47-48.[10]

### 2.   The Headlines Are Privileged

The Headlines are also protected by the fair report privilege.[11]  As this Court recently

noted, "[t]here is no requirement that the report contain only quotations from the court

---

[10] Plaintiffs allege that the Article was not fair because it "intentionally omitted many facts that show [Plaintiffs]
conducted a thorough and fair investigation" but this argument has several glaring defects.  First and foremost, the
fair report privilege does not require Megan's story to be told in the light most favorable to the police.  *See, e.g.*,
*Lawton*, 456 S.E.2d at 278 ("The fact that exculpatory evidence was omitted from the broadcast is not dispositive
since it was not required to devote equal time [to both sides].").  *See also* 27-30, *infra*.

[11] The Headlines are also not actionable for a more fundamental reason: they do not mention Plaintiffs nor do they
accuse them of any wrongdoing or defamatory conduct.  Because there is no "false and defamatory statement …

documents in order to be privileged.  Instead, the publication is privileged when it contains 'a fair abridgment of the occurrence reported.'"  *Shuler*, 2017 WL 191267, at *20 (quoting *Wilson*, 482 So. 2d at 1211).  And courts in other jurisdictions have held that the fair report privilege applies to headlines that consist of a "a fair and true headnote – or miniature synopsis – of the body of the article …."  *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 177 (S.D.N.Y. 2021).  Thus, a headline is privileged if it is an "accurate abridgement" of criminal proceedings reported in the article that follows.  *Harrison v. Chi. Sun-Times, Inc.*, 793 N.E.2d 760, 774 (Ill. App. Ct. 2003).  When applying the fair report privilege to a headline, "the headline is not to be considered in a vacuum but must be viewed on the backdrop of the entire report."  *Salzano v. N. Jersey Media Grp. Inc.*, 993 A.2d 778, 793 (N.J. 2010).

Courts applying the fair report privilege do not hesitate to dismiss defamation claims based on headlines that pithily sum up news articles about official investigations.  For instance, a court recently held that the New York fair report privilege protected a headline identifying the plaintiff as "The Lawyer at the Center of the SEC Pump-and-Dump Case" because the headline was a "miniature synopsis" of the rest of the article's reporting about an official investigation into plaintiff's alleged involvement in securities fraud.  *Kesner*, 515 F. Supp. 3d at 177. Similarly, the Illinois Supreme Court reversed a decision denying summary judgment and dismissed defamation claims based on the headline "Officials find porn on town computer" because the headline was "neither substantially inaccurate nor unfair" in its description of the

---

concerning the plaintiff[s]" in the Headlines, Plaintiffs cannot establish a basic element of defamation and their claims must be dismissed.  *Bell v. Smith*, 281 So. 3d 1247, 1254 (Ala. 2019).  *See also Shuler*, 2017 WL 191267, at *19 ("A plaintiff may not recover in a defamation action if she has not pled that a false statement was made specifically concerning her.").

official disciplinary proceedings reported in the rest of the article.  *Howell*, 920 N.E.2d at 23-24.[12]

Here, the Headlines are fair-report privileged because they offer a "miniature synopsis" of the Article's accurate reporting about the Rondini case.  Statement 1, the headline, crystalizes the very essence of what the Article is about – *i.e.*, "How Accusing a Powerful Man of Rape Drove a College Student to Suicide."  Appx A, Statement 1.  And Statement 2 accurately recounts that the story begins when "Rondini told police she was sexually assaulted" and triggered the official investigation into her claims.  *Id*. at Statement 2.  And, as the subhead reports, that story did not reach its conclusion until Megan "ended up killing herself."  *Id*.  Indeed, the authorities pursued Megan beyond the grave and indicted her for theft posthumously.  Doc.63-70, pp. 47-48.  Taken altogether, the Headlines are clearly privileged as a "fair abridgement" of the official investigation described in the Article.[13]

### C.      Plaintiffs Cannot Overcome the Fair Report Privilege

Plaintiffs cannot overcome the qualified fair report privilege because Plaintiffs have no evidence of actual malice.  As public officials, Plaintiffs must prove actual malice as defined by *N.Y. Times v. Sullivan* – *i.e.*, knowledge of falsity or reckless disregard for the truth – in order to deprive Defendants of the fair report privilege.  *See, e.g.*, *Mead Corp.*, 448 So. 2d at 313 (stating that in public official libel cases, "[s]tatements subject to a qualified privilege are not actionable unless the plaintiff can prove … Sullivan 'actual malice'"); *Fulton v. Advertiser Co.*, 388 So. 2d

---

[12] *See also Harrison*, 793 N.E.2d at 774 (fair report privilege protected headline "Deirdre Harrison Kidnapped Beatrice Tabacchi"); *Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130, 1131 (Fla. Dist. Ct. App. 1984) (privilege protected headline "Top-Ranked Policeman Took Bribes from Gamblers, Informant Claiming").

[13] The Court should also dismiss Plaintiffs' claims based on the Headlines under the related "fair index" doctrine. *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 458 (Ind. 1999).  Under that rule, a headline "is not actionable" if it is "a fair index of an accurate article" (citation omitted).  Alabama courts have not addressed the "fair index rule," but there is nothing to suggest that they would not "adopt this approach when determining whether a headline is defamatory."  *Id*.

533, 537-38 (Ala. 1980) (reversing trial court because it failed to determine whether plaintiffs were public figures before applying the qualified privilege); *WKRG-TV, Inc., v. Wiley*, 495 So. 2d 617, 619 (Ala. 1986) (requiring public official to prove actual malice).  For the many reasons stated below, Plaintiffs cannot establish actual malice based on the undisputed facts of this case and thus cannot overcome the privilege.  *See* Section IV, *infra*.

Even if the standard for private figures is applied – *i.e.*, common law malice – Plaintiffs still cannot defeat the privilege.  Common law malice must be established through evidence that Defendants bore Plaintiffs  "previous ill will" or by showing that the Article demonstrates "violen[t] … language." *Wilson*, 482 So. 2d at 1213.[14]  There is no evidence on the record remotely suggesting that Defendants' bore Plaintiffs "previous ill will" – not least because the undisputed evidence shows that Baker and her editors never knew who Plaintiffs were before researching the Article.  Docs.64-1 ¶¶ 67, 71, 113; Doc.64-2 ¶¶ 17, 20; Doc.64-3 ¶ 25.  Far from being motivated by personal animus, the Article only mentions Plaintiffs because they were the police officers tasked with investigating Megan's claims and thus were indispensable to a story about how she was treated by the institutions that were supposed to help her.  *Id*.; Doc.64-4 ¶ 18. Similarly, there is nothing in the Statements that constitutes "sufficiently violent language from which to infer [common law] malice."  *Files v. Deerfield Media (Mobile), Inc.*, 2020 WL 1161089, at *3 (S.D. Ala. Mar. 10, 2020).  In *Files*, for instance, the court held that "calling someone a rapist and pillager" could support a finding of actual malice sufficient to overcome the privilege.  *Id.*  But there is nothing remotely equivalent in this Article, which does not contain any direct criticism of Plaintiffs let alone epithets as strong as "rapists and pillagers."  Any

---

[14] *See also Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 187 (Ala. 2016) (reversing lower court and awarding summary judgment because "[t]he record does not contain substantial evidence of … malice"); *Byrd v. Jones*, 2015 WL 2194697, at *21 (N.D. Ala. May 11, 2015) (dismissing defamation claim where "the plaintiff offers no factual allegations that either of the defendants acted maliciously"), *aff'd*, 673 F. App'x 968 (11th Cir. 2016).

argument that the Article was somehow unfair also ignores the self-evident fact that the Article quotes multiple statements from Captain Hood defending Plaintiffs and providing their perspective.  Doc.63-5.  Plaintiffs cannot possibly establish common law malice when the facts conclusively demonstrate that the Article was accurate, based on public records and provided both sides of the story.

In sum, all eleven Statements are privileged and, for this reason alone, the Court should grant summary judgment dismissing Plaintiffs claims in their entirety.

## II.    THE STATEMENTS ARE NOT ACTIONABLE BECAUSE THEY ARE TRUE

Plaintiffs' defamation claims also fail because they have "failed to produce any evidence demonstrating that the [Article]… contained any false statements."  *Birmingham Broad.*, 303 So. 3d at 1158.[15]  "[F]alsity is a *sine qua non* of a libel claim."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016) (quoting *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995)).  *See also Shuler*, 2017 WL 191267, at *19 ("[A] prerequisite to pleading a defamation claim is the publication of a false statement of fact.").  The falsity analysis "overlooks minor inaccuracies and concentrates upon substantial truth."  *Id*. at *21 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991)).  In other words, "minor inaccuracies do not amount to falsity so long as the 'gist' or 'sting' of the libelous charge can be justified."  *Id*.  The burden of establishing this level of falsity – *i.e.*, "material falsity" – rests entirely on Plaintiffs' shoulders.  *See Forrester v. WVM TV, Inc.*, 709 So. 2d 23, 26 (Ala. Civ. App. 1997) ( "Because this case involves a matter of public concern, the burden is on [Plaintiffs] to show that the

---

[15] There is significant overlap between the material falsity analysis and the fair report privilege because they both immunize accurate reporting from defamation liability.  As one Alabama court explained, "[i]f the broadcasts were … fair and impartial reports [of official proceedings], it follows that they were accurate statements made based on the information supplied by the police authorities ….  Accurate or truthful statements … will not support a defamation claim."  *Jackson v. WAFF, LLC*, 109 So. 3d 1123, 1127 (Ala. Civ. App. 2012).  *See also Shuler*, 2017 WL 191267, at *21.

[Article] was false.") (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986));

*Deutcsh v. Birmingham Post Co.*, 603 So. 2d 910, 912 (Ala. 1992) (affirming summary dismissal

of police officer's defamation claim because he "failed to present evidence that the statements …

were false …").[16]

### A.    Plaintiffs Cannot Prove that Any Statement Is Materially False

Summary judgment must be granted because Plaintiffs have failed completely to carry

this burden.  They have produced *no* evidence that the Article contains any false statements of

fact.  *See, e.g.*, *Leidig v. BuzzFeed, Inc.*, 371 F. Supp. 3d 134, 144 (S.D.N.Y.) (affirming

summary judgment because "Plaintiffs provide no evidence that the [allegedly defamatory]

statements … are false"), *aff'd* 788 F. App'x 76 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 256

(2020).  In fact, Plaintiffs all but concede that the Statements are factually accurate and true –

they just dislike the way the truth makes them look.  *See, e.g.*, Doc.63-1 ¶ 47 (accusing

Defendants of "maliciously vilifying these officer Plaintiffs and the system under which they

worked" by reporting contents of interview videos).  In this respect, Plaintiffs' claims resemble

the claims in *Forrester*.  There, the court affirmed summary judgment in favor of a news

organization that broadcast video of a father "slapping his son at a ball game" as part of "a story

about adults putting pressure on children in sports."  *Forrester*, 709 So. 2d at 26.  The

defamation claim could not stand because "[t]he video and the reporters' corresponding

explanations as to what occurred are true in their most literal sense" and plaintiff "failed to

present any evidence that the broadcast was false."  *Id*.  In so holding, the Court made clear that

---

[16] The Article clearly "involves a matter of public concern" as required by *Hepps*.  "Criminal conduct and activities have consistently been acknowledged as matters of public interest."  *Wilson*, 482 So. 2d at 1212.  But this investigation has particular social significance – which is apparent from the fact that a Texas congressman introduced "the Megan Rondini Act of 2017" in the wake of Rondini's experience to require hospitals to have sexual assault forensic examiners available at all times.  *See* Megan Rondini Act, H.R.3415, 115th Cong. (2017).

there can be no defamation liability for a report that "truthfully depicted" the plaintiff because journalists are "not to blame for [Plaintiffs'] embarrassment over [their] own actions."  *Id.*  The same rule applies here – the Article accurately (and indisputably) depicts the institutional response to Megan's rape claims.  No matter how much the Article's truthful reporting upset Plaintiffs, their discomfort does not amount to evidence of falsity.

> **B.    Plaintiffs Cannot Establish Falsity by Claiming that the Article Contains an Implication that Simply Does Not Exist**

Seemingly anticipating that the Article's undisputed accuracy presents an existential problem for their defamation claims, Plaintiffs devote the bulk of their Complaint to laying the groundwork for two farfetched arguments that they were implicitly defamed even though the Article does not actually include a false statement.  Neither is persuasive.

*First*, Plaintiffs allege they were defamed because the Article "intentionally omitted many facts that show these investigators conducted a thorough and fair investigation…" Doc.63-1 ¶ 60.  The Eleventh Circuit, however, recently held that publishers cannot be held liable simply for "omitting" facts that would make the plaintiff look better because courts must show "deference to [journalists'] editorial discretion in what to publish."  *Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018).  Indeed, Plaintiffs' arguments here are identical to the arguments of the plaintiff in *Turner*, who claimed that he was defamed because the report in question "purposefully omitted certain facts." *Id*. at 1269.  The Eleventh Circuit gave this argument short shrift because the law protects the right of publishers to "choose the true facts to include in their publication."  *Id*. at 1270.[17]  Defendants cannot, as a matter of law, be held liable

---

[17] *See also Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 686 (9th Cir. 1990) ("Editorial decisions … are best left to editors, not to judges and juries"); *Perk v. Readers Digest Ass'n*, 931 F.2d 408, 412 (6th Cir. 1991) ("[Publishers] have no legal obligation to present a balanced view").

because Plaintiffs claim the Article unfairly omitted facts that might have placed them in a more flattering light.

Further, most of the facts Plaintiffs claim to be omitted are actually in the Article.  For instance, Plaintiffs allege that the article failed to report that Megan told Jones "that she did not try to fight or resist Bunn" (Doc.63-1 ¶ 51), "ignored the video of Ms. Rondini entering and leaving her apartment with Mr. Bunn" (*id*. at ¶ 47) and omitted the fact that Plaintiff Jones "abruptly" left the room when Megan mentioned taking the gun because it "was accessible to neighborhood children."  *Id*. at ¶ 57.  But the Article expressly reports that Megan admitted that she never "kicked him or hit him" (Doc.63-5, p. 12), that Bunn "had indeed visited Megan's apartment before going to his place" (*id*. at p. 11) and that Plaintiff Jones left the room to find the gun because "little kids could shoot themselves."  *Id*.  Clearly, Plaintiffs cannot be held liable for omitting facts that were actually included in the Article.

Plaintiffs also allege the Article omits their side of the story, but this argument does not stand up to scrutiny.  For instance, the Complaint faults Defendants for not reporting that "a rape charge under the circumstances … was improbable" under Alabama law.  Doc.63-1 ¶ 46.  But the Article explicitly states that investigators were bound to follow "Alabama's archaic rape law [requiring] victims [to] prove they 'earnestly' resisted…"  Doc.63-5, p. 22.  The Article also openly acknowledges Plaintiffs' view of the weaknesses in Megan's case by incorporating extensive comments from Captain Hood defending his officers' conduct.  Consider, for instance, the bolded sentence from Statement 7, which Plaintiffs misleadingly (and ironically) omitted when they quoted the Statement in the Complaint:

> But investigators never tested Megan's blood or urine, according to the state department that processes toxicology reports, which found no records associated with Megan's case.  (**Hood said that was because Megan 'admitted to drinking**

**alcohol on her own free will' – even though she told investigators she didn't think she had enough to black out.)**

> It's unclear if the hospital even collected the blood and urine samples necessary for forensic testing when it performed a basic rape kit on Megan.

Doc.63-5, p. 11.  The Article contains many other exculpatory statements from Captain Hood.  *Id*. at pp. 10, 12, 16-17.  In light of these many statements providing innocent explanations for why Plaintiffs said and did the things they did, Plaintiffs alleged "omissions" neither exist nor render the Article false.

Finally*,* Plaintiffs fixate on the idea that Defendants omitted facts that they claim prove that Megan had consensual sex with Bunn.  In particular, Plaintiffs scrape the bottom of the barrel by alleging that the "guck" text, which they did not know about or ask Megan about while she was alive, somehow proves "that the sexual encounter between Bunn and Rondini was planned, welcomed, voluntary, and consensual from Rondini's perspective."  *See* Doc.63-1 ¶¶ 51, 83, 84, 89.  But Plaintiffs' argument misses the mark – the Article is not about proving or disproving that Megan consented to have sex with Bunn – it is about "how various institutions handled Megan's rape claims."  Doc.64-1 ¶ 74.[18]  And, it is undisputed that Plaintiffs were unaware of these text messages during the investigation: they were not mentioned in the felony packet, Plaintiff Jones never brought them up during his interviews with Megan, Captain Hood never once mentioned them during his many conversations with Baker for the Article and Plaintiff Jones confirmed that the police did not know about them during the relevant time period.  Docs.63-44 through 47; 63-61, Tr. 199:21-202:15.  It would have been *inaccurate* to report that the "guck" text message justified or even informed Plaintiffs' determination that no

---

[18] For reasons that should be obvious to sexual assault investigators, the fact that Megan made statements arguably indicating sexual interest in Bunn at one point in time does not disprove her claims that she was raped later on.

rape occurred, because this simply never happened.  The alleged "omission", therefore, does not render the Article false.

*Second*, Plaintiffs allege that the Article is false because it implied Plaintiffs "were involved in a departmental conspiracy to protect the accused rapist because he and his family were powerful and popular." Doc.63-1 ¶¶ 31, 15, 37.  But "[n]o reasonable reading of the text supports the implication" that Plaintiffs urge the Court to adopt.  *Rubin v. U.S. News & World Report Inc.*, 271 F.3d 1305, 1308 (11th Cir. 2001).  *See also Turner*, 879 F.3d at 1270 (affirming dismissal of libel by implication claim because "[n]o reasonable person's perception of the entirety of this discussion would be that the Defendants defamed Turner by juxtaposing facts").  To be clear, and as Plaintiffs must admit, the actual Article never states or remotely suggests that Plaintiffs were "corrupt law enforcement officers" who "intentionally covered up a powerful Tuscaloosa man's rape of Ms. Rondini."  Doc.63-1 ¶ 15.  Lacking any textual support for their reading, Plaintiffs repeatedly assert in conclusory fashion that the implication exists and expect the Court to take their word for it.[19]  But the Court is neither required nor permitted to accept their strained interpretation at face value.  To the contrary, "[w]hether the communication [at issue] is reasonably capable of a [particular] defamatory meaning is a question, in the first instance, for the court."  *Harris v. School Annual Publ'g Co.*, 466 So. 2d 963, 964, 965 (Ala. 1985) (dismissing defamation claims because, "as a matter of law, … the cartoon and caption are not reasonably susceptible of the defamatory inferences [plaintiff] alleges").  Here, Plaintiffs

---

[19] Plaintiffs' argument that the Article tells a different story from the story it clearly tells derives from Dr. Lucchesi's "framing analysis," which twists the Article beyond recognition.  But Dr. Lucchesi's convoluted analysis of "framing," "stigma communications" and "event-driven problem definitions" is the very antithesis of the proper way to determine defamatory meaning.  "The test to be applied by the court in determining the defamatory nature of an imputation is that meaning which would be ascribed to the language by a reader or listener of ordinary or average intelligence, or by a common mind."  *Finebaum*, 854 So. 2d at 1128 (citation, internal quotation marks, alterations omitted).  Accordingly, this Court should grant Defendants' motion to strike the Lucchesi report and reject, as a matter of law, Plaintiffs' strained interpretation that the Article accused them of corruption.

cannot meet their burden of showing that the Article is susceptible of "corruption insinuations" (Doc.63-1 ¶ 36) because that interpretation is simply not supported by the text.  Indeed, the undisputed record show that references to a possible "cover up" were affirmatively *deleted* from drafts of the Article before publication.  Doc.64-1 ¶¶ 70, 106.

And to the extent Plaintiffs seek to allege a claim for libel by implication, they have failed to establish the elements thereof on this record.  To plead and prove a defamation by implication claim, Plaintiff must plead and prove that Defendants "intend[] to imply [a conspiracy] or were reckless towards th[ose] implications" at the time of publication.  *Finebaum v. Coulter*, 854 So. 2d 1120, 1125 (Ala. 2003).  Courts may not presume "that the defendants knew they were making [an implicitly] defamatory statement because the statement has defamatory and nondefamatory meanings… [I]n such cases, plaintiffs must show something that establishes defendants' intent to communicate the defamatory meaning."  *Kendall v. Daily News Publ. Co.*, 716 F.3d 82, 89 (3d Cir. 2013).  The mere allegation that a statement was published with "intent … to smear" is not sufficient to establish the necessary level of intent because Plaintiffs "must prove that [Defendants] intended the reader to believe" the alleged defamatory implication – in this case that Plaintiffs engaged in a corrupt cover up.  *Moore v. Cecil*, 2021 U.S. Dist. LEXIS 61843, at *22 (N.D. Ala. Mar. 31, 2021).  Here, there is no evidence remotely capable of backing up such an allegation.  Nor could there be – all of the BuzzFeed newsgatherers have offered unrebutted testimony that they did not intend that implication.  Docs. 64-1, ¶ 106; 64-2, ¶ 27; 64-3, ¶ 32.  This unrebutted testimony is backed up by undisputed evidence that all references to a "cover up" were deleted from drafts of the Article after Baker determined that she did not have the evidence to support that claim.  64-1, ¶ 70.[20]

---

[20] *See, e.g.*, *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1319 (7th Cir. 1988) (holding that defendants' awareness of a "lack of … evidence tends to support [their] contention that they did not intend" to convey a

## III.    THE STATEMENTS CONTAINING EXPRESSIONS OF OPINION ARE NOT ACTIONABLE

Plaintiffs' defamation claims based on the IACP Guidelines in Statements 7 and 9 should also be dismissed because any suggestion that Plaintiffs' truthfully reported conduct fell short of good policing practice is an expression of opinion that enjoys absolute protection under the First Amendment.

It is well established that "one cannot recover in a defamation action because of another's expression of an opinion based upon disclosed, nondefamatory facts, no matter how derogatory the expression may be." *Bell*, 281 So. 3d at 1252(citation omitted).  Thus, a statement cannot not give rise to a defamation claim "[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts." *Shuler*, 2017 WL 191267, at *19.  In other words, "[u]nder the First Amendment," a statement "is not actionable unless it is 'provable as false.'"  *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1275-76 (M.D. Ala. 2019) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990), *aff'd*, 6 F.3d 1247 (11th Cir. 2021)).  "An alleged defamatory statement is generally not provable as false when it labels the plaintiff with a term that has an imprecise and debatable meaning" or when its truth or falsity cannot "be determined based on 'a core of objective evidence.'"  *Coral Ridge*, 406 F. Supp. 3d at 1276-77 (quoting *Milkovich*, 497 U.S. at 21).[21]  "The determination of whether a communication

---

defamatory implication.").  Even assuming *arguendo* that the Article could be read to imply that Plaintiffs conducted the investigation incompetently and were biased towards Bunn, Plaintiffs' claims would still fail because undisputed facts have emerged during this litigation that prove beyond any doubt that Bunn was given special treatment and Plaintiffs failed to investigate properly.  *See infra* 11-13 (stating undisputed material facts about Plaintiffs mishandling of the investigation).

[21] Courts regularly dismiss libel claims arising from statements of opinion predicated on clearly disclosed facts.  *See, e.g.*, *Bell*, 281 So. 3d at 1255 (dismissing claim because the "article is clearly a piece of advocacy expressing … opinion that the people of Alabama should pay more attention to whom they elect…"); *Finebaum*, 854 So. 2d at 1129 (dismissing claim where statement at issue could not "reasonably be interpreted as stating actual facts") (citation, internal quotation marks, alterations omitted); *Coral Ridge*, 406 F. Supp. 3d at 1277 (dismissing claim

is an expression of opinion is a question of law for the court," not a question to be determined by

individual parties. *Marks v. N.Y. Life Ins. Co.*, 2020 WL 5752852, at *12 (S.D. Ala. Sept. 25,

2020) (citing *Bell*, 281 So. 3d at 1253). *See also Michel*, 816 F.3d at 695 ("Whether a particular

statement constitutes fact or opinion is a question of law for the courts, to be decided based on

what the average person hearing or reading the communication would take it to mean.") (citation

and internal quotation marks omitted).[22]

  Here, the statements about the IACP Guidelines are obvious expressions of opinion based

on clearly disclosed true facts. For instance, Statement 9 reports that:

> Jones offered to give Megan a 'refusal to prosecute' form to sign.
>
> More than 40% of people who reported sexual assault in Tuscaloosa from 2011 to
> 2016 officially dropped their charges by signing such forms, according to a
> BuzzFeed News analysis of the homicide department's data. There are many
> reasons why someone might not want to pursue a case, Hood said: "I know for
> instance in many cases people are mad at someone initially, then change their
> mind." But the IACP tells police not to pressure victims to make any decisions
> about prosecution during the initial stages of an investigation. Doing so is "poor
> practice" and "potentially damaging to an agency," its guidelines state.

Appx. A, Statement 9. Plaintiffs allege that this statement "falsely claim[s] that the Plaintiff

investigators wrongfully 'pressured' Ms. Rondini to the detriment of their department to get her

to drop the criminal prosecution of Mr. Bunn." Assuming *arguendo* that this interpretation is

correct, it is clearly an opinion based on the true, disclosed undisputed facts that (i) "[Plaintiff

Jones] offered to give Megan a 'refusal to prosecute' form" less than 24 hours after the alleged

rape occurred and (ii) that IACP guidelines warn police "not to pressure" victims to decide in the

early stages of a case whether to drop or pursue charges. Any suggestion that Plaintiff Jones

---

based on a statement with a "highly debatable and ambiguous meaning"); *Shuler*, 2017 WL 191267, at *19
(dismissing claims because statement "did no more than explain her thought process and express a statement of
possibility").

[22] For this reason, Baker's testimony that she does not think she included her opinions in the Article is not
dispositive of the issue. Baker is a lay person, using a colloquial definition of opinion, not a legal one.

"wrongfully 'pressured'" Megan to drop the case is an expression of opinion based on those facts.  In fact, even the terms used in the passage – including "pressured," "poor practice" and "potentially damaging to an agency" – are marked by "loosely definable, variously interpretable" language that is the hallmark of opinion.  *Coral Ridge*, 406 F. Supp. 3d at 1277.

Statement 7 also qualifies as a non-actionable expression of opinion for similar reasons. Plaintiffs allege that they were defamed by the suggestion that they "improperly and/or intentionally failed in their duty to test Rondini's blood and/or urine."  Doc.63-1 ¶ 38.  Assuming this is a valid interpretation of Statement 7, it is based on the true disclosed and undisputed facts that (i) "investigators never tested Megan's blood or urine" and (ii) the IACP guidelines explain that "police should consider the possibility of drug-facilitated sexual assault" when victims present "fragmented memories of assault," like Megan did.  Appx. A, Statement 7.  Any purported criticism is opinion based on these disclosed facts.  In any event, Captain Hood is again quoted with equal prominence explaining that no tests were necessary because Megan "admitted to drinking alcohol on her own free will."  Doc.63-5, p. 11.[23]  Statements 7 and 9, therefore, are also protected as statements of opinion.

## IV.   PLAINTIFFS' DEFAMATION CLAIMS MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF ACTUAL MALICE

Summary judgment should also be granted for a wholly separate reason:  Plaintiffs are public officials who have not produced any evidence – much less clear and convincing evidence – that Defendants published *any* Statement with actual malice.  In *New York Times v.*

---

[23] The Complaint also alleges that many of the Statements falsely convey the message that Megan's "death resulted, in part, because the Plaintiff officers failed to do their job."  *See, e.g.*, Doc.63-1 ¶¶ 13, 16, 17, 31, 38.  Nowhere does the Article explicitly assert those claims.  But to the extent the Article can be read to suggest that Plaintiffs mishandling of the investigation contributed to Megan's death, this too would be opinion based on disclosed fact. The Article discloses many undisputed facts about Megan's experience – including the true fact that she wrote "[r]aped, bullied by police, changed university" on medical intake forms shortly before killing herself.  Doc.63-5, p. 17.

*Sullivan*, the United States Supreme Court held that "libel can claim no talismanic immunity from constitutional limitations.  It must be judged by standards that satisfy the First Amendment." *Sullivan*, 376 U.S. at  269.  For that reason, public officials – like Plaintiffs – must demonstrate that the publisher of an allegedly defamatory statement acted with a heightened level of scienter, which is known as "actual malice."  *Id*. at 279-80; *Smith v. Huntsville Times Co*., 888 So. 2d 492, 496 (Ala. 2004) (police officers must show actual malice).

The actual malice standard requires Plaintiffs to prove that Defendants published a Statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Silvester v. Am. Broad Cos.*, 839 F.2d 1491, 1498 (11th Cir. 1988) (quoting *Sullivan*, 376 U.S. at 279-80).  This is an exclusively subjective inquiry that focus on the publisher's actual state of mind "at the time of publication." *Bose Corp.*, 466 U.S. at 512.  "[K]nowledge of falsity is self-explanatory" and requires proof that the defendant knowingly published a false statement of fact. *Silvester*, 839 F.2d at 1498 (citation omitted).  Less intuitive is the "reckless disregard" standard, which does not mean "recklessness" in the typical sense of gross negligence.  Rather, "reckless disregard for the truth" is a "subjective test, focusing on whether the defendant *actually* entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Turner*, 879 F.3d at 1273 (quoting *Michel*, 816 F.3d at 702-03) (emphasis added, internal quotation marks omitted). *See also St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968).  Proof of actual malice "requires more than a departure from reasonably prudent conduct.  'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

As an additional constitutional safeguard for publishers, the First Amendment requires public officials to "prove actual malice by clear and convincing evidence." *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)).  This standard of proof imposes an evidentiary burden "well beyond a preponderance of the evidence." *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020), (citation omitted), *cert. denied*, 141 S. Ct. 2424 (2021).  "[T]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law" – which means that courts can and frequently do grant pre-trial motions to dismiss defamation lawsuits on actual malice grounds.  *Finebaum*, 854 So. 2d 1120 at 1128 (quoting *Milkovich*, 497 U.S. at 17) (internal quotation marks omitted).

There can be no serious dispute that the actual malice standard applies here because Plaintiffs are "public officials" – specifically, police officers – who have filed suit over an Article reporting on their "conduct as … public official[s]." *Little v. Consol. Publ'g Co.*, 83 So. 3d 517, 522 (Ala. Civ. App. 2011).  Police officers are quintessential public officials who are invariably required to prove actual malice – beginning with the plaintiff in *Sullivan*, who was a police commissioner in Montgomery.  *Sullivan*, 376 U.S. at 256.  Since then, "courts have uniformly held that a patrolman or low-level police officer is a 'public official' for the purpose of the *New York Times* privilege." *Gomes v. Fried*, 136 Cal. App. 3d 924, 933 (1st Dist. Ct. App. 1982).[24]  There is also no question that all of the Statements relate to Plaintiffs' conduct as police officers and thus qualify for the actual malice standard.

Applying the exacting actual malice standard to the record in this case, it is clear that Plaintiffs lack the evidence needed to show Defendants "*in fact* entertained serious doubts as to

---

[24] *See* Doc.61, p p. 5-6 (citing more than 30 decisions nationwide applying actual malice standard to police officers).

the truth" of the Statements.  *Berisha*, 973 F.3d at 1312.  To the contrary, Baker, her fact checker

and her editors have all affirmed that they believed that the entire Article was factually accurate

at the time it was published.  Docs.64-1 ¶ 112; 64-2 ¶ 29; 64-3 ¶ 33; 63-4 ¶ 20.  In light of these

"professions of good faith," summary judgment must be granted unless Plaintiffs produce clear

and convincing evidence that the Article was:

> [f]abricated by the defendant, is the product of his imagination, or is based wholly
> on an unverified anonymous telephone call … [or that] the publisher's allegations
> are so inherently improbable that only a reckless man would have put them in
> circulation.  Likewise, recklessness may be found where there are obvious reasons
> to doubt the veracity of the informant or the accuracy of his reports.

*Michel*, 816 F.3d at 703, quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  There is no

evidence on the record here to support any of these contentions.

On the contrary, Defendants based the Statements in large part on the felony packet,

interview videos and other investigatory materials created by the Tuscaloosa County Sherriff's

Department.  As a matter of law, there can be no actual malice "when reporters rely on police

information" unless there is "evidence that the reporters actually entertained serious doubt about

the truth of the reports…."  *Erdmann v. SF Broad. of Green Bay, Inc.*, 599 N.W.2d 1, 8 (Wis. Ct.

App. 1999).[25]  Here, there is no evidence of subjective doubt (nor could there be) since the

relevant investigatory documents originated with the police, are indisputably authentic and their

contents were reported accurately.  *See* Appx. A.  "[R]eliance on these many independent

sources, alone, should defeat any claim of actual malice."  *Berisha*, 973 F.3d at 1313.  And here,

---

[25] *See also Time Inc. v. Pape*, 401 U.S. 279, 291 (1971) (dismissing libel claim based on the alleged
"misinterpretation of the gist of a lengthy government document" for lack of actual malice); *Lewis v. NewsChannel
5 Network, L.P.*, 238 S.W.3d 270, 301-02 (Tenn. Ct. App. 2007) (holding that article based on information "from
persons identifying themselves as police officers" was not published with actual malice); *Seymour v. A.S. Abell Co.*,
557 F. Supp. 951, 958 (D. Md. 1983) ("[N]o reasonable jury could find that defendants acted with actual malice in
reporting the police investigation and charges"); *Torrance v. Morris Publ'g Grp., LLC*, 656 S.E.2d 152, 155 (Ga. Ct.
App. 2007) (affirming summary judgment on actual malice grounds where publisher relied, in part, on "copies of
police reports, crime scene logs, and notes").

the Statements were also buttressed with accurate information from other sources – including

IACP guidelines, rape reporting statistics, the parameters of "Alabama's archaic rape law" and

other information gathered from myriad sources over the course of several months – including

Captain Hood himself.  *Id.*  In short, Baker's reliance on exhaustively sourced and inherently

reliable newsgathering materials *precludes* a finding of malice here.

The absence of actual malice is further confirmed by undisputed evidence that

"Defendants conducted a long and thorough investigation before publishing their article."  *Talley

v. Time, Inc.*, 923 F.3d 878, 898 (10th Cir. 2019).  *See also Tavoularas v. Piro*, 817 F.2d 762,

797 (D.C. Cir. 1987) (the "nature and scope" of investigation "was sufficiently thorough and

professional when held up to the daunting standards of actual malice").[26]  As set forth in the 45-

page Baker declaration, Defendants ensured the Article's accuracy by taking the following steps

(among others).  The Article was researched and written over the course of five months during

which time Baker sought to speak with anybody who might have information about the Rondini

case – which amounted to dozens of people – and even traveled to Tuscaloosa to report from the

scene.  Doc.64-1 ¶¶ 13-74.  Plaintiffs were sent detailed "no surprises" letters well in advance of

publication and were given multiple opportunities to comment on the specific claims in the

Article – which they declined to do.  *Id.* at ¶¶ 75-77.  Baker also sought comment from Captain

Hood and (after being repeatedly turned down) corresponded with him over several emails to

address specific questions about the Rondini investigation.  *Id.* at ¶¶ 78-84.  Captain Hood's

"very helpful" comments defending Plaintiffs' handling of the investigation were quoted

liberally throughout the Article, including as part of several Statements.  Doc.63-5 ¶¶ 10, 12, 16-

---

[26] *See also Talley*, 923 F.3d at 899 (no actual malice for "article … based on an extended research process"); *Carr v. Forbes, Inc.*, 259 F.3d 273, 282-83 (4th Cir. 2001) (no actual malice for "meticulously fact-checked" article).

17. BuzzFeed assigned two experienced editors and a factchecker to the story, who rigorously tested the accuracy of every piece of reporting.  Docs. 64-2, ¶¶ 7-30; 64-3, ¶¶ 9-34; 64-4 ¶¶ 9-21. Over the course of several drafts, BuzzFeed made significant changes to the Article in response to newly discovered facts.  64-1, ¶ 70.  All of these undisputed facts are indicia of responsible journalism of the highest caliber, not actual malice.

In addition, Plaintiffs' theories of actual malice in the Complaint are contradicted by the undisputed evidence.  For instance, Plaintiffs alleged that the Defendants acted with actual malice because "Defendants knew Rondini was not raped or subjectively had serious doubts regarding whether Bunn had raped Rondini."  Doc.63-1, ¶ 82.  In particular, Plaintiffs suggest that Defendants' awareness of Megan's text messages – including the "guck" text – meant that they knowingly published false Statements indicating that Megan had been raped.  But the text messages are a red herring.  As discussed above, the Article is not about whether Megan was raped.  It was about the way the police and other institutions "handled Megan's *allegations* of rape."  Doc.64-1 ¶ 109.  Baker, who received the "guck text" from Megan's father, not the police, had no reason to believe that the police saw the "guck text" because she believed – and she was correct to believe – that the "guck text" was not part of the investigation.  *Id.*

Plaintiffs also sought to allege actual malice by alleging that Defendants deliberately or recklessly omitted material facts in order to "falsely report[] that Jones and Hastings failed to do their jobs …."  Doc.63-1, ¶ 91.  This claim is inaccurate.  The Article includes many statements from Captain Hood defending Plaintiffs' handling of the investigation.  *See supra* 28-29.  And it includes many details undermining Megan's claims.  *See supra* 28.  The inclusion of this "information cutting against" the alleged implied defamatory meaning makes "any allegation of

actual malice *less plausible*" because it permits "readers to decide for themselves what to conclude."  *Turner*, 879 F.3d at 1274 (emphasis added).

*Finally*, Plaintiffs allege that Defendants intentionally framed Plaintiffs as "corrupt law enforcement officers" in order "to promote their 'rape culture' agenda-driven narrative." Doc.63-1 ¶¶ 15, 107.[27]  Leaving aside for the moment that this is a profoundly inaccurate interpretation of the Article, allegations that journalists have "preconceived notions or suspicions usually do little to show actual malice.  After all, virtually any work of investigative journalism begins with some measure of suspicion."  *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 241 (D.C. Cir. 2021) (internal citation, quotation marks, alterations omitted), *pet. for cert. docketed*, No. 21-121 (U.S. July 28, 2021).  Equally immaterial are allegations of political animus.  *See, e.g.*, *Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020) ("Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment.").  What is important is the journalist's state of mind at the moment of publication.  The undisputed facts demonstrate that the Article constantly evolved from the time Michael Rondini approached Baker to pitch a story about what he saw as a law-enforcement cover up.  Doc.64-1, ¶ 15.  Baker's undisputed testimony establishes that the published Article told a more nuanced story about what happened to a young woman who reported what she believed to be a sexual assault to different institutions, including the police, the hospital and a mental health counselor.  *Id*. at ¶ 74.  In fact, all references to a "cover-up" were affirmatively deleted.  *Id*. at ¶¶ 70, 106.  There is simply no actual malice here.

## <u>CONCLUSION</u>

For these reasons, Defendants respectfully request that the Court grant summary judgment.

---

[27] Plaintiffs allege that Defendants' "news publication goals are based on 'sensational presentation' in search of 'viral' success on the internet" (Doc.63-1 ¶70), but this is a new twist on an old argument that has been rejected many times before, beginning with *Sullivan*.  As the Supreme Court held, the existence of a financial motivation to publish a compelling news story does not give rise to actual malice.  *See, e.g.*, *Sullivan*, 376 U.S. at 266.

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Katherine M. Bolger*
Katherine M. Bolger (*pro hac vice*)
Rachel F. Strom (*pro hac vice*)
John M. Browning (*pro hac vice*)

1251 Avenue of the Americas, 21st Fl.
New York, NY 10020-1104
T: (212) 489-8230
F: (212) 489-8340

**LIGHTFOOT, FRANKLIN & WHITE, LLC**

J. Banks Sewell, III
John G. Thompson
Jonathan R. Little, III

400 20th Street North
Birmingham, AL 35203-3200
T: (205) 581-0772
F: (205) 380-9172

*Attorneys for Defendants*
*BuzzFeed, Inc., Katie J.M. Baker, and Ben Smith*

41

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was electronically filed on this the 16th day of September, 2021, using the CM/ECF system which will send notification to the following.  Should the Notice of Electronic Filing indicate that notice needs to be delivered by other means to any of the following, I certify that a copy will be sent via U.S. Mail, postage prepaid and properly addressed.

Bobby H. Cockrell, Jr.
Jonathan D. Townsend
G. Scotch Ritchey, Jr.
Cockrell, Cockrell, Townsend & Ritchey LLP
1409 University Blvd.
Tuscaloosa, Alabama 35401
T: (205) 349-2009
F: (205) 758-3090
bcockrell@cctr.law
jtownsend@cctr.law
sritchey@cctr.law
Counsel for Plaintiffs


*/s/   John G. Thompson*
Of Counsel

42