FILED
2021 Oct-21  PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **ADAM JONES,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 7:19-cv-00403-RDP** |
| | ) | |
| **BUZZFEED, INC.,** *et al*, | ) | |
| | ) | **ORAL ARGUMENT** |
| **Defendants.** | ) | **REQUESTED** |

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

    **COMES NOW**, the Plaintiffs, Adam Jones and Joshua Hastings, by and through the

undersigned counsel, and file this Response in Opposition to Defendants' Motion for Summary

Judgment (Doc. 65, 66), and respond as follows:

    In support of their opposition, Plaintiffs rely upon the deposition of Adam Jones (attached

hereto, incorporated herein by reference, and marked as Exhibit 1), the deposition of Joshua

Hastings (attached hereto, incorporated herein by reference, and marked as Exhibit 2), the

deposition of Marisa Carroll (attached hereto, incorporated herein by reference, and marked as

Exhibit 3), a document that has been produced by Defendants and bates stamped as Buzzfeed03399

(attached hereto, incorporated herein by reference, and marked as Exhibit 4), the deposition of

Katie Baker (attached hereto, incorporated herein by reference, and marked as Exhibit 5), a

document produced by Defendants and bates stamped Buzzfeed01223 – Buzzfeed01224 (attached

hereto, incorporated herein by reference, and marked as Exhibit 6), the deposition of Ben Smith

(attached hereto, incorporated herein by reference, and marked as Exhibit 7), the expert report of

Carlton Hershman (Defendants' expert witness) (attached hereto, incorporated herein by reference,

and marked as Exhibit 8), the deposition of Carlton Hershman (Defendants' expert witness) (attached hereto, incorporated herein by reference, and marked as Exhibit 9), the transcription of the July 2, 2015 Ms. Rondini Interview Part 1 (attached hereto, incorporated herein by reference, and marked as Exhibit 10), the video of the July 2, 2015 Ms. Rondini Interview Part 1 (attached hereto, incorporated herein by reference, and marked as Exhibit 6; to be filed in its native format), the audio of the July 2, 2015 Ms. Rondini Interview at DCH (attached hereto, incorporated herein by reference, and marked as Exhibit 11; to be filed in its native format), the transcription of the July 2, 2015 Ms. Rondini Interview at DCH (attached hereto, incorporated herein by reference, and marked as Exhibit 13), the Felony Packet concerning the allegations against Bunn (hereinafter referred to as the "Felony Packet") (attached hereto, incorporated herein by reference, and marked as Exhibit 14), a copy of the June 22, 2017 article entitled "How Accusing A Powerful Man of Rape Drove A College Student To Suicide" written by Defendant Katie Baker and published by Defendant Buzzfeed, Inc. which forms the basis of this lawsuit (hereinafter referred to as the "Article") (attached hereto, incorporated herein by reference, and marked as Exhibit 15),[1] a document produced by Defendants and bates stamped as Buzzfeed 00111 – Buzzfeed 00126 (attached hereto, incorporated herein by reference, and marked as Exhibit 16), the deposition of Captain Gary Hood (attached hereto, incorporated herein by reference, and marked as Exhibit 17), a document produced by Defendants and bates stamped Buzzfeed00002 (attached hereto, incorporated herein by reference, and marked as Exhibit 18), a document produced by Defendants and bates stamped Buzzfeed 01144, a draft of the Article created around February 13, 2017 which was produced by Defendants and bates stamped Buzzfeed03815 – Buzzfeed 03825 (attached hereto, incorporated herein by reference, and marked as Exhibit 20), a draft of the Article created

---

[1] Plaintiffs have added line numbers to Exhibit 15 to assist in making references to the Article. No other alterations were made to the Article.

around February 16, 2017 which was produced by Defendants and bates stamped Buzzfeed03826 – Buzzfeed 03843 (attached hereto, incorporated herein by reference, and marked as Exhibit 21), a draft of the Article created around May 22, 2017 which was produced by Defendants and bates stamped Buzzfeed03844 – Buzzfeed03856 (attached hereto, incorporated herein by reference, and marked as Exhibit 22), a draft of the Article created around May 5, 2017 which was produced by Defendants and bates stamped Buzzfeed03803 – Buzzfeed03814 (attached hereto, incorporated herein by reference, and marked as Exhibit 23), a draft of the Article created around June 3, 2017 which was produced by Defendants and bates stamped Buzzfeed03783-03793 (attached hereto, incorporated herein by reference, and marked as Exhibit 25), the transcription of the July 2, 2015 Ms. Rondini Interview Part 2 (attached hereto, incorporated herein by reference, and marked as Exhibit 25), the video of the July 2, 2015 Ms. Rondini Interview Part 2 (attached hereto, incorporated herein by reference, and marked as Exhibit 26; to be filed in its native format), a document produced by Defendants and bates stamped Buzzfeed00556 – Buzzfeed 00567 (attached hereto, incorporated herein by reference, and marked as Exhibit 27), a document produced by Defendants and bates stamped Buzzfeed05771 – Buzzfeed05773 (attached hereto, incorporated herein by reference, and marked as Exhibit 28), a document produced by Defendants and bates stamped Buzzfeed03259 – Buzzfeed 03260 (attached hereto, incorporated herein by reference, and marked as Exhibit 29), a document produced by Defendants and bates stamped Buzzfeed02781 – Buzzfeed 02797 (attached hereto, incorporated herein by reference, and marked as Exhibit 30), a document produced by Defendants and bates stamped Buzzfeed00056 – Buzzfeed00061 (attached hereto, incorporated herein by reference, and marked as Exhibit 31), the deposition of Loyd Baker (attached hereto, incorporated herein by reference, and marked as Exhibit 32), a document produced by Defendants and bates stamped Buzzfeed01637 – Buzzfeed 01639 (attached hereto,

incorporated herein by reference, and marked as Exhibit 33), a document produced by Defendants and bates stamped Buzzfeed01967 – Buzzfeed1974 (attached hereto, incorporated herein by reference, and marked as Exhibit 34), the felony packet concerning allegations against Ms. Rondini (attached hereto, incorporated herein by reference, and marked as Exhibit 35), Ms. Rondini's DCH medical records produced by Defendants and bates stamped Buzzfeed04262 – Buzzfeed04309 (attached hereto, incorporated herein by reference, and marked as Exhibit 36), a document produced by Defendants and bates stamped as Buzzfeed05783 – Buzzfeed05829 (attached hereto, incorporated herein by reference, and marked as Exhibit 37), Baker's notes produced by Defendants and bates stamped Buzzfeed03857 – Buzzfeed04012 (attached hereto, incorporated herein by reference, and marked as Exhibit 38), Ms. Rondini's text messages produced by Defendants and bates stamped Buzzfeed04165 – Buzzfeed-4190 (attached hereto, incorporated herein by reference, and marked as Exhibit 39), the deposition of Sharmila Venkatasubban (attached hereto, incorporated herein by reference, and marked as Exhibit 40), the deposition of Tina Susman (attached hereto, incorporated herein by reference, and marked as Exhibit 41), the deposition of Chief Bryon Waid (attached hereto, incorporated herein by reference, and marked as Exhibit 42), the specific false and defamatory statements claimed by Plaintiffs (hereinafter referred to as the "Defamatory Statements) (attached hereto, incorporated herein by reference, and marked as Exhibit 43), a document produced by Defendants and bates stamped Buzzfeed04872 – Buzzfeed04875 (attached hereto, incorporated herein by reference, and marked as Exhibit 44), the deposition of Michael Mertz (Defendants' expert witness) (attached hereto, incorporated herein by reference, and marked as Exhibit 45), the transcription of the July 6, 2015 Bunn Interview (attached hereto, incorporated herein by reference, and marked as Exhibit 46), the video of the July 6, 2015 Bunn Interview (attached hereto, incorporated herein by reference, and marked as Exhibit 47; to

be filed in its native format), Facebook comments made on the Article's website (attached hereto, incorporated herein by reference, and marked as Exhibit 48), the first Houndstooth Condominium surveillance video (attached hereto, incorporated herein by reference, and marked as Exhibit 49; to be filed in its native format), the second Houndstooth Condominium surveillance video (attached hereto, incorporated herein by reference, and marked as Exhibit 50, to be filed in its native format), the Innisfree surveillance videos (collectively, 11 videos) (attached hereto, incorporated herein by reference, and marked as Exhibit 51, to be filed in its native format), a document produced by Defendants and bates stamped Buzzfeed02830 – Buzzfeed02834 (attached hereto, incorporated herein by reference, and marked as Exhibit 52), a document produced by Defendants and bates stamped Buzzfeed01874 (attached hereto, incorporated herein by reference, and marked as Exhibit 53), a document produced by Defendants and bates stamped Buzzfeed01514 – Buzzfeed01516 (attached hereto, incorporated herein by reference, and marked as Exhibit 54), a document produced by Defendants and bates stamped Buzzfeed03202 – Buzzfeed03205 (attached hereto, incorporated herein by reference, and marked as Exhibit 55), a document produced by Defendants and bates stamped Buzzfeed03241 – Buzzfeed03248 (attached hereto, incorporated herein by reference, and marked as Exhibit 56), the transcription of the July 2, 2015 Bunn Interview at the Scene (attached hereto, incorporated herein by reference, and marked as Exhibit 57), the audio of the July 2, 2015 Bunn Interview at the Scene (attached hereto, incorporated herein by reference, and marked as Exhibit 58; to be filed in its native format), a document produced by Defendants and bates stamped Buzzfeed03049 (attached hereto, incorporated herein by reference, and marked as Exhibit 59), a document produced by Defendants and bates stamped Buzzfeed03332 – Buzzfeed03334 (attached hereto, incorporated herein by reference, and marked as Exhibit 60), a document produced by Defendants and bates stamped

Buzzfeed03368 – Buzzfeed03370 (attached hereto, incorporated herein by reference, and marked as Exhibit 61), a document produced by Defendants and bates stamped Buzzfeed02713 – Buzzfeed02717 (attached hereto, incorporated herein by reference, and marked as Exhibit 62), a document produced by Defendants and bates stamped Buzzfeed03081 (attached hereto, incorporated herein by reference, and marked as Exhibit 63), a document produced by Defendants and bates stamped Buzzfeed03056 – Buzzfeed03057 (attached hereto, incorporated herein by reference, and marked as Exhibit 64), a document produced by Defendants and bates stamped Buzzfeed03422 – Buzzfeed03427 (attached hereto, incorporated herein by reference, and marked as Exhibit 65), the Article's statistics page produced by Defendants (attached hereto, incorporated herein by reference, and marked as Exhibit 66), SnapChat videos taken by Ms. Rondini while in Bunn's residence (3 videos) (collectively attached hereto, incorporated herein by reference, and marked as Exhibit 67; to be filed in its native format), and a document produced by Defendants and bates stamped Buzzfeed02919 – Buzzfeed02921 (attached hereto, incorporated herein by reference, and marked as Exhibit 68).

Table of Contents

Response to Movants' Statement of Undisputed Material Facts .................................................... 1

Nonmovants' Statement of Additional Undisputed Facts ........................................................... 13

Standard of Review.................................................................................................................... 21

Argument ................................................................................................................................... 22

I.     Plaintiffs have presented sufficient evidence to show that the Defamatory Statements are actionable and defamed the Plaintiffs. ...................................................................................... 22

   A.     Plaintiffs have presented sufficient evidence that Defendants were at least negligent in publishing the Defamatory Statements. Alternatively, Plaintiffs have presented sufficient evidence of common law and actual malice. ........................................................................... 24

      1.     Plaintiffs have presented sufficient evidence that Defendants were at least negligent in publishing the Article........................................................................................................ 25

      2.     Alternatively, if this Honorable Court finds that the fair reporting privilege is applicable, Plaintiffs nevertheless have presented sufficient evidence under the common law malice standard to survive summary judgment. ..................................................................... 26

      3.     In the second alternative, if this Honorable Court finds that Plaintiffs are public officials, sufficient evidence exists to show actual malice for the defamation claim to proceed to the jury. ......................................................................................................................... 27

   B.     Plaintiffs have provided sufficient evidence that the Defamatory Statements are false and capable of a defamatory meaning. ....................................................................................... 30

      1.     Statement 1 and 2: Headline and Deck........................................................................... 32

      2.     Statement 3: Bunn as Victim ......................................................................................... 33

      3.     Statement 4: Inducement to Drop Charges and Civil Lawsuit ................................... 34

      4.     Statement 5: Doubted Ms. Rondini ............................................................................. 37

      5.     Statement 6: Bare Minimum/ Abruptly Left ............................................................. 38

      6.     Statement 7: Biological Samples.................................................................................... 40

      7.     Statement 8: Wrong to Mirandize .............................................................................. 41

      8.     Statement 9: Refusal to Prosecute Form........................................................................ 42

      9.     Statement 10: Not Taking Investigation Seriously...................................................... 44

      10.    Statement 11: Did Not Intend to Fight Too Hard...................................................... 45

   C.     Plaintiffs have presented sufficient evidence that Statement 7 and 9 are provable as false.   46

   D.     Plaintiffs have provided sufficient evidence that the Headline and Deck (Statement 1 and 2) were published of and concerning Jones and Hastings.................................................. 48

II.    Alabama's fair reporting privilege does not apply in this case, and even if it did, Plaintiffs have provided sufficient evidence to overcome the qualified privilege. ...................................... 48

Conclusion ................................................................................................................................. 50

While the Plaintiffs maintain that the Defendants have not met their burden under Fed. R. Civ. P. 56 and have failed to show that no genuine issue of material fact exists and the Defendants are entitled to a judgment as a matter of law, Plaintiffs nevertheless submit the following as a response to Defendant's narrative summary of purported undisputed facts:

## RESPONSE TO MOVANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Adam Jones is not currently an officer or investigator for the City of Tuscaloosa. At the time of his deposition, Jones was employed by the University of Alabama in the Environmental, Health, and Safety Department as a hazard technician. [Exhibit 1, Depo. of Jones, p. 24:6 – p. 25:7]. Jones was the lead or primary investigator on the case. [Exhibit 1, Depo. of Jones, p. 73:9 – p. 74:5]. All other material facts stated in paragraph 1 of the Movants' Statement of Undisputed Material Facts ("Movants' Statement") are undisputed.

2.      Before Josh Hastings was promoted to Sergeant, he had to pass a sergeant test and go through "interviews with the chiefs." Once he obtained the promotion, he was assigned to the county jail for eight or nine months, and was then assigned to the patrol division. [Exhibit 2, Depo. of Hastings, p. 35:19 – p. 39:18]. All other material facts stated in paragraph 2 of the Movants' Statement are undisputed.

3.      The material facts contained in paragraph 3 of the Movants' Statement are undisputed except that winning a Pulitzer Prize for a wholly unrelated article is immaterial to this case.

4.      According to one of Defendant Katie Baker's editors, Marisa Carroll, Baker's beat, or topic on which she does a number of stories, was stories concerning sexual assault. [Exhibit 3, Depo. of Carroll, p. 229:13 – p. 231:7]. All other material facts stated in paragraph 4 of the Movants' Statement are undisputed.

5.      Defendant Ben Smith assisted and contributed to the editing of the headline or "deck" – the line underneath the headline. [Exhibit 4]. Editors are generally responsible for writing the

headline or "deck." [Exhibit 5, Depo. of Katie Baker, p. 218:3 – p. 219:2]. Smith also knew about the story early on. [Exhibit 6]. Smith also had the power and authority to decide whether a story is ultimately published. [Exhibit 7, Depo. of Smith, p. 53:16 – p. 53:22]. Smith's employment history in paragraph 5 of the Statement is undisputed.[2]

6.     The material facts contained in paragraph 6 of the Movants' Statement are undisputed.

7.     To the extent that the material facts contained in paragraph 7 of the Movants' Statement imply that Tina Susman and Carroll oversaw all of Baker's work, such contention is disputed. Baker only showed Susman and Carroll what they asked for, neither saw everything that Baker obtained through the investigation of the story. [Exhibit 5, Depo. of Katie Baker, p. 141:3 – p. 145:11]. All other material facts contained in paragraph 8 of the Movants' Statement are undisputed.

8.     The material facts contained in paragraph 8 of the Movants' Statement are undisputed.

9.     The material facts contained in paragraph 9 of the Movants' Statement are undisputed.

10.    Megan Rondini did not "black out" for a long period of time. According to Defendants' expert, Ms. Rondini did not remember only approximately thirty (30) minutes of the night, during the time when Ms. Rodnini, T.J. Bunn, and Jason Barksdale traveled to Ms. Rondini's apartment. [Exhibit 8, p. 12-13; Exhibit 9, Depo. of Hershman, p. 198:17 – p. 199:23]. Further, Ms. Rondini never specifically stated that she "blacked out," rather she said that she had some memory gaps but remembered a majority of the night. [Exhibit 10, p. 41:1-4, p. 45:6-8, p. 53:4-5, p. 57:15-16; Exhibit 11, 1:04:42-1:04:52, 1:10:06-1:10:12, 1:30:13-1:30:16, 1:46:53-1:46:59]. Further, the cited Incident/Offense Report was not taken, written, or drafted by Jones or Hastings,

---

[2] Defendants also contend that the claims against Ben Smith are due to be dismissed because he was entitled to rely on Baker's reputation and experience. (Doc. 66, p. 10 n.2). Yet, Smith participated in the editing and publishing of the Article. Smith had the authority to publish and not to publish, and he helped edit portions of the Article. Thus, the claims against Smith should not be dismissed.

rather the responding officer was R.B. Phillips. Ms. Rondini also knew that she was at Bunn's residence. [Exhibit 13, p. 1; Exhibit 12, 1:57-2:00]. It is further disputed whether any sexual assault occurred. [Exhibit 14, Jones-Hastings 06-07]. Any other material fact contained in paragraph 10 of the Movants' Statement is undisputed.

11.    The material facts contained in paragraph 11 of the Movants' Statement are undisputed.

12.    The material facts contained in paragraph 12 of the Movants' Statement are undisputed.

13.    In Baker's deposition, she did not remember any specific content of the interviews she conducted with six (6) of Ms. Rondini's friends. Instead, she stated that her clearest memories were included in the Article.[3] [Exhibit 5, Depo. of Katie Baker, p. 57:12 – p. 58:14, p. 59:16-23]. Yet, the Article never mentions that Ms. Rondini's friends were told by Ms. Rondini that she felt like she was being bullied by the officers. [Exhibit 15]. Baker had further interviews with Ms. Rondini's friends which discussed Ms. Rondini's text messages and the investigation in general. [Exhibit 5, Depo. of Katie Baker, p. 178:17 – p. 179:15, p. 220:20 – p. 221:16].

14.    The material facts contained in paragraph 14 of the Movants' Statement are undisputed.

15.    On February 24, 2017, Captain Gary Hood of the Tuscaloosa County Homicide Unit ("Homicide Unit") emailed Alex Campbell and explained that a report designated as a "special inquiry" are written as such "because the victim does not know if something happened to them *or there is not enough information initially to meet the elements of a crime* or there are some other

---

[3] As referred to herein, the "Article" means the June 22, 2017 article published by Defendant Buzzfeed entitled "How Accusing A Powerful Man of Rape Drove A College Student to Suicide" written by Defendant Baker. The Article is still published and available online: https://www.buzzfeednews.com/article/katiejmbaker/how-accusing-a-powerful-man-of-rape-drove-a-college-student.

extenuating circumstances." [Exhibit 16, Buzzfeed00112]. Captain Hood does not remember receiving a call from or speaking to Alex Campbell. [Exhibit 17, Depo. of Hood, p. 205:2 – p. 206:22]. Defendants also did not want to include a lot of information concerning special inquiries in the Article. [Exhibit 52, Buzzfeed02830]. It is undisputed that Campbell sent a records request to the Tuscaloosa County District Attorney's Office and spoke with Jonathan Cross.

16.    The focus or gist of the Article never changed, it started as a cover-up and corruption story and ended as one. [*See* Exhibit 18; Exhibit 19; Exhibit 20, Exhibit 21, Exhibit 22, Exhibit 23, Exhibit 24, Exhibit 15].

17.    The material facts contained in paragraph 17 of the Movants' Statement are undisputed.

18.    The material facts contained in paragraph 18 of the Movants' Statement are undisputed.

19.    The material facts contained in paragraph 19 of the Movants' Statement are undisputed.

20.    The entire Felony Packet, [Exhibit 14], was not submitted to the grand jury. [Exhibit 1, Depo. of Jones, p. 277:6 – p. 278:4]. Instead, the Felony Packet was submitted to the Tuscaloosa County District Attorney's Office to be prepared for presentation to the grand jury, the whole packet does not get presented to the grand jury. [*Id.*]. Further, paragraph 66 of Doc. 64-1 (Declaration of Katie Baker) which is cited to in paragraph 20 of the Movants' Statement does not state that the entire Felony Packet was submitted to the grand jury. Defendants have not cited any evidence to support that the entire Felony Packet was submitted to the grand jury; in fact, Baker did not know what was presented to the grand jury, *see* paragraph 75 of the Nonmovants'

Statement of Additional Undisputed Facts ("Nonmovants' Statement"), *infra*. The other material facts contained in paragraph 20 of the Movants' Statement are undisputed.

21.     Bunn later recanted his initial statement about Ms. Rondini not being present at his residence and told officers that Ms. Rondini did in fact spend the night at his house. [Exhibit 14, Jones-Hastings 059]. All other material facts contained in paragraph 21 of the Movants' Statement are undisputed.

22.     The "Uniform Incident/Offense Report" referenced and cited to in paragraph 22 of the Movants' Statement listed the type of incident or offense as "Theft of Property Second Degree (Greater than $500 to $2,500" and "Unlawful Breaking and Entering a Vehicle." Further, the following property was reported stolen: a 2012 Ford F-150 key fob, $200 dollars, credit card, and a Ruger .380 with laser. [Exhibit 14, Jones-Hastings 058-059]. All other material facts contained in paragraph 22 of the Statement are undisputed.

23.     The material facts contained in paragraph 23 of the Movants' Statement are undisputed.

24.     Ms. Rondini first reported the accusations against Bunn on July 2, 2015 at 4:30 A.M. to officers of the Tuscaloosa Police Department ("TPD"). [Exhibit 14, Jones-Hastings 08-011]. Ms. Rondini's interview at the sheriff's office began at approximately 11:30 A.M. on July 2, 2015. [Exhibit 11]. While Jones offered to present a refusal to prosecute form, Ms. Rondini was never actually presented with the refusal to prosecute form. [Exhibit 25, p. 27: 2 – p. 29:2; Exhibit 26 50:18-53:13]. Further, the fact that the refusal to prosecute form was never actually presented to Ms. Rondini should have been included in the Article. [Exhibit 41, Depo. of Susman, p. 81:3 – p. 83:14]. However, the facts did not allow for such detention or arrest. All other material facts contained in paragraph 24 of the Movants' Statement are undisputed.

25.    Bunn was not "permitted to go on a fishing trip with his lawyer." Rather, the investigators did not have enough evidence to detain or arrest Bunn. The investigators did not actively allow or permit Bunn to travel. [Exhibit 2, Depo. of Hastings, p. 81:23 – p. 84:11 p. 223:4 – p. 224:5; Exhibit 1, Depo. of Jones, p. 99:4 – p. 100:10, p. 160:1 – p. 163:3]. Baker also did not know if there was sufficient evidence to arrest or detain Bunn. [Exhibit 5, Depo. of Katie Baker, p. 85:2-13]. The interview with Bunn does not establish "conspicuous courtesy," rather it exemplifies common interrogation techniques used by investigators. [Exhibit 2, Depo. of Hastings, p. 239:8 – p. 269:10]. What is lost in this attempt to compare the interview of Ms. Rondini to that of Bunn are the facts that two different investigators were interviewing two different people, one of which was present with an attorney; it is a comparison of apples to oranges which cannot be made without serious doubts or recklessness. In fact, Jones followed-up with Ms. Rondini and asked her to come into the station for another interview so he could gather more facts in an attempt to detain or arrest Bunn. [Exhibit 1, Depo. of Jones, p. 145:10 – p. 146:21]. All other material facts contained in paragraph 25 of the Movants' Statement are undisputed.

26.    The material facts contained in paragraph 26 of the Movants' Statement are undisputed.

27.    While Baker never used the word "cover up" in the Article, there certainly were references and imputations to a cover up and corruption, *inter alia*. [Exhibit 15]. As stated in paragraph 16, *supra*, the intentions of the Article remained the same throughout the writing, editing, and publishing process.

28.    Baker's contact with Jones and Hastings as referenced and cited to in paragraph 28 of the Movants' Statement only mentioned a portion of the Article and did not fully inform them of the entire content. Jones and Hastings forwarded these emails to their supervisor, Captain Kip Hart

or Captain Gary Hood, per the Homicide Unit's policy. [Exhibit 1, Depo. of Jones, p. 321:5 – p. 323:13; Exhibit 2, Depo. of Hastings, p. 312:1 – p. 313:20]. All other material facts contained in paragraph 28 of the Movants' Statement are undisputed.

29.   Captain Hood made several other substantial statements in his email response referenced in paragraph 29 of the Statement, *see* paragraph 71 of the Nonmovants' Statement. All other material facts contained in paragraph 29 of the Movants' Statement are undisputed.

30.   Captain Hood made several other substantial statements in his email response referenced in paragraph 30 of the Statement, *see* paragraph 71 of the Nonmovants' Statement. All other material facts contained in paragraph 30 of the Movants' Statement are undisputed.

31.   Baker selectively added some statements from Hood's correspondence referenced in paragraph 31 of the Movants' Statement yet omitted a majority of Hood's statements, *see* paragraph 71 of the Nonmovants' Statement. Baker further undermined the statements of Hood in the Article by misstating Alabama law. [*Compare* Exhibit 27 *to* Exhibit 15, p. 17].

32.   The material facts contained in paragraph 32 of the Movants' Statement are undisputed.

33.   Again, the Article was not just about how institutions responded to the allegations against Bunn. *See* Paragraph 16, *supra*. The date the Article was published is not disputed. Since the Article was published it has been viewed over 2.4 million times. [Exhibit 66].

34.   The Article speaks for itself, and any material fact contained in paragraph 34 of the Movants' Statement which contradicts the Article, or the facts and arguments made herein, is disputed.

35.    The Article speaks for itself, and any material fact contained in paragraph 35 of the Movants' Statement which contradicts the Article, or the facts and arguments made herein, is disputed.

36.    The Article speaks for itself, and any material fact contained in paragraph 36 of the Movants' Statement which contradicts the Article, or the facts and arguments made herein, is disputed.

37.    While Bunn initially told officers that Ms. Rondini was not present at his residence on the morning after the incident, he later recanted this statement and told officers she was present. *See* Paragraph 21, *supra*. Bunn was not "permitted to go on 'a weekend fishing trip'" and his interview was not "conducted with conspicuous courteousy [*sic*]." *See* Paragraph 25, *supra*.

38.    Ms. Rondini learned that the charges against her were still pending through her civil attorney who received the information from Bunn's attorney, Baker knew this before the publication of the Article. [Exhibit 5, Depo. of Katie Baker, p. 228:12 – p. 229:13, p. 238:2 – p. 241:2; Exhibit 28; Exhibit 29; Exhibit 30]. The passage of the Article referenced in paragraph 38 of the Movants' Statement more accurately reads: "There was a catch. In a package deal, the grand jury would also rule on felony charges against Megan for breaking into Bunn's car and stealing his gun. Internal documents from September 2015 imply authorities didn't intend to fight too hard on Megan's behalf: Investigators noted they found 'no sexual assault occurred.'" [Exhibit 15, p. 15:319-323].

39.    The Article speaks for itself, and any material fact contained in paragraph 39 of the Movants' Statement which contradicts the Article, or the facts or arguments stated herein, is disputed.

40.   The Article speaks for itself, and any material fact contained in paragraph 40 of the Movants' Statement which contradicts the Article, or the facts or arguments stated herein, is disputed.

41.   The material facts contained in paragraph 41 of the Movants' Statement are undisputed.

42.   Paragraph 42 of the Movants' Statement does not contain any material facts. To the extent that paragraph 42 of the Movants' Statement is construed to contain material facts, said facts are disputed.

43.   Neither Jones nor Hastings knew Bunn before the investigation began. [Exhibit 2, Depo. of Hastings, p. 73:1-21, p. 141:17 – p. 143:15; Exhibit 1, Depo. of Jones, p. 65:9 – p. 69:4; Exhibit 26, Buzzfeed00561; Exhibit 25, p. 30:2 – p. 32:3]. The familiarity with the "Bunn" name came from Bunn Construction vehicles that drive around the Tuscaloosa area. [Exhibit 1, Depo. of Jones, p. 67:6-17; Exhibit 2, Depo. of Hastings, p. 73:14-21]. Any insinuation otherwise is disputed.

44.   Ms. Rondini never told Jones or Hastings "that she did not consent to having sex with Bunn." Defendants do not cite to any evidence suggesting or demonstrating such. The portion of the Deposition of Adam Jones that Defendants cite to does not provide evidence for such a statement. Defendants also cite hospital records for this contention, which neither Jones nor Hastings would have had access to during the investigation. Finally, the initial incident report that Defendants cite to was taken by another officer with the TPD and not a member of the Homicide Unit. [*See also* Exhibit 1, Depo. of Jones, p. 80:12-19]. Further, Jones followed-up concerning "being held down," and Ms. Rondini responded: "Just kind of on my hips and on the top half of my body." [Exhibit 1, Depo. of Jones, p. 91:18 – p. 92:12, p. 95:5 – p. 96:17; Exhibit 13, p. 3;

Exhibit 12, 7:30-7:44]. The Article never mentioned Ms. Rondini's comments concerning being "held down." [*see generally* Exhibit 15].

45.   There is no indication that Jones "concluded that Megan's claims had not met the elements of rape," after the interview at the hospital, and Defendants have not cited to any such evidence. Again, Jones did not write the initial Uniform Incident/Offense Report which designated the report as a special inquiry, instead the responding officer R.B. Phillips did. [Exhibit 14, Jones-Hastings 08-011]. There was no indication or evidence to suggest that Ms. Rondini was drugged during the subject incident. In fact, Bunn and Ms. Rondini did not interact at the bar, and Ms. Rondini poured her own drinks throughout the night. [Exhibit 1, Depo. of Jones, p. 87:10 – p. 88:15, p. 189:17 – p. 191:19, p. 215:2-5; Exhibit 14, Jones-Hastings 013]. Ms. Rondini admitted that she did not think she was drugged. [Exhibit 25, p. 36:2-11; *see also* Exhibit 27, Buzzfeed00561]. Ms. Rondini only had one short memory gap (approximately 30 minutes), which was when she went with Bunn and Barksdale to her apartment, and she remembered most of the night, *see* Paragraph 10, *supra*. Ms. Rondini also remembered the color of the comforter and sheets in Bunn's room, as well as, the fact that Bunn had monogramed pillows. [Exhibit 10, p. 20:19 – p. 21:4; Exhibit 11, 19:55-20:12]. Further, it is the policy of the hospital that drug and alcohol testing is to be "ordered at the discretion of the ED physician that sees the patient." [Exhibit 31, Buzzfeed00060]. It is not the job or duty of investigators to order drug or alcohol testing, but they may request samples if the circumstances dictated the need for the samples (and assuming the hospital obtained such samples). [Exhibit 27, Buzzfeed00561; Exhibit 31, *see also* Exhibit 32, Depo. of Loyd Baker, p. 50:11 – p. 51:10]. Baker knew all of this prior to the publication of the Article. [Exhibit 5, Depo. of Katie Baker, p. 165:5-15; Exhibit 53; Exhibit 54; Exhibit 38,

Buzzfeed04008 – Buzzfeed04009].[4] The only evidence that Baker had which suggested that law enforcement officers' duties included the collecting urine and blood samples from a victim was from the director of the "Alabama toxicology lab," Angelo Dell Manna. Baker did not know whether he was ever a law enforcement officer, knew the procedures and policies of law enforcement, or even investigated a sexual assault as an investigator. [Exhibit 5, Depo. of Katie Baker, p: 166:25 – p. 167:25, p. 246:3 – p. 248:6; Exhibit 33]. Further, in a transcribed interview with Angelo Della Manna, Baker writes:

> First, I'm interested in how it generally works. It's my understanding that hospitals collect the evidence and then it's up to the police to test it?
> A. correct, Samples arent [*sic*] sent to us unless there's a criminal charge pending….

[Exhibit 5, Depo. of Katie Baker, p. 246:3 – p. 248:6; Exhibit 34, Buzzfeed01967 – Buzzfeed01968]. Thus, directly contradicting her belief that law enforcement was responsible for collecting samples from the victim. [Exhibit 5, Depo. of Katie Baker, p. 166:25 – p. 167:13]. Neither cite included in paragraph 45 of the Movants' Statement supports the alleged facts contained in said paragraph.

46.   The time period when investigators first left the scene and then returned was 15 minutes instead of 30 minutes. Further, there is no evidence, and Defendants have not pointed to any evidence that the scene was tampered with during this time. [*See* Exhibit 2, Depo. of Hastings, p. 132:22 – p. 136:10]. This was also never mentioned in the Article. All other material facts contained in paragraph 46 of the Movants' Statement are undisputed.

---

[4] Baker claims that Captain Hood never gave her department policies, yet in his email response to her inquiry, he provided Baker with the policy concerning urine and blood samples. [Exhibit 26, Buzzfeed00561].

47.   The material facts contained in paragraph 41 of the Movants' Statement are undisputed.[5]

48.   Neither Jones nor Hastings allowed or permitted Bunn to travel, *see* Paragraph 25, *supra*.

49.   There was no need to "collect Bunn's phone records" because generally that is done when investigators are attempting to ascertain locations involved in the investigation, which was not needed from Bunn in this investigation. [Exhibit 2, Depo. of Hastings, p. 150:1-11]. Both parties admitted to having sex. Ms. Rondini told Jones that Bunn was texting someone while they were sitting in "the room that had, like, animals in it…." [Exhibit 10, p. 11:8 – p. 12:19; Exhibit 11, 10:39-12:01].

50.   Jones obtained consent from Ms. Rondini to download her cellphone. [Exhibit 10, p. 45:21 – p. 53:17; Exhibit 11, 1:16:30-1:30:37].

51.   The Homicide Unit's investigation ended on September 21, 2015. [Exhibit 5, Depo. of Katie Baker, p. 194:18 – p. 198:5; Exhibit 27, Buzzfeed00556]. It was the district attorney who decided to present the case to the grand jury. [Exhibit 5, Depo. of Katie Baker, p. 238:5 – p. 240:18; Exhibit 27, Buzzfeed00556]. All other material facts contained in paragraph 51 of the Movants' Statement are undisputed.

52.   The charge was not "based solely on the word of Bunn," Ms. Rondini admitted to some, if not all, of the allegations Bunn made against her. [Exhibit 25, p. 4:16 – p. 19:2, Exhibit 26, 13:05-38:05, *see also* Exhibit 35]. The charges against Ms. Rondini were: Theft of Property Second Degree (Greater than $500 to $2,500) and Unlawful Breaking and Entering a Vehicle. [Exhibit 35]. From the testimony of Thomas Nelson cited in paragraph 52 of the Movants'

---

[5] Baker did not have any knowledge of the conversation between Hood and Abernathy or Waid prior to the publication of the Article, as this information was obtained through the deposition of Gary Hood.

Statement, it appears the grand jury returned a true bill for both these charges, although there has been contradicting testimony regarding this fact.

53.    The portion of the deposition of Robert Pastula that Defendants cited to in paragraph 53 of the Movants' Statement merely states that Jones and Hastings deviated from "best practices" when they left Bunn's residence for 15 minutes, and for no other reason. Further, Jones and Hastings are not bound by "best practices." Instead, they are subject to department policy and guidelines. [Exhibit 32, Depo. of Loyd Baker, p. 33:10 – p. 35:9, p. 47:1-10, p. 60:21 – p. 62:23; Exhibit 17, Depo. of Hood, p. 191:14 – p. 193:14; Exhibit 42, Depo. of Waid, p. 34:16 – p. 36:20].

54.    Paragraph 54 of the Movants' Statement does not contain any material facts, rather the paragraph contains some of the procedural history of this case.

a.    Appendix A as referenced in paragraph 54.a. of the Movants' Statement speaks for itself, and any material fact contained in paragraph 54.a. of the Movants' Statement which contradicts Appendix A, or facts or arguments stated herein, is disputed.

b.    Appendix A as referenced in paragraph 54.b. of the Movants' Statement speaks for itself, and any material fact contained in paragraph 54.b. of the Movants' Statement which contradicts Appendix A, or facts or arguments stated herein, is disputed.

c.    Appendix A as referenced in paragraph 54.c. of the Movants' Statement speaks for itself, and any material fact contained in paragraph 54.c. of the Movants' Statement which contradicts Appendix A, or facts or arguments stated herein, is disputed.

### NONMOVANTS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Plaintiffs offer the following additional undisputed facts:

55.    On July 2, 2015, at approximately 2:43 A.M., Ms. Rondini was admitted to Druid City Hospital ("DCH" or the "hospital") in Tuscaloosa, Alabama. [Exhibit 36, Buzzfeed04265].

56.     At approximately 3:32 A.M., Ms. Rondini stated to the registered nurse that attended to her that she (Ms. Rondini) had the address and last name of Bunn. [Exhibit 36, Buzzfeed04277].[6]

57.     At approximately 3:35 A.M., Ms. Rondini stated to the registered nurse that the last consensual intercourse she engaged in was "yesterday morning," which would be the morning of July 1, 2015. [Exhibit 36, Buzzfeed04277].

58.     At approximately 4:01 A.M., a rape kit was started by the registered nurse. [Exhibit 36, Buzzfeed04277].

59.     At approximately 4:21 A.M., an officer with the TPD was present bedside with Ms. Rondini. [Exhibit 36, Buzzfeed04277].

60.     At approximately 4:55 A.M., the rape kit was completed. [Exhibit 36, Buzzfeed04277].

61.     At approximately 5:27 A.M., the rape kit was given to Jones. [Exhibit 36, Buzzfeed04276 – Buzzfeed04277].

62.     At approximately 5:31 A.M, a representative of the University of Alabama Women's Resource Center was present beside with Ms. Rondini. [Exhibit 36, Buzzfeed04276].

63.     At approximately 5:34 A.M., Jones was present bedside with Ms. Rondini. [Exhibit 36, Buzzfeed04276].

64.     At approximately 5:37 A.M., Jones and Hastings took a recorded statement from Ms. Rondini (hereinafter referred to as "Ms. Rondini's Hospital Interview"). In this statement, Ms. Rondini tells Jones and Hastings what had happened leading up to the admission into the hospital, and she recounted the night from the time she went to Innisfree up until she went to the hospital. She told the investigators that when she, Bunn, and Barksdale arrived at Bunn's residence, they

---

[6] According to Bunn, Ms. Rondini called him by name when he picked her up on University Boulevard. [Exhibit 57, p. 2:12-18, p. 7:11-13; Exhibit 58, 0:36-1:03, 4:35-4:42].

went into "a room with all the animals." Then Bunn told her to go upstairs to his room, and she did. She waited 10 to 15 minutes in his room alone before Bunn came in. Ms. Rondini told the investigators that Bunn "want[ed] to have sex." Ms. Rondini said she responded by saying that she had friends back at Innisfree and needed to go. She then told investigators that Bunn "didn't really take that," and she "felt like just letting him have sex with [her] was the only way he would let [her] go." Ms. Rondini then continued to recount the night, including when she went through the window on the second story, climbed down a gate and onto the ground, realized she did not have her keys, stacked a cooler on a trashcan, and climbed back up to the second story and back into Bunn's room. Notably, Ms. Rondini, at this time, did not mention anything about taking money or the gun, or discharging the gun. Ms. Rondini further told investigators that Bunn did not hit or shove her. Ms. Rondini also knew Bunn was "an influential person" and she "didn't want to burn bridges." [Exhibit 13, p. 1-3; *see generally* Exhibit 12].

65.   At approximately 5:58 A.M., Ms. Rondini was discharged from DCH. [Exhibit 36, Buzzfeed04265].

66.   Baker knew the material facts contained in paragraphs 55-65, *supra*, of Nonmovant's Statement prior to the publication of the Article. [Exhibit 37; Exhibit 38, Buzzfeed03894 – Buzzfeed03895].

67.   Prior to the publication of the Article, Baker had all the information and documents gathered by the Homicide Unit, including a full download of Ms. Rondini's cellphone and SnapChat videos Ms. Rondini took in Bunn's residence. [Exhibit 5, Depo. of Katie Baker, p. 51:15-23, p. 75:20-25, p. 131:12-19, p. 177:5-17, p. 180:5-25; Exhibit 67].

68.   Prior to the publication, Baker also knew that Ms. Rondini made the following statements to the investigators on July 2, 2015, beginning at approximately 11:30 A.M., at the

Homicide Unit's station (hereinafter referred to as "Ms. Rondini's Station Interview"),[7] [Exhibit 5, Depo. of Katie Baker, p. 131:5-19]:

  a. That she (Ms. Rondini) saw Bunn when she first walked into Innisfree, but never interacted with him in the bar. [Exhibit 10, p. 4:4 – p. 6:12; Exhibit 11, 4:12-6:12].

  b. That she poured her own drinks at Innisfree. [Exhibit 10, p. 7:5-12; Exhibit 11, 6:41-6:58].

  c. That she, again, told investigators that Bunn told her to go to his room, she complied, and waited there for 10 to 15 minutes. [Exhibit 10, p. 13:8 – p. 15:22; Exhibit 11, 12:22-14:38].

  d. That she "kind of let him do whatever," and they had sex. [Exhibit 10, p. 16:11 – p. 17:1; Exhibit 11, 15:05-15:54].

  e. That when Bunn took her shirt off, she responded by saying that she needed to leave, but then she "kind of just let him do it." [Exhibit 10, p. 17:19 – p. 18:6; Exhibit 11, 16:34-16:58].

  f. That she was laying on her side during intercourse. [Exhibit 10, p. 19:17-21; Exhibit 11, 18:52-19:01].

  g. That, after the intercourse, she went out a window onto a flat roof when she was unable to "unlock" Bunn's door,[8] jumped down onto a gate and then to the ground, ran to the street, realized she did not have her keys, tried to re-enter Bunn's residence, ended up stacking a trashcan on a cooler, got back onto the flat roof, and went back into Bunn's bedroom. [Exhibit 10, p. 22:9 – p. 24:4; Exhibit 11, 21:23-23:20].

---

[7] This reference to the interview encompasses what has been termed as Part 1 and Part 2 of Ms. Rondini's July 2, 2015 Interview at the Homicide Unit's station. [Exhibit 11, 26].
[8] Baker knew there was no evidence to support that the door was actually locked. [Exhibit 68; *see also* Exhibit 25, p. 33:6-13; Exhibit 26, 58:14-58:45].

h.     That she had taken a pistol from Bunn's vehicle, discharged the gun towards Bunn's residence, and then discarded the pistol in the front yard of Bunn's residence when her friends arrived. [Exhibit 10, p. 24:11-18; Exhibit 11, 23:34-23:57; Exhibit 25, p. 4:21 – p. 7:17; Exhibit 26, 15:10-16:05]. Baker also knew that Jones left the interview room after Ms. Rondini told him about the pistol to try and recover it, or get someone to recover it, so no one would get hurt. [Exhibit 10, p. 26:18 – p. 27:22, p. 34:11-12; Exhibit 11, 26:30-27:35; 47:47-47:50; Exhibit 55, Buzzfeed03202; Exhibit 56, Buzzfeed03241].

i.     That she (Ms. Rondini) remembered a majority of the night. [Exhibit 10, p. 57:6-16; Exhibit 11, 1:46:53-1:46:59].

j.     That, again, she "just kind of let him," she did not feel like she was in danger, and she never verbally told Bunn "No." [Exhibit 25, p. 22:9 – p. 24:3, Exhibit 26, 44:04-46:50].

k.     That she did not want to press charges, did not "want to make this a big to do," and wanted "to be done" and "move on." [Exhibit 25, p. 27:8-14; Exhibit 26, 50:35-50:52].

l.     That, again, she did not feel like she had been drugged. [Exhibit 25, p. 36:2-17; Exhibit 26, 1:01:35-1:02:29]. In fact, there is no evidence to support that Ms. Rondini was drugged.

69.   Baker also knew prior to the publication of the Article that Jones believed Ms. Rondini throughout the interviews. [Exhibit 25, p. 25:15-23, p. 29:15 – p. 30:1; Exhibit 26, 48:48-49:12; 53:44-54:21].

70.   Prior to the publication of the Article, Baker further knew that Jones did not know Bunn and would not allow any perceived influence to impact the investigation. [Exhibit 25, p. 30:2 – p. 31:2, Exhibit 26, 54:21-55:30]. Baker also knew that Hastings did not know Bunn prior to the investigation. [Exhibit 27, Buzzfeed00561].

71.   Baker also believed, prior to publication, that Captain Hood was the best source of information. [Exhibit 5, Depo. of Katie Baker, p. 36:25 – p. 37:15, p. 235:9-24]. Baker also had no reason to believe that Captain Hood would give her inaccurate information. [Exhibit 5, Depo. of Katie Baker, p. 145:14-22]. Captain Hood explained to Baker that a report is designated as a special inquiry when "the reporting officer does not feel the complaint meets the criteria to be a criminal charge under the Alabama State Code." [Exhibit 27, Buzzfeed00559]. Captain Hood also explained the policy concerning biological samples, that Jones and Hastings did not know Bunn prior to the investigation, and other pertinent information concerning the investigation. [Exhibit 27].

72.   Prior to the publication of the Article, Baker obtained Ms. Rondini's handwritten notes that Ms. Rondini gave to the investigators. In said notes, Ms. Rondini wrote: "When he came to his room he insisted we have sex and I let him have sex with me after much insisting that I needed to leave." [Exhibit 14, Jones-Hastings016].

73.   Baker was also in possession of Ms. Rondini's text message and in particular a text message string, timestamped July 2, 2015, 12:08 A.M., which read:

> Ms. Rondini: "We are going to guck."
> Friend: "Do it (money bag emoji)"
> "Wear a condom"
> "Good luck"
> Ms. Rondini: "Eww but I'll make it real good"
> Friend: "Hahah like a tru horseback rider"

[Exhibit 39, Buzzfeed04167]. This text message was discussed prior to publication, and it was the belief of Baker and other Buzzfeed employees that "guck" was misspelled for "fuck." [Exhibit 40, Depo. of Venkatasubban, p. 76:22 – p. 77:10].

74.   At the time the Article was published, Baker was also in the possession of the Houndstooth Condominium surveillance videos, [Exhibit 49, 50], which showed Ms. Rondini

leading Bunn and Barksdale into her apartment and then leading them out the building. [Exhibit 49, 21:33 – 21:49; Exhibit 50, 21:08 – 21:22]. Baker also had all of the Innisfree surveillance videos that were pulled by the investigators. [Exhibit 51].

75.   At the time the Article was published, Baker:

      a.   knew the case did not meet the Alabama standards for rape, [Exhibit 59, 60];

      b.   believed that Jones and Hastings were "building a case against" Ms. Rondini but also knew that their duties and responsibilities were to investigate crimes, [Exhibit 5, Depo. of Katie Baker, p. 81:18 – p. 83:6; Exhibit 61, Buzzfeed03369; Exhibit 24, Buzzfeed03783 cmt. 58; Exhibit 62, Buzzfeed02713 – Buzzfeed02714; Exhibit 63];

      c.   did not know whether Jones or Hastings had enough to detain or arrest Bunn, [Exhibit 5, Depo. of Katie Baker, p. 85:2-13];

      d.   did not believe that Jones or Hastings quickly decided that no sexual assault occurred, [Exhibit 64];

      e.   did not believe that Jones or Hastings threatened Ms. Rondini with criminal charges, [Exhibit 5, Depo. of Katie Baker, p. 86:2-10];

      f.    did not believe that Jones or Hastings covered up any crime that may have been committed by Bunn, [Exhibit 5, Depo. of Katie Baker, p. 86:11-15, p. 94:6-9];

      g.   had no reason to believe that Jones or Hastings were not taking the investigation seriously, [Exhibit 5, Depo. of Katie Baker, p. 89:4-16];

      h.   had no reason to believe that special inquiry investigations were not treated like other criminal investigations, [Exhibit 5, Depo. of Katie Baker, p. 90:18-24];

      i.   did not believe that Jones or Hastings were corrupt, [Exhibit 5, Depo. of Katie Baker, p. 90:25 – p. 91:18];

j.   had no way of knowing what caused Ms. Rondini to commit suicide, [Exhibit 5, Depo. of Katie Baker, p. 93:14-17];

k.   did not believe that Jones or Hastings made up or fabricated criminal charges against Ms. Rondini, [Exhibit 5, Depo. of Katie Baker, p. 99:10-14];

l.   neither believed that Jones or Hastings induced Ms. Rondini into dropping charges against Bunn nor caused Ms. Rondini to drop her civil lawsuit, [Exhibit 5, Depo. of Katie Baker, p. 100:6-18];

m.   did not know what information or documents were actually presented to the grand jury, [Exhibit 5, Depo. of Katie Baker, p. 100:19 – p. 101:23];

n.   believed that Jones and Hastings doubted that Ms. Rondini was raped under Alabama law but believed that Jones and Hastings did not doubt everything Ms. Rondini said, [Exhibit 5, Depo. of Katie Baker, p. 101:24 – p. 102:15; Exhibit 65, Buzzfeed03425];

o.   had no reason to believe that Jones left the room after Ms. Rondini told him about the gun for any reason other than to recover the gun for the protection of the neighborhood, [Exhibit 5, Depo. of Katie Baker, p. 103:5 – p. 104:10; Exhibit 24, Buzzfeed03788 cmt. 67];

p.   did not believe Jones did anything wrong when he read Ms. Rondini the Miranda rights, [Exhibit 5, Depo. of Katie Baker, p. 104:11-23];

q.   neither believed that Ms. Rondini was bullied by Jones or Hastings nor pressured by them to sign a refusal to prosecute form, [Exhibit 5, Depo. of Katie Baker, p. 108:8 – p. 110:15];

r.   did not know whether Jones or Hastings established, or were even involved in creating or drafting, department policy and procedures, nor what training they received, [Exhibit 5, Depo. of Katie Baker, p. 110:16 – p. 112:3];

s.   relied upon Captain Hood's statement to understand how the grand jury process worked in Alabama, [Exhibit 5, Depo. of Katie Baker, p. 113:10-12]; and

t.   did not know what the grand jury saw from the Felony Packet, [Exhibit 14], and relied upon the fact that included in the Felony Packet was a statement that read "no sexual assault occurred" to reason that Jones and Hastings "didn't intend to fight too hard on Megan's behalf" because Baker recklessly believed that the whole Felony Packet was presented to the grand jury with no support for that belief, [Exhibit 5, Depo. of Baker, p. 113:13 – p. 116:16].

76.   Baker also knew that the investigation was completed on September 21, 2015 and handed over to the district attorney. The presentation to the grand jury was then scheduled for February of 2016, but it was not presented until March 4, 2016. [Exhibit 27, Buzzfeed00556].

## STANDARD OF REVIEW

"Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Killingsowrth v. Birmingham-Jefferson Cnty. Transit Authority*, 2019 WL 3892340, at *1 (N.D. Ala. Aug. 19, 2019) (quoting Fed. R. Civ. P. 56). "The moving party bears the initial burden of proving the absence of a genuine issue of material fact." *Id.* (citing *Celotex*, 477 U.S. at 323). "The burden then shifts to the nonmoving party, who is required to 'go beyond the pleadings' to establish that there is a 'genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"At summary judgment, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Any factual disputes will be resolved in the non-moving

party's favor when sufficient competent evidence supports the non-moving party's version of the

disputed facts." *Id.* (citing *Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002)).

<u>**ARGUMENT**</u>

Defendants advance four arguments in their Motion for Summary Judgment : (1) the fair

reporting privilege bars any recovery, (2) the statements at issue cannot be shown to be false or

defamatory, (3) the Article expresses opinions concerning "comparison of Plaintiffs' handling of

the investigation to IACP guidelines (or any other implied criticisms)," and (4) actual malice

cannot be established. (Doc. 66, p. 14-15). However, for reasons stated below, Defendants' Motion

for Summary Judgment is due to be denied because a genuine issue of material fact exists and the

Defendants are not entitled to a judgment as a matter of law.

The statements that form the basis of this lawsuit are attached hereto, incorporated herein

by reference, and marked as Exhibit 43 (collectively referred to as the "Defamatory Statements").

**I.**     **Plaintiffs have presented sufficient evidence to show that the Defamatory Statements are actionable and defamed the Plaintiffs.**

In regard to the elements of defamation, the Defendants argue that Plaintiffs cannot

establish that some of the Defamatory Statement concern the Plaintiffs, that the Defamatory

Statements were false and defamatory, that no implications can be drawn from the Article, and

that actual malice exists. (Doc. 66, p. 21, 25-27, 34). However, as stated below, Plaintiffs have

presented sufficient evidence for their defamation claim to advance to the jury.

"To establish a prima facie case of defamation, the plaintiff must show [1] that the

defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another

[4] concerning the plaintiff, [5] which is either actionable without having to prove special harm

(actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)."

*Birmingham Broadcasting (WVTM-TV) LLC v. Hill*, 303 So.3d 1148, 1158 (Ala. 2020) (internal

quotation marks omitted) (citations omitted) (edits in original). In Defendants' Motion for Summary Judgment, Defendants only argue that elements [1], [3], and [4] are not met. Defendants do not raise arguments challenging elements [2] and [5].

The United States Supreme Court and the First Amendment to the United States Constitution place further protections when speech deals with matters of public concern or public officials. *See Lovingood v. Discovery Comm., Inc.*, 800 Fed. Appx. 840, 845-46 (11th Cir. 2020); *Forrester v. WVTM TV, Inc.*, 709 So. 2d 23, 25-26 (Ala. Civ. App. 1997).

"But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error material advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)). "They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).

"[I]n deciding whether a person has been defamed, the trial court must first determine whether the plaintiff is a public or private individual." *Forrester*, 709 So. 2d at 25. "This determination will establish the plaintiff's burden of proof." *Cottrell v. NCAA*, 975 So. 2d 306, 333 (Ala. 2007). Here, it is disputed whether Jones and Hastings, as low-level law enforcement officers, are considered private or public officials.

As argued in Plaintiffs' Response in Opposition to Defendants' Opposed Motion to Strike the Expert Reports and Preclude Expert Testimony of Dr. Emilie L. Lucchesi (Doc. 57, p. 5-12) (hereinafter "Plaintiffs' Response to the Motion to Strike Dr. Lucchesi"), which is hereby expressly incorporated herein in its entirety, including all attached exhibits, by reference, Jones

and Hastings should not be considered public officials, due to their low-ranking positions at the time the Article was published.[9]

**A. Plaintiffs have presented sufficient evidence that Defendants were at least negligent in publishing the Defamatory Statements. Alternatively, Plaintiffs have presented sufficient evidence of common law and actual malice.**

As private individuals, Plaintiffs only have to establish negligence in regard to element [1], *supra*.[10] *See Forrester*, 709 So. 2d at 25-26. The fact that the Article involved a matter of public concern does not heighten the level of fault necessary for a private individual to prove, rather it adds the burden of proving falsity on the private individual (which is already part of the prima facie case under Alabama law). *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (In discussing defamation in the context of statements concerning a private individual which dealt with a matter of public concern, "[w]e believe that the common law's rule on falsity – that the defendant must bear the burden of proving truth – must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346-48 (1974).

If this Honorable Court finds that Ala. Code § 13A-11-161 (qualified fair reporting privilege) is applicable in this case, then the Plaintiffs, if deemed private individuals, must prove common law malice to overcome the privilege. *See Mead Corp. v. Hicks*, 448 So. 2d 308, 313 (Ala. 1983); *Shuler v. Garrison*, 2017 WL 191267, at *20 (N.D. Ala. Jan. 13, 2017) (noting that the fair reporting privilege is qualified).

---

[9] A further investigation into the cases cited by *Hailey v. KTBS, Inc.*, 935 S.W.2d 857 (Tex. App. 1996) finds that all of these cases either (1) deal with law enforcement officers in a managerial or supervisory position (distinguishable from Plaintiffs' position in this case), (2) assume, or it is conceded or stipulated, that the law enforcement officer plaintiff is a public official, or (3) apply the wrong standard as enumerated in *Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981), or similar erroneous standards, *see Coursey v. Greater Niles Township Pub. Co.*, 239 N.E.2d 837 (Ill. 1968) (relied upon by *Gray*).

[10] It is undisputed that the Article deals with a matter of public concern. Also, as the fault element (element [1]) and falsity element (element [3]) are closely related, further discussion about the fault element is contained in Section I.B., *infra*.

On the other hand, if this Honorable Court finds that Plaintiffs are public officials, then, in regard to element [1], *supra*, Jones and Hastings must show actual malice. *Cottrell*, 975 So. 2d at 333. Regardless of the burden of proof, Plaintiffs have provided sufficient evidence to survive Defendants' Motion for Summary Judgment.

### 1. Plaintiffs have presented sufficient evidence that Defendants were at least negligent in publishing the Article.

As explained in Section II, *infra*, the fair reporting privilege is not applicable here, and as a result, Jones and Hastings need only to provide sufficient evidence, by a preponderance of the evidence, of at least negligence on the part of the Defendants. *See Forrester*, 709 So. 2d at 25-26; *Mead Corp.*, 448 So. 2d at 313. As explained further in Section I.B., *infra*, Defendants published the Article about Jones and Hastings claiming that they were corrupt, were part of a conspiracy and cover-up, failed to properly investigate the allegations in accord with the Homicide Unit's policies and procedures and training received, were the cause of and complicit in Ms. Rondini's suicide, only viewed Ms. Rondini as a suspect and did not believe her, built a case against Ms. Rondini, were ultimately responsible for the determination of the merits of the charges alleged by Ms. Rondini, induced Ms. Rondini to drop her charges and civil lawsuit, pressured and bullied Ms. Rondini, and were subject to IACP guidelines. As stated in paragraph 75 of the Nonmovant's Statement, *supra*, the Defendants knew that these published statements were false, had reason to seriously doubt the statements, and negligently or recklessly published these statements with a disregard to the truth. As a result, Plaintiffs have presented sufficient evidence that Defendants were at least negligent in publishing the Defamatory Statements in the Article.

**2. Alternatively, if this Honorable Court finds that the fair reporting privilege is applicable, Plaintiffs nevertheless have presented sufficient evidence under the common law malice standard to survive summary judgment.**

Even if this Honorable Court finds that the fair reporting privilege applies in this case, Plaintiffs have still presented sufficient evidence of common law malice for this case to proceed to the jury. When a qualified privilege applies, a plaintiff must prove common law malice, as the heightened fault requirement. *Mead Corp.*, 448 So. 2d at 313. "[C]ommon-law malice may be shown, *not only* by 'evidence of hostility, rivalry, the violence of language, the mode and extent of publication,' but, also, by proof of 'the recklessness of the publication and prior information regarding its falsity.'" *Wiggins v. Mallard*, 905 So. 2d 776, 788 (Ala. 2004) (emphasis in original) (quoting *Johnson Pub. Co. v. Davis*, 124 So. 2d 441, 487 (Ala. 1960)). "Indeed, 'evidence that the defendant failed to determine whether or not his or her statements were ground in fact is probative of whether common-law malice motivated the statements, since disregard of the truth may suggest that ill will and hostility were actually at work.'" *Id.* at 787 (quoting *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1253 n.16 (M.D. Ala. 1998)).[11]

Here, Defendants knew all of the Defamatory Statements were false, as explained further in Section I.B., *infra*, prior to the publication of the Article. Defendants did not care whether the statements made in the Article were true or false, they were focused on pushing a corrupt, cover-up narrative to garner the eyes of the public with a sensationalized story. Further, as argued in the Plaintiffs' Response to the Motion to Strike Dr. Lucchesi (Doc. 57, p. 2-5, 19), Dr. Lucchesi's provides evidence of common-law malice through her framing analysis by explaining the language

---

[11] "In reality, evidence needed to establish constitutional [(actual)] malice and common-law malice 'overlaps significantly.'" *Wiggins*, 905 So. 2d at 787 (edits added) (quoting *Paul v. Hearst Corp.*, 261 F. Supp. 2d 303, 306 (M.D. Pa. 2002)). "It overlaps insofar as the same evidence bears both on the defendant's motive, for purposes of common-law malice, and on the defendant's attitude toward the truth or falsity of his published material, for purposes of constitutional malice." *Id.* (internal quotations and citations omitted).

used, and its positioning, in the Article. Dr. Lucchesi also provides evidence of priming used by Defendants, which cornered the readers of the Article into feeling a certain negative way about Jones and Hastings. As a result, ill-will and hostility are shown through the Defendants' intentional and reckless disregard for the truth. Thus, Plaintiffs have provided sufficient evidence of common law malice.

### 3. In the second alternative, if this Honorable Court finds that Plaintiffs are public officials, sufficient evidence exists to show actual malice for the defamation claim to proceed to the jury.

Even if this Honorable Court deems Plaintiffs as public officials, Plaintiffs have provided sufficient evidence of actual malice for their claims to survive summary judgment. The First Amendment to the United States Constitution requires public officials to "prove that the defendant acted with actual malice – knowledge or reckless disregard as to the falsity of the statement." *Klayman v. City Pages*, 650 Fed. Appx. 744, 749 (11th Cir. 2016). "This constitutional requirement is examined under a subjective standard, and a plaintiff must produce evidence that the defendants "actually entertained serious doubts as to the veracity of the published account, or [were] highly aware that the account was probably false.'" *Id.* (edits in original) (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016)).

[T]he appropriate question at summary judgment is 'whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)). "In making the determination whether the [public official] has produced evidence of a sufficient 'caliber and quantity to allow a rational finder of fact to find [actual] malice by clear and convincing evidence,' the court must believe the evidence submitted by the [public official] and all justifiable inferences must be drawn in his or her favor." *Little v. Consolidated Pub. Co.*, 83 So. 3d 517, 523 (Ala. 2011) (edits added) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 254-55 (1986)). Actual malice may also be established "if the 'alteration [of quotes] results in a material change in the meaning conveyed by the statement.'" *Moore v. Cecil*, 488 F. Supp. 3d 1144, 1172 (N.D. Ala. 2020) (hereinafter "*Moore I*") (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

"The issue of actual malice on the part of the defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns motive, intent, and subjective feelings and reactions." *Camp v. Yeager*, 601 So. 2d 924, 929 (Ala. 1992).

Here, Jones and Hastings have provided clear and convincing evidence of actual malice – that Defendants did not believe the Defamatory Statements that were published, or at least that the Defamatory Statements were published with a reckless disregard for the truth. It is undisputed that Defendants published the Defamatory Statements when they did not believe the statements, themselves, and published the Defamatory Statements with serious doubts as to their truthfulness and with high awareness that the statements were false, s*ee* Section I.B., *infra*.

Moreover, the Defendants employed the technique of framing to manipulate the presentation of the Article such that readers interpreted the Article in the way the Defendants wanted the Article to be interpreted. (Doc. 57, p. 2-3, 20-21). Further, Dr. Lucchesi provides evidence that Defendants departed from normal journalistic standards when investigating and publishing the Article. (Doc. 57, p. 4). While "[a]ctual malice requires more than a departure from reasonable journalistic standards," there is no bar against the Court, or the jury, considering journalistic standards in its determination of actual malice. *Cf. Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016). Thus, a departure from journalistic standards coupled with Defendants' knowledge of the falsity of the statements, or at least a reckless disregard as to the

falsity, and the implementation of framing provides sufficient evidence to show clear and convincing evidence of actual malice on the part of the Defendants.

While not binding precedent, *Stickney v. Chester County Comms., Ltd.*, 522 A.2d 66 (Pa. Super. Ct. 1987) provides a persuasive analysis of the actual malice standard.[12] The court first noted that: "The term 'reckless disregard' cannot be fully encompassed in one infallible definition." *Id.* at 69. The *Stickney* court found clear and convincing evidence of actual malice when the defendants (1) had obvious reasons to doubt the veracity of their source, (2) distorted the account of a police captain explaining the subject incident, and (3) made accusations of a cover up and political influence without any factual support. *Id.* at 69-70. Likewise, the Article distorted statements made by Captain Hood, the hospital, Jones, and Hastings, *see* Section I.B., *infra*. Further, accusations of a cover-up, political influence, and corruption were made without factual basis, *see* Section I.B., *infra*.

While there was an obvious reason to doubt the veracity of Michael Rondini, who admitted bias, [Exhibit 44], there is no clear indication that Defendants had an obvious reason to doubt the veracity of other sources. The notable fact is that the scope of the investigation of the story on the Defendants' part coupled with the shear thoughtlessness and recklessness of what was published leads to the conclusion that Defendants published the Article with serious doubts to its truthfulness, or at least recklessly disregarded the truth, because of the material alteration of information and quotes gathered and the omission of such a vast amount of pertinent information concerning the subject incident of the Article. The Defendants did not accurately and truthfully present the facts

---

[12] The *Stickney* court assumed, without analysis, that the plaintiff-officers were public officials. The court relied upon *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6 (Pa. Super. Ct. 1982) and *Brophy v. Philadelphia Newspapers, Inc.*, 422 A.2d 625 (Pa. Super. Ct. 1980) for this assertion. In *Dunlap*, the parties agreed that the plaintiff was a public official. *Dunlap*, 448 A.2d at 17 n.1. In *Brophy*, the court assumed the plaintiffs are public officials without explanation. *Brophy*, 422 A.2d at 629. Thus, while persuasive on the analysis of actual malice, *Stickney* is not persuasive on the determination of public official status.

of the subject incident and instead chose what they wanted the reader to see and withheld significant and substantial information which made the Article false. Thus, like the plaintiffs in *Stickney*, Jones and Hastings have presented clear and convincing evidence of actual malice. As a result, a genuine issue of material fact exists, and Defendants are not entitled to a judgment as a matter of law.

### B. Plaintiffs have provided sufficient evidence that the Defamatory Statements are false and capable of a defamatory meaning.

In their Motion for Summary Judgment, Defendants argue that the Defamatory Statements are not false or capable of a defamatory meaning. (Doc. 66, p. 25-31). In regard to the falsity element of defamation, element [3], *supra*, "[s]tatements are provable as false when their truth or falsity can be determined based on 'a core of objective evidence.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1275-76 (M.D. Ala. 2019) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). "[W]hether the false statements [are] capable of being understood as defamatory is a question of law for the trial court's determination; ***and ... whether those statements were intended by the publisher and understood by the recipients as defamatory (assuming plaintiffs survive summary judgment) are questions of fact for the jury***." *McCaig v. Talladega Pub. Co., Inc.*, 544 So. 2d 875, 878 (Ala. 1989) (emphasis added); *see also Cottrell*, 975 So. 2d at 346 ("A decision whether a statement is reasonably capable of a defamatory meaning is a question of law"); *Camp*, 601 So. 2d at 927 ("[I]f the trial court finds that the statement is reasonably capable of a defamatory meaning, 'it is then for the jury to say whether the statement was in fact so understood'") (quoting W. Page Keeton, et al. *Prosser and Keeton on Torts* § 111, at 781 (5th ed. 1984)).

"The test to factually determine the defamatory nature of a statement is that meaning that would be ascribed to the language by a reader or listener of 'average or ordinary intelligence, or

by a common mind.'" *Camp*, 601 So. 2d at 927 (quoting *Loveless v. Graddick*, 325 So. 2d 137, 142 (Ala. 1975)). "In doing so, the publication must be read as a whole (*Berry v. City of New York Ins. Co.*, 98 So. 290 (Ala. 1923)), and 'the printed words are to be taken in their natural meaning, and according to the sense in which they appear to have been used and the idea they are adapted to convey to those who read them.'" *Campbell v. Seabury Press*, 486 F. Supp. 298, 300 (N.D. Ala. 1979) (quoting *McGraw v. Thomason*, 93 So. 2d 741, 744 (Ala. 1957)). "If the words employed in the allegedly libelous publication are understood to impute dishonesty or corruption to an individual, they are actionable." *Id.*

In *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517-18 (1991), the Supreme Court explained:

> Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language. And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning. In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait of petitioner especially damning because so much of it appeared to be a self-portrait, told by petitioner in his own words. And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.

Moreover, the "Alabama Supreme Court has said that a defamation claim can be proved by various means, such as the use of 'defamatory implication,' 'defamatory innuendo,' and … the unfair juxtaposition of words." *Moore v. Cecil*, 2021 WL 1208870, at *1 (N.D. Ala. Mar. 31, 2021) (hereinafter "*Moore II*") (quoting *Finebaum v. Coulter*, 854 So. 2d 1120, 1124-25 (Ala. 2003)).[13]

---

[13] "The test to be applied by the court in determining the defamatory nature of an imputation is that meaning which would be ascribed to the language by a reader or listener of ordinary or average intelligence, or by a common mind." *Finebaum v. Coulter*, 854 So. 2d 1120, 1128 (Ala. 2003) (internal quotations and edits omitted) (citations omitted).

In this case, for reasons stated below, Jones and Hastings have provided sufficient evidence that the Defamatory Statements are false and capable of a defamatory meaning.[14] [Exhibit 43].

1. **Statement 1 and 2: Headline and Deck**

Statement 1 is the headline of the Article and Statement 2 is the "Deck." [Exhibit 15, p. 1]. Statement 1 and 2 convey a defamatory meaning that Jones and Hastings were the cause of Ms. Rondini's suicide. When these statements are read in conjunction with Statement 4 and the Article as a whole, Statement 1 and 2 convey a defamatory meaning that Jones and Hastings were working and building a case against Ms. Rondini and caused Ms. Rondini to leave Tuscaloosa [Exhibit 15, p. 3:53-54], fall into depression [Exhibit 15, p. 3:54], and ultimately commit suicide [Exhibit 15, p. 3:57]. Statement 1 reads that the accusation of the rape, which undoubtably refers to the investigation conducted by Jones, Hastings, and the Homicide Unit, "drove" Ms. Rondini to commit suicide; especially when Statement 1 is directly followed by Statement 2 and when the Article mentions that the only named law enforcement officers that Ms. Rondini reported the alleged rape to was Jones and Hastings.[15] The use of the word "drove" in Statement 1 also conveys to the reader that Jones and Hastings impelled or caused Ms. Rondini to commit suicide.

Prior to publication, Baker had no way of knowing what caused the suicide of Ms. Rondini, *see* Nonmovant's Statement, ¶ 75, *supra*; thus, the statement that Jones and Hastings caused Ms. Rondini's suicide was false and made with a reckless disregard and serious doubts as to its truthfulness.[16] Likewise, Baker did not believe that Jones or Hastings were corrupt or covered up any crime that may have been committed by Bunn, *see* Nonmovant's Statement, ¶ 75. While Baker

---

[14] The below arguments are further substantiated by the Facebook comments that were made and posted on the Article's website, which utilized the Facebooks Comments Plugin. [Exhibit 48].

[15] Jones and Hastings are the only investigators mentioned in the Article; and thus, this reference to "police" can only refer to Jones and Hastings. While Captain Hood and Hart are mentioned in the Article, they are not mentioned in any investigative capacity and only in their managerial and supervisory capacity.

[16] References made to the actual malice standard should not be interpreted as an admission or concession that this fault standard applies, rather it is used to show that even if this heightened standard applies, then Defendants are still liable.

believed that Jones and Hastings were "building a case" against Ms. Rondini, she also knew that it was their duty and responsibility to investigate crimes, *see* Nonmovant's Statement, ¶ 75. Baker also knew that this phrase was misleading. [Exhibit 24, Buzzfeed03787 cmt. 58; Exhibit 61]. The use of "building a case," instead of investigating crimes, infers that Jones and Hastings were not within their duties and responsibilities when investigating the crimes committed by Ms. Rondini. Baker knew that Jones and Hastings were just doing their job. As a result, Baker entertained serious doubts and recklessly disregarded the truth when conveying Statement 1 and 2. Thus, Statement 1 and 2 are false and defamatory and made with actual malice.

### 2. Statement 3: Bunn as Victim

Statement 3, [Exhibit 15, p. 24-26], conveys to readers that Jones and Hastings actually and only viewed Bunn as the victim instead of Ms. Rondini and were not acting within their duties and responsibilities when they were investigating the crimes Ms. Rondini admitted to committing. To support these defamatory statements, Baker relied on the fact that within the Felony Packet, [Exhibit 14], Bunn was listed as a victim, one single time, [Exhibit 14, Jones-Hastings059], and that while Ms. Rondini was also listed in the Felony Packet as a victim, multiple times, [Exhibit 14, Jones-Hastings02, 04, 05, 06-07, 09, 012-013, 057], this was negated, in Baker's mind, by the fact that the investigation concluded that "no sexual assault occurred." [Exhibit 5, Depo. of Baker, p. 222:16 – p. 225:11]. Yet, Ms. Rondini was labeled as a victim throughout the Felony Packet, except for the one page in which Bunn is listed as a victim. Moreover, Jones and Hastings did not take the report where Bunn was listed as a victim, rather that was done by another sheriff's deputy. [Exhibit 14, Jones-Hastings058]. Thus, Baker recklessly disregarded the truth – that Jones and Hastings viewed Ms. Rondini as the victim instead of Bunn – by conveying that Jones and Hastings did not view Ms. Rondini as the victim.

Even assuming that Baker's explanation did not recklessly disregard the truth, Statement 3 conveys that from the outset Jones and Hastings believed that Rondini was the suspect and not a victim and that Bunn was actually and only the victim because the statement is qualified by "soon" and preceded by facts related to Ms. Rondini's Station Interview. Taken together, the statements convey that Jones and Hastings believed Bunn to be the victim instead of Ms. Rondini when she arrived for the interview at the Homicide Unit's station. This certainly is false and made with a reckless disregard to the truth, as Baker relied upon a statement in the Synopsis of the Felony Packet, [Exhibit 14, Jones-Hastings04], in her explanation to support Statement 3 which was made at the conclusion of the investigation [Exhibit 1, Depo. of Jones, p. 275:12 – p. 277:8].[17] Thus, the synopsis could not be relied upon to support something that allegedly occurred during the investigation.

Further, neither Jones nor Hastings casted Ms. Rondini as a criminal. The language used implied that Jones and Hastings wrongfully or sinisterly turned the case on Ms. Rondini and illegally and wrongfully investigated crimes she admitted to committing. Baker knew that it was their jobs to investigate crimes and the imputation that suggested otherwise was made with serious doubts and a reckless disregard to its truthfulness. Baker was further reckless towards conveying this message by the word placement she employed, which conveyed such an idea. As a result, Statement 3 is false and defamatory and made with actual malice.

### 3.   Statement 4: Inducement to Drop Charges and Civil Lawsuit

Statement 4, [Exhibit 15, p.3:30-38], conveys to the reader that Jones and Hastings had the ability to change or alter the criminal code of the State of Alabama, decided before completing the investigation that the earnest resistance element was not met, fabricated or made-up charges

---

[17] The synopsis is made to assist the supervisor review the Felony Packet before it is submitted to the district attorney. [Exhibit 1, Depo. of Jones, p. 275:12 – p. 276:6].

against Ms. Rondini to induce her into dropping charges and civil lawsuit against Bunn and were the reason Ms. Rondini dropped her civil lawsuit against Bunn, and worked against Ms. Rondini and wrongfully investigated Ms. Rondini's admissions.

When Statement 4 is read as a whole, and in the context of the entire Article, it conveys to the reader that Jones and Hastings did not properly reach the conclusion that the crime of rape did not occur, it suggests that they were wrong in doing so and deficient in their means of reaching that conclusion. This message is made clear when Baker wrote "But he didn't stop there. Instead, he started building a case against Megan…." When this language was used, the message conveyed became the investigation was more concerned about covering up the allegations against Bunn and using Ms. Rondini's admissions as the vehicle to do so.

Further, when Baker wrote "quickly decided," the statement conveys a meaning that Jones and Hastings went against and ignored the evidence to conclude that no rape occurred. While in fact there was no evidence to suggest the earnest resistance requirement was met, and in fact, the district attorney was also consulted and concluded the same (Baker knew this prior to the publication of the Article). [Exhibit 14, Jones-Hastings04]. Baker also knew that neither Jones nor Hastings were able to change Alabama law; and thus, bound to it. [Exhibit 5, Depo. of Katie Baker, p. 94:10-20]. Yet, this statement conveys that Jones and Hastings did not follow and acted outside the law to reach the conclusion, when in reality the conclusion was actually confirmed by the district attorney. Further, the use of "quickly" conveys that Jones and Hastings made this conclusion prior to the completion of the investigation, while in fact the "no sexual assault occurred" conclusion, [Exhibit 14, Jones-Hastings04], was made at the conclusion of the investigation.

Moreover, when Baker wrote: "But he didn't stop there. Instead, he started building a case against Megan, questioning her for multiple crime she wasn't even aware she had committed. Later, when Megan tried to file a civil suit, she learned the only way to escape possible prosecution for those crimes was to drop her case," the message to the reader turned to one of corruption and cover-up. Baker knew what Jones' and Hastings' responsibilities and duties were and knew they were tasked to investigate crimes. Yet, Baker recklessly conveyed to the readers that Jones and Hastings were working outside the law. The use of "building a case against…" conveys to the reader that Jones and Hastings were using unsubstantiated, made-up, and fabricated crimes to induce Ms. Rondini drop charges and a civil lawsuit against Bunn.

This is further supported by the fact that Baker does not tell the readers that Bunn's attorney was the one that told Ms. Rondini's attorney that charges were still pending against Ms. Rondini, and that neither Jones, Hastings, nor anyone in the Homicide Unit, were threatening to charge Ms. Rondini if she did not drop her charges or civil lawsuit (or were even involved in inducing Ms. Rondini to drop the charges or lawsuit). Instead, this conveys to the reader that Jones and Hastings were involved in inducing Ms. Rondini to drop her civil lawsuit against Bunn, threatened to proceed with the charges against her if she did not do so, and fabricated and made-up those charges against Ms. Rondini. This is completely false, and even Baker did not believe that charges were fabricated or made up by Jones or Hastings or that they induced Ms. Rondini to drop her civil lawsuit. [Exhibit 5, Depo. of Katie Baker, p. 99:10 – p. 100:12]. Rather, she believed that neither Jones nor Hastings were part of the reason Ms. Rondini dropped her civil lawsuit. [Exhibit 5, Depo. of Katie Baker, p. 100:13-18]. Any statement made conveying otherwise was recklessly made with serious doubts and a reckless disregard to the truth. This is further bolstered when Baker wrote Statement 11 and the ensuing lines, [Exhibit 15, p. 15:324-28], which again conveys to the reader

that Jones and Hastings were responsible for Ms. Rondini dropping the case, and which never mentions that Bunn's attorney was the source of the information concerning the pending charges against Ms. Rondini. As a result, Statement 4 is false and defamatory and made with serious doubts and recklessness as to its truthfulness.

### 4. Statement 5: Doubted Ms. Rondini

Statement 5, [Exhibit 15, p. 10:169-171], conveys that Ms. Rondini's accusations should not have been labeled a special inquiry because of her GPA and that Jones and Hastings doubted Ms. Rondini before "she went to the station for a follow-up interview" (Ms. Rondini's Station Interview).

Statement 5 taken with the preceding lines, [Exhibit 15, p. 10:148-168], convey that Ms. Rondini's allegations should not have been designated as a special inquiry because her circumstances (i.e., a 3.8 GPA) did not align with the reason that Captain Hood gave as to why some people make false reports (i.e., "not doing well in school"). This further advances the corruption and cover-up narrative conveyed by the Article. Statement 5 conveys that there was no reason for Ms. Rondini's accusations to be designated as a special inquiry (because of her grades) and further conveys that something sinister occurred because the accusations were listed as such. Yet, the actual evidence gathered by Jones, Hastings, and the Homicide Unit reveal that there was not sufficient evidence to charge Bunn with rape under Alabama law, which is why the accusations were designated as a special inquiry. Baker knew this prior to the publication, *see* Nonmovants' Statement, ¶ 75. Any suggestion otherwise is recklessly made with serious doubts and a recklessness as to its truthfulness, especially in light of the fact that Baker had no reason to believe that Jones or Hastings knew Ms. Rondini's GPA. [Exhibit 5, Depo. of Katie Baker, p. 160:9-12].

Further, there is no evidence that Jones or Hastings doubted Ms. Rondini "when she went to the station for a follow-up interview…." On the contrary, there is an abundance of evidence that

Jones and Hastings believed Ms. Rondini because they began investigating the allegation by going

to Bunn's residence after interviewing Ms. Rondini at the hospital, making contact with Bunn (the

suspect), and processing the alleged crime scene before Ms. Rondini's Station Interview. [Exhibit

14, Jones-Hastings06]. Further, during Ms. Rondini's Station Interview, Jones repeatedly stated

that he believed Ms. Rondini, *see* paragraph 69 of Nonmovant's Statement, *supra*. Baker attempt

to explain that Jones and Hastings doubted Ms. Rondini by pointing out that the initial report, not

made by Jones or Hastings, was designated as a special inquiry and that Captain Hood stated that

reports are designated as such because the elements of a crime have not been met. [Exhibit 5,

Depo. of Katie Baker, p. 102:10-15]. Likewise, Defendants make a similar argument in their

Motion for Summary Judgment (i.e., the statement that Jones and Hastings doubted Ms. Rondini

entirely is backed up by the fact that they doubted that a sexual assault had occurred). (Doc. 66-1,

p. 5). Yet, this is not what is conveyed in Statement 5. Statement 5 conveys that neither Jones nor

Hastings believed Ms. Rondini ***at all***. The Statement does not provide that Jones and Hastings

doubted that Ms. Rondini was raped or that a sexual assault had occurred; no such qualifier is used

in the Article. As a result, Statement 5 is false and defamatory and was made with actual malice.

### 5.   Statement 6: Bare Minimum/ Abruptly Left

Statement 6, [Exhibit 14, p. 10:174-178], conveys the continuative narrative of corruption

and cover-up, a false portrayal of the depth of the investigation undertaken by Jones, Hastings, and

the Homicide Unit, that Jones and Hastings were building a case against Ms. Rondini, rather than

investigating crimes she admitted to, which lead to the inducement of Ms. Rondini dropping her

civil lawsuit, and that Jones changed his line of questioning not related to Ms. Rondini's

allegations.

By specifically stating the amount of time that Ms. Rondini took, in what was now her third

interview to law enforcement officers, to again restate her story falsely portrays the depth of the

investigation undertaken by Jones, Hastings, and the Homicide Unit. It imputes that Jones and Hastings were doing the bare minimum and attempted to use Ms. Rondini's admissions as a way to cover-up the alleged crimes of Bunn, and Baker at least recklessly made these imputations by the language she used to describe these events. Ms. Rondini also told her side of the story to the responding TPD officer and Jones and Hastings at the hospital prior to this third interview (Ms. Rondini's Station Interview).

Further, in the next three sentences, Baker conveys a message of cover-up and corruption. Baker wrote that Jones "abruptly" left the room after the gun was mentioned, he changed his course of questioning, and never returned to Ms. Rondini's allegations. The way these sentences were written communicate to the reader that Jones was jumping on anything information he could use against Ms. Rondini. When in reality, and any viewer of the video can see, Jones was merely looking out for the safety of the neighborhood when a gun was sitting out in the open (especially when Ms. Rondini did not know whether she left it loaded), then continued for a while to gather more details about the incident (i.e., what happened after she left Innisfree, whether she remembered traveling to her apartment, and what happened after the intercourse), and further followed up on her allegations. [Exhibit 10, p. 24:11 – p. 44:11; Exhibit 11, 23:33-1:07:57]. Baker altered what happened during Ms. Rondini's Station Interview and concealed the actual interview from readers, [Exhibit 5, Depo. of Katie Baker, p. 251:14 – p. 253:8],[18] to further advance the corruption and cover-up narrative she sought to convey to readers, all while not believing that Jones or Hastings were corrupt or trying to cover-up any crime.

---

[18] In fact, another article was written about the allegations of Ms. Rondini and the subsequent investigation, which actually uploaded and presented all the evidence to the readers. Stephanie Taylor, *Files detail investigation into Megan Rondini case*, GateHouse Media, https://stories.usatodaynetwork.com/investigativefiles/.

Furthermore, Statement 6 read in conjunction with Statement 3 and 4 continued the portrayal of Jones and Hastings actively building a case and working against Ms. Rondini, rather than simply doing their job. While Statement 6 does not literally contain "building a case," the readers were already primed to think this way by the words and language used in Statement 3 and 4. (*see* Doc. 57, p. 19-21). In turn, readers already were primed to think that Jones and Hastings induced Ms. Rondini to drop her civil lawsuit with Statement 4, and when taken together with Statement 6, Baker continued the narrative of Jones and Hastings using their position to induce Ms. Rondini to drop her charges and suit against Bunn. Again, which she did not even believe. As a result, Statement 6 is false and defamatory and made with serious doubts and a reckless disregard to its truthfulness.

### 6. Statement 7: Biological Samples

Statement 7, [Exhibit 15, p. 10:184-188, p. 10:190 – 11:192], conveys to the reader that Jones and Hastings were responsible for the collection and testing of urine and blood samples. To back up this statement, Defendants rely upon the email from Captain Hood, [Exhibit 27], which provided that the circumstances did not require investigators to ask for blood to be drawn or urine samples taken. (Doc. 66-1, p. 8). Baker further knew that the attending physician ordered drug and alcohol testing, at his or her discretion, at the hospital; not law enforcement officers. [Exhibit 31]. Further, Baker did not know the policies of the Homicide Unit, or whether they implemented IACP guidelines, [Exhibit 5, Depo. of Katie Baker, p. 106:4-6; 165:5-15]; thus, any statement providing that it was the duty and responsibility of the Jones and Hastings to collect and test blood and urine samples would be recklessly made with a reckless disregard to the truth. While the standard operating procedures for the Homicide Unit does state that officers should collect biological samples, it is conditioned on the suspicion of "rape drugs," which in this case was not suspected, and the extent of control investigators have over the medical facility, *see* paragraph 45 of the

Response to Movants' Statement of Undisputed Material Facts (hereinafter "Response to Movants' Statement"). Moreover, the reliance upon Defendants' expert witness testimony to support this statement is misplaced as neither of Defendants' expert witness were aware of any of the hospital's procedure or polices concerning sexual assault and ignored the policies and procedures of the Homicide Unit. [Exhibit 9, Depo. of Hershman, p. 128:16-23, p. 155:9 – p. 161:11; Exhibit 45, Depo. of Mertz, p. 145:5-7, p. 260:20-23]. One of Defendants' expert witness also testified that there is not one, all encompassing best practices standard that applies to all law enforcement agencies. [Exhibit 9, Depo. of Hershman, p. 160:23 – p. 161:11]. As a result, Statement 7 is false and defamatory and made with actual malice.

7.   **Statement 8: Wrong to Mirandize**

Statement 8, [Exhibit 15, p. 11:203-212], conveys yet again the corruption and cover-up narrative pushed by Defendants and that Jones and Hastings were building a case against Ms. Rondini to induce her to drop her charges and a civil lawsuit. This statement further conveys that Jones was almost complete with the investigation of the accusations against Bunn and that Jones acted in a sinister and irresponsible manner, outside the bounds of his duties and responsibilities, when he read Ms. Rondini the Miranda rights.[19]

Baker altered and distorted the quotation of Jones to the point that if became false and defamatory and took on a whole new meaning. In Ms. Rondini's Station Interview, immediately prior to saying "we are close on your case," Jones lists all the different pieces of evidence that still needed to be collected to complete the investigation (which was not mentioned in the Article); meaning the investigation was not near an end. [Exhibit 25, p. 2:1-10; Exhibit 26, 9:54-10:41].

---

[19] Defendants misstate that the Felony Packet indicted Ms. Rondini on theft charges. (Doc. 66-1, p. 9). The grand jury returns indictments, not investigators and the Felony Packet did not indicate whether an indictment was returned. [Exhibit 14].

However, instead of conveying that Jones had other tasks and evidence to gather before the investigation was complete, Baker manipulated, distorted, and changed the quotation to convey to the reader that Jones was finished with investigating Ms. Rondini's claims and now only focused on Bunn's accusations. Baker knew that Jones was not finished with investigating the accusation of Ms. Rondini, as she possessed the Innisfree and Houndstooth surveillance videos that Jones said he needed to pull. [Exhibit 5, Depo. of Katie Baker, p. 161:6 – p. 163:3; Exhibit 40, Depo. of Venkatasubban, p. 79:3 – p. 81:13, p. 90:5 – p. 91:11; *see also* Exhibit 1, Depo. of Jones, p. 226:2-8].

Baker continued the overarching theme of corruption and cover-up when she wrote, "He didn't tell Megan that, although she had entered the room an alleged victim, she was now a suspect as well." This conveyed to the reader that Jones was not within his duties and responsibilities as a law enforcement officer when he read Ms. Rondini the Miranda rights and did not expressly tell Ms. Rondini he was investigating allegations against her. Further, it conveyed that Jones did this because he was attempting to cover-up accusations against Bunn. Notably, Baker did not believe that Jones did anything wrong when he read Ms. Rondini the Miranda rights and had no reason to believe that Jones was outside the scope of his duties when he did not explain to Ms. Rondini that he was now investigating accusations against her. [Exhibit 5, Depo. of Katie Baker, p. 104:11-23, p. 105:18 – p. 106:6]. Moreover, Jones's supervisor told him to Mirandize Ms. Rondini. [Exhibit 17, Depo. of Hood, p. 92:2 – p. 93:6]. Again, Baker did not believe that either Jones or Hastings were corrupt or attempting to cover up the accusations. As a result, Statement 8 is false and defamatory and made with serious doubts, or at least a reckless disregard, to its truthfulness.

### 8. Statement 9: Refusal to Prosecute Form

Statement 9, [Exhibit 15, p. 11:216 – p. 12:234], conveys that Jones wrongfully pressured and bullied Ms. Rondini to sign a refusal to prosecute form, the continued narrative of corruption

and cover-up, and that Jones did not follow Homicide Unit policy when he did not conform to the IACP guidelines. The predominant narrative of corruption and cover-up is continued through Statement 9. Baker manipulated and altered the quotations of Jones to the point where the meaning substantially changed. Baker rearranges the quotations in a way to convey to readers that Jones was working against Ms. Rondini and pressuring and bullying her into signing a refusal to prosecute form.[20] However, Baker did not even believe that Jones or Hastings ever pressured or bullied Ms. Rondini into signing the refusal to prosecute form. [Exhibit 5, Depo. of Katie Baker, p. 108:8 – p. 110:15]. Even more telling, Susman, one of Baker's editors, testified that the Article should have mentioned whether or not the form was actually presented to Ms. Rondini; yet, the Article never does so, *see* paragraph 24 of Response to Movants' Statement. Again, this material alteration to the actual statements made by Jones and Ms. Rondini convey a corruption and cover-up narrative to the reader. The reader was never presented with the full interview videos and could not see for themselves that Baker altered what was actually said.

Baker furthers the corruption and cover-up theme by representing facts that did not match elements of earnest resistance. However, Baker conveys these represented fact as if they should have been sufficient to charge Bunn with a crime. This is further advanced later in the Article where Baker does the same as in Statement 8. [Exhibit 15, p. 17:350-365]. The continuous false conveyance that the facts were sufficient for a criminal charge conveyed to the reader that Jones and Hastings were involved in the cover-up concerning the allegations against Bunn, when in fact Baker did not believe a cover-up ever occurred. In addition, and again, Baker uses IACP guidelines to convey to the readers that Jones and Hastings acted outside of their duties, responsibilities, and

---

[20] The quotes on lines 216-219 of the Article come first in Ms. Rondini's Station Interview, [Exhibit 25, p. 23:18-22], next are the quotes on lines 225-226, [Exhibit 25, p. 27:13-18], then come the quotes on lines 221-222, [Exhibit 25, p. 32:4-13], and finally comes the quote on line 220 (starts on line 219), [Exhibit 25, p. 34:4-5]. Baker jumbled these quotes up and took them out of context to create a whole new meaning than the original quotations.

training by not conforming to IACP guidelines; all while not knowing the training of Jones and Hastings or the policies and procedures of the Homicide Unit. As a result, Statement 9 is false and defamatory and made with actual malice.

### 9. Statement 10: Not Taking Investigation Seriously

Statement 10, [Exhibit 15, p. 13:242-244, p. 13:250-251, p. 13:265 – p. 14:270, p. 14:272-274], conveys to the reader that Hasting did not take the investigation seriously, the continued narrative of corruption and cover-up, and the continued narrative that Jones and Hastings were inducing Ms. Rondini to drop her charges.

By describing the interview of Bunn with phrases like "high-spirited small talk," Baker conveys to the reader that Hastings is not taking this investigation seriously. While Baker believed that Jones and Hastings could have done things differently throughout the investigation, she had no reason to believe that they did not take the investigation seriously. [Exhibit 5, Depo. of Katie Baker, p. 87:25 – p. 90:24]. Baker further takes these quotations out of context of the interview and parses them to convey to the reader that Hastings was not serious about investigating the allegations against Bunn. Without the full context, the readers did not know that Hastings went through the whole night with Bunn again and questioned him about what happened. [*see generally* Exhibit 46, 47]. Again, the reader never had access to the full video interview. As a result, the quotations used because false and defamatory because they were substantially altered and taken out of context.

Further, Statement 10 continues the narrative of corruption and cover-up, as well as, the inducement to drop the charges. Baker described Hastings as "fumbling a bit," which leads a reader to believe that Hastings was nervous around Bunn while asking tough questions and trying to do anything he could to cover up the allegations against Bunn, especially when read in conjunction with Statement 11. It further conveys that Hastings was unusually casual with Bunn because the

readers are lead to believe that this is the first interaction between Hastings and Bunn. Yet, Baker knew that Hastings was talking to Bunn, for a lengthy amount of time, while investigators were processing the scene, but she did not tell the reader this fact. [Exhibit 27, Buzzfeed00556].

Moreover, the first time the reader is informed that Ms. Rondini discharged the gun towards Bunn's residence was through the voice of Hastings. This makes it appear that Hastings is making up facts against Ms. Rondini to induce her into dropping the charges against Bunn. This is further advanced when Baker states that Bunn did not know whether Ms. Rondini hit anything when she discharged the gun and the omission that Ms. Rondini admitted to Jones that she had fired the gun towards the residence. Without Ms. Rondini's admission and the addition of Bunn not knowing where the round struck, a reader would understand this statement to mean that Hasting was fabricating and making up charges against Ms. Rondini to cover-up the allegations against Bunn and induce Ms. Rondini to drop her charges.

This narrative is further advanced when the actual amount of money that Bunn claimed Ms. Rondini took was completely omitted from the Article. While the Article provided, "Bunn claimed he was missing more than the $3 Megan said she grabbed for the cab," it is silent to the actual amount claimed, which was $200 along with other items claimed taken. [Exhibit 14, Jones-Hastings058]. Again, this advances the narrative that Jones and Hastings were using anything they could to fabricate charges in order to induce Ms. Rondini to drop her charges. Yet, Baker knew this was not the case and did not believe so. As a result, Statement 10 is false and defamatory and was made with serious doubts and recklessness to its truthfulness.

### 10. Statement 11: Did Not Intend to Fight Too Hard

Statement 11, [Exhibit 15, p. 15:319-323], continues the corruption and cover-up narrative and falsely states that Hastings and Jones "didn't intend to fight too hard on Megan's behalf …." By using the phrase "there was a catch," the message conveyed to the reader is one of dishonestly

where Jones and Hastings were using everything they could to make the charges against Bunn disappear. It also conveys that Jones and Hastings were acting outside the scope of their duties, responsibilities, and training.

Defendants base their support that Jones and Hastings "didn't fight too hard" on the fact that the Felony Packet, [Exhibit 14, Jones-Hastings04], stated "no sexual assault occurred," the packet indicted Ms. Rondini, and the officers were responsible for presenting the case to the grand jury. Neither of these contentions show that Jones and Hastings did not fight too hard for Ms. Rondini. First, the synopsis, which included the "no sexual assault occurred" language, was used for internal purposes so the supervisor could conduct his review of the Felony Packet. [Exhibit 1, Depo. of Jones, p. 275:12 – p. 276:6]. Baker did not know the responsibilities regarding the presentation to the grand jury or what was actually presented to the grand jury. [Exhibit 5, Depo. of Katie Baker, p. 100:19 – p. 101:23; *see also* paragraph 20 of the Response to Movants' Statement]. In fact, the entire Felony Packet is not presented to the grand jury, *see* paragraph 20 of the Response to Movants' Statement, *supra*. Thus, any belief that the synopsis was presented to the grand jury was made with serious doubts and recklessness to its truthfulness.

In addition, the Felony Packet did not indict Ms. Rondini, all it contained were the information and evidence gathered by investigators during the course of the investigation. It did not indicate whether an indictment was returned, and certainly, the investigators were not responsible for returning an indictment. Therefore, Statement 11 is false and defamatory and made with serious doubts and a reckless disregard to its truthfulness.

### C.  Plaintiffs have presented sufficient evidence that Statement 7 and 9 are provable as false.

Defendants argue that only Statement 7 and 9 of the Defamatory Statements are expressions of opinion. (Doc. 66, p. 32-34). "[W]hether a statement is opinion or fact 'should

typically be resolved by a jury unless no reasonable jury could find it to be a statement of fact.'"
*Cajun Steamer Ventures, LLC v. Thompson*, 402 F. Supp. 3d 1328, 1348 (N.D. Ala. 2019) (using
Alabama law) (quoting *Thomas v. Henderson*, 297 F. Supp. 2d 1311, 1316 (S.D. Ala. 2003)).[21]
First and foremost, Baker continuously reiterated that the Article contained no opinions,
whatsoever, and only reported facts. [Exhibit 5, Depo. of Katie Baker, p. 42:17-21, 43:14-24, p.
44:9-11, p. 77:17-20, p. 79:3-4].

"One cannot recover in a defamation action because of another's expression of an opinion
based upon disclosed nondefamatory facts, no matter how derogatory the expression may be."
*Sanders v. Smitherman*, 776 So. 2d 68, 74 (Ala. 2000) (citing *Restatement (Second) of Torts* § 566
cmt. c (1977)). "Generally, a 'false statement of fact,' if couched as an opinion or rhetorical
question, must 'contain objectively verifiable facts or imply the existence of verifiable facts'
before it may be termed an actionable statement of fact." *Shuler*, 2017 WL 191267, at *19 (quoting
*Marshall v. Planz*, 13 F. Supp. 2d 1246, 1257 (M.D. Ala. 1998)). "A statement of fact is not
shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it
is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or
surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is
not actionable." *Id.* (citing *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1257 (M.D. Ala. 1998). Here,
Baker was in possession, or at least claimed to be in possession, of objectively verifiable facts, *see*
Section I.B, *supra*. Baker also does not couch any Defamatory Statement as an opinion or

---

[21] Defendants' reliance upon *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016) (using New York law) is misplaced as that court was construing New York law, not Alabama law. Likewise, reliance upon *Marks v. New York Life Ins. Co.*, 2020 WL 5752852 (S.D. Ala. Sept. 25, 2020) is misplaced. *Marks* relied upon *Bell v. Smith*, 281 So. 3d 1247 (Ala. 2019) for the proposition that whether a statement is fact or opinion is a question of law. However, the *Bell* court does not cite any authority to support this proposition; rather, it reiterated that whether a statement is capable of a defamatory meaning is a question of law and noted that no party cited authority to support that whether a statement is an opinion is a question for the jury. *Bell*, 218 So. 3d at 1253-54. Contrary to the *Bell* court, the court in *Thomas v. Henderson*, 297 F. Supp. 2d 1311, 1316 (S.D. Ala. 2003), relied upon by the court in *Cajun Steamer Ventures*, cited to many Alabama court decisions supporting the proposition that this is a question for the jury.

rhetorical question. *See Shuler*, 2017 WL 191267, at *19. Rather, Baker stated or implied in the Article that she is in possession of verifiable facts, yet does not disclose all the facts to the reader, *see* Section I.B., Response to Movants' Statement, and Nonmovants' Statement, *supra*. As a result, Statement 7 and 9 do not contain a non-actionable expression of opinion.

### D. Plaintiffs have provided sufficient evidence that the Headline and Deck (Statement 1 and 2) were published of and concenring Jones and Hastings.

In footnote 11 on page 21 of Defendants' Motion for Summary Judgment (Doc. 66), Defendants argue that the Headline and Deck (Statement 1 and 2) are not actionable because they do not concern either Jones or Hastings.[22] While these two statements do not expressly mention Jones or Hastings, Statement 1 and 2 were published of and concerning Plaintiffs. *See Butler v. Town of Argo*, 871 So. 2d 1, 16 (Ala. 2003). When read as a whole, the Article was written about the investigation conducted by Jones and Hastings and contains quotes made to and by Jones and Hastings and only names Hones and Hastings as investigators on the case, *see also* Section I.B.1., *supra*. As a result, these statements are actionable because the were published of and concerning Jones and Hastings.

### II.    Alabama's fair reporting privilege does not apply in this case, and even if it did, Plaintiffs have provided sufficient evidence to overcome the qualified privilege.

Defendants argue that they are protected from liability because the Alabama fair reporting privilege, Ala. Code § 13A-11-161, is applicable in this case. This privilege encompasses fair and accurate reports of criminal charges and official investigations. *Wilson v. Birmingham Post Co.*, 482 So. 2d 1209, 1211 (Ala. 1986). "Further, the publication of an otherwise defamatory matter 'is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.' *Wilson v. Birmingham Post Co.*, 482 So. 2d 1209, 1211 (Ala. 1986) (emphasis added). Whether a

---

[22] This argument is not raised as to any other Defamatory Statement.

defendant is entitled to this qualified privilege is determined as a matter of law. *See Wiggins v. Mallard*, 905 So. 2d 776, 782 (Ala. 2004)." *Shuler v. Garrison*, 2017 WL 191267, at *20 (N.D. Ala. Jan. 13, 2017). While there is no requirement that the Article only contain quotations from official investigations, the Article still must be 'a fair abridgment of the occurrence reported.'" *Id.* (quoting *Wilson*, 482 So. 2d at 1211). In addition, "[a]ctual malice as used in this statute refers to the common law standard of malice rather than the constitutional standard of malice as set out in *New York Times Co. v. Sullivan*, 376 U.S. 254 [] (1964)." *Wilson*, 482 So. 2d at 1213. Proof of actual malice is not the only means to overcome this privilege. This privilege may also be overcome if "the defendant has refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable explanation or contradiction thereof by the plaintiff…." Ala. Code § 13A-11-161.

Here, while the Article concerns matters within an official investigation, it does not give an accurate or fair abridgment of the occurrence reported. As stated in Section I.B., *supra*, the Article contains false and defamatory statements which is not protected under this privilege. As a result, this privilege does not apply.

Even if this privilege applies, Plaintiffs have presented sufficient evidence to show common law malice to overcome this privilege, *see* Section I.A.2.[23] In addition, this privilege is overcome because Defendants failed to publish contradictions made by Captain Hood. Baker knew that Hood would speak for Jones and Hastings, yet did not include explanations and contradictions stated in his emails. [Exhibit 5, Depo. of Baker, p. 74:11-16; *Compare* Exhibit 27 *to* Exhibit 15]. Therefore, even if this privilege applies, the Plaintiffs have provided sufficient evidence to overcome the privilege.

---

[23] Even if this Honorable Court finds that constitutional/actual malice is the standard used in this privilege, Plaintiffs have provided sufficient evidence of such, *see* Section I.A.3., I.B.

## <u>CONCLUSION</u>

For reasons stated above, Plaintiffs have presented sufficient evidence for their claims of defamation to proceed to the jury, as a genuine issue of material fact exists and the Defendants are not entitled to a judgment as a matter of law. Wherefore, the Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment.

*Respectfully submitted this 21st day of October, 2021.*

*s/ Bobby H. Cockrell, Jr.*
Bobby H. Cockrell, Jr.
Bar Number: ASB-1332-E47B
Attorney for Plaintiffs
bcockrell@ccrr.law

*s/ G. Scotch Ritchey, Jr.*
G. Scotch Ritchey, Jr.
Bar Number: ASB-6144-Q55D
Attorney for Plaintiffs
sritchey@ccrr.law

**<u>OF COUNSEL:</u>**
COCKRELL, COCKRELL, RITCHEY & RITCHEY, LLP
1409 University Boulevard
Tuscaloosa, Alabama 35401
Telephone: (205) 349-2009
Facsimile: (205) 758-3090

---

## CERTIFICATE OF SERVICE

---

I, the undersigned, hereby certify that I have on this date, served a copy of the foregoing upon the following via private process server, and/or by U.S.P.S. certified mail, return service requested, with adequate postage prepaid, and/or electronic mail, and/or regular mail, and/or hand delivered, and/or by filing a copy of the foregoing using the AlaFile system which will automatically notify all counsel of record, and/or by filing a copy of the foregoing with the Clerk of Court using the CM/ECF system which will provide notice to the following CM/ECF participants:

**Katherine M. Bolger (*pro hac vice*)**
**Rachel F. Strom (*pro hac vice*)**
**John M. Browning (*pro hac vice*)**
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
katebolger@dwt.com
rachelstrom@dwt.com
jackbrowning@dwt.com

**J. Banks Sewell, III**
**John G. Thompson**
**Jonathan R. Little, III**
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Telephone: (205) 581-0772
Facsimile: (205) 380-9172
bsewell@lightfootlaw.com
jthompson@lightfootlaw.com
jlittle@lightfootlaw.com

*s/ G. Scotch Ritchey, Jr.*
*Of Counsel*

C-1