FILED
2021 Oct-21 PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 5



Deposition of:

# Katie Baker

*July 23, 2021*

In the Matter of:

# Jones, Adam, et al. Vs. Buzzfeed, Inc., et al.

Veritext Legal Solutions

877.373.3660 | calendar-al@veritext.com | 800.808.4958

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE NORTHERN DISTRICT OF ALABAMA

4              WESTERN DIVISION

5    Case No:  7:19-CV-00403-RDP

6    ------------------------------------x

7    ADAM JONES, et al,

8                        Plaintiffs,

9             -against-

10   BUZZFEED, INC., et al,

11                       Defendants.

12   ------------------------------------x

13

14                   July 23, 2021

15                    9:27 a.m.

16

17            Deposition of KATIE BAKER, held at the

18   offices of David Wright Tremaine LLP, 1251 Avenue

19   of the Americas, New York, New York, pursuant to

20   Notice, before Lynne D. Metz, a Shorthand Reporter

21   and Notary Public of the State of New York.

22

23

24

25

Page 2

```
1
2    APPEARANCES:
3
4        DAVIS WRIGHT TREMAINE LLP
5        Attorneys for Defendants
6            1251 Avenue of the Americas
7            New York, New York 10020
8        BY:  KATHERINE M. BOLGER, ESQ.
9
10
11       COCKRELL, COCKRELL TOWNSEND & RITCHEY LLP
12       Attorneys for Plaintiffs
13           1409 University Boulevard
14           Tuscaloosa, Alabama 35401
15       BY:  G. SCOTCH RITCHEY, JR., ESQ.
16           Sritchey@cctr.law
17           BOBBY H. COCKRELL, JR., ESQ.
18
19
20
21
22
23
24
25
```

Page 3

```
1
2
3
4        IT IS HEREBY STIPULATED AND AGREED, by and
5    between the attorneys for the respective parties
6    herein, that filing and sealing be and the same
7    are hereby waived.
8        IT IS FURTHER STIPULATED AND AGREED
9    that all objections, except as to the form of the
10   question, shall be reserved to the time
11   of the trial.
12       IT IS FURTHER STIPULATED AND AGREED that the
13   within deposition may be signed and sworn to
14   before any officer authorized to administer an
15   oath, with the same force and effect as if signed
16   and sworn to before the officer before whom the
17   within deposition was taken.
18
19
20
21
22
23
24
25
```

Page 4

```
1
2        KATIE  BAKER,
3    called as a witness, having been first duly sworn
4    by the Notary Public (Lynne D. Metz), was examined
5    and testified as follows:
6
7    EXAMINATION BY
8    MR. RITCHEY:
9        Q.   Would you please introduce yourself on
10   the record.
11       A.   My name is Katie Baker.
12       Q.   Katie, I am Scotch Ritchey.  I
13   represent Adam Jones and Josh Hastings in this
14   case.  They are the plaintiffs.  I am just going
15   to ask you a few questions about your article and
16   some things about your investigation and so forth.
17       I am just going to go over a few
18   ground rules.  If you need a break, just let us
19   know.  This one may take a little while, so if you
20   need some time let me know and we will be happy to
21   take a break.
22       We are not over Zoom thank goodness.
23   We are here in person, so I won't have to worry
24   about a Zoom interference, but if you didn't hear
25   a question, just ask me to repeat it and I will be
```

Page 5

```
1            K. Baker
2    happy to do so.
3        If you don't understand the question
4    the same thing, ask me to clarify it and I would
5    be happy to do so.
6        If you will give me a second to
7    complete my question I will give you some time to
8    answer just so we are not talking over each other
9    so Lynne can take down everything we say today.
10       And if you would, just give audible
11   answers yes or no and try to refrain from shaking
12   your head so we can get that clean record again.
13       If you answer, then we will assume you
14   heard and understood the question.
15       Is that fair?
16       A.   Yes.
17       MS. BOLGER:  I object to the form of
18   the question.  I object to that instruction
19   but it is okay.
20       Q.   Are there any reasons why you cannot
21   answer truthfully or fully today?
22       A.   No.
23       Q.   Is there anything that would interfere
24   with you answering questions today?
25       A.   No.
```

Page 6

K. Baker

1
2     Q.    Have you ever given a deposition
3  before?
4     A.    No.
5     Q.    Other than your attorneys, have you
6  spoken with anyone about this lawsuit against
7  BuzzFeed, yourself and Ben Smith that was filed by
8  my client?
9     A.    My husband and coworkers know that I
10  am here today, but I haven't gone into details.
11     Q.    And you haven't spoken with any of
12  your colleagues at BuzzFeed concerning this
13  lawsuit?
14     A.    No, not in details.  They know that I
15  am taking time off from my job to be here, but
16  that was it.
17     Q.    Have you reviewed anything in
18  preparation for this deposition?
19     A.    Yes.
20     Q.    What have you reviewed?
21     A.    I have reviewed the article and some
22  of the e-mails and drafts and other documents
23  related to the article.
24     Q.    Where do you currently reside?
25     A.    London.

Page 7

K. Baker

1
2     Q.    Do you have a cell phone number?
3     MS. BOLGER:  You don't need that.  You
4     can reach her through me.
5     Q.    And your e-mail address associated
6  with BuzzFeed, what is that?
7     A.    It is katie.baker at BuzzFeed.com.
8     Q.    Do you use any other e-mail addresses
9  for BuzzFeed work?
10     A.    No.
11     Q.    Do you have any social media accounts?
12     A.    Yes.
13     Q.    Which ones do you have?
14     A.    I have Twitter and I have Facebook and
15  I have Instagram and I think that's it and the
16  Facebook and Instagram are private.
17     Q.    What is your Twitter handler?
18     A.    My Twitter handle is Katie JM Baker
19  because there are two other Katie Bakers who are
20  journalists.  It's very confusing for all of us.
21  She writes about sports.  Sometimes I get e-mails
22  about Lacrosse which I don't often cover.
23     Q.    No Lacrosse in London?
24     A.    No.
25     Q.    Your Facebook, is that just your name?

Page 8

K. Baker

1
2     A.    I think so.  I don't use it very often
3  so I am not actually sure, but I am sure.
4     Q.    Do you know your Instagram handle?
5     A.    It is the same as my Twitter handle.
6     Q.    What is your date of birth?
7     A.    September 15, 1987.
8     Q.    I believe you said you are married?
9     A.    Yes.
10     Q.    Who are you married to?
11     A.    I am married to Max Strasser.
12     Q.    Spell that last name please?
13     A.    S-T-R-A-S-S-E-R.
14     Q.    What does he do for a living?
15     A.    He is an editor at the New York Times.
16     Q.    Does he reside with you in London?
17     A.    He does.
18     Q.    Have you had any other marriages?
19     A.    No.
20     Q.    Does he have any relatives that live
21  in Alabama that you know of?
22     A.    No.
23     Q.    Do you have any relatives?
24     A.    No.
25     Q.    Do y'all have any children?

Page 9

K. Baker

1
2     A.    No.
3     Q.    Have you ever been treated for
4  alcoholism or drug abuse?
5     A.    No.
6     Q.    Have you ever served in the military?
7     A.    No.
8     Q.    Have you ever been charged or arrested
9  for a crime?
10     A.    No.
11     Q.    Have you ever been a party to a
12  previous lawsuit other than this one where you
13  were either a defendant or a plaintiff?
14     A.    No.
15     Q.    What about since this lawsuit was
16  filed?
17     A.    No.
18     Q.    I am going to go into your employment
19  history and I want to start out before you were
20  with BuzzFeed.  If you will just run through just
21  the ten years previous to BuzzFeed if it was that
22  long.
23     A.    Yes.  It's been more than ten years.
24  I will start with so after I graduated from
25  college I worked at the San Francisco Chronicle.

3 (Pages 6 - 9)

Page 10

K. Baker

1    K. Baker
2    That was where my first job was. I started out as
3    an assistant for the former editor and chief of
4    the paper, Phil Braunstein and I did research,
5    fact checking. All sorts of things.
6           Then I started writing articles for
7    the newspaper and I wrote front page articles. I
8    just was a news reporter there.
9           Then after that I worked for The Daily
10   which was an iPad paper. I don't know if anybody
11   remembers it. It was Murdock owned. It was kind
12   of an experiment. Not very many people had iPads
13   at the time. I didn't so I couldn't read it which
14   is why I didn't work there that long because you
15   want to be able to read your work, but I was a
16   general assignment news reporter there as well and
17   I also freelanced for a variety of publications;
18   the New York Times. All sorts of places.
19          And after that I worked for Jezebel
20   which is a women's interest website.
21          After that I worked for Newsweek where
22   I was a general assignment reporter.
23          And then I took my job at BuzzFeed and
24   I have had a few different roles there and I've
25   worked there for seven and a half years.

Page 11

K. Baker

1    K. Baker
2    Q.   I am going to go back to the San
3    Francisco Chronicle.
4           When did you start working there?
5    A.   I started there in 2010 and I worked
6    there until I moved to New York in 2011. I worked
7    there almost two years.
8    Q.   And then you moved to The Daily?
9    A.   Yes.
10   Q.   What years did you work?
11   A.   I just worked for The Daily when I got
12   to New York from October 2011 to the Spring of
13   2012 and then I took the job at Jezebel.
14   Q.   You started Jezebel in 2012 and then?
15   A.   I worked there until Fall of 2013.
16   Q.   And then Newsweek from Fall of 2013?
17   A.   Yes.
18   Q.   And then until?
19   A.   April 1, 2014 was when I started at
20   BuzzFeed.
21   Q.   What were your positions at Jezebel?
22   A.   I was a staff reporter.
23   Q.   Is that the only position you held?
24   A.   Yes.
25   Q.   What about for Newsweek?

Page 12

K. Baker

1    K. Baker
2    A.   Staff reporter.
3    Q.   Before BuzzFeed when you were working
4    for these various organizations, did you ever
5    write about sexual assaults or rape cases?
6    A.   Yes. I had.
7    Q.   Do you remember any of them
8    specifically?
9    A.   We are going a long way back. I am
10   happy to talk about specific articles if you want
11   to.
12   Q.   That would be fine. I don't have any
13   specific. I am just saying if you remember any
14   off the top of your head.
15   A.   No, I am sorry.
16   Q.   That's fine.
17          Do you know about how many you wrote
18   before you moved to BuzzFeed?
19   A.   No, I don't.
20   Q.   Was there any reason for leaving the
21   San Francisco Chronicle?
22   A.   I left because I wanted to move to
23   another state. I had lived in California my
24   entire life. Grew up in southern California.
25   Went to college northern California. Worked at

Page 13

K. Baker

1    K. Baker
2    the best newspaper, in my opinion, in the state.
3    Just wanted to try new things.
4    Q.   Needed something new?
5    A.   Yes.
6    Q.   Was there any reason for leaving The
7    Daily?
8    A.   I got the job offer at Jezebel and
9    like I said, I didn't own an iPad and not very
10   many people did. So it was a weird place to work
11   because it was difficult to read my own writing.
12   And it didn't last very long.
13   Q.   And The Daily was based in New York?
14   A.   Right at the Dow Jones Murdock
15   building which is right there.
16   Q.   And is Jezebel based in New York as
17   well?
18   A.   Yes. It was or is I guess.
19   Q.   Was there any reason for leaving
20   Jezebel?
21   A.   Well, as you can see from my other
22   jobs I always worked at newspapers and magazines
23   and more traditional reporting outlets and Jezebel
24   was a unique opportunity, but I wanted to go back
25   to more traditional reporting.

4 (Pages 10 - 13)

Page 14

K. Baker
1
2      Q.    And then Newsweek, is that based in
3   New York?
4      A.    Yes.
5      Q.    Was there any reason for leaving
6   Newsweek?
7      A.    I got the job offer at BuzzFeed.
8      Q.    Who offered you a job at BuzzFeed?
9      A.    Ben Smith.
10     Q.    And you started there April 1, 2014;
11  is that right?
12     A.    Yes.
13     Q.    What was your titled position at that
14  time?
15     A.    I believe I was just a reporter.  I
16  started out as a reporter and then they created a
17  national desk soon after and I was a reporter on
18  the national desk and then I was senior reporter
19  on the national desk and then I moved to what we
20  call the investigations desk and that's where I
21  currently still work.
22     Q.    When you were first hired on were you
23  associated with any particular desk?
24     A.    There wasn't really -- the desks
25  weren't the same as they are now.  I was just on

Page 15

K. Baker
1
2   the news team.  It was a smaller -- yeah.
3      Q.    Was BuzzFeed always an online
4   publication?
5      A.    Yes.
6      Q.    When did you move to the national
7   desk?
8      A.    I don't recall.
9      Q.    Were you on the national desk when the
10  article concerning the Rondini investigation was
11  written and published?
12     A.    Yes.
13     Q.    I am just going to probably refer to
14  that as the article.
15        Is that okay?
16     A.    Yes.
17     Q.    Were you based in New York when you
18  first started at BuzzFeed through your time at the
19  national desk?
20     A.    Yes, but I traveled almost every other
21  week.  I spent lots of time all over the country
22  because I was on the national desk, so I was
23  reporting on and from many different states.
24     Q.    Do you know when you joined the
25  investigations desk?

Page 16

K. Baker
1
2      A.    Summer, Fall 2017 I believe.
3      Q.    Why did you move from the national
4   desk to the investigations desk?
5      A.    One of the things I really like about
6   BuzzFeed News is there are lots of different
7   opportunities there and one of the reasons I
8   stayed so long is just to get the opportunity to
9   work with different people and have different
10  experiences and so I just wanted to try something
11  different.
12     Q.    Were you living in New York when the
13  article was published?
14     A.    Yes.
15     Q.    Were you living in New York when you
16  were doing the investigation into the article of
17  the underlying story?
18     A.    I was based in New York but I traveled
19  while reporting the story.  I went to Alabama and
20  I went to Texas.
21     Q.    Then when you joined the
22  investigations desk, were you still based in New
23  York?
24     A.    Yes.
25     Q.    Now you are currently in London; is

Page 17

K. Baker
1
2   that right?
3      A.    Yes.
4      Q.    When did you make that move?
5      A.    I moved to London in February 2018.
6      Q.    Any reason for that move?
7      A.    Good question.  Yes.  My husband's job
8   at the New York Times they wanted him to be there
9   and we have an investigation bureau in London and
10  I knew the people who worked at that bureau
11  already so it was a really easy move for me and we
12  thought why not have a, we called it a soft
13  adventure because they speak English and try
14  something new.
15     Q.    Just a different dialect?
16     A.    Yes.
17     Q.    While you were on the national desk,
18  what were your duties and responsibilities?
19     A.    My duties and responsibilities were to
20  write stories that were of interest to our
21  national audience.
22     Q.    And is there some kind of decision
23  making into what goes into what the audience would
24  think would be interesting?
25        MS. BOLGER:  Object to the form of the

5 (Pages 14 - 17)

Page 18

K. Baker

1
2     question.
3          You can answer if you understand it.
4     A.   No, not really.  It is just you -- no.
5     Q.   Is there a difference between the
6  national desk and the investigations desk?
7     A.   So at BuzzFeed News I would say we
8  bring the same standard of care to all of our
9  work.  So there is no difference in that regard.
10 In an investigations desk and the national desk
11 people often work together.  It is very
12 collaborative across teams but on the
13 investigations desk sometimes there is like you
14 take two years to do a project or there is a big
15 team project.  For example, the team last year did
16 something called a Fincen, F-I-N-C-E-N, file where
17 they partnered with over a hundred different other
18 journalistic outlets across the world and spent
19 two years putting a big project together.  That's
20 the type of thing the investigations desk might
21 do.  So if that makes sense.
22    Q.   At BuzzFeed, was there a separate
23 opinions desk?
24         MS. BOLGER:  Object to the form of the
25    question.

Page 19

K. Baker

1
2     A.   No.
3     Q.   Do you remember all the desks that
4  BuzzFeed has?
5     A.   No, I am sorry.
6     Q.   That's okay.
7          When you were first hired on at
8  BuzzFeed on the news team, did you have a
9  supervisor?
10    A.   Yes.
11    Q.   Who was that?
12    A.   Lisa Tozzi, T-O-Z-Z-I.
13    Q.   Do you remember what her title or
14 position was?
15    A.   She was the head of the news team.
16    Q.   While you were at the national desk,
17 did you have a supervisor?
18    A.   Yes.  There were a few different
19 people.
20    Q.   Who are thy?
21    A.   The first one was Adam Serwer and then
22 it was Tina Susman, S-U-S-M-A-N, who you know.
23    Q.   Those were the only two?
24    A.   Yes.
25    Q.   What about supervisor for the

Page 20

K. Baker

1
2  investigations desk?
3     A.   So it was Mark, M-A-R-K, Schoofs,
4  S-C-H-O-O-F-S.  He is our editor-in-chief now and
5  then it was Heidi Blake, H-E-I-D-I B-L-A-K-E and
6  now it's Ariel Kaminer, A-R-I-E-L K-A-M-I-N-E-R.
7     Q.   Do you know about how many
8  investigative reports you have written that have
9  been published during your tenure at BuzzFeed?
10        MS. BOLGER:  Object to the form of the
11    question. I don't quite understand what an
12    investigative report is, but Katie can very
13    well answer the question.
14    A.   I don't understand.
15    Q.   Do you consider that article an
16 investigative report?
17    A.   I think all journalism could be called
18 investigative.  All investigative really means is
19 that you are trying to get answers to your
20 question.
21    Q.   Do you have a particular beat or area
22 of focus at BuzzFeed?
23    A.   Currently?
24    Q.   Sure.  Let's start currently.
25    A.   No.

Page 21

K. Baker

1
2     Q.   What about in the past?
3     A.   It's changed, but I think in general I
4  would say I like to report on institutions.
5     Q.   What do you mean by that?
6     A.   I am interested in how different types
7  of institutions operate and I reported on a
8  variety of different institutions over the course
9  of my career.
10    Q.   Can you give me an example?
11    A.   Yes.  Different institutions could
12 include a high school, a university, a private
13 company, a charity.  That kind of thing.
14    Q.   At any point during your tenure at
15 BuzzFeed, was your wage salary or commission based
16 on views, hits, shares, impressions or clicks of a
17 published article?
18    A.   Absolutely not.
19    Q.   Did you receive a promotion after you
20 wrote and published the article?
21    A.   No.
22    Q.   Have you ever received a promotion at
23 BuzzFeed?
24    A.   Yes.
25    Q.   When did you receive that?

6 (Pages 18 - 21)

Page 22

K. Baker

1
2    A.   When I was -- I went from a senior --
3  I went from a reporter on the national desk to a
4  senior reporter but they didn't even tell me.  I
5  just noticed.
6    Q.   When did that occur?
7    A.   I honestly don't know.
8    Q.   Can you ballpark it?
9    A.   Before -- no.  I would be speculating.
10    Q.   Was it before or after the article was
11  published?
12    A.   Before.
13    Q.   Do you consider clicks, views or
14  impressions when determining whether a particular
15  article is good?
16       MS. BOLGER:  Object to the form of the
17    question.
18       You can answer it if you understand
19    it.
20    A.   No, and something that I really like
21  about working at BuzzFeed is that they really --
22  that's not what they are looking for.  When we are
23  looking for good stories we look for stories that
24  we believe are in the public interest.
25    Q.   Have you ever had a click, view,

Page 23

K. Baker

1
2  impression or shares quota at BuzzFeed?
3    A.   Never.
4       MS. BOLGER:  Objection to form.
5       You can answer.
6    A.   I will wait longer.
7       No.
8    Q.   Has anyone at BuzzFeed said your
9  articles need more clicks, views, impressions or
10  shares?
11       MS. BOLGER:  Objection to form.
12       You can answer.
13    A.   Never and like I said, the thing I
14  really like about BuzzFeed is that the goal is to
15  report on stories in the public interest.
16    Q.   Is there a determination of what
17  factors to consider when seeing what's in the
18  public interest?
19       MS. BOLGER:  Objection to form.
20       You can answer.
21    A.   No.  I think it is just up to the
22  editors and reporters.
23    Q.   We are going to get into a little bit
24  of your education history.
25       Where did you attend high school?

Page 24

K. Baker

1
2    A.   I attended high school in the San
3  Fernando Valley in Southern California.
4    Q.   Was that the name of the school?
5    A.   No.  The school was called Oakwood,
6  O-A-K-W-O-O-D.
7    Q.   When did you graduate?
8    A.   I graduated in 2005.
9    Q.   Do you attend college after that?
10    A.   I did.
11    Q.   Where did you attend?
12    A.   UC Berkeley.
13    Q.   Did you graduate there?
14    A.   Yes.
15    Q.   When did you graduate?
16    A.   2009.
17    Q.   Did you graduate with a degree?
18    A.   Yes.
19    Q.   What degree was that?
20    A.   English literature.
21    Q.   Did you have any specialization?
22    A.   No.  They didn't offer that at
23  Berkeley.
24    Q.   Did you write for the school newspaper
25  while you were there?

Page 25

K. Baker

1
2    A.   Yes.
3    Q.   When did you start writing?
4    A.   My freshman year and I also worked at
5  a variety of local newspapers and other outlets
6  during my time there.
7    Q.   Do you remember what those news
8  outlets were?
9    A.   Yes.  I wrote for the San Francisco
10  Bay Guardian.  I wrote for Wired Magazine.  I
11  wrote for a number of local blogs that sadly no
12  longer exist, but the San Francisco Appeal which
13  was started by a former San Francisco Chronicle
14  editor.  Eastbay Express I think.  Just whatever
15  local papers I could I wanted to write for.
16    Q.   What was the name of the US Berkeley
17  paper that you worked for?
18    A.   The Daily Californian.
19    Q.   Did you hold any other positions with
20  The Daily Californian?
21    A.   No.
22    Q.   Just reporter?
23    A.   I just wrote for them.
24    Q.   Have you had any other education we
25  haven't spoken about?

7 (Pages 22 - 25)

Page 26

K. Baker

2    A.    In terms of what?
3    Q.    Secondary education, grad school or
4  trade school.
5    A.    No.
6    Q.    Did you take any journalism courses at
7  UC Berkeley?
8    A.    When I was there UC Berkeley didn't
9  offer journalism courses to undergraduates.
10   Q.    Did they have a graduate school that
11 offered journalism?
12   A.    They do and I tried to take the
13 classes but they would not let me which I am still
14 kind of upset about because why.  I think that
15 they do let undergraduates take journalism classes
16 now which is good, but sometimes I try to sit in
17 on the seminars.
18   Q.    Did you try to attend the graduate
19 journalism school?
20   A.    No.
21   Q.    You haven't taken any media law
22 courses?
23   A.    I have.
24   Q.    When have you taken those?
25   A.    In 2016 I applied to and was accepted

Page 27

K. Baker

2  to something called Journalist Law School.  It is
3  a week long course at Loyola Law School in Los
4  Angeles and it is a week long course and you cover
5  all aspects of the law as it pertains to
6  journalism and you meet with judges and lawyers.
7  It is really cool.
8    Q.    Did they have specific classes that
9  they taught during that week?
10   A.    Yes, and I took many of them but it
11 was five or six years ago so I don't recall
12 anymore.
13   Q.    Just in general, do you remember what
14 you learned at that course?
15   A.    You can look up the course's online.
16   Q.    But do you remember anything?
17   A.    Just it covered all aspects of the law
18 and journalism.  Lots of different things.
19   Q.    Have you ever taken any other courses
20 that concern media law or journalism in general?
21       MS. BOLGER:  Objection to form.
22       You mean courses in a formal setting?
23       MR. RITCHEY:  Yes, similar to this
24       journalism week long course at Loyola.
25   A.    No, but at every organization I worked

Page 28

K. Baker

2  at they always held seminars on media law and that
3  type of thing and I have also gotten a chance to
4  work with Pulitzer Price winning editors who
5  taught me a lot at every place I worked at.
6    Q.    Do you BuzzFeed hold any of these
7  seminars?
8    A.    Yes.
9    Q.    Do you remember any in particular?
10   A.    I do.  We held courses on no surprises
11 which I don't know if you are familiar with the
12 term no surprises journalism.
13   Q.    No.
14       Would you explain that?
15   A.    Yes.  So we practice no surprises
16 journalism, which is a term which means that when
17 reporting a story it is really crucial that we
18 reach out to everybody who we are reporting on and
19 we give them a chance to know what we plan to
20 report in our story that concerns them and we give
21 them the opportunity to respond to what we plan to
22 report and to tell us their perspectives.
23   Q.    When do you usually reach out to these
24 types of people?
25       MS. BOLGER:  Objection to form.

Page 29

K. Baker

2       You can answer.
3    A.    We reach out when we know what we plan
4  to report in our story.
5    Q.    And is there a certain time in the
6  process of writing a story where you know what the
7  story is about I guess?  I guess do you know when
8  in the process that you know what you are planning
9  on reporting?  Does that make sense?
10       MS. BOLGER:  Object to the form of the
11       question for two reasons.  One is I am not
12       sure it is that clear but two, more
13       importantly if you want to ask about this
14       story that's fine, but to the extent that
15       you are asking the question about other
16       stories, Katie answer them in that general
17       way --
18       MR. RITCHEY:  Yes, just generally.
19       MS. BOLGER:  But if you feel you can
20       answer you can answer it, but just don't
21       give up other information about another
22       story.
23   A.    I don't feel like I can answer this
24 question because every story is different.
25   Q.    What about in the article that we are

Page 30

K. Baker

1   here for today, when did you know what you planned
2   to report?
3       A.   I have turned over all my e-mails to
4   my lawyers and I know they have given them to you.
5   So you can see that when I was ready to start
6   reaching out to the people in the story that's
7   when I knew.
8       Q.   What do you mean reaching out to those
9   people?
10      A.   So you can see that I contacted let's
11  start with Mr. Bunn.  I e-mailed, texted, called
12  repeatedly and when he didn't respond to me I sent
13  him the no surprises letter I was describing where
14  we lay out everything we are planning to report in
15  the story so he would know what we are planning to
16  report and he would have a chance to comment or
17  clarify or share anything he wanted to with us.
18  So I did send that to him.  I didn't get a
19  response.  I reached out to his lawyer and
20  ultimately got a statement from his lawyer and I
21  put it in the story.
22          So that's kind of an example how it
23  goes.  I did that process with everybody we were
24  reporting on in the story.
25

Page 31

K. Baker

1       Q.   At that point did you have the story
2   fully written?
3       A.   No, because the point of a no
4   surprises letter is to get the perspective of the
5   people we are reporting on.  So that's why we say
6   this is what we are planning to report but of
7   course it could really change depending on what
8   they tell us.
9       Q.   Do you remember any other specific
10  seminars that BuzzFeed put on that you attended?
11      A.   I have taken multiple seminars on
12  defamation laws.  How to access public documents,
13  court documents.  So I've worked there for seven
14  and a half years.  It is hard to remember all of
15  them.
16      Q.   Do you remember about when those two
17  were put on?
18      A.   No.
19      Q.   The journalism law school course, was
20  that something you had applied for?
21      A.   Yes.
22      Q.   How does that work?
23      A.   Well, sorry to brag for a second but
24  it was very exclusive.  I had to do an

Page 32

K. Baker

1   application.  I hadn't applied for something like
2   that in a while, so I remember hoping to get in
3   because it sounded like a great opportunity and I
4   did get in based on the applications that I sent.
5       Q.   I may have asked you already but have
6   you taken any other courses where you had to apply
7   to get into?
8       A.   About any courses at all?
9       Q.   Journalism specific.
10      A.   I can't recall.
11      Q.   Have you taken any law enforcement
12  investigation classes or courses?
13      A.   No.
14      Q.   Have you ever investigated a sexual
15  assault or rape?
16          MS. BOLGER:  Objection to the form of
17      the question.  She is not a police officer.
18      She is a journalist.
19      Q.   Not a police officer?
20      A.   No.  I am not a police officer.
21      Q.   Do you know the elements of rape under
22  Alabama law?
23      A.   Yes.
24      Q.   What are they?
25

Page 33

K. Baker

1       A.   Well, it's been some time since I
2   wrote the story, but I know that as I put in my
3   story people must prove that they earnestly
4   resisted their attacker.
5       Q.   And do you know what earnest
6   resistance requires?
7       A.   I do.
8       Q.   What is that?
9       A.   So again, I can't recite the law off
10  the top of my head but I understood it clearly at
11  the time I reported the story and I claimed the
12  law in my story.
13      Q.   Have you ever taken any class or
14  course on criminal law of Alabama?
15          MS. BOLGER:  Object to the form of the
16      question.
17          You can answer.
18      A.   No, but I spoke with multiple experts
19  for my story to make sure I understood the law.
20      Q.   Who did you speak with?
21      A.   I spoke with a lot of different
22  experts for this story.  I spoke with experts from
23  the International Association of Chiefs of Police.
24  I spoke with experts in forensic nursing.  I spoke

Page 34

K. Baker

1       K. Baker
2   with law professors.  And I spoke with other
3   academics who specialize in the law for sexual
4   assault and policing.
5       Q.   Were any of those from Alabama?
6       A.   Yes.
7       Q.   Who?
8       A.   So I spoke with Meg McGlamery
9   (phonetic) and I spoke with a number of other
10  people.  Their names would be in the e-mails.  It
11  is hard to recall exactly how to spell them five
12  years later, but I spoke with a number of other
13  people who worked at state organizations.
14      I spoke with two people from the
15  forensic toxicology lab in Alabama.  I remember
16  their first names not their last names.  Angelo
17  Delamana and Curtis something.  Those are two
18  people I spoke with.  And so those are some
19  examples.
20      Q.   Who is Meg McGlamery?
21      A.   She was an expert in sexual assault
22  forensic examiners I believe but I don't recall
23  exactly.  I would have to go back and check.
24      I also spoke with -- she wasn't from
25  Alabama.  Sorry.

Page 35

K. Baker

1       K. Baker
2       Q.   Do you remember who you spoke with
3   from the IACP?
4       A.   I do.  I remember his first name.  It
5   is in my e-mails.  I also spoke with someone
6   called Tom Trembley, who is a former police chief
7   who is an expert on policing and sexual assault
8   and the laws nationwide.
9       Q.   What do you mean he is an expert in
10  the laws nationwide; what do you mean by that?
11      A.   I mean that he is an expert in rape
12  law and consults nationwide.  I am sure you can
13  look up his bio which would be better explained.
14      Q.   Was he based out of Alabama?
15      A.   No.
16      Q.   Do you know if he had any experience
17  in investigating criminal cases in Alabama?
18      A.   I don't know because that's not what I
19  was asking him about.  I was asking him about rape
20  laws nationwide.
21      Q.   Did he provide you with any
22  information about Alabama rape laws?
23      A.   I can't recall.
24      Q.   Did you consult with any experts
25  concerning Alabama rape laws?

Page 36

K. Baker

1       K. Baker
2       A.   Yes.  I consulted with the experts who
3   I just told you.
4       Q.   But were any of them specifically tell
5   you about the elements of rape laws in Alabama?
6       MS. BOLGER:  Object to the form of the
7   question.  Asked and answered.
8       You can answer it again Katie.
9       A.   Yes.
10      Q.   Which ones told you about the
11  elements?
12      A.   So Meg McGlamery, for example.
13      Q.   And she was a sexual assault examiners
14  expert?
15      MS. BOLGER:  Objection to form.
16  That's not what she testified to.
17      MR. RITCHEY:  I'm sorry.
18      Q.   Tell me --
19      A.   Since this story was five years ago I
20  would feel more confident referring you to look
21  them up and see exactly what their titles were.
22      Q.   That's fine.
23      I am just trying to figure out what
24  did they tell you?
25      A.   I wanted to understand what the

Page 37

K. Baker

1       K. Baker
2   process is for people who are reporting rape in
3   Alabama and understanding the law.
4       Q.   And what did she tell you about that?
5       A.   I can't recall, but I would say the
6   best information I got on this issue came from
7   Captain Hood actually because we had a long back
8   and forth about Alabama rape law and he was really
9   generous with his time and laid out exactly what
10  it means not to meet the criteria of rape in
11  Alabama.
12      Q.   Do you remember what organization Meg
13  McGlamery was with?
14      A.   I can't recall but like I said, my
15  best information came from Captain Gary Hood.
16      Q.   Did you every consult with an attorney
17  that has not been retained by you concerning rape
18  or sexual assault under Alabama law?
19      A.   I did.
20      Q.   Who was that?
21      A.   Early on in my investigation I asked
22  Leroy Maxwell about Alabama rape law.
23      Q.   What did he tell you?
24      A.   I honestly don't recall.  It was very
25  early on in my investigation.  Like I said, I

10 (Pages 34 - 37)

K. Baker

1 asked lots and lots of people but the things
2 that's strongest in my memory because it is in
3 that e-mail exchange is with Captain Gary Hood.
4 Q. Do you remember the first time you
5 reached out to Leroy Maxwell?
6 A. Yes.
7 Q. When was that?
8 A. You have my e-mails, but it was around
9 early January.
10 Q. That would have been 2016?
11 A. Early January 2017. I believe around
12 that time.
13 Q. Who gave you his name?
14 MS. BOLGER: I am going to object to
15 the form of the question.
16 To the extent that it calls for
17 information that was provided to you by a
18 confidential source, you know how to deal
19 with that if it was. If not obviously you
20 can testify about it.
21 For the record, it is not a memory
22 test. You have all these documents and you
23 are welcome to show them to her.
24 MR. RITCHEY: I am not trying to give

K. Baker

1 her a memory test. I am just trying to get
2 a timeline in my head going.
3 MS. BOLGER: The documents would be
4 helpful in that respect.
5 MR. RITCHEY: I understand.
6 A. Because I reported on this story for
7 over six months five years ago, it is just a bit
8 difficult. That's why it is easiest for me to
9 remember the things that happened at the end like
10 the Gary Hood interview and stuff like that. But
11 I am happy to look at the e-mail I first sent to
12 him if that's easier.
13 Q. I am trying to see what you remember.
14 Do you have any strong recollection of
15 what he told you, anything that stood out?
16 A. So I reached out to him early on
17 because I was just doing general research. I
18 didn't really know what I was writing about yet at
19 all and I was interested in learning more about
20 another case and somebody told me he was the
21 lawyer for the other case. So I wasn't talking to
22 him about the article or about Megan Rondini. I
23 was just doing some general research.
24 Q. And did he ever share with you the

K. Baker

1 laws or the elements of rape or sexual assault in
2 Alabama?
3 MS. BOLGER: Object to the form of the
4 question. Asked and answered.
5 You can answer it again.
6 A. Yes. Like I said, I don't recall.
7 What I recall the most strongly is learning really
8 clearly about the elements of rape law from
9 Captain Gary Hood.
10 Q. Did you ever become aware that Leroy
11 Maxwell was representing the Rondini family?
12 A. Shortly before my story I learned
13 that, yes.
14 Q. And when you say shortly before the
15 story?
16 A. Before it published. Sorry.
17 Q. And do you remember how you came to be
18 aware of that?
19 A. I don't.
20 Q. Have we covered any other attorneys
21 that have not been retained by you concerning rape
22 or sexual assault in Alabama?
23 MS. BOLGER: Objection to form.
24 A. I don't remember.

K. Baker

1 Q. To the best of your recollection, have
2 we talked about it at all?
3 MS. BOLGER: Objection to form.
4 A. I just can't recall.
5 Q. Do you consider yourself an
6 investigative reporter?
7 A. Yes, but like I said, I think that all
8 reporting is investigative.
9 Q. Is there a category of reporting or I
10 know in previous depositions they used featured as
11 a category that the article would fit into.
12 Would you agree with that or is there
13 something else you would classify it as?
14 MS. BOLGER: Object to the form of the
15 question.
16 A. I don't know what I would classify it
17 as.
18 Q. Just a story?
19 A. An article.
20 Q. Would an opinion story be different
21 from the article?
22 MS. BOLGER: Objection to form.
23 If you understand it you can answer.
24 A. I don't.

K. Baker

1
2      Do you mean in general or what do you
3  mean?
4      Q.   Yes.  Like an editorial or something
5  where you would, a writer would share his or her
6  opinion.
7          MS. BOLGER:  Object to the form of the
8      question.
9      A.   What's the question?
10     Q.   So would an opinion story or an
11  editorial be something separate or different than
12  what the article would be considered?
13         MS. BOLGER:  Object to the form of the
14     question.
15     A.   Sorry.  It is a general question.  I
16  don't really know how to answer it.
17     Q.   Did you share any opinions in the
18  article?
19     A.   I don't think that my story has my
20  opinion in it.  I think that my story has truthful
21  and accurate facts in it.
22     Q.   If your story had opinions in it,
23  would that be something that would be disclosed to
24  the reader?
25         MS. BOLGER:  Object to the form of the

K. Baker

1
2      question.
3          If you understand it you can answer.
4      A.   I don't understand it.  I am sorry.
5      Q.   So if you had, based on your
6  experience as a writer in journalism, if you had
7  included opinions in a story, would those be
8  disclosed to the reader as such?
9          MS. BOLGER:  Same question.  I
10     generally don't understand it.
11         If you understand it Katie you can
12     answer it, but I object.
13     A.   No, I'm sorry.  I don't understand.
14     Q.   In your writing do you ever include
15  your opinions?
16     A.   In general?
17     Q.   Yes.
18     A.   I have written stories.  I wrote
19  something for the -- in other jobs yes, in the
20  past but at BuzzFeed in general I don't really
21  think my opinions are in the stories.  I think
22  that I report on truthful and accurate facts and
23  then readers can draw their own conclusions from
24  those facts.
25     Q.   Do you generally include bias in your

K. Baker

1
2  stories?
3          MS. BOLGER:  Object to the form of the
4      question.  I literally don't understand how
5      you include bias, but if you do Katie you
6      can answer.
7      A.   What do you mean by bias?
8      Q.   Just your own views of an event.
9      A.   Like I said, I don't think my opinion
10  was in the story.  I think that I reported on
11  truthful and accurate facts.
12     Q.   Do you know what framing is?
13     A.   No.
14         Do you mind if I go to the bathroom?
15  I'll be right back.
16         MS. BOLGER:  Let's take -- it's almost
17     an hour.  If you have a line of questioning
18     I am sure Katie can wait until you finish it
19     off, then we can break.
20         MR. RITCHEY:  Why don't we go ahead
21     and take one.
22         (Recess taken.)
23  BY MR. RITCHEY:
24     Q.   Did you refer the Rondini family to
25  Leroy Maxwell?

K. Baker

1
2      A.   No.
3      Q.   Do you know who did?
4      A.   I don't know.
5      Q.   Did you reach out to Leroy Maxwell
6  first or did he reach out to you first?
7      A.   I reached out to him really early on
8  because I was interested in writing about another
9  case and he was the lawyer in the other case.
10     Q.   Who decided what was written or
11  published in the article?
12         MS. BOLGER:  Object to the form of the
13     question.
14         You can answer if you understand.
15     A.   Sorry.
16         What's the question?
17         MR. RITCHEY:  Do you mind repeating
18     that?
19         (Record read.)
20     A.   In this article or in general?
21     Q.   Right, in this article.
22     A.   I think at BuzzFeed an article is a
23  collaboration between the reporter, fact checker,
24  editors, legal.  So all that goes into the
25  article.

12 (Pages 42 - 45)

Page 46

K. Baker

1
2   Q.   Do you remember who those people were
3   for the article?
4   A.   Yes.  So me and then Tina Carroll.  I
5   am sorry, Marisa Carroll and then Tina Susman and
6   then I will not be able to spell Sharmila's name.
7   She is a fact checker Sharmila and I know I am not
8   allowed to speak about anything related to my
9   lawyer.
10   Q.   Don't worry about that.
11   A.   So I would say it was Marisa, Tina and
12   Sharmila.
13   MS. BOLGER:  For the record, the names
14   of the lawyers are Nabiha Fyed and Matthew
15   Schafer so you understand who they are from
16   the document.
17   Q.   Can we just go through the process
18   from start to end on how a story would be
19   investigated, written, all the way through
20   publication?
21   MS. BOLGER:  I will object to the form
22   of the question.
23   You can answer a general question if
24   you feel you can but do not talk about any
25   article other than this one in specifics.

Page 47

K. Baker

1
2   A.   Every story is really different.  I am
3   happy to get into specifics about this article but
4   it would be really hard for me to speak generally.
5   Q.   Let's do this article then and go
6   through the whole process from start to end.
7   A.   It was a six-month process.  If you
8   could ask me specific questions that would be much
9   easier.
10   Q.   How did you first hear about the
11   article?  I am sorry.
12   How did you first hear about Megan
13   Rondini?
14   A.   I first heard about Megan Rondini from
15   a confidential source.  Someone I promised
16   confidentiality to.
17   Q.   And what did they tell you about Megan
18   Rondini?
19   A.   As a journalist who is interested in
20   institutions, I love reporting on public documents
21   because I think that's the best way to tell a
22   story.  What they told me about Megan Rondini was
23   that she had reported what she believed to be rape
24   to multiple institutions, to the police
25   department, to the hospital and to the mental

Page 48

K. Baker

1
2   health counselor, the therapist at the university
3   and this person told me that there is a
4   possibility that I could get documentation that
5   explained exactly what happened at all those
6   institutions and as someone who is interested in
7   institutions I thought it would be interesting to
8   try and obtain all those documents and report on
9   what happened next.
10   Q.   I don't want to get into the
11   confidential source, so if this reveals too much
12   information let me know, but is this person
13   someone close to the Rondini family?
14   A.   I really just can't say anything about
15   them.
16   Q.   After you heard about Megan Rondini's
17   story from the confidential source, what did you
18   do after that?
19   A.   I spoke with Mike Rondini on the
20   phone.
21   Q.   Do you remember about when that
22   happened?
23   A.   December 2016 I believe, but that
24   would be in the documentation you have.
25   Q.   Do you remember anything specific that

Page 49

K. Baker

1
2   he said during that telephone conversation?
3   A.   I don't at this point.  It was so long
4   ago.
5   Q.   Do you remember what the general
6   conversation was about?
7   A.   It was about Megan Rondini and what
8   happened to her after she reported what she
9   believed to be rape to the police, the hospital
10   and the therapist.
11   Q.   And after you spoke with him in
12   potentially 2016, what did you do after that?
13   A.   After that I started just doing some
14   really general research.  When I start a story I
15   just kind of look into as much stuff as I can.  I
16   tell people to send me whatever they want and I
17   started just figuring out what I wanted to do
18   next.
19   Q.   Do you remember what that research was
20   or where it went?
21   A.   You have everything that I had.
22   Q.   And after this general research, what
23   did you do?
24   A.   I went to meet with Mike and Cindy
25   Rondini in person.

13 (Pages 46 - 49)

Page 50

1                K. Baker
2       Q.   Do you remember about when that was?
3       A.   It was in January 2017 I believe.
4       Q.   Did you go to Austin for that?
5       A.   They live -- I flew into Austin and
6   they live about an hour outside of Austin, to my
7   recollection.
8       Q.   How long were you there with the
9   Rondinis?
10      A.   I remember meeting with them one time.
11  I was reporting on another story in Texas.  So I
12  was in Texas longer, but I wasn't just there to
13  meet with the Rondinis, is my recollection.
14      Q.   What do you remember about the
15  conversations with the Rondinis at that time?
16          MS. BOLGER:  Object to the form of the
17      question.  If there was more than one
18      conversation.
19          MR. RITCHEY:  I am sorry.
20      A.   We had one conversation.  I remember
21  going to their home and speaking with them for
22  about an hour and I remember I was really eager to
23  know what documentation they had that they could
24  give me because they weren't there at the time of
25  when Megan reported what she believed to be rape

Page 51

1                K. Baker
2   and I wanted the documents and that was my goal.
3   So I was there to kind of assess how many
4   documents they could give me.
5       Q.   What documents could they give you or
6   what documents did they give you?
7       A.   So you have everything that I
8   received.  As I am sure you know, I received the
9   bulk of the documents that I got five months after
10  that.  So those documents were most crucial to my
11  story and they are the ones that are clearest to
12  my mind.  So it is hard to remember what I got
13  before those documents.
14      Q.   Explain that to me.  I got lost.
15      A.   So I had a few documents at the
16  beginning but I would be guessing if I told you
17  exactly what they were because in or around May or
18  June, so almost half a year later I got -- Mike
19  Rondini subpoenaed the police and got a lot of
20  documents from the police that he gave to me and
21  so those are the documents that are freshest in my
22  mind but I can't remember exactly what else I got
23  when before then.
24          Does that make sense?
25      Q.   I think I got it now.

Page 52

1                K. Baker
2          Just so for my clarity and correct me
3   if I am wrong, when you went to go meet with the
4   Rondinis, and that would have been in January of
5   2017, they had a few documents; correct?
6       A.   They had -- I would be guessing.
7          MS. BOLGER:  It is not a memory test.
8      You have these documents.
9       A.   But you know what they were.
10          MS. BOLGER:  You can show her the
11      documents.  It is not a memory test.
12          MR. RITCHEY:  I am just trying to find
13      out when we got what we got.
14      A.   It should be in the e-mail that you
15  have.
16      Q.   He shared the documents with you via
17  e-mail?
18      A.   You would have everything that I had.
19  I can't remember off the top of my head.  It was
20  January 2017.
21      Q.   But everything that has been produced
22  to us you had before the article was published; is
23  that right?
24      A.   What do you mean everything?
25          MS. BOLGER:  For the record, the

Page 53

1                K. Baker
2      document requests say we drew a hard line on
3      the discovery dates for these articles.  So
4      you have nothing -- everything in the
5      production was obtained by BuzzFeed before
6      the publication of the article period.
7       A.   The articles.
8       Q.   After you met with the Rondinis, what
9   did you do next?
10      A.   After I met with the Rondinis, I
11  planned a trip to Tuscaloosa.
12      Q.   Do you remember about when that was?
13      A.   It was shortly after, but the dates
14  would be in my e-mails.
15      Q.   How long did you stay in Tuscaloosa?
16      A.   I spent time both in Tuscaloosa and in
17  Birmingham and in some other areas of the state.
18      Q.   Was that all in connection to the
19  Rondini story?
20      A.   Yes, and I believe I was there for
21  around a week but the exact dates would be in my
22  e-mails.
23      Q.   Where did you go in Alabama I guess
24  since you went to other places than just
25  Tuscaloosa?

14 (Pages 50 - 53)

K. Baker
1
2      A.    To a confidential source, so I can't
3  say.
4      Q.    Did that confidential source tell you
5  anything?
6      A.    I can't say because it is
7  confidential.
8      Q.    Did they give you anything about the
9  Rondini investigation?
10      A.    I can't comment on what the
11  confidential source told me.  I am sorry.
12      Q.    Just, I am not trying to get --
13          MS. BOLGER:  Can we just take a break
14      and let me talk to her?
15          MR. RITCHEY:  Yes.
16          (Recess taken.)
17          MS. BOLGER:  The confidential source
18      that Katie is referring to did not provide
19      her information that's contained in the
20      story.
21  BY MR. RITCHEY:
22      Q.    Did a confidential source provide any
23  information about the Rondini investigation?
24      A.    No.
25      Q.    Totally separate person or

K. Baker
1
2  information, nothing to do with the articles?
3          MS. BOLGER:  There is no information
4      from the source in the story is all she is
5      going to tell you about the confidential
6      source.
7          MR. RITCHEY:  Okay.
8  BY MR. RITCHEY:
9      Q.    But did they say anything about the
10  investigation of Rondini?
11          MS. BOLGER:  No.  The information
12      obtained from this source is not in the
13      story.
14          MR. RITCHEY:  I get that.
15      Q.    What I am asking though is did the
16  source say anything about the Rondini
17  investigation that the police undertook?
18      A.    No.
19      Q.    So had nothing to do with the Rondini
20  investigation that our officers --
21          MS. BOLGER:  She is done with the
22      answer.  You know it is not in the story and
23      you know it wasn't about the Rondini
24      investigation and anything else is going to
25      be --

K. Baker
1
2          MR. RITCHEY:  I am just trying to make
3      it clear.  I'm just so confused.
4          MR. COCKRELL:  Let's make it clear.
5      It is not part of the story?
6          MS. BOLGER:  It is not part of the
7      story.
8          MR. COCKRELL:  Not part of the
9      investigation.
10          MS. BOLGER:  Not part of the
11      investigation.
12          MR. RITCHEY:  I got it now.
13  BY MR. RITCHEY:
14      Q.    So after you met with this
15  confidential source, what did you do in Tuscaloosa
16  or Birmingham, where did you go next?
17      A.    I met with a variety of people across
18  the two places.  I interviewed about a half dozen
19  of Megan's friends.  I spoke with a woman Amy, I
20  don't know how to spell her last name, Gunlach
21  Foster and she was the head of Turning Point
22  Crisis Center in Tuscaloosa and she no longer
23  works -- she left her job before my story
24  published, but at the time that was her job so I
25  interviewed her about her job and about the

K. Baker
1
2  hospital and just to get some general information
3  and you have the notes of that.  And I met with
4  Leroy Maxwell because he was representing this
5  other woman and I was interested in possibly
6  meeting this other woman and learning more about
7  her case, but he wouldn't connect me with her and
8  he didn't give me any information so that didn't
9  go very far.
10          And I think that pretty much sums it
11  up.
12      Q.    What did Megan's friends tell you?
13          MS. BOLGER:  Object to the form of the
14      question.
15          Go ahead if you can answer.
16      A.    So my story was about the
17  investigation into what Megan reported what she
18  believed to be rape and how different institutions
19  handled those claims and so at the time I was
20  still waiting on documents so I just was trying to
21  get more general information.  I just let them
22  talk to me about whatever they wanted to talk
23  about.  There are lots of different things that
24  they said.
25      Q.    Do you remember anything specific that

15 (Pages 54 - 57)

Page 58

K. Baker

1          K. Baker
2  they said?
3      A.    It's hard for me to generalize.  They
4  just told me about her feelings about the
5  investigation.  Her feelings about leaving
6  Alabama.  That kind of thing.
7      Q.    What were her feelings about the
8  investigation?
9      A.    I think they are accurately
10  represented in my story.
11      Q.    What were her feelings about leaving
12  Alabama?
13      A.    I also think those are accurately
14  represented in my story.
15      Q.    Did Amy Gunlach Foster ever talk to
16  you about Josh Hastings?
17      A.    Not that I recall.  I don't include
18  her in my story because she left her job and I
19  couldn't get in touch with her.
20      Q.    Did you ever become aware that Josh
21  Hastings was on the board of Turning Point?
22      A.    No, I didn't know that.
23      Q.    After you met with these people we
24  just discussed, what did you do next?
25      A.    Next I tried to put together all the

Page 59

K. Baker

1          K. Baker
2  information I had so far to see what else I needed
3  to do to report my story.
4      Q.    So you left Tuscaloosa and Alabama
5  after that?
6      A.    After I was done with the reporting
7  trip, yes.
8      Q.    Did you ever visit any of the places
9  mentioned in the article?
10      A.    Yes.  I went to Innisfree and I went
11  to -- I just kind of generally tried to get a feel
12  for the area.
13      Q.    Did you travel around a little bit?
14      A.    Yes.
15      Q.    What did you do at Innisfree?
16      A.    I interviewed two of Megan's friends
17  that were with her around the time that she filed
18  her report.
19      Q.    Do you remember anything specific
20  about that interview?
21      A.    I think the most accurate information
22  is the information I included in my story.  That's
23  what I remember the clearest.
24      Q.    So you leave Alabama and you come back
25  to New York after that?

Page 60

K. Baker

1          K. Baker
2      A.    To my home, yes.
3      Q.    And then after that, what comes next
4  in the process?
5      A.    So then I just sat down and tried to
6  understand what I had known so far and what I had
7  been told.  At this point I was still trying to
8  get a lot of information.  I didn't have much of
9  anything that would ultimately be in my story, so
10  I just kind of tried to figure out what I had,
11  what I needed, what my next steps were.
12      Q.    What came after that?
13      A.    After that well, you can see from my
14  e-mails but I spent a lot of time interviewing
15  experts about best practices to understand whether
16  the institutions that Megan reported to what they
17  did.  How the processes worked.  I spent a lot of
18  time doing that.  I spent a lot of time chasing
19  done data from Captain Hood and I spent a lot of
20  time trying to obtain more documentation because I
21  felt that I couldn't report my story and fully
22  understand what happened until I had more
23  documentation from the police and from the
24  hospital and from the DA and from the therapist.
25          So I really just -- this is a lot of

Page 61

K. Baker

1          K. Baker
2  -- maybe it's similar to being a lawyer, but it is
3  funny months went by, what was I doing.  I was
4  just trying to get all this information.
5      Q.    I think you mentioned you were trying
6  to get data from Hood?
7      A.    Yes.
8      Q.    What was the purpose of that?
9      A.    I wanted to make sure I had accurate
10  statistics in my article.
11      Q.    Was there a reason you put statistics
12  in the article?
13      A.    I think statistics are really
14  interesting to readers.  They are publicly
15  available documentation and I just think they are
16  in the public interest.
17      Q.    So you are getting all the documents
18  and everything.
19          What comes next?
20      A.    Well, I wrote a few different drafts
21  just to see where I was in my story and in my
22  thinking.
23          THE WITNESS:  Can I ask you a question
24  about the confidential source?
25          MS. BOLGER:  Just finish this answer.

16 (Pages 58 - 61)

K. Baker

1  K. Baker
2      A.   I spent a lot of time tracking -- I am
3  trying to think about how to say this without
4  breaking confidentiality which I won't, don't
5  worry.  I just spent a lot of time working on the
6  story chasing down leads.  As a journalist people
7  tell you things and then you try and find public
8  documents the corroboration, the data for it.  I
9  was doing that but I can't get into all the
10  details.
11      Q.   Did you write your first draft of this
12  article before receiving those subpoenaed
13  documents that Mike Rondini obtained?
14      A.   So the way the drafts work is they are
15  not for publication at all.  They are just kind of
16  like a memo to yourself so you can kind of
17  understand where you ae in the story because
18  otherwise you just have all this stuff floating
19  around and you don't know how it is organized and
20  you can't tell what you have to do next.  So I
21  wrote drafts but they were just based on the
22  information I had.  They weren't for publication.
23      Q.   But you did have some drafts before
24  you received the subpoenas, subpoenaed information
25  from Mike Rondini?

1  K. Baker
2      A.    Yes, but they were very different from
3  the story I published and they were not meant for
4  publication.
5      Q.   Did you ever have to run the article
6  by anyone higher up than you in BuzzFeed?
7          MS. BOLGER:  Object to the form of the
8      question.  I don't quite understand what you
9      mean by higher up.
10          You can answer it Katie if you
11      understand it.
12      A.   I don't understand what you mean.
13      Q.   Did any supervisor or anyone in
14  management have to approve the article?
15      A.   I don't know what you mean by approve.
16      Q.   For publication.
17          Did they have to say yes, we are going
18  to publish this or no, we are not going to publish
19  this?
20      A.    The way publication works is you have
21  an editor and a fact checker and we legally vet
22  our articles.  So my editors read the story and
23  edited it and the fact checker fact checked it and
24  I can't speak about the legal setting.
25      Q.   Who would have the final decision to

1  K. Baker
2  say the article was going to be published?
3      A.   I think those decisions happen above
4  my head.  I usually file the story.  We do the
5  editing, fact checking, legal process and then it
6  publishes.  So I don't know what other decisions
7  are made.
8      Q.   At BuzzFeed have you ever had a story
9  that you have written that hasn't been published
10  just in general?
11          MS. BOLGER:  Object to the form of the
12      question.
13          You can answer.
14      A.   Not that I recall.  I have never had a
15  story, we call it killed if that's what you mean.
16  I never wanted to publish a story and had someone
17  say I couldn't publish it, no.
18      Q.   You say in some of the documents the
19  use of a content management system or CMS.
20          Do you know what that is?
21      A.   Yes.
22      Q.   What is that?
23      A.   The CMS is the way that you -- I am
24  not very technical.  That's how I -- I write my
25  draft in a Google doc and then at some point my

1  K. Baker
2  editor would put it into the CMS and then the
3  final changes are made in the CMS, but that's not
4  something that I do.
5      Q.   Who makes the changes in the CMS?
6      A.   The editors, copy editors, art design.
7  That type of thing.
8      Q.   When the article gets put into the
9  CMS, is it basically done other than some
10  grammatical changes?
11      A.   No.
12      Q.   Does the content of the story change
13  in the CMS when it gets put into the CMS?
14          MS. BOLGER:  Objection to form.
15          You can answer.
16      A.   Are you talking about this article?
17      Q.   This article.
18      A.   I don't recall.  It is very common to
19  put a draft in CMS and not publish it for months.
20  Sometimes it does get put in right away.  It
21  really varies.  I don't remember what happened in
22  this case.  It doesn't matter.
23      Q.   Why not?
24      A.   Why would it?
25      Q.   I don't know.  I don't know the

17 (Pages 62 - 65)

Page 66

K. Baker

1
2  process.
3      A.    Sorry.  I just mean I guess I don't
4  really know because I don't make those decisions,
5  but it's just -- I don't really know.
6      Q.    When this article got put into the CMS
7  you made no changes after that, you personally?
8          MS. BOLGER:  Object to the form of the
9      question.
10     A.    I don't remember.
11         MS. BOLGER:  I will just repeat for
12     the record that you have all drafts and
13     everything from the CMS.
14     A.    Putting something in the CMS doesn't
15  mean something special.  It is just another way to
16  look at what the story might look like one day.
17     Q.    I am just wondering because it sounds
18  like when it got put into the CMS you don't really
19  touch it anymore.
20         It is editors and copy editors that
21  touch and change it; is that right or am I wrong
22  in that?
23     A.    It is the editors who put it into the
24  CMS and make the changes, but I can go into the
25  CMS if I want to.

Page 67

K. Baker

1
2      Q.    Do you regularly do that for your
3  articles?
4      A.    Not really.  Sometimes I like to see
5  what it looks like in CMS because it has -- like
6  to see a photo or something, but I don't spend
7  much time in there.
8      Q.    So it shows like a final version of it
9  in CMS, what it would look like on the BuzzFeed
10  page?
11     A.    Sometimes.  It is a little wonky.  I
12  really can't speak to the CMS that well.  That's
13  not my side of the production.
14     Q.    Is there ever a time when your
15  investigation into the story in the article
16  stopped?
17     A.    Do you mean before publication or
18  after publication?
19     Q.    Just general.  I am not sure when that
20  would happen.
21         MS. BOLGER:  I am sorry.
22         Could you ask the question again?
23     Q.    Is there a time where you would stop
24  gathering information for the article in this
25  circumstance?

Page 68

K. Baker

1
2          MS. BOLGER:  Objection to form.
3          You can answer if you understand.
4      A.    I don't really understand the
5  question.  Once we compiled I did some reporting.
6  I reached out to everybody in the story for
7  comment.  Then I incorporated their comments and
8  anything I needed to change into the story and
9  then we published the story.
10     Q.    So you gathered facts all the way up
11  to publish?
12     A.    Yes.
13     Q.    What was the purpose of publishing the
14  article?
15         MS. BOLGER:  Object to the form of the
16     question.  I don't understand it.
17         You can answer if you do.
18     A.    I don't understand what you mean the
19  purpose.
20     Q.    Was there a reason you decided to look
21  into the story that was published in the article?
22         MS. BOLGER:  Objection to form.
23     A.    I thought it was in the public
24  interest.  My story was about a woman who believed
25  that she was raped and what happened when she did

Page 69

K. Baker

1
2  what people who -- when people are raped they are
3  generally called to do two things, go to the
4  hospital and go to the police and that's exactly
5  what Megan did and my story was about the
6  different institutions she reported that to and
7  what happened next.
8      Q.    Do you often write stories that
9  concern sexual assault or rapes?
10     A.    What do you mean by often?
11     Q.    Regularly.
12     A.    I have written about them in the past.
13     Q.    Would you consider that part of your
14  focus?
15     A.    I see my focus as institutional
16  injustice.
17     Q.    What does that mean?
18     A.    Just how institutions handle
19  complaints of misconduct, but not just sexual
20  misconduct.
21     Q.    What other misconduct would that --
22     A.    I reported stories on mental health
23  issues on college campuses.  I just did a real big
24  project on the charity, the World Wildlife Fund,
25  the WWF and there were reports that they were

K. Baker

1  
2  funding paramilitary groups in Africa and Asia
3  that were torturing and killing indigenous people
4  and so there are the local villagers in places
5  like Cameroon and Nepal were making complaints
6  that they were being beaten up and tortured and
7  stuff like that and those complaints were going
8  ignored.
9       So that's an example of an
10  institution, the charity and complaints from the
11  villagers.
12     Q.   Going back to when you were in
13  Tuscaloosa and Alabama, did you have to ask
14  permission from anyone to visit Tuscaloosa or
15  Alabama?
16       MS. BOLGER:  Objection to form.
17     A.   At my job?
18     Q.   Yes, at BuzzFeed.
19     A.   I wouldn't call it asking permission.
20  I told them I wanted to go.
21     Q.   Who did you tell?
22     A.   My editors.
23     Q.   That would have been Marisa and Tina?
24     A.   Correct.
25     Q.   Did anyone accompany you to Alabama?

K. Baker

1  
2     A.   No.
3     Q.   Did you ever speak with any of Miss
4  Rondini's family other than that initial contact
5  we discussed earlier?
6     A.   I just spoke with her parents.  I
7  don't recall speaking to anybody else in her
8  family.
9     Q.   Do you know how many times you spoke
10  with her parents?
11     A.   I don't know.
12     Q.   Would this have been over the phone or
13  e-mail?
14     A.   You have the e-mails between me and
15  Mike Rondini.  So you would know the number.
16     Q.   Do you remember any phone calls?
17     A.   I can't recall it was so long ago.
18     Q.   Did they ever share with you what they
19  thought happened in the investigation?
20       MS. BOLGER:  Objection to form.  It's
21  a very vague question.
22       Katie, but you can answer if you want.
23     A.   They shared with me their feelings
24  about what happened when Megan reported what she
25  believed was rape, yes.

K. Baker

1  
2     Q.   What was that?
3     A.   I think it is accurately reflected in
4  the article.
5     Q.   I don't know.
6     A.   Mike Rondini is quoted in the article.
7     Q.   As what you are saying he told you?
8     A.   I think that's an accurate
9  representation.
10     Q.   Is there anything that wasn't
11  mentioned in the article that he told you?
12     A.   I am happy to answer specific
13  questions, but four and a half years later it is
14  hard to answer so generally.
15     Q.   Did you ever speak with Valentina
16  Restrepo?
17     A.   Yes.  I e-mailed with her.
18     Q.   Who is that?
19     A.   So Valentina is a college friend of my
20  sister-in-law's and I met her once at a barbecue
21  2013.
22     Q.   Does she live in Alabama?
23     A.   She was a public defender in
24  Birmingham at the time.
25     Q.   Did you ever share any information with you

K. Baker

1  
2  about the Rondini investigation?
3     A.   You have my e-mails with her.  So you
4  can see what she said to me.  It was just via
5  e-mail.
6     Q.   Did you ever meet her in person or
7  talk to her over the phone?
8     A.   I don't believe so.
9     Q.   Did anyone else help assist you in
10  gathering information or facts for the article?
11     A.   What do you mean?
12     Q.   Like was anyone else gathering facts
13  for the article other than you?
14       MS. BOLGER:  Do you mean at BuzzFeed?
15       MR. RITCHEY:  At BuzzFeed.  I am
16  sorry.
17     A.   Yes, Alex Campbell.
18     Q.   Did you ask him for help on the
19  article?
20     A.   We were considering working on the
21  story together, but he ended up moving to London
22  and so he couldn't work on the story any longer.
23     Q.   Had y'all worked on stories before?
24     A.   Yes.
25     Q.   Do you know about how many?

K. Baker

1
2    A.    Just a few stories, but just one main
3  story and some followup stories based on that one.
4    Q.    Is that the Baltimore one?
5    A.    Yes.  I think that was it.  There may
6  have been more that I don't remember, but I think
7  that was it.
8    Q.    Did you ever speak to Adam Jones and
9  Josh Hastings prior to the publication of the
10  article?
11    A.    I tried really hard.  I sent them mail
12  like snail mail, no surprises questions.  I called
13  the police department.  I tried really hard to
14  speak with them directly but I was told that the
15  best person to speak with was Captain Hood and he
16  would speak for everybody.
17    Q.    Was all the information and facts that
18  you gathered included in the article?
19    A.    Sorry.
20        Like all of the information and facts?
21    Q.    Yes.
22    A.    No.  That's not how journalism works.
23    Q.    Explain to me what that is.
24    A.    In the course of an investigation like
25  this one where you work for six months, you gather

K. Baker

1
2  all sorts of information, documentation.  At the
3  end you have to determine what is relevant and
4  pertinent so that readers can understand what
5  happened and what you are reporting on but if you
6  include everything it would be a million words.
7    Q.    What was relevant and pertinent in the
8  article?
9    A.    The facts that I included.
10    Q.    And those are the only ones?
11    A.    We included what we believed were the
12  most accurate and relevant facts related to what
13  the story was about which was a story about what
14  happened to Megan Rondini when she reported what
15  she believed was a sexual assault and what
16  happened when she reported that to different
17  institutions including the police, the hospital
18  and a mental health counselor at the university
19  and what happened after that.
20    Q.    If I refer to the felony packet, do
21  you understand what I am talking about?
22    A.    Yes.
23    Q.    Is that part of the subpoena documents
24  that Mike Rondini gave you?
25    A.    Yes.

K. Baker

1
2    Q.    And then when I refer to the audio
3  interviews, do you know what I am talking about
4  there?
5        MS. BOLGER:  I am going to object to
6    that actually.  There were so many audio
7    interviews.  She won't answer questions
8    about (inaudible).
9    Q.    The TJ Bunn audio interview on July 2,
10  2015?
11        MS. BOLGER:  If that's what you are
12    going to ask, these specific questions, you
13    either got to show her or (inaudible) but
14    she is not just going to answer questions
15    generally about specific documents.
16    Q.    Based on the source material that you
17  gathered, what do you think happened the night of
18  July 1, 2015 and into the morning of July 2, 2015
19  in regards to interactions between Miss Rondini
20  and TJ Bunn?
21        MS. BOLGER:  Object to the form.
22        You can answer.
23    A.    My story wasn't about what happened
24  between the two of them.  My story was about what
25  happened when Megan Rondini reported what she

K. Baker

1
2  believed to be a rape to different institutions
3  including the police department, the hospital and
4  the mental health counselor at the university and
5  what happened after that.
6    Q.    But what do you believe happened
7  during that time period I just said?
8        MS. BOLGER:  Objection.  Has no
9    bearing on the story, but go ahead.
10    A.    Again, that wasn't what my story was
11  about.  My story was about what happened when
12  Megan reported what she believed to be a rape and
13  what happened as a result of that report.
14    Q.    I get that.  I know what the story is
15  about.  I want to know your personal thoughts
16  about it.
17    A.    I don't think my opinion is in the
18  story and especially because my story wasn't about
19  that.  My story was about the investigation.
20    Q.    I am still trying to get an answer to
21  my question.
22        MS. BOLGER:  I am going to object.
23        You can answer Katie.
24    A.    I don't think I will ever know what
25  happened between them.  That wasn't the focus of

Page 78

K. Baker

1   my investigation.  I wasn't trying to determine
2   what happened between them.  I was looking at what
3   happened when she reported what she believed to be
4   a rape.
5       Q.   When the article was published did you
6   think investigators Jones and Hastings built a
7   case against Miss Rondini?
8          MS. BOLGER:  Object to the form of the
9       question, but you can answer.
10      A.   I am sorry.  I don't really understand
11  what you mean.
12      Q.   Just asking do you think they were
13  trying to build a case against Miss Rondini to
14  frame her as a suspect?
15      A.   I didn't report that in my story.
16         Do you want to talk about what is in
17  my story?
18      Q.   No.  I want to know what you thought
19  about at the time of the publication.
20      A.   I reported in my story truthful and
21  accurate facts of what took place and we can talk
22  about what's in the story.  I think that would be
23  easier.
24      Q.   I want to know what your subjective

Page 79

K. Baker

1   opinion was at the time of publication?
2       A.   I don't think my opinion is in the
3   story.  I think I reported on facts.
4       Q.   But I want to know.
5       A.   You wanted my opinion of what?
6          MS. BOLGER:  What's the question?
7       Q.   I want to know at the time that the
8   article was published, do you think that
9   Investigator Jones and Hastings built a case
10  against Miss Rondini?
11         MS. BOLGER:  Outside the story, is
12      that the question?
13         MR. RITCHEY:  Yes.
14      Q.   I am trying to get into your specific
15  thoughts.
16      A.   A case for what?
17      Q.   A case against, criminal case against
18  her.
19      A.   For what?
20      Q.   For the gun incident, alleged taking
21  money.  All those things that were mentioned in
22  the story.
23      A.   Well, I had the felony packet and I
24  talked to Captain Hood about that and Captain Hood

Page 80

K. Baker

1   actually told me that the case against Megan
2   didn't go to a Grand Jury, but that was
3   inaccurate.  I learned they did and they true
4   billed her after her death.
5       Q.   Still trying to get into --
6       A.   Do I -- sorry.
7       Q.   Still trying to get an answer into
8   your thoughts at the time of the publication.
9          Did you think Investigator Jones and
10  Investigator Hastings built a criminal case
11  against Miss Rondini?
12      A.   I thought they read her her Miranda
13  rights and I thought that they put together a
14  report alleging that she committed those crimes
15  because I read it in the felony packet and I saw
16  it in an interview.
17      Q.   But you don't believe they built a
18  case against Miss Rondini?
19      A.   Can I talk about what I reported on
20  the story?
21         MS. BOLGER:  Objection.  She's asked
22      for a document.  Show her her story.
23      Q.   I can read what's in the story.  I
24  want to know what was in your head.

Page 81

K. Baker

1          MS. BOLGER:  The witness has asked to
2   see a document and there is no reason to not
3   show her the document she's asked you for.
4          MR. RITCHEY:  Mark this as Plaintiffs'
5   Exhibit 122.
6          (Plaintiffs' Exhibit 122, a printed
7       out article, marked for identification, as
8       of this date.)
9       Q.   Katie, we are going to show you what
10  has been marked as Plaintiffs' Exhibit 122.
11         Can we just identify it for the
12  record?
13      A.   It is a printed out article.  My
14  article that I wrote.
15         Do you want to ask me your question
16  again or read it back to me?
17      Q.   Yes.  The time the article was
18  published, did you personally believe that
19  Investigator Jones and Investigator Hastings built
20  a criminal case against Miss Rondini?
21      A.   I believed, as I reported, they
22  started building a case against her because I saw
23  they read her her Miranda rights and I read in the
24  felony packet that they included the case where TJ

21 (Pages 78 - 81)

Page 82

K. Baker

1
2  Bunn is the victim and Megan is the suspect and
3  detailed the allegations and they also questioned
4  her about the allegations in the interview and
5  like I said, there was a lot of documentation that
6  that case was brought to a Grand Jury. I, of
7  course, ran that by Captain Hood and he told me it
8  wasn't, but I later found out that that was
9  inaccurate information he gave me and it did go to
10  a Grand Jury.
11     Q.   You said they true billed her?
12     A.   Yes.
13     Q.   Where did you learn that information
14  from?
15     A.   I learned that --
16        MS. BOLGER:  From documents produced
17     in this litigation.
18     Q.   At the time the article was published,
19  did you think it was Investigator Jones and
20  Hasting's job to investigate the alleged crimes
21  that Miss Rondini committed?
22     A.   I am sorry.
23        Do you mind reading that question back
24  to me or telling it again?
25        (Record read.)

Page 83

K. Baker

1
2     A.   Yes. Captain Hood told me it was
3  their job and I saw them doing the job. So I mean
4  I don't think my opinions are in the story. I
5  think I was reporting on facts and factually that
6  was the job that they were doing.
7     Q.   Do you believe that Investigator Jones
8  or Investigator Hastings did anything wrong when
9  they investigated the alleged crimes committed by
10  Miss Rondini?
11        MS. BOLGER:  Object to the form of the
12     question. What does wrong mean?
13        You can answer if you know what it
14     means.
15     A.   Well like I said, I don't think my
16  opinions are in the story. I think there are
17  facts in the story. There are a number of things
18  that I think the police could have done
19  differently. For example, Bunn lied to them when
20  they originally went to interview him. Megan had
21  never been there. He tampered at the crime scene
22  but they let him go on a four-day fishing trip
23  with his lawyer and they didn't arrest him or take
24  his phone or take him in for questioning until
25  after that. They didn't follow up Megan said that

Page 84

K. Baker

1
2  Bunn had held her down by the hips and that she
3  said verbally informed him that she didn't want to
4  have sex with him. They didn't follow up on that.
5        They didn't interview her friends even
6  though she gave them their contact information.
7        They didn't obtain her blood and urine
8  sample despite best practices.
9        They offered her a refusal to
10  prosecute form within half a day after she
11  reported her rape despite best practices.
12        There are a number of things the
13  police could have done differently, but I don't
14  think my opinion is in the story. I think there's
15  facts in my story.
16     Q.   What's the basis that Bunn tampered
17  with the crime scene?
18     A.   According to the reports he closed a
19  window and they let him -- he lied and said Megan
20  hadn't been there that night and then he closed a
21  window and that is tampering with the crime scene.
22     Q.   Other than the windows any other
23  basis?
24        MS. BOLGER:  Objection to form.
25     A.   I think that is the basis.

Page 85

K. Baker

1
2     Q.   The time the article was published did
3  you believe that Investigator Jones or Hastings
4  had enough evidence to arrest or detain Bunn?
5        MS. BOLGER:  Object to the form of the
6     question. She is not a cop.
7        You can answer the question.
8     A.   I would have said the same thing. I
9  am not a police officer.
10     Q.   So you wouldn't know either way?
11     A.   No, I wouldn't know. I believe that
12  lying to a police officer is a crime but I am not
13  a police officer.
14     Q.   The time the article was published did
15  you believe Investigator Jones or Hastings
16  threatened charges against Miss Rondini?
17        MS. BOLGER:  Object to the form of the
18     question.
19     A.   Again, my opinion is not in the story.
20  My story just includes truthful facts.
21     Q.   I got that part. I am still asking
22  for your personal thoughts on this, not what's in
23  the story.
24     A.   Sorry.
25        What was the question again?

22 (Pages 82 - 85)

Page 86

K. Baker

1           K. Baker
2       Q.   The time the article was published,
3   did you believe that Investigator Jones or
4   Hastings threatened charges against Miss Rondini?
5       A.   I didn't report that they threatened
6   charges against her.
7       Q.   So that's a no?
8       A.   My opinion is not in the story and I
9   am just trying to remember.  It is five years ago.
10  No, I don't believe they threatened her.
11      Q.   The time the article was published did
12  you believe Investigator Jones or Investigator
13  Hastings covered up any crime that may have been
14  committed by TJ Bunn?
15      A.   No.
16      Q.   Do you know if Investigator Jones or
17  Hastings led the investigation of the charges
18  filed against Miss Rondini?
19          MS. BOLGER:  Object to the form of the
20      question.
21          You can answer.
22      A.   I know that they led the investigation
23  into Megan's rape allegations and I know that she
24  told them about what happened with the gun and
25  Jones read her her Miranda rights and started

Page 87

K. Baker

1           K. Baker
2   questioning her and I know that Jones' name is on
3   the felony packet which includes those charges or
4   the complaint and that's all that's reported in my
5   story, I believe.
6       Q.   Did you ever ask for or attain a
7   felony packet for the charges against Miss
8   Rondini?
9       A.   I didn't know there was a separate
10  felony packet.  So in this felony packet I
11  received it includes the charges against her.  It
12  said Bunn was the suspect.  I'm sorry.  That was
13  an error.  It said Bunn was the victim and Megan
14  was the suspect and there was a lot of information
15  in that felony packet about that case.
16          Like I said, Captain Hood told me that
17  the case against Megan never went to a Grand Jury.
18  I had now learned that that wasn't true and there
19  was a separate packet but I have no way of knowing
20  that.
21      Q.   When did you learn there was a second
22  packet?
23          MS. BOLGER:  In the course of this
24      litigation as I just said.
25      Q.   At the time the article was published

Page 88

K. Baker

1           K. Baker
2   did you believe that Investigator Jones or
3   Hastings did not take Miss Rondini's allegations
4   against Bunn seriously?
5       A.   Well, as I said before, I do think
6   there are a number of things that the police could
7   have done differently.  I am happy to list them
8   all again if you would like me to.
9       Q.   That's fine.
10          Do you want to answer that question
11  that would be great?
12          MS. BOLGER:  Objection.  Asked and
13      answered.  That is the answer.
14          You can do it again.
15      A.   I think there are a number of things
16  they could have done differently starting with
17  when Bunn lied to them.  I don't want to waste
18  your time listing them all again.
19      Q.   And I am not asking what you think
20  they should have done differently.
21          Do you think they took the
22  investigation seriously?
23          MS. BOLGER:  You can answer.
24      A.   I think they could have done a number
25  of different things differently and that's my

Page 89

K. Baker

1           K. Baker
2   answer.
3       Q.   That's a different question.
4          I am just asking you do you think they
5   took it seriously?
6          MS. BOLGER:  Object to the form of the
7      question.  She now answered it twice.
8          You can answer it again.
9          MR. RITCHEY:  I think she is answering
10      a different question I had.  Not the same.
11          MS. BOLGER:  I don't agree.
12          Katie can answer it again.
13      A.   I'm sorry.  I'm not trying to be
14  difficult, but I think the most accurate thing for
15  me to say is I think they could have done a number
16  of things differently.
17      Q.   At the time the article was published,
18  did you believe investigators treated Miss
19  Rondini's allegations differently because they
20  were listed as a special inquiry as opposed to if
21  they were actually listed as a crime under the
22  Alabama code?
23          MS. BOLGER:  Object to the form of the
24      question, but if you get it you can answer.
25      A.   I reported in the story Captain Hood

23 (Pages 86 - 89)

K. Baker

1          K. Baker
2 told me special inquiries are treated the same as
3 other crimes and I included that information in my
4 story.
5     Q.   And that's what you thought at the
6 time of the publication as well?
7        MS. BOLGER: Object to the form of the
8    question. That's not what she said.
9       You can answer the question.
10    A.   What was the question again?
11       MR. RITCHEY: Do you mind repeating
12    that?
13       MS. BOLGER: The question itself was
14    not clear. So if you want to re-ask. I am
15    going to object to it so if you want to ask
16    it again.
17 BY MR. RITCHEY:
18    Q.   You mentioned Captain Hood had put in
19 that all investigators treat special inquiry like
20 any other crime.
21      Did you believe that as well as at the
22 time of the publication of the article?
23    A.   I had no reason to believe that
24 Captain Hood would give me inaccurate information.
25    Q.   At the time the article was published,

1          K. Baker
2 did you believe that Investigator Jones or
3 Hastings acted corruptly during the Rondini
4 investigation?
5        MS. BOLGER: Object to the form of the
6    question.
7       What does corrupt mean?
8       MR. RITCHEY: I think they covered up
9    or sided with Bunn or acted in a manner that
10    would be a crime.
11       MS. BOLGER: Object to the form of the
12    question.
13       I object to your definition of
14    corrupt, but having give it you can answer
15    the question.
16    A.   No. I didn't think that they were
17 corrupt and I didn't report that they were corrupt
18 in my story.
19    Q.   At the time the article was published
20 did you believe that Investigator Jones or
21 Hastings caused the tragic suicide of Miss
22 Rondini?
23       MS. BOLGER: What? Object to the form
24    of the question.
25       I thought you just said call.

1          K. Baker
2       MR. RITCHEY: Caused.
3    A.   Sorry.
4      Could you ask that question again?
5       MR. RITCHEY: Do you mind reading that
6    back please?
7      (Record read.)
8    A.   As I keep saying I think the police
9 could have done a number of things differently,
10 but I didn't report that in my story that they did
11 that. My story was about Megan and what happened
12 to her after she reported what she believed to be
13 rape to a number of institutions and what happened
14 after that.
15    Q.   So you don't believe they caused the
16 suicide?
17    A.   As I said, my story was about what
18 happened to Megan after she reported what she
19 believed to be rape to a number of different
20 institutions and what happened after that.
21    Q.   I get that and I want your thought
22 process not just the article.
23      Do you see what I am saying?
24       MS. BOLGER: I object to that
25    question.

1          K. Baker
2      If the question is do you think they
3    caused the suicide you can answer that
4    question.
5    A.   I don't know how to answer that
6 question. That's not what my article was about.
7 My article was about what happened to her at the
8 different institutions and what happened after she
9 reported what she believed to be rape. She was at
10 the police, in the hospital and the counselor and
11 everything that happened after that.
12    Q.   I understand that part. I am asking a
13 different question than what you are answering.
14      I am asking do you think that they
15 caused, in your mind did they cause the suicide?
16    A.   I have no way of knowing what caused
17 that. There is no way of me knowing.
18    Q.   At the time the article was published,
19 did you believe that Investigator Jones or
20 Hastings covered up the allegations against Bunn?
21       MS. BOLGER: Objection to form.
22    That's asked and answered. She already
23    answered that.
24    A.   I feel like I am repeating myself.
25       MS. BOLGER: You can answer it again.

24 (Pages 90 - 93)

Page 94
K. Baker
1        K. Baker
2     A.    Like I said, I think there is a number
3  of things the police could have done differently
4  and I can list them all again if you would like me
5  to.
6     Q.    I'm just asking if you thought they
7  covered up the allegations against Bunn?
8     A.    No, and I didn't report that in my
9  story.
10     Q.    At the time the article was published,
11  did you believe that Investigator Jones or
12  Investigator Hastings could change Alabama law?
13     MS. BOLGER:  Object to the form of the
14     question.
15     And cause for a legal conclusion and
16     magical thinking, but you can answer.
17     A.    No, and I didn't report that in my
18  story.  In fact, I report in my story at length
19  about the law and what Captain Hood thought about
20  the law.
21     MS. BOLGER:  Are you getting near a
22     stopping time?
23     MR. RITCHEY:  Yes.  Give me a few
24     more -- I think we can take a break here.  I
25     still got a few ways to go with this one,

Page 95
1        K. Baker
2  but we can take a break.
3     (Recess taken.)
4  BY: MR. RITCHEY:
5     A.    There is one thing I wanted to clarify
6  on the record.  I think I did meet Valentina for a
7  drink in Birmingham.  It would be in my e-mails
8  probably if we had met up.  It was very early on
9  so I don't recall for sure.
10     Q.    Do you remember any specifics from the
11  conversation?
12     A.    I don't because I didn't use anything
13  from her in the story.  It was not very useful,
14  but I just don't remember.
15     Q.    Kind of on the same lines, did you
16  ever make any recording of any of your interviews
17  or conversations with any of the Rondini family,
18  Maxwell, any of Megan's friends or any
19  non-confidential sources?
20     MS. BOLGER:  I am going to object
21     because it is a very compound question, but
22     she can answer.
23     A.    If I had you would have them but I
24  just don't recall at this time.
25     Q.    I may need to check with you on that

Page 96
1        K. Baker
2  one.
3     A.    It's not common that I keep
4  recordings.  So if you don't have them they maybe
5  gone.  Sorry.
6     MS. BOLGER:  I am sure you have
7     everything.
8     MR. RITCHEY:  I think there was some
9     talk about there being some recording but
10     they may have been from confidential sources
11     but I will follow up and we will deal with
12     that at the time.
13     A.    When I moved I got rid of a lot of
14  stuff because I was moving to another country.
15     MS. BOLGER:  We will sort it out.
16     MR. RITCHEY:  We will sort that out, I
17     think I talked to Jack about it but we will
18     take it up later.
19     MS. BOLGER:  As you know by now we
20     will get you whatever you need.
21     MR. RITCHEY:  Absolutely.  I am not
22     saying y'all withholding or anything.
23     MS. BOLGER:  We haven't done that.
24     MR. RITCHEY:  Y'all have not.
25  BY: MR. RITCHEY:

Page 97
1        K. Baker
2     Q.    At the time the article was published,
3  did you believe that Investigator Jones or
4  Investigator Hastings quickly decided that the
5  earnest resistance requirement was not met?
6     A.    Can you say that again?
7     Q.    At the time the article was published,
8  did you believe that Investigator Jones or
9  Investigator Hastings quickly decided that the
10  earnest resistance requirement was not met?
11     A.    Yes.
12     Q.    What led you to believe that?
13     A.    Well, first of all, they labeled her
14  case a special inquiry.  Her case was labeled a
15  special inquiry which means -- so Captain Hood did
16  tell me that those cases are investigated as
17  seriously as other crimes I put in my story.  But
18  he told me that means that either the alleged
19  victim doesn't know whether something happened to
20  them or the police believed that the case likely
21  doesn't meet the standard, a standard of a crime
22  under Alabama law and during the interview, which
23  I watched, Jones told Megan that he said look -- I
24  will read exactly what he said.  He said "Look at
25  it from my side.  You never kicked him or hit him

25 (Pages 94 - 97)

Veritext Legal Solutions
877-373-3660                              800.808.4958

Page 98

K. Baker

1            K. Baker
2 or tried to resist him." And Megan said "I did
3 resist him and she looked at all the ways she felt
4 she resisted him." And like I said earlier, I
5 know she said Bunn put his hands on her hips and
6 that she verbally told him she didn't want to have
7 sex with him but he continued. So Megan told
8 investigators in her first few interviews that
9 Bunn had held her down by the hips and that she
10 had verbally informed Bunn that she didn't want to
11 have sex with him but he continued to engage in
12 intercourse with her and in my story I said that
13 Megan said I did resist him. Megan said listing
14 the way she did from repeatedly telling Bunn she
15 wanted to leave, to turning him away when he
16 kissed her. I wanted to go home. He didn't take
17 me home and I reported that Jones said look at it
18 from my side, you never kicked him or hit him or
19 tried to resist him and he never followed up or
20 investigators never told up on those original
21 statements Megan made about Bunn holding her down
22 by the hips and telling him verbally that she
23 didn't want to have, continue to have sex with
24 him.
25      And also in the felony packet there

Page 99

K. Baker

1            K. Baker
2 was, is it possible for me to see the felony
3 packet?
4   Q. I don't have it on me.
5     MS. BOLGER: I have it but why don't
6   you continue.
7   A. There was just additional reasons why
8 I came to that conclusion based on the facts that
9 I reviewed but I guess we can stop here.
10   Q. At the time the article was published
11 did you believe that Investigator Jones or
12 Hastings made up or fabricated charges against
13 Rondini?
14   A. No, and that's not in my story.
15   Q. At the time the article was published,
16 did you believe that Investigator Jones or
17 Hastings induced Miss Rondini into dropping
18 charges against TJ Bunn?
19   A. What I reported is that despite best
20 practices according to experts I interviewed from
21 the IACP you are not supposed to ask an alleged
22 victim to decide anything about prosecution in the
23 initial stages of an investigation and as I
24 reported, Jones offered to give Megan a refusal to
25 prosecute form to sign I think maybe 12 hours

Page 100

K. Baker

1            K. Baker
2 after she first reported her allegation in the
3 middle of the night.
4   Q. I am still trying to get an answer to
5 that question.
6     Do you believe that Jones or Hastings
7 induced Miss Rondini into dropping charges against
8 TJ Bunn?
9   A. I didn't use the word induce in my
10 story, so I didn't believe that. I believe what I
11 reported in my story which is what I just read to
12 you.
13   Q. At the time the article was published,
14 did you believe that Investigator Jones or
15 Hastings was the reason why Miss Rondini dropped
16 the civil case against TJ Bunn?
17   A. No, and that's not what I reported in
18 my story.
19   Q. At the time the article was published,
20 did you believe that Investigator Jones or
21 Investigator Hastings were responsible for what is
22 presented to the grand jury?
23     MS. BOLGER: Object to the form of the
24   question.
25     I don't quite understand that

Page 101

K. Baker

1   question.
2   A. Can you be a little bit more specific
3 about what is presented?
4   Q. The facts or information presented,
5 are they responsible for presenting or deciding
6 what is presented as far as facts and information
7 to the grand jury?
8     MS. BOLGER: Object to the form of the
9   question. It calls for a legal conclusion
10   or information that you all have told me is
11   privileged, but to the extent she can answer
12   Katie can answer.
13   A. Grand jury proceedings are secret so I
14 don't know.
15   Q. I understand, but do you think that
16 investigators in their capacity are responsible
17 for deciding what is presented to the grand jury?
18     MS. BOLGER: Same objection.
19   You can answer.
20   A. There is no way of knowing because the
21 grand jury proceedings are secret and I didn't
22 report otherwise in my story.
23   Q. At the time the article was published,
24 did you believe that Investigator Jones or

K. Baker

1
2 Hastings doubted Miss Rondini prior to the
3 interview at the station on July 2, 2015?
4       MS. BOLGER:  Object to the form of the
5       question because there were we know more
6       than one interview on July 2nd and I want
7       clarification.
8       MR. RITCHEY:  Just the first one on
9       July 2nd at the station of Miss Rondini.
10    A.    As I reported my story, I think they
11 doubted that she was raped.  I don't think that
12 they doubted everything she said, but I think from
13 the beginning they doubted that her claim that the
14 rape statute under Alabama law and that's what I
15 reported in my story.
16    Q.    At the time the article was published
17 did you believe that Investigator Jones or
18 Investigator Hastings forced Miss Rondini to the
19 station for that initial interview she did with
20 Investigator Jones on July 2, 2015?
21    A.    Sorry.
22          Did you say forced?
23    Q.    Right.
24    A.    Do I believe they forced her to go to
25 the station?

K. Baker

1
2    Q.    Right.
3    A.    No, and I didn't report that in my
4 story.
5    Q.    At the time the article was published
6 after Miss Rondini had told Investigator Jones
7 about the gun incident, what do you believe the
8 reason why Investigator Jones left the interview
9 room?
10          MS. BOLGER:  Object to the form of the
11          question.
12          Are you asking her to get into Mr.
13          Jones's head, is that the question?
14          MR. RITCHEY:  I am just asking what
15          she thought he was doing.
16    A.    Yeah.  I don't speculate on what's
17 going on in people's heads.  I just report what
18 Megan told a friend which is what I was looking
19 for.  He said he had to go make sure that kids
20 couldn't grab the gun.  Oh, yeah Megan, because I
21 don't like to speculate I used a text where Megan
22 said he left as soon as I said that and hasn't
23 come back and then told me that little kids can
24 shoot themselves.
25    Q.    And that was what you believed he left

K. Baker

1
2 the room for or do you have an opinion as to what?
3          MS. BOLGER:  I am going to object to
4          the form of the question.
5    A.    As you know I did reach out to the
6 plaintiffs for comment and told them what was
7 going to be reported in my story.  All I had to go
8 on, since they declined to speak to me, was what
9 he told Megan at the time and I had no reason to
10 believe that what Jones said was inaccurate.
11    Q.    At the time the article was published,
12 did you believe there was something wrong with
13 Investigator Jones reading Miranda rights to Miss
14 Rondini?
15          MS. BOLGER:  Object to what you mean
16          by something wrong.
17          You can answer.
18    A.    No.  I didn't think there was anything
19 wrong and I don't report that there is anything
20 wrong with it in my story.  I do think that they
21 could have done a number of things differently in
22 that regard and I am happy to go into that if you
23 would like.
24    Q.    Sure, that's fine.
25    A.    When Bunn was accused of a suspect in

K. Baker

1
2 Megan's case against him they gave him four days
3 to go on a fishing trip with his lawyer and even
4 though he originally lied to them about Megan not
5 being at his house they didn't press him on that.
6 Yet when Megan was, willingly told investigators
7 going through the chronology that night what had
8 happened with the gun, while Jones did read her
9 her Miranda rights he didn't fully explain to her
10 that in the middle of what she had thought was an
11 interview about reporting what she believed to be
12 rape, she was now being investigated for multiple
13 felonies and got no other clear information other
14 than him reading the Miranda rights and I think
15 that could have been done a bit differently and I
16 think I report that all factually accurate in my
17 story.
18    Q.    Do you believe it was Investigator
19 Jones' job to explain to Miss Rondini that she was
20 now being looked into for criminal acts?
21          MS. BOLGER:  I am going to object to
22          that question.  She is not here as an expert
23          on the police.  She's never purported to be
24          an expert on the police.  She can't possibly
25          answer questions where you are asking her to

K. Baker

1                 K. Baker
2   be an expert on the police.
3         Katie, you can answer if you can.
4    A.   I did ask Captain Hood for his
5 policies and procedures, but he wouldn't give them
6 to me so.
7    Q.   When did you ask Captain Hood for the
8 policy and procedures?
9    A.   I believe I asked for them repeatedly
10 in the e-mail correspondence that we had.
11    Q.   Would you have asked him over the
12 telephone?
13        MS. BOLGER: Object to the form of the
14    question. Just because I don't understand
15    what you mean by would.
16       Are you looking for the hypothetical
17    or are you asking her if?
18    Q.   Is the e-mails the only place where
19 you would have asked Captain Hood for the policies
20 and procedures there?
21    A.   We can look at the e-mails now and I
22 can show you where I asked for them.
23    Q.   I can read those.
24      I am asking if you had a conversation
25 with him over the telephone that you can remember

K. Baker

1                 K. Baker
2 where you asked him for the policies and
3 procedures?
4    A.   The clearest thing I remember is the
5 e-mail correspondence because I recently reviewed
6 it and I asked him repeatedly for the related
7 policies and procedures there.
8    Q.   At the time the article was published
9 did you believe that Investigator Jones or
10 Hastings pressured or bullied Miss Rondini to sign
11 a refusal to prosecute form?
12    A.   So I believe what I reported in my
13 story which is that best practices, according to
14 IACP, is not to ask an alleged victim to make
15 decisions about prosecution in the initial stage
16 of the investigation. I think 12 hours into an
17 investigation would constitute the initial stages
18 of an investigation and they did offer her a form
19 then which according to the expert I interviewed
20 was not in line with those policies.
21      So that was what I reported in my
22 story and that is what I believed.
23    Q.   Do you believe though that
24 Investigator Jones or Hastings pressured or
25 bullied Miss Rondini into signing a refusal to

K. Baker

1                 K. Baker
2 prosecute form?
3        MS. BOLGER: I will object to that
4    question because it is compound. You have
5    pressured and bullied.
6      Can you break it up?
7    Q.   We will do pressure first.
8      At the time the article was published,
9 did you believe that Investigator Jones or
10 Investigator Hastings pressured Miss Rondini to
11 sign a refusal to prosecute form?
12        MS. BOLGER: That one I object to. It
13    was asked and answered because I think she
14    just answered that very question, but you
15    can answer it again.
16    A.   I believe I reported which is that the
17 IACP tells police not to pressure victims and
18 doing so is poor practice and potentially damaging
19 to an agency and I reported that Jones offered her
20 a refusal to prosecute form so I believe I
21 reported.
22      In terms of bullying, I believe that
23 in general Megan felt bullied by the police. I
24 quoted her putting that on her intake forms two
25 days before she hanged herself, but I just

K. Baker

1                 K. Baker
2 reported that Megan believed that.
3    Q.   But you don't believe that?
4    A.   No and I didn't -- no.
5    Q.   And going back to the pressure part of
6 it, did you believe that the offering of the
7 refusal to prosecute form was pressuring?
8        MS. BOLGER: Objection to form. That
9    really has been asked and answered.
10    A.   I am going to answer it the same way.
11    Q.   I get what she's put in the story and
12 the facts and everything.
13      I want to know if you thought that
14 when Jones offered the refusal to prosecute form,
15 did you think that was Jones pressuring Miss
16 Rondini to sign that form?
17        MS. BOLGER: Again, object. It's been
18    asked and answered.
19      You can do it.
20    A.   I can't answer it any clearer how I
21 reported in my story which is I interviewed an
22 expert and that's what the expert said and I
23 reported on what happened factually and readers
24 can draw their own conclusions.
25    Q.   So you agree with the expert saying if

Page 110

K. Baker

1        K. Baker
2   you offer a refusal to prosecute form in the
3   initial stages of an investigation that's
4   pressuring a victim to sign it?
5        MS. BOLGER: Objection to form.
6   That's not what she said.
7        MR. RITCHEY: I am trying to get to
8   that.
9        A.    The IACP tells police not to pressure
10  victims, make any decisions about prosecution. I
11  don't think that they are pressuring her to sign
12  it, but I do think that it would constitute
13  pressuring someone to make any decision about
14  prosecution by offering them a refusal to
15  prosecute form.
16       Q.    At the time the article was published,
17  did you believe that Investigator Jones or
18  Hastings established the homicide unit's policies?
19  DI      MS. BOLGER: I am sorry. I don't
20       understand that question.
21       Don't answer it. Please redo it.
22       MR. RITCHEY: What did you not
23       understand?
24       MS. BOLGER: You said do you think
25       that they established the policies. I

Page 111

1        K. Baker
2        didn't understand that. I don't understand
3        the question Scotch.
4        Do you mean did they write them?
5        Q.    Did they establish them, did they
6   write them, did they change them?
7        MS. BOLGER: Objection to form. I
8        don't know how she can answer that, but she
9        can answer.
10       A.    As I said, I requested to see those
11  policies and procedures. So I have never seen
12  them but I would assume that they would --
13       MS. BOLGER: Don't assume.
14       A.    I am sorry. I can't assume.
15       MS. BOLGER: If you can't answer the
16       question just say you can't answer the
17       question. Don't speculate.
18       A.    I can't answer the question.
19       Q.    So you wouldn't know one way or the
20  other?
21       A.    Sorry.
22       I wouldn't know one way or the other
23  if they came up with the policies and procedures?
24       Q.    Right.
25       A.    No. I asked for a copy of those

Page 112

1        K. Baker
2   policies and procedures, but they weren't given to
3   me.
4        Q.    At the time the article was published,
5   did you know how the Grand Jury process worked in
6   Alabama?
7        A.    Captain Hood described some of it to
8   me.
9        Q.    Was that the extent of your knowledge?
10       A.    I knew what I reported in my story to
11  be truthful and accurate except for the inaccurate
12  information that Hood gave me which I reported
13  because I assumed it was accurate.
14       Q.    But you didn't get any other
15  information concerning the Grand Jury process in
16  Alabama from anyone else besides Hood?
17       A.    I definitely would have asked others.
18  I can't recall exactly who at this time, but it is
19  clearest in my head because I had that extensive
20  back and forth via e-mail with Hood.
21       Q.    I am just asking if you remember now
22  how the Grand Jury process works in Alabama?
23       MS. BOLGER: Object to the form of the
24       question and I note for the record that you
25       refused to tell us how the Grand Jury

Page 113

1        K. Baker
2   process works in Alabama but go ahead.
3        MR. RITCHEY: I don't think it is the
4        process. I think it's what's said in the
5        Grand Jury. I don't think it's been the
6        process of it. It is what's presented to
7        the Grand Jury.
8        MS. BOLGER: Oh, I agree it has been
9        the process, but you can answer again.
10       A.    Like I said, I was relying on Captain
11  Hood as a public official to answer my questions
12  accurately about how the Grand Jury process works.
13       Q.    At the time the article was published,
14  did you believe that Investigator Jones or
15  Hastings did not fight too hard on Miss Rondini's
16  behalf?
17       MS. BOLGER: Object to the form of the
18       question. It's highly subjective.
19       You can answer the question if you
20       can.
21       A.    I think I know or sorry, I don't want
22  to speculate but I do think that it's notable that
23  in the felony packet they put together for, Jones'
24  name is on it, that Jones put together for -- the
25  felony packet for Megan's case it says on the

29 (Pages 110 - 113)

Page 114

1           K. Baker
2    first page of text that no sexual assault occurred
3    and I think, I do believe if you put together a
4    packet for a Grand Jury when as Hood told me it is
5    the Grand Jury's choice to decide whether to bring
6    charges based in part on that and when you say no
7    sexual assault occurred that means the police
8    don't believe a sexual assault occurred.
9        Q.   But that also means they didn't fight
10   too hard on Miss Rondini's behalf?
11       A.   Are you referring to a specific part
12   of my story?
13       Q.   Can you point me to it?
14           MS. BOLGER:  It is on page 15 of 18
15       and it is the third graph from the bottom.
16       Q.   That's the right one.
17       A.   So I think that the document speaks
18   for themselves and I was summarizing what the
19   document said which is that investigators noted
20   they found no sexual assault occurred.
21       Q.   And I am referring to the part where
22   you say authorities didn't intend to fight too
23   hard on Megan's behalf.
24           MS. BOLGER:  Just for the record, the
25       full sentence reads "Internal documents from

Page 115

1           K. Baker
2        September 2015 imply authorities didn't
3        intend to fight too hard on Megan's behalf:
4        Investigators noted they found "no sexual
5        assault occurred."  That's what the sentence
6        said.  You can ask a question about that.
7           MR. RITCHEY:  Right.
8    BY MR. RITCHEY:
9        Q.   I am asking do you think that
10   Investigator Jones or Hastings did not fight too
11   hard on Miss Rondini's behalf?
12       A.   I think exactly what that sentence
13   says as I wrote it.
14       Q.   Just for my clarity and you probably
15   answered that, you believe they didn't fight too
16   hard because of that quote, no sexual assault
17   occurred, included in the felony packet?
18           MS. BOLGER:  Object to the form of the
19       question.
20           That's not what that sentence says,
21       but you can answer the question Katie.
22       A.   I think that if you are a law
23   authority and you are putting together a felony
24   packet for somebody whose alleged sexual assault,
25   alleged rape and the goal of the packet is for a

Page 116

1           K. Baker
2    Grand Jury, from what I understand, to decide if
3    her claims are true and the first page of that
4    felony packet says no sexual assault occurred, it
5    is fair to say that those documents imply
6    authorities didn't intend to fight too hard on
7    Megan's behalf as I reported it.
8        Q.   At the time the article was published,
9    did you believe the whole felony packet would have
10   been presented to the Grand Jury?
11       A.   Like we said, I don't know what.  The
12   Grand Jury proceedings are secret.
13       Q.   So you wouldn't know if the whole
14   packet was presented or not?
15       A.   I wouldn't know exactly what the Grand
16   Jury saw.
17           MS. BOLGER:  If you are going to ask
18       questions about the felony packet you have
19       to show it to her.
20       Q.   Was there anything that factored into
21   the decision as to whether to leave some gathered
22   fact or information out of the article?
23           MS. BOLGER:  Object to the form of the
24       question.
25           You can answer if you understood it.

Page 117

1           K. Baker
2        A.   It is a bit general, your question.
3        Can you be more specific?
4        Q.   Just in general, is there anything
5    that factors into it?
6        A.   My story was about what happened to
7    Megan after she reported what she believed to be
8    rape to a number of institutions including the
9    police department, the hospital and a therapist
10   for mental health services at the university.  I
11   included all the pertinent details to that
12   investigation and I also made sure to include
13   everything I felt the people that I interviewed
14   wanted me to put in from their perspective.
15           So it was crucial to me that I
16   accurately report on how the police conducted
17   their investigations, the DA's decision, Bunn's
18   perspective, the mental health counselor's
19   perspective.  Anyone I reported on I really wanted
20   to be accurate about how they felt that
21   investigation took place and especially with
22   Captain Hood.  He really laid out what he felt
23   about the case and I included all his key points
24   in my story.
25       Q.   But you didn't include his whole

30 (Pages 114 - 117)

Veritext Legal Solutions
877-373-3660                                    800.808.4958

Page 118

K. Baker

1        K. Baker
2  explanation in your story, did you?
3      A.   I included about three paragraphs from
4  him and other quotes from him throughout the
5  story.  I think I included all the key points from
6  his perspective.
7      Q.   What factors into whether or not to
8  include the whole explanation or what you pulled
9  out of it?
10     A.   I make sure to include the key points.
11     Q.   And how do you figure out what the key
12  points are?
13     A.   It is just judgment.
14     Q.   So your judgment or do other people
15  weigh in?
16     A.   Definitely with something like this
17  editors, fact checkers.  I can't talk about our
18  discussions with our lawyers, but it is so
19  important to me as a journalist that I accurately
20  portray what I am writing about and my only goal
21  with this story in terms of the police
22  investigation was to accurately portray what they
23  thought about Megan's case and that was my goal
24  here.
25     Q.   You mentioned in your answer, it might

Page 119

K. Baker

1        K. Baker
2  have been a few questions ago, you said something
3  about the DA's decision.
4          MS. BOLGER:  I object to the form of
5      the question.  I don't know what you are
6      talking about.
7      So can you be clearer?
8      Q.   I don't remember which question it was
9  to but you said something about the DA's decision?
10     A.   I said I reached out to a DA's office
11  for comment.  I was talking about how it was
12  important for me to reach out to everybody for
13  comment.
14     Q.   I am going to refer to the video clips
15  that were embedded in the article.
16         Do you understand that I am talking
17  about those?
18     A.   Yes.
19         MS. BOLGER:  Are you talking about
20     them as a whole or are you asking about them
21     specifically and if so point to the ones you
22     are.
23     Q.   I am just asking about decisions made
24  about the video clips.  So if different decisions
25  were made on each one, just let me know and I will

Page 120

K. Baker

1        K. Baker
2  break them up if you remember to.
3          But how was it determined which
4  portion of the full video was included for the
5  clips?
6      A.   I don't recall anymore.
7      Q.   In general, who would have made those
8  types of decisions?
9          MS. BOLGER:  Just objection to the
10     form to the extent it requires you to
11     speculate.  If you know you know, if you
12     don't you don't.
13     A.   I don't recall those decisions exactly
14  how they were made as it has been so many years.
15     Q.   In your articles that you have written
16  and have been published by BuzzFeed, do you
17  generally include video clips?
18     A.   Sometimes.
19     Q.   Is there a reason you would or would
20  not?
21     A.   If we obtained footage.
22     Q.   Was there a reason why the full video
23  was not included and only clips were included?
24         MS. BOLGER:  Object to the form of the
25     question.

Page 121

K. Baker

1        K. Baker
2          You can answer if you know.
3      A.   My job as a reporter isn't to just
4  regurgitate all the information.  It is to put
5  together a story based on truthful and accurate
6  facts that I believe are relevant to what I am
7  reporting on.
8      Q.   Wouldn't the full video be the most
9  accurate?
10     A.   That's just not my job as a
11  journalist.
12     Q.   What is your job?
13     A.   My job is to report stories that are
14  in the public interest.
15     Q.   And would that include to include
16  accurate facts?
17     A.   Yes.
18     Q.   And wouldn't the most accurate fact be
19  a full video instead of just a portion of a video?
20         MS. BOLGER:  Are you asking that
21     question in all circumstances forever?
22         MR. RITCHEY:  Sure.
23     A.   No, I don't agree.  I don't think that
24  any journalist sees their job as putting all the
25  information that they compile out.  The job is to

31 (Pages 118 - 121)

K. Baker

1         K. Baker
2  put a story together based on truthful and
3  accurate information and what you think is most
4  relevant to the story.
5      Q.   So you don't put all the information
6  out for a reader to decide then?
7      A.   I put out accurate and truthful facts
8  that are pertinent to what I am reporting on.
9      Q.   But not all information?
10         MS. BOLGER:  Object to the form.
11         In every story ever?  It's just a
12     little bit -- are you talking about in
13     general or are you talking about this story?
14         MR. RITCHEY:  Let's talk about in
15     general and then in this story.
16         MS. BOLGER:  I think that calls for
17     speculation about what every journalist has
18     ever done in the history of time.
19      Q.   In your experience.
20      A.   I prefer to just talk about this
21  story.
22      Q.   In this story the most accurate
23  information concerning the interviews, the videoed
24  and IO interviews would have been the full video
25  and not these video clips that were embedded in

1         K. Baker
2  the article; is that right?
3         MS. BOLGER:  Objection to form.
4         You can answer.
5      A.   If I included everything that I
6  compiled over the course of the six-month
7  investigation the story would not have been
8  readable.
9      Q.   And why not?
10      A.   Because it would be hundreds of
11  thousands of words and hours and hours of tape
12  long and the point of reporting is to report
13  stories in the public interest that readers can
14  understand.
15      Q.   Why couldn't you link to the full
16  video in this article?
17         MS. BOLGER:  Object to the form of the
18     question.  Calls for a hypothetical.
19         Katie, if you can answer it feel free.
20      A.   Myself and my editors and the fact
21  checker and I guess I can't talk about other
22  people involved in the decision, we felt that the
23  right thing to do for the story was to include
24  these clips.
25      Q.   And withhold the full videos from the

1         K. Baker
2  readers?
3         MS. BOLGER:  Objection to the form of
4     the question.
5      A.   I don't know how I can put it
6  otherwise that we felt this was the right decision
7  journalistically.
8      Q.   Would you agree with me that that
9  video clip is not all the information that was
10  available from the video?
11         MS. BOLGER:  Objection to form.
12         You can answer.
13      A.   The clip was a clip.
14      Q.   So who decided which information that
15  was not presented to the reader in the article?
16         MS. BOLGER:  Wait.
17         Can you do that again?
18         MR. RITCHEY:  Can you read that back?
19     I may need to try again.
20         (Record read.)
21         MS. BOLGER:  I think that's been asked
22     and answered, but you can answer again
23     Katie.
24      A.   So there is me and then there is Tina
25  and Marisa.  There is Sharmila.  Of course we have

1         K. Baker
2  lawyers and you file a story as a journalist and
3  then you have editors and fact checkers and legal
4  and that's the process.
5      Q.   Why was the exact amount of money that
6  TJ Bunn alleged was taken from him left out of the
7  story?
8      A.   I only put accurate information in my
9  story and my recollection is that it was confirmed
10  that it was only, I believe it was $3 and that his
11  initial allegation was inaccurate and I had
12  evidence of that so I included the accurate
13  information.
14      Q.   What evidence and who confirmed that?
15      A.   It would be in the fact checking
16  documents I handed over.  I can't remember every
17  detail four and a half years later, but I feel a
18  hundred percent confident about all the
19  information that I was given in the story at the
20  time.
21      Q.   Is there a reason why Miss Rondini's
22  version of the story was told first in the
23  article?
24         MS. BOLGER:  Object to the form of the
25     question.

32 (Pages 122 - 125)

Page 126

K. Baker

1
2   A.   I don't know if I understand the
3 question.
4   Q.   So was there a reason why her side of
5 the story was told first in the article?
6       MS. BOLGER:  Objection to form.
7   A.   I don't know if I agree that her story
8 was told first in the article.  I told the story.
9 You can see in the second paragraph I say what
10 Bunn's perspective was actually.  I say the
11 34-year-old later told authorities he offered
12 20-year-old Megan a ride home because he and a
13 friend saw her leaving downtown Tuscaloosa.
14 Michael was to tell the story through public
15 records and include both perspectives and I
16 include his perspective right at the beginning,
17 right at the top.
18   Q.   Did you ever pitch this story to
19 anyone at BuzzFeed?
20   A.   What do you mean by pitch?
21   Q.   Is there a pitching process at
22 BuzzFeed?  I just don't know.  Did you have to go
23 to someone and say here is a lead I found, can I
24 pursue it?
25   A.   It is more of an ongoing conversation

Page 127

K. Baker

1
2 with editors.  So people will come to us with tips
3 or with ideas for stories and we talked to them
4 and at some point I'll bring all my editors in and
5 say this is what I have heard so far and of course
6 it is up to the editor to say that's not
7 interesting, I don't think you should report on
8 that or go ahead, but because I have been at
9 BuzzFeed for so long and I have a senior position,
10 usually for me it is more of a conversation.  I
11 can't speak for all the reporters.
12   Q.   In this article did you pitch or tell
13 someone about the article before pursuing it
14 further?
15   A.   Of course I kept my editors in the
16 loop as I learned more information I would
17 explain to them kind of where I was at and what I
18 was hearing.
19   Q.   Would that have been Marisa and Tina?
20   A.   Definitely Marisa and Tina, yes.
21   Q.   Would anyone else have been kept in
22 the loop?
23   A.   Possibly.  BuzzFeed is a very
24 corroborative place.  I can't recall exactly who
25 else it would have been, but it would have been

Page 128

K. Baker

1
2 mostly Marisa and Tina.
3   Q.   Did you ever pitch the story to Ben
4 Smith?
5   A.   I didn't pitch it to him, no because I
6 didn't pitch stories to Ben.  He was
7 editor-in-chief.  If he asked me what I was
8 working on I might have told him, but it wouldn't
9 have been him who I would have looped in like
10 Marisa and Tina.
11   Q.   Do you recall any conversations with
12 Ben Smith concerning the article?
13   A.   I didn't before reviewing documents in
14 preparation for today.  I think I saw one or two
15 e-mails, like really brief ones, but I didn't
16 remember them until I saw them.
17   Q.   Did Ben Smith help edit the story?
18   A.   No.  I don't recall anything he did on
19 the story honestly.
20   Q.   Do you remember any conversations, any
21 verbal conversations about any draft or final
22 publication of the article?
23       MS. BOLGER:  With who?
24       MR. RITCHEY:  Anyone.
25       MS. BOLGER:  At BuzzFeed --

Page 129

K. Baker

1
2       MR. RITCHEY:  Yes.
3       MS. BOLGER:  -- or in the world?
4       MR. RITCHEY:  Anyone in the world
5   besides attorneys.
6   A.   So much has happened in the past four
7 and a half years I cannot remember conversations
8 that I had at this point.
9   Q.   Would you explain the editing process
10 that the article went through?
11   A.   Yes.
12       Well, would you mind asking me
13 specific questions that would allow me to answer
14 more accurately?
15   Q.   I don't know how to works.
16   A.   But you must have read the
17 documentation I produced.
18   Q.   The best I can tell and you maybe be
19 able to go off of this, you have a first draft.
20 Looks like editors get in on the first draft.  It
21 gets reviewed a few more times.  Fact checking
22 comes in and just I guess go off of that.  I can't
23 really tell how the process works.
24   A.   I will try my best.
25       MS. BOLGER:  I guess again my

33 (Pages 126 - 129)

K. Baker

1
2     instruction would be to confine yourself to
3     this story.
4          MR. RITCHEY:  Just this article.
5          MS. BOLGER:  And again, this is not a
6     memory test.  So if you want to give your
7     best recollection you can but it is not a
8     memory test.
9     A.    So every story is different.  That's
10    why it is not easy for me to recall because it is
11    not like -- something I really like about working
12    on longer pieces, it is not like you are a
13    breaking news reporter and you have a deadline and
14    you file and it's edited immediately.
15         With this story I believe that I wrote
16    a few drafts at the beginning that were not for
17    publication and were very, very different from the
18    final story that was published.  I wrote those
19    drafts because I find it useful to just summarize
20    everything that you know at the time.  I don't
21    know if lawyers do this, but it is just you are
22    learning so much information and sometimes it is
23    just really helpful to sit down and write it in
24    chronological order even if you haven't
25    corroborated anything or even sure if there is

K. Baker

1
2     going to be a story yet.  It is just helpful to
3     sit down and look at it and then go this is what
4     needs to be there.
5          So I started the draft process early
6     and if you can see from my drafts, the first
7     drafts were just completely different than the
8     final story.  That's because one, they weren't for
9     publication, but I was taking them seriously while
10    I was writing them because I take my job really
11    seriously.  So I had those first draft and then I
12    knew I had to keep reporting.  I changed a lot of
13    stuff about the story and then in late May or
14    early June, I don't remember exactly when, I
15    received the felony packet from Mike who had
16    subpoenaed the police I believe and the video
17    interviews and some other documentation and as I
18    said at the beginning, because my goal was to get
19    as many public documents as possible.
20         Also by this point I had gotten
21    toxicology results or lack thereof for Megan.  I
22    had gotten more of her hospital records which I
23    also got very late in the process.  I was waiting
24    on those.  I got the statistics I was waiting for.
25    I got more documentation from the university I

K. Baker

1
2     believe.
3          It just took a few months to gather
4     everything together and again, something I really
5     love about BuzzFeed is they give you as much time
6     as you need to make sure your story is as accurate
7     as possible.  I changed the story a lot and of
8     course my story kept changing as I kept reporting.
9     Once I got all the documents I had to rewrite the
10    story.
11         So then there is a draft and we had a
12    preliminary fact check and then once I knew what I
13    wanted to report in the story, I still wasn't done
14    because the most important part had to happen and
15    that's reaching out and doing those no surprises
16    letters that I told you about.  So it was time to
17    finally reach out to all the people in my story
18    and give them as much time as they needed to
19    understand what I was planning to report at that
20    time and asked them to comment or clarify and once
21    I was able to reach everybody and made sure I
22    heard back from them and then I asked some people
23    like Captain Hood followup questions.  Then I was
24    done ready to publish my story.
25         I think that pretty much sums it up

K. Baker

1
2     but obviously this is just an overview.
3     Q.    That works.
4          Did you ever attempt to get the police
5     records from the homicide department?
6     A.    I did.
7     Q.    How did you do that?
8     A.    I believe that Alex Campbell was
9     handling the records and all the data and he filed
10    a public records request with the police.  That's
11    my recollection based on documentation that I
12    reviewed recently.
13    Q.    And I couldn't tell from the e-mails.
14         Did they ever respond to that initial
15    request, do you remember?
16    A.    All I know is they did not give it to
17    us.  They denied it.  I don't remember what form
18    that denial took, but I had to get it from Mike
19    through the subpoena.
20    Q.    Do you remember who denied it,
21    anything like that?
22    A.    I don't but I assume it would be in
23    their records.
24    Q.    Is there a reason for not -- that you
25    did not send those no surprise letters earlier?  I

34 (Pages 130 - 133)

Page 134

K. Baker

1  believe you kind of get the core of the story and
2  correct me if I am wrong if I say anything, but
3  the core of the story back in and around January,
4  December?
5      A.   No, you are wrong.
6      Q.   Tell me how that works.
7      A.   So with no surprises I don't want to
8  waste people's time.  I don't want to put things
9  to them that are inaccurate because what's the
10  point in that.  I have to wait until I know what I
11  believe I want to report in my story.  I did not
12  have the core, as you can see if you read them.
13  My draft changed from a completely different story
14  from the beginning to six months later and we
15  don't send no surprises letter until we fully
16  understand what we believe to be the facts.  Then
17  of course we don't know for sure, the story is not
18  done.
19      If I had written a no surprises letter
20  back when I didn't know what the story was and I
21  (indecipherable) the documents no one would have
22  gotten anywhere because people don't want to
23  answer your questions all day.  They have their
24  own jobs to do and actually, you can see in my

Page 135

K. Baker

1  e-mails with Gary Hood, Captain Hood at some point
2  he very politely and I understood waived me off a
3  bit and said I understand you have a job to do but
4  I have my own job to do.  People have limited time
5  and so in order to make sure you are doing your
6  job as accurately as possible you wait until you
7  know what you want to ask people.
8      Q.   Did you know you were writing about
9  the Rondini investigation in January of 2017?
10      MS. BOLGER:  Objection to form.
11      You can answer.
12      A.   In January I wasn't sure yet what
13  would be in the final story.
14      Q.   But did you know you were writing it
15  about the Rondini investigation?
16      MS. BOLGER:  Objection to form.  Same
17  question.
18      You can give the same answer.
19      A.   I was in the research phase.
20      Q.   So you didn't know what the story was
21  and what you were writing about in January?
22      A.   I didn't even know if there would be a
23  story.  I know I was researching a story and
24  considering all sorts of things and this is part

Page 136

K. Baker

1  of the -- I don't if being a lawyer is similar,
2  but you just don't know what your story is going
3  to be about in the beginning.
4      Q.   During your research phase is there
5  any reason why you didn't reach out to the
6  homicide unit other than the records request?
7      MS. BOLGER:  I am going to object to
8  the form.  I think that's not correct but I
9  also don't think you are seeking to mislead
10  her.  I am going to let her answer it, but I
11  --
12      MR. RITCHEY:  I think he talks about
13  statistics too I'll say.
14      MS. BOLGER:  I don't actually think
15  that's totally right.  Scotch, I really
16  don't think you are trying to mislead her.
17      MR. RITCHEY:  No, I am not.
18      MS. BOLGER:  So I just wanted to make
19  the right objection that I think that's
20  wrong, if that's okay.
21      Q.   Correct me if I am wrong then.  I'm
22  sorry.
23      A.   I don't remember what the question
24  was.

Page 137

K. Baker

1      Q.   You are saying in January 2017 you
2  don't know what the story is about yet; right?
3      A.   I was just researching it.
4      Q.   You were in the research mode.
5      So is there a reason why you didn't
6  reach out to the homicide department other than
7  the statistics and the record request prior to
8  those no surprise letters that you sent in June?
9      A.   We requested the files in her case I
10  believe.
11      Q.   I am saying except for those.
12      A.   The files on Megan Rondini's case?
13      Q.   Right.
14      A.   And the general data and I had some
15  other conversations and maybe I wasn't as eloquent
16  as I thought I was.  I thought I really described
17  well why we wait for the no surprises e-mails.  We
18  don't want to waste people's time.  We want to
19  make sure we are accurate and we have to wait
20  until we know what our questions are.  I think
21  that -- I tried to explain it as clearly as I
22  could.
23      Q.   I am just wondering, was there a
24  reason that you didn't ask Mr. Hood about what

35 (Pages 134 - 137)

Page 138

1          K. Baker
2    happened, Gary Hood or someone from homicide what
3    happened during the investigation?
4          MS. BOLGER:  In January?
5          MR. RITCHEY:  Prior to the no surprise
6       letters.
7          MS. BOLGER:  I am going to object to
8       the form.
9          You can answer it again.
10    A.    I do want to make sure that I -- I of
11   course you know sent letters to and called and
12   tried to speak to all the individual officers as
13   well, but I was told Captain Hood was the person
14   to talk to.  He is at the end even though I tried
15   to talk to them all separately.
16         As I said, we can't waste people's
17   time and we also can't and don't want to put
18   inaccurate information to them.  We have to wait
19   until we know what our story is going to be, what
20   it is going to look like and wait until we have
21   all the information we want to ask them about.
22   There is no way to ask the questions until we know
23   what the questions are.
24    Q.    So at the time that the no surprise
25   letters were sent out in this article, was only

Page 139

1          K. Baker
2    one side of the story told?
3          MS. BOLGER:  Objection to form.  I
4       don't understand.
5     Q.    Because you didn't reach out to TJ
6    Bunn, you didn't reach out to Adam or Josh prior
7    to the no surprise letters; correct?
8    DI       MS. BOLGER:  I don't understand what
9       you mean.  Did the draft have only one side?
10      Are you suggesting that the draft she had
11      it?  I don't understand what the question is
12      so I am not going to let her answer because
13      I don't understand what you mean by one side
14      of the story.
15    Q.    How do you know what the story is
16   about without getting every side of the story?
17    A.    I few thoughts on that.  I said the
18   most important part of the story to me is the no
19   surprises part.  When I sent them out of course I
20   incorporated what they said, what all the various
21   people I reached out to their responses to me,
22   given to me I incorporated them into my draft and
23   it is the most important part of my story, as I
24   said, because of course you have to give people a
25   chance to respond to our story.

Page 140

1          K. Baker
2          I also had a lot of public records for
3    this story.  I had worked very hard to try and
4    understand why the police did their investigation
5    the way that they did even before I reached out to
6    comment to everybody.  In fact, I waited six
7    months to do so.  I started looking into the story
8    and doing research, but I didn't publish it for
9    months because I didn't think I had enough of an
10   understanding to know if I wanted to continue and
11   then I got a lot of records, right.  I got the
12   felony packet, I had the interviews that the
13   police did with everybody and I had some other
14   materials as well.
15         So through that I did have a sense of
16   how the investigators did their job and of course
17   the story wasn't just about the police.  I also
18   had a sense of what happened at the hospital, what
19   happened with the mental health counselor through
20   records, but like I said, I wasn't done reporting
21   the story.
22         A crucial and, in my opinion, most
23   important part is when I did all those reach-outs
24   and had those conversations and I am really
25   thankful that Captain Hood gave me so much

Page 141

1          K. Baker
2    information that I put in my story.
3     Q.    Did Marisa Carroll have access to all
4    the information and documents you gathered for the
5    article?
6     A.    I would have given her access to
7    anything she asked to see.
8     Q.    Would the same be for Tina?
9     A.    Yes.  If they asked to see any
10   information from, that I reported on in the
11   article I would have given it to them, yes.
12    Q.    But only if they would have asked for
13   it?
14         MS. BOLGER:  Object to the form of the
15      question.  I don't think she knows what is
16      in their heads, but you can answer.
17    Q.    Let's see if I can do it this way.
18         Is there like a Google drive or
19   something where all the documents or information
20   that you had was stored?
21    A.    I don't recall exactly what the
22   situation was with all these documents four and a
23   half years later.
24    Q.    But if Tina or Marisa wanted a
25   document or some information that you gathered,

36 (Pages 138 - 141)

K. Baker

1        K. Baker
2   they would ask you for it, they wouldn't go
3   somewhere to get it?
4        MS. BOLGER:  Objection to form.  I
5   don't think that's what she testified.
6        You can clear it up Katie.
7        A.   If I was asked by the editors can I
8   see the underlying document for this, I would show
9   it to them.
10       Q.   And you may have answered this and I
11  apologize for asking it if you did, but did they
12  have access to everything without having to ask
13  you to show them the document?
14       MS. BOLGER:  Objection to form.
15       To the extent you know what they did
16       you can answer that question.
17       A.   I don't really understand the question
18  because it kind of wouldn't matter because if they
19  needed something they would have asked me where it
20  was and I would give it to them.
21       Q.   But you knew all the information, you
22  knew all the documents that you gathered; right
23  obviously?
24       A.   Yes.
25       Q.   How would they know what you had?

1        K. Baker
2        MS. BOLGER:  Object to the form of the
3        question.  You deposed them and you could
4        have asked them, but Katie you can answer.
5        A.   I can't speak for them.  All I can say
6   is during the fact checking process how it works
7   is I would go and I would highlight or comment in
8   the draft every single assertion, factual
9   assertion of the story and I would put this is
10  where this assertion is from and then Sharmila the
11  fact checker goes through every single one and she
12  makes sure every single fact in the story is
13  corroborated and so I know where everything is
14  from in the story and if anyone else wanted to
15  know they could ask me.
16       Q.   So you would be the source of their
17  knowledge, would that be fair to say?
18       MS. BOLGER:  Objection to form.
19       Again, you can answer if you know.
20       A.   I don't think I was the source.  The
21  public documents would be the source and I could
22  help them look at the public documents which I
23  obviously would do.
24       Q.   Did you give them all the source
25  material you gathered or just what they asked for?

K. Baker

1        K. Baker
2        MS. BOLGER:  Who?  Objection to form.
3        I think that would be different per person.
4        Q.   We will start with Sharmila.
5        A.   I gave Sharmila access to everything.
6        Q.   What about Marisa?
7        A.   It is just not the job of the editor
8   to fact check the story.  That's the fact
9   checker's job.  If an editor had asked me for
10  something and sometimes they want to see it for
11  themselves, they could have access to whatever
12  they wanted, but it is the fact checker's job to
13  check the facts.
14       Q.   So just what Marisa asked for you
15  would give to her?
16       MS. BOLGER:  Object to the form.  It
17       is calling for a hypothetical.  You can ask
18       if it happened.
19       Q.   That's what I am asking, in the
20  article or for the article if Marisa asked you for
21  some source material you would give it to her, she
22  wouldn't have access to everything?
23       A.   I can't recall -- I am sorry.
24       MS. BOLGER:  Objection to form.
25       You can answer.

1        K. Baker
2        A.   I can't recall exactly what happened
3   in the process of this article to that granular
4   detail, but I have to say I don't think it really
5   -- from my perspective there is nothing hidden in
6   terms of the source material.  Sharmila had access
7   to everything.  Editors could see anything they
8   wanted.  So I don't remember at a granular level
9   if someone asked for what or not, but everything
10  was corroborated by the documents or other
11  materials that I had.
12       Q.   Do you think any part of the article
13  is misleading?
14       A.   No.  Well, the only thing I know to be
15  inaccurate in the article is Captain Hood told me
16  that Megan's case never went to a Grand Jury and I
17  had no reason to believe that Captain Hood would
18  give me inaccurate information.  So I reported
19  what he said and I later learned that he gave me
20  the wrong information and it did go forward, but
21  other than that I believe everything there to be
22  true and accurate.
23       Q.   I believe you said you requested a
24  standard operating procedures of the homicide
25  unit; is that correct?

37 (Pages 142 - 145)

Page 146

K. Baker

1               K. Baker
2      MS. BOLGER:  You can answer.
3     A.   I would have to look at my e-mails
4  with Captain Hood to see the exact wording I used,
5  but you have those e-mails.
6     Q.   And I am assuming you never got a copy
7  of any standard operating agreement of the
8  homicide unit; correct?
9     A.   No.  He -- I asked a few times for
10  policies and procedures and he did not give them
11  to me.
12     Q.   What is your definition of blackout in
13  regards to the article, as used in the article?
14       MS. BOLGER:  Can we look at the
15    sentence in here?
16     A.   I am so sorry.  I have to use the
17  bathroom very quickly at some point in the near
18  future.  It doesn't have to be right now.
19       MS. BOLGER:  Before you start or stop,
20    it is almost 1.  So the food is outside.  I
21    don't know if you were in the middle of
22    something or --
23       MR. RITCHEY:  Yes.  Let me just finish
24    this.
25       MS. BOLGER:  Of course.

Page 147

K. Baker

1               K. Baker
2     A.   I am not trying to take a full break.
3     Q.   Just a few questions about that.
4     A.   Of course.
5     Q.   Let me see if I can find where it was
6  used.
7       MS. BOLGER:  The paragraph starts
8    "Megan who stood 5 foot 6" towards the top.
9     Q.   What page was that on?
10     A.   It is page 6.
11     Q.   This is Exhibit 122 and we are looking
12  at page 6 of 18 and it is the second paragraph on
13  this page.
14     A.   So my understanding of blacked out as
15  written here is that there were some gaps in her
16  memory from that night.  So for example, she came
17  to, as I wrote, around midnight in his car but she
18  had gaps in her memory and didn't remember how she
19  got into that car.
20       I've actually read a story that you
21  might find interesting about this woman Kim Fromm
22  who is an expert witness and she testifies in
23  sexual assault cases on behalf of the accused
24  assailant.  She does very high profile cases;
25  Steubenville, the Stanford trial and she is a

Page 148

K. Baker

1               K. Baker
2  clinical psychologist and she is an expert in
3  blackouts and she has testified that there is lots
4  of things you can do in a blackout.  You can sing
5  karaoke and dance and walk and even consent to sex
6  in a blackout is what she often testifies.  So
7  she'll testify in cases on behalf of the assailant
8  and say he could have gotten consent to sex even
9  if the person doesn't remember consenting.  It is
10  very interesting what I learned.
11       So yeah, my understanding of a
12  blackout and I bring that up because I have done
13  research or read about this is that in a blackout
14  you forget what happened for maybe a few hours,
15  maybe shorter maybe longer but it doesn't
16  necessarily mean that other people know that you
17  are in a blackout.
18     Q.   At the time the article was published,
19  did you believe that Miss Rondini was blacked out
20  during the sexual intercourse?
21       MS. BOLGER:  Object to the form of the
22    question.
23       You can answer.
24     A.   As I report in my story, Megan was not
25  blacked out during the allegation that she made of

Page 149

K. Baker

1               K. Baker
2  rape and she told the police that.
3     Q.   You said you read an article about Kim
4  Fromme?
5     A.   Yes.
6     Q.   What's that article entitled?
7     A.   I don't recall.  If you Google Kim
8  Fromme from a BuzzFeed you will find it.  She
9  works at the University of Texas in Austin.
10     Q.   Do you recall if Miss Rondini ever
11  stated that she blacked out to law enforcement?
12       MS. BOLGER:  Objection to form.
13       You mean the word blackout?
14       MR. RITCHEY:  The word.
15     A.   I don't recall the exact words she
16  used anymore unless I reported them in my story,
17  but she was very clear that she had gaps in her
18  memory and did not recall what happened during
19  that time and that's the definition of a blackout.
20     Q.   Is that your definition of blackout or
21  the definition of blackout?  Are those two
22  separate things or are they the same?
23     A.   I would have looked up the definition
24  and like I said, I talked to clinical psychologist
25  about the definition and this would have been fact

Page 150

K. Baker

1  checked but four years later I can't remember
2  semantics, but I would have described -- I would
3  have felt confident that I described it
4  accurately.
5      Q.   Do you remember where you looked up
6  the definition of blackout?
7      A.   I feel confident that I described it
8  accurately in the story.
9      Q.   But do you remember where you looked
10 it up?
11     A.   Four and a half years later I don't
12 remember things like that, but I do have a fact
13 checking document and there could be information
14 in there that could be useful to you.
15     Q.   Could you have left Josh Hastings and
16 Adam Jones out of the article?
17         MS. BOLGER:  Object to the form of the
18     question.
19     A.   As a journalist I can't redact the
20 names of public officials, tax payer funded public
21 officials doing who are doing their job in public
22 documents that I am reporting on.  I fully respect
23 the police and I am glad they are there to protect
24 and serve us, but I also think they have to be

Page 151

K. Baker

1  accountable for the work they do.  That's why
2  those records are public and we wouldn't redact
3  names of people who we are writing about in that
4  way.
5      Q.   Why weren't you more critical about
6  the training that they received?
7         MS. BOLGER:  Object to the form of the
8     question.
9      I don't understand that question, but
10     you can answer it if you do.
11     A.   What do you mean critical?  I don't
12 understand the question.
13     Q.   I mean do you believe that Officer
14 Jones and Hastings were only as good as the
15 training they received?
16     A.   I never saw a copy of their policies
17 and procedures even though I asked for it.  So I
18 can't comment on that.
19     Q.   Was there a reason why other officers
20 involved in the investigation were not named?
21         MS. BOLGER:  Objection to form.
22         You can answer.
23     A.   I included the names of two other
24 officers who were involved Lieutenant Hart and

Page 152

K. Baker

1  Captain Hood.  I include the names of the people
2  that investigated Megan's allegations that I knew
3  of.
4      Q.   Is there a reason why you didn't
5  include all the officers listed in the felony
6  report?
7      A.   What other officers?
8      Q.   You have the two initial Tuscaloosa
9  Police Department officers.  You've got I think, I
10 maybe, you got Carroll.  There maybe a few more I
11 am missing.
12     A.   I think the fact that you don't
13 remember their names either kind of speaks to the
14 fact that I was really focusing on the key people
15 that investigated this case and when I got all the
16 information from the police it was Jones and
17 Hastings who were conducting the interviews.
18 Jones' name was on the felony packet and like I
19 said, I included Lieutenant Hart's name because he
20 wrote the e-mails to the Title IX administrator at
21 the school and of course I included Captain Hood
22 because he was the head of the department.
23     So of course I included the names of
24 all the people that were public officials who I

Page 153

K. Baker

1  was writing about.
2      Q.   Do you believe any of the other
3  officers other than Jones and Hastings that were
4  involved in the investigation did anything wrong
5  during the investigation?
6         MS. BOLGER:  Object to the form of the
7     question.
8      A.   I am not sure how to answer that
9  question because my story was about an
10 investigation into Megan Rondini's rape claim,
11 multiple institutions and I was reporting on how
12 her case was handled and the facts are accurate
13 and truthful and they are based on public records
14 and the public records that I used I included the
15 names of the public officials in those documents.
16     Q.   I believe you listed some ways you
17 think Officer Jones and Hastings could have
18 conducted an investigation differently.
19     Is there any other officer involved in
20 the investigation that you believe that they
21 should have conducted themselves in a different
22 way?
23         MS. BOLGER:  I am going to object.  I
24     don't think she testified it was Jones and

39 (Pages 150 - 153)

Page 154

K. Baker
1
2    Hastings.  She testified it was the
3    sheriff's department.
4        MR. RITCHEY:  Even better.
5    BY MR. RITCHEY:
6        Q.   The things you listed out to me
7    earlier, who are those attributable to?
8        A.   My story was about the institution,
9    the police department and of course I had to
10   include the names of the public officials and the
11   public documents that I used that were key to the
12   story, but I wasn't focusing on these officers.  I
13   mean I was focusing on them in their capacity as
14   investigators of this case.
15       Q.   And why did you not list every single
16   investigator in the case?
17       A.   Because I was reporting on the
18   investigation and in order to report on the
19   investigation and tell the story in a legible way
20   I had to include the names of the people who were
21   part of the investigation, who are leading the
22   investigation, but I wasn't -- I was reporting on
23   the institution of the police department.
24       Q.   But why not include, if you are
25   writing on an investigation and writing on the

Page 155

K. Baker
1
2    sheriff's office and the homicide department, why
3    not include every single investigator that was
4    involved in the case?
5        A.   We were just talking about them
6    earlier and you didn't even remember all their
7    names because there are a few people who are key
8    to the investigation whose names are all over the
9    records that I had and those are the people that I
10   named.
11       Q.   So of the people you didn't name as
12   investigators, do you think they did anything
13   wrong during the investigation?
14       MS. BOLGER:  Object to the form of the
15   question.
16       A.   I don't know what or who you are
17   referring to in that question.
18       Q.   So there are other officers, other
19   investigators in the case.
20       Can you attribute whether or not they
21   did anything wrong?
22       MS. BOLGER:  Objection to form.
23       A.   I don't know who you are referring to.
24   I am sorry.
25       Q.   Officer Carroll and the Tuscalosa

Page 156

K. Baker
1
2    Police Department officers.
3        A.   I don't know who that is.  I am sorry.
4        Q.   So the list of things that you told me
5    that could have been done differently in the
6    investigation, are you attributing those
7    specifically to Adam Jones and Josh Hastings or
8    are you attributing those to the homicide unit as
9    a whole?
10       A.   Are you talking about my opinion which
11   I think is not in the story?
12       Q.   Right.
13       A.   Let's go through all of those again.
14       Q.   Okay.
15       A.   The first thing I said was that I
16   didn't think that Jones and Hastings, who were
17   leading the investigation, followed up on Megan's
18   claims that Bunn had held her down by the hips
19   which she did tell them directly.
20       Q.   Let me stop you right there.
21       MS. BOLGER:  No, she is answering.
22       Q.   Okay.  Go ahead.  I wanted to clarify
23   that a little bit.
24       A.   And the fact that she had said that
25   she had verbally told Bunn that she didn't want to

Page 157

K. Baker
1
2    have sex with him and that he continued.  There
3    are a few claims like that that they just did not
4    pursue further.  As the investigators who were in
5    charge of the investigation and who ultimately
6    found that no rape occurred under Alabama law, I
7    do think I wonder why they didn't follow up on
8    that questioning.
9        So then in terms of Bunn, I think that
10   given that they were in charge of the
11   investigation they, I think I find it notable that
12   they let him go on a four-day fishing trip with
13   his lawyer.  That they didn't -- Hastings followed
14   up a little bit about the fact that he had lied to
15   police initially, but didn't really press him on
16   that at all.  They never kind of went deeper into
17   whether he had tampered with evidence or anything
18   like that.  I thought that was notable.
19       I thought it was notable that Hastings
20   and Jones never interviewed Megan's friends from
21   that night even though she had given them their
22   phone numbers.
23       I thought it was notable Jones also
24   gave her a refusal to -- offered to give her that
25   refusal to prosecute form despite best practices

Case 7:19-cv-00403-RDP   Document 71-6   Filed 10/21/21   Page 43 of 115

Page 158

K. Baker

1
2  that experts said you shouldn't do something like
3  that.
4         I think all of those do refer to Jones
5  and Hastings.
6     Q.   So Jones and Hastings were the only
7  officers in the investigation that you disagreed
8  with their conduct?
9         MS. BOLGER:  Objection to form.
10    That's absolutely not what she said.
11    Q.   That's why I am asking.
12        MS. BOLGER:  You can answer the
13    question.
14    A.   I am happy to go through everything I
15  said again.  But you asked me to walk through all
16  the points I made before and I believe I just did
17  and I also explained why, how they related to
18  Jones and Hastings.
19    Q.   So you don't believe any other
20  investigator did anything wrong in the
21  investigation?
22        MS. BOLGER:  Objection to form.
23    A.   I don't think I can answer that
24  question.
25    Q.   Why not?

Page 159

K. Baker

1
2     A.   Because my story was about what
3  happened when Megan reported what she believed to
4  be rape and in part was about our institutions
5  too, but in part it was about how her claim was
6  handled by the police and Jones and Hastings were
7  the ones in charge of her case.  Like I said, I
8  also included e-mails from Kip Hart.  I spoke at
9  length with Captain Hood, e-mailed with him at
10  length.  So I don't think it is accurate that the
11  only police officers in the story are Jones and
12  Hastings.
13        MS. BOLGER:  The woman needs to go to
14    the bathroom.
15        Can we end this?
16        MR. RITCHEY:  Yes.  I want to circle
17    back when she gets back, but sure.
18        MS. BOLGER:  Off the record.
19        (Discussion off the record.)
20        (Recess taken.)
21        (Luncheon recess:  1:12 p.m.)
22
23
24
25

Page 160

K. Baker

1
2         A F T E R N O O N   S E S S I O N.
3            (1:45 p.m.)
4  K A T I E   B A K E R,
5     having been previously sworn, resumed the
6     stand and testified further as follows:
7  EXAMINATION (Cont'd)
8  BY MR. RITCHEY:
9     Q.   When the article was published did you
10  have any reason to believe that Investigator Jones
11  or Hastings knew Miss Rondini's GPA?
12    A.   No.
13    Q.   Did you ever inquire into the locking
14  mechanism used on TJ Bunn's door in his bedroom?
15    A.   No and I don't report in the story
16  that it was locked.  I just say she couldn't open
17  the door.
18    Q.   Did the article ever receive any
19  awards?
20    A.   No, not that I am aware of.
21    Q.   Again, I am going into some of the
22  videos and ask when you received them.  If you
23  need me to show them to you I can show them to you
24  but I am not going to go into any specifics in the
25  videos, but for the Innisfree surveillance videos,

Page 161

K. Baker

1
2  do you understand what I am talking about there?
3         MS. BOLGER:  I am not sure there is a
4     question there.
5         Do you mean just do you understand?
6     Q.   Yes.  If I refer to the Innisfree
7  videos, do you understand that I am referring to
8  those Innisfree surveillance videos?  Do you
9  understand what I am talking about?
10    A.   I can't recall whether I looked at the
11  Innisfree surveillance videos.
12    Q.   Did you receive a copy of those
13  videos?
14    A.   So you have everything that I
15  received, but I can't recall -- I do recall most
16  other things, but I can't recall whether I saw
17  this video surveillance.
18    Q.   But you did receive them, am I getting
19  that right?  I can't remember what's been
20  produced.
21        MS. BOLGER:  I think she is trying to
22    tell you that she can't remember and if it
23    has been produced, it's been produced.
24    Q.   Did you ever receive a copy of the
25  surveillance videos from the houndstooth

41 (Pages 158 - 161)

Veritext Legal Solutions

877-373-3660                                          800.808.4958

Page 162

K. Baker

1   apartment?
2       A.   I did receive that, but I could not
3   see footage that showed Megan or TJ Bunn or Jason
4   Barksdale.  So I was given some surveillance
5   footage, but for whatever reason I couldn't find
6   any images of people in the surveillance footage.
7       Q.   Was this surveillance footage that you
8   received from recorded on July 1st or July 2nd of
9   2015?
10      A.   I don't recall, but I can tell you why
11  I didn't -- I can expand on -- I don't recall.
12      Q.   What did you want to expand on?
13          MS. BOLGER:  Go ahead.
14      A.   Both Megan and Bunn and -- at first
15  Megan didn't remember going there but then police
16  told her she went there.  She gave them her phone
17  so they could track her movements.  She didn't
18  deny having gone there.  She just didn't remember
19  it.  So I didn't see anything on the footage, but
20  I didn't feel like I needed the footage to
21  corroborate anything.  So I didn't ask for more
22  footage.
23      Q.   Who did you get the footage from?
24      A.   Mike Rondini subpoenaed the police and

Page 163

K. Baker

1   as I said the police wouldn't give us the case
2   file, but I got it from Mike Rondini.
3          MR. RITCHEY:  Please mark this as
4      Plaintiffs' Exhibit 123.
5          (Plaintiffs' Exhibit 123, a document
6      Bates Stamped BuzzFeed 60 to 61, marked for
7      identification, as of this date.)
8          MR. RITCHEY:  Please mark this as
9      Plaintiffs' Exhibit 124.
10         (Plaintiffs' Exhibit 124, a document
11     Bates stamped BuzzFeed 56 through 57, marked
12     for identification, as of this date.)
13      Q.   We have marked Exhibit 123 as BuzzFeed
14  60 to 61 and Exhibit 124 will be BuzzFeed 56
15  through 57.
16         Katie, I am going to ask you first to
17  identify Exhibit 123 which is BuzzFeed 60 to 61.
18      A.   You want me to do what?
19      Q.   Just identify it on the record.
20      A.   This looks like part of e-mail
21  correspondence I had with Bradley Fisher.
22      Q.   If you could identify Exhibit 124
23  which is BuzzFeed 56 and 57.
24      A.   This looks like a statement that I was

Page 164

K. Baker

1   given in February 2017 from the same person
2   Bradley Fisher.
3       Q.   Does Exhibits 123 and 124 represent
4   the DCH policy concerning victims of assault?
5          MS. BOLGER:  Object to the form of the
6      question.  She can't verify whether it is
7      actually their policy.  She can verify that
8      she received them, but that's it.
9       A.   I asked Bradley Fisher some questions
10  and they gave me a statement that says in response
11  to an inquiry.
12      Q.   And do you believe that Exhibits 123
13  and 124, is that your understanding that this is
14  the policy of DCH concerning victims of sexual
15  assault?
16      A.   No.  It is not my understanding
17  because they told me the procedures they followed
18  and then they responded to some of my questions
19  but I don't believe it is their full policy.
20      Q.   Would both exhibits combined, would
21  you consider that DCH's policies Exhibits 123 and
22  124?
23      A.   No.  The first one is just an e-mail
24  exchange.

Page 165

K. Baker

1       Q.   It looks like it was a followup to the
2   statement.
3       A.   They were just answering my questions.
4       Q.   Was it the responsibility of Jones and
5   Hastings to take blood or urine samples from Miss
6   Rondini during the course of the investigation?
7       A.   That's a good question.  So I
8   interviewed numerous experts.  I interviewed state
9   experts, national experts.  I am happy to tell you
10  about all of whom said it was, but of course I
11  don't know if it was the policy of the police
12  department because Captain Hood wouldn't give me
13  the policies, but I told Captain Hood what I would
14  be reporting in my story.
15      Q.   Those two experts you mentioned, who
16  are they?
17          MS. BOLGER:  Object to the form of the
18      question.  She mentioned four.
19      Q.   I'm sorry, four.
20      A.   Yeah, I did mention four.  So I
21  interviewed two high officials at the Texas State
22  forensic lab that handles the forensic report.  So
23  when somebody's blood and urine -- when police do
24  request that someone's blood and urine is tested,

42 (Pages 162 - 165)

Page 166

K. Baker

1        K. Baker
2  it goes to this lab and I had two interviews with
3  two officials there and they told me that it is
4  the police who are supposed to request it if they
5  suspect that there has been a drug facilitated
6  sexual assault or if there's just been gaps in
7  someone's memory and if there has been those gaps,
8  then that's the best practice.
9        Then I also spoke with Meg McGlamery
10 and the woman who is the CEO of Turning Point who
11 then left her job so I couldn't get back in touch
12 with her.
13        I spoke with the International
14 Association of Chiefs of Police, the IACP and that
15 those are some of the people I spoke with.
16    Q.   Did you speak to anyone that was
17 actually in law enforcement about it?
18    A.   I tried.  I spoke with Captain Hood
19 and I ran everything by him that I was going to
20 put in the story and I asked him repeatedly for
21 those policies and procedures.
22        MS. BOLGER:  Is IACP not in law
23    enforcement?
24    Q.   I'm sorry.  Specific to Alabama.
25    A.   I think going to the director of the

Page 167

1        K. Baker
2  state, the Alabama toxicology lab is from my
3  perspective one of the foremost experts they can
4  find since they handled the request and they work
5  with law enforcement specifically on those
6  requests.
7    Q.   Do they actually collect those
8  samples?
9    A.   They process them and test them.
10    Q.   But they don't collect them from the
11 victim, do they?
12    A.   They told me the police are supposed
13 to do that.
14    Q.   Do you know what their basis was for
15 saying that?
16    A.   The basis for the director of the
17 forensics toxicology lab?
18    Q.   Yes.
19    A.   That's his job.  His job is to process
20 those tests and work with law enforcement.
21    Q.   Just to process the test though;
22 correct?
23    A.   I don't know everything that falls
24 under -- they are the director.  So I assume that
25 they have lots of responsibilities.

Page 168

1        K. Baker
2    Q.   In Exhibit 123 on BuzzFeed 60 if you
3  look at the response from Bradley Fisher it says
4  "Drug and alcohol testing of the patient is
5  ordered at the discretion of the ED physician that
6  sees the patient."
7        Do you see where I am reading that?
8    A.   Yes.
9    Q.   Is that what your understanding was at
10 the time of the publication of the article as
11 well?
12    A.   No.  This was February 7th.  My story
13 came out June 26th.  By then I had done all the
14 other interviews I told you about and of course
15 talked to Captain Hood and I just want to make
16 clear that in the story when I talk about this I
17 talk about the hospital and the police separately
18 and I say that.  Let me just go to it.  I want to
19 make sure I am being accurate.
20        So do you mind if I read it from the
21 part that I am referring to?
22    Q.   That's fine.  If you will tell me what
23 page you are on.
24    A.   It is page 10.
25    Q.   And this is on the BuzzFeed article in

Page 169

1        K. Baker
2  Exhibit 122?
3    A.   Yes.
4        So do you want me to read the full
5  paragraph?
6        MS. BOLGER:  Yes.
7    A.   So "Studies show that trauma victims
8  often have fragmented memories of assault.  When
9  confronted with such gaps police should consider
10 the possibility of drug facilitated sexual assault
11 the International Association of Chiefs of Police
12 Guidelines explain.  But investigators never
13 tested Megan's blood or urine.  According to the
14 State Department that processes toxicology
15 reports, which found no records associated with
16 Megan's case."  Then of course I explain that by
17 Captain Hood as I did everything.  He said "Hood
18 said that was because Megan admitted to drinking
19 alcohol on her own free will even though she told
20 investigators she didn't think she'd had enough to
21 blackout."  Then I said "It's unclear if the
22 hospital even collected the blood and urine
23 samples necessary for forensic testing when it
24 performed a basic rape kit on Megan.  And "A DCH
25 spokesperson declined to comment on Megan's case

43 (Pages 166 - 169)

Veritext Legal Solutions
877-373-3660                                800.808.4958

Page 170

K. Baker

1        K. Baker
2  but he did say that the hospital doesn't employ
3  SANE, sexual assault nurse examiners who are
4  specially trained to collect critical forensic
5  evidence."
6        So I wanted to make clear what best
7  practices are for police given the constraints I
8  had because I didn't have the policies for the
9  police of course and I put Hood's perspective for
10 that reason but also wanted to explain what
11 happened at the hospital and it is actually my
12 understanding as a result of my reporting there is
13 now a SANE program in Tuscaloosa.
14       My story wasn't -- my story is on
15 multiple institutions. It was also about the
16 hospital and it is my understanding that as a
17 result of this reporting now there is a SANE
18 center in Tuscaloosa.
19    Q.  Do you disagree that drug and alcohol
20 testing of the patient is ordered at the
21 discretion of the ED physician that sees a patient
22 according to DCH policy?
23    A.  So I --
24       MS. BOLGER:  Objection to form. There
25    is nothing in the record that it suggested

Page 171

K. Baker

1        K. Baker
2  this is a DCH policy.  This is a response
3  from a flack I think.  PR person, a PR
4  spokesperson.
5        You can answer the question.
6  A.  Sorry.
7       MR. RITCHEY:  Do you mind repeating
8    that question?
9       (Record read.)
10      MS. BOLGER:  Same objection. There is
11   no testimony that this is a policy.
12      You can answer.
13   A.  I agree with her objection.  This was
14 a response now we know from Bradley Fisher but I
15 wanted to make clear the story was about
16 institutions and my goal was to say what are these
17 institutions do.  What could they have done
18 differently.  What was in line with best practices
19 and so in this paragraph that I read I made clear
20 that both investigators never tested her blood and
21 urine even though according to the guidelines and
22 that I did additionally four interviews just
23 because I always try to over-report things, facts
24 that everyone told me that it is something the
25 police should do in this type of situation.  But I

Page 172

K. Baker

1        K. Baker
2  also made it clear in the story that the hospital
3  could have collected the sample additionally and
4  it is unclear if that happened.
5    Q.  Do you believe Bradley Fisher was
6  truthful when he was telling you that drug and
7  alcohol testing was ordered at the discretion of
8  the ED physician for DCH?
9    A.  I have no way of knowing that.
10   Q.  Is there anything that would dispute
11 that?
12   A.  I don't want to speculate.  I don't
13 know.
14   Q.  Did you ever obtain any text messages
15 that were sent or received by Miss Rondini?
16   A.  In general?
17   Q.  For the article.
18   A.  Yes.
19   Q.  Do you know about how many?
20   A.  When I first met with Mike Rondini in
21 early 2017 he gave me the text messages.  All the
22 text messages that were on her phone.  I would
23 guess hundreds if not thousands but, I know I am
24 not supposed to speculate, but there was tons of
25 text messages.

Page 173

K. Baker

1        K. Baker
2    Q.  Is there any reason he gave those to
3  you?
4    A.  I don't know why he gave those to me.
5  I always accept whatever people would give me,
6  just why not.
7    Q.  You didn't ask for them though, he
8  just gave them to you?
9    A.  I asked him to give me anything he
10 wanted to give me.  You can see he sent me all
11 sorts of things.
12   Q.  What was the format of those text
13 messages?
14   A.  Gosh, I don't really know.  You would
15 know them because you would have seen them from my
16 discovery I think.
17   Q.  Were they screen captures of text
18 messages or was it --
19   A.  I am sorry.  I am not very technically
20 minded.  I can read the text messages.
21   Q.  No, that's fine.  I will show you one
22 in a second, but I am trying to find out what
23 format you received them in.
24       Did he take like a picture of all the
25 text messages and given them to you?

44 (Pages 170 - 173)

Page 174

K. Baker

1
2      A.     Somehow he had the data from her
3    phone.  I don't know how or what the technical
4    term is but it was not copy and pasted.  I could
5    see that they were text messages is my
6    recollection.
7      Q.     And the data from the phone, this is
8    the cell phone extraction report, does that ring a
9    bell?
10     A.     No.
11         MS. BOLGER:  Actually, that question
12       makes me think that she got that information
13       from the police and that's not in the
14       record.
15         MR. RITCHEY:  Okay, I'll ask her that.
16   BY MR. RITCHEY:
17     Q.    Do you know where he got the text
18   message printouts?
19     A.    He had them because it was his
20   daughter's phone and he downloaded the data
21   himself for a family member to (indecipherable)
22   something from his phone.
23     Q.    So he didn't obtain that from the
24   police or anything, to your knowledge?
25     A.    No.

Page 175

K. Baker

1
2      Q.    Do you know who downloaded those text
3    messages and other data for Mike Rondini?
4      A.    I think Mike -- I don't know.
5          MR. RITCHEY:  Please mark this as
6        Plaintiffs' Exhibit 125.
7          (Plaintiffs' Exhibit 125, a document
8        Bates stamped BuzzFeed 4165 through 4190,
9        marked for identification, as of this date.)
10     Q.    I am showing you what has been marked
11   as Exhibit 125.  This will be BuzzFeed 4165
12   through 4190.  Take your time to review it if you
13   need.
14     A.    This will take me a long time to
15   review.
16     Q.    I will only ask you questions on the
17   first couple of pages, but is this a text message,
18   a printout of a text message stream that you
19   received from Mike Rondini?
20     A.    No, I don't recall everything because
21   my story was about the investigation.  So I was
22   really focusing on what the police investigation
23   and then what happened at the hospital.  What
24   happened with the mental health counselor was
25   looking at.  I didn't look in depth at every

Page 176

K. Baker

1
2    single text message that Mike showed me.
3      Q.    But you think you received this when
4    he got all of the text messages that Mike gave
5    you?
6      A.    He gave me what he said were all of
7    the text messages.  So I definitely had all the
8    text messages but like I said, my story was about
9    the police investigation.  So I was looking at
10   information that was pertinent to the police
11   investigation.
12         MS. BOLGER:  Let me clarify.  There
13       are several versions of these text messages
14       that were found in the BuzzFeed files and
15       sent to you.  I think what Katie is
16       struggling with is that you are seeking to
17       identify what she got from Mike Rondini
18       specifically and she can't do that.  She
19       doesn't remember.  That's what I think the
20       disconnect is.
21         MR. RITCHEY:  Let me try again.
22   BY MR. RITCHEY:
23     Q.    Did you have Exhibit 125 before you
24   published the article?
25         MS. BOLGER:  So that's the point.  I

Page 177

K. Baker

1
2    think she would testify she had text
3    messages, but I don't know that she could
4    testify she had this one.
5      A.    When I met with Mike six months before
6    I published my story, he gave me what he said was
7    his personal download of Megan's phone and her
8    text messages.  So I had those, but my story was
9    about the rape report that she made and the
10   institutions and everything that happened after
11   that.  So I was really focused on what the police
12   knew and how the police decided that Megan's
13   allegations did not constitute rape.
14         And so I was given a lot of stuff but
15   I am not -- the things I am familiar with are the
16   facts pertinent to my story which was the
17   investigation.
18     Q.    And if you will turn to BuzzFeed 4167
19   in Exhibit 125 about halfway down there is a
20   stream and it starts with the date 7/2/15 12:08
21   a.m.
22         Do you see that?
23     A.    Yes.
24     Q.    Do you ever remember reviewing that
25   stream of text messages?

45 (Pages 174 - 177)

Page 178

K. Baker

1   K. Baker
2       A.   I do.
3       Q.   And that would have been done before
4   you published the article; correct?
5       A.   Yes.  I did see these and even though
6   I had no evidence that these texts were part of
7   the police investigation, I did ask the person
8   that Megan texted about these texts and I also
9   asked her father about these texts.
10      Q.   Can you disclose who that person is?
11      A.   No.  I promised her confidentiality
12  but I know the police didn't interview her.
13      Q.   Did you discuss this text message
14  string on BuzzFeed 146 in Exhibit 125 with anyone
15  within BuzzFeed?
16      A.   I don't recall.
17      Q.   Do you remember discussing that with
18  anyone outside of BuzzFeed other than any of your
19  attorneys?
20           MS. BOLGER:  Other than the people she
21       just testified to?  She just testified she
22       spoke to two people.
23      Q.   I'm sorry.
24           Who were those two people?
25      A.   I spoke with the woman that Megan

Page 179

K. Baker

1   K. Baker
2   texted it to which the police did not and I spoke
3   to Mike Rondini about them as well.
4       Q.   What did you discuss with the actual
5   recipient of this text message, what was
6   discussed?
7       A.   I asked her what she thought Megan
8   meant by those text messages.
9       Q.   And what did she say?
10      A.   She said that she didn't know because
11  an hour or so later Megan told her that she had
12  been raped and went immediately to the hospital
13  and immediately after that went to talk to the
14  police and she believed her friend and that was
15  kind of the end of it.
16      Q.   What was discussed with Mike Rondini?
17      A.   I asked him if he ever saw them or
18  thought anything of it.
19      Q.   What did he say?
20      A.   He said the same.  He said that he saw
21  them, but the next thing he knew as well she had
22  gone directly to the hospital saying she was raped
23  and neither the woman that Megan texted nor Mike
24  thought that that meant that her rape allegation
25  wasn't what she believed to have happened to her

Page 180

K. Baker

1   K. Baker
2   and Mike said that the police never asked him
3   about it and like I said, the police never asked
4   the woman about it either.
5       Q.   Did you ever receive a copy of the
6   Snapchat videos that Miss Rondini took of Bunn's
7   residence?
8       A.   I believe that I did, but I only
9   recall that because I saw reference to them in
10  documents we were reviewing.
11      Q.   Do you remember who gave those to you?
12      A.   I don't recall.
13      Q.   Do you remember when you received
14  those?
15      A.   I just don't recall.
16      Q.   Do you remember whether or not you had
17  those Snapchat videos before publication of the
18  article?
19           MS. BOLGER:  Object to the form of the
20       question.  Asked and answered.
21      A.   I just said that I saw that I
22  referenced having them so I must have had them,
23  but I don't recall when I received them.
24      Q.   But you had them before publication?
25      A.   Yes.

Page 181

K. Baker

1   K. Baker
2           MR. RITCHEY:  Please mark this
3       document as Plaintiffs' Exhibit 126.
4           (Plaintiffs' Exhibit 126, a document
5       Bates stamped BuzzFeed 4151 through 4155,
6       marked for identification, as of this date.)
7       Q.   I am showing you what has been marked
8   as Plaintiffs' Exhibit 126.  It is BuzzFeed 4151
9   through 4155.
10           Do you recognize what Exhibit 126 is?
11      A.   It looks like it was a slack channel.
12  It looks like it was a slack channel set up to
13  discuss the images for the story.
14      Q.   This one you may not remember, but
15  there is a user name associated with a few of
16  these messages.  It looks like the first one
17  appears on 4151 and goes throughout.
18           Do you remember who that was?
19           MS. BOLGER:  Don't speculate Katie.
20           THE WITNESS:  I wasn't going to.
21      A.   I don't know.  It's going to be
22  somebody who left the company.  It is not me, if
23  that's what you are wondering.
24           MR. RITCHEY:  Please mark this
25       document as Plaintiffs' Exhibit 127.

46 (Pages 178 - 181)

Page 182

K. Baker

1
2      (Plaintiffs' Exhibit 127, a document
3    Bates stamped BuzzFeed 92 through 95, marked
4    for identification, as of this date.)
5      Q.   I am showing you what has been marked
6    as Plaintiffs' Exhibit 127.  It is BuzzFeed 92
7    through 95.
8        Do you recognize what Exhibit 127 is?
9      A.   It looks like an e-mail that I was, an
10   e-mail exchange with Laura Geiser who is a photo
11   editor at BuzzFeed.
12     Q.   On BuzzFeed 93 about halfway down
13   there is an e-mail looks like you wrote on
14   February 24, 2017 at 3:20 p.m.
15       Do you see where I am?
16     A.   Yes.
17     Q.   In there you say "I have never done
18   that with a freelancer and a source particularly
19   legally sensitive."
20       What did you mean by legally
21   sensitive?
22       MS. BOLGER:  Just before you answer
23     that question Katie, why don't you take a
24     chance to read the whole exhibit so you know
25     what you are talking about.

Page 183

K. Baker

1
2      MR. RITCHEY:  Please do that.
3      MS. BOLGER:  Then of course you are
4    free to answer.
5    A.   If you look at the date, which is
6    February 24th, March, April, May, it is still four
7    months before my final story ran and I knew full
8    well I did not have all the facts yet in the story
9    and I didn't really know what my story was going
10   to look like and at the end of the day I was still
11   waiting for more information.  I wasn't ready to
12   tell anyone especially not my editor or my fact
13   checker what I was looking at yet because my story
14   concerned Megan Rondini's report of what she
15   believed to be rape which is a serious allegation
16   and I didn't want to -- it concerns the
17   investigation into a serious allegation and it
18   concerned institutions, the police department, the
19   hospital, mental health services and I just didn't
20   want to have anyone hear rumors when I wasn't done
21   with my reporting.
22       MR. RITCHEY:  Please mark this as
23     Plaintiffs' Exhibit 128.
24     (Plaintiffs' Exhibit 128, a document
25   Bates stamped BuzzFeed 2495 through 2500,

Page 184

K. Baker

1
2    marked for identification, as of this date.)
3      Q.   I am showing you what has been marked
4    as Exhibit 128 and this is BuzzFeed 2495 through
5    2500.
6        Do you recognize what this Exhibit is?
7      A.   They look like they are comments on a
8    very early draft that was over four months before
9    my final story ran.
10     Q.   If you look towards the bottom of 2495
11   it says "My larger point was that no officer would
12   do this.  It doesn't make any sense to test in
13   this way.  Maybe we should just delete this
14   paragraph completely."
15       Do you know what this is referencing
16   to?
17     A.   I have no idea.
18     Q.   And I tried to find a match to it in
19   the draft and I could not find it.
20       MS. BOLGER:  I can tell you it is
21     related to confidential source information
22     that was redacted before this was produced.
23     Let me say this, I believe it.  I don't want
24     to swear on a stack of bibles, but my memory
25     and what I understand is the redacted

Page 185

K. Baker

1
2    comment from Marisa Carroll is what she was
3    commenting on and that was related to a
4    source that was confidential and was removed
5    from the story.
6        MR. RITCHEY:  That answers that
7      question.  Please mark this document as
8      Plaintiffs' Exhibit 129.
9      (Plaintiffs' Exhibit 129, a document
10   Bates stamped BuzzFeed 2602, marked for
11   identification, as of this date.)
12     Q.   I am showing you what has been marked
13   as Plaintiffs' Exhibit 129.  This is BuzzFeed
14   2602.
15       Do you recognize this Exhibit?
16     A.   It looks like a comment on that really
17   early draft.
18     Q.   And I am just using this to try to
19   refresh your recollection, but you state looks
20   like I guess I am going to call it call out.  I
21   can't think of the term.
22     A.   Tagging.
23     Q.   You are tagging Marisa and Tina asking
24   can we please talk about something related to this
25   tomorrow Friday.  It looks like it is relating to

47 (Pages 182 - 185)

Page 186

K. Baker

1          K. Baker
2 a special inquiry.  I am hoping this refreshes
3 your recollection.  If it doesn't, just tell me,
4 if you had any conversations with them about
5 special inquiry.
6     A.    No.  And I would be very impressed
7 with myself if I could remember.  If I wrote this
8 last week I probably wouldn't remember what it
9 meant.  Sorry.
10     Q.   I had to try.
11     A.   I wish my memory was that good.
12          MR. RITCHEY:  Please mark this as
13     Plaintiffs' Exhibit 130.
14          (Plaintiffs' Exhibit 130, a document
15     Bates stamped BuzzFeed 2570, marked for
16     identification, as of this date.)
17     A.    It looks like I am not on this e-mail.
18     Q.   Give me one second.  I am showing you
19 what has been marked as Exhibit 130.  This is
20 BuzzFeed 2570 and if you would just identify it
21 for the record.
22          MS. BOLGER:  She can't identify it if
23     she didn't receive it.
24     Q.    Have you ever received this e-mail?
25     A.    No.

Page 187

K. Baker

1          K. Baker
2     Q.    You have never seen Exhibit 130
3 before?
4     A.    No.
5     Q.    This is an e-mail from Marisa Carroll
6 to Shani Hilton, Maggie Schultz and Tina Susman
7 regarding national desk memo 3/7/17 sent on
8 3/7/2017 at 3:52 p.m. and I understand you have
9 not seen this.  I want to see if this refreshes
10 your recollection.  It appears that the article
11 may have been published after Spring break in
12 March of 2017.
13          Was that the case ever?
14     A.    I can't speak for an e-mail that I
15 didn't send or receive.
16     Q.    Do you ever remember this article
17 being ready to publish at the end of March or
18 early April 2017?
19     A.    No, I do not.
20          MS. BOLGER:  I am going to object to
21     the form actually because it doesn't say we
22     are ready to publish.  It says we are almost
23     done, but that's okay.
24          MR. RITCHEY:  Please mark this
25     document as Plaintiffs' Exhibit 131.

Page 188

K. Baker

1          K. Baker
2          (Plaintiffs' Exhibit 131, a document
3     Bates stamped BuzzFeed 2622, marked for
4     identification, as of this date.)
5          MR. RITCHEY:  Please mark this
6     document as Plaintiffs' Exhibit 132.
7          (Plaintiffs' Exhibit 132, a document
8     Bates stamped BuzzFeed 3826 through 3843,
9     marked for identification, as of this date.)
10     Q.    We have first marked Exhibit 131 and
11 that's going to be BuzzFeed 2622.
12          Do you recognize Exhibit 131?
13     A.    It looks like comments on that draft,
14 the same draft we have been discussing.
15     Q.    And then the second Exhibit I handed
16 to you was 132 and that is BuzzFeed 3826 through
17 3843.
18          Do you recognize Exhibit 132?
19     A.    Just looking quickly it just looks
20 like a draft of the story, but I don't know which
21 one.
22     Q.    Is there any way to tell from the
23 drafts which draft is it other than you
24 remembering?
25          MS. BOLGER:  They all had metadata as

Page 189

K. Baker

1          K. Baker
2 produced to you.  All of the digital files
3 contains metadata.
4          MR. RITCHEY:  I may need to talk to
5     you about that because I am not sure where
6     to look for that, but we can discuss that
7     later.
8          MS. BOLGER:  So I will tell you the
9     drafts are dynamic electronic documents so
10     they are difficult because they are
11     constantly updated, but they have all data
12     that identifies which is which.
13          MR. RITCHEY:  That one is over my head
14     believe it or not.
15          MS. BOLGER:  And obviously it is over
16     mine but Kathleen and Amanda assures me that
17     there is a way to tell them apart.
18          MR. RITCHEY:  That would be helpful.
19 BY  MR. RITCHEY:
20     Q.    Any ways, on Exhibit 131 BuzzFeed 2622
21 you talk about not implicating Tuscaloosa.  This
22 comment is also found on Exhibit 132 and that's
23 going to be BuzzFeed 3828.  Those comments look
24 like comments 28 through 30 just for reference.
25 If you need a second to review let me know.

48 (Pages 186 - 189)

Page 190

1           K. Baker
2     MS. BOLGER:  I am going to ask you to
3   review please.
4    A.  That comment that I made, do you know
5 what sentence that comment relates to?
6    Q.  The best I can give you is it looks
7 like most of those go to a point right above those
8 three stars.
9    A.  Then I am just not going to be able to
10 remember what it referred to.
11     MS. BOLGER:  So again just for the
12   record, that redaction relates to
13   information that was taken out of the story
14   because it related to a confidential -- the
15   big block text is redacted because it
16   related to the confidential source that was
17   taken out of the story.
18    A.  So the comment related to something
19 that was taken out because --
20     MS. BOLGER:  I don't know about that
21   but I know that that redaction in the middle
22   was for that reason.
23     MR. RITCHEY:  Mark this as the next
24   Exhibit please Plaintiffs' Exhibit 133.
25     (Plaintiffs' Exhibit 133, a document

Page 191

1           K. Baker
2   Bates stamped BuzzFeed 3313 through 3314,
3   marked for identification, as of this date.)
4    Q.  You have just been handed what was
5 marked as Plaintiffs' Exhibit 133.  It is BuzzFeed
6 3313 through 3314.
7     Do you recognize Exhibit 133?
8    A.  It looks like comments between me and
9 my editor.
10    Q.  And I could not find a match to this
11 specific comment I am going to be talking about.
12 It is going to be the last comment on 3313 of
13 Exhibit 133.  It says "I just thought that legally
14 we were trying to make it clear the difference
15 between making the report and the crime itself and
16 this seems to me to put more focus on the act of
17 reporting, but if you don't like it we can take it
18 out."
19     I am just wondering, what is the
20 difference that you are referring to here between
21 making the report and the crime itself?
22     THE WITNESS:  I have a question for
23   you about redactions.
24     MS. BOLGER:  She is asking me a
25   privileged question.

Page 192

1           K. Baker
2   Do you mind if we could we take a
3 break so I can help her with a privilege
4 assertion on this question?
5     MR. RITCHEY:  Okay.
6   Is it about a confidential source?
7     MS. BOLGER:  No.  As you see it says I
8 just thought that legally we were trying to
9 make it clear the difference between making
10 the report and the crime itself and she
11 wants me to ask a question, ask me a
12 question about that, the word legal and
13 whether there are privileged objections.
14   So just hold on one second and we will
15 be right back.
16   (Pause.)
17   (Witness confers with counsel.)
18     MS. BOLGER:  Katie just told me that
19 that refers to a conversation.  This was
20 clawed back.  I just got a text from Amanda
21 saying we clawed this back.
22     MR. RITCHEY:  This one was?
23     MS. BOLGER:  Yes.
24     MR. RITCHEY:  I apologize.  I have
25 seen a lot of them and I can't keep up.

Page 193

1           K. Baker
2     MS. BOLGER:  Totally fine don't worry.
3 But the reason we clawed it back, just so
4 you know, is that reference is a
5 conversation with an attorney, so we clawed
6 it back.  We didn't know when we produced it
7 that it did and then we clawed it back once
8 we learned.
9     THE WITNESS:  Should I rip it up?
10     MS. BOLGER:  Just put it with the
11 other documents.
12     MR. RITCHEY:  Please mark this
13 document as Plaintiffs' Exhibit 134.
14     (Plaintiffs' Exhibit 134, a document
15 Bates stamped BuzzFeed 509 to 519, marked
16 for identification, as of this date.)
17    Q.  You have just been handed Exhibit 134.
18 This is BuzzFeed 509 to 519.
19     Do you recognize Exhibit 134?
20    A.  Yes.
21    Q.  What is it?
22    A.  This was my correspondence with
23 Captain Hood.  As I said, I reached out to all of
24 the police officers named in the story and tried
25 really hard to get them to speak with me

49 (Pages 190 - 193)

Page 194

K. Baker

1      K. Baker
2  individually, but I was told that Captain Hood
3  would speak for everybody.  So I asked him my
4  questions and we had a back and forth for a while
5  and this was my no surprises letter that I had
6  told you about.  So I sent him everything we were
7  planning to include in the story and the goal was
8  to give him a chance to tell me anything that I
9  didn't know that was part of the investigation
10  that I wasn't aware of and he did tell me some
11  things and we reflected all his key points in our
12  story.
13     Q.    Were any discussions held concerning
14  the explanations provided in this e-mail?
15        MS. BOLGER:  Where?
16     Q.   Any time besides with your attorneys.
17     A.   I can't recall for sure.
18     Q.   Was there any reason why the dates
19  that Captain Hood mentions on BuzzFeed 509 in the
20  Exhibit 134 concerning the Grand Jury process was
21  not included in the article.  So I am looking at
22  the second paragraph on 509.
23        Any reason why those dates were not
24  included in the article?
25     A.   Sorry.  I am just refamiliarizing

Page 195

1      K. Baker
2  myself with all of this.
3        MS. BOLGER:  Actually, I object to the
4     form of the question.
5        You can answer.
6     A.   Sorry.  I am just trying to make sure
7  I understand.
8        MS. BOLGER:  I object to the predicate
9     that the date wasn't included in the
10     article.
11        MR. RITCHEY:  All the dates.
12     A.   So which dates weren't included in the
13  article?
14     Q.   I believe it is never mentioned that
15  the investigation was finished and submitted to
16  the District Attorney's Office on September 21,
17  2015.
18     A.   So I say internal documents from
19  September 2015 in my article which is what I knew
20  I had.  I had internal documents.  So I do say
21  September 2015.
22     Q.   You say you have a document from
23  September 2015.  You don't say it was presented to
24  the Grand Jury or anything was presented to the
25  Grand Jury.

Page 196

1      K. Baker
2        MS. BOLGER:  Actually, that paragraph
3     is about the Grand Jury.
4     A.   Is your --
5        MS. BOLGER:  You want to look at the
6     story?
7     A.   I don't see September 21st.  I see
8  September 2015 which I think is more than fair
9  enough for the reader.  It is page 15 and it is
10  three paragraphs up from the bottom and exactly I
11  say in my story that "Although Megan and her
12  family were told her criminal case wouldn't move
13  forward, the District Attorney's Office eventually
14  decided to present it to a Grand Jury after all.
15  There was a catch in a package deal.  The Grand
16  Jury would also rule on felony charges against
17  Megan for breaking into Bunn's car and stealing
18  his gun.  Internal documents from September 2015
19  imply authorities didn't intend to fight too hard
20  on Megan's behalf.  Investigators noted they found
21  no sexual assault occurred."
22     Q.   So you never stated that the
23  investigation was finished and the file submitted
24  to the District Attorney's Office on September 1,
25  2015 why was that not included?

Page 197

1      K. Baker
2     A.   You are asking why this September 2015
3  instead of September 21st?
4     Q.   No.  I think I am more asking is why
5  did you not say when the investigation was
6  finished and when that investigative file was
7  submitted to the District Attorney's Office?
8     A.   I think it is clear in the story that
9  I say September 2015.  I am sorry.  I don't
10  understand what you think I should have included.
11     Q.   All it says is you've got internal
12  documents from September 2015 and authorities
13  didn't intend to fight too hard on Megan's behalf.
14  Investigators noted they found no sexual assault
15  occurred.  Got that.
16        I am asking why did you not put in
17  when the investigation ended and when the
18  investigator file was turned over to the District
19  Attorney's Office?
20     A.   I think the timeline is clear in this
21  paragraph.  I say "The District Attorney's Office
22  eventually decided to present it to a Grand Jury
23  after all."  And this information that Captain
24  Hood helpfully provided, help me fact check that I
25  was right and do the chronology, but of course as

50 (Pages 194 - 197)

K. Baker

1   I said, he told me that Megan's case never went
2   forward which it did.  So I didn't know that, but
3   I think the timeline on my story is clear and
4   accurate.
5       Q.   When the article was published, were
6   you aware that Josh Hastings had spoken to TJ Bunn
7   during the time that Josh was at Bunn's residence?
8       MS. BOLGER:  You mean the morning of
9       July 2nd?
10      MR. RITCHEY:  Correct.
11      A.   So it's hard for me to recall
12  everything that I knew.  So I am just looking at
13  the story and I report that Josh Hastings is
14  interviewing Bunn on July 6th.
15      MS. BOLGER:  I don't think that was
16      Scotch's question.
17      A.   Could you repeat the question?
18      MR. RITCHEY:  Do you mind repeating my
19      question please?
20      (Record read.)
21      MS. BOLGER:  That question is very
22  confusing.
23      So can you give her a timeline?
24      MR. RITCHEY:  Okay.

*(Note: line numbering above condensed — preserving original.)*

K. Baker

1   BY  MR. RITCHEY:
2       Q.   I am going to ask it again.  It maybe
3   better.
4       At the time the article was published,
5   were you aware that Josh Hastings had spoken to TJ
6   Bunn at TJ Bunn's residence on July 2, 2015?
7       A.   I was aware that investigators went to
8   Bunn's house and he said that Megan hadn't been
9   there that night.  Yes, I did know that.  I was
10  aware and I was aware that Bunn initially said
11  Megan hadn't been there that night and that
12  eventually they left and they didn't call him in
13  for questioning until after he went on the
14  four-day fishing trip with his lawyer and close
15  the window and the tampering with the crime
16  screen.
17      Q.   For my clarity, you were aware at the
18  time of publishing that Josh Hastings had spoken
19  to TJ Bunn at TJ's residence on July 2, 2015?
20      A.   Yes and as I report in the story when
21  he comes in four days later after the fishing
22  trip, Hastings refers to that initial conversation
23  they have and I quote from it in the story.
24      Q.   At the time the article was published,

K. Baker

1   were you aware that it was standard procedure for
2   law enforcement to keep in touch with the Title IX
3   office with the University of Alabama?
4       A.   I couldn't have known what the
5   policies and procedures were because Captain Hood
6   wouldn't give them to me.
7       Q.   Did Captain Hood ever tell you that
8   was the standard policy and procedure?
9       A.   I asked repeatedly for the policies
10  and procedures and he wouldn't give them to me.
11      MS. BOLGER:  We have been going for
12      about an hour, so I wouldn't mind a break
13      any time soon.
14      MR. RITCHEY:  I have one more question
15      on this.  I am trying to find the spot to
16      direct y'all to but after that we can.
17      I think you may have answered it
18      already, so why don't we go ahead and take
19      that break.
20      MS. BOLGER:  Thanks.
21      (Recess taken.)
22      A.   I wanted to correct one thing.
23  Captain Hood didn't give me his policies and
24  procedures.  I answered too quickly and he did say

K. Baker

1   that it was standard procedure for us to stay in
2   contact with the Title IX coordinator and keep
3   them informed.  So I just wanted to get that on
4   the record.
5       Q.   Is there any reason why that did not
6   make it into the article?
7       A.   I didn't say in the article that there
8   was a problem with them keeping them informed.
9   What I found notable about the correspondence is
10  that Lieutenant Hart also kept them informed in
11  the case against Megan and shared allegations
12  before they formally charged her or anything like
13  that which wasn't part of the protocol.
14      MR. RITCHEY:  Please mark this as
15      Plaintiffs' Exhibit 135.
16      (Plaintiffs' Exhibit 135, a document
17      Bates stamped BuzzFeed 2475 through 2477,
18      marked for identification, as of this date.)
19      Q.   I am showing you what has been marked
20  as Exhibit 135.  It is BuzzFeed 2475 through 2477.
21  Feel free to take a look, but I am going to be
22  asking you about a comment on BuzzFeed 2476 about
23  almost halfway down where he says something like
24  this to make clear she thought she was drugged,

K. Baker

1         K. Baker
2  but if you need a second to read for context let
3  me know.
4      A.    So this looks like a comment from that
5  early on draft back in February and this was
6  before I had any of the medical records or
7  anything like that.
8      Q.    Would this had been before you had the
9  subpoenaed documents from Mike Rondini as well?
10     A.    Yes.
11     Q.    When you published the article, did
12  you think that Miss Rondini thought she was
13  drugged?
14     A.    There is no way of knowing whether she
15  was drugged because her blood and her urine was
16  never tested.
17     Q.    And then at the time of publication
18  did you have any reason to believe that Miss
19  Rondini thought she was drugged?
20     A.    I didn't report that she thought she
21  was drugged in my story and I didn't believe that
22  either because I didn't report it in my story but
23  I did report in my story she had gaps in her
24  memory and as I reported in my story, when someone
25  has gaps in their memory of the kind Megan has it

1         K. Baker
2  is best practice to test the urine and the blood
3  regardless of what the alleged victim thinks.
4         MR. RITCHEY:  Please mark this
5      document as Plaintiffs' Exhibit 136.
6         (Plaintiffs' Exhibit 136, a document
7      Bates stamped BuzzFeed 3719, marked for
8      identification, as of this date.)
9      Q.    You are being shown what was marked as
10  Plaintiffs' Exhibit 136.  It is BuzzFeed 3719.  I
11  am just wondering what it means to be badged
12  trending.
13     A.    So BuzzFeed News because our
14  editor-in-chief is a Pulitzer Price winning
15  journalist and we are very serious people but
16  originally because the website started off, I
17  don't know how it started off, but there is all
18  this stuff I don't really understand about badges
19  and so on that are from before I started and it is
20  sort of automatic.  From what I can tell it just
21  means people are reading your story.  I often get
22  this type of thing when I write a story.  It
23  publishes and people are reading it and you got
24  this thing that people are reading your story.
25     Q.    Do you happen to know what threshold

1         K. Baker
2  you have to reach?
3      A.    I don't know.
4         MR. RITCHEY:  Please mark this
5      document as Plaintiffs' Exhibit 137.
6         (Plaintiffs' Exhibit 137, a document
7      Bates stamped BuzzFeed 3202 through 3205,
8      marked for identification, as of this date.)
9         MR. RITCHEY:  Go ahead and mark this
10     document as Plaintiffs' Exhibit 138 as well.
11         (Plaintiffs' Exhibit 138, a document
12     Bates stamped BuzzFeed 3783 through 3793,
13     marked for identification, as of this date.)
14     Q.    You have been handed Exhibit 137 which
15  is BuzzFeed 3202 through 3205.
16         Do you recognize Exhibit 137?
17     A.    It looks like it is a conversation
18  between me, Marisa Carroll and the fact checker
19  Sharmila.
20     Q.    I have handed you Exhibit 138 and
21  that's BuzzFeed 3783 through 3793.
22         Do you recognize Exhibit 138?
23     A.    It looks like it is another one of my
24  many drafts.
25     Q.    If you need time to review let me

1         K. Baker
2  know.
3      A.    I think it might take a while for me
4  to read the whole draft.
5         Is that what you want me to do?
6      Q.    Why don't I try to ask the question
7  and if you need to review for context, let me know
8  and we can, we will do that.  I don't want you to
9  have to read the whole thing.
10         On Exhibit 137 on BuzzFeed 3202
11  Sharmila had a few questions about the video
12  interview specifically when you stated Jones
13  abruptly left the room.  It's going to be the
14  first comment section right there.
15         Did you and Sharmila have any
16  conversations concerning this part of the article?
17  And these comments are going to be also found in
18  Exhibit 138 on BuzzFeed 3787 comment 58 through
19  61.
20     A.    So for fact checking we try and have
21  our conversations written down for these purposes
22  not because we hope one day we will be deposed,
23  but because it is so easy to go back and see what
24  we were thinking.  So I think these comments
25  actually like clearly lay out our discussion where

52 (Pages 202 - 205)

Page 206

1        K. Baker
2   I felt that Sharmila was speculating on what was
3   in somebody's head which of course we do reach out
4   for comment and I did, but if someone doesn't tell
5   us what they are thinking and we just have a video
6   as I say here, I tried to stick to the facts
7   rather than speculate on his intentions.  And I
8   asked her to be specific if she felt I was being
9   factually inaccurate and she, with the final
10  wording, did not.
11       So again we didn't want to speculate
12  on what Jones was thinking.  We wanted to describe
13  it and also because I reached out to him and he
14  didn't get back to me, I did include a text from
15  Megan where she said that he said he was going to
16  get the gun because he was worried about little
17  kids getting it because I really wanted to explain
18  what he was doing.
19       Q.   In this portion that's being referred
20  to in the comments, did you agree with Sharmila at
21  the time that it misled Jones's intention in any
22  way?
23       MS. BOLGER:  I object to the form of
24       the question.  That's not what Sharmila
25       testified.  Sharmila testified that when the

Page 207

1        K. Baker
2       story was published she was perfectly
3       comfortable with the story.
4       MR. RITCHEY:  Yeah, I got that.  I'm
5       saying at the time she wrote this comment.
6       A.   I think I just answered that because I
7   said I tried to stick to the facts rather than
8   speculate on his intentions.  So I felt like she
9   was speculating into what was in his head and I
10  wanted to stick with the facts, as is always what
11  I try to do, and like I said, just to be extra,
12  extra clear given that Jones declined to speak
13  with me about this part of the story, I included
14  the text that Megan sent at that time where she
15  said that Jones said that he was going to get the
16  gun to make sure that little kids couldn't use it.
17       Q.   As used in the article, what was your
18  definition of abruptly?
19       A.   Abruptly means like quickly.  I was
20  just describing his literal physical actions.
21  Like I said, I was explaining in the only way
22  possible given that he wouldn't speak to me.  He
23  said that he had to go make sure to get the gun so
24  kids didn't grab it.
25       Q.   You are saying you couldn't tell

Page 208

1        K. Baker
2   Jones' intentions from the video interview?
3       A.   I try and stick with the facts rather
4   than speculate.  So he told Megan why he went.  I
5   think in terms of abruptly as well.  Megan was
6   there to report what she believed to be a rape and
7   then she was describing what happened and then she
8   mentioned the gun and then he left the room and
9   the investigation changed because he started
10  investigating her for those felonies, but like I
11  said, I made clear to include in the story what he
12  said to Megan through her text since Jones
13  wouldn't talk to me directly.
14       Q.   Why did you use Megan's text to
15  introduce the idea that he was going to get the
16  gun for the protection of the neighborhood rather
17  than using Jones' words itself?
18       A.   I thought that it was really important
19  for readers to understand that he had a reason to
20  go get the gun.  He wanted to protect children.
21       Q.   Why didn't you use Jones' voice to
22  tell the readers that rather than Miss Rondini's
23  voice to do so?
24       A.   I used Jones' voice as well.
25       Q.   For that specific part?

Page 209

1        K. Baker
2       A.   Yes.
3       Q.   How?
4       A.   I think it was clearest in her voice.
5       Q.   Wouldn't it be clear from the person
6   who actually said it rather than a secondhand
7   account?
8       A.   I think the clearest thing is that he
9   is going to help little children from a gun.  If I
10  use that quote that's because he said the thing
11  about the children clearest in that way.
12       Q.   But why not use his voice if he said
13  it?
14       A.   I don't recall how he used, how he
15  described it to Megan or how that might have been
16  on the record, but at the time I felt the clearest
17  way of showing it is I wanted to get across the
18  fact he wanted to help children.  He wouldn't
19  speak to me even though I called him and sent him
20  a letter and I really wanted to make it clear
21  that's what he was doing and that's what I had to
22  work with.
23       Q.   He says in the interview, recorded
24  interview tape with Megan Rondini; correct?
25       A.   I can't recall the exact words from

Page 210

K. Baker
2 the interview.  All I know is at the time I felt
3 it was important for me to be accurate what he was
4 going to do and I felt since he did go do it for
5 that reason; right.
6        That is why Jones went to go get the
7 gun; right?
8    Q.   You tell me.
9        What did you think?
10   A.   I thought he went to go protect
11 children.
12   Q.   At the time the article was published,
13 did you believe that Investigator Jones was
14 building a case against Miss Rondini when he left
15 the room after she mentioned the gun?
16   A.   So I believe what I reported in my
17 story.  We covered this a few hours ago.  Let me
18 go back to make sure I have the timeline correct.
19        I believe that when he read her her
20 Miranda rights that was evidence that he had
21 started to investigate her for those crimes he
22 thought she may have committed.
23        MR. RITCHEY:  Please mark this
24     document as Plaintiffs' Exhibit 139.
25        (Plaintiffs' Exhibit 139, a document

Page 211

K. Baker
2     Bates stamped BuzzFeed 3857 through 4012,
3     marked for identification, as of this date.)
4    Q.   You have been given an Exhibit 139.
5 It is BuzzFeed 3857 through 4012.
6        Would you just tell me what this is?
7    A.   Yes.  I will try.
8        So have you heard of the application
9 Scribner?
10   Q.   No.
11   A.   So it is an application that people
12 use for compiling projects.  I had never used it
13 before and to be honest, I don't think I have used
14 it since.  Journalists share things they use to
15 organize all their research and I am going to try
16 and describe it.  It is basically -- like it is
17 almost like having Post-its or sticky notes on the
18 side, on the left if you are looking at the screen
19 and you can kind of click through and you can
20 label them facts about Megan Rondini.  Facts about
21 the hospital and then you have kind of looking at
22 where you are writing mainly in the middle.  I
23 know this seems a bit confusing.
24        All of this was in that Scribner when
25 I wanted to hand over the notes I had and they

Page 212

K. Baker
2 were in the Scribner, but in retrospect and why I
3 haven't used it since, it doesn't tell you dates
4 or anything.  I can tell you that I used it from
5 December to, mostly from December like to
6 February, March and then I kind of gave up using
7 it because it didn't work that well, but that's
8 why there is a lot of kind of confusing notes
9 about random things.
10        Does that make sense?
11   Q.   Yes.  Let me try to get it in my mind.
12        Are these notes that you compiled
13 throughout your investigation concerning the
14 article?
15   A.   Some of them -- yes.  That was the
16 intention.  Some of them concerned the article.
17 Much of it didn't make it into the article.  It
18 was really just from the beginning when I first
19 heard about Megan Rondini and what happened with
20 her rape complaint, I just started to use it to
21 try and organize all the information I was
22 researching but a lot of it didn't make it to the
23 article which is why you can see some kind of
24 random stuff in there and I do feel I used it more
25 in the beginning and then as I started to write

Page 213

K. Baker
2 the drafts and I was using Google docs and records
3 I didn't use it as much.
4    Q.   These are notes you had upon the
5 investigation into the --
6    A.   Yes.
7    Q.   If you will turn to 3915 in Exhibit
8 139.
9    A.   Yes.
10   Q.   About three quarters of the way down
11 under notes it says "I think the framing is --
12 was it a typical case of cops, prosecutors and
13 universities failing at woman who reported a rape
14 or something more sinister."
15        Is that something you wrote or is that
16 something you found?
17   A.   This is something that Mike Rondini --
18 a note I took while talking to Mike Rondini and I
19 would like to elaborate if you would allow me.
20   Q.   Of course.
21   A.   When I first started this story, six
22 months before I published it, the first person I
23 talked to was Mike Rondini and what he told me how
24 he saw what happened was he thought maybe there
25 was a possibility that there might have been a

54 (Pages 210 - 213)

K. Baker

1 coverup in some way or maybe it was more kind of a
2 typical case like I wrote here. He wasn't sure.
3 In his own words that's what he said I was
4 just writing down what he thought in the very
5 beginning and you can see here that I put, this is
6 kind of who else do I need to talk to because I
7 hadn't talked to anyone else yet and you can also
8 see that I wrote down the documents I wanted and I
9 just want to read some because I think it shows
10 how early on this was. I said full police report.
11 Hope to get it through public records request. My
12 coworker Alex filed. I wanted the video. I
13 wanted the rape kit. I wanted some transcripts.
14 I wanted the complaint. The court subpoenaed
15 request. Drop the complaint demand letter.
16 I think this makes it really clear
17 this was in the very beginning based on what Mike
18 Rondini told me but ultimately I did not write
19 Mike Rondini's story. I wrote my own story and my
20 story six months later did not say there was
21 something sinister or anything like that.
22 Q. Did you write the word framing on
23 3915?
24 A. I guess so.

K. Baker

1 Q. What does that mean to you?
2 A. What does framing mean to me?
3 Q. Right.
4 A. Do you mean like a technical
5 definition or just like colloquially?
6 Q. Let's do both.
7 A. I don't know if there is a technical
8 definition, but I think colloquially it's just
9 like what Mike thought of the situation.
10 Q. Why do you use the term framing to
11 describe what Mike Rondini thought?
12 MS. BOLGER: Objection to form.
13 A. I have no idea. If you look at all
14 these notes, I put a lot of weird things in here
15 but it is just a word to me.
16 Q. Outside of this note, does framing
17 mean something different to you?
18 A. I think framing just means how you
19 think, look at something, anything.
20 Q. If you turn over to 3917.
21 A. Yes.
22 Q. At the bottom it says "Don't do Haley
23 Nicks."
24 Who is Haley Nicks?

K. Baker

1 A. I have no idea. I didn't talk to
2 them.
3 Q. Did someone mention her name to you?
4 Do you remember how you got the name Haley Nicks?
5 A. I honestly do not recall who that
6 person is.
7 Q. And another long shot, do you remember
8 why you put don't do Haley Nicks?
9 A. I have no idea.
10 Q. Then if you turn to 4012, still on
11 Exhibit 139, you see the line where it says "She
12 told her immediately that she was raped via text
13 and in person right after?"
14 A. Yes, I see that.
15 Q. Do you know what that refers to at
16 all?
17 A. I don't. I use this when I am on the
18 phone with people I type things out as I said
19 before. It is hard for me to know now if they are
20 my words or someone else's words what was going
21 on. I realize this wasn't a great way to take
22 notes and I stopped using Scribner.
23 Q. Did you ever see a text message where
24 Miss Rondini said she was raped?

K. Baker

1 A. I can't recall, but I would be happy
2 to look through all the texts.
3 MS. BOLGER: Text messages typically?
4 MR. RITCHEY: Mm-hmm.
5 A. I would be speculating just because
6 there are so many texts, I just don't remember
7 them all. She said it in text that I quoted my
8 story but I can't recall what this is referring
9 to.
10 Q. I am going to go through the article a
11 little bit so if you want to pull that up. Remind
12 me what Exhibit that was.
13 A. 122.
14 Q. We will be looking at Exhibit 122 now
15 which is the article.
16 A. Are we done with these notes?
17 Q. Yes. I think I am saying this right
18 the headline on the article is How Accusing a
19 Powerful Man of Rape Drove a College Student to
20 Suicide. That's the title of it.
21 What is your definition of a powerful
22 man and how it was used in this article?
23 A. So I don't write my own headlines.
24 Q. Do you know who wrote this headline?

Page 218

K. Baker

1
2    A.    I don't recall.
3        Q.    Is that a separate department that
4    writes headlines?
5        A.    It would have been my editor I think
6    but I would be speculating if I said exactly who
7    wrote it.  I mean if I said I knew exactly who
8    wrote it.
9        Q.    Is it their job to write headlines?
10        A.    It is something that they do.
11        Q.    Were you ever consulted concerning the
12    headline?
13        A.    I would have been able to weigh in on
14    the process of choosing the headline.  Generally I
15    am, but I don't recall how it went in this case
16    for this story.
17        Q.    Did you write the byline?
18        A.    The byline is my name.
19        Q.    What's the thing underneath the
20    headline called?
21        A.    It is called a deck.  The head and the
22    deck and similarly it is the editors who are
23    responsible for that and in general a reporter
24    weighs in and stuff but ultimately it is up to the
25    editors and I don't recall exactly how that

Page 219

K. Baker

1
2    process went here.
3        Q.    Did you believe Bunn to be a powerful
4    man?
5        A.    I think that especially this story
6    isn't just about the police.  It is about what
7    happened when Megan reported what she believed to
8    be rape to the hospital and also a therapist at
9    her university and when she reported to the
10    university the therapist knew the name of TJ Bunn
11    when she reported it, but two months later when
12    Megan went to meet with her she said I can't help
13    you because I know his family and I think that was
14    really notable because I think anyone can imagine
15    that would have been really difficult.
16        So I think in that sense Megan felt
17    that he was a powerful man given that she was
18    trying to seek counseling and she couldn't get
19    help because even the counselor knew who he was.
20        Q.    Did you believe that Bunn was a
21    powerful man at publication?
22        A.    I think that in a way I just described
23    I understood why Megan felt that he had influence
24    and in fact Bunn's lawyer put out a statement
25    after my story and they described their own family

Page 220

K. Baker

1
2    as prominent.  I think that there is lots of kind
3    of -- I think the Bunns themselves sees themselves
4    as a prominent person.
5        Q.    At the time the article was published,
6    what did you believe drove Miss Rondini to
7    suicide?
8        MS. BOLGER:  Object to the form of the
9    question.  That's been asked and answered.
10        THE WITNESS:  Should I answer it
11    again?
12        MS. BOLGER:  You can answer it again.
13        A.    I think Megan drove herself to
14    suicide.  I think she hanged herself.
15        Q.    On page 2 of the same Exhibit 122
16    towards or at the bottom it says "Megan never
17    imagined that she would soon be cast as a criminal
18    or that investigators would view Sweet T, really
19    TJ Bunn, son of an influential Tuscaloosa family
20    as the true victim but that's exactly what
21    happened."
22        How do you know that Megan never
23    imagined that she would be cast as a criminal?
24        A.    Megan didn't think that, you know when
25    you look at the felony packet you can see that the

Page 221

K. Baker

1
2    investigators say in the first page of text that
3    they don't -- a sexual assault didn't occur but
4    then they include a report where Sweet T or TJ
5    Bunn junior is listed as the victim and Megan is
6    listed as the suspect, and when she went to go
7    report what she believed to be rape she thought
8    she was reporting rape allegations.  She was doing
9    what she thought people who thought they had been
10    raped were supposed to do and I know from
11    interviewing her family and her friends and that
12    she just was surprised when what happened next
13    happened in terms of when she was telling them
14    honestly what happened and they started
15    investigating her during her interview about her
16    rape allegations.
17        Q.    So the interview with her parents and
18    family is how you were able to find out that Megan
19    never imagined she would be soon cast as a
20    criminal; is that right?
21        MS. BOLGER:  Objection to form.
22    You've decided to ignore the first half of
23    her answer.
24        Q.    I think she talks about the second
25    part of that sentence.

56 (Pages 218 - 221)

Page 222

K. Baker

1
2      MS. BOLGER:  You can answer the
3   question, but that's not what you just
4   testified to.
5   Q.   What in the felony packet did Megan
6   say that led you to believe that she never thought
7   she would be cast as a criminal?
8      MS. BOLGER:  Object to the form of the
9   question.  Megan didn't say anything about
10   the felony packet.  You are confused.  I am
11   confused.
12      MR. RITCHEY:  I think we are all
13   confused.  I am trying to figure out what
14   source backs that statement up.
15      MS. BOLGER:  What statement?
16      MR. RITCHEY:  The statement that Megan
17   never imagined that she would be soon cast
18   as a criminal.
19   A.   I think --
20      MS. BOLGER:  The rest of the sentence
21   or just that --
22      MR. RITCHEY:  That statement.
23      MS. BOLGER:  I object to that being
24   taken out of context.
25      Katie, you can answer that question.

Page 223

K. Baker

1
2   A.   Obviously I couldn't interview Megan
3   because she hanged herself, but I do include some
4   of the transcripts from the interview which I
5   think speak to what you are asking.  So on page 11
6   after she told the police about the gun she wrote
7   about, she said "He left as soon as I said that
8   and hasn't come back and then told me little kids
9   can shoot themselves."  She wrote "I am about to
10   vomit.  I hate this."  And her friend wrote back
11   "Just be completely open and honest and you will
12   be okay.  You didn't do anything wrong."  And then
13   after that Jones comes back and says "Do you have
14   any reasoning behind what you did what you did?"
15   And she says "What do you mean?"  And he says "I
16   just need you to tell me once you get into the
17   questioning what your reasoning was.  Is that why
18   you did these things?"  And Megan stares at Jones
19   as he reads her Miranda rights and she starts
20   crying and she says "I was never going to hurt
21   anybody with it.  I got it just to protect myself,
22   but I don't eat meat.  I could never kill
23   anything.  Even if it came to that point I
24   wouldn't have been able to use it on a person."
25      So I think watching that interview and

Page 224

K. Baker

1
2   seeing her response in real time and her confusion
3   and fear makes it clear that she never thought
4   when she explained what happened during her
5   interview for what she thought was her rape
6   allegation, she never imagined this and I was also
7   able to interview her family and friends to also
8   use that.
9   Q.   What did you mean about true victim in
10   that sentence?
11   A.   In the felony packet, the felony
12   packet again, I only had the one that was supposed
13   to be Megan's rape claim.  I didn't know that
14   there was a separate felony packet because Captain
15   Hood told me that the case against Megan ever
16   went to a Grand Jury but he gave me the wrong
17   information.  So in the felony packet that I had
18   which was ostensibly about Megan's allegations,
19   the first page of text said that, concluded that
20   no sexual assault occurred but that felony packet
21   also included the charges against Megan and they
22   listed Bunn as the victim.  So that is what that
23   meant.
24   Q.   Did that felony packet also list Megan
25   as a victim?

Page 225

K. Baker

1
2   A.   It said, it concluded what happened in
3   her case and said no sexual assault occurred.  If
4   no sexual assault occurred, then she was not the
5   victim, but in Bunn's case in the case that he
6   made against Megan just said that he was the
7   victim.  It didn't say what the conclusion was.  I
8   now know what the conclusion was and I now know
9   that the conclusion is that it was brought to a
10   Grand Jury after Megan's death and it was true
11   billed.
12   Q.   On page 3 looking at the bottom of
13   that first paragraph on the page where it says
14   "His investigation would conclude that no rape
15   occurred but he didn't stop there.  Instead he
16   started building a case against Megan questioning
17   her for multiple crimes she wasn't even aware she
18   had committed."
19      Do you see where I am?
20   A.   Mm-hmm.
21   Q.   Are you referring to Adam Jones in
22   that sentence?
23   A.   Yes.
24   Q.   What did you mean he started building
25   a case against Megan?

57 (Pages 222 - 225)

Page 226

K. Baker

1  K. Baker
2      A.    He read her her Miranda rights and
3  started asking her questions about multiple
4  crimes.
5      Q.    And it is your understanding that was
6  his job to do so?
7      A.    Yes and I include again, he wouldn't
8  talk to me even though I reached out to him
9  repeatedly.  So I had to talk to Captain Hood
10  about him and I do include what Captain Hood said
11  about that.  I will direct you, if you don't mind,
12  to page 17.  I say "The authorities weren't just
13  required to follow Alabama rape law Hood said,
14  they were quote legally obligated unquote to
15  investigate the felonies Megan admitted to
16  committing during her interview.  Her mental state
17  at the time didn't matter nor apparently did the
18  fact that she soon after went to the hospital and
19  told her story to police."  And then I quote Hood
20  and I say "Although she did not realize she
21  committed a crime does not negate the fact that
22  she did commit the crime."  So I wanted to quote
23  Hood to make it clear what the authority's
24  response was even though Jones wouldn't talk to me
25  directly.

Page 227

1  K. Baker
2      Q.    Why did you not put that up here on
3  page 3 what you just quoted to me?
4      A.    I mean it's in the story.
5      Q.    Why wasn't it put further up in the
6  story?
7      A.    I don't recall, but I think the
8  important thing is that it's in the story and even
9  though Jones wouldn't talk to me it was really
10  important for me to get the perspective in the
11  story which is why I made sure to ask Hood about
12  it.
13      Q.    You say "His investigation would
14  conclude that no rape occurred, but he didn't stop
15  there."
16         You see where I am at?
17      A.    Yes.
18      Q.    Why wouldn't after that incidence be a
19  good spot to tell him what Jones' job was in
20  regards to the charges alleged against Miss
21  Rondini?
22         MS. BOLGER:  Object to the form of the
23      question.
24         You can answer.
25      A.    I can't recall editorial decisions we

Page 228

1  K. Baker
2  made while writing this story four and a half
3  years ago.  I'm sorry.
4      Q.    Do you think that Jones should have
5  stopped?
6         MS. BOLGER:  Object to the form of the
7      question.
8      A.    I am not a police officer.  I was just
9  reporting on truthful and accurate facts and he is
10  a public official and these were public records
11  and I was explaining what happened.
12      Q.    In that next paragraph you wrote
13  "Later when Megan tried to file a civil suit she
14  learned the only way to escape possible
15  prosecution for those crimes was to drop her case.
16         How did you find that out?
17      A.    So I found that out two ways.  And I
18  go into it a bit later in the story as well.  So I
19  knew that because when she hired a lawyer for the
20  civil suit and he reached out to the Bunn's
21  attorney they learned that from the Bunn's
22  attorney and also in some of those e-mails from
23  Lieutenant Hart he kind of explained how it is
24  going in those e-mails.
25      Q.    What do you mean?

Page 229

1  K. Baker
2      A.    I would have to have the e-mails in
3  front of me to show them to you.
4      Q.    Are you saying in the sentence that
5  you think the homicide unit was part of the
6  responsibility for Miss Rondini dropping her civil
7  suit?
8      A.    No, and this entire paragraph doesn't
9  mention the police at all actually.
10      Q.    It doesn't mention how she learned of
11  that either.
12      A.    Yeah, but police aren't responsible
13  for deciding whether to prosecute.
14      Q.    Look at page 10 now and it is about
15  five paragraphs down it starts "Megan's 3.8 GPA,
16  it goes on to say, she didn't know they already
17  doubted her when she went to the station for a
18  followup interview the same morning she was
19  discharged from the hospital even though she
20  hadn't slept."
21         Do you see that?
22      A.    Yes.
23      Q.    Are you referring to Adam Jones and
24  Josh Hastings in that sentence?
25      A.    I am referring to police and police is

58 (Pages 226 - 229)

Page 230

K. Baker
1          K. Baker
2  what I wrote.
3      Q.   Who already doubted her as far as
4  police is concerned?
5      A.   I started by institutions and I was
6  writing about the police in this paragraph says
7  police.
8      Q.   What backs this sentence up?
9          MS. BOLGER:  I object to the form.
10    That's been asked and answered.
11         You can do it again.
12     A.   If you don't mind go back to the Gary
13 Hood.  Gary Hood explained to me what a special
14 inquiry meant.  I quoted him throughout the story.
15 So on page 10, do you mind if I read out the part
16 about the special inquiry that Captain Hood told
17 me?
18         MS. BOLGER:  Not if it answers the
19    question.
20     A.   So he explained to me what special
21 inquiries meant because I never heard that term
22 before and he said that "It is a local law
23 enforcement term for cases in which the victim
24 does not know what or if anything happened or the
25 investigators don't think the complaint meets the

Page 231

K. Baker
1          K. Baker
2  criteria to be a criminal charge under state law."
3      So you asked, me sorry.  I think you
4  said why I knew how they already doubted her;
5  right.  So they already doubted that she was raped
6  because they labeled it as special inquiry which
7  means that they either thought the complaint
8  didn't meet the criteria to be a criminal charge
9  under state law or they thought she didn't know
10 what, if anything, happened which wasn't the case.
11     Q.   At the time the article was published
12 do you believe Adam Jones or Josh Hastings doubted
13 any part of Miss Rondini's story?
14     A.   I believe that they doubt she was
15 raped.
16     Q.   But I am not asking that.
17     I am asking did they doubt any part of
18 her story?
19         MS. BOLGER:  She just told you.
20     A.   The part of the story was they were
21 very clear in the documentation I reviewed that we
22 discussed and through Captain Hood because they
23 wouldn't talk to me that they did not think that
24 she had been raped.
25     Q.   I understand that part.

Page 232

K. Baker
1          K. Baker
2      I am asking what do you think or did
3  you think at the time of publication that Adam
4  Jones or Josh Hastings doubted any part of the
5  story that she told them?
6      A.   So I wrote that they doubted her as in
7  Megan and Megan was reporting she had been raped
8  and they doubted she had been raped.
9      Q.   But you don't -- I am still trying to
10 say there is a difference between them doubting
11 that she was raped or them doubting her story.
12         MS. BOLGER:  I object to that
13    question.  You asked that question three
14    times.  You just don't like the way she is
15    answering.
16         MR. RITCHEY:  No.  She's not answering
17    my question.
18         MS. BOLGER:  She can answer the
19    question again if you want.
20     A.   I believe what I wrote and I believe
21 they doubted her.
22     Q.   Just in general?
23     A.   Yeah.  I believe that they doubted her
24 when she said that she was raped.
25         MR. RITCHEY:  Do you mind reading back

Page 233

K. Baker
1          K. Baker
2  that answer?
3      (Record read.)
4      Q.   Are you saying, I am tying to figure
5  out a good way of saying this.
6      Are you saying that they doubted what
7  she told them as her story constituted the crime
8  of rape?
9          MS. BOLGER:  Object to the form of the
10    question.
11         You can answer again.
12     A.   I believe what I wrote in my story and
13 I wrote in my story that they doubted her and when
14 I wrote what I meant is they doubted that she
15 was raped which is true.
16     Q.   In your mind is there a difference
17 between what Megan told police -- in your mind is
18 there a difference between what Megan told police
19 and whether what she told met the elements of rape
20 under Alabama law or are those the same thing in
21 your mind?
22         MS. BOLGER:  So object to the form of
23    the question.
24         To the extent that you are linking
25    that question to the article, Katie has told

Page 234

K. Baker

1
2      you what the article said and that she
3      believed it.  If you are asking a question
4      separate from the article, she can answer it
5      but it is not the same question as what's in
6      the article.
7          A.    So I am not sure I understand your
8      question, but Megan told the police all sorts of
9      things.  She told them her name, her birthday.
10     She told them many, many, many things.  The point
11     is that she was making a rape allegation and at
12     the end of the day the police concluded that she
13     was not raped.
14         Q.    So you are not saying the officers
15     doubted all of Megan's stories, just her claims
16     that she was raped?
17         A.    You are asking is that my opinion
18     separate from the story?
19         Q.    Correct.
20         A.    Yeah, I don't think that they doubted
21     that she gave them accurate information about her
22     birthday and her address and other elements of
23     what she told them, but the point that my story
24     was about what happened to Megan when she made her
25     rape allegation and how different institutions

Page 235

K. Baker

1
2      handle that and one of those institutions was the
3      police department and they did not believe that
4      she was raped.
5          Q.    At the time of publication did you
6      believe that Miss Rondini was drugged?
7          A.    There was no way for me to know that
8      because they didn't test her blood and urine.
9          Q.    Was there any reason why you did not
10     include a lawyer or an attorney to explain the
11     earnest resistance requirements in Alabama?
12         A.    Who better could I have gone to
13     explain it than the head of the police department.
14         Q.    An attorney or a lawyer?
15         A.    You think that would be better than
16     Captain Gary Hood who runs the police department
17     that was overseeing this investigation.
18         Q.    Do you not think so?
19         A.    I think the best person that could
20     have explained that to me and of course I told you
21     that I had spoken to a number of other experts,
22     but ultimately I felt that talking to Captain Hood
23     about it was the best person to give me that
24     information.
25         Q.    So would you think he would have more

Page 236

K. Baker

1
2      information concerning various resistant
3      requirement than a lawyer or attorney that does
4      criminal defense?
5          A.    I did speak with lawyers as well as I
6      think we discussed earlier in the day but
7      ultimately since my story was about different
8      institutions and one of those institutions was the
9      Tuscaloosa Police Department.  Captain Hood was
10     speaking for the police department.  I was asking
11     him about this specific investigation and he told
12     me specifically the holes he saw in Megan's story
13     and why it didn't meet the criteria and I included
14     that in my story.
15         Q.    You also talked about the District
16     Attorney's Office in your article; correct?
17         A.    Sorry.
18                Where are you referring to?
19         Q.    You mention Tuscaloosa District
20     Attorney's Office throughout the article.
21                Is that not one of the institutions
22     you were talking about in the article?
23         A.    There is an article --
24         Q.    Why would they not be a better source
25     for that type of question?

Page 237

K. Baker

1
2          A.    I do say in the story.  Hold on I will
3      show you.  That if you look ahead I think.  So I
4      do say on page 14 that the district attorney
5      called Mike Rondini to let him know Megan's case
6      didn't meet the legal definition of sexual assault
7      and wouldn't be brought to a Grand Jury, but I
8      reached out to everyone for comments and I asked
9      them all the same questions and Captain Hood went
10     into detail with me which I thought was great
11     because he was speaking for the police department
12     in my story and I think that's really great that
13     he was able to give me that information.
14         Q.    Wouldn't a district attorney or
15     assistant district attorney from Tuscaloosa be
16     able to explain earnest resistance better than
17     Captain Hood?
18                MS. BOLGER:  Objection to form.
19                Go ahead.
20         A.    If they were willing to answer my
21     questions I would have been happy to talk to them,
22     but I do say that Megan's case didn't meet the
23     legal definition of sexual assault and wouldn't be
24     brought to a Grand Jury so I included that as
25     well.

60 (Pages 234 - 237)

Page 238

K. Baker

1    K. Baker
2    Q.   On page 15 looking at third paragraph
3  from the bottom it starts out but although Megan.
4    A.   Yes.
5    Q.   And I am looking at the second
6  sentence says there was a catch.
7    A.   Yes.
8    Q.   What did you mean by that?
9    A.   I think what I meant by that is clear
10  from the next sentence that says "In a package
11  deal the Grand Jury would also rule on felony
12  charges against Megan for breaking into Bunn's car
13  and stealing his gun."
14    Q.   So did you think those two cases being
15  presented together was wrong?  Why did you use
16  there was a catch?
17    A.   I think I explained how Megan felt in
18  the next paragraph where I talk about how once the
19  Rondinis heard Megan might face felony charges
20  they decided it was best for Megan to drop the
21  civil case, withdraw early from school and go home
22  to Texas.  Megan left so quickly that she didn't
23  even say goodbye to some of her closest friends.
24  Her depression and anxiety grew worse as her
25  isolation deepened.

Page 239

1    K. Baker
2    Q.   Who did she learned that the criminal
3  case was back on the table from?
4    A.   We went over this before I believe.
5  When she hired a lawyer for the civil case they
6  heard it from the Bunn's lawyer but there is also
7  some corroboration for this in e-mails that Kip
8  Hart, Lieutenant Kip Hart sent to the Title IX
9  coordinator.  I can't remember off the top of my
10  head but I can show them to you if you want.
11    Q.   Why did you not source that to the
12  Bunn attorney?
13    A.   I source everything in the story and
14  it was fact checked but just for -- you don't put
15  every single reason why you found something in the
16  story.
17    Q.   Why did you choose to use the Rondinis
18  voice instead of Bunn's attorney's voice in that
19  sentence?
20    A.   Because I heard about it from the
21  Rondinis.  Bunn's attorney would only give me a
22  short statement.  He wouldn't talk to me at
23  length.
24    Q.   Why did you not clarify and say that
25  the Rondinis attorney heard it from the Bunn's

Page 240

1    K. Baker
2  attorney?  Why did you leave the Bunn's attorney
3  totally out of this?
4    MS. BOLGER:  Objection to form.
5    She testified to that already, but go
6    ahead.
7    A.   I think we just thought the relevant
8  thing was the District Attorney's Office was
9  deciding to present to the Grand Jury even though
10  the criminal case didn't go forward, it didn't
11  really matter who told who.  We put it to everyone
12  we were reporting about.  Gave everyone a chance
13  to clarify or comment or say that's not true.  We
14  have proof that it happened but what the reader
15  needed to know was that the criminal case wasn't
16  moving forward and then the District Attorney's
17  Office decided to present it to a Grand Jury after
18  all.
19    Q.   You are not clear in here stating
20  where the Rondinis learned how the criminal case
21  was back on the table.
22    You are not clear where they got that
23  information, are you?
24    A.   We didn't think that it mattered where
25  they got that information.  What mattered was the

Page 241

1    K. Baker
2  information was accurate.
3    MS. BOLGER:  Whenever you are ready
4    with this line of questioning, let's take a
5    quick break.
6    MR. RITCHEY:  We can do that.  I don't
7    think I will have too much after that.
8    MS. BOLGER:  Thanks.
9    (Recess taken.)
10    MR. RITCHEY:  Please mark this as
11  Plaintiffs' Exhibit 140.
12    (Plaintiffs' Exhibit 140, a document
13   Bates stamped BuzzFeed 2769 through 2771,
14   marked for identification, as of this date.)
15  BY  MR. RITCHEY:
16    Q.   I am showing you what has been marked
17  as Plaintiffs' Exhibit 140.  It is going to be
18  BuzzFeed 2769 through 2771.  I am just going to
19  ask you a question on 2769 and it is your second
20  comment and it says "I know we don't like experts
21  but they say a key part of solving rape cases and
22  sharing all the authorities work together and the
23  fact that the prosecutors have no idea what's
24  going on in their own cities seem directly relate
25  to how few cases get prosecuted."

61 (Pages 238 - 241)

Veritext Legal Solutions
877-373-3660                                      800.808.4958

K. Baker

1
2        I am just going to ask about that
3    first part, what does it mean that we don't like
4    experts?
5        A.    Fair question.  So we were having a
6    conversation in our newsroom editorially.  The
7    editors were having this conversation about how
8    sometimes you will report expert quote to state
9    something obvious when you could just say it, but
10   you do the expert interviews and you corroborate
11   it, but you don't necessarily have to use like a
12   literal quote.  You just do the reporting and you
13   fact check it and you corroborate it and I was
14   making a joke trying to be funny saying we don't
15   like experts but I interviewed a dozen experts for
16   this piece and sometimes there are a lot of quotes
17   in there.  Ultimately, we use them more for fact
18   checking purposes at the end of the day.
19       Q.    Was there any reason why you didn't
20   use experts in the article outside of those
21   experts that touch the case?
22       A.    Aside from the experts I did use?
23       Q.    Let me rephrase.
24       A.    Are you asking why I didn't use more
25   experts?

K. Baker

1
2        Q.    You said you interviewed a ton of
3    experts in this investigation.  It seems like the
4    only, and I guess you called them experts, that
5    you actually sourced in the piece were those that
6    were involved within the investigation or involved
7    with some part of the Rondini story, not a
8    third-party investigator that had nothing to do --
9    I'm sorry.  A third-party expert that had nothing
10   to do or had any involvement with the
11   investigation at all; is that right?
12       A.    I refer to the IACP guidelines but I
13   think ultimately it is an editorial decision.  It
14   was not my decision.
15       Q.    Whose decision was that concerning the
16   articles?
17       A.    My editors were Tina and Marisa.  So I
18   don't recall exactly who decided what, but I don't
19   really think it matters that much because I
20   interviewed those experts and I interviewed them,
21   for months I interviewed probably over a dozen
22   experts.
23            So the fact is that I spoke with them
24   all and I understood all the information I needed
25   to understand.

K. Baker

1
2        Q.    Did you personally think those experts
3    that you interviewed were important to the story?
4        A.    Well, I think that they informed my
5    story and my story was about institutions and I
6    spoke with a lot of experts about those
7    institutions and then I was able to report
8    accurately due to all the research that I did.
9            MR. RITCHEY:  Please mark this
10           document as Plaintiffs' Exhibit 141.
11           (Plaintiffs' Exhibit 141, a document
12           Bates stamped BuzzFeed 2663 through 2664,
13           marked for identification, as of this date.)
14       Q.    You are being shown what has been
15   marked as Plaintiffs' Exhibit 141.  It is BuzzFeed
16   2663 through 2664.  This of course is -- let me
17   ask you this first.
18           Do you recognize Exhibit 141?
19       A.    This is from that really, really,
20   really early draft over four months before my
21   final article.
22       Q.    In here in and this corresponds with
23   comments 179 and 180 on BuzzFeed 3842.
24       A.    I think I can see what it relates to.
25   Does it relate to that sentence like it is

K. Baker

1
2    Marisa's comment and then my sentence or is there
3    more I have to look at?
4        Q.    No.  It's just right there.  If you
5    need context in the draft article, let me know and
6    I will --
7        A.    Sorry.
8        Q.    So you see where Marisa Carroll writes
9    "Reads more like what you would see at the end of
10   a straight news story."
11       A.    I see that she said that.
12       Q.    Does that mean anything to you a
13   straight news story?
14       A.    No.
15           MS. BOLGER:  Object to the form of the
16           question.
17       A.    I didn't write this comment.
18       Q.    Do you remember how you interpreted
19   straight news story?
20       A.    No.  I don't remember this comment at
21   all.
22       Q.    Just in general, what would a straight
23   news story be?
24           MS. BOLGER:  From Marisa Carroll?
25           MR. RITCHEY:  No, just to Katie.

Page 246

K. Baker

1           K. Baker
2      A.   I don't know.
3           MR. RITCHEY:  Please mark this as
4      Plaintiffs' Exhibit 142.
5           (Plaintiffs' Exhibit 142, a document
6      Bates stamped BuzzFeed 1967 through 1974,
7      marked for identification, as of this date.)
8      Q.   Showing you what has been marked as
9  Plaintiffs' Exhibit 142.  It is BuzzFeed 1967
10 through 1974.
11      Can you tell me what Exhibit 142 is?
12      A.   I can't without -- it is an interview
13 I did.  I would guess who it is with, but I would
14 be guessing without more context.
15      Q.   Would it be with Angelo?
16      A.   It would either be with Angelo or
17 Curtis because I spoke with two of them and it
18 looks like because of the large amounts of
19 information that's redacted, that it was a lot of
20 it was concerning a confidential source that's not
21 in the story.
22      Q.   Do you remember when this interview
23 took place?
24      A.   I don't.
25      Q.   And at the time of this interview, did

Page 247

K. Baker

1  you know this person's qualifications?
2      A.   Did I know the person's
3  qualifications?  If it was Angelo Delamana, then
4  yes.
5      Q.   Did you know if this person had ever
6  investigated a sexual assault or rape?
7      A.   I wasn't asking him about whether he
8  had ever investigated a sexual assault.  It says
9  "Researching toxicology talks analyses conducted
10 relative to DFSA."  And I was asking him about his
11 analytical perspective and that's what he was
12 giving to me.
13      Q.   Did you know if this person had ever
14 investigated sexual assault or rape?
15           MS. BOLGER:  Objection to form.
16      A.   That's not his job.
17      Q.   Did you ever note this person was in
18 law enforcement?
19      A.   I can't recall Angelo Delamana, his
20 full bio at this point four and a half years
21 later, but I was trying to speak with him in his
22 capacity at the toxicology lab about toxicology.
23      Q.   Is this just a transcription of an
24 interview?

Page 248

K. Baker

1      A.   I don't quote him in the story and a
2  lot of this interview I am not even sure was about
3  anything related to the story.  So much of it is
4  redacted.  It seems like a lot of it was
5  pertaining to my confidential source.
6      Q.   I believe there were some e-mails that
7  were produced when you were reaching out to the
8  IACP?
9      A.   Yes.
10      Q.   Do you remember any conversations you
11 had with any of the representatives of IACP?
12      A.   I do.  His name is in the e-mails.  I
13 don't recall it off of top of my head, but he
14 called me on the phone and I spoke with him about
15 how I wanted to -- there is a few parts in the
16 story where I quote the IACP guidelines because I
17 wanted to make a point for readers and not just
18 have his voice in there and I wanted to make sure
19 I fully understood the IACP's perspective on some
20 elements of the case and the easiest way for me to
21 remember the key things I talked to about him was
22 by looking at what's in the story referring to the
23 IACP.
24      Q.   But other than what's in the story, do

Page 249

K. Baker

1  you remember anything else y'all discussed?
2      A.   Because it was four and a half years
3  ago I don't, but I know it was related to how I
4  refer to the IACP in the story.
5      Q.   Have you ever spoken to or e-mailed
6  Stephanie Taylor?
7      A.   Is that the Stephanie Taylor who used
8  to be a reporter for the Tuscaloosa News but now
9  works for the police department?
10      Q.   That's right.
11      A.   I haven't spoken to her I don't think.
12      Q.   Did you read Stephanie Taylor's
13 article published in the Tuscaloosa News
14 concerning the Rondini investigation?
15      A.   I did at the time, but I haven't read
16 it since.
17      Q.   Do you remember what she thought about
18 it?
19      A.   Honestly, I thought it was very -- her
20 stories were very different.  I was reporting on
21 the police investigation.  My story was about
22 Megan and what happened when she reported her rape
23 not just to the police but the different
24 institutions, the hospital, the mental health

Page 250

K. Baker

1 counselor at the university and everything that
2 happened after that.  In terms of the part that
3 refer to the police I was focusing on the
4 investigation what the police knew and what they
5 considered when they decided that Megan Rondini's
6 claim did not meet the elements of rape and I
7 think Stephanie's story was more just like a full
8 timeline, but I honestly don't recall the details.
9     Q.   Could you have produced the source
10 materials surrounding the Rondini investigation in
11 the same manner that Stephanie Taylor did?
12         MS. BOLGER: Object to the form of the
13     question.
14         What do you mean produced?
15     Q.   As in put it on the website or linked
16 to it.
17         MS. BOLGER: If she could have written
18     Stephanie Taylor's story?
19         MR. RITCHEY: No.  I'm asking if she
20     could have put a source material like
21     Stephanie Taylor did out on the BuzzFeed
22     website or link to it from the story.
23     A.   I would be speculating because I wrote
24 the story that I wrote and made the decisions I

Page 251

K. Baker

1 made with my editors.
2     Q.   But nothing was stopping you from
3 linking all the source material that you gathered
4 to the article?
5         MS. BOLGER: Objection to form.  I
6     don't think that's what she said, but you
7     can answer.
8     A.   I think that my story reports
9 truthful, accurate facts and I am really proud of
10 my story and I think that my story as it stands is
11 what I wrote.
12     Q.   Let me ask you this specifically then.
13     The audio/video recording of Megan
14 Rondini's interview on July 2, 2015, the full
15 recording, could you have uploaded that and linked
16 that to your article?
17     A.   I think I already answered this
18 question, but I am happy to say what I said before
19 again which is that if I was to put everything I
20 came across in the course of reporting this story
21 it would not be legible to a reader.  I think the
22 role of a journalist is to report on
23 (indecipherable) the public interest and to write
24 truthfully and accurately.  We have an editorial

Page 252

K. Baker

1 judgment and we use it.
2     Q.   Was anything preventing you from
3 posting the full video or uploading the full video
4 where you could link to it?
5         MS. BOLGER: Objection to form.
6     What video?
7         MR. RITCHEY: The video we just
8     referenced, the July 2, 2015 interview of
9     Miss Rondini.
10     A.   I think I just have to answer the same
11 way I just did which is that as a journalist it is
12 not my protocol to just produce everything that I
13 cover during the course of an investigation.  My
14 job as a journalist is to report stories that are
15 in the public interest truthfully and accurately
16 and I am proud of the work that I did and I think
17 the story stands as I wrote it.
18     Q.   I get that, but if you wanted to post
19 the full videos nothing was preventing you from
20 doing so?
21         MS. BOLGER: Objection to form.
22     That's the fourth time you asked the
23     question.
24         You can answer it.

Page 253

K. Baker

1     A.   Was something physically preventing
2 me?
3     Q.   Yes.
4     A.   No, but I can tell you why I didn't.
5 As I said, if I was to produce everything that I
6 had in the course of my investigation it wouldn't
7 have been legible for a reader.
8     Q.   Do you know if anyone from the
9 Tuscaloosa News -- I'm sorry.
10     Do you know if anyone from BuzzFeed
11 ever wrote to the Tuscaloosa News concerning the
12 Tuscaloosa News' article of the Rondini
13 investigation?
14     A.   I don't know.
15     Q.   Do you ever e-mail anyone from
16 Tuscaloosa News?
17     A.   In general or about Stephanie Taylor's
18 article?
19     Q.   Concerning Stephanie Taylor's article.
20         MS. BOLGER: Why would you do that?
21         MR. RITCHEY: I am just asking.
22     A.   I believe in the First Amendment and
23 freedom of speech and people should be able to
24 write whatever they want I think unless -- I

64 (Pages 250 - 253)

Page 254

1                K. Baker
2    missed the fact that she wrote a story that was
3    different than mine.
4              MR. RITCHEY:  Give me a few minutes.
5              (Recess taken.)
6    BY. MR. RITCHEY:
7         Q.   I just have one more.
8              Did you ever speak with any former
9    Tuscaloosa county law enforcement officer or
10   agents concerning the Rondini investigation?
11        A.   Not that I recall.
12        Q.   Other than those discussed today and
13   mentioned in the article, did you speak to any
14   other current Tuscaloosa county law enforcement
15   officers or agents?
16        A.   In the beginning of my reporting when
17   I was trying to find out some information about
18   like basic practices and statistics, I think Alex
19   Campbell or I called a few times to get basic
20   information, but I am not sure who I spoke to.
21        Q.   Have you ever spoken to a Donald
22   Watkins?
23        A.   No, I don't think so.
24        Q.   I think that's all I've got.
25             (Continued on the next page.)

Page 255

1                K. Baker
2              MS. BOLGER:  Thank you very much.
3              (Time Noted:  4:45 p.m.)
4
5
6              KATIE BAKER
7
8    Subscribed and sworn to before me
9    this      day of       , 2021.
10
11
12   (Notary Public)      My Commission Expires:
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 256

1
2              C E R T I F I C A T E
3    STATE OF NEW YORK   )
                          : ss.
4    COUNTY OF NEW YORK  )
5              I, LYNNE D. METZ, a Shorthand Reporter
6    and a Notary Public within and for the State of
7    New York, do hereby certify that the foregoing
8    deposition of KATIE BAKER was taken before me on
9    the 23rd day of July, 2021;
10             That the said witness was duly sworn
11   before the commencement of her testimony; that the
12   said testimony was taken stenographically by me
13   and then transcribed.
14             I further certify that I am not
15   related by blood or marriage to any of the parties
16   to this action or interested directly or
17   indirectly in the matter in controversy; nor am I
18   in the employ of any of the counsel in this
19   action.
20             IN WITNESS WHEREOF, I have hereunto
21   set my hand this 25th day of July, 2021.
22
23
24             LYNNE D. METZ
25

Page 257

1
2    July 23, 2021
3
4              I N D E X
5    WITNESS          EXAMINATION BY      PAGE
6    KATIE BAKER      MR. RITCHEY         4
7
8    ---------- INFORMATION REQUESTS ----------
9    DIRECTIONS (DI):   110, 139
10   INSERT:      None
11   RULINGS (RL):    None
12   REQUESTS (RQ):    None
13   CERTIFIED (CE):   None
14   MOTIONS (MO):     None
15
16             E X H I B I T S
17   Plaintiffs' Exhibits          For ID
18   Exhibit 122, a printed out article    81
19   Exhibit 123, a document Bates Stamped  163
20   BuzzFeed 60 to 61
21   Exhibit 124, a document Bates stamped  163
22   BuzzFeed 56 through 57
23   Exhibit 125, a document Bates stamped  175
24   BuzzFeed 4165 through 4190
25   Exhibit 126, a document Bates stamped  181

65 (Pages 254 - 257)

Page 258

```
 1
 2    BuzzFeed 4151 through 4155
 3    Exhibit 127, a document Bates stamped    182
 4    BuzzFeed 92 through 95
 5    Exhibit 128, a document Bates stamped    183
 6    BuzzFeed 2495 through 2500
 7    Exhibit 129, a document Bates stamped    185
 8    BuzzFeed 2602
 9    Exhibit 130, a document Bates stamped    186
10    BuzzFeed 2570
11    Exhibit 131, a document Bates stamped    188
12    BuzzFeed 2622
13    Exhibit 132, a document Bates stamped    188
14    BuzzFeed 3826 through 3843
15    Exhibit 133, a document Bates stamped    190
16    BuzzFeed 3313 through 3314
17    Exhibit 134, a document Bates stamped    193
18    BuzzFeed 509 to 519
19    Exhibit 135, a document Bates stamped    201
20    BuzzFeed 2475 through 2477
21    Exhibit 136, a document Bates stamped    203
22    BuzzFeed 3719
23    Exhibit 137, a document Bates stamped    204
24    BuzzFeed 3202 through 3205
25    Exhibit 138, a document Bates stamped    204
```

Page 259

```
 1
 2    BuzzFeed 3783 through 3793
 3    Exhibit 139, a document Bates stamped    210
 4    BuzzFeed 3857 through 4012
 5    Exhibit 140, a document Bates stamped    241
 6    BuzzFeed 2769 through 2771
 7    Exhibit 141, a document Bates stamped    244
 8    BuzzFeed 2663 through 2664
 9    Exhibit 142, a document Bates stamped    246
10    BuzzFeed 1967 through 1974
11    (Exhibits retained by the court reporter.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 260

```
 1    To: KATHERINE M. BOLGER, ESQ.
 2    Re: Signature of Deponent Katie Baker
 3    Date Errata due back at our offices: 8/29/2021
 4
 5    Greetings:
 6    This deposition has been requested for read and sign by
      the deponent.  It is the deponent's responsibility to
 7    review the transcript, noting any changes or corrections
      on the attached PDF Errata.  The deponent may fill
 8    out the Errata electronically or print and fill out
      manually.
 9
10    Once the Errata is signed by the deponent and notarized,
      please mail it to the offices of Veritext (below).
11
12    When the signed Errata is returned to us, we will seal
      and forward to the taking attorney to file with the
13    original transcript.  We will also send copies of the
      Errata to all ordering parties.
14
15    If the signed Errata is not returned within the time
      above, the original transcript may be filed with the
16    court without the signature of the deponent.
17
18    Please Email the completed errata/witness cert page
      to readandsign@veritext.com
19    or mail to
20    Veritext Production Facility
21    2031 Shady Crest Drive
22    Hoover, AL 35216
23    205-397-2397
24
25
```

Page 261

```
 1    ERRATA for ASSIGNMENT #4710428
 2    I, the undersigned, do hereby certify that I have read the
      transcript of my testimony, and that
 3
 4    ___ There are no changes noted.
 5    ___ The following changes are noted:
 6
      Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
 7    (2017). Rule 30(e) states any changes in form or
      substance which you desire to make to your testimony shall
 8    be entered upon the deposition with a statement of the
      reasons given for making them.  To assist you in making any
 9    such corrections, please use the form below.  If additional
      pages are necessary, please furnish same and attach.
10
11    Page _____ Line _____ Change _____
12    _____
13    Reason for change _____
14    Page _____ Line _____ Change _____
15    _____
16    Reason for change _____
17    Page _____ Line _____ Change _____
18    _____
19    Reason for change _____
20    Page _____ Line _____ Change _____
21    _____
22    Reason for change _____
23    Page _____ Line _____ Change _____
24
25
```

66 (Pages 258 - 261)

Page 262

1  Page _____ Line _____ Change _____

2  _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5  _____

6  Reason for change _____

7  Page _____ Line _____ Change _____

8  _____

9  Reason for change _____

10  Page _____ Line _____ Change _____

11  _____

12  Reason for change _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16

17

18  _____

    DEPONENT'S SIGNATURE

19

   Sworn to and subscribed before me this ____ day of

20  _____, _____.

21  _____

22

23  NOTARY PUBLIC / My Commission Expires:_____

24

25

Veritext Legal Solutions

877-373-3660                                                        800.808.4958

**&**

**&**   2:11

**0**

**00403**   1:5

**1**

**1**   11:19 14:10 76:18
146:20 196:24
**10**   168:24 229:14
230:15
**10020**   2:7
**11**   223:5
**110**   257:9
**12**   99:25 107:16
**122**   81:6,7,11
147:11 169:2
217:14,15 220:15
257:18
**123**   163:5,6,14,18
164:4,13,22 168:2
257:19
**124**   163:10,11,15
163:23 164:4,14,23
257:21
**125**   175:6,7,11
176:23 177:19
178:14 257:23
**1251**   1:18 2:6
**126**   181:3,4,8,10
257:25
**127**   181:25 182:2,6
182:8 258:3
**128**   183:23,24
184:4 258:5
**129**   185:8,9,13
258:7
**130**   186:13,14,19
187:2 258:9
**131**   187:25 188:2
188:10,12 189:20
258:11

**132**   188:6,7,16,18
189:22 258:13
**133**   190:24,25
191:5,7,13 258:15
**134**   193:13,14,17
193:19 194:20
258:17
**135**   201:16,17,21
258:19
**136**   203:5,6,10
258:21
**137**   204:5,6,14,16
205:10 258:23
**138**   204:10,11,20
204:22 205:18
258:25
**139**   210:24,25
211:4 213:8 216:12
257:9 259:3
**14**   237:4
**140**   241:11,12,17
259:5
**1409**   2:13
**141**   244:10,11,15
244:18 259:7
**142**   246:4,5,9,11
259:9
**146**   178:14
**15**   8:7 114:14 196:9
238:2
**163**   257:19,21
**17**   226:12
**175**   257:23
**179**   244:23
**18**   114:14 147:12
**180**   244:23
**181**   257:25
**182**   258:3
**183**   258:5
**185**   258:7

**186**   258:9
**188**   258:11,13
**190**   258:15
**193**   258:17
**1967**   246:6,9
259:10
**1974**   246:6,10
259:10
**1987**   8:7
**1:12**   159:21
**1:45**   160:3
**1st**   162:9

**2**

**2**   76:9,18 102:3,20
199:7,20 220:15
251:15 252:9
**20**   126:12
**2005**   24:8
**2009**   24:16
**201**   258:19
**2010**   11:5
**2011**   11:6,12
**2012**   11:13,14
**2013**   11:15,16
72:21
**2014**   11:19 14:10
**2015**   76:10,18,18
102:3,20 115:2
162:10 195:17,19
195:21,23 196:8,18
196:25 197:2,9,12
199:7,20 251:15
252:9
**2016**   26:25 38:11
48:23 49:12
**2017**   16:2 38:12
50:3 52:5,20
135:10 137:2 164:2
172:21 182:14
187:12,18 261:7

**2018**   17:5
**2021**   1:14 255:9
256:9,21 257:2
**203**   258:21
**2031**   260:21
**204**   258:23,25
**205-397-2397**
260:23
**21**   195:16
**210**   259:3
**21st**   196:7 197:3
**23**   1:14 257:2
**23rd**   256:9
**24**   182:14
**241**   259:5
**244**   259:7
**246**   259:9
**2475**   201:18,21
258:20
**2476**   201:23
**2477**   201:18,21
258:20
**2495**   183:25 184:4
184:10 258:6
**24th**   183:6
**2500**   183:25 184:5
258:6
**2570**   186:15,20
258:10
**25th**   256:21
**2602**   185:10,14
258:8
**2622**   188:3,11
189:20 258:12
**2663**   244:12,16
259:8
**2664**   244:12,16
259:8
**26th**   168:13
**2769**   241:13,18,19
259:6

**2771** 241:13,18
259:6
**28** 189:24
**2nd** 102:6,9 162:9
198:10

**3**

**3** 125:10 225:12
227:3
**3.8** 229:15
**3/7/17** 187:7
**3/7/2017** 187:8
**30** 189:24 261:6,7
**3202** 204:7,15
205:10 258:24
**3205** 204:7,15
258:24
**3313** 191:2,6,12
258:16
**3314** 191:2,6
258:16
**34** 126:11
**35216** 260:22
**35401** 2:14
**3719** 203:7,10
258:22
**3783** 204:12,21
259:2
**3787** 205:18
**3793** 204:12,21
259:2
**3826** 188:8,16
258:14
**3828** 189:23
**3842** 244:23
**3843** 188:8,17
258:14
**3857** 211:2,5 259:4
**3915** 213:7 214:24
**3917** 215:21
**3:20** 182:14

**3:52** 187:8

**4**

**4** 257:6
**4012** 211:2,5
216:11 259:4
**4151** 181:5,8,17
258:2
**4155** 181:5,9 258:2
**4165** 175:8,11
257:24
**4167** 177:18
**4190** 175:8,12
257:24
**4313** 256:23
**4710428** 261:1
**4:45** 255:3

**5**

**5** 147:8
**5-30** 261:6
**509** 193:15,18
194:19,22 258:18
**519** 193:15,18
258:18
**56** 163:12,15,24
257:22
**57** 163:12,16,24
257:22
**58** 205:18

**6**

**6** 147:8,10,12
**60** 163:7,15,18
168:2 257:20
**61** 163:7,15,18
205:19 257:20
**6th** 198:15

**7**

**7/2/15** 177:20
**7:19** 1:5

**7th** 168:12

**8**

**8/29/2021** 260:3
**81** 257:18

**9**

**92** 182:3,6 258:4
**93** 182:12
**95** 182:3,7 258:4
**9:27** 1:15

**a**

**a.m.** 1:15 177:21
**able** 10:15 46:6
129:19 132:21
190:9 218:13
221:18 223:24
224:7 237:13,16
244:7 253:24
**abruptly** 205:13
207:18,19 208:5
**absolutely** 21:18
96:21 158:10
**abuse** 9:4
**academics** 34:3
**accept** 173:5
**accepted** 26:25
**access** 31:13 141:3
141:6 142:12 144:5
144:11,22 145:6
**accompany** 70:25
**account** 209:7
**accountable** 151:2
**accounts** 7:11
**accurate** 42:21
43:22 44:11 59:21
61:9 72:8 75:12
78:22 89:14 105:16
112:11,13 117:20
121:5,9,16,18
122:3,7,22 125:8
125:12 132:6

137:20 145:22
153:13 159:10
168:19 198:5 210:3
228:9 234:21 241:2
251:10
**accurately** 58:9,13
72:3 113:12 117:16
118:19,22 129:14
135:7 150:5,9
244:8 251:25
252:16
**accused** 104:25
147:23
**accusing** 217:19
**act** 191:16
**acted** 91:3,9
**action** 256:16,19
**actions** 207:20
**acts** 105:20
**actual** 179:4
**adam** 1:7 4:13
19:21 74:8 139:6
150:17 156:7
225:21 229:23
231:12 232:3
**additional** 99:7
261:9
**additionally** 171:22
172:3
**address** 7:5 234:22
**addresses** 7:8
**administer** 3:14
**administrator**
152:21
**admitted** 169:18
226:15
**adventure** 17:13
**ae** 62:17
**africa** 70:2
**agency** 108:19

**agents** 254:10,15
**ago** 27:11 36:19
  39:8 49:4 71:17
  86:9 119:2 210:17
  228:3 249:4
**agree** 41:13 89:11
  109:25 113:8
  121:23 124:8 126:7
  171:13 206:20
**agreed** 3:4,8,12
**agreement** 146:7
**ahead** 44:20 57:15
  77:9 113:2 127:8
  156:22 162:14
  200:19 204:9 237:3
  237:19 240:6
**al** 1:7,10 260:22
**ala** 261:6
**alabama** 1:3 2:14
  8:21 16:19 32:23
  33:15 34:5,15,25
  35:14,17,22,25
  36:5 37:3,8,11,18
  37:22 40:3,23
  53:23 58:6,12 59:4
  59:24 70:13,15,25
  72:22 89:22 94:12
  97:22 102:14 112:6
  112:16,22 113:2
  157:6 166:24 167:2
  200:4 226:13
  233:20 235:11
**alcohol** 168:4
  169:19 170:19
  172:7
**alcoholism** 9:4
**alex** 73:17 133:8
  214:13 254:18
**allegation** 100:2
  125:11 148:25
  179:24 183:15,17

224:6 234:11,25
**allegations** 82:3,4
  86:23 88:3 89:19
  93:20 94:7 152:3
  177:13 201:12
  221:8,16 224:18
**alleged** 79:21 82:20
  83:9 97:18 99:21
  107:14 115:24,25
  125:6 203:3 227:20
**alleging** 80:15
**allow** 129:13
  213:19
**allowed** 46:8
**amanda** 189:16
  192:20
**amendment** 253:23
**americas** 1:19 2:6
**amount** 125:5
**amounts** 246:18
**amy** 56:19 58:15
**analyses** 247:10
**analytical** 247:12
**angeles** 27:4
**angelo** 34:16
  246:15,16 247:4,20
**answer** 5:8,13,21
  18:3 20:13 22:18
  23:5,12,20 29:2,16
  29:20,20,23 33:18
  36:8 40:6 41:24
  42:16 43:3,12 44:6
  45:14 46:23 55:22
  57:15 61:25 63:10
  64:13 65:15 68:3
  68:17 71:22 72:12
  72:14 76:7,14,22
  77:20,23 78:10
  80:8 83:13 85:7
  86:21 88:10,13,23
  89:2,8,12,24 90:9

91:14 93:3,5,25
  94:16 95:22 100:4
  101:12,13,20
  104:17 105:25
  106:3 108:15
  109:10,20 110:21
  111:8,9,15,16,18
  113:9,11,19 115:21
  116:25 118:25
  121:2 123:4,19
  124:12,22 129:13
  134:24 135:12,19
  136:11 138:9
  139:12 141:16
  142:16 143:4,19
  144:25 146:2
  148:23 151:11,23
  153:9 158:12,23
  171:5,12 182:22
  183:4 195:5 220:10
  220:12 221:23
  222:2,25 227:24
  232:18 233:2,11
  234:4 237:20 251:8
  252:11,25
**answered** 36:7 40:5
  88:13 89:7 93:22
  93:23 108:13,14
  109:9,18 115:15
  124:22 142:10
  180:20 200:18,25
  207:6 220:9 230:10
  251:18
**answering** 5:24
  89:9 93:13 156:21
  165:4 232:15,16
**answers** 5:11 20:19
  185:6 230:18
**anxiety** 238:24
**anybody** 10:10
  71:7 223:21

**anymore** 27:12
  66:19 120:6 149:16
**apart** 189:17
**apartment** 162:2
**apologize** 142:11
  192:24
**apparently** 226:17
**appeal** 25:12
**appears** 181:17
  187:10
**application** 32:2
  211:8,11
**applications** 32:5
**applied** 26:25
  31:21 32:2
**apply** 32:7
**approve** 63:14,15
**april** 11:19 14:10
  183:6 187:18
**area** 20:21 59:12
**areas** 53:17
**ariel** 20:6
**arrest** 83:23 85:4
**arrested** 9:8
**art** 65:6
**article** 4:15 6:21,23
  15:10,14 16:13,16
  20:15 21:17,20
  22:10,15 29:23
  39:23 41:12,20,22
  42:12,18 45:11,20
  45:21,22,25 46:3
  46:25 47:3,5,11
  52:22 53:6 59:9
  61:10,12 62:12
  63:5,14 64:2 65:8
  65:16,17 66:6
  67:15,24 68:14,21
  72:4,6,11 73:10,13
  73:19 74:10,18
  75:8 78:6 79:9 81:8

81:14,15,18 82:18
85:2,14 86:2,11
87:25 89:17 90:22
90:25 91:19 92:22
93:6,7,18 94:10
97:2,7 99:10,15
100:13,19 101:24
102:16 103:5
104:11 107:8 108:8
110:16 112:4
113:13 116:8,22
119:15 123:2,16
124:15 125:23
126:5,8 127:12,13
128:12,22 129:10
130:4 138:25 141:5
141:11 144:20,20
145:3,12,15 146:13
146:13 148:18
149:3,6 150:17
160:9,18 168:10,25
172:17 176:24
178:4 180:18
187:10,16 194:21
194:24 195:10,13
195:19 198:6 199:5
199:25 201:7,8
202:11 205:16
207:17 210:12
212:14,16,17,23
217:11,16,19,23
220:5 231:11
233:25 234:2,4,6
236:16,20,22,23
242:20 244:21
245:5 249:14 251:5
251:17 253:13,19
253:20 254:13
257:18
**articles**   10:6,7
   12:10 23:9 53:3,7

55:2 63:22 67:3
   120:15 243:16
**asia**   70:2
**aside**   242:22
**asked**   32:6 36:7
   37:21 38:2 40:5
   80:22 81:2,4 88:12
   93:22 106:9,11,19
   106:22 107:2,6
   108:13 109:9,18
   111:25 112:17
   124:21 128:7
   132:20,22 141:7,9
   141:12 142:7,19
   143:4,25 144:9,14
   144:20 145:9 146:9
   151:18 158:15
   164:10 166:20
   173:9 178:9 179:7
   179:17 180:2,3,20
   194:3 200:10 206:8
   220:9 230:10 231:3
   232:13 237:8
   252:23
**asking**   29:15 35:19
   35:19 55:15 70:19
   78:13 85:21 88:19
   89:4 93:12,14 94:6
   103:12,14 105:25
   106:17,24 112:21
   115:9 119:20,23
   121:20 129:12
   142:11 144:19
   158:11 185:23
   191:24 197:2,4,16
   201:23 223:5 226:3
   231:16,17 232:2
   234:3,17 236:10
   242:24 247:8,11
   250:20 253:22

**aspects**   27:5,17
**assailant**   147:24
   148:7
**assault**   32:16 34:4
   34:21 35:7 36:13
   37:18 40:2,23 69:9
   75:15 114:2,7,8,20
   115:5,16,24 116:4
   147:23 164:5,16
   166:6 169:8,10
   170:3 196:21
   197:14 221:3
   224:20 225:3,4
   237:6,23 247:7,9
   247:15
**assaults**   12:5
**assertion**   143:8,9
   143:10 192:4
**assess**   51:3
**assignment**   10:16
   10:22 261:1
**assist**   73:9 261:8
**assistant**   10:3
   237:15
**associated**   7:5
   14:23 169:15
   181:15
**association**   33:24
   166:14 169:11
**assume**   5:13 111:12
   111:13,14 133:22
   167:24
**assumed**   112:13
**assuming**   146:6
**assures**   189:16
**attach**   261:9
**attached**   260:7
**attacker**   33:5
**attain**   87:6
**attempt**   133:4

**attend**   23:25 24:9
   24:11 26:18
**attended**   24:2
   31:11
**attorney**   37:16
   193:5 228:21,22
   235:10,14 236:3
   237:4,14,15 239:12
   239:21,25 240:2,2
   260:12
**attorney's**   195:16
   196:13,24 197:7,19
   197:21 236:16,20
   239:18 240:8,16
**attorneys**   2:5,12
   3:5 6:5 40:21 129:5
   178:19 194:16
**attributable**   154:7
**attribute**   155:20
**attributing**   156:6,8
**audible**   5:10
**audience**   17:21,23
**audio**   76:2,6,9
   251:14
**austin**   50:4,5,6
   149:9
**authorities**   114:22
   115:2 116:6 126:11
   196:19 197:12
   226:12 241:22
**authority**   115:23
**authority's**   226:23
**authorized**   3:14
**automatic**   203:20
**available**   61:15
   124:10
**avenue**   1:18 2:6
**awards**   160:19
**aware**   40:11,19
   58:20 160:20
   194:10 198:7 199:6

199:8,11,11,18
200:2 225:17

**b**

**b** 4:2 20:5 160:4
257:16
**back** 11:2 12:9
13:24 34:23 37:7
44:15 59:24 70:12
81:17 82:23 92:6
103:23 109:5
112:20 124:18
132:22 134:4,21
159:17,17 166:11
192:15,20,21 193:3
193:6,7 194:4
202:5 205:23
206:14 210:18
223:8,10,13 230:12
232:25 239:3
240:21 260:3
**backs** 222:14 230:8
**badged** 203:11
**badges** 203:18
**baker** 1:17 4:11 5:1
6:1 7:1,18 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1

74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1

203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1,6
256:8 257:6 260:2
**bakers** 7:19
**ballpark** 22:8
**baltimore** 74:4
**barbecue** 72:20
**barksdale** 162:5
**based** 13:13,16
14:2 15:17 16:18
16:22 21:15 32:5
35:14 43:5 62:21
74:3 76:16 99:8
114:6 121:5 122:2
133:11 153:14
214:18
**basic** 169:24
254:18,19
**basically** 65:9
211:16
**basis** 84:16,23,25
167:14,16
**bates** 163:7,12
175:8 181:5 182:3
183:25 185:10

186:15 188:3,8
191:2 193:15
201:18 203:7 204:7
204:12 211:2
241:13 244:12
246:6 257:19,21,23
257:25 258:3,5,7,9
258:11,13,15,17,19
258:21,23,25 259:3
259:5,7,9
**bathroom** 44:14
146:17 159:14
**bay** 25:10
**bearing** 77:9
**beat** 20:21
**beaten** 70:6
**bedroom** 160:14
**beginning** 51:16
102:13 126:16
130:16 131:18
134:15 136:4
212:18,25 214:6,18
254:16
**behalf** 113:16
114:10,23 115:3,11
116:7 147:23 148:7
196:20 197:13
**believe** 8:8 14:15
16:2 22:24 34:22
38:12 48:23 50:3
53:20 73:8 77:6
80:18 81:19 83:7
85:3,11,15 86:3,10
86:12 87:5 88:2
89:18 90:21,23
91:2,20 92:15
93:19 94:11 97:3,8
97:12 99:11,16
100:6,10,10,14,20
101:25 102:17,24
103:7 104:10,12

105:18 106:9 107:9
107:12,23 108:9,16
108:20,22 109:3,6
110:17 113:14
114:3,8 115:15
116:9 121:6 125:10
130:15 131:16
132:2 133:8 134:2
134:12,17 137:11
145:17,21,23
148:19 151:14
153:3,17,21 158:16
158:19 160:10
164:13,20 172:5
180:8 184:23
189:14 195:14
202:18,21 210:13
210:16,19 219:3,20
220:6 222:6 231:12
231:14 232:20,20
232:23 233:12
235:3,6 239:4
248:7 253:23
**believed** 47:23 49:9
50:25 57:18 68:24
71:25 75:11,15
77:2,12 78:4 81:22
92:12,19 93:9
97:20 103:25
105:11 107:22
109:2 117:7 159:3
179:14,25 183:15
208:6 219:7 221:7
234:3
**bell** 174:9
**ben** 6:7 14:9 128:3
128:6,12,17
**berkeley** 24:12,23
25:16 26:7,8
**best** 13:2 37:6,15
41:2 47:21 60:15

74:15 84:8,11
99:19 107:13
129:18,24 130:7
157:25 166:8 170:6
171:18 190:6 203:2
235:19,23 238:20
**better** 35:13 154:4
199:4 235:12,15
236:24 237:16
**bias** 43:25 44:5,7
**bibles** 184:24
**big** 18:14,19 69:23
190:15
**billed** 80:5 82:14
225:11
**bio** 35:13 247:21
**birmingham** 53:17
56:16 72:24 95:7
**birth** 8:6
**birthday** 234:9,22
**bit** 23:23 39:8
59:13 101:3 105:15
117:2 122:12 135:4
156:23 157:14
211:23 217:12
228:18
**blacked** 147:14
148:19,25 149:11
**blackout** 146:12
148:4,6,12,13,17
149:13,19,20,21
150:7 169:21
**blackouts** 148:3
**blake** 20:5
**block** 190:15
**blogs** 25:11
**blood** 84:7 165:6
165:24,25 169:13
169:22 171:20
202:15 203:2 235:8
256:15

**board** 58:21
**bobby** 2:17
**bolger** 2:8 5:17 7:3
17:25 18:24 20:10
22:16 23:4,11,19
27:21 28:25 29:10
29:19 32:17 33:16
36:6,15 38:15 39:4
40:4,24 41:4,15,23
42:7,13,25 43:9
44:3,16 45:12
46:13,21 50:16
52:7,10,25 54:13
54:17 55:3,11,21
56:6,10 57:13
61:25 63:7 64:11
65:14 66:8,11
67:21 68:2,15,22
70:16 71:20 73:14
76:5,11,21 77:8,22
78:9 79:7,12 80:22
81:2 82:16 83:11
84:24 85:5,17
86:19 87:23 88:12
88:23 89:6,11,23
90:7,13 91:5,11,23
92:24 93:21,25
94:13,21 95:20
96:6,15,19,23 99:5
100:23 101:9,19
102:4 103:10 104:3
104:15 105:21
106:13 108:3,12
109:8,17 110:5,19
110:24 111:7,13,15
112:23 113:8,17
114:14,24 115:18
116:17,23 119:4,19
120:9,24 121:20
122:10,16 123:3,17
124:3,11,16,21

125:24 126:6
128:23,25 129:3,25
130:5 135:11,17
136:8,15,19 138:4
138:7 139:3,8
141:14 142:4,14
143:2,18 144:2,16
144:24 146:2,14,19
146:25 147:7
148:21 149:12
150:18 151:8,22
153:7,24 155:14,22
156:21 158:9,12,22
159:13,18 161:3,21
162:14 164:6
165:18 166:22
169:6 170:24
171:10 174:11
176:12,25 178:20
180:19 181:19
182:22 183:3
184:20 186:22
187:20 188:25
189:8,15 190:2,11
190:20 191:24
192:7,18,23 193:2
193:10 194:15
195:3,8 196:2,5
198:9,16,22 200:12
200:21 206:23
215:13 217:4 220:8
220:12 221:21
222:2,8,15,20,23
227:22 228:6 230:9
230:18 231:19
232:12,18 233:9,22
237:18 240:4 241:3
241:8 245:15,24
247:16 250:13,18
251:6 252:6,22
253:21 255:2 260:1

**bottom**  114:15
184:10 196:10
215:23 220:16
225:12 238:3
**boulevard**  2:13
**bradley**  163:22
164:3,10 168:3
171:14 172:5
**brag**  31:24
**braunstein**  10:4
**break**  4:18,21
44:19 54:13 94:24
95:2 108:6 120:2
147:2 187:11 192:3
200:13,20 241:5
**breaking**  62:4
130:13 196:17
238:12
**brief**  128:15
**bring**  18:8 114:5
127:4 148:12
**brought**  82:6 225:9
237:7,24
**build**  78:14
**building**  13:15
81:23 210:14
225:16,24
**built**  78:7 79:10
80:11,18 81:20
**bulk**  51:9
**bullied**  107:10,25
108:5,23
**bullying**  108:22
**bunn**  30:12 76:9,20
82:2 83:19 84:2,16
85:4 86:14 87:12
87:13 88:4,17 91:9
93:20 94:7 98:5,9
98:10,14,21 99:18
100:8,16 104:25
125:6 139:6 156:18

156:25 157:9 162:4
162:15 198:7,15
199:7,11,20 219:3
219:10,20 220:19
221:5 224:22
239:12
**bunn's**  117:17
126:10 160:14
180:6 196:17 198:8
199:7,9 219:24
225:5 228:20,21
238:12 239:6,18,21
239:25 240:2
**bunns**  220:3
**bureau**  17:9,10
**buzzfeed**  1:10 6:7
6:12 7:6,9 9:20,21
10:23 11:20 12:3
12:18 14:7,8 15:3
15:18 16:6 18:7,22
19:4,8 20:9,22
21:15,23 22:21
23:2,8,14 28:6
31:11 43:20 45:22
53:5 63:6 64:8 67:9
70:18 73:14,15
120:16 126:19,22
127:9,23 128:25
132:5 149:8 163:7
163:12,14,15,18,24
168:2,25 175:8,11
176:14 177:18
178:14,15,18 181:5
181:8 182:3,6,11
182:12 183:25
184:4 185:10,13
186:15,20 188:3,8
188:11,16 189:20
189:23 191:2,5
193:15,18 194:19
201:18,21,23 203:7

203:10,13 204:7,12
204:15,21 205:10
205:18 211:2,5
241:13,18 244:12
244:15,23 246:6,9
250:22 253:11
257:20,22,24 258:2
258:4,6,8,10,12,14
258:16,18,20,22,24
259:2,4,6,8,10
**buzzfeed.com.**  7:7
**byline**  218:17,18

**c**

**c**  2:2 18:16 20:4
256:2,2
**california**  12:23,24
12:25 24:3
**californian**  25:18
25:20
**call**  14:20 64:15
70:19 91:25 185:20
185:20 199:13
**called**  4:3 17:12
18:16 20:17 24:5
27:2 30:12 35:6
69:3 74:12 138:11
209:19 218:20,21
237:5 243:4 248:15
254:19
**calling**  144:17
**calls**  38:17 71:16
101:10 122:16
123:18
**cameroon**  70:5
**campbell**  73:17
133:8 254:19
**campuses**  69:23
**capacity**  101:17
154:13 247:23
**captain**  37:7,15
38:4 40:10 60:19

74:15 79:25,25
82:7 83:2 87:16
89:25 90:18,24
94:19 97:15 106:4
106:7,19 112:7
113:10 117:22
132:23 135:2
138:13 140:25
145:15,17 146:4
152:2,22 159:9
165:13,14 166:18
168:15 169:17
193:23 194:2,19
197:23 200:6,8,24
224:14 226:9,10
230:16 231:22
235:16,22 236:9
237:9,17
**captures**  173:17
**car**  147:17,19
196:17 238:12
**care**  18:8
**career**  21:9
**carroll**  46:4,5
141:3 152:11
155:25 185:2 187:5
204:18 245:8,24
**case**  1:5 4:14 39:21
39:22 45:9,9 57:7
65:22 78:8,14
79:10,17,18,18
80:2,11,19 81:21
81:23,25 82:6
87:15,17 97:14,14
97:20 100:16 105:2
113:25 117:23
118:23 137:10,13
145:16 152:16
153:13 154:14,16
155:4,19 159:7
163:2 169:16,25

187:13 196:12
198:2 201:12
210:14 213:12
214:3 218:15
224:15 225:3,5,5
225:16,25 228:15
231:10 237:5,22
238:21 239:3,5
240:10,15,20
242:21 248:21
**cases** 12:5 35:17
97:16 147:23,24
148:7 230:23
238:14 241:21,25
**cast** 220:17,23
221:19 222:7,17
**catch** 196:15 238:6
238:16
**category** 41:10,12
**cause** 93:15 94:15
**caused** 91:21 92:2
92:15 93:3,15,16
**cctr.law** 2:16
**ce** 257:13
**cell** 7:2 174:8
**center** 56:22
170:18
**ceo** 166:10
**cert** 260:18
**certain** 29:5
**certified** 257:13
**certify** 256:7,14
261:2
**chance** 28:3,19
30:17 139:25
182:24 194:8
240:12
**change** 31:8 65:12
66:21 68:8 94:12
111:6 261:11,13,14
261:16,17,19,20,22

261:23 262:1,3,4,6
262:7,9,10,12,13
262:15
**changed** 21:3
131:12 132:7
134:14 208:9
**changes** 65:3,5,10
66:7,24 260:7
261:4,5,7
**changing** 132:8
**channel** 181:11,12
**charge** 157:5,10
159:7 231:2,8
**charged** 9:8 201:13
**charges** 85:16 86:4
86:6,17 87:3,7,11
99:12,18 100:7
114:6 196:16
224:21 227:20
238:12,19
**charity** 21:13 69:24
70:10
**chasing** 60:18 62:6
**check** 34:23 95:25
132:12 144:8,13
197:24 242:13
**checked** 63:23
150:2 239:14
**checker** 45:23 46:7
63:21,23 123:21
143:11 183:13
204:18
**checker's** 144:9,12
**checkers** 118:17
125:3
**checking** 10:5 64:5
125:15 129:21
143:6 150:14
205:20 242:18
**chief** 10:3 20:4 35:6
128:7 203:14

**chiefs** 33:24 166:14
169:11
**children** 8:25
208:20 209:9,11,18
210:11
**choice** 114:5
**choose** 239:17
**choosing** 218:14
**chronicle** 9:25 11:3
12:21 25:13
**chronological**
130:24
**chronology** 105:7
197:25
**cindy** 49:24
**circle** 159:16
**circumstance**
67:25
**circumstances**
121:21
**cities** 241:24
**civil** 100:16 228:13
228:20 229:6
238:21 239:5 261:6
**claim** 102:13
153:11 159:5
224:13 250:7
**claimed** 33:12
**claims** 57:19 116:3
156:18 157:3
234:15
**clarification** 102:7
**clarify** 5:4 30:18
95:5 132:20 156:22
176:12 239:24
240:13
**clarity** 52:2 115:14
199:18
**class** 33:14
**classes** 26:13,15
27:8 32:13

**classify** 41:14,17
**clawed** 192:20,21
193:3,5,7
**clean** 5:12
**clear** 29:12 56:3,4
90:14 105:13 142:6
149:17 168:16
170:6 171:15,19
172:2 191:14 192:9
197:8,20 198:4
201:25 207:12
208:11 209:5,20
214:17 224:3
226:23 231:21
238:9 240:19,22
**clearer** 109:20
119:7
**clearest** 51:11
59:23 107:4 112:19
209:4,8,11,16
**clearly** 33:11 40:9
137:22 205:25
**click** 22:25 211:19
**clicks** 21:16 22:13
23:9
**client** 6:8
**clinical** 148:2
149:24
**clip** 124:9,13,13
**clips** 119:14,24
120:5,17,23 122:25
123:24
**close** 48:13 199:15
**closed** 84:18,20
**closest** 238:23
**cms** 64:19,23 65:2
65:3,5,9,13,13,19
66:6,13,14,18,24
66:25 67:5,9,12
**cockrell** 2:11,11,17
56:4,8

code  89:22 261:6
collaboration
  45:23
collaborative  18:12
colleagues  6:12
collect  167:7,10
  170:4
collected  169:22
  172:3
college  9:25 12:25
  24:9 69:23 72:19
  217:20
colloquially  215:6
  215:9
combined  164:21
come  59:24 103:23
  127:2 223:8
comes  60:3 61:19
  129:22 199:22
  223:13
comfortable  207:3
commencement
  256:11
comment  30:17
  54:10 68:7 104:6
  119:11,13 132:20
  140:6 143:7 151:19
  169:25 185:2,16
  189:22 190:4,5,18
  191:11,12 201:23
  202:4 205:14,18
  206:4 207:5 240:13
  241:20 245:2,17,20
commenting  185:3
comments  68:7
  184:7 188:13
  189:23,24 191:8
  205:17,24 206:20
  237:8 244:23
commission  21:15
  255:12 262:23

commit  226:22
committed  80:15
  82:21 83:9 86:14
  210:22 225:18
  226:21
committing  226:16
common  65:18
  96:3
company  21:13
  181:22
compile  121:25
compiled  68:5
  123:6 212:12
compiling  211:12
complaint  87:4
  212:20 214:15,16
  230:25 231:7
complaints  69:19
  70:5,7,10
complete  5:7
completed  260:18
completely  131:7
  134:14 184:14
  223:11
compound  95:21
  108:4
concern  27:20 69:9
concerned  183:14
  183:18 212:16
  230:4
concerning  6:12
  15:10 35:25 37:17
  40:22 112:15
  122:23 128:12
  164:5,15 194:13,20
  205:16 212:13
  218:11 236:2
  243:15 246:20
  249:15 253:12,20
  254:10

concerns  28:20
  183:16
conclude  225:14
  227:14
concluded  224:19
  225:2 234:12
conclusion  94:15
  99:8 101:10 225:7
  225:8,9
conclusions  43:23
  109:24
conduct  158:8
conducted  117:16
  153:19,22 247:10
conducting  152:18
confers  192:17
confident  36:20
  125:18 150:4,8
confidential  38:19
  47:15 48:11,17
  54:2,4,7,11,17,22
  55:5 56:15 61:24
  95:19 96:10 184:21
  185:4 190:14,16
  192:6 246:20 248:6
confidentiality
  47:16 62:4 178:11
confine  130:2
confirmed  125:9,14
confronted  169:9
confused  56:3
  222:10,11,13
confusing  7:20
  198:23 211:23
  212:8
confusion  224:2
connect  57:7
connection  53:18
consent  148:5,8
consenting  148:9

consider  20:15
  22:13 23:17 41:6
  69:13 164:22 169:9
considered  42:12
  250:6
considering  73:20
  135:25
constantly  189:11
constitute  107:17
  110:12 177:13
constituted  233:7
constraints  170:7
consult  35:24 37:16
consulted  36:2
  218:11
consults  35:12
cont'd  160:7
contact  71:4 84:6
  201:3
contacted  30:11
contained  54:19
contains  189:3
content  64:19
  65:12
context  202:2
  205:7 222:24 245:5
  246:14
continue  98:23
  99:6 140:10
continued  98:7,11
  157:2 254:25
controversy  256:17
conversation  49:2
  49:6 50:18,20
  95:11 106:24
  126:25 127:10
  192:19 193:5
  199:23 204:17
  242:6,7
conversations
  50:15 95:17 128:11

128:20,21 129:7
137:16 140:24
186:4 205:16,21
248:11
cool  27:7
coordinator  201:3
239:9
cop  85:6
copies  260:13
cops  213:12
copy  65:6 66:20
111:25 146:6
151:17 161:12,24
174:4 180:5
core  134:2,4,13
correct  52:2,5
70:24 134:3 136:9
136:22 139:7
145:25 146:8
167:22 178:4
198:11 200:23
209:24 210:18
234:19 236:16
corrections  260:7
261:9
correspondence
106:10 107:5
163:22 193:22
201:10
corresponds
244:22
corroborate  162:22
242:10,13
corroborated
130:25 143:13
145:10
corroboration  62:8
239:7
corroborative
127:24

corrupt  91:7,14,17
91:17
corruptly  91:3
counsel  192:17
256:18
counseling  219:18
counselor  48:2
75:18 77:4 93:10
140:19 175:24
219:19 250:2
counselor's  117:18
country  15:21
96:14
county  254:9,14
256:4
couple  175:17
course  21:8 27:3,4
27:14,24 31:8,20
33:15 74:24 82:7
87:23 123:6 124:25
127:5,15 132:8
134:18 138:11
139:19,24 140:16
146:25 147:4
152:22,24 154:9
165:7,11 168:14
169:16 170:9 183:3
197:25 206:3
213:20 235:20
244:16 251:21
252:14 253:7
course's  27:15
courses  26:6,9,22
27:19,22 28:10
32:7,9,13
court  1:2 31:14
214:15 259:11
260:16
cover  7:22 27:4
252:14

covered  27:17
40:21 86:13 91:8
93:20 94:7 210:17
coverup  214:2
coworker  214:13
coworkers  6:9
created  14:16
crest  260:21
crime  9:9 83:21
84:17,21 85:12
86:13 89:21 90:20
91:10 97:21 191:15
191:21 192:10
199:16 226:21,22
233:7
crimes  80:15 82:20
83:9 90:3 97:17
210:21 225:17
226:4 228:15
criminal  33:15
35:17 79:18 80:11
81:21 105:20
196:12 220:17,23
221:20 222:7,18
231:2,8 236:4
239:2 240:10,15,20
crisis  56:22
criteria  37:10
231:2,8 236:13
critical  151:6,12
170:4
crucial  28:17 51:10
117:15 140:22
crying  223:20
current  254:14
currently  6:24
14:21 16:25 20:23
20:24
curtis  34:17 246:17
cv  1:5

| d |
|---|
| d  1:20 4:4 20:5 |
| 24:6 256:5,24 |
| 257:4 |
| da  60:24 |
| da's  117:17 119:3,9 |
| 119:10 |
| daily  10:9 11:8,11 |
| 13:7,13 25:18,20 |
| damaging  108:18 |
| dance  148:5 |
| data  60:19 61:6 |
| 62:8 133:9 137:15 |
| 174:2,7,20 175:3 |
| 189:11 |
| date  8:6 81:9 163:8 |
| 163:13 175:9 |
| 177:20 181:6 182:4 |
| 183:5 184:2 185:11 |
| 186:16 188:4,9 |
| 191:3 193:16 195:9 |
| 201:19 203:8 204:8 |
| 204:13 211:3 |
| 241:14 244:13 |
| 246:7 260:3 |
| dates  53:3,13,21 |
| 194:18,23 195:11 |
| 195:12 212:3 |
| daughter's  174:20 |
| david  1:18 |
| davis  2:4 |
| day  66:16 83:22 |
| 84:10 134:24 |
| 157:12 183:10 |
| 199:15 205:22 |
| 234:12 236:6 |
| 242:18 255:9 256:9 |
| 256:21 262:19 |
| days  105:2 108:25 |
| 199:22 |

**dch** 164:5,15
169:24 170:22
171:2 172:8
**dch's** 164:22
**deadline** 130:13
**deal** 38:19 96:11
196:15 238:11
**death** 80:5 225:10
**december** 48:23
134:5 212:5,5
**decide** 99:22 114:5
116:2 122:6
**decided** 45:10
68:20 97:4,9
124:14 177:12
196:14 197:22
221:22 238:20
240:17 243:18
250:6
**deciding** 101:6,18
229:13 240:9
**decision** 17:22
63:25 110:13
116:21 117:17
119:3,9 123:22
124:6 243:13,14,15
**decisions** 64:3,6
66:4 107:15 110:10
119:23,24 120:8,13
227:25 250:25
**deck** 218:21,22
**declined** 104:8
169:25 207:12
**deepened** 238:25
**deeper** 157:16
**defamation** 31:13
**defendant** 9:13
**defendants** 1:11
2:5
**defender** 72:23

**defense** 236:4
**definitely** 112:17
118:16 127:20
176:7
**definition** 91:13
146:12 149:19,20
149:21,23,25 150:7
207:18 215:6,9
217:22 237:6,23
**degree** 24:17,19
**delamana** 34:17
247:4,20
**delete** 184:13
**demand** 214:16
**denial** 133:18
**denied** 133:17,20
**deny** 162:19
**department** 47:25
74:13 77:3 117:9
133:5 137:7 152:10
152:23 154:3,9,23
155:2 156:2 165:13
169:14 183:18
218:3 235:3,13,16
236:9,10 237:11
249:10
**depending** 31:8
**deponent** 260:2,6,7
260:10,16
**deponent's** 260:6
262:18
**deposed** 143:3
205:22
**deposition** 1:17
3:13,17 6:2,18
256:8 260:6 261:8
**depositions** 41:11
**depression** 238:24
**depth** 175:25
**describe** 206:12
211:16 215:12

**described** 112:7
137:17 150:3,4,8
209:15 219:22,25
**describing** 30:14
207:20 208:7
**design** 65:6
**desire** 261:7
**desk** 14:17,18,19
14:20,23 15:7,9,19
15:22,25 16:4,4,22
17:17 18:6,6,10,10
18:13,20,23 19:16
20:2 22:3 187:7
**desks** 14:24 19:3
**despite** 84:8,11
99:19 157:25
**detail** 125:17 145:4
237:10
**detailed** 82:3
**details** 6:10,14
62:10 117:11 250:9
**detain** 85:4
**determination**
23:16
**determine** 75:3
78:2
**determined** 120:3
**determining** 22:14
**dfsa** 247:11
**di** 110:19 139:8
257:9
**dialect** 17:15
**difference** 18:5,9
191:14,20 192:9
232:10 233:16,18
**different** 10:24
15:23 16:6,9,9,11
17:15 18:17 19:18
21:6,8,11 27:18
29:24 33:22 41:21
42:11 47:2 57:18

57:23 61:20 63:2
69:6 75:16 77:2
88:25 89:3,10
92:19 93:8,13
119:24 130:9,17
131:7 134:14 144:3
153:22 215:18
234:25 236:7
249:21,24 254:3
**differently** 83:19
84:13 88:7,16,20
88:25 89:16,19
92:9 94:3 104:21
105:15 153:19
156:5 171:18
**difficult** 13:11 39:9
89:14 189:10
219:15
**digital** 189:2
**direct** 200:17
226:11
**directions** 257:9
**directly** 74:14
156:19 179:22
208:13 226:25
241:24 256:16
**director** 166:25
167:16,24
**disagree** 170:19
**disagreed** 158:7
**discharged** 229:19
**disclose** 178:10
**disclosed** 42:23
43:8
**disconnect** 176:20
**discovery** 53:3
173:16
**discretion** 168:5
170:21 172:7
**discuss** 178:13
179:4 181:13 189:6

**discussed** 58:24
71:5 179:6,16
231:22 236:6 249:2
254:12
**discussing** 178:17
188:14
**discussion** 159:19
205:25
**discussions** 118:18
194:13
**dispute** 172:10
**district** 1:2,3
195:16 196:13,24
197:7,18,21 236:15
236:19 237:4,14,15
240:8,16
**division** 1:4
**doc** 64:25
**docs** 213:2
**document** 46:16
53:2 80:23 81:3,4
114:17,19 141:25
142:8,13 150:14
163:6,11 175:7
181:3,4,25 182:2
183:24 185:7,9
186:14 187:25
188:2,6,7 190:25
193:13,14 195:22
201:17 203:5,6
204:5,6,10,11
210:24,25 241:12
244:10,11 246:5
257:19,21,23,25
258:3,5,7,9,11,13
258:15,17,19,21,23
258:25 259:3,5,7,9
**documentation**
48:4,24 50:23
60:20,23 61:15
75:2 82:5 129:17

131:17,25 133:11
231:21
**documents** 6:22
31:13,14 38:23
39:4 47:20 48:8
51:2,4,5,6,9,10,13
51:15,20,21 52:5,8
52:11,16 57:20
61:17 62:8,13
64:18 75:23 76:15
82:16 114:25 116:5
125:16 128:13
131:19 132:9
134:22 141:4,19,22
142:22 143:21,22
145:10 150:23
153:16 154:11
180:10 189:9
193:11 195:18,20
196:18 197:12
202:9 214:9
**doing** 16:16 39:18
39:24 49:13 60:18
61:3 62:9 83:3,6
103:15 108:18
132:15 135:6 140:8
150:22,22 206:18
209:21 221:8
252:21
**donald** 254:21
**door** 160:14,17
**doubt** 231:14,17
**doubted** 102:2,11
102:12,13 229:17
230:3 231:4,5,12
232:4,6,8,21,23
233:6,13,14 234:15
234:20
**doubting** 232:10,11
**dow** 13:14

**download** 177:7
**downloaded**
174:20 175:2
**downtown** 126:13
**dozen** 56:18 242:15
243:21
**draft** 62:11 64:25
65:19 128:21
129:19,20 131:5,11
132:11 134:14
139:9,10,22 143:8
184:8,19 185:17
188:13,14,20,23
202:5 205:4 244:20
245:5
**drafts** 6:22 61:20
62:14,21,23 66:12
130:16,19 131:6,7
188:23 189:9
204:24 213:2
**draw** 43:23 109:24
**drew** 53:2
**drink** 95:7
**drinking** 169:18
**drive** 141:18
260:21
**drop** 214:16 228:15
238:20
**dropped** 100:15
**dropping** 99:17
100:7 229:6
**drove** 217:20 220:6
220:13
**drug** 9:4 166:5
168:4 169:10
170:19 172:6
**drugged** 201:25
202:13,15,19,21
235:6
**due** 244:8 260:3

**duly** 4:3 256:10
**duties** 17:18,19
**dynamic** 189:9

**e**

**e** 2:2,2 4:2,2 6:22
7:5,8,21 8:13 18:16
20:5,5,6,6 30:4,12
34:10 35:5 38:4,9
39:12 52:14,17
53:14,22 60:14
71:13,14 72:17
73:3,5 95:7 106:10
106:18,21 107:5
112:20 128:15
133:13 135:2
137:18 146:3,5
152:21 159:8,9
160:2,2,4,4 163:21
164:24 182:9,10,13
186:17,24 187:5,14
194:14 228:22,24
229:2 239:7 248:7
248:13 249:6
253:16 256:2,2
257:4,16 261:6,7
**eager** 50:22
**earlier** 71:5 98:4
133:25 154:7 155:6
236:6
**early** 37:21,25
38:10,12 39:17
45:7 95:8 131:5,14
172:21 184:8
185:17 187:18
202:5 214:11
238:21 244:20
**earnest** 33:6 97:5
97:10 235:11
237:16
**earnestly** 33:4

easier  39:13 47:9
  78:24
easiest  39:9 248:21
eastbay  25:14
easy  17:11 130:10
  205:23
eat  223:22
ed  168:5 170:21
  172:8
edit  128:17
edited  63:23
  130:14
editing  64:5 129:9
editor  8:15 10:3
  20:4 25:14 63:21
  65:2 127:6 128:7
  144:7,9 182:11
  183:12 191:9
  203:14 218:5
editorial  42:4,11
  227:25 243:13
  251:25
editorially  242:6
editors  23:22 28:4
  45:24 63:22 65:6,6
  66:20,20,23 70:22
  118:17 123:20
  125:3 127:2,4,15
  129:20 142:7 145:7
  218:22,25 242:7
  243:17 251:2
education  23:24
  25:24 26:3
effect  3:15
either  9:13 76:13
  85:10 97:18 152:14
  180:4 202:22
  229:11 231:7
  246:16
elaborate  213:19

electronic  189:9
electronically
  260:8
elements  32:22
  36:5,11 40:2,9
  233:19 234:22
  248:21 250:7
eloquent  137:16
else's  216:21
email  260:18
embedded  119:15
  122:25
employ  170:2
  256:18
employment  9:18
ended  73:21 197:17
enforcement  32:12
  149:11 166:17,23
  167:5,20 200:3
  230:23 247:19
  254:9,14
engage  98:11
english  17:13 24:20
entered  261:8
entire  12:24 229:8
entitled  149:6
errata  260:3,7,8,10
  260:12,13,15,18
  261:1
error  87:13
escape  228:14
especially  77:18
  117:21 183:12
  219:5
esq  2:8,15,17 260:1
establish  111:5
established  110:18
  110:25
et  1:7,10
event  44:8

eventually  196:13
  197:22 199:13
everybody  28:18
  30:24 68:6 74:16
  119:12 132:21
  140:6,13 194:3
evidence  85:4
  125:12,14 157:17
  170:5 178:6 210:20
exact  53:21 125:5
  146:4 149:15
  209:25
exactly  34:11,23
  36:21 37:9 48:5
  51:17,22 69:4
  97:24 112:18
  115:12 116:15
  120:13 127:24
  131:14 141:21
  145:2 196:10 218:6
  218:7,25 220:20
  243:18
examination  4:7
  160:7 257:5
examined  4:4
examiners  34:22
  36:13 170:3
example  18:15
  21:10 30:23 36:12
  70:9 83:19 147:16
examples  34:19
exchange  38:4
  164:25 182:10
exclusive  31:25
exhibit  81:6,7,11
  147:11 163:5,6,10
  163:11,14,15,18,23
  168:2 169:2 175:6
  175:7,11 176:23
  177:19 178:14
  181:3,4,8,10,25

182:2,6,8,24
  183:23,24 184:4,6
  185:8,9,13,15
  186:13,14,19 187:2
  187:25 188:2,6,7
  188:10,12,15,18
  189:20,22 190:24
  190:24,25 191:5,7
  191:13 193:13,14
  193:17,19 194:20
  201:16,17,21 203:5
  203:6,10 204:5,6
  204:10,11,14,16,20
  204:22 205:10,18
  210:24,25 211:4
  213:7 216:12
  217:13,15 220:15
  241:11,12,17
  244:10,11,15,18
  246:4,5,9,11
  257:18,19,21,23,25
  258:3,5,7,9,11,13
  258:15,17,19,21,23
  258:25 259:3,5,7,9
exhibits  164:4,13
  164:21,22 257:17
  259:11
exist  25:12
expand  162:12,13
experience  35:16
  43:6 122:19
experiences  16:10
experiment  10:12
expert  34:21 35:7,9
  35:11 36:14 105:22
  105:24 106:2
  107:19 109:22,22
  109:25 147:22
  148:2 242:8,10
  243:9

**experts** 33:19,23,23
33:25 35:24 36:2
60:15 99:20 158:2
165:9,10,10,16
167:3 235:21
241:20 242:4,15,15
242:20,21,22,25
243:3,4,20,22
244:2,6
**expires** 255:12
262:23
**explain** 28:14
51:14 74:23 105:9
105:19 127:17
129:9 137:22
169:12,16 170:10
206:17 235:10,13
237:16
**explained** 35:13
48:5 158:17 224:4
228:23 230:13,20
235:20 238:17
**explaining** 207:21
228:11
**explanation** 118:2
118:8
**explanations**
194:14
**express** 25:14
**extensive** 112:19
**extent** 29:14 38:17
101:12 112:9
120:10 142:15
233:24
**extra** 207:11,12
**extraction** 174:8

**f**

**f** 18:16 20:4 160:2
256:2
**fabricated** 99:12

**face** 238:19
**facebook** 7:14,16
7:25
**facilitated** 166:5
169:10
**facility** 260:20
**fact** 10:5 45:23
46:7 63:21,23,23
64:5 94:18 116:22
118:17 121:18
123:20 125:3,15
129:21 132:12
140:6 143:6,11,12
144:8,8,12 149:25
150:13 152:13,15
156:24 157:14
183:12 197:24
204:18 205:20
209:18 219:24
226:18,21 239:14
241:23 242:13,17
243:23 254:2
**factored** 116:20
**factors** 23:17 117:5
118:7
**facts** 42:21 43:22
43:24 44:11 68:10
73:10,12 74:17,20
75:9,12 78:22 79:4
83:5,17 84:15
85:20 99:8 101:5,7
109:12 121:6,16
122:7 134:17
144:13 153:13
171:23 177:16
183:8 206:6 207:7
207:10 208:3
211:20,20 228:9
251:10
**factual** 143:8

**factually** 83:5
105:16 109:23
206:9
**failing** 213:13
**fair** 5:15 116:5
143:17 196:8 242:5
**fall** 11:15,16 16:2
**falls** 167:23
**familiar** 28:11
177:15
**family** 40:12 44:24
48:13 71:4,8 95:17
174:21 196:12
219:13,25 220:19
221:11,18 224:7
**far** 57:9 59:2 60:6
101:7 127:5 230:3
**father** 178:9
**fear** 224:3
**featured** 41:11
**february** 17:5
164:2 168:12
182:14 183:6 202:5
212:6
**feel** 29:19,23 36:20
46:24 59:11 93:24
123:19 125:17
150:8 162:21
201:22 212:24
**feelings** 58:4,5,7,11
71:23
**felonies** 105:13
208:10 226:15
**felony** 75:20 79:24
80:16 81:25 87:3,7
87:10,10,15 98:25
99:2 113:23,25
115:17,23 116:4,9
116:18 131:15
140:12 152:6,19
196:16 220:25

222:5,10 224:11,11
224:14,17,20,24
238:11,19
**felt** 60:21 98:3
108:23 117:13,20
117:22 123:22
124:6 150:4 206:2
206:8 207:8 209:16
210:2,4 219:16,23
235:22 238:17
**fernando** 24:3
**fight** 113:15 114:9
114:22 115:3,10,15
116:6 196:19
197:13
**figure** 36:23 60:10
118:11 222:13
233:4
**figuring** 49:17
**file** 18:16 64:4
125:2 130:14 163:3
196:23 197:6,18
228:13 260:12
**filed** 6:7 9:16 59:17
86:18 133:9 214:13
260:15
**files** 137:10,13
176:14 189:2
**filing** 3:6
**fill** 260:7,8
**final** 63:25 65:3
67:8 128:21 130:18
131:8 135:14 183:7
184:9 206:9 244:21
**finally** 132:17
**fincen** 18:16
**find** 52:12 62:7
130:19 147:5,21
149:8 157:11 162:6
167:4 173:22
184:18,19 191:10

200:16 221:18
228:16 254:17
**fine**  12:12,16 29:14
36:22 88:9 104:24
168:22 173:21
193:2
**finish**  44:18 61:25
146:23
**finished**  195:15
196:23 197:6
**first**  4:3 10:2 14:22
15:18 19:7,21
34:16 35:4 38:5
39:12 45:6,6 47:10
47:12,14 62:11
97:13 98:8 100:2
102:8 108:7 114:2
116:3 125:22 126:5
126:8 129:19,20
131:6,11 156:15
162:15 163:17
164:24 172:20
175:17 181:16
188:10 205:14
212:18 213:21,22
221:2,22 224:19
225:13 242:3
244:17 253:23
**fisher**  163:22 164:3
164:10 168:3
171:14 172:5
**fishing**  83:22 105:3
157:12 199:15,22
**fit**  41:12
**five**  27:11 34:11
36:19 39:8 51:9
86:9 229:15
**flack**  171:3
**flew**  50:5
**floating**  62:18

**focus**  20:22 69:14
69:15 77:25 191:16
**focused**  177:11
**focusing**  152:15
154:12,13 175:22
250:4
**follow**  83:25 84:4
96:11 157:7 226:13
**followed**  98:19
156:17 157:13
164:18
**following**  261:5
**follows**  4:5 160:6
**followup**  74:3
132:23 165:2
229:18
**food**  146:20
**foot**  147:8
**footage**  120:21
162:4,6,7,8,20,21
162:23,24
**force**  3:15
**forced**  102:18,22
102:24
**foregoing**  256:7
**foremost**  167:3
**forensic**  33:25
34:15,22 165:23,23
169:23 170:4
**forensics**  167:17
**forever**  121:21
**forget**  148:14
**form**  3:9 5:17
17:25 18:24 20:10
22:16 23:4,11,19
27:21 28:25 29:10
32:17 33:16 36:6
36:15 38:16 40:4
40:24 41:4,15,23
42:7,13,25 44:3
45:12 46:21 50:16

57:13 63:7 64:11
65:14 66:8 68:2,15
68:22 70:16 71:20
76:21 78:9 83:11
84:10,24 85:5,17
86:19 89:6,23 90:7
91:5,11,23 93:21
94:13 99:25 100:23
101:9 102:4 103:10
104:4 106:13
107:11,18 108:2,11
108:20 109:7,8,14
109:16 110:2,5,15
111:7 112:23
113:17 115:18
116:23 119:4
120:10,24 122:10
123:3,17 124:3,11
125:24 126:6
133:17 135:11,17
136:9 138:8 139:3
141:14 142:4,14
143:2,18 144:2,16
144:24 148:21
149:12 150:18
151:8,22 153:7
155:14,22 157:25
158:9,22 164:6
165:18 170:24
180:19 187:21
195:4 206:23
215:13 220:8
221:21 222:8
227:22 228:6 230:9
233:9,22 237:18
240:4 245:15
247:16 250:13
251:6 252:6,22
261:7,9
**formal**  27:22

**formally**  201:13
**format**  173:12,23
**former**  10:3 25:13
35:6 254:8
**forms**  108:24
**forth**  4:16 37:8
112:20 194:4
**forward**  145:20
196:13 198:3
240:10,16 260:12
**foster**  56:21 58:15
**found**  82:8 114:20
115:4 126:23 157:6
169:15 176:14
189:22 196:20
197:14 201:10
205:17 213:16
228:17 239:15
**four**  72:13 83:22
105:2 125:17 129:6
141:22 150:2,12
157:12 165:19,20
165:21 171:22
183:6 184:8 199:15
199:22 228:2
244:20 247:21
249:3
**fourth**  252:23
**fragmented**  169:8
**frame**  78:15
**framing**  44:12
213:11 214:23
215:3,11,17,19
**francisco**  9:25 11:3
12:21 25:9,12,13
**free**  123:19 169:19
183:4 201:22
**freedom**  253:24
**freelanced**  10:17
**freelancer**  182:18

freshest 51:21
freshman 25:4
friday 185:25
friend 72:19
  103:18 126:13
  179:14 223:10
friends 56:19 57:12
  59:16 84:5 95:18
  157:20 221:11
  224:7 238:23
fromm 147:21
fromme 149:4,8
front 10:7 229:3
full 114:25 120:4
  120:22 121:8,19
  122:24 123:15,25
  147:2 164:20 169:4
  183:7 214:11
  247:21 250:8
  251:15 252:4,4,20
fully 5:21 31:3
  60:21 105:9 134:16
  150:23 248:20
fund 69:24
funded 150:21
funding 70:2
funny 61:3 242:14
furnish 261:9
further 3:8,12
  127:14 157:4 160:6
  227:5 256:14
future 146:18
fyed 46:14

                g

g 2:15
gaps 147:15,18
  149:17 166:6,7
  169:9 202:23,25
gary 37:15 38:4
  39:11 40:10 135:2
  138:2 230:12,13

235:16
gather 74:25 132:3
gathered 68:10
  74:18 76:17 116:21
  141:4,25 142:22
  143:25 251:4
gathering 67:24
  73:10,12
geiser 182:10
general 10:16,22
  21:3 27:13,20
  29:16 39:18,24
  42:2,15 43:16,20
  45:20 46:23 49:5
  49:14,22 57:2,21
  64:10 67:19 108:23
  117:2,4 120:7
  122:13,15 137:15
  172:16 218:23
  232:22 245:22
  253:18
generalize 58:3
generally 29:18
  43:10,25 47:4
  59:11 69:3 72:14
  76:15 120:17
  218:14
generous 37:9
getting 61:17 94:21
  139:16 161:18
  206:17
give 5:6,7,10 21:10
  28:19,20 29:21
  38:25 50:24 51:4,5
  51:6 54:8 57:8
  90:24 91:14 94:23
  99:24 106:5 130:6
  132:5,18 133:16
  135:19 139:24
  142:20 143:24
  144:15,21 145:18

146:10 157:24
163:2 165:13 173:5
173:9,10 186:18
190:6 194:8 198:24
200:7,11,24 235:23
237:13 239:21
254:4
given 6:2 30:5
  112:2 125:19
  139:22 141:6,11
  157:10,21 162:5
  164:2 170:7 173:25
  177:14 207:12,22
  211:4 219:17 261:8
giving 247:13
glad 150:24
go 4:17 9:18 11:2
  13:24 34:23 44:14
  44:20 46:17 47:5
  50:4 52:3 53:23
  56:16 57:9,15
  66:24 69:3,4 70:20
  77:9 80:3 82:9
  83:22 94:25 98:16
  102:24 103:19
  104:7,22 105:3
  113:2 126:22 127:8
  129:19,22 131:3
  142:2 143:7 145:20
  156:13,22 157:12
  158:14 159:13
  160:24 162:14
  168:18 190:7
  200:19 204:9
  205:23 207:23
  208:20 210:4,6,10
  210:18 217:11
  221:6 228:18
  230:12 237:19
  238:21 240:5,10

goal 23:14 51:2
  115:25 118:20,23
  131:18 171:16
  194:7
goes 17:23 30:24
  45:24 143:11 166:2
  181:17 229:16
going 4:14,17 9:18
  11:2 12:9 15:13
  23:23 38:15 39:3
  50:21 55:5,24
  63:17,18 64:2 70:7
  70:12 76:5,12,14
  77:22 81:10 90:15
  95:20 103:17 104:3
  104:7 105:7,21
  109:5,10 116:17
  119:14 131:2 136:3
  136:8,11 138:7,19
  138:20 139:12
  153:24 160:21,24
  162:16 163:17
  166:19,25 181:20
  181:21 183:9
  185:20 187:20
  188:11 189:23
  190:2,9 191:11,12
  199:3 200:12
  201:22 205:13,17
  206:15 207:15
  208:15 209:9 210:4
  211:15 216:21
  217:11 223:20
  228:24 241:17,18
  241:24 242:2
good 17:7 22:15,23
  26:16 151:15 165:8
  186:11 227:19
  233:5
goodbye 238:23

**goodness** 4:22
**google** 64:25
  141:18 149:7 213:2
**gosh** 173:14
**gotten** 28:3 131:20
  131:22 134:23
  148:8
**gpa** 160:11 229:15
**grab** 103:20 207:24
**grad** 26:3
**graduate** 24:7,13
  24:15,17 26:10,18
**graduated** 9:24
  24:8
**grammatical** 65:10
**grand** 80:3 82:6,10
  87:17 100:22 101:8
  101:14,18,22 112:5
  112:15,22,25 113:5
  113:7,12 114:4,5
  116:2,10,12,15
  145:16 194:20
  195:24,25 196:3,14
  196:15 197:22
  224:16 225:10
  237:7,24 238:11
  240:9,17
**granular** 145:3,8
**graph** 114:15
**great** 32:4 88:11
  216:22 237:10,12
**greetings** 260:5
**grew** 12:24 238:24
**ground** 4:18
**groups** 70:2
**guardian** 25:10
**guess** 13:18 29:7,7
  53:23 66:3 99:9
  123:21 129:22,25
  172:23 185:20
  214:25 243:4

**guessing** 51:16
  52:6 246:14
**guidelines** 169:12
  171:21 243:12
  248:17
**gun** 79:21 86:24
  103:7,20 105:8
  196:18 206:16
  207:16,23 208:8,16
  208:20 209:9 210:7
  210:15 223:6
  238:13
**gunlach** 56:20
  58:15

**h**

**h** 2:17 20:4,5
  257:16
**haley** 215:23,25
  216:5,9
**half** 10:25 31:15
  51:18 56:18 72:13
  84:10 125:17 129:7
  141:23 150:12
  221:22 228:2
  247:21 249:3
**halfway** 177:19
  182:12 201:24
**hand** 211:25
  256:21
**handed** 125:16
  188:15 191:4
  193:17 204:14,20
**handle** 7:18 8:4,5
  69:18 235:2
**handled** 57:19
  153:13 159:6 167:4
**handler** 7:17
**handles** 165:23
**handling** 133:9

**hands** 98:5
**hanged** 108:25
  220:14 223:3
**happen** 64:3 67:20
  132:14 203:25
**happened** 39:10
  48:5,9,22 49:8
  60:22 65:21 68:25
  69:7 71:19,24 75:5
  75:14,16,19 76:17
  76:23,25 77:5,6,11
  77:13,25 78:3,4
  86:24 92:11,13,18
  92:20 93:7,8,11
  97:19 105:8 109:23
  117:6 129:6 138:2
  138:3 140:18,19
  144:18 145:2
  148:14 149:18
  159:3 170:11 172:4
  175:23,24 177:10
  179:25 208:7
  212:19 213:24
  219:7 220:21
  221:12,13,14 224:4
  225:2 228:11
  230:24 231:10
  234:24 240:14
  249:23 250:3
**happy** 4:20 5:2,5
  12:10 39:12 47:3
  72:12 88:7 104:22
  158:14 165:10
  217:2 237:21
  251:19
**hard** 31:15 34:11
  47:4 51:12 53:2
  58:3 72:14 74:11
  74:13 113:15
  114:10,23 115:3,11
  115:16 116:6 140:3

  193:25 196:19
  197:13 198:12
  216:20
**hart** 151:25 159:8
  201:11 228:23
  239:8,8
**hart's** 152:20
**hasting's** 82:20
**hastings** 4:13 58:16
  58:21 74:9 78:7
  79:10 80:11 81:20
  83:8 85:3,15 86:4
  86:13,17 88:3 91:3
  91:21 93:20 94:12
  97:4,9 99:12,17
  100:6,15,21 102:2
  102:18 107:10,24
  108:10 110:18
  113:15 115:10
  150:16 151:15
  152:18 153:4,18
  154:2 156:7,16
  157:13,19 158:5,6
  158:18 159:6,12
  160:11 165:6 198:7
  198:14 199:6,19,23
  229:24 231:12
  232:4
**hate** 223:10
**head** 5:12 12:14
  19:15 33:11 39:3
  52:19 56:21 64:4
  80:25 103:13
  112:19 152:23
  189:13 206:3 207:9
  218:21 235:13
  239:10 248:14
**headline** 217:19,25
  218:12,14,20
**headlines** 217:24
  218:4,9

**heads** 103:17
141:16
**health** 48:2 69:22
75:18 77:4 117:10
117:18 140:19
175:24 183:19
249:25
**hear** 4:24 47:10,12
183:20
**heard** 5:14 47:14
48:16 127:5 132:22
211:8 212:19
230:21 238:19
239:6,20,25
**hearing** 127:18
**heidi** 20:5
**held** 1:17 11:23
28:2,10 84:2 98:9
156:18 194:13
**help** 73:9,18 128:17
143:22 192:3
197:24 209:9,18
219:12,19
**helpful** 39:5 130:23
131:2 189:18
**helpfully** 197:24
**hereunto** 256:20
**hidden** 145:5
**high** 21:12 23:25
24:2 147:24 165:22
**higher** 63:6,9
**highlight** 143:7
**highly** 113:18
**hilton** 187:6
**hips** 84:2 98:5,9,22
156:18
**hired** 14:22 19:7
228:19 239:5
**history** 9:19 23:24
122:18

**hit** 97:25 98:18
**hits** 21:16
**hmm** 217:5 225:20
**hold** 25:19 28:6
192:14 237:2
**holding** 98:21
**holes** 236:12
**home** 50:21 60:2
98:16,17 126:12
238:21
**homicide** 110:18
133:5 136:7 137:7
138:2 145:24 146:8
155:2 156:8 229:5
**honest** 211:13
223:11
**honestly** 22:7 37:24
128:19 216:6
221:14 249:20
250:9
**hood** 37:7,15 38:4
39:11 40:10 60:19
61:6 74:15 79:25
79:25 82:7 83:2
87:16 89:25 90:18
90:24 94:19 97:15
106:4,7,19 112:7
112:12,16,20
113:11 114:4
117:22 132:23
135:2,2 137:25
138:2,13 140:25
145:15,17 146:4
152:2,22 159:9
165:13,14 166:18
168:15 169:17,17
193:23 194:2,19
197:24 200:6,8,24
224:15 226:9,10,13
226:19,23 227:11
230:13,13,16

231:22 235:16,22
236:9 237:9,17
**hood's** 170:9
**hoover** 260:22
**hope** 205:22 214:12
**hoping** 32:3 186:2
**hospital** 47:25 49:9
57:2 60:24 69:4
75:17 77:3 93:10
117:9 131:22
140:18 168:17
169:22 170:2,11,16
172:2 175:23
179:12,22 183:19
211:21 219:8
226:18 229:19
249:25
**houndstooth**
161:25
**hour** 44:17 50:6,22
179:11 200:13
**hours** 99:25 107:16
123:11,11 148:14
210:17
**house** 105:5 199:9
**hundred** 18:17
125:18
**hundreds** 123:10
172:23
**hurt** 223:20
**husband** 6:9
**husband's** 17:7
**hypothetical**
106:16 123:18
144:17

**i**

**iacp** 35:3 99:21
107:14 108:17
110:9 166:14,22
243:12 248:9,12,17
248:24 249:5

**iacp's** 248:20
**idea** 184:17 208:15
215:14 216:2,10
241:23
**ideas** 127:3
**identification** 81:8
163:8,13 175:9
181:6 182:4 184:2
185:11 186:16
188:4,9 191:3
193:16 201:19
203:8 204:8,13
211:3 241:14
244:13 246:7
**identifies** 189:12
**identify** 81:12
163:18,20,23
176:17 186:20,22
**ignore** 221:22
**ignored** 70:8
**images** 162:7
181:13
**imagine** 219:14
**imagined** 220:17
220:23 221:19
222:17 224:6
**immediately**
130:14 179:12,13
216:13
**implicating** 189:21
**imply** 115:2 116:5
196:19
**important** 118:19
119:12 132:14
139:18,23 140:23
208:18 210:3 227:8
227:10 244:3
**importantly** 29:13
**impressed** 186:6
**impression** 23:2

impressions 21:16
22:14 23:9
inaccurate 80:4
82:9 90:24 104:10
112:11 125:11
134:10 138:18
145:15,18 206:9
inaudible 76:8,13
incidence 227:18
incident 79:21
103:7
include 21:12
43:14,25 44:5
58:17 75:6 117:12
117:25 118:8,10
120:17 121:15,15
123:23 126:15,16
152:2,6 154:10,20
154:24 155:3 194:7
206:14 208:11
221:4 223:3 226:7
226:10 235:10
included 43:7
59:22 74:18 75:9
75:11 81:25 90:3
115:17 117:11,23
118:3,5 120:4,23
120:23 123:5
125:12 151:24
152:20,22,24
153:15 159:8
194:21,24 195:9,12
196:25 197:10
207:13 224:21
236:13 237:24
includes 85:20 87:3
87:11
including 75:17
77:3 117:8
incorporated 68:7
139:20,22

indecipherable
134:22 174:21
251:24
indigenous 70:3
indirectly 256:17
individual 138:12
individually 194:2
induce 100:9
induced 99:17
100:7
influence 219:23
influential 220:19
information 29:21
35:22 37:6,15
38:18 48:12 54:19
54:23 55:2,3,11
57:2,8,21 59:2,21
59:22 60:8 61:4
62:22,24 67:24
72:25 73:10 74:17
74:20 75:2 82:9,13
84:6 87:14 90:3,24
101:5,7,11 105:13
112:12,15 116:22
121:4,25 122:3,5,9
122:23 124:9,14
125:8,13,19 127:16
130:22 138:18,21
141:2,4,10,19,25
142:21 145:18,20
150:14 152:17
174:12 176:10
183:11 184:21
190:13 197:23
212:21 224:17
234:21 235:24
236:2 237:13
240:23,25 241:2
243:24 246:19
254:17,20 257:8

informed 84:3
98:10 201:4,9,11
244:4
initial 71:4 99:23
102:19 107:15,17
110:3 125:11
133:14 152:9
199:23
initially 157:15
199:11
injustice 69:16
innisfree 59:10,15
160:25 161:6,8,11
inquire 160:13
inquiries 90:2
230:21
inquiry 89:20
90:19 97:14,15
164:12 186:2,5
230:14,16 231:6
insert 257:10
instagram 7:15,16
8:4
institution 70:10
154:8,23
institutional 69:15
institutions 21:4,7
21:8,11 47:20,24
48:6,7 57:18 60:16
69:6,18 75:17 77:2
92:13,20 93:8
117:8 153:12 159:4
170:15 171:16,17
177:10 183:18
230:5 234:25 235:2
236:8,8,21 244:5,7
249:25
instruction 5:18
130:2
intake 108:24

intend 114:22
115:3 116:6 196:19
197:13
intention 206:21
212:16
intentions 206:7
207:8 208:2
interactions 76:19
intercourse 98:12
148:20
interest 10:20
17:20 22:24 23:15
23:18 61:16 68:24
121:14 123:13
251:24 252:16
interested 21:6
39:20 45:8 47:19
48:6 57:5 256:16
interesting 17:24
48:7 61:14 127:7
147:21 148:10
interfere 5:23
interference 4:24
internal 114:25
195:18,20 196:18
197:11
international 33:24
166:13 169:11
interpreted 245:18
interview 39:11
59:20 76:9 80:17
82:4 83:20 84:5
97:22 102:3,6,19
103:8 105:11
178:12 205:12
208:2 209:23,24
210:2 221:15,17
223:2,4,25 224:5,7
226:16 229:18
246:12,22,25
247:25 248:3

251:15 252:9
**interviewed** 56:18
  56:25 59:16 99:20
  107:19 109:21
  117:13 157:20
  165:9,9,22 242:15
  243:2,20,20,21
  244:3
**interviewing** 60:14
  198:15 221:11
**interviews** 76:3,7
  95:16 98:8 122:23
  122:24 131:17
  140:12 152:18
  166:2 168:14
  171:22 242:10
**introduce** 4:9
  208:15
**investigate** 82:20
  210:21 226:15
**investigated** 32:15
  46:19 83:9 97:16
  105:12 152:3,16
  247:7,9,15
**investigating** 35:17
  208:10 221:15
**investigation** 4:16
  15:10 16:16 17:9
  32:13 37:21,25
  54:9,23 55:10,17
  55:20,24 56:9,11
  57:17 58:5,8 67:15
  71:19 73:2 74:24
  77:19 78:2 86:17
  86:22 88:22 91:4
  99:23 107:16,17,18
  110:3 117:12,21
  118:22 123:7
  135:10,16 138:3
  140:4 151:21 153:5
  153:6,11,19,21

154:18,19,21,22,25
155:8,13 156:6,17
157:5,11 158:7,21
165:7 175:21,22
176:9,11 177:17
178:7 183:17 194:9
195:15 196:23
197:5,17 208:9
212:13 213:5
225:14 227:13
235:17 236:11
243:3,6,11 249:15
249:22 250:5,11
252:14 253:7,14
254:10
**investigations**
  14:20 15:25 16:4
  16:22 18:6,10,13
  18:20 20:2 117:17
**investigative** 20:8
  20:12,16,18,18
  41:7,9 197:6
**investigator** 79:10
  80:10,11 81:20,20
  82:19 83:7,8 85:3
  85:15 86:3,12,12
  86:16 88:2 91:2,20
  93:19 94:11,12
  97:3,4,8,9 99:11,16
  100:14,20,21
  101:25 102:17,18
  102:20 103:6,8
  104:13 105:18
  107:9,24 108:9,10
  110:17 113:14
  115:10 154:16
  155:3 158:20
  160:10 197:18
  210:13 243:8
**investigators** 78:7
  89:18 90:19 98:8

98:20 101:17 105:6
114:19 115:4
140:16 154:14
155:12,19 157:4
169:12,20 171:20
196:20 197:14
199:8 220:18 221:2
230:25
**involved** 123:22
  151:21,25 153:5,20
  155:4 243:6,6
**involvement**
  243:10
**io** 122:24
**ipad** 10:10 13:9
**ipads** 10:12
**isolation** 238:25
**issue** 37:6
**issues** 69:23
**ix** 152:21 200:3
  201:3 239:8

**j**

**jack** 96:17
**january** 38:10,12
  50:3 52:4,20 134:4
  135:10,13,22 137:2
  138:4
**jason** 162:4
**jezebel** 10:19 11:13
  11:14,21 13:8,16
  13:20,23
**jm** 7:18
**job** 6:15 10:2,23
  11:13 13:8 14:7,8
  17:7 56:23,24,25
  58:18 70:17 82:20
  83:3,3,6 105:19
  121:3,10,12,13,24
  121:25 131:10
  135:4,5,7 140:16
  144:7,9,12 150:22

166:11 167:19,19
218:9 226:6 227:19
247:17 252:15
**jobs** 13:22 43:19
  134:25
**joined** 15:24 16:21
**joke** 242:14
**jones** 1:7 4:13
  13:14 74:8 78:7
  79:10 80:10 81:20
  82:19 83:7 85:3,15
  86:3,12,16,25 87:2
  88:2 91:2,20 93:19
  94:11 97:3,8,23
  98:17 99:11,16,24
  100:6,14,20 101:25
  102:17,20 103:6,8
  104:10,13 105:8,19
  107:9,24 108:9,19
  109:14,15 110:17
  113:14,23,24
  115:10 150:17
  151:15 152:17,19
  153:4,18,25 156:7
  156:16 157:20,23
  158:4,6,18 159:6
  159:11 160:10
  165:5 205:12
  206:12 207:12,15
  208:2,12,17,21,24
  210:6,13 223:13,18
  225:21 226:24
  227:9,19 228:4
  229:23 231:12
  232:4
**jones's** 103:13
  206:21
**josh** 4:13 58:16,20
  74:9 139:6 150:16
  156:7 198:7,8,14
  199:6,19 229:24

231:12 232:4
**journalism** 20:17
26:6,9,11,15,19
27:6,18,20,24
28:12,16 31:20
32:10 43:6 74:22
**journalist** 27:2
32:19 47:19 62:6
118:19 121:11,24
122:17 125:2
150:20 203:15
251:23 252:12,15
**journalistic** 18:18
**journalistically**
124:7
**journalists** 7:20
211:14
**jr** 2:15,17
**judges** 27:6
**judgment** 118:13
118:14 252:2
**july** 1:14 76:9,18
76:18 102:3,6,9,20
162:9,9 198:10,15
199:7,20 251:15
252:9 256:9,21
257:2
**june** 51:18 131:14
137:9 168:13
**junior** 221:5
**jury** 80:3 82:6,10
87:17 100:22 101:8
101:14,18,22 112:5
112:15,22,25 113:5
113:7,12 114:4
116:2,10,12,16
145:16 194:20
195:24,25 196:3,14
196:16 197:22
224:16 225:10
237:7,24 238:11

240:9,17
**jury's** 114:5

**k**

**k** 4:2,2 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1,3,5,6 21:1
22:1 23:1 24:1,6
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1

139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1,4,4 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1

**kaminer** 20:6
**karaoke** 148:5
**katherine** 2:8
260:1
**kathleen** 189:16
**katie** 1:17 4:11,12
7:18,19 20:12
29:16 36:8 43:11
44:5,18 54:18
63:10 71:22 77:23
81:10 89:12 101:13
106:3 115:21
123:19 124:23
142:6 143:4 163:17
176:15 181:19
182:23 192:18
222:25 233:25
245:25 255:6 256:8
257:6 260:2
**katie.baker** 7:7
**keep** 92:8 96:3
131:12 192:25
200:3 201:3
**keeping** 201:9
**kept** 127:15,21
132:8,8 201:11
**key** 117:23 118:5
118:10,11 152:15
154:11 155:7
194:11 241:21
248:22
**kicked** 97:25 98:18
**kids** 103:19,23
206:17 207:16,24
223:8
**kill** 223:22
**killed** 64:15
**killing** 70:3
**kim** 147:21 149:3,7
**kind** 10:11 17:22
21:13 26:14 30:23

49:15 51:3 58:6
59:11 60:10 62:15
62:16 95:15 127:17
134:2 142:18
152:14 157:16
179:15 202:25
211:19,21 212:6,8
212:23 214:2,7
220:2 228:23
**kip** 159:8 239:7,8
**kissed** 98:16
**kit** 169:24 214:14
**knew** 17:10 30:8
112:10 131:12
132:12 142:21,22
152:3 160:11
177:12 179:21
183:7 195:19
198:13 218:7
219:10,19 228:19
231:4 250:5
**know** 4:19,20 6:9
6:14 8:4,21 10:10
12:17 15:24 19:22
20:7 22:7 28:11,19
29:3,6,7,8 30:2,5
30:16 32:22 33:3,6
35:16,18 38:19
39:19 41:11,17
42:16 44:12 45:3,4
46:7 48:12 50:23
51:8 52:9 55:22,23
56:20 58:22 62:19
63:15 64:6,20
65:25,25 66:4,5
71:9,11,15 72:5
73:25 76:3 77:14
77:15,24 78:19,25
79:5,8 80:25 83:13
85:10,11 86:16,22
86:23 87:2,9 93:5

96:19 97:19 98:5
101:15 102:5 104:5
109:13 111:8,19,22
112:5 113:21
116:11,13,15 119:5
119:25 120:11,11
121:2 124:5 126:2
126:7,22 129:15
130:20,21 133:16
134:11,18,21 135:8
135:9,15,21,23,24
136:3 137:3,21
138:11,19,22
139:15 140:10
142:15,25 143:13
143:15,19 145:14
146:21 148:16
155:16,23 156:3
165:12 167:14,23
171:14 172:13,19
172:23 173:4,14,15
174:3,17 175:2,4
177:3 178:12
179:10 181:21
182:24 183:9
184:15 188:20
189:25 190:4,20,21
193:4,6 194:9
198:3 199:10 202:3
203:17,25 204:3
205:2,7 210:2
211:23 215:8
216:16,20 217:25
219:13 220:22,24
221:10 224:13
225:8,8 229:16
230:24 231:9 235:7
237:5 240:15
241:20 245:5 246:2
247:2,3,6,14 249:4
253:9,11,15

**knowing** 87:19
93:16,17 101:21
172:9 202:14
**knowledge** 112:9
143:17 174:24
**known** 60:6 200:5
**knows** 141:15

**l**

**l** 20:5,6
**lab** 34:15 165:23
166:2 167:2,17
247:23
**label** 211:20
**labeled** 97:13,14
231:6
**lack** 131:21
**lacrosse** 7:22,23
**laid** 37:9 117:22
**large** 246:18
**larger** 184:11
**late** 131:13,23
**laura** 182:10
**law** 26:21 27:2,3,5
27:17,20 28:2
31:20 32:12,23
33:10,13,15,20
34:2,3 35:12 37:3,8
37:18,22 40:9
94:12,19,20 97:22
102:14 115:22
149:11 157:6
166:17,22 167:5,20
200:3 226:13
230:22 231:2,9
233:20 247:19
254:9,14
**law's** 72:20
**laws** 31:13 35:8,10
35:20,22,25 36:5
40:2

**lawsuit** 6:6,13 9:12
9:15
**lawyer** 30:20,21
39:22 45:9 46:9
61:2 83:23 105:3
136:2 157:13
199:15 219:24
228:19 235:10,14
236:3 239:5,6
**lawyers** 27:6 30:5
46:14 118:18 125:2
130:21 236:5
**lay** 30:15 205:25
**lead** 126:23
**leading** 154:21
156:17
**leads** 62:6
**learn** 82:13 87:21
**learned** 27:14
40:13 80:4 82:15
87:18 127:16
145:19 148:10
193:8 228:14,21
229:10 239:2
240:20
**learning** 39:20 40:8
57:6 130:22
**leave** 59:24 98:15
116:21 240:2
**leaving** 12:20 13:6
13:19 14:5 58:5,11
126:13
**led** 86:17,22 97:12
222:6
**left** 12:22 56:23
58:18 59:4 103:8
103:22,25 125:6
150:16 166:11
181:22 199:13
205:13 208:8
210:14 211:18

223:7 238:22

**legal** 45:24 63:24
64:5 94:15 101:10
125:3 192:12 237:6
237:23

**legally** 63:21
182:19,20 191:13
192:8 226:14

**legible** 154:19
251:22 253:8

**length** 94:18 159:9
159:10 239:23

**leroy** 37:22 38:6
40:11 44:25 45:5
57:4

**letter** 30:14 31:5
134:16,20 194:5
209:20 214:16

**letters** 132:16
133:25 137:9 138:6
138:11,25 139:7

**level** 145:8

**lied** 83:19 84:19
88:17 105:4 157:14

**lieutenant** 151:25
152:20 201:11
228:23 239:8

**life** 12:24

**limited** 135:5

**line** 44:17 53:2
107:20 171:18
216:12 241:4
261:11,14,17,20,23
262:1,4,7,10,13

**lines** 95:15

**link** 123:15 250:23
252:5

**linked** 250:16
251:16

**linking** 233:24
251:4

**lisa** 19:12

**list** 88:7 94:4
154:15 156:4
224:24

**listed** 89:20,21
152:6 153:17 154:6
221:5,6 224:22

**listing** 88:18 98:13

**literal** 207:20
242:12

**literally** 44:4

**literature** 24:20

**litigation** 82:17
87:24

**little** 4:19 23:23
59:13 67:11 101:3
103:23 122:12
156:23 157:14
206:16 207:16
209:9 217:12 223:8

**live** 8:20 50:5,6
72:22

**lived** 12:23

**living** 8:14 16:12
16:15

**llp** 1:18 2:4,11

**local** 25:5,11,15
70:4 230:22

**locked** 160:16

**locking** 160:13

**london** 6:25 7:23
8:16 16:25 17:5,9
73:21

**long** 9:22 10:14
12:9 13:12 16:8
27:3,4,24 37:7 49:3
50:8 53:15 71:17
123:12 127:9
175:14 216:8

**longer** 23:6 25:12
50:12 56:22 73:22

130:12 148:15

**look** 22:23 27:15
35:13 36:20 39:12
49:15 66:16,16
67:9 68:20 97:23
97:24 98:17 106:21
131:3 138:20
143:22 146:3,14
168:3 175:25 183:5
183:10 184:7,10
189:6,23 196:5
201:22 215:14,20
217:3 220:25
229:14 237:3 245:3

**looked** 98:3 105:20
149:23 150:6,10
161:10

**looking** 22:22,23
78:3 103:18 106:16
140:7 147:11
175:25 176:9
183:13 188:19
194:21 198:13
211:18,21 217:15
225:12 238:2,5
248:23

**looks** 67:5 129:20
163:21,25 165:2
181:11,12,16 182:9
182:13 185:16,19
185:25 186:17
188:13,19 190:6
191:8 202:4 204:17
204:23 246:18

**loop** 127:16,22

**looped** 128:9

**los** 27:3

**lost** 51:14

**lot** 28:5 33:22
51:19 60:8,14,17
60:18,19,25 62:2,5

82:5 87:14 96:13
131:12 132:7 140:2
140:11 177:14
192:25 212:8,22
215:15 242:16
244:6 246:19 248:3
248:5

**lots** 15:21 16:6
27:18 38:2,2 57:23
148:3 167:25 220:2

**love** 47:20 132:5

**loyola** 27:3,24

**luncheon** 159:21

**lying** 85:12

**lynne** 1:20 4:4 5:9
256:5,24

---
**m**
---

**m** 2:8 19:22 20:3,6
260:1

**magazine** 25:10

**magazines** 13:22

**maggie** 187:6

**magical** 94:16

**mail** 7:5,8 38:4
39:12 52:14,17
71:13 73:5 74:11
74:12 106:10 107:5
112:20 163:21
164:24 182:9,10,13
186:17,24 187:5,14
194:14 253:16
260:10,19

**mailed** 30:12 72:17
159:9 249:6

**mails** 6:22 7:21
30:4 34:10 35:5
38:9 53:14,22
60:14 71:14 73:3
95:7 106:18,21
128:15 133:13
135:2 137:18 146:3

146:5 152:21 159:8
228:22,24 229:2
239:7 248:7,13
**main** 74:2
**making** 17:23 70:5
191:15,21 192:9
234:11 242:14
261:8,8
**man** 217:20,23
219:4,17,21
**management** 63:14
64:19
**manner** 91:9
250:12
**manually** 260:8
**march** 183:6
187:12,17 212:6
**marisa** 46:5,11
70:23 124:25
127:19,20 128:2,10
141:3,24 144:6,14
144:20 185:2,23
187:5 204:18
243:17 245:8,24
**marisa's** 245:2
**mark** 20:3 81:5
163:4,9 175:5
181:2,24 183:22
185:7 186:12
187:24 188:5
190:23 193:12
201:15 203:4 204:4
204:9 210:23
241:10 244:9 246:3
**marked** 81:8,11
163:7,12,14 175:9
175:10 181:6,7
182:3,5 184:2,3
185:10,12 186:15
186:19 188:3,9,10
191:3,5 193:15

201:19,20 203:7,9
204:8,13 211:3
241:14,16 244:13
244:15 246:7,8
**marriage** 256:15
**marriages** 8:18
**married** 8:8,10,11
**match** 184:18
191:10
**material** 76:16
143:25 144:21
145:6 250:21 251:4
**materials** 140:14
145:11 250:11
**matter** 65:22
142:18 226:17
240:11 256:17
**mattered** 240:24,25
**matters** 243:19
**matthew** 46:14
**max** 8:11
**maxwell** 37:22 38:6
40:12 44:25 45:5
57:4 95:18
**mcglamery** 34:8,20
36:12 37:13 166:9
**mean** 21:5 27:22
30:9 35:9,10,11
42:2,3 44:7 52:24
63:9,12,15 64:15
66:3,15 67:17
68:18 69:10,17
73:11,14 78:12
83:3,12 91:7
104:15 106:15
111:4 126:20 139:9
139:13 148:16
149:13 151:12,14
154:13 161:5
182:20 198:9 215:2
215:3,5,18 218:7

223:15 224:9
225:24 227:4
228:25 238:8 242:3
245:12 250:15
**means** 20:18 28:16
37:10 83:14 97:15
97:18 114:7,9
203:11,21 207:19
215:19 231:7
**meant** 63:3 179:8
179:24 186:9
224:23 230:14,21
233:14 238:9
**meat** 223:22
**mechanism** 160:14
**media** 7:11 26:21
27:20 28:2
**medical** 202:6
**meet** 27:6 37:10
49:24 50:13 52:3
73:6 95:6 97:21
219:12 231:8
236:13 237:6,22
250:7
**meeting** 50:10 57:6
**meets** 230:25
**meg** 34:8,20 36:12
37:12 166:9
**megan** 39:23 47:12
47:14,17,22 48:16
49:7 50:25 57:17
60:16 69:5 71:24
75:14 76:25 77:12
80:2 82:2 83:20,25
84:19 87:13,17
92:11,18 97:23
98:2,7,13,13,21
99:24 103:18,20,21
104:9 105:4,6
108:23 109:2 117:7
126:12 131:21

137:13 147:8
148:24 153:11
159:3 162:4,15,16
169:18,24 178:8,25
179:7,11,23 183:14
196:11,17 199:9,12
201:12 202:25
206:15 207:14
208:4,5,12 209:15
209:24 211:20
212:19 219:7,12,16
219:23 220:13,16
220:22,24 221:5,18
222:5,9,16 223:2
223:18 224:15,21
224:24 225:6,16,25
226:15 228:13
232:7,7 233:17,18
234:8,24 238:3,12
238:17,19,20,22
249:23 250:6
251:14
**megan's** 56:19
57:12 59:16 86:23
95:18 105:2 113:25
114:23 115:3 116:7
118:23 145:16
152:3 156:17
157:20 169:13,16
169:25 177:7,12
196:20 197:13
198:2 208:14
224:13,18 225:10
229:15 234:15
236:12 237:5,22
**member** 174:21
**memo** 62:16 187:7
**memories** 169:8
**memory** 38:3,22
39:2 52:7,11 130:6
130:8 147:16,18

149:18 166:7
184:24 186:11
202:24,25
**mental** 47:25 69:22
75:18 77:4 117:10
117:18 140:19
175:24 183:19
226:16 249:25
**mention** 165:21
216:4 229:9,10
236:19
**mentioned** 59:9
61:5 72:11 79:22
90:18 118:25
165:16,19 195:14
208:8 210:15
254:13
**mentions** 194:19
**message** 174:18
175:17,18 176:2
178:13 179:5
216:24
**messages** 172:14,21
172:22,25 173:13
173:18,20,25 174:5
175:3 176:4,7,8,13
177:3,8,25 179:8
181:16 217:4
**met** 53:8,10 56:14
56:17 57:3 58:23
72:20 95:8 97:5,10
172:20 177:5
233:19
**metadata** 188:25
189:3
**metz** 1:20 4:4 256:5
256:24
**michael** 126:14
**middle** 100:3
105:10 146:21
190:21 211:22

**midnight** 147:17
**mike** 48:19 49:24
51:18 62:13,25
71:15 72:6 75:24
131:15 133:18
162:25 163:3
172:20 175:3,4,19
176:2,4,17 177:5
179:3,16,23 180:2
202:9 213:17,18,23
214:18,20 215:10
215:12 237:5
**military** 9:6
**million** 75:6
**mind** 44:14 45:17
51:12,22 82:23
90:11 92:5 93:15
129:12 168:20
171:7 192:2 198:19
200:13 212:11
226:11 230:12,15
232:25 233:16,17
233:21
**minded** 173:20
**mine** 189:16 254:3
**minutes** 254:4
**miranda** 80:13
81:24 86:25 104:13
105:9,14 210:20
223:19 226:2
**misconduct** 69:19
69:20,21
**mislead** 136:10,17
**misleading** 145:13
**misled** 206:21
**missed** 254:2
**missing** 152:12
**mm** 217:5 225:20
**mo** 257:14
**mode** 137:5

**money** 79:22 125:5
**month** 47:7 123:6
**months** 39:8 51:9
61:3 65:19 74:25
132:3 134:15 140:7
140:9 177:5 183:7
184:8 213:22
214:21 219:11
243:21 244:20
**morning** 76:18
198:9 229:18
**motions** 257:14
**move** 12:22 15:6
16:3 17:4,6,11
196:12
**moved** 11:6,8 12:18
14:19 17:5 96:13
**movements** 162:18
**moving** 73:21
96:14 240:16
**multiple** 31:12
33:19 47:24 105:12
153:12 170:15
225:17 226:3
**murdock** 10:11
13:14

## n

**n** 2:2 18:16,16
19:22 20:6 160:2,2
160:2 257:4
**nabiha** 46:14
**name** 4:11 7:25
8:12 24:4 25:16
35:4 38:14 46:6
56:20 87:2 113:24
152:19,20 155:11
181:15 216:4,5
218:18 219:10
234:9 248:13
**named** 151:21
155:10 193:24

**names** 34:10,16,16
46:13 150:21 151:4
151:24 152:2,14,24
153:16 154:10,20
155:7,8
**national** 14:17,18
14:19 15:6,9,19,22
16:3 17:17,21 18:6
18:10 19:16 22:3
165:10 187:7
**nationwide** 35:8,10
35:12,20
**near** 94:21 146:17
**necessarily** 148:16
242:11
**necessary** 169:23
261:9
**need** 4:18,20 7:3
23:9 95:25 96:20
124:19 132:6
160:23 175:13
189:4,25 202:2
204:25 205:7 214:7
223:16 245:5
**needed** 13:4 59:2
60:11 68:8 132:18
142:19 162:21
240:15 243:24
**needs** 131:4 159:13
**negate** 226:21
**neighborhood**
208:16
**neither** 179:23
**nepal** 70:5
**never** 23:3,13
64:14,16 83:21
87:17 97:25 98:18
98:19,20 105:23
111:11 145:16
146:6 151:17
157:16,20 169:12

171:20 180:2,3
182:17 187:2
195:14 196:22
198:2 202:16
211:12 220:16,22
221:19 222:6,17
223:20,22 224:3,6
224:15 230:21
**new** 1:19,19,21 2:7
2:7 8:15 10:18 11:6
11:12 13:3,4,13,16
14:3 15:17 16:12
16:15,18,22 17:8
17:14 59:25 256:3
256:4,7
**news** 10:8,16 15:2
16:6 18:7 19:8,15
25:7 130:13 203:13
245:10,13,19,23
249:9,14 253:10,12
253:13,17
**newspaper** 10:7
13:2 24:24
**newspapers** 13:22
25:5
**newsroom** 242:6
**newsweek** 10:21
11:16,25 14:2,6
**nicks** 215:24,25
216:5,9
**night** 76:17 84:20
100:3 105:7 147:16
157:21 199:10,12
**non** 95:19
**northern** 1:3 12:25
**notable** 113:22
157:11,18,19,23
201:10 219:14
**notarized** 260:10
**notary** 1:21 4:4
255:12 256:6

262:23
**note** 112:24 213:18
215:17 247:18
**noted** 114:19 115:4
196:20 197:14
255:3 261:4,5
**notes** 57:3 211:17
211:25 212:8,12
213:4,11 215:15
216:23 217:17
**notice** 1:20
**noticed** 22:5
**noting** 260:7
**number** 7:2 25:11
34:9,12 71:15
83:17 84:12 88:6
88:15,24 89:15
92:9,13,19 94:2
104:21 117:8
235:21
**numbers** 157:22
**numerous** 165:9
**nurse** 170:3
**nursing** 33:25

**o**

**o** 19:12 20:4,4 24:6
24:6,6 160:2,2,2
**oakwood** 24:5
**oath** 3:15
**object** 5:17,18
17:25 18:24 20:10
22:16 29:10 33:16
36:6 38:15 40:4
41:15 42:7,13,25
43:12 44:3 45:12
46:21 50:16 57:13
63:7 64:11 66:8
68:15 76:5,21
77:22 78:9 83:11
85:5,17 86:19 89:6
89:23 90:7,15 91:5

91:11,13,23 92:24
94:13 95:20 100:23
101:9 102:4 103:10
104:3,15 105:21
106:13 108:3,12
109:17 112:23
113:17 115:18
116:23 119:4
120:24 122:10
123:17 125:24
136:8 138:7 141:14
143:2 144:16
148:21 150:18
151:8 153:7,24
155:14 164:6
165:18 180:19
187:20 195:3,8
206:23 220:8 222:8
222:23 227:22
228:6 230:9 232:12
233:9,22 245:15
250:13
**objection** 23:4,11
23:19 27:21 28:25
32:17 36:15 40:24
41:4,23 65:14 68:2
68:22 70:16 71:20
77:8 80:22 84:24
88:12 93:21 101:19
109:8 110:5 111:7
120:9 123:3 124:3
124:11 126:6
135:11,17 136:20
139:3 142:4,14
143:18 144:2,24
149:12 151:22
155:22 158:9,22
170:24 171:10,13
215:13 221:21
237:18 240:4
247:16 251:6 252:6

252:22
**objections** 3:9
192:13
**obligated** 226:14
**obtain** 48:8 60:20
84:7 172:14 174:23
**obtained** 53:5
55:12 62:13 120:21
**obvious** 242:9
**obviously** 38:20
133:2 142:23
143:23 189:15
223:2
**occur** 22:6 221:3
**occurred** 114:2,7,8
114:20 115:5,17
116:4 157:6 196:21
197:15 224:20
225:3,4,15 227:14
**october** 11:12
**offer** 13:8 14:7
24:22 26:9 107:18
110:2
**offered** 14:8 26:11
84:9 99:24 108:19
109:14 126:11
157:24
**offering** 109:6
110:14
**office** 119:10 155:2
195:16 196:13,24
197:7,19,21 200:4
236:16,20 240:8,17
**officer** 3:14,16
32:18,20,21 85:9
85:12,13 151:14
153:18,20 155:25
184:11 228:8 254:9
**officers** 55:20
138:12 151:20,25
152:6,8,10 153:4

154:12 155:18
156:2 158:7 159:11
193:24 234:14
254:15
**offices**  1:18 260:3
260:10
**official**  113:11
228:10
**officials**  150:21,22
152:25 153:16
154:10 165:22
166:3
**oh**  103:20 113:8
**okay**  5:19 15:15
19:6 55:7 136:21
156:14,22 174:15
187:23 192:5
198:25 223:12
**old**  126:11,12
**once**  68:5 72:20
132:9,12,20 193:7
223:16 238:18
260:10
**ones**  7:13 36:10
51:11 75:10 119:21
128:15 159:7
**ongoing**  126:25
**online**  15:3 27:15
**open**  160:16 223:11
**operate**  21:7
**operating**  145:24
146:7
**opinion**  13:2 41:21
42:6,10,20 44:9
77:17 79:2,3,6
84:14 85:19 86:8
104:2 140:22
156:10 234:17
**opinions**  18:23
42:17,22 43:7,15
43:21 83:4,16

**opportunities**  16:7
**opportunity**  13:24
16:8 28:21 32:4
**opposed**  89:20
**order**  130:24 135:6
154:18
**ordered**  168:5
170:20 172:7
**ordering**  260:13
**organization**  27:25
37:12
**organizations**  12:4
34:13
**organize**  211:15
212:21
**organized**  62:19
**original**  98:20
260:13,15
**originally**  83:20
105:4 203:16
**ostensibly**  224:18
**outlets**  13:23 18:18
25:5,8
**outs**  140:23
**outside**  50:6 79:12
146:20 178:18
215:17 242:20
**overseeing**  235:17
**overview**  133:2
**owned**  10:11

**p**

**p**  2:2,2
**p.m.**  159:21 160:3
182:14 187:8 255:3
**package**  196:15
238:10
**packet**  75:20 79:24
80:16 81:25 87:3,7
87:10,10,15,19,22
98:25 99:3 113:23
113:25 114:4

115:17,24,25 116:4
116:9,14,18 131:15
140:12 152:19
220:25 222:5,10
224:11,12,14,17,20
224:24
**page**  10:7 67:10
114:2,14 116:3
147:9,10,12,13
168:23,24 196:9
220:15 221:2 223:5
224:19 225:12,13
226:12 227:3
229:14 230:15
237:4 238:2 254:25
257:5 260:18
261:11,14,17,20,23
262:1,4,7,10,13
**pages**  175:17 261:9
**paper**  10:4,10
25:17
**papers**  25:15
**paragraph**  126:9
147:7,12 169:5
171:19 184:14
194:22 196:2
197:21 225:13
228:12 229:8 230:6
238:2,18
**paragraphs**  118:3
196:10 229:15
**paramilitary**  70:2
**parents**  71:6,10
221:17
**part**  56:5,6,8,10
69:13 75:23 85:21
93:12 109:5 114:6
114:11,21 132:14
135:25 139:18,19
139:23 140:23
145:12 154:21

159:4,5 163:21
168:21 178:6 194:9
201:14 205:16
207:13 208:25
221:25 229:5
230:15 231:13,17
231:20,25 232:4
241:21 242:3 243:7
250:3
**particular**  14:23
20:21 22:14 28:9
**particularly**  182:18
**parties**  3:5 256:15
260:13
**partnered**  18:17
**parts**  248:16
**party**  9:11 243:8,9
**pasted**  174:4
**patient**  168:4,6
170:20,21
**pause**  192:16
**payer**  150:21
**pdf**  260:7
**people**  10:12 13:10
16:9 17:10 18:11
19:19 28:24 30:7
30:10 31:6 33:4
34:10,13,14,18
37:2 38:2 46:2
49:16 56:17 58:23
62:6 69:2,2 70:3
117:13 118:14
123:22 127:2
132:17,22 134:23
135:5,8 139:21,24
148:16 151:4 152:2
152:15,25 154:20
155:7,9,11 162:7
166:15 173:5
178:20,22,24
203:15,21,23,24

211:11 216:19
221:9 253:24
people's  103:17
134:9 137:19
138:16
percent  125:18
perfectly  207:2
performed  169:24
period  53:6 77:7
permission  70:14
70:19
person  4:23 48:3
48:12 49:25 54:25
73:6 74:15 138:13
144:3 148:9 164:2
171:3 178:7,10
209:5 213:22 216:7
216:14 220:4
223:24 235:19,23
247:6,14,18
person's  247:2,3
personal  77:15
85:22 177:7
personally  66:7
81:19 244:2
perspective  31:5
117:14,18,19 118:6
126:10,16 145:5
167:3 170:9 227:10
247:12 248:20
perspectives  28:22
126:15
pertaining  248:6
pertains  27:5
pertinent  75:4,7
117:11 122:8
176:10 177:16
phase  135:20 136:5
phil  10:4
phone  7:2 48:20
71:12,16 73:7

83:24 157:22
162:17 172:22
174:3,7,8,20,22
177:7 216:19
248:15
phonetic  34:9
photo  67:6 182:10
physical  207:20
physically  253:2
physician  168:5
170:21 172:8
picture  173:24
piece  242:16 243:5
pieces  130:12
pitch  126:18,20
127:12 128:3,5,6
pitching  126:21
place  13:10 28:5
78:22 106:18
117:21 127:24
246:23
places  10:18 53:24
56:18 59:8 70:4
plaintiff  9:13
plaintiffs  1:8 2:12
4:14 81:5,7,11
104:6 163:5,6,10
163:11 175:6,7
181:3,4,8,25 182:2
182:6 183:23,24
185:8,9,13 186:13
186:14 187:25
188:2,6,7 190:24
190:25 191:5
193:13,14 201:16
201:17 203:5,6,10
204:5,6,10,11
210:24,25 241:11
241:12,17 244:10
244:11,15 246:4,5
246:9 257:17

plan  28:19,21 29:3
planned  30:2 53:11
planning  29:8
30:15,16 31:7
132:19 194:7
please  4:9 8:12
92:6 110:21 163:4
163:9 175:5 181:2
181:24 183:2,22
185:7,24 186:12
187:24 188:5 190:3
190:24 193:12
198:20 201:15
203:4 204:4 210:23
241:10 244:9 246:3
260:10,18 261:9,9
point  21:14 31:2,4
49:3 56:21 58:21
60:7 64:25 114:13
119:21 123:12
127:4 129:8 131:20
134:11 135:2
146:17 166:10
176:25 184:11
190:7 223:23
234:10,23 247:21
248:18
points  117:23
118:5,10,12 158:16
194:11
police  32:18,20,21
33:24 35:6 47:24
49:9 51:19,20
55:17 60:23 69:4
74:13 75:17 77:3
83:18 84:13 85:9
85:12,13 88:6 92:8
93:10 94:3 97:20
105:23,24 106:2
108:17,23 110:9
114:7 117:9,16

118:21 131:16
133:4,10 140:4,13
140:17 149:2
150:24 152:10,17
154:9,23 156:2
157:15 159:6,11
162:16,25 163:2
165:12,24 166:4,14
167:12 168:17
169:9,11 170:7,9
171:25 174:13,24
175:22 176:9,10
177:11,12 178:7,12
179:2,14 180:2,3
183:18 193:24
214:11 219:6 223:6
226:19 228:8 229:9
229:12,25,25 230:4
230:6,7 233:17,18
234:8,12 235:3,13
235:16 236:9,10
237:11 249:10,22
249:24 250:4,5
policies  106:5,19
107:2,7,20 110:18
110:25 111:11,23
112:2 146:10
151:17 164:22
165:14 166:21
170:8 200:6,10,24
policing  34:4 35:7
policy  106:8 164:5
164:8,15,20 165:12
170:22 171:2,11
200:9
politely  135:3
poor  108:18
portion  120:4
121:19 206:19
portray  118:20,22

position   11:23
14:13 19:14 127:9
positions   11:21
25:19
possibility   48:4
169:10 213:25
possible   99:2
131:19 132:7 135:7
207:22 228:14
possibly   57:5
105:24 127:23
post   211:17 252:19
posting   252:4
potentially   49:12
108:18
powerful   217:20,22
219:3,17,21
pr   171:3,3
practice   28:15
108:18 166:8 203:2
practices   60:15
84:8,11 99:20
107:13 157:25
170:7 171:18
254:18
predicate   195:8
prefer   122:20
preliminary   132:12
preparation   6:18
128:14
present   196:14
197:22 240:9,17
presented   100:22
101:4,5,7,18 113:6
116:10,14 124:15
195:23,24 238:15
presenting   101:6
press   105:5 157:15
pressure   108:7,17
109:5 110:9

pressured   107:10
107:24 108:5,10
pressuring   109:7
109:15 110:4,11,13
pretty   57:10
132:25
preventing   252:3
252:20 253:2
previous   9:12,21
41:11
previously   160:5
price   28:4 203:14
print   260:8
printed   81:7,14
257:18
printout   175:18
printouts   174:18
prior   74:9 102:2
137:8 138:5 139:6
private   7:16 21:12
privilege   192:3
privileged   101:12
191:25 192:13
probably   15:13
95:8 115:14 186:8
243:21
problem   201:9
procedure   200:2,9
201:2 261:6
procedures   106:5,8
106:20 107:3,7
111:11,23 112:2
145:24 146:10
151:18 164:18
166:21 200:6,11,25
proceedings   101:14
101:22 116:12
process   29:6,8
30:24 37:2 46:17
47:6,7 60:4 64:5
66:2 92:22 112:5

112:15,22 113:2,4
113:6,9,12 125:4
126:21 129:9,23
131:5,23 143:6
145:3 167:9,19,21
194:20 218:14
219:2
processes   60:17
169:14
produce   252:13
253:6
produced   52:21
82:16 129:17
161:20,23,23
184:22 189:2 193:6
248:8 250:10,15
production   53:5
67:13 260:20
professors   34:2
profile   147:24
program   170:13
project   18:14,15,19
69:24
projects   211:12
prominent   220:2,4
promised   47:15
178:11
promotion   21:19
21:22
proof   240:14
prosecute   84:10
99:25 107:11 108:2
108:11,20 109:7,14
110:2,15 157:25
229:13
prosecuted   241:25
prosecution   99:22
107:15 110:10,14
228:15
prosecutors   213:12
241:23

protect   150:24
208:20 210:10
223:21
protection   208:16
protocol   201:14
252:13
proud   251:10
252:17
prove   33:4
provide   35:21
54:18,22
provided   38:18
194:14 197:24
psychologist   148:2
149:24
public   1:21 4:4
22:24 23:15,18
31:13 47:20 61:16
62:7 68:23 72:23
113:11 121:14
123:13 126:14
131:19 133:10
140:2 143:21,22
150:21,21,22 151:3
152:25 153:14,15
153:16 154:10,11
214:12 228:10,10
251:24 252:16
255:12 256:6
262:23
publication   15:4
46:20 53:6 62:15
62:22 63:4,16,20
67:17,18 74:9
78:20 79:2 80:9
90:6,22 128:22
130:17 131:9
168:10 180:17,24
202:17 219:21
232:3 235:5

publications 10:17
publicly 61:14
publish 63:18,18
64:16,17 65:19
68:11 132:24 140:8
187:17,22
published 15:11
16:13 20:9 21:17
21:20 22:11 40:17
45:11 52:22 56:24
63:3 64:2,9 68:9,21
78:6 79:9 81:19
82:18 85:2,14 86:2
86:11 87:25 89:17
90:25 91:19 93:18
94:10 97:2,7 99:10
99:15 100:13,19
101:24 102:16
103:5 104:11 107:8
108:8 110:16 112:4
113:13 116:8
120:16 130:18
148:18 160:9
176:24 177:6 178:4
187:11 198:6 199:5
199:25 202:11
207:2 210:12
213:22 220:5
231:11 249:14
publishes 64:6
203:23
publishing 68:13
199:19
pulitzer 28:4
203:14
pull 217:12
pulled 118:8
purported 105:23
purpose 61:8 68:13
68:19

purposes 205:21
242:18
pursuant 1:19
261:6
pursue 126:24
157:4
pursuing 127:13
put 30:22 31:11,18
33:3 58:25 61:11
65:2,8,13,19,20
66:6,18,23 80:14
90:18 97:17 98:5
109:11 113:23,24
114:3 117:14 121:4
122:2,5,7 124:5
125:8 134:9 138:17
141:2 143:9 166:20
170:9 191:16
193:10 197:16
214:6 215:15 216:9
219:24 227:2,5
239:14 240:11
250:16,21 251:20
putting 18:19
66:14 108:24
115:23 121:24

**q**

qualifications
247:2,4
quarters 213:10
question 3:10 4:25
5:3,7,14,18 17:7
18:2,25 20:11,13
20:20 22:17 29:11
29:15,24 32:18
33:17 36:7 38:16
40:5 41:16 42:8,9
42:14,15 43:2,9
44:4 45:13,16
46:22,23 50:17
57:14 61:23 63:8

64:12 66:9 67:22
68:5,16 71:21
77:21 78:10 79:7
79:13 81:16 82:23
83:12 85:6,7,18,25
86:20 88:10 89:3,7
89:10,24 90:8,9,10
90:13 91:6,12,15
91:24 92:4,25 93:2
93:4,6,13 94:14
95:21 100:5,24
101:2,10 102:5
103:11,13 104:4
105:22 106:14
108:4,14 110:20
111:3,16,17,18
112:24 113:18,19
115:6,19,21 116:24
117:2 119:5,8
120:25 121:21
123:18 124:4
125:25 126:3
135:18 136:24
139:11 141:15
142:16,17 143:3
148:22 150:19
151:9,10,13 153:8
153:10 155:15,17
158:13,24 161:4
164:7 165:8,19
171:5,8 174:11
180:20 182:23
185:7 191:22,25
192:4,11,12 195:4
198:17,18,20,22
200:15 205:6
206:24 220:9 222:3
222:9,25 227:23
228:7 230:19
232:13,13,17,19
233:10,23,25 234:3

234:5,8 236:25
241:19 242:5
245:16 250:14
251:19 252:24
questioned 82:3
questioning 44:17
83:24 87:2 157:8
199:14 223:17
225:16 241:4
questions 4:15 5:24
47:8 72:13 74:12
76:7,12,14 105:25
113:11 116:18
119:2 129:13
132:23 134:24
137:21 138:22,23
147:3 164:10,19
165:4 175:16 194:4
205:11 226:3 237:9
237:21
quick 241:5
quickly 97:4,9
146:17 188:19
200:25 207:19
238:22
quite 20:11 63:8
100:25
quota 23:2
quote 115:16
199:24 209:10
226:14,19,22 242:8
242:12 248:2,17
quoted 72:6 108:24
217:8 227:3 230:14
quotes 118:4
242:16

**r**

r 2:2 4:2 8:13,13
20:3,6,6 160:2,4
256:2

**ran** 82:7 166:19
183:7 184:9
**random** 212:9,24
**rape** 12:5 32:16,22
35:11,19,22,25
36:5 37:2,8,10,17
37:22 40:2,9,22
47:23 49:9 50:25
57:18 71:25 77:2
77:12 78:5 84:11
86:23 92:13,19
93:9 102:14 105:12
115:25 117:8 149:2
153:11 157:6 159:4
169:24 177:9,13
179:24 183:15
208:6 212:20
213:13 214:14
217:20 219:8 221:7
221:8,16 224:5,13
225:14 226:13
227:14 233:8,19
234:11,25 241:21
247:7,15 249:23
250:7
**raped** 68:25 69:2
102:11 179:12,22
216:13,25 221:10
231:5,15,24 232:7
232:8,11,24 233:7
234:13,16 235:4
**rapes** 69:9
**rdp** 1:5
**reach** 7:4 28:18,23
29:3 45:5,6 104:5
119:12 132:17,21
136:6 137:7 139:5
139:6 140:23 204:2
206:3
**reached** 30:20 38:6
39:17 45:7 68:6

119:10 139:21
140:5 193:23
206:13 226:8
228:20 237:8
**reaching** 30:7,9
132:15 248:8
**read** 10:13,15
13:11 45:19 63:22
80:13,16,24 81:17
81:24,24 82:25
86:25 92:7 97:24
100:11 105:8
106:23 124:18,20
129:16 134:13
147:20 148:13
149:3 168:20 169:4
171:9,19 173:20
182:24 198:21
202:2 205:4,9
210:19 214:10
226:2 230:15 233:3
249:13,16 260:6
261:2
**readable** 123:8
**readandsign**
260:18
**reader** 42:24 43:8
122:6 124:15 196:9
240:14 251:22
253:8
**readers** 43:23
61:14 75:4 109:23
123:13 124:2
208:19,22 248:18
**reading** 82:23 92:5
104:13 105:14
168:7 203:21,23,24
232:25
**reads** 114:25
223:19 245:9

**ready** 30:6 132:24
183:11 187:17,22
241:3
**real** 69:23 224:2
**realize** 216:22
226:20
**really** 14:24 16:5
17:11 18:4 20:18
22:20,21 23:14
27:7 28:17 31:8
37:8 39:19 40:8
42:16 43:20 45:7
47:2,4 48:14 49:14
50:22 60:25 61:13
65:21 66:4,5,18
67:4,12 68:4 74:11
74:13 78:11 109:9
117:19,22 128:15
129:23 130:11,23
131:10 132:4
136:16 137:17
140:24 142:17
145:4 152:15
157:15 173:14
175:22 177:11
183:9 185:16
193:25 203:18
206:17 208:18
209:20 212:18
214:17 219:14,15
220:18 227:9
237:12 240:11
243:19 244:19,19
244:20 251:10
**reason** 12:20 13:6
13:19 14:5 17:6
61:11 68:20 81:3
90:23 100:15 103:8
104:9 120:19,22
125:21 126:4
133:24 136:6 137:6

137:25 145:17
151:20 152:5
160:10 162:6
170:10 173:2
190:22 193:3
194:18,23 201:6
202:18 208:19
210:5 235:9 239:15
242:19 261:13,16
261:19,22 262:3,6
262:9,12,15
**reasoning** 223:14
223:17
**reasons** 5:20 16:7
29:11 99:7 261:8
**recall** 15:8 27:11
32:11 34:11,22
35:23 37:5,14,24
40:7,8 41:5 58:17
64:14 65:18 71:7
71:17 95:9,24
112:18 120:6,13
127:24 128:11,18
130:10 141:21
144:23 145:2 149:7
149:10,15,18
161:10,15,15,16
162:11,12 175:20
178:16 180:9,12,15
180:23 194:17
198:12 209:14,25
216:6 217:2,9
218:2,15,25 227:7
227:25 243:18
247:20 248:14
250:9 254:11
**receive** 21:19,25
160:18 161:12,18
161:24 162:3 180:5
186:23 187:15

**received**  21:22 51:8
  51:8 62:24 87:11
  131:15 151:7,16
  160:22 161:15
  162:9 164:9 172:15
  173:23 175:19
  176:3 180:13,23
  186:24
**receiving**  62:12
**recess**  44:22 54:16
  95:3 159:20,21
  200:22 241:9 254:5
**recipient**  179:5
**recite**  33:10
**recognize**  181:10
  182:8 184:6 185:15
  188:12,18 191:7
  193:19 204:16,22
  244:18
**recollection**  39:15
  41:2 50:7,13 125:9
  130:7 133:11 174:6
  185:19 186:3
  187:10
**record**  4:10 5:12
  38:22 45:19 46:13
  52:25 66:12 81:13
  82:25 92:7 95:6
  112:24 114:24
  124:20 137:8
  159:18,19 163:20
  170:25 171:9
  174:14 186:21
  190:12 198:21
  201:5 209:16 233:3
**recorded**  162:9
  209:23
**recording**  95:16
  96:9 251:14,16
**recordings**  96:4

**records**  126:15
  131:22 133:5,9,10
  133:23 136:7 140:2
  140:11,20 151:3
  153:14,15 155:9
  169:15 202:6 213:2
  214:12 228:10
**redact**  150:20
  151:3
**redacted**  184:22,25
  190:15 246:19
  248:5
**redaction**  190:12
  190:21
**redactions**  191:23
**redo**  110:21
**refamiliarizing**
  194:25
**refer**  15:13 44:24
  75:20 76:2 119:14
  158:4 161:6 243:12
  249:5 250:4
**reference**  180:9
  189:24 193:4
**referenced**  180:22
  252:9
**referencing**  184:15
**referred**  190:10
  206:19
**referring**  36:20
  54:18 114:11,21
  155:17,23 161:7
  168:21 191:20
  217:9 225:21
  229:23,25 236:18
  248:23
**refers**  192:19
  199:23 216:16
**reflected**  72:3
  194:11

**refrain**  5:11
**refresh**  185:19
**refreshes**  186:2
  187:9
**refusal**  84:9 99:24
  107:11,25 108:11
  108:20 109:7,14
  110:2,14 157:24,25
**refused**  112:25
**regard**  18:9 104:22
**regarding**  187:7
**regardless**  203:3
**regards**  76:19
  146:13 227:20
**regularly**  67:2
  69:11
**regurgitate**  121:4
**relate**  241:24
  244:25
**related**  6:23 46:8
  75:12 107:6 158:17
  184:21 185:3,24
  190:14,16,18 248:4
  249:4 256:15
**relates**  190:5,12
  244:24
**relating**  185:25
**relative**  247:11
**relatives**  8:20,23
**relevant**  75:3,7,12
  121:6 122:4 240:7
**relying**  113:10
**remember**  12:7,13
  19:3,13 25:7 27:13
  27:16 28:9 31:10
  31:15,17 32:3
  34:15 35:2,4 37:12
  38:5 39:10,14
  40:18,25 46:2
  48:21,25 49:5,19
  50:2,10,14,20,22

**refrain**  51:12,22 52:19
  53:12 57:25 59:19
  59:23 65:21 66:10
  71:16 74:6 86:9
  95:10,14 106:25
  107:4 112:21 119:8
  120:2 125:16
  128:16,20 129:7
  131:14 133:15,17
  133:20 136:24
  145:8 147:18 148:9
  150:2,6,10,13
  152:14 155:6
  161:19,22 162:16
  162:19 176:19
  177:24 178:17
  180:11,13,16
  181:14,18 186:7,8
  187:16 190:10
  216:5,8 217:7
  239:9 245:18,20
  246:22 248:11,22
  249:2,18
**remembering**
  188:24
**remembers**  10:11
**remind**  217:12
**removed**  185:4
**repeat**  4:25 66:11
  198:18
**repeatedly**  30:13
  98:14 106:9 107:6
  166:20 200:10
  226:9
**repeating**  45:17
  90:11 93:24 171:7
  198:19
**rephrase**  242:23
**report**  20:12,16
  21:4 23:15 28:20
  28:22 29:4 30:3,15

30:17 31:7 43:22
48:8 59:3,18 60:21
77:13 78:16 80:15
86:5 91:17 92:10
94:8,17,18 101:23
103:3,17 104:19
105:16 117:16
121:13 123:12
127:7 132:13,19
134:12 148:24
152:7 154:18
160:15 165:23
171:23 174:8 177:9
183:14 191:15,21
192:10 198:14
199:21 202:20,22
202:23 208:6
214:11 221:4,7
242:8 244:7 251:23
252:15
**reported** 21:7
33:12 39:7 44:10
47:23 49:8 50:25
57:17 60:16 69:6
69:22 71:24 75:14
75:16 76:25 77:12
78:4,21 79:4 80:20
81:22 84:11 87:4
89:25 92:12,18
93:9 98:17 99:19
99:24 100:2,11,17
102:10,15 104:7
107:12,21 108:16
108:19,21 109:2,21
109:23 112:10,12
116:7 117:7,19
141:10 145:18
149:16 159:3
202:24 210:16
213:13 219:7,9,11
249:23

**reporter** 1:20 10:8
10:16,22 11:22
12:2 14:15,16,17
14:18 22:3,4 25:22
41:7 45:23 121:3
130:13 218:23
249:9 256:5 259:11
**reporters** 23:22
127:11
**reporting** 13:23,25
15:23 16:19 28:17
28:18 29:9 30:25
31:6 37:2 41:9,10
47:20 50:11 59:6
68:5 75:5 83:5
105:11 121:7 122:8
123:12 131:12
132:8 140:20
150:23 153:12
154:17,22 165:15
170:12,17 183:21
191:17 221:8 228:9
232:7 240:12
242:12 249:21
251:21 254:16
**reports** 20:8 69:25
84:18 169:15 251:9
**represent** 4:13
164:4
**representation**
72:9
**representatives**
248:12
**represented** 58:10
58:14
**representing** 40:12
57:4
**request** 133:10,15
136:7 137:8 165:25
166:4 167:4 214:12
214:16

**requested** 111:10
137:10 145:23
260:6
**requests** 53:2 167:6
257:8,12
**required** 226:13
**requirement** 97:5
97:10 236:3
**requirements**
235:11
**requires** 33:7
120:10
**research** 10:4
39:18,24 49:14,19
49:22 135:20 136:5
137:5 140:8 148:13
211:15 244:8
**researching** 135:24
137:4 212:22
247:10
**reserved** 3:10
**reside** 6:24 8:16
**residence** 180:7
198:8 199:7,20
**resist** 98:2,3,13,19
**resistance** 33:7
97:5,10 235:11
237:16
**resistant** 236:2
**resisted** 33:5 98:4
**respect** 39:5 150:23
**respective** 3:5
**respond** 28:21
30:13 133:14
139:25
**responded** 164:19
**response** 30:20
164:11 168:3 171:2
171:14 224:2
226:24

**responses** 139:21
**responsibilities**
17:18,19 167:25
**responsibility**
165:5 229:6 260:6
**responsible** 100:21
101:6,17 218:23
229:12
**rest** 222:20
**restrepo** 72:16
**result** 77:13 170:12
170:17
**results** 131:21
**resumed** 160:5
**retained** 37:17
40:22 259:11
**retrospect** 212:2
**returned** 260:12,15
**reveals** 48:11
**review** 175:12,15
189:25 190:3
204:25 205:7 260:7
**reviewed** 6:17,20
6:21 99:9 107:5
129:21 133:12
231:21
**reviewing** 128:13
177:24 180:10
**rewrite** 132:9
**rid** 96:13
**ride** 126:12
**right** 13:14,15
14:11 17:2 44:15
45:21 52:23 65:20
66:21 102:23 103:2
111:24 114:16
115:7 123:2,23
124:6 126:16,17
136:16,20 137:3,14
140:11 142:22
146:18 156:12,20

161:19 190:7
192:15 197:25
205:14 210:5,7
215:4 216:14
217:18 221:20
231:5 243:11 245:4
249:11
**rights**  80:14 81:24
86:25 104:13 105:9
105:14 210:20
223:19 226:2
**ring**  174:8
**rip**  193:9
**ritchey**  2:11,15 4:8
4:12 27:23 29:18
36:17 38:25 39:6
44:20,23 45:17
50:19 52:12 54:15
54:21 55:7,8,14
56:2,12,13 73:15
79:14 81:5 89:9
90:11,17 91:8 92:2
92:5 94:23 95:4
96:8,16,21,24,25
102:8 103:14 110:7
110:22 113:3 115:7
115:8 121:22
122:14 124:18
128:24 129:2,4
130:4 136:13,18
138:5 146:23
149:14 154:4,5
159:16 160:8 163:4
163:9 171:7 174:15
174:16 175:5
176:21,22 181:2,24
183:2,22 185:6
186:12 187:24
188:5 189:4,13,18
189:19 190:23
192:5,22,24 193:12

195:11 198:11,19
198:25 199:2
200:15 201:15
203:4 204:4,9
207:4 210:23 217:5
222:12,16,22
232:16,25 241:6,10
241:15 244:9
245:25 246:3
250:20 252:8
253:22 254:4,6
257:6
**rl**  257:11
**role**  251:23
**roles**  10:24
**rondini**  15:10
39:23 40:12 44:24
47:13,14,18,22
48:13,19 49:7,25
51:19 53:19 54:9
54:23 55:10,16,19
55:23 62:13,25
71:15 72:6 73:2
75:14,24 76:19,25
78:8,14 79:11
80:12,19 81:21
82:21 83:10 85:16
86:4,18 87:8 91:3
91:22 95:17 99:13
99:17 100:7,15
102:2,9,18 103:6
104:14 105:19
107:10,25 108:10
109:16 135:10,16
148:19 149:10
162:25 163:3 165:7
172:15,20 175:3,19
176:17 179:3,16
180:6 202:9,12,19
209:24 210:14
211:20 212:19

213:17,18,23
214:19 215:12
216:25 220:6
227:21 229:6 235:6
237:5 243:7 249:15
250:11 252:10
253:13 254:10
**rondini's**  48:16
71:4 88:3 89:19
113:15 114:10
115:11 125:21
137:13 153:11
160:11 183:14
208:22 214:20
231:13 250:6
251:15
**rondinis**  50:9,13,15
52:4 53:8,10
238:19 239:17,21
239:25 240:20
**room**  103:9 104:2
205:13 208:8
210:15
**rq**  257:12
**rule**  196:16 238:11
261:6,7
**rules**  4:18
**rulings**  257:11
**rumors**  183:20
**run**  9:20 63:5
**runs**  235:16

---
**s**
---

**s**  2:2 8:13,13,13
19:22,22 20:4,4
160:2,2,2 257:16
**sadly**  25:11
**salary**  21:15
**sample**  84:8 172:3
**samples**  165:6
167:8 169:23

**san**  9:25 11:2 12:21
24:2 25:9,12,13
**sane**  170:3,13,17
**sat**  60:5
**saw**  80:16 81:23
83:3 116:16 126:13
128:14,16 151:17
161:16 179:17,20
180:9,21 213:24
236:12
**saying**  12:13 72:7
92:8,23 96:22
109:25 137:2,12
167:15 179:22
192:21 207:5,25
217:18 229:4 233:4
233:5,6 234:14
242:14
**says**  113:25 115:13
115:20 116:4
164:11 168:3
184:11 187:22
191:13 192:7
197:11 201:24
209:23 213:11
215:23 216:12
220:16 223:13,15
223:15,20 225:13
230:6 238:6,10
241:20 247:9
**scene**  83:21 84:17
84:21
**schafer**  46:15
**schoofs**  20:3
**school**  21:12 23:25
24:2,4,5,24 26:3,4
26:10,19 27:2,3
31:20 152:22
238:21
**schultz**  187:6

**scotch** 2:15 4:12
  111:3 136:16
**scotch's** 198:17
**screen** 173:17
  199:17 211:18
**scribner** 211:9,24
  212:2 216:23
**seal** 260:12
**sealing** 3:6
**second** 5:6 31:24
  87:21 126:9 147:12
  173:22 186:18
  188:15 189:25
  192:14 194:22
  202:2 221:24 238:5
  241:19
**secondary** 26:3
**secondhand** 209:6
**secret** 101:14,22
  116:12
**section** 205:14
**see** 13:21 30:6,11
  36:21 39:14 59:2
  60:13 61:21 67:4,6
  69:15 73:4 81:3
  92:23 99:2 111:10
  126:9 131:6 134:13
  134:25 141:7,9,17
  142:8 144:10 145:7
  146:4 147:5 162:4
  162:20 168:7
  173:10 174:5
  177:22 178:5
  182:15 187:9 192:7
  196:7,7 205:23
  212:23 214:6,9
  216:12,15,24
  220:25 225:19
  227:16 229:21
  244:24 245:8,9,11

**seeing** 23:17 224:2
**seek** 219:18
**seeking** 136:10
  176:16
**seen** 111:11 173:15
  187:2,9 192:25
**sees** 121:24 168:6
  170:21 220:3
**semantics** 150:3
**seminars** 26:17
  28:2,7 31:11,12
**send** 30:19 49:16
  133:25 134:16
  187:15 260:13
**senior** 14:18 22:2,4
  127:9
**sense** 18:21 29:9
  51:24 140:15,18
  184:12 212:10
  219:16
**sensitive** 182:19,21
**sent** 30:13 32:5
  39:12 74:11 137:9
  138:11,25 139:19
  172:15 173:10
  176:15 187:7 194:6
  207:14 209:19
  239:8
**sentence** 114:25
  115:5,12,20 146:15
  190:5 221:25
  222:20 224:10
  225:22 229:4,24
  230:8 238:6,10
  239:19 244:25
  245:2
**separate** 18:22
  42:11 54:25 87:9
  87:19 149:22 218:3
  224:14 234:4,18

**separately** 138:15
  168:17
**september** 8:7
  115:2 195:16,19,21
  195:23 196:7,8,18
  196:24 197:2,3,9
  197:12
**serious** 183:15,17
  203:15
**seriously** 88:4,22
  89:5 97:17 131:9
  131:11
**serve** 150:25
**served** 9:6
**services** 117:10
  183:19
**serwer** 19:21
**set** 181:12 256:21
**setting** 27:22 63:24
**seven** 10:25 31:14
**sex** 84:4 98:7,11,23
  148:5,8 157:2
**sexual** 12:5 32:15
  34:3,21 35:7 36:13
  37:18 40:2,23 69:9
  69:19 75:15 114:2
  114:7,8,20 115:4
  115:16,24 116:4
  147:23 148:20
  164:15 166:6
  169:10 170:3
  196:21 197:14
  221:3 224:20 225:3
  225:4 237:6,23
  247:7,9,15
**shady** 260:21
**shaking** 5:11
**shani** 187:6
**share** 30:18 39:25
  42:5,17 71:18
  72:25 211:14

**shared** 52:16 71:23
  201:12
**shares** 21:16 23:2
  23:10
**sharing** 241:22
**sharmila** 46:7,12
  124:25 143:10
  144:4,5 145:6
  204:19 205:11,15
  206:2,20,24,25
**sharmila's** 46:6
**she'd** 169:20
**she'll** 148:7
**sheriff's** 154:3
  155:2
**shoot** 103:24 223:9
**short** 239:22
**shorter** 148:15
**shorthand** 1:20
  256:5
**shortly** 40:13,15
  53:13
**shot** 216:8
**show** 38:24 52:10
  76:13 80:23 81:4
  81:10 106:22
  116:19 142:8,13
  160:23,23 169:7
  173:21 229:3 237:3
  239:10
**showed** 162:4
  176:2
**showing** 175:10
  181:7 182:5 184:3
  185:12 186:18
  201:20 209:17
  241:16 246:8
**shown** 203:9
  244:14
**shows** 67:8 214:10

**side** 67:13 97:25
   98:18 126:4 139:2
   139:9,13,16 211:18
**sided** 91:9
**sign** 99:25 107:10
   108:11 109:16
   110:4,11 260:6
**signature** 256:23
   260:2,16 262:18
**signed** 3:13,15
   260:10,12,15
**signing** 107:25
**similar** 27:23 61:2
   136:2
**similarly** 218:22
**sing** 148:4
**single** 143:8,11,12
   154:15 155:3 176:2
   239:15
**sinister** 213:14
   214:22
**sister** 72:20
**sit** 26:16 130:23
   131:3
**situation** 141:22
   171:25 215:10
**six** 27:11 39:8 47:7
   74:25 123:6 134:15
   140:6 177:5 213:21
   214:21
**slack** 181:11,12
**slept** 229:20
**smaller** 15:2
**smith** 6:7 14:9
   128:4,12,17
**snail** 74:12
**snapchat** 180:6,17
**social** 7:11
**soft** 17:12
**solving** 241:21

**somebody** 39:21
   115:24 181:22
**somebody's** 165:24
   206:3
**someone's** 165:25
   166:7
**son** 220:19
**soon** 14:17 103:22
   200:14 220:17
   221:19 222:17
   223:7 226:18
**sorry** 12:15 19:5
   31:24 34:25 36:17
   40:17 42:15 43:4
   43:13 45:15 46:5
   47:11 50:19 54:11
   66:3 67:21 73:16
   74:19 78:11 80:7
   82:22 85:24 87:12
   89:13 92:3 96:5
   102:21 110:19
   111:14,21 113:21
   136:23 144:23
   146:16 155:24
   156:3 165:20
   166:24 171:6
   173:19 178:23
   186:9 194:25 195:6
   197:9 228:3 231:3
   236:17 243:9 245:7
   253:10
**sort** 96:15,16
   203:20
**sorts** 10:5,18 75:2
   135:25 173:11
   234:8
**sounded** 32:4
**sounds** 66:17
**source** 38:19 47:15
   48:11,17 54:2,4,11
   54:17,22 55:4,6,12

55:16 56:15 61:24
   76:16 143:16,20,21
   143:24 144:21
   145:6 182:18
   184:21 185:4
   190:16 192:6
   222:14 236:24
   239:11,13 246:20
   248:6 250:10,21
   251:4
**sourced** 243:5
**sources** 95:19
   96:10
**southern** 12:24
   24:3
**speak** 17:13 33:21
   46:8 47:4 63:24
   67:12 71:3 72:15
   74:8,14,15,16
   104:8 127:11
   138:12 143:5
   166:16 187:14
   193:25 194:3
   207:12,22 209:19
   223:5 236:5 247:22
   254:8,13
**speaking** 50:21
   71:7 236:10 237:11
**speaks** 114:17
   152:14
**special** 66:15 89:20
   90:2,19 97:14,15
   186:2,5 230:13,16
   230:20 231:6
**specialization**
   24:21
**specialize** 34:3
**specially** 170:4
**specific** 12:10,13
   27:8 31:10 32:10
   47:8 48:25 57:25

59:19 72:12 76:12
   76:15 79:15 101:3
   114:11 117:3
   129:13 166:24
   191:11 206:8
   208:25 236:11
**specifically** 12:8
   36:4 119:21 156:7
   167:5 176:18
   205:12 236:12
   251:13
**specifics** 46:25 47:3
   95:10 160:24
**speculate** 103:16
   103:21 111:17
   113:22 120:11
   172:12,24 181:19
   206:7,11 207:8
   208:4
**speculating** 22:9
   206:2 207:9 217:6
   218:6 250:24
**speculation** 122:17
**speech** 253:24
**spell** 8:12 34:11
   46:6 56:20
**spend** 67:6
**spent** 15:21 18:18
   53:16 60:14,17,18
   60:19 62:2,5
**spoke** 33:19,22,23
   33:25,25 34:2,8,9
   34:12,14,18,24
   35:2,5 48:19 49:11
   56:19 71:6,9 159:8
   166:9,13,15,18
   178:22,25 179:2
   243:23 244:6
   246:17 248:15
   254:20

spoken 6:6,11
25:25 198:7 199:6
199:19 235:21
249:6,12 254:21
spokesperson
169:25 171:4
sports 7:21
spot 200:16 227:19
spring 11:12
187:11
sritchey 2:16
ss 256:3
stack 184:24
staff 11:22 12:2
stage 107:15
stages 99:23 107:17
110:3
stamped 163:7,12
175:8 181:5 182:3
183:25 185:10
186:15 188:3,8
191:2 193:15
201:18 203:7 204:7
204:12 211:2
241:13 244:12
246:6 257:19,21,23
257:25 258:3,5,7,9
258:11,13,15,17,19
258:21,23,25 259:3
259:5,7,9
stand 160:6
standard 18:8
97:21,21 145:24
146:7 200:2,9
201:2
stands 251:11
252:18
stanford 147:25
stares 223:18
stars 190:8

start 9:19,24 11:4
20:24 25:3 30:6,12
46:18 47:6 49:14
144:4 146:19
started 10:2,6 11:5
11:14,19 14:10,16
15:18 25:13 49:13
49:17 81:23 86:25
131:5 140:7 203:16
203:17,19 208:9
210:21 212:20,25
213:21 221:14
225:16,24 226:3
230:5
starting 88:16
starts 147:7 177:20
223:19 229:15
238:3
state 1:21 12:23
13:2 34:13 53:17
165:9,22 167:2
169:14 185:19
226:16 231:2,9
242:8 256:3,6
stated 149:11
196:22 205:12
statement 30:21
163:25 164:11
165:3 219:24
222:14,15,16,22
239:22 261:8
statements 98:21
states 1:2 15:23
261:7
stating 240:19
station 102:3,9,19
102:25 229:17
statistics 61:10,11
61:13 131:24
136:14 137:8
254:18

statute 102:14
stay 53:15 201:2
stayed 16:8
stealing 196:17
238:13
stenographically
256:12
stephanie 249:7,8
249:13 250:12,19
250:22 253:18,20
stephanie's 250:8
steps 60:11
steubenville 147:25
stick 206:6 207:7
207:10 208:3
sticky 211:17
stipulated 3:4,8,12
stood 39:16 147:8
stop 67:23 99:9
146:19 156:20
225:15 227:14
stopped 67:16
216:23 228:5
stopping 94:22
251:3
stored 141:20
stories 17:20 22:23
22:23 23:15 29:16
43:18,21 44:2 69:8
69:22 73:23 74:2,3
121:13 123:13
127:3 128:6 234:15
249:21 252:15
story 16:17,19
28:17,20 29:4,6,7
29:14,22,24 30:7
30:16,22,25 31:2
33:3,4,12,13,20,23
36:19 39:7 40:13
40:16 41:19,21
42:10,19,20,22

43:7 44:10 46:18
47:2,22 48:17
49:14 50:11 51:11
53:19 54:20 55:4
55:13,22 56:5,7,23
57:16 58:10,14,18
59:3,22 60:9,21
61:21 62:6,17 63:3
63:22 64:4,8,15,16
65:12 66:16 67:15
68:6,8,9,21,24 69:5
73:21,22 74:3
75:13,13 76:23,24
77:9,10,11,14,18
77:18,19 78:16,18
78:21,23 79:4,12
79:23 80:21,23,24
83:4,16,17 84:14
84:15 85:19,20,23
86:8 87:5 89:25
90:4 91:18 92:10
92:11,17 94:9,18
94:18 95:13 97:17
98:12 99:14 100:10
100:11,18 101:23
102:10,15 103:4
104:7,20 105:17
107:13,22 109:11
109:21 112:10
114:12 117:6,24
118:2,5,21 121:5
122:2,4,11,13,15
122:21,22 123:7,23
125:2,7,9,19,22
126:5,7,8,14,18
128:3,17,19 130:3
130:9,15,18 131:2
131:8,13 132:6,7,8
132:10,13,17,24
134:2,4,12,14,18
134:21 135:14,21

135:24,24 136:3
137:3 138:19 139:2
139:14,15,16,18,23
139:25 140:3,7,17
140:21 141:2 143:9
143:12,14 144:8
147:20 148:24
149:16 150:9
153:10 154:8,12,19
156:11 159:2,11
160:15 165:15
166:20 168:12,16
170:14,14 171:15
172:2 175:21 176:8
177:6,8,16 181:13
183:7,8,9,13 184:9
185:5 188:20
190:13,17 193:24
194:7,12 196:6,11
197:8 198:4,14
199:21,24 202:21
202:22,23,24
203:21,22,24 207:2
207:3,13 208:11
210:17 213:21
214:20,20,21 217:9
218:16 219:5,25
226:19 227:4,6,8
227:11 228:2,18
230:14 231:13,18
231:20 232:5,11
233:7,12,13 234:18
234:23 236:7,12,14
237:2,12 239:13,16
243:7 244:3,5,5
245:10,13,19,23
246:21 248:2,4,17
248:23,25 249:5,22
250:8,19,23,25
251:9,11,11,21
252:18 254:2

**straight**  245:10,13
  245:19,22
**strasser**  8:11
**stream**  175:18
  177:20,25
**string**  178:14
**strong**  39:15
**strongest**  38:3
**strongly**  40:8
**struggling**  176:16
**student**  217:20
**studies**  169:7
**stuff**  39:11 49:15
  62:18 70:7 96:14
  131:13 177:14
  203:18 212:24
  218:24
**subjective**  78:25
  113:18
**submitted**  195:15
  196:23 197:7
**subpoena**  75:23
  133:19
**subpoenaed**  51:19
  62:12,24 131:16
  162:25 202:9
  214:15
**subpoenas**  62:24
**subscribed**  255:8
  262:19
**substance**  261:7
**suggested**  170:25
**suggesting**  139:10
**suicide**  91:21 92:16
  93:3,15 217:21
  220:7,14
**suit**  228:13,20
  229:7
**summarize**  130:19
**summarizing**
  114:18

**summer**  16:2
**sums**  57:10 132:25
**supervisor**  19:9,17
  19:25 63:13
**supposed**  99:21
  166:4 167:12
  172:24 221:10
  224:12
**sure**  8:3,3 20:24
  29:12 33:20 35:12
  44:18 51:8 61:9
  67:19 95:9 96:6
  103:19 104:24
  117:12 118:10
  121:22 130:25
  132:6,21 134:18
  135:6,13 137:20
  138:10 143:12
  153:9 159:17 161:3
  168:19 189:5
  194:17 195:6
  207:16,23 210:18
  214:3 227:11 234:7
  248:3,19 254:20
**surprise**  133:25
  137:9 138:5,24
  139:7
**surprised**  221:12
**surprises**  28:10,12
  28:15 30:14 31:5
  74:12 132:15 134:8
  134:16,20 137:18
  139:19 194:5
**surrounding**
  250:11
**surveillance**  160:25
  161:8,11,17,25
  162:5,7,8
**susman**  19:22 46:5
  187:6

**suspect**  78:15 82:2
  87:12,14 104:25
  166:5 221:6
**swear**  184:24
**sweet**  220:18 221:4
**sworn**  3:13,16 4:3
  160:5 255:8 256:10
  262:19
**system**  64:19

**t**

**t**  4:2 8:13 19:12
  160:2,4 220:18
  221:4 256:2,2
  257:16
**table**  239:3 240:21
**tagging**  185:22,23
**take**  4:19,21 5:9
  18:14 26:6,12,15
  44:16,21 54:13
  83:23,24 88:3
  94:24 95:2 96:18
  98:16 131:10 147:2
  165:6 173:24
  175:12,14 182:23
  191:17 192:2
  200:19 201:22
  205:3 216:22 241:4
**taken**  3:17 26:21
  26:24 27:19 31:12
  32:7,12 33:14
  44:22 54:16 95:3
  125:6 159:20
  190:13,17,19
  200:22 222:24
  241:9 254:5 256:8
  256:12
**talk**  12:10 46:24
  54:14 57:22,22
  58:15 73:7 78:17
  78:22 80:20 96:9
  118:17 122:14,20

123:21 138:14,15
168:16,17 179:13
185:24 189:4,21
208:13 214:7 216:2
226:8,9,24 227:9
231:23 237:21
238:18 239:22
**talked** 41:3 79:25
96:17 127:3 149:24
168:15 213:23
214:8 236:15
248:22
**talking** 5:8 39:22
65:14 75:21 76:3
119:6,11,16,19
122:12,13 155:5
156:10 161:2,9
182:25 191:11
213:18 235:22
236:22
**talks** 136:13 221:24
247:10
**tampered** 83:21
84:16 157:17
**tampering** 84:21
199:16
**tape** 123:11 209:24
**taught** 27:9 28:5
**tax** 150:21
**taylor** 249:7,8
250:12,22
**taylor's** 249:13
250:19 253:18,20
**team** 15:2 18:15,15
19:8,15
**teams** 18:12
**technical** 64:24
174:3 215:5,8
**technically** 173:19
**telephone** 49:2
106:12,25

**tell** 22:4 28:22 31:9
36:4,18,24 37:4,23
47:17,21 49:16
54:4 55:5 57:12
62:7,20 70:21
97:16 112:25
126:14 127:12
129:18,23 133:13
134:7 154:19
156:19 161:22
162:11 165:10
168:22 183:12
184:20 186:3
188:22 189:8,17
194:8,10 200:8
203:20 206:4
207:25 208:22
210:8 211:6 212:3
212:4 223:16
227:19 246:11
253:5
**telling** 82:24 98:14
98:22 172:6 221:13
**tells** 108:17 110:9
**ten** 9:21,23
**tenure** 20:9 21:14
**term** 28:12,16
174:4 185:21
215:11 230:21,23
**terms** 26:2 108:22
118:21 145:6 157:9
208:5 221:13 250:3
**test** 38:23 39:2 52:7
52:11 130:6,8
167:9,21 184:12
203:2 235:8
**tested** 165:25
169:13 171:20
202:16
**testified** 4:5 36:16
142:5 148:3 153:25

154:2 160:6 178:21
178:21 206:25,25
222:4 240:5
**testifies** 147:22
148:6
**testify** 38:21 148:7
177:2,4
**testimony** 171:11
256:11,12 261:2,7
**testing** 168:4
169:23 170:20
172:7
**tests** 167:20
**texas** 16:20 50:11
50:12 149:9 165:22
238:22
**text** 103:21 114:2
172:14,21,22,25
173:12,17,20,25
174:5,17 175:2,17
175:18 176:2,4,7,8
176:13 177:2,8,25
178:13 179:5,8
190:15 192:20
206:14 207:14
208:12,14 216:13
216:24 217:4,8
221:2 224:19
**texted** 30:12 178:8
179:2,23
**texts** 178:6,8,9
217:3,7
**thank** 4:22 255:2
**thankful** 140:25
**thanks** 200:21
241:8
**therapist** 48:2
49:10 60:24 117:9
219:8,10
**thereof** 131:21

**thing** 5:4 18:20
21:13 23:13 28:3
58:6 65:7 85:8
89:14 95:5 107:4
123:23 145:14
156:15 179:21
200:23 203:22,24
205:9 209:8,10
218:19 227:8
233:20 240:8
**things** 4:16 10:5
13:3 16:5 27:18
38:2 39:10 57:23
62:7 69:3 79:22
83:17 84:12 88:6
88:15,25 89:16
92:9 94:3 104:21
134:9 135:25 148:4
149:22 150:13
154:6 156:4 161:16
171:23 173:11
177:15 194:11
211:14 212:9
215:15 216:19
223:18 234:9,10
248:22
**think** 7:15 8:2
17:24 20:17 21:3
23:21 25:14 26:14
41:8 42:19,20
43:21,21 44:9,10
45:22 47:21 51:25
57:10 58:9,13
59:21 61:5,13,15
62:3 64:3 72:3,8
74:5,6 76:17 77:17
77:24 78:7,13,23
79:3,4,9 80:10
82:19 83:4,5,15,16
83:18 84:14,14,25
88:5,15,19,21,24

89:4,9,14,15 91:8
91:16 92:8 93:2,14
94:2,24 95:6 96:8
96:17 99:25 101:16
102:10,11,12
104:18,20 105:14
105:16 107:16
108:13 109:15
110:11,12,24 113:3
113:4,5,21,22
114:3,17 115:9,12
115:22 118:5
121:23 122:3,16
124:21 127:7
128:14 132:25
136:9,10,13,15,17
136:20 137:21
140:9 141:15 142:5
143:20 144:3 145:4
145:12 150:25
152:10,13 153:18
153:25 155:12
156:11,16 157:7,9
157:11 158:4,23
159:10 161:21
166:25 169:20
171:3 173:16
174:12 175:4 176:3
176:15,19 177:2
185:21 196:8 197:4
197:8,10,20 198:4
198:16 200:18
202:12 205:3,24
207:6 208:5 209:4
209:8 210:9 211:13
213:11 214:10,17
215:9,19,20 217:18
218:5 219:5,13,14
219:16,22 220:2,3
220:13,14,24
221:24 222:12,19

223:5,25 227:7
228:4 229:5 230:25
231:3,23 232:2,3
234:20 235:15,18
235:19,25 236:6
237:3,12 238:9,14
238:17 240:7,24
241:7 243:13,19
244:2,4,24 249:12
250:8 251:7,9,11
251:18,22 252:11
252:17 253:25
254:18,23,24
**thinking** 61:22
94:16 205:24 206:5
206:12
**thinks** 203:3
**third** 114:15 238:2
243:8,9
**thought** 17:12 48:7
68:23 71:19 78:19
80:13,14 90:5
91:25 92:21 94:6
94:19 103:15
105:10 109:13
118:23 137:17,17
157:18,19,23 179:7
179:18,24 191:13
192:8 201:25
202:12,19,20
208:18 210:10,22
213:24 214:5
215:10,12 221:7,9
221:9 222:6 224:3
224:5 231:7,9
237:10 240:7
249:18,20
**thoughts** 77:15
79:16 80:9 85:22
139:17

**thousands** 123:11
172:23
**threatened** 85:16
86:4,5,10
**three** 118:3 190:8
196:10 213:10
232:13
**threshold** 203:25
**thy** 19:20
**time** 3:10 4:20 5:7
6:15 10:13 14:14
15:18,21 25:6 29:5
33:2,12 37:9 38:5
38:13 50:10,15,24
53:16 56:24 57:19
59:17 60:14,18,18
60:20 62:2,5 67:7
67:14,23 72:24
77:7 78:20 79:2,8
80:9 81:18 82:18
85:2,14 86:2,11
87:25 88:18 89:17
90:6,22,25 91:19
93:18 94:10,22
95:24 96:12 97:2,7
99:10,15 100:13,19
101:24 102:16
103:5 104:9,11
107:8 108:8 110:16
112:4,18 113:13
116:8 122:18
125:20 130:20
132:5,16,18,20
134:9 135:5 137:19
138:17,24 148:18
149:19 168:10
175:12,14 194:16
198:8 199:5,19,25
200:14 202:17
204:25 206:21
207:5,14 209:16

210:2,12 220:5
224:2 226:17
231:11 232:3 235:5
246:25 249:16
252:23 255:3
260:15
**timeline** 39:3
197:20 198:4,24
210:18 250:9
**times** 8:15 10:18
17:8 71:9 129:21
146:9 232:14
254:19
**tina** 19:22 46:4,5
46:11 70:23 124:24
127:19,20 128:2,10
141:8,24 185:23
187:6 243:17
**tips** 127:2
**title** 19:13 152:21
200:3 201:3 217:21
239:8
**titled** 14:13
**titles** 36:21
**tj** 76:9,20 81:25
86:14 99:18 100:8
100:16 125:6 139:5
160:14 162:4 198:7
199:6,7,20 219:10
220:19 221:4
**tj's** 199:20
**today** 5:9,21,24
6:10 30:2 128:14
254:12
**told** 36:3,10 39:16
39:21 47:22 48:3
51:16 54:11 58:4
60:7 70:20 72:7,11
74:14 80:2 82:7
83:2 86:24 87:16
90:2 97:18,23 98:6

**[told - undergraduates]**

98:7,20 101:11
103:6,18,23 104:6
104:9 105:6 114:4
125:22 126:5,8,8
126:11 128:8
132:16 138:13
139:2 145:15 149:2
156:4,25 162:17
164:18 165:14
166:3 167:12
168:14 169:19
171:24 179:11
192:18 194:2,6
196:12 198:2 208:4
213:23 214:19
216:13 223:6,8
224:15 226:19
230:16 231:19
232:5 233:7,17,18
233:19,25 234:8,9
234:10,23 235:20
236:11 240:11
**tom** 35:6
**tomorrow** 185:25
**ton** 243:2
**tons** 172:24
**top** 12:14 33:11
52:19 126:17 148:8
239:9 248:14
**tortured** 70:6
**torturing** 70:3
**totally** 54:25
136:16 193:2 240:3
**touch** 58:19 66:19
66:21 166:11 200:3
242:21
**townsend** 2:11
**toxicology** 34:15
131:21 167:2,17
169:14 247:10,23
247:23

**tozzi** 19:12
**track** 162:18
**tracking** 62:2
**trade** 26:4
**traditional** 13:23
13:25
**tragic** 91:21
**trained** 170:4
**training** 151:7,16
**transcribed** 256:13
**transcript** 260:7,13
260:15 261:2
**transcription**
247:24
**transcripts** 214:14
223:4
**trauma** 169:7
**travel** 59:13
**traveled** 15:20
16:18
**treat** 90:19
**treated** 9:3 89:18
90:2
**tremaine** 1:18 2:4
**trembley** 35:6
**trending** 203:12
**trial** 3:11 147:25
**tried** 26:12 58:25
59:11 60:5,10
74:11,13 98:2,19
137:22 138:12,14
166:18 184:18
193:24 206:6 207:7
228:13
**trip** 53:11 59:7
83:22 105:3 157:12
199:15,23
**true** 80:4 82:11
87:18 116:3 145:22
220:20 224:9
225:10 233:15

240:13
**truthful** 42:20
43:22 44:11 78:21
85:20 112:11 121:5
122:2,7 153:14
172:6 228:9 251:10
**truthfully** 5:21
251:25 252:16
**try** 5:11 13:3 16:10
17:13 26:16,18
48:8 62:7 124:19
129:24 140:3
171:23 176:21
185:18 186:10
205:6,20 207:11
208:3 211:7,15
212:11,21
**trying** 20:19 36:23
38:25 39:2,14
52:12 54:12 56:2
57:20 60:7,20 61:4
61:5 62:3 77:20
78:2,14 79:15 80:6
80:8 86:9 89:13
100:4 110:7 136:17
147:2 161:21
173:22 191:14
192:8 195:6 200:16
219:18 222:13
232:9 242:14
247:22 254:17
**turn** 177:18 213:7
215:21 216:11
**turned** 30:4 197:18
**turning** 56:21
58:21 98:15 166:10
**tuscaloosa** 2:14
53:11,15,16,25
56:15,22 59:4
70:13,14 126:13
152:9 155:25

170:13,18 189:21
220:19 236:9,19
237:15 249:9,14
253:10,12,13,17
254:9,14
**twice** 89:7
**twitter** 7:14,17,18
8:5
**two** 7:19 11:7 18:14
18:19 19:23 29:11
29:12 31:17 34:14
34:17 56:18 59:16
69:3 76:24 108:24
128:14 149:21
151:24 152:9
165:16,22 166:2,3
178:22,24 219:11
228:17 238:14
246:17
**tying** 233:4
**type** 18:20 28:3
65:7 171:25 203:22
216:19 236:25
**types** 21:6 28:24
120:8
**typical** 213:12
214:3
**typically** 217:4

**u**

**u** 19:22
**uc** 24:12 26:7,8
**ultimately** 30:21
60:9 157:5 214:19
218:24 235:22
236:7 242:17
243:13
**unclear** 169:21
172:4
**undergraduates**
26:9,15

**underlying** 16:17
142:8
**underneath** 218:19
**undersigned** 261:2
**understand** 5:3
18:3 20:11,14
22:18 36:25 39:6
41:24 43:3,4,10,11
43:13 44:4 45:14
46:15 60:6,15,22
62:17 63:8,11,12
68:3,4,16,18 75:4
75:21 78:11 93:12
100:25 101:16
106:14 110:20,23
111:2,2 116:2
119:16 123:14
126:2 132:19
134:17 135:4 139:4
139:8,11,13 140:4
142:17 151:10,13
161:2,5,7,9 184:25
187:8 195:7 197:10
203:18 208:19
231:25 234:7
243:25
**understanding**
37:3 140:10 147:14
148:11 164:14,17
168:9 170:12,16
226:5
**understood** 5:14
33:11,20 116:25
135:3 219:23
243:24 248:20
**undertook** 55:17
**unique** 13:24
**unit** 136:7 145:25
146:8 156:8 229:5
**unit's** 110:18

**united** 1:2
**universities** 213:13
**university** 2:13
21:12 48:2 75:18
77:4 117:10 131:25
149:9 200:4 219:9
219:10 250:2
**unquote** 226:14
**updated** 189:11
**uploaded** 251:16
**uploading** 252:4
**upset** 26:14
**urine** 84:7 165:6,24
165:25 169:13,22
171:21 202:15
203:2 235:8
**use** 7:8 8:2 64:19
95:12 100:9 146:16
207:16 208:14,21
209:10,12 211:12
211:14 212:20
213:3 215:11
216:18 223:24
224:8 238:15
239:17 242:11,17
242:20,22,24 252:2
261:9
**useful** 95:13 130:19
150:15
**user** 181:15
**usually** 28:23 64:4
127:10

**v**

**vague** 71:21
**valentina** 72:15,19
95:6
**valley** 24:3
**varies** 65:21
**variety** 10:17 21:8
25:5 56:17

**various** 12:4
139:20 236:2
**verbal** 128:21
**verbally** 84:3 98:6
98:10,22 156:25
**verify** 164:7,8
**veritext** 260:10,20
**veritext.com**
260:18
**version** 67:8
125:22
**versions** 176:13
**vet** 63:21
**victim** 82:2 87:13
97:19 99:22 107:14
110:4 167:11 203:3
220:20 221:5 224:9
224:22,25 225:5,7
230:23
**victims** 108:17
110:10 164:5,15
169:7
**video** 119:14,24
120:4,17,22 121:8
121:19,19 122:24
122:25 123:16
124:9,10 131:16
161:17 205:11
206:5 208:2 214:13
251:14 252:4,4,7,8
**videoed** 122:23
**videos** 123:25
160:22,25,25 161:7
161:8,11,13,25
180:6,17 252:20
**view** 22:25 220:18
**views** 21:16 22:13
23:9 44:8
**villagers** 70:4,11
**visit** 59:8 70:14

**voice** 208:21,23,24
209:4,12 239:18,18
248:19
**vomit** 223:10

**w**

**w** 24:6
**wage** 21:15
**wait** 23:6 44:18
124:16 134:11
135:7 137:18,20
138:18,20
**waited** 140:6
**waiting** 57:20
131:23,24 183:11
**waived** 3:7 135:3
**walk** 148:5 158:15
**want** 9:19 10:15
12:10 29:13 48:10
49:16 66:25 71:22
77:15 78:17,19,25
79:5,8 80:25 81:16
84:3 88:10,17
90:14,15 92:21
98:6,10,23 102:6
109:13 113:21
130:6 134:8,9,12
134:23 135:8
137:19,19 138:10
138:17,21 144:10
156:25 159:16
162:13 163:19
168:15,18 169:4
172:12 183:16,20
184:23 187:9 196:5
205:5,8 206:11
214:10 217:12
232:19 239:10
253:25
**wanted** 12:22 13:3
13:24 16:10 17:8
25:15 30:18 36:25

49:17 51:2 57:22
61:9 64:16 70:20
79:6 95:5 98:15,16
117:14,19 132:13
136:19 140:10
141:24 143:14
144:12 145:8
156:22 170:6,10
171:15 173:10
200:23 201:4
206:12,17 207:10
208:20 209:17,18
209:20 211:25
214:9,13,14,14,15
226:22 248:16,18
248:19 252:19
**wants** 192:11
**waste** 88:17 134:9
137:19 138:16
**watched** 97:23
**watching** 223:25
**watkins** 254:22
**way** 12:9 29:17
46:19 47:21 62:14
63:20 64:23 66:15
68:10 85:10 87:19
93:16,17 98:14
101:21 109:10
111:19,22 138:22
140:5 141:17 151:5
153:23 154:19
172:9 184:13
188:22 189:17
202:14 206:22
207:21 209:11,17
213:10 214:2
216:22 219:22
228:14 232:14
233:5 235:7 248:21
252:12

**ways** 94:25 98:3
153:17 189:20
228:17
**website** 10:20
203:16 250:16,23
**week** 15:21 27:3,4
27:9,24 53:21
186:8
**weigh** 118:15
218:13
**weighs** 218:24
**weird** 13:10 215:15
**welcome** 38:24
**went** 12:25 16:19
16:20 22:2,3 49:20
49:24 52:3 53:24
59:10,10 61:3
83:20 87:17 129:10
145:16 157:16
162:17 179:12,13
198:2 199:8,14
208:4 210:6,10
218:15 219:2,12
221:6 224:16
226:18 229:17
237:9 239:4
**western** 1:4
**whereof** 256:20
**wildlife** 69:24
**willing** 237:20
**willingly** 105:6
**window** 84:19,21
199:16
**windows** 84:22
**winning** 28:4
203:14
**wired** 25:10
**wish** 186:11
**withdraw** 238:21
**withhold** 123:25

**withholding** 96:22
**witness** 4:3 61:23
81:2 147:22 181:20
191:22 192:17
193:9 220:10
256:10,20 257:5
260:18
**woman** 56:19 57:5
57:6 68:24 147:21
159:13 166:10
178:25 179:23
180:4 213:13
**women's** 10:20
**wonder** 157:7
**wondering** 66:17
137:24 181:23
191:19 203:11
**wonky** 67:11
**word** 100:9 149:13
149:14 192:12
214:23 215:16
**wording** 146:4
206:10
**words** 75:6 123:11
149:15 208:17
209:25 214:4
216:21,21
**work** 7:9 10:14,15
11:10 13:10 14:21
16:9 18:9,11 28:4
31:23 62:14 73:22
74:25 151:2 167:4
167:20 209:22
212:7 241:22
252:17
**worked** 9:25 10:9
10:19,21,25 11:5,6
11:11,15 12:25
13:22 17:10 25:4
25:17 27:25 28:5
31:14 34:13 60:17

73:23 112:5 140:3
**working** 11:4 12:3
22:21 62:5 73:20
128:8 130:11
**works** 56:23 63:20
74:22 112:22 113:2
113:12 129:15,23
133:3 134:7 143:6
149:9 249:10
**world** 18:18 69:24
129:3,4
**worried** 206:16
**worry** 4:23 46:10
62:5 193:2
**worse** 238:24
**wright** 1:18 2:4
**write** 12:5 17:20
24:24 25:15 62:11
64:24 69:8 111:4,6
130:23 203:22
212:25 214:19,23
217:24 218:9,17
245:17 251:24
253:25
**writer** 42:5 43:6
**writes** 7:21 218:4
245:8
**writing** 10:6 13:11
25:3 29:6 39:19
43:14 45:8 118:20
131:10 135:9,15,22
151:4 153:2 154:25
154:25 211:22
214:5 228:2 230:6
**written** 15:11 20:8
31:3 43:18 45:10
46:19 64:9 69:12
120:15 134:20
147:15 205:21
250:18

**wrong** 52:3 66:21
83:8,12 104:12,16
104:19,20 134:3,6
136:21,22 145:20
153:5 155:13,21
158:20 223:12
224:16 238:15
**wrote** 10:7 12:17
21:20 25:9,10,11
25:23 33:3 43:18
61:20 62:21 81:15
115:13 130:15,18
147:17 152:21
182:13 186:7 207:5
213:15 214:3,9,20
217:25 218:7,8
223:6,9,10 228:12
230:2 232:6,20
233:12,13,14
250:24,25 251:12
252:18 253:12
254:2
**wwf** 69:25

**x**

**x** 1:6,12 257:4,16

**y**

**y'all** 8:25 73:23
96:22,24 200:17
249:2
**yeah** 15:2 103:16
103:20 148:11
165:21 207:4
229:12 232:23
234:20
**year** 18:15 25:4
51:18 126:11,12
**years** 9:21,23 10:25
11:7,10 18:14,19
27:11 31:15 34:12
36:19 39:8 72:13

86:9 120:14 125:17
129:7 141:23 150:2
150:12 228:3
247:21 249:3
**york** 1:19,19,21 2:7
2:7 8:15 10:18 11:6
11:12 13:13,16
14:3 15:17 16:12
16:15,18,23 17:8
59:25 256:3,4,7

**z**

**z** 19:12,12
**zoom** 4:22,24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.