FILED
2021 Oct-21  PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 8

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

**Sexual Assault Investigations Training & Consulting**

Detective **Carlton R. Hershman** (Ret.)

San Diego Police Department

9450 Mira Mesa Boulevard, Suite C, PMB #433

San Diego, California, 92126

(858) 349-7908

chershman@gmail.com

**Re:**   *Jones et al. v. BuzzFeed Inc., et al.*
**Case No.: 19-cv-00403-RDP (ND. Ala 2019)**

I was contacted by Davis Wright Tremaine LLP (New York, New York), which represents BuzzFeed Senior National Investigative Reporter Katie J.M. Baker, BuzzFeed Editor in Chief Ben Smith, and BuzzFeed Incorporated, for expert services in the above case number.

I was asked to review the files of an investigation by the Tuscaloosa County Homicide Unit of the Tuscaloosa Sheriff's Office, number 20150702471, dated July 2, 2015. In particular, I was asked to focus on the actions of investigators Joshua Hastings, and Detective Adam Jones, who I understand to be the plaintiffs in this action, in investigating the alleged sexual assault of Megan Elizabeth Rondini ("Rondini"), who is now deceased, which occurred on July 2, 2015.

**I.     Materials Reviewed**

My opinions are based on the below-listed documents, recordings, and videos, which I have reviewed.  I also relied on my training, and experience to make my opinions, and conclusions.  My analysis and conclusions are based on the information available to me as of the date this report was submitted. Should additional information become available to me as this matter proceeds, I reserve the right to update my analysis and refine my opinions as appropriate.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

1. BuzzFeed news article dated July 3, 2017, written by Katie J.M. Baker

2. BuzzFeed news article dated July 3, 2017, written by Tyler Kingkade

3. Tuscaloosa County Homicide Unit investigation case #20150702471/Felony packet,

   which included the following documents:

   i. Felony Report Fact Sheet, dated September 9, 2015, written by Investigator Adam
      Jones ("Jones")

   ii. Statement of Defendant, dated July 6, 2015, signed by Jones

   iii. Synopsis, undated, written by Jones

   iv. Witness List, undated, unattributed

   v. Case Report for 201502471, undated, unattributed

   vi. Alabama Uniform Incident/Offense Report dated July 2, 2015, written by Officer
      R.B. Phillips ID ▬

   vii. Tuscaloosa County Homicide Unit Statement of Megan Elizabeth Rondini, report
      dated July 2, 2015, written by Jones

   viii. "The Rights of a Person Being Interviewed" statement form (Admonishment of
      Megan Elizabeth Rondini) dated July 2, 2015, written by Investigator Adam Jones

   ix. Tuscaloosa Police Department Form, Handwritten Statement of Megan Rondini,
      report dated July 2, 2015, written by Officer Phillips

   x. Handwritten statement of Megan Elizabeth Rondini, undated, written by Rondini

   xi. Tuscaloosa County Homicide Unit Statement of Terry Jackson Bunn JR
      ("Bunn")., report dated July 6, 2015, written by Investigator Joshua Hastings
      ("Hastings")

   xii. Handwritten notes of Terry Jackson Bunn's statement dated July 6, 2015, written

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

       by Investigator Carroll

xiii.    "The Rights of a Person Being Interviewed" statement form (Admonishment of Terry Bunn) dated July 6, 2015, written by Investigator Joshua Hastings

xiv.    Tuscaloosa County Homicide Unit Statement Navid Khan, report dated July 2, 2015, written by Sergeant Davis

xv.    Handwritten notes of Navid Khan's statement dated July 2, 2015, written by Sergeant Davis

xvi.    Tuscaloosa County Homicide Unit Statement of Jason Stephen Barksdale, report dated July 2, 2015, written by Investigator T. Carroll

xvii.    Handwritten notes of Jason Barksdale's statement, dated July 2, 2015, written by T. Carroll

xviii.    Tuscaloosa County Homicide Unit Statement of Ciara Younger, report dated July 2, 2015, written by Sergeant R.J. Davis

xix.    Tuscaloosa Police Department Form, Handwritten Statement of Ciara Younger, report dated July 2, 2015, written by Officer Phillips

xx.    Handwritten notes of Ciara Younger's statement, dated July 2, 2015, written by Sergeant R.J. Davis

xxi.    Evidence List

xxii.    Copy of Rondini's debit card

xxiii.    Taxi receipt, dated July 2, 2015

xxiv.    Address list, undated

xxv.    Photo log, dated September 9, 2015

xxvi.    Tuscaloosa County Homicide Unit Consent to Search form for the premises and

vehicle located at ███████████ dated July 2, 2015, written by Investigators Jones and Hastings.

xxvii.   Tuscaloosa County Homicide Unit Consent to Search form for the residence located at ███████████ dated July 2, 2015, written by Investigators Jones, Investigator T. Caroll, and Sgt. Franks.

xxviii.  Tuscaloosa County Homicide Unit Consent to Search form for Tery Bunn Jr.'s person, property, premises, outbuilding and vehicle located at ███████████ dated July 2, 2015, written by Investigators Jones, Investigator T. Carroll, and Sgt. Franks.

xxix.    Tuscaloosa County Homicide Unit Consent to Search form for the residence located at ███████████ dated July 2, 2015, written by Investigator Adam Jones

xxx.     Tuscaloosa County Homicide Unit Consent to Search form for Megan Rondini's cell phone, dated July 2, 2015, written by Investigator Adam Jones

xxxi.    Property Release form (Ford truck keys & Assorted keys on key ring), dated July 6, 2015, written by Investigator Hastings

xxxii.   Property Release Form (States "Victim requested clothing destroyed"), dated August 21, 2015, written by Investigator Adam Jones

xxxiii.  Driver record for Megan Rodnini, dated July 2, 2015

xxxiv.   Sexual Assault Information Form (Megan Rondini), dated July 2, 2015, written by Examining Physician Nicholas Vetrano, MD.

xxxv.    Form documenting "Theft of Property II – Special Inquiry" describing a Ruger handgun, undated

    xxxvi.    Person details for Jason Stephen Barksdale, undated

    xxxvii.    Handwritten list of names & phone numbers, undated, not assigned

    xxxviii.    Letter addressed to Miss Rondini on Tuscaloosa County Homicide Unit letter head, dated August 14, 2015, written by Investigator Adam Jones

    xxxix.    Alabama Uniformed Incident/Offense Report listing Megan Rondini as a suspect in a theft, dated July 2, 2015

    xl.    Images of various DVDs and/or CDs

    xli.    Letter addressed to "Dear Mr. Jones:" (Representation letter) with Scott James Meyer, JD, LL.M letterhead, undated, written by Scott James Meyer, Esq.

    xlii.    Letter addressed to "Dear Mr. Jones:" (Cooperate letter) with Scott James Meyer, JD, LL.M letter head, undated, written by Scott James Meyer, Esq.

    xliii.    Letter addressed to "Dear Mr. Jones:" (Preserve evidence letter) with Scott James Meyer, JD, LL.M letter head, undated, written by Scott James Meyer, Esq.

    xliv.    Custody Receipt list, dated August 2, 2015, signed by Investigator Adam Jones

    xlv.    Disposition Receipt list, dated August 21, 2015, signed by Investigator Adam Jones

4. Timeline of events, dated May 4, 2020, written by Detective Carlton Hershman.

5. Text messages of Ciara Younger

6. Text messages of Courtney Rentas

7. Text messages of Hannah Carter

8. Text messages of Michelle Arcia

9. Civil complaint filed by Adam Jones & Joshua Hastings, Case 7:19-cv-00403-LSC, Filed March 7, 2019

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

10. Deposition of Investigator Adam Jones, dated February 14, 2019

11. Deposition of Terry Jackson Bunn, Jr., dated January 16, 2019

12. Videotape of Bunn's property by Law Enforcement, dated July 2, 2015

13. Audio of Rondini during search of her apartment

14. Audio of Rondini's interview at the hospital, by Jones

15. Videotape of Ciara Younger's interview, by Sgt. Davis

16. Transcription of Jason Barksdale's interview, by Hastings, dated July 2, 2015

17. Transcription of TJ Bunn, Jr. giving verbal consent to search of his property to Hastings,

    dated July 2, 2015

18. Transcription of police interview of TJ Bunn, JR, by Hastings, dated July 2, 2015

19. Screenshots of Innisfree bar surveillance video, dated July 1, 2015

20. Screenshots of Houndstooth Condominium surveillance video, dated July 1 & 2, 2015

21. Excerpt of data retrieved from Megan Rondini's phone by the Tuscaloosa County

    Homicide Unit of the Tuscaloosa Sheriff's Office

22. Videotape of Megan Rondini's interview, Part 1, by Jones, dated July 2, 2015

23. Videotape of Megan Rondini's interview, Part 2, by Jones, dated July 2, 2015

24. Videotape of TJ Bunn JR's interview, by Hastings, dated July 6, 2015

25. Tuscaloosa News article by Stephanie Taylor, titled "Files detail investigation into

    Megan Rondini case"

26. Report of Plaintiffs' Expert Robert G. Pastula. \

II. **Hourly Rate**

I am a paid expert by the law firm of Davis Wright Tremaine LLP, New York, New

York, at the rate of $75.00 an hour.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

### III.    Background

For 31 years, from December 1986 until April 2017, when I retired, I was a police officer and detective with the San Diego Police Department ("SDPD").  I now own and operate a business called "Sexual Assault Training and Consulting."  A copy of my curriculum vitae is attached. I was a detective assigned to the SDPD Sex Crimes Unit on two different occasions.

From October 1999 to November 2005 and November 2007 to November 2010, a total of 9 ½ years, I was part of a team of detectives that investigated thousands of sex related crimes, mainly various types of sexual assaults and rapes.  Those cases included sexual battery, child molestation, acquaintance rape, stranger rape, rape by force or fear, rape of an intoxicated person, unlawful sex with a minor, rape in concert (gang rape), incest, sexting, stalking, image-based pornography sexual abuse (revenge pornography), spousal sexual assault, same-sex partner sexual assault, sexual assault of elders and sex with animals.

I was assigned as lead investigator on over 1,300 of these types of cases.

From July 2015 to April 2017, I was assigned to the "Computer and Technology Crime High-Tech Response Team" (C.A.T.C.H. Team), which is a San Diego County task force investigating cybercrimes. While assigned to this team as an investigator I was assigned approximately 200 "image-based pornography sexual abuse" cases also known as "revenge pornography" or "nonconsensual pornography."

As a detective my duties were to interview victims, suspects and witnesses and gather evidence, write search/arrest warrants and submit a report to my superiors, as well as the San Diego County District Attorney.  The reports to my superiors or the district attorney either recommended or did not recommend prosecution of a particular case.

I also testified in the San Diego Superior Court system in my cases, and as an expert in

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

sexual assault investigations, behavior evidence, and delayed reporting.

I am certified by the State of California Law Enforcement as a POST (Police Officers Standard & Training) criminal investigator as to sex crimes and homicides. I am a lifetime member of the California Sexual Assault Investigators Association. I have been the instructor in over 300 courses and seminars concerning the investigations of sex-related crimes. Here are some of the more significant teaching assignments I have held:

- 2001 to 2017, an instructor at the San Diego Police Regional Law Enforcement Academy, teaching classes on sex crimes investigations, victimology of sex crimes, first responders to sex crimes, crime scene investigations, cold case sexual assault investigations, California sex crimes laws, drug facilitated sexual assaults and basic interviewing and interrogations.

- February 2002 to February 2009, an instructor training sexual assault victim advocates for the Center for Community Solutions, San Diego, California.

- May 2003 to November 2010, an instructor training sexual assault victim advocates for the United States military.

- June 2003 to September 2017, an instructor training sexual assault victim advocates for the Oceanside Women's Resource Center, Oceanside.

- July 2003 to May 2014, an instructor training for Sexual Assault Examiner in training for healthcare professionals.

- 2012 to present, a member of the "End Violence Against Women" cadre of experts and instructor in training sexual assault investigations, nationwide.

- October 2018 to present, an instructor in training sexual assault investigations for the "International Association of Chiefs of Police" nationwide.

I have testified as an expert at trial or by deposition in the following actions over the past four years:

- L.S. vs. William Ashley Oliver III – Case No. 19-CV-0746-JLS-LL

  (United States District Court, Southern District of California)

  (Deposition 02/06/2020)

- N.G. vs. County of San Diego – Case No. 37-2018-00049834-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- D.F. vs. County of San Diego – Case No. 37-2018-00016761-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- T.M. vs. County of San Diego – Case No. 37-2018-00016624-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- P.S. vs. County of San Diego – Case No. 37-2018-00016743-CU-PT-CTL

  (Super. Ct. San Diego Co.) (Hearing 03/28/2019)

- People of the State of California vs. Alfonso Hernandez Oilvares – Case No.
  M233932SC

  (Super Ct. San Diego Co.) (Trial 02/13/18)

## IV.    REBUTTAL OF OPINION BY ROBERT G. PASTULA

I have read the report by Robert G. Pastula.  I disagree with his analysis, conclusions, and opinions.  I will offer opinions rebutting his testimony.

## V.    OPINION

In my expert opinion, Jones and Hastings failed to complete a thorough, accurate, factual and detailed investigation into Rondini's allegations of sexual assault.  They drew premature

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

conclusions from the information gathered in the early stages of their investigation and failed to

make follow-up inquiries, which meant that they did not properly assess the truth of their initial

conclusions by corroborating or contradicting them.  As a result, they did not properly assess

whether Rondini earnestly resisted Bunn and/or whether Rondini was legally incapacitated and

so unable to consent to sex.  We will never know the true facts of what occurred between Ms.

Rondini and Mr. Bunn on July 2, 2015 because of the failure of Jones and Hastings to correctly

investigate the incident.

Initially, every case, no matter what type, has the same investigative goals: identification

of the suspect(s), collection of evidence, exoneration of the innocent, and discovery of the truth.

Some if not all of these goals can be tough to obtain. For this reason, an investigator should be

trained and competent in obtaining these goals.

An investigation is supposed to either "corroborate" or "contradict" what people say or

do. Investigators obtain these two pillars of an investigation by questioning people who are

involved and collection of relevant evidence of different types.

The goal is to, as much as possible, "corroborate" or "contradict" what people tell an

investigator. This will point an investigator in the right direction, and will lead to new

information, new leads, other victim(s), witnesses, suspects, and relevant evidence.

Corroboration makes people "truth" tellers. Investigators have to find out what happened and

piece it together. Investigators should not make assumptions of any kind -- they should learn and

verify facts.

Sexual-based investigations have their own unique dynamics and cannot be treated like

other types of investigations. The investigator should be trained in all aspects of these special

dynamics or they will not be successful.  In particular, law enforcement professionals face three

fundamental challenges while conducting a sexual assault investigation involving a non-stranger victim interview.

- Most victims do not "physically" resist a sexual assault.

- Most victims only report their sexual assault to law enforcement after a delay of some kind.

- Most victims provide some information in their interview that is incomplete, inconsistent, or even untrue.

These challenges are obstacles to the ultimate truth-finding goal of a sexual assault investigation.  When these challenges arise during a victim interview, investigators must recognize and overcome them.  Using common and well-known investigative tools and practices, investigators must continue to probe beyond these challenges, rather than simply accept witness statements at face value.  When investigators fail to recognize and attempt to overcome these common obstacles, the entire investigation becomes flawed, incomplete, and fails its truth-finding mission.

This case had all three of these challenges.  But Jones and Hastings did not undertake an investigation sufficient to address them because they: 1) failed to follow necessary leads, including interviewing relevant witnesses and collecting evidence; 2) failed to properly interview Rondini at the hospital; 3)  failed to allow Rondini the opportunity to sleep or eat before bringing her to the police station; 4)  failed to arrest Bunn and remove him from his home; 4) failed to obtain a search warrant for Bunn's home; 5) allowed Bunn to contaminate the crime scene; 6) failed to collect evidence from Bunn and from his home; 7) failed to image Bunn's phone; 8) failed to interrogate Bunn in a timely manner, instead allowing him to travel with his attorney on a fishing trip before interrogating him; 9) failed to properly interview Rondini in the police

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

station, including failing to conduct a trauma-based interview, which made it impossible for them to understand whether Rondini either earnestly resisted Bunn or was incapacitated at the time of the alleged assault; 10) chose to Mirandize and interrogate Rondini about her alleged theft of some money from Bunn's wallet and about moving his handgun from his car to his front lawn, which improperly shifted the focus of the investigation away from the assault and made Rondini the criminal; 11) failed to properly interrogate Bunn, not only allowing him to delay the interrogation, but also aiding him in responding to questions, not cross-examining him or seeking to confirm what he said and appearing to favor him by helping him to get Rondini to not prosecute the alleged assault.  As a result, their investigation was incomplete and failed to find the truth.

**THE INVESTIGATION:**

**A.      A TIMELINE OF THE ALLEGED ASSAULT AND THE INVESTIGATION**

Below is a timeline of the alleged assault and the law enforcement investigation thereof, as reflected in the documents provided to me.

**July 1, 2015**

7:25 p.m. – Surveillance video shows Bunn arriving at Innisfree Bar.

8:30 p.m. – Surveillance video shows Rondini and friends enter Innisfree Bar for trivia night. Surveillance video from the bar shows Rondini and Bunn did not interact.

11:35 p.m. – Surveillance video shows Bunn leaving Innisfree with his friend, Jason Barksdale.

11:36 p.m. – Surveillance video shows Rondini exiting Innisfree alone.  Rondini told law enforcement she did not recall leaving the bar.

Time unknown – Bunn told investigators he and Barksdale were driving down University Boulevard and saw Rondini walking down the road.  Bunn stated he offered Rondini a ride and she entered the car.  Rondini told law enforcement she remembered being in Bunn's car, but did not recall how she got there.

11:47 p.m. – Surveillance video from inside Rondini's apartment complex shows Rondini, Bunn, and Barksdale entering her apartment.  Bunn told investigators that Rondini prepared drinks for the group.  Rondini told investigators she did not recall being in her apartment with Bunn.

**July 2, 2015**

12:02 a.m. – Surveillance video from inside Rondini's apartment complex shows Rondini, Bunn, and Barksdale leaving her apartment.

12:08 a.m. – Rondini sends text messages to her friends during the time in which she must have been riding in Bunn's car.

12:23 a.m. – Rondini sends her friends videos taken inside of a room in Bunn's house that had multiple animals mounted on the wall.

Time unknown –  Rondini and Bunn have sexual intercourse.  Bunn told investigators this intercourse was consensual; Rondini told investigators it was not.  Bunn and Rondini both told investigators that Bunn fell asleep immediately after.

1:04 a.m. – Rondini's cell phone records show that she began texting and calling friends asking for help, telling them she needed help and needed a ride.  She told friends she was unable to exit Bunn's bedroom because the door was locked and she could not figure out how to unlock it.  Rondini also contacted several taxi companies to try to secure a ride.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Time unknown – Rondini told investigators that she climbed out of the window of Bunn's bedroom.  Upon jumping to the ground, she realized she did not have her keys, so she climbed back in.  She could not find her keys in Bunn's bedroom, so she took his car keys to unlock his car in order to search for her keys.  Rondini did not find her keys in Bunn's car, but did find Bunn's handgun and his wallet.  Rondini told investigators she took the handgun for protection, but dropped it after she accidentally discharged the handgun.  Rondini also told investigators that she removed $3 from Bunn's wallet to pay for the taxi she had contacted.

2:14 a.m. – Rondini told investigators a taxi that she called arrived at Bunn's house.  After entering the car, she realized two of her friends had arrived to pick her up.  She paid for the taxi and got into the car driven by her friend Ciara Younger.  Rondini's friends drove her to their apartment, and then to the hospital, DCH Regional Medical Center.

3:50 a.m. – DCH Regional Medical Center staff notified the Tuscaloosa Police Department that Megan Rondini had reported a sexual assault.

3:55 a.m. – Officer Jordan Phillips arrives at DCH.

4:01 a.m. – DCH personnel conduct a sexual assault examination on Rondini.

5:25 a.m. –  Investigators Hastings and Jones arrive at DCH.

5:37 a.m. – Jones conducts the first interview of Rondini at DCH (the "Hospital Interview").  The Hospital Interview is recorded by audiotape.

6:45 a.m. – Jones and Hastings arrive at Bunn's residence.  They then left briefly, allowing Bunn to be alone inside of his residence, and returned "very shortly after they left" with several other officers.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

6:47 a.m. —Bunn signs a form consenting to search of his residence.

7:00 a.m. – Bunn calls his attorney, Jason Neff.

8:19 a.m. – Sergeant Davis conducts his interview with Navid Khan, the cab driver called by
Megan Rondini.

8:29 a.m. – Officer David Griffin fills out an "Alabama Uniform Incident/Offense Report"
listing Bunn as a victim of a theft and Rondini as the suspect.

8:37 a.m. – Investigator T. Carroll obtained a recorded audio statement from Bunn, at his
residence.

11:25 a.m. –Jones conducts his second interview with Rondini (the "Second Interview"). There
is an advocate present.

12:05 p.m. – Sergeant R.J. Davis interviewed Ciara Younger. Younger picked up Rondini from
the Bunn residence and later took her to the hospital.

12: 43 p.m. – Rondini signs a form consenting to have the data on her phone collected by the
Tuscaloosa Sheriff's office.

1:15 p.m. – Rondini signs a form consenting to Jones' search of her apartment. Rondini
accompanied Jones on the search of her apartment, which was apparently conducted to verify
whether Bunn and Barksdale had returned to her apartment with her the night before.

1:59 p.m. –Jones and Rondini return to the police station. Jones conducts his interrogation with
Rondini (the "Interrogation"). During this interrogation, Jones reads Rondini her rights and she
signs a Miranda waiver form, after which he interrogates Rondini about her alleged theft of

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Bunn's property incident to her escape from his residence.

**July 6, 2015**

9:41 a.m. –Hastings interviews Bunn at the Sheriff's office. Bunn's attorney is present.

**July 28, 2015**

District Attorney Lyn Head contacts Rondini's father to let him know Megan's case did not meet the legal definition of sexual assault and would not be brought to a grand jury.

**August 14, 2015**

A letter from Investigator Jones to Rondini written on Tuscaloosa County Homicide Unit letterhead. The letter notifies Rondini her case will be closed. Also, any items belonging to her will be released. The letter states, "Any evidence pertaining to this case will be destroyed if not claimed within ten days."

**August 21, 2015**

Tuscaloosa County Homicide Unit releases Rondini's shoes to her.  She requests that her clothing be destroyed.  The release of property is videotaped.

**February 26, 2016**

Rondini dies by suicide.

**March 2016**

Sexual assault case against Bunn is presented to a grand jury, which decides not to charge him with a criminal offense.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

### B.   ANALYSIS

My review of the investigation leads me to conclude that Jones and Hastings made grave

errors at almost every step of the investigation in a way that makes it difficult to know what

actually happened to Megan Rondini.

### 1.   The Investigation Was Not Sufficiently In Depth to Reach An Accurate Conclusion

Right from the start, it is worth noting that the bulk of the investigation took place over a

13-hour period, with one additional interview of Bunn conducted several days after Rondini first

reported the alleged assault.  This is simply insufficient to conduct a rape investigation

particularly where, as here, the complaining witness reported major failures of memory.  Indeed,

when she was initially interviewed at DCH, Rondini told the officers that she did not recall the

circumstances under which she ended up in Bunn's car.  Furthermore, although Bunn had told

the officers that he, Barksdale, and Rondini had visited her apartment that evening, Rondini

repeatedly stated that she had no memory of this trip back to her apartment.  To properly

understand the full context of what had happened that evening, Jones and Hastings should have

sought to determine why Rondini had blacked out, and whether she had been drugged.   They

also should have interviewed the women she was with at the bar, and most significantly, they

should have undertaken an investigation to determine exactly how Rondini ended up walking by

herself on the edge of a busy road, and was picked up in Bunn's car. None of those things

happened.

Notably, Jones and Hastings failed to contact multiple people who they were aware had

knowledge of key events of the night:

- They did not interview any of the nine people who accompanied Rondini to Innisfree

    Bar, even though Rondini provided their names and cell phone numbers to Investigator

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Jones.  These witnesses could have shed light on, among other things, possible reasons

that Rondini left the bar alone, why she did not leave with her friends, her quantity of

alcohol intake at the bar and degree of intoxication, whether her behavior towards the end

of the evening was unusual, whether the group knew or discussed Mr. Bunn, and why she

was walking home alone on the side of the road.

- o  Kara Whelphy

- o  Elisabeth Mapes

- o  Hannah Carter

- o  Logan St. Pierre

- o  Shannon Towles

- o  Haley Wightman

- o  Aimee Intagliata

- o  Bridgette Bernarding

- o  Sammie Auer

- Jones and Hastings did not interview Rebecca Lundgren, who accompanied Ciara

  Younger to pick Rondini up from the Bunn residence.  Lundgren was one of the first

  people to whom Rondini disclosed she had been sexually assaulted.  Rondini provided

  her name and cell phone number to Investigator Jones.

- Jones and Hastings did not interview any of the numerous people to whom Rondini sent

  digital messages over the course of the night of the alleged assault, with the exception of

Ciara Younger.  In particular, Rondini was participating in several digital message exchanges during the time where she experienced memory lapses, and the other parties to these conversations could have provided valuable information to the investigators. Jones and Hastings had collected the data from Rondini's phone, and thus had ready access to the names and cell phone numbers of the parties with whom Rondini was communicating over the course of the night.

Similarly, Jones and Hastings did not collect or ensure that the following evidence was collected:

- They never collected any data from Bunn's phone, even though Rondini recounted that she remembered that Bunn was sending text messages while she was in his car.  This created probable cause to collect the data from Bunn's phone.

- They did not collect the clothing that Bunn was wearing immediately before the assault, missing the chance to perform forensic analysis of this clothing.

- No photos were ever taken of the injuries to Rondini's ankle, upper thigh, or upper calf.  These injuries were described in the report of the physical examination conducted at DCH.  The investigators should have made sure these injuries were properly documented.

- The hospital failed to collect a blood sample from Rondini, and only collected her urine.  This prevented proper testing to determine if Rondini had been exposed to any date-rape drugs.  Investigator Jones also failed to take custody of the sample, thus compromising the chain of evidence.

- There is no evidence that Jones or Hastings checked the social media of any of the

persons involved in this case. Investigators know that social media is used to

communicate between persons who have been involved in or witnessed criminal actively.

Social media is the easiest and fastest way to obtain information. Investigators do not

need to obtain a search warrant for this type of digital evidence.

Jones and Hastings simply failed to conduct a thorough investigation.

2.    The Hospital Interview

In addition, the investigators made significant errors in their first interview with Rondini

that set the tone for the rest of the case.  The first victim interview is one of the most important

components of a sexual assault investigation – the initial victim statement is important because it

is "pure" and has not been corrupted by others making statements or comments about what

occurred. [1]  A badly done interview can only lead to a bad outcome. Investigators often use the

interview as a scale or gauge to determine "credibility" of the person with whom they are

speaking.  If the investigator is not trained to notice and take account of the credibility

"indicators" while interviewing a sexual assault victim, they will misjudge the victim.

Any mistake made during an interview can have a disastrous effect on the victim's

cooperation. This reduces the likelihood that the case will be successfully investigated and

prosecuted. One of the primary mistakes that is often seen is treating victims not only like

potential sources of evidence, but in fact, like suspects.

The Hospital Interview occurred at 5:37 am, only about five hours after the alleged

assault.  The questioning portion of the interview was less than nine minutes long. The entire

interview was ten minutes long.  I have reviewed the audiotape and, even though this initial

---

[1] Though Rondini had spoken to Ciara Younger and Rebecca Lundgren immediately after the
alleged assault, she did not speak in detail with them.

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

information-gathering interview was short, there was enough relevant information to form an idea that a sexual assault investigation was necessary.  But Jones and Hastings did not properly follow up.

Initially, it is clear from the audiotape that Rondini was disheveled, disorganized, and disoriented during the interview. This is consistent with post-incident stress and trauma. Jones and Hastings should have recognized this and sent Rondini home to shower, sleep and eat.  It is a gross departure from best practices that she was not allowed to do those things.

In addition, Rondini explicitly told the officers during her first interview that she had been "held down" by Bunn as he was allegedly assaulting her.  When asked, Rondini told the investigators, Bunn's hands were on her hips and the top half of her body. But Jones and Hastings appear to not have understood the importance of that statement because the very next question from Jones was, "*Did you ever resist him? Did you swing at him?*" But if one is being held down against their will then the element of resisting is already present.  These statements were more than enough "probable cause" to seek a court ordered search warrant, and detain, if not make an arrest of Bunn.  But Jones and Hastings did not follow up on Rondini's statements.

Rondini also explained very clearly to Jones and Hastings all the many ways in which she relayed to Bunn that she did not want to have sexual contact with him.  She repeatedly told Jones and Hastings that she said she did not want to have sex, turned her head away, and refused to participate among other things.  But still, she told them, Bunn held her down and did not halt his advances.  Rondini told the police that she ultimately had sex with Bunn because she felt it was the only way that he would let her leave his house and go home—she felt she had no choice. Jones and Hastings should have asked questions about all of these statements, rather than simply ignore them.  In fact, Rondini's actions immediately after Bunn falls asleep, and particularly the

fact, that she climbed down a second story to her freedom, provided further reason to believe the sexual conduct was unwanted.  And Rondini provided other evidence as well.  When Jones asked Rondini, *"He ever take your phone from you and keep you from calling…?"*  Rondini cut Jones off to respond, *"He did, that's why I don't know where my keys are because he took my phone and keys. I found my phone because it was like dinging because they were texting me."*  These indicia, coupled with Rondini's statement that she was held down should have provided support for a search warrant and/or arrest warrant for Bunn.

Instead, Jones and Hastings focused on Rondini's statement that she felt like "letting [Bunn] have sex with her was the only way that he would let [her] go" as conclusive evidence that she did not "earnestly resist" Bunn's advances and, consequently, no assault occurred. Jones and Hasting erred in making this conclusion so early on in the investigation – with less than 9 minutes of questioning – and particularly in light of the evidence Rondini had provided to Jones and Hastings that she had been held down and did not give consent.  This error had an impact on Rondini, who started crying apparently because she was beginning to deduce that Jones and Hastings did not believe her.   As discussed more fully below, this is a terrible dynamic to create in a police interrogation because it appears to have caused Jones and Hastings to proceed under the assumption that the sex was consensual before they did any other work.

Furthermore, because Jones and Hastings had already begun proceeding under the assumption that the sex was consensual, they did not take the opportunity at the hospital to conduct a "pre-text" phone call between Rondini and Bunn. A pre-text phone call is a phone call orchestrated by law enforcement and the alleged sexual assault victim in which the alleged victim calls the alleged assailant and records the conversation.  Before the call, the victim and the police agree on a list of questions they want the victim to ask, which might lead to new