FILED
2021 Oct-21  PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

information or new witnesses.  Pre-text phone calls are considered the "bread and butter" of consent cases. It is a gross departure from best practices not to conduct a pre-text phone call between a victim who was assaulted by a non-stranger. The potential to gain new information and corroborate the actions/statements of persons who have been interviewed is very high.

3.   The Initial Contact with Bunn

From the hospital, Jones and Hastings visited Bunn at his home.  The visit to Bunn's home, including the conversations between Bunn and the investigators, were video and audiotaped and I have reviewed them. The interaction with Bunn was so poorly handled that it prejudiced the rest of the investigation in multiple respects.

a)   *Bunn Was Allowed to Contaminate the Crime Scene*

Initially, as Bunn testified at his deposition on January 16, 2019 in the wrongful death action brought by Megan Rondini's family, Jones and Hastings initially arrived at his residence and alerted Bunn to the nature of Rondini's allegations, prompting Bunn to call his lawyer. Jones and Hastings then left briefly and allowed Bunn to be alone inside of his residence.  Bunn stated Hastings and Jones returned "very shortly after they left" with several other officers.  This was a serious error for at least two reasons. First, based on Megan's initial statement at the hospital that she was "held down" and sexually assaulted by Bunn, he should have been immediately arrested or brought in for questioning, not allowed to remain in his home without law enforcement presence.  At a minimum, the officers should have arrived with a search warrant that allowed them to search Bunn's home immediately.  Second, this error was made more egregious by the fact that the officers alerted Bunn to their presence and the nature of Rondini's allegations, and then left their prime suspect alone at the scene, thus entirely compromising the crime scene.  Bunn could have destroyed evidence in the time he was allowed

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

to remain in his house.  And, indeed, it is notable that Rondini's keys to her apartment, which she

told officers had been lost in Bunn's house, were never found.  Bunn certainly had time to hide

or dispose of them before Jones and Hastings returned.

> b)      *Bunn Lied To The Investigators And They Did Not Follow-Up*

Similarly, in the subsequent interview of Bunn, conducted on July 6, 2015, the

investigators acknowledge that during their initial conversation with Bunn the morning of July 2,

Bunn had stated that he was alone the night before the investigators arrived.  This was a direct

falsehood, one he then corrected moments later suddenly remembering that he slept with

someone the night before.  Yet the police do not follow up on it at all and, indeed, later help him

explain away this falsehood.  This is a radical departure from best practices and shows that right

off the bat, the investigators were treating Bunn sympathetically and not like someone who had

assaulted Rondini.

Indeed, the investigators appear to have inadvertently recorded themselves rationalizing

Bunn's lie.  One officer who is taking a video of Bunn's house can be heard saying "…had

consensual sex so…Think he was scared when we showed up, still probably intoxicated, making

some bad decisions."  Another officer asks "do you get audio on that?" to the camera operator.

The video then ends.

This is a valuable window into the investigators' state of minds, strongly suggesting they

had already decided the sexual encounter Bunn had initially denied was consensual, even before

they had conducted full-length interviews of Bunn or Rondini.

> c)      *Bunn Was Permitted To Follow the Investigators Around As They*
> *Searched His Home*

Moreover, as the videotape of his police interview makes clear, the officers did not obtain

a search warrant, but instead requested that Bunn consent to a search.  They then permitted Bunn

to accompany them as they searched the house, repeatedly allowing him to contaminate the

crime scene and successfully allowing Bunn to steer the conversation.   For example, the officers

allowed Bunn to rummage through the clothing he was wearing immediately before the alleged

assault – potentially destroying any physical evidence of the alleged assault that could have been

recovered through forensic analysis – in order to locate his wallet.

Second, when the officers allowed Bunn to tag along with them during their search of his

home, he reported to the officers at the scene that he was missing $300 and a gas card from his

wallet.  Bunn was also allowed to look through his car, after which he informed the officers that

his handgun was missing.  After learning of these missing items, law enforcement derailed their

investigation into Rondini's alleged assault in order to open a concurrent investigation into this

purported theft of Bunn's property, re-framing Bunn as the victim of the theft and Rondini as the

suspect. Had Bunn been properly removed from the scene, investigators could have completed

the investigation into Rondini's allegations rather than been side tracked by Bunn's claims.

> d)      *Insufficient Physical Evidence was Collected From Bunn and His*
> *Home*

Next, the investigators failed to collect the right or enough evidence from Bunn's home.

First, the bodies of both Rondini and Bunn were evidence of the alleged crime.  Rondini's body

was (partially) examined – she submitted to a rape exam at the hospital.  But Bunn's body was

not examined.  Remember, when the investigators arrived at the home, Rondini had already told

them that she was raped by Bunn and that he held her down.  In addition, Bunn told the police he

had been alone the night before, which was false.  The police had sufficient evidence for an

arrest warrant and a search warrant.  And Bunn, consistent with the standard protocol for sexual

assault investigations should have been required to have a SANE exam to secure physical

evidence. Because it was only a few hours after the alleged assault, a physical examination of

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Bunn could have revealed physical evidence of his contact with Rondini, including DNA from her body.  The taking of DNA, urine, and blood samples from Bunn could have determined his blood alcohol level and/or whether he had drugs in his system.  These tests simply did not occur.  This is a serious omission in the investigation.

Similarly, while investigators collected Rondini's clothes she was wearing at the time of the alleged assault at the hospital, they did not collect Bunn's, but instead allowed him to rifle through them.  Left uncontaminated, Bunn's clothes could have proved key evidence of the events of the night before.   Instead, investigators merely photographed them.

 Critically, the investigators also failed to "image" or make a copy of the data on Bunn's cellular phone or phones, even though they did image Rondini's phone.  This is a serious failure of the investigation.  In particular, this type of evidence would have shown any text messages between Rondini and Bunn, text messages between Bunn and other people that evening, text messages between Bunn and other possible victims, photos Bunn may have taken of Rondini while she was in his room, and text messages sent by Bunn when Hastings first arrived at his door. It also would have contained call logs to see who Bunn could have called.  In short, by not imaging Bunn's phone, investigators missed an obvious source of potentially inculpatory – or exculpatory – phone call records, photos, texts messages or other crucial evidence related to the alleged assault.

> *e)      Bunn Is Allowed To Take A Multi-Day Fishing Trip (With His
>         Attorney) Before Being Interrogated*

Furthermore, law enforcement did not conduct an in-depth interview of Bunn the day of the alleged assault.  Instead, after recording an eight-minute interview with Bunn at his home, the investigators permitted Bunn to leave town to go fishing for a few days, and to return at his convenience for the videotaped interview.  Bunn's attorney accompanied him on the fishing trip,

meaning he had more than three full days to prepare for the police interview with the benefit of

counsel.  Giving the suspect such a long period of time to rehearse his answers severely

compromised the reliability of the information ultimately elicited during Bunn's interview.

Furthermore, the simple fact that the investigators allowed a suspect who had been accused of a

serious violent crime to travel out of town for a recreational excursion before he had even faced a

full-length police interrogation demonstrated that they simply did not take the sexual assault

allegations against him seriously.  One infers that they would not have let a potentially dangerous

sexual predator freely travel out of town if they had not already made up their minds that he

could not possibly be guilty.

### 4.   Second Interview With Rondini:

After their visit to the Bunn home, Jones then interviewed Rondini a second time  at

police headquarters inside of an interview room.  I have reviewed the videotape.  It too is riddled

with errors.

First, it was entirely too short.  Rondini was sitting in the interview room for about two

hours, but only 31 minutes of that time was questioning of her (the interview was videotaped and

I reviewed the tape). This is not enough time to complete a professional, detailed, and in-depth

interview in relation to an allegation of a sexual assault. In my experience, it would have taken a

half hour just to obtain background information and build a rapport with Rondini. I understand

Investigator Jones had spoken with Rondini at the hospital, but that is not a substitute for a

proper interview.

Next, Jones immediately begins questioning Rondini about the prior night of events. He

does not establish trust, rapport, and comfort for Rondini.  Rondini had not slept for over 24

hours, had not eaten, and was alleging that she was the victim of rape and had just participated in

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

a physical rape examination, which is a deeply personal and invasive occurrence. She was clearly suffering from trauma. The proper way to question her would have been to conduct a "Trauma-Informed" interview. In a trauma-informed interview, questions are asked in ways that are consistent with how traumatic memories are often encoded, stored, and retrieved. Interviewers also understand, listen for, and gather information about common brain-based impacts of trauma on attention, cognition, and behavior (e.g., narrowed attention, impaired reasoning capacities, freezing, habit behaviors, dissociation, and tonic immobility). A trauma-informed interview can elicit more complete and accurate information from sexual assault victims, which can, in turn, lead to a more thorough "evidence-based" investigation.

Investigators must carefully elicit from victims during an interview "exactly" how they responded to the "situation," and what they were thinking, and feeling at the time. When doing so, it is critically important to use open-ended questions that allow victims to describe the experience in their own words—*e.g., "How did that make you feel, was it fear?" "Did you think you had any other options?" "What were you thinking?"* Investigators should never ask questions such as *"Did you fight back?" "Why didn't you try to escape?" "Did you scream for help?" "Why didn't you immediately call 911?"* Questions like these imply to the victim that there is a "correct" response to sexual assault. Yet for the majority of the victims, these types of questions can make them feel they are being judged and/or their case is viewed with suspicion.

Jones' questioning of Rondini followed none of these techniques. On the contrary, Jones' interview technique with Rondini was at best ineffective, and at worst inappropriate or even abusive. He failed to understand she was suffering from trauma, lack of food and sleep.

Jones uses very few "open-ended" questions, instead he uses "leading" questions throughout the interview with Rondini. Jones does not encourage narrative responses from

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

Rondini and interrupts her repeatedly. Jones failed to have Rondini focus on what she can recall "thinking" and "feeling" throughout the alleged assault. Jones fails to obtain or understand Rondini's state of mind before, during, and after the alleged assault.  Jones failed to give her the opportunity to talk about her thoughts, feelings, and experiences during the alleged assault. This type of questioning would explain how Rondini "resisted". If Jones had conducted a proper interview with Rondini, he could have reconstructed the entire reality of the alleged assault.

In particular, Jones' questioning on the issue of consent and physical abuse was insufficient.  Notably, Jones again fails to follow-up on Rondini's statement that Bunn "held her down" while sexually assaulting her – in fact it does not come up at all in the Second Interview. This is remarkable as it was itself evidence relevant to whether Rondini resisted.  Indeed, while interviewing her, Jones tells Rondini that "based on your statements to me, you never resisted him." Jones simply does not sufficiently follow-up on Rondini's statements in an effort to see if a case can be made that she "earnestly resisted" Bunn.   Here is how Rondini communicated to Jones that she verbally and with her actions said "no" to Bunn in the Hospital Interview and in the Second Interview:

- Rondini told Bunn that she needed to go find her friends with her friends, but he insisted on showing her his house.

- When they arrived at Bunn's residence, she did not say anything because she didn't want to be *"rude."*  Rondini thought Bunn was going to show her the room in his house with all of the animals, and then was going to take her back home.

- Once inside of Bunn's bedroom, Rondini sat in a chair "away from his bed" and waited for him. She did not sit on the bed or disrobe.

- According to Rondini, Bunn entered the bedroom and indicated he wanted to have sex

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

with her.  She did not reciprocate his statement.  He then walked over to Rondini who was still sitting in a chair and tried to kiss her, despite that she "really didn't want to."

- Rondini continued to communicate to Bunn she needed to leave. Rondini felt she could only leave if she let Bunn do whatever he wanted to her.

- Bunn took Rondini by the arm and "brought" her to his bed.

- Bunn started kissing Rondini. He removed her shirt and bra. Rondini was not interacting with Bunn. Bunn removed his own clothes.

- Bunn placed Rondini on her side while she was still wearing her shorts. Bunn placed his penis in Rondini's mouth. Rondini did not actively participate in orally copulating Bunn, stating to Jones "*I didn't do anything."*

- Bunn "*held her down.*"

- Bunn "*pulled*" her shorts "*to the side*" to have vaginal sex with her.

- Rondini did not look at Bunn or say anything to him as he had sex with her.
  .Rondini decided to let Bunn have sex with her because he wasn't responding to her repeated statements that she needed to leave.. Rondini gave up and allowed Bunn to have sex with her because she felt it was *"the only way that he would let me go."*

- When Bunn was finished having sex with her, he fell asleep. Immediately Rondini grabbed her shirt and bra from the floor. She attempted to leave via the bedroom door. Rondini stated there were six doors in the room and she was unable to exit the bedroom.

- Rondini attempted to unlock the bedroom door, but was unable to. She tried several times.  When this did not work, she climbed out the window.

Jones should have followed up on all of these in order to determine whether a case could

be made that Rondini "earnestly resisted" Bunn within the meaning of the Alabama law. He did

not do so.

Next, Jones made no effort during this interview or at any other time to understand why

Rondini could not remember what happened to her during the night of the alleged assault.

Rondini had clearly experienced a "blackout" period prior to her sexual assault pursuant to which

she could not remember why she left the bar alone, how she got into the car with Bunn or that

she went back to her apartment with Bunn and Barksdale. This should have concerned Jones.

But, instead, he declines to follow-up on it. Jones should have:

- Interviewed the witnesses set forth above to try to figure out what happened at the
  bar.

- Conduct a thorough interview of Barksdale and/or image his phone. Barksdale
  was interviewed for less than five minutes at Bunn's house. He was never
  brought to the police station for a formal interview, even though he was the only
  witness other than Bunn and Rondini to many of the events of the evening,
  including events that took place while Rondini had blacked out.

- Tried to ascertain how Bunn and Barksdale ended up in Rondini's apartment after
  offering her a ride, whether Bunn or Barksdale texted each other or any third
  parties from the apartment, and what prompted Rondini to decide to leave her
  friends, why Rondini decided to leave her apartment to accompany Bunn to his
  house, and whether Bunn or Barksdale texted anyone from the apartment. These
  and more questions where neither asked nor answered by the investigators.

   5.   <u>Interrogation of Megan Rondini:</u>
The second stage of Ms. Rondini's interview at the police station was even more

problematic.  After taking her to her apartment to investigate whether there was evidence of her

returning the prior evening with Bunn and Barksdale, Jones brings Rondini back to the police

station, and asks her more questions.  Prolonging the interview in this way was improper because

Rondini no longer had her advocate present, had not slept in over 24 hours, and was not in a

position to keep answering questions.  Moreover, this second stage of the interview immediately

turned into an interrogation (which is why I refer to it as such), as Jones read Rondini her

Miranda rights, and began treating her as a suspect in an investigation into the theft of Bunn's

property.  This is a gross departure from best practices, which dictate that the investigation into

the alleged assault be clearly separated from any related investigation into whether the victim of

the alleged assault may have also committed a crime.  If the police officers did feel they needed

to investigate whether Rondini had committed a crime by moving Bunn's gun from his car to his

lawn, and by taking $3 or $300 from his wallet, they should have pursued this investigation at a

later date.  This temporal separation would have helped to make it clear that the officers were

pursing an entirely different set of charges, distinct from the sexual assault, and that in this

investigation, Rondini was being viewed as the potential perpetrator, not the victim.

As it was, the shift from casting Rondini from victim to perpetrator – less than 12 hours

after the alleged assault took place – made it clear to Rondini that the police did not believe her

story in a way that made it impossible for Jones to continue the investigation in a productive

manner.  Once a victim feels they are not being believed by law enforcement, they will shut

down, alter, or give untruthful information. They will not volunteer information believing

whatever they say will not be believed.  Losing the victim's trust in this way severely

compromises an officer's ability to gather the facts needed to pursue a meaningful investigation.

Jones solidifies Rondini's sense that he does not believe her by asking her to sign a

"refusal to prosecute" form at the end of the Interrogation, before he and the rest of the department have had a meaningful opportunity to follow up on any of the information Rondini had provided in the Second Interview or the Interrogation.  Jones does not even volunteer the full consequences of her signing this form – namely, that no charges would be filed against Bunn – until Rondini repeatedly asks him what will happen if she signs.  Indeed, even while he explains the significance of the form, Jones references his perceived weaknesses in her case.  By the time Rondini leaves the police station, it has been made clear to her that no one sees her as a victim—indeed, law enforcement only sees her as a suspect in a theft.

Jones' and Hastings' failure to conduct sufficient interviews of Rondini are significant because their failures made it impossible for them to address the three challenges I identified at the beginning of this report as being inherent in sexual assault allegations.  As to the first challenge, *i.e.* that most victims do not "physically" resist a sexual assault, Jones' and Hastings' failure to follow-up on Rondini's statements – most notably that she was "held down" by Bunn – made it impossible for them to assess whether in fact Rondini earnestly resisted her attacker.  As discussed above, Jones simply did not properly follow-up on those facts that could have led to a charge that Rondini resisted Bunn and/or was too incapacitated to consent to sexual contact.  Similarly, Jones and Hastings failure to even attempt to learn what happened while Rondini was blacked out made it impossible to determine whether Rondini was legally incapacitated at the time of the alleged assault.

Next, the second fundamental challenge is that most victims only report their sexual assault to law enforcement after a delay of some kind.  An experienced investigator would have understood that delays in reporting do not undermine a victim's credibility – and, indeed, the delay here was not a long one.  Nonetheless, one of Jones' questions was to ask Rondini "why"

didn't she immediately call "911."   Asking the question this way makes it sound like Rondini

has done something "wrong" by not calling 911 and, as discussed above, likely made her feel

that Jones did not believe her.  More than that, it shows that Jones misunderstood the immediate

actions Rondini took to extricate herself from Bunn's home.  First, it ignores the fact that

Rondini had been isolated by Bunn, by taking her to his residence. Rondini did not know the

address of Bunn's residence, so she would not have been able to give law enforcement the

address of her location.  And it ignores that Rondini contacted at least 12 friends seeking help

immediately after the alleged assault, and told the two women who came to assist her that she

had been sexually assaulted.  Jones' failure to address the ways in which Rondini did try to

report her assault failed to successfully address the complexity of the rape allegation.

Finally, Jones' strategy failed to address the third fundamental challenge, *i.e.* that most

victims provide some information in their interview that is incomplete, inconsistent, or even

untrue.  Rather than understand this and try to ask trauma- induced questions that might lead to

the truth of these inconsistencies, Jones either failed to follow up or used these inconsistencies as

tools to disbelieve Rondini.

Jones and Hastings failed to properly interview Rondini as the victim of a crime and,

instead, without allowing her to sleep, eat or bathe after an alleged sexual assault, treated her as a

criminal.  This hopelessly compromised the investigation.

6.   Bunn's Interrogation

The way in which Jones and Hasting conducted Bunn's interrogation was also a gross

departure from best practices.  There are two aspects of every investigation and that is "solving"

and "proving" a criminal case. The case was solved because Hastings knew Bunn was the

suspect. Hastings should have directed his interrogation down the path of proving Rondini's

allegations. If, after a proper interrogation, Hastings was able to "prove" a sexual assault did not

occur, then Bunn would have been exonerated. Hastings did not properly interrogate Bunn.  On

the contrary, not one ounce of new information came out of the interrogation other than Hastings

learning that Bunn enjoyed his fishing trip.  This is a serious departure from what Hasting should

have been doing.

Initially, as referenced above, Jones and Hastings knowingly allowed Bunn to go fishing

with his attorney before requiring that he be interviewed.  This is simply unheard of in any

serious police investigation.  Accordingly, when Bunn was interviewed on July 6, he had had not

only the benefit of time, but also of extended legal guidance, in preparing his story.  By allowing

Bunn to leave town to go fishing, Jones exhibited favoritism.  It would be natural for someone to

think Bunn was handled in a special way.

In addition, I note that this interview of Jones was conducted by Hastings.  There is no

record that Jones ever spoke to Bunn after the morning of the alleged assault and, indeed, Jones

testified as such at his deposition in the wrongful death action. This is a major mistake. Jones is

the "lead investigator" and should know all aspects of the investigation.

Hastings' bias in favor of Bunn is on full display during the interview and it hopelessly

compromises the investigation.  He starts off by being chatty and conversational with Bunn,

asking him details about his recent fishing trip.  At no time does he give off the impression that

he does not believe Bunn, or that he suspects Bunn of having done anything wrong.  Indeed, he

asks Bunn leading questions that help establish the narrative that Bunn did nothing wrong, and

offers Bunn assistance in answering when he stumbles.

A particularly egregious example of this assistance occurs when Hastings brings up the

lie Bunn told on the morning of the alleged assault.  Rather than pushing Bunn to explain himself

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

and own up to the lie, Hasting helps Bunn rationalize his falsehoods.  Here is the exchange:

> HASTINGS: So after you had sex y'all end up falling asleep, you end up falling asleep?
>
> MR. BUNN: I apparently fell asleep.
>
> OFFICER: What do you remember next?
>
> MR. BUNN: You ringing my doorbell.
>
> HASTINGS: Okay. Okay. Do you remember anybody going in and out of a window in your house? Did you know a window was open?
>
> MR. BUNN: (Shaking head).
>
> HASTINGS: At what point did you realize -- you knew you had somebody there, right? You knew you had a female there? I know we talked to you –
>
> MR. BUNN: Once I had time -- I am not going -- you know, of course when you -- when you all rung the door and then thinking the worst, I really wasn't thinking about that, but once y'all were there for a few minutes and I got time to kind of collect my thoughts, yes.
>
> HASTINGS: So, because this is – you know, this is something that I have to ask the question because it has to be asked, but initially we asked did you have anybody there and your response was no, why?
>
> MR. BUNN: At that time, to be honest with you, I didn't recall.
>
> HASTINGS: Okay. Still trying to –
>
> MR. BUNN: Still trying to, you know –
>
> HASTINGS: Scared?
>
> Mr. BUNN: Of course, yeah, sure.
>
> HASTINGS: Okay.
>
> MR. BUNN: Sure was.
>
> HASTINGS: You know, you collect your thoughts –
>
> MR. BUNN: Still scared.
>
> HASTINGS: Right. Right. You end up collecting your thoughts and coming around and that is when you remember that you had her over there?
>
> MR. BUNN: Right.

This assistance the police provide to Bunn is simply astonishing.  I understand that Hastings suggested that his manner in questing Bunn was a tactic designed to elicit the truth. But if it was, it was unlike any interrogation I have ever seen in my 32 years of law enforcement.  And

notably, it is unlike the demeanor Jones and Hastings used when questioning Rondini. They were quick to criticize and cross-examine Rondini but never once ask anything other than helpful questions of Bunn.

Hastings also provides a different kind of leeway by accepting Bunn's statements as the truth, never pushing back on Bunn's version of events. Most egregiously, Hastings never challenges Bunn's assertion that he and Rondini had consensual sex. Hastings never pursues any line of questioning aimed at establishing *why* Bunn thought Rondini had consented to sexual contact. Consent to sexual contact is rarely telegraphed as a direct "yes" or "no"—rather, it is communicated through indirect statements, body language and physical actions. Hastings never explored what Rondini and Bunn discussed before Bunn initiated sexual contact—if he had, he would have had Bunn's response to the fact that Rondini stated several times that she needed to leave to meet up with her friends. Hastings also failed to ask about Rondini's body language immediately before the sexual encounter—if he had, he would have learned that Bunn saw Rondini sitting on a chair and not on Bunn's bed and that she was fully clothed when he entered the bedroom. Hastings should also have asked Bunn to explain his statement that the only sexual intercourse he had with Rondini involved her being on top of him, as this did not match Rondini's account that Bunn placed her on her side and penetrated her from behind. None of these questions that could have been used to determine the presence or absence of consent were asked of Bunn.

Hastings clearly accepts Bunn's version of events. But there was nothing in the investigation that supported Hastings' belief in Bunn's credibility. Bunn's background was not investigated, beyond the fact that the investigators seem to know something about his family's status in the community. Jones and Hastings should have looked into Bunn's past. Hastings

should have conducted interviews with people at the pub, both staff and customers. Maybe Bunn has done something similar in the past.   The investigators should have located and interviewed Bunn's high school, and college friends, ex-girlfriend(s), ex-wife(s), friend(s), ex-friend(s), neighbors, and co-worker(s). They should have learned Bunn's sexual experiences. Any one of these people could have discredited or exonerated Bunn.

A particularly disturbing aspect of this interrogation is the discussion between Hastings and Bunn about the fact that Bunn will not pursue charges against Rondini if she drops the charges against him. This is a deeply problematic exchange.  First of all, how does Bunn know that there are any charges to pursue?  The likeliest explanation is that there had been some discussion between Bunn or his attorney and the police.   Second of all, charges are pursued by law enforcement not by victims. This is not a civil matter. Hastings treats it as one. In particular, at the end of the interrogation there is a very troubling exchange between Hastings and Bunn's attorney:

> ATTORNEY: I know there is any number of things that could come, we just want this to be over with.

> OFFICER: I understand, and, you know, we are still kind of waiting to hear back from her. I mean, obviously, you know, we have got a couple issues we are dealing with here. We have got the vehicle broken into, we have got money stolen, cards stolen, now possibly even the possibility of a round that struck an occupied  residence, so there is a couple things there we are dealing with on that end of things with her, just kind of waiting to see what --how far she is going to push this.

This exchange makes it appear that Hastings is working with Bunn to get Rondini to not

pursue the charges against Bunn by threatening her with the charge of theft.  This is not the role

of law enforcement and is deeply troubling.  In one sentence, Hastings betrays the fact that law

enforcement never believed Rondini and were working to clear Bunn of wrongdoing.  This is

simply wrong.

### 7.     Failure to Document and Create Timeline

Finally, the investigators failed to keep sufficient record of the investigation.  Most

investigations are confusing, especially at the beginning. It does not become any easier when

persons involved are intoxicated due to alcohol or under the influence of narcotics. However, it

is vital for investigators to begin to ascertain the sequence of events, and which key persons were

involved in which events.  In circumstances where one or more parties have clouded and

unreliable memories for part or all of the key period, it is also important to determine when their

memories started to become unreliable.  Accordingly, it is a standard investigatory practice to

create a timeline of the incident.  Jones and Hastings entirely failed to create such a timeline or to

otherwise synthesize the information that they gathered in any format.  While they documented

that they had conducted interviews and collected evidence, they never presented any of the

conclusions they derived from their investigatory work.  This is entirely improper.

## **CONCLUSION:**

Jones and Hastings failed to complete a thorough, accurate, factual, and detailed

investigation.  Significantly, as described above they (1) failed to meaningfully interview Bunn

and allowed him to go fishing; (2) failed to issue a full search warrant and allowed Bunn to

compromise the crime scene; (3) failed to let Megan rest and relax before interviewing her; (4)

failed to properly interview Rondini; and (5) treated Rondini like a suspect on the same day she

reported the alleged assault.  Each one of these failures alone compromised the

**Jones v. BuzzFeed**
**Case NO.: et al, 19-cv-00403-RDP (ND. Ala 2019)**

investigation.  Together they constituted an egregious and gross departure from effective

investigative techniques.  We will, as a result, never know what really happened between

Rondini and Bunn.



**Signed:**_____

Detective **Carlton R. Hershman** (Ret.)

San Diego Police Department

Sexual Assault Training & Consulting

Cell: (858) 349-7908

Email: crhershman@gmail.com

Date of report:  **August 19, 2020**