FILED

2021 Oct-21  PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 9

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CASE NUMBER
7:19-cv-00403-RDP

ADAM JONES and JOSHUA HASTINGS,

    Plaintiff(s),

vs.

BUZZFEED, INC., BUZZFEED NEWS, BEN SMITH,
and KATIE J.M. BAKER,

    Defendant(s).

VIDEO AND ZOOM DEPOSITION TESTIMONY OF:
CARLTON R. HERSHMAN, JR.

MARCH 16, 2021
10:01 a.m.
COURT REPORTER:
NANCY W. PANNELL, CCR
The reading and signing of this deposition
has NOT been waived

## Page 2

1    CARLTON R. HERSHMAN, JR.
2    INSTRUCTIONS TO THE WITNESS
3
4        Please read your deposition
5  over carefully before you sign it.  You
6  should make all your changes on the
7  attached errata sheet.
8        After making any changes
9  which you have noted on the attached
10  errata sheet, sign your name on the
11  Deponent's Certificate and date it.  You
12  are signing it subject to the changes you
13  have made on the errata sheet, which will
14  be attached to the deposition.
15        Return the attached errata
16  sheet and Deponent's Certificate to
17  Birmingham Reporting, 3710 4th Avenue
18  South, Birmingham, Alabama 35222.
19        According to the Rules of
20  Civil Procedure, you will have thirty (30)
21  days from the date you receive this
22  deposition in which to read it, sign it,
23  and return the errata sheet and Deponent's

## Page 3

1    Certificate to the above office.  If you
2  fail to do so, you automatically waive
3  your right to make any corrections to your
4  deposition.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## Page 4

1    ERRATA SHEET
2  PAGE  LINE  EXPLANATION
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23

Carlton Hershman                                              3/16/2021

Page 5

1    DEPONENT'S CERTIFICATE
2
3         I, CARLTON R. HERSHMAN, the
4    witness herein, have read the transcript
5    of my testimony and the same is true and
6    correct, to the best of my knowledge.  Any
7    corrections and/or additions, if any, are
8    listed separately.
9
10   _____
11        CARLTON R. HERSHMAN, JR.
12
13   _____
14   DATE
15
16        Sworn to and subscribed
17   before me, this the _____ day of
18   _____, 2021, to certify my hand
19   and seal of office.
20
21
22   _____
               NOTARY PUBLIC
23

Page 6

1         S T I P U L A T I O N
2         IT IS STIPULATED AND AGREED
3    by and between the parties through their
4    respective counsel that the VIDEO AND ZOOM
5    DEPOSITION of CARLTON R. HERSHMAN, JR.,
6    may be taken before Nancy W. Pannell,
7    Certified Shorthand Reporter and Notary
8    Public, State at Large, at the Birmingham
9    Reporting Service WorkSouth Tuscaloosa
10   office, 1490 Northbank Parkway,
11   Tuscaloosa, Alabama 35406, on MARCH 16,
12   2021, commencing at approximately 10:01
13   a.m.
14        IT IS FURTHER STIPULATED AND
15   AGREED that the signature to and the
16   reading of the deposition by the witness
17   IS NOT waived, the deposition to have the
18   same force and effect as if full
19   compliance had been had with all laws and
20   rules of Court relating to the taking of
21   depositions.
22        IT IS FURTHER STIPULATED AND
23   AGREED that it shall not be necessary for

Page 7

1    any objections to be made by counsel to
2    any questions, except as to form or
3    leading questions, and that counsel for
4    the parties may make objections and assign
5    grounds at the time of trial or at the
6    time said deposition is offered in
7    evidence, or prior thereto.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1              I N D E X
2
3    EXAMINATION BY:            PAGE NO.
4    MR. RITCHEY               13
5    CERTIFICATE               289
6
7
8         INDEX OF EXHIBITS
9
10   PLAINTIFF'S EXHIBITS:       PAGE NO.
11   117  Hershman CV            29
12   118  Hershman Expert Report    98
13   119  BuzzFeed 4167          218
14
15
16
17
18
19
20
21
22
23

2  (Pages 5 to 8)

Carlton Hershman                                          3/16/2021

Page 9

1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFF(S): @Birmingham
4   Reporting WorkSouth Tuscaloosa office
5        MR. BOBBY H. COCKRELL, JR.
6        MR. G. SCOTCH RITCHEY, JR.
7        COCKRELL, COCKRELL, TOWNSEND &
8        RITCHEY, LLP
9        1409 UNIVERSITY BOULEVARD
10       TUSCALOOSA, ALABAMA 35401
11
12  FOR THE DEFENDANT(S): (Via Zoom)
13       MS. KATHERINE M. BOLGER
14       DAVIS, WRIGHT, TREMAINE, LLP
15       1251 AVENUE OF THE AMERICAS
16       21ST FLOOR
17       NEW YORK, NEW YORK, 10020-1104
18
19       MR. JOHN G. "JT" THOMPSON (Via Zoom)
20       LIGHTFOOT FRANKLIN & WHITE
21       400 NORTH 20TH STREET
22       THE CLARK BUILDING
23       BIRMINGHAM, ALABAMA, 35203

Page 10

1
2        ALSO PRESENT:
3            Nancy Pannell, court reporter,
4            @WorkSouth Tuscaloosa
5            Trevor Webster, Zoom Host
6            @Birmingham Reporting
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 11

1        I, Nancy W. Pannell, a
2   Certified Shorthand Reporter of
3   Birmingham, Alabama, and a Notary Public
4   for the State of Alabama at Large, acting
5   as Commissioner, certify that on this
6   date, pursuant to the Federal Rules of
7   Civil Procedure and the foregoing
8   stipulation of counsel, there came before
9   me at the offices of Birmingham Reporting
10  Service WorkSouth Tuscaloosa office, 1490
11  Northbank Parkway, Tuscaloosa, Alabama,
12  commencing at approximately 10:01 a.m. on
13  MARCH 16, 2021, CARLTON R. HERSHMAN, JR.,
14  witness in the above cause, for oral
15  examination, whereupon the following
16  proceedings were had:
17
18
19       VIDEOGRAPHER:  We are now on
20  the record.  This is the video deposition
21  of Carlton Hershman, in the matter of Adam
22  Jones, et al., versus BuzzFeed, Inc., et
23  al., Case Number 7:19-CV-00403-RDP in the

Page 12

1   United States District Court for the
2   Northern District of Alabama, Western
3   Division.
4            Today's date is March 16,
5   2021 and the time is 10:01 a.m.  Would
6   counsel introduce yourself into the
7   record, after which time the court
8   reporter will swear in the witness.
9            MR. RITCHEY:  Scotch Ritchey
10  for the plaintiffs.
11           MR. COCKRELL:  Bob Cockrell
12  for the plaintiffs.
13           MS. BOLGER:  Kate Bolger on
14  behalf of the defendants and the witness,
15  and with me is my co-counsel JT Thompson.
16           CARLTON R. HERSHMAN, JR.,
17  being first duly sworn, was examined and
18  testified as follows:
19           COURT REPORTER:  Thank you.
20  And will this be usual stipulations?
21           MR. RITCHEY:  That's fine.
22           MS. BOLGER:  We would like
23  to read this one.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                          3/16/2021

---

Page 13

1      EXAMINATION
2  BY MR. RITCHEY:
3  Q.    Will you please state your name
4  for the record?
5  A.    Carlton Ray Hershman, Jr.
6  Q.    Mr. Hershman, I'm Scotch Ritchey,
7  and I'm representing the plaintiffs in
8  this case and I appreciate you sitting
9  down for this deposition and I'll just be
10  asking a few questions.
11      I'll go over just a few ground
12  rules for the deposition.  If you need a
13  break, just let us know, we'll be happy to
14  let you take a break.
15      Since this is over Zoom, we may
16  have some lag or disconnect over this
17  deposition so if you don't hear a
18  question, let me know or if it breaks up,
19  let me know, I'll be happy to repeat it.
20      If you don't understand a question
21  I ask, please ask me for clarification
22  I'll be happy to do so.  And, again, since
23  this is over Zoom, if you would give me a

---

Page 14

1  second to complete my question and I'll
2  give you some time to answer as well.
3      This will just allow the court
4  reporter to get everything down and have
5  that clean record.
6      And also if you'll give audible
7  answers, yes or no, that will be great
8  just to get that clean record again.  And
9  if I say is that a yes or is that a no,
10  I'm not trying to get on to you, just
11  trying to get that record clear.
12      But if you answer, then we'll
13  assume that you heard and understood the
14  question; is that fair?
15      MS. BOLGER:  I object to
16  that instruction, but you can answer it.
17  A.    That's fair.
18  Q.    (By Mr. Ritchey) Are there any
19  reasons why you cannot answer truthfully
20  and fully today?
21  A.    No.
22  Q.    Is there anything that would
23  interfere with you answering questions

---

Page 15

1  today?
2  A.    No.
3  Q.    Have you ever given a deposition
4  before?
5  A.    Yes.
6  Q.    How many times?
7  A.    I would probably say around 20 or
8  so.
9  Q.    Were all of those in criminal
10  trials or were those in civil trials as
11  well, or civil cases?
12  A.    Those were all criminal, except
13  for I want to say two.
14  Q.    And what were those two civil
15  cases where you gave a deposition?
16  A.    One was a case involving a female
17  who had been a victim of a masseuse, where
18  as she had gone in for a massage and was
19  digitally penetrated by the masseuse with
20  his finger.
21      And my portion of that was to
22  speak as an expert and also to speak with
23  -- to take the victim and witness

---

Page 16

1  statements and also spoke with the suspect
2  where he confessed to it.  And this
3  masseuse worked at a hotel.
4  Q.    Did you investigate that crime?
5  A.    No, I did not.
6  Q.    Do you remember when this case
7  was?
8  A.    I want to say my portion of it was
9  2018, 2018.
10  Q.    Okay.  Do you remember what court
11  that was in?
12  A.    I'm sorry, I do not.  It was here
13  in San Diego.
14  Q.    San Diego.  Do you remember the
15  plaintiffs or defendant's name in that
16  case?
17  A.    I do not.  I can get it for you.
18  They were -- he's from Europe so he had
19  like a Slovakian last name.
20  Q.    Were you hired by the plaintiff in
21  that case?
22  A.    I was.
23  Q.    Do you remember if you had any

---

Page 17

1    contact with the plaintiff's attorney in
2    that case?
3    A.    Yes, I did.
4    Q.    Do you remember his or her name?
5    A.    Daniel Gilliland.
6    Q.    Did you write a report, an expert
7    report for that case?
8    A.    I did not.
9    Q.    Did that case go to trial?
10   A.    No, it did not.
11   Q.    Do you remember what you said at
12   the deposition just in general?
13   A.    Because I had interviewed the
14   victim, that deposition was more or less
15   what she had told me.
16        The only thing that I prepared for
17   that was her victim's -- or a statement
18   from her.  And also when I interviewed
19   him, obviously the confession.
20        So I didn't do an expert report.
21   The only reports that I did was their
22   statements to me and they were both
23   recorded anyway, but I typed one out.

Page 18

1    Q.    Do you know if that case was
2    settled?
3    A.    I don't know.
4    Q.    Did the plaintiff pay you for your
5    testimony?
6    A.    Yes.
7    Q.    All right.  And then what about
8    the second one you mentioned?
9    A.    The second one was a female who
10   was being stalked by an ex-boyfriend who
11   lived in Florida and she lived here in San
12   Diego.
13        He flew out here to San Diego and
14   over a three-day period that they were
15   together there was some domestic violence
16   going on.  And the last day of that
17   domestic violence he ends up sexually
18   assaulting her.
19        I'm sorry, it was an attempted
20   sexual assault.  She was able to --
21   somebody knocked on the door or banged on
22   the wall, I can't remember now, he stopped
23   his attack and then left.

Page 19

1         So she ended up civilly suing him
2    for his actions.
3    Q.    And do you know when that was case
4    was?
5    A.    I believe that was 2018 as well.
6    Could have been the early portion of 2019
7    that it was -- that I testified.
8    Q.    Okay.  Do you remember the
9    plaintiff or defendant's name in that
10   case?
11   A.    I do not.
12        THE WITNESS:  Can I check
13   something in my report?  I might have it
14   in that, in the front.
15        MS. BOLGER:  That's all
16   right, Carl.  You don't need to do that.
17        THE WITNESS:  Okay.
18   Q.    (By Mr. Ritchey) Were you hired by
19   the plaintiff in that case?
20   A.    I was.
21   Q.    Did you write an expert report in
22   that case?
23   A.    I believe I did.

Page 20

1    Q.    Do you still have a copy of that
2    expert report?
3    A.    I probably do, yes.
4    Q.    Okay.  Would you mind producing
5    that to us?
6         MS. BOLGER:  I'll take it
7    under advisement.
8         THE WITNESS:  Yes.
9         MS. BOLGER:  I'll take it
10   under advisement.  We'll get back to you
11   about that.
12   Q.    (By Mr. Ritchey) Okay.
13        Did you have any contact with the
14   plaintiff's attorney?
15   A.    Yes.
16   Q.    And who was that contact?
17   A.    It was his first name is Samuel,
18   and I'm trying to remember his last name.
19   I can't remember right now.  It will come
20   to me.
21   Q.    That's all right.
22        Do you remember what firm he
23   worked for?

Carlton Hershman                                            3/16/2021

Page 21

1   A.   It's his firm, so.
2   Q.   Okay.  And was that case in San
3   Diego, too?
4   A.   It was.
5   Q.   Do you remember what court that
6   was in?
7   A.   I do not.  I can't remember.
8   Q.   And in general what was your
9   expert report concerning?
10  A.   Just how she did not report her
11  assault to the police right away, that not
12  all stalking victims report that they're
13  being stalked, so the delayed reporting.
14       There was some behavioral evidence
15  such as her continuing to stay in contact
16  with him.  So along those lines.
17  Q.   Okay.
18  A.   Basically victim behavior.
19  Q.   Did your testimony in that case
20  fall along those same lines?
21  A.   It did.
22  Q.   Did the plaintiff pay you for that
23  testimony?

Page 22

1   A.   Yes.
2   Q.   Do you know if that case went to
3   trial?
4   A.   I don't know.
5   Q.   Do you know the outcome of that
6   case?
7   A.   I don't know.  I usually don't
8   follow up with stuff like that.
9   Q.   Are there any other civil cases
10  where you were hired as an expert witness?
11  A.   Yes, there was one other one.
12  Q.   Okay.  What was that one about?
13  A.   That was a college student who had
14  gotten severely intoxicated and she became
15  blacked out and later passed out.
16       She was in her own dorm room with
17  her roommate and there were two males that
18  were visiting, and during the night they
19  were playing drinking games which included
20  taking shots of alcohol.
21       And she becomes at one point
22  blacked out and there's several things
23  that happened that she didn't remember in

Page 23

1   the living room and then she passed out in
2   the living room.
3        She ended up waking up and she was
4   in her own bedroom with one of the males
5   having active intercourse with her.
6        She jumps up and runs out of her
7   dorm room into the street across this
8   little open field, short field, into a
9   parking lot where a school safety officer
10  found her along with her roommate who ran
11  after her.
12       And they end up -- ended up
13  determining they didn't think a sexual
14  assault occurred.  They did take her to
15  the hospital to get tested.
16       They drove the suspect home to his
17  apartment five miles away.  And the
18  follow-up with the school's side of it was
19  inadequate and violated their MOU and San
20  Diego Police Department was eventually
21  called came in and worked the case.
22  Q.   Were you involved in any of the
23  investigation of that case?

Page 24

1   A.   I was not.
2   Q.   You said MOU.  What is that?
3   A.   Memorandum of understanding.
4   Q.   And what is that?
5   A.   It's kind of like the SOP.
6   Q.   And that would be for the school?
7   A.   I'm sorry, say again.
8   Q.   And you said it was like an SOP?
9   A.   Kind of.  It was an understanding
10  between the school and the San Diego
11  Police Department.
12       So the way it's written is the
13  school they were sworn officers but they
14  did not have detectives, and any violent
15  crime such as sexual assaults, assault and
16  battery with injury, DUI with injury,
17  homicide, any of those type of felonious
18  assaults the school will immediately call
19  the San Diego Police Department and they
20  would come in, their detective would come
21  in and take over the case, which in that
22  case was not done immediately.
23  Q.   What school was that?

Carlton Hershman                                            3/16/2021

Page 25

1   A.    That was the University of San
2   Diego.  Not San Diego State.  Everybody
3   messes that up.
4        University of San Diego.  It's a
5   private school.
6   Q.    Okay.  Do you remember the
7   plaintiffs or defendants' names in that
8   case?
9   A.    No, I do not.  I never spoke with
10  any of them.
11  Q.    Okay.  Did they sue the
12  university?  Did the plaintiffs sue the
13  university?
14  A.    They did.
15  Q.    Were you hired by the plaintiffs
16  in that case?
17  A.    I was.
18  Q.    Did you write an expert report in
19  that case?
20  A.    Yes, I did.
21  Q.    Do you still have a copy of that?
22  A.    I do.
23  Q.    Do you mind producing that?

Page 26

1        MS. BOLGER:  I'll answer
2   that, which is that we'll take that under
3   advisement and get back to you.
4   Q.    (By Mr. Ritchey) And what was the
5   general line of your expert report?
6        MS. BOLGER:  Object to the
7   form.
8        You can answer, Carl.
9   A.    In that case?
10  Q.    (By Mr. Ritchey) Right, in that
11  case.
12  A.    In the San Diego case?
13       That the officers did not follow
14  their standard operating procedures and
15  how their actions hindered the case.
16       That case ended up going to the
17  district attorney's office, but because of
18  some failures on their part it was not
19  issued for -- charges were not issued.
20  Q.    Did you give a deposition in that
21  case?
22  A.    I did.
23  Q.    Is your deposition along the same

Page 27

1   lines as your expert report?
2   A.    Yes, sir.
3   Q.    Did the plaintiff pay for your
4   testimony?
5   A.    Yes.
6   Q.    Did you have contact with the
7   plaintiff's attorney in that case?
8   A.    Yes.
9   Q.    Do you remember who that attorney
10  was?
11  A.    Yes, her name was Carla Mara.  I
12  think it's M-a-r-a, Mara.
13  Q.    Do you know who the defendant's
14  attorney was?
15  A.    I do not.  There were several.
16  There's a law firm downtown.  I cannot
17  remember their law firm.
18  Q.    Okay.  Do you remember who Carla
19  worked for or what firm she was with?
20  A.    She has her own firm.  I don't
21  remember the attorney's name, but her last
22  name is Bus.
23  Q.    Bus, B-u-s?

Page 28

1   A.    That was for -- B-u-s.  That was
2   for the law firm for the school.
3   Q.    Okay.  Do you know what the
4   outcome of that case was?
5   A.    I don't.
6   Q.    And you don't know if it went to
7   trial or not?
8   A.    I don't know.
9   Q.    Since this is over Zoom, I'm going
10  to be offering a few documents, and I can
11  -- what I can do is I'm going to share
12  them on my screen.
13       Most of the time I can't fit the
14  full document on my screen, and I'll put
15  it up there and if you need me to scroll
16  down to review it, just let me know and
17  I'll be happy to do so.
18  A.    Sure.
19       MS. BOLGER:  And, Carl, you
20  should do that.  You want to ask to look
21  at the whole the document.
22  Q.    (By Mr. Ritchey) It's usually
23  easier in person, but we get to deal with

7 (Pages 25 to 28)

Carlton Hershman                                           3/16/2021

Page 29

1    the new world of Coronavirus and this is
2    how we get to do it.
3    A.    Maybe things will open up here
4    shortly.
5    Q.    I hope so.
6          MS. BOLGER:  This is the
7    only time in my professional life I've
8    attended so many depositions without my
9    shoes on.
10   Q.    (By Mr. Ritchey) All right.
11   Mr. Hershman, I'm showing you what's been
12   produced to us as your CV and we'll mark
13   this as Exhibit 117.
14         (Whereupon, a document was marked
15          as Plaintiff's Exhibit No. 117 and
16          is attached to the original
17          transcript.)
18   Q.    Do you need to review it further
19   or are you okay?
20   A.    Oh, no, I'm sorry.  I was waiting
21   for you.
22   Q.    Okay.  Just tell me when you're
23   ready and I can scroll.

Page 30

1    A.    Yeah, I'm good.  You can scroll.
2    You can keep going.  You can keep going.
3    You can keep going.
4          MS. BOLGER:  Scotch, on this
5    one if you have a particular page or
6    question, I'm sure you can direct him to
7    it because I'm sure he knows this one.
8          MR. RITCHEY:  I can do that,
9    too.
10   A.    I'm familiar with the document.
11   Q.    Let me just ask you questions and
12   I'll direct you kind of where it is in the
13   document, if you're good with that.
14         We'll go down to page 6 of
15   Exhibit 117.  And towards the bottom you
16   have testified in San Diego County Court
17   System as an expert in sex crimes
18   investigations and victimology, slash,
19   behavior evidence.
20         Do you see where I am?
21   A.    Yes.
22   Q.    What is victimology, slash,
23   behavior evidence?

Page 31

1    A.    So victimology is the study of
2    victims, and in my case it's the study of
3    victims of sexual assault.
4          As to -- you know, which leads
5    into behavioral evidence as to why victims
6    do certain things, delayed report, maybe
7    drive their -- drive the suspect to an ATM
8    to get gas money, this is after their
9    assault, maybe having prior sexual
10   assaults with the same suspect but
11   continue to see that person.
12         And so I get called in, and also
13   in my own case and in other cases where
14   victims do odd things or do things that
15   doesn't make sense to the rest of us who
16   were not in that situation and who had not
17   been a victim of a sexual assault.
18         So I will testify to usually the
19   delayed reporting is kind of a big thing
20   and also why they would continually say
21   have contact with somebody who sexually
22   assaulted them.
23   Q.    Where did you learn, you know, the

Page 32

1    aspects of victimology and behavior
2    evidence?
3    A.    The fifth floor of the HQ
4    downtown, sex crimes unit.
5    Q.    Okay.  What do you mean by that?
6    A.    It's just my experience that I've
7    had some training in it, but over a period
8    of time I noticed -- my first few cases
9    that I was assigned to it didn't make
10   sense to me.
11         But over a period of time, very
12   short period of time, I noticed that all
13   of these victims were doing the same
14   things.
15         It couldn't be a coincidence, so I
16   knew there had to be something to it.  So
17   I just started digging into that and
18   figured out what was going on as far as my
19   victims.
20   Q.    What do you mean you digged into
21   it?
22   A.    I just started keeping track of
23   how many victims delayed report, how many,

8  (Pages 29 to 32)

Carlton Hershman                                    3/16/2021

Page 33

1    you know, would tell me a couple of white
2    lies, if you will, about how much maybe
3    they had to drink or, you know, what drugs
4    they did or didn't take.
5         And I just kind of noticed this
6    pattern of my victims basically telling me
7    the same thing.
8    Q.    Okay.
9    A.    So I just kind of kept a running
10   list of it.
11   Q.    And you said you did this while
12   you were in the sex crimes unit at San
13   Diego Police Department?
14   A.    Yes, I did.
15   Q.    Did anyone tell you to do this?
16   A.    No.
17   Q.    Were you trained in any way to
18   keep track of these types of things you
19   saw with victims?
20   A.    No.
21   Q.    Did you receive any training in
22   victimology or behavior evidence while you
23   were in the sex crimes unit?

Page 34

1    A.    No, just by experience.  I end up
2    now I train on it.  Now I instruct, so I
3    teach the same subject.
4    Q.    So just based on your on-the-job
5    experience and training, that's where you
6    learned how to do this type of victimology
7    and behavior evidence tracking; is that
8    right?
9    A.    That is correct.
10   Q.    And this line of your CV are these
11   all criminal cases you're referring to or
12   are there civil cases as well?
13   A.    The majority of those were
14   criminal cases.  I think I list one on my
15   report where I in the last four years
16   testified in courts that a case that was
17   not mine and that was for the city
18   attorney's office.
19   Q.    Was that a criminal investigation
20   case?
21   A.    Yes, sir.
22   Q.    Have we talked about all the cases
23   which you've given expert opinion in civil

Page 35

1    cases?
2    A.    Civil cases?  No, there's one
3    other that's also in my report.
4         I testified in a hearing with a
5    judge that was a police officer here in
6    San Diego who was a sheriff deputy, and he
7    was groping women during his regular
8    calls.
9         And we ended up with I think 23
10   victims altogether.  21 of them I spoke to
11   and took their statements.  That was a
12   civil case.  That was a hearing also on
13   the victimology and the delayed reporting.
14   Q.    Is your knowledge of victimology
15   and behavior evidence based on any
16   scientific studies or research?
17   A.    Well, that of my own, and also now
18   that, you know, years later I noticed that
19   other people were, you know, talking about
20   it, they may have been talking about it
21   prior to that, but now there's other
22   studies and research out there.
23   Q.    Okay.  Did you have any -- what

Page 36

1    kind of research did you conduct on these
2    topics or subjects?
3    A.    Just comparing one victim to
4    another in my caseload --
5    Q.    Was any of this research -- I'm
6    sorry, go ahead.
7    A.    I was just going to say that's
8    about it.  I just -- I mean there's
9    nothing fancy, but I just kind of kept a
10   running tab of how many delayed and the
11   length of the delay and what type of
12   sexual assault that it was.  Kind of the
13   simple stuff.
14   Q.    Was any of your research
15   peer-reviewed or published?
16   A.    No, it was not published or
17   peer-reviewed.  I was a keynote speaker on
18   this same subject back in 2015 -- it was
19   either 20 -- maybe it was 2016 down in
20   Orlando, Florida.
21   Q.    Okay.  Do you know who came up
22   with the term victimology?
23        MS. BOLGER:  I'm just going

9 (Pages 33 to 36)

Carlton Hershman                                          3/16/2021

Page 37

1    to object.  You're welcome to conduct your
2    deposition however you want, but we're not
3    offering Mr. Hershman as an expert on
4    victimology or behavior evidence, so this
5    is totally irrelevant to the purpose he's
6    here for today.
7          So I guess you can ask the
8    questions, but I just want you to know
9    this has nothing to do with the price of
10   tea in China, but you can ask what you
11   want; you're just wasting time.
12         Carl, you can answer.
13   A.    The term victimology has been
14   around a long time.  I think back in the
15   '50s and '60s it was the coined around
16   that timeframe, if I remember right.
17   Q.    (By Mr. Ritchey) Okay.  What about
18   behavior evidence?
19         MS. BOLGER:  Same objection.
20   A.    That term has been around not as
21   long, but I did not coin it.
22         I've read it somewhere, why
23   certain people don't call 911 after

Page 38

1    they've been shot or raped.  And I believe
2    it was in an article, if I remember right,
3    but it's been so long I can't remember.
4    Q.    All right.  On page 2 through 6 of
5    your CV you've listed all of your
6    instructor courses; is that correct?
7    A.    Yes, sir.
8    Q.    Did you ever instruct any of these
9    courses in Alabama?
10   A.    I don't think so.  The closest I
11   got was Louisiana.
12   Q.    All right.  On page 3 in September
13   of 2004 looks like you taught a course at
14   San Diego State University entitled Rape
15   by Intoxication.
16         Am I understanding that correctly?
17   A.    Yes.
18   Q.    What was taught in that course?
19   A.    So the frat matters -- frat
20   manners, I'm sorry, came out of an
21   incident, a couple of incidents of rape by
22   intoxication.
23         And the school was going through

Page 39

1    hearings to have some of these chapters to
2    be punished.
3          And I'm not a college person, so I
4    don't know how it works, but they were
5    going to be punished and maybe even lose
6    their charter.
7          And the school reached out to our
8    unit, being the sex crimes unit, and asked
9    us to come in and do some training as to
10   preventative -- to prevent sexual assault
11   by intoxication.
12         So myself and another person from
13   the office went in and taught that class.
14   It was, I don't know, about an hour and a
15   half.
16         We went over it along with these
17   frat guys, and I think part of their, you
18   know, punishment if you will is that they
19   had to do all these things to keep their
20   charter and one of them was to sit through
21   my training.
22   Q.    Okay.  Was this just one
23   fraternity you taught this to?

Page 40

1    A.    Well, no.  There were several
2    fraternities that were in this group that
3    was, for lack of a better word, in trouble
4    and they -- they had to come -- I think I
5    was in the cafeteria, if you will, and a
6    bunch of them came in to this hall or a
7    cafeteria where chairs were set up.
8          And I would say it was probably a
9    couple hundred people there, and it was
10   just for the frat -- frat guys.
11   Q.    Okay.  And you said you taught
12   them the law, I can't remember exactly how
13   you said it, but talked about the law
14   about sexual assault or something like
15   that?  Correct me if I'm wrong.
16         MS. BOLGER:  Object to the
17   form.  I'm not sure what the question is.
18         So, Carl, if you understand, you
19   can answer, but if you don't, just ask
20   Scotch to rephrase it.
21   A.    I understand it.
22         So we wanted them to understand
23   what consent was and what the law says

Carlton Hershman                                    3/16/2021

Page 41

1   stating that you cannot have sexual
2   contact with somebody who is severely
3   intoxicated or passed out and also under
4   age and females and such, so that's what I
5   meant by the law; what the penal code
6   says.
7   Q.    (By Mr. Ritchey) And is that
8   California law?
9   A.    Yes, sir.
10         MS. BOLGER:  At that seminar
11  in 2004 in San Diego; is that the
12  question, Scotch?
13         MR. RITCHEY:  Right.
14  Q.    Is that right, Mr. Hershman?
15  A.    Yes, yes.
16  Q.    On the same page 3, looks like in
17  March of 2009, you taught a course I guess
18  to the National Sexual Assault Institute
19  called Pursuing Justice Through Civil
20  Legal Remedies, Sexual Assault by
21  Intoxication, Credibility, and Consent.
22         Do you see where I am?
23  A.    Yes.

Page 42

1   Q.    What was that course about?
2   A.    Again, that was about sexual
3   assault, credibility and consent.
4         So the credibility portion of it
5   -- consent portion of it is obvious.  The
6   credibility issue of it was that a lot of
7   victims of sexual assaults are incorrectly
8   judged on their credibility because they
9   have done something before, during, or
10  after their assault that a lot of people
11  wouldn't agree with or even criminal.  So
12  that was that portion of it.
13         The civil remedies was a very
14  short talk on if the case is not adju --
15  well, it's adjudicated, but it does not go
16  and have charges issued; in other words,
17  it's a closed case, that your case could
18  go through the civil arena, and if that
19  happens, how would that work.
20  Q.    Was this also based off California
21  law, this course?
22  A.    I'm sorry, say that again.
23  Q.    Was this course also based off of

Page 43

1   California law?
2   A.    Yes, the consent portion of it
3   was, yes.
4   Q.    Okay.  What other law was it based
5   off of?
6         MS. BOLGER:  Sorry, we're
7   talking about this specific class 12 years
8   ago?
9         MR. RITCHEY:  Right.
10  A.    Yeah, I'm sorry, it wasn't a
11  course just about law.  It was more about
12  what you could do -- what happens when
13  your case, you know, if a civil attorney
14  contacts you.
15         I think I had half the room saying
16  they're not allowed to have any, you know,
17  I wouldn't give them anything, you know,
18  that type of thing.
19         In that class the consent portion
20  of it, the law was just it was stated.  It
21  wasn't a deep dig into what our consent
22  law is.
23         And the credibility is just what

Page 44

1   investigators usually, you know, screw up
2   on as far as they misjudge a victim
3   because of their -- because of their, you
4   know, behavioral -- you know, because of
5   their behavior.
6   Q.    Okay.  In April of 2009, looks
7   like you taught a course to End Violence
8   Against Women International entitled
9   Investigating Difficult Sexual Assault
10  Cases.
11         What was that about?
12  A.    Investigating difficult sexual
13  assault cases.
14         It's about, you know, approaching
15  cases that involve a victim who was
16  severely intoxicated and they have memory
17  loss or refractive memory or no memory at
18  all of what had occurred to her or him.
19         How to go through the
20  investigation from start to finish.
21  That's about it.
22  Q.    Did you come up with the procedure
23  of how to go through an investigation

11  (Pages 41 to 44)

Carlton Hershman                                    3/16/2021

Page 45

1    start to finish that you taught in this
2    course?
3         MS. BOLGER:  Object to the
4    form.  I don't remember him talking about
5    creating a procedure.
6         But I guess, Carl, if you
7    can answer that question, if it's clear,
8    you can answer it.
9    A.    The procedure itself there was
10   some things that I guess I came up with
11   but majority of it I was taught.
12   Q.    (By Mr. Ritchey) How were you
13   taught those procedures?
14   A.    My sergeant at the time which
15   ended up later becoming the founder of End
16   Violence Against Women, she's a very
17   notable -- noted person internationally on
18   this topic.
19   Q.    What's her name?
20   A.    Joanne Archambault.
21   Q.    Can you spell last name?
22   A.    Boy, I cannot.
23   Q.    Okay.  That's all right.

Page 46

1    A.    If you Google Joanne Archambault,
2    or End Violence Against Women, her name
3    comes up.
4    Q.    Okay.
5    A.    Don't tell her I couldn't spell
6    her name though.
7    Q.    I won't, I promise.
8    A.    I only worked for her for five
9    years.
10   Q.    Are all sexual assault cases
11   difficult to investigate?
12   A.    Yes.
13   Q.    And how so?
14   A.    Well, the number one thing that's
15   difficult is the consent hurdle.  It's the
16   number one defense in most sexual
17   assaults, but all sexual assaults there is
18   a component of consent statute.
19   Q.    What do you mean by the consent
20   hurdle?
21        MS. BOLGER:  Object to the
22   form.
23   A.    This is the only crime where

Page 47

1    consent is actually a defense.  You know,
2    you come home and your television is gone,
3    somebody broke in your house and stole
4    your car, there's not a -- you don't have
5    to worry about consent or any other
6    crimes.
7         This is the only crime where
8    consent is actually written into the law.
9    And it is a defense.
10        And, you know, when you have two
11   people in a room and they're by
12   themselves, that hurdle can be high.  So
13   some consent cases are easier than others
14   but most of them are difficult.
15   Q.    I'm going to move on to page 4.
16   In April of 2011 you taught National
17   District Attorney's Association.  One of
18   the names of the courses was called
19   Pretext Phone Calls and non-Mirandized
20   Confessions.
21        Will you just tell me what that
22   was about please?
23        MS. BOLGER:  You mean other

Page 48

1    than pretext phone calls and
2    non-Mirandized confessions?
3         MR. RITCHEY:  Well, I kind
4    of want to get into, you know, what they
5    are and what is and what was actually
6    taught during the course.
7    A.    So pretext phone calls is -- what
8    that is it's a controlled phone call
9    between two people, usually your victim
10   and the suspect, but it could be your
11   victim or anybody else as to -- it's a
12   controlled phone call that's recorded and
13   can be used in criminal court.
14        And this phone call is, you know,
15   it will get information as to what
16   happened.  Also, possibility -- there's a
17   possibility that the suspect would make
18   incriminating statements.
19        There's a wealth of information
20   that comes from these phone calls that
21   kind of fills in the blanks, if you will,
22   where, you know, your victim is blacked
23   out or passed out and does not know, you

12  (Pages 45 to 48)

Carlton Hershman                                    3/16/2021

---

Page 49

1    know, what happened.
2        You also can come across other
3    evidence that might be talked about in the
4    case.  Maybe you have a crime scene such
5    as don't you remember, you know, we had
6    sex in my car and she didn't know that, so
7    now you have a crime scene.
8        You could come across or identify
9    other witnesses, maybe other victims or
10   even other suspects in those phone calls.
11   So that training was how to conduct a
12   pretext phone call.
13   Q.    Okay.  When did you learn about
14   pretext phone calls?
15   A.    The first week I was in the unit.
16   These phone calls are used constantly.
17   Q.    Was there a specific -- I'm sorry,
18   go ahead.
19   A.    I was just going to say there's a
20   lot of cases that you would want to
21   conduct a pretext phone call in.
22   Q.    What are those cases?
23   A.    Well, the majority of them are

---

Page 50

1    cases where there's consent issue and
2    there is no evidence, physical -- say
3    physical evidence or scientific evidence.
4        There may be only, you know, what
5    most people or a lot of people call he
6    said/she said cases; those type.
7    Q.    And you said you learned of these
8    types of phone calls in the first week in
9    the unit.  What unit was that?
10   A.    The sex crimes unit.  We also used
11   them in the homicide unit, too.
12   Q.    Did you receive a training course
13   in those pretext phone calls?
14   A.    No, I did not.
15   Q.    Who taught you about pretext phone
16   calls?
17   A.    It was another detective within
18   the unit.  I don't remember which one.
19   Q.    So would that be on-the-job
20   training?
21   A.    Yes, sir.
22   Q.    On page five, let me try to find
23   it.  I'm sorry, this one is on page 26,

---

Page 51

1    May 29, 2019, looks like you taught RISE,
2    one of the courses was entitled
3    Trauma-Informed Responses to Sexual
4    Assault.
5        MS. BOLGER:  Sorry, let me
6    just catch up before you ask a question.
7    I've lost you.  Where are you?
8        MR. RITCHEY:  This is going
9    to be page 6 --
10       MS. BOLGER:  May 29th, I got
11   you.  Sorry.
12   Q.    (By Mr. Ritchey) Do you see where
13   we are, Mr. Hershman?
14   A.    I do.
15       MS. BOLGER:  Sorry, Scotch.
16   Q.    (By Mr. Ritchey) It's all right.
17       What are trauma-informed responses
18   to a sexual assault or what was that
19   course about?
20   A.    Yes, that was actually somebody
21   that I had co-presented with.  That
22   training was when you respond to someone
23   who has just been through a traumatic

---

Page 52

1    incident or even witnessed one, how you
2    would approach that person and there's
3    several different things that an
4    investigator should do when approaching
5    that person and that's what that was
6    about.
7    Q.    What are those several different
8    things?
9    A.    The one that's most important is
10   to understand and to recognize that they
11   have suffered trauma and to, you know,
12   conduct your business, you know, slowly,
13   give them time to understand what is --
14   has occurred to them.
15       Now, depending when this interview
16   takes place, if it takes place in close
17   proximity of the actual crime, then this
18   person you could get, you know, some
19   information from them if you need to, but
20   mainly they need to be -- they need to
21   have sleep.
22       They need to have food.  They need
23   to kind of de-cell if you will.  There's

---

13  (Pages 49 to 52)

Carlton Hershman                                    3/16/2021

Page 53

1  this myth that, you know, the fresher the
2  crime, the closer to reporting that that's
3  -- you're going to get your best
4  information, but that's not actually how
5  it works with somebody that's been a
6  victim of, you know, a trauma.
7      You have to also understand that
8  they may say things that are not complete
9  or sometimes even untrue or inconsistent
10  as to what they had seen or, you know,
11  they had participated in and it's
12  basically just how the brain works, that
13  during trauma it only receives some
14  information and that information will be
15  broken up.
16      So you have to understand that
17  they cannot tell you in chronological
18  order what happened to them.  They may,
19  for example, say he put his finger inside
20  my vagina but they don't know which hand
21  or which finger.
22      So in that teaching, you know, for
23  law enforcement is that talking with

Page 54

1  somebody or interviewing somebody who has
2  suffered from trauma is not like talking
3  to somebody who, you know, walked out and
4  their car was gone, not to use the old
5  standard way of interviewing someone.
6  Q.     Did you develop this concept of
7  trauma-informed responses?
8  A.     I did not.
9          MS. BOLGER:  Object to the
10  form.  You mean did he create it?  Is that
11  what you mean?
12          MR. RITCHEY:  Right.
13  A.     I did not.
14  Q.     Where did you learn about
15  trauma-informed responses?
16  A.     I learned that from Russell
17  Strand.  He came up with that concept.  He
18  now teaches all over the world.
19      I know him personally.  I've met
20  him at several conferences.  At one point
21  he was one of our -- one of End Violence
22  Against Women's experts.
23  Q.     So when you said you learned it

Page 55

1  from Russell Strand were these conferences
2  he taught and what form was it?
3  A.     Yes, it was a training that he put
4  on that I sat in on.
5      I mean I knew of some level of,
6  you know, interviewing somebody with
7  trauma, but I never had formal training in
8  it and so I sat through his training.
9  Q.     When did you receive that formal
10  training?
11  A.     I want to say maybe it was
12  Chicago, maybe it was Chicago 2018.  I
13  can't remember exactly.
14  Q.     Were you employed by any law
15  enforcement agency at that time?
16  A.     No, I retired in 2017.
17  Q.     Was there any reason you attended
18  that formal training session?
19  A.     I was there to present myself.  I
20  was there to also speak.
21  Q.     Do you know when this concept was
22  developed?
23  A.     For Russell Strand I don't know.

Page 56

1  I know that I was taught this type of
2  interviewing I would say 2002, maybe 2001.
3  Q.     Who were you taught by?
4  A.     Joanne Archambault.
5  Q.     And was this while you were at the
6  San Diego Police Department?
7  A.     Yes, sir.
8  Q.     Were you sent to any formal
9  training on trauma-informed responses by
10  San Diego Police Department?
11  A.     No.
12  Q.     Other than the Russell Strand
13  training, did you attend any other
14  training on trauma-informed responses?
15          MS. BOLGER:  Object to the
16  form.
17      You can answer.
18  A.     No.
19  Q.     (By Mr. Ritchey) Were you paid for
20  all the courses you taught that are listed
21  on your CV?
22  A.     No.
23  Q.     Do you know about how many you

Page 57

1    were paid for?  Was it a majority?
2             MS. BOLGER:  I'm going to
3    object and just say I don't understand the
4    question.
5             Carl, if you understand the
6    question, but I don't know what you mean
7    by paid for.  You mean paid for the course
8    or paid for in salary?
9             I legitimately don't
10   understand the question and ask you to
11   rephrase it so I can.
12   Q.    (By Mr. Ritchey) Mr. Hershman, did
13   you receive compensation for teaching any
14   of these courses on your CV?
15   A.    Nothing before 2017.
16   Q.    And what about after 2017?
17   A.    Everything except for the
18   conferences I was -- let's see here.  Can
19   you -- I don't have control.
20        Can you go up to the next page to
21   2017?
22   Q.    Yes.  So April 16th, May 29th and
23   April 18th I was not paid for.  April 5th

Page 58

1    I was not paid for.  April 17th I was not
2    paid for.
3             June 26th I was not paid for, I
4    wasn't paid.  September 6th I was not
5    paid.  October 15th I was paid for.
6             MS. BOLGER:  You have to be
7    paid to go to Albany.
8    A.    Okay.  Let's see here, and then
9    January 20, 2019, I was paid for that.
10   And then the May 6, 2019, International
11   Association Chiefs of Police I was paid
12   for that.
13            May 22nd Louisiana Department of
14   Justice I was paid for that.  May 29,
15   2019, I was not paid for that.  June 10,
16   2019, I was not paid for that.
17            June 19th -- I'm sorry, June 10th
18   I was not paid for that.  June 19th I was
19   paid for that for the South Dakota.
20            And let's see, September 10th,
21   11th and 12th Nampa Police Department or
22   Nampa, Idaho I was paid for that.
23            And can you scroll up?  And let's

Page 59

1    see here, September 29th, 2019, I was paid
2    for that.  October 23rd, 2019, the Union
3    County, Ohio I was paid for that.
4             And then the February 3rd and 7th,
5    2020 those are the classes that the state
6    of California puts on.  I teach in those
7    every other month, and I do get paid for
8    those.
9    Q.    (By Mr. Ritchey) Do you have an
10   opinion as to whether actions or inactions
11   by law enforcement officers are influenced
12   by the training they receive?
13            MS. BOLGER:  I'm sorry,
14   could you do that again?  You were cut off
15   in the middle.
16            MR. RITCHEY:  Do you mind
17   reading that?
18       (Whereupon, requested portion was
19       read back by court reporter.)
20            MS. BOLGER:  That's a very
21   broad question.
22            Carl, if you can answer it,
23   you can answer it.

Page 60

1    A.    It can be.
2    Q.    (By Mr. Ritchey) How so?
3    A.    How so?  Is that what you're
4    asking me?
5    Q.    Yes.
6             MS. BOLGER:  Just in general
7    in the universe?  That's just generally
8    every law enforcement person all of their
9    training forever; is that the question?
10            MR. RITCHEY:  I'm just
11   asking what I'm asking.
12            MS. BOLGER:  And I'm getting
13   clarification.
14            So, Carl, if you think you
15   can answer it, go ahead.
16   A.    Lack of training if there's
17   something that you are doing that you
18   shouldn't be doing in a case, and that
19   could be from patrol or investigations or
20   even management, that could have an impact
21   on the case.
22   Q.    (By Mr. Ritchey) Have you reviewed
23   any documents in preparation for this

Carlton Hershman                                             3/16/2021

Page 61

1   deposition?
2   A.    Yes.
3   Q.    Which documents are those?
4   A.    My report --
5         MS. BOLGER: Just for the
6   record, of course, Scotch, you have a full
7   list of everything that the witness has.
8   A.    I reviewed my own reports and
9   everything that I listed in that report.
10  Depositions also of people that were
11  involved.
12  Q.    (By Mr. Ritchey) Anything else?
13  A.    The standing operating procedures
14  of the Tuscaloosa Police Department.
15  Q.    Is that it?
16  A.    I think so.  Everything that I
17  didn't list is actually in my report but I
18  think that's it.  There could be one or
19  two out there that I'm not aware of, that
20  I can't remember.
21  Q.    Do you have any adult children or
22  adult relatives that live in the state of
23  Alabama?

Page 62

1   A.    Not that I'm aware of.
2   Q.    Have you conducted any business or
3   consultations in Alabama?
4   A.    No.
5   Q.    Have you ever been arrested or
6   charged with a crime?
7   A.    No.  No.
8   Q.    I can bring this back up if you
9   need me to, but is all your employment
10  history listed on your CV, which is
11  Exhibit 117?
12  A.    Yes, anything other than working
13  at a grocery store at 15 years old I
14  think, yeah.
15  Q.    That's fair enough.
16        And it looks like all your law
17  enforcement career was with the San Diego
18  Police Department; is that right?
19  A.    That's correct.
20  Q.    Were you subject to any
21  disciplinary actions while there?
22  A.    No, I was not.
23  Q.    What was the highest rank you

Page 63

1   achieved in the San Diego Police
2   Department?
3   A.    Detective.
4   Q.    And it looks like you were part of
5   the sex crimes unit during two stints with
6   the department; is that right?
7   A.    That is correct.
8   Q.    Did you investigate any other sex
9   crimes in any of the other departments
10  that you were involved in?
11  A.    Yes, I did.
12  Q.    Okay.  Which departments would
13  those be?
14  A.    That would be the elder abuse
15  unit.  So if the victim was 65 years and
16  older, I investigated all those sex crimes
17  that would come into the elder abuse unit.
18        When I worked in our cyber unit I
19  got all the cybersex crimes such as penis
20  pics and revenge pornography.  I did
21  investigate a lot of the revenge
22  pornography cases that came in.
23  Q.    When you were with the San Diego

Page 64

1   Police Department did you seek out
2   training voluntarily or were you ordered
3   by your superiors to attend training?
4         MS. BOLGER:  Object to the
5   form.  All training ever?
6         Carl, you can answer if you
7   can do it.
8   A.    No, I would seek out training on
9   my own.  There's only one class that was
10  mandatory and that was our POST, which is
11  a Police Officer Standards and Training
12  stated you have to have 40 hours of sex
13  crimes training, which California
14  Department of Justice would put on, which
15  that's what I teach now in that aspect.
16        But if you went to homicide, my
17  homicide course was 40 hours and child
18  abuse was also 40 hours.
19  Q.    (By Mr. Ritchey) Okay.
20  A.    All the other training I seeked
21  out on my own.
22  Q.    Okay.  How did you seek it out?
23  A.    Well, most of it was when I was

16  (Pages 61 to 64)

Carlton Hershman                                    3/16/2021

Page 65

1  speaking I would go to, you know, a one,
2  two or three-day conference and upon
3  speaking, once you were done with your
4  presentation you could go and sit in on
5  other classes and that's what did.  That
6  was the majority of my training.
7  Q.     Okay.  So you were just
8  participating when everyone else was
9  talking in those conferences?
10          MS. BOLGER:  Object to the
11  form.
12  A.     I didn't understand the question.
13  I'm sorry.
14  Q.     (By Mr. Ritchey) So when you went
15  to the conferences you were speaking on,
16  you just stayed and listened to what other
17  speakers had to say?
18  A.     Yes, that was the majority of my
19  training.  I also went to there's a
20  company that puts on training and they
21  still do to this day in Las Vegas, and I
22  paid to go there.
23          Some homicide training I took

Page 66

1  there.  I took their sex course, sex
2  crimes course, and that's a whole week
3  course.  I put in for that and my
4  department paid for it.
5          The homicide -- I'm sorry, the
6  homicide course they paid for.  The sex
7  crimes course I paid out of my own pocket.
8  Q.     What's that company called?
9  A.     I don't know.  Again, if you
10  Google it, it will come up.  If you put in
11  -- it's -- I can't remember, something law
12  enforcement.
13          I'm sorry, I just -- I just can't
14  remember.  But if you were to Google law
15  enforcement training in Las Vegas, it will
16  come up.  I think that's how I searched
17  it.
18  Q.     Okay.  And the sex crimes course
19  that you attended what was the reason
20  behind attending that one?
21  A.     I was in Las Vegas, I mean.
22  Q.     I hear you.
23  A.     No, there was good training there.

Page 67

1  Even though I speak, you know, I speak on
2  sex crimes, things new come up, you know,
3  so I like to stay on top of things and
4  sometimes new things come up and, yeah, I
5  just like to stay current.
6  Q.     Did you use it to assist you in
7  your speaking engagements?
8  A.     I can't remember.  I may have
9  learned something new and used it, but
10  that wasn't the purpose for going.
11  Q.     What was the purpose?
12  A.     Just to see if anything new, you
13  know, what other people were talking about
14  as far as the training.  I mean I was
15  there for the training to help me in my
16  investigations.
17  Q.     When did you attend the sex crimes
18  course in Las Vegas?
19  A.     That was -- I want to say 2003,
20  but I'm not 100 percent sure.  I think it
21  was 2003.
22  Q.     Okay.  And what about the homicide
23  course with the Las Vegas company?

Page 68

1  A.     I believe that was 2004.
2  Q.     Have any of the cases that you
3  worked with the San Diego Police
4  Department been investigated internally by
5  the San Diego Police Department?
6          MS. BOLGER:  Sorry, can you
7  ask that again?  I just didn't understand
8  it.
9          MR. RITCHEY:  Can you read
10  that back?
11          (Whereupon, requested portion was
12          read back by court reporter.)
13  A.     I don't think so.  There were a
14  couple of police officer cases that I
15  investigated that internal affairs looked
16  at, but I don't -- I mean that was the
17  standard thing that they would do.
18          Does that make sense?  Does that
19  answer make sense?
20  Q.     What do you mean it was the
21  standard thing they would do?
22  A.     Well, any time a police officer is
23  accused of something, it goes to internal

17 (Pages 65 to 68)

Page 69

1    affairs.  They don't -- the way San Diego
2    Police Department works is if an officer
3    is accused of a crime, depending on that
4    crime, the unit, say a child molester or
5    sex crimes or elder abuse, whatever the --
6    you know, the complaint comes in or the
7    possibility that a police officer
8    committed a crime, that specialty unit
9    will investigate it and then turn it over
10   to internal affairs.
11   Q.    Okay.  Were you ever the subject
12   of any investigation like the ones you
13   just explained?
14   A.    No.
15   Q.    For any of the cases that you
16   worked for at the San Diego Police
17   Department did an entity or agency outside
18   the San Diego Police Department
19   investigate in any of those cases?
20          MS. BOLGER:  Object to the
21   form.
22          You can answer if you
23   understand it.

Page 70

1    A.    Talking about the police officer
2    cases?
3    Q.    (By Mr. Ritchey) Just any case you
4    investigated or you were the subject of
5    the investigation.
6    A.    That --
7          MS. BOLGER:  I didn't
8    understand that question.  Can you
9    rephrase that last question?  I didn't
10   understand it.
11   Q.    (By Mr. Ritchey) Basically, have
12   you worked on any cases that have been
13   investigated by some agency or entity
14   outside of the San Diego Police
15   Department?
16   A.    Have I investigated any cases that
17   was investigated by another entity outside
18   --
19   Q.    Right.
20   A.    -- of the police department?  No.
21   Q.    Within the San Diego Police
22   Department who generally set the training
23   policies or ordered training?

Page 71

1    A.    Well, all that stuff is set
2    through our academy classes.  So whoever
3    at the time is the captain up there.
4          I believe it actually falls on the
5    lieutenant but they set the training
6    standards for -- we have a regional
7    academy, so where we mix our sheriffs and
8    all the other agencies together.
9    Q.    While you were at the San Diego
10   Police Department were you ordered to go
11   into any other training other than the
12   regional academy?
13          MS. BOLGER:  Object to the
14   form.  That's asked and answered, but you
15   can answer.
16   A.    No.
17   Q.    (By Mr. Ritchey) Did you have a
18   mandatory amount of hours you had to
19   complete in training for each year?
20          MS. BOLGER:  Object to the
21   form.  Asked and answered.
22          You can answer.
23   A.    Every 18 months we have what we

Page 72

1    call Regional Officer Training, and it's
2    every 18 months, that's where they'll put
3    on classes.
4          We get our CPR card updated.  We
5    have our driving that -- a day of driving
6    that we do night shoots down at the range.
7    All those perishable skills they redo
8    those every 18 months.
9          And then they have a day or
10   sometimes a day and a half we'll go do
11   classes on domestic violence or sex
12   crimes, it just depends.
13          Every 18 months it changes, and it
14   could be just officer professionalism.
15   The classes are just kind of random, so
16   that's the only training that they really
17   -- that we have to do.
18   Q.    And does the San Diego Police
19   Department require more than just that
20   every 18-month regional officer training?
21          MS. BOLGER:  Object to the
22   form.  I thought he answered that already,
23   but go ahead.

                              18  (Pages 69 to 72)

Carlton Hershman                                          3/16/2021

Page 73

1    A.    Yeah, that's the required
2    training, yes.
3    Q.    (By Mr. Ritchey) Okay.
4    A.    Other than going into the units as
5    I explained before.
6    Q.    So you may have answered this, but
7    just so I have it in my head, the sex
8    crimes unit you went into you had to have
9    specific training before becoming a member
10   of that?
11   A.    Yes, within -- so you have to have
12   that 40-hour class that the DOJ puts on,
13   California DOJ.
14        Once you're in the unit you have
15   to have that class within one year of
16   being in that unit.  The child molest unit
17   or child abuse unit and the homicide unit
18   also had those classes, mandatory classes.
19   Q.    Is that mandatory based on state
20   law or is that a policy of the San Diego
21   Police Department?
22   A.    The classes?  That's the
23   Department of Justice, California

Page 74

1    Department of Justice, so it would be
2    state.
3    Q.    All right.  Where did you attend
4    high school?
5    A.    Riverdale High School in Fort
6    Myers, Florida.
7    Q.    Did you attend college?
8    A.    Community college, yes.
9    Q.    What was the name of that
10   community college?
11   A.    Miramar College.
12        COURT REPORTER:  What was
13   it?
14        MR. RITCHEY:  Miramar.
15   Q.    I'm guessing that was in Florida
16   that, too?
17   A.    No, that was here in San Diego.
18   Q.    Did you graduate from there?
19   A.    I did not.
20   Q.    How long did you attend Miramar
21   College?
22   A.    You know, at the time -- when I
23   was in the military I was in the Navy.  I

Page 75

1    couldn't real -- it was harder to go to
2    college.
3        Once I became a cop, I would go to
4    night school, so I would only take maybe
5    one class or two at a time, so it got
6    spread out over, you know, a few years.
7    Q.    Okay.
8    A.    And I just -- there's only two
9    math classes I needed and I stopped, so.
10   Q.    I was never good at math either.
11        MS. BOLGER:  That's why we
12   all went to law school, Carl.
13   A.    That's why I became a cop.  My
14   wife keeps telling me just go do it.
15   Well, at this point I don't think it
16   matters, so.
17   Q.    (By Mr. Ritchey) Did you attend
18   any other community college or any other
19   secondary schooling?
20   A.    No.
21   Q.    I believe you told me this, you
22   attended the California Police Academy?
23        MS. BOLGER:  Object to the

Page 76

1    form.
2    A.    San Diego Regional Academy.
3    Q.    (By Mr. Ritchey) San Diego
4    Regional.  What year did you attend that?
5    A.    My first -- I was hired
6    December 18th, 1986.
7    Q.    And when did you graduate from the
8    Academy?
9    A.    I think it was May 15th of 1987.
10   Q.    Did you receive any training in
11   sexual assault or rape investigations
12   while at that Academy?
13   A.    Yes.
14   Q.    Were they specific to those types
15   of investigations or just in general?
16   A.    Well, it was for first responders.
17   It wasn't an investigative class.  It was
18   for first responders for patrol.
19   Q.    Other than what we've discussed
20   already, have you had any other training
21   pertaining to sexual assaults or rape?
22        MS. BOLGER:  I'm sorry,
23   other than everything else he said already

Carlton Hershman                                          3/16/2021

|                        Page 77                        |

1    this morning?
2            MR. RITCHEY:  Right, that's
3    what I said.  Other than what we discussed
4    already.
5    A.    I can't think of any.
6    Q.    Did the San Diego Police
7    Department have standard operating
8    procedures?
9    A.    Yes.
10   Q.    And who was responsible for
11   putting those procedures together?
12   A.    I have no clue.
13   Q.    Would it be someone in the
14   supervisor or managerial positions?
15   A.    Yes.
16   Q.    Do you know the elements of rape
17   under Alabama law?
18   A.    I'm familiar with it, yes.
19   Q.    What's your familiarity?
20           MS. BOLGER:  Sorry, object
21   to the form.
22           Do you mean how was he
23   familiar?  I don't understand the

|                        Page 78                        |

1    question.  Would you mind rephrasing it?
2    Q.    (By Mr. Ritchey) I just want to
3    know what's your understanding of Alabama
4    law on rape.
5    A.    Well, I understand that you have a
6    consent statute.  You also have an earnest
7    resistance statute.
8    Q.    What is your understanding of the
9    consent statute?
10   A.    I mean there's different avenues
11   to, you know, consent.  Obviously somebody
12   that's underage can't consent.  You know,
13   a prisoner can't consent.
14           Somebody that is incapacitated
15   can't consent.  So you have those which
16   are kind of common, you know, we also have
17   those here in San Diego, so those are
18   about the same.
19   Q.    And what's your understanding of
20   an earnest resistance statute?
21   A.    That is resistance that a victim
22   would have to show that they were not
23   giving consent to another person, and it

|                        Page 79                        |

1    shows that they're not wanting to have
2    sexual contact with another person.
3    Q.    And what is your understanding of
4    how that is shown?
5            MS. BOLGER:  Object to the
6    form.
7    A.    How it's shown by the victim, is
8    that --
9    Q.    (By Mr. Ritchey) Right.
10   A.    Well, that's resistance, enough
11   resistance to show the person that is
12   going to possibly sexual assault them that
13   they don't want to have, you know, sexual
14   contact with them and that is different
15   levels.
16   Q.    Okay.  Is there a similar earnest
17   resistance statute in California?
18   A.    No, there's not.
19   Q.    Was there one while you were
20   working with the San Diego Police
21   Department?
22   A.    No.
23   Q.    Have you ever read any Alabama

|                        Page 80                        |

1    opinions concerning earnest resistance?
2    A.    No.
3            MS. BOLGER:  Object to the
4    form.
5            Scotch, I don't want to
6    interrupt you in the middle of a topic,
7    but when you're done with this topic, can
8    we take a break?
9            MR. RITCHEY:  Sure.  I've
10   just got a few more questions and we're
11   going to switch a little bit.
12   Q.    Have you ever taken a class or
13   course on criminal law of Alabama?
14   A.    No.
15   Q.    Have you ever conducted your own
16   research concerning Alabama law on rape or
17   sexual assault?
18   A.    No.
19   Q.    Have you ever investigated rape or
20   sexual assault in Alabama?
21   A.    No.
22   Q.    Have you ever investigated a
23   drug-facilitated sexual assault?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                              3/16/2021

Page 81

1    A.    Have I?
2    Q.    Yes.
3    A.    Oh, yeah.
4    Q.    Is that commonly known as a DFSA?
5    A.    Yes.
6    Q.    Okay.  And what is a DFSA?
7    A.    It's a person who has been
8    sexually assaulted due to intoxication, so
9    I mean --
10   Q.    Go ahead, I'm sorry.
11         MS. BOLGER:  Let him finish.
12   A.    I mean what I was going to say
13   it's called by several different things,
14   but basically that's it.
15   Q.    (By Mr. Ritchey) Okay.  And you
16   said it's -- correct me if I'm wrong, but
17   sexual assault by intoxication; is that
18   what you said?
19   A.    Yes.
20   Q.    What do you mean by intoxication?
21   A.    You broke.
22   Q.    I'm sorry.  What do you mean by
23   intoxication?

Page 82

1    A.    Somebody that's under the
2    influence of drugs or alcohol or a
3    combination of both.
4    Q.    Are there certain types of drugs
5    that are commonly used in DFSAs?
6    A.    Known as date rape drugs; is that
7    what you're asking me about?
8    Q.    Sure, if that's the answer.
9    A.    Well, sure --
10         MS. BOLGER:  Well, object to
11   the form.  I'm not sure it is the answer.
12   I think he's asking you to clarify the
13   question.
14         So, Carl, you can answer if
15   that's the answer, but I think he's asking
16   you to clarify the question and not giving
17   an answer.
18   A.    There's several drugs that are
19   used in date rape -- I mean there's a
20   classification of date rape drugs and then
21   there's other drugs that are used, so I
22   didn't know if you were asking me about
23   date rape drugs or other drugs that are

Page 83

1    used.
2    Q.    (By Mr. Ritchey) Well, let's start
3    with date rape drugs.  What are those?
4    A.    Your common ones would be GHB.
5    You would have Rohypnol.  You would have
6    Ecstasy.  Those are the common ones.
7    Q.    Okay.
8    A.    Also Ketamine.
9    Q.    And you said other drugs are used
10   as well.  What are those?
11   A.    Those would be what we call OTC,
12   so over-the-counter drugs, also
13   prescription drugs.
14         People will use muscle relaxers.
15   They'll slip it into a drink.  It's not
16   known as a date rape drug, but they're
17   used because it will have the same effect
18   as a date rape drug.
19         MS. BOLGER:  All right.  I
20   guess I still don't understand the line of
21   questioning, Scotch.
22         You can clarify it, but you
23   mean all substances used for date rape or

Page 84

1    are you asking actually like alcohol or do
2    you mean like all drugs?  I don't
3    understand the question.
4         I'll just say I object.  I
5    take that all back.  I object to the line
6    of questioning.  I don't understand the
7    question, but if Carl does, he can answer.
8    Q.    (By Mr. Ritchey) Okay.
9         And you say alcohol can be
10   considered a drug used for sexual
11   assaults; is that correct?
12         MS. BOLGER:  Well, I just
13   said that, but, Carl, I don't know --
14   A.    She did, but that is correct, it's
15   the most common.
16   Q.    (By Mr. Ritchey) Okay.  And how is
17   that used, you know, in regards to sexual
18   assaults?
19   A.    The alcohol?
20   Q.    Right.
21         MS. BOLGER:  Object to the
22   form, yeah.
23   A.    There's a couple of different

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                    3/16/2021

Page 85

1    ways.  You can go to a bar, kind of sit
2    and watch other people drink.
3         Let's just say the male is the
4    suspect, the female is the victim.  These
5    guys will go in towards -- later towards
6    the night, they'll watch drunk females or
7    females acting drunk, as far as, you know,
8    unsteady gait, slurring their speech,
9    going to the bathroom constantly and
10   they'll see that they're drunk.
11        And other ways are what we call
12   feeding alcohol.  They'll buy them drink
13   after drink after drink.
14        They may introduce say shots into
15   somebody that is only having beer for the
16   night and then your suspect will start
17   buying shots for that person.  And so,
18   yeah, there's a few different ways that
19   alcohol is used.
20   Q.   Okay.  For the date rape drugs we
21   discussed is there a common type of effect
22   that these have on victims?
23        MS. BOLGER:  Object to the

Page 86

1    form.
2    A.   The date rape drugs?
3    Q.   (By Mr. Ritchey) Right.
4    A.   Yes, they're all made to
5    incapacitate them or to lower their
6    ability to fight back or say no.
7    Q.   And by incapacitate, what kind of
8    level of incapacitation are we talking
9    about?
10        MS. BOLGER:  Object to the
11   form again.
12   A.   Someone that just doesn't have
13   their normal faculties about them.  It
14   could be someone that is in a blackout
15   situation, someone that's passed out, or
16   someone who is just severely intoxicated
17   and may have a refractive memory so
18   they're only remembering pieces of what's
19   happening.
20        Also, there's a level of
21   intoxication where people start to make
22   bad decisions.
23   Q.   (By Mr. Ritchey) What do you mean

Page 87

1    by make bad decisions?
2    A.   It could be not sticking with
3    their plan that night.  They get separated
4    from their, you know, from their group.
5    It could be losing track of time.
6        It could be drinking too much,
7    maybe, you know, continuing to drink.
8    Maybe driving a car.  Maybe ended up going
9    home with somebody that they don't know,
10   so there's a lot of bad decisions.
11   Q.   And you mentioned blacked out.
12   What does that mean?
13   A.   That's somebody that is at a level
14   of consciousness where they do not know or
15   understand what's happening around them
16   but they're able to function on some
17   level.
18        So, you have, you know, a lot of
19   drunk drivers, you know, are sometimes in
20   blacked out situations where they leave
21   the bar, they remember sitting in a car,
22   and the next thing that they remember is
23   sitting in the car in their driveway and

Page 88

1    they just drove 20 miles and don't even
2    remember it.
3        So the difference between the
4    blackout and the passed out, the blackout
5    is when you are walking and talking and
6    functioning, but you have no memory of it.
7        The passed out is you are
8    completely incapacitated.  You're passed
9    out on the floor, you're not moving,
10   you're not functioning at all.
11   Q.   Is a person's level of function
12   diminished when they're blacked out?
13        MS. BOLGER:  Object to the
14   form.  You mean cognitive function,
15   physical function?  What do you mean?
16   Q.   (By Mr. Ritchey) I can't remember
17   exactly what he said, but something about
18   the function of the person while they're
19   blacked out.  I'm trying to delve into
20   what that exactly means.
21   A.   Could you just repeat your
22   question then?  I'm sorry.
23   Q.   Yeah.  Is a person's level of

                            22  (Pages 85 to 88)

Carlton Hershman                                        3/16/2021

Page 89

1    functionality or is their normal faculties
2    diminished when they're blacked out?
3    A.    It depends on the person.  I think
4    everybody is different.
5          I mean that's been my experience
6    of blackout.  Some people black out for a
7    short period of time, some people black
8    out for a very long period of time.
9    Q.    Do you mind repeating that?  We
10   had a glitch on our end.
11   A.    Sure, I said I think it depends,
12   the level of, you know, the blackout or
13   the function, how much they can function,
14   depends on each person and that goes to,
15   you know, how much you had to eat, height,
16   weight, how much alcohol you had.
17         You know, you may be blacked out
18   for a short period or you may be blacked
19   out for a long period of time.
20   Q.    Are you able to determine if an
21   individual's blacked out by their
22   appearance?
23         MS. BOLGER:  Object to the

Page 90

1    form.  He just said it depends on the
2    person, but you can answer it, Carl.
3    A.    Some people are very highly
4    functioning.  You know, we always hear the
5    term functioning alcoholic.
6          I think, you know, that's a point
7    of term here in this deposition, but I
8    guess there's a functioning blacked out
9    person.
10         I would -- I don't think I've been
11   around people who are blacked out to say
12   that that's -- that I could tell the
13   difference.  Does that make sense?
14   Q.    (By Mr. Ritchey) Sure.
15   A.    I'm not trying to skirt around
16   your question.  I just don't know.
17   Q.    Okay.  Where did you learn your
18   definition of blacked out?
19   A.    Just from my cases, just from
20   working them and understanding how alcohol
21   works.
22   Q.    And where did you learn how
23   alcohol works?

Page 91

1    A.    Well, between personally and also
2    from my cases, just how -- you know, why
3    some people, you know, get drunk off of
4    two beers and why others don't get drunk
5    off of six.
6          You know, we do receive training
7    in the academy on people being drunk in
8    public, also driving while, you know,
9    under the influence, so we can gauge, you
10   know, what their eyes look like and that
11   type of thing.
12         MS. BOLGER:  Scotch, are you
13   getting near a break?
14         MR. RITCHEY:  Yeah, I'm
15   getting close.  Just a few more.
16   Q.    In your experience do victims, are
17   victims passed out or become completely
18   incapacitated by these date rape drugs
19   that we've discussed?
20   A.    Yes, they do.
21         MS. BOLGER:  Object to the
22   form.  The whole category of date rape
23   drugs that you just discussed?

Page 92

1          MR. RITCHEY:  Right.
2    A.    Yes, some of the -- all of those
3    can make you passed out.  Not all of them
4    do, though.
5          It depends on the dosage that is
6    given and what form that it's given, if
7    it's mixed with alcohol, so there's a lot
8    of different levels of it, but.
9    Q.    Are there common ways for these
10   date rape drugs to be administered to
11   victims?
12         MS. BOLGER:  Object to the
13   form.
14   A.    It could be secretly.  It could be
15   voluntarily.
16   Q.    (By Mr. Ritchey) What do you mean
17   by secretly?
18   A.    It could be -- I knew you were
19   going to ask that.  It could be slipped
20   into their drink.
21   Q.    And then voluntarily what do you
22   mean by that?
23   A.    They just take it on their own.

Carlton Hershman                                          3/16/2021

Page 93

1   They're given it.  You see that more in
2   Ecstasy and Rohypnol.
3        GHB some people take that
4   voluntarily, but not many.
5            MR. RITCHEY:  All right.  I
6   think we're at good place to stop, I'll be
7   changing subjects, so if y'all want to
8   take I guess a couple minute break or
9   y'all tell me what y'all want to do.
10           MS. BOLGER:  Yeah, why don't
11  we take -- my bladder thanks you.  Why
12  don't we take a ten-minute break and we
13  can get back and like ten?
14           MR. RITCHEY:  Sounds good.
15           VIDEOGRAPHER:  Off the
16  record at 11:45.
17           (Recess was taken.)
18           VIDEOGRAPHER:  Back on the
19  reported at 11:56 a.m.
20  Q.    (By Mr. Ritchey) All right.
21  Mr. Hershman, I'm going to get into your
22  involvement with this case that we're here
23  for today.

Page 94

1            When were you first contacted?
2   A.    That would be July -- I think it's
3   July of last year, 2020, maybe a little
4   before that but I was hired in July.
5            MS. BOLGER:  I think you may
6   have forgotten that last year didn't
7   really happen.
8   Q.    (By Mr. Ritchey) Who contacted
9   you?
10  A.    I believe it was Kate.
11  Q.    Did she provide you any
12  information about the case which you
13  relied upon in your expert report?
14  A.    Yes.
15  Q.    What was that?
16  A.    She -- these things that I listed
17  in my report that she had sent me, which
18  was a felony packet, at the time there
19  were two articles from BuzzFeed, there
20  were some recordings that she sent me.
21       So everything in my report she had
22  sent me, not all at once, but kind of
23  gradually over a short period of time.

Page 95

1   Q.    And you listed all of that in your
2   report?
3   A.    I did.
4   Q.    Is there anything not listed in
5   your report that you have relied upon in
6   forming your opinions?
7            MS. BOLGER:  As I said
8   earlier, also the stuff we sent you last
9   week, it listed additional materials, so
10  just so you know for the record we did
11  provide Mr. Hershman additional materials
12  that are listed in the email you got last
13  week.
14  A.    Yes, they also sent me some
15  depositions, but they weren't -- those
16  materials weren't used to form my opinion
17  in my report.
18  Q.    (By Mr. Ritchey) Did any of the
19  material you received after you formed
20  your opinion and wrote your report change
21  any of your opinions in your expert
22  report?
23  A.    No, sir.

Page 96

1   Q.    What is your understanding as to
2   what this lawsuit is about?
3   A.    From what I understand, BuzzFeed
4   was being accused of writing two articles
5   that Jones and Hastings didn't agree with
6   the information in those articles.
7   Q.    And I believe you already said
8   this, but I'm going to ask it again.
9        Have you read the BuzzFeed article
10  published by Katie Baker on June 22nd,
11  2017, which involved the Rondini
12  investigation?
13           MS. BOLGER:  I object to the
14  form.
15           You can answer.
16  A.    I did.
17  Q.    (By Mr. Ritchey) What was your
18  impression of Adam Jones after reading
19  that article?
20  A.    Well, to tell you the truth, I
21  only read that article once and that was a
22  year ago, almost a year ago, so I don't
23  remember exactly what the article

24  (Pages 93 to 96)

Page 97

1    stated --
2    Q.    Are you saying you've only -- I'm
3    sorry --
4    A.    I was just going to say I only
5    read it once, so.
6    Q.    Okay.  And just for my
7    clarification, you didn't read the article
8    before you were hired by the defendants,
9    did you?
10   A.    No, I did not.
11   Q.    Did you have an impression of Josh
12   Hastings after reading that article?
13   A.    Again, it doesn't -- I don't
14   recall the article or what exactly it
15   said, so I don't -- I didn't form my
16   opinion on either one of them from that
17   article.
18   Q.    Have you ever met Adam Jones or
19   Josh Hastings?
20   A.    No, I have not.
21   Q.    Have you ever been to Tuscaloosa,
22   Alabama?
23   A.    No, I've been to Mobile and

Page 98

1    Huntsville, but I have never been to
2    Tuscaloosa.
3    Q.    And what were you hired to do in
4    this case?
5    A.    I was hired to take a look at the
6    investigation that was conducted by Jones
7    and Hastings and to give my opinion on the
8    quality and type of investigation that
9    they conducted.
10   Q.    All right.  Let me show you what's
11   going to be marked as Exhibit 118.
12        (Whereupon, a document was marked
13        as Plaintiff's Exhibit No. 118 and
14        is attached to the original
15        transcript.)
16   Q.    Do you recognize Exhibit 118?
17   A.    I do.
18   Q.    And just for the record what is
19   it?
20   A.    It is my copy of my report.
21        MS. BOLGER:  Of course,
22   technically it's the first page of his
23   report, but I have faith, Scotch, that you

Page 99

1    have the other 39 pages, though.
2    Q.    (By Mr. Ritchey) I sure do.  I
3    would love to scroll through them with
4    you, but I hoped that wouldn't be
5    necessary.
6         MS. BOLGER:  No, I know.  I
7    just feel like I should mention that we
8    can only see one.  I don't think you're
9    tricking me.
10        MR. RITCHEY:  No, I'm not
11   tricking you.
12        MS. BOLGER:  No, I don't
13   think you are.
14   Q.    (By Mr. Ritchey) We'll go through
15   it in a little bit.
16        Does this report contain all of
17   your opinions that you're intending to
18   offer at the trial of this case if called
19   to do so?
20   A.    I think I might have one or two
21   opinions outside this report, but this
22   reflects pretty much most of them, yes.
23   Q.    What are your one or two opinions

Page 100

1    outside the report?
2    A.    I don't know.  I mean, I'm just
3    saying I kind of want to leave it
4    open-ended that there might be an opinion
5    down the road that I think of that is not
6    in my report, but sitting here right now,
7    I don't know what that would be.
8    Q.    Okay.  But as we sit here today,
9    you don't have any other opinions other
10   than what's included in this report?
11   A.    That is correct.
12   Q.    Okay.  All right.  On pages 1
13   through 6 of Exhibit 118 you've listed the
14   materials you reviewed.
15        If you need me to I can scroll
16   through all of them, but I'm just going to
17   ask is this the only materials you relied
18   upon in forming your opinions expressed in
19   this report?
20   A.    That is correct.
21   Q.    Have you reviewed the Tuscaloosa
22   County Homicide Unit's standard operating
23   procedures?

25 (Pages 97 to 100)

Page 101

1    A.    I have.
2    Q.    And when did you review those
3    SOPs?
4    A.    Probably about a month ago.  Maybe
5    earlier than that, but not much earlier
6    than that.
7    Q.    Has your opinion changed after
8    reviewing the SOPs?
9    A.    No, sir.
10   Q.    Why not?
11   A.    I'm sorry, what was that?
12   Q.    Why not?
13   A.    Why not?
14   Q.    Correct.
15   A.    Is that -- I think the SOPs
16   actually support my report.
17   Q.    How does the SOP support your
18   report?
19   A.    It talks about how to treat a
20   victim of a sexual assault and the things
21   that are listed there, I can tell you that
22   Investigator Jones did not follow by
23   having comfort for the victim and having

Page 102

1    -- making them feel comfortable.
2    Q.    And how did he fail at doing that?
3    A.    Well, he read her rights to her,
4    sir.  I mean his line of questioning was
5    accusatorial.  He treated her as a suspect
6    at one portion of the interview.  He
7    didn't allow her to at least get some
8    sleep, some food.
9    Q.    Is it your opinion he shouldn't
10   have read Ms. Rondini her rights?
11         MS. BOLGER:  Object to the
12   form.
13   A.    No, he shouldn't have.
14   Q.    (By Mr. Ritchey) Even though she
15   was confessing to a crime?
16   A.    Correct.
17   Q.    Did you review the Tuscaloosa
18   Police Department PGO or SOP?
19   A.    Is that the same document?
20   Q.    It would be different than the
21   Tuscaloosa County Homicide Unit's SOP.
22         MS. BOLGER:  So, Scotch, he
23   reviewed lots and lots of documents and I

Page 103

1    listed them all for you, so if you want to
2    show him the list, he can do it, but it's
3    a little unfair having a list in your
4    possession.
5          If you want to refresh his
6    memory, you can, but he's not going to
7    remember the whatever it was, 55 documents
8    he's looked at verbatim in any one moment,
9    and since you have the list I think you
10   should show it to him.  If it's there he
11   probably reviewed it.
12   Q.    (By Mr. Ritchey) Do you remember
13   reviewing it, Mr. Hershman?
14   A.    I don't know which -- so is there
15   two different SOPs that you're talking
16   about?  I don't understand the question.
17         Is it -- is there one for
18   Tuscaloosa Police Department and then one
19   for the homicide task force; is that what
20   you're saying?
21   Q.    Correct.
22   A.    I don't recall if I read the other
23   one or not.

Page 104

1    Q.    On page 2 of your report, which is
2    Exhibit 118, I think this was just a typo,
3    I just want to make sure I'm interpreting
4    that right, but list Item Number 1 says
5    BuzzFeed News article dated July 3rd,
6    2017, so that's supposed to be June 22nd,
7    2017?
8    A.    Yes, sir.
9    Q.    Okay.  Then I'm going to scroll
10   down to page 5.  It's a list of items, it
11   says images of DVDs and/or -- I'm sorry,
12   images of various DVDs and/or CDs.
13         Do you see where I am?
14   A.    Yes.
15   Q.    Did you just review the images of
16   these DVDs or CD?
17   A.    No, sir, they were just copies of
18   the DVDs that were inserted into the
19   felony packet.  I never had a DVD where I
20   actually viewed what was on it.
21   Q.    Did you ever ask to see what was
22   on this those DVDs or CDs?
23         MS. BOLGER:  And just for

Carlton Hershman                                    3/16/2021

---

Page 105

1    the record that's a really misleading
2    question, because as you know, we don't
3    have those.
4            So to the extent we're
5    implying that something was withheld or we
6    didn't have access to something, that is
7    misleading.
8            As you know, we don't have
9    those and there's no evidence as to what
10   was on them anywhere, so, no, Carl did not
11   see them.
12   A.    That's my answer.
13   Q.    (By Mr. Ritchey)  Is that correct?
14   A.    That's correct.  I didn't view or
15   ask for those, yeah.
16   Q.    Then on page 6 number 19, number
17   20 -- number 19 says screen shots of
18   Innisfree bar and number 20 says screen
19   shots of Houndstooth Condominiums
20   surveillance video.
21        Did you only view screen shots of
22   these videos or have you reviewed the
23   whole videos?

---

Page 106

1    A.    At the time I wrote this it was
2    the screen shots only.  Yeah, they've only
3    been the screen shots.
4            MS. BOLGER:  When you wrote
5    this report is what you're saying?
6            THE WITNESS:  Yes.
7    Q.    (By Mr. Ritchey) Do you remember
8    what those screen shots were of?
9    A.    The screen shots at the bar just
10   was just a bunch of people standing
11   around.
12        There was really no compelling
13   image that -- you know, within those
14   screen shots.
15        The other was of Rondini and Bunn
16   and Barksdale walking down the highway at
17   her apartment complex.
18   Q.    Have you ever -- or since you've
19   written this report, have you ever viewed
20   the full videos from Innisfree or
21   Houndstooth Condominiums?
22   A.    I don't believe so.  I don't
23   recall that.

---

Page 107

1    Q.    Is there a reason why you haven't?
2    A.    I don't think they were given to
3    me.  I know definitely the one at the bar
4    was -- that interview or screen shots were
5    just her leaving and him leaving, him
6    meaning Mr. Bunn.
7            Yeah, I just don't recall seeing
8    any actual them walking or anything like
9    that.  I mean, I reviewed a lot of
10   material, so.
11   Q.    The Houndstooth Condominium
12   apartment video was kind of important,
13   wasn't it?
14   A.    No, I don't -- it's important the
15   fact that they had gone there, but it
16   wasn't that important, no.
17   Q.    Well, this was the time that you
18   noted that Ms. Rondini did not remember;
19   isn't that right?
20   A.    That's correct.
21   Q.    So wouldn't viewing these whole
22   videos be important to your review of his
23   investigation?

---

Page 108

1    A.    Well, when you say important, it's
2    not -- it's not like it's a -- you know,
3    that it's something very compelling.
4            I mean, she did state that she did
5    not remember going there and then, you
6    know, she doesn't remember leaving the
7    bar, so as to her being blacked out, I
8    think verbally she is able to relay that.
9            I didn't need a video to show
10   that.  I mean it was nice to have because
11   in an investigation you want to have
12   everything.
13        But, you know, if she's walking
14   and talking like normal, then, you know,
15   that's part of being blacked out.
16   Q.    Wouldn't that contradict being
17   blacked out, though?
18   A.    No.  Blacked out is not -- there's
19   a difference between being drunk and
20   stumbling and as to blacked out.
21        You can talk to somebody blacked
22   out and you would have no clue that they
23   were.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                          3/16/2021

|                          Page 109 |                          Page 110 |
|-----------------------------------|-----------------------------------|

**Page 109**

1    Q.    All right.  On number 21, it says
2    you reviewed an excerpt of data reviewed
3    -- I'm sorry, retrieved from Megan
4    Rondini's phone by Tuscaloosa County
5    Homicide Unit of the Tuscaloosa Sheriff's
6    Office.
7         Do you remember what excerpt you
8    had?
9         MS. BOLGER:  Just for the
10   record, part of it is listed above; right?
11        There's -- this is part of a
12   much longer list, so there's other things
13   in the list other than that reference.
14   Q.    (By Mr. Ritchey) Well, it may be.
15   It's just not clear on his report is what
16   I'm just trying to get clarification of.
17   A.    Well, some of it was her texting
18   her friends and some of it was her texting
19   different -- at different parts of the
20   night once she had left the bar.
21   Q.    Are sending and receiving these
22   text messages that you reviewed consistent
23   with being blacked out?

**Page 110**

1         MS. BOLGER:  I'm sorry,
2    could you say it again, Scotch?  You cut
3    out.
4         MR. RITCHEY:  Do you mind
5    reading it back?
6         (Whereupon, requested portion was
7         read back by court reporter.)
8         MR. RITCHEY:  And that's you
9    reviewed.
10   A.    It can be, yes.
11        MS. BOLGER:  Scotch, since
12   there's no pending question, you guys must
13   have the microphone in a slightly
14   different space today because you're kind
15   of garbled a little.
16        Would you mind just moving
17   it closer?  I don't want to have to
18   interrupt you in every question.
19        MR. RITCHEY:  Does that
20   sound better?
21        MS. BOLGER:  Yeah, that does
22   actually.  Thanks.
23   Q.    (By Mr. Ritchey) Okay.

|                          Page 111 |                          Page 112 |
|-----------------------------------|-----------------------------------|

**Page 111**

1         I'm going to scroll to page 9.  On
2    page 9 it's Section 4 rebuttal of opinion
3    by Robert G. Pastula.
4         You said you've read the report
5    and disagree with his analysis,
6    conclusions, and opinions and will offer
7    rebutting testimony.
8         What is that testimony you'll be
9    offering?
10   A.    As to his report?
11   Q.    Correct.
12   A.    What he states in his report that
13   the two investigators had done everything
14   they could, they had done a good job, and
15   I would rebut that, that statement alone
16   that that is not what occurred.
17   Q.    What --
18   A.    Could you scroll up a little bit?
19   Q.    Sure.
20   A.    No, I'm sorry, down.
21   Q.    Okay.
22   A.    Yeah, so I stated right there what
23   I would be rebutting, that they had drew

**Page 112**

1    premature conclusions and he's saying that
2    they had done a good job, and my opinion
3    is that they have not -- that they did
4    not.
5    Q.    Okay.  Are there any other
6    opinions that you're offering to rebut
7    Mr. Pastula's opinion that is not included
8    in this expert report?
9    A.    Not off the top of my head, no.
10   Q.    In your opinion, how did Jones and
11   Hastings fail to complete a thorough,
12   factual and detailed investigation into
13   Ms. Rondini's allegations of sexual
14   assault?
15   A.    Well, they did not conduct a
16   detailed report because they from the very
17   beginning of them responding to the
18   hospital all the way through until the end
19   of the day they had made several gross
20   errors in their investigation.
21        And a bad investigation is you're
22   going to have a bad outcome.  And there's
23   a lot of things that they did not do

28  (Pages 109 to 112)

Carlton Hershman                                              3/16/2021

Page 113

1    proper, and that was from not getting
2    enough information at the hospital, not
3    having a forensic kit, a complete forensic
4    kit done on Ms. Rondini.
5         Failure to obtain a court-ordered
6    search warrant.  They did not arrest
7    Mr. Bunn so he also could be processed.
8         The interview of Rondini was just
9    not adequate in any way.  They did not
10   receive the proper information from
11   Rondini, which they could have if they
12   would have interviewed her correctly.
13        They allowed Mr. Bunn to not be
14   questioned for four days which is unheard
15   of.  There was evidence that was collected
16   that was never tested.
17        The supposed interrogation of
18   Mr. Bunn was inadequate and completely
19   inappropriate for what this was.  Their
20   actions -- unfortunately we won't know the
21   truth of what happened that night because
22   of their actions, Hastings and Jones, and
23   the way they conducted their

Page 114

1    investigation.
2         For Mr. Bunn they didn't offer him
3    a polygraph.  They had in my view
4    confirmation bias as to his, you know, for
5    him as for what he was being accused of,
6    and their investigation, excuse me, was
7    clearly -- their target was to end the
8    investigation as quick as it started.
9    Q.    Do you know if the Homicide Unit
10   had access to a polygraph at the time of
11   the investigation?
12   A.    I'm sorry, all I heard was the
13   last part of that.
14   Q.    Do you know if the Homicide Unit
15   had access to a polygraph at the time of
16   the investigation?
17   A.    I don't know.
18   Q.    And they couldn't give him a
19   polygraph if they didn't have access to a
20   polygraph; is that correct?
21         MS. BOLGER:  Object to the
22   form.
23   A.    If they don't have it, they don't

Page 115

1    have it, but they could always offer it.
2    I mean somebody -- I would assume somebody
3    down there has a polygraph --
4    Q.    (By Mr. Ritchey) But you've never
5    been to Tuscaloosa -- I'm sorry.
6         But you have never been to
7    Tuscaloosa so you wouldn't know that; is
8    that correct?
9    A.    That's correct, uh-huh
10   (affirmative).
11   Q.    Were Jones and Hastings the only
12   two investigators that were assigned to
13   this case?
14   A.    No.
15   Q.    Did any of the other investigators
16   that were assigned to this case contribute
17   to the failure which you opine on in your
18   expert opinion?
19   A.    Well, the investigation, I think
20   his last name is Carroll, when he takes
21   the statement from Mr. Bunn while they're
22   sitting in a car is -- there's just no
23   relevant information that he obtains from

Page 116

1    him.
2         And the fact that he's put in a
3    situation where he doesn't know anything
4    about the case and here he is charged with
5    taking a statement from a suspect.
6    Q.    How do you know --
7    A.    I mean that's --
8    Q.    I'm sorry.  Go ahead.
9    A.    I was just going to say that this
10   whole investigation was rushed and it
11   didn't need to be rushed.
12        This investigation should have
13   took four to six weeks to complete, and by
14   piecing or to piecemeal out different
15   things, you do this, you do that, and then
16   not to have it all come back to one lead
17   investigator is just not a proper
18   investigation, it's not even close.
19   Q.    Why is that not a proper
20   investigation to use other investigators
21   on a case?
22         MS. BOLGER:  Object to the
23   form.  That's not what she said.

Carlton Hershman                                    3/16/2021

Page 117

1      Carl, go ahead.
2      A.    Yeah, so when you go to a crime
3      scene, of course, you have other
4      investigators, people are all doing
5      certain things, and, you know, you have
6      the crime scene, I take the victim, you do
7      the witness statements.
8          At some point, though, you come
9      together and all that information gets
10     funneled into one investigator, which is
11     the lead investigator.
12         The one thing that you don't want
13     to piecemeal out would be the person that
14     interviews the victim should also
15     interview the suspect.  That's just one
16     thing you don't piecemeal.
17     Q.    And how do you come to learn not
18     to piecemeal that?
19     A.    Well, I just have been taught that
20     and I've also practiced it and I also
21     teach that that because you lose so much
22     -- there's so many questions that don't
23     get answered when one side doesn't know

Page 118

1      what the other side is saying.
2      Q.    And do you know if Adam Jones or
3      Josh Hastings were taught that same
4      tactic?
5      A.    I'm sorry, say that again.
6          MR. RITCHEY:  Do you mind
7      repeating that?
8          (Whereupon, requested portion was
9          read back by court reporter.)
10         MS. BOLGER:  Object to the
11     form.
12     A.    I don't know if they were taught
13     that.  It's just -- that's investigation
14     101.  That's -- I mean, that's just common
15     sense that you don't do that.
16     Q.    (By Mr. Ritchey) Did you have this
17     common sense before you attended your
18     first law enforcement training?
19         MS. BOLGER:  Object to the
20     form of the question.
21         You can answer that one
22     question about common sense.
23     A.    Sure, I learned that in patrol.

Page 119

1      Q.    (By Mr. Ritchey) Right.  And you
2      were trained on that; right?
3          MS. BOLGER:  Trained on
4      common sense?  Sorry, is that the
5      question?
6          MR. RITCHEY:  Well, he said
7      it was common sense to him so --
8          MS. BOLGER:  No, I'm asking
9      what the question is.  I'm not arguing
10     with you.  I want to know what the
11     question you're asking the witness is.
12     Q.    (By Mr. Ritchey) I want to know
13     how he was trained on what he's been
14     discussing?
15         MS. BOLGER:  And he just
16     told you he was in patrol and he was
17     trained when he was in the sex crimes
18     unit.  He just answered the question.
19         MR. RITCHEY:  No, I think
20     you answered that.
21         MS. BOLGER:  No, that's what
22     he said, but, Carl, you can answer it.
23     When were you trained to investigate

Page 120

1      crimes?
2      A.    Yeah, I mean, when you're a patrol
3      officer you go to a crime scene, you need
4      to find out what happened and you don't
5      have -- you don't split people up.
6          And then if you do, and that's
7      fine to do that, but then whoever is
8      talking to the victim needs to know what
9      the suspect said, and that's when you --
10     you know, when you go to a crime scene as
11     a patrol officer things happen very
12     quickly, and it's different than when
13     you're an investigator.
14         When you become an investigator,
15     that's -- you know, you're the lead
16     investigator.  You have to know every
17     aspect of what was said, done, collected,
18     not collected.  You need to know all that.
19         And when you have -- in this case,
20     you know, Mr. Bunn was questioned by two
21     different investigators, one was by
22     Investigator Carroll and the other was by
23     Hastings.

Carlton Hershman                                    3/16/2021

Page 121

```
1          Now, did they talk amongst
2     themselves?  Who knows.  I mean, none of
3     it is documented.
4     Q.    (By Mr. Ritchey) Who taught you
5     not to split up interrogations?
6          MS. BOLGER:  Object to the
7     form of the question.
8     A.    I don't know who taught me that,
9     sir.  I became a detective in 1997 and
10    that's just a very basic thing that you
11    don't do.  It's very basic.
12    Q.    (By Mr. Ritchey) Well, who told
13    you it was basic?  Is this something you
14    got on-the-job training or is this some
15    kind of formal training you received?
16         MS. BOLGER:  Same objection.
17    A.    It's my experience.
18    Q.    (By Mr. Ritchey) And do you know
19    if Adam Jones or Josh Hastings had the
20    same experience as you did?
21    A.    I would -- I don't know.  I don't
22    think so.  Who knows.
23         I mean if they did, they wouldn't
```

Page 122

```
1     have done what they did.
2     Q.    Do you know what training Adam
3     Jones or Josh Hastings went through?
4     A.    No, I do not.
5     Q.    Do you know what on-the-job
6     training Adam Jones or Josh Hastings had?
7     A.    No, I do not.
8     Q.    Do you know what rank I believe
9     you said Carroll was that took Mr. Bunn's
10    interview on July 2nd, 2015?
11    A.    I'm sorry, his rank?
12    Q.    Right.
13    A.    I believe he was a sergeant.
14    Q.    Is that usually someone who is
15    superior to detectives?
16         MS. BOLGER:  Object to the
17    form of the question.
18    Q.    (By Mr. Ritchey) I'm sorry, what
19    was that, Mr. Hershman?
20    A.    Yes.
21    Q.    On page 10 of your report, saying
22    Jones and Hastings failed to make
23    follow-up inquiries?
```

Page 123

```
1          MS. BOLGER:  I'm sorry, I
2     don't know where you are.  Where are you?
3     Q.    (By Mr. Ritchey) On page 10, end
4     of the first line going into the second
5     line.
6          MS. BOLGER:  Okay.
7     A.    I see it.
8     Q.    (By Mr. Ritchey) What follow-up
9     inquiries are you alleging they failed to
10    do?
11    A.    Well, first of all, they didn't --
12    they could have followed up with the
13    nurse, the hospital staff, and could have
14    interviewed them.
15         Could have tested the one sample
16    that they did have.  They could have
17    talked to the nine people that was given
18    to them on Ms. Rondini's handwritten list
19    of the nine people she was with that night
20    along with their phone numbers.
21         They could have talked to the bar
22    staff.  They could have talked to any
23    customers that was there that possibly
```

Page 124

```
1     were witnesses.
2          Could have talked to the doorman
3     as to her condition walking out.  They
4     could have dumped his phone.  They could
5     have followed up with the second tier
6     witnesses, her friends that knew how she
7     felt or how she acted, you know, days
8     after the assault and talked with her
9     parents to see what kind of, you know, has
10    she changed in any way, how the assault
11    had affected her.
12         They could have followed up with
13    maybe Barksdale's phone also to see if he
14    had been texting anybody.  There's a lot
15    of questions that were unanswered or at
16    least needed to be clarified with the taxi
17    cab driver.
18         So, yeah, there's a lot of things
19    that, you know, they could have done.
20    They could have brought Rondini back in
21    for another interview about her assault,
22    about the theft and clear up a lot of what
23    was lacking in the investigation.
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                                3/16/2021

Page 125

1   Q.   What could the nurse or hospital
2   staff told Jones or Hastings?
3   A.   They could have been witnesses to
4   Ms. Rondini when she first arrived on her
5   demeanor, things that she had told them
6   about the assault, did they witness her
7   talking about her being held down.
8      In their reports, in the nurse's
9   report it actually says was held down.
10  They should have went back and contacted
11  that nurse and asked her what Rondini had
12  told them about being held down.
13  Q.   That was Ms. Rondini --
14  A.   That wasn't done.
15  Q.   Is Ms. Rondini's recount of what
16  happened not enough?
17       MS. BOLGER:  What?  I'm
18  sorry, objection.  I didn't understand the
19  question but I may also not have heard the
20  end.
21       Would you ask it again,
22  Scotch?
23  Q.   (By Mr. Ritchey) Sure.

Page 126

1      So you're saying they could have
2   -- the nursing or hospital staff could
3   have told a little bit more about what
4   Rondini said to them.
5      Was it not enough to take
6   Ms. Rondini's statement about what
7   happened?
8   A.   No, an investigator in any case
9   has to either corroborate or contradict
10  what people say.
11      And the fact that she had said
12  this to at least two different people,
13  they needed to corroborate what she had
14  said, and just somebody writing it down on
15  the form did she say -- did she just say
16  she was held down or did she elaborate
17  more on it.
18      I mean was this just kind of a,
19  you know, a bullet form of, you know,
20  writing it down or did she elaborate?  So,
21  yeah, you want to be able to corroborate
22  because, look, that's a very, very
23  important statement for Ms. Rondini to

Page 127

1   make.
2      I mean very -- that's very
3   compelling that she made that statement,
4   and not once though at least twice.
5   Q.   Couldn't Ms. Rondini have
6   elaborated on that statement in her
7   interviews with Jones and Hastings?
8   A.   If she was asked, yeah.  She was
9   never -- she volunteers it, but she was
10  never asked.
11      So, you know, for me they should
12  have, you know, have her clarify it more
13  as to how she was held down, when she was
14  held down, at what point, and so on and so
15  forth.
16      But talking to the hospital staff
17  is it may be that she had relayed
18  something to them more than she had
19  relayed to Hastings and Jones.
20      Again, that's a very standard
21  thing to do to go back and talk to the
22  nurses, especially since the report is one page.
23  I mean it's -- I've never seen that

Page 128

1   before.
2   Q.   What report are you referring to?
3   A.   The report that the nurse prepared
4   at the hospital.
5   Q.   Okay.  So you've never seen the
6   hospital or a hospital have a one-page
7   report concerning a sexual assault?
8   A.   No --
9   Q.   Do you know --
10  A.   -- I mean here in San Diego
11  they're 10 to 15 pages long.
12  Q.   Do you know if the hospital that
13  Ms. Rondini went to had a SANE nurse or a
14  SANE examiner?
15  A.   I don't believe so.
16  Q.   Are you aware of any hospital
17  policy or procedure as it pertains to
18  sexual assaults?
19       MS. BOLGER:  Object to the
20  form.  Do you mean in the world?
21  Q.   (By Mr. Ritchey) No, I'm sorry for
22  DCH.
23  A.   I'm not aware, no.

                              32  (Pages 125 to 128)

Carlton Hershman                                              3/16/2021

---

Page 129

1    Q.    What would you be able to gather
2    from Ms. Rondini's demeanor?
3    A.    That she had suffered from trauma.
4    Would she be capable at that point in time
5    to give a detailed interview.  Was she be
6    capable of that.
7         What caused her demeanor to be,
8    you know, crying or upset or scared.  She
9    obviously had reacted to something that
10   happened to her so demeanor is very
11   important.
12   Q.    Do you know whether or not Jones
13   or Hastings talked to a nurse or someone
14   at the hospital concerning Ms. Rondini?
15   A.    I don't know.  They never
16   documented it if they did.
17   Q.    Then you mentioned they should
18   have tested this one sample from the
19   hospital; is that correct?
20   A.    Yes.
21   Q.    What was that sample?
22   A.    I believe it was urine.
23   Q.    And what could testing that sample

---

Page 130

1    tell?
2    A.    It could tell you any number of
3    drugs that were in her system, the amount
4    of alcohol at that point in time in her
5    system.
6    Q.    And how would that have affected
7    the outcome of this case or this
8    investigation?
9    A.    The outcome?
10   Q.    Right.
11   A.    Is that what you're -- well, I
12   don't know the outcome.
13        It's -- look, her capacity is part
14   of the case.  It's -- it goes back to, you
15   know, her being blacked out and how did
16   she get that way.
17        And it could be any number of
18   things why you would want to test it.  I
19   mean, the outcome, who knows.  Maybe
20   nothing or it could be the whole thing.
21   It could be the whole case.  We don't know
22   because it was never tested.
23   Q.    Is it your opinion that

---

Page 131

1    Ms. Rondini was drugged during this time
2    of her allegations --
3         MS. BOLGER:  Object to the
4    form of the question.
5    A.    I have no idea.
6    Q.    (By Mr. Ritchey) Is there any
7    evidence suggesting that she was drugged?
8    A.    No, there is no evidence that she
9    was drugged when it comes to this
10   investigation.
11        I mean, again, I don't -- we don't
12   know.  I mean, we'll never know because of
13   the way the investigation was conducted.
14        I mean we just don't know.  So I
15   can't, you know, answer that question.
16   Q.    How would the amount of alcohol
17   Ms. Rondini had in her system affected the
18   outcome of the case?
19   A.    Well, I mean, I know you keep
20   saying outcome, but I think it shows --
21   the amount of alcohol would show how she
22   ended up, you know, leaving on her own
23   from this bar, not having memory of her

---

Page 132

1    going to her apartment.
2         Again, making those choices that
3    she -- that, you know, that she probably
4    wouldn't have if she was sober and if, in
5    fact, she was drunk.
6         So it shows her state of mind and
7    mentality of, you know, having somebody
8    come back to her apartment with her and
9    not -- and having -- and just not being
10   aware of it.
11        It shows her actions at the very
12   beginning of the night of the case
13   throughout, so yeah, I mean you would want
14   to be able to explain those things to a
15   jury as to why she did certain things.
16   Q.    Is that an investigator's job to
17   explain those things to a jury?
18   A.    Absolutely.  Absolutely.  It goes
19   back to that behavioral evidence.
20   Q.    What do you mean it goes back to
21   the behavioral evidence?
22   A.    Well, again, was her plan to show
23   up with nine friends at a bar and then

---

33  (Pages 129 to 132)

Carlton Hershman                                    3/16/2021

---

Page 133

1   leave by herself?
2        You know, does it show that -- I
3   mean it shows that, you know, what was she
4   thinking by getting into a car and she has
5   no memory of getting into that car.  She
6   just remembers being in the car.
7        So when you have all of these, you
8   know, what I call strange things that
9   happen in these type of sexual assault
10  cases, that they need to be explained and
11  the jury needs to understand why your
12  victim does these odd things.
13       And usually it comes back to the
14  drugs and alcohol, and in her case, you
15  know, more the alcohol.
16  Q.   What would -- why would you need
17  to explain away these strange things, as
18  you call it, that Ms. Rondini did
19  throughout the night?
20       MS. BOLGER:  Object to the
21  form.
22  A.   So the jury gets the big picture,
23  right.  So they understand the whole

---

Page 134

1   picture and the truth as to what happens
2   and why someone that doesn't know another
3   person or other two people invite them
4   back to her apartment and then have no
5   memory of it.
6        So, you know, juries in criminal
7   cases are told -- you know, they're given
8   jury instructions and they're told
9   basically, you know, if you're on the
10  fence and you don't know, then you have to
11  give the defendant the benefit of the
12  doubt, and in these type of cases there's
13  always doubt, any case really, but in
14  these cases so much more because juries
15  have biases.
16       So it needs to be explained to
17  them and the only way to do that is to
18  conduct a detailed, thorough, accurate
19  report.
20  Q.   Would these actions that you're
21  calling strange have any bearing on the
22  sexual assault case or a rape case?
23       MS. BOLGER:  Object to the

---

Page 135

1   form.
2        I think you're mixing apples
3   and oranges.  Do you mean Megan Rondini or
4   all -- I don't understand the question.
5        If you understand, Carl, you
6   can answer.
7        I don't understand what the
8   question is about.
9   A.   Yeah, I don't know if it's general
10  or not.
11  Q.   (By Mr. Ritchey) Let's be specific
12  to Ms. Rondini's allegations and her
13  investigation.
14       MS. BOLGER:  So what's the
15  question?
16  Q.   (By Mr. Ritchey) So what
17  significance would her actions earlier in
18  the night have on whether or not she was
19  raped?
20  A.   Well, it shows, you know, a
21  chronological order of what occurred, her
22  mindset, her sobriety.
23       Throughout the night you always

---

Page 136

1   want to know everything that your victim
2   has done before, during, and after an
3   assault.
4        It's just a complete detailed
5   investigation.  You know, you don't start
6   a joke with the punch line, right?  You
7   set it up.
8        And that's what investigations do.
9   You find out what happened and then you
10  tell a story.
11  Q.   You also mentioned that I think in
12  the interview the nine people Ms. Rondini
13  listed that were at the bar.  What could
14  those nine people have offered?
15  A.   Well, they could, you know, they
16  could explain or at least give you some
17  insight as to how much she had to drink.
18       You know, how was she acting from
19  the beginning of the night and then until
20  the last time she was seen at the bar by
21  herself.  What was the plan.
22       Was the plan to all leave together
23  or, you know, did something happen at the

---

34  (Pages 133 to 136)

Carlton Hershman                                          3/16/2021

Page 137

1    bar.  You know, she was -- I believe she
2    was in an argument or had gotten into an
3    argument with another female.  What was
4    that about?
5         Did Rondini say something to them
6    that, you know, that pointed them to
7    Mr. Bunn or Mr. Barksdale.  So there's a
8    lot of information there that just became
9    lost.
10        You know, usually you only have
11   one or two witnesses.  Here you had nine.
12   I mean, and they had phone numbers where
13   they could just contact them, so it wasn't
14   like they had to hunt them down.
15   Q.    But these witnesses didn't see the
16   alleged rape, did they?
17   A.    I would think not, no.
18   Q.    And how would that information
19   that could have been obtained from these
20   nine people have affected the course of
21   the Rondini investigation?
22        MS. BOLGER:  Object to the
23   form.  Asked and answered.

Page 138

1         You can answer it again,
2    Carl.
3    A.    I don't know if it would affect
4    the outcome or not, sir.  What I'm saying
5    is they give you the entire picture of
6    what occurred.  By not talking to them, I
7    don't know.
8         Maybe they had, you know, good
9    information, maybe they didn't have any
10   information at all, but you've got to go
11   out and talk to them, so we don't know if
12   it would have affected the outcome or not.
13        And the only way we would know
14   that is if Jones or Hastings would have,
15   you know, contacted them.  Look, these
16   people were important to Ms. Rondini.
17        She wanted these two investigators
18   to know that these are the people that
19   were with me at the bar that night.
20   Q.    And none of them witnessed --
21   A.    I mean, that's why she gave their
22   names and phone numbers to them.
23   Q.    But none of them witnessed the

Page 139

1    alleged rape, did they?
2    A.    I don't think any of them was in
3    the room that day, no.  But, again, we
4    don't know what information they have.
5    Q.    You mentioned that Ms. Rondini may
6    have had an argument with another female
7    at the bar; is that right?
8    A.    That's correct.
9    Q.    Where did you get that information
10   from?
11   A.    I don't recall.  I don't recall,
12   sir.  I can't remember where I got that
13   from.  Let me think about it.  It will
14   come to me.
15   Q.    Okay.  If it does, just let me
16   know and we'll come back to it.
17   A.    It will.  I will come back to it.
18   Q.    Do you remember what the argument
19   was about?
20   A.    Again, we don't know because
21   nobody at the bar is spoken to, and
22   Rondini was never -- never volunteered it
23   or asked about it, so I don't know if the

Page 140

1    female was part of that group or part of
2    somebody else's group or who knows, or if
3    it was an employee.
4         None of those questions were ever
5    asked or answered so, and they should have
6    been.
7    Q.    What effect would that have had on
8    the investigation?
9    A.    I don't know.  I don't know what
10   information they have.  I mean, it could
11   have been a big nothing or it could have
12   been very important.
13        I mean did Mr. Bunn hit on one of
14   these other girls.  I mean was there a
15   conversation between what I call the nine
16   and Mr. Barksdale or Mr. Bunn.  I don't --
17   I don't know and we'll never know.
18   Q.    What would talking to the bar
19   staff or customers have provided to the
20   investigation?
21   A.    What -- again, and I keep saying
22   that we don't know because we don't know
23   what information they had.

Carlton Hershman                                           3/16/2021

Page 141

```
 1        What they possibly could have as
 2  to Ms. Rondini's her, you know, capacity
 3  as far as, you know, how much she had to
 4  drink and was she slurring her speech.
 5  Did Mr. Bunn say something to the
 6  bartender about Ms. Rondini.
 7        I mean, there's a lot of things
 8  that could have been said.  Had Mr. Bunn
 9  -- was there complaints before by other
10  young ladies about him.
11        So the information could just run,
12  you know, a thousand different things,
13  and, again, that's why you want to go out
14  and, you know, obtain that, these
15  statements from these people.
16  Q.    What would Bunn saying something
17  to one of the bartenders or staff, you
18  know, how would that have affected the
19  investigation, if he had said something?
20  A.    I don't know, sir.  I mean, if he
21  was asking about Ms. Rondini, maybe he
22  targeted her.  I don't know.
23  Q.    Is there any evidence that he
```

Page 142

```
 1  targeted her?
 2  A.    Of course not, because none of
 3  these people were talked to.  I'm just
 4  saying that's a possibility, sir.
 5        I mean, you asked me the question
 6  so I answered it, but, again, we don't
 7  know.
 8  Q.    You also mentioned that they
 9  failed to dump Bunn's phone.  What could
10  Bunn's phone have provided the
11  investigation?
12  A.    It could have maybe shown that he
13  was texting about Rondini or maybe he had
14  prior plans that he was canceling things
15  because of Rondini or maybe he was texting
16  to Barksdale.
17        You know, some people text to
18  people right next to them.  Again, we
19  don't know because his phone wasn't dumped
20  so.
21        But it is a possibility that, you
22  know, that he had mentioned her or
23  something to do with what was happening
```

Page 143

```
 1  inside the bar or even afterwards that
 2  he's texting to a person, but, again, we
 3  don't know.
 4  Q.    And how would that affect the
 5  investigation?
 6  A.    Again, we don't know.  And I keep
 7  saying that.  It's just part of the
 8  problem with this investigation is all
 9  this information that was just not
10  collected, just, you know, makes it
11  incomplete and not detailed.
12        I mean to answer your question, I
13  don't know.  Maybe it doesn't, maybe it
14  doesn't.  I don't know.
15  Q.    And correct me if I'm wrong, I
16  think you said some second tier witnesses
17  could have told investigators how
18  Ms. Rondini felt or acted; is that
19  correct?  Did I say that right?
20  A.    I don't think I said felt.  I
21  think I said her, maybe her -- you know,
22  if she had her faculties, I mean, was she,
23  you know, speaking with slurred speech,
```

Page 144

```
 1  that type of thing.
 2  Q.    Okay.  From your review of
 3  everything that you've listed in your
 4  materials, could you tell if Ms. Rondini
 5  had a decrease in her use of faculties?
 6        MS. BOLGER:  Object to the
 7  form.  Ever?  Or at what point?
 8  Q.    (By Mr. Ritchey) Any point during
 9  anything you've reviewed as far as this
10  case is concerned?
11  A.    Okay, I didn't hear the very end
12  of that question, though, Mr. Ritchey.
13  I'm sorry.
14  Q.    Okay.  In what you've reviewed and
15  forming your expert opinion what evidence
16  is there that Ms. Rondini did not have
17  full use of her faculties?
18        MS. BOLGER:  You mean when
19  she said she blacked out?  What time are
20  you talking about?
21  Q.    (By Mr. Ritchey) At any point --
22  from what he reviewed at any point that
23  you told me.
```

36 (Pages 141 to 144)

Carlton Hershman                                    3/16/2021

Page 145

1    A.    Well, the fact that she doesn't
2    remember going back to her apartment and
3    then regains her faculties in the backseat
4    of Mr. Bunn's car and she has this very
5    large gap of being blacked out and, you
6    know, not remembering leaving the bar, you
7    know, and that's per her statement, you
8    know, her testimonial evidence would be
9    the fact that she was blacked out.
10        That shows me that she was
11   incapacitated and because she said she had
12   four, you know, five or six beers I
13   believe it was, so, yeah, the fact that
14   she was blacked out.
15   Q.    What does the amount of beers have
16   to do with it?
17   A.    Well, it shows that she had been
18   drinking. We don't know the type of beer,
19   the alcohol content of it, the size of it.
20        We don't know any of that stuff,
21   which, again, that's where the bar people
22   come in as to how much alcohol she had on
23   board.

Page 146

1         We also don't know if she had any
2    depression medicines or anything like that
3    because the blood test wasn't taken.
4    Q.    In your report are you ever
5    opining that Ms. Rondini lost
6    consciousness or passed out?
7         MS. BOLGER: Object to the
8    form. The report speaks for itself, but
9    you can answer.
10   A.    No, I don't -- I never said that
11   she had passed out.
12   Q.    (By Mr. Ritchey) You just said a
13   blood test was not taken. Whose
14   responsibility is it to take a blood test?
15   A.    In Alabama I don't know. In San
16   Diego it's the forensic doing the -- the
17   rape kit.
18        But I mean I -- you know, when we
19   go to those here in San Diego, I don't
20   know about Alabama, because I know you're
21   going to ask me that, but you have to know
22   that blood and urine was taken.
23        I mean you think that it would be

Page 147

1    standard and sometimes it's not. That's
2    why as an investigator you make sure that
3    those, you know, samples are taken and
4    also, you know, swabs in different areas.
5    That's why you sit and talk, you know,
6    with the person collecting that stuff.
7    Q.    And who taught you to do that?
8    A.    That's what we do here in San
9    Diego. That's the standard. I thought it
10   was standard everywhere, right, but --
11   Q.    Let me ask you this when you're
12   mentioning best practices and standard, I
13   guess procedure for lack of a better term,
14   are you basing that off of what you know
15   with the San Diego Police Department only?
16        MS. BOLGER: So I'm going to
17   object to the form of that question and
18   ask you to unpack it.
19        You just asked best
20   practices and standard procedure. There
21   are best practices and there are standard
22   operating procedures.
23        We've sent Carl the standard

Page 148

1    operating procedures and he can talk about
2    them, but you can't bunch them together.
3         So if you want to ask those
4    two separate questions, ask them separate,
5    but otherwise it's misleading.
6    Q.    (By Mr. Ritchey) Okay. When
7    you're talking about best practices is
8    that based on your experience with the San
9    Diego Police Department only?
10   A.    No.
11   Q.    And what else is it based on?
12   A.    Well, I mean, I travel all over
13   the United States instructing and teaching
14   and speaking at conferences.
15        I, you know, sat in on other
16   trainings, but I also talk to other
17   investigators and other instructors who
18   are in law enforcement.
19        And, you know, when we sit down
20   and talk and do these roundtables, you
21   know, we talk about all aspects of sexual
22   assault and not just these types but other
23   types.

37  (Pages 145 to 148)

Carlton Hershman                                          3/16/2021

Page 149

1    And, you know, the standards
2  testing that you do are actually, you
3  know, the swabs and blood and urine.
4  That's just a gimme.
5    I would never think that was a
6  problem this day and age, but I'm just
7  saying and I'm not, you know -- I'm just
8  saying that that's kind of a fundamental
9  thing that you would do.
10   But you are an investigator across
11 the nation, you're in charge of that, of
12 all aspects of collecting evidence.
13 You're the lead investigator.
14 Q.    And when you're talking about
15 standard procedure is that just based on
16 your experience with the San Diego Police
17 Department?
18 A.    No.  That's actually I mean
19 Alabama they have written in there that
20 you are responsible for the actual kit
21 itself and, you know, what is, you know,
22 the type of samples that are taken.
23   I believe it says in there that

Page 150

1  you also take -- for the chain of custody
2  you also will take custody of it.
3  Q.    Did you review Loyd Baker's
4  deposition?
5  A.    I did.
6  Q.    Do you remember in there when he
7  was talking about that provision you just
8  spoke about?
9  A.    Not off the top of my head, sir.
10 You can refresh my memory.
11 Q.    Give me one second.
12 A.    Sure.
13 Q.    All right.  I am showing you Loyd
14 Baker's deposition in this case, and we're
15 looking at pages 49 through 52.  I've
16 highlighted the relevant portions.
17   If you need me to scroll up or
18 down for reference, I would be happy to do
19 so as well, but just let me know when
20 you've reviewed that.
21   MS. BOLGER:  Do you want to
22 show him the SOP that you're trying to get
23 around or do you just want to show him the

Page 151

1  testimony?
2    MR. RITCHEY:  I just want to
3  show him the testimony.
4    MS. BOLGER:  Actually could
5  you make it a little larger?
6  A.    Yeah, it's kind of small, sorry.
7  Q.    (By Mr. Ritchey) Is that better?
8  A.    Yes, a lot better.  Thank you.
9  Q.    And if I need to scroll down more,
10 just let me know.
11 A.    Okay.  Can you scroll a little
12 bit?  Thank you.  That's good.  Okay.
13 Q.    Okay.  Is this the SOP you were
14 talking about?
15   MS. BOLGER:  Why don't you
16 show him the SOP?  This is -- object to
17 the form.  This is not an SOP.  You're not
18 showing him an SOP.
19   Carl, the answer to that
20 question is no.
21   If you want to show him an
22 SOP, show him the SOP.  Don't show him
23 Baker's testimony.

Page 152

1    MR. COCKRELL:  Katie, let
2  him answer the questions and just make
3  objections --
4    MS. BOLGER:  No, you're
5  trying to --
6    MR. COCKRELL:  Put your
7  objection on the record and let's -- quit
8  clouding the document.  Just answer the
9  question and object --
10   MS. BOLGER:  You can't
11 answer A question about the SOP looking at
12 this document, Carl.
13   I direct you not to answer a
14 question about the SOP based on this
15 document --
16   MR. COCKRELL:  He can say
17 that without -- he can say that without
18 you volunteering that information.
19   If he wants to see it, he
20 can see it, but, you know --
21   MS. BOLGER:  Carl, you can't
22 answer the question that's pending --
23   MR. COCKRELL:  -- state an

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                        3/16/2021

---

Page 153

1    objection without making statements --
2         MS. BOLGER: -- Carl, don't
3    answer the question that's pending.
4         Scotch, you can ask him a
5    question that's not about an SOP he's not
6    looking at.
7    A.   I would like to see the SOP.
8    Q.   (By Mr. Ritchey) Was this not part
9    of the SOP that we've been talking about?
10        MS. BOLGER: Object to the
11   form.
12        If you want to ask him a
13   question about the SOP, show him the SOP.
14        MR. RITCHEY: It has the SOP
15   in quotes right there.
16        MS. BOLGER: How does he
17   know? He doesn't know. This is
18   ridiculous. Show him the SOP if you want
19   to ask him a question about the SOP.
20        MR. RITCHEY: I really want
21   to ask him a question about this
22   deposition that he's reviewed.
23        MS. BOLGER: So then ask him

---

Page 154

1    that. Don't ask him if this is part of an
2    SOP he doesn't have in front of him.
3         MR. COCKRELL: We don't know
4    if knows the answer or not because you're
5    talking. You didn't give him a chance to
6    answer whether he knows it or not, that's
7    part of the SOP.
8         MS. BOLGER: He's testified
9    he saw the SOPs. If you want him to look
10   at the SOP and ask him more questions
11   about the SOP, show him the SOP.
12        If you don't, if you want to
13   ask him about what Baker said, ask him
14   about what Baker said.
15   Q.   (By Mr. Ritchey) Let me try this,
16   maybe this will work.
17        You've reviewed Mr. Baker's
18   testimony in this case; right?
19   A.   Okay, hang on. My screen is
20   completely black.
21   Q.   Okay.
22   A.   Something flashes and that's it.
23        MS. BOLGER: Scotch, try

---

Page 155

1    unsharing and re-sharing. Maybe that will
2    fix it.
3         THE WITNESS: There you go.
4    I got it.
5         MS. BOLGER: Now, try
6    re-sharing. How's that?
7         THE WITNESS: That's good,
8    perfect.
9    Q.   (By Mr. Ritchey) All right. So
10   you have reviewed this testimony of
11   Mr. Baker; right?
12   A.   Yes.
13   Q.   Does this testimony change your
14   opinion concerning whether under the SOP
15   Jones or Hastings were tasked with
16   collecting blood sample or making sure a
17   blood sample was taken at the hospital?
18   A.   Are you saying does it change my
19   testimony -- or my report; is that what
20   you're saying?
21   Q.   Yeah, your report or your opinion.
22   A.   No, it doesn't.
23   Q.   And why not?

---

Page 156

1    A.   Because the lead investigator is
2    responsible for all aspects of the
3    evidence collecting, and if you don't --
4    you know, he's not, you know, we're not
5    trained to collect it ourselves, so you
6    have to make sure that it is collected,
7    and that's why you get more information at
8    the hospital from your victim, from
9    Ms. Rondini, and then speak with the
10   person that's collecting, saying hey, this
11   person ejaculated on her arm or her leg,
12   swab there.
13        She at one point was, you know,
14   blacked out or passed out, so, therefore,
15   we'll need blood and urine. So if the
16   lead investigator is not communicating
17   with the person collecting any evidence,
18   then, you know, there could be evidence
19   lost, or at least relevant evidence, and
20   you may even collect things that you don't
21   need.
22        So, you know, sir, my opinion is
23   that the lead investigator is in charge of

---

Page 157

1    all aspects of the evidence.
2    Q.    Okay. And then what if the
3    hospital doesn't collect a blood sample?
4    A.    That should have been caught
5    immediately by, you know, Jones. I mean
6    he should have caught that immediately.
7         MS. BOLGER: We've been
8    going like an hour and 15, Scotch, if
9    there's a break in your outline soon,
10   let's have a break. We can go a little
11   longer, I don't need one right now, but
12   just at next break please give us a high
13   sign.
14        MR. RITCHEY: Okay, I'll let
15   you know.
16   Q.    And what standard are you basing
17   that he should have collected or told the
18   hospital to collect the blood sample on?
19   A.    That's just standard across the
20   board. I mean, again, no matter what type
21   of crime that you're investigating, it
22   could be a homicide, it doesn't matter,
23   the lead investigator oversees the entire

Page 158

1    investigation and is responsible for
2    evidence that needs to be collected or
3    tested.
4    Q.    Is there one standard procedure
5    that governs all law enforcement agencies?
6    A.    No, not that I'm aware of.
7    Q.    Does each law enforcement agency
8    implement their own standard procedure?
9         MS. BOLGER: Object to the
10   form.
11        If you know the answer to
12   that question, which is huge, you can
13   answer it.
14   A.    I just know, I mean I just know
15   San Diego PD how we do it. And, you know,
16   most agencies kind of steal each other's
17   ideas if you will.
18        I'm sure some agencies have
19   different procedures, but again, the one
20   thing that doesn't change and that is the
21   lead investigator is responsible for the
22   collection and the testing of the evidence
23   in the case. That's why you have a lead

Page 159

1    investigator.
2    Q.    (By Mr. Ritchey) How do you know
3    that doesn't change?
4    A.    From agency to agency?
5    Q.    Right.
6    A.    Because it's just investigations
7    101. I mean it's just, you know, for
8    hundreds of years there's been lead
9    investigators and, you know, you're the
10   one that's going testify to the bulk of
11   your investigation and, you know, in
12   court.
13        If you have five people and you
14   all know five different things and it's
15   not funneled into one person, this is
16   where we get into investigations like this
17   that is, you know, not detailed,
18   professional or accurate.
19        You know, that's why you have lead
20   investigators, and that's, you know, you
21   put a thousand investigators in a room,
22   they're all going to tell you the same
23   thing. You have to have a lead

Page 160

1    investigator.
2    Q.    Is there one set of best practices
3    that govern all law enforcement agencies?
4         MS. BOLGER: Object to the
5    form. Asked and answered.
6    A.    As it comes to exams at the
7    hospital. What are you asking?
8    Q.    (By Mr. Ritchey) Just in any case
9    is there one set of best practices in any
10   case that would govern all law enforcement
11   agencies?
12   A.    Yes.
13   Q.    What are those?
14   A.    That's just common sense
15   investigation. I mean they're not written
16   down, I wouldn't think, but an
17   investigation in San Diego or New York or
18   Seattle or Alabama all have a very basic
19   start and finish to them such as, you
20   know, the interviewing, the collection of
21   evidence, how you handle crime scene, all
22   those are standard across the board.
23   Q.    But there's no one written set of

Carlton Hershman                                    3/16/2021

---

Page 161

1    best practices that govern all law
2    enforcement agencies?
3            MS. BOLGER:  Object to the
4    form of the question.
5    A.     No, sir, there's not one big thick
6    book that we're all handed out, so no,
7    it's not written down under one, you know,
8    policy and procedure for everybody across
9    the nation.  There is a basic aspect to
10   each one of those and some of them will
11   vary.
12   Q.     (By Mr. Ritchey) I want to go
13   back.  You said Jones or Hastings should
14   have gone back to a taxi cab driver for
15   some sort of clarification.
16          Did I say that right?
17   A.     Yes.
18   Q.     Who took the taxi cab driver's
19   statement, if you know, off the top of
20   your head?
21   A.     I can't remember.
22   Q.     Was it Jones or Hastings, if you
23   know?

---

Page 162

1    A.     I don't think so.
2    Q.     And what kind of clarification
3    could they have gotten out of the taxi cab
4    driver?
5    A.     Well, again, they could have got
6    his demeanor -- I'm sorry, her demeanor,
7    how she was acting, you know, was she
8    nervous, was she acting scared, you know,
9    immediately when she got into the cab what
10   did she say to you.
11          The biggest thing with the cab
12   driver is this money, this cash money that
13   she gave him to pay for the cab.
14          Now, when she sees her friends
15   come down the road she says oh, there's my
16   friends.  She gives him some cash, and he
17   says, no, you have to pay for it and she
18   gives him some cash.
19          It's never stated how much cash
20   did she give him.  Now, did the cab cost
21   $27 and some odd cents, the cash that she
22   gave him was that not enough, is that why
23   she paid with her credit card.

---

Page 163

1            I mean, there's a lot of things
2    that, you know, at least to that aspect of
3    what I would want to know, to go back and
4    clarify that with him.
5    Q.     And what kind of bearing would
6    that have had on Ms. Rondini's allegations
7    and the investigations of those?
8    A.     Well, again, it would have
9    corroborated that she did call a cab and
10   that she paid for it with her credit card.
11          The other is, you know, she's --
12   she was being accused of stealing well
13   different kinds -- different amounts of
14   money.  I think one was $200 and then --
15   it was listed as $200 in a report and then
16   Mr. Bunn said it was $300.
17          I think as investigator, I mean,
18   the outcome of that would be that you
19   would want to either contradict or
20   corroborate that she had taken that money
21   and as to the amount of it.
22          Now, you know, she gets in the
23   cab.  She gives him again cash, we don't

---

Page 164

1    know how much.  When she's told it's $27
2    she takes the cash back and then pays for
3    it with her debit card or credit card or
4    whatever it is.
5            It seems to me if she had two or
6    $300 cash, she wouldn't have had to use
7    her credit card.  I mean right, she just
8    took two, $300 worth of cash in her hand,
9    you just pay the cab cash.
10   Q.     And how --
11   A.     And so -- I was going to say that
12   could have changed the aspect or the
13   outcome of at least how much did she
14   supposely taken.
15   Q.     Okay.  Could any of that tell us
16   whether or not Ms. Rondini was raped?
17   A.     No, I wouldn't think so.
18          MR. RITCHEY:  I think we're
19   getting into another aspect of the report,
20   if we want to take a break, it would be a
21   good time to do so.
22          MS. BOLGER:  Okay.  Can I
23   just ask you so it's 2:20 in New York and

---

41  (Pages 161 to 164)

Carlton Hershman                                    3/16/2021

---

Page 165

1    God only knows what time it is anywhere
2    else in the world because we just changed
3    our clocks.
4          How -- do we want to take
5    like a break long enough to eat?  How much
6    longer do you want to go?  What kind of
7    break do you want to do, Scotch?
8          MR. RITCHEY:  I think a
9    lunch break is good.  I've got quite a few
10   to go through.
11         MS. BOLGER:  Just in terms
12   of timing how much longer do you think you
13   have, and as Bob always says I'm not going
14   to hold you to it but I wondered how much
15   time you have.
16         MR. RITCHEY:  It's a 40-page
17   report and there's, you know, quite a few
18   questions I have about it, so it may be a
19   good bit into the afternoon.
20         MS. BOLGER:  Okay.  I feel
21   that was very imprecise.  So what time do
22   you want to come back?
23         MR. RITCHEY:  You want to

---

Page 166

1    say an hour?  45 minutes?
2          MR. COCKRELL:  Let's try
3    45 minutes.
4          MS. BOLGER:  I don't want to
5    take an hour, sorry, no.  So half an hour
6    is fine.
7          MR. COCKRELL:  A half hour?
8          MR. RITCHEY:  A half hour?
9    Okay.
10         VIDEOGRAPHER:  Off the
11   record at 1:23 p.m.
12         (Recess was taken.)
13         VIDEOGRAPHER:  Back on the
14   record at 2:00 p.m.
15   Q.   (By Mr. Ritchey) Mr. Hershman, I'm
16   going to bring up your expert report again
17   and we're on page 10.
18        I'm looking at the first full
19   paragraph that starts, initially every
20   case no matter what type.
21        Do you see where I am?
22   A.   I see it, yes.
23   Q.   And you list a few goals out there

---

Page 167

1    and then underneath it you say
2    investigator should be trained and
3    competent in obtaining these goals.
4          Who would be responsible for
5    training an investigator in these goals?
6    A.   I guess their perspective police
7    department.
8    Q.   And in this you talk a lot about
9    corroborating or contradicting what people
10   tell an investigator.
11        Does corroboration always make
12   someone tell or someone -- let me rephrase
13   that.
14        Does corroboration make people
15   truth tellers?
16         MS. BOLGER:  Object to the
17   form of the question.  That's not what the
18   word means.
19         Go ahead.
20   A.   It can make them a truth teller,
21   if they're stating -- if they make a
22   statement and you're able to corroborate
23   it, then, you know, that person told the

---

Page 168

1    truth, at least about that aspect of it.
2    Q.   (By Mr. Ritchey) Is the opposite
3    true if you find contradicting evidence,
4    it makes a person a liar or how would you
5    say that?
6          MS. BOLGER:  Object to the
7    form.  He didn't say that.
8    A.   No, that -- I didn't say that.
9    You're thinking of inconsistent
10   statements.
11        I think that's when you're not
12   able to -- look, you can't corroborate
13   every statement or aspect of a case but,
14   you know, all cases have inconsistencies
15   on some level.
16   Q.   (By Mr. Ritchey) Why can sexual
17   based investigations not be treated like
18   other types of investigations?
19   A.   Well, they have their own unique
20   dynamic, so investigators often look for
21   credibility issues when someone is
22   speaking with them and that could be a
23   victim, suspect, witness, and, you know,

---

42  (Pages 165 to 168)

Carlton Hershman                                          3/16/2021

Page 169

1    most of those witnesses and suspects and
2    victims when there is, you know, kind of
3    some standard things that they say or do
4    where you think their credibility is
5    lacking.
6         In sexual assault cases it's
7    completely different, so because sexual
8    assault victims do some things that would
9    be considered a red flag and actually
10   they're just a dynamic of a sexual
11   assault, those things that we had talked
12   about earlier about just doing what I say
13   are weird things, which if they would do
14   in other cases, it would cause you
15   concern.
16        But in sexual assault cases
17   because of the type of crime it is, that
18   it's not a red flag.  In fact, delayed
19   reporting is a very common thing.
20        Where in most other cases delayed
21   reporting is not an issue.  That's just
22   one, one example.
23   Q.    Okay.  Where did you learn all of

Page 170

1    that?
2    A.    Over 1300 cases, so I learned by
3    on-the-job training, my experiences.
4    Again, End Violence Against Women are very
5    knowledgeable.  I learned that also from
6    those trainings and teachings.
7    Q.    Is training the foundation of
8    success in a sexual assault or rape
9    investigation?
10   A.    I'm sorry, Mr. Ritchey, could you
11   repeat that?
12   Q.    Is training the foundation of
13   success in a sexual assault or rape
14   investigation?
15   A.    It's part of it, yes.
16   Q.    What are other parts of it?
17   A.    Your experiences, learning -- when
18   you say training I assume that you're
19   talking maybe in a classroom setting, but
20   also training from, you know, on-the-job
21   training and people that do know that can
22   help you.
23        I'm going to close my window real

Page 171

1    quick here, okay, because I'm having a
2    hard time hearing you, okay?
3    Q.    Okay.
4    A.    Okay.  Much better.  Sorry about
5    that.
6    Q.    That's fine.
7         Did you have anything to add or
8    were you done?
9    A.    I don't think so, no.  I'm done.
10   Q.    All right.  We're looking at
11   page 11 of your report.  Here you say most
12   victims do not physically resist.  They
13   report after a delay and provide
14   information as incomplete, inconsistent,
15   or even untrue.
16        Where did you learn that most
17   victims do these three things?
18   A.    Through my cases and also through
19   other sex crimes investigators.
20   Q.    Were those other sex crimes
21   investigators in the San Diego Police
22   Department?
23   A.    Most of them were, yes, but also

Page 172

1    outside.
2    Q.    Were there any from Alabama that
3    you learned from?
4    A.    Not that I know of, no.
5    Q.    All right.  In the middle of this
6    first full paragraph on page 11, you
7    reference common and well-known
8    investigative tools and practices.  Do you
9    see where I'm at?
10        MS. BOLGER:  Let Carl catch
11   up to you please, and, Carl, please feel
12   free to read around it.
13   A.    Yes, I see it.
14   Q.    (By Mr. Ritchey) What are these?
15   A.    The common and well-known
16   investigative tools or practices?
17   Q.    Right.
18   A.    Yes, the proper interviewing,
19   understanding the real dynamics of sexual
20   assault.
21        Best practices is, you know, to
22   not shut down your investigation because
23   your victim had said or done something

                                    43  (Pages 169 to 172)

Page 173

1   wrong, to start by believing at the
2   beginning of your -- of the investigation.
3         Understanding the dynamics, mainly
4   the delayed reporting, and understanding
5   that there's going to be inconsistent or
6   incomplete or even untrue statements.
7   Q.     And where did you learn these?
8   A.     Again, in my office after nine and
9   a half years and doing training or
10  conducting trainings and also sitting in
11  on trainings.
12  Q.     And then the last paragraph on
13  this report you list a few things that you
14  say Jones and Hastings did not undertake
15  to have a sufficient investigation.
16        Just want to kind of go through
17  these.  What evidence did they fail to
18  collect?
19        MS. BOLGER:  Where are you?
20  That's not the first one I have.  I'm just
21  confused.
22        You mean number one, failed
23  to follow necessary leads, including

Page 174

1   relevant witnesses and collecting
2   evidence?  You're asking about the
3   evidence portion?
4         MR. RITCHEY:  Correct.
5         MS. BOLGER:  Okay, sorry.
6   Q.     (By Mr. Ritchey) I think we've
7   already discussed all the witnesses; is
8   that correct, Mr. Hershman?
9   A.     I believe so, yes.
10  Q.     Okay.
11        MS. BOLGER:  As you said,
12  it's a 40-page report.
13        MR. RITCHEY:  I'm sorry?
14        MS. BOLGER:  As you said,
15  there's 40 pages of report that he also
16  said things in, but, go ahead, Carl.
17  A.     Yes, so I mean what they failed to
18  collect obviously interviewing the
19  relevant witnesses we spoke about that.
20        Obtaining a full sexual assault
21  exam from Ms. Rondini.  Failure to collect
22  a sexual assault exam from Mr. Bunn.
23        Then testing of those exams and

Page 175

1   the samples or anything like that.  And
2   then the data dump from Bunn's cell phone.
3   Q.     (By Mr. Ritchey) What could a
4   sexual exam from Bunn tell the
5   investigators?
6   A.     It could show that there was some
7   type of sexual contact between him and
8   Ms. Rondini and maybe even the type of
9   sexual contact.
10  Q.     What do you mean by type?
11  A.     Well, say if the proper swabs were
12  taken, they would swab his finger to see
13  if maybe he had inserted his finger inside
14  of her vagina, swab his lip and mouth area
15  or chin area to see if he had orally
16  copulated her.  There would have been her
17  secretions also possibly on his penis.
18  Q.     Did either Mr. Bunn or Ms. Rondini
19  dispute that sex had occurred?
20  A.     Well, at that point no, but in my
21  experience a lot of times these guys will
22  say yes, we had consensual sex and then
23  come the 11th hour prior to going to a

Page 176

1   preliminary hearing or into trial, they'll
2   say no, we didn't, I didn't have sex with
3   her at all.
4         And now, you know, scientifically
5   if you will, you cannot, you know, prove
6   that they did.  So, again, it goes back to
7   corroborating what people tell you.  If a
8   victim tells you hey, he orally copulated
9   me, then we had that swab and so on and so
10  forth, finger or penis.
11        You know, Mr. Bunn had made a
12  comment that he wore a condom and didn't
13  ejaculate, he ejaculated and didn't wear a
14  condom, and, so, again, we try to get to
15  the truth, right.
16        We want to discover the truth, and
17  if we can do that forensically, great.  If
18  you are going to depend on two separate
19  people saying what had happened and they
20  were both either at that point or at some
21  point under the influence of alcohol,
22  you're not -- you may not get exactly the
23  big picture of what happened in that

Carlton Hershman                                    3/16/2021

|                          Page 177 |
| --- |

1    bedroom.
2         The other thing that they failed
3    to collect was his clothes from the night
4    before or the night that it occurred and
5    they could have done that, you know,
6    through an arrest and they could have had
7    him processed that way.
8         You could have gotten, you know,
9    forensics from his clothes. Now, we don't
10   know what he was wearing because, you
11   know, Ms. Rondini was never asked.
12        That was one of the questions that
13   should have been asked at the hospital as
14   to what he was wearing, so I mean if
15   they're going to go do a search, they need
16   to know what to collect.
17        The other thing is once they were
18   at the house, he could have pointed to any
19   of the pants laying there or shirt and
20   said, yes, that's what I was wearing, so
21   there's another misstep.
22        The other is at least boxer shorts
23   that he was wearing when they showed up to

|                          Page 178 |
| --- |

1    conduct that search. There could have
2    been transfer from his penis to the inner
3    part of his underwear and they didn't
4    collect that either.
5    Q.    Would any of that evidence been
6    able to tell investigators whether or not
7    a rape had occurred?
8    A.    No.
9    Q.    How did they fail to properly
10   interview Ms. Rondini at the hospital?
11   A.    Well, you know, she mentions that
12   she had been held down and they really
13   needed to drill down on that.
14        They should have got into that
15   further as to when it happened, how it
16   happened, how hard did he hold you down.
17   They should have got into that a lot more.
18   And then again, as to what Mr. Bunn was
19   wearing.
20        Now, that first interview
21   obviously you're gathering some quick
22   information, I understand that. It's not
23   a sit down, you know, drag out interview

|                          Page 179 |
| --- |

1    of her.
2         However, in my opinion it was way
3    too short. I mean there was a lot of
4    other things that, you know, there's other
5    things that they could have asked such as
6    what he was wearing.
7         Also, you know, her state of mind
8    as to what was occurring in there, and I
9    say that because she suffered from trauma
10   so there's going to be a lot of things
11   that she doesn't remember. There's going
12   to be a lot of things that happened in
13   that room that she's not going to be aware
14   of.
15        So like her missing shirt, I mean,
16   it would have been simple just to ask her,
17   do you have all -- do you have your purse,
18   do you have your wallet, do you have your
19   keys, do you have your phone. Are you
20   missing anything.
21        And from what I understand to this
22   day that shirt was never found, which is
23   very odd to me.

|                          Page 180 |
| --- |

1    Q.    Would the shirt be able to tell us
2    whether or not she had been raped?
3         MS. BOLGER: Object to the
4    form of the question.
5    A.    No, it wouldn't have.
6         MR. COCKRELL: Is that a no?
7    Q.    (By Mr. Ritchey) Was that a no?
8    A.    That is a no. Yes, that is a no.
9    Q.    Couldn't the investigators have
10   been assessing her state of mind while
11   they were asking these questions and
12   that's why the questions were asked and
13   the length of time was so short on this
14   interview?
15        MS. BOLGER: Object to the
16   form of the question.
17   A.    I don't think they asked her any
18   state of the mind questions if I recall.
19   Q.    (By Mr. Ritchey) Well, can they
20   see how she looked?
21        MS. BOLGER: Object to the
22   form of the question. You're asking him
23   to speculate about what the investigators

                              45  (Pages 177 to 180)

Carlton Hershman                                                3/16/2021

Page 181

1  were thinking when they -- that's not an
2  expert opinion.  You're just asking him to
3  speculate.
4  Q.    (By Mr. Ritchey) I'm just saying
5  couldn't that have been a consideration of
6  why this interview was so short, as you
7  say it?
8          MS. BOLGER:  Again, you're
9  asking -- that's a question asking him to
10  opine on the state of mind of the
11  investigators.
12          He's here to give you an
13  expert opinion on the quality of the
14  investigation, not their state of mind.
15          Carl, if you feel qualified
16  to talk about what the investigators were
17  thinking in their head, you can do that
18  but that is what that question is calling
19  for.
20  A.    I don't know why it was short.  I
21  mean, they might have thought they had
22  enough but they didn't, so.
23  Q.    (By Mr. Ritchey) What were they

Page 182

1  missing?
2          MS. BOLGER:  Object to the
3  form.  Asked and answered.
4  A.    That she was held down?  I mean
5  that is so important to know why she
6  thought that and how she thought that.
7          And that, you know, that is
8  something that would later come up with
9  Mr. Bunn, but at that point in time you
10  have to determine, you know, what type of
11  sexual assault investigation am I
12  conducting here.
13          I mean is it a drunk, you know, or
14  drunk by intoxication, is it a force or
15  fear.  That's going to tell you what kind
16  of actions you're going to have and what
17  type of process you're going to have in
18  your investigation.
19  Q.    Did Jones or Hastings bring
20  Ms. Rondini to the police station for the
21  second interview?
22  A.    Did they bring her there --
23  Q.    Right.

Page 183

1  A.    -- is that what you're asking?  I
2  don't know -- did they actually drive her;
3  is that what you're asking me, sir?
4  Q.    Right.
5  A.    I don't know.
6  Q.    Was Ms. Rondini forced to submit
7  to that second interview?
8          MS. BOLGER:  Object to the
9  form of the question.  You mean did the
10  police call her at least four times?  Does
11  that qualify as forcing?
12          MR. RITCHEY:  I didn't ask
13  that question.
14          MS. BOLGER:  Come on.  What
15  do you mean by force?  Did they detain
16  her?  What's the question?
17  Q.    (By Mr. Ritchey) Basically, did
18  they detain her?
19          MS. BOLGER:  No, they did
20  that two hours later, Scotch.  Come on,
21  you know they didn't detain her.
22          MR. COCKRELL:  That's not
23  true either.  Let him answer the question,

Page 184

1  Kate.  We're not taking your deposition;
2  we're taking his.
3          MS. BOLGER:  Don't try to
4  trick him.
5          Carl, go ahead.
6  Q.    (By Mr. Ritchey) I'm not trying to
7  trick him.
8          MR. COCKRELL:  We're not
9  tricking him.  We're asking questions he
10  can answer.  He's an expert.
11          MR. RITCHEY:  He's
12  insinuating that these investigators
13  forced Ms. Rondini to the police station
14  without --
15          MS. BOLGER:  He's not
16  insinuating anything.  He's never said
17  anything about force.  The only person
18  that's ever said the word force is you.
19          MR. COCKRELL:  You can
20  answer the question, if that's an
21  objection.
22          MS. BOLGER:  If the question
23  is did they force her to come to the

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                          3/16/2021

Page 185

1    police station.  Carl, you go right ahead
2    and answer that.
3         A.    Mr. Ritchey, I have no idea.  If
4    they forced her or not, I have no idea,
5    and I don't know why you think I
6    insinuated that, sir.  I don't -- is it
7    something I said that --
8              MS. BOLGER:  Carl, there's
9    no pending question -- there's no pending
10   question --
11             THE WITNESS:  Yeah --
12             MS. BOLGER:  You can ask him
13   a question, Scotch.
14        Q.    (By Mr. Ritchey) Number three you
15   said the investigators failed to allow
16   Rondini the opportunity to eat or sleep
17   before bringing her to the police station,
18   that's why I'm asking those questions.
19             It sounds like they just took her
20   from wherever she was into the police
21   station and for some, I don't know,
22   somehow they stopped her from eating or
23   sleeping.

Page 186

1              MS. BOLGER:  Stop right now.
2    Carl is perfectly prepared to answer
3    questions about the words he put on his
4    page --
5              MR. RITCHEY:  It's on his
6    page.
7              MS. BOLGER:  -- he's not
8    going to answer questions about what you
9    think he asked, what you think he means.
10   That seems to be kind of a problem in this
11   lawsuit.
12             The words he used were that
13   they failed to allow Rondini the
14   opportunity to sleep or eat before
15   bringing her to the police station.  Ask
16   him what he meant by that.  Don't ask him
17   about force.
18             MR. RITCHEY:  That's what
19   I'm trying to do, if you would let me.
20             MS. BOLGER:  Ask the
21   question then; use his words.
22        Q.    (By Mr. Ritchey) Okay.  You said
23   they failed to allow Rondini the

Page 187

1    opportunity to sleep or eat before
2    bringing her to the police station.
3              What did you mean by that?
4         A.    That they should have let a break
5    occur between the examination and allowing
6    her to have at least three to four hours
7    of rest and some food before they start
8    their in-depth investigation -- or
9    interview.
10        Q.    What do you mean allow?
11        A.    An opportunity or they should
12   have -- I mean, I don't know what the one
13   word means to you, but they didn't allow
14   her to do it.
15             Did she ask to do it?  I have no
16   clue.  There's nothing in this, you know,
17   that I've read.  I guess I'm looking at it
18   as more that you should allow somebody to
19   have the opportunity.
20        Q.    How do you know the investigators
21   did not allow it?
22        A.    They never said.  I mean in the
23   report they never said we gave her the

Page 188

1    opportunity to rest but she demanded to
2    come in.  I mean, none of that stuff is in
3    the report.
4         Q.    So just because it's not in the
5    report, it doesn't happen?
6              MS. BOLGER:  And also it
7    didn't happen, Scotch.  Don't mislead the
8    witness.
9         Q.    (By Mr. Ritchey) I mean there was
10   a gap in time.  I'm just not sure where
11   you got that they didn't allow this to
12   happen is what I'm trying to get to.
13             MS. BOLGER:  He told you.
14             MR. RITCHEY:  I don't think
15   he did --
16             MS. BOLGER:  -- objection,
17   if you have another question, you can ask
18   the question --
19             MR. COCKRELL:  -- I don't
20   think he did --
21             MS. BOLGER:  -- and first of
22   all, Bob, it's not your deposition.  I'm
23   done with this double teaming, so pick a

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                      3/16/2021

Page 189

1    team, boys --
2         MR. COCKRELL: -- and I'm
3    tird of you leading the --
4         MS. BOLGER: -- second of
5    all, Scotch, if you would like to ask a
6    question, ask a question, but you're not
7    asking a question.  He's told you the
8    answer to that question.
9         If you'd like to ask it
10   again, I'll let him answer it again, but
11   ask a question.
12        MR. COCKRELL: Okay.  He can
13   answer it again.  Go, Scotch.
14   Q.    (By Mr. Ritchey) Again --
15        MS. BOLGER:  There's no
16   pending question.  Ask a question.
17   Q.    (By Mr. Ritchey) How did they fail
18   to allow Rondini the opportunity to either
19   eat or sleep before bringing her to the
20   police station?
21   A.    Look, from the time -- I don't
22   know what they said to her or offered her,
23   I don't know, because it's not written

Page 190

1    down that that happened.
2         Of course, I mean we don't know
3    because -- and we'll never know because
4    she's not obviously around, so I mean to
5    ask that question to.
6         But from the time that she is, you
7    know, at the hospital and the time that
8    she walks, you know, that she is
9    interviewed, there's very little time in
10   between.
11        So I mean one can, you know, you
12   know, estimate that she didn't have that
13   opportunity.  Was she given it?  I don't
14   know, I don't know.
15   Q.    All right.  Number four you said
16   they failed to arrest Bunn.  What evidence
17   would support an arrest?
18   A.    Probable cause --
19        MS. BOLGER:  It actually --
20   it actually reads failed to arrest Bunn
21   and remove him from his home.
22   Q.    (By Mr. Ritchey) Okay, you're
23   right.

Page 191

1         What would support the arrest?
2    A.    Okay.  The answer is probable
3    cause.  They had probable cause to arrest
4    him.
5    Q.    What would support the probable
6    cause?
7    A.    Her statement that she had been
8    sexually assaulted.
9    Q.    Is that the only support?
10   A.    At that point, yes.  At that point
11   in time.  I mean, and the fact that he
12   lied to them when they came to the door.
13   That's kind of a big issue.
14   Q.    Number four, you said they failed
15   to obtain a search warrant for Bunn's
16   home.  What point in time do you mean?
17   A.    When they arrived there.  They
18   should have arrested him when he came to
19   the door and then sat him in the car in
20   handcuffs, obtained a court-ordered search
21   warrant and searched the house.
22   Q.    Based on her statements only?
23        MS. BOLGER:  And the lie; he

Page 192

1    just testified to that.
2    Q.    (By Mr. Ritchey) Well, he wouldn't
3    have been able to -- the investigators
4    wouldn't have been able to talk to Bunn if
5    they already had an arrest warrant to go
6    into the house.
7    A.    No, sir.  You can make an arrest
8    and then get a search warrant.  You
9    understand what I'm saying?
10   Q.    Let me try to see if I get this.
11   Are you saying in that -- was it number
12   four, I'm sorry, there are two number 4s.
13        The one that says failed to obtain
14   a search warrant for Bunn's home.  I'm
15   looking at that number.
16        Are you saying they should have
17   obtained a search warrant before showing
18   up at Bunn's home?
19   A.    No.  They should have obtained a
20   search warrant when they got there.  I
21   mean they could have done it before, but
22   with that time of day it was early in the
23   morning that instead of going through an

48  (Pages 189 to 192)

Carlton Hershman                                                3/16/2021

Page 193

1   attorney that is on call, they could have
2   arrested him and then go and write a
3   search warrant or do a telephonic search
4   warrant over the phone.
5   Q.    Number 5, you said they allowed
6   Bunn to contaminate the crime scene. How
7   did they allow that?
8   A.    They did this in two instances.
9   First when they first came up to the door
10  for some reason they identify themselves
11  and then they leave, which still isn't
12  clear why.
13        They come back, I don't know, 10,
14  15 minutes later, and then they obtain a
15  consent to search from him. And then
16  while they're doing it he's walking around
17  the house with them as they're videotaping
18  the house.
19  Q.    Okay. What did he contaminate
20  though?
21  A.    I don't know.
22  Q.    Is there any evidence showing that
23  he contaminated any of the crime scene?

Page 194

1   A.    We don't know. Because of the
2   investigation -- look, you allow somebody
3   in their house for 15 minutes, I mean
4   there's a lot of stuff I could do in
5   15 minutes. There's lot of stuff I could
6   destroy, hide, whatever you want to -- you
7   know, so that's the problem.
8        I mean, you don't, you don't know.
9   And the second time they come back and
10  they're walking around with the videotape
11  and he's walking around who knows what,
12  you know, it's possible he's taking things
13  off dresser drawers or whatever.
14        I'm just giving you an example.
15  There's no proof of that, but I'm just
16  saying we don't know. And that's why
17  crime scenes are just -- especially this
18  here would be attacked in court.
19        Some defense attorneys would love
20  this, they would attack a crime scene
21  alone.
22  Q.    What could Bunn have hidden or
23  destroyed?

Page 195

1   A.    I don't know.
2   Q.    How did they fail to properly
3   interview Ms. Rondini at the police
4   station?
5        MS. BOLGER: Sorry, you're
6   at the bottom of this page to the top --
7   you forgot -- you skipped over two; right?
8        MR. RITCHEY: Yeah, I think
9   we talked about those two.
10       MS. BOLGER: The one where
11  they let him go fishing with his attorney,
12  and then you say failed to properly --
13  okay, so can you just scroll up -- there
14  you go, thank you.
15  A.    Okay. So, again, they don't, you
16  know, he doesn't ask very many open-ended
17  questions.
18       Most of your questioning should be
19  open-ended. First of all, we'll go back
20  to whether she was offered or not, she did
21  not eat or sleep, or at least was able to
22  rest and have some kind of break between
23  the actual possible assault and the exam

Page 196

1   and to the point where now she's being
2   interviewed.
3        So, you know, she's tired, she's
4   been through a lot, and this goes for any
5   victim, and so they failed to have that
6   break.
7        The trauma-based interview really
8   you have to understand how trauma works
9   and how your brain works when it receives
10  that.
11       You know, you get very narrow
12  tunnel vision. Your body has to decide
13  between a fight -- flight or freeze, and
14  you still have to breathe and walk and
15  talk, so your brain is very busy at that
16  time so when she states that she can't
17  open the door, she can't unlock the
18  bedroom door, instead of taking that as,
19  you know, one thing, it's actually because
20  she was suffering under that trauma and
21  she was confused and disheveled to where
22  she couldn't open the door.
23       That's why she decides to go out

Page 197

1    the window.  She decides -- well, she puts
2    on his shirt because she can't find hers.
3    She decides to climb back through the
4    window, so all that -- all those things
5    that in that interview, you know, Jones
6    could have clarified why she was doing
7    those things, and, again, it comes to
8    state of mind.
9         And she can't explain why -- you
10   know, she won't be able to explain the
11   small details of why didn't she run, why
12   didn't you fight back, why didn't you do
13   all of these things.
14        And as, you know, an interviewer
15   you have to understand all of the dynamics
16   of the sexual-based crimes and when people
17   are molested or they're attacked sexually
18   how the brain actually records that.
19   Q.    How did you come to learn about
20   trauma-based interviews?
21        MS. BOLGER:  Object to the
22   form.  It's been answered this morning.
23        You can do it again, Carl.

Page 198

1    A.    Yeah, I mean I learned it when I
2    went to sex crimes.  Joanne Archambault
3    taught me that.  I also learned from
4    Russell Strand later.
5    Q.    (By Mr. Ritchey) Do you know if
6    Jones or Hastings ever received
7    trauma-based interview training?
8    A.    I have no clue.
9    Q.    How long was Ms. Rondini's memory
10   gap as it pertains to these allegations
11   and events?
12        MS. BOLGER:  Object to the
13   form.
14   A.    I don't understand the question,
15   sir.  You mean when did she start having
16   memory lapse; is that what you're saying?
17   Q.    (By Mr. Ritchey) I guess you said
18   she blacked out.  When was that blackout
19   period?
20        MS. BOLGER:  Object to the
21   form.  I'm not sure I think that's what he
22   testified to, but you can answer it if you
23   understand it.

Page 199

1    A.    From my reading of the report is,
2    in her interview, is the last thing she
3    remembered was being on the patio and the
4    next thing she remembers was being in the
5    car with Barksdale and Bunn.
6    Q.    (By Mr. Ritchey) When she's in the
7    car with Barksdale and Bunn is she
8    traveling to her apartment or Bunn's
9    house?
10        MS. BOLGER:  I'm going to
11   object to the form.  You mean -- Carl
12   obviously wasn't in the car so you mean --
13   I guess I don't understand what you're
14   asking there.
15   Q.    (By Mr. Ritchey) Just based on the
16   review of the material he's done already.
17   A.    I think it's both.  I mean I think
18   she was in the car both times.  I think
19   what she remembers is obviously she says
20   the next thing she remembers is being in
21   the car with Bunn and Barksdale is that
22   they're on the way to Mr. Bunn's
23   residence.

Page 200

1    Q.    Is this the only blackout period
2    Ms. Rondini had in your opinion?
3    A.    I don't know.
4    Q.    From what you reviewed is there
5    any other blackout period?
6    A.    I don't know.  I mean, I didn't
7    see any, but I don't know if there
8    actually was one or not, I don't know.
9    Q.    All right.  I'm now on page 13 of
10   your report, and this is part of the
11   timeline that you included.
12        And I'm looking, it's under the
13   July 2nd, 2015, bold and underlined
14   heading, and it's the time entry after the
15   12:23 a.m. and it says time unknown
16   Rondini and Bunn have sexual intercourse.
17        Do you see where I'm at?
18   A.    Yes.
19   Q.    You wrote Bunn told investigators
20   that this intercourse was consensual.
21   Rondini told investigators it was not.
22        When did she tell investigators it
23   was not consensual?

Carlton Hershman                                    3/16/2021

Page 201

1    A.    She told them a couple of times.
2    The first time it's at the hospital when
3    she stated that she had been held down.
4    She told them that she didn't want to have
5    sex.
6          The second time was in the
7    interview with Jones at the police
8    station.
9    Q.    Did Ms. Rondini ever use the term
10   consensual or non-consensual?
11   A.    I don't remember.  I don't recall
12   that.
13   Q.    Is it your opinion that
14   Ms. Rondini was blacked out during the
15   sexual intercourse?
16         MS. BOLGER:  Object to the
17   form of the question.  He's certainly not
18   here to testify to that.
19         Carl, if you can answer, go
20   ahead.
21   A.    I don't think she said she was
22   blacked out during the intercourse.
23   Q.    (By Mr. Ritchey) I'm looking on

Page 202

1    page 14 of your report, and it's going to
2    be about the first entry time unknown.
3          Looks like you're recounting when
4    Ms. Rondini is climbing out of the bedroom
5    window and climbing back in.
6          Do you see where I'm at?
7    A.    Yes, sir.
8    Q.    Have you ever been involved in a
9    sexual assault or rape investigation where
10   the alleged victim re-enters a room with
11   the alleged suspect after fleeing that
12   room?
13         MS. BOLGER:  I'm sorry.  Can
14   you do that again?  I'm sorry to ask you
15   to do that again because I know that must
16   be horrible but can you do that again?
17         (Whereupon, requested portion was
18         read back by court reporter.)
19         MS. BOLGER:  Thanks.
20         Sorry.  I object to the
21   form, but, Carl, you can answer.
22   A.    Yes, I did, but under different
23   circumstances than this.

Page 203

1    Q.    (By Mr. Ritchey) What was
2    different?
3    A.    There was another male out in the
4    living room, and my victim felt -- she
5    feared this other person, so she came back
6    into the room and actually pretended to be
7    asleep.
8    Q.    So in that case she felt
9    threatened when she escaped and went back
10   into the room with the alleged suspect?
11   A.    Yes, these were all Hell's Angels.
12   Q.    Okay.  I'm now looking at page 16
13   of your report, looking at the March 2016
14   entry where you say sexual assault case
15   against Bunn if presented to a grand jury
16   which decides not to charge him with
17   criminal offense.
18   A.    Right.
19   Q.    Do you see where I am?
20   A.    Yes.
21   Q.    Do you know when the case or
22   investigation was submitted to the
23   district attorney's office?

Page 204

1    A.    Do I know when it was?
2    Q.    Right.
3    A.    I don't know the date of it, no,
4    sir.
5    Q.    Do you know how long before the
6    grand jury presentation the investigation
7    was submitted to the district attorney?
8          MS. BOLGER:  Which grand
9    jury presentation?  The one against Megan
10   or the one against T. J. Bunn?
11         MR. RITCHEY:  The one
12   against T. J. Bunn.
13   A.    You're asking me what the length
14   of time between the investigation was over
15   and then they submitted it?  Is that what
16   you're asking me, sir?
17   Q.    Right.  What I'm asking you is do
18   you know about how long before the sexual
19   assault case against T. J. Bunn was
20   presented to a jury was in relation to
21   when that case was handed over to the
22   district attorney's office?
23   A.    No, I don't know that timeframe.

                                    51  (Pages 201 to 204)

|                                                   Page 205 |
| --- |

1    I don't -- I mean, I don't understand why
2    it was sent over and I don't understand
3    why or the timeframe.
4    Q.    What do you mean you don't
5    understand why it was sent over?
6    A.    Well, you send investigations over
7    to request charges in order to, you know,
8    hold somebody accountable to have them
9    charged with a crime.
10         And the only way to do that is to
11   have a victim, you know, you get to face
12   your accuser, and she's dead.  She'll
13   never walk into a court.  She could never
14   testify.
15         Which at first I thought I got my
16   dates mixed up, and the more I looked at
17   it, it was like this says to me, and there
18   might be some reason, I don't know, but to
19   me it didn't make any sense that, you
20   know -- I mean what happens if they did
21   charge her?  What then?
22         Is the prosecutor going to call
23   her in to testify, you know?  So that part

|                                                   Page 206 |
| --- |

1    always kind of bothered me, so I don't
2    know why it was sent.
3    Q.    Are you saying you don't know what
4    the district attorney presented that case
5    to the grand jury, or are you saying you
6    don't know why the Homicide Unit sent the
7    case to the district attorney's office?
8         MS. BOLGER:  I'm going to
9    again ask for clarification.  You mean the
10   one against Megan or the one against Bunn?
11   Q.    (By Mr. Ritchey) We're just
12   talking about the one against Bunn right
13   now.
14   A.    Well, I don't know who presents it
15   to a grand jury, sir.
16        But at some point only the cops
17   have it -- have the case, and at some
18   point they send it over to a district
19   attorney who presents it.
20        So I don't know the dates or when
21   that occurred.  Do you see what I'm
22   saying?  I mean, I don't -- yeah, I don't
23   know when the cops sent it over and I

|                                                   Page 207 |
| --- |

1    don't know when it was presented, but just
2    what I have it just kind of looked funny
3    is what I'm saying.
4    Q.    All right.  I'm looking on page 17
5    now of your report.  This is in the
6    analysis section under number one of the
7    subheading of investigation was not
8    sufficiently in-depth to reach an accurate
9    conclusion.
10        I'm looking at the second sentence
11   underneath that heading.  It says this is
12   simply insufficient to conduct a rape
13   investigation, particularly whereas here
14   the complaining witness reported major
15   failures of memory.
16        When you're saying major failures
17   of memory, are you talking about, you
18   know, where she couldn't remember leaving
19   the bar to when she remembered being in
20   Bunn's car or what are you talking about
21   there?
22   A.    Well, what I'm talking about there
23   is you had this gap of -- a major gap that

|                                                   Page 208 |
| --- |

1    was never really fully looked at.  I mean
2    she invites two men to her apartment.  I
3    mean, correct?
4         I mean so we don't know what
5    happened in that apartment.  We don't know
6    what happened when she first gets into the
7    car, so, yeah, there's this big chunk of
8    time that needs to be accounted for.
9    Q.    And interviewing the two witnesses
10   during that time is not sufficient?
11   A.    Yes, their perspective on it, yes.
12   Q.    And then getting GPS data during
13   that failure memory is not sufficient?
14   A.    Yeah, that's part of it.
15   Q.    What other evidence could they
16   have uncovered for those memory gaps?
17        MS. BOLGER:  Object to the
18   form.  He's testified extensively about
19   this.
20        This is the same question
21   we've done before, but go ahead and talk
22   about it again, Carl.
23   A.    Well, I mean, we needed to know

Page 209

1  what made her black out.  She said she
2  didn't have enough alcohol to become drunk
3  so something caused her to black out.
4       Now, we don't have -- we didn't
5  test the urine; right?  There was no blood
6  taken, so we don't know if she was under
7  the influence of a date rape drug or a
8  muscle relaxer or depression medicine or
9  anything of that stuff.
10      Look, you have a person that's
11 being accused, and then his buddy you just
12 didn't let them fill in the blanks, right,
13 that's not fair to your investigation and
14 it's certainly not fair to the victim who
15 doesn't know what happened.
16      And, again, that's why these type
17 of investigations it's just not one small
18 thing, it's the whole picture.  You
19 wouldn't be able to tell a story as an
20 investigator.
21      I'm not telling my story through
22 Ms. Rondini's eyes and I'm not telling my
23 story through Mr. Bunn's eyes.  Okay, it's

Page 210

1  not just those two what they're telling
2  me.
3       So the investigation in a whole,
4  the whole investigation is not sufficient
5  for you to tell me what happened or for
6  anybody -- for that investigation to tell
7  me what happened.
8       It's just not a fair, accurate
9  depiction of what occurred.
10 Q.    During this blackout period that
11 you say that happened, what other evidence
12 would there be?  None of the people at the
13 bar were present during this blackout
14 period, were they?
15      MS. BOLGER:  Object to the
16 form of the question.  You can answer the
17 question, Carl, in addition to the pages
18 you have of this, but go ahead.
19 A.    That's what I'm saying, you need
20 to talk to the bartender.  You need to
21 talk to the door guy.
22      You need to talk to other people
23 as to, you know, hey, she was here with a

Page 211

1  group of people and then they all left and
2  she was here by herself.  What did she do
3  after that?  We don't know.
4       So again, that's why it goes back
5  to doing a complete investigation and talk
6  to as many people as possible that could
7  give you -- that could fill in those
8  blanks because we don't -- the last thing
9  she remembers is being on the patio.
10      Was it three minutes later she
11 left?  Was it 30 minutes later?  I mean
12 who knows; we don't know.
13 Q.    (By Mr. Ritchey) Well, we have the
14 Innisfree -- sorry, go ahead.
15 A.    As I said, we don't have anybody
16 to tell us that because they weren't --
17 they weren't questioned.
18 Q.    We have the Innisfree surveillance
19 videos, don't we?
20 A.    Yes.
21 Q.    And wouldn't that tell us if she
22 was on the patio when she left?
23 A.    Yes, it doesn't tell you when she

Page 212

1  first blacked out though, sir.
2  Q.    Still on this same page, and I'm
3  kind of midway through that same paragraph
4  we were discussing.
5       And it says to properly understand
6  the full context of what had happened that
7  evening Jones and Hastings should have
8  sought to determine why Rondini had
9  blacked out and whether she had been
10 drugged.
11      Are you contending that she could
12 have been drugged?
13      MS. BOLGER:  Object to the
14 form of the question.
15 A.    Yeah, it's possible.  That's what
16 that blood test and the urine test are so
17 important.
18 Q.    (By Mr. Ritchey) Would the review
19 of the Innisfree videos not show us
20 whether or not she's been drugged?
21      MS. BOLGER:  Object to the
22 form.
23 A.    No, I don't think so.

Carlton Hershman                                    3/16/2021

| Page 213 |
| --- |

1    Q.    (By Mr. Ritchey) Why not?
2    A.    If somebody is going to slip
3    something in your drink, I mean, they're
4    not holding it out this high and going to
5    slip it in.
6         You know, they're not -- you know,
7    could that have captured somebody slipping
8    in somebody's drink, I guess it could
9    have, but more than likely I mean these
10   guys -- if this is what happened, they
11   could have put it in a drink, and again,
12   there's nothing that I've read or was
13   given to me that even suggest that.
14   Q.    But you never even looked at the
15   Innisfree videos, did you?
16   A.    I'm sorry?
17   Q.    You never even looked at the
18   Innisfree videos, did you?
19   A.    I looked at the still photos.
20   Q.    But you never saw the videos?
21   A.    I don't think so, no, I can't
22   recall.
23   Q.    On page 19 at the top of the page

| Page 214 |
| --- |

1    you said in particular Rondini was
2    participating in several digital messages
3    exchanged during the time where she
4    experienced memory lapses.
5         MS. BOLGER:  Carl, do not
6    start there.  There's a whole first part
7    of that, so read that first sentence on
8    page 18 before you answer the next
9    question.
10   Q.    (By Mr. Ritchey) Sure.  I can
11   scroll up.  Just let me know when you're
12   ready.
13   A.    Okay.
14   Q.    Do you know what messages you're
15   specifically referring to?  I know you've
16   listed you've reviewed text message from
17   her friends.
18        Are there specific text messages
19   within those that you're referencing here?
20   A.    Just the facts that she doesn't
21   remember texting while she's in the car.
22   Specifically which ones, I don't know, but
23   she doesn't remember texting in the car

| Page 215 |
| --- |

1    because she's -- she was asked that and
2    she said that she had not texted anybody
3    but we know later once her phone is dumped
4    then we do know that she had texted in the
5    car.
6    Q.    All right.  On that same sentence
7    you continue and the other parties to
8    these conversations could have provided
9    valuable information to investigators.
10        How could they do this if they
11   weren't present during that time?
12   A.    I'm sorry, sir.  Where are you at?
13        MS. BOLGER:  I'm going to
14   object to the form of the question.  I
15   don't understand what you mean by present
16   during that time.
17        We don't have any reason to
18   believe they were present when they were
19   getting the text messages, so I just don't
20   understand what you mean by present during
21   that time.
22        You can answer the question,
23   Carl, if you do understand.

| Page 216 |
| --- |

1    A.    I'm sorry, okay.
2         Yes, so, you know, Jones could
3    have asked them or Hastings could have
4    asked them did she text you at one o'clock
5    in the morning, does she text at three in
6    the morning, is that a common thing.
7         When she does text you and she's
8    saying certain things is that how she is
9    normally when she's, you know, sober or,
10   you know, in her normal course of being
11   Ms. Rondini is that the way she relates
12   herself.
13        They could have got that aspect of
14   the type of person she is, maybe some of
15   her texting habits.
16   Q.    Are you opining that Ms. Rondini
17   was incapacitated during the sexual
18   encounter?
19        MS. BOLGER:  Object to the
20   form of the question.  No, he's not.  We
21   have told you what he's opining about.
22        This is not a question that
23   he needs to answer, but I guess you can,

                                    54  (Pages 213 to 216)

Carlton Hershman                                                    3/16/2021

Page 217

1   Carl.
2   A.    What was the question again?
3         MR. RITCHEY:  Do you mind
4   repeating that?
5         THE WITNESS:  Sorry, Nancy.
6   (Whereupon, requested portion was
7         read back by court reporter.)
8   A.    No, I'm not.
9   Q.    (By Mr. Ritchey) All right.  I'm
10  showing you what's been produced as
11  BuzzFeed 4167.
12        I don't know if this has been
13  marked yet.  We'll go ahead and mark it as
14  Exhibit 119.  We'll mark it as Exhibit
15  119.
16        MS. BOLGER:  Do you want to
17  give the witness a little context about
18  what you're showing him?
19  Q.    (By Mr. Ritchey) Sure.  This is
20  just a text message conversation between
21  Ms. Rondini and one of her friends and the
22  part I'm asking about is this exchange on
23  7/2/15 at 12:08 a.m., kind of in the

Page 218

1   middle towards the bottom.
2   A.    I see it.
3   Q.    Did you review this text message
4   as a part of your review?
5         (Whereupon, a document was marked
6         as Plaintiff's Exhibit No. 119 and
7         is attached to the original
8         transcript.)
9   A.    Yes, I did.
10  Q.    Does this text message have any
11  bearing on your expert report?
12  A.    No, I did not.
13        MS. BOLGER:  Object to the
14  form.
15  Q.    (By Mr. Ritchey) Why not?
16        MS. BOLGER:  Wait, stop for
17  one second.  I don't understand what you
18  mean by bearing.  Can you reask that
19  question because I don't understand what
20  you mean by bearing.
21  Q.    (By Mr. Ritchey) Did you consider
22  this text message in forming your opinions
23  in your report?

Page 219

1   A.    No, I did not.
2   Q.    Why not?
3   A.    It really has nothing to do with
4   what occurred later in the evening or in
5   the night when it comes to consent.
6   Q.    And how does the interview of the
7   people at the bar how is that relevant to
8   the consent issues you just spoke about?
9         MS. BOLGER:  Object to the
10  form.  He's never said it was.
11        Go ahead, Carl.
12  A.    What they can tell you is how
13  Ms. Rondini ends up in the backseat of
14  Mr. Bunn's car, that she was intoxicated
15  or blacked out or acting intoxicated.
16        So there's two things here that
17  we're talking about.  On the front end of
18  it at the bar and those people and those
19  witnesses and her friends are going to
20  show you or tell you how she ends up by
21  herself.
22        She ends up walking alone down the
23  street and how she ends up in the back of

Page 220

1   a car, okay.  Also, how she does not
2   remember going back to her house.
3         In the backseat of the car is when
4   she in my opinion is coming out of that
5   blackout and by that time she's already in
6   route to Mr. Bunn's residence.
7         So, again, looking at the big
8   picture of everything and not just one
9   moment in time that -- all that stuff on
10  the front end is how she gets into this
11  vehicle and ends up at his residence and
12  then, boom, we can start over from the
13  residence to the time that she's in the
14  bedroom.
15        Does that make sense to you, sir?
16  Q.    (By Mr. Ritchey) I think so.
17  A.    Okay.
18        MS. BOLGER:  Scotch, if you
19  want to follow up, I'm totally fine for
20  you to follow up.  I have to check
21  something in my five minutes.  I don't
22  want to cut you off on a follow-up, but if
23  you wouldn't mind giving me five minutes

Carlton Hershman                                          3/16/2021

Page 221

1    after that follow-up, I would like to take
2    a break.
3    Q.    (By Mr. Ritchey) Yeah, just give
4    me one minute, I think we're good.
5         Does this text message not show
6    Ms. Rondini's state of mind during this
7    time?
8    A.    I don't know, sir.  I don't know
9    what -- I mean, I don't know if it
10   actually states her state of mind or not.
11   I couldn't tell from just this text.
12        MR. RITCHEY:  Why don't we
13   take a break for you, Kate?
14        MS. BOLGER:  Yeah, I'm
15   really sorry.  No child care, so thank you
16   very much.
17        VIDEOGRAPHER:  Off the
18   record at 3:09 p.m.
19        (Recess was taken.)
20        VIDEOGRAPHER:  Back on the
21   record at 3:14 p.m.
22   Q.    (By Mr. Ritchey) All right.  I'm
23   going to show you your report again, and

Page 222

1    this is still page 19.
2         And this is the second bullet
3    point where you said they did not collect
4    the clothing that Bunn was wearing
5    immediately before they missed any chance
6    to perform a forensic analysis of his
7    clothing.
8         You may have answered this one
9    already but I don't remember.  What would
10   a forensic analysis of the clothing show?
11        MS. BOLGER:  Object to the
12   form.
13   A.    That he -- that he actually
14   ejaculated.  When he puts his clothes back
15   on there's some transfer of her vaginal
16   secretions on his clothing.
17   Q.    (By Mr. Ritchey) Would this have
18   shown whether a rape had occurred or not?
19   A.    No.
20   Q.    And the next bullet point you're
21   talking about Ms. Rondini's injuries.
22        Are you saying these injuries
23   occurred directly from Mr. Bunn or through

Page 223

1    another act during the course of these
2    events?
3         MS. BOLGER:  Object to the
4    form.
5    A.    No, these injuries were actually
6    from when she went down and she received
7    -- when she climbed out the window.
8    Q.    (By Mr. Ritchey) All right.  And
9    then the next bullet point said
10   Investigator Jones also failed to take
11   custody of the sample.
12        I believe you're referring to
13   urine sample.  Thus compromising the chain
14   of evidence.  Where did you get this
15   information from?
16   A.    I don't recall.  I remember
17   reading it.  Let me think.  I remember
18   reading it, sir.  I just don't remember
19   where I read it from.
20   Q.    Would that have been in the
21   materials you listed in this report that
22   you reviewed?
23   A.    Yes.

Page 224

1    Q.    The next bullet point and that
2    continues on to page 20, there's no
3    evidence that Jones or Hastings checked
4    social media of any of the persons
5    involved in the case.
6    A.    Correct.
7    Q.    Do you see where I am?
8    A.    Yes, sir.
9    Q.    Have you checked the social media
10   of any of the persons involved in the
11   case?
12        MS. BOLGER:  Object to the
13   form.
14   A.    You broke like halfway through so
15   I didn't hear it --
16   Q.    (By Mr. Ritchey) Did you review --
17   did you review any of the social media of
18   any of the persons involved in the case?
19   A.    No, I did not.
20   Q.    How would the social media
21   accounts affected the case?
22   A.    I don't know how it would have.  I
23   mean, I've had cases where it has.  I've

56 (Pages 221 to 224)

Page 225

1  gained information from suspects and
2  witnesses of them posting certain things
3  on social media.
4       But in this case I don't know
5  because it was never collected or looked
6  at and never documented.
7  Q.    Later on page 20, looking about
8  midway on the page under hospital
9  interview, couple of sentences from there
10 it says investigators often use interview
11 scale -- the interview as a scale or gauge
12 to determine credibility of a person with
13 whom they're speaking.
14      If the investigator is not trained
15 to notice and take account of credibility
16 indicators while interviewing a sexual
17 assault victim, they will misjudge the
18 victim.  Do you see that?
19 A.    Correct, yes, I do.
20 Q.    What indicators are you talking
21 about?
22 A.    There's indicators where somebody
23 is not or says something that's untrue and

Page 226

1  you know it to be true.
2       They may not volunteer certain
3  information and then you find out that
4  they had done that.  Traditionally, and I
5  said this earlier this morning but
6  traditionally there's indicators this
7  person would have a credibility issue.
8       In these type of cases where
9  somebody has suffered trauma and because
10 of the type of crime that it is that those
11 traditional indicators should not be a
12 gauge of their credibility.
13 Q.    Do you know if Jones or Hastings
14 were trained in these indicators?
15 A.    I do not know that.
16 Q.    I'm going to scroll down to the
17 footnote on this page.  You said though
18 Rondini has spoken to Ciara Younger and
19 Rebecca Lundgren immediately after the
20 alleged assault she did not speak in
21 detail with them.  Do you see where I am?
22 A.    Yes, sir.
23 Q.    How do you know they did not speak

Page 227

1  in detail?
2  A.    Well, Ms. Younger said that in her
3  interview with Jones at the police
4  station.
5  Q.    Scrolling down to page 21, I'm
6  looking at the second full paragraph
7  towards the end of that paragraph it says
8  but if one is being held down against
9  their will, then the element of resisting
10 is already present.
11      MS. BOLGER:  I lost you.
12 A.    I don't know where that is.
13 Q.    (By Mr. Ritchey) I'll try to
14 highlight it.  Kind of right there where
15 that blue highlight is.
16 A.    Okay.
17      MS. BOLGER:  Feel free to
18 read the whole paragraph.
19 Q.    (By Mr. Ritchey) Yeah, if you need
20 time, let me know.
21 A.    Okay, I read it.
22 Q.    In that sentence are you saying
23 the element of earnest resisting is

Page 228

1  already present?
2  A.    That's already present; is that
3  what you're asking me?
4  Q.    Yeah, I'm trying to determine if
5  you are just saying resisting is present
6  or the element of earnest resisting is
7  present.
8  A.    I think that the element of
9  earnest resistant is present.  If somebody
10 is holding you down, that means you're
11 trying to get up.
12      If you're trying to get up,
13 they're pushing back, so for her to say he
14 was holding me down, therefore that means
15 she was trying to get up and if she's
16 trying to get up, then that's her push
17 back, that's her resistance.
18 Q.    Did you just assume she was trying
19 to get up?
20 A.    Well --
21      MS. BOLGER:  Object to the
22 form.
23 A.    -- she was already down, yes.

Carlton Hershman                                          3/16/2021

<table>
<tr><td>

Page 229

1  Q.    (By Mr. Ritchey) Did she ever
2  say --
3  A.    Well we don't know, sir.  Right, I
4  mean, that's what's so frustrating about
5  this case is that she could have been
6  asked those things but she never was and
7  that's what again, you know, these two
8  detectives should have got a little more
9  into that at the hospital and definitely
10 Jones should have really dug down deep on
11 that at the police station.
12 Q.    Just for my clarification, she
13 never mentioned she was trying to get up
14 when she was talking to investigators?
15       MS. BOLGER:  Object to the
16 form.  You can look at the document
17 yourself.
18 A.    I don't believe she verbally said
19 that, no, sir.
20 Q.    (By Mr. Ritchey) Towards the end
21 of that paragraph or at the end of that
22 paragraph actually, you put but Jones and
23 Hastings did not follow up on Rondini's

</td><td>

Page 230

1  statements.
2        MS. BOLGER:  I'm lost --
3  there it is, okay.
4        Are you there, Carl?
5  A.    Yeah, I'm reading it.
6  Q.    (By Mr. Ritchey) Let me know when
7  you're ready.
8  A.    Okay.
9  Q.    Was Jones questioning whether she
10 resisted in any manner not a follow-up to
11 these statements you referenced?
12 A.    Yes, he did not ask her the
13 questions, the follow-up questions of what
14 makes you think you were being held down.
15 Well, I was trying to get up or not to get
16 into any of those.
17       There should have been a lot more
18 follow-up questions to that and also
19 her --
20 Q.    (By Mr. Ritchey) Did --
21       MS. BOLGER:  He's answering,
22 Scotch --
23 Q.    (By Mr. Ritchey) I'm sorry, that's

</td></tr>
<tr><td>

Page 231

1  my fault.
2  A.    Just a little delay, I'm sorry.
3        Also the resistance of her
4  verbally telling him that, you know, she
5  didn't want or she needed to meet with her
6  friends and her body language, I mean she
7  definitely just wasn't into doing this.
8        And so, you know, those more
9  follow-up questions I feel that if Jones
10 would have questioned her properly along
11 those lines, that he would have figured
12 out that she was resisting but it was
13 verbal and this is before she even got
14 onto the bed.
15 Q.    (By Mr. Ritchey) So asking
16 Ms. Rondini how she resisted Bunn's
17 advances was not a follow-up question in
18 your opinion?
19 A.    I think that is a follow-up
20 question, yes, but I don't think it's
21 enough.
22 Q.    And you say they didn't follow up
23 on Rondini's statements.  You didn't say

</td><td>

Page 232

1  they don't follow up enough.
2        MS. BOLGER:  I'm sorry, is
3  that a question -- stop, I didn't
4  understand the question.  Could you do
5  that again, Scotch?
6        MR. RITCHEY:  Would you mind
7  repeating that?
8        (Whereupon, requested portion was
9        read back by court reporter.)
10       MS. BOLGER:  Okay.
11 A.    Well, I think -- I mean I think
12 you're mincing words with me.  To me it's
13 the same thing.
14       There's some statements you follow
15 up on and then other ones you don't, even
16 though what you're following -- the
17 statements that are made are kind of
18 intertwined here.
19       If she says she did one thing on
20 the bed, you know, and something else, you
21 know, sitting on a chair and you asked a
22 partial follow-up -- you ask a follow-up
23 question and it's partial, okay, then it

</td></tr>
</table>

58  (Pages 229 to 232)

Carlton Hershman                                                3/16/2021

Page 233

1  wasn't enough. I mean was it -- or was it
2  none at all. I think it's both.
3  Q.    (By Mr. Ritchey) The next
4  paragraph, second sentence you say she
5  repeatedly told Jones and Hastings that
6  she did not want to have sex, and it goes
7  on from there, but I want to kind of focus
8  on that first part. Are you saying --
9         MS. BOLGER: Carl, you need
10  to read the rest of it though.
11  Q.    (By Mr. Ritchey) Well, let me know
12  when you're ready.
13  A.    Okay. Okay.
14  Q.    Did Ms. Rondini ever say she did
15  not want to have sex to Bunn?
16  A.    Not that I'm aware of, no.
17  Q.    Did Ms. Rondini ever say she could
18  not fight back?
19         MS. BOLGER: Object to the
20  form of the question.
21  A.    Did she actually say that she
22  wasn't able to, is that what you're asking
23  me, sir?

Page 234

1  Q.    (By Mr. Ritchey) Right.
2  A.    I don't think she said that, no.
3  That she couldn't physically fight back,
4  no.
5  Q.    Scrolling down to page 22. This
6  is the first full paragraph on this page.
7  It starts out instead Jones and Hastings
8  focused on Rondini's statement, and if you
9  want to continue reading, you can. I can
10  direct you --
11         MS. BOLGER: You can also
12  read before that.
13  Q.    (By Mr. Ritchey) -- and read
14  before that. You tell me where you want
15  to go on it and I'll be happy to take you.
16  A.    What question are you going to ask
17  me so I know what to read here?
18  Q.    I'll ask you and then if you need
19  to read something, just let me know.
20  A.    Okay.
21  Q.    In this paragraph you said Jones
22  and Hastings erred in making this
23  conclusion.

Page 235

1         Are you referring to the sentence
2  above where no assault occurred; is that
3  correct?
4         MS. BOLGER: If you're going
5  to ask that question, I'm going to insist,
6  Carl, that you read the prior at least two
7  paragraphs or three paragraphs.
8  A.    Okay. Where are you at,
9  Mr. Ritchey, in the paragraph?
10  Q.    (By Mr. Ritchey) I am right here.
11  A.    Okay. So in that first sentence
12  you say instead Jones and Hastings focused
13  on Rondini's statements that she felt like
14  letting Bunn have sex with her was the
15  only way that he would let her go as
16  conclusive evidence that she did not
17  earnestly resist Bunn's advances and
18  consequently no assault occurred.
19         Next sentence you say Jones and
20  Hastings erred in making this conclusion
21  so early on in the investigation with less
22  than nine minutes of questioning and
23  particularly in light of the evidence

Page 236

1  Rondini had provided to Jones and Hastings
2  that she had been held down and did not
3  give consent.
4         Are you saying that Jones and
5  Hastings concluded no assault had
6  occurred after these nine minutes of
7  questioning?
8         MS. BOLGER: Carl, I'm
9  asking you to read the rest -- read at
10  least a couple of paragraphs above and
11  below before you answer that.
12  A.    Yeah, I did. I got it.
13         Yeah, they determined when she
14  said I had been held down, he immediately
15  goes into, you know, did you fight back.
16         And she says no. And then, you
17  know, did you tell him no. Did you use
18  the word no. No, she did not.
19         And without doing any
20  investigation whatsoever he starts to have
21  this bias that she did not earnest resist.
22         I mean if you listen to that
23  interview you can hear it. He completely

59 (Pages 233 to 236)

Carlton Hershman                                    3/16/2021

|                                          Page 237 |
| --- |

1    switches from trying to gather information
2    to trying to determine whether she was
3    sexually assaulted or not without even
4    leaving that hospital.
5    Q.    (By Mr. Ritchey) So you were able
6    to determine what Investigator Jones and
7    Hastings were thinking based on that audio
8    interview?
9    A.    By the questions they were asking,
10   yes, sir.
11   Q.    All right.  Later in that
12   paragraph you said this error had an
13   impact on Rondini who started crying
14   apparently because she was beginning to
15   deduce that Jones and Hastings did not
16   believe her.
17         How do you know --
18   A.    Correct.
19   Q.    -- how do you know what she was
20   deducing at that point?
21         MS. BOLGER:  Object to the
22   form.  It does say apparently.  You can
23   answer.

|                                          Page 238 |
| --- |

1    A.    Well, I mean she's not crying when
2    they first come in.  She's conversing with
3    them.  She sounds -- you know, when
4    they're asking questions she's able to
5    answer them.
6         When she does get to the sexual
7    assault portion of it and she states that
8    he held her down and then when the moment
9    there's pushback, meaning he starts asking
10   her about earnest resistance then that's
11   when she starts crying, not before that.
12        And this was, you know, seven or
13   eight minutes into this interview towards
14   the end and that's when she starts to cry.
15   Q.    (By Mr. Ritchey) And that's what
16   you base this sentence off of?
17   A.    Yeah, I mean it's apparent to me
18   that, you know, apparently that's what
19   happened.  I'm not saying that, you know,
20   that everybody has to cry.
21        It's just that she cries at that
22   very moment that portion of the
23   questioning, and it just so happens that

|                                          Page 239 |
| --- |

1    well, you know, hey, if you didn't push
2    back then this isn't a rape.
3    Q.    Didn't she start -- I'm sorry --
4    A.    I was just going to say it's very
5    well that she took it that way.  You know,
6    it's likely that she could have took it
7    that way.
8    Q.    Didn't she start crying when she
9    was beginning to explain the door handle
10   situation?
11   A.    Yes, I mean that was frustration
12   that she couldn't get out this door, but
13   also that a person would be fearful.
14        I don't know exactly what she is
15   thinking because I wasn't -- you know, I'm
16   not the investigator that should have been
17   asking her those questions, and those are
18   the questions that should have been asked
19   of her.
20        I know your question to me was was
21   that the same thing as far as the crime,
22   but again, when I as an investigator and
23   interrogator and interviewer and I ask a

|                                          Page 240 |
| --- |

1    question, it's timing, content and tone.
2         And when somebody reacts or
3    responds to that, it's also timing,
4    context, and tone, so this is why, you
5    know, it's very important to, you know,
6    ask the open-ended questions and not being
7    accusatorial or confrontational.
8         I mean to any victim, I think
9    that's common knowledge but especially
10   more so to someone who's claiming a sexual
11   assault.
12   Q.    Scrolling down to the top of
13   page 23, that first full sentence on
14   page 23, you say pretext phone calls are
15   considered the bread and butter of consent
16   cases.
17        Who considers pretext phone calls
18   the bread and butter of consent cases?
19   A.    I do.
20   Q.    And I've kind of got a basic
21   understanding of pretext phone calls.
22   Would those type of calls fall into some
23   sort of entrapment?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                    3/16/2021

---

Page 241

1  A.    Well, that's what defendants
2  always claim, yes. But they're not.
3  Q.    And why not?
4  A.    It's the way the law is written, I
5  mean if you have a one party state, and
6  from my understanding Alabama is, that one
7  person knows if law enforcement is
8  listening in, then it's okay to listen in.
9      It's, you know, victims and law
10  enforcement often are accused that these
11  are entrapment or a tool of entrapment,
12  and we've had law up and down, you know,
13  the court is stating that it's not.
14  Q.    Have you reviewed Alabama's law in
15  regards to pretext phone calls?
16  A.    No, sir, I just know that it's --
17  that you are a one party state and they
18  are allowed.
19  Q.    Who do you mean a one party state?
20  A.    When you have a phone conversation
21  with, you know, two or more people and one
22  person knows that law enforcement is
23  listening in, they're aware of it, then

---

Page 242

1  you do not need what we call a wiretap
2  warrant to listen in.
3      Now, the other subjects don't know
4  law enforcement is listening in but only
5  one does, and that's considered a pretext
6  phone call and it's allowed by law.
7  Q.    Do you know if Jones or Hastings
8  ever received training on pretext phone
9  calls?
10  A.    No, I don't. I would hope they
11  did but no, I don't know.
12  Q.    Were pretext phone calls included
13  in the homicide's SOP?
14  A.    I don't recall reading that.
15  Q.    I'm going to scroll down to page
16  24, and it's on the second full paragraph
17  under B when you are discussing this
18  recording where you say they're
19  rationalizing Bunn's lie and you look like
20  you quote some of that recording; is that
21  correct?
22  A.    Can I have a moment to read it?
23  Q.    Sure.

---

Page 243

1      MS. BOLGER: Of course. You
2  can read as much as you like.
3  A.    Okay, sir, are you asking me if I
4  quoted him?
5  Q.    (By Mr. Ritchey) Yes, is this --
6  A.    Mr. Bunn.
7  Q.    Well, let me ask you this, is this
8  the full quote you were able to obtain
9  from that video?
10  A.    Sir, I haven't seen or listened to
11  the video in a long time so I don't know
12  the answer to that question. I'm sorry.
13  Q.    It looks like there's some
14  ellipses in there. Is that noting that
15  you weren't able to hear the full
16  conversation that was taking place on that
17  recording?
18      MS. BOLGER: Object to the
19  form.
20  A.    I probably -- I probably listened
21  the whole thing. Just when I take a
22  snippet out of a sentence, then I'll put
23  the dots there, yes.

---

Page 244

1  Q.    (By Mr. Ritchey) Okay. Do you
2  know if you heard the whole conversation
3  that took place?
4  A.    I listened to the whole
5  conversation, yes, sir.
6  Q.    But you don't know if there's
7  anything said before or after that
8  recording?
9      MS. BOLGER: Object to the
10  form. That's not what he said. He
11  doesn't know now. Not in general. He
12  said he can't remember.
13  Q.    (By Mr. Ritchey) Well, what I'm
14  asking is you don't know if there is a
15  conversation before that recording was
16  started or that conversation continued
17  after that recording ended?
18  A.    Are you talking about Mr. Bunn's
19  lie at the door? Is that what you're
20  talking about?
21  Q.    No, I'm talking about this video
22  you're talking about in this paragraph.
23  A.    Yes, when they're doing the search

---

61  (Pages 241 to 244)

Page 245

1    warrant?
2    Q.    I'm sorry.
3    A.    Is that what you're talking about
4    --
5          MS. BOLGER: Scotch, I don't
6    think he understands your question.
7    Q.    (By Mr. Ritchey) Let me try it
8    again. In this paragraph you are quoting
9    from a video that you've reviewed; right?
10   A.    Yes.
11   Q.    Okay. Do you know if that video
12   recorded any part of the conversation that
13   may have started before that recording?
14         MS. BOLGER: Do you mean
15   like from the beginning of time? That's
16   what I think I'm having a hard time with.
17   Q.    (By Mr. Ritchey) I'm saying do you
18   know if this was the full conversation or
19   could there have been parts of the
20   conversation that were not captured on
21   this video?
22   A.    Which one are you talking about?
23   When they first talk to him at the door or

Page 246

1    when they're walking through his
2    residence?
3    Q.    I'm talking about the one you have
4    quoted here in this paragraph that we've
5    been talking about.
6    A.    That's when they're walking around
7    with the video.
8    Q.    Right. And you don't know what
9    was said before that video started; right?
10         MS. BOLGER: You mean the
11   world on planet Earth? I don't understand
12   the question.
13   Q.    (By Mr. Ritchey) In the context of
14   the video. I mean in the house, that's
15   all I'm trying to get, is you don't know
16   what started that conversation, do you?
17   A.    No, sir. When he's walking down
18   the hallway and they're in another room, I
19   can hear people talking but I don't know
20   what they're saying and so he comes around
21   the corner.
22         But that's the conversation you're
23   talking about. I don't know what was

Page 247

1    said.
2    Q.    And you don't know the full
3    context around what was said in this
4    video?
5    A.    That is correct. I'm sorry,
6    Mr. Ritchey, I just wasn't understanding.
7    Q.    That's fine. It was probably my
8    fault not asking good questions.
9          Do you know who is talking in the
10   video?
11   A.    No, I do not. His voice sounds
12   familiar.
13   Q.    Have you ever seen the Homicide
14   Unit's uniforms that were worn during
15   2015?
16   A.    No.
17   Q.    Were you aware that the uniforms
18   had the word homicide on those uniforms?
19         MS. BOLGER: Object to the
20   form of the question and that is
21   misleading as to what people were wearing
22   that morning.
23   A.    I understand that they had like a

Page 248

1    pull-over colored shirt that says homicide
2    on the breast.
3    Q.    (By Mr. Ritchey) Scrolling to
4    page 25. And I'll scroll up for some
5    context.
6          I'm looking at the first full
7    paragraph or, sorry, first full sentence
8    on page 25. It says, for example, the
9    officers allowed Bunn to rummage through
10   the clothing he was wearing immediately
11   before the alleged assault.
12         How do you know they allowed Bunn
13   to rummage through that clothing?
14         MS. BOLGER: I'll say --
15   A.    If I remember right, that they
16   asked him what he was wearing. I'm just
17   going through my process here.
18         MS. BOLGER: Feel free to
19   read the paragraph.
20   A.    Yeah, I know. I'm reading it now.
21   I don't know how I -- I can't remember how
22   I came about that, sir.
23         I don't know if I saw it on video

Carlton Hershman                                           3/16/2021

Page 249

1    or they mentioned it, but it's one of the
2    two things.
3    Q.    (By Mr. Ritchey) And in that next
4    paragraph, you say second when the
5    officers allowed Bunn to tag along with
6    them during the search of his home, he
7    reported to officers at the scene that he
8    was missing $300 and a gas card from his
9    wallet.
10        Are you saying those officers were
11   Jones and Hastings?
12   A.    I'm saying whoever was doing the
13   video recording.
14   Q.    And you don't know who that was?
15   A.    No.  It sounded like Jones and it
16   sounded like Hastings was holding the
17   camera because I heard them in their
18   interviews and interrogation, so their
19   voices are different.
20        And when I went back and listened
21   to the recordings from Mr. Bunn's
22   residence I kind of matched them up if you
23   will.

Page 250

1    Q.    Do you know who allowed Bunn to
2    look through his car?
3            MS. BOLGER:  Object to the
4    form.
5    A.    I do not -- I do not know.
6    Q.    (By Mr. Ritchey) And kind of going
7    to that next sentence, you said after
8    learning of these items law enforcement
9    derailed their investigation into
10   Rondini's alleged assault in order to open
11   a concurrent investigation into this
12   purported theft of Bunn's property.  How
13   did they derail that investigation?
14   A.    Can you tell me where you're at,
15   sir?
16   Q.    Yeah.  I'm going to highlight it
17   for you.
18   A.    Okay.  Sure, so they derailed it
19   by stopping investigating the sexual
20   assault portion of it.
21        They did very little to no
22   follow-up on the sexual assault portion of
23   it and then they directed their

Page 251

1    investigation into a theft investigation.
2    Q.    Okay.  So are you saying after
3    they went out to the Bunn -- Mr. Bunn's
4    residence, that's when they stopped the
5    sexual assault investigation?
6            MS. BOLGER:  Object to the
7    form.  That's not what the sentence you
8    just looked at said.
9    A.    Look, I don't know exactly when
10   that occurred but it was soon thereafter.
11        When Mr. Bunn mentions that he had
12   a gas card missing and that he would need
13   a pass number or code to get into it, he's
14   explaining to them about his missing
15   items, the money.
16        And then I think at that point
17   it's just money and a gas card.  I'm not
18   sure at that point if they knew about the
19   firearm or not.
20        You know, they at that point when
21   Mr. Bunn makes this comment to them either
22   when they were still at the house or when
23   they left, now this became a theft

Page 252

1    investigation and they derailed it by not
2    talking to her nine friends, not doing all
3    the things that we talked about this
4    morning and earlier this afternoon.
5        They didn't do any of that.  In
6    fact, once at the station they tried to
7    get her to sign a form to stop the
8    investigation.
9    Q.    (By Mr. Ritchey) Later down this
10   page under D.
11   A.    Okay.
12   Q.    The second sentence from the
13   bottom it says, and Bunn consistent with
14   the standard protocol for sexual assault
15   investigations, should have been required
16   to have a SANE exam to secure physical
17   evidence.  It's towards the bottom of the
18   page.  Do you see where I am?
19   A.    Yes.
20          MS. BOLGER:  Feel free to
21   read as much as you need to, Carl.
22   Q.    (By Mr. Ritchey) Yeah, if you need
23   to let me know.

63  (Pages 249 to 252)

Carlton Hershman                                                    3/16/2021

Page 253

1   A.    I got it.
2   Q.    Okay.  What I'm asking is what's
3   the standard protocol for sexual assault
4   investigations?
5   A.    That if you have a suspect that
6   you're able to obtain forensic evidence
7   from them, that you arrest them, you
8   process them to obtain that evidence,
9   whether it be physical or scientific.
10  Q.    Is this a written protocol?
11  A.    It's so standard, it's ridiculous
12  to say you have to write something like
13  that down, so I don't know where it would
14  be written, but, you know, every sexual --
15  you know, sexual assault, you know, sex
16  crimes investigator would know that.
17  Q.    What do you mean it's so standard?
18  A.    Well, it would be like I don't
19  know in your line of work there's the
20  things that are standard or that are very
21  basic, something that you would learn your
22  first year in law school, and if you
23  didn't learn it in law school you learned

Page 254

1   it soon after.
2        And, you know, when you go into
3   court you have to have evidence of a crime
4   to go into court.  And the way to collect
5   that evidence or obtain that evidence is
6   to search for it, to look for it.
7        You know, he, Mr. Bunn, is a crime
8   scene.  Ms. Rondini is a crime scene.  The
9   bedroom is a crime scene.  You have three
10  crime scenes here and none of them was
11  processed correctly.
12       And not to arrest Mr. Bunn is
13  just, you know, it's a dagger into a case
14  like this, it just kills it.
15  Q.    So this standard protocol for
16  sexual assault investigations that you're
17  referencing you learned that through
18  training and on-the-job training?
19  A.    Yes.
20  Q.    Do you know if Jones or Hastings
21  ever received this training?
22  A.    I do not know if they did or not.
23  Q.    Do you know if the Homicide Unit

Page 255

1   implemented this protocol?
2        MS. BOLGER:  Sorry, the
3   basic thing he just talked about, that's
4   what you're calling a protocol?  The part
5   about how investigators investigate crimes
6   which is what Carl just said.  That's not
7   a protocol.  I object to the word
8   protocol --
9        MR. RITCHEY:  He called it a
10  protocol.  He says the standard protocol
11  for sexual assault and just told me what
12  it was --
13       MS. BOLGER:  -- in that he
14  does and then he gave you long testimony
15  about it, and now you're characterizing it
16  as something you train in a training.
17  That's not what Carl said.
18       Carl, you can answer the
19  question --
20       MR. COCKRELL:  Look, Kate --
21       MS. BOLGER:  -- you don't
22  need me, Carl.
23  A.    Look, I don't know what they were

Page 256

1   trained in, Mr. Ritchey, but I can tell
2   what they weren't trained.
3        They weren't trained to let
4   somebody that's accused of a sexual
5   assault walk away and not be processed.  I
6   mean there's no way that they were trained
7   to do that, to not speak with that person
8   for four days when they had him right in
9   front of them.
10       I mean they weren't trained to let
11  somebody, you know, walk through a crime
12  scene and contaminate it.  Those things
13  they're not trained in.
14       Now, were they not trained in
15  interviewing somebody that has trauma,
16  okay, maybe not.  But I'm going to tell
17  you there's some super very basic things
18  that they didn't do and they should have.
19       I mean, they're in a homicide
20  unit, correct.  I worked homicide.  I
21  couldn't -- I would not be doing my job if
22  I went to a homicide scene and somebody is
23  saying yeah, you know, he's the only

Carlton Hershman                                              3/16/2021

Page 257

1   person in the house and that's my suspect,
2   I don't arrest him and process him?
3        I mean, it's the same thing.  I
4   mean some people want to kind of downplay
5   sexual assault.  I mean, I had people
6   doing hundreds and hundreds of years in
7   prison in the state of California for what
8   they've done in a sexual assault.
9        But I mean these very basic things
10  that, you know, Jones and Hastings didn't
11  do I know they weren't trained not to do
12  those.
13       I'm sure they didn't receive some
14  training, but there's other training I
15  know that they didn't receive -- or
16  received and that was clearly, clearly
17  letting somebody, you know, contaminate
18  their crime scene, not arresting a person
19  that's committed a felonious assault on
20  another person and not have them
21  processed.
22  Q.    (By Mr. Ritchey) Do you know if
23  there were trained SANE nurses in

Page 258

1   Tuscaloosa at the time of the Rondini
2   allegations?
3        MS. BOLGER:  Object to the
4   form.
5        That has been asked and
6   answered.  You can answer it again.
7   A.    I don't know if there was actually
8   trained SART nurses or not.
9   Q.    (By Mr. Ritchey) I'm scrolling to
10  page 26, and I'll scroll up for some
11  context.
12       I'm looking at the top of page 26
13  where you said the taking of DNA, urine
14  and blood samples from Bunn could have
15  determined his blood alcohol level or
16  whether he had drugs in his system.
17       These tests simply did not occur.
18  This is a serious omission in the
19  investigation.
20  A.    Correct.
21  Q.    Why was -- why were these serious
22  omissions?
23       MS. BOLGER:  Object to the

Page 259

1   form.
2        I think we've been over
3   this.  You can answer again.
4   A.    Somebody that's under the
5   influence, you know, of alcohol their
6   memory may, you know, may not be clear
7   depending on how much alcohol they had or
8   drugs that they had.
9        They may have not done certain
10  things that they would done when they were
11  sober.  You know, when I'm interviewing
12  somebody and they're telling me something
13  that happened in the near past, I ask them
14  are you under the influence of alcohol or
15  drugs when this particular thing happened.
16       You know, no, I'm sober.  I'm
17  going to give more weight to that
18  statement than I would if somebody says
19  oh, no, I was shooting heroin or I was
20  completely drunk, so that tells me as an
21  interviewer that I'm still going to
22  interview this person but I'm going to
23  have to seriously evaluate whether what

Page 260

1   they're telling me was not in a drunken
2   stupor or they witnessed it in a drunken
3   stupor.
4   Q.    (By Mr. Ritchey) Were Bunn's
5   statements he made on July 6th of 2015
6   different than from the statements he made
7   on July 2nd, 2015?
8   A.    Were they different?
9   Q.    Right.
10  A.    Okay --
11       MS. BOLGER:  Michael, what's
12  wrong?
13       THE WITNESS:  Is it okay to
14  go ahead and answer?
15       MS. BOLGER:  Sorry, yes,
16  guys.
17       THE WITNESS:  Okay.
18       MS. BOLGER:  I just did that
19  for verisimilitude so you know I didn't
20  make up my children.  Sorry.
21  A.    I think he didn't make too many
22  statements at the police station.  They
23  were made for him and they were consistent

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                        3/16/2021

Page 261

1    for what he was saying prior at his
2    residence.
3    Q.    (By Mr. Ritchey) On page 27, this
4    is towards the bottom of this first half
5    paragraph and I'll scroll up for context
6    for you.
7         You say one infers that they would
8    not have let a potentially dangerous
9    sexual predator freely travel out of town
10   if they had not already made up their
11   minds that he could not possibly be
12   guilty.  Let me know if you see where I'm
13   at.
14   A.    I see where you're at.
15   Q.    Are you saying he's a potential
16   dangerous sexual predator because of the
17   Rondini case or are you basing that on
18   another case or incident?
19   A.    I'm basing it on this case.  I
20   mean and it's -- if you are investigating
21   someone who's being accused of a sexual
22   assault and holding somebody down and
23   forcing them, you know, to have sex with

Page 262

1    you that person needs to be arrested.
2         I mean that person is dangerous
3    until you find out otherwise.  That's why
4    you arrest them and process them and sit
5    down and talk to him and figure out what
6    happened.
7         I didn't know -- I mean is there
8    another case?  Is that what you're saying?
9    Q.    I'm just wondering, you know, what
10   made you put that there.  I didn't know if
11   that was just based on this case or if you
12   had other information I may not have.
13   A.    No.
14   Q.    I was just wondering that.
15   A.    Okay.  No, just based on this case
16   and this case only, but I mean it's the
17   same difference as, you know, letting, you
18   know, somebody that is violent -- I mean
19   this isn't a -- they weren't investigating
20   two people that was not consenting to be
21   under the influence of alcohol.
22        You have a victim who states that
23   she was held down by her hips and her

Page 263

1    shoulders, the upper part of her body
2    period.
3         That should be what you're
4    investigating until your investigation
5    goes down a path and goes one way or the
6    other.
7         Now, you come across that person
8    in his own residence, you let him go on
9    vacation?  I mean it's just odd to me that
10   somebody would let that happen.
11        MS. BOLGER:  Hey, Scotch,
12   just in terms of a break and timing, how
13   much longer do you have?
14        MR. RITCHEY:  I've got a
15   little bit to go.
16        MR. COCKRELL:  Let's take a
17   five-minute break, that will be okay.
18        MS. BOLGER:  Nancy, I need
19   to know how long we've been going now, if
20   you don't mind.
21        COURT REPORTER:  Okay, can I
22   figure it up while we take a break?
23        MS. BOLGER:  That would be

Page 264

1    awesome.
2         VIDEOGRAPHER:  Off the
3    record at 4:12 p.m.
4         (Recess was taken.)
5         VIDEOGRAPHER:  Back on the
6    record at 4:17 p.m.
7    Q.    (By Mr. Ritchey) I kind of want to
8    talk about the second interview with
9    Rondini, what you're calling the second
10   interview on page 27.
11        Not going to really ask you
12   anything right now about your report on
13   it, but I just want to ask you a few
14   questions concerning the second interview.
15        Are you aware that an assistant
16   district attorney was viewing this
17   interview of Ms. Rondini at the time it
18   was taking place?
19   A.    No.
20   Q.    Wouldn't an assistant district
21   attorney know when there's enough evidence
22   for an arrest warrant or a detention of a
23   suspect?

66 (Pages 261 to 264)

Carlton Hershman                                    3/16/2021

Page 265

1            MS. BOLGER:  Again, object
2    to the form and the premise because, in
3    fact, that's not what the testimony is,
4    but you can answer the question.
5    A.     Would they know; is that what
6    you're asking?  Yeah, they should know,
7    yeah.
8    Q.     (By Mr. Ritchey) Wouldn't you
9    think that an assistant district attorney
10   would have proceeded to tell the
11   investigators to obtain a warrant if one
12   was able to be obtained?
13           MS. BOLGER:  Again, I
14   absolutely object because there's
15   absolutely no testimony about that, and in
16   fact, your witnesses refused to answer
17   questions about their conversations with
18   the assistant district attorney, so to the
19   extent you're implying any of these
20   conversations existed, I object to this
21   line of questioning, but, Carl, you can
22   answer it as a pure hypothetical.
23   A.     Look, I see what you're getting at

Page 266

1    here.  I don't think any attorney watching
2    an interview with one female has the whole
3    picture of what happened.
4            I mean, I don't know what that
5    person's thinking or seeing or what, if
6    anything, they have in front of them.  The
7    arrest -- what I'm talking about is arrest
8    for probable cause arrest and that should
9    have been done earlier in the morning.
10   Q.     (By Mr. Ritchey) I'm on page 29 of
11   your report.  The last sentence of this
12   first half paragraph it says if Jones had
13   conducted a proper interview with Rondini,
14   he could have reconstructed the entire
15   reality of the alleged assault.
16           And if you need time to read it
17   for context, please let me know.
18           MS. BOLGER:  Yes, he needs
19   time to read for context.  And when you've
20   done so, Carl, feel free to answer.
21   A.     What was the question?
22   Q.     (By Mr. Ritchey) What do you mean
23   by that sentence?

Page 267

1    A.     It would understand where her
2    state of mind as to that she didn't want
3    to have sex and that that's how she had
4    resisted.
5            You know, with the fact that she
6    makes a big deal about, you know, when I
7    went into the room I sat on the sofa, you
8    know, or chair versus sitting on the bed.
9            You know, she didn't take her
10   clothes off.  All these things that she
11   did and had actually told Bunn that she
12   needed to leave to meet with her friends.
13           So in a proper interview, he could
14   have figured that out by asking the proper
15   questions, allowing her to express why she
16   made certain decisions, what she was
17   thinking at the time, and that would have
18   given -- he would have been able to
19   reconstruct what she was thinking and what
20   she was going through at the time that she
21   was in the bedroom.
22   Q.     Would what she was thinking and
23   feeling rise to the level of earnest

Page 268

1    resistance?
2    A.     I would say yes.
3    Q.     I'm on page 34 of your report.
4    I'm looking under number six, Bunn's
5    interrogation.  Scroll down for some
6    context.  It flows onto page 35.
7            You're talking about solving and
8    proving a criminal a case.
9            The last sentence of 34 it says,
10   Hastings should have directed his
11   interrogation down a path of proving
12   Rondini's allegations.
13   A.     I'm sorry, Mr. Ritchey, I was
14   waiting for your question.
15   Q.     I'm sorry.  I was trying to give
16   you some time to review, but my question
17   is what did you mean by that sentence?
18   A.     Which one?  I read the whole thing
19   so --
20           MS. BOLGER:  Yeah, you
21   didn't read the sentence.  You read a half
22   sentence.
23           MR. RITCHEY:  I believe I

Carlton Hershman                                           3/16/2021

Page 269

1    read the full sentence.  It was Hastings
2    should have directed his interrogation
3    down the path of proving Rondini's
4    allegations.  That looks like a period to
5    me after that.
6         MS. BOLGER:  Sorry.  I
7    thought you read a different sentence.  I
8    apologize.  We're all getting tired.
9    A.    Right.  So his interrogation
10   should have been directed to Mr. Bunn as
11   to if he had consent, if he felt that he
12   had consent or not, first of all.
13        Second of all, this whole holding
14   down aspect of it, did you hold her down
15   and if so -- and if he denies that then,
16   you know, why would we say something like
17   that.  It's that kind of verbiage that you
18   use in an interrogation.
19        You're interrogating someone
20   because you're trying to prove an element
21   of a crime and in this, again, it's kind
22   of split.  One, did you have consent, and
23   the other is the earnest resistance, you

Page 270

1    know, where did you hear her make comments
2    like hey, I need to go, I have to meet my
3    friends.
4         Yes, I heard that.  Well, what
5    does that mean to you?  Does that mean
6    that she wanted to have sex with you or
7    she was trying to tell you that she was
8    trying to -- or that she needed to go and
9    be with her friends.
10        None of that occurs.  None of that
11   is brought up.  The earnest resisting
12   whether he felt that he had consent and
13   the fact did you hold her down.
14        I mean none of that -- well, the
15   holding down part I think he did mention
16   that, but he doesn't go further and say
17   well, why would she say that.
18        So I mean, there was no pushback
19   at all whatsoever, and, in fact, you know,
20   you have, and I don't know if we'll get
21   into this, but, you know, Hastings asked
22   the question and he answers it for him
23   several times.

Page 271

1         I mean, that's just unheard of.  I
2    mean the only time that happens is at the
3    end of a full interrogation where you're
4    trying to clarify certain things.
5         You certainly don't sit down and
6    within, you know, a minute and a half and
7    say, hey, let me put it this way, did you
8    do this, this and this.  It's just
9    improper to do that.
10   Q.    Couldn't Hastings have spoken to
11   Bunn prior to that video or audio
12   recording?
13   A.    At the residence?
14        MS. BOLGER:  Object to the
15   form of the question.
16   Q.    (By Mr. Ritchey) At any time prior
17   to that audio or video recording.
18   A.    I think he spoke with him very
19   shortly maybe at the residence, but as an
20   interview, no, not that I know of because
21   I thought that was Carroll that
22   interviewed him in the backseat of his
23   car.

Page 272

1    Q.    On page 35, I'm looking at the
2    first full paragraph, second sentence from
3    the bottom of that paragraph, it says, by
4    allowing Bunn to leave town to go fishing,
5    Jones exhibited favoritism.
6    A.    Yes, I think he exhibited that,
7    yes.
8    Q.    How so?
9    A.    He let him go.  Sir, this, you
10   know, Mr. Ritchey, this is an allegation
11   to Mr. Bunn, his actions, you know, just a
12   few hours before.
13        Even if he didn't play favoritism,
14   it looks like he did.  I mean the
15   perspective, you know, when we look at
16   something like that -- or the perception,
17   I'm sorry, is that he did, and I can't
18   think of any other reason why he would do
19   that.
20        And, look, I'm going to -- I'll be
21   quite frank to you, that's not fair to
22   Ms. Rondini and it's actually not fair to
23   Mr. Bunn, right.

                          68  (Pages 269 to 272)

Carlton Hershman                                                      3/16/2021

|                         Page 273 |
| --- |

1          I mean if you're an investigator,
2     you go down the middle of the path.  I
3     mean, you, you know, you're investigating a
4     cases, you don't play favoritism to the
5     victim and you don't play favoritism to
6     the suspect.
7          I mean would it be fair to
8     Mr. Bunn that he wasn't exonerated if he
9     didn't do something?  Of course.
10         And it's the same with
11    Ms. Rondini.  Was it fair to her if she
12    was actually sexually assaulted?  So I
13    mean he didn't do anybody a favor by
14    letting him go on this four-day fishing
15    trip or whatever.
16    Q.    Why do you say only Jones allowed
17    Bunn to leave to go fishing?
18    A.    Because he's the lead
19    investigator, sir.  I mean, whether it's
20    his call or not he's the lead
21    investigator.
22    Q.    The next paragraph it starts, in
23    addition, I note that this interview of

|                         Page 274 |
| --- |

1     Jones was conducted by Hastings.
2          I'm just assuming that's a typo,
3     it should say interview of Bunn was
4     conducted by Hastings; is that correct?
5     A.    That's correct.
6     Q.    And then why is it noteworthy that
7     this interview of Bunn was conducted by
8     Hastings?
9     A.    Because as the lead investigator
10    the two people that you should talk
11    directly to, no matter what, there might
12    be an exception or two, very, very small
13    one, but you talk to the victim and you
14    talk to the suspect.
15         Because there's a lot of things
16    that the victim is going to tell you that
17    you can confront or corroborate or
18    contradict when you do your interrogation
19    of a suspect.
20         If you piecemeal it out, you don't
21    have the entire story, or at least what
22    you believe the entire story to be.
23         You go into -- look, you're

|                         Page 275 |
| --- |

1     Investigator Hastings.  Do you know at
2     least, you know, 90 percent of what
3     happened here and what Ms. Rondini said.
4     We don't know.
5          I can tell you more likely he
6     didn't just by the questions that he had
7     asked.  So who would know that?  The lead
8     investigator.  That's why you put that in
9     there.
10    Q.    Do you know if Jones ever spoke to
11    Hastings prior to this interview of Bunn?
12    A.    I do not know that.
13    Q.    And do you know if Hastings talked
14    to Jones about the interview of Bunn?
15         MS. BOLGER:  Object to the
16    form.  Isn't that the same question?
17    A.    Was it the other way around?
18    Q.    (By Mr. Ritchey) Yes, it was the
19    other way around.
20    A.    Okay.  I do not know.
21    Q.    Does Ms. Rondini's statements that
22    she stated several times that she needed
23    to leave and meet up with friends rise to

|                         Page 276 |
| --- |

1     the level of earnest resistance?
2          MS. BOLGER:  Object to the
3     form.
4     A.    Yes.  In my opinion, yes.  I mean,
5     look, you know when a girl's into you.
6     You know, she's making excuses, if you
7     will, because I'm pretty sure that wasn't
8     true that she was meeting with her
9     friends, but it's some kind of a
10    resistance.
11         I mean, she's not jumping into bed
12    with Mr. Bunn, so, yeah, if you're in your
13    bedroom, you know, and the person you're
14    in there with says, oh, by the way, I've
15    got to go, I've got to go meet my friends
16    how is that to me an invitation of hey,
17    let's jump in bed real quick here, so to
18    me, yeah, that is a level of resistance.
19    Q.    (By Mr. Ritchey) Does that rise to
20    the level of earnest resistance though?
21    A.    Well, I think for Ms. Rondini it
22    is the level of -- I mean for her level.
23    You know, earlier she said she didn't want

Carlton Hershman                                      3/16/2021

Page 277

1    to be rude, right.
2         She didn't want to be rude, so
3    she's doing what most females do,
4    especially young girls, they're nice.
5         You know, I've had so many victims
6    across the years that didn't fight back,
7    they wanted to be nice and then they find
8    themself in a bad situation.
9         What happened to Ms. Rondini is
10   such a classic type of a thing that
11   happens to a lot of victims.  They paint
12   themself in a corner and they give up, but
13   to answer your question I think for her
14   level of earnest resistance because she
15   doesn't want to be rude, that was her
16   level.
17   Q.   I'm not talking about her level of
18   earnest resistance.  I'm talking about
19   earnest resistance under the law.  Does
20   that meet the level of earnest resistance
21   under the law?
22        MS. BOLGER:  I'm going to
23   object to the form of the question.

Page 278

1         He's not a lawyer.  He's not
2    here as a lawyer.  He's not presented as
3    an expert on what constitutes or doesn't
4    constitute earnest resistance under
5    Alabama law, so this question is
6    objectionable --
7         MR. RITCHEY:  I believe --
8         MS. BOLGER:  Carl, you can
9    answer if you like.
10        MR. RITCHEY:  -- I believe
11   he has stated an opinion as to that,
12   though.
13        MS. BOLGER:  He's not being
14   offered as an expert in this case on what
15   earnest resistance is under Alabama law.
16   But, Carl, you can answer.
17   A.   Okay.  I don't think in Alabama
18   law there's a list of -- a bullet form
19   list of what earnest resistance is.
20        I think it just states does it
21   rise to a level of earnest resistance and
22   I think that level is different for
23   everyone.

Page 279

1         You know, I'm sure some women
2    would have fought him off to the death and
3    others would have just tried to run out
4    the door.  Others would have screamed and
5    others would have just said I need to be
6    somewhere else, I need to leave.
7         And that's what her level of
8    earnest resistance is.
9         As far as Alabama law, the way I
10   read it, and I read a very small portion
11   of it, that there isn't a list of, you
12   know, punch, kick, push, I just didn't see
13   that, sir.
14        And, you know, from what Mr. -- or
15   I'm sorry, Investigator Jones was saying
16   at the hospital was did you use the word
17   "no", which leads me to believe that
18   that's verbiage, right, that's language
19   that he's used to is that earnest
20   resistance under Alabama law if you use
21   the word no, the actual word no, those are
22   air quotes, which I hate when people use
23   those, but -- so that leads me to believe,

Page 280

1    not knowing, you know, Alabama law, that
2    you can resist by saying no, that you can
3    use verbiage.
4         Her way of saying no was I need to
5    be somewhere else, I need to meet with my
6    friends.
7    Q.   (By Mr. Ritchey) But she never
8    actually said the word no?
9    A.   She never used the word no.
10        MR. COCKRELL:  Off the
11   record.
12        (Off the record.)
13   Q.   (By Mr. Ritchey) Mr. Hershman, did
14   you review the Tuscaloosa News or
15   Gatehouse Media Article by Stephanie
16   Taylor detailing the Rondini
17   investigation?
18        MS. BOLGER:  Object to the
19   form.  That's not what that does, but you
20   can answer it.
21   A.   Is that the last one that -- what
22   was the name of the author, I'm sorry?
23   Q.   (By Mr. Ritchey) Stephanie Taylor.

Page 281

```
1    It was the -- I believe it was published
2    online.
3    A.    Yes, I did.
4    Q.    Did that article assist or help
5    you form any of your opinions in your
6    expert report?
7    A.    No.
8    Q.    Did you consider the article in
9    forming your expert report?
10   A.    No, not at all.
11       MS. BOLGER:  I'm sorry,
12   wait, stop.  What article?
13       MR. RITCHEY:  Still on the
14   Stephanie Taylor article.
15   Q.    Did Ms. Rondini say she was ever
16   afraid of Mr. Bunn or felt threatened by
17   him?
18   A.    She didn't say it, but I think
19   when -- I mean she said she grabbed the
20   gun for protection.
21   Q.    What did you think that meant?
22   A.    That she was scared of something.
23   Q.    But you don't know what?
```

Page 282

```
1    A.    No.  I assume it's the person who
2    just had done something to her.
3        MR. RITCHEY:  If y'all will
4    just give me a few minutes, I just need to
5    check over my notes and see if we need to
6    go through anything else, but we can take
7    a short five-minute break.
8        VIDEOGRAPHER:  Off the
9    record at 4:45 p.m.
10       (Recess was taken.)
11       VIDEOGRAPHER:  Back on the
12   record at 4:54.
13   Q.    (By Mr. Ritchey) Mr. Hershman, I
14   just have a few more questions.  I may
15   have asked these before, forgive me if I
16   have.  Just making sure we got everything.
17       Have we talked about every civil
18   case where you've rendered an expert
19   opinion or report either by affidavit,
20   written report, deposition or trial?
21   A.    Yes, I believe so.
22   Q.    In the report you've used the word
23   blackout and you've used it a little bit
```

Page 283

```
1    here today.  Where did you get that
2    definition of blackout?
3        MS. BOLGER:  Sorry, where?
4    What definition?
5        MR. RITCHEY:  Definition of
6    blackout.
7        MS. BOLGER:  I guess I --
8    you just referenced his report and today
9    --
10       THE WITNESS:  In my report?
11       MS. BOLGER:  -- and I guess
12   I didn't -- that's two different things,
13   and I just didn't know if you're talking
14   about a specific line in the report.
15   A.    Yeah, I don't know if I gave a
16   straight definition or an example, but I
17   mean, if you could direct me, I'll take a
18   look at it.
19   Q.    (By Mr. Ritchey) Well, I believe
20   you've written blackout in your report and
21   I know you've mentioned it a few times
22   here.  Are there two different terms
23   you're referring to?
```

Page 284

```
1        MS. BOLGER:  You're just
2    referring to a specific definition, and
3    Carl and I are having a hard time trying
4    to figure out what definition you're
5    referring to.
6    A.    You asked where I got a definition
7    from.  I don't know if I put a definition
8    in.
9    Q.    (By Mr. Ritchey) I'm sorry, you
10   gave -- okay, then why don't we do this.
11   Will you give me the definition of
12   blackout?
13   A.    Sure.  That's when somebody is --
14   doesn't remember what they're doing.
15   However, they may be driving a car or
16   they're functioning in some way, but
17   they're just not aware of their
18   surroundings.
19       They could have full-on
20   conversations.  They could be texting.
21   They could make a phone call.  Again, like
22   I said, they could drive a car, but
23   they're not passed out and I think that's
```

Carlton Hershman                                          3/16/2021

Page 285

1    what we were talking about earlier,
2    blacked out versus passed out.
3    Q.    And is that your definition of
4    blacked out or did you get that definition
5    from someone or somewhere?
6    A.    I'm sure I got it through training
7    somewhere.  I couldn't tell you where, but
8    that isn't something I came up with, no.
9    Q.    And I believe you mentioned you've
10   been to Mobile and Huntsville, Alabama; is
11   that right?
12   A.    Yes.
13   Q.    What was the purpose of going to
14   Mobile?
15   A.    Kind of embarrassing but I was in
16   a bowling tournament and, yes, bowling is
17   a sport.
18   Q.    I'm sorry --
19   A.    I was there for a US Open for
20   bowlers.
21   Q.    Okay.
22   A.    Also in Huntsville.
23         (Off the record.)

Page 286

1    Q.    Do you know any police chiefs or
2    sheriffs in the state of Alabama?
3    A.    I'm thinking.  I know quite a few
4    just from the trainings and stuff and
5    traveling.
6          I don't think so, sir, but I would
7    like to reserve that if down the road I
8    come across one.  I'm not personal friends
9    with any of them, I can tell you that.  If
10   I do know one, it would be from training.
11   Q.    If it comes to you, you know,
12   later down the road, just tell your
13   attorney and she can get that to us.
14   A.    Sure.
15   Q.    I'm not quite sure if you know
16   this or not, but BuzzFeed's retained
17   another expert in this case name Michael
18   Mertz.  Are you aware of that?
19   A.    No.
20   Q.    Have you ever talked to Mr. Mertz?
21   A.    No.
22   Q.    And kind of earlier in the day you
23   mentioned that you thought Megan had an

Page 287

1    argument with another friend and you
2    couldn't remember how you obtained that
3    information.  Do you remember now?
4    A.    No, sir, I don't, and it's going
5    to bug me because -- I will look it up, I
6    promise you that.  I will let Kate know
7    and she can -- because it will bug me.
8    Q.    Okay.  Yeah, if you could just
9    provide that to Kate and we can get that.
10   A.    Sure.
11   Q.    Did you ever determine if
12   Ms. Rondini knew Mr. Bunn before July of
13   2015?
14   A.    I don't know if I could do that.
15   The only thing I know is that she stated
16   she had met him on Thanksgiving Day or
17   Thanksgiving of 2014.  Other than that --
18   and she had seen him at a bar but never
19   conversed with him.
20         MR. RITCHEY:  I think that's
21   all I have.
22         MS. BOLGER:  I have no
23   questions.

Page 288

1          VIDEOGRAPHER:  Off the
2    record at 4:59 p.m., and this concludes
3    the deposition.
4
5          [The deposition was concluded at
6    4:59 p.m., and further deponent saith
7    not.]
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Carlton Hershman                                              3/16/2021

```
                              Page 289
 1                CERTIFICATE
 2    STATE OF ALABAMA    )
 3    TUSCALOOSA COUNTY   )
 4        I hereby certify that the above and
 5    foregoing proceedings were taken down by
 6    me in stenotype, and the questions and
 7    answers thereto were reduced in transcript
 8    form by computer-aided transcript under my
 9    supervision, and that the foregoing
10    represents a true and correct transcript
11    of the proceedings occurring on said date
12    at said time.
13        I further certify that I am neither
14    of counsel nor of kin to the parties to
15    the action, nor am I anywise interested in
16    the results of said cause.
17    Signed March 16, 2021.
18
19    /s/ Nancy Pannell, CCR
20    NANCY PANNELL, CCR
21    Alabama CCR No. 30, Expires 9/30/2021
22    Commissioner for the State of Alabama at
23    Large, Commission expires 07/17/2021
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

**A**

**a.m** 1:19 6:13
11:12 12:5
93:19 200:15
217:23
**ability** 86:6
**able** 18:20 87:16
89:20 108:8
126:21 129:1
132:14 167:22
168:12 178:6
180:1 192:3,4
195:21 197:10
209:19 233:22
237:5 238:4
243:8,15 253:6
265:12 267:18
**absolutely**
132:18,18
265:14,15
**abuse** 63:14,17
64:18 69:5
73:17
**academy** 71:2,7
71:12 75:22
76:2,8,12 91:7
**access** 105:6
114:10,15,19
**account** 225:15
**accountable**
205:8
**accounted** 208:8
**accounts** 224:21
**accurate** 134:18
159:18 207:8
210:8
**accusatorial**
102:5 240:7
**accused** 68:23
69:3 96:4
114:5 163:12
209:11 241:10
256:4 261:21
**accuser** 205:12
**achieved** 63:1

**act** 223:1
**acted** 124:7
143:18
**acting** 11:4 85:7
136:18 162:7,8
219:15
**action** 289:15
**actions** 19:2
26:15 59:10
62:21 113:20
113:22 132:11
134:20 135:17
182:16 272:11
**active** 23:5
**actual** 52:17
107:8 149:20
195:23 279:21
**Adam** 1:8 11:21
96:18 97:18
118:2 121:19
122:2,6
**add** 171:7
**addition** 210:17
273:23
**additional** 95:9
95:11
**additions** 5:7
**adequate** 113:9
**adju** 42:14
**adjudicated**
42:15
**administered**
92:10
**adult** 61:21,22
**advances** 231:17
235:17
**advisement** 20:7
20:10 26:3
**affairs** 68:15
69:1,10
**affect** 138:3
143:4
**affidavit** 282:19
**affirmative**
115:10
**afraid** 281:16

**afternoon**
165:19 252:4
**age** 41:4 149:6
**agencies** 71:8
158:5,16,18
160:3,11 161:2
**agency** 55:15
69:17 70:13
158:7 159:4,4
**ago** 43:8 96:22
96:22 101:4
**agree** 42:11 96:5
**AGREED** 6:2
6:15,23
**ahead** 36:6
49:18 60:15
72:23 81:10
116:8 117:1
167:19 174:16
184:5 185:1
201:20 208:21
210:18 211:14
217:13 219:11
260:14
**air** 279:22
**al** 11:22,23
**Alabama** 1:2
2:18 6:11 9:10
9:23 11:3,4,11
12:2 38:9
61:23 62:3
77:17 78:3
79:23 80:13,16
80:20 97:22
146:15,20
149:19 160:18
172:2 241:6
278:5,15,17
279:9,20 280:1
285:10 286:2
289:2,21,22
**Alabama's**
241:14
**Albany** 58:7
**alcohol** 22:20
82:2 84:1,9,19

85:12,19 89:16
90:20,23 92:7
130:4 131:16
131:21 133:14
133:15 145:19
145:22 176:21
209:2 258:15
259:5,7,14
262:21
**alcoholic** 90:5
**allegation**
272:10
**allegations**
112:13 131:2
135:12 163:6
198:10 258:2
268:12 269:4
**alleged** 137:16
139:1 202:10
202:11 203:10
226:20 248:11
250:10 266:15
**alleging** 123:9
**allow** 14:3 102:7
185:15 186:13
186:23 187:10
187:13,18,21
188:11 189:18
193:7 194:2
**allowed** 43:16
113:13 193:5
241:18 242:6
248:9,12 249:5
250:1 273:16
**allowing** 187:5
267:15 272:4
**altogether** 35:10
**AMERICAS**
9:15
**amount** 71:18
130:3 131:16
131:21 145:15
163:21
**amounts** 163:13
**analysis** 111:5
207:6 222:6,10

**and/or** 5:7
104:11,12
**Angels** 203:11
**answer** 14:2,12
14:16,19 26:1
26:8 37:12
40:19 45:7,8
56:17 59:22,23
60:15 64:6
68:19 69:22
71:15,22 82:8
82:11,14,15,17
84:7 90:2
96:15 105:12
118:21 119:22
131:15 135:6
138:1 143:12
146:9 151:19
152:2,8,11,13
152:22 153:3
154:4,6 158:11
158:13 183:23
184:10,20
185:2 186:2,8
189:8,10,13
191:2 198:22
201:19 202:21
210:16 214:8
215:22 216:23
236:11 237:23
238:5 243:12
255:18 258:6
259:3 260:14
265:4,16,22
266:20 277:13
278:9,16
280:20
**answered** 71:14
71:21 72:22
73:6 117:23
119:18,20
137:23 140:5
142:6 160:5
182:3 197:22
222:8 258:6
**answering** 14:23

230:21
**answers** 14:7
  270:22 289:7
**anybody** 48:11
  124:14 210:6
  211:15 215:2
  273:13
**anyway** 17:23
**anywise** 289:15
**apartment**
  23:17 106:17
  107:12 132:1,8
  134:4 145:2
  199:8 208:2,5
**apologize** 269:8
**apparent** 238:17
**apparently**
  237:14,22
  238:18
**appearance**
  89:22
**apples** 135:2
**appreciate** 13:8
**approach** 52:2
**approaching**
  44:14 52:4
**approximately**
  6:12 11:12
**April** 44:6 47:16
  57:22,23,23
  58:1
**Archambault**
  45:20 46:1
  56:4 198:2
**area** 175:14,15
**areas** 147:4
**arena** 42:18
**arguing** 119:9
**argument** 137:2
  137:3 139:6,18
  287:1
**arm** 156:11
**arrest** 113:6
  177:6 190:16
  190:17,20
  191:1,3 192:5

192:7 253:7
254:12 257:2
262:4 264:22
266:7,7,8
**arrested** 62:5
  191:18 193:2
  262:1
**arresting** 257:18
**arrived** 125:4
  191:17
**article** 38:2 96:9
  96:19,21,23
  97:7,12,14,17
  104:5 280:15
  281:4,8,12,14
**articles** 94:19
  96:4,6
**asked** 39:8
  71:14,21
  125:11 127:8
  127:10 137:23
  139:23 140:5
  142:5 147:19
  160:5 177:11
  177:13 179:5
  180:12,17
  182:3 186:9
  215:1 216:3,4
  229:6 232:21
  239:18 248:16
  258:5 270:21
  275:7 282:15
  284:6
**asking** 13:10
  60:4,11,11
  82:7,12,15,22
  84:1 119:8,11
  141:21 160:7
  174:2 180:11
  180:22 181:2,9
  181:9 183:1,3
  184:9 185:18
  189:7 199:14
  204:13,16,17
  217:22 228:3
  231:15 233:22

236:9 237:9
238:4,9 239:17
243:3 244:14
247:8 253:2
265:6 267:14
**asleep** 203:7
**aspect** 64:15
  120:17 161:9
  163:2 164:12
  164:19 168:1
  168:13 216:13
  269:14
**aspects** 32:1
  148:21 149:12
  156:2 157:1
**assault** 18:20
  21:11 23:14
  24:15 31:3,9
  31:17 36:12
  39:10 40:14
  41:18,20 42:3
  42:10 44:9,13
  46:10 51:4,18
  76:11 79:12
  80:17,20,23
  81:17 101:20
  112:14 124:8
  124:10,21
  125:6 128:7
  133:9 134:22
  136:3 148:22
  169:6,8,11,16
  170:8,13
  172:20 174:20
  174:22 182:11
  195:23 202:9
  203:14 204:19
  225:17 226:20
  235:2,18 236:5
  238:7 240:11
  248:11 250:10
  250:20,22
  251:5 252:14
  253:3,15
  254:16 255:11
  256:5 257:5,8

257:19 261:22
266:15
**assaulted** 31:22
  81:8 191:8
  237:3 273:12
**assaulting** 18:18
**assaults** 24:15
  24:18 31:10
  42:7 46:17,17
  76:21 84:11,18
  128:18
**assessing** 180:10
**assign** 7:4
**assigned** 32:9
  115:12,16
**assist** 67:6 281:4
**assistant** 264:15
  264:20 265:9
  265:18
**Association**
  47:17 58:11
**assume** 14:13
  115:2 170:18
  228:18 282:1
**assuming** 274:2
**ATM** 31:7
**attached** 2:7,9
  2:14,15 29:16
  98:14 218:7
**attack** 18:23
  194:20
**attacked** 194:18
  197:17
**attempted** 18:19
**attend** 56:13
  64:3 67:17
  74:3,7,20
  75:17 76:4
**attended** 29:8
  55:17 66:19
  75:22 118:17
**attending** 66:20
**attorney** 17:1
  20:14 27:7,9
  27:14 43:13
  193:1 195:11

204:7 206:4,19
264:16,21
265:9,18 266:1
286:13
**attorney's** 26:17
  27:21 34:18
  47:17 203:23
  204:22 206:7
**attorneys**
  194:19
**audible** 14:6
**audio** 237:7
  271:11,17
**author** 280:22
**automatically**
  3:2
**Avenue** 2:17
  9:15
**avenues** 78:10
**aware** 61:19
  62:1 128:16,23
  132:10 158:6
  179:13 233:16
  241:23 247:17
  264:15 284:17
  286:18
**awesome** 264:1

---

**B**

**B** 242:17
**B-u-s** 27:23 28:1
**back** 20:10 26:3
  36:18 37:14
  59:19 62:8
  68:10,12 84:5
  86:6 93:13,18
  110:5,7 116:16
  118:9 124:20
  125:10 127:21
  130:14 132:8
  132:19,20
  133:13 134:4
  139:16,17
  145:2 161:13
  161:14 163:3
  164:2 165:22

166:13 176:6
193:13 194:9
195:19 197:3
197:12 202:5
202:18 203:5,9
211:4 217:7
219:23 220:2
221:20 222:14
228:13,17
232:9 233:18
234:3 236:15
239:2 249:20
264:5 277:6
282:11
**backseat** 145:3
219:13 220:3
271:22
**bad** 86:22 87:1
87:10 112:21
112:22 277:8
**Baker** 1:12
96:10 154:13
154:14 155:11
**Baker's** 150:3
150:14 151:23
154:17
**banged** 18:21
**bar** 85:1 87:21
105:18 106:9
107:3 108:7
109:20 123:21
131:23 132:23
136:13,20
137:1 138:19
139:7,21
140:18 143:1
145:6,21
207:19 210:13
219:7,18
287:18
**Barksdale**
106:16 137:7
140:16 142:16
199:5,7,21
**Barksdale's**
124:13

**bartender** 141:6
210:20
**bartenders**
141:17
**base** 238:16
**based** 34:4
35:15 42:20,23
43:4 73:19
148:8,11
149:15 152:14
168:17 191:22
199:15 237:7
262:11,15
**basic** 121:10,11
121:13 160:18
161:9 240:20
253:21 255:3
256:17 257:9
**basically** 21:18
33:6 53:12
70:11 81:14
134:9 183:17
**basing** 147:14
157:16 261:17
261:19
**bathroom** 85:9
**battery** 24:16
**bearing** 134:21
163:5 218:11
218:18,20
**becoming** 45:15
73:9
**bed** 231:14
232:20 267:8
276:11,17
**bedroom** 23:4
177:1 196:18
202:4 220:14
254:9 267:21
276:13
**beer** 85:15
145:18
**beers** 91:4
145:12,15
**beginning**
112:17 132:12

136:19 173:2
237:14 239:9
245:15
**behalf** 12:14
**behavior** 21:18
30:19,23 32:1
33:22 34:7
35:15 37:4,18
44:5
**behavioral**
21:14 31:5
44:4 132:19,21
**believe** 19:5,23
38:1 68:1 71:4
75:21 94:10
96:7 106:22
122:8,13
128:15 129:22
137:1 145:13
149:23 174:9
215:18 223:12
229:18 237:16
268:23 274:22
278:7,10
279:17,23
281:1 282:21
283:19 285:9
**believing** 173:1
**BEN** 1:11
**benefit** 134:11
**best** 5:6 53:3
147:12,19,21
148:7 160:2,9
161:1 172:21
**better** 40:3
110:20 147:13
151:7,8 171:4
**bias** 114:4
236:21
**biases** 134:15
**big** 31:19 133:22
140:11 161:5
176:23 191:13
208:7 220:7
267:6
**biggest** 162:11

**Birmingham**
2:17,18 6:8 9:3
9:23 10:6 11:3
11:9
**bit** 80:11 99:15
111:18 126:3
151:12 165:19
263:15 282:23
**black** 89:6,7
154:20 209:1,3
**blacked** 22:15
22:22 48:22
87:11,20 88:12
88:19 89:2,17
89:18,21 90:8
90:11,18 108:7
108:15,17,18
108:20,21
109:23 130:15
144:19 145:5,9
145:14 156:14
198:18 201:14
201:22 212:1,9
219:15 285:2,4
**blackout** 86:14
88:4,4 89:6,12
198:18 200:1,5
210:10,13
220:5 282:23
283:2,6,20
284:12
**bladder** 93:11
**blanks** 48:21
209:12 211:8
**blood** 146:3,13
146:14,22
149:3 155:16
155:17 156:15
157:3,18 209:5
212:16 258:14
258:15
**blue** 227:15
**board** 145:23
157:20 160:22
**Bob** 12:11
165:13 188:22

**BOBBY** 9:5
**body** 196:12
231:6 263:1
**bold** 200:13
**Bolger** 9:13
12:13,13,22
14:15 19:15
20:6,9 26:1,6
28:19 29:6
30:4 36:23
37:19 40:16
41:10 43:6
45:3 46:21
47:23 51:5,10
51:15 54:9
56:15 57:2
58:6 59:13,20
60:6,12 61:5
64:4 65:10
68:6 69:20
70:7 71:13,20
72:21 75:11,23
76:22 77:20
79:5 80:3
81:11 82:10
83:19 84:12,21
85:23 86:10
88:13 89:23
91:12,21 92:12
93:10 94:5
95:7 96:13
98:21 99:6,12
102:11,22
104:23 106:4
109:9 110:1,11
110:21 114:21
116:22 118:10
118:19 119:3,8
119:15,21
121:6,16
122:16 123:1,6
125:17 128:19
131:3 133:20
134:23 135:14
137:22 144:6
144:18 146:7

147:16 150:21
151:4,15 152:4
152:10,21
153:2,10,16,23
154:8,23 155:5
157:7 158:9
160:4 161:3
164:22 165:11
165:20 166:4
167:16 168:6
172:10 173:19
174:5,11,14
180:3,15,21
181:8 182:2
183:8,14,19
184:3,15,22
185:8,12 186:1
186:7,20 188:6
188:13,16,21
189:4,15
190:19 191:23
195:5,10
197:21 198:12
198:20 199:10
201:16 202:13
202:19 204:8
206:8 208:17
210:15 212:13
212:21 214:5
215:13 216:19
217:16 218:13
218:16 219:9
220:18 221:14
222:11 223:3
224:12 227:11
227:17 228:21
229:15 230:2
230:21 232:2
232:10 233:9
233:19 234:11
235:4 236:8
237:21 243:1
243:18 244:9
245:5,14
246:10 247:19
248:14,18

250:3 251:6
252:20 255:2
255:13,21
258:3,23
260:11,15,18
263:11,18,23
265:1,13
266:18 268:20
269:6 271:14
275:15 276:2
277:22 278:8
278:13 280:18
281:11 283:3,7
283:11 284:1
287:22
**book** 161:6
**boom** 220:12
**bothered** 206:1
**bottom** 30:15
195:6 218:1
252:13,17
261:4 272:3
**BOULEVARD**
9:9
**bowlers** 285:20
**bowling** 285:16
285:16
**boxer** 177:22
**Boy** 45:22
**boys** 189:1
**brain** 53:12
196:9,15
197:18
**bread** 240:15,18
**break** 13:13,14
80:8 91:13
93:8,12 157:9
157:10,12
164:20 165:5,7
165:9 187:4
195:22 196:6
221:2,13
263:12,17,22
282:7
**breaks** 13:18
**breast** 248:2

**breathe** 196:14
**bring** 62:8
166:16 182:19
182:22
**bringing** 185:17
186:15 187:2
189:19
**broad** 59:21
**broke** 47:3
81:21 224:14
**broken** 53:15
**brought** 124:20
270:11
**buddy** 209:11
**bug** 287:5,7
**BUILDING**
9:22
**bulk** 159:10
**bullet** 126:19
222:2,20 223:9
224:1 278:18
**bunch** 40:6
106:10 148:2
**Bunn** 106:15
107:6 113:7,13
113:18 114:2
115:21 120:20
137:7 140:13
140:16 141:5,8
141:16 163:16
174:22 175:4
175:18 176:11
178:18 182:9
190:16,20
192:4 193:6
194:22 199:5,7
199:21 200:16
200:19 203:15
204:10,12,19
206:10,12
222:4,23
233:15 235:14
243:6 248:9,12
249:5 250:1
251:3,11,21
252:13 254:7

254:12 258:14
267:11 269:10
271:11 272:4
272:11,23
273:8,17 274:3
274:7 275:11
275:14 276:12
281:16 287:12
**Bunn's** 122:9
142:9,10 145:4
175:2 191:15
192:14,18
199:8,22
207:20 209:23
219:14 220:6
231:16 235:17
242:19 244:18
249:21 250:12
251:3 260:4
268:4
**Bus** 27:22,23
**business** 52:12
62:2
**busy** 196:15
**butter** 240:15,18
**buy** 85:12
**buying** 85:17
**BuzzFeed** 1:11
1:11 8:13
11:22 94:19
96:3,9 104:5
217:11
**BuzzFeed's**
286:16

────────
C
────────
**C** 9:1
**cab** 124:17
161:14,18
162:3,9,11,13
162:20 163:9
163:23 164:9
**cafeteria** 40:5,7
**California** 41:8
42:20 43:1
59:6 64:13

73:13,23 75:22
79:17 257:7
**call** 24:18 37:23
48:8,12,14
49:12,21 50:5
72:1 83:11
85:11 133:8,18
140:15 163:9
183:10 193:1
205:22 242:1,6
273:20 284:21
**called** 23:21
31:12 41:19
47:18 66:8
81:13 99:18
255:9
**calling** 134:21
181:18 255:4
264:9
**calls** 35:8 47:19
48:1,7,20
49:10,14,16
50:8,13,16
240:14,17,21
240:22 241:15
242:9,12
**camera** 249:17
**canceling**
142:14
**capable** 129:4,6
**capacity** 130:13
141:2
**captain** 71:3
**captured** 213:7
245:20
**car** 47:4 49:6
54:4 87:8,21
87:23 115:22
133:4,5,6
145:4 191:19
199:5,7,12,18
199:21 207:20
208:7 214:21
214:23 215:5
219:14 220:1,3
250:2 271:23

284:15,22
**card** 72:4
  162:23 163:10
  164:3,3,7
  249:8 251:12
  251:17
**care** 221:15
**career** 62:17
**carefully** 2:5
**Carl** 19:16 26:8
  28:19 37:12
  40:18 45:6
  57:5 59:22
  60:14 64:6
  75:12 82:14
  84:7,13 90:2
  105:10 117:1
  119:22 135:5
  138:2 147:23
  151:19 152:12
  152:21 153:2
  172:10,11
  174:16 181:15
  184:5 185:1,8
  186:2 197:23
  199:11 201:19
  202:21 208:22
  210:17 214:5
  215:23 217:1
  219:11 230:4
  233:9 235:6
  236:8 252:21
  255:6,17,18,22
  265:21 266:20
  278:8,16 284:3
**Carla** 27:11,18
**Carlton** 1:16 2:1
  5:3,11 6:5
  11:13,21 12:16
  13:5
**Carroll** 115:20
  120:22 122:9
  271:21
**case** 1:5 11:23
  13:8 15:16
  16:6,16,21

17:2,7,9 18:1
19:3,10,19,22
21:2,19 22:2,6
23:21,23 24:21
24:22 25:8,16
25:19 26:9,11
26:12,15,16,21
27:7 28:4 31:2
31:13 34:16,20
35:12 42:14,17
42:17 43:13
49:4 60:18,21
70:3 93:22
94:12 98:4
99:18 115:13
115:16 116:4
116:21 120:19
126:8 130:7,14
130:21 131:18
132:12 133:14
134:13,22,22
144:10 150:14
154:18 158:23
160:8,10
166:20 168:13
203:8,14,21
204:19,21
206:4,7,17
224:5,11,18,21
225:4 229:5
254:13 261:17
261:18,19
262:8,11,15,16
268:8 278:14
282:18 286:17
**caseload** 36:4
**cases** 15:11,15
  22:9 31:13
  32:8 34:11,12
  34:14,22 35:1
  35:2 44:10,13
  44:15 46:10
  47:13 49:20,22
  50:1,6 63:22
  68:2,14 69:15
  69:19 70:2,12

70:16 90:19
91:2 133:10
134:7,12,14
168:14 169:6
169:14,16,20
170:2 171:18
224:23 226:8
240:16,18
273:4
**cash** 162:12,16
  162:18,19,21
  163:23 164:2,6
  164:8,9
**catch** 51:6
  172:10
**category** 91:22
**caught** 157:4,6
**cause** 11:14
  169:14 190:18
  191:3,3,6
  266:8 289:16
**caused** 129:7
  209:3
**CCR** 1:21
  289:19,20,21
**CD** 104:16
**CDs** 104:12,22
**cell** 175:2
**cents** 162:21
**certain** 31:6
  37:23 82:4
  117:5 132:15
  216:8 225:2
  226:2 259:9
  267:16 271:4
**certainly** 201:17
  209:14 271:5
**Certificate** 2:11
  2:16 3:1 5:1
  8:5 289:1
**Certified** 6:7
  11:2
**certify** 5:18 11:5
  289:4,13
**chain** 150:1
  223:13

**chair** 232:21
  267:8
**chairs** 40:7
**chance** 154:5
  222:5
**change** 95:20
  155:13,18
  158:20 159:3
**changed** 101:7
  124:10 164:12
  165:2
**changes** 2:6,8,12
  72:13
**changing** 93:7
**chapters** 39:1
**characterizing**
  255:15
**charge** 149:11
  156:23 203:16
  205:21
**charged** 62:6
  116:4 205:9
**charges** 26:19
  42:16 205:7
**charter** 39:6,20
**check** 19:12
  220:20 282:5
**checked** 224:3,9
**Chicago** 55:12
  55:12
**chiefs** 58:11
  286:1
**child** 64:17 69:4
  73:16,17
  221:15
**children** 61:21
  260:20
**chin** 175:15
**China** 37:10
**choices** 132:2
**chronological**
  53:17 135:21
**chunk** 208:7
**Ciara** 226:18
**circumstances**
  202:23

**city** 34:17
**civil** 2:20 11:7
  15:10,11,14
  22:9 34:12,23
  35:2,12 41:19
  42:13,18 43:13
  282:17
**civilly** 19:1
**claim** 241:2
**claiming** 240:10
**clarification**
  13:21 60:13
  97:7 109:16
  161:15 162:2
  206:9 229:12
**clarified** 124:16
  197:6
**clarify** 82:12,16
  83:22 127:12
  163:4 271:4
**CLARK** 9:22
**class** 39:13 43:7
  43:19 64:9
  73:12,15 75:5
  76:17 80:12
**classes** 59:5 65:5
  71:2 72:3,11
  72:15 73:18,18
  73:22 75:9
**classic** 277:10
**classification**
  82:20
**classroom**
  170:19
**clean** 14:5,8
**clear** 14:11 45:7
  109:15 124:22
  193:12 259:6
**clearly** 114:7
  257:16,16
**climb** 197:3
**climbed** 223:7
**climbing** 202:4
  202:5
**clocks** 165:3
**close** 52:16

91:15 116:18
170:23
**closed** 42:17
**closer** 53:2
  110:17
**closest** 38:10
**clothes** 177:3,9
  222:14 267:10
**clothing** 222:4,7
  222:10,16
  248:10,13
**clouding** 152:8
**clue** 77:12
  108:22 187:16
  198:8
**co-counsel**
  12:15
**co-presented**
  51:21
**Cockrell** 9:5,7,7
  12:11,11 152:1
  152:6,16,23
  154:3 166:2,7
  180:6 183:22
  184:8,19
  188:19 189:2
  189:12 255:20
  263:16 280:10
**code** 41:5
  251:13
**cognitive** 88:14
**coin** 37:21
**coincidence**
  32:15
**coined** 37:15
**collect** 156:5,20
  157:3,18
  173:18 174:18
  174:21 177:3
  177:16 178:4
  222:3 254:4
**collected** 113:15
  120:17,18
  143:10 156:6
  157:17 158:2
  225:5

**collecting** 147:6
  149:12 155:16
  156:3,10,17
  174:1
**collection**
  158:22 160:20
**college** 22:13
  39:3 74:7,8,10
  74:11,21 75:2
  75:18
**colored** 248:1
**combination**
  82:3
**come** 20:19
  24:20,20 39:9
  40:4 44:22
  47:2 49:2,8
  63:17 66:10,16
  67:2,4 116:16
  117:8,17 132:8
  139:14,16,17
  145:22 162:15
  165:22 175:23
  182:8 183:14
  183:20 184:23
  188:2 193:13
  194:9 197:19
  238:2 263:7
  286:8
**comes** 46:3
  48:20 69:6
  131:9 133:13
  160:6 197:7
  219:5 246:20
  286:11
**comfort** 101:23
**comfortable**
  102:1
**coming** 220:4
**commencing**
  6:12 11:12
**comment**
  176:12 251:21
**comments** 270:1
**Commission**
  289:23

**Commissioner**
  11:5 289:22
**committed** 69:8
  257:19
**common** 78:16
  83:4,6 84:15
  85:21 92:9
  118:14,17,22
  119:4,7 160:14
  169:19 172:7
  172:15 216:6
  240:9
**commonly** 81:4
  82:5
**communicating**
  156:16
**community** 74:8
  74:10 75:18
**company** 65:20
  66:8 67:23
**comparing** 36:3
**compelling**
  106:12 108:3
  127:3
**compensation**
  57:13
**competent**
  167:3
**complaining**
  207:14
**complaint** 69:6
**complaints**
  141:9
**complete** 14:1
  53:8 71:19
  112:11 113:3
  116:13 136:4
  211:5
**completely** 88:8
  91:17 113:18
  154:20 169:7
  236:23 259:20
**complex** 106:17
**compliance** 6:19
**component**
  46:18

**compromising**
  223:13
**computer-aided**
  289:8
**concept** 54:6,17
  55:21
**concern** 169:15
**concerned**
  144:10
**concerning** 21:9
  80:1,16 128:7
  129:14 155:14
  264:14
**concluded** 236:5
  288:5
**concludes** 288:2
**conclusion**
  207:9 234:23
  235:20
**conclusions**
  111:6 112:1
**conclusive**
  235:16
**concurrent**
  250:11
**condition** 124:3
**condom** 176:12
  176:14
**Condominium**
  107:11
**Condominiums**
  105:19 106:21
**conduct** 36:1
  37:1 49:11,21
  52:12 112:15
  134:18 178:1
  207:12
**conducted** 62:2
  80:15 98:6,9
  113:23 131:13
  266:13 274:1,4
  274:7
**conducting**
  173:10 182:12
**conference** 65:2
**conferences**

54:20 55:1
  57:18 65:9,15
  148:14
**confessed** 16:2
**confessing**
  102:15
**confession** 17:19
**confessions**
  47:20 48:2
**confirmation**
  114:4
**confront** 274:17
**confrontational**
  240:7
**confused** 173:21
  196:21
**consciousness**
  87:14 146:6
**consensual**
  175:22 200:20
  200:23 201:10
**consent** 40:23
  41:21 42:3,5
  43:2,19,21
  46:15,18,19
  47:1,5,8,13
  50:1 78:6,9,11
  78:12,13,15,23
  193:15 219:5,8
  236:3 240:15
  240:18 269:11
  269:12,22
  270:12
**consenting**
  262:20
**consequently**
  235:18
**consider** 218:21
  281:8
**consideration**
  181:5
**considered**
  84:10 169:9
  240:15 242:5
**considers**
  240:17

consistent 109:22 252:13 260:23
constantly 49:16 85:9
constitute 278:4
constitutes 278:3
consultations 62:3
contact 17:1 20:13,16 21:15 27:6 31:21 41:2 79:2,14 137:13 175:7,9
contacted 94:1,8 125:10 138:15
contacts 43:14
contain 99:16
contaminate 193:6,19 256:12 257:17
contaminated 193:23
contending 212:11
content 145:19 240:1
context 212:6 217:17 240:4 246:13 247:3 248:5 258:11 261:5 266:17 266:19 268:6
continually 31:20
continue 31:11 215:7 234:9
continued 244:16
continues 224:2
continuing 21:15 87:7
contradict 108:16 126:9 163:19 274:18

contradicting 167:9 168:3
contribute 115:16
control 57:19
controlled 48:8 48:12
conversation 140:15 217:20 241:20 243:16 244:2,5,15,16 245:12,18,20 246:16,22
conversations 215:8 265:17 265:20 284:20
conversed 287:19
conversing 238:2
cop 75:3,13
copies 104:17
cops 206:16,23
copulated 175:16 176:8
copy 20:1 25:21 98:20
corner 246:21 277:12
Coronavirus 29:1
correct 5:6 34:9 38:6 40:15 62:19 63:7 81:16 84:11,14 100:11,20 101:14 102:16 103:21 105:13 105:14 107:20 111:11 114:20 115:8,9 129:19 139:8 143:15 143:19 174:4,8 208:3 224:6 225:19 235:3 237:18 242:21

247:5 256:20 258:20 274:4,5 289:10
corrections 3:3 5:7
correctly 38:16 113:12 254:11
corroborate 126:9,13,21 163:20 167:22 168:12 274:17
corroborated 163:9
corroborating 167:9 176:7
corroboration 167:11,14
cost 162:20
counsel 6:4 7:1 7:3 11:8 12:6 289:14
County 30:16 59:3 100:22 102:21 109:4 289:3
couple 33:1 38:21 40:9 68:14 84:23 93:8 201:1 225:9 236:10
course 38:13,18 41:17 42:1,21 42:23 43:11 44:7 45:2 48:6 50:12 51:19 57:7 61:6 64:17 66:1,2,3 66:6,7,18 67:18,23 80:13 98:21 117:3 137:20 142:2 190:2 216:10 223:1 243:1 273:9
courses 38:6,9 47:18 51:2

56:20 57:14
court 1:1,20 6:20 10:3 12:1 12:7,19 14:3 16:10 21:5 30:16 48:13 59:19 68:12 74:12 110:7 118:9 159:12 194:18 202:18 205:13 217:7 232:9 241:13 254:3,4 263:21
court-ordered 113:5 191:20
courts 34:16
CPR 72:4
create 54:10
creating 45:5
credibility 41:21 42:3,4,6,8 43:23 168:21 169:4 225:12 225:15 226:7 226:12
credit 162:23 163:10 164:3,7
cries 238:21
crime 16:4 24:15 46:23 47:7 49:4,7 52:17 53:2 62:6 69:3,4,8 102:15 117:2,6 120:3,10 157:21 160:21 169:17 193:6 193:23 194:17 194:20 205:9 226:10 239:21 254:3,7,8,9,10 256:11 257:18 269:21
crimes 30:17 32:4 33:12,23 39:8 47:6

50:10 63:5,9 63:16,19 64:13 66:2,7,18 67:2 67:17 69:5 72:12 73:8 119:17 120:1 171:19,20 197:16 198:2 253:16 255:5
criminal 15:9,12 34:11,14,19 42:11 48:13 80:13 134:6 203:17 268:8
cry 238:14,20
crying 129:8 237:13 238:1 238:11 239:8
current 67:5
custody 150:1,2 223:11
customers 123:23 140:19
cut 59:14 110:2 220:22
CV 8:11 29:12 34:10 38:5 56:21 57:14 62:10
cyber 63:18
cybersex 63:19

D
D 8:1 252:10
dagger 254:13
Dakota 58:19
dangerous 261:8,16 262:2
Daniel 17:5
data 109:2 175:2 208:12
date 2:11,21 5:14 11:6 12:4 82:6,19,20,23 83:3,16,18,23 85:20 86:2

Carlton Hershman                                              3/16/2021

Page 297

91:18,22 92:10
204:3 209:7
289:11
**dated** 104:5
**dates** 205:16
206:20
**DAVIS** 9:14
**day** 5:17 18:16
65:21 72:5,9
72:10 112:19
139:3 149:6
179:22 192:22
286:22 287:16
**days** 2:21
113:14 124:7
256:8
**DCH** 128:22
**de-cell** 52:23
**dead** 205:12
**deal** 28:23 267:6
**death** 279:2
**debit** 164:3
**December** 76:6
**decide** 196:12
**decides** 196:23
197:1,3 203:16
**decisions** 86:22
87:1,10 267:16
**decrease** 144:5
**deduce** 237:15
**deducing** 237:20
**deep** 43:21
229:10
**defendant**
134:11
**defendant's**
16:15 19:9
27:13
**Defendant(s)**
1:13 9:12
**defendants**
12:14 97:8
241:1
**defendants'**
25:7
**defense** 46:16

47:1,9 194:19
**definitely** 107:3
229:9 231:7
**definition** 90:18
283:2,4,5,16
284:2,4,6,7,11
285:3,4
**delay** 36:11
171:13 231:2
**delayed** 21:13
31:6,19 32:23
35:13 36:10
169:18,20
173:4
**delve** 88:19
**demanded**
188:1
**demeanor** 125:5
129:2,7,10
162:6,6
**denies** 269:15
**department**
23:20 24:11,19
33:13 56:6,10
58:13,21 61:14
62:18 63:2,6
64:1,14 66:4
68:4,5 69:2,17
69:18 70:15,20
70:22 71:10
72:19 73:21,23
74:1 77:7
79:21 102:18
103:18 147:15
148:9 149:17
167:7 171:22
**departments**
63:9,12
**depend** 176:18
**depending**
52:15 69:3
259:7
**depends** 72:12
89:3,11,14
90:1 92:5
**depiction** 210:9

**deponent** 288:6
**Deponent's** 2:11
2:16,23 5:1
**deposition** 1:15
1:22 2:4,14,22
3:4 6:5,16,17
7:6 11:20 13:9
13:12,17 15:3
15:15 17:12,14
26:20,23 37:2
61:1 90:7
150:4,14
153:22 184:1
188:22 282:20
288:3,5
**depositions** 6:21
29:8 61:10
95:15
**depression**
146:2 209:8
**deputy** 35:6
**derail** 250:13
**derailed** 250:9
250:18 252:1
**destroy** 194:6
**destroyed**
194:23
**detail** 226:21
227:1
**detailed** 112:12
112:16 129:5
134:18 136:4
143:11 159:17
**detailing** 280:16
**details** 197:11
**detain** 183:15,18
183:21
**detective** 24:20
50:17 63:3
121:9
**detectives** 24:14
122:15 229:8
**detention**
264:22
**determine** 89:20
182:10 212:8

225:12 228:4
237:2,6 287:11
**determined**
236:13 258:15
**determining**
23:13
**develop** 54:6
**developed** 55:22
**DFSA** 81:4,6
**DFSAs** 82:5
**Diego** 16:13,14
18:12,13 21:3
23:20 24:10,19
25:2,2,4 26:12
30:16 33:13
35:6 38:14
41:11 56:6,10
62:17 63:1,23
68:3,5 69:1,16
69:18 70:14,21
71:9 72:18
73:20 74:17
76:2,3 77:6
78:17 79:20
128:10 146:16
146:19 147:9
147:15 148:9
149:16 158:15
160:17 171:21
**difference** 88:3
90:13 108:19
262:17
**different** 52:3,7
78:10 79:14
81:13 84:23
85:18 89:4
92:8 102:20
103:15 109:19
109:19 110:14
116:14 120:12
120:21 126:12
141:12 147:4
158:19 159:14
163:13,13
169:7 202:22
203:2 249:19

260:6,8 269:7
278:22 283:12
283:22
**difficult** 44:9,12
46:11,15 47:14
**dig** 43:21
**digged** 32:20
**digging** 32:17
**digital** 214:2
**digitally** 15:19
**diminished**
88:12 89:2
**direct** 30:6,12
152:13 234:10
283:17
**directed** 250:23
268:10 269:2
269:10
**directly** 222:23
274:11
**disagree** 111:5
**disciplinary**
62:21
**disconnect**
13:16
**discover** 176:16
**discussed** 76:19
77:3 85:21
91:19,23 174:7
**discussing**
119:14 212:4
242:17
**disheveled**
196:21
**dispute** 175:19
**district** 1:1,2
12:1,2 26:17
47:17 203:23
204:7,22 206:4
206:7,18
264:16,20
265:9,18
**Division** 1:3
12:3
**DNA** 258:13
**document** 28:14

28:21 29:14
30:10,13 98:12
102:19 152:8
152:12,15
218:5 229:16
**documented**
121:3 129:16
225:6
**documents**
28:10 60:23
61:3 102:23
103:7
**doing** 32:13
60:17,18 102:2
117:4 146:16
169:12 173:9
193:16 197:6
211:5 231:7
236:19 244:23
249:12 252:2
256:21 257:6
277:3 284:14
**DOJ** 73:12,13
**domestic** 18:15
18:17 72:11
**door** 18:21
191:12,19
193:9 196:17
196:18,22
210:21 239:9
239:12 244:19
245:23 279:4
**doorman** 124:2
**dorm** 22:16 23:7
**dosage** 92:5
**dots** 243:23
**double** 188:23
**doubt** 134:12,13
**downplay** 257:4
**downtown** 27:16
32:4
**drag** 178:23
**drawers** 194:13
**dresser** 194:13
**drew** 111:23
**drill** 178:13

**drink** 33:3 83:15
85:2,12,13,13
87:7 92:20
136:17 141:4
213:3,8,11
**drinking** 22:19
87:6 145:18
**drive** 31:7,7
183:2 284:22
**driver** 124:17
161:14 162:4
162:12
**driver's** 161:18
**drivers** 87:19
**driveway** 87:23
**driving** 72:5,5
87:8 91:8
284:15
**drove** 23:16
88:1
**drug** 83:16,18
84:10 209:7
**drug-facilitated**
80:23
**drugged** 131:1,7
131:9 212:10
212:12,20
**drugs** 33:3 82:2
82:4,6,18,20
82:21,23,23
83:3,9,12,13
84:2 85:20
86:2 91:18,23
92:10 130:3
133:14 258:16
259:8,15
**drunk** 85:6,7,10
87:19 91:3,4,7
108:19 132:5
182:13,14
209:2 259:20
**drunken** 260:1,2
**due** 81:8
**dug** 229:10
**DUI** 24:16
**duly** 12:17

**dump** 142:9
175:2
**dumped** 124:4
142:19 215:3
**DVD** 104:19
**DVDs** 104:11,12
104:16,18,22
**dynamic** 168:20
169:10
**dynamics**
172:19 173:3
197:15

––––––––––––
**E**
––––––––––––
**E** 8:1 9:1,1
**earlier** 95:8
101:5,5 135:17
169:12 226:5
252:4 266:9
276:23 285:1
286:22
**early** 19:6
192:22 235:21
**earnest** 78:6,20
79:16 80:1
227:23 228:6,9
236:21 238:10
267:23 269:23
270:11 276:1
276:20 277:14
277:18,19,20
278:4,15,19,21
279:8,19
**earnestly** 235:17
**Earth** 246:11
**easier** 28:23
47:13
**eat** 89:15 165:5
185:16 186:14
187:1 189:19
195:21
**eating** 185:22
**Ecstasy** 83:6
93:2
**effect** 6:18 83:17
85:21 140:7

**eight** 238:13
**either** 36:19
75:10 97:16
126:9 163:19
175:18 176:20
178:4 183:23
189:18 251:21
282:19
**ejaculate** 176:13
**ejaculated**
156:11 176:13
222:14
**elaborate**
126:16,20
**elaborated**
127:6
**elder** 63:14,17
69:5
**element** 227:9
227:23 228:6,8
269:20
**elements** 77:16
**ellipses** 243:14
**else's** 140:2
**email** 95:12
**embarrassing**
285:15
**employed** 55:14
**employee** 140:3
**employment**
62:9
**encounter**
216:18
**ended** 19:1 23:3
23:12 26:16
35:9 45:15
87:8 131:22
244:17
**ends** 18:17
219:13,20,22
219:23 220:11
**enforcement**
53:23 55:15
59:11 60:8
62:17 66:12,15
118:18 148:18

158:5,7 160:3
160:10 161:2
241:7,10,22
242:4 250:8
**engagements**
67:7
**entire** 138:5
157:23 266:14
274:21,22
**entitled** 38:14
44:8 51:2
**entity** 69:17
70:13,17
**entrapment**
240:23 241:11
241:11
**entry** 200:14
202:2 203:14
**errata** 2:7,10,13
2:15,23 4:1
**erred** 234:22
235:20
**error** 237:12
**errors** 112:20
**escaped** 203:9
**especially**
127:22 194:17
240:9 277:4
**estimate** 190:12
**et** 11:22,22
**Europe** 16:18
**evaluate** 259:23
**evening** 212:7
219:4
**events** 198:11
223:2
**eventually** 23:20
**everybody** 25:2
89:4 161:8
238:20
**evidence** 7:7
21:14 30:19,23
31:5 32:2
33:22 34:7
35:15 37:4,18
49:3 50:2,3,3

105:9 113:15
131:7,8 132:19
132:21 141:23
144:15 145:8
149:12 156:3
156:17,18,19
157:1 158:2,22
160:21 168:3
173:17 174:2,3
178:5 190:16
193:22 208:15
210:11 223:14
224:3 235:16
235:23 252:17
253:6,8 254:3
254:5,5 264:21
**ex-boyfriend**
18:10
**exactly** 40:12
55:13 88:17,20
96:23 97:14
176:22 239:14
251:9
**exam** 174:21,22
175:4 195:23
252:16
**examination** 8:3
11:15 13:1
187:5
**examined** 12:17
**examiner**
128:14
**example** 53:19
169:22 194:14
248:8 283:16
**exams** 160:6
174:23
**exception**
274:12
**excerpt** 109:2,7
**exchange**
217:22
**exchanged**
214:3
**excuse** 114:6
**excuses** 276:6

**Exhibit** 29:13,15
30:15 62:11
98:11,13,16
100:13 104:2
217:14,14
218:6
**exhibited** 272:5
272:6
**EXHIBITS** 8:8
8:10
**existed** 265:20
**exonerated**
273:8
**experience** 32:6
34:1,5 89:5
91:16 121:17
121:20 148:8
149:16 175:21
**experienced**
214:4
**experiences**
170:3,17
**expert** 8:12
15:22 17:6,20
19:21 20:2
21:9 22:10
25:18 26:5
27:1 30:17
34:23 37:3
94:13 95:21
112:8 115:18
144:15 166:16
181:2,13
184:10 218:11
278:3,14 281:6
281:9 282:18
286:17
**experts** 54:22
**expires** 289:21
289:23
**explain** 132:14
132:17 133:17
136:16 197:9
197:10 239:9
**explained** 69:13
73:5 133:10

134:16
**explaining**
251:14
**EXPLANATI...**
4:2
**express** 267:15
**expressed**
100:18
**extensively**
208:18
**extent** 105:4
265:19
**eyes** 91:10
209:22,23

_____

**F**
**face** 205:11
**fact** 107:15
116:2 126:11
132:5 145:1,9
145:13 169:18
191:11 252:6
265:3,16 267:5
270:13,19
**facts** 214:20
**factual** 112:12
**faculties** 86:13
89:1 143:22
144:5,17 145:3
**fail** 3:2 102:2
112:11 173:17
178:9 189:17
195:2
**failed** 122:22
123:9 142:9
173:22 174:17
177:2 185:15
186:13,23
190:16,20
191:14 192:13
195:12 196:5
223:10
**failure** 113:5
115:17 174:21
208:13
**failures** 26:18

207:15,16
**fair** 14:14,17
62:15 209:13
209:14 210:8
272:21,22
273:7,11
**faith** 98:23
**fall** 21:20 240:22
**falls** 71:4
**familiar** 30:10
77:18,23
247:12
**familiarity**
77:19
**fancy** 36:9
**far** 32:18 44:2
67:14 85:7
141:3 144:9
239:21 279:9
**fault** 231:1
247:8
**favor** 273:13
**favoritism** 272:5
272:13 273:4,5
**fear** 182:15
**feared** 203:5
**fearful** 239:13
**February** 59:4
**Federal** 11:6
**feeding** 85:12
**feel** 99:7 102:1
165:20 172:11
181:15 227:17
231:9 248:18
252:20 266:20
**feeling** 267:23
**felonious** 24:17
257:19
**felony** 94:18
104:19
**felt** 124:7 143:18
143:20 203:4,8
235:13 269:11
270:12 281:16
**female** 15:16
18:9 85:4

137:3 139:6
140:1 266:2
**females** 41:4
85:6,7 277:3
**fence** 134:10
**field** 23:8,8
**fifth** 32:3
**fight** 86:6
196:13 197:12
233:18 234:3
236:15 277:6
**figure** 262:5
263:22 284:4
**figured** 32:18
231:11 267:14
**fill** 209:12 211:7
**fills** 48:21
**find** 50:22 120:4
136:9 168:3
197:2 226:3
262:3 277:7
**fine** 12:21 120:7
166:6 171:6
219:19 247:7
**finger** 15:20
53:19,21
175:12,13
176:10
**finish** 44:20 45:1
81:11 160:19
**firearm** 251:19
**firm** 20:22 21:1
27:16,17,19,20
28:2
**first** 12:17 20:17
32:8 49:15
50:8 76:5,16
76:18 94:1
98:22 118:18
123:4,11 125:4
166:18 172:6
173:20 178:20
188:21 193:9,9
195:19 201:2
202:2 205:15
208:6 212:1

214:6,7 233:8
234:6 235:11
238:2 240:13
245:23 248:6,7
253:22 261:4
266:12 269:12
272:2
**fishing** 195:11
272:4 273:14
273:17
**fit** 28:13
**five** 23:17 46:8
50:22 145:12
159:13,14
220:21,23
**five-minute**
263:17 282:7
**fix** 155:2
**flag** 169:9,18
**flashes** 154:22
**fleeing** 202:11
**flew** 18:13
**flight** 196:13
**floor** 9:16 32:3
88:9
**Florida** 18:11
36:20 74:6,15
**flows** 268:6
**focus** 233:7
**focused** 234:8
235:12
**follow** 22:8
26:13 101:22
173:23 220:19
220:20 229:23
231:22 232:1
232:14
**follow-up** 23:18
122:23 123:8
220:22 221:1
230:10,13,18
231:9,17,19
232:22,22
250:22
**followed** 123:12
124:5,12

**following** 11:15
232:16
**follows** 12:18
**food** 52:22 102:8
187:7
**footnote** 226:17
**force** 6:18
103:19 182:14
183:15 184:17
184:18,23
186:17
**forced** 183:6
184:13 185:4
**forcing** 183:11
261:23
**foregoing** 11:7
289:5,9
**forensic** 113:3,3
146:16 222:6
222:10 253:6
**forensically**
176:17
**forensics** 177:9
**forever** 60:9
**forgive** 282:15
**forgot** 195:7
**forgotten** 94:6
**form** 7:2 26:7
40:17 45:4
46:22 54:10
55:2 56:16
64:5 65:11
69:21 71:14,21
72:22 76:1
77:21 79:6
80:4 82:11
84:22 86:1,11
88:14 90:1
91:22 92:6,13
95:16 96:14
97:15 102:12
114:22 116:23
118:11,20
121:7 122:17
126:15,19
128:20 131:4

133:21 135:1
137:23 144:7
146:8 147:17
151:17 153:11
158:10 160:5
161:4 167:17
168:7 180:4,16
180:22 182:3
183:9 197:22
198:13,21
199:11 201:17
202:21 208:18
210:16 212:14
212:22 215:14
216:20 218:14
219:10 222:12
223:4 224:13
228:22 229:16
233:20 237:22
243:19 244:10
247:20 250:4
251:7 252:7
258:4 259:1
265:2 271:15
275:16 276:3
277:23 278:18
280:19 281:5
289:8
**formal** 55:7,9,18
56:8 121:15
**formed** 95:19
**forming** 95:6
100:18 144:15
218:22 281:9
**Fort** 74:5
**forth** 127:15
176:10
**fought** 279:2
**found** 23:10
179:22
**foundation**
170:7,12
**founder** 45:15
**four** 34:15
113:14 116:13
145:12 183:10

187:6 190:15
191:14 192:12
256:8
**four-day** 273:14
**frank** 272:21
**FRANKLIN**
9:20
**frat** 38:19,19
39:17 40:10,10
**fraternities** 40:2
**fraternity** 39:23
**free** 172:12
227:17 248:18
252:20 266:20
**freely** 261:9
**freeze** 196:13
**fresher** 53:1
**friend** 287:1
**friends** 109:18
124:6 132:23
162:14,16
214:17 217:21
219:19 231:6
252:2 267:12
270:3,9 275:23
276:9,15 280:6
286:8
**front** 19:14
154:2 219:17
220:10 256:9
266:6
**frustrating**
229:4
**frustration**
239:11
**full** 6:18 28:14
61:6 106:20
144:17 166:18
172:6 174:20
212:6 227:6
234:6 240:13
242:16 243:8
243:15 245:18
247:2 248:6,7
269:1 271:3
272:2

**full-on** 284:19
**fully** 14:20
208:1
**function** 87:16
88:11,14,15,18
89:13,13
**functionality**
89:1
**functioning** 88:6
88:10 90:4,5,8
284:16
**fundamental**
149:8
**funneled** 117:10
159:15
**funny** 207:2
**further** 6:14,22
29:18 178:15
270:16 288:6
289:13

---
**G**
---

**G** 9:6,19 111:3
**gained** 225:1
**gait** 85:8
**games** 22:19
**gap** 145:5
188:10 198:10
207:23,23
**gaps** 208:16
**garbled** 110:15
**gas** 31:8 249:8
251:12,17
**Gatehouse**
280:15
**gather** 129:1
237:1
**gathering**
178:21
**gauge** 91:9
225:11 226:12
**general** 17:12
21:8 26:5 60:6
76:15 135:9
244:11
**generally** 60:7

70:22
getting 60:12
  91:13,15 113:1
  133:4,5 164:19
  208:12 215:19
  265:23 269:8
GHB 83:4 93:3
Gilliland 17:5
gimme 149:4
girl's 276:5
girls 140:14
  277:4
give 13:23 14:2
  14:6 26:20
  43:17 52:13
  98:7 114:18
  129:5 134:11
  136:16 138:5
  150:11 154:5
  157:12 162:20
  181:12 211:7
  217:17 221:3
  236:3 259:17
  268:15 277:12
  282:4 284:11
given 15:3 34:23
  92:6,6 93:1
  107:2 123:17
  134:7 190:13
  213:13 267:18
gives 162:16,18
  163:23
giving 78:23
  82:16 194:14
  220:23
glitch 89:10
go 13:11 17:9
  30:14 36:6
  42:15,18 44:19
  44:23 49:18
  57:20 58:7
  60:15 65:1,4
  65:22 71:10
  72:10,23 75:1
  75:3,14 81:10
  85:1,5 99:14

116:8 117:1,2
120:3,10
127:21 138:10
141:13 146:19
155:3 157:10
161:12 163:3
165:6,10
167:19 173:16
174:16 177:15
184:5 185:1
189:13 192:5
193:2 195:11
195:14,19
196:23 201:19
208:21 210:18
211:14 217:13
219:11 234:15
235:15 254:2,4
260:14 263:8
263:15 270:2,8
270:16 272:4,9
273:2,14,17
274:23 276:15
276:15 282:6
goals 166:23
  167:3,5
God 165:1
goes 68:23 89:14
  130:14 132:18
  132:20 176:6
  196:4 211:4
  233:6 236:15
  263:5,5
going 18:16
  26:16 28:9,11
  30:2,2,3 32:18
  36:7,23 38:23
  39:5 47:15
  49:19 51:8
  53:3 57:2
  67:10 73:4
  79:12 80:11
  81:12 85:9
  87:8 92:19
  93:21 96:8
  97:4 98:11

100:16 103:6
104:9 108:5
111:1 112:22
116:9 123:4
132:1 145:2
146:21 147:16
157:8 159:10
159:22 164:11
165:13 166:16
170:23 173:5
175:23 176:18
177:15 179:10
179:11,13
182:15,16,17
186:8 192:23
199:10 202:1
205:22 206:8
213:2,4 215:13
219:19 220:2
221:23 226:16
234:16 235:4,5
239:4 242:15
248:17 250:6
250:16 256:16
259:17,21,22
263:19 264:11
267:20 272:20
274:16 277:22
285:13 287:4
good 30:1,13
  66:23 75:10
  93:6,14 111:14
  112:2 138:8
  151:12 155:7
  164:21 165:9
  165:19 221:4
  247:8
Google 46:1
  66:10,14
gotten 22:14
  137:2 162:3
  177:8
govern 160:3,10
  161:1
governs 158:5
GPS 208:12

grabbed 281:19
gradually 94:23
graduate 74:18
  76:7
grand 203:15
  204:6,8 206:5
  206:15
great 14:7
  176:17
grocery 62:13
groping 35:7
gross 112:19
ground 13:11
grounds 7:5
group 40:2 87:4
  140:1,2 211:1
guess 37:7 41:17
  45:6,10 83:20
  90:8 93:8
  147:13 167:6
  187:17 198:17
  199:13 213:8
  216:23 283:7
  283:11
guessing 74:15
guilty 261:12
gun 281:20
guy 210:21
guys 39:17
  40:10 85:5
  110:12 175:21
  213:10 260:16

────────────
      H
────────────

H 9:5
habits 216:15
half 39:15 43:15
  72:10 166:5,7
  166:8 173:9
  261:4 266:12
  268:21 271:6
halfway 224:14
hall 40:6
hallway 246:18
hand 5:18 53:20
  164:8

handcuffs
  191:20
handed 161:6
  204:21
handle 160:21
  239:9
handwritten
  123:18
hang 154:19
happen 94:7
  120:11 133:9
  136:23 188:5,7
  188:12 263:10
happened 22:23
  48:16 49:1
  53:18 113:21
  120:4 125:16
  126:7 129:10
  136:9 176:19
  176:23 178:15
  178:16 179:12
  190:1 208:5,6
  209:15 210:5,7
  210:11 212:6
  213:10 238:19
  259:13,15
  262:6 266:3
  275:3 277:9
happening
  86:19 87:15
  142:23
happens 42:19
  43:12 134:1
  205:20 238:23
  271:2 277:11
happy 13:13,19
  13:22 28:17
  150:18 234:15
hard 171:2
  178:16 245:16
  284:3
harder 75:1
Hastings 1:8
  96:5 97:12,19
  98:7 112:11
  113:22 115:11

118:3 120:23
121:19 122:3,6
122:22 125:2
127:7,19
129:13 138:14
155:15 161:13
161:22 173:14
182:19 198:6
212:7 216:3
224:3 226:13
229:23 233:5
234:7,22
235:12,20
236:1,5 237:7
237:15 242:7
249:11,16
254:20 257:10
268:10 269:1
270:21 271:10
274:1,4,8
275:1,11,13
**hate** 279:22
**head** 73:7 112:9
150:19 161:20
181:17
**heading** 200:14
207:11
**hear** 13:17
66:22 90:4
144:11 224:15
236:23 243:15
246:19 270:1
**heard** 14:13
114:12 125:19
244:2 249:17
270:4
**hearing** 35:4,12
171:2 176:1
**hearings** 39:1
**height** 89:15
**held** 125:7,9,12
126:16 127:13
127:14 178:12
182:4 201:3
227:8 230:14
236:2,14 238:8

262:23
**Hell's** 203:11
**help** 67:15
170:22 281:4
**heroin** 259:19
**Hershman** 1:16
2:1 5:3,11 6:5
8:11,12 11:13
11:21 12:16
13:5,6 29:11
37:3 41:14
51:13 57:12
93:21 95:11
103:13 122:19
166:15 174:8
280:13 282:13
**hey** 156:10
176:8 210:23
239:1 263:11
270:2 271:7
276:16
**hidden** 194:22
**hide** 194:6
**high** 47:12 74:4
74:5 157:12
213:4
**highest** 62:23
**highlight** 227:14
227:15 250:16
**highlighted**
150:16
**highly** 90:3
**highway** 106:16
**hindered** 26:15
**hips** 262:23
**hired** 16:20
19:18 22:10
25:15 76:5
94:4 97:8 98:3
98:5
**history** 62:10
**hit** 140:13
**hold** 165:14
178:16 205:8
269:14 270:13
**holding** 213:4

228:10,14
249:16 261:22
269:13 270:15
**home** 23:16 47:2
87:9 190:21
191:16 192:14
192:18 249:6
**homicide** 24:17
50:11 64:16,17
65:23 66:5,6
67:22 73:17
100:22 102:21
103:19 109:5
114:9,14
157:22 206:6
247:13,18
248:1 254:23
256:19,20,22
**homicide's**
242:13
**hope** 29:5
242:10
**hoped** 99:4
**horrible** 202:16
**hospital** 23:15
112:18 113:2
123:13 125:1
126:2 127:16
128:4,6,6,12
128:16 129:14
129:19 155:17
156:8 157:3,18
160:7 177:13
178:10 190:7
201:2 225:8
229:9 237:4
279:16
**Host** 10:5
**hotel** 16:3
**Houndstooth**
105:19 106:21
107:11
**hour** 39:14
157:8 166:1,5
166:5,7,8
175:23

**hours** 64:12,17
64:18 71:18
183:20 187:6
272:12
**house** 47:3
177:18 191:21
192:6 193:17
193:18 194:3
199:9 220:2
246:14 251:22
257:1
**How's** 155:6
**HQ** 32:3
**huge** 158:12
**hundred** 40:9
**hundreds** 159:8
257:6,6
**hunt** 137:14
**Huntsville** 98:1
285:10,22
**hurdle** 46:15,20
47:12
**hypothetical**
265:22

───────────
        **I**
───────────
**Idaho** 58:22
**idea** 131:5 185:3
185:4
**ideas** 158:17
**identify** 49:8
193:10
**image** 106:13
**images** 104:11
104:12,15
**immediately**
24:18,22 157:5
157:6 162:9
222:5 226:19
236:14 248:10
**impact** 60:20
237:13
**implement**
158:8
**implemented**
255:1

**implying** 105:5
265:19
**important** 52:9
107:12,14,16
107:22 108:1
126:23 129:11
138:16 140:12
182:5 212:17
240:5
**imprecise**
165:21
**impression**
96:18 97:11
**improper** 271:9
**in-depth** 187:8
207:8
**inactions** 59:10
**inadequate**
23:19 113:18
**inappropriate**
113:19
**incapacitate**
86:5,7
**incapacitated**
78:14 88:8
91:18 145:11
216:17
**incapacitation**
86:8
**incident** 38:21
52:1 261:18
**incidents** 38:21
**included** 22:19
100:10 112:7
200:11 242:12
**including**
173:23
**incomplete**
143:11 171:14
173:6
**inconsistencies**
168:14
**inconsistent**
53:9 168:9
171:14 173:5
**incorrectly** 42:7

incriminating
  48:18
INDEX 8:8
indicators
  225:16,20,22
  226:6,11,14
individual's
  89:21
infers 261:7
influence 82:2
  91:9 176:21
  209:7 259:5,14
  262:21
influenced
  59:11
information
  48:15,19 52:19
  53:4,14,14
  94:12 96:6
  113:2,10
  115:23 117:9
  137:8,18 138:9
  138:10 139:4,9
  140:10,23
  141:11 143:9
  152:18 156:7
  171:14 178:22
  215:9 223:15
  225:1 226:3
  237:1 262:12
  287:3
initially 166:19
injuries 222:21
  222:22 223:5
injury 24:16,16
inner 178:2
Innisfree 105:18
  106:20 211:14
  211:18 212:19
  213:15,18
inquiries 122:23
  123:9
inserted 104:18
  175:13
inside 53:19
  143:1 175:13

insight 136:17
insinuated
  185:6
insinuating
  184:12,16
insist 235:5
instances 193:8
Institute 41:18
instruct 34:2
  38:8
instructing
  148:13
instruction
  14:16
instructions 2:2
  134:8
instructor 38:6
instructors
  148:17
insufficient
  207:12
intending 99:17
intercourse 23:5
  200:16,20
  201:15,22
interested
  289:15
interfere 14:23
internal 68:15
  68:23 69:10
internally 68:4
International
  44:8 58:10
internationally
  45:17
interpreting
  104:3
interrogating
  269:19
interrogation
  113:17 249:18
  268:5,11 269:2
  269:9,18 271:3
  274:18
interrogations
  121:5

interrogator
  239:23
interrupt 80:6
  110:18
intertwined
  232:18
interview 52:15
  102:6 107:4
  113:8 117:15
  122:10 124:21
  129:5 136:12
  178:10,20,23
  180:14 181:6
  182:21 183:7
  187:9 195:3
  196:7 197:5
  198:7 199:2
  201:7 219:6
  225:9,10,11
  227:3 236:23
  237:8 238:13
  259:22 264:8
  264:10,14,17
  266:2,13
  267:13 271:20
  273:23 274:3,7
  275:11,14
interviewed
  17:13,18
  113:12 123:14
  190:9 196:2
  271:22
interviewer
  197:14 239:23
  259:21
interviewing
  54:1,5 55:6
  56:2 160:20
  172:18 174:18
  208:9 225:16
  256:15 259:11
interviews
  117:14 127:7
  197:20 249:18
intoxicated
  22:14 41:3

44:16 86:16
  219:14,15
intoxication
  38:15,22 39:11
  41:21 81:8,17
  81:20,23 86:21
  182:14
introduce 12:6
  85:14
investigate 16:4
  46:11 63:8,21
  69:9,19 119:23
  255:5
investigated
  63:16 68:4,15
  70:4,13,16,17
  80:19,22
investigating
  44:9,12 157:21
  250:19 261:20
  262:19 263:4
  273:3
investigation
  23:23 34:19
  44:20,23 69:12
  70:5 96:12
  98:6,8 107:23
  108:11 112:12
  112:20,21
  114:1,6,8,11
  114:16 115:19
  116:10,12,18
  116:20 118:13
  124:23 130:8
  131:10,13
  135:13 136:5
  137:21 140:8
  140:20 141:19
  142:11 143:5,8
  158:1 159:11
  160:15,17
  170:9,14
  172:22 173:2
  173:15 181:14
  182:11,18
  187:8 194:2

202:9 203:22
  204:6,14 207:7
  207:13 209:13
  210:3,4,6
  211:5 235:21
  236:20 250:9
  250:11,13
  251:1,1,5
  252:1,8 258:19
  263:4 280:17
investigations
  30:18 60:19
  67:16 76:11,15
  136:8 159:6,16
  163:7 168:17
  168:18 205:6
  209:17 252:15
  253:4 254:16
investigative
  76:17 172:8,16
investigator
  52:4 101:22
  116:17 117:10
  117:11 120:13
  120:14,16,22
  126:8 147:2
  149:10,13
  156:1,16,23
  157:23 158:21
  159:1 160:1
  163:17 167:2,5
  167:10 209:20
  223:10 225:14
  237:6 239:16
  239:22 253:16
  273:1,19,21
  274:9 275:1,8
  279:15
investigator's
  132:16
investigators
  44:1 111:13
  115:12,15
  116:20 117:4
  120:21 138:17
  143:17 148:17

159:9,20,21
168:20 171:19
171:21 175:5
178:6 180:9,23
181:11,16
184:12 185:15
187:20 192:3
200:19,21,22
215:9 225:10
229:14 255:5
265:11
**invitation**
276:16
**invite** 134:3
**invites** 208:2
**involve** 44:15
**involved** 23:22
61:11 63:10
96:11 202:8
224:5,10,18
**involvement**
93:22
**involving** 15:16
**irrelevant** 37:5
**issue** 42:6 50:1
169:21 191:13
226:7
**issued** 26:19,19
42:16
**issues** 168:21
219:8
**Item** 104:4
**items** 104:10
250:8 251:15

— J —

**J** 204:10,12,19
**J.M** 1:12
**January** 58:9
**Joanne** 45:20
46:1 56:4
198:2
**job** 111:14 112:2
132:16 256:21
**JOHN** 9:19
**joke** 136:6

**Jones** 1:8 11:22
96:5,18 97:18
98:6 101:22
112:10 113:22
115:11 118:2
121:19 122:3,6
122:22 125:2
127:7,19
129:12 138:14
155:15 157:5
161:13,22
173:14 182:19
197:5 198:6
201:7 212:7
216:2 223:10
224:3 226:13
227:3 229:10
229:22 230:9
231:9 233:5
234:7,21
235:12,19
236:1,4 237:6
237:15 242:7
249:11,15
254:20 257:10
266:12 272:5
273:16 274:1
275:10,14
279:15
**Josh** 97:11,19
118:3 121:19
122:3,6
**JOSHUA** 1:8
**Jr** 1:16 2:1 5:11
6:5 9:5,6 11:13
12:16 13:5
**JT** 9:19 12:15
**judge** 35:5
**judged** 42:8
**July** 94:2,3,4
104:5 122:10
200:13 260:5,7
287:12
**jump** 276:17
**jumping** 276:11
**jumps** 23:6

**June** 58:3,15,17
58:17,18 96:10
104:6
**juries** 134:6,14
**jury** 132:15,17
133:11,22
134:8 203:15
204:6,9,20
206:5,15
**Justice** 41:19
58:14 64:14
73:23 74:1

— K —

**Kate** 12:13
94:10 184:1
221:13 255:20
287:6,9
**KATHERINE**
9:13
**Katie** 1:12 96:10
152:1
**keep** 30:2,2,3
33:18 39:19
131:19 140:21
143:6
**keeping** 32:22
**keeps** 75:14
**kept** 33:9 36:9
**Ketamine** 83:8
**keynote** 36:17
**keys** 179:19
**kick** 279:12
**kills** 254:14
**kin** 289:14
**kind** 24:5,9
30:12 31:19
33:5,9 36:1,9
36:12 48:3,21
52:23 72:15
78:16 85:1
86:7 94:22
100:3 107:12
110:14 121:15
124:9 126:18
149:8 151:6

158:16 162:2
163:5 165:6
169:2 173:16
182:15 186:10
191:13 195:22
206:1 207:2
212:3 217:23
227:14 232:17
233:7 240:20
249:22 250:6
257:4 264:7
269:17,21
276:9 285:15
286:22
**kinds** 163:13
**kit** 113:3,4
146:17 149:20
**knew** 32:16 55:5
92:18 124:6
251:18 287:12
**knocked** 18:21
**know** 13:13,18
13:19 18:1,3
19:3 22:2,4,5,7
27:13 28:3,6,8
28:16 31:4,23
33:1,3 35:18
35:19 36:21
37:8 39:4,14
39:18 43:13,16
43:17 44:1,4,4
44:14 47:1,10
48:4,14,22,23
49:1,5,6 50:4
52:11,12,18
53:1,6,10,20
53:22 54:3,19
55:6,21,23
56:1,23 57:6
65:1 66:9 67:1
67:2,13 69:6
74:22 75:6
77:16 78:3,11
78:12,16 79:13
82:22 84:13,17
85:7 87:4,7,9

87:14,18,19
89:12,15,17
90:4,6,16 91:2
91:3,6,8,10
95:10 99:6
100:2,7 103:14
105:2,8 106:13
107:3 108:2,6
108:13,14
113:20 114:4,9
114:14,17
115:7 116:3,6
117:5,23 118:2
118:12 119:10
119:12 120:8
120:10,15,16
120:18,20
121:8,18,21
122:2,5,8
123:2 124:7,9
124:19 126:19
126:19 127:11
127:12 128:9
128:12 129:8
129:12,15
130:12,15,21
131:12,12,14
131:15,19,22
132:3,7 133:2
133:3,8,15
134:2,6,7,9,10
135:9,20 136:1
136:5,15,18,23
137:1,6,10
138:3,7,8,11
138:13,15,18
139:4,16,20,23
140:9,9,17,17
140:22,22
141:2,3,12,14
141:18,20,22
142:7,17,19,22
143:3,6,10,13
143:14,21,23
145:6,7,8,12
145:18,20

146:1,15,18,20
146:20,21
147:3,4,5,14
148:15,19,21
149:1,3,7,21
149:21 150:19
151:10 152:20
153:17,17
154:3 156:4,4
156:13,18,22
157:5,15
158:11,14,14
158:15 159:2,7
159:9,11,14,17
159:19,20
160:20 161:7
161:19,23
162:7,8 163:2
163:3,11,22
164:1 165:17
167:23 168:14
168:23 169:2
170:20,21
172:4,21 176:4
176:5,11 177:5
177:8,10,11,16
178:11,23
179:4,7 181:20
182:5,7,10,13
183:2,5,21
185:5,21
187:12,16,20
189:22,23
190:2,3,7,8,11
190:12,14,14
193:13,21
194:1,7,8,12
194:16 195:1
195:16 196:3
196:11,19
197:5,10,14
198:5 200:3,6
200:7,8 202:15
203:21 204:1,3
204:5,18,23
205:7,11,18,20

205:23 206:2,3
206:6,14,20,23
207:1,18 208:4
208:5,23 209:6
209:15 210:23
211:3,12 213:6
213:6 214:11
214:14,15,22
215:3,4 216:2
216:9,10
217:12 221:8,8
221:9 224:22
225:4 226:1,13
226:15,23
227:12,20
229:3,7 230:6
231:4,8 232:20
232:21 233:11
234:17,19
236:15,17
237:17,19
238:3,12,18,19
239:1,5,14,15
239:20 240:5,5
241:9,12,16,21
242:3,7,11
243:11 244:2,6
244:11,14
245:11,18
246:8,15,19,23
247:2,9 248:12
248:20,21,23
249:14 250:1,5
251:9,20
252:23 253:13
253:14,15,15
253:16,19
254:2,7,13,20
254:22,23
255:23 256:11
256:23 257:10
257:11,15,17
257:22 258:7
259:5,6,11,16
260:19 261:12
261:23 262:7,9

262:10,17,18
263:19 264:21
265:5,6 266:4
266:17 267:5,6
267:8,9 269:16
270:1,19,20,21
271:6,20
272:10,11,15
273:3 275:1,2
275:4,7,10,12
275:13,20
276:5,6,13,23
277:5 279:1,12
279:14 280:1
281:23 283:13
283:15,21
284:7 286:1,3
286:10,11,15
287:6,14,15
**knowing** 280:1
**knowledge** 5:6
35:14 240:9
**knowledgeable**
170:5
**known** 81:4 82:6
83:16
**knows** 30:7
121:2,22
130:19 140:2
154:4,6 165:1
194:11 211:12
241:7,22

——————
**L**
**L** 6:1
**lack** 40:3 60:16
147:13
**lacking** 124:23
169:5
**ladies** 141:10
**lag** 13:16
**language** 231:6
279:18
**lapse** 198:16
**lapses** 214:4
**large** 6:8 11:4

145:5 289:23
**larger** 151:5
**Las** 65:21 66:15
66:21 67:18,23
**law** 27:16,17
28:2 40:12,13
40:23 41:5,8
42:21 43:1,4
43:11,20,22
47:8 53:23
55:14 59:11
60:8 62:16
66:11,14 73:20
75:12 77:17
78:4 80:13,16
118:18 148:18
158:5,7 160:3
160:10 161:1
241:4,7,9,12
241:14,22
242:4,6 250:8
253:22,23
277:19,21
278:5,15,18
279:9,20 280:1
**laws** 6:19
**lawsuit** 96:2
186:11
**lawyer** 278:1,2
**laying** 177:19
**lead** 116:16
117:11 120:15
149:13 156:1
156:16,23
157:23 158:21
158:23 159:8
159:19,23
273:18,20
274:9 275:7
**leading** 7:3
189:3
**leads** 31:4
173:23 279:17
279:23
**learn** 31:23
49:13 54:14

90:17,22
117:17 169:23
171:16 173:7
197:19 253:21
253:23
**learned** 34:6
50:7 54:16,23
67:9 118:23
170:2,5 172:3
198:1,3 253:23
254:17
**learning** 170:17
250:8
**leave** 87:20
100:3 133:1
136:22 193:11
267:12 272:4
273:17 275:23
279:6
**leaving** 107:5,5
108:6 131:22
145:6 207:18
237:4
**left** 18:23 109:20
211:1,11,22
251:23
**leg** 156:11
**Legal** 41:20
**legitimately**
57:9
**length** 36:11
180:13 204:13
**let's** 57:18 58:8
58:20,23 83:2
85:3 135:11
152:7 157:10
166:2 263:16
276:17
**letting** 235:14
257:17 262:17
273:14
**level** 55:5 86:8
86:20 87:13,17
88:11,23 89:12
168:15 258:15
267:23 276:1

Carlton Hershman                                        3/16/2021

Page 306

276:18,20,22
276:22 277:14
277:16,17,20
278:21,22
279:7
**levels** 79:15 92:8
**liar** 168:4
**lie** 191:23
242:19 244:19
**lied** 191:12
**lies** 33:2
**lieutenant** 71:5
**life** 29:7
**light** 235:23
**LIGHTFOOT**
9:20
**line** 4:2 26:5
34:10 83:20
84:5 102:4
123:4,5 136:6
253:19 265:21
283:14
**lines** 21:16,20
27:1 231:11
**lip** 175:14
**list** 33:10 34:14
61:7,17 103:2
103:3,9 104:4
104:10 109:12
109:13 123:18
166:23 173:13
278:18,19
279:11
**listed** 5:8 38:5
56:20 61:9
62:10 94:16
95:1,4,9,12
100:13 101:21
103:1 109:10
136:13 144:3
163:15 214:16
223:21
**listen** 236:22
241:8 242:2
**listened** 65:16
243:10,20

244:4 249:20
**listening** 241:8
241:23 242:4
**little** 23:8 80:11
94:3 99:15
103:3 110:15
111:18 126:3
151:5,11
157:10 190:9
217:17 229:8
231:2 250:21
263:15 282:23
**live** 61:22
**lived** 18:11,11
**living** 23:1,2
203:4
**LLP** 9:8,14
**long** 37:14,21
38:3 74:20
89:8,19 128:11
165:5 198:9
204:5,18
243:11 255:14
263:19
**longer** 109:12
157:11 165:6
165:12 263:13
**look** 28:20 91:10
98:5 126:22
130:13 138:15
154:9 168:12
168:20 189:21
194:2 209:10
229:16 242:19
250:2 251:9
254:6 255:20
255:23 265:23
272:15,20
274:23 276:5
283:18 287:5
**looked** 68:15
103:8 180:20
205:16 207:2
208:1 213:14
213:17,19
225:5 251:8

**looking** 150:15
152:11 153:6
166:18 171:10
187:17 192:15
200:12 201:23
203:12,13
207:4,10 220:7
225:7 227:6
248:6 258:12
268:4 272:1
**looks** 38:13
41:16 44:6
51:1 62:16
63:4 202:3
243:13 269:4
272:14
**lose** 39:5 117:21
**losing** 87:5
**loss** 44:17
**lost** 51:7 137:9
146:5 156:19
227:11 230:2
**lot** 23:9 42:6,10
49:20 50:5
63:21 87:10,18
92:7 107:9
112:23 124:14
124:18,22
137:8 141:7
151:8 163:1
167:8 175:21
178:17 179:3
179:10,12
194:4,5 196:4
230:17 274:15
277:11
**lots** 102:23,23
**Louisiana** 38:11
58:13
**love** 99:3 194:19
**lower** 86:5
**Loyd** 150:3,13
**lunch** 165:9
**Lundgren**
226:19

| M |
|---|

**M** 9:13
**M-a-r-a** 27:12
**major** 207:14,16
207:23
**majority** 34:13
45:11 49:23
57:1 65:6,18
**making** 2:8
102:1 132:2
153:1 155:16
234:22 235:20
276:6 282:16
**male** 85:3 203:3
**males** 22:17
23:4
**management**
60:20
**managerial**
77:14
**mandatory**
64:10 71:18
73:18,19
**manner** 230:10
**manners** 38:20
**Mara** 27:11,12
**March** 1:18 6:11
11:13 12:4
41:17 203:13
289:17
**mark** 29:12
217:13,14
**marked** 29:14
98:11,12
217:13 218:5
**massage** 15:18
**masseuse** 15:17
15:19 16:3
**matched** 249:22
**material** 95:19
107:10 199:16
**materials** 95:9
95:11,16
100:14,17
144:4 223:21

**math** 75:9,10
**matter** 11:21
157:20,22
166:20 274:11
**matters** 38:19
75:16
**mean** 32:5,20
36:8 46:19
47:23 54:10,11
55:5 57:6,7
66:21 67:14
68:16,20 77:22
78:10 81:9,12
81:20,22 82:19
83:23 84:2
86:23 87:12
88:14,15 89:5
92:16,22 100:2
102:4 107:9
108:4,10 115:2
116:7 118:14
120:2 121:2,23
126:18 127:2
127:23 128:10
128:20 130:19
131:11,12,14
131:19 132:13
132:20 133:3
135:3 137:12
138:21 140:10
140:13,14
141:7,20 142:5
143:12,22
144:18 146:18
146:23 148:12
149:18 157:5
157:20 158:14
159:7 160:15
163:1,17 164:7
173:22 174:17
175:10 177:14
179:3,15
181:21 182:4
182:13 183:9
183:15 187:3
187:10,12,22

188:2,9 190:2
190:4,11
191:11,16
192:21 194:3,8
198:1,15
199:11,12,17
200:6 205:1,4
205:20 206:9
206:22 208:1,3
208:4,23
211:11 213:3,9
215:15,20
218:18,20
221:9 224:23
229:4 231:6
232:11 233:1
236:22 238:1
238:17 239:11
240:8 241:5,19
245:14 246:10
246:14 253:17
256:6,10,19
257:3,4,5,9
261:20 262:2,7
262:16,18
263:9 266:4,22
268:17 270:5,5
270:14,18
271:1,2 272:14
273:1,3,7,13
273:19 276:4
276:11,22
281:19 283:17
**meaning** 107:6
238:9
**means** 88:20
167:18 186:9
187:13 228:10
228:14
**meant** 41:5
186:16 281:21
**media** 224:4,9
224:17,20
225:3 280:15
**medicine** 209:8
**medicines** 146:2

**meet** 231:5
267:12 270:2
275:23 276:15
277:20 280:5
**meeting** 276:8
**Megan** 109:3
135:3 204:9
206:10 286:23
**member** 73:9
**Memorandum**
24:3
**memory** 44:16
44:17,17 86:17
88:6 103:6
131:23 133:5
134:5 150:10
198:9,16
207:15,17
208:13,16
214:4 259:6
**men** 208:2
**mentality** 132:7
**mention** 99:7
270:15
**mentioned** 18:8
87:11 129:17
136:11 139:5
142:8,22
229:13 249:1
283:21 285:9
286:23
**mentioning**
147:12
**mentions** 178:11
251:11
**Mertz** 286:18,20
**message** 214:16
217:20 218:3
218:10,22
221:5
**messages** 109:22
214:2,14,18
215:19
**messes** 25:3
**met** 54:19 97:18
287:16

**Michael** 260:11
286:17
**microphone**
110:13
**middle** 59:15
80:6 172:5
218:1 273:2
**midway** 212:3
225:8
**miles** 23:17 88:1
**military** 74:23
**mincing** 232:12
**mind** 20:4 25:23
59:16 78:1
89:9 110:4,16
118:6 132:6
179:7 180:10
180:18 181:10
181:14 197:8
217:3 220:23
221:6,10 232:6
263:20 267:2
**minds** 261:11
**mindset** 135:22
**mine** 34:17
**minute** 93:8
221:4 271:6
**minutes** 166:1,3
193:14 194:3,5
211:10,11
220:21,23
235:22 236:6
238:13 282:4
**Miramar** 74:11
74:14,20
**misjudge** 44:2
225:17
**mislead** 188:7
**misleading**
105:1,7 148:5
247:21
**missed** 222:5
**missing** 179:15
179:20 182:1
249:8 251:12
251:14

**misstep** 177:21
**mix** 71:7
**mixed** 92:7
205:16
**mixing** 135:2
**Mobile** 97:23
285:10,14
**molest** 73:16
**molested** 197:17
**molester** 69:4
**moment** 103:8
220:9 238:8,22
242:22
**money** 31:8
162:12,12
163:14,20
251:15,17
**month** 59:7
101:4
**months** 71:23
72:2,8,13
**morning** 77:1
192:23 197:22
216:5,6 226:5
247:22 252:4
266:9
**MOU** 23:19
24:2
**mouth** 175:14
**move** 47:15
**moving** 88:9
110:16
**muscle** 83:14
209:8
**Myers** 74:6
**myth** 53:1

—————————
**N**
**N** 6:1 8:1 9:1
**name** 2:10 13:3
16:15,19 17:4
19:9 20:17,18
27:11,21,22
45:19,21 46:2
46:6 74:9
115:20 280:22

286:17
**names** 25:7
47:18 138:22
**Nampa** 58:21,22
**Nancy** 1:21 6:6
10:3 11:1
217:5 263:18
289:19,20
**narrow** 196:11
**nation** 149:11
161:9
**National** 41:18
47:16
**Navy** 74:23
**near** 91:13
259:13
**necessary** 6:23
99:5 173:23
**need** 13:12
19:16 28:15
29:18 52:19,20
52:20,22,22
62:9 100:15
108:9 116:11
120:3,18
133:10,16
150:17 151:9
156:15,21
157:11 177:15
210:19,20,22
227:19 233:9
234:18 242:1
251:12 252:21
252:22 255:22
263:18 266:16
270:2 279:5,6
280:4,5 282:4
282:5
**needed** 75:9
124:16 126:13
178:13 208:23
231:5 267:12
270:8 275:22
**needs** 120:8
133:11 134:16
158:2 208:8

216:23 262:1
266:18
**neither** 289:13
**nervous** 162:8
**never** 25:9 55:7
75:10 98:1
104:19 113:16
115:4,6 127:9
127:10,23
128:5 129:15
130:22 131:12
139:22,22
140:17 146:10
149:5 162:19
177:11 179:22
184:16 187:22
187:23 190:3
205:13,13
208:1 213:14
213:17,20
219:10 225:5,6
229:6,13 280:7
280:9 287:18
**new** 9:17,17
29:1 67:2,4,9
67:12 160:17
164:23
**News** 1:11 104:5
280:14
**nice** 108:10
277:4,7
**night** 22:18 72:6
75:4 85:6,16
87:3 109:20
113:21 123:19
132:12 133:19
135:18,23
136:19 138:19
177:3,4 219:5
**nine** 123:17,19
132:23 136:12
136:14 137:11
137:20 140:15
173:8 235:22
236:6 252:2
**non-consensual**

201:10
**non-Mirandiz...**
47:19 48:2
**normal** 86:13
89:1 108:14
216:10
**normally** 216:9
**NORTH** 9:21
**Northbank** 6:10
11:11
**Northern** 1:2
12:2
**notable** 45:17
**Notary** 5:22 6:7
11:3
**note** 273:23
**noted** 2:9 45:17
107:18
**notes** 282:5
**noteworthy**
274:6
**notice** 225:15
**noticed** 32:8,12
33:5 35:18
**noting** 243:14
**number** 1:5
11:23 46:14,16
104:4 105:16
105:16,17,18
109:1 130:2,17
173:22 185:14
190:15 191:14
192:11,12,15
193:5 207:6
251:13 268:4
**numbers** 123:20
137:12 138:22
**nurse** 123:13
125:1,11 128:3
128:13 129:13
**nurse's** 125:8
**nurses** 127:22
257:23 258:8
**nursing** 126:2

_____
**O**
_____

**O** 6:1
**o'clock** 216:4
**object** 14:15
26:6 37:1
40:16 45:3
46:21 54:9
56:15 57:3
64:4 65:10
69:20 71:13,20
72:21 75:23
77:20 79:5
80:3 82:10
84:4,5,21
85:23 86:10
88:13 89:23
91:21 92:12
96:13 102:11
114:21 116:22
118:10,19
121:6 122:16
128:19 131:3
133:20 134:23
137:22 144:6
146:7 147:17
151:16 152:9
153:10 158:9
160:4 161:3
167:16 168:6
180:3,15,21
182:2 183:8
197:21 198:12
198:20 199:11
201:16 202:20
208:17 210:15
212:13,21
215:14 216:19
218:13 219:9
222:11 223:3
224:12 228:21
229:15 233:19
237:21 243:18
244:9 247:19
250:3 251:6
255:7 258:3,23
265:1,14,20
271:14 275:15

276:2 277:23
280:18
**objection** 37:19
121:16 125:18
152:7 153:1
184:21 188:16
**objectionable**
278:6
**objections** 7:1,4
152:3
**obtain** 113:5
141:14 191:15
192:13 193:14
243:8 253:6,8
254:5 265:11
**obtained** 137:19
191:20 192:17
192:19 265:12
287:2
**obtaining** 167:3
174:20
**obtains** 115:23
**obvious** 42:5
**obviously** 17:19
78:11 129:9
174:18 178:21
190:4 199:12
199:19
**occur** 187:5
258:17
**occurred** 23:14
44:18 52:14
111:16 135:21
138:6 175:19
177:4 178:7
206:21 210:9
219:4 222:18
222:23 235:2
235:18 236:6
251:10
**occurring** 179:8
289:11
**occurs** 270:10
**October** 58:5
59:2
**odd** 31:14

133:12 162:21
179:23 263:9
**offense** 203:17
**offer** 99:18
111:6 114:2
115:1
**offered** 7:6
136:14 189:22
195:20 278:14
**offering** 28:10
37:3 111:9
112:6
**office** 3:1 5:19
6:10 9:4 11:10
26:17 34:18
39:13 109:6
173:8 203:23
204:22 206:7
**officer** 23:9 35:5
64:11 68:14,22
69:2,7 70:1
72:1,14,20
120:3,11
**officers** 24:13
26:13 59:11
248:9 249:5,7
249:10
**offices** 11:9
**oh** 29:20 81:3
162:15 259:19
276:14
**Ohio** 59:3
**okay** 16:10 19:8
19:17 20:4,12
21:2,17 22:12
25:6,11 27:18
28:3 29:19,22
32:5 33:8
35:23 36:21
37:17 39:22
40:11 43:4
44:6 45:23
46:4 49:13
58:8 63:12
64:19,22 65:7
66:18 67:22

| | | | | |
|---|---|---|---|---|
| 69:11 73:3 | 122:5 170:3,20 | 281:5 | 47:15 50:22,23 | 242:16 244:22 |
| 75:7 79:16 | 254:18 | **opportunity** | 51:9 57:20 | 245:8 246:4 |
| 81:6,15 83:7 | **once** 65:3 73:14 | 185:16 186:14 | 98:22 104:1,10 | 248:7,19 249:4 |
| 84:8,16 85:20 | 75:3 94:22 | 187:1,11,19 | 105:16 111:1,2 | 261:5 266:12 |
| 90:17 97:6 | 96:21 97:5 | 188:1 189:18 | 122:21 123:3 | 272:2,3 273:22 |
| 100:8,12 104:9 | 109:20 127:4 | 190:13 | 127:22 166:17 | **paragraphs** |
| 110:23 111:21 | 177:17 215:3 | **opposite** 168:2 | 171:11 172:6 | 235:7,7 236:10 |
| 112:5 123:6 | 252:6 | **oral** 11:14 | 186:4,6 195:6 | **parents** 124:9 |
| 128:5 139:15 | **one-page** 128:6 | **orally** 175:15 | 200:9 202:1 | **parking** 23:9 |
| 144:2,11,14 | **ones** 69:12 83:4 | 176:8 | 203:12 207:4 | **Parkway** 6:10 |
| 148:6 151:11 | 83:6 214:22 | **oranges** 135:3 | 212:2 213:23 | 11:11 |
| 151:12,13 | 232:15 | **order** 53:18 | 213:23 214:8 | **part** 26:18 39:17 |
| 154:19,21 | **online** 281:2 | 135:21 205:7 | 222:1 224:2 | 63:4 108:15 |
| 157:2,14 | **open** 23:8 29:3 | 250:10 | 225:7,8 226:17 | 109:10,11 |
| 164:15,22 | 196:17,22 | **ordered** 64:2 | 227:5 234:5,6 | 114:13 130:13 |
| 165:20 166:9 | 250:10 285:19 | 70:23 71:10 | 240:13,14 | 140:1,1 143:7 |
| 169:23 171:1,2 | **open-ended** | **original** 29:16 | 242:15 248:4,8 | 153:8 154:1,7 |
| 171:3,4 174:5 | 100:4 195:16 | 98:14 218:7 | 252:10,18 | 170:15 178:3 |
| 174:10 186:22 | 195:19 240:6 | **Orlando** 36:20 | 258:10,12 | 200:10 205:23 |
| 189:12 190:22 | **operating** 26:14 | **OTC** 83:11 | 261:3 264:10 | 208:14 214:6 |
| 191:2 193:19 | 61:13 77:7 | **other's** 158:16 | 266:10 268:3,6 | 217:22 218:4 |
| 195:13,15 | 100:22 147:22 | **outcome** 22:5 | 272:1 | 233:8 245:12 |
| 203:12 209:23 | 148:1 | 28:4 112:22 | **pages** 99:1 | 255:4 263:1 |
| 214:13 216:1 | **opine** 115:17 | 130:7,9,12,19 | 100:12 128:11 | 270:15 |
| 220:1,17 | 181:10 | 131:18,20 | 150:15 174:15 | **partial** 232:22 |
| 227:16,21 | **opining** 146:5 | 138:4,12 | 210:17 | 232:23 |
| 230:3,8 232:10 | 216:16,21 | 163:18 164:13 | **paid** 56:19 57:1 | **participated** |
| 232:23 233:13 | **opinion** 34:23 | **outline** 157:9 | 57:7,7,8,23 | 53:11 |
| 233:13 234:20 | 59:10 95:16,20 | **outside** 69:17 | 58:1,2,3,4,5,5 | **participating** |
| 235:8,11 241:8 | 97:16 98:7 | 70:14,17 99:21 | 58:7,9,11,14 | 65:8 214:2 |
| 243:3 244:1 | 100:4 101:7 | 100:1 172:1 | 58:15,16,18,19 | **particular** 30:5 |
| 245:11 250:18 | 102:9 111:2 | **over-the-coun...** | 58:22 59:1,3,7 | 214:1 259:15 |
| 251:2 252:11 | 112:2,7,10 | 83:12 | 65:22 66:4,6,7 | **particularly** |
| 253:2 256:16 | 115:18 130:23 | **oversees** 157:23 | 162:23 163:10 | 207:13 235:23 |
| 260:10,13,17 | 144:15 155:14 | | **paint** 277:11 | **parties** 6:3 7:4 |
| 262:15 263:17 | 155:21 156:22 | **P** | **Pannell** 1:21 6:6 | 215:7 289:14 |
| 263:21 275:20 | 179:2 181:2,13 | **P** 6:1 9:1,1 | 10:3 11:1 | **parts** 109:19 |
| 278:17 284:10 | 200:2 201:13 | **p.m** 166:11,14 | 289:19,20 | 170:16 245:19 |
| 285:21 287:8 | 220:4 231:18 | 221:18,21 | **pants** 177:19 | **party** 241:5,17 |
| **old** 54:4 62:13 | 276:4 278:11 | 264:3,6 282:9 | **paragraph** | 241:19 |
| **older** 63:16 | 282:19 | 288:2,6 | 166:19 172:6 | **pass** 251:13 |
| **omission** 258:18 | **opinions** 80:1 | **packet** 94:18 | 173:12 212:3 | **passed** 22:15 |
| **omissions** | 95:6,21 99:17 | 104:19 | 227:6,7,18 | 23:1 41:3 |
| 258:22 | 99:21,23 100:9 | **page** 4:2 8:3,10 | 229:21,22 | 48:23 86:15 |
| **on-the-job** 34:4 | 100:18 111:6 | 30:5,14 38:4 | 233:4 234:6,21 | 88:4,7,8 91:17 |
| 50:19 121:14 | 112:6 218:22 | 38:12 41:16 | 235:9 237:12 | 92:3 146:6,11 |

156:14 284:23
285:2
**Pastula** 111:3
**Pastula's** 112:7
**path** 263:5
268:11 269:3
273:2
**patio** 199:3
211:9,22
**patrol** 60:19
76:18 118:23
119:16 120:2
120:11
**pattern** 33:6
**pay** 18:4 21:22
27:3 162:13,17
164:9
**pays** 164:2
**PD** 158:15
**peer-reviewed**
36:15,17
**penal** 41:5
**pending** 110:12
152:22 153:3
185:9,9 189:16
**penetrated**
15:19
**penis** 63:19
175:17 176:10
178:2
**people** 35:19
37:23 40:9
42:10 47:11
48:9 50:5,5
61:10 67:13
83:14 85:2
86:21 89:6,7
90:3,11 91:3,7
93:3 106:10
117:4 120:5
123:17,19
126:10,12
134:3 136:12
136:14 137:20
138:16,18
141:15 142:3

142:17,18
145:21 159:13
167:9,14
170:21 176:7
176:19 197:16
210:12,22
211:1,6 219:7
219:18 241:21
246:19 247:21
257:4,5 262:20
274:10 279:22
**percent** 67:20
275:2
**perception**
272:16
**perfect** 155:8
**perfectly** 186:2
**perform** 222:6
**period** 18:14
32:7,11,12
89:7,8,18,19
94:23 198:19
200:1,5 210:10
210:14 263:2
269:4
**perishable** 72:7
**person** 28:23
31:11 39:3,12
45:17 52:2,5
52:18 60:8
78:23 79:2,11
81:7 85:17
88:18 89:3,14
90:2,9 117:13
134:3 143:2
147:6 156:10
156:11,17
159:15 167:23
168:4 184:17
203:5 209:10
216:14 225:12
226:7 239:13
241:7,22 256:7
257:1,18,20
259:22 262:1,2
263:7 276:13

282:1
**person's** 88:11
88:23 266:5
**personal** 286:8
**personally**
54:19 91:1
**persons** 224:4
224:10,18
**perspective**
167:6 208:11
272:15
**pertaining**
76:21
**pertains** 128:17
198:10
**PGO** 102:18
**phone** 47:19
48:1,7,8,12,14
48:20 49:10,12
49:14,16,21
50:8,13,15
109:4 123:20
124:4,13
137:12 138:22
142:9,10,19
175:2 179:19
193:4 215:3
240:14,17,21
241:15,20
242:6,8,12
284:21
**photos** 213:19
**physical** 50:2,3
88:15 252:16
253:9
**physically**
171:12 234:3
**pick** 188:23
**pics** 63:20
**picture** 133:22
134:1 138:5
176:23 209:18
220:8 266:3
**piecemeal**
116:14 117:13
117:16,18

274:20
**pieces** 86:18
**piecing** 116:14
**place** 52:16,16
93:6 243:16
244:3 264:18
**plaintiff** 16:20
18:4 19:9,19
21:22 27:3
**plaintiff's** 8:10
17:1 20:14
27:7 29:15
98:13 218:6
**Plaintiff(s)** 1:9
9:3
**plaintiffs** 12:10
12:12 13:7
16:15 25:7,12
25:15
**plan** 87:3 132:22
136:21,22
**planet** 246:11
**plans** 142:14
**play** 272:13
273:4,5
**playing** 22:19
**please** 2:4 13:3
13:21 47:22
157:12 172:11
172:11 266:17
**pocket** 66:7
**point** 22:21
54:20 75:15
90:6 117:8
127:14 129:4
130:4 144:7,8
144:21,22
156:13 175:20
176:20,21
182:9 191:10
191:10,16
196:1 206:16
206:18 222:3
222:20 223:9
224:1 237:20
251:16,18,20

**pointed** 137:6
177:18
**police** 21:11
23:20 24:11,19
33:13 35:5
56:6,10 58:11
58:21 61:14
62:18 63:1
64:1,11 68:3,5
68:14,22 69:2
69:7,16,18
70:1,14,20,21
71:10 72:18
73:21 75:22
77:6 79:20
102:18 103:18
147:15 148:9
149:16 167:6
171:21 182:20
183:10 184:13
185:1,17,20
186:15 187:2
189:20 195:3
201:7 227:3
229:11 260:22
286:1
**policies** 70:23
**policy** 73:20
128:17 161:8
**polygraph** 114:3
114:10,15,19
114:20 115:3
**pornography**
63:20,22
**portion** 15:21
16:8 19:6 42:4
42:5,12 43:2
43:19 59:18
68:11 102:6
110:6 118:8
174:3 202:17
217:6 232:8
238:7,22
250:20,22
279:10
**portions** 150:16

positions 77:14
possession 103:4
possibility 48:16
  48:17 69:7
  142:4,21
possible 194:12
  195:23 211:6
  212:15
possibly 79:12
  123:23 141:1
  175:17 261:11
POST 64:10
posting 225:2
potential 261:15
potentially
  261:8
practiced
  117:20
practices 147:12
  147:20,21
  148:7 160:2,9
  161:1 172:8,16
  172:21
predator 261:9
  261:16
preliminary
  176:1
premature
  112:1
premise 265:2
preparation
  60:23
prepared 17:16
  128:3 186:2
prescription
  83:13
present 10:2
  55:19 210:13
  215:11,15,18
  215:20 227:10
  228:1,2,5,7,9
presentation
  65:4 204:6,9
presented
  203:15 204:20
  206:4 207:1

278:2
presents 206:14
  206:19
pretended 203:6
pretext 47:19
  48:1,7 49:12
  49:14,21 50:13
  50:15 240:14
  240:17,21
  241:15 242:5,8
  242:12
pretty 99:22
  276:7
prevent 39:10
preventative
  39:10
price 37:9
prior 7:7 31:9
  35:21 142:14
  175:23 235:6
  261:1 271:11
  271:16 275:11
prison 257:7
prisoner 78:13
private 25:5
probable 190:18
  191:2,3,5
  266:8
probably 15:7
  20:3 40:8
  101:4 103:11
  132:3 243:20
  243:20 247:7
problem 143:8
  149:6 186:10
  194:7
procedure 2:20
  11:7 44:22
  45:5,9 128:17
  147:13,20
  149:15 158:4,8
  161:8
procedures
  26:14 45:13
  61:13 77:8,11
  100:23 147:22

148:1 158:19
proceeded
  265:10
proceedings
  11:16 289:5,11
process 182:17
  248:17 253:8
  257:2 262:4
processed 113:7
  177:7 254:11
  256:5 257:21
produced 29:12
  217:10
producing 20:4
  25:23
professional
  29:7 159:18
professionalism
  72:14
promise 46:7
  287:6
proof 194:15
proper 113:1,10
  116:17,19
  172:18 175:11
  266:13 267:13
  267:14
properly 178:9
  195:2,12 212:5
  231:10
property 250:12
prosecutor
  205:22
protection
  281:20
protocol 252:14
  253:3,10
  254:15 255:1,4
  255:7,8,10,10
prove 176:5
  269:20
provide 94:11
  95:11 171:13
  287:9
provided 140:19
  142:10 215:8

236:1
proving 268:8
  268:11 269:3
provision 150:7
proximity 52:17
public 5:22 6:8
  11:3 91:8
published 36:15
  36:16 96:10
  281:1
pull-over 248:1
punch 136:6
  279:12
punished 39:2,5
punishment
  39:18
pure 265:22
purported
  250:12
purpose 37:5
  67:10,11
  285:13
purse 179:17
pursuant 11:6
Pursuing 41:19
push 228:16
  239:1 279:12
pushback 238:9
  270:18
pushing 228:13
put 28:14 53:19
  55:3 64:14
  66:3,10 72:2
  116:2 152:6
  159:21 186:3
  213:11 229:22
  243:22 262:10
  271:7 275:8
  284:7
puts 59:6 65:20
  73:12 197:1
  222:14
putting 77:11

───────────
        Q
───────────
qualified 181:15

qualify 183:11
quality 98:8
  181:13
question 13:18
  13:20 14:1,14
  30:6 40:17
  41:12 45:7
  51:6 57:4,6,10
  59:21 60:9
  65:12 70:8,9
  78:1 82:13,16
  84:3,7 88:22
  90:16 103:16
  105:2 110:12
  110:18 118:20
  118:22 119:5,9
  119:11,18
  121:7 122:17
  125:19 131:4
  131:15 135:4,8
  135:15 142:5
  143:12 144:12
  147:17 151:20
  152:9,11,14,22
  153:3,5,13,19
  153:21 158:12
  161:4 167:17
  180:4,16,22
  181:9,18 183:9
  183:13,16,23
  184:20,22
  185:9,10,13
  186:21 188:17
  188:18 189:6,6
  189:7,8,11,16
  189:16 190:5
  198:14 201:17
  208:20 210:16
  210:17 212:14
  214:9 215:14
  215:22 216:20
  216:22 217:2
  218:19 231:17
  231:20 232:3,4
  232:23 233:20
  234:16 235:5

239:20 240:1
243:12 245:6
246:12 247:20
255:19 265:4
266:21 268:14
268:16 270:22
271:15 275:16
277:13,23
278:5
**questioned**
113:14 120:20
211:17 231:10
**questioning**
83:21 84:6
102:4 195:18
230:9 235:22
236:7 238:23
265:21
**questions** 7:2,3
13:10 14:23
30:11 37:8
80:10 117:22
124:15 140:4
148:4 152:2
154:10 165:18
177:12 180:11
180:12,18
184:9 185:18
186:3,8 195:17
230:13,13,18
231:9 237:9
238:4 239:17
239:18 240:6
247:8 264:14
265:17 267:15
275:6 282:14
287:23 289:6
**quick** 114:8
171:1 178:21
276:17
**quickly** 120:12
**quit** 152:7
**quite** 165:9,17
272:21 286:3
286:15
**quote** 242:20

243:8
**quoted** 243:4
246:4
**quotes** 153:15
279:22
**quoting** 245:8

_____
**R**
**R** 1:16 2:1 5:3
5:11 6:5 9:1
11:13 12:16
**ran** 23:10
**random** 72:15
**range** 72:6
**rank** 62:23
122:8,11
**rape** 38:14,21
76:11,21 77:16
78:4 80:16,19
82:6,19,20,23
83:3,16,18,23
85:20 86:2
91:18,22 92:10
134:22 137:16
139:1 146:17
170:8,13 178:7
202:9 207:12
209:7 222:18
239:2
**raped** 38:1
135:19 164:16
180:2
**rationalizing**
242:19
**Ray** 13:5
**re-enters** 202:10
**re-sharing**
155:1,6
**reach** 207:8
**reached** 39:7
**reacted** 129:9
**reacts** 240:2
**read** 2:4,22 5:4
12:23 37:22
59:19 68:9,12
79:23 96:9,21

97:5,7 102:3
102:10 103:22
110:7 111:4
118:9 172:12
187:17 202:18
213:12 214:7
217:7 223:19
227:18,21
232:9 233:10
234:12,13,17
234:19 235:6
236:9,9 242:22
243:2 248:19
252:21 266:16
266:19 268:18
268:21,21
269:1,7 279:10
279:10
**reading** 1:22
6:16 59:17
96:18 97:12
110:5 199:1
223:17,18
230:5 234:9
242:14 248:20
**reads** 190:20
**ready** 29:23
214:12 230:7
233:12
**real** 75:1 170:23
172:19 276:17
**reality** 266:15
**really** 72:16
94:7 105:1
106:12 134:13
153:20 178:12
196:7 208:1
219:3 221:15
229:10 264:11
**reask** 218:18
**reason** 55:17
66:19 107:1
193:10 205:18
215:17 272:18
**reasons** 14:19
**Rebecca** 226:19

**rebut** 111:15
112:6
**rebuttal** 111:2
**rebutting** 111:7
111:23
**recall** 97:14
103:22 106:23
107:7 139:11
139:11 180:18
201:11 213:22
223:16 242:14
**receive** 2:21
33:21 50:12
55:9 57:13
59:12 76:10
91:6 113:10
257:13,15
**received** 95:19
121:15 198:6
223:6 242:8
254:21 257:16
**receives** 53:13
196:9
**receiving** 109:21
**Recess** 93:17
166:12 221:19
264:4 282:10
**recognize** 52:10
98:16
**reconstruct**
267:19
**reconstructed**
266:14
**record** 11:20
12:7 13:4 14:5
14:8,11 61:6
93:16 95:10
98:18 105:1
109:10 152:7
166:11,14
221:18,21
264:3,6 280:11
280:12 282:9
282:12 285:23
288:2
**recorded** 17:23

48:12 245:12
**recording**
242:18,20
243:17 244:8
244:15,17
245:13 249:13
271:12,17
**recordings**
94:20 249:21
**records** 197:18
**recount** 125:15
**recounting**
202:3
**red** 169:9,18
**redo** 72:7
**reduced** 289:7
**reference**
109:13 150:18
172:7
**referenced**
230:11 283:8
**referencing**
214:19 254:17
**referring** 34:11
128:2 214:15
223:12 235:1
283:23 284:2,5
**reflects** 99:22
**refractive** 44:17
86:17
**refresh** 103:5
150:10
**refused** 265:16
**regains** 145:3
**regards** 84:17
241:15
**regional** 71:6,12
72:1,20 76:2,4
**regular** 35:7
**relates** 216:11
**relating** 6:20
**relation** 204:20
**relatives** 61:22
**relaxer** 209:8
**relaxers** 83:14
**relay** 108:8

**relayed** 127:17
  127:19
**relevant** 115:23
  150:16 156:19
  174:1,19 219:7
**relied** 94:13
  95:5 100:17
**remedies** 41:20
  42:13
**remember** 16:6
  16:10,14,23
  17:4,11 18:22
  19:8 20:18,19
  20:22 21:5,7
  22:23 25:6
  27:9,17,18,21
  37:16 38:2,3
  40:12 45:4
  49:5 50:18
  55:13 61:20
  66:11,14 67:8
  87:21,22 88:2
  88:16 96:23
  103:7,12 106:7
  107:18 108:5,6
  109:7 139:12
  139:18 145:2
  150:6 161:21
  179:11 201:11
  207:18 214:21
  214:23 220:2
  222:9 223:16
  223:17,18
  244:12 248:15
  248:21 284:14
  287:2,3
**remembered**
  199:3 207:19
**remembering**
  86:18 145:6
**remembers**
  133:6 199:4,19
  199:20 211:9
**remove** 190:21
**rendered** 282:18
**repeat** 13:19

88:21 170:11
**repeatedly**
  233:5
**repeating** 89:9
  118:7 217:4
  232:7
**rephrase** 40:20
  57:11 70:9
  167:12
**rephrasing** 78:1
**report** 8:12 17:6
  17:7,20 19:13
  19:21 20:2
  21:9,10,12
  25:18 26:5
  27:1 31:6
  32:23 34:15
  35:3 61:4,9,17
  94:13,17,21
  95:2,5,17,20
  95:22 98:20,23
  99:16,21 100:1
  100:6,10,19
  101:16,18
  104:1 106:5,19
  109:15 111:4
  111:10,12
  112:8,16
  122:21 125:9
  127:22 128:2,3
  128:7 134:19
  146:4,8 155:19
  155:21 163:15
  164:19 165:17
  166:16 171:11
  171:13 173:13
  174:12,15
  187:23 188:3,5
  199:1 200:10
  202:1 203:13
  207:5 218:11
  218:23 221:23
  223:21 264:12
  266:11 268:3
  281:6,9 282:19
  282:20,22

283:8,10,14,20
**reported** 93:19
  207:14 249:7
**reporter** 1:20
  6:7 10:3 11:2
  12:8,19 14:4
  59:19 68:12
  74:12 110:7
  118:9 202:18
  217:7 232:9
  263:21
**reporting** 2:17
  6:9 9:4 10:6
  11:9 21:13
  31:19 35:13
  53:2 169:19,21
  173:4
**reports** 17:21
  61:8 125:8
**representing**
  13:7
**represents**
  289:10
**request** 205:7
**requested** 59:18
  68:11 110:6
  118:8 202:17
  217:6 232:8
**require** 72:19
**required** 73:1
  252:15
**research** 35:16
  35:22 36:1,5
  36:14 80:16
**reserve** 286:7
**residence**
  199:23 220:6
  220:11,13
  246:2 249:22
  251:4 261:2
  263:8 271:13
  271:19
**resist** 171:12
  235:17 236:21
  280:2
**resistance** 78:7

78:20,21 79:10
  79:11,17 80:1
  228:17 231:3
  238:10 268:1
  269:23 276:1
  276:10,18,20
  277:14,18,19
  277:20 278:4
  278:15,19,21
  279:8,20
**resistant** 228:9
**resisted** 230:10
  231:16 267:4
**resisting** 227:9
  227:23 228:5,6
  231:12 270:11
**respective** 6:4
**respond** 51:22
**responders**
  76:16,18
**responding**
  112:17
**responds** 240:3
**responses** 51:3
  51:17 54:7,15
  56:9,14
**responsibility**
  146:14
**responsible**
  77:10 149:20
  156:2 158:1,21
  167:4
**rest** 31:15 187:7
  188:1 195:22
  233:10 236:9
**results** 289:16
**retained** 286:16
**retired** 55:16
**retrieved** 109:3
**return** 2:15,23
**revenge** 63:20
  63:21
**review** 28:16
  29:18 101:2
  102:17 104:15
  107:22 144:2

150:3 199:16
  212:18 218:3,4
  224:16,17
  268:16 280:14
**reviewed** 60:22
  61:8 100:14,21
  102:23 103:11
  105:22 107:9
  109:2,2,22
  110:9 144:9,14
  144:22 150:20
  153:22 154:17
  155:10 200:4
  214:16 223:22
  241:14 245:9
**reviewing** 101:8
  103:13
**ridiculous**
  153:18 253:11
**right** 3:3 18:7
  19:16 20:19,21
  21:11 26:10
  29:10 34:8
  37:16 38:2,4
  38:12 41:13,14
  43:9 45:23
  51:16 54:12
  62:18 63:6
  70:19 74:3
  77:2 79:9
  83:19 84:20
  86:3 92:1 93:5
  93:20 98:10
  100:6,12 104:4
  107:19 109:1
  109:10 111:22
  119:1,2 122:12
  130:10 133:23
  136:6 139:7
  142:18 143:19
  147:10 150:13
  153:15 154:18
  155:9,11
  157:11 159:5
  161:16 164:7
  171:10 172:5

172:17 176:15
182:23 183:4
185:1 186:1
190:15,23
195:7 200:9
203:18 204:2
204:17 206:12
207:4 209:5,12
215:6 217:9
221:22 223:8
227:14 229:3
234:1 235:10
237:11 245:9
246:8,9 248:15
256:8 260:9
264:12 269:9
272:23 277:1
279:18 285:11
**rights** 102:3,10
**rise** 51:1 267:23
275:23 276:19
278:21
**Ritchey** 8:4 9:6
9:8 12:9,9,21
13:2,6 14:18
19:18 20:12
26:4,10 28:22
29:10 30:8
37:17 41:7,13
43:9 45:12
48:3 51:8,12
51:16 54:12
56:19 57:12
59:9,16 60:2
60:10,22 61:12
64:19 65:14
68:9 70:3,11
71:17 73:3
74:14 75:17
76:3 77:2 78:2
79:9 80:9
81:15 83:2
84:8,16 86:3
86:23 88:16
90:14 91:14
92:1,16 93:5

93:14,20 94:8
95:18 96:17
99:2,10,14
102:14 103:12
105:13 106:7
109:14 110:4,8
110:19,23
115:4 118:6,16
119:1,6,12,19
121:4,12,18
122:18 123:3,8
125:23 128:21
131:6 135:11
135:16 144:8
144:12,21
146:12 148:6
151:2,7 153:8
153:14,20
154:15 155:9
157:14 159:2
160:8 161:12
164:18 165:8
165:16,23
166:8,15 168:2
168:16 170:10
172:14 174:4,6
174:13 175:3
180:7,19 181:4
181:23 183:12
183:17 184:6
184:11 185:3
185:14 186:5
186:18,22
188:9,14
189:14,17
190:22 192:2
195:8 198:5,17
199:6,15
201:23 203:1
204:11 206:11
211:13 212:18
213:1 214:10
217:3,9,19
218:15,21
220:16 221:3
221:12,22

222:17 223:8
224:16 227:13
227:19 229:1
229:20 230:6
230:20,23
231:15 232:6
233:3,11 234:1
234:13 235:9
235:10 237:5
238:15 243:5
244:1,13 245:7
245:17 246:13
247:6 248:3
249:3 250:6
252:9,22 255:9
256:1 257:22
258:9 260:4
261:3 263:14
264:7 265:8
266:10,22
268:13,23
271:16 272:10
275:18 276:19
278:7,10 280:7
280:13,23
281:13 282:3
282:13 283:5
283:19 284:9
287:20
**Riverdale** 74:5
**road** 100:5
162:15 286:7
286:12
**Robert** 111:3
**Rohypnol** 83:5
93:2
**Rondini** 96:11
102:10 106:15
107:18 113:4,8
113:11 124:20
125:4,11,13
126:4,23 127:5
128:13 129:14
131:1,17
133:18 135:3
136:12 137:5

137:21 138:16
139:5,22 141:6
141:21 142:13
142:15 143:18
144:4,16 146:5
156:9 164:16
174:21 175:8
175:18 177:11
178:10 182:20
183:6 184:13
185:16 186:13
186:23 189:18
195:3 200:2,16
200:21 201:9
201:14 202:4
212:8 214:1
216:11,16
217:21 219:13
226:18 231:16
233:14,17
236:1 237:13
254:8 258:1
261:17 264:9
264:17 266:13
272:22 273:11
275:3 276:21
277:9 280:16
281:15 287:12
**Rondini's** 109:4
112:13 123:18
125:15 126:6
129:2 135:12
141:2 163:6
198:9 209:22
221:6 222:21
229:23 231:23
234:8 235:13
250:10 268:12
269:3 275:21
**room** 22:16 23:1
23:2,7 43:15
47:11 139:3
159:21 179:13
202:10,12
203:4,6,10
246:18 267:7

**roommate** 22:17
23:10
**roundtables**
148:20
**route** 220:6
**rude** 277:1,2,15
**rules** 2:19 6:20
11:6 13:12
**rummage** 248:9
248:13
**run** 141:11
197:11 279:3
**running** 33:9
36:10
**runs** 23:6
**rushed** 116:10
116:11
**Russell** 54:16
55:1,23 56:12
198:4

---

**S**

**S** 6:1 9:1
**s/** 289:19
**safety** 23:9
**said/she** 50:6
**saith** 288:6
**salary** 57:8
**sample** 123:15
129:18,21,23
155:16,17
157:3,18
223:11,13
**samples** 147:3
149:22 175:1
258:14
**Samuel** 20:17
**San** 16:13,14
18:11,13 21:2
23:19 24:10,19
25:1,2,4 26:12
30:16 33:12
35:6 38:14
41:11 56:6,10
62:17 63:1,23
68:3,5 69:1,16

69:18 70:14,21
71:9 72:18
73:20 74:17
76:2,3 77:6
78:17 79:20
128:10 146:15
146:19 147:8
147:15 148:8
149:16 158:15
160:17 171:21
**SANE** 128:13,14
252:16 257:23
**SART** 258:8
**sat** 55:4,8
148:15 191:19
267:7
**saw** 33:19 154:9
213:20 248:23
**saying** 43:15
97:2 100:3
103:20 106:5
112:1 118:1
122:21 126:1
131:20 138:4
140:21 141:16
142:4 143:7
149:7,8 155:18
155:20 156:10
176:19 181:4
192:9,11,16
194:16 198:16
206:3,5,22
207:3,16
210:19 216:8
222:22 227:22
228:5 233:8
236:4 238:19
245:17 246:20
249:10,12
251:2 256:23
261:1,15 262:8
279:15 280:2,4
**says** 40:23 41:6
104:4,11
105:17,18
109:1 125:9

149:23 162:15
162:17 165:13
192:13 199:19
200:15 205:17
207:11 212:5
225:10,23
227:7 232:19
236:16 248:1,8
252:13 255:10
259:18 266:12
268:9 272:3
276:14
**scale** 225:11,11
**scared** 129:8
162:8 281:22
**scene** 49:4,7
117:3,6 120:3
120:10 160:21
193:6,23
194:20 249:7
254:8,8,9
256:12,22
257:18
**scenes** 194:17
254:10
**school** 23:9 24:6
24:10,13,18,23
25:5 28:2
38:23 39:7
74:4,5 75:4,12
253:22,23
**school's** 23:18
**schooling** 75:19
**scientific** 35:16
50:3 253:9
**scientifically**
176:4
**Scotch** 9:6 12:9
13:6 30:4
40:20 41:12
51:15 61:6
80:5 83:21
91:12 98:23
102:22 110:2
110:11 125:22
153:4 154:23

157:8 165:7
183:20 185:13
188:7 189:5,13
220:18 230:22
232:5 245:5
263:11
**screamed** 279:4
**screen** 28:12,14
105:17,18,21
106:2,3,8,9,14
107:4 154:19
**screw** 44:1
**scroll** 28:15
29:23 30:1
58:23 99:3
100:15 104:9
111:1,18
150:17 151:9
151:11 195:13
214:11 226:16
242:15 248:4
258:10 261:5
268:5
**scrolling** 227:5
234:5 240:12
248:3 258:9
**seal** 5:19
**search** 113:6
177:15 178:1
191:15,20
192:8,14,17,20
193:3,3,15
244:23 249:6
254:6
**searched** 66:16
191:21
**Seattle** 160:18
**second** 14:1 18:8
18:9 123:4
124:5 143:16
150:11 182:21
183:7 189:4
194:9 201:6
207:10 218:17
222:2 227:6
233:4 242:16

249:4 252:12
264:8,9,14
269:13 272:2
**secondary** 75:19
**secretions**
175:17 222:16
**secretly** 92:14
92:17
**section** 111:2
207:6
**secure** 252:16
**see** 30:20 31:11
41:22 51:12
57:18 58:8,20
59:1 67:12
85:10 93:1
99:8 104:13,21
105:11 123:7
124:9,13
137:15 152:19
152:20 153:7
166:21,22
172:9,13
175:12,15
180:20 192:10
200:7,17 202:6
203:19 206:21
218:2 224:7
225:18 226:21
252:18 261:12
261:14 265:23
279:12 282:5
**seeing** 107:7
266:5
**seek** 64:1,8,22
**seeked** 64:20
**seen** 53:10
127:23 128:5
136:20 243:10
247:13 287:18
**sees** 162:14
**seminar** 41:10
**send** 205:6
206:18
**sending** 109:21
**sense** 31:15

32:10 68:18,19
90:13 118:15
118:17,22
119:4,7 160:14
205:19 220:15
**sent** 56:8 94:17
94:20,22 95:8
95:14 147:23
205:2,5 206:2
206:6,23
**sentence** 207:10
214:7 215:6
227:22 233:4
235:1,11,19
238:16 240:13
243:22 248:7
250:7 251:7
252:12 266:11
266:23 268:9
268:17,21,22
269:1,7 272:2
**sentences** 225:9
**separate** 148:4,4
176:18
**separated** 87:3
**separately** 5:8
**September**
38:12 58:4,20
59:1
**sergeant** 45:14
122:13
**serious** 258:18
258:21
**seriously** 259:23
**Service** 6:9
11:10
**session** 55:18
**set** 40:7 70:22
71:1,5 136:7
160:2,9,23
**setting** 170:19
**settled** 18:2
**seven** 238:12
**severely** 22:14
41:2 44:16
86:16

Carlton Hershman                                    3/16/2021

Page 316

**sex** 30:17 32:4
33:12,23 39:8
49:6 50:10
63:5,8,16
64:12 66:1,1,6
66:18 67:2,17
69:5 72:11
73:7 119:17
171:19,20
175:19,22
176:2 198:2
201:5 233:6,15
235:14 253:15
261:23 267:3
270:6
**sexual** 18:20
23:13 24:15
31:3,9,17
36:12 39:10
40:14 41:1,18
41:20 42:2,7
44:9,12 46:10
46:16,17 51:3
51:18 76:11,21
79:2,12,13
80:17,20,23
81:17 84:10,17
101:20 112:13
128:7,18 133:9
134:22 148:21
168:16 169:6,7
169:10,16
170:8,13
172:19 174:20
174:22 175:4,7
175:9 182:11
200:16 201:15
202:9 203:14
204:18 216:17
225:16 238:6
240:10 250:19
250:22 251:5
252:14 253:3
253:14,15
254:16 255:11
256:4 257:5,8

261:9,16,21
**sexual-based**
197:16
**sexually** 18:17
31:21 81:8
191:8 197:17
237:3 273:12
**share** 28:11
**She'll** 205:12
**sheet** 2:7,10,13
2:16,23 4:1
**sheriff** 35:6
**Sheriff's** 109:5
**sheriffs** 71:7
286:2
**shirt** 177:19
179:15,22
180:1 197:2
248:1
**shoes** 29:9
**shooting** 259:19
**shoots** 72:6
**short** 23:8 32:12
42:14 89:7,18
94:23 179:3
180:13 181:6
181:20 282:7
**Shorthand** 6:7
11:2
**shortly** 29:4
271:19
**shorts** 177:22
**shot** 38:1
**shots** 22:20
85:14,17
105:17,19,21
106:2,3,8,9,14
107:4
**shoulders** 263:1
**show** 78:22
79:11 98:10
103:2,10 108:9
131:21 132:22
133:2 150:22
150:23 151:3
151:16,21,22

151:22 153:13
153:18 154:11
175:6 212:19
219:20 221:5
221:23 222:10
**showed** 177:23
**showing** 29:11
150:13 151:18
192:17 193:22
217:10,18
**shown** 79:4,7
142:12 222:18
**shows** 79:1
131:20 132:6
132:11 133:3
135:20 145:10
145:17
**shut** 172:22
**side** 23:18
117:23 118:1
**sign** 2:5,10,22
157:13 252:7
**signature** 6:15
**Signed** 289:17
**significance**
135:17
**signing** 1:22
2:12
**similar** 79:16
**simple** 36:13
179:16
**simply** 207:12
258:17
**sir** 27:2 34:21
38:7 41:9
50:21 56:7
95:23 101:9
102:4 104:8,17
121:9 138:4
139:12 141:20
142:4 150:9
156:22 161:5
183:3 185:6
192:7 198:15
202:7 204:4,16
206:15 212:1

215:12 220:15
221:8 223:18
224:8 226:22
229:3,19
233:23 237:10
241:16 243:3
243:10 244:5
246:17 248:22
250:15 272:9
273:19 279:13
286:6 287:4
**sit** 39:20 65:4
85:1 100:8
147:5 148:19
178:23 262:4
271:5
**sitting** 13:8
87:21,23 100:6
115:22 173:10
232:21 267:8
**situation** 31:16
86:15 116:3
239:10 277:8
**situations** 87:20
**six** 91:5 116:13
145:12 268:4
**size** 145:19
**skills** 72:7
**skipped** 195:7
**skirt** 90:15
**slash** 30:18,22
**sleep** 52:21
102:8 185:16
186:14 187:1
189:19 195:21
**sleeping** 185:23
**slightly** 110:13
**slip** 83:15 213:2
213:5
**slipped** 92:19
**slipping** 213:7
**Slovakian** 16:19
**slowly** 52:12
**slurred** 143:23
**slurring** 85:8
141:4

**small** 151:6
197:11 209:17
274:12 279:10
**SMITH** 1:11
**snippet** 243:22
**sober** 132:4
216:9 259:11
259:16
**sobriety** 135:22
**social** 224:4,9,17
224:20 225:3
**sofa** 267:7
**solving** 268:7
**somebody** 18:21
31:21 41:2
47:3 51:20
53:5 54:1,1,3
55:6 78:11,14
82:1 85:15
87:9,13 108:21
115:2,2 126:14
132:7 140:2
187:18 194:2
205:8 213:2,7
225:22 226:9
228:9 240:2
256:4,11,15,22
257:17 259:4
259:12,18
261:22 262:18
263:10 284:13
**somebody's**
213:8
**soon** 157:9
251:10 254:1
**SOP** 24:5,8
101:17 102:18
102:21 150:22
151:13,16,17
151:18,22,22
152:11,14
153:5,7,9,13
153:13,14,18
153:19 154:2,7
154:10,11,11
155:14 242:13

**SOPs** 101:3,8,15
  103:15 154:9
**sorry** 16:12
  18:19 24:7
  29:20 36:6
  38:20 42:22
  43:6,10 49:17
  50:23 51:5,11
  51:15 58:17
  59:13 65:13
  66:5,13 68:6
  76:22 77:20
  81:10,22 88:22
  97:3 101:11
  104:11 109:3
  110:1 111:20
  114:12 115:5
  116:8 118:5
  119:4 122:11
  122:18 123:1
  125:18 128:21
  144:13 151:6
  162:6 166:5
  170:10 171:4
  174:5,13
  192:12 195:5
  202:13,14,20
  211:14 213:16
  215:12 216:1
  217:5 221:15
  230:23 231:2
  232:2 239:3
  243:12 245:2
  247:5 248:7
  255:2 260:15
  260:20 268:13
  268:15 269:6
  272:17 279:15
  280:22 281:11
  283:3 284:9
  285:18
**sort** 161:15
  240:23
**sought** 212:8
**sound** 110:20
**sounded** 249:15

249:16
**sounds** 93:14
  185:19 238:3
  247:11
**South** 2:18
  58:19
**space** 110:14
**speak** 15:22,22
  55:20 67:1,1
  156:9 226:20
  226:23 256:7
**speaker** 36:17
**speakers** 65:17
**speaking** 65:1,3
  65:15 67:7
  143:23 148:14
  168:22 225:13
**speaks** 146:8
**specialty** 69:8
**specific** 43:7
  49:17 73:9
  76:14 135:11
  214:18 283:14
  284:2
**specifically**
  214:15,22
**speculate**
  180:23 181:3
**speech** 85:8
  141:4 143:23
**spell** 45:21 46:5
**split** 120:5 121:5
  269:22
**spoke** 16:1 25:9
  35:10 150:8
  174:19 219:8
  271:18 275:10
**spoken** 139:21
  226:18 271:10
**sport** 285:17
**spread** 75:6
**staff** 123:13,22
  125:2 126:2
  127:16 140:19
  141:17
**stalked** 18:10

21:13
**stalking** 21:12
**standard** 26:14
  54:5 68:17,21
  77:7 100:22
  127:20 147:1,9
  147:10,12,20
  147:21,23
  149:15 157:16
  157:19 158:4,8
  160:22 169:3
  252:14 253:3
  253:11,17,20
  254:15 255:10
**standards** 64:11
  71:6 149:1
**standing** 61:13
  106:10
**start** 44:20 45:1
  83:2 85:16
  86:21 136:5
  160:19 173:1
  187:7 198:15
  214:6 220:12
  239:3,8
**started** 32:17,22
  114:8 237:13
  244:16 245:13
  246:9,16
**starts** 166:19
  234:7 236:20
  238:9,11,14
  273:22
**state** 6:8 11:4
  13:3 25:2
  38:14 59:5
  61:22 73:19
  74:2 108:4
  132:6 152:23
  179:7 180:10
  180:18 181:10
  181:14 197:8
  221:6,10 241:5
  241:17,19
  257:7 267:2
  286:2 289:2,22

**stated** 43:20
  64:12 97:1
  111:22 162:19
  201:3 275:22
  278:11 287:15
**statement** 17:17
  111:15 115:21
  116:5 126:6,23
  127:3,6 145:7
  161:19 167:22
  168:13 191:7
  234:8 259:18
**statements** 16:1
  17:22 35:11
  48:18 117:7
  141:15 153:1
  168:10 173:6
  191:22 230:1
  230:11 231:23
  232:14,17
  235:13 260:5,6
  260:22 275:21
**states** 1:1 12:1
  111:12 148:13
  196:16 221:10
  238:7 262:22
  278:20
**stating** 41:1
  167:21 241:13
**station** 182:20
  184:13 185:1
  185:17,21
  186:15 187:2
  189:20 195:4
  201:8 227:4
  229:11 252:6
  260:22
**statute** 46:18
  78:6,7,9,20
  79:17
**stay** 21:15 67:3
  67:5
**stayed** 65:16
**steal** 158:16
**stealing** 163:12
**stenotype** 289:6

**Stephanie**
  280:15,23
  281:14
**sticking** 87:2
**stints** 63:5
**STIPULATED**
  6:2,14,22
**stipulation** 11:8
**stipulations**
  12:20
**stole** 47:3
**stop** 93:6 186:1
  218:16 232:3
  252:7 281:12
**stopped** 18:22
  75:9 185:22
  251:4
**stopping** 250:19
**store** 62:13
**story** 153:10
  209:19,21,23
  274:21,22
**straight** 283:16
**Strand** 54:17
  55:1,23 56:12
  198:4
**strange** 133:8,17
  134:21
**street** 9:21 23:7
  219:23
**student** 22:13
**studies** 35:16,22
**study** 31:1,2
**stuff** 22:8 36:13
  71:1 95:8
  145:20 147:6
  188:2 194:4,5
  209:9 220:9
  286:4
**stumbling**
  108:20
**stupor** 260:2,3
**subheading**
  207:7
**subject** 2:12
  34:3 36:18

62:20 69:11
70:4
**subjects** 36:2
93:7 242:3
**submit** 183:6
**submitted**
203:22 204:7
204:15
**subscribed** 5:16
**substances**
83:23
**success** 170:8,13
**sue** 25:11,12
**suffered** 52:11
54:2 129:3
179:9 226:9
**suffering** 196:20
**sufficient**
173:15 208:10
208:13 210:4
**sufficiently**
207:8
**suggest** 213:13
**suggesting**
131:7
**suing** 19:1
**super** 256:17
**superior** 122:15
**superiors** 64:3
**supervision**
289:9
**supervisor**
77:14
**support** 101:16
101:17 190:17
191:1,5,9
**supposed** 104:6
113:17
**supposedly**
164:14
**sure** 28:18 30:6
30:7 40:17
67:20 80:9
82:8,9,11
89:11 90:14
99:2 104:3

111:19 118:23
125:23 147:2
150:12 155:16
156:6 158:18
188:10 198:21
214:10 217:19
242:23 250:18
251:18 257:13
276:7 279:1
282:16 284:13
285:6 286:14
286:15 287:10
**surroundings**
284:18
**surveillance**
105:20 211:18
**suspect** 16:1
23:16 31:7,10
48:10,17 85:4
85:16 102:5
116:5 117:15
120:9 168:23
202:11 203:10
253:5 257:1
264:23 273:6
274:14,19
**suspects** 49:10
169:1 225:1
**swab** 156:12
175:12,14
176:9
**swabs** 147:4
149:3 175:11
**swear** 12:8
**switch** 80:11
**switches** 237:1
**sworn** 5:16
12:17 24:13
**system** 30:17
130:3,5 131:17
258:16

——————
**T**
**T** 6:1,1 204:10
204:12,19
**tab** 36:10

**tactic** 118:4
**tag** 249:5
**take** 13:14 15:23
20:6,9 23:14
24:21 26:2
33:4 75:4 80:8
84:5 92:23
93:3,8,11,12
98:5 117:6
126:5 146:14
150:1,2 164:20
165:4 166:5
221:1,13
223:10 225:15
234:15 243:21
263:16,22
267:9 282:6
283:17
**taken** 6:6 80:12
93:17 146:3,13
146:22 147:3
149:22 155:17
163:20 164:14
166:12 175:12
209:6 221:19
264:4 282:10
289:5
**takes** 52:16,16
115:20 164:2
**talk** 42:14
108:21 121:1
127:21 138:11
147:5 148:1,16
148:20,21
167:8 181:16
192:4 196:15
208:21 210:20
210:21,22
211:5 245:23
262:5 264:8
274:10,13,14
**talked** 34:22
40:13 49:3
123:17,21,22
124:2,8 129:13
142:3 169:11

195:9 252:3
255:3 275:13
282:17 286:20
**talking** 35:19,20
43:7 45:4
53:23 54:2
65:9 67:13
70:1 86:8 88:5
103:15 108:14
120:8 125:7
127:16 138:6
140:18 144:20
148:7 149:14
150:7 151:14
153:9 154:5
170:19 206:12
207:17,20,22
219:17 222:21
225:20 229:14
244:18,20,21
244:22 245:3
245:22 246:3,5
246:19,23
247:9 252:2
266:7 268:7
277:17,18
283:13 285:1
**talks** 101:19
**target** 114:7
**targeted** 141:22
142:1
**task** 103:19
**tasked** 155:15
**taught** 38:13,18
39:13,23 40:11
41:17 44:7
45:1,11,13
47:16 48:6
50:15 51:1
55:2 56:1,3,20
117:19 118:3
118:12 121:4,8
147:7 198:3
**taxi** 124:16
161:14,18
162:3

**Taylor** 280:16
280:23 281:14
**tea** 37:10
**teach** 34:3 59:6
64:15 117:21
**teaches** 54:18
**teaching** 53:22
57:13 148:13
**teachings** 170:6
**team** 189:1
**teaming** 188:23
**technically**
98:22
**telephonic** 193:3
**television** 47:2
**tell** 29:22 33:1
33:15 46:5
47:21 53:17
90:12 93:9
96:20 101:21
130:1,2 136:10
144:4 159:22
164:15 167:10
167:12 175:4
176:7 178:6
180:1 182:15
200:22 209:19
210:5,6 211:16
211:21,23
219:12,20
221:11 234:14
236:17 250:14
256:1,16
265:10 270:7
274:16 275:5
285:7 286:9,12
**teller** 167:20
**tellers** 167:15
**telling** 33:6
75:14 209:21
209:22 210:1
231:4 259:12
260:1
**tells** 176:8
259:20
**ten** 93:13

**ten-minute**
93:12
**term** 36:22
37:13,20 90:5
90:7 147:13
201:9
**terms** 165:11
263:12 283:22
**test** 130:18
146:3,13,14
209:5 212:16
212:16
**tested** 23:15
113:16 123:15
129:18 130:22
158:3
**testified** 12:18
19:7 30:16
34:16 35:4
154:8 192:1
198:22 208:18
**testify** 31:18
159:10 201:18
205:14,23
**testimonial**
145:8
**testimony** 1:15
5:5 18:5 21:19
21:23 27:4
111:7,8 151:1
151:3,23
154:18 155:10
155:13,19
255:14 265:3
265:15
**testing** 129:23
149:2 158:22
174:23
**tests** 258:17
**text** 109:22
142:17 214:16
214:18 215:19
216:4,5,7
217:20 218:3
218:10,22
221:5,11

**texted** 215:2,4
**texting** 109:17
109:18 124:14
142:13,15
143:2 214:21
214:23 216:15
284:20
**thank** 12:19
151:8,12
195:14 221:15
**thanks** 93:11
110:22 202:19
**Thanksgiving**
287:16,17
**theft** 124:22
250:12 251:1
251:23
**themself** 277:8
277:12
**thereto** 7:7
289:7
**thick** 161:5
**thing** 17:16
31:19 33:7
43:18 46:14
68:17,21 87:22
91:11 117:12
117:16 121:10
127:21 130:20
144:1 149:9
158:20 159:23
162:11 169:19
177:2,17
196:19 199:2,4
199:20 209:18
211:8 216:6
232:13,19
239:21 243:21
255:3 257:3
259:15 268:18
277:10 287:15
**things** 22:22
29:3 31:6,14
31:14 32:14
33:18 39:19
45:10 52:3,8

53:8 67:2,3,4
81:13 94:16
101:20 109:12
112:23 116:15
117:5 120:11
124:18 125:5
130:18 132:14
132:15,17
133:8,12,17
141:7,12
142:14 156:20
159:14 163:1
169:3,8,11,13
171:17 173:13
174:16 179:4,5
179:10,12
194:12 197:4,7
197:13 216:8
219:16 225:2
229:6 249:2
252:3 253:20
256:12,17
257:9 259:10
267:10 271:4
274:15 283:12
**think** 23:13
27:12 34:14
35:9 37:14
38:10 39:17
40:4 43:15
60:14 61:16,18
62:14 66:16
67:20 68:13
75:15 76:9
77:5 82:12,15
89:3,11 90:6
90:10 93:6
94:2,5 99:8,13
99:20 100:5
101:15 103:9
104:2 107:2
108:8 115:19
119:19 121:22
131:20 135:2
136:11 137:17
139:2,13

143:16,20,21
146:23 149:5
160:16 162:1
163:14,17
164:17,18
165:8,12
168:11 169:4
171:9 174:6
180:17 185:5
186:9,9 188:14
188:20 195:8
198:21 199:17
199:17,18
201:21 212:23
213:21 220:16
221:4 223:17
228:8 230:14
231:19,20
232:11,11
233:2 234:2
240:8 245:6,16
251:16 259:2
260:21 265:9
266:1 270:15
271:18 272:6
272:18 276:21
277:13 278:17
278:20,22
281:18,21
284:23 286:6
287:20
**thinking** 133:4
168:9 181:1,17
237:7 239:15
266:5 267:17
267:19,22
286:3
**thirty** 2:20
**Thompson** 9:19
12:15
**thorough**
112:11 134:18
**thought** 72:22
147:9 181:21
182:6,6 205:15
269:7 271:21

286:23
**thousand**
141:12 159:21
**threatened**
203:9 281:16
**three** 171:17
185:14 187:6
211:10 216:5
235:7 254:9
**three-day** 18:14
65:2
**tier** 124:5
143:16
**time** 7:5,6 12:5,7
14:2 28:13
29:7 32:8,11
32:12 37:11,14
45:14 52:13
55:15 68:22
71:3 74:22
75:5 87:5 89:7
89:8,19 94:18
94:23 106:1
107:17 114:10
114:15 129:4
130:4 131:1
136:20 144:19
164:21 165:1
165:15,21
171:2 180:13
182:9 188:10
189:21 190:6,7
190:9 191:11
191:16 192:22
194:9 196:16
200:14,15
201:2,6 202:2
204:14 208:8
208:10 214:3
215:11,16,21
220:5,9,13
221:7 227:20
243:11 245:15
245:16 258:1
264:17 266:16
266:19 267:17

267:20 268:16
271:2,16 284:3
289:12
**timeframe**
37:16 204:23
205:3
**timeline** 200:11
**times** 15:6
175:21 183:10
199:18 201:1
270:23 275:22
283:21
**timing** 165:12
240:1,3 263:12
**tird** 189:3
**tired** 196:3
269:8
**today** 14:20 15:1
37:6 93:23
100:8 110:14
283:1,8
**Today's** 12:4
**told** 17:15 75:21
119:16 121:12
125:2,5,12
126:3 134:7,8
143:17 144:23
157:17 164:1
167:23 188:13
189:7 200:19
200:21 201:1,4
216:21 233:5
255:11 267:11
**tone** 240:1,4
**tool** 241:11
**tools** 172:8,16
**top** 67:3 112:9
150:9 161:19
195:6 213:23
240:12 258:12
**topic** 45:18 80:6
80:7
**topics** 36:2
**totally** 37:5
220:19
**tournament**

285:16
**town** 261:9
272:4
**TOWNSEND**
9:7
**track** 32:22
33:18 87:5
**tracking** 34:7
**traditional**
226:11
**traditionally**
226:4,6
**train** 34:2
255:16
**trained** 33:17
119:2,3,13,17
119:23 156:5
167:2 225:14
226:14 256:1,2
256:3,6,10,13
256:14 257:11
257:23 258:8
**training** 32:7
33:21 34:5
39:9,21 49:11
50:12,20 51:22
55:3,7,8,10,18
56:9,13,14
59:12 60:9,16
64:2,3,5,8,11
64:13,20 65:6
65:19,20,23
66:15,23 67:14
67:15 70:22,23
71:5,11,19
72:1,16,20
73:2,9 76:10
76:20 91:6
118:18 121:14
121:15 122:2,6
167:5 170:3,7
170:12,18,20
170:21 173:9
198:7 242:8
254:18,18,21
255:16 257:14

257:14 285:6
286:10
**trainings** 148:16
170:6 173:10
173:11 286:4
**transcript** 5:4
29:17 98:15
218:8 289:7,8
289:10
**transfer** 178:2
222:15
**trauma** 52:11
53:6,13 54:2
55:7 129:3
179:9 196:8,20
226:9 256:15
**trauma-based**
196:7 197:20
198:7
**trauma-infor...**
51:3,17 54:7
54:15 56:9,14
**traumatic** 51:23
**travel** 148:12
261:9
**traveling** 199:8
286:5
**treat** 101:19
**treated** 102:5
168:17
**TREMAINE**
9:14
**Trevor** 10:5
**trial** 7:5 17:9
22:3 28:7
99:18 176:1
282:20
**trials** 15:10,10
**trick** 184:4,7
**tricking** 99:9,11
184:9
**tried** 252:6
279:3
**trip** 273:15
**trouble** 40:3
**true** 5:5 168:3

183:23 226:1
276:8 289:10
**truth** 96:20
113:21 134:1
167:15,20
168:1 176:15
176:16
**truthfully** 14:19
**try** 50:22 154:15
154:23 155:5
166:2 176:14
184:3 192:10
227:13 245:7
**trying** 14:10,11
20:18 88:19
90:15 109:16
150:22 152:5
184:6 186:19
188:12 228:4
228:11,12,15
228:16,18
229:13 230:15
237:1,2 246:15
268:15 269:20
270:7,8 271:4
284:3
**tunnel** 196:12
**turn** 69:9
**Tuscaloosa** 6:9
6:11 9:4,10
10:4 11:10,11
61:14 97:21
98:2 100:21
102:17,21
103:18 109:4,5
115:5,7 258:1
280:14 289:3
**twice** 127:4
**two** 15:13,14
22:17 47:10
48:9 61:19
63:5 65:2 75:5
75:8 91:4
94:19 96:4
99:20,23
103:15 111:13

115:12 120:20
126:12 134:3
137:11 138:17
148:4 164:5,8
176:18 183:20
192:12 193:8
195:7,9 208:2
208:9 210:1
219:16 229:7
235:6 241:21
249:2 262:20
274:10,12
283:12,22
**type** 24:17 34:6
36:11 43:18
50:6 56:1
85:21 91:11
98:8 133:9
134:12 144:1
145:18 149:22
157:20 166:20
169:17 175:7,8
175:10 182:10
182:17 209:16
216:14 226:8
226:10 240:22
277:10
**typed** 17:23
**types** 33:18 50:8
76:14 82:4
148:22,23
168:18
**typo** 104:2 274:2

_____
**U**

**U** 6:1
**uh-huh** 115:9
**unanswered**
124:15
**uncovered**
208:16
**underage** 78:12
**underlined**
200:13
**underneath**
167:1 207:11

Carlton Hershman                                          3/16/2021

Page 321

understand
13:20 40:18,21
40:22 52:10,13
53:7,16 57:3,5
57:10 65:12
68:7 69:23
70:8,10 77:23
78:5 83:20
84:3,6 87:15
96:3 103:16
125:18 133:11
133:23 135:4,5
135:7 178:22
179:21 192:9
196:8 197:15
198:14,23
199:13 205:1,2
205:5 212:5
215:15,20,23
218:17,19
232:4 246:11
247:23 267:1
understanding
24:3,9 38:16
78:3,8,19 79:3
90:20 96:1
172:19 173:3,4
240:21 241:6
247:6
understands
245:6
understood
14:13
undertake
173:14
underwear
178:3
unfair 103:3
unfortunately
113:20
unheard 113:14
271:1
uniforms 247:14
247:17,18
Union 59:2
unique 168:19

unit 32:4 33:12
33:23 39:8,8
49:15 50:9,9
50:10,11,18
63:5,15,17,18
69:4,8 73:8,14
73:16,16,17,17
109:5 114:9,14
119:18 206:6
254:23 256:20
Unit's 100:22
102:21 247:14
United 1:1 12:1
148:13
units 73:4
universe 60:7
university 9:9
25:1,4,12,13
38:14
unknown
200:15 202:2
unlock 196:17
unpack 147:18
unsharing 155:1
unsteady 85:8
untrue 53:9
171:15 173:6
225:23
updated 72:4
upper 263:1
upset 129:8
urine 129:22
146:22 149:3
156:15 209:5
212:16 223:13
258:13
use 54:4 67:6
83:14 116:20
144:5,17 164:6
186:21 201:9
225:10 236:17
269:18 279:16
279:20,22
280:3
usual 12:20
usually 22:7

28:22 31:18
44:1 48:9
122:14 133:13
137:10

_____

**V**

vacation 263:9
vagina 53:20
175:14
vaginal 222:15
valuable 215:9
various 104:12
vary 161:11
Vegas 65:21
66:15,21 67:18
67:23
vehicle 220:11
verbal 231:13
verbally 108:8
229:18 231:4
verbatim 103:8
verbiage 269:17
279:18 280:3
verisimilitude
260:19
versus 11:22
267:8 285:2
victim 15:17,23
17:14 21:18
31:17 36:3
44:2,15 48:9
48:11,22 53:6
63:15 78:21
79:7 85:4
101:20,23
117:6,14 120:8
133:12 136:1
156:8 168:23
172:23 176:8
196:5 202:10
203:4 205:11
209:14 225:17
225:18 240:8
262:22 273:5
274:13,16
victim's 17:17

victimology
30:18,22 31:1
32:1 33:22
34:6 35:13,14
36:22 37:4,13
victims 21:12
31:2,3,5,14
32:13,19,23
33:6,19 35:10
42:7 49:9
85:22 91:16,17
92:11 169:2,8
171:12,17
241:9 277:5,11
video 1:15 6:4
11:20 105:20
107:12 108:9
243:9,11
244:21 245:9
245:11,21
246:7,9,14
247:4,10
248:23 249:13
271:11,17
VIDEOGRAP...
11:19 93:15,18
166:10,13
221:17,20
264:2,5 282:8
282:11 288:1
videos 105:22,23
106:20 107:22
211:19 212:19
213:15,18,20
videotape
194:10
videotaping
193:17
view 105:14,21
114:3
viewed 104:20
106:19
viewing 107:21
264:16
violated 23:19
violence 18:15

18:17 44:7
45:16 46:2
54:21 72:11
170:4
violent 24:14
262:18
vision 196:12
visiting 22:18
voice 247:11
voices 249:19
voluntarily 64:2
92:15,21 93:4
volunteer 226:2
volunteered
139:22
volunteering
152:18
volunteers
127:9
vs 1:10

_____

**W**

W 1:21 6:6 11:1
wait 218:16
281:12
waiting 29:20
268:14
waive 3:2
waived 1:23
6:17
waking 23:3
walk 196:14
205:13 256:5
256:11
walked 54:3
walking 88:5
106:16 107:8
108:13 124:3
193:16 194:10
194:11 219:22
246:1,6,17
walks 190:8
wall 18:22
wallet 179:18
249:9
want 15:13 16:8

28:20 37:2,8
37:11 48:4
49:20 55:11
67:19 78:2
79:13 80:5
93:7,9 100:3
103:1,5 104:3
108:11 110:17
117:12 119:10
119:12 126:21
130:18 132:13
136:1 141:13
148:3 150:21
150:23 151:2
151:21 153:12
153:18,20
154:9,12
161:12 163:3
163:19 164:20
165:4,6,7,22
165:23 166:4
173:16 176:16
194:6 201:4
217:16 220:19
220:22 231:5
233:6,7,15
234:9,14 257:4
264:7,13 267:2
276:23 277:2
277:15
**wanted** 40:22
138:17 270:6
277:7
**wanting** 79:1
**wants** 152:19
**warrant** 113:6
191:15,21
192:5,8,14,17
192:20 193:3,4
242:2 245:1
264:22 265:11
**wasn't** 43:10,21
58:4 67:10
76:17 107:13
107:16 125:14
137:13 142:19

146:3 199:12
231:7 233:1,22
239:15 247:6
273:8 276:7
**wasting** 37:11
**watch** 85:2,6
**watching** 266:1
**way** 24:12 33:17
54:5 69:1
112:18 113:9
113:23 124:10
130:16 131:13
134:17 138:13
177:7 179:2
199:22 205:10
216:11 235:15
239:5,7 241:4
254:4 256:6
263:5 271:7
275:17,19
276:14 279:9
280:4 284:16
**ways** 85:1,11,18
92:9
**we'll** 13:13
14:12 20:10
26:2 29:12
30:14 72:10
99:14 131:12
139:16 140:17
156:15 190:3
195:19 217:13
217:14 270:20
**we're** 37:2 43:6
80:10 93:6,22
105:4 150:14
156:4 161:6
164:18 166:17
171:10 184:1,2
184:8,9 206:11
219:17 221:4
269:8
**we've** 76:19
91:19 147:23
153:9 157:7
174:6 208:21

241:12 246:4
259:2 263:19
**wealth** 48:19
**wear** 176:13
**wearing** 177:10
177:14,20,23
178:19 179:6
222:4 247:21
248:10,16
**Webster** 10:5
**week** 49:15 50:8
66:2 95:9,13
**weeks** 116:13
**weight** 89:16
259:17
**weird** 169:13
**welcome** 37:1
**well-known**
172:7,15
**went** 22:2 28:6
39:13,16 64:16
65:14,19 73:8
75:12 122:3
125:10 128:13
198:2 203:9
223:6 249:20
251:3 256:22
267:7
**weren't** 95:15
95:16 211:16
211:17 215:11
243:15 256:2,3
256:10 257:11
262:19
**Western** 1:3
12:2
**whatsoever**
236:20 270:19
**white** 9:20 33:1
**wife** 75:14
**window** 170:23
197:1,4 202:5
223:7
**wiretap** 242:1
**withheld** 105:5
**witness** 2:2 5:4

6:16 11:14
12:8,14 15:23
19:12,17 20:8
22:10 61:7
106:6 117:7
119:11 125:6
155:3,7 168:23
185:11 188:8
207:14 217:5
217:17 260:13
260:17 283:10
**witnessed** 52:1
138:20,23
260:2
**witnesses** 49:9
124:1,6 125:3
137:11,15
143:16 169:1
174:1,7,19
208:9 219:19
225:2 265:16
**women** 35:7
44:8 45:16
46:2 170:4
279:1
**Women's** 54:22
**wondered**
165:14
**wondering**
262:9,14
**word** 40:3
167:18 184:18
187:13 236:18
247:18 255:7
279:16,21,21
280:8,9 282:22
**words** 42:16
186:3,12,21
232:12
**wore** 176:12
**work** 42:19
154:16 253:19
**worked** 16:3
20:23 23:21
27:19 46:8
63:18 68:3

69:16 70:12
256:20
**working** 62:12
79:20 90:20
**works** 39:4 53:5
53:12 69:2
90:21,23 196:8
196:9
**WorkSouth** 6:9
9:4 10:4 11:10
**world** 29:1
54:18 128:20
165:2 246:11
**worn** 247:14
**worry** 47:5
**worth** 164:8
**wouldn't** 42:11
43:17 99:4
107:21 108:16
115:7 121:23
132:4 160:16
164:6,17 180:5
192:2,4 209:19
211:21 220:23
264:20 265:8
**WRIGHT** 9:14
**write** 17:6 19:21
25:18 193:2
253:12
**writing** 96:4
126:14,20
**written** 24:12
47:8 106:19
149:19 160:15
160:23 161:7
189:23 241:4
253:10,14
282:20 283:20
**wrong** 40:15
81:16 143:15
173:1 260:12
**wrote** 95:20
106:1,4 200:19

_____
          **X**
_____
**X** 8:1

| Y | Z | | | |
|---|---|---|---|---|

**Y**

y'all 93:7,9,9
  282:3
yeah 30:1 43:10
  62:14 67:4
  73:1 81:3
  84:22 85:18
  88:23 91:14
  93:10 105:15
  106:2 107:7
  110:21 111:22
  117:2 120:2
  124:18 126:21
  127:8 132:13
  135:9 145:13
  151:6 155:21
  185:11 195:8
  198:1 206:22
  208:7,14
  212:15 221:3
  221:14 227:19
  228:4 230:5
  236:12,13
  238:17 248:20
  250:16 252:22
  256:23 265:6,7
  268:20 276:12
  276:18 283:15
  287:8
year 71:19 73:15
  76:4 94:3,6
  96:22,22
  253:22
years 34:15
  35:18 43:7
  46:9 62:13
  63:15 75:6
  159:8 173:9
  257:6 277:6
York 9:17,17
  160:17 164:23
young 141:10
  277:4
Younger 226:18
  227:2

**Z**

Zoom 1:15 6:4
  9:12,19 10:5
  13:15,23 28:9

**0**

07/17/2021
  289:23

**1**

1 100:12 104:4
1:23 166:11
10 58:15 122:21
  123:3 128:11
  166:17 193:13
10:01 1:19 6:12
  11:12 12:5
100 67:20
10020-1104 9:17
101 118:14
  159:7
10th 58:17,20
11 171:11 172:6
11:45 93:16
11:56 93:19
117 8:11 29:13
  29:15 30:15
  62:11
118 8:12 98:11
  98:13,16
  100:13 104:2
119 8:13 217:14
  217:15 218:6
11th 58:21
  175:23
12 43:7
12:08 217:23
12:23 200:15
1251 9:15
12th 58:21
13 8:4 200:9
1300 170:2
14 202:1
1409 9:9
1490 6:10 11:10
15 62:13 128:11

157:8 193:14
  194:3,5
15th 58:5 76:9
16 1:18 6:11
  11:13 12:4
  203:12 289:17
16th 57:22
17 207:4
17th 58:1
18 71:23 72:2,8
  72:13 214:8
18-month 72:20
18th 57:23 76:6
19 105:16,17
  213:23 222:1
1986 76:6
1987 76:9
1997 121:9
19th 58:17,18

**2**

2 38:4 104:1
2:00 166:14
2:20 164:23
20 15:7 36:19
  58:9 88:1
  105:17,18
  224:2 225:7
200 163:14,15
2001 56:2
2002 56:2
2003 67:19,21
2004 38:13
  41:11 68:1
2009 41:17 44:6
2011 47:16
2014 287:17
2015 36:18
  122:10 200:13
  247:15 260:5,7
  287:13
2016 36:19
  203:13
2017 55:16
  57:15,16,21
  96:11 104:6,7

2018 16:9,9 19:5
  55:12
2019 19:6 51:1
  58:9,10,15,16
  59:1,2
2020 59:5 94:3
2021 1:18 5:18
  6:12 11:13
  12:5 289:17
20TH 9:21
21 35:10 109:1
  227:5
218 8:13
21ST 9:16
22 234:5
22nd 58:13
  96:10 104:6
23 35:9 240:13
  240:14
23rd 59:2
24 242:16
25 248:4,8
26 50:23 258:10
  258:12
26th 58:3
27 162:21 164:1
  261:3 264:10
289 8:5
29 8:11 51:1
  58:14 266:10
29th 51:10 57:22
  59:1
2nd 122:10
  200:13 260:7

**3**

3 38:12 41:16
3:09 221:18
3:14 221:21
30 2:20 211:11
  289:21
300 163:16
  164:6,8 249:8
34 268:3,9
35 268:6 272:1
35203 9:23

35222 2:18
35401 9:10
35406 6:11
3710 2:17
39 99:1
3rd 59:4 104:5

**4**

4 47:15 111:2
4:12 264:3
4:17 264:6
4:45 282:9
4:54 282:12
4:59 288:2,6
40 64:12,17,18
  174:15
40-hour 73:12
40-page 165:16
  174:12
400 9:21
4167 8:13
  217:11
45 166:1,3
49 150:15
4s 192:12
4th 2:17

**5**

5 104:10 193:5
50s 37:15
52 150:15
55 103:7
5th 57:23

**6**

6 30:14 38:4
  51:9 58:10
  100:13 105:16
60s 37:15
65 63:15
6th 58:4 260:5

**7**

7/2/15 217:23
7:19-cv-00403...
  1:6 11:23

Carlton Hershman                                      3/16/2021

                                                     Page 324

| **7th** 59:4 | | | | |
|---|---|---|---|---|
| **8** | | | | |
| **9** | | | | |
| **9** 111:1,2 | | | | |
| **9/30/2021** | | | | |
| 289:21 | | | | |
| **90** 275:2 | | | | |
| **911** 37:23 | | | | |
| **98** 8:12 | | | | |