FILED
2021 Nov-12  PM 07:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**

```
·······················································   x
ADAM JONES, et al.                                      :
                                                        :
                    Plaintiffs,                         :       ORAL ARGUMENT REQUESTED
                                                        :
          - against -                                   :
                                                        :       7:19-CV-00403-RDP
BUZZFEED, INC., et al,                                  :
                                                        :
                    Defendants.                         :
·······················································   x
```

**REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**LIGHTFOOT, FRANKLIN & WHITE, LLC**

J. Banks Sewell, III
John G. Thompson
Jonathan R. Little, III

400 20th Street North
Birmingham, AL 35203-3200
T: (205) 581-0772
F: (205) 380-9172

**DAVIS WRIGHT TREMAINE LLP**

Katherine M. Bolger (*pro hac vice*)
Rachel F. Strom (*pro hac vice*)
John M. Browning (*pro hac vice*)

1251 Avenue of the Americas, 21st Fl.
New York, NY  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax

*Attorneys for Defendants BuzzFeed, Inc., Katie J.M. Baker and Ben Smith*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................... 1

RESPONSE TO NONMOVANTS' STATEMENT OF UNDISPUTED FACTS ....................... 2

ARGUMENT ................................................................. 4

    I.      PLAINTIFFS SEEK TO AVOID SUMMARY JUDGMENT BY
           MISREPRESENTING THE ARTICLE, THE FACTS AND THE LAW ................. 4

    II.     PLAINTIFFS CANNOT ESTABLISH ACTUAL MALICE ...................................... 7

    III.   THE FAIR REPORT PRIVILEGE BARS PLAINTIFFS' DEFAMATION
           CLAIM ................................................................... 11

    IV.   PLAINTIFFS HAVE FAILED TO SHOULDER THEIR BURDEN OF
           ESTABLISHING THAT THE ARTICLE IS MATERIALLY FALSE ..................... 14

    V.     THE ARTICLE CONTAINS PROTECTED OPINION ........................................... 19

CONCLUSION ............................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................................................5

*Bell v. Smith*,
  281 So. 3d 1247 (Ala. 2019) ......................................................................................20

*Berisha v. Lawson*,
  973 F.3d 1304 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021) ......................5

*Cajun Steamer Ventures, LLC v. Thompson*,
  402 F. Supp. 3d 1328 (N.D. Ala. 2019) .....................................................................19

*Dunn v. Air Line Pilots Ass'n*,
  193 F.3d 1185 (11th Cir. 1999) ....................................................................................5

*Edward Lewis Tobinick MD v. Novella*,
  848 F.3d 935 (11th Cir. 2017) ......................................................................................5

*Finebaum v. Coulter*,
  854 So. 2d 1120 (Ala. 2003) ......................................................................................10

*Forrester v. WVM TV, Inc.*,
  709 So. 2d 23 (Ala. Civ. App. 1997) .........................................................................17

*Gomes v. Fried*,
  136 Cal. App. 3d 924 (1st Dist. Ct. App. 1982) ..........................................................7

*Harris v. Quadracci*,
  856 F. Supp. 513 (E.D. Wis. 1994), *aff'd*, 48 F.3d 247 (7th Cir. 1995) ...................11

*Howell v. Enter. Publ'g Co.*,
  920 N.E.2d 1 (Mass. 2010) .........................................................................................13

*Hunt v. Liberty Lobby*,
  720 F.2d 631 (11th Cir. 1983) ......................................................................................5

*Kelly v. Arrington*,
  624 So. 2d 546 (Ala. 1993) ........................................................................................15

*Klayman v. City Pages*,
  650 F. App'x 744 (11th Cir. 2016) ...............................................................................5

*Labor Review Publ'g Co. v. Galliher*,
    45 So. 188 (Ala. 1907) ............................................................................................15

*Larreal v. Telemundo of Fla. LLC*,
    489 F. Supp. 3d 1309 (S.D. Fla. 2020) ........................................................5, 12, 13

*Levan v. Capital Cities/ABC, Inc.*,
    190 F.3d 1230 (11th Cir. 1999) ..................................................................................5

*McCaig v. Talladega Publ'g Co.*,
    544 So. 2d 875 (Ala. 1989) ................................................................14, 15, 16, 17

*McGraw v. Thomason*,
    93 So. 2d 741 (Ala. 1957) .......................................................................................15

*Meisler v. Gannett Co.*,
    12 F.3d 1026 (11th Cir. 1994) ..................................................................................5

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ........................................................................5, 7, 11

*Miller v. Gizmodo Media Grp., LLC*,
    994 F.3d 1328 (11th Cir. 2021) ..................................................................................5

*Moore v. Cecil*,
    No. 4:19-cv-1855, 2021 WL 1208870 (N.D. Ala. Mar. 31, 2021) ............................9

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................................2, 7, 10

*Newton v. Nat'l Broad. Co.*,
    930 F.2d 662 (9th Cir. 1990) ..................................................................................10

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ..................................................................................................5

*Rondini v. Bunn*,
    No. 7:17-cv-01114-RDP, 2018 WL 317713 (N.D. Ala. Jan. 8, 2018) ......................7

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990) ..............................................................................5

*Shuler v. Garrison*,
    No. 2:16-CV-695-RDP, 2017 WL 191267 (N.D. Ala. Jan. 13, 2017),
    *aff'd*, 718 F. App'x 825 (11th Cir. 2017) ................................................................12

*Silvester v. Am. Broad. Cos.*,
    839 F.2d 1491 (11th Cir. 1988) ..................................................................................5

*Smith v. Huntsville Times Co.*,
  888 So. 2d 492 (Ala. 2004) ...................................................................................................7

*Stickney v. Chester Cty. Commc'ns, Ltd.*,
  522 A.2d 66 (Pa. Super. Ct. 1987) .........................................................................................8

*Time, Inc. v. McLaney*,
  406 F.2d 565 (5th Cir. 1969) ..................................................................................................5

*Turner v. Wells*,
  879 F.3d 1254 (11th Cir. 2018) ..............................................................................................5

*Wiggins v. Mallard*,
  905 So. 2d 776 (Ala. 2004) ...................................................................................................12

*Wilson v. Birmingham Post Co.*,
  482 So. 2d 1209 (Ala. 1986) ............................................................................................11, 12

## STATUTES

Ala. Code § 13A-11-161 .............................................................................................................11

## PRELIMINARY STATEMENT

Defendants' Moving Brief clearly identifies the relevant law and precisely sets out the undisputed facts demonstrating that summary judgment should be granted on fair report, substantial truth, opinion and actual malice grounds.[1] Plaintiffs' Opposition Brief is the polar opposite.  It conflates separate legal arguments, misconstrues the Article's plain meaning and rides roughshod over undisputed facts, which are often ignored or misrepresented.  But these scattershot arguments do not change the fact that the Article is not capable of giving rise to a defamation claim because it accurately reports official documents that record what happened when Megan told the police she believed she had been sexually assaulted.

As Defendants predicted (Mov. Br. 27-31), Plaintiffs' primary argument is that the Article does not mean what it says and instead "implies" or "conveys" a "predominant narrative of corruption and cover-up."  Opp. Br. 43.  But this defamation by implication theory – which underpins Plaintiffs' entire brief – is bogus on multiple levels.  The Article, which never uses the words "corruption," "cover-up" or anything remotely similar to describe Plaintiffs, is not susceptible to the meaning Plaintiffs ascribe to it.  Even if this was a reasonable implication (and it is not), the mere existence of such an implication makes no difference to Defendants' multiple defenses as a matter of law because Plaintiffs failed to demonstrate that Defendants *intended* to imply that Plaintiffs were corrupt.  On the contrary, the undisputed facts show that Defendants affirmatively removed any such implication from the Article.  For reasons that should be obvious, Plaintiffs cannot sue Defendants for publishing a "corruption" narrative that does not actually exist and which was never intended.

---

[1] Unless otherwise noted, all capitalized definitions have the same meaning as they were ascribed in Defendants' moving brief (Doc. 66, "Moving Brief" or "Mov. Br.") and Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment.  Doc. 71 ("Opp. Br.").

This is a lawsuit about truthful, privileged speech on the subject of actions undertaken by police officers doing their public duties.  As the Supreme Court noted, "[t]hose who won our independence believed … that public discussion is a political duty; and that this should be a fundamental principle of the American government."  *N.Y. Times v. Sullivan*, 376 U.S. 254, 273 (1964).  The First Amendment and the essential democratic principles that support it require dismissal.  This Court should grant Defendants' motion for summary judgment.

### RESPONSE TO NONMOVANTS' STATEMENT OF UNDISPUTED FACTS

55-63. Undisputed.  The fact that "Ms. Rondini stated to the registered nurse that the last consensual intercourse she engaged in was 'yesterday morning'" – which was presumably included to suggest that Megan was promiscuous – is irrelevant and not material.[2]

64.     Disputed as incomplete.  Plaintiffs state that "Ms. Rondini further told investigators that Bunn did not hit or shove her."  In context, this is only half of Megan's statement, as she said "[a]nd he didn't hit me, he didn't shove me, but he held me down, and we-." Doc. 71-16 at 3.  When asked where his hands were, Megan responded that one hand was on her hip and the other was on the top half of her body.  *Id.*

65.     Undisputed.

66.     Disputed as incomplete.  Baker knew that Megan told Plaintiffs that Bunn held her down.

67.     Disputed as incomplete.  Baker testified that she obtained from Mike Rondini "his personal download of Megan's phone and her text messages." Baker did not have, never saw and has never seen any evidence of a full download of Ms. Rondini's cellphone in the records of the Homicide Unit.  Doc. 71-6 (Tr. 177:5-17).  Defendants admit she had the "SnapChat" videos.

---

[2] Furthermore, statements 55-63 and 65 do not contain material facts.

68.     Disputed as incomplete that there was "no evidence to support that Ms. Rondini was drugged."  Paragraph 68 is otherwise undisputed but not material because it is not relevant to any reasonable reading of the Article.  And, as to the reasonable reading of the Article, it is undisputed that, "[w]hen the Article was published, Baker … believed it to be true in every respect and still do[es] to this day" – which is the dispositive fact for the material element that paragraph 68 pertains to – *i.e.*, actual malice.  *Compare* Mov. Br. at 11, ¶41 *with* Opp. Br. at 9, ¶41; *see also* Doc. 64-1, at 41 ¶105 (denying the Article reports that Plaintiffs were corrupt).

69.     Disputed as incomplete.  Baker was aware that Plaintiff Jones believed that Rondini had been in Bunn's house and had climbed out of his window.  Doc. 71-31 (Tr. 29:15-30:1).  But based on Plaintiff Jones' interview of Megan, it appears that he did not believe her claims that the sex with Bunn was non-consensual.  Doc. 71-31 (Tr. 32:4-22); *see also* Doc. 71-2 (Tr. 101:21-102:3, 109:11-18).

70.     Disputed as incomplete.  Baker was aware that Plaintiff Jones said he did not know Bunn and would not allow any perceived influence to impact the investigation.  Doc. 71-31 (Tr. 30:2-31:2), Doc. 71-33 (Tr. 54:21-55:30).  Baker was also informed that Hastings never had contact with Bunn prior to this investigation.  Doc 71-34, at 3.  But Plaintiffs subsequently testified that they were aware of the Bunn family name and told their wives that they were investigating Bunn at the outset of the investigation.  Doc. 71-84 (Tr. 23:14-24:20), Doc. 71-85 (Tr. 25:21-29:7).

71.     Disputed as incomplete.  Baker testified that she found Captain Hood to be the best source of information on the elements of Alabama rape law, but not the best source of information generally.  Baker later discovered that Captain Hood had provided her with inaccurate information about whether the case against Megan was presented to the grand

jury.  Doc. 71-6 (Tr. 145:14-22).

72.     Undisputed.

73.     Undisputed but not material, as Plaintiffs have admitted they did not rely on this "guck" text in the course of their investigation into Ms. Rondini's claims and do not mention these communications in their argument.  Doc. 63-61 (Tr. 335:1-12); Doc. 63-62 (Tr. 357:5-358-10); *see generally* Opp. Br.

74.     Undisputed.

75.     Subparagraphs 75(b), (c), (e), (f), (i), (j), (k), (m), (n), (r), (s) and (u) are undisputed.  Subparagraphs 75(a), (d), (g), (h), (l), (o), (p), (q), (t) are disputed because they misstate Baker's testimony and are incomplete.[3]  All of the factual allegations in paragraph 75 about what Baker believed or did not believe at the time the Article was published are not material, however, because these facts are not relevant to any reasonable reading of the Article as published.  It is undisputed that "[w]hen the Article was published, Baker … believed it to be true in every respect and still do[es] to this day" – which is the dispositive fact for the material element of actual malice that paragraph 75 pertains to.

76.     Undisputed.

## ARGUMENT

## I.     PLAINTIFFS SEEK TO AVOID SUMMARY JUDGMENT BY MISREPRESENTING THE ARTICLE, THE FACTS AND THE LAW

Plaintiffs' theory of this case – *i.e.*, that Defendants defamed them by injecting hidden "corruption" messages into the Article – rests on a series of false assumptions that need to be briefly addressed at the outset.

---

[3] Defendants also dispute any characterization of testimony to the grand jury because they were not permitted to inquire about said testimony.  *See, e.g.*, Doc. 63-61 (Tr. 330:9-332:7).

*First*, the law imposes heavy burdens of proof on plaintiffs in defamation cases that Plaintiffs make no serious attempt to meet.  Plaintiffs concede, as they must, that there is "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault". *See also* Opp. Br. 24 (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).  It is equally settled that "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding *either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not*."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986)  (emphasis added).  *See also Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990) ("The moving parties' burden in a motion for summary judgment is simply showing – pointing out to this Court – that there is an absence of evidence to support the element of actual malice ….").[4]  And, as "the Eleventh Circuit has recognized, summary dismissal of *defamation* cases is particularly appropriate because 'there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation.'"  *Larreal v. Telemundo of Fla. LLC*, 489 F. Supp. 3d 1309, 1317-18 (S.D. Fla. 2020) (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)).[5]  Plaintiffs have not met any of these evidentiary burdens.

*Second*, Plaintiffs simply ignore the reality that the material facts in this case are

---

[4] Plaintiffs' evidentiary burden on actual malice is so heavy the Eleventh Circuit has not recognized a triable issue of fact in a public figure defamation suit against a news organization since 1983. *See, e.g.*, *Miller v. Gizmodo Media Grp., LLC*, 994 F.3d 1328 (11th Cir. 2021); *Berisha v. Lawson*, 973 F.3d 1304 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021); *Michel*, 816 F.3d 686; *Klayman v. City Pages*, 650 F. App'x 744 (11th Cir. 2016); *Levan v. Capital Cities/ABC, Inc*., 190 F.3d 1230 (11th Cir. 1999); *Meisler v. Gannett Co.*, 12 F.3d 1026 (11th Cir. 1994); *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491 (11th Cir. 1988).  *Cf. Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983).  The results of recent cases against non-media defendants are similar.  *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018); *Edward Lewis Tobinick MD v. Novella*, 848 F.3d 935 (11th Cir. 2017); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185 (11th Cir. 1999)

[5] *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969) (observing that "the failure to dismiss a libel suit might necessitate long and expensive trial proceedings" which, if unwarranted, have an impermissible "chilling effect").

undisputed and ripe for summary judgment.  There is no dispute, for instance, over the facts

relating to BuzzFeed's newsgathering, editing and publication of the Article – including the

crucial fact that all the journalists involved in preparing the Article "believed it to be true in

every respect [at the time of publication] and still do to this day."  Doc. 66, ¶41; Doc. 71, ¶41.

There are also no genuine disputes about what Plaintiffs said and did during the Rondini

investigation, nor could there be since this was all reported accurately from undisputedly

authentic interview videos, the felony packet and related investigatory materials.  *See* Doc. 66-1.

In response, Plaintiffs admit the core facts but try to create a false impression of disputes.  There

are multiple instances, for example, where Plaintiffs admit facts set forth by Defendants but add

irrelevant or immaterial comments designed to spin the truth in the most favorable light

possible.[6]  And, in a handful of instances, Plaintiffs purport to dispute facts but do so by

misrepresenting record evidence.[7]  Despite these efforts to quibble with or distort the record, the

parties substantially agree on the material facts and the case is ready for summary judgment.

        *Finally*, Plaintiffs ask this Court to set the law aside and hold that they are "private

figures" who need only prove negligence in order to prevail in this defamation suit.  But in the

---

[6] Plaintiffs admit, for instance, that Bunn "lied to police," but add the irrelevant observation that he "later recanted his initial statement" as if that excused their failure to take any action against him for lying.  Opp. Br. 5, ¶1. Plaintiffs similarly concede that they did not force Bunn to come to the station before he took "a fishing trip with his lawyer," but claim they "did not actively allow or permit Bunn to travel" in an attempt to put a face-saving gloss on another damning admission.  *Id.* at 6, ¶25.  Plaintiffs also admit that Megan did not remember portions of the night and quibble over whether the phrase "blacked out" accurately describes Megan's contention that she had memory gaps, including one lasting at least 30 minutes.  *Id.* at 2, ¶10.

[7] Plaintiffs assert, for example, that Megan "never told Jones or Hastings 'that she did not consent to having sex with Bunn.'"  Opp. Br. 9, ¶44.  In reality, the record contains indisputable evidence of Megan telling Plaintiffs themselves that she did not consent, had sex with Bunn against her will, and was held down.  Docs. 63-61 (Tr. 93:2-98:19); 63-32, at 18; 63-8, at 7-8.  Plaintiff also contends that "the portion of the deposition of Robert Pastula that Defendants cited to in paragraph 53 of the Movants' Statement merely states that Jones and Hastings deviated from "best practices" when they left Bunn's residence for 15 minutes, and for no other reason."  This is untrue.  The portion of Pastula's deposition that Defendants cited covers numerous aspects of the investigation where Pastula said Plaintiffs departed from best practices.  Mov. Br. 13, ¶53(citing Doc. 63-68, Tr. 68:18-69-17, 132:16-134:17). Plaintiffs further assert that there has been testimony contradicting Investigator Nelson's sworn statements that the grand jury returned a true bill on both charges against Megan, (Doc. 63-73, Tr. 115:23-116:18), but they do not cite any contradictory evidence because there is none.  *See* Opp. Br. 12, ¶ 52.

six decades since the U.S. Supreme Court decided *New York Times Co. v. Sullivan* and required

the Montgomery Police Commissioner to establish actual malice, no court has permitted an

officer of the law to proceed as a private figure in a defamation case.  To the contrary,

Defendants have identified more than 30 cases from Alabama courts and elsewhere uniformly

holding that rank-and-file police officers are public officials subject to the actual malice

standard.  *See* Doc. 61 at 5-6; Mov. Br. 36 (quoting *Gomes v. Fried*, 136 Cal. App. 3d 924, 933

(1st Dist. Ct. App. 1982) ("[C]ourts have uniformly held that a patrolman or low-level police

officer is a 'public official' for the purpose of the *New York Times* privilege.")); *Smith v.*

*Huntsville Times Co.*, 888 So. 2d 492, 497 (Ala. 2004).  It is also ironic that Plaintiffs now claim

to be private figures having so recently invoked qualified immunity – a privilege reserved for

public officials – in order to successfully move this Court to dismiss the wrongful death claims

filed against them by Megan's family.  *See Rondini v. Bunn*, No. 7:17-cv-01114-RDP, 2018 WL

317713, at *6-10 (N.D. Ala. Jan. 8, 2018).  Indeed, the adoption of the actual malice standard

was motivated in large part by an explicit desire to avoid such hypocritical results.  As the

Supreme Court reasoned in *Sullivan*, "[i]t would give public servants an unjustified preference

over the public they serve, if critics of official conduct did not have a fair equivalent of the

immunity granted to the officials themselves."  *Sullivan*, 376 U.S. at 282-83.

## II.     PLAINTIFFS CANNOT ESTABLISH ACTUAL MALICE

As quintessential public officials, Plaintiffs must prove actual malice by clear and

convincing evidence – but their Opposition Brief confirms that they are incapable of shouldering

this burden.  Actual malice requires proof that Defendants "actually entertained serious doubts as

to the veracity of the published account, or [were] highly aware that the account was probably

false."  *Michel*, 816 F.3d at 702-03.  Defendants have produced voluminous evidence

demonstrating that the Article was not published with knowing falsity or reckless disregard for

the truth, including five declarations and hundreds of pages of documents relating to Defendants' responsible newsgathering activities.  Exhibits 1-77 to Doc. 63; Exhibits 1-5 to Doc. 64.  And, most importantly, Defendants provided unrebutted testimony that everybody involved in writing and editing the Article "believed it to be true in every respect and still do to this day."  *Compare* Mov. Br. at 11, ¶41 *with* Opp. Br. at 9, ¶41.

Plaintiffs do not dispute a single piece of this evidence.  They do not dispute that Baker led a five-month plus investigation during which she reviewed thousands of pages of primary source documents, interviewed dozens of people, and repeatedly prodded the TCHU for comment – which was incorporated into the final Article.  Opp. Br. 2-8, ¶¶6, 8-15, 17, 19-25, 28-31, 39.  They do not dispute that Baker doggedly tracked down and pored over the critical investigatory materials, including medical records, the felony packet and Plaintiffs' videotaped interviews with Megan and Bunn.  *Id.* at 4, 5 ¶¶19, 21.  They do not dispute that BuzzFeed's experienced fact checker rigorously scrutinized multiple drafts of the article.  *Id*. at 2, 4, 7, ¶¶7, 18, 32.  And they do not dispute that, by the time the Article was published, Baker, Venkatasubban, Carroll and Susman believed it to be true in every respect.[8]  *Id*. at 9, ¶41. Plaintiffs do not even dispute that BuzzFeed was entitled to rely on the authentic law enforcement records upon which each Statement was based, including the felony packet and interview videotapes.  *Id.* at 29. These concessions make this an easy motion: the undisputed evidentiary record cannot support a finding of actual malice and the case must be dismissed.[9]

---

[8] It is also undisputed that Defendant Ben Smith believed the Article to be true at the time it was published.  Doc. 64-5, at 4 ¶11.  In addition lacking actual malice, the claims against Smith should be dismissed because his limited role in selecting the headline – which is undisputedly his only involvement with the Article (Opp. Br. 2, ¶5) – is not sufficient to hold him liable and because he was legally entitled to rely on Baker's experience.  *See* Mov. Br. 3, ¶7.

[9] Based on this undisputed evidence, Defendants satisfy even the jerry-rigged test Plaintiffs set out for reckless disregard of the truth, which is supposedly triggered when defendants "(1) had obvious reasons to doubt the veracity of their source, (2) distorted the account of a police captain explaining the subject incident, and (3) made accusations of a cover up…."  Opp. Br. 29 (citing *Stickney v. Chester Cty. Commc'ns, Ltd.*, 522 A.2d 66 (Pa. Super. Ct. 1987). There is no reckless disregard for the truth under that standard because (1) Plaintiffs concede that Defendants had no

Plaintiffs seek to avoid this result by making two arguments, the first of which falls back on their defamation by implication theory. Their implication argument is a clumsy two-step maneuver. First, Plaintiffs use words like "convey," "imply," or "impute" – which appear over fifty times in the brief – to suggest that the Statements contain a hidden meaning that accuses Plaintiffs of engaging in corruption. Opp. Br. at 6 ¶27, 32-46. Plaintiffs then assert that this straw man interpretation was published with actual malice because Baker testified that she does not believe that Plaintiffs were corrupt or that the Article can be read that way. *Id*. at 19. In other words, Plaintiffs argue that the Article was published with actual malice based on false implications that Defendants never intended and do not believe to exist. But this Court rejected that argument earlier this year. In *Moore v. Cecil*, the plaintiff argued that a tweet accusing Roy Moore of being a "pedophile" was published with actual malice because that word had two potential meanings – the meaning intended by the defendant (which was not actionable) and another meaning that was unintended and false. No. 4:19-cv-1855, 2021 WL 1208870, at *7 (N.D. Ala. Mar. 31, 2021). In rejecting this argument and holding that there was no actual malice, the Court joined "[f]ive Circuit Courts of Appeal [that] have adopted the requirement that, when parties disagree about a word's meaning, a public figure Plaintiff must prove the Defendant intended the reader to ascribe the defamatory meaning" proposed by the plaintiff. *Id*. at *7. Under this rule, courts "may no longer presume with certainty that the defendants knew they were making a defamatory statement because the statement has defamatory and nondefamatory meanings. Therefore, … plaintiffs must show something that establishes defendants' intent to communicate the defamatory meaning." *Moore*, 2021 WL 1208870, at *8.

---

obvious reason to doubt the sources for the Statements (Opp. Br. 29), (2) the Article contains multiple statements from Captain Hood accurately conveying Plaintiffs' position on the Rondini investigation (Mov. Br. 25) and (3) the Article does not contain any "accusations of a cover up." *See* Section IV *infra*.

*See also Finebaum v. Coulter*, 854 So. 2d 1120, 1125 (Ala. 2003).  Any other standard would "eviscerate[] the First Amendment protections established by *New York Times*" because "[i]t would permit liability to be imposed not only for what was not said but also for what was not intended to be said."  *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990).

Here, the undisputed facts prove that Defendants never intended the Article to convey the message that Plaintiffs were corrupt or engaged in a cover up.  Opp. Br. 36.  All of the BuzzFeed newsgatherers provided unrebutted testimony that they did not intend that implication.  Docs. 64-1, at 42 ¶106; 64-2, at 10 ¶27; 64-3, at 9 ¶32.  The evidence that Plaintiffs cite as support for their claim that "[t]he focus or gist of the Article never changed, it started as a cover-up and corruption story and ended as one" (Opp. Br. 4, ¶16) actually proves the opposite.  In reality, these documents consist of two early emails in which Baker indicates that she is investigating Mike Rondini's claims that there was a cover up (Docs. 71-24, 71-25), one early draft of the Article that contained references to this theory (Doc. 71-26), subsequent drafts in which Baker removed any mention of a cover-up because she had determined that there was no cover up (Docs. 71-27, 71-28, 71-29, 71-30) and the final Article, which contains no reference to Plaintiffs being corrupt.  Doc. 71-21.  It defies credulity for Plaintiffs to argue that Defendants intended to imply a "corruption and cover-up narrative" when the evidence shows that they *affirmatively deleted* all references to those claims.  Plaintiffs' failure to show the requisite intent is fatal to their ability to establish actual malice.

*Second*, Plaintiffs trot out Dr. Lucchesi's expert report as "evidence" that Defendants "employed the technique or framing" and "departed from normal journalistic standards."  Opp. Br. 28.  This argument also fails.  As discussed in the motion to strike Dr. Lucchesi's report, expert testimony is not admissible or useful on the question of actual malice because it is a

question of law for the Court that turns on Defendants' subjective intent.  *Harris v. Quadracci*, 856 F. Supp. 513, 518-19 (E.D. Wis. 1994), *aff'd*, 48 F.3d 247 (7th Cir. 1995).  *See also* Doc. 51, at 12 (citing cases).  Nor can Dr. Lucchesi's testimony prove that Defendants intended to imply that Plaintiffs were involved in corruption – which is a necessary element of any implication theory.  Finally, Dr. Lucchesi's (inaccurate) opinion that Defendants departed from journalistic standards is not relevant or probative because, as Plaintiffs concede, a departure from the normal standard of care is not evidence of actual malice.  Opp. Br. 28.  *See also Michel*, 816 F.3d at 703.  Since there is no evidence of actual malice, the Court need look no further to dismiss this action.

## III.   THE FAIR REPORT PRIVILEGE BARS PLAINTIFFS' DEFAMATION CLAIM

In the alternative – and for all the reasons set forth in Defendants' Moving Brief and Appendix A – this Court must grant summary judgment because Statements 1-11 are privileged as "fair and accurate reports of … official investigations."  *Wilson v. Birmingham Post Co.*, 482 So. 2d 1209, 1213 (Ala. 1986).  *See also* Ala. Code § 13A-11-161.  Appendix A specifically identifies the official records that serve as the basis for each Statement, including relevant portions of the interview transcripts and felony packet.  In each case, the Statement at issue directly quotes or fairly abridges one or more of those official records.  *See, e.g.*, Doc. 66-1, at 13-14 (identifying the portions of Plaintiff Hastings interview transcript with Bunn that were accurately quoted in Statement 10); *id*. at 2-3 (setting no fewer than five sources accurately referenced in Statement 3 report that "Megan never imagined that she would soon be cast as a criminal, or that investigators would view [Bunn] as the true victim").  In response, Plaintiffs do not dispute that the Article "concerns matters within an official investigation" (Opp. Br. 49) and they concede that Appendix A "speaks for itself."  Doc. 71, ¶54(a)-(c).  While these concessions alone warrant dismissal, Plaintiffs nonetheless soldier on with a few unpersuasive arguments.

*First*, Plaintiffs assert that the Article is not a fair report because "it contains false and

defamatory statements which is [sic] not protected under this privilege." Opp. Br. 49. But this argument badly misapprehends the law. The purpose of the fair report privilege is to provide journalists with a safe harbor for reporting the content of official records – even when those records contain "false and defamatory statements" – so that the public remains informed about important public affairs, including "the conduct of … law enforcement officers." *Wilson*, 482 So. 2d at 1211-12. All the privilege requires, as per the Supreme Court of Alabama, is a "substantially accurate" report of the official proceeding. *Wiggins v. Mallard*, 905 So. 2d 776, 783 (Ala. 2004). *See also Shuler v. Garrison*, No. 2:16-CV-695-RDP, 2017 WL 191267, at *20 (N.D. Ala. Jan. 13, 2017) (Proctor, J.) (noting that "the publication of an otherwise defamatory matter is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported") (citation, internal quotation marks and emphasis omitted), *aff'd*, 718 F. App'x 825 (11th Cir. 2017). Far from identifying specific inaccuracies, Plaintiffs incorporate by reference the entirety of "Section I.B" – their one-size-fits-all analysis of the Statements – into their fair report argument. But all of the Statements discussed in this Section are literally accurate descriptions of official records and thus non-actionable.

Falling back once more on their all-purpose defamation by implication theory, Plaintiffs suggest that the fair report privilege does not apply to literally accurate Statements because they carry false and defamatory implications of corruption. Opp. Br. 49. But this is merely a variation on their misguided argument that "false and defamatory statements" do not qualify for protection. To be clear, false and defamatory implications are *not relevant* because the applicability of the privilege "does not turn on the nature of the defamatory statement alleged. Instead, it simply depends on whether any such statement accurately conveyed information provided by a government source." *Larreal*, 489 F. Supp. 3d at 1321. In other words, a

publisher does not lose the fair report privilege just because a facially accurate report of official

proceedings carries a defamatory implication.  In *Larreal*, for instance, a news organization

broadcast a report about a drug raid that identified all of the individuals arrested at the scene.  *Id*.

at 1312.  One of those individuals, who was the only one not charged with narcotics offenses,

sued the broadcaster for defamation for failing to specify that he had been arrested for "driving

without a license."  *Id*.  The plaintiff in that case argued that the fair report privilege should not

apply because the broadcast falsely implied that he was a drug dealer.  *Id*. at 1321.  Rejecting this

argument, the court held that the existence of a defamatory implication "does not destroy the fair

report privilege" as long as the publisher "accurately reported the gist of the information

provided by [police]."  *Id*. at 1322.  This same reasoning requires dismissal here.[10]

    *Finally*, Plaintiffs make a half-hearted effort to overcome the fair report privilege by

arguing actual and common law malice – but they have effectively conceded that the evidence

necessary to overcome the privilege does not exist.  As discussed in Section II *infra*, Plaintiffs

cannot establish actual malice.  And even assuming *arguendo* that common law malice – *i.e.*, the

standard for private figures – applies, Plaintiffs have still failed to create a triable issue of fact

because they have conceded that the traditional indicia of common law malice, like "previous ill

---

[10] Plaintiffs identify one instance in which they claim that the Article "jumbled … quotes up and took them out of context to create a whole new meaning than the original quotations" (Opp. Br. 43), but this argument withers on closer inspection.  Plaintiffs quibble with Statement 9 because the Article reverses the order in which Plaintiff Jones told Megan to "[l]ook at it from my side…" and "offered to give [Megan] a 'refusal to prosecute form.'"  Opp. Br. 43.  But the privilege only ceases to apply if an alteration in the published article changes the meaning of the official record.  *Howell v. Enter. Publ'g Co.*, 920 N.E.2d 1, 13 (Mass. 2010) (fair report applies as long as publication "produces the same effect on the mind of the recipient which the precise truth would have produced") (citation and internal quotation marks omitted).  Here, the precise order of two accurately quoted portions of the videotaped interview is immaterial.  Either way, the gist is the same – *i.e.*, Plaintiff Jones offered Megan an opportunity to drop her case during a part of the interview in which he repeatedly expressed doubt about her ability to meet the elements of a rape claim.  Plaintiffs also twist BuzzFeed editor Tina Susman's testimony to suggest that "the fact that the refusal to prosecute form was never actually presented to Ms. Rondini should have been included in the Article."  Opp. Br. 5 (citing Doc. 71-57 (Tr. 81:3-83:14); *id.* at 43.  In reality, the Article accurately reports what transpired, which is that the form was "offered" but not actually produced for Megan to sign.  It is also undisputed that Susman believed the Article to be accurate in all respects at the time it was published.  *Compare* Mov. Br. at 11, ¶41 *with* Opp. Br. at 9, ¶41.

will" or "violent language," do not exist.  *See* Opp. Br 26; Mov. Br. 24-25.[11]  In sum, the fair

report privilege attaches to Statements 1-11 and bars this defamation suit in its entirety.

## IV.     PLAINTIFFS HAVE FAILED TO SHOULDER THEIR BURDEN OF ESTABLISHING THAT THE ARTICLE IS MATERIALLY FALSE

As Defendants explain more fully in their Moving Brief, summary judgment should also

be granted because Plaintiffs have "produced *no* evidence that the Article contains any false

statements of fact."  Mov. Br. 26-31.  In response, Plaintiffs make no serious effort to show that

the Article contains false facts (because it does not), but they focus instead on convincing the

Court that the Statements "convey," "imply" or "impute" false and defamatory meanings that do

not exist.  This argument falls apart for several reasons.

First and foremost, Plaintiffs misstate the analytical framework that the Court should

follow to determine whether the Article is substantially false.  The case that Plaintiffs cite for the

proposition that whether "statements were intended by the publisher and understood by the

recipients as defamatory … are questions of fact for the jury" actually holds the opposite.  Opp.

Br. 30 (quoting *McCaig v. Talladega Publ'g Co.*, 544 So. 2d 875, 878 (Ala. 1989).  The full

quotation – which Plaintiffs omit from their brief – actually states that:

> [P]laintiffs can survive a summary judgment motion only if the evidence meets a two-step test with respect to the issue of defamation: first, whether the false statements were capable of being understood as defamatory is a question of law for the trial court's determination; and second, given the falsity and meaning elements, whether those statements were intended by the publisher and understood by the recipients as defamatory (assuming the plaintiffs survive summary judgment) are questions of fact for the jury.

*McCaig*, 544 So. 2d at 878.  Here, Plaintiffs collapse the two-step standard by arguing that the

---

[11] Plaintiffs' argument of last resort is that the privilege does not apply because "Defendants failed to publish contradictions by Captain Hood."  Even assuming that such omissions could destroy the privilege (and Plaintiffs fail to cite any authority suggesting that it is), the argument fails because it is undisputed that the Article actually included voluminous "explanations and contradictions stated in [Hood's] emails."  *See* Mov. Br. 28-29; Opp. Br. 49.

Court must accept their preferred interpretation of the Article – *i.e.*, that there is a "predominant narrative of corruption and cover-up" (Opp. Br. 43) – and then automatically decide whether this contrived interpretation is true or false. But *McCaig* demonstrates that the proper approach is for the Court to read the Article independently and decide what it means before determining whether any false statements exist based on a fair reading of the text. *See* 544 So. 2d at 877-79 (holding that publication did not implicitly accuse plaintiffs of illegal activity *before* determining that "[t]he undisputed testimony of the parties indicates that facts set out in the article are in their most literal sense true"). Under this analysis, Plaintiffs cannot survive summary judgment.

Just like *McCaig*, Plaintiffs' defamation claims rest upon strained implications that this Court must reject as a matter of law. When determining whether a publication is susceptible of a particular meaning, the Court must follow the "common and reasonable understanding" of the text. *Kelly v. Arrington*, 624 So. 2d 546, 548 (Ala. 1993). *See also McGraw v. Thomason*, 93 So. 2d 741, 744 (Ala. 1957) ("[P]rinted words are to be taken in their natural meaning."). Indeed, it is axiomatic that "[n]o strained construction is tolerable" under defamation law. *Labor Review Publ'g Co. v. Galliher*, 45 So. 188, 190 (Ala. 1907) ("[I]f the matter pleaded is not susceptible of the meaning ascribed, the action must fail."). The problem with Plaintiffs' argument that the Statements all imply "corruption and a cover up" (Opp. Br. 25-37) is that there is no support for this intolerably strained reading in the text of the actual Article – which Plaintiffs have conceded "speaks for itself." *Id*. at 7, ¶34. The words "corruption," "conspiracy" and their derivatives *never* appear in the published Article. *See generally* Doc. 63-5. The only reference to a "cover up" has nothing to do with Plaintiffs, but rather refers to an unrelated incident involving former Governor Bailey. *Id*. And while BuzzFeed did consider the possibility of a "cover up" early in the reporting process (as did Mike Rondini, an early source)

any references to that avenue of inquiry were affirmatively deleted from drafts *before* the Article was published.  Doc. 64-1, at 29 ¶70.  In sum and substance, therefore, there is no support for Plaintiffs' byzantine reading of the Article as "convey[ing] to the reader that Jones and Hastings were involved in inducing Ms. Rondini to drop her civil lawsuit against Bunn, threatened to proceed with the charges against her if she did not do so, and fabricated and made-up those charges against Ms. Rondini."  Opp. Br. 36, 25.

The tenuousness of Plaintiffs' proposed implication is underscored by the linguistic gymnastics required to twist the Article so far out of shape.  For instance, Plaintiffs suggest that Statements 1 and 2 are defamatory when "read in conjunction with Statement 4" – which is found 5 paragraphs later.  *Id*. at 32.[12]  Similarly, Plaintiffs opine that "[w]hile Statement 6 does not literally contain 'building a case,' the readers were already primed to think this way by the words and language used in Statement 3 and 4," which  appear 144 lines apart.  *Id*. at 40.  But while this tactic of juxtaposing random parts of a Statement from one part of the Article with cherry-picked words from elsewhere might be appropriate for a game of MadLibs, it is not an acceptable way to read the publication at issue in a defamation case.  Other arguments are absurd, as when they argue that the Article "conveys to the reader that [Plaintiffs] had the ability to change … the criminal code in the State of Alabama.  *Id*. at 39.  Here, as in *McCaig*, the Article will not bear the strained interpretations that Plaintiffs seek to impose upon it.[13]

_____

[12] Plaintiffs defamation claims based on Statements 1 and 2 – the Headlines – also fail because those Statements are not "of and concerning" Plaintiffs.  Plaintiffs argue that the Headlines are about them because "the Article was written about the investigation conducted by Jones and Hastings" (Opp. Br. 48), but this is emblematic of the myopic view that they have of the Article.  The Article is really about how Megan was treated by various institutions and a fair reading of the Headlines show that they are about Megan – and "how she did everything she thought she was supposed to do" – rather than specific misconduct by Plaintiffs or anyone else.  Doc. 63-5, at 1.

[13] Plaintiffs' unmoored interpretations of the Article clearly derive from Dr. Lucchesi's "framing analysis".  *Compare* Opp. Br. 40 ("[T]he readers were already *primed* to think this way by the words and language used in Statement 3 and 4") *with* Doc 51-1 at 25. ("This question sought to understand how Baker's article *primed* readers' understanding of the event.") (emphases added).  But as Defendants explained in their motion to strike that report, abstract literary criticism such as this "cannot assist in resolving the (legal) question of whether the Article is

Once this Court has properly disregarded Plaintiffs' straw man interpretation of the Article, it inexorably follows that "that the facts set out in the article are in their most literal sense true" and require summary dismissal "[b]ecause truth is always an absolute defense to any action for libel." *McCaig*, 544 So. 2d at 878-79. *See also Forrester v. WVM TV, Inc.,* 709 So. 2d 23, 26 (Ala. Civ. App. 1997) (dismissing news report based on videotape of father "slapping his son at a ball game" because the reporting was "true in [its] most literal sense" and plaintiff "failed to present any evidence that the broadcast was false").[14] The factual support for each Statement is set forth in Appendix A, which Plaintiffs do not challenge. Opp. Br. 13, ¶54. And nowhere do Plaintiffs dispute the facts that they need to contest in order to prove that the challenged Statements are false. For example, Plaintiffs claim that Statement 4 is false because the words "building a case against Megan" somehow "conveyed" a false message that "the investigation was more concerned about covering up the allegations against Bunn." Opp. Br. 35. But Plaintiffs cannot seriously argue that there was anything false about this description because Plaintiff Jones used the exact same phrase during his interview with Megan to describe what he was doing. *See* Doc 63-49 (Tr. 38:6-8) ("We have a local database here that we just have to *build a case* in and that is what it is going to be.") (emphasis added).[15] Similarly, Plaintiffs

---

susceptible to a defamatory meaning because no scientific, technical, or specialized expertise is required to understand the effect of the challenged statements on the mind of the average reader." Doc. 51, at 16.

[14] Even assuming *arguendo* that the Article does imply that Plaintiffs participated in a "cover-up" to protect Bunn, they have still failed to satisfy their burden of identifying facts on the record capable of proving that this implication is materially false. It is undisputed, for instance, that Plaintiffs were familiar with the Bunn family and told their wives that they were investigating the Bunn family before they started investigating Megan's claims, that Plaintiff Jones testified at his deposition that he decided Megan had not been raped at the hospital, that Captain Hood gave the Sheriff a "heads up" because it was a high profile case, that Plaintiffs did not require Bunn to sit for an interview at the station before going on a weekend fishing trip with his attorney, that Bunn was permitted to go on said fishing trip because he was a "person of means" and that Megan was ultimately indicted for stealing Bunn's property after her death. Taken altogether, these facts are sufficient to preclude Plaintiffs from proving that there was no effort to cover-up the claims against Bunn. Doc. 63-65 (Tr. 23:14-24:20), Doc. 63-66 (Tr. 25:21-29:7); Doc. 63-61 (Tr. 75:1-6; 92:18-95:4); Doc. 63-63 (Tr. 314:21-316:17); Doc. 63-62 (Tr. 220:11-222:18); Doc. 63-70.

[15] Plaintiffs claim that "Baker knew [the] phrase ["building a case"] was misleading," but the claim is based on a misleading citation to the record. Opp. Br. 33 (citing Docs. 71-30, 71-84). Those documents show that an earlier

challenge Statement 8, but admit that Plaintiff Jones gave Megan a Miranda warning and questioned her for taking Bunn's property – which is exactly what that Statement reports. *Compare* Mov. Br. 7, ¶24 *and* Opp. Br. 5, ¶24.  For similarly obvious reasons, Plaintiffs fail to raise an issue of material fact on falsity with respect to any of the other Statements.

The remainder of Plaintiffs brief is devoted to meritless arguments that seek to create the false impression of falsity by twisting the words of the Article.  For example:

- Plaintiffs make several arguments based on basic errors in comprehension.  For instance, they argue that the Article falsely conveys that the evidence available "should have been sufficient to charge Bunn with a crime."  Opp. Br. 43 (Statement 9).  In fact, the Article explicitly says the opposite – *i.e.*, that "Alabama's archaic rape law" makes it difficult to prove rape because it requires earnest resistance" and "Megan's case was complex."  Doc. 63-5, at 3.

- Plaintiffs frequently misstate the record.  For instance, they allege that it was inaccurate to report that Plaintiffs "quickly decided" Megan had not been raped (*id*. at 35 (Statement 4)) and "doubted her when she went to the station for a follow up interview."  *Id*. at 38 (Statement 5).  But this ignores Jones' testimony that he "concluded that Megan's claims had not met the elements of rape" after a ten-minute interview at the hospital (*id*. ¶45) and a report prepared three hours before Megan came to the police station, which listed her as a "suspect."  Doc. 66, ¶22.

- Plaintiffs' arguments that certain Statements "manipulated, distorted, and changed … quotation[s]" lack any foundation.  Opp. Br. 42.  For instance, Plaintiffs argue that quotations in Statement 10 were misleading because "the readers did not know that Hastings went through the whole night with Bunn again and questioned him about what happened."  Opp. Br. 44.  But Plaintiffs ignore a passage in the Article – which is conspicuously omitted from their quotation of Statement 10 – that explicitly summarizes the questions Plaintiff Hastings asked Bunn about what happened over the course of that night. Doc 63-5, at 13.

- Plaintiffs baselessly assert that the quotations in Statements 5, 8, 9 and 10 were "altered" because readers of the Article "never had access to the full video interview[s]."  Opp. 44.  Initially, BuzzFeed had no obligation to provide the entire videos.  As Baker testified, journalists do not "just produce everything" when writing about criminal investigations because an article that reproduced entire police files "wouldn't have been legible for a reader."  Doc. 71-6 (Tr. 251:14-258:8).  Plaintiffs also fail to demonstrate how the meaning of the Article would be different if the entire videos were displayed – which is unsurprising since the Statements accurately

draft of the Article contained a different phrase – "built a case on the spot" – which was changed in response to a fact checking comment.  Doc. 71-84, at 3.  It is also undisputed that Baker and all of the other newsgatherers believed the phrase "building a case" to be accurate when the final Article was published.  Opp. Br. 19, 32-33.

report what Plaintiffs said and did.

- *Finally*, Plaintiffs take umbrage against certain words, like the description of Plaintiffs Jones' hasty departure from the interview room as "abrupt," calling Bunn the "true victim" or the use of the word "drove" in the Headlines. But none of this quibbling is enough to establish a false meaning. "How Accusing A Powerful Man of Rape Drove a College Student to Suicide," for instance, is supported by the message on the intake form Megan filled in shortly before her death: "raped, bullied by police, changed university." Doc 63-5, at 17. Plaintiffs also cannot seriously dispute that Bunn was the "true victim" given that it is undisputed that Megan was indicted for stealing his property while he was never charged for what he did to her. And the description of Plaintiff Jones leaving the room "abruptly" is obviously true, as can be readily discerned by anyone watching the videotape.[16]

None of these scattershot arguments is a substitute for actual disputes of material fact based on admissible evidence. Because Plaintiffs have failed to identify evidence that the Article was or could be substantially false in any material respect, summary judgment should be granted.[17]

## V.     THE ARTICLE CONTAINS PROTECTED OPINION

Finally, Plaintiffs seek to dodge dismissal on the opinions expressed in Statements 7 and 9 by suggesting that the question of "whether a statement is opinion or fact should typically be resolved by a jury …." Opp. Br. 46-47 (quoting *Cajun Steamer Ventures, LLC v. Thompson*, 402 F. Supp. 3d 1328, 1348 (N.D. Ala. 2019)). But this is at odds with recent precedent from the Alabama Supreme Court holding that "the determination of whether a communication is an expression of opinion or purports to be a statement of fact … is a question of law for the court." *Bell v. Smith*, 281 So. 3d 1247, 1253 (Ala. 2019). Plaintiffs also point out (as predicted) that

---

[16] Plaintiffs have abandoned many of the arguments previewed in their Complaint. For instance, Plaintiffs do not argue in their brief that the Article was false because it failed to mention the "guck" text or other evidence they believe to prove Megan was not raped. Plaintiffs also largely abandon their arguments that the Article was false because it omits information that would be more favorable to them. In any event, these arguments would fail even if they were not abandoned for all the reasons set forth in Defendants' Moving Brief. *See* Mov. Br. 27-29.

[17] Plaintiff has in the past argued that the Article defamed them by suggesting that they did not do a sufficient job investigating Megan's allegations against Bunn. Baker testified that she did not think the Article communicates that message. Doc. 64-1, at 41 ¶105. But if the Article does so, it is substantially true. Baker testified at her deposition that there were a number of things Plaintiffs could have done differently in the investigation, including conducting a full interview of Bunn before he left town for four days with his lawyer, and explaining more clearly to Megan that she was under investigation for multiple felonies. Doc. 71-6 (Tr. 104:18-105:17).

Baker opined that "the Article contained no opinions" (Opp. Br. 47) – but Baker's testimony is irrelevant because she is a lay person using a colloquial definition of opinion, not the legal definition applied by the Court.  Mov. Br. 33 n.22.  Opinion is a question of law for the Court, not lay fact witnesses.  *Next*, Plaintiffs argue that the Article "stated or implied that [Baker was] in possession of verifiable facts, yet does not disclose all the facts to the reader."  Opp. Br. 48. But this argument misreads the Article which clearly discloses the undisputed true facts on which the opinion is based – *i.e.*, that "investigators never tested Megan's blood or urine" (Statement 7) and "Jones offered to give [Megan] a 'refusal to prosecute' form to sign" during an initial interview (Statement 9).  *Finally*, Plaintiffs state in conclusory fashion that the Article "does not couch any Defamatory Statement as an opinion" but this too ignores the plain words of the Article, including the comparative language that is the hallmark of opinion – *i.e.*, Statement 7 suggests that "police *should* consider the possibility of drug-facilitated sexual assault" and Statement 9 suggests that it is "poor practice" to "pressure victims to make any decisions about prosecution during the initial stages of an investigation."[18]  *See* Mov. Br. 33-34.  In short, these sentences are about what Plaintiffs *should* have done – which is quintessential opinion.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant summary judgment.[19]

Dated:  November 12, 2021

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Katherine M. Bolger*

---

[18] Plaintiffs make much of the distinction that they were required to follow TCHU policies, not IACP guidelines. Opp. Br. 43-44.  This overlooks that the TCHU policy on sexual assault is directly based on the IACP guidelines and in many cases uses identical language.  Doc. 63-74 (Tr. 40:5-41:10).

[19] Indeed, this is an opinion shared by Plaintiffs' own expert who concluded that Plaintiffs departed from best practices in investigating Rondini's allegations against Bunn. Mov. Br. 13, ¶53.

Katherine M. Bolger (*pro hac vice*)
Rachel F. Strom (*pro hac vice*)
John M. Browning (*pro hac vice*)

1251 Avenue of the Americas, 21st Fl.
New York, NY 10020-1104
T: (212) 489-8230
F: (212) 489-8340

**LIGHTFOOT, FRANKLIN & WHITE, LLC**

J. Banks Sewell, III
John G. Thompson
Jonathan R. Little, III

400 20th Street North
Birmingham, AL 35203-3200
T: (205) 581-0772
F: (205) 380-9172

*Attorneys for Defendants*
*BuzzFeed, Inc., Katie J.M. Baker, and Ben Smith*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing was electronically filed on this the 12th day of November, 2021, using the CM/ECF system which will send notification to the following.  Should the Notice of Electronic Filing indicate that notice needs to be delivered by other means to any of the following, I certify that a copy will be sent via U.S. Mail, postage prepaid and properly addressed.

Bobby H. Cockrell, Jr.
Jonathan D. Townsend
G. Scotch Ritchey, Jr.
Cockrell, Cockrell, Townsend & Ritchey LLP
1409 University Blvd.
Tuscaloosa, Alabama 35401
T: (205) 349-2009
F: (205) 758-3090
bcockrell@cctr.law
jtownsend@cctr.law
sritchey@cctr.law
Counsel for Plaintiffs


*/s/  John G. Thompson*
Of Counsel

22