FILED

2022 Mar-15  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ADAM JONES, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:19-CV-00403-RDP** |
| | } | |
| **BUZZFEED, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

These days, criticisms of the media are ubiquitous and come from all ends of the political spectrum. Those on the conservative side of society dub news organizations like CNN, MSNBC, and the New York Times as "Fake News." And, those who are more liberal are quick to condemn Fox News as "right wing." Both sides seem to assume (indeed, they stridently contend) that this is some new phenomenon — *i.e.*, that the so-called "Fourth Estate" has only recently gone off the rails and, depending upon a particular news agency's politics and philosophy (and the particular base they "target" with their brand of the news), media outlets selectively decide what news to report and what spin to put on that news. Again, the spoken and unspoken premise is that this is all some new era in American politics and society.

But, these views are wholly ahistorical. There has always been a level of perceived, if not actual, bias in the media's reporting of our nation's affairs and local events. This has been so from our nation's beginning. In the eighteenth century, media outlets were roundly viewed as partisan, slanting their reporting one way or another. *E.g.*, Jeffrey L. Pasley, *The Two National "Gazettes": Newspapers and the Embodiment of American Political Parties*, 35 Early American Literature 51 (2000); Joseph M. Torsella, *National Identity, 1750-1790: Samples from the Popular Press*, 112

Penn. Magazine of History & Biography 167 (Apr. 1988) (noting the political lean of certain papers in the late eighteenth century) ("The American press in the 1700s was not a perfect mirror of popular thought: primitive journalistic ethics, propagandizing editors, and commercial competition for a small readership and smaller profits did not make for disinterested reporting."). Over time, the media simply has not changed. In the next century, and in the years leading up to the Civil War, to our great shame, there were pro-slavery publishers pitted against anti-slavery newspapers. Howard C. Perkins, *The Defense of Slavery in the Northern Press on the Eve of the Civil War*, 9 Journal of Southern History 501 (1943). Once war broke out, even within the federalist Union, there were Republican and Democratic publishers who either supported or bashed President Lincoln's handling of the Civil War. The trend continued into the twentieth century and, to be sure, it permeates our news cycles today. Yet, none of this was in any way unexpected by our founders, who gave us the Bill of Rights, including our First Amendment.

Yet, it was against this very backdrop -- of what was actually the state of the media in the 1700s and how it was reasonably expected that the media would continue to similarly function as our Nation grew older -- that one of the nation's founders, Thomas Jefferson, said "were it left to me to decide whether we should have a government without newspapers or newspapers without a government, I should not hesitate a moment to prefer the latter." Letter from Thomas Jefferson to Edward Carrington (Jan. 16, 1787), founders.archives.gov.

Granted, there was no electronic media in the eighteenth century, and there were certainly fewer publishers. But, the fact remains that Jefferson's sentiments were expressed at a time when nearly everyone thought the press was biased and that the various media outlets presented decidedly slanted narratives toward a particular viewpoint (*e.g.*, Federalist or Anti-Federalist). So, while the founders adamantly believed the distribution of the news to be a necessity at the birth of

a democratic nation, even then, the view that media organizations (newspapers and periodicals) were "biased" was widely prevalent. *Id.* This historical perspective serves to remind us of the wisdom of King Solomon — "there is nothing new under the Sun." (Ecclesiastes 1:9). And, the historical lesson can be applied here because, as we will see, applying the law to the facts of this case, media bias is not equivalent to defamation.

More to the point, the question presented in this defamation case is not whether Defendants Buzzfeed, Baker, and Smith may have been affected by bias in what they chose to report (and how they chose to report it). For if that were the legal test for deciding defamation cases, the President could not appoint, and the Senate could not confirm, enough judges to the federal judiciary to handle all the litigation that would be filed in federal courts in this one area of the law alone. Rather, the question is emphatically this: did Defendants defame Plaintiffs.

This case is before the court on Defendants' Motion for Summary Judgment (Doc. # 65), as well as Defendants' Motions to Strike the Expert Reports of Robert G. Pastula and Dr. Emilie L. Lucchesi. (Docs. # 50-51). Each motion is fully briefed (Docs. # 50, 51, 57, 58, 60, 61, 66, 71, 74) and ripe for decision. For the reasons discussed below, Defendants' Motion for Summary Judgment is due to be granted, and Defendants' Motions to Strike are due to be denied as moot.

## I.    Background[1]

This action concerns a news article entitled "How Accusing a Powerful Man of Rape Drove a College Student to Suicide."[2] (Doc. # 66 at 9-10, 16, 20). The article was written by Defendant

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] The title of the article online now appears as "A College Student Accused a Powerful Man of Rape. Then She Became a Suspect."

Katie Baker and published by Defendant BuzzFeed, Inc. ("BuzzFeed") on June 22, 2017. (*Id.*). It reports on the tragic events surrounding the death of Megan Rondini ("Rondini") and purports to address systemic hurdles and pitfalls that women face after they report sexual assault. (*See* Doc. # 1-1). Buzzfeed is the publisher for the organization BuzzFeed News. (Doc. # 66 at 9). At the time Baker wrote and Buzzfeed published the article, Defendant Ben Smith was the Editor in Chief at BuzzFeed News. (*Id.* at 10). Plaintiffs Adam Jones and Joshua Hastings contend that (1) what Baker wrote is defamatory, (2) Buzzfeed published it knowing that, (3) Smith retained the power to decide whether to publish the story, and (4) Smith was generally responsible for the headline and the "deck" (*i.e.*, what appears under the headline). (*See* Docs. # 71-8 at 15; 71-6 at 58). Jones is an officer in the Tuscaloosa County Homicide Unit ("TCHU") and was the lead investigator into Rondini's claims against T.J. (Sweet T) Bunn, Jr. ("Bunn").  (Doc. # 66 at 9). Hastings was a deputy sheriff in the Tuscaloosa County Sheriff's Department's Tuscaloosa Metro Homicide Unit, and he assisted in the investigation of Rondini's accusations against Bunn. (*Id.*).

      **A.**      **The Rule 56 Record**

      On July 1, 2015, Rondini was at a bar with her friends in Tuscaloosa, Alabama. (Doc. # 63-34 at 5). As she was walking back to her apartment, Bunn and a friend asked if she needed a ride. (Doc. # 63-48 at 8-9). After having a drink at Rondini's apartment, the three made their way to Bunn's residence. (Doc. # 63-50 at 13). Bunn and Rondini had sex that night. Bunn contends it was consensual. (Doc. # 63-34 at 20). Rondini claimed it was not. She later went to Druid City Hospital in the early hours of July 2, 2015, to have a rape-kit performed and made a report of sexual assault to the police. (Doc. # 63-34 at 12). Rondini had trouble finding a counselor at the University of Alabama and she believed that the police were not taking her accusations seriously. (Doc. # 63-10 at 6-7). Rondini eventually withdrew from the University of Alabama, returned to

her home-state of Texas, and began taking classes at Southern Methodist University. On February 26, 2016, Rondini tragically took her own life. Next to her bed, an intake form from SMU's mental health center was found. (Doc. # 66 at 9). On the form, in response to a question asking about any major changes or crises in her life, Rondini wrote "Raped, bullied by police, changed university." (*Id.*).

### 1.    The Investigation and Drafting of the Story

In December 2016, Baker received a tip from a confidential source about Rondini's story. (Doc. # 66 at 10). The confidential source introduced Baker to Rondini's father ("Mr. Rondini"). (*Id.*). On December 30, 2016, Baker spoke with Mr. Rondini over the phone. (Doc. # 64-1 at 6). Based on this conversation, Baker told her editors that she was intrigued because the story appeared to be "part basic mishandled rape story" and "part southern coverup." (Doc. # 64-1 at 6; Doc. # 63-7). Also, after their phone call, Mr. Rondini provided Baker with a packet of documents, including the initial police report and Rondini's own handwritten notes on the incident. (Doc. # 66 at 10-11).

In January 2017, Baker travelled to Texas to interview Rondini's parents and obtain any additional documentation that might be in their possession. (Doc. # 66 at 10-11). After the meeting, Baker sent an email to her editors summarizing the basics of the story, as told by Mr. and Mrs. Rondini. (Doc. # 63-11). In the email, Baker pondered: "Is the tragedy another example of the criminal justice system failing victims, or something more sinister, given that the accused rapist is the wealthy heir to an old Alabama fortune?" (*Id.*).

Along with her colleague Alex Campbell, Baker then travelled to Alabama to visit key locations and meet personally with several sources.[3] (Doc. # 66 at 11-12). Also, during this

---

[3] Before travelling to Alabama and during her visit there, Baker represents that she spoke to an expert in how police departments handle sexual misconduct claims, a public defender in Birmingham, an attorney representing an

timeframe, Baker read an article about another young woman in Tuscaloosa who had been arrested for lying about an alleged rape on campus. (*Id.* at 12). That article quoted Captain Hood as explaining that many college women make false rape claims because they "are not doing well in school and hope that by doing this they can get some help from the university with their grades." (*Id.*).

Campbell's role in the investigation was to obtain records and other information from officials at the Tuscaloosa District Attorney's Office and the TCHU. (Doc. # 66 at 12). He received statistical information from Hood regarding reported rapes and arrests by the TCHU through a records request and email exchange. (Doc. # 63-27). Campbell's communications with the DA's Office revealed that they did not have information about the number of sexual assault cases presented to the grand jury compared to the number of indictments that followed. (*See* Doc. # 63-28).

When Baker returned to her office, she began drafting the article, which went through several rounds of revisions (and, in turn, each draft went through extensive editing). (*Id.* at 12). In fact, there were six different drafts (or drafting phases) of the article as Baker continued her investigation, discovered new information, and made edits. (Doc. # 64-1 at 19). After Baker received the felony packet and interviews that had been conducted by Plaintiffs, she deleted any direct or indirect references in the article to corruption or a cover-up.

During the drafting process, Baker received comments and suggestions from her co-workers, Tina Susman and Marisa Carroll. (*Id.* at 12). Baker continued to investigate, including conducting research on Alabama's rape statute and the process for collecting blood and urine

---

individual accused of falsely reporting rape, the Director of Development and Communications for Crisis Center Birmingham, the Executive Director of an entity that supports domestic violence and sexual assault victims, a family friend of Mr. and Mrs. Rondini, six of Rondini's friends, and the Corporate Director of Marketing and Communications for Druid City Hospital. (*See* Docs. # 63-25, 63-26, 64-1).

samples from alleged rape victims. (*Id.* at 12). Baker also contacted several other sources, including individuals from the FBI, the director of the SANE-SART (Sexual Assault Nurse Examiner-Sexual Assault Response Teams) Resource Service, and representatives from the District Attorney's Office. (*Id.*; Docs. # 63-22; 63-24; 63-26 # 64-1 at 20-22).

Sometime around March 2017, Baker submitted another early draft to another colleague, Sharmilla Venkatasubban, for fact checking. (*Id.* at 12). Venkatasubban's role was to ensure that all the facts in the article were accurate and substantiated. (*Id.* at 13). This required that Venkatasubban be given access to all the information available to Baker and also entailed continued discussions between the two. For example, an early draft of the article contained the statement, "Tuscaloosa authorities threatened to charge Megan herself with a crime." However, after Venkatasubban's fact-checking and upon a further review of the police record, that entire section of the article was cut. (Doc. # 64-1 at 24-25). At the conclusion of the fact-checking process, Venkatasubban believed that the facts in the article were accurate. (Doc. # 66 at 13).

Then, in April 2017, Baker received Rondini's medical records, which revealed that Rondini told hospital personnel that she had sex with Bunn, but it was "not consensual." (*Id.* at 13). The medical records did not indicate whether Rondini's blood and urine samples were sent for a toxicology report. Baker would later learn from the Alabama Department of Forensic Sciences that they were not sent. (*Id.*).

Around May 2017, Baker went back to Texas to collect documents that Mr. Rondini had received from the Tuscaloosa police department in response to a subpoena. (*Id.*). The documents included the felony packet submitted against Bunn and the videotaped interviews of Rondini and Bunn that were conducted by Plaintiffs. (*Id.*; *see* Docs. # 63-35, 63-36, 63-37, 63-48, 63-49, 63-50, 63-70).

Baker learned of several new pieces of information from the felony packet. First, Baker discovered Jones's and Hastings's roles in the investigation, and, on the first page of the felony packet, Baker saw Jones's statement that "no sexual assault had occurred." (*Id.*). Second, Baker learned that Bunn initially lied to police about Rondini being at his home on the night of the incident. (*Id.*). Third, the felony packet included the Uniform Incident/Offense Report against Rondini. (*Id.* at 14). The report was timestamped 8:29 AM on July 2, 2015 -- between Rondini's initial report of rape to police at the hospital and her interview at the police station. (*Id.*). In the report, Rondini is labelled as the "suspect" and Bunn is called the "victim," because Rondini admitted to police that she had taken property from Bunn's house and his car as she fled his house. (*Id.*).

Baker also received the videos of three interviews. The first video shows Jones's initial interview of Rondini at the police station, which occurred seven hours after he talked to her at the hospital. (Docs. # 66 at 14; # 71 at 12). The next video shows Jones's further interview of Rondini, which took place after the police looked through her apartment to confirm that Bunn, his friend, and Rondini went there the previous night before going to Bunn's residence. (Doc. # 63-36).  The final video recounts Hasting's interview of Bunn at the police station, which occurred three days after the incident. (Doc. # 66 at 14). Baker included several quotations from (and summaries of) the felony packet and the police interviews throughout the article.

Baker also contacted a representative from the International Association of Chiefs of Police ("IACP"). (Doc. # 66 at 14-15). Based on her reading of that organization's guidelines, Baker did not believe that Plaintiffs' investigation of Rondini's allegations met IACP standards in two respects. (*Id.* at 15). First, she determined that IACP standards suggest that officers consider the possibility that a potential sexual assault victim that shows signs of memory loss may have been

drugged. (*Id.*). Second, she believed that IACP guidelines advise police not to pressure victims into making decisions about pursuing charges early in an investigation. (*Id.*).[4]

Also, after Baker reviewed the felony packet and the interviews, she believed that there was insufficient evidence to support Mr. Rondini's assertion that the police were part of a cover-up. (Doc. # 66 at 15). Therefore, Baker removed every statement that referenced corruption or a cover-up on the part of the police. (*Id.*).[5]

In late May and early June 2017, Baker contacted Bunn, Druid City Hospital, the University of Alabama, Kathy Echols (a University of Alabama counselor), Jonathan Cross (of the Tuscaloosa DA's Office), and the Tuscaloosa Police -- including Hood, Hart, Jones, and Hastings. (*Id.* at 15; Docs. # 64-1 at 31-32; 63-42; 63-43). Plaintiffs did not respond to Baker's invitation to comment. (Doc. # 66 at 15). Even after Hood twice declined to comment, Baker nonetheless continued to ask for additional information to ensure the accuracy of the article. (*See* Docs. # 63-42, 63-43). Hood eventually responded to Baker's inquiries, explaining: why an investigation would be labelled a special inquiry in general; why Rondini's allegations were labelled a special inquiry specifically; why the department did not ask the hospital to draw blood or urine from Rondini (and confirmed that the police would make that request if the circumstances called for it); and that the IACP are merely general recommendations. (*See* Doc. # 63-45). In her article, Baker quoted from or summarized passages from Hood's emails.

On May 22, 2017, Baker sent another draft of the article to Venkatasubban for fact-checking. (Doc. # 64-1 at 35). After that additional review, on June 22, 2017, Buzzfeed published

---

[4] Of course, IACP guidelines do not control Tuscaloosa Police investigations. (*See* Doc. # 63-45 at 6).

[5] Plaintiffs continue to allege that the article imputes a story of corruption and a cover-up, and this argument is addressed further in the court's analysis below. However, the article's only reference to a cover-up pertained to former Governor Robert Bentley's resignation after being accused of using state money to cover up an affair.

the article. (*Id.* at 16). Interestingly, Plaintiffs have admitted that Baker, Venkatasubban, Carroll, and Susman believed -- and still believe today -- that the facts referenced in the article are true. (*Compare* Doc. # 66 at 11 *with* Doc. # 71 at 16).

### 2.   The Contents of the Article at Issue

Earlier in this case, there was confusion about precisely which statements in the article Plaintiffs contended were defamatory. So, in its September 11, 2020 Order, the court instructed Plaintiffs to provide a list of statements in the article that they consider defamatory. (Doc. # 39). On October 2, 2020, the parties submitted a joint report and attached a list of eleven statements that Plaintiffs allege are actionable. (*See* Doc. # 40-1).

*First*, Plaintiffs contend that the article's headline, "How Accusing a Powerful Man of Rape Drove A College Student To Suicide," when read in conjunction with the article as a whole, is a false and malicious statement that imputes wrongdoing to Plaintiffs. (Doc. # 40-1 at 2). Plaintiffs claim that the headline primes the reader to view Bunn as a powerful man and the Plaintiffs as corrupt. Also, Plaintiffs suggest that the headline implies that Plaintiffs were involved in a department-wide conspiracy to cover up Rondini's rape allegation. (*Id.*).

*Second*, Plaintiffs claim that the article's byline, "When an Alabama college student told the police she was sexually assaulted, she did everything she thought she was supposed to do. She ended up killing herself," is defamatory (Doc. # 40-1 at 3). Plaintiffs allege that this statement falsely and maliciously connects Rondini's death to the police investigation. (*Id.*).

*Third*, Plaintiffs contend that the following statement is defamatory:

Megan [Rondini] never imagined that she would soon be cast as a criminal, or that investigators would view Sweet T — really T.J. Bunn Jr., son of an influential Tuscaloosa family — as the true victim. But that's exactly what happened.

(*Id.* at 3). Plaintiffs allege that this statement falsely and maliciously portrays that Plaintiffs viewed Bunn as the real victim. Plaintiffs also contend that the statement's structure demonstrates that Defendants were not neutral in their reporting. (*Id.*).

> *Fourth*, Plaintiffs claim that the following statement is defamatory:

> Under Alabama's archaic rape law, victims must prove they "earnestly" resisted their attackers, and the investigator who interviewed Megan quickly decided she hadn't fought back against Bunn—she hadn't "kicked him or hit him," he explained. His investigation would conclude that no rape occurred. But he didn't stop there. Instead, he started building a case against Megan, questioning her for multiple crimes she wasn't even aware she had committed. Later, when Megan tried to file a civil suit, she learned the only way to escape possible prosecution for those crimes was to drop her case.

(*Id.* at 3-4). Plaintiffs contend that this statement is false and malicious for various reasons. For example, they allege that this portion of the article portrays that Plaintiffs had the ability to alter Alabama's criminal code; that Plaintiffs quickly disregarded Rondini's allegation for lack of earnest resistance; that Jones was the only individual involved with the investigation and responsible for the ultimate determination; that Plaintiffs brought false charges against Rondini to induce her to drop the rape allegation against Bunn; that Plaintiffs were working against Rondini; and that Plaintiffs were the reason Rondini dropped her civil lawsuit. (*Id.* at 3-4). In sum, Plaintiffs allege that this statement portrays them as corrupt law enforcement officers who were covering up a crime for Bunn. (*Id.* at 4). Also, Plaintiffs complain that the article fails to note the limitations the law imposes on them and cherry picks from other statements made by Rondini. (*Id.*).

> *Fifth*, Plaintiffs argue that the following statement is defamatory:

> Megan's 3.8 GPA didn't stop police from marking her first report a "special inquiry." She didn't know that they already doubted her when she went to the station for a follow-up interview the same morning she was discharged from the hospital, even though she hadn't slept.

(*Id.* at 4). Plaintiffs contend that this statement suggests that they do not take a special inquiry seriously and that Rondini's allegations should not have been listed as a special inquiry because of her high GPA. (*Id.*). They also claim the statement falsely and maliciously provides that Jones doubted Rondini following her report in the hospital. (*Id.* at 5). And, Plaintiffs complain, the article omits that Rondini went to the police station on her own volition. (*Id.*).

> *Sixth*, Plaintiffs contend that the following statement is defamatory:

> It took about 21 minutes for Megan to tell investigator Adam Jones her side of the story, up to finding the pocket pistol in Bunn's car while looking for her keys. As soon as Megan mentioned the gun, Jones abruptly left the room, video of her interview shows. After that, he changed his course of questioning. For the next few hours, he came in and out of the room with questions for Megan that were about her behavior the previous night instead of her rape allegations.

(*Id.* at 5). Plaintiffs assert that this statement continues to imply that they were involved in a cover-up to protect Bunn. They take particular issue with the article explicitly mentioning the time it took Rondini to tell Jones her side of the story in her interview at the police station and what Plaintiffs say was Baker's use of the term "build a case." (*Id.*).

> *Seventh*, Plaintiffs allege that the following statement is defamatory:

> Studies show that trauma victims often have fragmented memories of assaults. When confronted with such gaps, police should consider the possibility of drug-facilitated sexual assault, the International Association of Chiefs of Police guidelines explain. But investigators never tested Megan's blood or urine, according to the state department that processes toxicology reports, which found no records associated with Megan's case ... . It's unclear if the hospital even collected the blood and urine samples necessary for forensic testing when it performed a basic rape kit on Megan.

(*Id.* at 6). Plaintiffs contend it was improper for Baker to imply that it was the police's responsibility to ask for a blood or urine sample. (*Id.*). Also, they assert this statement "falsely proclaims" that DCH did not obtain a urine sample from Rondini. (*Id.*).

12

*Eighth*, Plaintiffs contend the following statement was defamatory:

Around 2 p.m., about 12 hours after Megan had first reported the incident, Jones told her they were "close" on her case but had some other issues to discuss.

"Before I ask you any questions, you got any reasoning behind why you did what you did?" he asked Megan.

"What do you mean?" Megan said.

"I just need you to tell me, once we get into the questioning, what your reasoning was about why you did these things," he said.

Megan stared at Jones as he read her Miranda rights before asking her why she took Bunn's gun. He didn't tell Megan that, although she had entered the room an alleged victim, she was now a suspect as well.

(*Id.* at 6-7). Plaintiffs continue to assert these statements imply that they were part of a cover-up to suppress Rondini's rape allegations and sought to manufacture charges against her. (*Id.*). More specifically, they believe Baker should have mentioned that the investigation continued after this interview. (*Id.* at 6). Also, Plaintiffs assert that Baker should have mentioned at this point in the article that Bunn's case was presented to a grand jury. (*Id.* at 6).

*Ninth*, Plaintiffs allege that the following statement is defamatory:

Eventually, Jones returned to Megan's rape allegations. "Based on your statements to me, you said that you never resisted him," he said.

"I did resist him," Megan said, listing the ways she did, from repeatedly telling Bunn she wanted to leave to turning away when he kissed her. "I wanted to go home," she said. "He didn't take me home."

"Look at it from my side," Jones replied calmly. "You never kicked him or hit him or tried to resist him."

A few minutes later, Megan said she didn't know if she wanted to press charges after all.

"I want to be done," she said. "I just want to move on."

Jones offered to give her a "refusal to prosecute" form to sign.

13

> More than 40% of people who reported sexual assault in Tuscaloosa from 2011 to
> 2016 officially dropped their charges by signing such forms, according to a
> BuzzFeed News analysis of the homicide department's data. There are many
> reasons why someone might not want to pursue a case, Hood said: "I know for
> instance in many cases people are mad at someone initially, then change their
> mind." But the IACP tells police not to pressure victims to make any decisions
> about prosecution during the initial stages of an investigation. Doing so is "poor
> practice" and "potentially damaging to an agency," its guidelines state.

(*Id.* at 7-8). Plaintiffs argue this statement suggests that Jones pressured Rondini into signing a

refusal to prosecute form. (*Id.* at 7). They also contend the statement implies that Jones refused to

follow the law and further suggests inaccurately that he was subject to IACP guidelines. (*Id.* at 8).

> *Tenth*, Plaintiffs claim that the following statement is defamatory:

> "I'll get y'all out of here," investigator Josh Hastings assured them as they
> convened in the small room. After some high-spirited small talk about fishing —
> the snappers were biting — Hastings began his questioning. ... "This is something
> ... I'm gonna ask the question ... it's gotta be asked," Hastings said, fumbling a bit
> ... "We're still kinda waiting to hear back from her," Hastings said. "Obviously,
> we've got a couple issues we're dealing with," he said, mentioning the car "broken
> into," the money "stolen" — Bunn claimed he was missing more than the $3 Megan
> said she grabbed for the cab — and "now even the possibility of a round that struck
> an occupied residence."

> "We are dealing on that end of things with her, just kind of waiting to see how far
> she's going to push this," he said ... "No one wants someone showing up on their
> doorstep early in the morning," Hastings said. "The way I look at, man, if it was
> me on the other side of it, I would want you to do the same for me."

(*Id.* at 9). Plaintiffs contend that the article implies this is the officer's first interview of Bunn.

(*Id.*). They also allege that this passage further suggests they are corrupt. (*Id.*). Instead, Plaintiffs

assert that Baker should have recognized (and then explained) that Hastings was using a nice-guy

interrogation tactic in his interview of Bunn and the article should have acknowledged that Rondini

admitted to accidentally firing the gun she found in Bunn's vehicle toward the residence. (*Id.*).

> *Eleventh*, Plaintiffs contend that the following statement is defamatory:

> There was a catch. In a package deal, the grand jury would also rule on felony
> charges against Megan for breaking into Bunn's car and stealing his gun. Internal

14

documents from September 2015 imply authorities didn't intend to fight too hard on Megan's behalf: Investigators noted they found "no sexual assault occurred."

(*Id.* at 9-10). They allege that Baker falsely portrayed the grand jury process to make it appear that Plaintiffs, as opposed to prosecutors, had the ability to decide how the case was to be presented. (*Id.*). They contend that this statement also indicates an underlying narrative in the story that suggests corruption. (*Id.*).[6]

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub.*

---

[6] Plaintiffs also allege that a follow-up article entitled "The Parents of a College Student Who Killed Herself After Reporting She Was Raped Have Filed a Wrongful Death Suit," published on July 3, 2017, is defamatory. (Doc. # 1 at 6). However, Plaintiffs do not point to any specific statements in that article that they contend are defamatory, nor have they even named the author of the article as a defendant. In addition to these defects, the court concludes that, for the same reasons that they cannot as a matter of law make a sufficient showing that the first article (discussed below) was defamatory, Plaintiffs cannot make such a showing regarding the follow-up article.

*Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the nonmovant would bear the burden of proof at trial, a

> moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Fitzpatrick*, 2 F.3d at 1115 (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). And, where the moving party has met this initial burden by showing that there is an absence of evidence supporting the nonmoving party's case, the nonmoving party must

> respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Id.* (internal citations omitted).

## III.   Analysis

To recover on a claim of defamation, a plaintiff must prove: "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused

by the publication of the statement." *McCaig v. Talladega Pub. Co., Inc.*, 544 So. 2d 875, 877 (Ala. 1989). Here, the court concludes that Plaintiffs have failed to provide sufficient Rule 56 evidence for a reasonable juror to determine that the first two elements may be met. And, as explained below, because the contested statements are neither false nor defamatory, and (in the alternative) are privileged, Defendants' motion for summary judgment is due to be granted

### A.      The Statements are Neither False Nor Defamatory

The Alabama Supreme Court has emphasized that the first element of defamation requires proof of "a false *and* defamatory statement concerning the plaintiff." *McCaig*, 544 So. 2d at 877 (citing *Restatement (2d) of Torts* § 558 (1977)) (emphasis in original). Put differently, for a claim to be actionable, a contested statement must be false <u>and</u> defamatory, and these requirements are separate sub-elements. A plaintiff must prove both. Here, after careful review, the court concludes that each of the eleven statements are (1) true in their most literal sense and (2) not capable of being given a defamatory meaning by an ordinary reader.

### 1.      Each Contested Statement Is True; Therefore, Plaintiffs Cannot Establish the Requisite Elements of Defamation

"[F]alsity is a *sine qua non* of a [defamation] claim ... ." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016) (quotations omitted). Thus, "[t]he first element of a cause of action in defamation is a false statement." *Tidwell v. Winn-Dixie Inc.*, 502 So. 2d 747, 748 (Ala. 1987). Therefore, "truth is always an absolute defense to any action for libel or slander." *McCaig*, 544 So. 2d at 879; *see Ex parte Bole*, 103 So. 3d 40, 51 (Ala. 2012); *Battles v. Ford Motor Credit Co.*, 597 So. 2d 688, 692 (Ala. 1992). Further, when the contested speech is a matter of public concern (regardless of whether the plaintiff is a public or private individual), "the plaintiff bear[s] the burden of showing falsity, as well as fault, before recovering damages." *Forrester v. WVTM TV,*

*Inc.*, 709 So. 2d 23, 26 (Ala. Civ. App. 1997) (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986)).

In this case, the Rule 56 record indicates that each contested statement "[is] in [its] most literal sense true." *See McCaig*, 544 So. 2d 879. Therefore, it is hardly surprising that Plaintiffs have failed to produce summary judgment evidence that the statements challenged are false. *See Forrester*, 709 So. 2d at 26.

Before analyzing each of the purportedly defamatory statements -- and to be sure the court does just that below -- the court pauses to observe that Plaintiffs' briefing appears to present an alternative theory of liability. In fact, the bulk of the briefing suggests that while the challenged statements may not be false as far as each statement goes, they (and, in turn, the article) are defamatory because of the implications of the statements. According to Plaintiffs, one method used by Defendants to spin the story was the "intentional[] omi[ssion] [of] many facts that show [Defendants] conducted a thorough and fair investigation ... ." (Doc. # 63-1 at 26). These arguments regarding implication are addressed below, but they also bear some relationship to the issue addressed here: were these purported omissions sufficient to make the statements untrue?

In assessing this initial question -- were the statements untrue -- for the reason addressed below, Plaintiffs' argument cannot be squared with Eleventh Circuit precedent. With these points of law and logic in mind, the court addresses the statements that Plaintiffs contend are false and defamatory.

*First*, Plaintiffs claim that the headline -- "How Accusing a Powerful Man of Rape Drove A College Student To Suicide" -- is false. (Doc. # 71 at 39-40). Contrary to Plaintiffs' assertions, the facts in the headline are true: Rondini accused T.J. Bunn of rape, and she did commit suicide. As Rondini wrote on her intake form to SMU's mental health center: "Raped, bullied by police,

19

changed university." Nor is there any basis to say that the headline represents a statement about Plaintiffs. It does not imply a cover-up by law enforcement. Indeed, those portions in an earlier draft of the article that could be read to suggest a cover-up by Plaintiffs (and others) were scrubbed from the piece.

*Second*, contrary to Plaintiffs' assertions, the byline -- "When an Alabama college student told the police she was sexually assaulted, she did everything she thought she was supposed to do. She ended up killing herself." -- is true: Rondini told the police that she was sexually assaulted; she went to the hospital after the incident, she reported it to police, she sought help through the University's counseling program (*i.e.*, she did "everything she thought she was supposed to do"); and "[s]he ended up killing herself." The byline is simply a quick synopsis of the article. Here, the byline succinctly informs the reader that the article involves the circumstances surrounding Rondini allegedly being sexually assaulted, going to the hospital, reporting the sexual assault, seeking help from a university therapist, and committing suicide.

*Third*, Plaintiffs contend that the following statement is false:

> Megan [Rondini] never imagined that she would soon be cast as a criminal, or that investigators would view Sweet T — really T.J. Bunn Jr., son of an influential Tuscaloosa family — as the true victim. But that's exactly what happened.

(Doc. # 71 at 40-41). But, there is no indication in the record that this statement is false. According to one of the Uniform Offense Reports, Rondini was suspected of criminal theft -- taking money and a gun from Bunn's vehicle -- and in that Report Bunn was actually labelled the victim. (Doc. # 63-34 at 66). Also, at various points in the interviews, Jones questioned Rondini about taking the money and discharging the firearm, possibly in the direction of Bunn's residence. And, in his follow-up interview of Bunn, Hastings spoke with Bunn about the stolen money and gun, in addition to the rape allegations. (*See* Docs. # 63-35, 63-36, 63-37). Finally, the grand jury "no

20

billed" the sexual assault charges against Bunn, but "true billed" the counts of theft against Rondini. (Docs. # 63-44 at 2; 63-70 at 47).

> *Fourth*, Plaintiffs claim that the following statements are false:

> Under Alabama's archaic rape law, victims must prove they "earnestly" resisted their attackers, and the investigator who interviewed Megan quickly decided she hadn't fought back against Bunn — she hadn't "kicked him or hit him," he explained. His investigation would conclude that no rape occurred. But he didn't stop there. Instead, he started building a case against Megan, questioning her for multiple crimes she wasn't even aware she had committed. Later, when Megan tried to file a civil suit, she learned the only way to escape possible prosecution for those crimes was to drop her case.

(Doc. # 71 at 41-44). There is no Rule 56 evidence that indicates this passage contains false information.  Before September 1, 2019, Alabama law defined forcible compulsion (which is a required element of first-degree rape) as "[p]hysical force that overcomes *earnest resistance* or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." Ala. Code § 13A-6-60 (amended September 1, 2019) (emphasis added). The police investigation concluded that Bunn did not rape Rondini. (Doc. # 63-34 at 5) ("It was found no sexual assault occurred and investigators were able to determine that the victim went with the suspect willingly after they took her home to Houndstooth Apartments."). Further, Jones questioned Rondini extensively about the possible theft and her firing of the gun. (*See* Docs. # 63-36, 63-49). In fact, Jones later used the term "build a case" in reference to logging her allegations against Bunn into the police database. (Doc. # 63-49 at 39). Additionally, Rondini's attorney indicated to her father that the criminal charges against Rondini were mentioned to him -- possibly to have him "cool [his] jets" -- after sending Bunn a demand letter regarding a potential civil suit. (Doc. # 63-51 at 2-3). Bunn also said that he would not pursue the criminal charges against Rondini if she did not pursue him. (Doc. # 63-50 at 36).

*Fifth*, Plaintiffs argue that the following statements are false:

Megan's 3.8 GPA didn't stop police from marking her first report a "special inquiry." She didn't know that they already doubted her when she went to the station for a follow-up interview the same morning she was discharged from the hospital, even though she hadn't slept.

(Doc. # 71 at 44-45). Again, there is no basis in the summary judgment evidence to say this statement is false. The felony packet labelled Rondini's allegations as a special inquiry. (Doc. # 63-34 at 2). Hood explained in his email to Baker that Rondini's "initial statements did not meet the criminal elements of rape." (Doc. # 63-45). Also, Jones did not believe the elements of rape were met (in other words, he doubted that a first-degree rape occurred). (*See* Doc. # 63-61 at 40).

*Sixth*, Plaintiffs contend that the following statements are false:

It took about 21 minutes for Megan to tell investigator Adam Jones her side of the story, up to finding the pocket pistol in Bunn's car while looking for her keys. As soon as Megan mentioned the gun, Jones abruptly left the room, video of her interview shows. After that, he changed his course of questioning. For the next few hours, he came in and out of the room with questions for Megan that were about her behavior the previous night instead of her rape allegations.

(Doc. # 71 at 45-47). In fact, it did take approximately twenty-one minutes for Rondini to tell her side of the story to Jones when she was first interviewed at the police station. (Doc. # 63-35). When Rondini mentioned the gun, Jones did leave the room. (*Id.*). Also, when Jones returned, his questions during the interview (and the majority of the second interview of her at the police station) focused on the gun (as well as with Rondini and Bunn going to her apartment before the incident and certain other events after the incident). (*See* Docs. # 63-35, 63-36, 63-48, 63-49).

*Seventh*, Plaintiffs allege that the following statements are false:

Studies show that trauma victims often have fragmented memories of assaults. When confronted with such gaps, police should consider the possibility of [a] drug-facilitated sexual assault, the International Association of Chiefs of Police guidelines explain. But investigators never tested Megan's blood or urine, according to the state department that processes toxicology reports, which found no records associated with Megan's case ... . It's unclear if the hospital even collected

22

the blood and urine samples necessary for forensic testing when it performed a basic rape kit on Megan.

(Doc. # 71 at 47-48). The IACP guidelines provide that investigators should "[r]emain open to the possibility of [a] drug-facilitated sexual assault [and] victims of a drug-facilitated assault may report black-outs, gaps in time and memory, and a general uncertainty as to whether or not an assault occurred." (Doc. # 63-39 at 8). As Hood confirmed, investigators never tested Rondini's blood or urine (although investigators would generally do so if the circumstances dictated that such testing should occur). (Doc. # 63-44 at 4-5). And, it is unclear whether DCH collected blood or urine samples from Rondini. (Doc. # 63-33 at 2).

*Eighth*, Plaintiffs contend the following statements are false:

Around 2 p.m., about 12 hours after Megan had first reported the incident, Jones told her they were "close" on her case but had some other issues to discuss.

"Before I ask you any questions, you got any reasoning behind why you did what you did?" he asked Megan.

"What do you mean?" Megan said.

"I just need you to tell me, once we get into the questioning, what your reasoning was about why you did these things," he said.

Megan stared at Jones as he read her Miranda rights before asking her why she took Bunn's gun. He didn't tell Megan that, although she had entered the room an alleged victim, she was now a suspect as well.

(Doc. # 71 at 48-49). The transcript shows that the second interview at the police station between Jones and Rondini began as follows:

Officer [Jones]: We are in the process of getting the final pieces as far as the videos and stuff, we still got to touch base with Innisfree, but we are going back out to your apartment to go ahead and pull that before it rolls over and records over, but so *we are close on your case*. Now, based on the statements that you made to the me earlier, I need to ask you some questions about, okay? *Before I ask you any questions though, I mean, you got a reasoning behind why you did what you did?*

[Rondini]: *What do you mean?*

Officer [Jones]: Well, that is what we are going to get into. Now you -- *I just need you to tell me once we get into the questioning, you know, what your reasoning was about why you did these things,* but before I ask you the questions I have to read you your rights, okay?

(Doc. # 63-49 at 3) (emphasis added). Jones proceeded to read Rondini her *Miranda* rights. (*Id.* at 3-4). Jones continued the interview by questioning Rondini about taking the money and discharging the firearm (potentially toward an occupied residence). (*Id.* at 5-19). Indeed, the taped interview shows that Rondini was clearly a suspect in a crime, and the record indicates that Jones believed he was legally obligated to investigate the matter. (Doc. # 63-44 at 4).

*Ninth*, Plaintiffs allege that the following statements are false:

Eventually, Jones returned to Megan's rape allegations. "Based on your statements to me, you said that you never resisted him," he said.

"I did resist him," Megan said, listing the ways she did, from repeatedly telling Bunn she wanted to leave to turning away when he kissed her. "I wanted to go home," she said. "He didn't take me home."

"Look at it from my side," Jones replied calmly. "You never kicked him or hit him or tried to resist him."

A few minutes later, Megan said she didn't know if she wanted to press charges after all.

"I want to be done," she said. "I just want to move on."

Jones offered to give her a "refusal to prosecute" form to sign.

More than 40% of people who reported sexual assault in Tuscaloosa from 2011 to 2016 officially dropped their charges by signing such forms, according to a BuzzFeed News analysis of the homicide department's data. There are many reasons why someone might not want to pursue a case, Hood said: "I know for instance in many cases people are mad at someone initially, then change their mind." But the IACP tells police not to pressure victims to make any decisions about prosecution during the initial stages of an investigation. Doing so is "poor practice" and "potentially damaging to an agency," its guidelines state.

24

(Doc. # 71 at 49-51). According to the transcript, Jones did in fact return to investigating the specifics of Rondini's rape allegations, as follows:

> Officer [Jones]: … Here is what I want to talk to you about. And I think you know this, I really do, when we talked at the hospital you made a statement to me, you said that you felt like, you know, you had been taken advantage of or something to that effect, but you also said that you never told him no. You know, I felt like --
>
> [Rondini]: I --
>
> Officer [Jones]: And I am just -- I am not trying to put words in your mouth, okay, but here -- go ahead, go ahead.
>
> [Rondini]: I mean, I was saying that I wanted to leave and I mean, I wasn't -- when he started to touch me I was not responsive to him at all.
>
> Officer [Jones]: Okay.
>
> [Rondini]: I just -- I honestly felt like if I just -- like, because he wasn't going to stop, so if I just kind of let him then I would be able to leave.
>
> Officer [Jones]: Now you say that, do you feel like you were in danger?
>
> [Rondini]: I mean, I did not want to be there, I don't feel like I was in danger like he was going to, like, kill me.
>
> Officer [Jones]: Okay
>
> [Rondini]: But --
>
> Officer [Jones]: And here is my question to you, and this is after going over everything and there again, we are still working, it is an active case, okay? We are still working this case, but based on your statements to me, you said that you never resisted him?
>
> [Rondini]: I didn't [sic][7] resist him. I said I wanted to leave, when he tried to kiss me I turned away, like I didn't --
>
> Officer [Jones]: But you said you never said no, okay? And you said that you felt like if you let him have sex that you would be able to leave, okay?

---

[7] A review of the videotape of the interview confirms that Rondini said that she *did* resist Bunn. (Doc. # 63-36).

(Doc. # 63-49 at 23-25). The line of questioning continued, and Rondini listed ways in which she

believed she resisted Bunn's advances. (*Id.* at 26). Also, Jones did make the statements "look at it

from my side" and "you never kicked him or hit him, tried to resist him" as an example of what

resistance may have occurred. (*Id.* at 33). In the middle of this conversation, Jones offered to give

Rondini a refusal-to-prosecute form, and Jones then returned to explaining the refusal-to-prosecute

form toward the end of the interview. (*Id.* at 28, 38-39). The statistical information was provided

by Hood, who also made the statement "many people elect not to pursue cases for many reasons.

I know for instance in many cases people are mad at someone initially, then change their minds."

(Docs. # 63-27; 63-45 at 6). And the IACP Guidelines do state: "Pressuring a reluctant victim to

sign a form stating that they are not interested in prosecution and will not hold the agency

accountable for stopping the investigation is poor practice and is potentially damaging to an

agency." (Doc. # 63-39 at 7).

> *Tenth*, Plaintiffs claim that the following statements are false:
>
> "I'll get y'all out of here," investigator Josh Hastings assured them as they
> convened in the small room. After some high-spirited small talk about fishing —
> the snappers were biting — Hastings began his questioning. ... "This is something
> ... I'm gonna ask the question ... it's gotta be asked," Hastings said, fumbling a bit
> ... "We're still kinda waiting to hear back from her," Hastings said. "Obviously,
> we've got a couple issues we're dealing with," he said, mentioning the car "broken
> into," the money "stolen" — Bunn claimed he was missing more than the $3 Megan
> said she grabbed for the cab — and "now even the possibility of a round that struck
> an occupied residence."
>
> "We are dealing on that end of things with her, just kind of waiting to see how far
> she's going to push this," he said ... "No one wants someone showing up on their
> doorstep early in the morning," Hastings said. "The way I look at, man, if it was
> me on the other side of it, I would want you to do the same for me."

(Doc. # 71 at 51-52). When Hastings entered the room to begin Bunn's interview, he did begin

"Sorry guys … I'll get y'all out of here." (Docs. # 63-37; 63-50 at 5). Hastings and Bunn then

discussed potential evidence that Rondini discharged the firearm in the direction of Bunn's home

as well as Bunn and his attorney's fishing expedition that weekend. (Doc. # 63-50 at 5-11). The rest of the paragraph accurately summarizes the interview: Bunn claimed he did not see Rondini at the bar the night of the incident (*id.* at 30); Bunn stated that he had been drinking but said he was all right (*id.* at 15); Bunn told Hastings that Rondini invited him and his friend into her apartment, made drinks, and chose to go to Bunn's residence (*id.* at 13); Bunn said the sex was consensual, he fell asleep, and the next thing he remembers is the police at his door (*id.* at 16). The interview continued with the following exchange:

> Officer [Hastings]: So, because this is -- you know, this is something that I have to ask the question because it has to be asked, but initially we asked did you have anybody there and your response was no, why?
>
> Mr. Bunn: At that time, to be honest with you, I didn't recall
>
> Officer [Hastings]: Okay. Still trying to --
>
> Mr. Bunn: Still trying to, you know --
>
> Officer [Hastings] Scared?
>
> Mr. Bunn: Of course, yeah, sure.
>
> Officer [Hastings]: Okay
>
> Mr. Bunn: Sure was.
>
> Officer [Hastings]: You know, you collect your thoughts --
>
> Mr. Bunn: Still scared
>
> Officer [Hastings]: Right. Right. You end up collecting your thoughts and coming around and that is when you remember that you had her over there?
>
> Mr. Bunn: Right.

(*Id.* at 17-18). Bunn did state that Rondini was a "[v]ery willing participant." (*Id.* at 19). The conversation between Bunn and his attorney did occur when Hastings left the interview room. (*Id.* at 36). Near the end of the interview, Hastings commented:

I understand, and, you know, we are still kind of waiting to hear back from her. I mean, obviously, you know, we have got a couple issues we are dealing with here. We have got the vehicle broken into, we have got money stolen, now possibly even the possibility of a round that struck an occupied residence, so there is a couple things there we are dealing with on that end of things with her, just kind of waiting to see what -- how far she is going to push this.

(*Id.* at 39-40). And, during the interview, Bunn and Hastings did make the following comments:

Officer [Hastings]: Okay. Okay. I think that about covers it. I am going to go and check and make sure there is not anything else I am missing. I will get your keys, get those back to you.

Mr. Bunn: I will say this, I appreciate y'alls professionalism and I appreciate the way y'all have handled this. Y'all have handled it in a very ethical way.

Officer [Hastings]: I appreciate you. No one wants someone showing up at their doorstep early in the morning.

Mr. Bunn: Y'all did y'alls job and I appreciate it.

Officer [Hastings]: The way I look at it, man, if it was me on the other side, I would want to do the same thing for me.

Mr. Bunn: I do, I appreciate all y'all. Y'all have done a very thorough job and I appreciate it.

Officer [Hastings]: I appreciate it. I appreciate you being cooperative. I know it is not something -- and you too, man, you know. He has always been easy to deal with, I am telling you, always. I wish they were all that easy to get ahold of when I need to. Y'all give me just a second and I will be right back.

(*Id.* at 31-32).

*Eleventh*, Plaintiffs contend that the following statements are false:

There was a catch. In a package deal, the grand jury would also rule on felony charges against Megan for breaking into Bunn's car and stealing his gun. Internal documents from September 2015 imply authorities didn't intend to fight too hard on Megan's behalf: Investigators noted they found "no sexual assault occurred."

(Doc. # 71 at 52-53). Rondini's attorney (in her civil case) did indeed indicate to her father that

the charges against Rondini and Bunn were presented to the grand jury as a package deal. (Doc. #

63-51 at 2-3). The grand jury did hear about two theft charges against Rondini. (Doc. # 63-70 at

47). Also, the felony packet against Bunn, dated September 9, 2015, states that "no sexual assault occurred." (Doc. # 63-34 at 3, 5). Regardless of the veracity of this statement, it is the District Attorney's Office -- or a judicial officer -- that determines whether a criminal charge is presented to the grand jury, not police officers like Plaintiffs. Therefore, in context, the "package deal" statement cannot concern Plaintiffs. Indeed, the sentence preceding the contested statement explicitly notes that "*the district attorney's office* eventually decided to present [the cases] to a grand jury after all." (Doc. # 1-1 at 14) (emphasis added).

After careful review of each set of statements that Plaintiffs contend were defamatory and the record evidence underlying each statement, the court readily concludes that the Rule 56 record is devoid of evidence indicating that any of the alleged defamatory statements were false. Thus, Plaintiffs have not presented sufficient evidence of falsity to submit this matter to a jury.

Furthermore, because the events detailed in the article are a matter of public concern, Plaintiffs would bear the burden at trial of proving the falsity of each statement. *See Forrester*, 709 So. 2d at 26. At this stage, Plaintiffs "must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248. But, there is simply no such evidence in the Rule 56 record. Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Here, not only have Plaintiffs failed to meet this burden, but Defendants have pointed to undisputed evidence that shows the veracity of each allegedly false statement. Accordingly, based on this ground alone, Defendants are entitled to summary judgment.

2.      **In Addition to Each Statement Being True, an Ordinary Reader Would Not Assign a Defamatory Meaning to the Article or the Statements**

"Truthful statements cannot, as a matter of law, have a defamatory meaning." *Federal Credit, Inc. v. Fuller*, 72 So. 3d 5, 10 (Ala. 2011). The court has explained above why the contested statements on their face are simply not false. Nevertheless, Plaintiffs argue in the alternative that the article imputes a defamatory meaning. "The test to be applied in determining whether a newspaper article makes a defamatory imputation is whether an ordinary reader or a reader of average intelligence, reading the article as a whole, would ascribe a defamatory meaning to the language." *Drill Parts & Serv. Co., Inc. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1289 (Ala. 1993) (citing *Loveless v. Graddick*, 352 So. 2d 137, 142 (Ala. 1975)). In this context, when a reasonable juror could not assign a false meaning to the article as a whole, summary judgment is appropriate. *Id.* at 1290 (noting the trial court's conclusions that the articles in question were "substantially correct" and that the plaintiff had not presented contrary evidence).

Simply stated, "if the communication is not reasonably capable of a defamatory meaning, there is no issue of fact." *Harris v. School Annual Pub. Co.*, 466 So. 2d 963, 694-65 (1985). In *Harris*, the plaintiff was an African American teacher who sued a publishing company and several school officials concerning her representation in the yearbook. *Id.* at 964. The plaintiff declined to have her picture taken for the yearbook. *Id.* In her place, defendants placed a cartoon image of a monkey holding a banana with the caption "out munching." *Id.* The plaintiff alleged that the picture described her as "a lazy monkey, who was somewhere eating when she should have been in her classroom teaching students." *Id.* (She also highlighted the racially insensitive undertones of the image). *Id.* However, the Alabama Supreme Court reasoned that the image was "not reasonably susceptible of the defamatory inferences [the plaintiff] allege[d]." *Id.* at 965. The court concluded

that the representation was not defamatory because the only reasonable inference to be drawn from the image and caption was that a picture of the plaintiff was not available. *Id.*

"[P]rinted words are to be taken in their natural meaning, and according to the sense in which they appear to have been used and the idea they are adapted to convey to those who read them." *Loveless*, 325 So. 2d at 142 (quoting *McGraw v. Thomason*, 93 So. 2d 741 (1957)). In *Loveless*, the defendant published a newspaper advertisement with the message "Ralph Loveless Candidate for District Attorney Faces Fraud Charges!" in large, conspicuous print. *Id.* at 138. The plaintiff contended that the advertisement imputed that he was subject to criminal fraud charges, when, in actuality, he had been countersued in a civil case for fraud (a fact the defendant contended was made readily apparent to a "trained legal mind" in the body of the advertisement). *Id.* at 139-42. But, the *Loveless* court concluded that there was a genuine issue of material fact as to whether the average lay reader would impute that the plaintiff was subject to criminal -- rather than civil -- fraud. *Id.* at 142. Thus, it is abundantly clear that the proper legal test asks what the average lay person would impute from the statement at issue about a plaintiff, not what a trained legal mind would conclude.

Here, Plaintiffs, pointing to *Loveless*, make several arguments in an attempt to prove that the article is defamatory by way of imputation. They argue that the article implies that they caused Rondini's suicide (Doc. # 71 at 39); that they *only* viewed Bunn (not Rondini) as a victim (Doc. # 71 at 40); that they had the ability to change Alabama's criminal code (*id.* at 41); and that they were a part of a cover-up to protect Bunn (*id.* at 45-53). Each of these arguments is off the mark

The average reader would not impute to Plaintiffs any of these assertions based upon a reading of the article. Initially, due to her early conversations (in December 2016 and January 2017) with her confidential source and Mr. Rondini, Baker viewed the story as potentially being

about a cover-up. However, after Baker received and reviewed the police interviews and felony packets against Bunn and Rondini, she (and other Buzzfeed staff) determined that the facts did not support such a conclusion. As a result, any direct or indirect references to a cover-up (other than a wholly tangential point about how former Gov. Bentley used state funds to "cover up an affair" he had) were deleted from the finished product. The article as a whole does not in any way support such an implication.

Baker also included comments from Hood that special inquiries are investigated just as seriously as other crimes; that Rondini did not provide the police with any evidence of earnest resistance as required by Alabama law at the time; that the officers were legally obligated to follow Alabama's then on-the-books rape law; and that the officers were legally obligated to investigate potential felonies that Rondini admitted to during her interview. Additionally, Baker included background information in the article that would actually steer an average reader away from imputing a cover-up, including: calling Alabama's rape law at the time "archaic"; noting that Rondini's case was complex as most sexual assault allegations are; explaining that sex-crime specific police units are relatively new across the country; and mentioning that Druid City Hospital does not employ a SANE nurse. Each of these comments (and additional background information included in the article) indicates that it is a much larger "system" (not the individual Plaintiffs) that was to blame for the tragedy that befell Rondini.

The other purported imputations asserted by Plaintiffs are also unsupported by the record evidence. The natural reading of the article does not attribute Rondini's death to Plaintiffs. Rather, the article shows how Rondini's life changed after the night she claimed she was assaulted by Bunn and after she accused him of sexual assault. The article indicates that: the then-applicable legal framework did not help Rondini's situation (she needed to be able to prove earnest

resistance); she was unable to get counseling at the University of Alabama; and she felt that she needed to move to another state to escape Bunn's influence. The intake form for SMU's mental health center found by her bed after her death read, "Raped, bullied by police, changed university." Also, while the article refers to Bunn as the "true victim," Baker also acknowledged that Bunn's case was presented to a grand jury. Thus, Bunn was not the only victim. The article also notes that while Alabama had an archaic rape law, Plaintiffs were required to follow it. The ordinary reader would not read the article and believe that the police possessed any ability to change the laws they are duty bound to enforce.

In fact, the ordinary reader would see that Baker summarized the purpose of the article as follows:

> There are reforms that make it easier to report sexual assault. For example, many states have changed their legal definition of rape so that victims don't have to prove they "earnestly" fought their rapists, as they do in Alabama. These laws are better designed for sexual assault cases; a recent study found that many rape victims experience "involuntary paralysis" that prevents them from resisting.
>
> Tuscaloosa's hospital is overdue for the SANE forensic nursing program that's recommended by the Department of Justice and leading national medical organizations. An external review of the Tuscaloosa Homicide Unit's policies and practices around investigating sexual assault might be in order, as well as an inquiry into how and when prosecutors decide to move rape cases forward. The University of Alabama could strengthen its counseling services; earlier this year … .

(Doc. # 1-1 at 15). The article acknowledged that "There's no way of knowing how any of these changes might have affected [Rondini]." The ordinary reader would thus imply that Baker is seeking to influence systemic change, such as advocating for state legislatures to amend their rape statutes,[8] for hospitals nationwide to staff SANE nurses, for police departments nationwide to

---

[8] In fact, the Alabama legislature has since amended the definition of forcible compulsion to omit the requirement that the accused show earnest resistance. *See* Ala. Code § 13A-6-60 (effective Sept. 1, 2019) ("Forcible compulsion does not require proof of resistance by the victim.").

change their policies on investigating sexual offenses, for district attorney's offices nationwide to be more diligent in prosecuting sexual offenses, and for universities to strengthen counseling services for sexual assault victims. In sum, Baker utilized Rondini's tragic story to illustrate what she believes to be, and desires her audience to recognize as, a nationwide problem – not as a "sensationalized story" of a cover-up directed by Plaintiffs. (*See* Doc. # 71 at 33).

Plaintiffs have failed to show that a reasonable juror could find that the article is susceptible to a defamatory meaning by way of implication — an issue on which Plaintiffs would bear the burden at trial. Accordingly, Defendants are entitled to summary judgment because the contested statements individually are true in their most literal sense and the article as a whole is not capable of a defamatory meaning by imputation for an ordinary reader.[9]

### B.      Fair-Report Privilege

Alabama law also includes a statutory privilege against defamation for "fair and accurate reports … of official investigations." *Wilson v. Birmingham Post Co.*, 482 So. 2d 1209 (Ala. 1986). The statute provides:

> The publication of a fair and impartial report … of any investigation made by any legislative committee, or other public body or officer, shall be privileged, unless it be proved that the same was published with actual malice, or that the defendant has refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable explanation or contradiction thereof by the plaintiff… .

Ala. Code § 13A-11-161. In the first case in which the Alabama Supreme Court interpreted § 13A-11-161, the court held that the statute codified the common-law privilege. *Wilson*, 482 So. 2d at

---

[9] The court reaches this conclusion even after considering the expert statements of Lucchesi and Pastula. Also, for reasons the court hardly feels obliged to explain, the court notes that social media posts, such as the Facebook comments quoted by Plaintiffs in their complaint, are not conclusive evidence of the "ordinary reader" or the "reader of average intelligence." Rather, the court has considered the Rule 56 evidence in its entirety and applied that evidence to the controlling legal principles. After doing so, the court concludes that a reasonable juror would not be capable of assigning a defamatory meaning to the article.

1212 (concluding a news report that accurately reflected the statements made by an individual during a police investigation were conditionally privileged). In fact, "[t]he policy behind the privilege is that the public has a strong interest in receiving information to 'monitor the conduct of its government' and its personnel, such as law enforcement officers." *Id.* at 1211. The privilege applies when the news account is substantially accurate and a fair abridgement of the events. *Wiggins v. Mallard*, 905 So. 2d 776, 783-84 (Ala. 2004) (citing *Wilson*, 482 So. 2d 1211-12).

Plaintiffs do no dispute that the article covers an official investigation. (Doc. # 71 at 56); *see Wilson* 482 So. 2d at 1212. Instead, they argue that this privilege does not attach because (1) the article is not an accurate or fair abridgment of the investigation; (2) they have presented evidence of common law malice; and (3) they contend Defendants failed to include contradictions by *Hood* (not Plaintiffs). (Doc. # 71 at 56). For the reasons stated below, those arguments fail. Defendants are protected by the statutory privilege.

### 1. The Article is a Substantially Accurate Account of a Police Investigation

As explained above, each of the contested statements are true. But, to be clear, truth is not the test to determine whether the fair-report privilege applies. Instead, even a defamatory statement can be protected by the privilege if the news article is a substantially accurate report of the contents of the investigation. *Wilson*, 482 So. 2d at 1212 (reasoning that the news report was conditionally privileged because it accurately reported statements made by an individual during an official police investigation, as reflected in the official police incident report); *see Shuler v. Garrison*, No. 2:16-cv-695-RDP, 2017 WL 191267 at *20 (N.D. Ala. Jan. 13, 2017) (explaining that an otherwise defamatory statement is privileged if it constitutes a fair abridgment of the occurrence reported).

In this case, the Rule 56 evidence shows that the article is a substantially accurate report of the police investigation as evidenced by the police interviews and the felony packet prepared by

police against Bunn and Rondini. Each contested statement is corroborated by the evidence in the summary judgment record regarding the police investigation, and the ordinary reader would not impute a defamatory meaning when the article is read as a whole. Plaintiffs appear principally concerned about the presentation of the investigation (*e.g.*, what information was included and what facts were omitted from the article). However, such publication decisions are a matter of editorial discretion. *See Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018). The fair-report privilege protects news stories that are *substantially* accurate. The privilege does not require that newspapers publish the entirety of an investigation (for example, here, posting the entirety of all three police interviews or quoting the entire transcript of the interviews as well as the exact order in which information occurred). Rather, the court concludes that the article is a fair abridgement of the official investigation, and thus entitled to protection under § 13A-11-161.

### 2. A Reasonable Juror Could Not Conclude that Defendants Acted with Either Actual Malice or Common-Law Malice

In this area of the law, the term "actual malice" has two different definitions. The Alabama Supreme Court explained that there is common-law malice and constitutional malice. *Wiggins*, 905 So. 2d at 784. As the *Wiggins* court noted, the Alabama Pattern Jury Instructions define common-law malice as "ill will or spite, as shown by evidence of previous ill will, hostility, threats, other actions, former libels or slanders, or by the violence of the defendant's language, the mode and extent of publication, and the like." *Id.* at 783 (quoting *Alabama Pattern Jury Instructions: Civil* 23.13 (2d ed.1993)); *see Wilson*, 482 So. 2d at 1213 (concluding that there was no common-law malice when the defendants acted in their capacity as professional journalists, had no knowledge of the plaintiff prior to investigating the story, and each contested statement was based on and corroborated by the official police investigation). Additionally, common-law malice can be shown through evidence that a defendant made the statement with knowledge that it was false

36

or with reckless disregard for the truth. *Id.* (quoting *Barnett v. Mobile County Pers. Bd.*, 536 So. 2d 46, 54 (Ala. 1988)).

On the other hand, constitutional malice arises from decisions like *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).[10] For a public official or figure to recover either compensatory or punitive damages, he must prove that the defendant published a defamatory statement with actual knowledge of its falsity or made with reckless disregard for its truth. *Wiggins*, 905 So. 2d at 785-86. As one court has explained, the difference between the two variations of actual malice is that "constitutional malice 'focuses on the defendant's attitude toward the truth or falsity of his published material' [while] common-law malice focuses generally 'on the defendant's attitude toward the plaintiff.'" *Id.* at 76 (quoting *Gomes v. Fried*, 136 Cal. App. 3d 924, 934 (Cal. Ct. App. 1982)). The evidence needed to prove both types of malice overlaps significantly. *Id.* at 787.

Generally, the decision as to whether the fair-reporting privilege applies (including whether the statement was made with actual malice) is determined as a matter of law. *Shuler*, 2017 WL 191267 at *20. The *Wiggins* decision is an exception to the general rule. In *Wiggins*, the managing editor of the newspaper testified that the police chief told him that the plaintiff was arrested; however, the police chief testified that he gave the managing editor a different name. 905 So. 2d at 788. Both statements could not be true, so the determination about the truthfulness of the

---

[10] In a defamation action, Plaintiff must also prove the requisite level of fault. In this case, to recover compensatory damages, Plaintiffs would most likely have to prove actual malice for two reasons: (1) they are public officials as police officers and (2) the article speaks to a matter of public concern. *See Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 496 (Ala. 2004); *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 344 (Ala. 2007). However, there is room for disagreement on whether the Alabama (or United States) Supreme Court interprets *Sullivan* and its progeny to include low-ranking police officers as public officials. Also, there is room for disagreement on whether the *Cottrell* court properly interpreted the Alabama Supreme Court's and United States Supreme Court's prior cases as extending the actual malice requirement to matters of public concern irrespective of the status of the plaintiff. *See Files v. Deerfield Media, Inc.*, No. CV 19-0742-WS-B, 2020 WL 1161089, at *5-7 (S.D. Ala. Mar. 10, 2020). Therefore, the court declines to address this somewhat academic issue further. Instead, the court concludes that Defendants are entitled to summary judgment because the article is (1) true and (2) privileged under Alabama law.

publication was a credibility determination for the jury. *Id.* at 789. But, that limited exception has no application here. In this case, the general rule applies: whether Plaintiffs have presented sufficient evidence on which a reasonable juror could find the requisite level of fault is a question of law for the court.

The Rule 56 record shows that Defendants did not act with common-law malice or actual malice. As explained above, each contested statement is true.[11] Therefore, Defendants could not have published the article with actual knowledge of its falsity or with reckless disregard for the truth. Nor have Plaintiffs proffered any evidence of common-law malice. They have not pointed to any evidence that Baker had any knowledge of Plaintiffs before investigating this story. Thus, a reasonable juror could not find that Defendants harbored previous ill-will against Plaintiffs. Also, Plaintiffs have failed to show common-law malice through "violence of … language." Again, as explained above, the ordinary reader would not conclude that this article is a sensationalized story of a cover-up by Plaintiffs.

Here, as in *Wilson*, Defendants were acting in their capacity as paid journalists; each contested statement is corroborated by the police interviews and police records; and there is no evidence that Defendants had knowledge of Plaintiffs prior to investigating the story. Accordingly, Plaintiffs have not met their burden of providing Rule 56 evidence upon which a reasonable juror could decide that Defendants should lose the protection of the fair-reporting privilege.

---

[11] Additionally, the court notes that the record evidence is undisputed that: Defendants extensively investigated the veracity of the article. (Docs. # 66 at 10; 71 at 9) ("The Article was the culmination of a more than five-month investigation led by Baker. Baker interviewed dozens of people, traveled twice to Texas and once to Alabama, read thousands of pages of documentation and obtained substantive responses from the TCHU before the Article was published." (internal citations omitted)).

### 3. The Reasonable Explanation or Contradiction Exception Does Not Apply

"[U]nless the plaintiff has provided the defendant with an explanation or contradiction of the initial report, a court need not reach the question whether the [reasonable explanation or contradiction] exception in § 13A-11-161 applies." *Birmingham Broadcasting LLC v. Hill*, 303 So. 3d 1148, 1157 (Ala. 2020). In *Hill*, the defendant reported that the plaintiff was wanted by the Sheriff's Department for violation of the Sex Offender Act. *Id*. at 1151-52. After the broadcast, the Sheriff's Department -- rather than the plaintiff -- contacted the defendant with information that the plaintiff's arrest warrant had been recalled. *Id.* at 1157. The court concluded that the exception to the fair-report privilege did not apply because the plaintiff was not the party that provided the defendant with the explanation. *Id.* at 1157-58.

Plaintiffs argue that Defendants lost the protection of the statutory privilege by failing to fully include in the article those explanations (or contradictions) made by *Hood* (not Plaintiffs). (Doc. # 71 at 56). But, this argument is off the mark for two reasons. First, the statute explicitly provides that the contradiction must be presented by the plaintiff. *See* Ala. Code § 13A-11-161; *Birmingham Broadcasting LLC*, 303 So. 3d at 1157 ("The phrase 'by the plaintiff' … denotes that the *plaintiff* must take some action to provide a reasonable explanation or contradiction of the initial publication.) (emphasis added). Obviously, Hood is not a Plaintiff here. The only two plaintiffs in this action are Jones and Hastings. And, there is no indication that when he emailed Baker following her correspondence, Hood was speaking for (or, for that matter, could speak for) Plaintiffs in offering a contradiction under the statute. Second, the article did in fact include relevant portions of Hood's response to Baker's no-surprise correspondence, but Plaintiffs have

ignored those portions of the article.[12] For instance, the article includes Hood's explanation of a special inquiry and his comment that Plaintiffs were legally obligated to investigate the felonies Rondini virtually admitted to committing. Thus, neither of the exceptions to the fair-report privilege apply here. Rather, Defendants are protected by the privilege and entitled to summary judgment.

## IV.    Conclusion

The court recognizes that today, just as in centuries past, there is bias in the media's reporting. Defendants may have had an agenda when they published the contested article. However, a biased agenda is not equivalent to defamation. Here, Defendants' agenda was not to speak ill of Plaintiffs. Rather, Defendants' agenda was to influence systematic change in how sexual assault allegations are treated nationwide by police, hospitals, state legislatures, district attorney's offices, universities, and the public.

For the reasons discussed above, the alleged defamatory statements are (1) true, (2) not subject to being assigned a defamatory implication by a reasonable juror, and (3) privileged under Alabama law. Plaintiffs' proposed expert testimony does not affect the court's conclusion on any of these issues. Accordingly, Defendants' Motion for Summary Judgment is due to be granted, and Defendant's Motions to Strike are due to be denied as moot.

A separate order in accordance with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this March 15, 2022.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[12] Plaintiffs do not argue that Defendants' refusal to publish their retraction letter dated September 24, 2018 constitutes waiver of the privilege. (*Compare* Doc 1-2 at 9-19 *with* Doc. # 71 at 57). Regardless, the court notes that (1) the subject-matter of the retraction is not a *reasonable* explanation and (2) in any event, the timing of the letter (over a year after the article was published) would at least raise questions of its efficacy to overcome the statutory privilege.